**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

_____

REGIONS ASSET COMPANY, et al.,)
                             )
         Plaintiffs,         )
                             )
                             ) Civil Action No. 2:06-cv-882-MHT
                             )
REGIONS UNIVERSITY, INC.     )
                             )
         Defendant.          )
_____)

**MOTION FOR PROTECTIVE ORDER**

COMES NOW the defendant Regions University, Inc. and, pursuant to Rule 26(c), _Federal Rules of Civil Procedure_, moves this Court for a protective order that the deposition of James Shlesinger, one of defendant's trial counsel of record, not be taken. A copy of the Notice of Deposition for July 10, 2007 is attached hereto as Exhibit **A**. Defendant submits that this protective order is necessary in order to protect it from annoyance, embarrassment, oppression, and undue burden or expense and for the following reasons:

1. Prior to the application for registration of its trademark "Regions University," which is the subject of this litigation, defendant sought and obtained an opinion of trademark counsel, Mr. James Shlesinger, as to the registerability of that mark for educational services. (Exhibit **B**). A copy of that opinion has been produced to plaintiff, as

well as the minutes of meetings of representatives of defendant at which this opinion was discussed and the decision made to file for registration.

2. These documents were produced only after the parties had reached an agreement as to the potential effect that such disclosure would have in the litigation. Specifically, in a letter dated February 5, 2007, defendant's counsel wrote to plaintiff's counsel stating the following:

> "Request number 2 [requesting the trademark opinion and other documents relating to any trademark search] seeks documents that are subject to the attorney-client privilege. You will note that we filed a privilege log with our initial disclosures that listed such documents. Nevertheless, we are willing to produce these documents so long as we have an express understanding that (a) their production shall not be deemed to be a waiver in any respect of the attorney-client privileges that may apply to other communications either in writing or oral, and (b) there is no contention that either Jim Shlesinger or his law firm is disqualified from the further representation of Regions University by virtue of either of these documents or the opinions expressed in them."

(Exhibit **C**)(Emphasis added).

3. Plaintiff's counsel replied on February 23, 2007 stating:

> "I understand from your letters that you are willing to produce documents and information relating to this advice so long as this waiver does not constitute waiver of attorney-client communications dealing with

> <u>other matters and we will not seek to
> disqualify Mr. Shlesinger or his firm. Both
> conditions are acceptable</u>."

(Exhibit **D**)(Emphasis added).

4.   Thereafter, in reliance on this stipulation, defendant did produce a copy of Mr. James Shlesinger's written opinion, as well as internal documents of its team meetings which discussed the opinion of counsel and determined to apply for registration of its new name.   Defendant has produced all documents which constitute any communications between defendant and its counsel relative to the registerability of the name "Regions University" and upon which defendant relied in adopting and using that name.

5.   Additionally, plaintiff's counsel has been given a full opportunity to depose representatives of defendant who were at these team meetings, including the only individual with whom Mr. Shlesinger personally spoke regarding his opinions, Dr. Rex Turner, president of Regions University.   A true and correct copy of excerpts from the deposition of Dr. Turner relating to communications with Mr. Shlesinger about his written opinion are attached hereto as Exhibit **E**.   No objections were raised to these questions and the witness fully and fairly answered plaintiff's counsel's line of questioning in this respect.

6.   Having full access to all written communication between trademark counsel and his client concerning the availability of the mark, and the opportunity to depose all

individuals who spoke with Mr. Shlesinger or discussed his opinions, plaintiff now seeks to depose Mr. Shlesinger himself. As the following discussion reveals, the law does not permit the deposition of opposing counsel under these circumstances. Such a notice seems designed to attempt to place Mr. Shlesinger in a conflict of interest with his client so as to compel his disqualification in this litigation, in contravention of the parties' stipulation.

7. The deposition of an opposing party's attorney is disfavored and calls for special scrutiny. United States v. Yonkers Board of Education, 946 F.2d 180, 185 (2nd Cir. 1991); West Peninsula Title Company v. Palm Beach County, 132 F.R.D. 301, 302 (S.D. Fla. 1990); DOT Connectors, Inc. v. JB Nottingham & Co., Inc., 2001 WL 34104929 (N.D. Fla. Jan. 22, 2001). As the Eighth Circuit has noted, in a widely adopted opinion:

> "Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation. It is not hard to imagine additional pretrial delays to resolve work product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney's testimony. Finally, the practice of deposing opposing counsel detracts from the quality of client representation. Counsel should be free to devote his or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent. Moreover, the "chilling effect" that such practice will have on the

> truthful communications from the client to
> the attorney is obvious.
>
> ...
>
> We do not hold that opposing trial counsel
> is absolutely immune from being deposed. We
> recognize that circumstances may arise in
> which the court should order the taking of
> opposing counsel's deposition. But those
> circumstances should be limited to where the
> party seeking to take the deposition has
> shown that (1) no other means exist to
> obtain the information than to depose
> opposing counsel [citations] (2) the
> information sought is relevant and non-
> privileged; and (3) the information is
> crucial to the preparation of the case."

Shelton v. American Motors Corp., 805 F.2d 1323, 1327 (8th Cir.
1986)(emphasis added). For other courts adopting the Shelton
criteria, including courts in this circuit, see Nationwide
Mutual Insurance Co. v. Home Insurance Co., 278 F.3d 621, 628
(6th Cir. 2002); Boughton v. Cotter Corporation, 65 F.3d 823
(10th Cir. 1995); DOT Connectors, Inc. v. JB Nottington &
Company, Inc., supra; Lajoie v. Pavcon, Inc., 1998 WL 526784
(M.D. Fla. 1998); Steinig v. McDonald's Corp., 1998 WL 1064841
(S.D. Fla. 1998).

