IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

_____

REGIONS ASSET COMPANY, et al.,)
                              )
          Plaintiffs,         )
                              )
                              ) Civil Action No. 2:06-cv-882-MHT
                              )
REGIONS UNIVERSITY, INC.      )
                              )
          Defendant.          )
_____)

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

VICTOR T. HUDSON
[HUDSV1684]
tom@alabamatrial.com
WILLIAM W. WATTS, III
[WATTW5095]
bill@alabamatrial.com
Hudson & Watts, LLP
Post Office Box 989
Mobile, Alabama 36601

JAMES E. SHLESINGER
Shlesinger, Arkwright &
      Garvey LLP
1420 King Street, Suite 600
Alexandria, Virginia 22314

ATTORNEYS FOR DEFENDANT

TABLE OF CONTENTS

NATURE OF CASE . . . . . . . . . . . . . . . . . . . . . 1

NARRATIVE SUMMARY OF UNDISPUTED FACTS . . . . . . . . . . . 2

    A.   Regions University . . . . . . . . . . . . . . . 2

    B.   Change of Name from SCU to Regions University . . . 3

    C.   Nature and Style of Defendant's Mark . . . . . . . 10

    D.   History and Nature of Plaintiffs' Business
        and Mark . . . . . . . . . . . . . . . . . . . . 10

    E.   Third Party Use of "Region" or "Regions" . . . . . 12

        1.   Trademark Registrations . . . . . . . . . 12

        2.   Corporate/LLC Registrations . . . . . . . 15

        3.   Domain Name Use of "Region" or "Regions" . . . 16

        4.   Third Party Use of "Region" or "Regions"
           Mark . . . . . . . . . . . . . . . . . . 16

    F.   Plaintiff's Use of "Regions University" Mark for
        Employee Training . . . . . . . . . . . . . . . . 18

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . 19

    I.   The Use of Defendant's Mark Regions University
       is Not Likely to Cause Confusion as a Matter of
       Law Given the Extreme Weakness of the Plaintiffs'
       Mark Outside the Field of Banking, the Complete
       Dissimilarity of the Services, the Numerous
       Dissimilarities in the Marks Themselves, and
       the Lack of Probative Evidence of Any Actual
       Customer Confusion . . . . . . . . . . . . . . . 19

        A.   The First Factor:  Type of Mark Used
           by the Plaintiff . . . . . . . . . . . . 24

           1.   Type of Mark . . . . . . . . . . . . 24

           2.   Market Strength of Mark . . . . . . . 27

B.   The Second Factor:  The Similarity
     of the Marks . . . . . . . . . . . . . . . . . 33

C.   The Third Factor:  Similarity of the
     Goods/Services . . . . . . . . . . . . . . . . 37

D.   The Fourth Factor:  Similarity of the
     Parties' Retail Outlets and Customers . . . . 40

E.   The Fifth Factor:  Similarity of
     Advertising Media . . . . . . . . . . . . . . 40

F.   The Sixth Factor:  Whether Defendant
     Had Intent to Infringe . . . . . . . . . . . . 42

G.   The Seventh Factor:  Actual Confusion . . . . 43

II.  No Trademark Infringement Claim Can Be Based
     Upon the Plaintiffs' Internal Corporate
     Training Program Which Adopts the Name
     "Regions University" . . . . . . . . . . . . . . . 53

     A.   Plaintiff Can Have No Valid Service Mark
          For Its Internal Training Program Which
          is for Its Own Benefit and Not
          Sufficiently Separate From the Furnishing
          of Its Financial Services to the General
          Public . . . . . . . . . . . . . . . . . . . 54

     B.   There Can Be No Likelihood of Public
          Confusion Between an Internal Corporate
          Training  Program and a Post-Secondary
          Educational Institution . . . . . . . . . . 56

     C.   The Doctrine of Estoppel and/or Unclean
          Hands Should Bar the Plaintiffs from
          Employing Their "Regions University" Mark
          as a Basis for a Trademark Infringement
          Claim Where They Are Not Authorized to
          Operate a University and Where They
          Could Not Even Legally Use the Name
          "University" in Many of the States
          Where They Do Business . . . . . . . . . . . 58

III. Plaintiffs' Dilution Claims Fail as a Matter
     of Law . . . . . . . . . . . . . . . . . . . . . 60

A.  Plaintiff's Mark is Neither Famous
    Nor Distinctive Under the Federal
    Trademark Dilution Revision Act . . . . . . . 60

    1.  Lack of Fame . . . . . . . . . . . . . . 60

    2.  Lack of Distinctiveness . . . . . . . . 62

B.  Other Factors Relevant to Determination
    that Mark is Likely to Cause Dilution by
    Blurring Do Not Support Plaintiff's Claims . . 68

C.  Plaintiffs Cannot Recover Under the
    Alabama Anti-Dilution Statute for
    Similar Reasons . . . . . . . . . . . . . . 69

IV.  Plaintiffs' Remaining Claims Must be Dismissed . . 70

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 71

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

---

REGIONS ASSET COMPANY, et al.,)
                              )
        Plaintiffs,       )
                              )
                              ) Civil Action No. 2:06-cv-882-MHT
                              )
REGIONS UNIVERSITY, INC.     )
                              )
        Defendant.        )

---

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

NATURE OF CASE

In this action, plaintiffs allege (1) infringement of federally registered trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(1); (2) unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) dilution of a federally registered service mark in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (4) trademark infringement in violation of Code of Alabama § 8-12-16; (5) common law trademark infringement and unfair competition; (6) injury to business reputation and dilution of trademark in violation of Section 8-12-17, Code of Alabama.

<u>NARRATIVE SUMMARY OF UNDISPUTED FACTS</u>

A.     <u>Regions University</u>

Defendant Regions University, Inc., formerly known as Southern Christian University ("SCU"), is a fully licensed and accredited post-secondary educational institution with a campus in Montgomery, Alabama and a facility in Nashville, Tennessee. (Deposition of Rex Turner at pp. 24-25). The University has a school of human services, a college of business, a college of general studies and a school of theology. (Turner depo. at p. 54; Ex. 36). Since 1989, Regions University has been accredited by the Southern Association of Colleges and Schools (SACS) to grant degrees at the Bachelor's and Master's levels. (Ex. 36, RU098). It now also offers doctoral programs in family therapy, biblical studies, and ministry, among others. (Ex. 36, RU099-100). The University employs some 93 faculty members. (Turner depo. at p. 54).

Regions University is affiliated with and supported by various Churches of Christ. (Turner depo. at p. 22). However, some 70% of the students are not members of the Church of Christ. (<u>Id</u>.). Students are not required to sign a creedal statement of belief. (Ex. 36, RU084; Turner depo. at p. 187-89).

A head count from Fall 2006 through Summer 2007 was 990 students (Anita Crosby depo. at pp. 19-20). These came from

2

every state in the Union except Minnesota, Massachusetts, New Hampshire and North Dakota.  (Turner depo. at p. 97-99; Ex. 17). More than 72% of those students are from places other than Alabama (Ex. 17).

Education through Regions University is essentially online or "distance" learning, although doctoral students attend classes on campus to fulfill residency requirements.  (Turner depo. at pp. 31-33).  The school was among a handful of schools selected in 1999 by the United States Department of Education to be part of a pilot Distance Education Demonstration Program to assess distance education.  (Turner depo. at p. 34; Ex. 36, RU099).

B.   Change of Name from SCU to Regions University

On September 26, 2005, at a meeting of SCU's Board of Regents, Dr. Rex Turner, president of SCU, discussed enrollment trends at the school and a rationale for considering a name change.  (Turner depo. at pp. 65-68; Ex. 20).  Dr. Turner felt a broader name would help increase enrollment.  (Turner depo. at p. 68; Ex. 20, RU110).  Negative connotations associated with the words "Southern" and "Christian," in parts of the country and the world, had created problems for the school in its ability to attract students both nationally and internationally, including Russia and China.  (Turner depo. at pp. 156-60; Ex. 20, RU110).  Dr. Turner discussed the feasibility of changing

3

the school's name to "Masters University," which suggested the concept of Jesus being the "Master teacher." (Turner depo. at pp. 69-71; Ex. 20, RU110).

On December 16, 2005, the Board again met and discussed the reasons for a name change, including: (1) many colleges and universities have "South" or "Southern" in their name; (2) there was a local university called "South University;" (3) SCU was planning to go to Arizona and Nevada and the SCU name would not work well in those regions; and (4) roadblocks had been created in countries such as China and Russia with "Christian" in the school's name. (Turner depo. at pp. 87-90; Ex. 22). Some board members suggested "Turner University" as an option, in recognition of the founders of the school, Rex and Opal Turner. After much discussion, the Board adopted a motion to give Dr. Turner approval to proceed with getting the Masters University name officially registered as a trademark. (Turner depo. at pp. 89-91; Ex. 22).

On March 17, 2006, the Board adopted a resolution to change the name of the University to "Masters University, Inc." This was done to "increase [the school's] attractiveness to potential students, not just regionally, but also nationally and internationally, and thereby maximize educational opportunities and achievements" and further assisting the University "in projecting itself as a nationally recognized university of

prominence."    (Ex.  24).    Although  some  Board  members  were

reluctant  to  change  the  name,  they  understood  the  need  to  do  so.

Dr.  Turner  stated  that  the  school's  mission  would  not  change  and

that  "Masters  University  represents  Jesus,  the  Master  Teacher."

(Ex.  23,  RU135).

Thereafter,  application  was  made  to  register  the  mark

"Masters  University."    The  examining  attorney,  however,  refused

registration,  finding  that  the  mark  was  merely  descriptive  of

the  educational  services  to  be  rendered.    (Turner  depo.  at  p.

102;  Ex.  26).    Meanwhile,  school  officials  had  learned  of

another  school,  The  Master's  College  of  Bible  in  California.

(Turner  depo.  at  pp.  104-05;  Ex.  25,  RU148).    Dr.  Turner

contacted  trademark  counsel,  Jim  Shlesinger,  who  recommended

that  they  not  use  the  name  "Masters  University"  because  Masters

College  of  Bible  could  contest  it.    (Turner  depo.  at  p.  109;  Ex.

27).

Other  names  were  then  considered,  including  Rex  University,

Turner  University,  Regions  University,  Graystone  University,

Royal  University,  Providence  University  and  Regal  University.

(Turner  depo.  at  pp.  111-13).    Each  of  the  names  Royal,  Regal

and  Regions,  had  some  emphasis  of  prominence.    Regions  also

expressed the theme of the Christian call to go into all the regions of the world.[1] (Turner depo. at p. 114).

Dr. Turner did his own preliminary search as to the availability of these names. He checked them against those listed in the 2006 Higher Education Directory and then on the USPTO website online. (Turner depo. at pp. 116-18). He found numerous names that had the word "Regions" in it, including Regions Café, Regions Hospital and RegionsAir, all denoting a different service. (Turner depo. at p. 118). After doing this "spot" check, he asked Mr. Shlesinger to research the names Rex, Turner and Regions for use in a new name for their university. (Turner depo. at p. 123). He made Mr. Shlesinger aware that there was a Regions Bank in the area. (Turner depo. at pp. 136-37).

Mr. Shlesinger sent an e-mail report of his search results to Dr. Turner on July 27. (Ex. 28). He advised that the USPTO might refuse registration of the mark "Turner University" on the grounds of likelihood of confusion with one or more of the registered marks for educationally-related companies associated with Ted Turner, including "Turner Learning," "Turner South," and "Turner Adventure Learning." He advised that the mark "Rex University" appeared to be registerable, as well as the proposed

---

[1] 2 Corinthians 10:16 refers to Paul's hope "to preach the gospel in the regions beyond you, … ." (KJV; Turner depo. at p. 202-03).

mark "Regions University," for educational services, namely providing instruction at the university level. He identified some eight other registered marks employing variations of the term "Regions" for various educational services. In his opinion, however, these marks were either weak on their face, due to their use in a geographic context, or were otherwise different in spelling, pronunciation or meaning. He advised that the sophistication of the consumer of higher educational services also reduced the likelihood of any confusion. (Ex. 28).

The University's policy review team met later about the name change to "Masters University." Dr. Turner reported that trademark counsel had recommended against a name change to Masters University and presented a copy of Mr. Shlesinger's e-mail opinion as to the registerability of Rex University and Regions University. (Turner depo. at p. 109; Ex. 27). The policy team members all agreed that a change of name to "Regions University" would be appropriate for two reasons: (1) the school's heritage and mission involved going into all the "regions" of the world and (2) as a distance learning center offering on-line instruction, it was reaching all the "regions" of the United States and going into other "regions" of the world. (Ex. 27). No one mentioned Regions Bank at this meeting. (Turner depo. at p. 143).

At another Board meeting on July 28, Dr. Turner presented Mr. Shlesinger's e-mail opinion, a background on Masters University and the need to look for another name. Although some Board members were in favor of remembering the founder of the institution, they were made aware that "Turner University" had potential registerability issues. (Turner depo. at p. 151). The choice was left between Rex and Regions. The Board finally preferred Regions and adopted a resolution to change the name of the University accordingly. (Turner depo. at pp. 150-51; Ex. 31). Again, no one mentioned Regions Bank at the meeting. (Turner depo. at p. 155).

On July 31, 2006, before communicating the name change to the students, Dr. Turner reported the Board's approval of the name change at a meeting of the Executive Leadership Team. (Turner depo. at p. 162; Ex. 32). At that meeting, one of the team members mentioned that he thought that Regions Bank had an internal "Regions University." (Turner depo. at p. 164; Ex. 32). As a dean at another school, he had received an employment application from someone who had put on his resume that he had attended Regions University. Not knowing anything about such a university, he followed up with the applicant and discovered that it was an internal bank training program, not an accredited university. (Turner depo. at p. 165).