8. Plaintiff cannot establish its right to depose
opposing counsel based on these criteria. First of all,
plaintiff cannot establish that "no other means exist to obtain
the information than to depose opposing counsel." Plaintiff has
been given the written trademark opinion of Mr. Shlesinger and

has deposed the defendant's representatives concerning communication with Mr. Shlesinger and their reliance upon his opinion. Thus, plaintiff has other means of obtaining the information Mr. Shlesinger could supply and has, in fact, employed those means and obtained that information.

9. Moreover, Mr. Shlesinger, by his testimony, can add nothing that is "crucial" to plaintiff's case, and thus the third <u>Shelton</u> criterion cannot be satisfied. Plaintiff cannot contend that it needs to depose Mr. Shlesinger in order to determine his search strategies or other thought processes that were <u>never</u> communicated to the client, because such matters would be completely irrelevant. It is the <u>communication</u> of counsel's advice that is relevant in determining whether the alleged infringer reasonably relied upon such advice in adopting the mark (thus negating some intent to exploit the good will of plaintiff's mark), not what was <u>not</u> communicated. *See* <u>Frehling Enterprises, Inc. v. International Select Group, Inc.</u>, 192 F.3d 1330, 1340 (11th Cir. 1999). The issue is not the competence of the attorney giving the advice, the quality of the advice given, nor whether another attorney might have reached another conclusion. Similarly, the internal thought processes or other notes the attorney may have made, which were never communicated to the client, are not relevant. Rather, the issue is whether the objective communications between the parties demonstrate the

basis for an honest, good faith belief in the <u>client</u> that it could adopt the allegedly infringing mark. Thus, a waiver of the attorney-client privilege with respect to communications between trademark counsel and client, for purposes of showing good faith reliance on that advice and thus no bad faith in the adoption of the mark, does not serve to make discoverable counsel's internal drafts, thought processes and other research not communicated to the client. *See* <u>Eco Manufacturing, LLC v. Honeywell International, Inc.</u>, 2003 WL 1888988 (S.D. Ind. April 1, 2003).

10. Plaintiff also cannot seek to justify the deposition on the grounds that Mr. Shlesinger may have a different version of his oral communications with Dr. Turner. This would be nothing but a fishing expedition. The substance of Mr. Shlesinger's opinions were communicated in writing. The deposition testimony of Dr. Turner establishes that there were no other substantive discussions with Mr. Shlesinger that would have modified or altered those written opinions in any regard. There is no suggestion that Dr. Turner was untruthful or evasive at his deposition. Assuming *arguendo* that Mr. Shlesinger had any different "version" of those conversations, such matters would be of little probative value to the question of Regions University's good faith reliance upon the written opinion of counsel.

11.  In  any  event,  if  Mr.  Shlesinger's  deposition  were taken  for  this  purpose,  or  for  any  other  purpose,  that  testimony would  only  be  useful  to  the  plaintiff  if  it  could  be  used  at trial  or  in  other  pretrial  proceedings  in  a  manner  adverse  to the  interests  of  Mr.  Shlesinger's  client,  Regions  University. Thus,  the  deposition  testimony,  if  it  has  any  value  at  all  to plaintiff's  case,  will  put  Mr.  Shlesinger  precisely  in  the situation  that  the  stipulation  reached  by  counsel  was  designed to  prevent,  i.e.,  a  conflict  of  interest  requiring  the disqualification  of  Mr.  Shlesinger  and  his  firm  in  serving  as trial  counsel  for  Regions  University.  *See* Rule  3.7,  <u>Alabama Rules  of  Professional  Conduct</u> (lawyer  forbidden  from  acting  as advocate  at  trial  in  which  lawyer  is  likely  to  be  a  necessary witness).  As  the  Comments  to  Rule  3.7  note:

> "Whether  the  combination  of  roles  involves an  improper  conflict  of  interest  with respect  to  the  client  is  determined  by  Rule 1.7  or  1.9.  <u>For  example,  if  there  is  likely to  be  substantial  conflict  between  the testimony  of  the  client  and  that  of  the lawyer  or  a  member  of  the  lawyer's  firm,  the representation  is  improper.</u>"  (Emphasis added).

12.  In  summary,  any  potential  usefulness  of  the  deposition testimony  of  Mr.  Shlesinger  to  the  plaintiff  would  be  adverse  to the  defendant,  placing  Mr.  Shlesinger  in  a  substantial  conflict of  interest  and  prohibiting  his  further  representation  of  his client.  This  is  a  consequence  the  parties  expressly  sought  to

prevent by their stipulation, upon which defendant relied in agreeing to disclose privileged documents.

WHEREFORE, for all of the above reasons, defendant respectfully requests that the deposition of James Shlesinger be quashed and an order entered that such deposition shall not be taken.

Respectfully submitted,

/s/ VICTOR T. HUDSON
[HUDSV1684]
tom@alabamatrial.com
WILLIAM W. WATTS, III
[WATTW5095]
bill@alabamatrial.com
Hudson & Watts, LLP
Post Office Box 989
Mobile, Alabama 36601

JAMES E. SHLESINGER
Shlesinger, Arkwright &
    Garvey LLP
1420 King Street, Suite 600
Alexandria, Virginia 22314

ATTORNEYS FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

William G. Pecau, Esq.
Rachel M. Marmer, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

Charles B. Paterson, Esq.
Paul A. Clark, Esq.
BALCH & BINGHAM, LLP

105 Tallapoosa Street, Suite 200
Montgomery, Alabama  36104


/s/ VICTOR T. HUDSON

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

REGIONS ASSET COMPANY,          )
REGIONS FINANCIAL CORPORATION,  )
and REGIONS BANK                )
                                )
          Plaintiffs,           )
                                )
     v.                         )     Civil Action No. 2:06-cv-882-MHT
                                )
REGIONS UNIVERSITY, INC.        )
                                )
          Defendant.            )

## NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that pursuant to Rule 30 of the Federal Rules of Civil

Procedure, Plaintiffs will take the deposition upon oral examination of James Shlesinger of the

law firm of Shlesinger, Arkwright & Garvey LLP, on Tuesday, July 10, 2007, at 9:00 AM at

Steptoe & Johnson LLP, 1330 Connecticut Avenue, NW, Washington, DC 20036.