8

In light of this information, Dr. White, the University's Director of Institutional Research, immediately contacted Mr. Shlesinger's office and spoke to his partner, Dan Earle, who advised that because the name was used for an internal program within the Bank, it would not pose a registration issue. (Turner depo. at pp. 167-69). The team members "were assured that the industries provided different services, and that the Bank's 'Regions University' was not a public university, and that this would not be problem." (Ex. 32). The team decided to proceed that week with the filing of appropriate documents to effect the name change. (Ex. 32). On August 4, 2006, the University's application for trademark registration for the name "Regions University," for educational services, was filed. (Certified copy of Trademark Application 78/944,966).

On August 2, 2006, school personnel were advised of the name change and phone operators began adopting the name Regions University in answering phone calls. (Turner depo. at p. 170). On August 8, all enrolled students received an e-mail announcing the name change, explained "as a result of the University's increased presence in the global higher education market and the institution's Christian mission." (Turner depo. at p. 171; Ex. 33). On August 16, 2006, a more detailed letter was mailed to the students describing the new name change as reflective of the "founders' vision and goal of having a 'school without walls'

that could provide quality academic and Christian education to all regions of the world." (Turner depo. at p. 190; Ex. 34).

C.    Nature and Style of Defendant's Mark

Regions University uses primarily the three logos identified at the bottom of Ex. 75 (attached hereto)(Constanza depo. at p. 136). The "V" in university contains a kind of banner flying backwards across the top of the letter. In various advertising media, the name is usually accompanied by a globe of the world and the mark "Regions University" in red or against a red background. (Exs. 19, 44, 47, 68-70; Constanza depo. at pp. 107, 115, 127; Turner depo. at pp. 60, 222, 236).

D.    History and Nature of Plaintiffs' Business and Marks

The plaintiff Regions Bank, a subsidiary of plaintiff Regions Financial Corporation, is headquartered in Birmingham, Alabama with branch offices in Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee, Texas and Virginia. In 1994, First Alabama Bancshares, Inc. changed its name to Regions Financial Corporation "to better reflect its growing presence throughout the South," according to its webpage. *See* www.regions.com/about_regions/company_info.rf. *See also* "Regions History" (RAC270) and "Regions Fact Sheet" (RAC2229) produced by plaintiffs ("By 1994, its footprint had expanded to

cover seven states, and the more appropriate Regions name was adopted."). In 1996, its subsidiary, First Alabama Bank, changed its name to Regions Bank. The services offered by Regions Bank include basic banking services, savings or time deposit accounts, loans, trusts, investment, real estate mortgage, construction lending, real estate lending, private banking, and insurance services. (Dunman depo. at p. 36). Except through the web and what coverage the SEC and Sunbelt Conference sponsorships give it, the Bank does not advertise outside its sixteen state footprint. (Peters depo. at pp. 115-118).

In 1993, the plaintiffs filed for registration of the mark "Regionsbank," and "Regions" for banking services (Class 36) and obtained registration for these marks in 1995. Other marks registered by the plaintiffs since then include Regions Bank, Regions Financial Corporation, Regions Net, Regions Mortgage, Regions Funds, Regions Investment Company, Inc., Regions Express, Regions Basic Banking, Regions Classic Banking, Regions Rewards, Regions Lifespan Accounts, Regions Management Account, and other names all associated with banking services. (Class 36).

Since 1993, the plaintiffs have used a series of distinctive logos in promoting their services to the public. The first logo, from 1993 until the Bank merged with Union

11

Planters Bank in 2004, used a double tail on the "g" of Regions as reflected on Ex. 2 (attached hereto).  (Dunman depo. at pp. 83-84).

After the merger with Union Planters Bank, the Bank adopted a green or gold color scheme for "Regions" with a triangle overlaid by a three-leaved plant adjacent to the word mark. (Dunman depo. at p. 85-90; Ex. 3).  Ex. 3 (attached hereto) demonstrates the only ways the logo should be displayed; the strength of the logo is consistency.  (Dunman depo. at p. 89).

Ex. 103 (attached hereto) is the new logo of Regions after the merger with AmSouth Bank.  (Deposition of Scott Peters at p. 90).  The logo uses a green triangle now dissected by four spikes of a sun burst radiating upwards and outwards.

E.    Third Party Use of "Region" or "Regions"

1.    Trademark Registrations

The United States Patent and Trademark Office (USPTO) has registered numerous marks containing the terms "Region" or "Regions", either alone or in combination with other terms, for various goods and services, in addition to the marks registered by plaintiffs.  Filed herewith are certified copies for the following active U.S. Registrations, using the words "Region" or "Regions" without reference to a specific geographical region:

> 1)    Mark:  REGIONS BEYOND INTERNATIONAL, Registration
>        No. 3,103,534, for missionary services, namely,
>        ministerial services provided in Africa,

Eastern Europe and Asia

This mark is in use.  *See* Affidavit of Stephen J. Stricklin and www.regionsbeyond.org.

2)  Mark:  REGIONSAIR, Registration No. 3,047,007,
    for air transportation of persons, property
    and mail

This mark has been in use until this year when the FAA restricted the company from flying.  *See* Affidavit of Pauline Holder regarding Domain Name and www.regionsair.com.

3)  Mark:  CARE IN REGIONS, Registration No.
    2,960,732, for charitable fundraising
    services, etc.

This mark is in use.  *See* www.thrivent.com/fraternal/ chapterprograms/index.htm.

4)  Mark: THE REGION'S HOME PAGE, Registration No.
    2,821,459, for online computer services, etc.

5)  Mark:  REGIONS, Registration No. 2,175,755, for
    medical services, namely, health care services,
    hospital services, and in-patient, out-patient and
    surgery room care

This mark is in use.  *See* Holder affidavit and www.regionshospital.com.

6)  Mark:  REGIONS HOSPITAL, Registration No. 2,164,789,
    for medical services, namely, health care services,
    hospital services, and in-patient, out-patient and
    surgery room care

This mark is in use.  *See* Holder Affidavit and www.regionshospital.com.

7)  Mark:  REGIONS CAFÉ A WORLD OF DINING & DESIGN,
    Registration No. 1,502,627, for restaurant services

This mark is in use.  *See* Holder affidavit and www.martplaza.com/dining.cfm

8)  Mark:  REGIONSERV, Registration No. 3,001,159,

13

for telecommunications services for business and
residential customers, etc.

This mark is in use.  *See*
www.bellsouth.com/areacode/731.

9)   Mark:    REGION (& DESIGN), Registration No.
2,583,861, for clothing, etc.

This mark is in use.  *See* Holder affidavit and
www.regionusa.com.

10)  Mark:  BLUE REGION, Registration No. 3,120,186,
for wireless telephone services

This mark is in use.  *See* www.centennialwireless.com.

11)  Mark:  REGIONWISE, Registration No. 3,076,478,
for public policy research services

This mark is in use.  *See* Holder affidavit and
www.regionwise.com.

Certain third party applications are also pending before
the USPTO which contain the term "Regions", as a feature
thereof.  These include the following:

1)   Mark: REGIONS, Application Serial No.
76/242,955, for wine

2)   Mark: REGIONS FOUNDRY, Application Serial No.
77/066,517, for faucets; shower and tub fixtures,
etc.

This mark is in use as a house brand.  *See*
www.afccorp.net/brands.htm.

3)   Mark: REGIONS SPECIALTY COFFEE (STYLIZED),
Application Serial No. 76/678,650, for coffee
sold in whole bean and ground form

14

With the exception of the newly filed application for the mark, REGIONS SPECIALTY COFFEE, these applications have been approved for publication and/or published by the USPTO.

2.    Corporate/LLC Registrations

In addition to registered trademarks employing the word "Region" or "Regions," numerous third parties throughout the plaintiffs' sixteen state footprint have employed these terms in their corporate or LLC names.

In the State of Alabama, some 100 corporations or LLCs have been incorporated, organized or registered with the words "Region" or "Regions" in their names. *See* Notice of Filing of Certifications of Secretary of State of Alabama filed concurrently herewith.    Only fifteen of these have been dissolved.    The following is a list of those entities in Alabama which use the word "Region" or "Regions" in a manner that does not refer to a particular geographical region:

| Name of Organization | Date of Organization/ Incorporation | Date of Dissolution |
|---|---|---|
| Regions Construction Company, LLC | 01/30/2004 | |
| Regions Homes, Inc. | 01/28/1999 | |
| Regions Propane-Alabama, LLC | 01/26/1999 | |
| Regions Propane-Chattanooga, LLC | 02/03/2004 | |
| Regions Propane-South Carolina LLC | 01/26/1999 | |

15

| | | |
|---|---|---|
| Regions Real Estate, Inc. | 08/08/2005 | 09/20/2005[2] |
| Regions South Properties, LLC | 03/15/2000 | |
| Region 2020, Inc. | 07/25/1997 | |
| Region Builders Construction Services, Inc. | 12/06/2005 | |
| Region Computer Services, Inc. | 01/18/2000 | |
| Region Enterprises, Inc. | 06/23/1970 | 11/03/1977 |
| Sun Region Land Group, Inc. | 09/22/1983 | 10/03/1999 |

Additionally, in the other fifteen states within which the plaintiff Regions Bank does business, the websites for the respective Secretaries of State of those states reflect the registration, organization or incorporation of at least 163 corporate/LLC entities that use the word "Region" or "Regions" in their name in a manner that does not refer to a specific geographical area. *See* Affidavit of Pauline Holder regarding Corporate/LLC Registrations filed concurrently herewith.

    3.   <u>Domain Name Use of "Region" or "Regions"</u>

There are hundreds of domain names that contain the word "Region" or "Regions." Many identify businesses or organizations adopting the word "Region" or "Regions" as part of their trade name. *See* Affidavit of Pauline Holder regarding Domain Names filed concurrently herewith.

    4.   <u>Third Party Use of "Region" or "Regions" Mark</u>

---

[2] This business is still active. *See* Stricklin Affidavit.

An ongoing investigation has confirmed the current or recent use of the mark "Region" or "Regions" by many of the companies identified above, as well as other unincorporated businesses or organizations. *See* Affidavit of Stephen J. Stricklin filed concurrently herewith. In Alabama, for instance, the following companies' existence and use of their trade name has been confirmed:

    1. <u>Regions Construction Company</u>, a construction company located in Harvest, Alabama since 2004;

    2. <u>Regions Pest Control</u> in Trafford, Alabama, which has operated for some ten years, providing pest control services in Blount, Shelby, Jefferson and Walker Counties;

    3. <u>Regions Propane</u>, which had six branches located in the four corner region of Alabama, Georgia, Tennessee and North Carolina, with sales of some $2M per year, and which operated as Regions Propane from 1997 until sometime in 2004 at which time the name was changed to Thompson Gas, LLC.;

    4. <u>Regions Real Estate</u>, offering real estate brokerage and agency services in Baldwin County since 2005;

    5. <u>Region Computer Services, Inc.</u>, which operated in Mobile, Alabama for about a year in 1997-1998.

Many other companies using the word "Region" or "Regions" in their name with a geographical reference have been confirmed to be in existence and doing business in this State or have done business in the past. (Stricklin Affidavit).

In the other states where the Bank does business, some 45 businesses or organizations have so far been confirmed to be in existence, doing business and using the mark "Region" or

17

"Regions" without reference to a particular geographical area, almost all without objection by the plaintiffs, and a number of which have Regions Bank accounts. *See* Stricklin Affidavit.

Many of the third party usages of the terms "Region" and "Regions," as used by businesses in the foregoing states, have come to the attention of the plaintiffs in the form of trademark search reports that the Bank has received over the years. (Deposition of Hope Mehlman at p. 58; Ex. 108). While the Bank has sent cease and desist letters to a few of these businesses, it has not objected to many others. (Mehlman depo. at pp. 86-87). Indeed, in one instance, the Bank specifically indicated it had no objection to a propane business in Alabama using the word "Regions," only reserving the right to use the word "Regions" if it ever got into the propane business. *See* letter from Samuel Upchurch, general counsel, to Regions Propane dated March 2, 1999. (Mehlman depo. at pp. 136-37; Ex. 109).

F.    Plaintiff's Use of "Regions University" Mark for
      Employee Training

The Bank has adopted the name "Regions University" for an internal employee training program that is only available for employees of the Bank and can only be accessed via password. (Deposition of Russell Dunman at pp. 39-45). It is designed to increase the competency of the Bank's work force. (Deposition of Mike Pollard at p. 17). The Bank's "Regions University" does

18

not offer educational services to the public nor use the name in public. (Pollard depo. at pp. 19, 96). The Bank's "Regions University" has never been approved as an educational institution by any regional accrediting body. (Response to Request for Admission Number 6; Pollard depo. at p. 33). The plaintiffs are not licensed nor approved by any state agency in any state in which they do business to operate as a post-secondary educational institution. (Response to Defendant's Request for Admission Number 1; Pollard depo. at p. 19). Nor have they sought or obtained any exemption from licensure from any state agency in order to operate their employee training program. (Response to Request for Admission Number 3). The plaintiffs have never sought or obtained authorization from any state to publish or use the term "university." (Response to Request for Admission Number 7; Pollard depo. at pp. 33-34). There is no plan to use "Regions University" for anything except the Bank's internal employee training program. (Pollard depo. at p. 31).

<u>LEGAL ARGUMENT</u>

I. <u>The Use of Defendant's Mark Regions University is Not Likely to Cause Confusion as a Matter of Law Given the Extreme Weakness of the Plaintiffs' Mark Outside the Field of Banking, the Complete Dissimilarity of the Services, the Numerous Dissimilarities in the Marks Themselves, and the Lack of Probative Evidence of Any Actual Customer Confusion</u>

Plaintiffs have filed claims against Regions University for federal trademark infringement, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and for unfair competition pursuant to Section 43(a) of the Act, 15 U.S.C. § 1125(a)(1). 15 U.S.C. § 1141(1) states:

> "(1) Any person who shall, without the consent of the registrant –
>
> (a) Use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion or to cause mistake or to deceive ...;
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided."