NOTICE IS FURTHER GIVEN THAT the deposition will be transcribed by a certified

court reporter and notary public or such other person authorized to administer oaths under the

laws of the United States, and shall continue from day to day until completed. All counsel are

invited to attend and cross-examine.

NOTICE IS FURTHER GIVEN THAT pursuant to Rule 30(b)(5), the deponent is

requested to produce at said examination all documents and tangible things in his possession or

**EXHIBIT A**

under his custody or control relating to or concerning the matters specified in Schedule A,

attached hereto.

Dated: June 15, 2007

William & Pecau/RM

One of the Attorneys for Plaintiffs, Regions
Asset Company, Regions Financial
Corporation and Regions Bank

OF COUNSEL:

Charles B. Paterson (PAT018)
Paul A. Clark (CLA076)
Balch & Bingham LLP
105 Tallapoosa Street, Suite 200
P.O. Box 78 (36101-0078)
Montgomery, AL 36104
Tel: (334) 269-3143

William G. Pecau, Esq. (DC Bar # 478341)
Rachel M. Marmer, Esq. (DC Bar # 489606)
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing NOTICE OF DEPOSITION on counsel for Defendant by overnight courier on this 15th day of June, 2007 properly addressed to them:

Victor T. Hudson
William W. Watts, III
Hudson & Watts, LLP
Post Office Box 989
Mobile, Alabama 36601-0989

James E. Shlesinger
Shlesinger, Arkwright & Garvey LLP
1420 King Street
Suite 600
Alexandria, Virginia 22314

*Rachel M. Marmer*

## SCHEDULE A

### Documents Requested of James Shlesinger

#### DEFINITIONS AND INSTRUCTIONS

1.     "Plaintiffs" or "Regions" means Regions Asset Company, Regions Financial Corporation, Regions Bank, their predecessors, successors, and assigns, and any of their affiliates, officers, directors, agents, employees, or other persons, including, but not limited to, its attorneys, accountants and advisors, acting or purporting to act on its behalf.

2.     "Defendant" means Regions University, Inc., its predecessors, successors, and assigns, and any of its affiliates, officers, directors, agents, employees, or other persons, including, but not limited to, its attorneys, accountants and advisors, acting or purporting to act on its behalf.

3.     "Person" means, without limiting the generality of its meaning, any natural person, group of natural persons (such as a committee or board of directors), corporation, partnership, unincorporated association, joint venture and any other incorporated or unincorporated business, governmental, public or social entity.

4.     "You" means James Shlesinger.

5.     "Your Firm" means Shlesinger, Arkwright & Garvey LLP.

6.     "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Requests any information which might otherwise be construed as outside their scope.

7.     "Concerning" means containing, consisting of, referring to, supporting, prepared in connection with, used in preparation for, commenting upon, or being in any way legally, logically or factually connected with or pertaining to, in whole or in part, the matter discussed.

8.    Whenever appropriate in these Requests, the singular and plural forms of words shall be interpreted interchangeably so as to bring within the scope of these requests any matter which might otherwise be construed to be outside of their scope.

9.    If any information requested by these Requests is claimed to be immune from discovery on the grounds of privilege or otherwise:

      a.    identify the communication or document;

      b.    identify the person or persons making the communication or authoring the document and all persons receiving the information;

      c.    specify the type of privilege or other reason asserted for withholding the requested information;

      d.    specify the basis for the assertion; and

      e.    describe the withheld information to a degree sufficient to enable the court to decide if such claim has been properly invoked.

## DOCUMENTS REQUESTED

1.    All documents concerning any services performed by You or Your Firm on behalf of Defendant or any advice given by You or Your Firm to Defendant or any of its representatives in connection with Defendant's name change from Southern Christian University in 2006.

2.    All documents concerning any information provided to You or Your Firm by Defendant in connection with your representation of Defendant in connection with Defendant's name change from Southern Christian University, including information concerning Regions Bank, Defendant's knowledge of the REGIONS name or mark, the reason the word "regions" and other words were considered, Plaintiffs' Regions University, and Southern Christian University.

- 2 -

3.      All documents concerning any trademark or name searches and their results in connection with the Defendant's change of name from Southern Christian University in 2006, including any searches or other inquiries concerning the terms "Regions," "Rex," "Turner," Masters," "Greystone," "Royale," "Providence," or "Regal."

4.      All documents concerning Regions Bank, the REGIONS mark or name, or Plaintiff's Regions University.

5.      All documents concerning any opinion or advice provided by You or Your Firm to Defendant in 2006 concerning its change of name or the availability of any term, including the terms "Regions," "Rex," "Turner," Masters," "Greystone," "Royale," "Providence," or "Regal," alone or with other elements, for registration or use in connection with Defendant's services, products or businesses and any qualification or limitation to such opinion or advice.

6.      Any documents concerning the retention or employment of You or Your Firm by Defendant in connection with services or advice concerning the Defendant's name change from Southern Christian University in 2006.

7.      All documents concerning the application, registration, use or the possible use for a service, product or business of the following terms "Regions," "Rex," "Turner," Masters," "Greystone," "Royale," "Providence," or "Regal," alone or with other elements.