Section 43(a) of the Lanham Act is a broader federal unfair competition provision which protects <u>unregistered</u> trademarks, similar to the way that Section 32(1) of the Lanham Act protects registered marks. <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 155 (2nd Cir. 2002). The factors relevant to establishing a likelihood of confusion under either Section 32(1) or Section 43(a) are identical. <u>Ross Bicycles v. Cycles USA, Inc.</u>, 765 F.2d 1502, 1503-04 (11th Cir. 1985).

The primary object of the trademark laws is not to "protect" trademarks but to protect the consuming public from deception. <u>Chase Federal Savings and Loan Association v. Chase</u>

Manhattan Financial Services, 681 F.Supp. 771, 787 (S.D. Fla. 1987). The proper legal test of trademark infringement is whether the use of the allegedly infringing mark is likely to confuse consumers as to the source of the product. TGI Fridays, Inc. v. Int'l Restaurant Group, Inc., 569 F.2d 895 (5th Cir. 1978). A finding of trademark infringement requires a probability of consumer confusion, not a mere possibility. Elvis Presley Enterprises, Inc. v. Capece, 141 F.3d 188, 193 (5th Cir. 1998); *see* McCarthy on Trademarks and Unfair Competition § 23:3 (4th Ed.).

Although the plaintiff has obtained a federal trademark for the word "Regions," alone and with other elements, these trademarks are registered for banking services only. "The presumption of an exclusive right to use a registered mark extends only to the goods and services noted in a registration certificate." Arrow Fastener Company, Inc. v. Stanley Works, 59 F.3d 384, 397 (2nd Cir. 1995); *see* Faciane v. Starner, 230 F.2d 732, 738 (5th Cir. 1956). A plaintiff's trademark rights, while carrying no presumption beyond the goods or services noted in the registration certificate, may "extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods." E. Remy Martin and Co. v. Shaw Ross Int'l Imports, Inc., 756 F.2d 1525, 1530 (11th Cir. 1985).

21

The Eleventh Circuit considers the following seven factors in assessing whether or not a particular trademark is likely to cause confusion:

1.   The type of mark used by the Plaintiff;

2.   The similarity of the marks;

3.   The similarity of the goods or services represented by the marks;

4.   The similarity of the retail outlets and the customers served;

5.   The similarity of the advertising media used by the parties;

6.   Whether the Defendant had the intent to infringe; and,

7.   Any evidence of actual consumer confusion.

Frehling Enterprises, Inc. v. International Select Group, Inc., 192 F. 3d 1330 (11th Cir. 1999), *cert. denied*, 530 U.S. 1214, 120 S. Ct. 2216 (2000).  Of these factors, the type of mark and actual confusion are the most important.   Id.

Summary judgment is appropriate in infringement cases where there is no material factual issue as to the likelihood of confusion.  *See, e.g.,* Investacorp, Inc. v. Arabian Investment Banking Corp., 931 F.2d 1519 (11th Cir. 1991), *cert. denied*, 502 U.S. 1005, 112 S. Ct. 639 (1991) (affirming summary judgment for defendant); Sun Banks of Florida, Inc. v. Sun Federal Savings and Loan Association, 651 F.2d 311 (5th Cir. 1981)(reversing, as clearly erroneous, district court's finding of likelihood of

confusion and reversing injunctive relief issued against defendant); Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252 (5th Cir. 1980), *cert. denied*, 449 U.S. 899, 101 S. Ct. 268 (1980) (same); HBP, Inc. v. American Marine Holdings, 290 F.Supp.2d 1320 (M.D. Fla. 2003), *aff'd*, 129 Fed. Appx. 601 (11th Cir. 2005)(granting summary judgment for defendant). In Amstar Corp., the old Fifth Circuit concluded, as a matter of law, that no likelihood of confusion existed where the plaintiff's mark "Domino" was of limited strength outside of food products associated with its mark, due to its nature as a common English word and extensive third party use of the mark, even though the mark was used in an arbitrary fashion. *See also* HBP, Inc. v. American Marine Holdings, *supra*.

Defendant submits that a similar result should obtain in this case, where the mark "Regions" is extremely weak outside the field of banking, due to its descriptive nature, its nature as a common English word, and extensive third party usage. No likelihood of confusion exists, as a matter of law, in view of the weakness of this mark, particularly when combined with the complete unrelatedness of the services provided (banking versus post-secondary educational services), the dissimilarities in the marks used by the parties, and the lack of any probative evidence of actual customer confusion. Summary judgment should be entered in favor of defendant on Counts One and Two.

    A.    The First Factor:  Type of Mark Used by the Plaintiff

    This factor considers the strength of the plaintiff's mark, and hence the degree of legal protection that should be afforded to it.  Choice Hotels International, Inc. v. Kaushik, 147 F.Supp.2d 1242, 1247 (M.D. Ala. 2000), aff'd without opinion, 260 F.3d 627 (11th Cir. 2001).  This is one of the most important factors in this circuit.  Frehling Enterprises, Inc., 192 F.3d at 1335.  Determination of the type and strength of a mark is a two step process:

> "(1) Determining what category – generic, descriptive, suggestive, or arbitrary – the mark is; and
>
> (2) Determining what the relative market strength of the mark is."

Id. at 1247-48 (citing John H. Harlan Company v. Clarke Checks, 711 F.2d 966, 975 (11th Cir. 1983)).

    1.    Type of Mark

    The category of a mark depends upon the relationship between the mark and the product or service that it represents.  Choice Hotels, 147 F.Supp.2d at 1248; see Frehling Enterprises, 192 F.3d at 1335 (11th Cir. 1999).  The closer the relationship between the meaning of the mark and the services it describes, the less legal protection it is given.   Choice Hotels, 147 F.Supp.2d at 1248.

Generic marks are the names of particular products or services, such as "Liquor Store." These are considered the weakest marks, and are afforded the least protection under the law. 147 F.Supp.2d at 1248. The second weakest marks are descriptive marks, which identify a quality or characteristic particular to the product or service being represented by the mark, such as "Vision Center." Id. Suggestive marks, which are given the next highest protection, suggest characteristics of the services or products and require some degree of imagination on the consumer's part to make a connection between the mark and the product or service, such as "Penguin Refrigerators." Id. Arbitrary or fanciful marks are marks which bear no relationship to the product or service they represent, such as "Sun Bank." Finally, coined marks are words invented to identify a product such as Kodak or Xerox. Freedom Savings and Loan Assn v. Way, 757 F.2d 1176, 1182, n. 2 (11th Cir. 1985), cert. denied, 474 U.S. 845, 106 S. Ct. 134 (1985). Arbitrary, fanciful and coined marks are entitled to the highest level of protection under the law because they are the most distinctive and most likely to be associated by consumers with a particular product or service. Id; 147 F.Supp.2d at 1248.

In Choice Hotels International, Inc. v. Kaushik, supra, your Honor concluded that the marks "Econo" and "Econo Lodge" were descriptive marks because they described the reasonably

priced motel accommodations offered by the plaintiff; "Econo" was a shortened form of "economy." Id. at 1248. *See also* Investacorp, Inc. v. Arabian Investment, *supra* ("Investacorp" was a descriptive mark for investment consulting services); American Heritage Life Insurance Company v. Heritage Life Insurance Company, 494 F.2d 3, 11 (5th Cir. 1974)("Heritage" was descriptive of life insurance services); Day-Brite Lighting, Inc. v. Stay-Brite Florescent Manufacturing Company, 308 F.2d 377, 382 (5th Cir. 1962)("Day-Brite" was descriptive for lighting equipment).

Plaintiffs' marks are descriptive. A descriptive mark describes a characteristic or quality of the product or service and requires little imagination on the part of the consumer to reach a conclusion as to the nature of the product or service being sold. Choice Hotels, 147 F.Supp.2d at 1249. The word "regions" is the plural of the word "region", which is defined as "a specified district or territory". The American Heritage Dictionary 3d Ed. 1994. "Regions" would be several such districts or territories. This definition "describes a characteristic … of the [services]" being offered by plaintiffs, i.e., services offered and available in certain districts or territories. Plaintiffs have numerous branch banks, each of which offers services in a particular territory, or region. Plaintiffs' own description of its company's history describes

26

the reason for the change to "Regions" to "better reflect [the company's] growing presence throughout the South," and because "its footprint had expanded to cover seven states."  The mark is descriptive of the Bank's regional presence.

Evidence of extensive third party use of a word is also probative evidence that the term is descriptive.  Investacorp Inc., 931 F.2d. at 1523.  The numerous federal trademark registrations, state corporate registrations, domain names, and other third party usage of the words "Region" or "Regions" in the sixteen states where plaintiffs offer their services, demonstrate the popularity of these terms and are probative of their descriptiveness.  Id.  In each of these uses, the customer who observes the mark or business name can readily perceive that the goods or services are offered in different territories, or regions, of a state, country, or the world.

2.   Market Strength of Mark

The second part of the test relates to the strength of the mark in the market.  Courts in this circuit have held that common English words, when used as a mark – even where the mark could be characterized as "arbitrary" in connection with the goods or services identified – are "weak" marks and entitled to only limited protection, particularly outside of the uses to which the plaintiff has put its mark.  See Sun Banks of Florida, Inc., 651 F.2d at 316 ("Sun" is word of "common meaning" and a

27

weak mark); Amstar Corp., 615 F.2d at 265 (plaintiff's mark "Domino" was a common English word, and thus a weak mark, even though application to sugar may be arbitrary); Holiday Inns, Inc. v. Holiday Out in America, 481 F.2d 445, 448 (5th Cir. 1973)(common word "Holiday" is of weak trademark significance); Michael Caruso and Co. v. Estefan Enterprises, Inc., 994 F.Supp. 1454, 1459 (S.D. Fla. 1998), aff'd, 166 F.3d 353 (11th Cir. 1998)(plaintiff's mark "Bongo" was common English word which, although arbitrarily applied to retail clothing, was of weak trademark significance).    "The rationale underlying this principle is that courts should not grant the holder of a mark that consists of a common English word a monopoly on that term outside the user's field."  994 F.Supp. at 1459.

Other circuits concur that the adoption of a common English word as a mark generally affords little, if any, protection to the mark holder outside of the services or goods associated with the plaintiff's mark.  See Mead Data Central, Inc. v. Toyota Motor Sales USA, Inc., 875 F.2d 1026 (2nd Cir. 1989)(plaintiff's mark "Lexus" was common English word used by numerous other companies; plaintiff had made mark strong but only within its own market for computer-assisted legal research); Petro Stopping Centers, LP v. James River Petroleum, Inc., 130 F.3d 88 (4th Cir. 1997) cert. denied, 523 U.S. 1095, 118 S. Ct. 156 (1998) (strength of plaintiff's mark "Petro" was confined to field for

which those marks were registered, namely truck stop services;
numerous third party registrations using term "Petro" were
relevant to prove that the mark had a "normally understood and
well recognized descriptive or suggestive meaning," and thus was
"relatively weak."); ALFA Industries, Inc. v. ALFA Steel Tube
and Shapes, Inc., 616 F.2d 440, 445 (9th Cir. 1980)(trial
court's finding that plaintiff's trademark "ALFA" was "weak" was
not clearly erroneous since word was in common usage and had a
meaning in the English language); Major League Baseball
Properties v. Sed Non Olet Denarius, Ltd., 817 F.Supp. 1103,
1119 (S.D. N.Y. 1993), vacated pursuant to settlement, 859
F.Supp. 80 ("common English words, even if used arbitrarily in
application to a user's services, are of weak trademark
significance outside their field of operations").

In addition to the common nature of a word, extensive third
party uses and registrations of the mark dilute the strength of
the mark. Sun Banks of Florida, Inc., 651 F.2d at 316-17;
Amstar Corp., 615 F.2d at 259-60 ("the greater the number of
identical or more or less similar trademarks already in use on
different kinds of goods, the less is the likelihood of
confusion ... .")(quoting Rest. of Torts 2d, § 729, com. g).
"Third party usage of the mark is inversely related to its
strength; the more the mark is used by third parties, the weaker

it is considered to be." Choice Hotels International, Inc. v. Kaushik, 147 F.Supp.2d at 1248; see Frehling, 192 F.3d at 1336.

Thus, in Amstar Corp. v. Domino's Pizza, *supra*, some 72 third party registrations of the mark "Domino" in the U.S. Patent Office, for various kinds of products, as well as some 15 third party uses of the "Domino" mark from 1885 until the present, including a line of cigarettes, a couple of restaurants, a small chain of supermarkets and a doughnut mix, were sufficient to demonstrate the weakness of the mark outside of the plaintiff's line of sugars and related food products. *See also* Armstrong Cork Co. v. World Carpets, Inc., 597 F.2d 496 (5th Cir. 1979), *cert. denied*, 444 U.S. 932, 1005 S. Ct. 277 (1979) (existence of 85 different carpet companies using "World" in their business names militated against finding of likelihood of confusion between plaintiff's mark "World Carpets" and competitor's mark "Armstrong World Industries"); Michael Caruso and Co., 994 F.Supp. at 1459 (plaintiff's mark "Bongo" for clothing was weak where some 75 other businesses used "Bongo" or "Bongos" in their marks, and numerous state and federal trademark registrations incorporated those terms).