## Rex Turner

| | |
|---|---|
| **From:** | Jim Shlesinger [jim@saglip.com] |
| **Sent:** | Thursday, July 27, 2006 9:59 AM |
| **To:** | Rex Turner |
| **Subject:** | Service Mark searches—TURNER UNIVERSITY, REX UNIVERSITY and REGIONS UNIVERSITY |

Dear Dr. Turner:

Pursuant to your request, we conducted searches of the United States Patent and Trademark Office (USPTO) records in an effort to determine registrability of each of the above identified marks, for use in association with educational services at the post-secondary level. The searches were performed on our about July 26, 2006, and at the time the searches were conducted, the USPTO records were current through July 12, 2006.

A full report, including copies of the references developed will be mailed to you. Please be advised as follows:

TURNER UNIVERSITY

The references developed include multiple registrations issued to companies associated with Ted Turner for a wide range of products and services, including TURNER, for television programing; TURNER LEARNING, for the production of educational programs designed for school use; TURNER SOUTH, for entertainment and education services; and an expired mark, TURNER ADVENTURE LEARNING, for education and entertainment.

Based on the results, there exists the possibility that the USPTO may refuse registration of your proposed mark on grounds of a likelihood of confusion as to sponsorship or affiliation with one or more of the marks noted above. While there are good arguments which may be presented in favor of the registrability of your proposed mark, there remains some doubt concerning the ability to register TURNER UNIVERSITY, for educational services in light of the registrations developed.

REX UNIVERSITY

Our search did not find any conflicting marks. The closest registration developed is the mark, REX READER, for educational services, namely, providing elementary level reading activities. We believe we can distinguish this mark from your proposed mark. Accordingly, the mark, REX UNIVERSITY, appears to be registrable at this time.

REGIONS UNIVERSITY

The search developed variations of the term "regions" for various educational services. These include the following:

1. REGION 4 EDUCATED SOLUTIONS—for conducting educational training for educators at primary and secondary level schools;

2. REGIONAL CONNECTS—for conducting events for career development services for executive women in the food service industry;

3. NORTH CENTRAL REGIONAL EDUCATIONAL LABORATORY—for education services;

4. REGIONAL LEADERSHIP INSTITUTE—for providing classes, seminars, etc in the field of leadership;

5. REGIS UNIVERSITY—educational services (university level);

6. REGENT UNIVERSITY—educational services (university level);

**EXHIBIT B**

RU 178

7. REGAL UNIVERSITY—educational services (university level); and

8. REGENTS OF THE UNIVERSITY OF MINNESOTA—educational services (university level).

The records suggest that your proposed mark is registerable. The term "region" is used in a geographic context in the first four marks listed above, suggesting weakness in the strength of these marks. The remaining marks evidence weakness in marks which are otherwise different in spelling, pronunciation, or meaning.

The sophistication of the consumer or user of higher educational services reduces the likelihood that confusion would result from the concurrent use of the marks in question. Based on the results of the search, we are of the opinion that the mark, REGIONS UNIVERSITY, is registerable for educational services, namely, providing instruction at the university level.

In conclusion, the marks, REX UNIVERSITY, and REGIONS UNIVERSITY, appear to be registrable. Please consider filing applications for one or both of these marks at this time.

Very Truly Yours,


James E. Shlesinger
Shlesinger, Arkwright & Garvey LLP
1420 King Street, Suite 600
Alexandria, VA 22314
703-684-5600 phone
703-836-5288 fax
jim@sagllp.com


Warning: The information contained in this transmission is privileged and confidential and intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any distribution, copying, disclosure or taking of any action in reliance on the contents of this transmission is strictly prohibited and review by any individual other than the intended recipient shall not constitute waiver of privilege. If you have received this transmission in error, please notify us immediately and delete the original transmission.

RU 179

7/27/2006

HUDSON & WATTS, L.L.P.

ATTORNEYS AT LAW

ONE ST. LOUIS CENTRE

SUITE 2500

MOBILE, ALABAMA 36602

February 5, 2007

VICTOR T. HUDSON
WILLIAM W. WATTS, III*

ALSO ADMITTED IN
* CALIFORNIA

MAIL TO:
POST OFFICE BOX 989
MOBILE, ALABAMA 36601-0989
TELEPHONE: (251) 432-7200
TELEFAX: (251) 432-0073
E-MAIL: info@alabamatrial.com
WEBSITE: www.alabamatrial.com

William G. Pecau, Esq.
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

RE:    Regions Asset Company v. Regions University, Inc.
       Civil Action No. 2:06-CV-882-MHT

Dear William:

I have reviewed your discovery which was sent under cover of a letter dated January 29. Even though there are 17 numbered interrogatories (Interrogatory No. 11 was omitted) there are 42 subparts. Additionally, by utilizing the definition of "identify," four other elements are added resulting in an increase of 33 additional subparts for a grand total of 75 subparts. Only 50 are permitted. Nevertheless, we are willing to respond to all of these interrogatories so long as you agree that the plaintiff will respond to an equal number propounded by us.

As to the requests for production, we also have encountered some difficulty. Request No. 5 is nonsensical as phrased. Request Nos. 13 and 16 are over broad. We are willing to produce representative documents; but not "all" documents because to do so would be unduly burdensome. Similarly, Request Nos. 11, 14 and 15 are overly broad.

Request No. 17 is beyond the scope of Rule 26. The Pretrial Order provides for the exchange of expert reports. Nevertheless, it is local practice for lawyers to agree that prior to the expert's deposition the expert's entire file will be made available for counsel opposite. We would be willing to make such an agreement in this case.