Extensive use of a similar word in domain names can also work to dilute the strength of a mark. *See, e.g.,* Data Concepts, Inc. v. Digital Consulting, Inc., 150 F.3d 620, 625 (6th Cir. 1998); Gulf Coast Commercial Corp. v. Gordon River

30

Hotel Associates, 2006 WL 1382072 (M.D. Fla. May 18, 2006);
First Franklin Financial Corp. v. Franklin First Financial
Limited, 356 F.Supp.2d 1048 (N.D. Cal. 2005).

Third party use of a mark serves to weaken a mark, even if
it is "incontestable," and thus presumptively valid. Frehling
Enterprises, Inc., 192 F.3d at 1336; see Alltel Corporation v.
Actel Integrated Communications, Inc., 42 F.Supp.2d 1265, 1271,
n. 7 (S.D. Ala. 1999); Carnival Corporation v. Sea Escape Casino
Cruises, Inc., 74 F.Supp.2d 1261 (S.D. Fla. 1999); Michael
Caruso and Co., 994 F.Supp. at 1459. Although a mark's
incontestable status can enhance its strength, see Dieter v. B&H
Industries of S.W. Fla., Inc., 880 F.2d 322, 329 (11th Cir.
1939), cert. denied, 498 U.S. 950, 111 S. Ct. 369 (1990), its
presumed strength does not extend beyond the field for which the
mark was registered. See Savin Corp. v. Savin Group, 391 F.3d
439, 457 (2nd Cir. 2004), cert denied, 546 U.S. 822, 126 S. Ct.
116 (2005).

In the present case, the plaintiffs have chosen a mark to
identify their banking services which is not only an extremely
common English word but also a word widely used by a great
variety of businesses and other organizations throughout
plaintiffs' sixteen state footprint.

Filings with the Secretaries of State reflect that more
than 160 corporations and LLCs have employed the word "Region"

or "Regions" in their business name, without reference to a particular geographical region (such as "River Regions"). Independent investigation has confirmed the current public use of many of these names by active businesses. These include construction companies, real estate companies, an airline, an oil and gas business, a propane company, a pest control company, title companies, restaurants, a moving and storage company, non-profit ministries, hospitality management, security services, insurance service. a battery recycling business, and many others. A modular carpet tile is also sold under the name "Region." (Stricklin Affidavit).

At least 13 third party applications for the mark "Region" or "Regions" have either been registered or approved for publication by the USPTO. This is a subclass of marks where the word "Region" or "Regions" is used without other modifiers to the word, such as "First" Region or "River" Regions. A search of the term "Region" or "Regions," used in any capacity in any live mark, retrieves a listing of some 61 live marks, other than the plaintiffs' marks. *See* Ex. "A" attached hereto.

Finally, hundreds of active domain names include the word "Region" or "Regions" and identify numerous businesses using those words in their name, without reference to a particular geographical area. (Holder Affidavit).

If the word "Domino" was a weak mark outside the mark owner's line of sugar products, even though arbitrarily used, due to some 15 third party uses and some 72 third party registrations, *see* Amstar Corp. v. Domino's Pizza, *supra*, then certainly the plaintiffs' mark "Regions," used descriptively, is a very weak mark outside the banking and financial services sector, given the foregoing evidence of third party registrations and use.

B.    The Second Factor:  The Similarity of the Marks

Under this factor, the Court compares the marks and considers the overall impression that the marks create, including the sound, appearance and manner in which they are used.  Frehling, 192 F.3d at 1337.

Where the mark is weakly protected to begin with, minor alterations can effectively negate any confusing similarity between the two.  Freedom Savings, 757 F.2d at 1183; Sun Banks of Florida, 651 F.2d at 316.

In this Circuit, the mere fact that both marks incorporate the same word does not make the marks similar, even where one of the marks is only that one word.  *See* Freedom Savings and Loan Association v. Way, *supra* ("Freedom Realty" and "Freedom Savings and Loan Association" were not similar); Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d at 260 ("Domino's Pizza" not similar to "Domino"); Michael Caruso and Company v. Estefan

33

Enterprises, Inc., *supra* ("Bongo" and "Bongos Cuban Café" not similar); Bell Labs, Inc. v. Colonial Products, Inc., 644 F.Supp. 542, 547 (S. D. Fla. 1986)("Final Flip" and "Flip" marks not similar).

The consistent and repetitive use of a distinctive logo serves to distinguish the mark from others. *See* Choice Hotels, 147 F.Supp.2d at 1250. "The greater the recognition of a logo, the more likely the average consumer will recognize differences from it." Id.

First of all, plaintiffs' mark, REGIONS BANK, clearly differs from Defendant's mark, REGIONS UNIVERSITY, in sight, sound, and meaning. The use of the words "Bank" and "University" in the respective marks explicitly indicates to consumers very different kinds of services associated with each. These two words ("Bank" and "University") also have significant differences in sight, sound, and meaning. The word "Bank" has one syllable and four letters. The word "University" has five syllables, more syllables than the number of letters in the word "Bank", and ten letters, more than double the number of letters in the word "Bank". The only common letter between these two words is the letter "n". In sight, and sound, the differences between these words are obvious and significant.

Further, plaintiffs and defendant each use their marks in connection with differing color schemes and logos. Plaintiffs

have historically stylized the mark, REGIONS BANK, as well as
the mark, REGIONS, in one of several ways: (1) with a double-
tailed "g" on the word Regions (Ex. 2), (2) with a three-leaved
plant emblazoned on a triangle either at the end of the word or
directly above it (Ex. 3) and, currently, (3) with four spikes
of a sunburst dividing a triangle located beside the mark (Ex.
103).    In contrast, defendant uses a stylized "V" in
"University" that carries a flying banner across the top of the
letter and is usually accompanied with a globe design logo
preceding the mark, REGIONS UNIVERSITY (Ex. 75), which
communicates a global reach to defendant's services.    The
plaintiffs use shades of green on their current mark (Ex. 103)
and defendant uses a red color scheme (Ex. 75).    These
differences in the shape, color and meaning of the logos are
significant, and since the primary word in the marks has weak
trademark significance, these differences are sufficient to
negate any confusing similarity between the marks.    Freedom
Savings and Loan Assn v. Way, *supra*.

    The plaintiffs' mark, REGIONS, without the word "BANK", is
also sufficiently different from defendant's mark "Regions
University" so as to negate any confusing similarity.    The
plaintiffs consistently and pervasively use the mark, REGIONS,
with one of the same logos or stylizations described above.
Thus, the overall impression of the mark, REGIONS, has the same

major differences from defendant's mark, as discussed above. Finally, given the weakness of the term, REGIONS, even minor variations, such as the addition of another word ("university"), are sufficient to negate any confusing similarity. Plaintiffs' success in achieving a degree of public recognition of its mark with accompanying logo design serves to make recognizable any variations from it. *See* Choice Hotels Int'l v. Kaushik, *supra*.

The dissimilarity of the marks finds further support in the conclusion of the examining USPTO attorney who approved for publication the defendant's application for trademark registration of the mark "Regions University" for educational services. After conducting a thorough search of the records, the examining attorney found "no similar registered or pending marks" that would bar registration of the defendant's application. *See* Certified copy of Trademark Application File 78/944966. Such evidence is probative of the lack of similarity of the marks. *See* Amstar Corp., 615 F.2d at 261 (trademark examiner's search and determination, after plaintiff had registered its mark, that defendant's mark was not confusingly similar to any registered mark supported finding that marks were dissimilar).

In summary, the only commonality between plaintiffs' and defendant's marks is that they both share the common English word "Regions," a word used by many other businesses for many

36

other goods and services.  In all other respects, the marks are distinguishable and dissimilar.

C.  <u>The Third Factor:  Similarity of the Goods/Services</u>

This factor requires a determination as to whether the products are the kind that the public attributes to a single source.  <u>Frehling Enterprises, Inc.</u>, 192 F.3d at 1338.  The test is "whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods."  <u>Id</u>.

In <u>Trustees of Columbia University v. Columbia/HCA Health Care Corporation</u>, 964 F.Supp. 733 (S.D. N.Y. 1997), Columbia University brought an action against the operator of numerous hospitals using the mark "Columbia," alleging infringement of its federally registered "Columbia University" mark, for educational services.  The court concluded that the plaintiff could not prevail.  Among other things, it found the services rendered by the parties distinguishable.  Although the plaintiff operated a medical school, and also had an affiliation with hospitals in the area, this did not change the nature of the plaintiff's services.  The plaintiff did not provide health care services and did not have a license to practice medicine.  On the other hand, the defendant was a licensed provider of medical and health care services and not an educational institution. <u>Id</u>. at 746.

37

The dissimilarity between the services provided by the parties in a trademark infringement action "weighs heavily" in favor of the defendant. _Western Publishing Company v. Rose Art Industries, Inc._, 910 F.2d 57, 62 (2nd Cir. 1990). Indeed, where products are so dissimilar that no reasonable person could be confused, no question of fact is presented on the issue of likelihood of confusion. _Resource Developers, Inc. v. Statute of Liberty-Ellis Island Foundation, Inc._, 926 F.2d 134, 141 (2nd Cir. 1991); _Moore Business Forms, Inc. v. Rite Aid Corp._, 21 USPQ 2nd 2024, 2028 (W.D. N.Y. 1991) ("Products that Moore markets under its COMPURITE mark and the products that Rite Aid markets under its CompuRITE mark are so dissimilar that this alone is supportive of Rite Aid's motion for summary judgment."), _modified on other grounds_, number 90-CV-1211E, 1992 WL 125561 (W.D. N.Y.), _aff'd_, 983 F.2d 1048 (2nd Cir. 1982). Courts uniformly reject claims of infringement, even for identical marks, where the goods or services are unrelated. _See, e.g._, _HBP, Inc._, 290 F.Supp.2d at 1333 ("The use of similar marks does not constitute infringement if the products at issue are unrelated.")(and cases cited therein); _Beneficial Corp. v. Beneficial Capital Corp._, 529 F.Supp. 445 (S.D. N.Y. 1982)(BENEFICIAL for consumer loans not confusingly similar to BENEFICIAL for business loans); _Scott v. Mego International, Inc._, 519 F.Supp. 1118 (D. Minn. 1981)(MACRONAUTS for toys not

38

confusingly similar to MACRO NAUTS for hobby items); Schoenfeld Industries, Inc. v. Brittania Sales Ltd., 512 F.Supp. 979 (S.D. N.Y. 1981)(BRITTANIA for blankets, sheets and pillow cases not confusingly similar to BRITTANIA for wearing apparel); Dunfee Hotels Corp. v. Meridian Hotels Investment Group, Inc., 504 F.Supp. 371 (S.D. N.Y. 1980)(PARKER HOUSE for apartment services not confusingly similar to PARKER HOUSE for hotel services).

Indisputably, the financial services provided by the plaintiffs and the educational services provided by the defendant are completely unrelated. Consumers are unlikely to assume that a bank is operating a university or vice versa. The plaintiffs are not licensed under the laws of any states to operate a post-secondary institution and, indeed, as a banking institution, are disabled from doing so. A bank is a quasi-public corporation subject to state regulation and supervision and is not entitled to the same freedom of operation as ordinary corporations. Security Trust and Savings Bank v. Marion County Banking Company, 287 Ala. 507, 253 So.2d 17, 21 (1971); see Patrick v. Union State Bank, 681 So.2d 1364, 1396 (Ala. 1996)(quoting Security Trust and Savings Bank v. Marion County Banking Company, approvingly); 10 AmJur 2d Banks and Financial Institutions, § 597 ("It appears to be the policy of the law that banks are not allowed to exercise functions not strictly authorized by the law."). A bank can exercise no power that is

39

not granted to it by statute.   253 So.2d at 21.   None of the
powers listed under the Alabama statute enumerating the powers
of a bank has anything to do with the operation of an
educational institution.  *See* Section 5-5A-18, <u>Code of Ala</u>.

 D. <u>The Fourth Factor:   Similarity of the Parties'
   Retail Outlets and Customers</u>

 "Dissimilarities between the retail outlets for and the
predominant customers of plaintiff's and defendant's goods
lessen the probability of confusion, mistake or deception."
<u>Frehling Enterprises, Inc.</u>, 192 F.3d at 1339 (quoting <u>Amstar
Corp. v. Domino's Pizza, Inc.</u>, *supra*).

 The parties' retail outlets, or trade channels, are
completely dissimilar.   The plaintiffs provide financial
services through numerous branch offices located within some
sixteen states.   The defendant operates a single campus in
Montgomery, Alabama and a facility that it rents in Nashville,
Tennessee.  Most of its educational services are supplied to its
students online.

 There may be some overlap in the potential customer base,
to the extent defendant draws students from the sixteen state
region.   Nonetheless, plaintiffs and defendant are offering
completely different services to that customer base.

 E. <u>The Fifth Factor:  Similarity of Advertising Media</u>

Although in the literal sense, the parties advertise in the same types of media (television, radio, signs, print advertisement, and internet), it is the marketing methods used by the respective parties which should be considered in determining this factor. Choice Hotels, 147 F.Supp.2d at 1251. The style and content of the advertising should also be considered. Id. at 1252.

While both parties advertise and market their respective services through their respective websites, the method of marketing differs substantially. Defendant markets through the top level ".edu" domain, reserved only for post-secondary institutions that are accredited by an agency on the U.S. Department of Education's list of nationally recognized accrediting agencies. Plaintiffs are prevented from using the ".edu" top level domain, unless Plaintiffs were grandfathered in before the October 29, 2001, U.S. Department of Education limitations for .edu applicants. See www.educause.edu. Thus, although the parties both use the internet, the methodology used guarantees differentiation, not confusion.