Request No. 2 seeks documents that are subject to the attorney-client privilege. You will note that we filed a privilege log with our initial disclosures that listed such documents. Nevertheless, we are willing to produce these documents so long as we have an express understanding that (a) their production shall not be deemed to be a waiver in any respect of the attorney-client privilege as it may apply to other communications either in writing or oral, and (b) there is no contention that either Jim Shlesinger or his law firm is disqualified from the further representation of Regions University by virtue of either these documents or the opinions expressed in them. Jim tells me that this should not be a problem because sophisticated patent

**EXHIBIT C**

counsel such as you and he usually handle this issue in a manner that does not inconvenience either attorney.

I find, as you must, that it is highly preferable for counsel to resolve discovery disputes. I am pleased to say that in my practice attorneys are usually collegial and it is rarely necessary to submit any discovery dispute to the court. I look forward to working with you in this spirit.

Very truly yours

VICTOR T. HUDSON
For the Firm

VTH/jac

2

# STEPTOE & JOHNSON LLP

ATTORNEYS AT LAW

William G. Pecau
202.429.6244
wpecau@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Tel 202.429.3000
Fax 202.429.3902
steptoe.com

## CONFIRMATION

February 23, 2007

**Via FACSIMILE (251) 432-0073**

Victor T. Hudson
Hudson & Watts, L.L.P.
One St. Louis Centre
Suite 2500
Mobile, AL 36602

> **RE:     Regions Asset Company v. Regions University, Inc.**
> **Case No. CV-06-882-MHT**

Dear Tom:

As I indicated in my voice mail message today, we appreciate your letters of February 5 and 7 and the apparent spirit in which they were written. We do as a matter of course try to resolve discovery disputes informally between counsel.

Although it is not clear to us how you arrive at a grand total of 75 subparts to Regions' interrogatories, Regions is willing to respond to an equal number of subparts of Regions University interrogatories counted in the same manner as you seem to have counted Regions' interrogatories.

Turning to Regions' requests for production, Request No. 5 makes imminent sense because it simply asks for documents in Regions University's possession concerning Regions Bank or Regions' REGIONS mark. This should be a relatively small and identifiable universe of documents. However, if there is some ambiguity in the request that I fail to appreciate, I would be glad to discuss it with you.

We do not think that Request Nos. 13 and 16 are overly broad; rather, they are specifically limited to documents used to determine: (1) expenditures by Regions University for marketing, advertising, promoting or publicizing Regions University using the REGIONS name and mark, alone or with other elements, and (2) the total amount of student loans obtained for Regions

## EXHIBIT D

STEPTOE & JOHNSON LLP

Victor T. Hudson, Esq.
February 23, 2007
Page 2

University students in the years 2006 and 2007. Representative documents will not suffice because we do not want documents that, for example, are representative of expenditures. We are seeking documents that can be used to determine expenditures. If Regions University has a reason why it thinks these requests are overly burdensome, we will listen to its concerns and try to work out a manner to get the information sought and not overly burden the school.

   Request Nos. 11, 14 and 15 do not strike us as overly broad, but we are willing to listen to Regions University's concerns with respect to these requests.

   For Request No. 17, we would be glad to discuss with you what the parties will agree to mutually exchange with respect to experts retained for this proceeding.

   As for attorney-client privilege, and as I told Mr. Shlesinger, we do not believe that any searches conducted are privileged under any circumstance. With respect to the advice Mr. Shlesinger or other attorneys gave to Regions University about the searches concerning or the availability of the REGIONS mark, we believe that attorney-client privilege has been waived because of public remarks and communications made referring to the specific advice given by counsel to the school concerning such matters.

   I understand from your letters that you are willing to produce documents and information relating to this advice so long as this waiver does not constitute waiver of attorney-client communications dealing with other matters and that we will not seek to disqualify Mr. Shlesinger or his firm. Both conditions are acceptable.

   I look forward to discussing with you the specifics of the issues you raise.

     Very truly yours,

     William G. Pecau

Deposition of Rex Turner, Ed.D.                                                                 May 15, 2007

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE MIDDLE DISTRICT OF ALABAMA
 3                   NORTHERN DIVISION
 4
 5   REGIONS ASSET COMPANY,
 6        Plaintiff,
 7   Vs.               CIVIL ACTION NO.
                        2:06CV882-MHT
 8   REGIONS UNIVERSITY, INC.,
 9        Defendant.
10
11          * * * * * * * * * * * * *
12
13         DEPOSITION OF REX A. TURNER, JR., Ed.D.,
14   taken pursuant to stipulation and agreement before
15   Lisa J. Nix, Registered Professional Reporter and
16   Commissioner for the State of Alabama at Large, in
17   the Law Offices of Balch & Bingham, Suite 200, 105
18   Tallapoosa Street, Montgomery, Alabama on Tuesday,
19   May 15, 2007, commencing at approximately 9:00 a.m.
20
21          * * * * * * * * * * * * *
22
23
```

```
 1              APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4   Mr. William G. Pecau
     Ms. Rachel M. Marmer
 5   STEPTOE & JOHNSON
     Attorneys at Law
 6   1330 Connecticut Avenue NW
     Washington, D.C. 20036-1795
 7
     Mr. Charles B. Paterson
 8   BALCH & BINGHAM
     Attorneys at Law
 9   Suite 200
     105 Tallapoosa Street
10   Montgomery, Alabama 36104
11
12   FOR THE DEFENDANT:
13   Mr. Victor T. Hudson
     HUDSON & WATTS
14   Attorneys at Law
     Suite 2500
15   One St. Louis Centre
     Mobile, AL 36602
16
17
18          * * * * * * * * * * * * *
19
20          EXAMINATION INDEX
21   BY MR. PECAU . . . . . . . . . . .  7
22
23
```