Nor is the content of the parties' advertising media substantially similar in any way. All of Defendant's advertising is directed to post-secondary education. None of Plaintiffs' advertising is devoted to this purpose. The parties' respective advertisements carry slogans and tag lines

41

that are completely disparate in their meaning and impression, plaintiff using the slogan "It's time to expect more" (Peters depo. at pp. 129-30), and defendant describing itself as "A Christian University" and "Where traditional and online education merge." (Exs. 19, 44, 47, 69, 70, 75).

> F.    The Sixth Factor:   Whether Defendant Had Intent
>        to Infringe

To determine whether a defendant has acted in bad faith, a court must examine "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and good will and any confusion between his and the senior user's product." Michael Caruso and Co., 994 F.Supp. at 1462 (quoting The Sports Authority, Inc. v. Prime Hospital Corp., 89 F.3d 955, 964 (2nd Cir. 1996)). "Good faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relief on the advice of counsel." Id. (quoting WWW Pharmaceutical Company, Inc. v. Gillette Company, 984 F.2d 567, 575 (2nd Cir. 1993)).

In the present case, contemporaneous minutes of confidential board meetings and team committee meetings reflect numerous individuals involved in a good faith search for a new name for the University without any evidence of an intent to capitalize on the plaintiffs' reputation. A name was finally

chosen that reflected the mission of the school to go into all the "regions" of the world and its nature as a distance learning institution reaching students in all "regions" of the United States and beyond. Defendant hired trademark counsel to do a trademark search and relied upon the opinion of that counsel that the name was registerable. The fact that defendant's Board members were aware of the existence of Regions Bank is not sufficient evidence of an intent to adopt its mark in bad faith. *See* Amstar Corp., 615 F.2d at 263 (adoption of "Domino's Pizza" mark with knowledge of plaintiff's use of "Domino" did not reflect an intent to deceive); Caruso and Company, 994 F.Supp. at 1462. Even when, at the last minute, a Board member mentioned his knowledge of an employee training program at Regions Bank described as "Regions University," this information prompted an immediate phone call to trademark counsel who provided an opinion that such an internal training program would pose no problem to the registerability of the defendant's new mark. Such evidence is consistent with good faith, rather than bad faith, in the adoption of the mark.

    G.   The Seventh Factor:  Actual Confusion

This factor relates to existence of actual confusion by potential customers or others, such as suppliers or investors, whose confusion could affect the commercial interests of the plaintiffs. American Television and Communications Corp. v.

43

American Communications and Television, Inc., 810 F.2d 1546, 1550 (11th Cir. 1987)(discounting plaintiff's evidence of actual confusion which did not involve consumers, suppliers, or members of investment community); *see* Sun Banks of Florida, Inc., 651 F.2d at 319 (discounting remarks of confusion reported by plaintiff's employees which were not made by potential customers; Freedom Savings & Loan Association v. Way, 757 F.2d at 1185 (testimony of plaintiff's president as to inquiries from friends was properly discounted where none of friends were identified as "potential customers"); Choice Hotels, 147 F.Supp.2d at 1255 (confusion of emergency personnel was "significantly less probative" of the pertinent confusion, i.e., that of customers).

Although actual confusion of customers can often be the best evidence of likelihood of confusion, "short lived confusion" is "worthy of little weight." American Television and Communications Corp., 810 F.2d at 1550 (quoting Safeway Stores, Inc. v. Safeway Discount Drugs, Inc., 675 F.2d 1160, 1167 (5th Cir. 1982)); *see* Armstrong Cork Company, 597 F.2d at 506 (testimony of two businessmen upon learning of Armstrong's proposed name change, that they entertained "short lived impressions" that Armstrong had acquired or merged with World, was insufficient to tip scales in favor of World on issue of actual confusion).

This discounting of "short lived confusion" is similar to the principle that initial confusion, occurring immediately upon the first publication or advertisement of the allegedly infringing mark, is generally of little probative value. Thus, in Chase Federal Savings & Loan Association v. Chase Manhattan Financial Services, Inc., 681 F.Supp. 771, 786-87 (S.D. Fla. 1987), the trial court discounted the evidence of actual confusion which occurred when the defendant first placed its advertisements in Florida after beginning to maintain offices in Florida. The Court observed that "this confusion may well have occurred before people had time to assimilate the entry of defendant's name into the Florida financial community." Id. at 786 (citing Bank of Texas v. Commerce Southwest, Inc., 741 F.2d 785 (5th Cir. 1984); see Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1207 (1st Cir. 1983)("Temporary" confusion was "de minimus" and not sufficient to raise a genuine issue of fact relating to the likelihood of confusion); First National Bank in Sioux Falls v. First National Bank, South Dakota, 153 F.3d 885, 890 (8th Cir. 1998)("Isolated evidence of some actual confusion occurring initially upon the creation of a potentially confusing mark is not itself sufficient to establish a likelihood of confusion").

Another kind of "confusion" evidence is customer inquiries as to whether the plaintiff and defendant are affiliated or

45

connected.    Most   courts   have   concluded   that   an   inquiry   about
affiliation  reveals  that  the  questioner  was  not  "confused,"  but
had  the  difference  in  mind;  otherwise  he  would  not  have  bothered
even   to   inquire.    *See*   <u>McCarthy   on   Trademarks</u>,   §   23:16;
<u>Restatement  of  Unfair  Competition</u>,  §  23,  Comment  c.    As  the
Second  Circuit  has  observed:

> "Inquiries  about  the  relationship  between  an
> owner  of  a  mark  and  an  alleged  infringer  do
> not  amount  to  actual  confusion.    Indeed,
> such  inquiries  are  arguably  premised  upon  a
> lack  of  confusion  between  the  products  such
> as  to  inspire  the  inquiry  itself."

<u>Nora  Beverages,  Inc.  v.  Perrier  Group  of  America,  Inc.</u>,  269  F.3d
114  (2nd  Cir.  2001);  *see*  <u>Fisher  Stoves,  Inc.  v.  Allnighter  Stove</u>
<u>Works</u>,   626   F.2d   193,   195   (1st   Cir.   1980)(questions   about
affiliations  of  two  companies  indicate  the  customers  were  aware
of  different  product  sources);  <u>Gruner  &  Jahr  USA  Publishing  v.</u>
<u>Meredith  Corp.</u>,  991  F.2d  1072  (2nd  Cir.  1993)("It  was  proper  for
the  trial  court  to  consider  this  testimony  not  as  evidence  of
actual  confusion  but  rather  as  showing  only  queries  into  the
possible  relationship  between  the  parties'  publications").

    After  collecting  the  case  law  in  this  area,  Professor
McCarthy  concludes:

> "The   better   view   is   that   while   inquiry
> evidence   is   admissible   and   relevant,
> standing  alone  with  no  other  evidence  it  is
> insufficient  proof  of  actual  confusion."

McCarthy on Trademarks, § 23:16; *see* Jordache Enterprises, Inc.
v. Hogg Wyld, Ltd., 828 F.2d 1482, 1487 (10th Cir. 1987) (holding
that inquiries to plaintiff as to whether defendant's product
was affiliated with plaintiff was of "comparatively little
value" even when combined with other evidence; citing McCarthy
§23:16 approvingly).

Another factor that has influenced the courts in analyzing
evidence of actual confusion, and which works to discount the
weight of such evidence, is sophisticated purchasers who can be
deemed to have enough discrimination to avoid being confused.
*See* Checkpoint Systems v. Checkpoint Software Technologies, 269
F.3d 270, 298 (3rd Cir. 2001); American Television and
Communications Corp., 810 F.2d at 1550. Consumers of banking or
educational services are considered to be discriminating. *See*
First National Bank of Sioux Falls v. First National Bank of
South Dakota, 153 F.3d 885, 889 (8th Cir. 1998)(noting that
consumers "tend to exercise a relatively high degree of care in
selecting banking services"); Sears Roebuck & Co. v. Allstate
Driving School, 301 F.Supp. 4 (S.D. N.Y. 1969)("Driving
instruction is not inexpensive, and it would be unreasonable to
assume that purchasers of such instruction make hasty decisions
merely upon seeing the name of the school.").

The courts also consider the number of inquiries or reports
of confusion in relation to the overall number of transactions

47

which are handled by the parties when considering whether or not the confusion is significant. *See* Therma-scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 635 (6th Cir. 2002)(six confused customers were "legally insignificant" in light of scale of defendant's operations); Sun Banks of Florida, Inc., 651 F.2d at 319 (amount of past confusion was "negligible" in light of number of transactions conducted and extent of parties' advertising).

The Eleventh Circuit has also identified the following additional factors as discounting the weight of confusion evidence:

> (1) The fact that the plaintiff's mark is not particularly distinctive and is often used in corporate names in the industry;

> (2) The lack of direct competition between the parties;

> (3) The fact that the confusion did not result in any loss of sales.

American Television & Communications Corp., 810 F.2d at 1550.

Finally, evidence of consumer confusion introduced through testimony of employees of a party is generally either inadmissible as hearsay or entitled to little weight and considered unreliable given the lack of available cross-examination of the purportedly confused person, the varying inferences that can be drawn from the testimony as to such out-of-court statements, and the interested nature of the affiant as

48

an employee of a party.  *See* Holiday Inns, Inc., 481 F.2d at 448-49 (discounting testimony of plaintiff's vice president as to others' confusion); Freedom Savings and Loan, 757 F.2d at 1185 (discounting testimony of plaintiff's president as to inquiries from friends).  Vague testimony by parties as to confusion by unidentified customers is of little weight.  *See* Choice Hotels, 147 F.Supp.2d at 1254.

Plaintiffs have no competent evidence of actual confusion by potential customers of either the plaintiff or the defendant. In response to discovery, plaintiffs have produced a series of e-mails sent from various Regions employees to Russell Dunman, another Regions employee, in which the employees describe to Mr. Dunman conversations they have had with friends, neighbors, or other employees inquiring about possible affiliations between Regions Bank and Regions University.  These e-mails are, of course, hearsay upon hearsay and not admissible evidence of actual confusion by anyone, let alone potential customers.

The Bank has also produced a series of ten affidavits, nine of which are signed by banking employees, describing the questions that arose either in their own mind or in the mind of other Bank employees with whom they spoke when they first learned of the name change to Regions University through television and/or radio advertisements.  In each case, the affidavits indicate that the one having a question about a

possible relationship was shortly advised or learned otherwise through discussions with the affiant or another Bank employee or doing a Google search.  None of the affiants describes any inquiries by customers except for one affiant who testifies of other employees telling him of certain unidentified customer inquiries, clearly inadmissible hearsay, and so vague, in any event, as to be discreditable.

Only one affidavit, that of Jack Galassini, is a non-Regions Bank employee.  Mr. Galassini is a current customer of Regions Bank and a long time acquaintance of Russell Dunman, an officer at Regions Bank in Montgomery, Alabama.  He testifies that he became aware of Southern Christian University changing its name to Regions University through television advertisements and that "when I first heard about Regions University, I thought that the school had some type of relationship with Regions Bank and was curious about this."  Shortly thereafter, however, he asked Mr. Dunman about this and was advised that there was no affiliation between Regions Bank and Regions University.  This is nothing but short-lived, initial "curiosity," not actual confusion.

Russell Dunman has testified of his conversation with Jack Galassini as well.  This is the only conversation he has had with a specific person, that he recalls, about a possible

affiliation between Regions Bank and Regions University (Dunman depo. at p. 96).

Defendant has produced, in response to discovery, two e-mails received immediately after announcement of the name change, one from a former student and one from a professor from another university inquiring (one apparently jokingly) about a possible relationship to the Bank. (Turner depo. at 172-77, 196-97; Ex. 35). Neither is evidence of customer confusion and both indicate simply an inquiry as to possible affiliation, at best, when the name change was first announced.

To Dr. Turner's knowledge, no one else has asked whether Regions Bank has made a donation to Regions University. (Turner depo. at p. 199). Except for one or two occasions when certain individuals kidded him about changing the name because Regions Bank must have given money, and two telephone calls identified in response to plaintiffs' interrogatory number 13,[3] Dr. Turner was not aware of any other inquiries about an affiliation between Regions University and the Bank. (Defendant's Response to Plaintiff's Interrogatory Number 13; Turner depo. at pp. 179-80, 193-94). He recalls no other reports from others at the

---

[3] The University's responses to Interrogatory Number 13, requesting each instance where a person inquired as to a relationship, association or connection between the plaintiff and the defendant, identifies two telephone calls concerning degree programs and inquiring as to whether there was any affiliation of the University with Regions Bank. These callers did not identify themselves and did not state what had prompted their inquiry. (Deposition of Anita Crosby at pp. 89-92). One other suspicious "blocked" call was recently received from someone with a whole series of questions about affiliation with Regions Bank and who refused to identify herself. (Crosby depo. at pp. 93-94). These are the only inquiries received, according to Ms. Crosby who was responsible for polling the operators. (Crosby depo. at pp. 92-93). She has received no other inquiries herself nor has she been made aware of any from other employees. (Crosby depo. at pp. 94-95).

school indicating that people had approached them and asked about an affiliation. (Turner depo. at pp. 195-96).

Laina Costanza, the website designer for Regions University, and the one responsible for marketing the University, has had no one ask her about an affiliation between the Bank and the University and has not heard of anyone else inquiring about such an affiliation. (Costanza depo. at pp. 10, 15, 132).