```
 1              EXHIBIT INDEX
 2
 3   EXHIBIT NUMBER
 4   17  Regions University Enrolled Students      31
         from Regular Fall 2006 through Regular
 5       Spring 2007 (RU-1908)
 6   18  Southern Christian University             38
         Undergraduate Expense form (RU-1374)
 7
 8   19  Regions University advertisement          59
         (RU-216)
 9   20  Board of Regents Meeting Minutes FY        65
         7/1/05 - 6/30/06 (RU-109-111)
10
11   21  Team Meeting Minutes 9/29/05 (RU-113 -     84
         114)
12   22  Board Meeting minutes 12/16/05 (RU-117 -   87
         119)
13
14   23  Board Meeting minutes 3/17/06 (RU-133 -    91
         136)
15   24  Resolution dated 3/17/06 (RU-137- 139)     95
16   25  Team Meeting Minutes 7/6/06 (RU-146 -     100
         148)
17
18   26  U.S. Patent and Trademark Office          102
         correspondence re: Masters University
         (RU-140 - 145)
19
20   27  Team Meeting Minutes 7/27/06 (RU-149 -    108
         151)
21   28  7/27/06 email to Rex Turner from Jim      129
         Shlesinger (RU-178 - 179)
22
23
```

```
 1
 2
 3   29  BellSouth White Pages listing beginning   139
         with Ralph Smith Motors and ending with
 4       Rho, Frank
 5   30  Email to Rex Turner from Rick Johnson     143
         re: Mark University (RU-180 - 181)
 6
 7   31  Resolution dated 7/28/06 (RU-25- 27)      150
 8   32  Team Meeting Minutes 7/31/06 (RU-152)     150
 9   33  Letter to Students, Faculty and Staff     169
         from Rex Turner (RU-46)
10   34  Name Change Letter (RU-58 - 59)           169
11   35  Emails from Wilson Luquire and Randy      172
         Gore re: name change (RU-1909- 1911)
12
13   36  Regions University History, Mission and   187
         Organization of Regions University
14       (RU-80 - 108)
15   37  8/18/06 letter to Rex Turner from         190
         William Pecau (RU-63 - 65)
16   38  December 2006 letter to Dear Friend from  199
         Rex Turner (RU-1281 - 1282)
17
18   39  Online Message from the President of      199
         Regions University (RAC-30553 - 30554)
19   40  2 Corinthians - King James Bible          203
20   41  2 Corinthians - American Standard Bible   204
21   42  Regions University Logo effective         218
         8/15/06 (RU-191)
22
23
```

**EXHIBIT E**

Deposition of Rex Turner, Ed.D.                                                    May 15, 2007

Page 129

1   A.  I do not think it is a yes-no question. I
2        think it is a confused question because at
3        the point that I thought Regions University
4        was of a service, I had already learned
5        something that I had not learned prior.
6                MR. PECAU:  I think now would be a
7             good time to take a break.
8             Let's have some lunch.
9             (Lunch recess was taken.)
10            (Exhibit 28 was marked for
11            identification.)
12  Q.  Dr. Turner, let me show you what's been
13       marked as Exhibit 28.  Do you recognize
14       this?
15  A.  Yes, I do.
16  Q.  And is Jim Shlesinger the person you've
17       been referring to as your patent attorney?
18  A.  Is it patent or trademark?  I'm not --
19  Q.  Well, people confuse patents and
20       trademarks.  Usually, they're referred to
21       as trademark attorneys, but sometimes
22       they're patent attorneys.
23  A.  I consider him a trademark attorney.

Page 130

1   Q.  Okay.
2   A.  I don't know if he does patents or not, but
3        I consider him a trademark attorney.
4   Q.  Now, were you the person at -- I guess it
5        was Southern Christian University then who
6        was dealing directly with Mr. Shlesinger?
7   A.  I'm not the only one who has talked to
8        Mr. Shlesinger.  Dr. White has talked with
9        him, but I am the one that specifically
10       called him on Monday morning relative to
11       this document, 28, that -- and which I
12       asked him to give me a written opinion of
13       Turner University, Rex University, and
14       Regions University.  And this is his
15       response on Thursday morning of July the
16       27th.
17  Q.  So you called him up on Monday morning of
18       that week?
19  A.  Yes.
20  Q.  Okay.  And you gave him those three names?
21  A.  Yes.
22  Q.  Had you dealt with Mr. Shlesinger
23       beforehand?

Page 131

1                MR. HUDSON:  I think he's asking
2             about whether the university
3             had or not.
4   A.  Well, I'll just go back and put in a
5        capsule.  He originally did Southern
6        Christian University trademark for us.  And
7        we had some discussions relative to Masters
8        University, nothing in writing, because
9        most all that work was done by Jeff Foshee
10       and Dr. White.  And it was on that Monday
11       morning that I called him and asked him to
12       do this review for us.
13  Q.  So did you in around July 27, 2006, feel a
14       lot of pressure to choose a name?  You said
15       you were a couple of months behind in
16       choosing a name.
17               MR. HUDSON:  Object to the fom.
18  A.  Well, we needed to have changed our name
19       seven months before, and so this was a
20       means by which to try to resolve the issue.
21  Q.  So you did feel some time pressure to
22       choose a name; is that correct?
23               MR. HUDSON:  Object to the fom.

Page 132

1   A.  I just -- I mean, as an institution, I knew
2        that we needed to change our name.
3   Q.  Okay.  Did you call Mr. Shlesinger
4        directly?
5   A.  Yes.
6   Q.  Okay.  And what did you tell him that
7        Monday morning?
8   A.  I just simply called and said I have made a
9        review of these marks -- I said marks.  I
10       have made a review of these names, and when
11       I'm talking about names, I'm talking about
12       university:  Turner University, Rex
13       University, and Regions University.  And I
14       would like for him to give us a trademark
15       opinion.
16  Q.  Opinion as to what?
17  A.  As to the registerability of these names.
18  Q.  Did you ask him to do a search?