In summary, no competent evidence exists of actual confusion by potential customers of either the Bank or Regions University as a result of defendant's adoption of its new name. Most of the evidence concerns inquiries by Bank employees, those most fortified, by their association with the Bank, against any actual confusion that might be injurious to the Bank's commercial interests. If any customers made inquiries, they are unidentified. At best, the evidence shows a kind of "short lived confusion" arising upon first publication of the new mark before people had had time to assimilate the change of name. Further, at best, the evidence consists of inquiries about potential affiliation, indicative of a distinction in the mind of the questioner, rather than confusion. The high degree of care which customers tend to use in selecting either banking or educational services, precludes any real possibility of confusion in the purchase of these services. Furthermore, the

52

extremely high quantity of transactions that occur on a daily basis among all Regions banks, as compared to the scantiness of any evidence of actual customer confusion, makes such evidence legally insignificant.  There is no evidence that any confusion resulted in any loss of business to the Bank.  No competition exists between the parties.  Finally, plaintiffs' mark is not particularly distinctive and is often used in other business names throughout the sixteen state region.  The choice of such a common word always "entails some risk of uncertainty and confusion;" the law of trademark "will not assure absolute protection" against such risks.  E. R. Squibbs & Sons, Inc. v. Princeton Pharmaceutical, Inc., 1990 WL 272707, *8 (S.D. Fla. Sept. 4, 1990)(quoting Scott Paper Company v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1231 (3rd Cir. 1978)).

In summary, the evidence of actual customer confusion is either non-existent or so insignificant as to be negligible. Indeed, the paucity of such evidence raises a presumption against the likelihood of confusion in the future.  Amstar Corp., 615 F.2d at 263.

II.  No Trademark Infringement Claim Can Be Based Upon the Plaintiffs' Internal Corporate Training Program Which Adopts the Name "Regions University"

Plaintiffs may argue that their prior use of the name "Regions University" for its internal corporate training program serves as the basis for its claim of infringement against the

defendant.  Such an argument would be meritless.  This mark does not identify a service performed for the benefit of others but is merely incidental to the Bank's own business and thus cannot be validly protected as a trademark.  Moreover, there is simply no possibility of confusion because the only persons knowledgeable of both names would be Regions Bank employees who are deemed to know the difference.  Finally, plaintiffs should be estopped from seeking to enjoin the operation of a post-secondary educational institution on the basis of its mark "Regions University" for its internal training program where the plaintiffs have no lawful basis for using any such term in commerce or before the public.

> A.  Plaintiff Can Have No Valid Service Mark For Its Internal Training Program Which is for Its Own Benefit and Not Sufficiently Separate From the Furnishing of Its Financial Services to the General Public

In order for a "service" to qualify for service mark protection, the activity must be for the benefit of someone other than the applicant and must not be merely incidental or necessary to the applicant's larger business, i.e., "the activity performed must be qualitatively different from anything necessarily done in connection with the sale of goods or the performance of another service."  In Re Landmark Communications, Inc., 204 USPQ 692, 1979, WL 24901 (TTAB 1979); Trademark Manual of Examining Procedure, (TMEP) § 1301.01(a) (2d Ed.

54

1997)(setting forth criteria for defining a "service" within the meaning of the Lanham Act). In other words, where the provision of services are "insufficiently separate" from the sale of the applicant's goods or services, they cannot serve as the foundation for a registration of a trademark.

The conduct of a contest to advertise and promote the sale of one's goods and services is not a "service" within the meaning of the Lanham Act and thus not registerable. *See* In Re Dr. Pepper Co., 836 F.2d 508 (Fed. Cir. 1987). The repair or replacement of one's own merchandise or "guaranteeing" such repair is not a registerable "service" because it is normally expected by purchasers from the seller of goods. In Re O'Ryan Research, Inc., 523 F.2d 1398 (CCPA 1975); In Re Lowe's Theaters, Inc., 179 USPQ 126 (TTAB 1973). A newspaper is not entitled to a service mark which is simply the name of one of the sections regularly appearing in that newspaper. In Re Landmark Communications, Inc., 204 USPQ 692, 696 (TTAB 1979). "Such activities are clearly performed for oneself, not offered to others." In Re Dr. Pepper, 836 F.2d at 511.

If the services offered by the employer redound primarily to the employer's own benefit, the services are not "for the benefit of other," even though there may some tangential benefit to others. Thus, "a company that sets up a personnel department to employ workers for itself is merely facilitating the conduct

of its own business, while a company whose business is to recruit and place workers for other companies is performing employment agency services." TMEP § 1301.01(a)(ii). "The controlling question is who <u>primarily</u> benefits from the activity for which registration is sought. <u>Id</u>.

The plaintiffs' provision of in-house training to its employees is not "sufficiently separable" from the provision of Regions Financial Services to its customers so as to give it valid trademark rights in its mark "Regions University." The training of its employees is a necessary adjunct to the provision of its financial services. Its purpose is to increase the competency of the Bank's workforce. Because the plaintiffs are the ones who "primarily benefit" from the training, this corporate training program is not a "service" which can serve as the basis for a valid trademark.

> B.  <u>There Can Be No Likelihood of Public
> Confusion Between an Internal Corporate
> Training Program and a Post-Secondary
> Educational Institution</u>

In order to prove the first element of a trademark infringement claim – that the plaintiffs had "prior rights to the mark at issue" – the claimant must show actual prior "use in commerce." See 15 U.S.C. § 1125(a)(1). Use sufficient to establish common law trademark rights must be "sufficiently public to identify or distinguish the marked goods in an

appropriate segment of the public mind as those of the adopter of the mark." <u>American Heritage Life Insurance Company v. Heritage Life Insurance Company</u>, 494 F.2d 3 (5th Cir. 1974)(intracorporate uses of word "Heritage," among agents, employees and selected shareholders of company, did not amount to service mark usage). The "appropriate segment" of the public mind must be those in a position to be potentially confused by the respective marks. *See* <u>McCarthy on Trademarks and Unfair Competition</u>, § 19:116 ("a party should have to prove with relative clarity prior use of its mark sufficient to bring about a likelihood of confusion with its opponent's use").

In the present case, there is no such overlap. The only persons even aware of the plaintiffs' internal corporate training program are their own employees. This segment of the public is not susceptible to any likelihood of confusion that would be actionable. They, of all people, would certainly know that they could not obtain the corporate training from any other source than their own employer and they, upon inquiry, would know that their employer is not affiliated or associated with defendant's university. Any other segment of the public would be ignorant of the Bank's training program and, of course, would not even have access to it if they learned about that program.

The complete dissimilarity of the services and the lack of any likelihood of confusion is also demonstrated by the action

taken by the USPTO when the plaintiffs, after initiating this litigation, applied for federal registration of the mark "Regions University" for "educational services, namely, employee training programs and courses in the field of banking services and distribution of course materials in connection therewith." *See* Certified copy of Trademark Application 77/098922. After the search of the office records, including the pending application by defendant for its mark "Regions University," "for educational services, namely providing courses and programs of instruction at the higher education level ...," the trademark examining attorney found "no similar registered or pending mark which would bar registration under the Trademark Act," and approved the application for publication. *See* certified Trademark Application 77/098,922, Examiner's Amendment, and Affidavit of Jean E. Patterson filed herewith. Clearly, the examining attorney found the marks not so similar as to bar registration, even though they contained the same words, because of the completely disparate nature of the educational services being offered, one being a purely internal employee training program and the other a publicly advertised post-secondary educational institution.

> C.  The Doctrine of Estoppel and/or Unclean Hands Should Bar the Plaintiffs from Employing Their "Regions University" Mark as a Basis for a Trademark Infringement Claim Where They Are Not Authorized to Operate a

University and Where They Could Not Even
Legally Use the Name "University" in Many of
the States Where They Do Business

It is well settled that "no trademark rights can be acquired in a trademark that is deceptive or deceptively misdescriptive." R. Newman and Company v. Overseas Shipments, Inc., 326 F.2d 786, 788 (CCPA 1964). See Worden and Company v. California Fig Syrup Company, 187 U.S. 516, 23 S. Ct. 161 (1903). This is an application of the doctrine of unclean hands. See Shattel Corp. v. Mao Ta Lumber and Yacht Corp., 697 F.2d 1352, 1355 (11th Cir. 1983).

None of the plaintiffs is licensed in any state to operate a post-secondary institution. In a number of states where they do business, they would be proscribed from even using the word "university" the name of their employee training program and certainly could not advertise as such. See Section 49-7-2007(4), Tennessee Code; Section 20-3-250.7(b), Georgia Code; Section 61.3.13(c), Texas Education Code; Section 23-276.10, Code of Virginia; Section 1005.03(4), Florida Code; Section 59-58-60, South Carolina Code. Moreover, state statutes generally regulate the powers of banks, and would not authorize a bank to operate a post-secondary educational institution. See, e.g., § 5-5A-18, Code of Ala.

Given the statutory and regulatory proscriptions against the plaintiffs, in operating a post-secondary institution in any

59

of the states in which they do business, they should be precluded, by such equitable doctrines as estoppel and unclean hands, from seeking an injunction in equity on the apparent basis of a likelihood of confusion between the name they have chosen for their internal employee training program and the name of a publicly advertised, licensed and accredited university. The plaintiffs cannot do business as a licensed and accredited university. They cannot promote themselves as owning or operating a "university," to the public. In some states, they cannot even make use of the name "university" without meeting licensure requirements for post-secondary institutions. Their mark "Regions University," if used publicly, would be "deceptively misdescriptive," given these legal restrictions. Therefore, plaintiffs simply cannot base their trademark infringement action upon a mark used only for their own internal employee training program.

III. <u>Plaintiffs' Dilution Claims Fail as a Matter of Law</u>

A. <u>Plaintiffs' Mark is Neither Famous Nor Distinctive Under the Federal Trademark Dilution Revision Act</u>

1. <u>Lack of Fame</u>

In October of 2006, the Trademark Dilution Revision Act of 2006 ("TDRA"), HR683, became effective, amending 15 U.S.C. § 1125(c). Under the Act, the owner of a "famous mark that is

distinctive, inherently or through acquired distinctiveness" is entitled to an injunction against a junior user of a mark "that is likely" to cause dilution by blurring or dilution by tarnishment of the famous mark. 15 U.S.C. § 1125(c). The statute defines a mark as famous "if it is widely recognized by the general consuming public of the United States as a designation of the source of the goods or services of a mark's owner." Id. (emphasis added).

In requiring recognition of the mark on a national basis, the TDRA eliminates the concept of "niche" fame among a narrow subset of purchasers or in a limited geographic area, which had been recognized in some cases under the former dilution statute. See Hearing Before Subcommittee on Courts, the Internet and Intellectual Property of the Committee on the Judiciary, House of Representatives on HR 683, 109th Cong. at p. 6, testimony of Ann Gundelfinger (February 17, 2005)("Under the proposed standard [for fame] marks that are famous in a niche product or service market, or that are recognized only in a limited geographic region, will not qualify for federal dilution protection.").

Clearly, the plaintiffs' marks cannot qualify as "famous" marks under the TDRA. The plaintiffs only do business in sixteen states in the South and Midwest regions of the United States. They have no branch offices outside of this sixteen

state region.  They do no advertising in other states (outside
of whatever television coverage their collegiate athletic
sponsorships give them).  (Peters depo. at p. 118).  Plaintiffs
have not, and cannot, present admissible evidence that their
marks are "widely recognized by the general consuming public of
the United States."

### 2.  Lack of Distinctiveness

Assuming, arguendo, the plaintiffs were able to establish
fame throughout the United States, their marks still would not
qualify for protection under the TDRA because they are not
sufficiently "distinctive."

The requirement of distinctiveness is a further important
limitation upon the kinds of marks that can be subject to
dilution.  Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208 (2nd
Cir. 1999), *abrogated on other grounds*, Moseley v. V Secret
Catalogue, Inc., 537 U.S. 418, 123 S. Ct. 1115 (2003).  As the
Second Circuit explained:

> "A mark that, notwithstanding its fame, has
> no distinctiveness is lacking the very
> attribute that the anti-dilution statute
> seeks to protect.  The anti-dilution statute
> seeks to guarantee exclusivity not only in
> cases where confusion would occur but
> throughout the realms of commerce.  Many
> famous marks are of the common or quality-
> claiming or prominence-claiming type-such as
> American, National, Federal, Federated,
> First, United, Acme, Merit or Ace.  It seems
> most unlikely that the statute contemplates
> allowing the holders of such common, albeit

62

> famous, marks to exclude all new entrants.
> This is why the statute grants that
> privilege only to holders of distinctive
> marks."

Id. at 216.

To be capable of being diluted, "a mark must have a degree of distinctiveness and 'strength' beyond that needed to serve as a trademark." Carnival Corporation, 74 F.Supp.2d at 1270 (quoting 3 McCarthy, Trademarks and Unfair Competition, § 24:109); see Restatement on Unfair Competition, § 25, Comment e (majority of courts recognize that a higher degree of distinctiveness is required to support dilution claim than a traditional infringement claim).

Whether a mark is distinctive for dilution purposes depends upon the same factors that measure the strength of a mark for infringement purposes. Mead Data Central, Inc., 875 F.2d at 1030. Trademark dilution claims are generally reserved for arbitrary, coined or fanciful names, that have been added to the human vocabulary, not for words or phrases "in common use." Moseley v. V Secret Catalogue, Inc., 537 U.S. at 429, n. 10, (quoting approvingly from Schecter, "Rational Basis of Trademark Protection," 40 Harv. L. Rev. 813, 831 (1927)). "Suggestive" marks "possess a low level of distinctiveness." EBSCO Industries, Inc. v. LMN Enterprises, Inc., 89 F.Supp.2d 1248, 1264 (N.D. Ala. 2000)(quoting Nabisco v. PF Brands, Inc., 191

F.3d at 215-16); *see* Freedom Savings and Loan, 757 F.2d at 1186-87 (suggestive mark "Freedom" for banking services was not distinctive for dilution claim purposes).