19  A.  What do you mean by -- or how do you define
20       search?
21  Q.  Did you ask him to search whether the mark
22       was available?
23  A.  Yes.

Deposition of Rex Turner, Ed.D.                                                          May 15, 2007

| Page 133 | Page 135 |
|---|---|

**Page 133**

1  Q.  Did he tell you that there are different
2     kinds of searches that could be done?
3  A.  We did not go into that.
4  Q.  Did you ask him just to search the Patent
5     and Trademark Office records?
6  A.  I think it was understood that he knew that
7     we were trying to change our name. He knew
8     the impact of such a decision, and I was
9     expecting him to do whatever appropriate
10    search that he was supposed to do to give
11    me some kind of definitive statement as to
12    the registerability of that.
13 Q.  Did he ask you if you wanted to do -- have
14    a search conducted of uses of the marks
15    that -- of the marks that might not be
16    registered?
17 A.  I think you're going to have to explain
18    that a little bit from your trademark
19    background for my lack of knowledge.
20 Q.  It's possible to search marks in addition
21    to marks that are registered. It's often
22    done. Did he suggest to you that you
23    should do a search of marks that weren't

**Page 135**

1     talk to any of the other administrators
2     about these three names?
3  A.  Well, obviously, Turner and Rex have been
4     out there and have been understood out
5     there and have been out there for -- you
6     know, but I don't know that --
7        Now, Turner University has been, but
8     Rex University, in no special way had it
9     really been discussed because it was not
10    even up for consideration, and the same is
11    true of Regions.
12 Q.  So do you recall discussing with anyone
13    prior to speaking to Mr. Shlesinger
14    about -- I mean, in addition to your wife
15    and your sister about the possibility of
16    adopting Regions as a mark?
17 A.  No, I did not talk to anybody else.
18 Q.  Did your wife or your sister mention the
19    bank when you said the name Regions
20    University?
21 A.  I do not recollect. I don't recollect that
22    they did. They may have, but they -- I
23    don't recollect that.

**Page 134**

1     registered?
2  A.  Give me an example.
3  Q.  Well, Masters Bible College is not a
4     registered mark. There are means of
5     searching marks that aren't registered
6     marks. Did you ask him to do that kind of
7     search?
8  A.  I do not recollect any discussion of that.
9     I think he understood the import because of
10    the names and the potential thereof, and so
11    that's all I know. That's all I can speak
12    to.
13 Q.  Do you recall discussing with him the price
14    of different kinds of searches?
15 A.  You know, I don't -- he told me
16    approximately about how much it would be.
17    But, you know, I don't even -- I never saw
18    the bill. I do not know how much he
19    charged and ...
20 Q.  Did you tell him that there was a time
21    limit when you needed his opinion by?
22 A.  I did not give him a timeline.
23 Q.  Prior to talking to Mr. Shlesinger, did you

**Page 136**

1  Q.  When you spoke to -- Now, you know Regions
2     is the largest bank in Montgomery, right?
3  A.  Well, I didn't know that personally. No
4     one has told me that. Colonial has a
5     mighty big presence here in this city with
6     their having their headquarters here. I
7     know that Regions is prominent, but I also
8     know that there are other banks here that
9     are just as prominent as well.
10 Q.  Prior to speaking to Mr. Shlesinger, do you
11    remember in that summer, stories on
12    television and in newspapers about the
13    merger of AmSouth and Regions?
14 A.  Yes, I knew about that, and I also -- you
15    need to know that I said to Mr. Shlesinger
16    on that Monday morning, there is a Regions
17    Bank here.
18 Q.  So you made him aware that Regions was a
19    prominent bank in your community?
20 A.  I didn't say --
21       MR. HUDSON: Object to the form of
22       the question.
23 A.  I didn't say prominent. I just said

34 (Pages 133 to 136)

Deposition of Rex Turner, Ed.D.

May 15, 2007

Page 137

1      there's a Regions Bank.
2   Q.   Did you describe how big Regions was to
3      Mr. Shlesinger at all?
4   A.   Huh-uh. (Negative response.)
5   Q.   Did he ask you anything about the bank?
6   A.   Well, his comment was, well, I don't know
7      anything about them up here in Virginia.
8   Q.   So what did you tell him about people's
9      knowledge of Regions in Montgomery?
10   A.   That was not discussed.
11   Q.   Well, did you tell him it was a well-known
12      bank in Alabama?
13   A.   Regions Bank, Regions University, Troy
14      Bank & Trust, Troy University, Tuskegee
15      University, First Tuskegee Savings, Regal
16      Bank, Regal University -- it's service, and
17      those are my concepts.
18   Q.   Did you tell him that Regions was a
19      well-known bank in Alabama when you spoke
20      to him?
21   A.   No, I just said there's a Regions Bank.
22   Q.   So as far as you know, Mr. Shlesinger
23      didn't know that Regions was the largest

Page 138

1      bank in Montgomery?
2   A.   I don't know what Mr. Shlesinger understood
3      or knew. I asked him to do a trademark
4      review, research, however you would
5      describe it, which both of you as attorneys
6      would understand that a lot better than I
7      would.
8      And I am not a legal counsel in that
9      area, and I would not want to put that --
10      put myself out to give you that kind of
11      description of what was going on in his
12      mind.
13   Q.   So you don't know whether he knew it was
14      the largest bank in Alabama or not?
15   A.   No, sir, I don't know.
16   Q.   Okay. Did you tell him at that time that
17      Regions had a Regions University?
18   A.   No.
19   Q.   Did you tell him about the searches that
20      you did concerning Regions when you spoke
21      to him on the phone?
22   A.   I don't recollect that I did.