In this Circuit, even arbitrary marks, if commonly used words, are generally "weak" marks outside the field of the goods and services so identified and thus insufficiently distinctive for purposes of a dilution claim against one employing a similar mark in an unrelated category of goods or services. *See* Amstar Corp., 615 F.2d at 265 (finding no dilution, as a matter of law, because, in part, plaintiff's mark "Domino," a common English word, was weak outside of plaintiff's line of food products); Michael Caruso and Company, 994 F.Supp. at 1463 (common word "Bongo," while possibly distinctive in junior women's apparel market, where plaintiff used it, was not sufficiently distinctive to support claim for dilution against owner of mark "Bongo's Cuban Café").

Other circuits concur. *See, e.g.,* Mead Data Central, Inc., 875 F.2d at 1031 (plaintiff's mark "Lexis" was common English word, made strong only within plaintiff's own market for computer-assisted legal research and had no distinctive quality that "Lexus," for line of luxury automobiles, would dilute); Petro Stopping Centers, LP, 130 F.3d at 94 (strength of plaintiff's "Petro" marks were weak outside of field for which marks were registered, i.e., truck stop services, given evidence

that mark had a "normally understood and well-recognized descriptive or suggestive meaning"); Pan American World Airways, Inc. v. Pan American School of Travel, Inc., 648 F.Supp. 1026 (S.D. N.Y. 1986)(plaintiff's trademark "Pan American," was "a use of words of our general vocabulary which others should be free to use to describe their products or services, absent a better showing by plaintiff that it is somehow distinctive to its services.").

The reluctance of courts to recognize a dilution claim brought by the owner of a mark adopting a common English word is informed by the recognition that "others remain entitled to use such words in their primary, lexicographic sense, and this permissible alternative use makes it unlikely that consumers will associate the designation exclusively with the trademark owner." Restatement of Unfair Competition, § 25, Comment e. Thus, in Esquire v. Esquire Slipper Manufacturing Company, 243 F.2d 540 (1st Cir. 1957), the Court agreed with the lower court that the plaintiff, owner of "Esquire" magazine, had no valid cause to complain of the defendant's use of the word "Esquire" as part of its corporate name because it was "not a coined word but one firmly established in the English vocabulary ... ." Id. at 543. The Court noted:

> "We do not think a trader can pluck a word
> with favorable connotations for his goods or
> services out of the general vocabulary and

> appropriate it to his exclusive use no
> matter how much effort and money he may
> expend in the attempt."

Id. at 543.  *See also* Duluth News-Tribune v. Mesabi Publishing
Company, 84 F.3d at 1000 ("Plaintiff cannot expect to acquire
exclusive use, even in a limited area, of the common words
'news' and 'tribune.'    Plaintiff's claim of extensive
advertising does not change this fact."); M-F-G Corp. v. Emra
Corp., 817 F.2d 410, 411 (7th Cir. 1987)(noting that a plaintiff
cannot exclusively appropriate "part of the language that it has
neither created nor enriched, nor deny another party "a natural
description for its products"); Hasbro, Inc. v. Clue Computing,
Inc., 66 F.Supp.2d 117 (D. Mass. 1999)(finding "no calibrated
fairness in awarding Hasbro equitable relief through 'an anti
dilution injunction granting it a nationwide monopoly in the use
of this rather common word' against other companies ...
legitimately using that word in other contexts"); Major League
Baseball Properties v. Sed Non Olet Denarius, Ltd., 817 F.Supp.
at 1119 ("The courts have demonstrated a reluctance to grant a
user or holder of a mark which consists of a word of common
English usage, even a word less commonly used than 'Dodgers,' a
monopoly on that term outside its field.").

Marks also lack the necessary distinctiveness where there
is extensive third party use of the mark, making it already a
diluted mark.  Thus, in Amstar Corp. v. Domino's Pizza, *supra*,

66

the old Fifth Circuit reversed injunctive relief granted under a Georgia anti-dilution statute because the plaintiff's mark "Domino" was a weak mark outside of the plaintiff's line of food products due to the extensive third party use of the word in other sectors. 615 F.2d at 265. *See* <u>Freedom Savings and Loan</u>, 757 F.2d at 1186-87 (upholding district court's finding of no dilution of plaintiff's mark "Freedom Savings and Loan" by "Freedom Realty" given weakness of mark caused by third party use); <u>Michael Caruso and Company</u>, 994 F.Supp. at 1463 (extensive third party use of the word "Bongo" by other businesses in other fields undermined distinctiveness of plaintiff's mark).

In bringing its claim of injunctive relief, based upon alleged dilution of its "Regions" mark, by a non-competing post-secondary educational institution, the plaintiffs are asking this Court to grant it, in essence, an exclusive right to use the name "Regions" on any goods or services throughout the sixteen states in which it does business, no matter how unrelated the goods or services may be and in spite of the lack of any possible consumer confusion. The "Regions" mark simply lacks the necessary distinctiveness to warrant such relief. The plaintiffs have chosen a common English word widely used on a great variety of products and services. Whatever distinctiveness the plaintiffs may have acquired for their mark through advertising and marketing, in the field of banking and

67

financial services, they have not, and cannot, acquire distinctiveness outside of that sector, particularly in a sector so far removed from plaintiff's financial arena, i.e., graduate and post-graduate education.

> B.   Other Factors Relevant to Determination
> that Mark is Likely to Cause Dilution by
> Blurring Do Not Support Plaintiffs' Claims

In addition to the factors of fame and distinctiveness, the TDRA requires the Court to consider the following factors in determining whether a mark or trade name is likely to cause dilution by blurring:

> (1)  The degree of similarity between the mark or trade name and the famous mark;

> (2)  The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark;

> (3)  The degree of recognition of the famous mark;

> (4)  Whether the user of the mark or trade name intended to create an association with the famous mark;

> (5)  Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B).

The dissimilarity of plaintiffs' and defendant's marks described above, at part I.B., cuts against the determination of a likelihood to cause dilution by blurring. Indeed, for dilution to occur, the marks "must be 'very' or 'substantially' similar ... ." Michael Caruso and Company, Inc., 994 F.Supp. at 1464 (quoting Ringling Brothers-Barnum & Bailey Combined Shows,

Inc. v. B. E. Windows Corp., 937 F.Supp. 204, 211 (S.D. N.Y. 1996)).

The plaintiffs are also not able to show that that they are engaging in substantially "exclusive" use of the mark, given the evidence of extensive third party usage. Moreover, plaintiffs have failed to submit competent evidence of the degree of recognition of their mark. Nor is there evidence that Regions University "intended" to create an association with the famous mark, in the adoption of its new name. Finally, the plaintiffs have failed to submit competent evidence of any "actual association" between the defendant's mark and their mark.

C.  Plaintiffs Cannot Recover Under the Alabama Anti-Dilution Statute for Similar Reasons

Section 8-12-17, Code of Alabama, provides:

> "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this article,[4] or a mark valid at common law, including a trade name valid at common law, shall be ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." (emphasis added)

Like the federal anti-dilution act, the state act requires that the mark be "distinctive." The plaintiffs' burden of proof for dilution under this statute is essentially the same as that under federal law. EBSCO Industries, Inc., 89 F.Supp.2d at

---

[4] Plaintiffs' marks are not registered under "this article."

1264.  As discussed above, the Eleventh Circuit, applying other similar state anti-dilution statutes, has concluded that a plaintiff's mark may have strength within its industry but, outside that industry, can be a weak mark due to extensive third party use, and thus insufficiently distinctive in an action against a user of the mark outside that industry.  *See* <u>Freedom Savings and Loan Association v. Way</u>, *supra* (applying Florida anti-dilution statute); <u>Amstar Corp. v. Domino's Pizza, Inc.</u>, *supra* (applying Georgia anti-dilution statute).  Although there are no Alabama state court decisions construing Section 8-12-17, other state courts, construing similar anti-dilution state statutes, have required that the mark be "highly distinctive." *See* <u>Great Southern Bank v. First Southern Bank</u>, 625 So.2d 463, 470 (Fla. 1993)(citing <u>Restatement of Unfair Competition</u> § 25, Comment e)).  For the same reasons that the plaintiffs' mark lacks sufficient distinctiveness to qualify for relief under the federal act, the plaintiffs' claims under the state anti-dilution act must also fail.

    IV.  <u>Plaintiffs' Remaining Claims Must be Dismissed</u>

    The remaining claims brought by the plaintiffs for trademark infringement in violation of Section 8-12-16, <u>Code of Ala.</u> (Count Four), and common law trademark infringement and unfair competition (Count Five), must be dismissed.  The state statute for trademark infringement requires registration of a

mark with the Alabama Secretary of State.    Plaintiffs do not allege and have no evidence of current registration of any of their marks with the Alabama Secretary of State.    This claim must be dismissed.

The claim for common law trademark infringement and unfair competition must be dismissed for the same reasons that the federal trademark infringement action must be dismissed.    *See* Choice Hotels Int'l, Inc., 147 F.Supp.2d at 1256 (test for common law trademark infringement in Alabama is same as test under Lanham Act).

CONCLUSION

For all of the above reasons, defendant respectfully submits that it is entitled to summary judgment on all of the claims filed by the plaintiffs herein.

Respectfully submitted,

/s/ WILLIAM W. WATTS
WILLIAM W. WATTS, III
[WATTW5095]
bill@alabamatrial.com
[HUDSV1684]
tom@alabamatrial.com
Hudson & Watts, LLP
Post Office Box 989
Mobile, Alabama 36601

JAMES E. SHLESINGER
Shlesinger, Arkwright &
    Garvey LLP
1420 King Street, Suite 600
Alexandria, Virginia 22314

ATTORNEYS FOR DEFENDANT


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 17, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

William G. Pecau, Esq.
Rachel M. Marmer, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

Charles B. Paterson, Esq.
Paul A. Clark, Esq.
BALCH & BINGHAM, LLP
105 Tallapoosa Street, Suite 200
Montgomery, Alabama 36104


/s/ WILLIAM W. WATTS

Record List Display

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Tue Jul 17 04:07:26 EDT 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | PREV LIST | NEXT LIST | BOTTOM | HELP |

Logout | *Please logout when you are done to release system resources allocated for you.*

Start | List At: [        ] OR Jump | to record: [        ]  **61 Records(s) found (This page: 1 ~ 61)**

Refine Search [s6 not("regions asset")[on]        ]  Submit

Current Search: S7: s6 not("regions asset")[on] docs: 61 occ: 64

| | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 79027922 | | SYSTEM@TIC PARIS-REGION | TARR | LIVE |
| 2 | 78944966 | | REGIONS UNIVERSITY | TARR | LIVE |
| 3 | 78942915 | | REGIONS UNIVERSITY PRESS | TARR | LIVE |
| 4 | 78595768 | 3103534 | REGIONS BEYOND INTERNATIONAL | TARR | LIVE |
| 5 | 78787111 | 3217377 | REGION 4 EDUCATED SOLUTIONS | TARR | LIVE |
| 6 | 78526721 | 3072182 | GIVE ME LIBERTY. RICHMOND REGION 2007 | TARR | LIVE |
| 7 | 78603169 | 3152186 | LEADING THE EHEALTH EVOLUTION REGION BY REGION | TARR | LIVE |
| 8 | 78680567 | 3120186 | BLUE REGION | TARR | LIVE |
| 9 | 78554082 | 3072321 | AUTHENTIC ARTISAN TEAS FROM THE WORLD'S FINEST GROWING REGIONS | TARR | LIVE |
| 10 | 78300652 | 3109996 | PORCUPINE RIDGE BOEKENHOUTSKLOOF WINES W.O..COASTAL REGION W.O. COASTAL REGION | TARR | LIVE |
| 11 | 78117581 | 2719412 | NEW YORK CITY REGION ONE GAY OFFICERS ACTION LEAGUE 41982 | TARR | LIVE |
| 12 | 78210529 | 3210091 | BIOTEAM PARIS REGION | TARR | LIVE |
| 13 | 78179745 | 2812933 | ENVISION CENTRAL TEXAS YOUR IDEAS OUR REGION'S FUTURE | TARR | LIVE |
| 14 | 78414088 | 3177827 | LREC LAKE REGION ELECTRIC COOPERATIVE | TARR | LIVE |
| 15 | 78474874 | 3075819 | VIRGINIA'S REGION 2000 | TARR | LIVE |
| 16 | 78412429 | 3046976 | COLUMBIA RIVERBANKS REGION | TARR | LIVE |
| 17 | 78324011 | 2860434 | CHOCTAW NATION ALL-INDIAN RODEO ASSOCIATION - REGION 8 | TARR | LIVE |
| 18 | 78284022 | 2904947 | GATEWAY TO SCIENCE ST. LOUIS REGION | TARR | LIVE |
| 19 | 78170495 | 2849457 | THE REGIONS|MORGAN KEEGAN SELECT ANNUITY | TARR | LIVE |
| 20 | 78155434 | 2960732 | CARE IN REGIONS | TARR | LIVE |
| 21 | 78145094 | 2839205 | 7 RIVERS REGION | TARR | LIVE |
| 22 | 78040260 | 2714589 | CINGULAR REGION | TARR | LIVE |
| 23 | 78037098 | 2583861 | REGION | TARR | LIVE |
| 24 | 77066517 | | REGIONS FOUNDRY | TARR | LIVE |