23   Q.   Did you tell him that -- with respect to

Page 139

1      Turner, that you folks have used Turner
2      School of Theology for a number of years?
3   A.   You know, I do not recollect that there was
4      a discussion of Turner School of Theology.
5   Q.   How long did your telephone call with
6      Mr. Shlesinger last on Monday morning? Do
7      you remember?
8   A.   I do not recall, but it would have been
9      more than -- it would not have been more
10      than ten minutes -- ten to 15 minutes.
11   Q.   Prior to calling Mr. Shlesinger, did you
12      take a look at the White Pages to see if
13      there are any other Regions institutions?
14   A.   I did not.
15   Q.   Have you ever looked at the White Pages to
16      see if there are any other Regions
17      institutions?
18   A.   I looked Saturday to see if Regions
19      University was in the White Pages -- of
20      this past week.
21      MR. PECAU: Let's mark this as the
22      next exhibit, please.
23      (Exhibit 29 was marked for

Page 140

1      identification.)
2   Q.   Let me show you Exhibit 29. Do you
3      recognize that as the BellSouth White and
4      Yellow Pages for Montgomery?
5   A.   Yes.
6   Q.   Let's go to page 88. Do you see Regions
7      Bank there?
8   A.   Yes.
9   Q.   See any other Region -- Regions marks
10      there?
11   A.   Not in this book, I don't.
12   Q.   So all you see on --
13   A.   I do see some Regional.
14   Q.   Right, but I didn't ask you about Regional,
15      did I?
16      So the only Regions that you see in the
17      Montgomery White Pages is beginning about
18      two-thirds of the way down, Regions Bank,
19      and on the next page about -- all the way
20      down to Regions Financial Leasing and then
21      Regions Mortgage; is that correct?
22   A.   That's what I see.
23   Q.   And there are no other Regions, right?

Deposition of Rex Turner, Ed.D.                                    May 15, 2007

Page 153

1    A.  Yes, I do.
2    Q.  And one of the reasons they might reject it
3         is on the grounds of likelihood of
4         confusion as to sponsorship or affiliation
5         with one or more --
6    A.  Okay.
7    Q.  Is it your understanding that's a reason to
8         reject the use of a mark?
9    A.  Mr. Pecau, you're looking at someone who
10        has no real knowledge of trademarks and at
11        best, I'm totally inadequate and I must
12        leave this to the trademark attorneys and
13        so forth and so on.  I just know that when
14        you're talking to a board who has no more
15        background than I would have and would have
16        less background of trademarks, that all
17        these things stated are going to be
18        important to them because it has come from
19        somebody who is in the trademark industry.
20   Q.  So the ground of likelihood of confusion
21        has no meaning to you?  Is that what you're
22        saying?
23   A.  As to my -- You know, when we talk about

Page 154

1         confusion here, I don't know what all he
2         means by likelihood of confusion as to the
3         sponsorship.
4    Q.  Okay.  Now, with regard to Mr. Shlesinger's
5         e-mail, did he ever send you a letter
6         following up this e-mail, Exhibit 28?
7    A.  I don't recall whether hedid or not.
8    Q.  Do you recall ever seeing the results of
9         the search that he might have done that
10        supported the things that he states in
11        Exhibit 28?
12   A.  I do not remember.  I'll have to ask him.
13   Q.  So in terms of Regions University, he
14        doesn't refer to any other Regions marks in
15        his response, does he?
16   A.  Well, this e-mail and this documentation is
17        as it is.  I mean, I can't add to or take
18        away from what he's expressed here.
19   Q.  And he doesn't identify any Regions marks
20        in his --
21   A.  If he has beyond this or whatever, we would
22        have to ask him.
23   Q.  Did you have a telephone call with

Page 155

1         Mr. Shlesinger on July 27th?
2    A.  If I recall correctly, as he was closing
3         the day on the 26th, he either called or I
4         called and he just basically gave me a
5         synopsis of what he'd discovered.  And I
6         asked him when he was going to send this,
7         and he said I will try to send it in the
8         morning, and that's what he did.
9    Q.  Now, you said that the July 28th meeting of
10        the board of regents started at 2:00.  How
11        long did that meeting last?
12   A.  I didn't time that.
13   Q.  Two hours?  Three hours?  Half an hour?
14   A.  I would say it was within an hour time
15        frame.
16   Q.  Okay.  Was there any mention of the
17        Regions -- the financial institution in
18        that meeting that you recall?
19   A.  I do not recall, but I do not want to sit
20        here and say somebody did not mention it.
21        I do not recollect.
22   Q.  Now, with respect to Exhibit 31, the three
23        whereas clauses, do you see that in the

Page 156

1         resolution?
2    A.  Yes.
3    Q.  Was it a part of the board's resolution
4         that the name Regions University would help
5         increase the institution's attractiveness
6         to potential students?
7    A.  We have been in the process of making
8         application to the State of Arizona.  We
9         recently here about a month or two sent a
10        4000 book to them, trying to make
11        application to the State of Arizona.  When
12        I go out there and they say Southern is
13        just not going to do well out here in
14        Arizona and I meet with the Chinese
15        ambassador and Christian is a problem,
16        where we have an Italian missionary who did
17        a lot of work in Italy and he looks at me
18        and he says, Rex, Southern is going to be a
19        real problem in Italy, you know, this is
20        the ramifications of attractiveness.  We
21        don't like to have a turnoff with a name,
22        and that's where this is coming from.
23   Q.  Okay.  So Regions -- So it was the board's