| 25 | 77048639 | | X REGION LAND WATER AIR | TARR | LIVE |
|---|---|---|---|---|---|
| 26 | 77206924 | | SERIES SOUTHEAST REGION INFORMATION ESYSTEM | TARR | LIVE |
| 27 | 77202431 | | ALWAYS-ON REGION | TARR | LIVE |
| 28 | 77169434 | | CAPITAL REGION LIVING MAGAZINE | TARR | LIVE |
| 29 | 77149564 | | APPLY PHOTO HERE; WITH OPTIONAL POCKET. BLANK AREAS OR REGIONS RESERVED FOR: PHOTOS, STICKERS, ETC..... | TARR | LIVE |
| 30 | 77055265 | | AMERICA'S FIRST REGION | TARR | LIVE |
| 31 | 76678650 | | REGIONS SPECIALTY COFFEE | TARR | LIVE |
| 32 | 76066650 | 2506075 | JOLIET REGION CHAMBER OF COMMERCE & INDUSTRY | TARR | LIVE |
| 33 | 76516057 | 2888526 | CATSKILL REGION | TARR | LIVE |
| 34 | 76480161 | 3113373 | SAN FRANCISCO REGION SPORTS CAR CLUB OF AMERICA | TARR | LIVE |
| 35 | 76480160 | 3078066 | SCCA SPORTS CAR CLUB OF AMERICA SAN FRANCISCO REGION | TARR | LIVE |
| 36 | 76393560 | 2795732 | HISTORIC REGION RICHMOND EASY TO LOVE | TARR | LIVE |
| 37 | 76285200 | 2706271 | THE HEARTLAND MARKET NATIONAL NUTRITIONAL FOODS ASSOCIATION MIDWEST REGION | TARR | LIVE |
| 38 | 76594223 | 3039262 | CAPITAL REGION WELLNESS CENTER MIND BODY SPIRIT | TARR | LIVE |
| 39 | 76370742 | 3177356 | REPOSADO 100% DE AGAVE TEQUILA CABO WABO REPOSADO 100% TEQUILANA WEBER BLUE AGAVE FROM THE REGION OF TEQUILA, STATE OF JALISCO, MEXICO HECHO EN MEXICO CONT. NET. 750 ML 40% ALC. VOL. 80 PROOF NOM 1426 CRT | TARR | LIVE |
| 40 | 76008383 | 2821459 | THE REGION'S HOME PAGE | TARR | LIVE |
| 41 | 76233099 | 2674037 | CBIRD UNA REGION UN FUTURO ONE REGION ONE FUTURE | TARR | LIVE |
| 42 | 76627512 | 3115769 | BIOCONNEX CONNECTING THE REGION'S BIOTECH COMMUNITY | TARR | LIVE |
| 43 | 76480162 | 3113374 | SCCA. SPORTS CAR CLUB OF AMERICA SAN FRANCISCO REGION | TARR | LIVE |
| 44 | 76242955 | | REGIONS | TARR | LIVE |
| 45 | 76387021 | 2982551 | REGION #5 | TARR | LIVE |
| 46 | 76408526 | 2752239 | WE KEEP THE REGION MOVING | TARR | LIVE |
| 47 | 76285964 | 2662210 | BUSINESS COURIER SERVING THE CINCINNATI-NORTHERN KENTUCKY REGION | TARR | LIVE |
| 48 | 76282902 | 2624378 | RESEARCH TRIANGLE REGION NORTH CAROLINA | TARR | LIVE |
| 49 | 75858172 | 2428279 | EASTERN REGION HELICOPTER COUNCIL, INC. | TARR | LIVE |
| 50 | 75472166 | 2437390 | REGIONS HOSPITAL DIRECT | TARR | LIVE |
| 51 | 75032553 | 2076982 | LAKES REGION FACTORY STORES | TARR | LIVE |
| 52 | 75032551 | 2015647 | LAKES REGION FACTORY STORES | TARR | LIVE |
| 53 | 75283429 | 2175755 | REGIONS | TARR | LIVE |
| 54 | 75283405 | 2164789 | REGIONS HOSPITAL | TARR | LIVE |
| 55 | 75023226 | 2126085 | REGION FOCUS | TARR | LIVE |
| 56 | 74539097 | 1948142 | OUR REGION | TARR | LIVE |
| 57 | 74564139 | 1974302 | CAPITAL REGION MEDICAL CENTER | TARR | LIVE |
| 58 | 74096499 | 1663347 | LAKE REGION | TARR | LIVE |
| 59 | 74553198 | 2019620 | ROCK REGION HEALTH PARTNERS | TARR | LIVE |
| 60 | 73680082 | 1502627 | REGIONS CAFE A WORLD OF DINING | TARR | LIVE |
| 61 | 71128004 | 0153696 | Y PURE OLIVE OIL YBARRA SELECTED OLIVE OIL PRODUCED AND EXPORTED BY HIJOS DE YBARRA IN SEVILLE, SPAIN THIS PURE OLIVE OIL IS GUARANTEED TO BE A DIRECT PRODUCT OF THE FINEST OLIVES GROWN IN THE REGION OF SEVILLE RIPENED BY THE RADIANT SUN OF AMDALUCIA, PRESSED AND FILTERED BY THE MOST MODERN AND SANITARY METHODS, | TARR | LIVE |

RESULTING IN AN OLIVE OIL, THE PURITY OF WHICH IS RECOMMENED FOR MEDICINAL USES, AND ITS FRAGRANCE IS UNSURPASSED FOR SALADS AND GENERAL COOKING.

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | PREV LIST | NEXT LIST | TOP | HELP

[.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY



RAC00010061

## SIGNATURE FORMATS

There are two approved formats
for the Regions Financial Corp.
signature.
**Format A** is preferred and used
for horizontally restrictive space.
**Format B** is used for
horizontally restrictive space. Do
not alter the relationships of the
signature elements. Use only
approved reproduction artwork.

A



B

## SIGNATURE COLOR

The Regions signature colors are
referred to as Regions Metallic
Gold, Regions Gold, and Regions
Green. These colors should
appear the same regardless of
application medium. The
equivalent formulas for CMYK,
PANTONE®, RGB and websafe
execution of these colors are
shown below.

*In lieu of the specified Regions colors,
you may use the equivalents shown.
The standards for PANTONE® colors are
as shown in the current edition
of the PANTONE Color Formula Guide.

The colors shown on these pages have
not been evaluated by PANTONE, Inc.,
for accuracy and may not match the
PANTONE Color Standards. PANTONE®
is a registered trademark of PANTONE,
Inc.

Note that Websafe equivalents are
approximations of the Regions colors.
Monitors can display only a limited
palette, so it is not possible to match the
desired colors exactly.



| Regions Metallic Gold | PANTONE® 873 | Cyan - 40% Magenta - 43% Yellow - 84% Black - 8% | Red - 141 Green - 110 Blue - 38 | Websafe: N/A |



| Regions Gold | PANTONE® 1245 | Cyan - 0% Magenta - 28% Yellow - 100% Black - 18% | Red - 209 Green - 152 Blue - 0 | Websafe: CC9900 |

| Regions Green | PANTONE® 3305 | Cyan - 100% Magenta - 0% Yellow - 60% Black - 51% | Red - 0 Green - 71 Blue - 55 | Websafe: 00584A |

RAC00002058

## SIGNATURE COLOR USE

Consistent signature appearance is important in maintaining the strength of our identity. Therefore, only the signature color formats shown here may be used. The full color version of the Region signature is preferred for both positive (on light-valued backgrounds) and reverse (on dark colored backgrounds) applications. The colors for each of the signature components are indicated to the right for both positive and reversed applications.

### Positive

**Two-Color** - Preferred



The logotype appears in Regions Green. The symbol appears in Regions Metallic Gold.

**Two-Color** - Alternative



The logotype appears in Regions Green. The symbol appears in Regions Gold.

**One-Color** - Preferred



All signature components appear in Regions Green.

**One-Color Black** - Preferred

**REGIONS**

The logotype appears in black. The symbol appears in 40% black.

**One-Color Black** - alternate

**REGIONS**

All signature components appear in Black.

### Reverse

**Two-Color** - Preferred

**REGIONS** 

The logotype appears in White. The symbol appears in Regions Metallic Gold.

**Two-Color** - Alternative

**REGIONS**

The logotype appears in White. The symbol appears in Regions Gold.

**One-Color** - Preferred

**REGIONS**

All signature components appear in Regions Gold.

**One-Color Black** - Preferred

**REGIONS**

The logotype appears in white. The symbol appears in 40% black.

**One-Color** - Alternative

**REGIONS**

All signature components appear in White.

RAC00002059

## SIGNATURE AREA OF ISOLATION

To ensure clear legibility and presentation of the corporate signature, a clear space equal to or greater then the height of the "R" in Regions must surround the signature. This space remains free of any imagery including typography, background patterns and/or page trim. This is only the minimum distance. Ample "white space" is always preferred.

The area of isolation for the horizontal (format A) and vertical (format B) signatures is illustrated to the right.



## SIGNATURE SIZING

To ensure clear legibility and to prevent poor signature reproduction, sizes less than 1" should be avoided. These standards apply to Regions Financial Corp. and all subsidiaries that use the Regions signature.

Minimum size 1"



RAC00002060

## SIGNATURE MISUSE

Preserving the integrity of our signatures is essential to their legal protectability. Inaccurate use may cause deterioration of this protection. To the right are just a few potential misuses of our signatures. These misuses must always be avoided.

**Do not** typeset our name in attempt to recreate the signature.



**Do not** display the signature in an unapproved colors.



**Do not** alter the proportion of the signature in attempt to fit it into a display area.



**Do not** not move or alter the scale of individual graphic elements.



**Do not** display the signature on a visually active background.



**Do not** display the signature on a background with insufficient contrast to the signature.



**Do not** apply drop shadows or other stylized elements to the signature.



**Do not** use the signature in a sentence, headline or body copy.



**Do not** use gradients to color the signature.



RAC00002061

Current 2007 Logos

Font: Belwe Std Light





Use:
Presidential Stationery
and Envelopes

Web Site Logos



Use:
Standard 2 color Letterhead
and Envelopes

Print Ads





EXHIBIT
75

**RU 185**

*Letterhead 2-06*



REGIONS UNIVERSITY
Where Traditional and Online Education Merge

1200 Taylor Road | Montgomery, AL 36117-3553 | 800.351.4040 | Phone: 334.387.3877 | Fax: 334.387.3878
www.regionsuniversity.edu

RU 190



 **REGIONS UNIVERSITY**

**REGISTRATION FORM**

1200 TAYLOR ROAD
MONTGOMERY, AL 36117-3553
(334) 387-3877
1-800-351-4040

REGISTRATION REQUIREMENTS:
1. The catalog is the student/institution contract as to all academic requirements and procedures - please consult RU catalog.
2. Tuition and fees are due upon registration!
3. Your student ID number is very important, please use this number when referring to anything that pertains to your academic records.
4. It is the responsibility of each student to immediately notify the Registrar's Office of a withdrawal or a drop and add of courses.

STUDENT NO.                          DATE                    REGISTRATION NO.

NAME                                          CAMPUS
ADDRESS                                       PHONE      HOME
                                                          OFFICE

SOCIAL SECURITY NO.                           DEGREE / SEEKING
CHURCH AFFILIATION                            STATUS
                                              VETERAN

| CAMPUS | DEPT. | COURSE # | SEC | TITLE/INSTRUCTOR | HRS. | C/A | MTWTFS | FEE | TIME | ROOM |
|--------|-------|----------|-----|------------------|------|-----|--------|-----|------|------|
|        |       |          |     |                  |      |     |        |     |      |      |
|        |       |          |     |                  |      |     |        |     |      |      |
|        |       |          |     |                  |      |     |        |     |      |      |
|        |       |          |     |                  |      |     |        |     |      |      |
|        |       |          |     |                  |      |     |        |     |      |      |
|        |       |          |     |                  |      |     |        |     |      |      |

TOTAL HOURS

**PAYMENT OF TUITION AND FEES**

FEES:                                          LESS
    COURSE FEES
    CREDIT/AUDIT TUITION & FEES
    GENERAL COMPREHENSIVE FEE
    LATE FEE

                                               AMOUNT OF PAYMENT
                                               CHECK NO.

    TOTAL TUITION & FEES                       REMAINING BALANCE

8.0
2006

REFLEX
BLUE

**RU 203**



RU 234

# Regions University

To all to whom these presents shall come, Greetings in the Lord:

*Be it known that the Board of Regents in recognition of successful completion of the regular Course of Study and fulfillment of all other prescribed conditions, is pleased on the recommendation of the faculty of the School of Human Services of Regions University to confer upon*

## Jane Doe

*the degree of*

## Master of Science
## Professional Counseling

*with all the rights, privileges, honors and marks of distinction thereunto appertaining. In Testimony Whereof, the seal of this University and the signatures of the duly authorized officers are hereunto affixed in the city of Montgomery in the state of Alabama on this* **3rd day of June, two thousand and seven.**



President of the University

Chairperson, Board of Regents

Vice President for Academic Affairs

Dean of School of Leadership and Human Services

RU 235



RU 236

RAC00032250

RETURN TO REGIONS.COM

**REGIONS**      HOME PAGE          DETAIL PAGE          BRANDING

## Our Promise

Regions and AmSouth are merging to create the new Regions. It is time to expect more. Yes, we are in the business of banking. But we are also in the business of life. And while our financial solutions will help you get more from your money, it is our mission to help you get more out of life.

## Watch for the new Regions logo.



**The sign of good things to come!**

Starting immediately, you'll see our new logo just about everywhere:

**Throughout the new Regions.com**, you will notice the new Regions logo and the new life green color, designed to reflect our new brand.

**In advertising** to highlight new account offerings and unusual values.

**On your new credit cards and CheckCards** as a symbol of extra benefits and expanded convenience to come.

**On your branches and ATMs.** We'll let you know when our combined banking network will become available to you.

## Here's why you'll like the new Regions

**More Convenience:** After our companies are fully combined, you'll have access to more than 1,900 branches and 2,400 ATMs in 16 states. Plus, you'll have expanded service online, by phone and in person.

**Easy Transition:** You can keep the same accounts, checks, PINs and more.

**More Choices:** Right now, you can open any of our great new accounts and add special benefits and rewards.

**Renewed Commitment To You:** You're the focus of everything we do. At the new Regions, we're dedicated to making