**HR Integration**



**DEFENDANT'S EXHIBIT**

## Team Name (e.g. Organizational Development and Learning)

Team Lead Name: Mike Pollard

---

**Department Mission:**

Human Resource's Organizational Development and Learning function is being designed to support the creation and sustainment of "a winning team" and "a high performance work culture" in the new Regions. Seven major work streams described below involve developing associates as well as the organization as a whole through a comprehensive human capital strategy.

---

**Vision for Target Environment:**

1. *Strategic HR Initiatives*
   The Strategic HR Initiatives Department will support HR in it's effort to impact business results and create positive associate experiences by providing assistance with key change management planning, development of HR initiative training, and corporate human resource planning associated with launching new HR initiatives (i.e.: Performance Management, eRecruit, Talent Retention Strategy, etc). This department will use the new HR model to interact with business partners and college learning officers to ensure an aligned approach to project implementation. The Strategic HR Initiatives Department will also implement and maintain career management and talent management processes used in Union Planters. The department will be located in Cordova. Associates reporting to the manager of Strategic HR Initiatives may be located in other cities where a corporate presence exists.

2. *Learning Technologies Team*
   The Learning Technologies Group creates a consistent learning culture across the company through key technology/tools. It provides the vehicle for decentralized training administration in the NewCo using the learning management system (UP³). The Learning Technology Group will support LMS admin competencies for instructors, training coordinators, HR business partners and call center support. Virtual classroom technology will be used to provide instructor-led training across the organizational footprint. Legacy training data will be mapped from the Regions PS Training Admin to the LMS, which will serve as the system of record. E-Learning development will be centralized into a core function within Learning Technology to develop online, self-paced training and interactive distance learning content for job skills training and support the development of e-learning competencies within the instructional design group. Selection of the e-learning development architecture and integration of digital content into the LMS will be managed by the Learning Technology Group. The Learning Technology Group will deliver training mission critical management reporting.

3. *Regions University*
   Regions University provides a comprehensive Learning Strategy aligned to the company's strategic business initiatives through a relationship management orientation. The University's six colleges – Retail, Commercial, Operations, IT, Mortgage, and Corporate Support are headed by College Learning Officers (CLO's) responsible to manage design and delivery resources to support conversion and mission critical training efforts. The University CLO's maintain constant awareness of the business needs and the delivery of the new hire associates training, existing associates training, and sustainment strategies. Key emphasis is placed on creating individual associate development plans, delivering only the training needed to build core competency, and measuring training impacts.

4. *Individual Assessments*
   To provide comprehensive selection and development assessment strategies and tools that enhance leadership effectiveness, front-line performance, managerial style and job knowledge. Individual Assessment will provide consulting services to Recruitment, HR Business Partners and managers facilitating the use of objective assessment tools across the organization.

5. *Organizational Effectiveness*
   The Organizational Effectiveness Group will incorporate research methodology, survey technologies, consulting processes and training programs to support OD&L, HR Business Partners and functional units within the bank. The group will provide information on human capital to facilitate more effective planning and decisions impacting productivity, quality and cost. Through organizational interventions and team building programs the group will enhance relationships and communication between individuals and groups. Through surveys and HR Research, will provide timely and accurate information about Human Capital and Organizational Performance, enhance the capability to better manage and retain talent. Special emphasis will demonstrate the impact on business results and return on investment for organizational development and training initiatives and improve organizational effectiveness through targeted interventions.

6. *Leadership and Sales Institute*
   The Leadership and Sales Institute will support the building of a high performance culture in the new company by developing Great Leaders who create such an engaging climate that associates choose to perform at their best every day. As a strategic partner, the Institute develops and sustains specific leadership competencies identified by senior management as key to the execution of business strategy; provides performance consulting and coaching for business partners, seeking first to understand their strategy, and then to integrate the business unit's unique needs into the execution of strategy; recommends effective solutions that produce individualized action plans, use client resources efficiently, and develop processes that facilitate future improvements. Continued development of sales skills in the new company will incorporate the learning's of each company and the principles of EnAct in order to continuously improve the Chart the Course sales process. The Leadership and Sales Institute acts as a key vendor to the Colleges to provide job specific sales, sales management, and leadership courses based on forecasted needs.

7. *Conversion Training Process Management*
   A full time Conversion Process Training Manager will work closely with Integration Team Managers, Conversion Management, and Region's University College Officers to identify, design, deliver, and evaluate required conversion training programs. The majority of the training resources required to meet conversion training needs will be supplied by the University Colleges. Secondary consideration should be given to staff training and support needs from the field. Key consideration will be given to coordinate related systems and processes (i.e. Retail, Commercial, etc). Associates will participate in competency certifications associated with conversions. Training will consist of classroom and distance learning to create cost efficient blended learning processes delivered within the critical 2 to 3 week period preceding conversions.

**Staffing Model – Use a separate sheet if needed.  Organizational Chart for Day 1 (July 1st) and Organizational Chart for your long term vision.**

| Name | Grade | Job Title | Location | Comment |
|---|---|---|---|---|
| Mike Pollard | TBD | Director Organizational Development and Learning | TBD | |
| TBD | TBD | Administration | TBD | |
| TBD | TBD | Conversion Training Process | TBD | |
| TBD | TBD | Manager Strategic HR Initiatives | TBD | |
| TBD | TBD | Manager Learning Technologies | TBD | |
| Mike Pollard | | Director Regions University | TBD | |
| TBD | TBD | Manager Individual Assessments | TBD | |
| TBD | TBD | Manager Organizational Effectiveness | TBD | |
| TBD | TBD | Retail College Officer | TBD | |
| TBD | TBD | Commercial College Officer | TBD | |
| TBD | TBD | Mortgage Officer | TBD | |
| TBD | TBD | IT College Officer | TBD | |
| TBD | TBD | Operations College Officer | TBD | |
| TBD | TBD | Corporate Support College Officer | TBD | |
| TBD | TBD | Leadership & Sales Institute Officer | TBD | |

Put "TBD" where details have not been finalized.



**Describe the services offered:**

➢ Consultant to HR Business Partners and Recruitment insuring correct interpretation of personality, cognitive and interview data.
➢ Implementation of testing processes (e.g., development of procedures/cut-off scores, legal defensibility issues) for selection, promotions and reorganizations.
➢ Testing/Assessments for cognitive ability, managerial style, leadership skills, and specific soft skills (e.g., sales, customer service).
➢ Developmental feedback discussions (based on personality data) with leaders to enhance specific leadership skills.
➢ Competency based, behavioral interview guides for specific positions.
➢ Validation research to insure suitability and legal defensibility of testing products.
➢ Discussions with hiring managers about candidate strengths/weaknesses.
➢ Creation of individual assessments to evaluate employee job knowledge (e.g., product).
➢ Support the assimilation of the new HR model through change management practices
➢ Work with HR Business Partners to assess change management / training needs related to implementing new initiatives
➢ Design and develop change management / training materials for HR initiatives
➢ Provide tools to assist HR Business Partners implementing the talent management process
➢ Provide tools to assist HR Business Partners implementing succession management
➢ Support head of HR in gathering talent/succession planning information for strategic planning sessions
➢ Implement career management for all associates
➢ Support / lead employee brand project
➢ Management reporting of training data for the NewCo
➢ Support for decentralized training administration
➢ Distance Learning support, development and quality control
➢ E-Learning development and implementation
➢ Certification and Curricula Delivery and Reporting
➢ Training Lab Management
➢ Job Analysis/Competency Modeling focused on high performer behaviors
➢ Conducting HR Research Survey design, analysis and reporting
➢ Measurement and evaluation of training
➢ OD planning, interventions and consulting
➢ Designing/delivering teambuilding programs
➢ Maintenance of HR's performance management process
➢ Organizational design consulting
➢ Leadership Development across all business units with specific focus on:
  · Sales Leadership / Coaching
  · Executive & Senior Management
  · Mid-Management
  · Supervisors
  · New Managers
➢ Sales skill development by line of business
➢ Behavioral Interviewing training
➢ Quality / Continuous Learning and Improvement programs
➢ On-Boarding of New Managers process

4

**Expected Results:**

➢ Improved employee retention in key, front-line positions because of better person/job fit and performance of selected candidates.
➢ Enhanced performance (e.g., managerial style, decision making) of leaders due to job fit and cognitive ability.
➢ Enhanced leader self-awareness of strengths, weaknesses and developmental needs.
➢ Enhanced performance (e.g., sales, customer service, decision making) of front-line, customer focused employees.
➢ Improved level of job knowledge to insure high performance.
➢ Increased understanding of HR model within HR
➢ Increased understanding of available OD services
➢ Consistent approach to training implementation of HR-led initiatives
➢ Decreased time to competency through training
➢ Increased retention of high value associates
➢ Continuity of quality leadership
➢ Reduction in training administrative staff through automation
➢ Reduction in implementation time for corporate-wide training initiatives
➢ Faster delivery of training reports to support management and business strategy
➢ Increase in organizational effectiveness and capability due to overall increase in organizational competency
➢ Improved human resources planning and decision making as a result of better information about organizational climate, key performance indicators, and human capital
➢ Increased effectiveness of training and development programs
➢ Improved working relationships between individuals and groups
➢ Highly skilled leaders and sales staff resulting in improved bottom-line business results
➢ Improved climate resulting in reduction in voluntary turnover
➢ Improved Retention and Expansion of Relationships with Key Clients due to improved market planning (EnAct)
➢ Expanded referral of clients between functional lines of business
➢ Improved client relationships because workforce recognizes sales and service as different extensions of the same process: understanding customer needs and finding the solutions that meet those needs
➢ Agile Workforce able to adapt quickly to an ever changing business environment
➢ Engaged Workforce with the ability to self-monitor and self-correct through coaching process
➢ Culture of continuous learning and continuous improvement
➢ Culture of synergy - where breakthrough learning is the norm

| Major Milestone | Expected Completion |
|---|---|
| **Assessment & Selection:** | |
| √ Individual Assessment strategy finalized and integrated with UP$^3$ and Competency Management | Q2, 2004 |
| √ Executives on board with Assessment Strategy | Q3, 2004 |
| √ Current Pre-employment Testing extended to all of new Regions | Q4, 2004 |
| √ Behavioral Interviewing Approach implemented in all of new Regions | Q2, 2005 |
| √ New Testing implemented in all of Regions (e.g., First Line Supervisor, Commercial Lender) | Q2, 2005 |
| √ Individual Assessment strategy implemented across new Regions (e.g., Strategic Leaders) | Q4, 2005 |
| | |
| **Organizational Development Plan** | |
| √ OD Plan is implemented with HR Business Partners | TBD |
| | |
| **Competency Management:** | |
| √ Current Competency Models deployed to all of new Regions | Q4, 2004 |
| √ Revalidation of competency models for NewCo | Q2, 2005 |
| √ Competency Models developed for new jobs / jobs not yet studied | TBD |
| √ Competency Developmental Assessment training completed and deployed using UP$^3$ for all of new Regions | Q4, 2005 |
| | |
| **Performance Management:** | |
| √ Performance Management soft skills training completed in all of new Regions | TBD |
| √ Performance Management system deployed | TBD |
| √ Performance Management system training completed | TBD |
| | |
| **HR Research and Metrics** | |
| √ 2nd KPI Workshop with New Regions Completed | Est. Q4, 2004 |
| √ Available sources loaded to fulfill KPI measures | Est. Q4, 2004 |
| √ New Regions HR Business Partners fully trained in HR Metrics site navigation | Est. Q4, 2004 |
| √ 3rd Associate Survey Completed | Est. Q1, 2005 |
| √ Consolidated "hired-to-termed" Profile of Associate Perception of Org | Est. Q1, 2005 |
| √ 3rd Sales Culture/Effectiveness Survey Completed | Est. Q2, 2005 |
| | |
| **Talent Management:** | |
| √ Talent Management strategy determined by Regions Leadership | Q4, 2004 |
| √ Talent Management deployed to all of new Regions | Q3, 2005 |
| | |
| **Career Management:** | |
| √ Career Management strategy defined for Regions leadership | Q4 2004 |
| √ Career Web Site e-Tours Re-aligned | Q4 2004 |
| √ Career Advisor Network deployed | Q1 2005 |
| √ Career Directions workshops training implemented | Q1 2005 |
| | |
| **Initiatives Rollout:** | |
| √ The new HR Model has been communicated to HR associates. | Q3 2004 |
| √ Business partners share model with their LOB | Q3 2004 |
| √ New Hire Orientation redesigned | Q3 2004 |
| √ HR PeopleSoft system conversion training completed | TBD |
| √ UP3 system training completed | TBD |

6

| Major Milestone (CONT) | Expected Completion |
|---|---|
| **Learning Technologies Team:** | |
| √   Determination of LMS | 04/15/04 |
| √   Determination of distance learning vendor | 04/15/04 |
| √   Contracts executed for LMS | 07/15/04 |
| √   Contracts executed for distance learning vendor | 07/15/04 |
| √   Scoping of integration project | 07/30/04 |
| √   Manager reporting needs of training activity defined and temporary solution to deliver training reports through conversion | 07/30/04 |
| √   Standardized business process defined for custom e-learning and distance learning development | 08/15/04 |
| √   System administrators ready to implement on LMS | 09/15/04 |
| √   All legacy training data is populated in the LMS | 09/30/04 |
| | |
| **Leadership:** | |
| √   Leadership Competencies reviewed, updated | Q2, 2004 |
| √   Curriculum defined by target audience:  Senior, Mid-Mgmt, Front-Line Supervisor, New Manager | Q3, 2004 |
| √   Measurement Process Defined | Q3, 2004 |
| √   Leadership Curriculum:  Developed, Validated, or Updated | Q4, 2004 |
| √   Leadership Sustainment Systems Identified | Q3, 2004 |
| √   Leadership Sustainment Systems Implemented | Q2, 2005 |
| | |
| **Sales:** | |
| √   Sales / Sales Leadership / Market Planning(EnAct) Model Developed | Q2, 2004 |
| √   Core Curriculum Identified based on Competencies | Q2, 2004 |
| √   Measurement Process Defined | Q3, 2004 |
| √   Chart the Course Type kick-off meetings completed | Q3, 2004 |
| √   Coaching and Sustainment Plan Developed | Q3, 2004 |
| √   Reporting Process Developed | Q3, 2004 |
| √   Course Content Developed | Q4, 2005 |
| | |
| **Conversion Training:** | |
| √   Conversion training structure/process developed | 04/2004 |
| √   Conversion training prioritized and scoped | 05/15/04 |
| √   Conversion training designed | |
| ·   Retail | |
| ·   Commercial | TBD |
| ·   Operations | TBD |
| ·   Mortgage | TBD |
| ·   Sales/Leadership | TBD |
| | TBD |

# HR BUSINESS PARTNER & OD&L RELATIONSHIP

| HR BUSINESS PARTNER RESPONSIBILITIES | OD&L RESOURCES |
|---|---|
| • Drives corporate culture with organization objectives through business units and serves as a primary carrier of corporate messages to the business unit. | 1. HR Initiative Function<br>2. Culture Survey and Initiatives<br>3. Leadership & Sales Strategy |
| • Consults with leaders to ensure to ensure compensation and benefit strategies support and meet business objectives (i.e. executive base pay, incentive pay, etc.). | |
| • Provides strategic HR counsel regarding organizational effectiveness and performance. | 1. CLC Metrics<br>2. Performance Management Process<br>3. Competency Analysis |
| • Serves as a relationship driver to bring needed resources to the table to address obstacles preventing successful business results. | 1. HR Research<br>2. Regions University<br>3. Learning Technology |
| • Serves as a change agent through implementation of change management ideas and guidance to the business unit. | 1. Internal Consulting Process<br>2. Change Management Processes |
| • Leads team building within assigned business unit and addresses conflict that arises within the management team. | 1. Team Building Programs & Consulting |
| • Guides the talent assessment process to ensure top performers are identified and a retention strategy is in place for those individuals. | 1. Career Management Processes |
| • Provides continuous guidance with performance management ensuring planning, feedback, and evaluation is completed on all employees. | 1. Performance Management Templates<br>2. LMS Development Plans<br>3. Competency Models |
| • Provides guidance with Human Resources metric tools to ensure all concerned situations are being evaluated. | 1. CLC Metrics<br>2. PeopleSoft EPM |
| • Assists the business unit with reorganizations through organizational planning, talent identification, and structure redesign | 1. Organizational Design Consulting<br>2. Individual Assessments |
| • Consults with management in regards to the results of the employee survey and the effects that the feedback tells the organization about the climate of the business unit. Assists with the development of action plans with the management team to ensure all opportunities are utilized. | 1. Climate Surveys<br>2. Organizational Development Plan Process<br>3. Focus Group Facilitation |
| • Provides executive coaching to the business unit's senior management team. | 1. Executive Coaching Programs<br>2. Leadership Training |

HR Initiatives



Regions University Core Curriculum © Matrix.xls

Corp Support

Regions University Core Curriculum ID Matrix.xls

| Learning Initiative | OLC | Area / Project Leader | Date | LCR Sign Off | Target Audience | Delivery Method | Design Strategy | Estimated Design Hours | Baseline Starting Start Date | Baseline Finish | % Comp | Status | Baseline Finish | % Comp | Status | Baseline Finish | % Comp | Status | Implementation Plan Sign Off | Baseline Finish | % Comp | Status | Baseline Finish | % Comp | Status | Baseline Finish | % Comp | Status | Finish Date | % Comp | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|



## 2006 *Training* Top 100 Application

### Deadline for FINAL Application:
## October 3, 2005

### INSTRUCTIONS: PLEASE READ

**1.     Please download and read the Top 100 tip sheet.**
Go to http://www.trainingmag.com/training/images/pdf/2006Top100TipSheet.doc to download the tip sheet.

**2. We encourage you to fill out this application as completely as possible.** Complete each question fully and avoid ranges wherever possible. Incomplete or vague responses may adversely affect your ranking, while specific and/or detailed answers help us determine the appropriate position for your company.

> **To complete this Application Form, <u>you must enable the Form Toolbar</u> in your Word Software Program.**
> - **From the main tool bar, select the View Tab. Then select the View Toolbars option.**
> - **Then check the box next to "Forms." This will enable the Form Tool functions. The "Padlock" icon should be selected for data entry Purposes.**

**3. You may designate certain answers Not For Publication (NFP) if you wish.** We encourage you to use this option sparingly, because one of the benefits of the *Training* Top 100 is the dissemination of information, methods and best practices to the wider training community.

**4. In completing this application, simply place your the cursor <u>inside</u> the answer field alongside each question and type your response.** When answers have been provided, they have been pre-populated based on the online application request have been pre-populated into this document was requested online.

**5. Essay questions have word count limits, which will be noted in the question.** Please observe these limits, as we have imposed them in an effort to cope with the number of applications we receive.

**6. On selected questions you will be asked to record your answer using a pull down list or check box.** On others, you will check a box and complete a text response. To check the box, click the mouse in the box. To uncheck it, click in the box again. ☒

**All applicants must submit their application as an electronic file, either a Word document or a PDF, to edit@trainingmag.com by October 3, 2005.** If you wish, you may also send supporting materials. If you send them by mail, send them to:
> *Training* magazine
> 2006 *Training* Top 100 Awards
> 50 South 9th Street
> Minneapolis, MN 55402

If you have any questions about the Top 100, feel free to call us toll-free at 866-226-1081or to e-mail us at top100awards@skypoint.com

**TERMS AND CONDITIONS:** By submitting an application for the *Training* Top 100, you give *Training* magazine permission to publish any information not marked NFP (Not For Publication) and to use the data in any presentation or description of the Top 100 ranking. No materials submitted for the Top 100 competition will be returned.

RAC00031056



## PART ONE: ABOUT YOUR ORGANIZATION

**1.1**    **What is the name and address of your company/organization?**

Company Name: (As you would like it to appear in print): Regions Financial Corporation

Address 1:     105 Vulcan Road

Address 2:

City:    Birmingham              State/Province: AL      ZIP/Postal Code: 35209

Web site:      www.regions.com

**1.2**    **What is your contact information?**

Name:    Todd A. Massey              Title:    Human Resources Consultant

Phone:    901-580-4463      Fax:    901-580-3123

E-mail:    todd.massey@regions.com

**1.3**    **For follow-up purposes only, is there an alternative contact at your organization?**

Name:    Mike Tuseth        Title:    Manager, Organizational Effectiveness

Phone:    901-580-6025      Fax:    901-580-3123

E-mail:    mike.tuseth@regions.com

**1.4**    **What were your company's annual revenues (Both U.S. and Worldwide Operations) in 2004 (or your most recent completed fiscal year)?  (Please provide your answer in the form of a WHOLE NUMBER - Do not use words, ranges or abbreviations.)**

U.S. Operations        $ 5,000,000,000       ☐ NFP

Total Worldwide        $ 0              ☐ NFP

**1.5**    **How many employees are there in your organization? (Please provide your answer in the form of a WHOLE NUMBER - Do not use words, ranges or abbreviations)**

United States:        25,000              ☐ NFP

Total Worldwide:      0              ☐ NFP

RAC00031057

**1.6    Which of the following best describes your organization's primary business activity?** (select only one)

☐ Manufacturing

☐ Hospitality (food, lodging)

☐ Retail

☐ Wholesale/Distribution

☒ Finance/Banking

☐ Real Estate/Insurance

☐ Business Services

☐ Communications

☐ Transportation/Utilities

☐ Health/Medical Services

☐ Educational Services/Academic Institution

☐ Government and Military

☐ Consulting

☐ Public Administration

☐ Other: (Please Specify):

**1.7    Please provide a brief description of your company:** (Word count limit: 150)

The new Regions Financial Corporation has been serving customers with strength and stability for more than 135 years. Its merger with Memphis, Tenn.-based Union Planters Corporation took place in July 2004, creating a new regional force in financial services that shares a rich history of customer and community commitment, as well as the strength and stability of one of the Top 15 financial services providers in the nation. The new company has over $85 billion in assets, and serves over 5 million customers via 1,400 offices and a 1,700-ATM network across a 16-state geographic footprint. We are a full-service provider of retail and commercial banking, trust, securities brokerage, mortgage, and insurance products and services. Regions works to help customers and communities realize their dreams by anticipating, understanding, and meeting financial needs through effective solutions.

RAC00031058

# PART TWO: ABOUT YOUR TRAINING ORGANIZATION

**2.1    GOALS: Describe how you strategically link training to your organization's business goals and objectives.** (Word count limit: 400)

The Organizational Development and Learning (OD&L) group forges strategic alliances with key senior and executive officers in all lines of business to determine how we can continue to best support and champion Regions' vision and focus. We have structured the various teams within OD&L (including HR Strategic Initiatives, Organizational Effectiveness, Instructional Learning & Design, Learning Systems, and the College Learning Officers within Regions University) to be aligned with the major lines of business within Regions. In fact, our College Learning Officers have seats at the table of each of the 5 major steering committees: Retail, Private Banking, Commercial, Credit, and Branching. This alignment allows for the various roles within OD&L to fully participate in frequent and in-depth meetings with line of business executives to determine strategic management decisions, including understanding the direction and changes needed in the business and in the associate competencies by creating the training interventions and determing the budgets needed to accomplish the organization's mission-critical goals.

Moreover, since the Director of Human Resources reports directly to the Chief Executive Officer, allowing us to continually identify and evaluate our formal, interrelated change management processes to enhance the company's culture in critical areas of leadership, sales, talent/career management, and learning/technical training. Some examples include:

- The use of validated assessments, behavioral interviewing, competency modeling, and onboarding programs to select and retain the right people for our organization.
- Developing our leaders via an extensive leadership and management training program to ensure the continued success of our organizations' leadership potential.
- The thoroughness of our corporate university and career management programs to provide our associates with opportunities for extensive growth and development.
- The successful application of performance management, business metrics, climate development, and internal consulting to continually secure a high-performance work environment.

Our talented OD&L group persistently sets new standards for creativity, teamwork, vision, partnerships, and perseverance. We focus our efforts on supporting our associates and executive leaders by increasing the attainment and effectiveness of our organization's goals. As such, the OD&L group at Regions Financial aligns change efforts that more fully integrate individual needs with organizational goals; change that will lead to greater organizational effectiveness through better utilization of its human resources, and change that will increase critical competencies for success.

These efforts have positively impacted associate turnover levels, increased sales performance, improved leadership practices, increased utilization of talent management practices, identified effective and efficient learning strategies improving time to proficiency, and improved organizational climate. These substantive results and the ongoing OD&L projects continue to evolve and support the mission of Regions Financial Corporation. The benefits realized by OD&L's diligence are shared by our company, our shareholders, our associates and ultimately, our customers.

RAC00031059

**2.2    Using the scale below, where 1=Always, 2=Often, 3=Seldom and 4=Never, please indicate which of the following formal training programs your organization uses, and rate how often it's used.**

Briefly describe your approach of each where appropriate. Select the Not Applicable box if the situation does not apply to your organization. (Word count limit for each description: 400)

|  | Always | Often | Seldom | Never | Not Applicable |
|---|---|---|---|---|---|
| **Career Counseling:** | ☒ | ☐ | ☐ | ☐ | ☐ |

Describe Approach:
Regions Financial recognizes and respects our associates' needs to prepare for the future and manage their careers. Any associate with a desire to grow within the company can do so through a variety of career counseling resources, including the Online Career Center, the Career Directions Workshop, and the Career Advisor Network. The Online Career Center serves as a one-stop-shop for accessing individual career planning tools and can be used at the associate's convenience. The hyperlink to the site is visibly posted on the company LMS (Learning Management System) and can be accessed through any Internet connection, enabling associates to work on their career plans from work or home. Through August of this year, the site's homepage has averaged over 8,000 hits per month. The Career Directions Workshop provides hands-on training on career planning basics and consistently receives stellar ratings from program participants. The Career Advisor Network provides an opportunity for one-on-one career counseling sessions through some 45 HR professionals who annually volunteer to assist fellow associates across the company with career planning questions or needs. These resources are accessible to all associates and serve as visible evidence of Regions' commitment to provide extensive growth and learning opportunities for performance oriented associates.

How we get mgrs involved and their associates involved. Annually, mgrs provide fb and do the competency assessment; mgrs are being trained to be coaches in the career directions workshop.

Career direction also takes place in the RLDP. Becky has a special retail career coaching prgram to be lauched in near future.

| | Always | Often | Seldom | Never | Not Applicable |
|---|---|---|---|---|---|
| **Certification:** | ☒ | ☐ | ☐ | ☐ | ☐ |

Describe Approach:
Certifications are used at Regions Financial in three distinct ways. First, certifications are used to manage the required training for high incumbent job groups. For instance, our Teller certification program ensures each Teller receives training specific to the products, processes, and systems necessary for high performance in the role. The certification allows a consistent approach to skill acquisition that can be tracked and managed through the organizational Learning Management System (LMS). Certifications foster a sense of accomplishment and pride in the learner population for completion of a challenging training program.

Secondly, certifications are used by the organization to ensure that specific training has been successfully completed prior to allowing associates access to designated systems. Systems' training often involves completion of a simulation computer-based training program, which provides the learner with a safe environment to practice their skills prior to accessing the system in production. This approach reduces errors and Help Desk calls by certifying that the associate has received the appropriate training prior to granting system access.

RAC00031060

The third and final way in which certifications are used at Regions Financial is through required regulatory training. Training which is mandated by external agencies that audit compliance with industry regulations must be tracked and reported. Certifications are assigned and delivered through the Learning Management System to ensure that the associates remain in compliance with the annual or bi-annual training requirements. The LMS serves as the system of record for this process and it provides managers with a method to track the status of their direct reports' certifications on an as-needed basis.

Each manager can run a Team Certification Monitor Report from the LMS to determine individual associate's progress toward certification completion. The report will indicate how many of the requirements each associate has completed and the associate's percentage toward overall certification completion. If the certification has been completed, the report provides the achieved date and expiration date of the certification.

Certification efforts are limited to our most strategic initiatives (the use of certifications to training initiatives that are closely monitored and enforced. Executive management receives regular reports in relation to any particular training which is part of an all-associates global certification program (e.g., Code of Conduct). Our associates understand the need for the few, but important, mandatory training programs that we have; more importantly, they realize the value and potential in all of the other rich training opportunities that we offer.

Numbers: # of certifications oper year, annualized, or any type of other numbers. Number of certification in last 12 mnths: How many hours of certification training did we do?

**Communications Skills:**  ☒  ☐  ☐  ☐  ☐
Describe Approach:
Communication skills are a core competency required for an associate's success, both internally to the organization and externally in serving our customers. Our approach to teaching communication skills is two-fold: 1) We offer specific communication skill-building classes through on-line CBTs (Computer Based Training), and 2) We incorporate components of communications skill training into various other training progams that require compentency in communication (for example, Teller training, sales skills, executive coaching, leadership, MBTI, and performance management). Some of our on-line CBT classes include Effective Communication Tools, Conquering Conflict through Communication, and Sales Communication Techniques. The communications training is customized and specific skill areas of communication are stressed as they relate to accomplishing the objectives of the specific program.

NAO: communication skills in NAO. COmmunicating with supervisor, peers. Another major effort for us is training communication and the skills bw magrs and peers. Piece about respect in DVD: do we do communications. New hires, Tellers, and on-going basis on certain workshops: leadership, MBTI. mjor efforts in perf management.

**Customer Service:**  ☒  ☐  ☐  ☐  ☐
Describe Approach:
Regions Financial places a heavy emphasis on customer service. To support our service culture, all Retail new-hire curricula (spanning several different jobs) includes a strong customer service component. This component incorporates our Regions Service Principles combined with simulations and scenarios tailored to specific job groups. To further support excellent service, Regions has created an Excellence through Quality Service (EQS) process that includes a website, computer-based training, and a Quality Council. These processes and tools are woven through our

RAC00031061

training curricula to support one of Regions' core values, "Consistent and ever improving quality service".

As we continued to successfully merge two very large financial organizations (Union Planters and Regions), it became imperative to benchmark customer service for our new company. To do so, we partnered with Market Probe to create a program known as BQSI (Branch Quality Satisfaction Index), a way of effectively measuring our branch service quality, customer satisfaction, and customer loyalty levels. This study measures the customer experience to ensure that they have had satisfactory service and their loyalty remains strong.

To support this service and satisfaction program, training was developed to drive performance to an even higher level. A self-paced training guide was developed for Branch Sales Managers and Area Sales Managers that explains the BQSI program, how to read the reports, and how to interpret the data provided in those reports. Key drivers having the biggest impact on customer satisfaction were identified, and a coaching job aid focusing on those areas was created to assist managers in improving performance in these satisfaction areas.

Plug in major improvement as it relates to BQSI, if focus is on training quality trng, show me how by trng folks to be quiality analysts, processors, consumer lending training effort focused on quality, 100% of staff went through trng, and major enhancements in loan processing.

**Diversity:**  ☒  ☐  ☐  ☐  ☐
Describe Approach:
At Regions, we recognize and celebrate the cultural differences in our associates. Our perspective on diversity includes our internal associates and our external customers, and is viewed as a broad opportunity to increase our community relations as well as our market share. As a critical business issue, research suggests that the diversity / performance link ultimately depends upon specific managerial practices and that, given the increasing global context in which organizations must operate, the real question for organizations is whether or not they can do a better job of managing diversity (Human Resources Institute, 2006).

Regions Financial continues to build community relationships and train our recruiters to achieve greater impact by diversifying their external sources for candidates, leverage relationships with existing sources, and gain a deeper understanding of our image in the communities we serve. Internally, we strive to educate the workforce on diversity and develop objectives and metrics associated with tracking diversity in our workforce. Our training programs and career management resources are available to all associates, regardless of gender, age, ethnicity or any other cultural aspect. Furthermore, our competency management process ensures that we are selecting associates based only upon desired competencies, wherever they may fall in the rich cultural spectrum. There are so many opportunities and resources available for our associates that anyone who wishes to advance in their career has the opportunity to do so. In addition, we train our managers in regard to legal issues and the importance and value of diversity in management practices. Moreover, from an legal perspective, all of our HR policies incoprate EEO verbiage, and we utilize metrics that measure and mark progress toward a more diversified workforce.

**Employee Orientation:**  ☒  ☐  ☐  ☐  ☐
Describe Approach:
Regions' approach to orientation is aimed at promoting associate engagement while providing an effective onboarding experience. Major emphases include affirming the associate's decision to join the company, assimilating the associate into the company culture, and helping the associate see how he/she can contribute to the overall company strategy. The 2005 program was enhanced to include a

RAC00031062

welcome web site, a one-day classroom component, and an onboarding plan for associates to complete with their managers during the first 90 days of employment.

Each process component works together to provide a comprehensive approach from the time an associate is hired to being fully functional on the job. The welcome web site was designed to familiarize new hires with the Regions on-boarding process. Access information to this site is provided by the indivdual's recruiter once a candidate accepts a job offer. This web site covers general information about the company, its history, available benefits, what to expect on the first day, and an overview of what will be covered during the the new associate orientation class. The classroom experience is focused on helping associates better understand the company culture. Through a new associate video, participants hear from both key leadership and fellow associates about their experience with the company as well as recognition that Regions has received for accomplishments in the financial services industry. The class itself is highly participative and includes a learning map exercise that helps new associates better understand the company vision, values, and strategies. Through this exercise, each associate becomes aware of the role that he/she can play in contributing to company success. While the majority of associates attend this class in person, associates who are in out-lying areas experience a one-on-one version to ensure they get the information and support they need. The associate 90-day onboarding plan has been cleverly designed into a "check register" format that plays off of the fact that these associates work for a financial institution. The register leads associates through a weekly list of activities that need to be completed to have an effective onboarding experience. The leather check register cover represents a "take-away" that associates can later use with their personal checkbooks.

To create a dynamic feedback loop on each associate's transition to their job, a 90-day follow-up survey is conducted to ensure each associate received appropriate guidance and on-the-job support as well as benchmark their satisfaction with the organizational climate.

Our corporate-wide orientation initiative helps support the Human Resources strategy of creating one culture. All new associates receive the same information about the organization regardless of where they are hired. When asked about the orientation program, one associate said, "The program really said 'welcome' and offered a chance to not just see other faces, but to briefly get acquainted with each other as a team coming aboard."

**Executive Coaching:**              ☒        ☐        ☐        ☐        ☐
Describe Approach:
Regions' Human Resources Business Partner model requires that human resources professionals become more strategic and proactive in their role. As a result, a train-the-trainer Executive Coaching Workshop for HR Business Partners was developed in 2002 and since that time, over 70 individuals have been trained to conduct internal executive coaching. All existing HR Business Partners were trained in 2002 and 2003 and the workshop is now an integral part of the HR Business Partner curriculum.

Training individuals to act as internal coaches complements a leadership development strategy that also incorporates the use of external executive coaches. The highly interactive two-day workshop is built upon a case study, and is designed to:

- Give HR Business Partners the knowledge needed to provide internal coaching to mid- to upper-level leaders.
- Help HR Business Partners understand the different types of coaching and the coaching process.
- Practice "real life" scenarios to increase comfort level and effectiveness in coaching.

RAC00031063

- Provide executive coaching resources for further development.

In addition to providing individuals with the knowledge needed to coach others, the Executive Coaching workshop also enables participants to carry forward the coaching skills they learned in the classroom. Each participant identifies the executive coaching competencies most critical to their own development and develops an individual coaching plan that they commit to implement over the next several months. Pairing up with another participant/learning partner allows each person to experience the role of both the "coach" and "coachee" back on the job.

In addition to Internal Executive Coaching training, our Leadership Development strategy provides for the selection and services of external executive coaches. External coaching is a feedback and relationship-based approach that compliments classroom and experiential learning.

In 2005, all of our group presidents (30) are going thru a development assessment and exec coaching process. Executives are nominated for executive coaching through their experiences in previous executive development efforts, while supervisors are nominated for executive coaching based upon identified developmental and performance issues. We use a heterogeneous combination of coaches including external and internal consultants, based largely upon the characteristics of each situation and/or executive. A typical coaching contract lasts 3 months (though a contract can last for a full year), and includes 360 degree assessments, identification of opportunities for growth, and behavioral contracting.

Effort right now to place our 30 top group presidents into executive coaching and development process.

**First-Line Supervisor Development:**    ☒        ☐        ☐        ☐        ☐

Describe Approach:

Our first-line supervisor development program includes three core courses for new managers and supervisors. The first is actually a pre-course which sets the stage for the other two. This course is called Exploring Leadership and introduces participants to Management Systems, Policies and Procedures and includes topics ranging from HR to legal to ethics. Participants are required to pass a certification to ensure they meet the required proficiency level. The first classroom course is called Essential Leadership (EL1): Management Foundations. This is an on-boarding leadership orientation class for new managers and supervisors. It introduces new managers and supervisors to the role of managing and leading people and is intended to assist a new manager's transition into their respective leadership role. An assessment is used to help managers understand their unique strengths and developmental opportunities as leaders. All new managers and supervisors are required to complete this course within the first 90 days of employment. Existing managers and supervisors are encouraged to attend and many who have attended recommend it for all managers regardless of tenure. Following the classroom experience, participants develop a plan for their first 90 days with their manager. Leadership trainers are responsible for following up on the plan. The second course is called Everyday Leadership (EL2) and is designed to build on the content areas presented in EL1. This course focuses on practical application on the job. The course emphasizes the importance of leadership, the role of attitude and self-management in leadership, conflict management (including an assessment of the participants' preferred conflict modes/styles), conducting performance management discussions, change and change management, and business ethics. Participants receive extensive opportunities for skill practice during the course.

**Job Rotation: (including overseas assignments)**    ☒        ☐        ☐        ☐        ☐

RAC00031064

**Describe Approach:**

Regions Retail Leadership Development Program (RLDP) began in 2003 and has achieved great success over the last two years. The rigorous program provides a twelve-month, structured on-the-job training experience for young professionals in retail banking. It is designed to fully prepare trainees for a retail management position. The curriculum consists of a series of job rotations within a retail branch including Teller, Financial Sales Representative, and Branch Sales Manager. These rotations utilize a blending learning approach consisting of instructor-led training, computer-based courses, on-the-job training with a trained mentor, and virtual classroom training sessions via WebEx. Trainees gain knowledge of sales, service, branch operations, and leadership.

The class of 2004-05 completed more than 834 hours of computer based (CBT) and classroom training with approximately 358 hours learning the Teller and Teller Supervisor functions, 336 hours Financial Sales Representative and Consumer Lending, and 140 hours in a management rotation. In their final rotation, this group of bright trainees brought in more than $7,955,000 in deposits and more than $6,644,000 in funded loans.

In its first year of inception, the program saw 85% of its beginning trainees complete the program through graduation and 83% of those trainees placed in management positions. The second year graduated 23 of the original 31 management trainees and from that group, 8 were promoted to management positions while 3 were promoted into other positions with the company. With enrollment growing strong each year and a continued success rate of graduate promotions, Regions demonstrates its value of providing growth and learning opportunities for performance-oriented associates through the Retail Leadership Development Program.

Job rotation in RIT - 2 full time positions set aside for folks to be pulled out of line and into job rotation processes reporting to RIT CLO. 12-18 month job rotation with Technology depts. We manage those.

**Leadership Development:**    ☒    ☐    ☐    ☐    ☐

**Describe Approach:**

We have designed and implemented a leadership development process that begins with first-line supervisors and continues to highest level executives. The process is based on research that identifies a manager's emotional intelligence as a prime differentiator in creating the climate needed to achieve outstanding business results. A Regions-specific competency model has been developed related to emotional intelligence and serves as the foundation for all classroom experiences. Classroom experiences are linked (each course builds upon the previous one) and multiple learning techniques are used to address individual learning styles, motivations, and backgrounds. Techniques include experiential and blended learning, self-assessments, 360 assessments, observation, coaching, and personal development planning.

Over the past year, 600 leaders have participated in these programs, a significant investment. Regions is actively working to protect that investment by continuously refining its leadership sustainment process. This ensures associates retain and use what they've learned. Sustainment activities include coaching, follow up 360 feedback, web conferences, ongoing training and action planning. The company links this initiative to formal performance management, talent management and succession planning processes to provide a holistic approach to effective leadership development. Historical results have demonstrated a dramatic shift in the climate created by leaders who have participated in the process vs. those leaders who have not.

The five core programs are:

RAC00031065

1) Exploring Leadership (self-paced online course), 2) Essential Leadership, 3) Everyday Leadership. For more details, see the description of our First Line Supervisor program above.

4) Exceptional Leadership Practices for Managers. Managers explore and identify leadership roles using Hay's 4 Circle Model and Emotional Intelligence Framework. This course includes effective communication practices, managerial styles, talent, and competency management.

5) Executive Leadership. Executives focus on enhancing their leadership effectiveness by recognizing their personal influence over four key areas crucial to organizational success: individual motives and competencies, job demands, managerial style, and organizational climate. Managers receive extensive feedback in each of these areas followed by a 1-hour private consultation with course facilitators. During the course, leaders learn to analyze how each of these areas work together to drive the performance of the organization.

Following the classroom experience (approximately 12–15 months later), Executive Leaders have the opportunity to participate in an individual leadership assessment designed to enable leaders to guage their progress since completing the course. This process utilizes even more in-depth assessment tools and is followed up with a private consultation. Executives share their strengths and developmental needs with their manager and develop a next step action plan.

**Mentoring:**          ☐          ☒          ☐          ☐          ☐

Describe Approach:

At Regions Financial, mentoring is evident throughout our organization. For example, Retail College trainers alone average 20% of their time coaching and mentoring in the field to support new hire trainees. An analysis of a control group of 30 branches which include a representative sample of our metro and community markets revealed the following:

- Net annual over/short for Tellers who had gone through training without a mentor in these branches was $1,830.99 short.
- Net annual over/short for Tellers who had gone through a mentored training program in these branches was $590.29 over.
- 25% of the trainees that went through a mentored training program had a net annual over/short of $0.00. The other 75% had an *average* annual over/short of $36.89 over per Teller as compared to the annual branch *average* of $61.03 short per Teller.

When asked for feedback on the mentoring program, one of our Area Sales Managers commented, "When I send a new hire Teller through the training program with a mentor, I know that Teller will be ready to perform at a much more efficient, accurate level than a new hire Teller who has not been mentored. I see the impact of this mentoring process in higher retention rates of new associates because of the confidence in their knowledge and abilities to perform the new job."

Better teamwork, morale, and productivity are also positively impacted by mentored training. We currently have approximately 550 certified Teller mentors, and new mentors are being recruited and trained to support our expanding organizational footprint.

Opportunities to be mentored do not end with the completion of new hire training. All of Regions' associates can be mentored by a member of the Career Advisor Network while they explore and manage their own career path. The Career Advisor Network is group of trained, knowledgeable HR staff who are available to help associates get the most out of their career planning efforts through the use of a comprehensive set of career planning resources. Available tools in the Career Advisor

RAC00031066

Network include the Online Career Center, the Career Directions Workshop, an Informational Interviewing process, the RULearning System, and the Career Resource Advisor Network.

**Professional Skills:**    ☒    ☐    ☐    ☐    ☐
Describe Approach:

Regions' University creates and updates curricula that support the business unit's training needs, including professional skills development. The approach to professional skills development is formulated within the University's colleges. RU Learning (the organization's Learning Management System) houses several e-learning libraries, including Skill Soft and ABA (American Bankers Association), which include professional skills courseware. E-learning libraries are updated yearly at the request of College Learning Officers who stay attuned to the various populations' needs. For example, new courses were added to RU Learning during 2005 for HR professionals, including Recruitment & Selection, EEOC & Affirmative Action, and Human Resource Development. Existing or new instructor-led programs are also implemented to meet professional skills needs. For instance, a new course was developed in-house during 2005 to advance the Internal Consulting Skills of HR Business Partners and was incorporated into the new HR Business Partner curriculum.

Regions' leadership supports national and local memberships in professional organizations to advance professional skills and designations, such as the Society for Human Resource Management (SHRM), the American Society for Training & Development (ASTD), the Center for Financial Training (CFT), the Mortgage Bankers Association (MBA), the American Bankers Association (ABA), as well as various state/national boards for professional certifications and continuing education. Targeted participation by Regions professionals in external development events sponsored by such organizations is also supported by Regions leadership. Professional Certifications Plans are administered through Compensation to provide incentives to associates who complete targeted professional certifications. For example, incentives are awarded to Corporate Security staff who complete one or more of eight approved certifications including CPP (Certified Protection Professional), and to HR associates who complete their PHR certification or SPHR certification.

Ultimately, the College Learning Officers who support professional staff select appropriate professional skills courses for their populations, and include those in targeted curriculums or in-house certification programs. College Learning Officers also strive to incorporate continuing education programs and external certification programs into the overall recommended curricula. Instructor-led or online courses delivered in-house are submitted for CE or CPE credit to sponsoring boards to benefit professional staff working towards designations or certifications.

**Remedial Skills Training:**    ☐    ☒    ☐    ☐    ☐
Describe Approach:

Remedial training is available to all associates for any computer-based training programs they have successfully completed. CBT courses require the learner to complete a Level 2 assessment to ensure content knowledge prior to assigning a "passed" status. When learners need a refresher on some component of the course, they can easily launch the course in "review" mode from their learning history screen. This functionality of the LMS allows the learner to review content without the testing requirement for the course. Remedial training is available on an as-needed basis in a self-service environment.

Additional remedial training is provided to learners who participate in instructor-led virtual classroom training events. After the initial rollout of training using synchronous distance learning as the delivery vehicle, the training sessions are recorded and posted as courses on the Learning Management System for remedial training.

RAC00031067

Approximately 70% of all training offered at Regions Financial supports remediation on demand.

**Sales Training:**    ☒    ☐    ☐    ☐    ☐
Describe Approach:
Our sales training, Chart The Course (CTC), is composed of sales training classes, short-term coaching interventions, performance coaching contracts with Retail managers, and sales incentives and initiatives from Retail Sales and Service. The program is highly integrated with the sales efforts and initiatives of Regions' Retail Sales and Service department.

Sustainment efforts for our sales training program include a weekly CTC publication that contains program updates and best practices, branch sales contests, weekly updated centralized sales information that includes financial results and sales behaviors, direct sales incentives, and sales recognition for selected sales campaigns. Updates on associates' progress to the coveted Chairman's Club designation are also included (Chairman's Club designation is awarded to high performing Branch Managers and multiple-branch managers for exceeding multiple performance targets). Also, Branch Managers view their updated results on sales behaviors and financial results on a weekly basis. They can also view their performance relative to other branches, and the progress of their geographical divisions. Sales Training Team members view this information prior to conducting classes or conducting Coaching Contracts, and in consultation with local leadership, determine the appropriate sales development learning strategy.

CTC is evaluated through direct Level 1 assessments, the CTC Tracking and Reporting database System (Level 3), and an annual Sales Review (Level 3) in which twenty-five percent of all branches are reviewed on-site by teams of top performing managers and sales trainers to audit compliance for all sales and sales management behaviors. An analysis between those receiving high scores on the Sales Review (actually doing the desired behaviors) and those exceeding sales and financial goals indicates a strong positive correlation (Level 4).

**Succession Planning:**    ☒    ☐    ☐    ☐    ☐
(specific to the executive team and separate from leadership development in general)
Describe Approach:
Regions has a formal succession management process (known as "Talent Management" for the top three levels of the organization. This process is aimed at ensuring the continuation of the company's leadership pipeline and takes a comprehensive approach that includes components related to talent identification, talent review, talent tracking/retention planning, and replacement planning for executive and key positions. The talent identification process assesses individual performance contribution, leadership potential, and retention risk. The talent review process provides an opportunity for multi-source feedback on the capabilities of the talent pool while identifying possible next assignments for those groups. The talent tracking/retention planning component enables the movement of top level talent to be tracked from the top of the organization so that individualized retention plans can be developed with the support of HR. Formal replacement planning ensures that back-ups are available for key positions. With the roll-out of the talent management process to the new company, Regions is currently expanding its replacement planning process for top level positions to include a comprehensive assessment/interview process to better explore the fit between individuals in the talent pool and available top-level positions.

Link succession planning to executive development. Part of the succ planning processes is to identify development needs of our execs and develop tracking and plannning system to ensure the development activites are completed. The succession planning efforts are aimed at top 3 levels of organization. It occurs annually, execs prepare presentations on their particular areas of company

RAC00031068

Culminates in annual meeting where plans are presented, reviewed and approved. The plans are monitored and reviewed throught the year. Significant openings occur, deceisions i plancement are made via review of succession plans.

**Technical/IT Skills**
**Training:**    ☐    ☒    ☐    ☐    ☐
Describe Approach: Don M. as primary; Cindi

**Other: Conversion Training**    ☒    ☐    ☐    ☐    ☐
Describe Approach:
Due to a notable merger within the finance industry between two very large financial institutions involving ourselves and another major organization, we needed to convert and integrate all of our legacy retail branches so that the entire retail organization would be aligned under the same operating model. This required Organizational Development & Learning to design, develop, and deliver retail branch conversion training to support the conversion of over 700 legacy retail branches. Over 5,500 retail associates were in need of being trained on new products, new systems, and new processes.

To accomplish this monumental task, we created the Retail Merger Integration Training Strategy, under which we implemented a blended training approach to establish general culture awareness, keep associates engaged, develop new practices/processes, and develop skills for enhanced or converted system use. Our mission was to provide our associates with new, established skills *prior* to product enhancement releases and retail branch conversion dates.

The Retail Merger Integration Training Strategy required weekly learning leading up to the conversion, delivered by a Branch Coach and Training Coach. Conversion training took place 12 weeks prior to conversion dates. The overall conversion-training model entailed a layered training approach, with learning beginning with an emphasis on recall/knowledge, and progressing over 12 weeks to application/mastery as the conversion date approaches.

The specific training curricula were determined by working extensively with line of business executives and subject matter experts, and included professional development, business orientation, and systems use. The curricula was determined by job roles (e.g., Teller, FSR, Branch Manger), and involved 35-45 hours of training (2-8 hours per week). The conversion training curricula is not classroom-weighted, as there is a healthy mix of self-study and coach-led learning activities. Our Retail College Conversion Coaches were each assigned to 7-10 branches, and each branch also had a Branch Conversion Lead, who lead/supervised the self-directed learning activities in the branch. We also leveraged technology to deliver, track, and measure training.

The success of the merger hinged upon the success of this innovate training. There was no practical way to convert 700 branches and 5,500 associates to the new organizational model without suffering drastic performance reductions in sales, customer service, turnover, and associate engagement.

Number of total hours of training from ASTD

**Other: Mortgage**    ☒    ☐    ☐    ☐    ☐
Describe Approach:
Regions Mortgage College provides a blended learning approach for our Mortgage Loan Originators (MLOs), encompassing system on boarding, policies, procedures, and Regions Mortgage proprietary products. There are three distinct aspects of the curricula:

RAC00031069

The first requirement for new hires during their first week on the job is to read material describing the various aspects of their job responsibilities and 88 Regions-specific mortgage loan products. Once the material has been reviewed, the new hire completes 16 open book assessments on Regions' Learning Management System. Each new hire must also complete four system simulations. These simulations cover system access and navigation, loan registration, and loan application data entry requirements.

After completion of all assessments and simulations, new hire MLOs attend a 3-½ day instructor-led course. At the outset of the course, new hires are required to complete a closed book, comprehensive assessment to gauge their retention of the prework material. The course then focuses on hands-on system training for two days. A certification is required; the Learning Coach must observe each participant complete his or her required job functions with a 90% degree of accuracy. Lack of certification requires additional on the job training and a manager review of applications.

The final 1½ day of the class focuses on the policies, procedures, and products introduced in the pre-work. New hires are grouped together and provided with actual case files; they must assess the borrower's needs, establish which programs the borrower qualifies for and price each loan scenario. Each group presents their findings to the class participants, who in turn validate the recommendations. Each class participant is then assigned an individual case study in which he/she completes the same process described above. Class participants complete a peer review of each presenter, challenging their recommendations, pricing, and assumptions.

At the end of the class, each participant must complete a 100-question closed book assessment covering the pre-work as well as classroom topics. Each participant must achieve a minimum score of 75% to continue employment with Regions Mortgage. Should a participant fail to reach that standard, they are given two additional chances to re-take the assessment in a proctored environment.

Class results, including peer and learning coach comments, are provided to the hiring manager within 48 hours of class completion. Senior management receives a monthly comprehensive report. New hires are also tracked for tenure and productivity during their first year of employment.

**Other: Behavioral Interviewing** ☒          ☐          ☐          ☐          ☐
**Describe Approach:**
Behavioral-based interviewing is an integral part of Regions' Selection and Assessment strategy. The Assessment team has implemented a well-researched and rigorous interviewing methodology that is legally defensible and effective at identifying candidates who are likely to be successful in their jobs. The interview is based on job-specific, validated competency models that identify the critical knowledge, skills, abilities and personal characteristics that are essential to be successful in the job.

Our Assessment team is responsible for creating tailored, behavior-based interview guides to be used in the selection interview as well as to ensure that all hiring managers and interviewers are trained in the use of the guides and skilled in conducting effective interviews.

The goal of the behavioral-based training program is to address the fundamental hiring practices at Regions and to assist hiring managers in maximizing the potential from the job candidate interview process in order to select candidates with high probability of success in the job and to increase employee retention. The target group for the behavior based interview training is all managers as well as other job incumbents who are likely to participate in the interview process. The training is an all day program that uses a combination of instructor-led training, video clips with interactive

exercises, and several skill-building exercises that provide course participants with an opportunity for hands-on learning.

As part of the training, the participants learn of the potential errors that can happen with using an unstructured interview process. They are also exposed to the costs of bad hiring decisions (i.e., undesired turnover). The training highlights research findings that demonstrate the effectiveness of using a behavior-based interview approach.

The training includes creating awareness around legal implications in hiring practices, with attention paid to major employment laws and with learning targeted toward conducting a sound, legal interview.

A considerable part of the training program is also devoted to building skills in conducting effective interviews. The interview skills covered range from how to build rapport with candidates to asking effective, probing questions and evaluating for job fit. The final section of the training program covers evaluation of the information collected in the interview to help the interviewers arrive at a hiring decision.

RAC00031071

# RETURN ON INVESTMENT

Describe your best return on investment outcome. For example, a company in the 2003 Training Top 100 gained $250,000 in additional revenue from a $30,000 investment in executive coaching. **Please remember that ROI does not include savings associated with course conversion or T&E costs avoided.** (Word count limit: 500)

**Sales Training.** Our sales training, Chart The Course (CTC), is composed of sales training classes, short-term coaching interventions, performance coaching contracts with Retail managers, and sales incentives and initiatives from Retail Sales and Service. The program is highly integrated with the sales efforts and initiatives of Regions' Retail Sales and Service department.

Sustainment efforts for our sales training program include a weekly CTC publication that contains program updates and best practices, branch sales contests, weekly updated centralized sales information that includes financial results and sales behaviors, direct sales incentives, and sales recognition for selected sales campaigns. Updates on associates' progress to the coveted Chairman's Club designation are also included (Chairman's Club designation is awarded to high performing Branch Managers and multiple-branch managers for exceeding multiple performance targets). Also, Branch Managers view their updated results on sales behaviors and financial results on a weekly basis. They can also view their performance relative to other branches, and the progress of their geographical divisions. Sales Training Team members view this information prior to conducting classes or conducting Coaching Contracts, and in consultation with local leadership, determine the appropriate sales development learning strategy.

CTC has contributed to an increase in most of the profitable customer households ("Mainsails"), and to an increase in the profitability of each. The number Mainsails has increased by 2.9% and the services (products) per Mainsail has increased 6.96%. Applying a conservative 5% value estimate, the increase in profitability would exceed $1.9 million.

CTC is evaluated through direct Level 1 assessments, the CTC Tracking and Reporting database System (Level 3), and an annual Sales Review (Level 3) in which twenty-five percent of all branches are reviewed on-site by teams of top performing managers and sales trainers to audit compliance for all sales and sales management behaviors. An analysis between those receiving high scores on the Sales Review (actually doing the desired behaviors) and those exceeding sales and financial goals indicates a strong positive correlation (Level 4). As coaching and sales leadership skills are gained through CTC, it was expected that membership in the top-performing Chairman's Club would increase. In fact, the number of managers attaining this designation doubled each year for four consecutive years since the beginning of the new CTC curriculum, sales training, and performance sales coaching. In 2004, the number of branches attaining Chairman's Club increased by 79%. A Chairman's Club branch exhibits a ten-to-one profitability compared to other branches.

Sales Performance Coaching contracts between members of the Sales Training Team and local managers have also proven profitable. Sixty-eight percent of coaching contracts have resulted in branches attaining Chairman's Club designation within two years. The average cost of a contract is $1,550, and the profitability increase is demonstrated by Chairman's Club members experiencing a 12.7% growth in deposits compared to a 0.9% growth for others. Further, Fee Income increase for Chairman's Club branches was 7.37% compared to a -4.7% decline for others. Meanwhile, average Loan Growth of a Chairman's Club branch was 37.7%, while others were at a -.2% decline.

The direction and focus to change behaviors and deliver results through the overall CTC program is clearly demonstrating financial results.

RAC00031072

# BEST PRACTICE AWARDS

As part of the Training Top 100 Award Program, a number of special BEST PRACTICE AWARDS will be presented. Please nominate up to three formal training program(s), from the list of programs in question 2.2 above, that you would like to submit for consideration of this distinction.

You may nominate up to three formal programs for this award. Please limit your additional descriptions and details to 350 words per program being nominated.

**The list of formal programs includes:**
*Career Counseling; Certification; Communications Skills; Customer Service; Diversity; Employee Orientation; Executive Coaching; First-Line Supervisor Development; Job Rotation; Leadership Development; Mentoring; Professional Skills; Remedial Skills Training; Sales Training; Succession Planning and Technical/IT Skills Training.*

**Best Practice Award Submission One: (350 word limit)**

**Leadership.** Building a leadership culture is key to our ability to meet market expectations. A company's cultural traits can impact individual performance more than 30% (Corporate Leadership Council 2002). Obtaining maximum individual performance is driven extensively by each individual's desire to give her or his best discretionary effort (i.e., employee engagement). According to a 2003 Towers Perrin survey, the number one driver of employee engagement is the degree to which employees believe that senior management has a sincere interest in their well-being. This requires a management team consisting of emotionally engaged, emotionally intelligent leaders prepared to meet the leadership needs of their work unit. Leadership Development at Regions is designed to develop emotionally intelligent leaders by helping them first understand and manage themselves so that they will be maximally effective in understanding and leading others.

To develop an accurate understanding of self, leaders need feedback and each of the Regions leadership programs is rich in feedback. Feedback tools include: Climate (6 dimensions as defined by HayGroup), 360 Leadership Competency feedback, 360 Managerial Style feedback, Individual Motive Profiles, Learning Styles, Conflict Styles, Job Fit (self assessment), Personal Styles and private consultations. The depth of the assessments is richer and the insights gained are deeper with each progressive leadership experience. Other leadership courses meet targeted needs and include: managing change, managing performance, leading stressed associates, etc. Our strategy provides for the selection and services of External Executive Coaches. Coaching is feedback and relationship-based; it compliments classroom and experiential learning.

In addition to general leadership development, Regions recognizes the need for line of business specific applications of leadership principles. At the start of each new year, "Leadership in Financial Services" -- a 2 day program delivered in the local markets -- is used to build "clarity" with regard to the year's business strategy. Approximately 80 sessions are conducted each year by the sales training team, senior leadership trainers, the retail training staff, and the retail sales organization. The process includes an overview of specific annual goals, the annual marketing focus, and a full day devoted to building skills needed to execute the business strategy.

RAC00031073

**Best Practice Award Submission Two: (350 word limit)**

**New Associate Orientation.** What were we facing? What was the issue? Two companies coming together, needed to define for new hires what this org was about-need to create identity, need to discuss culture for new org, need to ensure folks that the new org is viable entrprise. To do that, we totally reenigered NAO!

How many components do this class have? Five, six-passowrds, IDs, checkbook, survey, etc! Major change management process!

Regions recognizes that effective orientation must extend beyond a classroom experience to be truly comprehensive. To support this need, Regions put together a 90-day on-boarding plan that covers everything from remembering to enroll in a benefits plan to making sure the associate understands individual goals and objectives. This plan has been cleverly designed into a "check register" format that plays off of the fact that these associates work for a financial institution. Check items in the 1000 range are expected to be completed during the first week; items in the 2000 range are expected to be completed in the second week, items in the 3000 range are to be completed during the third week, and so forth. Each week, associates are encouraged to "balance their checkbook" with their manager to ensure that they have completed necessary activities and have the information they need to be successful in their jobs. Associates receive these "check register" plans inside of a leather checkbook cover that is embossed with the Regions logo. This cover represents a "take-away" that associates can later use with their personal checkbooks. These "checkbooks" have been so well received by the field that numerous requests for something similar for existing associates have been made.

To create a dynamic feedback loop on each associate's transition to their job, a 30-day follow-up survey is conducted to ensure each associate received appropriate guidance and on-the-job support as well as benchmark their satisfaction with the organizational climate.

Our corporate-wide orientation initiative helps support the Human Resources strategy of creating one culture. All new associates receive the same information about the organization regardless of where they are hired. HR associates throughout the organization have been certified to deliver the orientation program.

When asked about the orientation program, one associate said, "The program really said 'welcome' and offered a chance to not just see other faces, but to get acquainted with each other as a team coming aboard."

Number of trainers we've trained to delivery this? Number of classed YTD (from Cindi), number of particips YTD? We've added a fulltime coordinator for NAO (Beverly Boggins)!

RAC00031074

**Best Practice Award Submission Three: (350 word limit)**

**Learning Maps: Building for the Future**

What is the business case for this? Add lrng map component to above list?

The 2005 re-orientation of existing associates into the newly merged company involved a series of 4 learning map sessions known as the "Building for the Future" campaign that proved to be a tremendous success. During these sessions, associates learned about emerging issues in the financial services industry, Regions' plans for responding to these issues, and opportunities for individual involvement in making the merger a success. Evaluation of this process revealed that most associates found the process to be a fun and effective way to connect to organizational strategies. Some 89% of survey respondents believed that the process helped them better understand organization's business plans, and 88% believed the process helped them identify ways that they can contribute to the organzation's success. Ninety-three percent said that they appreciated having the opportunity to learn about the organization's strategic plans. Most comments on the process were extremely positive and can be summed up in this reponse from one survey respondent: "It was nice to get some direciton from our newly merged company, Regions Bank, as to its plans and direction within the financial institution world. The maps helped to give us an idea of where we fit, and how each of our roles within the organization can make us all successful."

Regions was able to take the map that dealt with the overall direction of the company and adapt it to support the on-boarding of new associates. Regions has plans to use the map format in the future as a key change management tool for taking complex information and making it understandable to a broad range of audience groups. A new map is currently being developed to explain the direction the company will take in 2006.

RAC00031075

## OUTSTANDING TRAINING INITIATIVE AWARD

*In addition to the Best Practice Awards described above, several winners will also receive an OUTSTANDING TRAINING INITIATIVE AWARD will be presented.*

*To nominate an outstanding initiative for consideration for this award, please describe an outstanding training and development initiative (EXCLUDING the formal programs nominated above for Best Practice Award consideration) that your organization has undertaken in the past 12 months that could serve as a benchmark for other companies.*

Outstanding Training Initiative Award Nomination: (Word count limit: 500)

**Conversion Training**. Organizations sometimes struggle with capturing training investment and the impact on the business and employees. In the context of a merger, the connection can often be made more directly. Employees are confused and uncertain about the change and the new skills required. Customers are impacted and turnover rates for both customers and employees increase. According to industry research data, up to 30% of all mergers substantially erode business performance and shareholder value.

But not at Regions: during the Regions and Union Planters merger in 2005, our business performance stability and Associate satisfaction outperformed analysts' and leadership expectations. This strong track record, over the course of three merger 'events', is due in large part to the learning strategy undertaken. An independent audit taken by KPMG found that performance (as a result of training) and degree of confidence and satisfaction with the training, was strong and improved consistently across all three events.

The new company would now have 5 million customers through approximately 1,400 branch locations. Serving this larger customer base effectively, while preserving the business case at the heart of the merger, concentrated the focus on enabling the newly merged workforce, approximately 5,500 retail associates and 1,200 commercial associates, to perform at the highest levels. In short, the challenge was how to do more with less when, the reality was, the company really wasn't that much "less". Given the business goals of the Regions-Union Planters merger—which depended upon reducing time to proficiency for the workforce while holding down costs— we knew from the beginning that e-learning would play a critical role. Even if there had been time to administer instructor-led learning, the costs of delivery would have undermined a great deal of the business case of the merger itself. About 22,000 hours of development time were needed to create the e-learning solutions—over 150 different learning solutions, almost all of which were custom developed.

The learning strategy provided for a blended delivery approach of online learning and expert led sessions. This required a training capability for business partnership, training development, and delivery. Curricula development cycles in our case were much shorter and measured in weeks and days rather than months; partnering with the business for content approval was measured in days and hours rather than weeks. Coordination across learning, business and technology groups was key as learning solutions were approved, loaded and tested for delivery on the Learning Management System (LMS), and as the stability and consistency of the technology environment was tested. In delivery, the need for rapid learning take-up was higher, as each week compounded the various learning needs before the merger conversion date.

Associates advanced through a curriculum of cultural values, product knowledge, system applications and specialized procedures. This led learners right up to the week before conversion when we could get into specific mastery assignments for especially critical roles. Also important to

RAC00031076

the learning experience: the deployed learning coaches. This approach has been especially well-received by the workforce, and has helped maintain the cost structure and effectiveness of the online learning experience, while getting the kind of reinforcement that comes from direct and personal interaction with experts. Coaches emphasize important lessons and offer remediation where necessary. Overall, this approach 'advanced the bar' for how learning, and in particular, e-Learning, was applied. e-Learning established baseline skills, allowing for field coaches to engage in much more influential dialogue with learners to advance skill sets even further. Given the high degree of business commitment and sponsorship, coach support and learner motivation, we consistently had above 80% completion rates for conversion training overall.

RAC00031077

**2.3     HOURS OF TRAINING:** For each of the following "types of employees," how many PER-PERSON HOURS of formal, planned training (excluding orientation) does your organization provide employees ANNUALLY?

☐ NFP

|  | Annual per-person Hours |
|---|---|
| Production/Line Employees | N = |
| Supervisory Employees | N = 975 (Operations) |
| Administration/Support Staff | N = |
| Professional Employees | N = 2,300 (Sr Professional, Professional) |
| Sales/Account Management FSRs, etc.) | N = 15,000 (Sales, Sr Clerical, Clerical – Tellers, |
| Technical/IT Staff | N = 570 (Technicians) |
| Management Employees | N = 3,200 (Supervisory/Line Mngmnt; Management) |
| Senior Management | N = 200 |

| 11. Percentage of learning content (provided) devoted to the following areas: | 21,500 hrs provided. 750,000 received | |
|---|---|---|
|  | 2004 | 2005 Projected |
| (a) Executive development | 4% | 4% |
| (b) Managerial and supervisory | 13% | 10% |
| (c) Sales | 16% | 18% |
| (d) Customer service | 10% | 10% |
| (e) Mandatory and compliance (e.g., safety, security) | 8% | 6% |
| (f) Processes, procedures, business practices, and quality | 9% | 8% |
| (g) Information technology and systems (e.g., enterprise and desktop software) | 5% | 4% |
| (h) Interpersonal skills (e.g., communication, team work) | 10% | 10% |
| (i) New employee orientation | 3% | 3% |
| (j) Basic skills | 15% | 20% |
| (k) Profession-specific or industry-specific (e.g., engineering, accounting, legal, medical) | 2% | 2% |
| (l) Product Knowledge | 5% | 5% |
| (m) Other (please specify): | 0% | 0% |

**2.4     What is the TOTAL number of each classification of TRAINING PROFESSIONALS in your organization?**

| Full-time Trainers: | 140 | ☐ NFP |
|---|---|---|
| Part-time Trainers: | 0 | ☐ NFP |
| Subject Matter Experts: | See Mike P. | ☐ NFP |

RAC00031078

**2.5     TRAINING BUDGET: What is your company's TOTAL training budget for 2005 or your current fiscal year?** (Please provide your answer in the form of a WHOLE NUMBER in US Dollars - do not use words, ranges or abbreviations. Be sure to include training staff salaries, outside expenditures, materials, services, etc.)

Total Training Budget   $: 21.5M          ☐ NFP

**2.6     When your organization calculates total payroll, please identify all components used.**

☒  Salaries

☒  Bonuses

☒  Stock options

☐  Profit sharing

☒  Benefits

☒  Other (please specify), Please Specify: shift pay, overtime, incentive pay

**2.7     How much does the total training budget provided above represent as a percentage of payroll for 2005?**

% of total payroll:  1.92% in 2004; 1.57% in 2003          ☐ NFP

**2.8     Does your organization have a tuition reimbursement/payment program available to employees?** (If you select NO, please skip to question 2.14.)

☒ Yes          ☐ No

**2.9     What percentage of eligible employees MADE USE of tuition reimbursement in 2004 or your most recently completed fiscal year?**

6.3 %          ☐ NFP

**2.10     What is the maximum tuition reimbursement/payment your company has established for each employee in 2005?** (If your organization does not provide a maximum amount, please respond as "no maximum")

$: 5,000          ☐ NFP

**2.11     Using the scale below, please indicate how often each situation applies to your organization's tuition reimbursement/prepayment program.**

|  | Always | Often | Seldom | Never | Not Applicable |
|---|---|---|---|---|---|
| a. Program must be related to job of employee | ☒ | ☐ | ☐ | ☐ | |
| b. Program must be degree-seeking in nature | ☐ | ☒ | ☐ | ☐ | |

RAC00031079

c. Tuition is reimbursed on a sliding scale depending upon grade achieved

☐ ☐ ☐ ☒ ☐

d. Tuition is reimbursed after course work is completed

☒ ☐ ☐ ☐ ☐

e. Tuition is prepaid by the organization

☐ ☐ ☐ ☒ ☐

f. Tuition reimbursement/payment includes materials and books

☒ ☐ ☐ ☐ ☐

g. Employee must complete a certain term of employment before participating in the program

☒ ☐ ☐ ☐ ☐

h. Employee must stay with the organization for a certain length of time after finishing courses or he/she may have to pay back all or part of the tuition reimbursement

☒ ☐ ☐ ☐ ☐

**2.12    Company-wide, how much did you spend on your tuition reimbursement/payment program in 2004 or your most recent fiscal year?** Please provide your answer in the form of a WHOLE NUMBER - do not use words, ranges or abbreviations.

$1,500,000    ☐ NFP

**2.13    Please provide additional comments if desired about your organization's tuition reimbursement / prepayment program:** (Word count limit: 200))

Regions Financial reimburses associates for courses that further their education in the practice and theory of banking and/or a field directly related to their current job.  Associates must have a performance rating of Acceptable or better, both at the time they begin the course and the time they request tuition reimbursement. Associates must also receive an overall grade of "C" or better in the course to be eligible for tuition reimbursement.

RAC00031080

**2.14**  **Does your organization have a corporate university?**
(If you select NO, please skip to question 3.1.))

⊠ Yes        ☐ No

**2.15**  **Would you describe your organization's corporate university as:** (select all that apply)

☐ Traditional single-site facility

⊠ Shared facility Regional facilities

⊠ Virtual Corporate University

☐ Shared facility

⊠ Other (please describe): Please Describe Learning Labs (30) strategically located thru 15-state footpront

**2.16**  **To better describe your Corporate University (CU), please provide some additional information as requested below:**

What is the name of your corporate university?   Regions University

Is it promoted or marketed to employees under that name?        ⊠ Yes   ☐ No

How many years has your Corporate University been in existence?        **4**

On average, how many users does your CU serve annually?        **25,000 (all associates)**

How many course offerings are provided through your CU annually?        **1,500**

How many classroom-based sessions are conducted annually?        **4,300**

How many online or Web-based sessions are provided annually?        **340**

What is the technological infrastructure of your corporate university?
For example, do you use an LMS, an LCMS, or other information systems? (Word count limit: 200)

Vendor ASP (Associated Service Provider) model (We have them host the application) with internal content servers. The application is named RU Learning.

All of Regions' training delivery methods are supported by "RU Learning," the organization's Learning Management System (LMS). RU Learning is a web-based application available from the organization's intranet as well as the Internet. When associates log on, they can visit the virtual University College that supports their job, and search the course catalog for computer-based training and classroom learning events that match their competency development needs. While providing the basics of training management, this system also houses the job-specific competency models. Associates can access information on needed competencies, can identify gaps in their current abilities, and can find learning and development activities. In addition, RU Learning resources support the company's Talent Management strategy by providing manager and learner reporting, development planning tools, competency assessments, and career exploration services. RU Learning's University Web Site provides every associate access to critical, job specific training support material, contact information and training rollout plans for their respective college. With 1,500 course offerings in seven different colleges (Retail, Commercial, Mortgage,

RAC00031081

Operations, Corporate Support, Trust, and Technology), associates can register for training classes, review training records, explore career options, launch computer-based training courses (including compliance training), and develop skills for promotions.

RAC00031082

# PART THREE: ABOUT YOUR TRAINING PROGRAMS

**3.1    EVALUATION:** Describe the processes and mechanisms you use to evaluate the effectiveness of training in your organization by indicating which of the following measurements you use. (Select all that apply and, briefly describe your approach. (Word count limit: 300 per description.)

☐ No Formal Evaluation Used

☐ Return on Value
Describe:

☐ Return on Investment
Describe:

☐ Balanced Scorecard Approach
Describe:

☐ SIX SIGMA
Describe:

☒ Kirkpatrick's Level 1 (Reaction)
Describe:
For Kirkpatrick's Level 1 evaluation, our Organizational Development & Learning team utilizes reaction-to-training assessments for 100% of our training events. Our Level 1 assessments include items related to content of the course, effectiveness of the trainer(s), method(s) of training delivery, materials used in training, training environment, and to what extent trainees expect their future job performance to be influenced by the training.

For example,
*Coping with Stress?*
*Behavioral Interviewing?*

☒ Kirkpatrick's Level 2 (Learning)
Describe:
For Kirkpatrick's Level 2 evaluation, our Organizational Development & Learning team utilizes learning assessment for 60% of our training events. Our Level 2 assessments include items related to the acquisition of knowledge, skills, or behavior resulting from training immediately post training and at a later point in time.

For example,
*NAO?*
*Retail Knowledge Product Assessment?*

☒ Kirkpatrick's Level 3 (Transfer)
Describe:
For Kirkpatrick's Level 3 evaluation, our Organizational Development & Learning team utilizes transfer of training assessments for 30% of our training events. Our Level 3 assessments include items related to supervisor's ratings, self-reported behaviors, and observations.

For example,
*Chart the Course and the coaches?*

☒ Kirkpatrick's Level 4 (Business Results)

RAC00031083

Describe:
For Kirkpatrick's Level 4 evaluation, our Organizational Development & Learning team utilizes results assessments for 20% of our training events. Our Level 4 assessments include items related to the assessment of organizational outcome objectives and acheivement of business results such as cost reduction, turnover, absenteeism, grievances, accidents, profits, productivity, and customer satisfaction.

For example,
*BQSI?*

☒ Other: Please specify and describe:
Describe:
We also utilize Phillips' (ROI) evaluation for 10% of our training events.

For example,
*Conversion training?*

Moreover, we evaluate the effectiveness of training via measures of culture and climate through on-boarding surveys, associate climate surveys, and exit interviews. In addition, our organization has a Quality Counsel that has been in operation for more than 10 years.

RAC00031084

**3.2    BUSINESS METRICS:** Which of the following business metrics does your organization track and use to evaluate or demonstrate the effects of training? Please provide examples of how these metrics have been improved through training. (Word count limit: 300 per metric)

**Retention/Turnover**                    ☒ Yes ☐ No ☐ N/A
Example:

Facilitating the growth and development of our associates is part of Regions' strategy to retain a highly effective workforce capable of providing quality service to both internal and external customers.  To this end, we offer a variety of training that our associates use to prepare for the next stage of their careers making it more likely they will choose to continue employment with Regions. We use a two pronged approach in order to facilitate this development.  First, we have begun offering an eight hour instructor led Career Directions Workshop that is open to all associates. Participants learn basic career planning concepts, self-assessment techniques, information on the world of Regions, and techniques for finding their best fit within the company.  By the end of the class associates are ready to become active participants in partnering with their manager in driving their growth and development.  In addition to the Career Directions Workshops, associates have access to over 200 developmental courses through our corporate college system, RU Learning. Associates can use web based tools to identify knowledge and skill gaps either at their current level or in their desired career direction that can then be addressed through developmental training. We have found that associates who are actively working on increasing knowledge and skills are 1.5 times more likely to remain with Regions than those who do not.  Our initial analysis is encouraging and has initiated further research focusing on affective reaction to training and its relationship to job satisfaction and turnover.

**Associate Turnover**. We achieved efficiency in the past 12 months with regards to associate turnover by focusing efforts on two areas: 1) New Associate Orientation, and 2) Retail Branch Teller Retention.

Our New Associate Orientation (NAO) program received an overhaul in 2004, and was rededicated to achieving its most important objective: confirming the new hire's decision to join our organization. We de-emphasized the paperwork drill and instead focused on enrolling the hearts and minds of our new associates.

In the new NAO program, we 1) focus on setting the expectations of our associates, 2) encourage new associates to continue networking with the other new associates, 3) provide them with the tools they need to perform at their best, and 4) provide them with tips about the best way to interact with their manager and other associates.

By implementing NAO properly, we expect to see a decrease of associate turnover for those associates who have less than 90 days of service with our organization. Research has shown that the on-boarding process is a key component to associate commitment (Corporate Leadership Council, 2004).

We have also achieved efficiency with regards to associate turnover by designing, developing, and delivering a comprehensive retention strategy for our retail branch Tellers. Historically, retail branch Teller turnover has been an issue in our organization, and our ultimate goal was to reduce Teller turnover by engaging, recognizing, and rewarding associates for the great work they do in our branches (details of the program are not provided here due to its proprietary nature, as well as space limitations).

During February of 2004, our Teller turnover was at 2.42%. During February of 2005, Teller turnover was at 2.20%. While this does not indicate a statistically significant

RAC00031085

decrease and may simply represent a stable turnover rate, it is important to note that all other turnover within Retail *increased* during the same 1-year time period (historically, Teller turnover should have increased along with all other turnover within Retail).

**New Employee Referrals**          ☒ Yes ☐ No ☐ N/A
Example:

The employee referral program rewards associates who refer individuals (and who must be subsequently hired and remain with the organization for 90 days) with a gift of $500. This program was enhanced in March of 2005 by focusing on the utilization of a centralized referral e-mailbox. In order to complete a referral, associates log into E-recruit (the Regions position management system, which automatically conducts a job search and records the requisition number of the position to which the associate is referring an individual). He/she then navigates to the virtual associate referral mailbox and enters the requested information to complete the referral. The training in relation to the referral program included communicating the program through The Source (Regions' associate newsletter), postings on Regions1Source (Regions' associate data portal), and poster distributions to every manager highlighting the referral program. We will continue to promote the centralized referral function and ease of the referral program and provide market boosts/refreshers where needed.

The success of this program has been monitored for the past six months. The primary measure is the number of referrals generated versus the number of individuals actually hired as a result of these referrals. Currently, out of the individuals referred, 30% of the group is being hired by Regions, a number that has been *doubled* since we implemented training on this topic. We've also measured the number of individuals who were hired by referrals compared to the number of individuals hired without referrals. We are currently tracking at a 12% hire rate from referrals.

**Internal Promotions**          ☒ Yes ☐ No ☐ N/A
Example:

Regions began the Qualified Service Representative (QSR) voluntary Teller certification program 5 years ago. The program was created to improve Teller performance and decrease turnover. This 18-month program is self-directed with a list of requirements provided to the participants. By assigning Tellers this responsibility, we create a sense of ownership for the Tellers, and instill the ability for them to manage their own career development.

The requirements of the program include a technical training component and a selection of professional development courses, such as Quality Customer Service and Product Knowledge. Additional courses that address banking basics, such as the History and Principles of Banking, Federal Regulations, and operations courses.

Internal research indicates an average of 42% of Tellers that are promoted to a higher position have completed the QSR program; with some districts as high as 75%. All of the Retail executives that we interviewed stated that the QSR program plays a very important role in advancement. This is a testament of the program's success and value to the Management of Retail Banking.

Currently, 1/3 of Regions' markets participate in the QSR program. Those areas that have implemented and embraced this program have had a significant drop in turnover, as well as shortages to the Bank. Administrators tell us that the associates in the QSR program are better prepared to effectively handle their job responsibilities. Not only do they understand more about the banking industry, they also have a clearer understanding of the role they play in the overall business plan of the company.

RAC00031086

**Quality**                         ☒ Yes ☐ No ☐ N/A
Example:

Excellence through Quality Service (EQS) is Regions' quality improvement program. All conversion projects were chartered according to EQS principles. Conversion leaders utilized tools and practices learned during EQS Training to accomplish conversion project goals. A College Learning Officer (CLO) was assigned to the Quality Director and Regions Quality Council to ensure the integration of EQS concepts and methodologies within OD&L strategies during this conversion year. As a result, EQS was integrated into the Learning Maps initiative and the New Associate Orientation initiative to promote Regions' focus on quality during this conversion year. In addition, OD&L Leadership Trainers attended an EQS Train-the-Trainer session to ensure the integration of quality management concepts and practices in the Leadership Training Series.

Quality standards are established by the Regions Quality Council for Corporate Support and Operations divisions. Quality measures are tracked and reported monthly. HR metrics and customer feedback contributed to the formation of a new HR Quality Council. The HR Quality Council was chartered as an EQS functional team and modeled after the Regions Quality Council. All HR Quality Council members attended EQS Project Management Training to ensure team success. In addition, various EQS training courses were incorporated into new HR curriculums to build quality focus within the HR organization. Operations divisions such as Lending Services Center, Collections & Recovery, and Technology also utilize quality councils/teams and training to maintain focus on quality standards and continuous improvement.

OD&L's Instructional Design & Learning team was recognized by the Regions Quality Council as a 2005 EQS Award recipient based on quality results: 62.5% of conversion development hours were completed by in-house designers, standardization of development processes and use of on-line learning realized significant savings, and 90% of associates who completed conversion training showed a satisfactory acceptance level of training materials.

Some examples of the types of quality measures utilized in the EQS program include our Associate Survey results, turnover rates, participation in improvements, money saved through associate suggestions, market share, customer retention rates, number of products per customer, customer satisfaction, cycle time, cost savings, and error rates. These EQS metrics are applied to programs such as Mystery Shopping, Financial Trust Training, Producing Quality Loans, Commercial Products Training, and Building Bank Quality Teams.

The impact of our EQS program can be found in cost reduction factors such as labor, inventory, cash flow, yield, capital expenditures, process simplification, and automation. Impacts can also be found in revenue enhancement factors such as sales volume, unit price, margin, and customer satisfaction.

**Production/Output**                 ☒ Yes ☐ No ☐ N/A
Example:

The Instructional Design team within OD&L faced a huge challenge – to provide development for conversion and integration training during the merger of Regions and Union Planters Bank.

The challenge was met by pulling together a cross-functional team that included Integration Team Leaders, Management Consultants, Project Management Office representatives, Line of Business owners, Subject Matter Experts, and College Learning Officers. This combined team worked together to capture and fulfill learning requirements for both Regions and Union Planters associates. A periodic formal review process was implemented to ensure customer quality standards and delivery deadlines were met. Weekly reports were submitted that showed percentages of completion within each step of the design phase – from analysis to evaluation. The gaps that were identified as

RAC00031087

part of the analysis phase required approximately 20,000 hours of development time that encompassed more than 150 formal courses for 128 learning hours and approximately 200 on the job training courses.

In-house designers completed 12,500 development hours, constituting 62.5 percent of the required 20,000 development hours. Development processes within the Instructional Design group were standardized and savings of approximately $1,500,000 were realized by not outsourcing all development. Key instructional designers managed 7,500 hours of development by external resources.

The quality of the finalized learning products was measured by Level One, Level Two, and Level Three assessments. Level One assessments were used to determine learner satisfaction with ratings greater than four on a five-point scale. Surveys conducted by outside management groups showed satisfactory acceptance of the training materials by 90% of associates surveyed. Level Two assessments were used to ensure learning and on-site learning coaches observed learner behavior in order to rate Level Three skills – the ability to perform the new tasks on the job.

Approximately 65% of the conversion and integration training was completed on the job either as print-based self study or as e-Learning. The organization was able to save an estimated $7,140,000 in travel costs and work time because associates were able to remain on the job.

**Customer Service/**
**Customer Satisfaction**               ☒ Yes ☐ No ☐ N/A
**Example:**
Alignment with the business strategy of the Regions Call Centers is vital to the success of the Call Center training program. This partnership demands the link of sales to service in all OD&L training initiatives. Therefore, Customer Service is the common thread woven throughout the Call Center training events.

Whether it's basic telephone skills, determining the caller's need by active listening, or providing proactive customer service through sales, each task performed by the telephone banker requires outstanding customer service skills. Being a community-focused bank, having the best and most capable workforce, and delivering the products and services that delight our customers are all part of Regions core value of "Doing the Right Thing".

Additionally, we know from research that our customers want responsive service and innovative, need-based financial solutions. Because true responsive service as a core value requires sustaining a continual service climate, multiple metrics on our balanced scorecard attest to OD&L's contribution toward this achievement. Because OD&L's Customer Service Training focuses on meeting the customer's need in a timely and efficient manner, two of the key measurements are the Call Abandonment Rate and the Percent of Customer Calls transferred from the telephone bankers back to the branch bankers. The Call Center telephone bankers routinely maintain an average Call Abandonment rate of less than 1%, well below their 5% benchmark target. In addition, with a goal of less than 15% of customer calls transferred back to the branches, after completing Customer Service training our telephone bankers average less than 6%.

**Customer Loyalty**                     ☒ Yes ☐ No ☐ N/A
**Example:**
Regions believes that customer loyalty depends on relationships. Therefore, in an effort to increase customer loyalty we conducted various training programs focusing on customer relationships throughout 2004. At the beginning of the year, managers attended leadership training focused on

RAC00031088

coaching the profiling skills of their sales associates. Associates attended Open/Close Workshops which reinforced profiling skills and Regions' Right Way Principles -- 10 ways to treat customers including standing while greeting the customer, smiling, and taking ownership of the issue. The workshops were named for one measure of customer loyalty -- the Open/Close ratio (the number of new checking accounts compared to the number of closed accounts). At year-end 2004, the company's Open/Close ratio was 0.97. By August 2005 (YTD) that figure had increased 28% to 1.24.

Another form of relationship training was Service Recovery Training which is based on Regions' belief that customer complaints should be handled using a structured process instead of being left to a haphazard reaction. The training focuses on a five-step process to turn dissatisfied customers into not only satisfied, but *loyal* customers. In one banking group where the training was implemented, the Open/Close ratio jumped from 0.84 to 1.11, a 32% increase.

Additonally, in preparation for the major system conversion, technical training was conducted consisting of a unique combination of 16–80 hours of computer-based training, in-market coaches, and simulation practice time. This training enabled bankers to be more confident in their abilities to operate the new system, and this confidence translated to interactions with the customer. Increased loyalty was evidenced by the fact that customer attrition was 94%, number that compares favorably to peer banks.

**Innovation/Product Development**
Example:
Kevin

☒ Yes ☐ No ☐ N/A

**Revenue/Sales**
Example:

☒ Yes ☐ No ☐ N/A

Our sales training program, Chart The Course (CTC), includes a sales interventions aspect. These sales interventions have contributed to revenue by moving branches to higher performance. The highest level performance for Retail branches is indicated by a Chairman's Club designation, which has increased 79% over approximately 335 branches. As of August 2005, over 500 branches are verifiably "on-track" in the CTC Tracking and Reporting database system for the designation by 2005 year end.

All Chairman's Club members have matriculated through the Advanced CTC classes. Fee Income for these branches was increased by 7.37%, compared to a decline of 4.7% for other branches. Moreover, loan growth for Chairman's Club was a strong 37.7% while others experienced a nominal decline of o.2%

**Market Share**
Example:

☒ Yes ☐ No ☐ N/A

Our Chart the Course training program is a unique, strategic, sales performance intervention. Regions' comprehensive sales performance strategy includes components for education, skill sustainment, and reinforcement of the sales culture. Chart the Course includes specific core curricula, formal performance coaching practices, incentive compensation and recognition programs, and continuing education.

Success is determined in part by improvement in key business measures related to market share. These measures are tracked and reviewed regularly and program enhancements are made accordingly. Such measures include:
- MainSail Households: increase in number as well as retention of existing client relationships.

RAC00031089

- Services per MainSail Household: evaluation of the number and variety of products maintained for each household.
- Chairman's Club: increase in number of Chairman's Club winners.
- Cross-sell Ratio: the ratio of products sold per client encounter.
- Open/Close Ratio: the ratio of total accounts opened to those closed over a period of time.

One annual continuing education component, Leadership in Financial Services (LFS), has contributed to increasing numbers of Chairman's Club winners since its inception in 1999. LFS is updated annually to best align with organization strategy and provide the resources necessary to successfully execute the business plan for the coming year.

Specific sales and retention initiatives were developed in 2004 to maintain the focus on customers during our company's merger and integration period. These efforts contributed to the improvement of our Open/Close ratio by 31% over an 8-month period. MainSail Services per Household also increased 7% for the year to date period.

**Safety/Health**                        ☒ Yes ☐ No ☐ N/A
**Example:**

Research has demonstrated that American workers report experiencing substantial stress in the workplace, and that such stress negatively impacts health, on the job accidents, general occupational functioning, and health care costs. However, one report from the Human Resource Institute (2005) indicated that only 34% of employers offer any type of stress management programs. Recognizing both the need and value of such a program, Regions Financial offers associates a comprehensive stress management training program that can be offered in formats varying from two to three hours to a full day (six hour) program. This training goes far beyond the "typical" stress management program that introduces participants to relaxation strategies and/or the importance of diet and exercise. Rather, the Regions stress program (developed internally by a board certified clinical and behavioral psychologist) emphasizes that while stress is a constant in today's world, distress is the internal reaction to the external stressors. To effectively cope with such stressors, we must detect the underlying thoughts, attitudes, and beliefs that creates the distress reaction.

The "Coping with Stress" workshop introduces participants to the relationship between thinking and feeling (distress), how to detect, dispute, and change distress-creating beliefs, provides opportunities for exploring stress and distress and practicing distress management techniques, and also additional stress management tools such as breathing techniques, relaxation strategies, and other practical tools. While geared toward stress management, the information presented is also useful to other on-the-job situations such as dealing with angry customers (internal and external) and defusing conflict within teams.

Since introducing the program in November of 2003, approximately 30 courses have been offered and over 200 associates have elected to participate in the training. Response to the course has been overwhelmingly positive with a rating of 4.9 (out of 5), indicating participants found the course useful and would recommend it to others.

In addition, our HR department distributes general health information to all associates via our Employee Assistance Program, which includes information from the Mayo Health Clinic and Lifeworks.

**Other: Sexual Harrassment**           ☒ Yes ☐ No ☐ N/A
**Example:**

RAC00031090

Through focused conflict resolution and management consulting services, our Associate Relations (AR) team brings issues to resolution through professional and legally sound advise including phone consultation, in-person interviewing, small group interventions, email advice, management guidance, Board of Review process, and mediation services. The AR team works closely with our HR Legal team, HR Corporate team, and OD&L department for proactive and risk-minimizing solutions.

In specific, Regions believes that our associates should be able to work in an environment free of harassment based on race, color, national origin, sex sexual orientation, religion, age, marital status, disability or veteran status. Therefore, a Code of Conduct Certification is administered annually through our Learning Management System, RU Learning. Each year, associates are required to review the Code of Conduct online, and pass a Code of Conduct assessment with a score of 100%. The HR Compliance Officer utilizes RU Learning compliance reports to identify and take action on non-compliant associates.

HR Associate Relations partnered with OD&L during 2005 to design and deliver harassment training strategies. In particular, we designed and delivered the "Sexual Harassment in the Workplace" CBT course for our Associate Relations professionals, and the "Sexual Harassment for Associates" CBT course for all of our associates. "Workplace Harassment," "Workplace Diversity," and "Respect and Dignity" are also relevant courses for associates and managers and are available through RU Learning. In cases where an AR intervention is needed, these CBTs can be followed with a instructor-led course taught by an Associate Relations Consultant.

Through the design and delivery of this type of training, we reinforce our belief that a workforce better able to resolve its own conflicts is also better able to serve its customers. It is our hope that improved associate relations will allow associates to focus on the work at hand in a healthy environment that enhances the performance of each individual and business unit.

**Other: Time-to-Fill Open Positions**                    ☒ Yes ☐ No ☐ N/A
**Example:**
At the beginning of the year, all Recruiters, Sourcing Specialists, and Recruiting Managers underwent training for E-Recruit, Regions' position management system. The two-day training focuses on navigating the system and system usage. We are also currently in progress of providing this training to line of business managers throughout our organization as well.

Time-to-Fill statistics are tracked and a report is generated on a weekly basis. The status of positions are dependent on the number of days the positions are open. For the field positions, a red status represents over 30 days open, a yellow status represents 21–30 days open, and a green status represents 20 and under days open. The recruiting team has developed recommended activities which will help move a position from red to yellow, and from yellow to green. This tracking provides focus and creates energy around keeping positions out of the red status. These statistics are also fed into the incentive plan, which rewards the Recruiters for strong performance (i.e., quality position filling, not just quotas).

Another way we track Time-to-Fill is via a quarterly client survey. The survey focuses on the quality and timeliness of the overall process. The resulting data is utilized in the incentive plan, and for gathering information on the timeliness of the new hire.

RAC00031091

Below are several questions about how training is viewed in your organization. Please answer either Yes or No to each question, and provide additional comments if desired.

### 3.3 Does your organization make use of competency maps and personal/individual development plans?

Yes ☒     No ☐

Additional Comment (word count limit: 200):

We acknowledge the training and development needs of all associates by providing job-based curricula and competency assessment opportunities. The validated competency models that we create are collections of essential knowledge, skills, abilities, and personal characteristics that result in successful performance of a role or job and differentiate solid from superior performance. Based on research and analysis, these models identify the competencies and behaviors of top performers and allow managers and associates to jointly take charge of the associate's development.

Job Competency profiles have defined proficiency levels for each skill or competency based on high-performer behaviors. Associates can rate themselves against a high-performer competency model created specifically for their job to identify skill gaps. Each competency model has a learning map of associated resources defined to assist associates and their manager in identifying appropriate training. Managers and associates can review a list of behaviors that an expert with a given competency will display.

This approach allows associates to realize their full potential in their current jobs by identifying development opportunities for those experiencing performance difficulties and preparing motivated associates to progress in their careers.

Combined with the use of behavioral-based interviewing methodologies, the use of competency models within Regions reduces turnover, increases the quality of new hires, provides developmental paths for our associates, and assists in the succession planning process. All competency models have been developed to support the organization's business strategy and vision.

### 3.4 Does your organization tie managers' compensation to the development of direct reports? Remember: Almost all companies include this item in performance reviews and determine compensation based on it and a number of other factors. We want to know if any part of a manager's bonus or salary is tied specifically and only to his or her efforts to develop direct reports.

Yes ☒     No ☐

Describe how compensation is tied to the development of direct reports.

Regions' Sales Managers have a specific portion of their salary tied to associate development. They are responsible for the coaching and the development of their associates, and to the extent that they are successful (measured via sales figures and credit quality), the Sales Managers' salary increases. Low performing managers are reassigned or managed out.

Moreover, all of our managers have an explicit responsibility for the development of our associates, as well as their own individual performance contributions and leadership potential. Talent reviews, facilitated by Human Resources, are conducted in every business line and the results documented through our formal talent management process. As part of the process, managers are asked to build development plans to ensure the ongoing growth of our talent pool. Managers are reviewed annually on progress development in this area.

RAC00031092

**3.5    Does your organization use employee satisfaction or climate surveys?** If so, describe how you have used the results to tailor or improve your training efforts. (Word count limit: 300)

Yes ☒    No ☐

Comment:

Regions monitors organizational climate and associate engagement/commitment through the use of our on-boarding surveys, annual climate surveys, and exit-interview surveys. Research has shown that 30% of the variance in business results can be explained by differences in organizational climate, and that 70% of the variance in organizational climate can be accounted for by the differences in managerial styles demonstrated by management (Corporate Leadership Council, 2004). In 2004, over 14,000 associates completed our annual climate survey. The survey results continue to reveal that we compare favorably to other companies nationally, and are significantly above the norm compared to other financial organizations. Provided with climate results for their respective business units, HR Business Partners conduct focus groups with their line of business partners and the associates they support in order to develop action plans to ensure that the climate of our organization allows us to move to the highest levels of performance.

We recognize that creating and sustaining a winning team and a high performance work culture involves developing individual associates as well as the organization as a whole. To achieve this objective, the OD&L team continues to forge strategic alliances with key senior and executive officers in all lines of business to determine how we can continue to best support and champion Regions' vision and focus through our training programs. In conjuction with organizational goals, surveys at Regions Financial continue to provide the understanding we need of our climate to select and retain qualified individuals, build and support great leaders, provide extensive growth and development for all associates, and foster a high performance work environment.

**3.6    What is the average length of service of your organization's employees?**

8 in 2004  years

**3.7    What is your company's current rate of turnover?** 30%. Within the financial services industry, the average rate of turnover is 24% (Watson-Wyatt, 2003, Saratoga, 2000).

**3.8    For your most recently completed fiscal year, what percentage of job openings did internal candidates fill?** 47%

**3.9    For your most recently completed fiscal year, what percentage of new hires did employees refer?** 12%

**3.10    Feel free to provide any additional information that might be useful in determining your position in the annual Training Top 100.** (Word count limit: 400)

## Competencies as the Foundation for Human Capital Growth

At Regions Financial, processes aimed at growing human capital involve competencies at every phase of the life-cycle of an associate. From hiring to training, and from performance management to professional development, competencies serve as the foundation for our associates' career growth and the overall development of our collective human resources.

In the hiring (Recruiting and Selection) process, competencies are used to further refine the job criteria and to recruit high quality candidates. Key competencies and top performing behaviors are used to identify the most appropriate/valid tests as well as to develop interview guides for a given job. This is a key requirement in the legal defensibility of employee assessment strategies.

The training function utilizes competencies (or KSAPs) to drive the learning curriculum through job competencies specific to the associate's current role. Targeted training based on critical job skills and individual associate skill gaps is more efficient and effective than a "one training program fits all" approach.

Within performance management, associates and their managers can use job competency profiles to assess critical skill areas as they relate to achieving goals and success on the job. Further, they can compare the associate's competency scores with expected proficiency levels in RULearning (Regions' Learning Management System) to identify skill gaps and related learning opportunities to fill those gaps.

Finally, in the development phase, two processes to grow and develop our associates have been created. The first, Talent Management, utilizes competencies as a benchmark to develop our leadership pipeline and evaluate each associate's current skills. The focus is then placed on identifying associates with strong leadership potential and providing them with structured development to grow and develop their leadership competencies.

The second, Career Management, provides associates who are interested in growing their career with access to information about career paths and job competency requirements for different jobs throughout the organization. At any point in an associate's day, he/she can easily and quickly view the competencies required for a job that he/she may be interested in learning more about.

At Regions Financial, we are committed to providing our associates with every opportunity to succeed and grow with the company. We accomplish this goal by utilizing competencies as the foundation for both the company's growth and the growth of our valued associates.

# Please print this page for your records.

## Thank you for applying for the 2006 *Training* Top 100.

If you have any questions, please contact us at
top100awards@skypoint.com
or toll-free at 866-226-1081

### Time line for the Top 100 process:

Judging will take place in October and November. All applicants will be told whether they placed in the Top 100 in the second half of December.

For those who place, invitations to the 2006 *Training* Top 100 Gala, which will be held in Orlando, Florida at the Caribe Royale resort on Sunday, March 5, will be sent out in mid- to late January.



RAC00031095

**2006 CLO Award**
*Verbiage for the on-line application*
*Note: each question has a 400-word limit.*

## 1.  Describe the learning initiative and the primary role or purpose of learning and development within the company.

When Regions Financial Corporation decided to change its Retail and Commercial business models, corporate leaders looked to Organizational Development and Learning (OD&L) to successfully design and support the business strategies with a comprehensive human capital solution. The solution OD&L developed included a synergistic set of interventions for talent assessment, learning strategies, performance management and career management processes founded on a basis of validated competency models.

The financial services industry has experienced rapid change over the last couple of decades. "RegionsNEXT" is the code name for Regions business model change strategy and represents our organization's blueprint to how we will enhance our profitability and long-term growth rate strategy. 1st we aligned the Regions University College Learning Officer structure to the organization's new business model by pairing a College Learning Officer to each of the Executive Managers responsible for the RegionsNEXT strategy in each line of business. Together, the Line of Business Executive and the associated College Learning Officer examined the strategic planning documents that outlined the changes needing to occur within each of our lines of business, and identified the related key talent management and learning issues. To support these changes, OD&L then developed a process to assess our current talent (appropriately 4500 professionals) to ensure that we had the right Human Capital available to implement RegionsNEXT over the long term.

Third, 42 critical learning initiatives were developed to support the changes in the business models, including specific applications related to technical, sales management, and sales profiling competencies. Forth, OD&L partnered with key management units to design a company-wide performance management process to support the reinforcement of new performance expectations. Building on the foundation created from the assessment processes, learning strategies and performance and developmental processes, OD&L also implemented a new career management structure that utilized these inputs.

One example of the magnitude of change involved in RegionsNEXT is the Branch Sales Manager(BSM)  role. BSMs were primarily involved with the transaction-based relationships of Retail Banking customers. With 1,400 BSMs now responsible for the organization's Small Business Lending, we initially built and utilized a validated competency assessment to identify and retain bankers with minimum qualifications. Then we provided them with the necessary skills to successfully operate within thi new role. Given the variety of experiences within the existing BSM population, we developed tailored training based upon individual skill-level and developmental needs. The model included a 30 – 70 hour customized blended learning approach of CBT's, instructor-led training, utilization of mentors and coaches, job performance feedback, and system support, and individual performance plans.

Similar efforts were implemented in the Commercial Line of Business for Lenders.

## 2. Describe how this initiative meets the criteria for the specific award category.

RAC00031096

As part of the RegionsNEXT organization-wide initiative, the bank created an integration team to study both current and future business model opportunities. In the end, Regions based the new paradigm on the Economic Profit Model, setting organizational business objectives/targets for the next five years, identifying current weaknesses and identifying the major changes needed to bring about success. OD&L, with a staff of 120 associates, supported the shift of Small Business Lending into the Retail Banking line of business, and restructured the Relationship Manager role within Commercial Banking. We also strengthened the sales management system and the sales delivery system in both lines of business by focusing on new product sets.

Within OD&L, we restructured our training department to align with the new organization's business models. As always, we continue to participate in the Strategic Integration Committee, analyzing business changes for possible impact on Human Capital, allowing us to effectively design and deliver our learning solutions in alignment with corporate business strategy. To support corporate strategy from a Learning & Development perspective, we design and deliver job-specific competency models to assess the impact that role-demands have on the requisite knowledge, skills, and abilities needed to be a top performer. We design and deliver college-specific training to match these knowledge, skills, and abilities, and support individual commitment plans oriented toward role demands.

Some specific changes we have made as a result of RegionNEXT include a new 4-day Branch Sales Manager orientation process, an updated Financial Service Representation training program (affecting 2,200 associates), and a new on-line Teller training program complete with e-coaches (affecting 6,200 associates). We incorporate our e-Learning department (housed within OD&L) for support on all training initiatives, and this work resulted in a carefully crafted set of interventions that mirrored and supported the business strategy every step of the way. These relations also resulted in the classic "cascading sponsorship" arrangement behind most successful change programs: the heads of the lines of business in turn appointed change sponsors to oversee the initiatives and build momentum for the learning programs.

For Regions, successfully realigning the OD&L organization after the change in business models and successfully designing and supporting the business strategies with comprehensive learning solutions was the result of a unique partnering strategy between the lines of business and the OD&L function under the leadership of Michael E. Pollard, SVP and Director of Organizational Development & Learning at Regions Financial Corporation.

### 3. Describe the impact of the initiative on the company and its stakeholders.

The Retail and Commercial Banking training initiatives positively impacted the company and its stakeholders on several levels. The restructuring of the business models and the Retail Small Business Lending and Commercial Sales Training initiatives were created to derive a reduction in Teller turnover, an increase in cross-selling, a more efficient delivery of small business products and relationships, enhanced loan production, enhanced deposit production, and a growth in customer base. Prior to the change in line of business models, we lost 1.2 accounts for every one we gained. Now, we keep 1.4 accounts for every one we lose. Initially, we grew our portfolio of Small Business Lending, created a more efficient use of resources and a more economic sales and service model by shifting Small Business Lending to the Retail organization, produced a dedicated sales force throughout our organization's footprint equipped with team-based tools, and are now able to attain higher levels of cross sales between Retail and Commercial Banking.

RAC00031097

We have also begun to see a higher revenue per FTE, a better efficiency ratio, and more alignment with our Economic Profit Model. The specialization of roles within the sales training teams, the building of new relationships with customers we previously did not have the opportunity to connect with, and the cultivation of deeper relationships with existing customers has been made possible by the RegionsNEXT business model changes. We have attained more diversified product relations, a better efficiency, a stronger focus on jobs, placed more focus on the customer, and generated more revenue and more momentum as our customers' trusted financial advisor.

The infrastructure is set, and preliminary results are in. Completion of training events is occurring as expected (associates have completed over 22,500 hours of training via 17 courses related to Small Business Lending). By utilizing this customized approach instead of the one-size-fits-all approach typical of large corporate training programs, we reduced the number of hours of training required to fulfill strategy which in turn will result in a return on investment of over 700%. Regions is already gaining in deposits and loans from small business, and seeing the impact throughout the company in terms incentive pay for Small Business Lending. It is the policy of the bank to not release financial results.

## 4. Describe the goals for the initiative, who established them and how they were met.

The goals for the initiative were established by the Executive Board, consisting of the Chairman/CEO, Heads of Finance, Human Resources, Legal, Credit, and the Head of Strategic Planning. Specific Retail and Commercial Banking learning initiatives were established by the relevant Steering Committees in each line of business, which includes the presence of Regions' Chief Learning Officer, Michael Pollard. To support the goals, we introduced a synergistic set of interventions for talent assessment, learning strategies, performance management and career management processes founded on a basis of validated competency models. We also established specific cultural awareness initiatives that included the re-orientation of 24,000 associates into the newly merged company by introducing a series of four learning map sessions known as the "Building for the Future" campaign. This learning campaign proved to be a tremendous success. During these sessions, associates learned about emerging issues in the financial services industry, Regions' plans for responding to these issues, and opportunities for individual involvement in making the merger a success. Evaluation of this process revealed that most associates found the exercises to be a fun and effective way to connect to organizational strategies. Eighty-eight percent believed the process helped them identify ways that they can contribute to the organzation's success, while ninety-three percent said that they appreciated having the opportunity to learn about the organization's strategic plans. The learning maps were critical in assisting us to develop a culture that understood the need for a change in the business models, and feedback from the field has been extremely positive. As one associate commented, "What I found most helpful was that my staff became more aware of how the bank makes money and of how it takes each one of us to contribute to the success of the company. It makes everyone more aware of what the company is striving to accomplish not only for our customers but also for each of the employees as well."

## 5. Describe the CLO's roles (leadership and other roles) in identifying, implementing and realizing the initiative and its impact.

In his role as Chief Learning Officer, Michael Pollard was able to successfully accomplish mission critical goals related to RegionsNEXT by:

RAC00031098

- Managing the OD&L team through the planning, solution design/development, implementation and review phases, as well as seeking and securing funding for activities and resources.
- Maintaining executive support and sponsorship throughout the process.
- Providing continuous status updates to line of business executives.
- Overseeing a series of kickoff meetings at the executive level in every market, focusing on training roles, bankers' roles, coaches' roles, and the opportunities presented by changing the business models.
- Leading the review of evaluation efforts to determine the success of the learning solutions.

The Organizational Development & Learning (OD&L) team plays a vital, ongoing role in supporting and championing the organization's business strategy. It does this in part by involving key senior and executive officers in determining how learning programs can best support and champion the organization's business stategy. OD&L identifies formal, interrelated change management processes for enhancing the company's culture in critical areas of organizational climate, leadership, sales, talent/career management, and learning/technical training processes.

Our talented organizational development and learning professionals partner with management to set new standards for performance, creativity, teamwork, vision, partnerships and perseverance. We measure these initiatives by continually examining associate turnover levels, sales performance, leadership practices, utilization of talent management practices, effective and efficient learning strategies to improve time to proficiency, and improvements in organizational climate.

The positive, substantive results we have achieved in the past and the ongoing OD&L projects that continue to evolve and support the mission of Regions Financial Corporation reap rewards and benefits that are shared by our customers, our shareholders, our associates and, ultimately, our entire company.

## 6. Provide a brief description of this CLO, their accomplishments and their contributions.

Michael E. Pollard is a SVP and Director of Organizational Development & Learning at Regions Financial Corporation. Under Michael's leadership, the OD&L team at Regions has successfully designed, developed and delivered a host of programs influencing all aspects of the organization: sales coaching, retention & turnover, quality process, assessment strategies, revenue growth, succession planning, executive coaching, leadership benchstrength development, hr research, first-line supervisor development, mentoring, job rotation, career counseling, new associate orientation, competency modeling, learning technologies, and much more. These efforts won us recognition from *Training* magazine twice in the past two years, via their coveted 2004 and 2005 "Training Top 100" awards.

A few of Michael's accomplishments include developing management and leadership talent by implementing an interactive series of learning interventions that involve a four-week executive development program, senior leadership workshops, and action learning projects. Other important accomplishments include designing organizational interventions to support culture changes, involving quality, continuous improvement, empowerment and learning strategies.

Michael also increased retail and commercial banking revenue per sales associate through customized sales management and sales associate training and learning strategies, and designed and implemented a high-performance organization model that aligned learning, performance management, career management and talent management processes.

RAC00031099

Regions Financial Corporation (NYSE: RF), headquartered in Birmingham, Ala., is a full-service provider of retail and commercial banking, securities brokerage, mortgage, and insurance products and services. With its merger with former Union Planters Corp. complete, Regions had assets of 84.6 billion as of Sept. 30, 2005, making it one of the nation's Top 15 financial services providers. Regions' banking subsidiaries, Regions Bank and Union Planters Bank, operate some 1,400 offices and a 1,700-ATM network across a 15-state geographic footprint in the South, Midwest and Texas. Its investment and securities brokerage, trust and asset management division, Morgan Keegan & Company Inc., provides services from more than 250 offices. Additional information about the new Regions, which is a member of both the Forbes and Fortune 500 and operates one of the Top 20 mortgage companies in the United States, can be found at www.regions.com.

RAC00031100





# Building A Career Filled With Opportunity

Everyday confidence. | **REGIONS** 
FINANCIAL CORP.



Jackson W. Moore,
President and Chief Executive Officer

Regions Financial Corporation is a high-performing financial services organization that offers tremendous opportunities for associates. Our vision for customers and associates is the same: we want them both to have "Everyday confidence" in Regions. We want customers to be confident in our ability to deliver financial services that meet their needs. And, we want associates to feel confident they are working for an organization focused on building relationships, showing respect and recognizing high performance.

There are seven Regions values that lead all of us as we work together in building a high-performing organization:

- Sound Financial Management that Optimizes Shareholder Value
- Collaborative Thinking
- Consistent and Ever-Improving Quality of Service
- Growth and Learning Opportunities for Performance-Oriented Associates
- Respect for All Individual Associates and Customers
- Work/Life Balance
- Doing the Right Thing

I am proud to be part of an organization that is guided by these sound values. The true values of a company beat within the hearts of its associates. Regions delivers on its promise to give customers superior service by employing highly talented associates who understand the organization's vision and embrace the values that drive how we operate each day.

Jackson W. Moore

RAC00012338


RFCFC0001233a







## COMPANY OVERVIEW

Regions Financial Corporation has been serving customers with strength and stability for more than 135 years. Our associates share the company's commitment to serving customers and helping communities realize their dreams by anticipating, understanding and meeting financial needs through effective solutions. This commitment is an extension of our promise of delivering *Everyday confidence* to our valued customers.

### FACTS ABOUT REGIONS:

- With over $84 billion in assets, Regions has the strength and stability of being one of the Top 15 financial services providers in the nation.
- Regions serves over five million customers throughout a 15-state geographic footprint in the South, Midwest and Texas.
- Regions, which trades on the New York Stock Exchange under ticker symbol RF, ranks on both the Forbes 500 and FORTUNE 500 listing of America's largest companies.
- Regions ranked in the Top 5 on *FORTUNE*'s 2004 list of the Most Admired Superregional Banks in the United States.
- *Training* magazine named Regions to its "Training Top 100 List" for being an organization that excels in workforce development.
- The U.S. Small Business Administration consistently ranks Regions as one of the top small-business-friendly financial services providers in the country.
- *Computerworld* magazine recently ranked Regions in the Top 50 of its 100 Best Places to Work in Information Technology in the magazine's 10th annual survey.

Regions is much more than a bank. It's a full-service financial services institution with retail and commercial banking, a mortgage subsidiary, an insurance affiliate and a full-service securities and investment-banking subsidiary. With all that Regions has to offer, there's no doubting why customers choose to do business with a financial services organization that gives them *Everyday confidence* each time they visit one of our office locations.





# BENEFITS HIGHLIGHTS

Associates have confidence in Regions' commitment to provide a competitive, comprehensive benefits program. Regions demonstrates respect for associates by ensuring they experience a balanced work/life environment, which includes healthcare benefits, paid time off and professional development opportunities.

Regions offers a benefits package that is flexible, comprehensive and recognizes that "one size does not fit all" for Regions associates. We call it our "Total Consumer" benefits package, and it includes a full spectrum of benefits to protect your health, wealth and family. It also offers a level of competitive benefits designed to attract and retain valuable associates.

## MEDICAL COVERAGE

To give associates peace of mind that they'll have health insurance when they need it, Regions provides two levels of PPO medical coverage (Core & Advantage) through Blue Cross Blue Shield of Alabama. Blue Cross Blue Shield of Alabama offers an extensive network of providers through partnerships with Blue Cross Blue Shield providers in other states.

## DENTAL COVERAGE

Good dental health is important, and that's why Regions provides comprehensive dental coverage through Blue Cross Blue Shield for services ranging from X-rays and routine cleanings to fillings and orthodontic care.

## VISION COVERAGE

The vision plan covers routine eye exams, as well as benefits for eyeglasses or contact lenses.

## LIFE AND ACCIDENTAL DEATH AND DISMEMBERMENT (AD&D)

Regions provides basic life insurance at twice the associate's salary (up to $300,000) at no cost. Basic life insurance includes an equal amount of accidental death and dismemberment (AD&D) coverage that pays a benefit if an associate suffers a covered loss or dies as a result of an accident. Regions also offers the opportunity to purchase additional life insurance and/or AD&D insurance.

## TUITION REIMBURSEMENT

Regions' commitment to supporting associates' growth and development is evident in its Tuition Reimbursement Program. Associates who meet eligibility requirements can be reimbursed for some of the expenses they incur while taking approved courses at local colleges.

## 401(k) PLAN

The 401(k) plan gives associates a great opportunity to save and invest for the future. Contributions are taken from each pay period before any federal income tax and most state and local taxes are withheld. Regions will match contributions 100 percent on the first six percent of pay, and associates immediately own the company matches.

RAC00012340





## LOOKING FOR A CAREER... NOT JUST EMPLOYMENT?

It doesn't take long for associates to feel confident in their decision to build a career at Regions Financial Corporation. Regions earns associates' confidence by providing a work environment that encourages strong relationships with coworkers and customers, shows respect by operating with a team focus and gives recognition for high performance.

Regions has a strong corporate commitment to provide growth and development opportunities for associates. If you have a desire to learn, grow and succeed, Regions is an excellent place to build a career! Opportunities for career growth through learning and development programs include:

▸ The Career Management Resources Program
▸ Retail Leadership Development Program
▸ Regions University
▸ Tuition Reimbursement Programs

There's a great deal to consider when choosing where to build your career. Learn more about Regions Financial Corporation and our career opportunities at www.regions.com.



RAC00012341



DEFENDANT'S
EXHIBIT
1

PENGAD-Bayonne, N. J.

12/6/2006





# REGIONS

Home · Investor Relations · Careers · Morgan Keegan · Privacy & Security · En Español

Search Regions [ ] Search

Find a Location ▼    Customer Care ▼    Apply Today ▼    Login to Online Services ▼

Personal Banking    Small Business    Corporate Banking ▼    About Regions ▼

## Let's Get Started

*Relationships, Respect and Recognition through Everyday Confidence.*

Welcome Message
Getting Started
Your First Day
New Associate Orientation
Benefits
Company Information



## Your First Day at Regions

When you arrive at your Regions location, be confident knowing that a talented team of associates is ready to welcome you. You were hired because your experience and skill set will contribute to your team?s focus on achieving performance excellence for Regions. Below are several tools you will find helpful as you start your career here:

**New Associate Orientation**

There's no doubt you will have questions on your first day! Your manager, coworkers and Human Resources Business Partner are all ready to answer your questions and help you get settled in your new career. During the New Associate Orientation session, you will also receive information that will provide answers to some of the most commonly asked questions.

**Checklist of Activities**

One item you will find helpful is a checklist of activities to complete over your first 90 days of employment. By completing the checklist of activities, you will become familiar with our operating systems, learn about our associate guidelines and discover what it means to be a Regions associate.

**Everyday Regions**

The Regions Intranet site, "Everyday Regions," is an important resource for you to use throughout your career at Regions. It provides current company news and access to a variety of our internal

http://www.regions.com/welcome/lets_get_started.shtml



12/6/2006

Regions | New Employee Welcome | Getting Started | Your First

Human Resources and training systems. Two of these systems you will find particularly helpful is Regions1Source and RU Learning (Regions University Learning).

Member FDIC

© 2006 Regions Financial Corporation   Terms and Conditions

http://www.regions.com/welcome/lets_get_started.shtml

RAC00000126

DEFENDANT'S
EXHIBIT
13



RETAIL


REGIONS UNIVERSITY
*Retail College*



**COMMERCIAL** 
Retail College

RAC00001301





MORTGAGE    *Retail College*





OPERATIONS 





CORPORATE SUPPORT



Retail College

RAC00001304



LEADERSHIP AND SALES



*Retail College*













REGIONS UNIVERSITY
*Retail College*





COMMERCIAL







*Retail College*



OPERATIONS





REGIONS UNIVERSITY

Retail College





CORPORATE SUPPORT





Retail College

REGIONS UNIVERSITY





LEADERSHIP AND SALES

RAC00001311



RETAIL COLLEGE CONVERSION COACH
Playbook

*Retail College*



*Retail College*

BRANCH CONVERSION LEAD WORKSHOP
Participant Guide



**BRANCH CONVERSION LEAD WORKSHOP**
Participant Guide



Retail College





**BRANCH CONVERSION LEAD WORKSHOP**
Leader Guide



*Retail College*





RETAIL COLLEGE CONVERSION COACH
Playbook



*Retail College*





Retail College

WACHOVIA UNIVERSITY

# BRANCH CONVERSION LEAD WORKSHOP
Participant Guide







REGIONS UNIVERSITY

*Retail College*

BRANCH CONVERSION LEAD WORKSHOP

Leader Guide



RAC00001317





REGIONS UNIVERSITY

*Retail College*





RETAIL COLLEGE CONVERSION COACH
Playbook

DEFENDANT'S EXHIBIT 14
PENGAD-Bayonne, N.J.

| Row | A | January 2005 | February 2005 | March 2005 | April 2005 | May 2005 | June 2005 | July 2005 | August 2005 | September 2005 | October 2005 | November 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual |
| 16 | | 599,052.44 | 576,571.58 | 602,105.24 | 612,470.57 | 618,544.49 | 609,317.56 | 589,774.32 | 621,149.90 | 608,479.90 | 601,322.75 | 593,716.98 |
| 17 | | 325.00 | 13,376.60 | 10.00 | 10.00 | (13.36) | | 50.00 | 50.00 | 62.50 | 134.00 | (1,000.00) |
| 18 | | 23,445.30 | 24,168.63 | (32,165.40) | 81,478.78 | 23,887.08 | 23,670.38 | 23,858.06 | 23,310.38 | 23,105.76 | 22,070.98 | 22,139.72 |
| 19 | | | | 81,478.78 | | | | | | | | |
| 20 | | 60,898.94 | 67,011.28 | 54,305.25 | 46,888.82 | 47,103.14 | 48,306.93 | 48,152.74 | 47,916.73 | 45,669.08 | 42,578.16 | 44,994.96 |
| 21 | | 39,340.27 | 38,590.91 | 39,422.54 | 39,668.88 | 38,974.24 | 38,563.91 | 38,971.63 | 39,481.76 | 37,029.42 | 37,624.60 | 36,692.34 |
| 22 | | 13,344.13 | 50,874.08 | 20,702.68 | 32,456.07 | (20,393.81) | 27,624.06 | 26,058.40 | 3,055.98 | 15,190.21 | 7,935.72 | 6,526.47 |
| 23 | | 736,406.08 | 770,593.08 | 684,370.31 | 812,973.12 | 708,115.12 | 747,482.84 | 726,865.05 | 735,048.75 | 729,476.87 | 712,532.21 | 703,070.47 |
| 26 | | 2,397.74 | 2,532.72 | 2,387.73 | (5,174.45) | (2,143.74) | 2,352.54 | 2,447.67 | 2,615.27 | 2,807.86 | 5,533.02 | 272.98 |
| 28 | | 2,527.68 | 2,492.74 | 2,482.77 | (5,047.08) | (13.36) | 1,616.72 | 1,616.85 | 1,616.73 | 1,616.87 | 1,616.78 | 1,616.78 |
| 29 | | 308.20 | 2,432.66 | 1,525.66 | (4,196.07) | 8.56 | 183.69 | 3,044.58 | 1,316.80 | 1,828.23 | 1,914.81 | 1,153.08 |
| 30 | | 58,721.70 | 34,748.18 | 93,571.54 | (78,712.66) | 206,279.24 | 63,574.27 | 57,787.85 | 57,722.85 | 57,845.85 | 57,787.85 | 57,712.85 |
| 32 | | 63,955.32 | 42,196.50 | 99,967.70 | (93,130.26) | 204,130.70 | 67,727.22 | 64,896.95 | 63,271.65 | 64,098.81 | 110,031.99 | 103,905.22 |
| 34 | | 14,338.49 | 14,784.72 | 4,790.45 | 11,858.64 | 11,856.92 | 11,803.56 | 11,744.54 | 11,743.93 | 11,843.04 | 11,962.35 | 12,138.23 |
| 35 | | 996.48 | 505.04 | 447.48 | 2,152.50 | 529.45 | 258.05 | 1,862.07 | | 274.39 | 1,217.06 | 1,217.06 |
| 36 | | 717.20 | 717.20 | 717.20 | 717.20 | 717.20 | 717.20 | 717.20 | 717.20 | 717.20 | 717.20 | 717.20 |
| 37 | | 1,049.54 | 537.01 | 1,165.31 | 557.28 | 591.54 | (958.22) | 578.60 | 111.32 | 484.22 | 111.32 | 484.22 |
| 38 | | 6,876.37 | 7,114.91 | 9,160.31 | 7,698.22 | 6,634.31 | 8,049.55 | 6,041.82 | 6,445.94 | 6,418.87 | 6,946.91 | 5,609.91 |
| 39 | | 1,004.45 | 872.77 | 2,234.58 | 1,213.46 | 230.57 | 140.32 | 1,085.70 | 1,592.25 | 1,280.30 | 3,715.61 | (121.82) |
| 40 | | 24,982.53 | 24,531.65 | 18,515.33 | 24,195.30 | 20,559.99 | 20,010.46 | 22,029.93 | 20,610.64 | 21,018.02 | 24,670.45 | 18,872.94 |
| 42 | | 13,937.49 | 33.46 | 44.71 | 1,489.25 | 532.77 | 720.29 | 1,041.16 | 294.86 | 933.83 | (95.61) | 1,876.98 |
| 44 | | (672.14) | 8,182.01 | 3,097.57 | 3,097.57 | 2,498.23 | 2,248.24 | 636.33 | 303.00 | 303.00 | 8,996.11 | 1,027.42 |
| 46 | | | | | | 67.34 | 7,145.60 | 25.00 | | | | |
| 47 | | | | | | | 25.00 | | | | | |
| 48 | | 317.97 | 565.73 | 3,975.57 | 97.70 | (3,949.44) | | 61.05 | 257.16 | | 1.82 | |

CONFIDENTIAL

**New Regions-Corporate Training**
**Summarized Budget Report**
**October 2006**

| | M | N | O | P | Q | R | S | T | U | V |
|---|---|---|---|---|---|---|---|---|---|---|
| | December 2005 | January 2006 | February 2006 | March 2006 | April 2006 | May 2006 | June 2006 | July 2006 | August 2006 | September 2006 |
| | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual |
| 16 | 562,264.70 | 547,185.99 | 499,772.73 | 509,255.17 | 494,867.03 | 507,568.13 | 513,559.64 | 516,661.76 | 512,986.05 | 505,591.51 |
| 17 | 31,656.22 | 21,387.48 | 44,043.60 | 20,963.05 | 20,898.25 | 21,095.37 | 21,674.08 | 21,621.49 | 21,572.01 | 19,769.79 |
| 20 | 60,300.08 | 59,350.15 | 83,366.21 | 43,306.43 | 36,953.76 | 37,022.40 | 36,461.60 | 36,394.49 | 36,182.47 | 34,915.69 |
| 21 | 36,287.18 | 34,190.71 | 33,675.53 | 33,040.23 | 32,103.63 | 32,355.75 | 33,405.25 | 33,866.94 | 34,077.87 | 32,655.17 |
| 22 | 19,717.44 | 9,816.22 | 11,923.66 | 29,972.42 | 7,361.81 | 6,299.26 | 29,814.89 | 7,232.96 | 8,474.85 | 4,451.77 |
| 23 | 710,225.60 | 671,730.55 | 672,781.73 | 636,537.30 | 592,184.48 | 604,340.91 | 634,915.46 | 615,777.64 | 613,293.25 | 597,783.93 |
| 28 | 1,616.80 | | | | | | | | | |
| 29 | 44.97 | | | | | | | | | |
| 30 | 57,814.45 | 93,326.48 | 93,326.48 | 94,230.96 | 95,179.14 | 94,754.59 | 95,094.23 | 95,094.23 | 94,898.56 | 94,898.56 |
| 31 | 101,490.73 | 93,326.48 | 93,326.48 | 94,230.96 | 95,179.14 | 94,754.59 | 95,094.23 | 95,094.23 | 94,898.56 | 94,898.56 |
| 34 | 11,894.91 | 11,398.42 | 8,050.43 | 8,014.98 | 8,197.35 | 8,086.36 | 7,510.75 | 7,661.10 | 7,618.43 | 7,663.77 |
| 35 | 338.85 | 573.94 | 97.28 | 1,092.38 | 1,187.18 | 116.59 | 431.51 | 39.33 | 8.87 | 599.20 |
| 36 | 717.20 | | | 717.20 | | (717.20) | | | | |
| 37 | 1,562.18 | 484.22 | 843.54 | 111.32 | 857.12 | 122.48 | 111.32 | 484.22 | 521.07 | 187.14 |
| 38 | 6,160.12 | 4,362.57 | 4,011.21 | 3,908.42 | 3,913.42 | 3,908.76 | 3,221.55 | 1,166.06 | 1,125.29 | 922.79 |
| 39 | 7,461.63 | 2,091.40 | 640.37 | 12,442.03 | 1,560.34 | 2,398.06 | 500.90 | 1,845.39 | 1,308.55 | 1,097.82 |
| 40 | 28,134.89 | 18,910.55 | 13,642.83 | 26,286.33 | 15,715.41 | 13,915.05 | 11,776.03 | 11,196.10 | 10,582.21 | 10,470.72 |
| 42 | 352.95 | 1,896.01 | 132.14 | 474.68 | (1,262.41) | 183.08 | 275.79 | 25.03 | 17,103.06 | 2,304.31 |
| 44 | 1,027.43 | 724.43 | 724.43 | 724.43 | 724.43 | 724.43 | 724.43 | 724.43 | 724.43 | 724.43 |
| 47 | | | | | | 200.00 | | | | |
| 48 | | | 69.76 | | | | | | | |
| 49 | 9,747.70 | 1,232.18 | 106.62 | | | | | | | |

CONFIDENTIAL

RAC00030348



| | W | X | Y | Z | AA | AB |
|---|---|---|---|---|---|---|
| | | CUBE<br>Im1servisanreview<br>Im1servisanaly/sismeasures | Im1servisanalysis<br>Net RAROC Performance View<br>Net Inc or Exp | | | |
| | Actual | | Actual | Budget | | |
| | **October 2006**<br>Actual | | **Oct YTD 2006**<br>Actual | **Oct YTD 2006**<br>Budget | **$ Variance** | |
| 16 | 501,587.91 | Salaries & Wages | 5,109,935.92 | 5,592,556.32 | (483,120.40) | |
| 17 | 83.34 | Commissions & Incentives | 83.34 | 83.34 | 83.34 | |
| 18 | 20,091.02 | Profit Sharing/401K/Slk Purch | 233,116.14 | 297,732.90 | (64,616.76) | |
| 19 | | Pension Plan | | | | |
| 20 | 41,307.96 | Payroll Taxes | 445,261.16 | 440,661.45 | 4,599.71 | |
| 21 | 32,635.30 | Group Insurance | 332,006.38 | 281,378.84 | 50,627.54 | |
| 22 | 4,093.02 | Other Benefits | 119,240.86 | (98,868.20) | 218,109.06 | |
| 23 | 599,798.55 | Salaries and Employee Benefits | 6,239,143.80 | 6,513,461.31 | (274,317.51) | |
| 24 | | Building Rent | | | | |
| 25 | | Utilities | | 933,264.80 | (933,264.80) | |
| 26 | | Real Estate Taxes | | | | |
| 27 | | Building Depreciation & Amortization | | | | |
| 28 | | Building Maintenance & Repairs | | | | |
| 29 | | Other Occupancy | | | | |
| 30 | 94,898.56 | Rental Income | 945,701.79 | | 945,701.79 | |
| 31 | | | | | | |
| 32 | 94,898.56 | Net Occupancy Expense | 945,701.79 | 933,264.80 | 12,436.99 | |
| 33 | | | | | | |
| 34 | 7,640.87 | Furn & Equip Depreciation | 81,842.46 | 75,273.22 | 6,569.24 | |
| 35 | 3,372.75 | Furn & Equip Maintenance & Repairs | 7,519.03 | 7,519.03 | 7,519.03 | |
| 36 | | Property Taxes | | | | |
| 37 | 111.32 | Furn & Equip Rent | 3,833.75 | | 3,833.75 | |
| 38 | 870.86 | Computer Equipment Expense incl Depreciation | 27,410.93 | 27,306.50 | 104.43 | |
| 39 | 537.84 | Other Furn & Equip Expense | 24,422.70 | 120,203.20 | (95,780.50) | |
| 40 | 12,533.64 | Furniture & Equipment Expense | 145,028.87 | 222,782.92 | (77,754.05) | |
| 41 | | | | | | |
| 42 | 1,535.61 | Advertising & Promotion | 22,667.30 | 16,666.70 | 6,000.60 | |
| 43 | | Amortization of Servicing | | | | |
| 44 | 724.43 | Amortization of Computer Programs | 7,244.30 | 6,000.60 | 7,244.30 | |
| 45 | | Amortization-XS Purchase Price | | | | |
| 46 | | Amortization of Employment Agreements | | | | |
| 47 | | Computer Service Fees Expense | | | | |
| 48 | | Contributions | | | | |
| 49 | 269.76 | Courier Service | 269.76 | 269.76 | 269.76 | |
| 50 | 1,338.80 | Credit Investigations | 1,338.80 | 1,338.80 | 1,338.80 | |

CONFIDENTIAL

RAC00030349



CONFIDENTIAL

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51 | | | | | | | | | | | | |
| 52 | | 360.75 | 415.00 | 388.00 | 639.91 | 501.95 | 3,099.00 | (99.00) | (270.50) | 2,161.25 | 823.55 | 490.89 |
| 53 | | | | 2,222.40 | | | 0.02 | | | | | |
| 54 | | | | 16,253.88 | (16,253.88) | | | | | | | |
| 55 | | 4,578.56 | 6,179.46 | 17,496.40 | (750.00) | 20,063.02 | 19,087.08 | 4,050.00 | 14,223.08 | 10,049.68 | 9,760.00 | 1,028.19 |
| 56 | | | 1,150.15 | 1,126.09 | 349.86 | 288.84 | 60.34 | | 8.90 | 69.35 | 35.13 | |
| 57 | | | | | | | | | | | | |
| 58 | | | | | | | | | | | | |
| 59 | | | | | | | | | | | | |
| 60 | | 39,399.52 | 3,389.92 | 22,098.76 | 30,000.34 | 5,399.77 | 16,110.28 | 10,385.10 | 358.11 | 156.32 | 5,103.31 | 37,551.70 |
| 61 | | 1,641.26 | 1,373.52 | 4,358.74 | 1,574.93 | 309.40 | 1,180.15 | 4,012.82 | (616.25) | 4,422.29 | 1,688.47 | (4,344.85) |
| 62 | | | | | | | | | | | | |
| 63 | | 6,267.48 | 12,603.94 | 14,937.41 | 10,312.34 | 7,813.02 | 16,380.60 | 14,549.77 | 7,305.19 | 4,737.58 | 5,367.12 | 6,124.56 |
| 64 | | | | | | | | | | | | |
| 65 | | 23,633.86 | 43,179.91 | 32,599.09 | 8,787.05 | (16,680.48) | 24,290.24 | 23,484.25 | 2,007.26 | 51,817.18 | 45,029.97 | (31,554.77) |
| 66 | | | | | | | | | (420.30) | | | |
| 67 | | | | | | | | | | | | |
| 68 | | 81,302.26 | 131,941.11 | 159,414.08 | 151,097.34 | (177,525.82) | 207,096.91 | 122,933.93 | 70,127.45 | 71,607.23 | 207,146.99 | (75,218.30) |
| 69 | | | 0.03 | | | | | | | | | |
| 70 | | 91,695.81 | 90,115.15 | 128,129.56 | 135,703.10 | 99,125.35 | 155,431.82 | 203,463.58 | 168,692.22 | 51,389.09 | 128,655.22 | (29,105.09) |
| 71 | | | | | | | | | | | | |
| 72 | | 282,462.82 | 299,129.39 | 404,140.26 | 326,145.51 | (81,556.05) | 452,883.55 | 384,543.99 | 262,270.18 | 197,646.80 | 412,512.08 | (92,123.27) |
| 73 | | | | | | | | | | | | |
| 74 | | | | | | | | | | | | |
| 75 | | 1,087,806.75 | 1,136,450.62 | 1,206,993.60 | 1,070,183.67 | 871,249.76 | 1,288,104.07 | 1,198,335.92 | 1,081,201.22 | 1,012,240.50 | 1,259,746.73 | 731,710.36 |
| 76 | | | | | | | | | | | | |

CONFIDENTIAL

| | M | N | O | P | Q | R | S | T | U | V |
|---|---|---|---|---|---|---|---|---|---|---|
| 51 | | | | | | | | | | |
| 52 | 12,827.50 | 12,659.00 | 12,969.00 | 12,932.15 | 12,700.00 | 12,412.79 | 12,931.65 | 15,182.53 | 13,805.29 | 46,228.25 |
| 53 | | | | | | | | | | |
| 54 | | | | | | | | | | |
| 55 | 7,531.60 | 16,700.65 | 43,108.00 | 30,415.34 | 21,850.27 | 20,912.59 | 28,369.35 | 16,664.00 | (2,786.90) | 31,095.00 |
| 56 | 32.09 | | 41.70 | 2.55 | 15.58 | 18.28 | 6.72 | 10.20 | 1.25 | 0.76 |
| 57 | | | | | | | | | | |
| 58 | | | | | | | | | | |
| 59 | | | | | | | | | | |
| 60 | 4,621.70 | 30,842.10 | 4,663.18 | 2,226.72 | 17,185.68 | 13,790.65 | 6,582.54 | 14,920.53 | 14,808.39 | 1,262.16 |
| 61 | 2,761.09 | 3,609.37 | 746.95 | 900.70 | 1,469.49 | 946.61 | 964.18 | 937.16 | 2,058.41 | 1,514.43 |
| 62 | | | | | | | | | | |
| 63 | 43,881.73 | 14,713.51 | 16,329.88 | 19,337.91 | 4,989.05 | 7,018.30 | 9,734.99 | 15,492.25 | 5,145.48 | 9,993.06 |
| 64 | 11,848.17 | 9,012.69 | 25,077.84 | 8,586.60 | 27,127.32 | 24,389.19 | 26,933.21 | 30,000.31 | 25,294.13 | 28,056.36 |
| 65 | | | | | | | | | | |
| 66 | | | | | | | | | | |
| 67 | (103,034.23) | 71,116.41 | 134,455.61 | 83,215.47 | 3,367.89 | 117,153.26 | 80,567.23 | 147,777.77 | (12,534.70) | 88,916.95 |
| 68 | | | | | | | | | | |
| 69 | 13,240.00 | | | | | | 1,285.51 | | | |
| 70 | 607,073.56 | 94,979.99 | 147,939.44 | 177,973.17 | 6,756.90 | 171,342.79 | 55,983.87 | 170,809.68 | 36,605.56 | 117,663.10 |
| 71 | 611,911.29 | 257,486.34 | 386,364.55 | 336,789.72 | 94,924.20 | 369,089.97 | 224,339.47 | 412,543.89 | 100,224.40 | 327,758.81 |
| 72 | | | | | | | | | | |
| 73 | | | | | | | | | | |
| 74 | 1,451,762.51 | 1,041,453.92 | 1,166,115.59 | 1,093,844.31 | 798,003.23 | 1,082,100.52 | 966,125.19 | 1,134,611.86 | 818,998.42 | 1,030,912.02 |
| 75 | | | | | | | | | | |
| 76 | | | | | | | | | | |

RAC00030352

| | W | X | Y | Z | AA | AB |
|---|---|---|---|---|---|---|
| 51 | | | | | | |
| 52 | 9,874.07 | Directors' Fees and Stock | 161,694.73 | 26,700.00 | 134,994.73 | |
| 53 | | Dues and Subscriptions | | | | |
| 54 | | Gain/Loss on Sale of Assets | | | | |
| 55 | 18,424.00 | Insurance | 224,752.30 | 171,000.00 | 53,752.30 | |
| 56 | 0.80 | Legal and Professional | 95.84 | | 95.84 | |
| 57 | | Licenses and Taxes | | | | |
| 58 | | Life Co Claims and Commissions | | | | |
| 59 | | Minority Interest RAMCO | | | | |
| 60 | 3,736.47 | Other Real Estate Expense | 110,018.42 | 69,393.40 | 40,625.02 | |
| 61 | (2,590.73) | Outside Services | 10,556.57 | 74,333.30 | (63,776.73) | |
| 62 | | Postage and Freight | | | | |
| 63 | 10,419.36 | Security Services | 113,173.79 | 79,833.30 | 33,340.49 | |
| 64 | 24,355.92 | Stationery & Supplies | 228,833.57 | 84,506.50 | 144,327.07 | |
| 65 | | Telephone Service | | | | |
| 66 | | Tellers' Differences | | | | |
| 67 | 82,802.75 | Tickets and Quotes | 796,838.64 | 989,015.40 | (192,176.76) | |
| 68 | | Travel & Business Development | | | | |
| 69 | 385.00 | Federal Reserve Bank Fees | 1,650.51 | | 1,650.51 | |
| 70 | 209,297.98 | Misc. Losses Net of Recoveries | 1,189,352.48 | 1,974,299.20 | (784,946.72) | |
| 71 | 358,995.66 | Miscellaneous Expense | 2,868,487.01 | 3,485,747.80 | (617,260.79) | |
| 72 | | Other Operating Expenses | | | | |
| 73 | | | | | | |
| 74 | 1,066,196.41 | | 10,198,361.47 | 11,155,256.83 | (956,895.36) | |
| 75 | | Non-Int Exp Less Affil Svs Fees | 10,198,361.47 | 11,155,256.83 | (956,895.36) | |
| 76 | | | | | (0.00) | |

CONFIDENTIAL

RAC00030353



CONFIDENTIAL

RAC00030354

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | January 2005 | February 2005 | March 2005 | April 2005 | May 2005 | June 2005 | July 2005 | August 2005 | September 2005 | October 2005 | November 2005 |
| | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual |
| 12 | 599,052.44 | 576,571.58 | 602,105.24 | 612,470.57 | 618,544.49 | 609,317.56 | 589,774.32 | 621,149.90 | 608,479.90 | 601,322.75 | 593,716.98 |
| 13 | 325.00 | 13,376.60 | (32,165.40) | 10.00 | | | 50.00 | 134.00 | 62.50 | 1,000.00 | (1,000.00) |
| 14 | 23,445.30 | 24,168.63 | | 81,478.78 | 23,887.08 | 23,670.38 | 23,856.06 | 23,310.38 | 23,105.76 | 22,070.98 | 22,139.72 |
| 16 | 60,898.94 | 67,011.28 | 54,305.25 | 46,888.82 | 47,103.14 | 48,306.93 | 48,152.74 | 47,916.73 | 45,669.08 | 42,578.16 | 44,994.96 |
| 17 | 39,340.27 | 38,590.91 | 39,422.54 | 39,668.88 | 38,974.22 | 38,563.91 | 38,971.53 | 39,481.76 | 37,029.42 | 37,624.60 | 36,692.34 |
| 18 | 13,344.13 | 50,874.08 | 20,702.68 | 32,456.07 | (20,393.81) | 27,624.06 | 26,058.40 | 3,055.98 | 15,130.21 | 7,935.72 | 6,526.47 |
| 19 | 736,406.08 | 770,593.08 | 684,370.31 | 812,973.12 | 708,115.12 | 747,482.84 | 726,865.05 | 735,048.75 | 729,476.87 | 712,532.21 | 703,070.47 |
| 22 | 2,397.74 | 2,532.72 | 2,387.73 | (5,174.45) | (2,143.74) | 2,352.54 | 2,447.67 | 2,615.27 | 2,807.86 | 5,533.02 | 272.98 |
| 24 | 2,527.68 | 2,482.74 | 2,482.77 | (5,047.08) | (13.36) | 1,616.72 | 1,616.85 | 1,616.73 | 1,616.87 | 1,616.78 | 1,616.78 |
| 25 | 308.20 | 2,432.86 | 1,525.66 | (4,196.07) | 8.56 | 183.69 | 3,044.58 | 1,316.80 | 1,828.23 | 1,914.81 | 1,153.08 |
| 26 | 58,721.70 | 34,748.18 | 93,571.54 | (78,712.66) | 206,279.24 | 63,574.27 | 57,787.85 | 57,722.85 | 57,845.85 | 57,787.85 | 57,712.85 |
| 28 | 63,955.32 | 42,196.50 | 99,967.70 | (93,130.26) | 204,130.70 | 67,727.22 | 84,896.95 | 63,271.65 | 64,098.81 | 66,852.46 | 60,755.69 |
| 30 | 14,338.49 | 14,784.72 | 4,790.45 | 11,856.64 | 11,856.92 | 11,803.56 | 11,744.54 | 11,743.93 | 11,843.04 | 11,962.35 | 12,138.23 |
| 31 | 996.48 | 505.04 | 447.48 | 2,152.50 | 529.45 | 258.05 | 1,862.07 | | 274.39 | 1,217.06 | |
| 32 | 717.20 | 717.20 | 717.20 | 717.20 | 717.20 | 717.20 | | 717.20 | 717.20 | 717.20 | 717.20 |
| 33 | 1,049.54 | 537.01 | 1,165.31 | 557.28 | 591.54 | (958.82) | 578.60 | 111.32 | 484.22 | 111.32 | 484.22 |
| 34 | 6,876.37 | 7,114.91 | 9,160.31 | 7,698.22 | 6,634.31 | 8,049.55 | 6,041.82 | 6,445.94 | 6,418.87 | 6,946.91 | 5,609.91 |
| 35 | 1,004.45 | 872.77 | 2,234.58 | 1,213.46 | 230.57 | 140.32 | 1,085.70 | 1,592.25 | 1,280.30 | 3,715.61 | (121.62) |
| 36 | 24,982.53 | 24,531.65 | 18,515.33 | 24,195.30 | 20,559.99 | 20,010.46 | 22,029.93 | 20,610.64 | 21,018.02 | 24,670.45 | 18,827.94 |
| 38 | 13,937.49 | 33.46 | 44.71 | 1,489.25 | 532.77 | 720.29 | 1,041.16 | 294.86 | 933.83 | (95.61) | 1,876.98 |
| 40 | (672.14) | 8,182.01 | 3,097.57 | 3,097.57 | 2,498.23 | 2,248.24 | 636.33 | 303.00 | 303.00 | 8,996.11 | 1,027.42 |
| 42 | | | | | 67.34 | 7,145.60 | 25.00 | | | | |
| 43 | | | | | | 25.00 | 61.05 | 257.16 | | | |
| 45 | 317.97 | 565.73 | 3,975.57 | 97.70 | (3,949.44) | | | | | | |
| 46 | | | | | | | | | | 1.82 | |
| 48 | 360.75 | 415.00 | 386.00 | 639.91 | 501.95 | 3,099.00 | (99.00) | (270.50) | 2,161.25 | 823.55 | 490.89 |
| 49 | | | 2,222.40 | | | 0.02 | | | | | |
| 50 | | | 16,253.88 | (16,253.88) | | | | | | | |



CONFIDENTIAL

tm1servisanalysis
Net RAROC Performance View
Net Inc or Exp
Actual

CUBE:
tm1servrepotrview
tm1servisanalysismeasures

Next Year Budget Detail

## NewRegions-Corporate Training

| | L | M | N | O | P | Q | R | S |
|---|---|---|---|---|---|---|---|---|
| | December 2005 Actual | $ Variance | % Variance | | Dec YTD 2005 Actual | Dec YTD 2005 Budget | $ Variance | % Variance |
| | Actual Budget | | | | Actual | Budget | | |
| 12 | 562,284.70 | (31,452.28) | -5.30% | Salaries & Wages | 7,194,770.43 | 8,206,070.18 | (1,011,299.75) | -12.32% |
| 13 | | 1,000.00 | -100.00% | Commissions & Incentives | 13,958.10 | | 13,958.10 | 0.00% |
| 14 | 31,656.22 | 9,516.50 | 42.98% | Profit Sharing/401K/Stk Purch | 290,625.89 | 567,969.45 | (277,343.56) | -48.83% |
| 15 | | | 0.00% | Pension Plan | | | | 0.00% |
| 16 | 60,300.08 | 15,305.12 | 34.02% | Payroll Taxes | 614,126.11 | 638,214.39 | (24,088.28) | -3.77% |
| 17 | 36,287.16 | (405.18) | -1.10% | Group Insurance | 460,647.54 | 511,041.82 | (50,394.28) | -9.86% |
| 18 | 19,717.44 | 13,190.97 | 202.11% | Other Benefits | 203,031.43 | | 203,031.43 | 0.00% |
| 19 | 710,225.60 | 7,155.13 | 1.02% | **Salaries and Employee Benefits** | 8,777,159.50 | 9,923,295.84 | (1,146,136.34) | -11.55% |
| 21 | | | 0.00% | Building Rent | | | | 0.00% |
| 22 | | (272.98) | -100.00% | Utilities | 16,029.34 | | 16,029.34 | 0.00% |
| 23 | | | 0.00% | Real Estate Taxes | | | | 0.00% |
| 24 | 1,616.80 | 0.02 | 0.00% | Building Depreciation & Amortization | 13,750.28 | | 13,750.28 | 0.00% |
| 25 | 44.97 | (1,108.11) | -96.10% | Building Maintenance & Repairs | 9,565.37 | | 9,565.37 | 0.00% |
| 26 | 57,814.45 | 101.60 | 0.18% | Other Occupancy | 724,853.97 | | (74,586.03) | -9.33% |
| 27 | | | 0.00% | Rental Income | | 799,440.00 | | 0.00% |
| 28 | 59,476.22 | (1,279.47) | -2.11% | **Net Occupancy Expense** | 764,198.96 | 799,440.00 | (35,241.04) | -4.41% |
| 30 | 11,894.91 | (243.32) | -2.00% | Furn & Equip Depreciation | 140,757.78 | | 140,757.78 | 0.00% |
| 31 | 338.85 | 338.85 | 0.00% | Furn & Equip Maintenance & Repairs | 8,581.37 | | 8,581.37 | 0.00% |
| 32 | 717.20 | 1,077.96 | 222.62% | Property Taxes | 8,606.40 | | 8,606.40 | 0.00% |
| 33 | 1,562.18 | 550.21 | 9.81% | Furn & Equip Rent | 6,274.32 | | 6,274.32 | 0.00% |
| 34 | 6,160.12 | 7,583.25 | -6235.20% | Computer Equipment Expense incl Depreciation | 83,157.24 | | 83,157.24 | 0.00% |
| 35 | 7,461.63 | | 49.43% | Other Furn & Equip Expense | 20,710.02 | | 20,710.02 | 0.00% |
| 36 | 28,134.89 | 9,306.95 | | **Furniture & Equipment Expense** | 268,087.13 | | 268,087.13 | 0.00% |
| 38 | 352.95 | (1,524.03) | 81.20% | Advertising & Promotion | 21,162.14 | | 21,162.14 | 0.00% |
| 39 | | | 0.00% | Amortization of Servicing | | | | 0.00% |
| 40 | 1,027.43 | 0.01 | 0.00% | Amortization of Computer Programs | 30,744.77 | | 30,744.77 | 0.00% |
| 41 | | | 0.00% | Amortization-XS Purchase Price | | | | 0.00% |
| 42 | | | 0.00% | Amortization of Employment Agreements | | | | 0.00% |
| 43 | | | 0.00% | Computer Service Fees Expense | 7,212.94 | | 7,212.94 | 0.00% |
| 44 | | | 0.00% | Contributions | 50.00 | | 50.00 | 0.00% |
| 45 | 9,747.70 | 9,747.70 | 0.00% | Courier Service | 11,073.44 | | 11,073.44 | 0.00% |
| 46 | | | 0.00% | Credit Service | 1.82 | | 1.82 | 0.00% |
| 47 | | | 0.00% | Directors' Fees and Stock | | | | 0.00% |
| 48 | 12,827.50 | 12,336.61 | 2513.11% | Dues and Subscriptions | 21,336.30 | 31,000.00 | (9,663.70) | -31.17% |
| 49 | | | 0.00% | Gain/Loss on Sale of Assets | 2,222.42 | | 2,222.42 | 0.00% |
| 50 | | | 0.00% | Insurance | | | | 0.00% |

CONFIDENTIAL

RAC00030356

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 51 | 4,578.56 | 6,179.46 | 17,496.40 | (750.00) | 20,063.02 | 19,087.08 | 4,050.00 | 14,223.08 | 10,049.68 | 9,760.00 | 1,028.19 |
| 52 | | 1,150.15 | 1,126.09 | 349.86 | 288.84 | 60.34 | | 8.90 | 69.35 | 35.13 | |
| 53 | | | | | | | | | | | |
| 54 | | | | | | | | | | | |
| 55 | | | | | | | | 358.11 | | | |
| 56 | 39,399.52 | 3,389.92 | 22,098.76 | 30,000.34 | 5,399.77 | 16,110.26 | 10,385.10 | (616.25) | 156.32 | 5,103.31 | 37,551.70 |
| 57 | 1,641.28 | 1,373.52 | 4,358.74 | 1,574.93 | 309.40 | 1,188.15 | 4,012.82 | 7,305.19 | 4,422.29 | 1,723.53 | (4,388.15) |
| 58 | | | | | | | | | | | |
| 59 | 6,267.48 | 12,603.94 | 14,937.41 | 10,312.34 | 7,813.02 | 16,380.60 | 14,549.77 | 2,007.26 | 4,737.58 | 5,367.12 | 6,124.56 |
| 60 | 50,737.86 | 70,283.91 | 59,703.09 | 35,891.05 | 10,423.52 | 51,394.24 | 53,076.96 | 29,172.41 | 73,943.76 | 54,423.97 | (22,160.77) |
| 61 | | | | | | | | | | | |
| 62 | | | | | | | | | | | |
| 63 | 81,302.26 | 131,941.11 | 159,414.08 | 151,097.34 | (177,525.82) | 207,096.91 | 122,933.93 | 70,127.45 | 71,607.23 | 207,146.99 | (75,218.30) |
| 64 | | 0.03 | | | | | | | | | |
| 65 | | | | | | | | | | | |
| 66 | 91,695.81 | 90,115.15 | 126,129.56 | 135,703.10 | 99,125.35 | 155,431.82 | 203,463.58 | 168,692.22 | 51,389.09 | 128,655.22 | (29,105.09) |
| 67 | 289,566.82 | 326,233.39 | 431,244.26 | 353,249.51 | (34,452.05) | 479,987.55 | 414,136.70 | 291,862.89 | 219,773.38 | 421,941.14 | (82,772.57) |
| 68 | | | | | | | | | | | |
| 69 | 1,114,910.75 | 1,163,554.62 | 1,234,097.60 | 1,097,287.67 | 898,353.76 | 1,315,208.07 | 1,227,928.63 | 1,110,793.93 | 1,034,367.08 | 1,225,996.26 | 699,881.53 |
| 70 | | | | | | | | | | | |
| 71 | | | | | | | | | | | |
| 72 | 66,361.91 | (37,919.53) | 170,463.35 | 47,807.91 | 47,528.91 | 47,528.91 | 91,233.91 | 91,233.91 | 91,818.91 | 116,165.75 | 116,165.75 |
| 73 | | | | | | | | | | | |
| 74 | | | | | | | | | | | |
| 75 | 66,361.91 | (37,919.53) | 170,463.35 | 47,807.91 | 47,528.91 | 47,528.91 | 91,233.91 | 91,233.91 | 91,818.91 | 116,165.75 | 116,165.75 |
| 76 | | | | | | | | | | | |
| 77 | 1,181,272.66 | 1,125,635.09 | 1,404,560.95 | 1,145,095.58 | 945,882.67 | 1,362,736.98 | 1,319,162.54 | 1,202,027.84 | 1,126,185.99 | 1,342,162.01 | 816,047.28 |

CONFIDENTIAL

RAC00030357



| # | L | M | N | O | P | Q | R | S |
|---|---|---|---|---|---|---|---|---|
| 51 | 7,531.60 | 6,503.41 | 632.51% | Legal and Professional | 108,718.51 | 150,000.00 | (41,281.49) | -27.52% |
| 52 | 32.09 | 32.09 | 0.00% | Licenses and Taxes | 7,699.31 | | 7,699.31 | 0.00% |
| 53 | | | 0.00% | Life Co Claims and Commissions | | | | 0.00% |
| 54 | | | 0.00% | Minority Interest RAMCO | | | | 0.00% |
| 55 | | | 0.00% | Other Real Estate Expense | | | | 0.00% |
| 56 | 4,621.70 | (32,930.00) | -87.69% | Outside Services | 358.11 | | 358.11 | 0.00% |
| 57 | 2,687.29 | 7,075.44 | -161.24% | Postage and Freight | 173,600.45 | | 173,600.45 | 0.00% |
| 58 | | | 0.00% | Security Services | 26,208.97 | | 26,208.97 | 0.00% |
| 59 | 43,881.73 | 37,757.17 | 616.49% | Stationery & Supplies | 144,982.81 | 81,450.00 | 63,532.81 | 78.00% |
| 60 | 21,242.17 | 43,402.94 | -195.85% | Telephone Service | 488,132.17 | 34,000.00 | 454,132.17 | 1335.68% |
| 61 | | | 0.00% | Tellers' Differences | | | | 0.00% |
| 62 | | | 0.00% | Tickets and Quotes | | | | 0.00% |
| 63 | (103,034.23) | (27,815.93) | 38.98% | Travel & Business Development | 846,888.95 | 110,000.00 | 736,888.95 | 669.90% |
| 64 | | | 0.00% | Federal Reserve Bank Fees | | | | 0.00% |
| 65 | 13,240.00 | 13,240.00 | 0.00% | Misc. Losses Net of Recoveries | 13,240.03 | | 13,240.03 | 0.00% |
| 66 | 607,073.56 | 636,178.65 | -2185.80% | Miscellaneous Expense | 1,828,369.37 | 4,373,558.00 | (2,545,188.63) | -58.19% |
| 67 | 621,231.49 | 704,004.06 | -850.53% | Other Operating Expenses | 3,732,002.51 | 4,780,008.00 | (1,048,005.49) | -21.92% |
| 68 | | | | | | | | |
| 69 | 1,419,068.20 | 719,186.67 | 102.76% | Non-Int Exp Less Affil Svs Fees | 13,541,448.10 | 15,502,743.84 | (1,961,295.74) | -12.65% |
| 70 | | | | | | | | |
| 71 | | | 0.00% | Affiliate Operations Charges | | | | 0.00% |
| 72 | 116,165.75 | | 0.00% | Affiliate Computer Service Fees | 964,555.44 | 964,555.44 | | 0.00% |
| 73 | | | 0.00% | Other Affiliate Service Fees | | | | 0.00% |
| 74 | | | 0.00% | Corporate Service Allocation | | | | 0.00% |
| 75 | | | 0.00% | Affiliate Service Fees - Elimination | | | | 0.00% |
| 76 | 116,165.75 | | 0.00% | Affiliate Service Fees | 964,555.44 | | 964,555.44 | 0.00% |
| 77 | 1,535,233.95 | 719,186.67 | 88.13% | Non-Interest Expense | 14,506,003.54 | 15,502,743.84 | (996,740.30) | -6.43% |

CONFIDENTIAL

RAC00030358

```
02/17/07                    REGIONS UNIVERSITY                    STUL11
11:16:23 AM              Student Count by State                Page    1

       Enrolled Students from Regular Fall 2006 through Regular Spring 2007
          --        2
          AE        5
          AK        3
          AL      240
          AP        5
          AR       26
          AZ       10
          CA       25
          CO        9
          CT        6
          DC        1
          DE        2
          FL       35
          GA       73
          HI        2
          IA        2
          ID        5
          IL        9
          IN        9
          KS        1
          KY        7
          LA       13
          MD       17
          ME        4
          MI       14
          MO        7
          MS       37
          MT        4
          NC       24
          NE        2
          NJ        3
          NM        6
          NV        5
          NY       16
          OH       20
          OK       15
          OR        5
          PA       10
          PR        1
          RI        1
          SC       11
          SD        2
          TN       44
          TX       75
          UT        4
          VA       33
          VT        1
          WA       12
          WI        5
          WV        6
          WY        1
                 =====
   Total:       875
```

**RU 1908**

EXHIBIT

17

# Board of Regents Meeting

## Southern Christian University
Fiscal Year July 1, 2005 to June 30, 2006

**Date of Meeting:  September 26, 2005**

## A Call to Order:

- Chairman Roger Dill called the meeting to order.

- Chairman Roger Dill led a special prayer for the Hugh Wyatt family in the loss of Jean

- Roll Call—those in attendance:
  Roger Dill, Dan Myers, Martin Anderson, Byron Benson, S.G. Gray, Don Pate, Jesse Russell, Bobby Terrell, E. J. Turner, Rex Turner, Jr., Hugh Wyatt

- A quorum was present for the meeting.

- Anita Crosby read the minutes for the secretary Brother Dan Myers for the spring May 27, 2005 meeting.  The minutes were approved by the regents as read.

## Anita Crosby, chief accountant, presented the following:

- Fiscal Year 2005 Audited Financial Statements

- Fall enrollment growth reports.



EXHIBIT

20

Turner

PENGAD 800-631-6989

## President Turner Gave An Overview of the University:

- President Turner reported on the evolution of the university.  He discussed the following:

  - Our distance learning program began in 1993 through the use of video

1

- 1999—SCU was selected as one of fifteen initial participants in the Distance Education Demonstration Program by the United States Department of Education

- Progress on our 185 acres

- President Turner discussed enrollment trends and rationale for considering a name change
  - Needed to increase enrollment in areas such as business in order to support our degrees in the Turner School of Theology
  - Discussion concerning offering courses online in China. The Chinese Embassy would not grant permission because we had "Christian" in our name
  - The name "Christian" does not serve our business degrees well. We have two and a half years remaining on our Title III grant—after that the salaries that are currently being paid out of the grant will be paid out of our operating budget
  - There is a possibility of beginning an online law school in California. This would be approved through an exemption in the law
  - President Turner discussed the feasibility of changing our name to Masters University within Southern Christian University. The Turner School of Theology would continue to exist as a school within the university. We would not change our mission.
  - This highlights our need—we need a for-profit type name that is a broad name. This would bring in students that would help fund the degrees in the Turner School of Theology

- President Turner assured the Board that he was totally committed to the PhD in Biblical Studies—a name change would help make the PhD in Biblical Studies a success. He reported that he has discussed the possibility of a name change with the PhD in Biblical Studies faculty. President Turner reminded the Board of his stand on baptism being essential for salvation. He believes that if we just teach the Bible, the rest will take care of itself.

- President Turner updated the Board on new computer programs Southern Christian University is purchasing for Student Information Systems. We will be writing a check for $260,000 to SCT for computer programs this week. We are purchasing PowerCampus (Microsoft-based), PowerFAIDS for Financial Aid and Great Plains for bookkeeping. It will also cost approximately $250,000 for installation this year. In addition, there will be a $55,000 per year charge for maintenance.

2

RU 110

- Dr. White is currently working with recruiting
- We will be making application in Arizona—thousands of students are leaving Arizona to go to faith-based universities
- We are considering a fundraiser from York College who has done an excellent job in raising money
- Dr. Alford is working on a substantive change for an Associate of Arts degree
- We are considering offering a PhD in Business Leadership

- President Turner presented the University's Mission Statement, Goals, and Purposes

- President Turner presented the University Master Plan

## Board of Regent Comments:

- Beau Greer indicated that he favored a name change. He understood that there were limitations with our current name. If we could broaden our non-Biblical programs, this will help us to broaden our Biblical programs. We need to consider what will be the future of this institution if we do not change our name
- S.G. Gray stated that he felt that Southern Christian University was limiting
- President Turner reported that no official action is to be taken by the Board at this time—he is just making them aware that we need to consider a name change in the near future
- Beau Greer reported on the mining
- Martin Anderson stated that we should consider James Watkins as a Board Member—it was discussed that the Board Policy must be followed
- Hugh Wyatt expressed his appreciation for the outpouring of love for Jean and the family from the Board members.

## Board of Regents Discussed, Reviewed and/or Approved the Following:

- Minutes from the May 27, 2005 Board of Regents meeting
- Audited SCU Financial Statements July 1, 2004 to June 30, 2005
- SCU's Mission S-tatement Goals, and Purposes
- Southern Christian University Master Plan

**RU 111**

# Board Meeting

## December 16, 2005
Friday 2pm

## In Attendance:

Dan Myers
Bobby Terrell
Jesse Russell
Raymond Elliott
Roger Dill
Don Pate
E.J. Turner
Byron Benson
Beau Greer
Rex Turner
<u>By Conference phone</u>:
Martin Anderson
Hugh Wyatt
Donnie Turner
Carl Barker
S.G. Gray

## Discussion

There was a lengthy discussion of the feasibility, need, and rationale for changing the name of Southern Christian University. Some of the reasons cited were: (1) A lot of colleges and universities have South or Southern in their name; (2) We have South University which is a local

1



RU 117

University which causes confusion; (3) SCU is planning to go to Arizona and Nevada and the Southern Christian University name will not work well in that region; and (4) We have run into problems with such countries as China and Russia with *Christian* in our name—we wanted to teach business courses in China.

The Board of Regents also cited that they understood the need, but felt that some might not like taking "Christian" out of the name. An observation was, however, made that several of our Christian universities have already done so—such as David Lipscomb University and Freed Hardeman University.

Some of the Regents felt that *Turner University* should be considered, but it was noted that some might think that it was named after Ted Turner rather than the founders Rex and Opal Turner. *Masters University* had been mentioned as the name, and after much discussion it was ultimately recognized by the majority as being the best name presented—knowing that this is not an easy decision!

After three hours of discussion Beau Greer made a motion as follows: "That the Board of Regents on this day has formally given approval to the president of Southern Christian University to proceed with getting the *Masters University* name officially registered, and that when this is accomplished the Board of Regents will reconvene to make a final decision to rename the institution to *Masters University*." Raymond Elliot seconded the motion and all

2

RU 118



g to

(4)

na

the

n"

that

so—

nan

d be

t it

Rex

oned

ely

otion

as

ers

his is

make

d all

favorably, except E.J. Turner. The motion was

ed.

## RESOLUTION

WHEREAS, Southern Christian University, Inc., has for some years operated under the name Southern Christian University; and,

WHEREAS, it is important that Southern Christian University increase its attractiveness to potential students, not just regionally, but also nationally and internationally, and thereby maximize educational opportunities and achievements; and,

WHEREAS, changing the institution's name will also assist the University in projecting itself as a nationally recognized university of prominence;

NOW THEREFORE BE IT RESOLVED THAT Southern Christian University, Inc. does hereby resolve that the name of the University is changed to "Masters University, Inc.";

BE IS FURTHER RESOLVED THAT this name change shall become effective on or before December 31, 2006, as determined by the President and evidenced by the President's letter to the Chairperson of the Board, to be recorded in the minutes of the Board meeting next occurring thereafter;

BE IT FURTHER RESOLVED THAT President Rex Turner, Jr. is hereby authorized to, acting on behalf of the Corporation and its Board, cause the proper State and County authorities to be notified of this name change, register (with or without the additional signature(s) of Board officers) the new name with the appropriate governmental officials and offices, protect the University's use of the new name from infringement and use by others, and take such other action he deems appropriate and consistent with the University's best interests; and,

BE IT FUTHER RESOLVED THAT President Turner is also hereby authorized to, for a period of one year after the name change becomes effective, take such action as he deems necessary or proper in order to effectuate a smooth transition in the use of University names, including but not limited to the use of either or both names in ongoing agreements, registrations, or otherwise.

DONE this the _17th_ day of _MARCH_, 2006.

IN WITNESS WHEREOF, the Chairman and Secretary of the Southern Christian University, Inc. Board of Trustees, as well as the President of Southern Christian University, Inc., have signed their names below as confirmation that, there being first assembled a quorum of the aforesaid Board of Trustees members, the aforesaid Resolution was duly consented to, agreed upon, approved, and adopted by a majority of the voting members of said Board of Trustees on this the _17th_ day of, _MARCH_, 2006.

EXHIBIT
24
Turner
PENGAD 800-531-6989
RU 137

ROGER DILL

_____, As Chairman,
Board of Trustees of
Southern Christian University, Inc.

STATE OF ALABAMA        )
MONTGOMERY COUNTY       )

Before me, _Elaine Jarnece_, a Notary Public in and for the State of Alabama, personally appeared _Roger Dill_, who being by me first duly sworn, states that he is over nineteen years of age, that he is a member of the Southern Christian University, Inc. Board of Trustees, that he is the duly elected Chairman of said Board of Trustees, and that in said capacity he confirms that, there being first assembled a quorum of the aforesaid Board of Trustees members, the aforesaid Resolution was duly consented to, agreed upon, approved, and adopted by a majority of the voting members of said Board of Trustees on the above-stated date.

This the 17th day of March, 2006.

(SEAL)

_____
Notary Public
My Commission Expires: 1-10-07

DAN MYERS

_____, As Secretary,
Board of Trustees of
Southern Christian University, Inc.

STATE OF ALABAMA        )
MONTGOMERY COUNTY       )

Before me, _Elaine Jarnece_, a Notary Public in and for the State of Alabama, personally appeared _Dan Myers_, who being by me first duly sworn, states that he is over nineteen years of age, that he is a member of the Southern Christian University, Inc. Board of Trustees, that he is the duly elected Secretary of said Board of Trustees, and that in said capacity he confirms that, there being first assembled a quorum of the aforesaid Board of Trustees members, the aforesaid Resolution was duly consented to, agreed upon, approved, and adopted by a majority of the voting members of said Board of Trustees on the above-stated date.

This the 17th day of March, 2006.

(SEAL)

_____
Notary Public
My Commission Expires: 1-10-07

RU 138

_Rex Turner, Jr., As President,_
Southern Christian University, Inc.

**STATE OF ALABAMA** )
**MONTGOMERY COUNTY** )

Before me, _Elaine Jarence_ a Notary Public in and for the State of Alabama, personally appeared _Rex A Turner, Jr_, who being by me first duly sworn, states that he is over nineteen years of age, that he is a the President of Southern Christian University, and that in said capacity he confirms that, there being first assembled a quorum of the aforesaid Board of Trustees members, the aforesaid Resolution was duly consented to, agreed upon, approved, and adopted by a majority of the voting members of said Board of Trustees on the above-stated date.

This the _17th_ day of _March_, 2006.

(SEAL)

Notary Public
My Commission Expires: _1-10-07_

Page 3 of 3

RU 139

## Rex Turner



**From:** Jim Shlesinger [jim@saglip.com]
**Sent:** Thursday, July 27, 2006 9:59 AM
**To:** Rex Turner
**Subject:** Service Mark searches--TURNER UNIVERSITY, REX UNIVERSITY and REGIONS UNIVERSITY

Dear Dr. Turner:

Pursuant to your request, we conducted searches of the United States Patent and Trademark Office (USPTO) records in an effort to determine registrability of each of the above identified marks, for use in association with educational services at the post-secondary level. The searches were performed on our about July 26, 2006, and at the time the searches were conducted, the USPTO records were current through July 12, 2006.

A full report, including copies of the references developed will be mailed to you. Please be advised as follows:

TURNER UNIVERSITY

The references developed include multiple registrations issued to companies associated with Ted Turner for a wide range of products and services, including TURNER, for television programing; TURNER LEARNING, for the production of educational programs designed for school use; TURNER SOUTH, for entertainment and education services; and an expired mark, TURNER ADVENTURE LEARNING, for education and entertainment.

Based on the results, there exists the possibility that the USPTO may refuse registration of your proposed mark on grounds of a likelihood of confusion as to sponsorship or affiliation with one or more of the marks noted above. While there are good arguments which may be presented in favor of the registrability of your proposed mark, there remains some doubt concerning the ability to register TURNER UNIVERSITY, for educational services in light of the registrations developed.

REX UNIVERSITY

Our search did not find any conflicting marks. The closest registration developed is the mark, REX READER, for educational services, namely, providing elementary level reading activities. We believe we can distinguish this mark from your proposed mark. Accordingly, the mark, REX UNIVERSITY, appears to be registrable at this time.

REGIONS UNIVERSITY

The search developed variations of the term "regions" for various educational services. These include the following:

1. REGION 4 EDUCATED SOLUTIONS--for conducting educational training for educators at primary and secondary level schools;

2. REGIONAL CONNECTS--for conducting events for career development services for executive women in the food service industry;

3. NORTH CENTRAL REGIONAL EDUCATIONAL LABORATORY--for education services;

4. REGIONAL LEADERSHIP INSTITUTE--for providing classes, seminars, etc in the field of leadership;

5. REGIS UNIVERSITY--educational services (university level);

6. REGENT UNIVERSITY--educational services (university level);

7/27/2006

EXHIBIT
28
Turner

PENGAD 800-831-6989

**RU 178**

7. REGAL UNIVERSITY--educational services (university level); and

8. REGENTS OF THE UNIVERSITY OF MINNESOTA--educational services (university level).

The records suggest that your proposed mark is registerable. The term "region" is used in a geographic context in the first four marks listed above, suggesting weakness in the strength of these marks. The remaining marks evidence weakness in marks which are otherwise different in spelling, pronunciation, or meaning.

The sophistication of the consumer or user of higher educational services reduces the likelihood that confusion would result from the concurrent use of the marks in question. Based on the results of the search, we are of the opinion that the mark, REGIONS UNIVERSITY, is registerable for educational services, namely, providing instruction at the university level.

In conclusion, the marks, REX UNIVERSITY, and REGIONS UNIVERSITY, appear to be registrable. Please consider filing applications for one or both of these marks at this time.

Very Truly Yours,

James E. Shlesinger
Shlesinger, Arkwright & Garvey LLP
1420 King Street, Suite 600
Alexandria, VA 22314
703-684-5600 phone
703-836-5288 fax
jim@sagllp.com

Warning: The information contained in this transmission is privileged and confidential and intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any distribution, copying, disclosure or taking of any action in reliance on the contents of this transmission is strictly prohibited and review by any individual other than the intended recipient shall not constitute waiver of privilege. If you have received this transmission in error, please notify us immediately and delete the original transmission.



# BELLSOUTH

## The Real Yellow Pages ®

Visit us online at YELLOWPAGES.COM™

Maxwell-Gunter Air Force Base

**Montgomery**

Do Not Discard Before
**May 2007**

Including Ft. Deposit, Millbrook, Prattville & Wetumpka

Includes customer listings for all local telecommunications companies.

EXHIBIT
29

PENGAD 800-631-6989

©2006 BellSouth Advertising & Publishing Corp.

100% Recyclable

Ralph Smith Motors Of Montgomery Inc-
427 E Jefferson St 36104 ---------------- 263-1123
427 E Jefferson St 36104 ---------------- 263-1347
427 E Jefferson St 36104 ---------------- 262-7538
306 N Decatur St 36104 ------------------ 834-4291
3130 Wetumpka Hwy 36110 ---------------- 272-3884
3130 Wetumpka Hwy Montgomery 36110 --- 272-4004
Used Auto Parts-
3130 Wetumpka Hwy 36110 ---------------- 277-3804
3130 Wetumpka Hwy 36110 ---------------- 277-3832
Ram Air Conditioning & Heating
3643 Pleasant Ridge Rd ----------------
Ram Computers Montgomery ------------- 272-8998
Ram Enterprises 1519 E Ann St 36107 ---- 398-2108
Ram Technologies 1519 E Ann St 36107 --- 834-6789
Ram Tool & Supply 541 Oliver Rd -------- 834-6787
Ramada Inn Airport 1100 W South Blvd --- 270-8665
Ramada Inn East
1355 Eastern Blvd Montgomery 36117 ---- 277-2200
Fax Line 1355 Eastern Blvd 36117 ------- 270-3338
Ramada Inn Southwest
3951 Norman Bridge Rd 36105 ----------- 288-1120
Ramada Limited
1040 W South Blvd Montgomery 36105 --- 286-8399
Ramada Limited
1040 W South Blvd Montgomery 36105 --- 286-8435
**RAMBO AIR CONDITIONING &
HEATING**
1231 Perry Hill Rd Montgomery 36109 ---- 285-1455
Rambo D Keith 4581 Landward Dr 36054 -- 285-4318
Ramirez Melba Elaine
5065 Virginia Loop Rd 36116 ------------ 284-1865
Rampy Construction 1318 Pike Rd Pk Rd 36064 --- 551-1234
Ramsey T Patrick CPA
8230 Old Federal Rd Mont 36117 -------- 213-0504
Randall Frank C Dr phys-
Ofc 1722 Pine St 36106 ----------------- 262-1647
If No Answer ------------------------- 293-8000
Res 2632 Lancaster Ln 36106 ----------- 277-1579
Randall's 7758 Atlanta Hwy Montgomery 36117 --- 277-4247
Randolph Wayne rl est appror
2762 Biltmore Av Montgomery 36109 ----- 272-4050
Randy B Blake Attorney at Law
4758 Woodmere Blvd Mont 36106 ------- 262-6676

**RAPE ASSISTANCE-COUNCIL
AGAINST RAPE**
24 Hours A Day 7 Days A Week
1231 Perry Hill Rd Montgomery 36109 --- **213-1227**
Rapid Bail Bonds 1101 Jackson Trace Rd -- 567-7003
Rapture Church The cgl 13 S Hopper St 36107 ---- 263-4001
Rash Robert Atty 300 Water St Montgomery 36104 --- 265-0535
Ratcliffe Thomas A PhD CPA
3815 Interstate Ct 36109 -------------- 271-2200
Rave 2715 Montgomery Mall 36116 ------ 288-8452
Rave Motion Pictures 7925 Vaughn Rd Mont --- 244-1300
Rawlinson Electric Co 2781 Main St 36054 --- 285-5739
Rawlinson Properties 609 S Hull St Mont 36104 --- 263-7565
Ray Adrienne R OD 3447-F McGehee Rd Mont --- 613-6614
Ray Bonner Homebuilders
3511 Flowers Dr Mont 36109 ----------- 260-0010
**RAY BOONE JEWELER**
7788 Atlanta Hwy Montgomery 36117 --- **272-4300**
Ray George David atty 600 Clay St 36104 -- 264-0400
Ray JoAnne W PhD
8650 Minnie Brown Rd Montgomery 36117 --- 834-2488
Raybon Insurance Agency
2143 Taylor Rd Mont 36117 ------------ 272-9266
Rayburn William Morgan Atty Davis Rayburn
Herrington & Prescott LLC
8650 Minnie Brown Rd 36117 ---------- 215-4449
Rayco serv stg eqpt
365 Gunn Rd Montgomery 36117 -------- 272-5524
Raycom Media 201 Monroe St 36104 ---- 206-1400
Raycom Program Ventures Inc
401 Adams Av Mont 36104 ------------- 223-5520
Raymon Bill invstmnts
4650 Woodmere Blvd Mont 36106 ------ 271-2600
Raymond James Financial Services
4209 Carmichael Rd Mont 36106 ------- 481-1400
Raymond James Financial Services
8314 Crossland Loop Montgomery 36117 --- 387-0094
Raymond James Financial Services Inc
118 E Bridge St Wetumpka 36092 ------- 514-8842
Rays Of Light Child Development Center
789 S Court St Montgomery 36104 ------ 269-6008
Ray's Pest Control Service
5315 Wares Ferry Rd Montgomery 36109 --- 277-4933
Razick's Construction Co
4303 Wares Ferry Rd Montgomery 36109 --- 396-1995
Razor Cuts 59 Federal Dr Montgomery 36107 --- 269-2724
RE Garrison Transportation-Lakeside Division
2835 Pyramid Av Mont 36105 ---------- 280-2876

Re Transportation 305 Interstate Park Dr 36109 --- 271-2244
Ready Built Transmission
3300 Atlanta Hwy Montgomery 36109 --- 270-7764
Ready Built Transmission
3300 Atlanta Hwy Montgomery 36109 --- 279-7164
Ready Routes Inc
1847 Robinson Hill Rd Montgomery 36109 --- 395-7515
Ready Routes Inc ------------------- 395-7510
**REAGAN BROTHERS AUTOMOTIVE
SPECIALTIES**
Air Conditioning
Air Condition Specialist
938 S Perry St 36104 ---------------- 263-5551
Transmission Service 938 S Perry St 36104 --- 263-5552
Computer Tuning 938 S Perry St 36104 --- 263-5551
Hose Dep 938 S Perry St 36104 ------- 263-5552
Reagan Reporters LLC
4137 Carmichael Rd Montgomery 36106 --- 262-7556
Real Clean 4024 Marquette Dr Montgomery 36109 --- 279-1331
Real Estate Appraisals
436 Arrowleaf Ct Montgomery 36117 ---- 213-0154
**REAL ESTATE APPRAISERS LLC**
4732 Woodmere Blvd Mont 36106 ------ **277-5077**
Real Estate & Business Broker
4152 Carmichael Rd Mont 36106 ------- 277-3280
Real Estate & Business Brokers
4152 Carmichael Rd Mont 36106 ------- 271-5800
Real Estate Closing Services
1430 I-85 Park Montgomery Al 36106 --- 386-3828
Real Estate Financing 643 S Perry 36104 --- 832-8805
Real Estate Financing Inc-
Main Office-
605 So Perry St ---------------------- 832-8701
For Departments Not Listed
605 So Perry 36104 ----------------- 832-8701
Income Property Loans 643 So Perry 36104 --- 832-8756
Insurance 605 So Perry 36104 ------- 832-8944
Residential-Loan Officer 605 So Perry 36104 --- 832-8805
**REAL ESTATE FUNDING CORP**
www.refmortgage.com
8421 Crossland Loop 36117 ---------- **215-6789**
**REAL YELLOW PAGES**
See BellSouth The Real Yellow Pages
REALPAGES.com
See BellSouth The Real Yellow Pages
Realty Action Inc
4144 Carmichael Rd Montgomery 36106 --- 244-9100
**REALVEST APPRAISAL SERVICES**
6031 Perimeter Place Mont 36116 ------ **277-7325**
Reaves Contracting Inc
702 Green Ridge Rd Mont 36109 ------- 356-8167
Reaves Contracting Inc -------------- 272-8194
Reaves Randolph P PC
200 S Lawrence St Montgomery 36104 --- 834-5345
Rebecca's Designs 620 Oliver Rd Mont --- 244-0394
Rebel Electronics 3401 Industrial Dr 36108 --- 832-4444

**REBEL PEST CONTROL**
1575 Rex St 36107 ----------------- 265-1831
1575 Rex St 36107 ----------------- 263-2723
Rebirth Christian Ministries
321 W Fleming Rd Montgomery 36105 --- 281-0910
Rebuilding Together With Christmas In April
123 Julia St 36104 ------------------ 262-9969
Rebuilt Auto 621 Air Base Blvd Montgomery 36108 --- 241-0836
Rech Joe atty ---------------------- 265-5200
Records Retention Services Inc
560 Arba St 36104 ------------------ 263-3500
Recovery Systems International
275 Hobbie Rd Montgomery ---------- 288-8585
**RECYCLE SERVICE CORPORATION**
111 S Eastdale Rd Montgomery 36117 --- **272-6225**

**RED BAZZELL & SON AUTO
BODY & PAINT SHOP**
511 N Eastern Blvd ------------------ **271-0311**
Red Bear Meat Store 3215 Day St 36108 --- 269-3237
Red Bluff Cottage Bed And Breakfast
551 Clay St 36104 ------------------ 264-0056
Red Eagle Pest Control -------------- 220-5441
Red Lion Apartments
4726 Narrow Lane Rd 36116 ---------- 281-2226
Red Lobster Restaurants 300 Eastdale Cir 36117 --- 277-0780
Red Star Tavern
7078 Eastchase Pkwy Montgomery 36117 --- 395-6465
Red Wing Shoe Store
5350 Atlanta Hwy Montgomery 36109 --- 272-4499
Redd Eloise 4180 Carmichael Rd -------- 277-9100
Redd Pest Control ------------------ 244-7771

**REDD RALPH DR** phys
2055 E South Blvd 36116 ------------ **284-65**
Redd Susanne 6530 Kobe Ct 36117 ----- 272-1
Reddi Tax Service
2621 Lower Wetumpka Rd Montgomery 36110 --- 263-70
Redick Charlene ------------------- 272-70
Reding Cofc 126 Commerce St 36104 --- 262-83
Redland Mini Storage
266 Sundown Rd Wetumpka 36093 ----- 567-19
Red's Little Schoolhouse Grady ------- 584-79
**REED EDWARD W MD** phys
2024 Chestnut St 36106 ------------ **265-354**
Reed Joe M atty
524 S Union St Montgomery 36104 ----- 834-20
Reed Stacy L Attorney At Law 441 High St 36104 --- 265-500
Reed Tew & Associates Attorney At Law
441 High St 36104 ------------------ 265-500
Reedy's Meat & Grocery
1500 Highland Av Montgomery 36104 --- 265-500
**REESE HOWELL INC**
101 Meriwether Rd Pike Road 36064 ---- **286-042**
Reese James rl est 844 S Court St 36104 --- 264-545
Res 2912 Ravenwood Dr -------------- 281-926
Reese Realty
Ofc 844 S Court St 36104 ------------ 264-545
Reese's Grocery
3088 Gaston Av Montgomery 36105 ----- 263-130
Reeves Michael L Dr phys ------------ 293-800
Reeves Trucking LLC
3058 Birmingham Hwy Montgomery 36108 --- 262-514
Reflections Barber Shop
1400 Carter Hill Rd Montgomery 36106 --- 265-882
Reflections Beauty Shop
1400 Carter Hill Rd 36106 ----------- 265-882
Reflections Car Wash Inc
3621 Malcolm Dr Montgomery --------- 272-465
Regal Auto Wash
2245 E South Blvd Montgomery 36116 --- 286-966
Regal Nail 3801 Eastern Blvd 36116 ---- 286-033
Regency Inn 1771 Dickinson Dr 36109 --- 260-044
Regency Worldwide Partners
2 N Jackson St Montgomery 36104 ----- 264-3014
Regional Biomedical
1240 County Line Rd Deatsville -------- 285-7524
Regional Biomedical Laboratory
4490 Virginia Loop Rd 36116 --------- 281-6911
Regional Biomedical Laboratory
2048 W Fairview Av 36108 ----------- 265-1140
Regional Development Center
6111 Perimeter Pkwy Montgomery 36116 --- 286-8096
Regional Development Consultants
6366 Eastwood Glen Pl Montgomery 36117 --- 279-7735
Regional Planning & Development Commission
125 Washington Av Montgomery 36104 --- 262-4300
**REGIONS BANK-**
8 Commerce St
Toll Free-Dial '1' & Then -------- 800 734-4667
Branch Office-
Adams Av Office-
901 Adams Av
Toll Free-Dial '1' & Then -------- 800 734-4667
Bell Road Office-
6900 Vaughn Rd
Toll Free-Dial '1' & Then -------- 800 734-4667
Cloverdale Office (Motor Branch)-
416 Cloverdale Rd
Toll Free-Dial '1' & Then -------- 800 734-4667
Eastbrook Office-
301 Coliseum Blvd
Toll Free-Dial '1' & Then -------- 800 734-4667
Eastdale Mall Office-
320 Eastdale Mall
Toll Free-Dial '1' & Then -------- 800 734-4667
Green Lantern Office-
2911 McGehee Rd
Toll Free-Dial '1' & Then -------- 800 734-4667
Jackson Hospital Office-
1722 Pine St
Toll Free-Dial '1' & Then -------- 800 734-4667
Main Office-
8 Commerce St
Toll Free-Dial '1' & Then -------- 800 734-4667
Maxwell AFB Office-
1081 Kelly St
Toll Free-Dial '1' & Then -------- 800 734-4667
McGehee Road Office-
3421 McGehee Rd
Toll Free-Dial '1' & Then -------- 800 734-4667
Millbrook Office-
3940 Hwy 14
Toll Free-Dial '1' & Then -------- 800 734-4667
ContinuedNextPage

Continued From Last Page

**REGIONS BANK-**
Branch Offices-
Chisholm Office Motor Branch-
2800 Lower Wetumpka Rd
Toll Free-Dial '1' & Then ---------- 800 734-4667
Eastern Motor Branch-
2906 Atlanta Hwy
Toll Free-Dial '1' & Then ---------- 800 734-4667
Normandale Office-
3720 Norman Bridge Rd
Toll Free-Dial '1' & Then ---------- 800 734-4667
Western Office Motor Branch-
3118 Mobile Hwy
Toll Free-Dial '1' & Then ---------- 800 734-4667
Prattville Offices-
Autauga County Office-
1901 Cobbs Ford Rd Prattville 36066
Toll Free-Dial '1' & Then ---------- 800 734-4667
Prattville Motor Branch-
744 East Main Street
Toll Free-Dial '1' & Then ---------- 800 734-4667
Taylor Road Office-
2381 Taylor Rd
Toll Free-Dial '1' & Then ---------- 800 734-4667
Vaughn East Office-
4750 Vaughn Rd
Toll Free-Dial '1' & Then ---------- 800 734-4667
Village West Office-
4585 Mobile Hwy
Toll Free-Dial '1' & Then ---------- 800 734-4667
Wetumpka Office-
5100 US Hwy 231
Toll Free-Dial '1' & Then ---------- 800 734-4667
Retail Administration-
8 Commerce 36104
Regions Merchant Service --------------- 280-5251
Checking Account Information ---------- 832-8250
Trust Account Information --------------- 832-8900
Business Banking ------------------------ 832-8144
Commercial Business Development ------ 832-8417
Commercial & Real Estate Loans -------- 832-8184
Construction Loans ---------------------- 832-8184
Consumer Loans Collection -------------- 280-5347
Consumer Loan Information-Any Branch Office
Savings Balances And Account Information -- 832-8011
Corporate Banking ---------------------- 833-1500
Consumer Banking ---------------------- 832-8850
Consumer Loans-
Property Improvements & Consumer Mortgages
Toll Free-Dial '1' & Then ------------ 800 734-4667
Individual Retirement Accounts ----------- 832-6043
Investments-Morgan Keegan ------------ 262-0100
Sales And Quality ----------------------- 832-8022
Private Banking ------------------------- 832-8344
Safe Deposit-
8 Commerce St 36104
Toll Free-Dial '1' & Then ------------ 832-8030
Sales Finance Collections
Toll Free-Dial '1' & Then ------------ 800 624-2415
Sales Financial Division
Toll Free-Dial '1' & Then ------------ 800 624-2415
Trust Department-
60 Commerce St 36104
Toll Free-Dial '1' & Then ------------ 230-6100
For Information Or Departments Not Listed
Toll Free-Dial '1' & Then ------------ 800 734-4667

**REGIONS FINANCIAL LEASING INC**
817 S Court Street 36104 ------------ 223-4500
Regions Mortgage-
Montgomery-
8301 Crossland Loop Montgomery 36117 -- 213-1340
Millbrook-
3940 Highway 14 36054 --------------- 285-0250
Prattville-
1901 Cobbs Ford Rd 36066 ----------- 361-2838
Wetumpka-
5100 US Highway 231 36092 ---------- 567-4713
Customer Service --------------------- 223-3844
Regis Atlantic 5400 Perimeter Pkwy Lt Mont -- 280-2712
Regis Salon-
Eastdale Mall ------------------------ 271-0222
Montgomery Mall -------------------- 281-8484
Registrar Of The Alabama/West Florida Conference
United Methodist Church Jackson Hall 36752 -- 833-4090
Registar USA-
Fax Line 2575 Container Dr Montgomery 36109 -- 244-1901
Register USA Inc
2575 Container Dr Montgomery 36109 -- 244-1881
Rehab Associates
4124 Carmichael Rd Montgomery 36106 -- 244-4098
Rehab Associates
207 Interstate Park Dr Montgomery 36117 -- 272-8255
Rehab Associates Inc
1329 Mulberry St Montgomery 36106 -- 240-0018

Rehab Associates LLC-
Corporate Office 207 Interstate Park Dr -- 272-9980
Central Billing ----------------------- 271-1088
Industrial Rehab 1801 Pine St 36106 --- 262-6009
Occupational Therapy 1801 Pine St 36106 -- 834-9901
Physical Therapy 1801 Pine St 36106 --- 262-6161
Physical Therapy 464 St Lukes Dr ------ 244-6699
RehabFirst 520 S Hull St ------------- 269-9931
Rehabilitation Services Alabama Department of
2129 E South Blvd 36116 ------------- 281-8780
Rehobeth Missionary Church
Hickory Grove Rd Letohatchee --------- 288-0811
Reid Bruce S 419 S Perry St Montgomery 36104 -- 263-7812
Reid Glenn A 7178 Wyngrove Dr 36117 -- 270-2047
Reid And K Water Associates
600 S Court St 36104 --------------- 262-3223

**REID & O'DONAHUE ADVERTISING**
**INC** 419 S Perry St Montgomery 36104 -- 263-7812
Reifenberg Edward G CPA
3815 Interstate Cr 36109 ------------ 271-2200
Res 2134 Vaughn Ln 36106 ----------- 277-3402
Reilly Kevin Custom Designs 441 Clay St 36104 -- 265-7151
Reilly Kevin Custom Designs
369 S Hopper St 36107 -------------- 269-2691
Reinhardt 5048 Dalphon Rd Montgomery 36117 -- 279-5231
Reinhardt Body Shop
720 Eastern Blvd Montgomery 36117 --- 213-1216
Reinhardt Lexus
720 Eastern Blvd Montgomery 36117 --- 270-0605
Reinhardt Motors
720 Eastern Blvd Montgomery 36117 --- 272-7147
Reinhardt Motors Prattville
2156 Cobbs Ford Rd Prattville 36066 --- 290-0080
Reinhardt Scion
720 Eastern Blvd Montgomery 36117 --- 386-2866
Reinhardt Toyota
720 Eastern Blvd Montgomery 36117 --- 272-7147
Reisner Mitchell reprtr 1 Church St Mont -- 265-2500
**RELAX INN** 4130 Birmingham Hwy 36108 -- 263-6911
Reli 4137 Carmichael Rd 36106 -------- 272-8491
Reli Title & Closing Professionals
5300 Oaktree Rd 36054 -------------- 290-1330
Reliable Communications And Data
435-A Hackel Dr -------------------- 244-2999
Reliable Lawn Care -------------------- 213-3233
Relief Massage 7020 Sydney Curve Mont 36117 -- 399-3057
Relief Pest Control --------------------- 277-5557
Relief Valve Svc Inc 2457 Wall St Millbrook 36054 -- 285-4147
Relocation Services Of Montgomery
2743 Office Park Cir ------------------ 396-7844

**RE/MAX OF**
**MONTGOMERY-**
4240 CARMICHAEL CT N 36106 -- 244-2400
Remax Properties Millbrook ------------ 285-0303

**RE/MAX PROPERTIES**
699 Summit Pkwy Prattville 36066 -- 361-9300

Remco ------------------------------ 270-8881
Remington Rand Systems
See Business Systems & Consultants Inc
**RENAL ASSOCIATES OF MONTGOMERY**
**PC-**
4760 WOODMERE BLVD 36106 -- 288-0814
Renascence Inc 215 Clayton St Montgomery 36104 -- 832-1402
Renew Corporation 3500 Eastern Blvd -- 271-0771
Renew Corporation 3500 Eastern Blvd -- 271-1068
Renfro Guy J PhD 1520 Mulberry St 36106 -- 269-1106
Renovations Unlimited LLC
1825 Hillwood Dr 36106 ------------- 409-0364
**RENT A WRENCH** 1614 Bell St 36104 -- 265-2018
Rent-A-Center-
2264 Mt Meigs Rd Montgomery 36107 -- 834-1241
864 W Fairview Av 36108 ------------ 269-2555
Rent-A-Center
2869 E South Blvd Montgomery 36116 -- 281-8180
Rent-A-Center
2422 E South Blvd Montgomery 36116 -- 281-3001
Rental Service
700 Enterprise Ct Montgomery 36117 --- 277-6401
Rentals-Brendle's 485 N Eastern Blvd 36117 -- 279-7368
Rents Arrow 5600 Calmar Dr 36116 ----- 277-0460
RentWay- ---------------------------- 262-2827
427 W Fairview Av 36105
3036 Woodley Rd 36116 -------------- 834-2230
Repeat Performance ------------------- 288-8900
1530 Mulberry St Montgomery 36106 --- 264-0496

**REPRODUCTIVE HEALTH**
**SVCS**
811 S Perry St 36104 ------------ 834-4988

Resa's 7004 Vaughn Rd Montgomery 36116 -- 213-1112
Rescue Clean Inc
930 Plantation Way Montgomery 36117 -- 215-7750
Research Quality and Design Engineering LLC -- 467-9431
**RESIDENCE GROUP SOUTH**
3453 Audobon Rd Mont 36111 ----- 834-8214
Residence Inn By Marriott 1200 Hilmar Ct 36117 -- 270-3300
**RESIDENTIAL MORTGAGE**
**CORPORATION**
6845 Halcyon Park Dr 36117 ------ 270-9100
Resource Container Inc
Toll Free-Dial '1' & Then ---------- 800 945-8483
Resource Management Solutions
4210 Lomac St Montgomery 36106 --- 244-9951
Respess Michael Antiques 1939 Ridge Av 36106 -- 264-6288
Respite Care Foundation
207 Montgomery St Montgomery 36104 -- 262-3002
Restaurant Equipment Maintenance Corp
995 Yeager Pkwy Pelham 35124 ------ 270-8881
Results LLC 2 N Jackson St Montgomery 36104 -- 265-2075
Results LLC 2 N Jackson St Montgomery 36104 -- 834-6667
Resurrection Catholic Church -------- 269-1770
**RESURRECTION CATHOLIC MISSIONS-**
2815 Forbes Dr Montgomery 36110 --- 263-4221
Resurrection Church 2815 Forbes Dr 36110 -- 265-4568
Father Walter Memorial Child Care Center
2815 Forbes Dr 36110 -------------- 262-6421
Montgomery Addictions Counseling Services
2815 Forbes Dr 36110 -------------- 269-4742
Resurrection Life Center Assisted Living Facility
1240 County Road 39 Deatsville 36752 -- 263-0727
Resurrection Life Center Skilled Nursing Facility
1240 County Road 39 Deatsville 36752 -- 263-0618
Resurrection Catholic School-
Early Child Care Center 2815 Forbes Dr 36110 -- 265-4615
Resurrection Life Center
1240 County Road 39 Deatsville 36752 -- 263-0618
Resurrection Life Center
1240 County Road 39 Deatsville 36752 -- 263-0727
Resurrection Missionary Baptist Church
2468 Hickman St 36108 ------------- 261-4205
Retail Wholesale Department Store Union Local 105
33 E South St 36104 ---------------- 262-3274
Retco Glass Inc 573 George Todd Dr 36117 -- 244-1984
Retina Specialists of Alabama in Montgomery LLC
2055 Normandie Dr 36111 ----------- 263-0105
Retina & Vitreous Associates Of Alabama PC
2055 Normandie Dr 36111 ----------- 263-0105
Retired Senior Volunteer Program
115 E Jefferson St 36104 ------------ 263-0105
Reuben Eva MD 2055 Normandie Dr 36111 -- 265-9204
Revam Of Alabama
100 N Union St Montgomery 36104 ---- 288-4624
Revco Drug Stores/Pharmacies --------- 265-5711
Revelation Baptist Church-        See CVS
810 Goode St 36104
Pastor's Office 810 Goode St Mont 36104 -- 263-4100
Revenge 2941 Montgomery Mall 36116 -- 263-5980
Rex T V & Stereo 3990 Eastern Blvd ---- 273-4685
Rexel Southern 1141 Holloway Pk 36117 -- 281-0068
Reynolds Carpet Care Montgomery ------ 270-9473
Reynolds Carpet Care
515 N Maryland St Montgomery 36107 -- 279-8046
Reynolds John D 5208 Lower Wetumpka Rd 36110 -- 834-9878
Reynolds Reynolds & Duncan LLC
402 S Perry St Montgomery 36104 ----- 263-6199
Reynolds Robert D atty
205 Montgomery St Montgomery Al 36104 -- 832-9553
Reynolds Sarah L 475 S Hull St 36104 --- 832-9553
Rheem 101 Bell Rd Montgomery 36117 -- 834-7720
Rheem Mfg ---------------------------- 272-0265
2754 W Gunter Park Dr Montgomery 36109 -- 213-0887
Rheem Manufacturing Co 101 Bell Rd 36117 -- 213-3800
Rheem Manufacturing Company
2600 Gunter Park Dr E 36117 -------- 213-3700
Rheem Mfg Co 2604 E Gunter Park Dr Mont -- 409-0873
Rheum 500 Arba St Mont 36104 -------- 264-9644
Rheumatology Arthritis & Osteo
500 Arba St Mont 36104 ------------- 396-8602
Rheumatology Arthritis & Osteoporsis Center
500 Arba St Mont 36104 ------------- 269-2292
Rhino Lawn & Landscape ------------- 207-1333
Rhino Video Games
3789 Eastern Blvd Mont 36116 ------- 270-1226
Rho Frank K Dr 1760 Platt Pl Montgomery 36117 -- 409-9490

© Publishing Corporation 2006

MONTGOMERY BUS.

## RESOLUTION

WHEREAS, Southern Christian University, Inc., has for some years operated under the name Southern Christian University; and,

WHEREAS, it is important that Southern Christian University increase its attractiveness to potential students, not just regionally, but also nationally and internationally, and thereby maximize educational opportunities and achievements; and,

WHEREAS, changing the institution's name will also assist the University in projecting itself as a nationally recognized university of prominence;

NOW THEREFORE BE IT RESOLVED THAT Southern Christian University, Inc. does hereby resolve that the name of the University is changed to "Regions University, Inc.";

BE IS FURTHER RESOLVED THAT this name change shall become effective on or before December 31, 2006, as determined by the President and evidenced by the President's letter to the Chairperson of the Board, to be recorded in the minutes of the Board meeting next occurring thereafter;

BE IT FURTHER RESOLVED THAT President Rex A. Turner, Jr. is hereby authorized to, acting on behalf of the Corporation and its Board, cause the proper State and County authorities to be notified of this name change, register (with or without the additional signature(s) of Board officers) the new name with the appropriate governmental officials and offices, protect the University's use of the new name from infringement and use by others, and take such other action he deems appropriate and consistent with the University's best interests; and,

BE IT FUTHER RESOLVED THAT President Turner is also hereby authorized to, for a period of one year after the name change becomes effective, take such action as he deems necessary or proper in order to effectuate a smooth transition in the use of University names, including but not limited to the use of either or both names in ongoing agreements, registrations, or otherwise.

DONE this the 28th day of July, 2006.


IN WITNESS WHEREOF, the Chairman and Secretary of the Southern Christian University, Inc. Board of Regents, as well as the President of Southern Christian University, Inc., have signed their names below as confirmation that, there being first assembled a quorum of the aforesaid Board of Regents members, the aforesaid Resolution was duly consented to, agreed upon, approved, and adopted by a majority of the voting members of said Board of Regents on this the 28th day of July, 2006.



EXHIBIT

31

RU 025

_Roger Will_
_ROGER DILL_       , As Chairman,
Board of Regents of
Southern Christian University, Inc.

STATE OF ALABAMA     )
MONTGOMERY COUNTY     )

      Before me, _Elaine Jarence_ a Notary Public in and for the State of Alabama,
personally appeared _Roger Will_     , who being by me first duly sworn, states
that he is over nineteen years of age, that he is a member of the Southern Christian University,
Inc. Board of Trustees, that he is the duly elected Chairman of said Board of Trustees, and that in
said capacity he confirms that, there being first assembled a quorum of the aforesaid Board of
Trustees members, the aforesaid Resolution was duly consented to, agreed upon, approved, and
adopted by a majority of the voting members of said Board of Trustees on the above-stated date.

      This the 28th day of July, 2006.

      (SEAL)

                            _Elaine Jarence_
                            Notary Public
                            My Commission Expires: _1-10-07_

_Dan Myers_
_DAN MYERS_       , As Secretary,
Board of Regents of
Southern Christian University, Inc.

STATE OF ALABAMA     )
MONTGOMERY COUNTY     )

      Before me, _Elaine Jarence_ a Notary Public in and for the State of Alabama,
personally appeared _Dan Myers_     , who being by me first duly sworn, states
that he is over nineteen years of age, that he is a member of the Southern Christian University,
Inc. Board of Trustees, that he is the duly elected Secretary of said Board of Trustees, and that in
said capacity he confirms that, there being first assembled a quorum of the aforesaid Board of
Trustees members, the aforesaid Resolution was duly consented to, agreed upon, approved, and
adopted by a majority of the voting members of said Board of Trustees on the above-stated date.

      This the 28th day of July, 2006.

      (SEAL)

                            _Elaine Jarence_
                            (Notary Public

RU 026

My Commission Expires: _1-10-07_

_Rex K. Turner, Jr., As President,_
Southern Christian University, Inc.

STATE OF ALABAMA    )
MONTGOMERY COUNTY    )

Before me, _Elaine Jarena_ a Notary Public in and for the State of Alabama, personally appeared _Rex Turner Jr.,_ who being by me first duly sworn, states that he is over nineteen years of age, that he is the President of Southern Christian University, and that in said capacity he confirms that, there being first assembled a quorum of the aforesaid Board of Trustees members, the aforesaid Resolution was duly consented to, agreed upon, approved, and adopted by a majority of the voting members of said Board of Trustees on the above-stated date.

This the 28th day of July, 2006.

(SEAL)

_Elaine Jarena_
Notary Public
My Commission Expires: _1-10-07_

RU 027

*Emailed to
students
8·16·06*

## NAME CHANGE LETTER

On August 2, 2006, the Board of Regents of *Southern Christian University* changed the institution's name to *REGIONS UNIVERSITY*. They determined that this name would enhance the university's opportunities and would complement the purpose and vision of this university as it accelerates its educational and religious heritage of *Going into all the regions of the world*.

The vision of this university is to expand its operations throughout the United States and internationally. The university is licensed and operating in the State of Tennessee and is in the process of seeking licensure in Arizona, Nevada, South Carolina, and North Carolina. An online Bible teaching program is presently being implemented for the people of Italy in the Italian language, and similar strategies are now being considered for other foreign countries.

The name *Southern* has been restrictive due to its geographical and political restraints. The university's regions of influence and operation are minimized within the western and northern United States and internationally. In foreign countries, *Southern* poses unique naming problems. On many occasions our faculty experienced the limiting access of the name as they taught in the regions of the former Communist Russia.

As you may know, changing the name of an accredited university is thought provoking and monumental. A trademark attorney was retained to assist in this process and to help determine the trademark registrability of several potential university names. The Board of Regents used this critical information in its deliberations.

The board naturally reviewed naming the institution after its founders, Rex and Opal. Turner. History records that several of our sister Christian institutions, such as: *Lipscomb University*, *Freed-Hardeman University*, and *Harding University* were most appreciative of their founders' biblical knowledge, example, and sacrifice, and as a result named their institutions after the founders. This board gave similar genuine consideration and appreciation for *Turner University*, but was diverted upon learning that Ted Turner's corporations posed trademark registration naming issues.

*Regions University* was also considered. The attorney's trademark search revealed: *"we are of the opinion that the mark, Regions University, is registerable for educational services, namely, providing instruction at the university level."* As well, a search for email domains positively disclosed the availability of www.regions.edu and www.regionsuniversity.edu.

One important consideration, with the board, was that this name reflects the founders' vision and goal of having a *"school without walls"* that could provide accredited quality academic and Christian education to all regions of the world. The founders spent a

RU 058

EXHIBIT
**34**
*Turner*

lifetime in service, traveling to all regions of the United States *"To preach the gospel in all regions beyond you . . ."* 2 Corinthians 10: 16. In appreciation for Rex and Opal Turner's lifetime service, you should know that in 1999 the board named one of the university schools *Turner School of Theology*.

The word *Regions* is used over seventy times in the Bible, and it corresponds to the institution's mission to go into all the regions of the world with the message of Christ. The university has 33 academic degree programs and annually enrolls over 1000 students who reside in all of the regions of the 50 United States. The university's expansion into the international global higher education markets will provide an open door opportunity in restrictive foreign countries, like China.

In light of all favorable information presented, the board approved renaming the institution to *Regions University* and authorized the creation of a new seal bearing an etched image of its founders and the new words *Regions University*. The board approached this decision with a united commitment to implement its institutional plans.

The university is entering its 40th year of operation and this name change does not alter its ownership, accreditation, institutional mission, or commitment for its *Positive Statement of Faith*. The fact that this institution is the first university among the fellowship of the Churches of Christ to offer an accredited *Ph.D. degree in Biblical Studies* speaks volumes about this institution's commitment to continue the founders' example of training laborers who make known the gospel of Christ in all regions of the world.

The purpose for which this university was founded will now have a better opportunity to expand into all regions of the world with the *Regions University* name. The university has the accreditation, the technology, the leadership, the faculty, the student body, and a well-built infrastructure to implement and accomplish this task!

*Regions University* has no debt and has valuable commercial property, a total of 195 acres, in two Alabama locations in Macon and Montgomery Counties on interstate I-85. To implement the vision before us, it will necessitate the cooperation, involvement and united support of the board, alumni, administration, staff, faculty, students, and friends.

Your interest in and support of *Southern Christian University* in the past is deeply appreciated, and your continued prayers and support of this university are respectfully solicited as we endeavor to maintain and expand its mission under the new banner, *Regions University*. Please, continue your moral and financial support for this important cause!

Sincerely Yours,


Rex A. Turner, Jr., Ed.D.
President


RU 059

**Rex Turner**

| | |
|---|---|
| From: | Dr. Wilson Luquire [luquirew@uah.edu] |
| Sent: | Wednesday, August 09, 2006 3:59 PM |
| To: | John White; Rex Turner |
| Cc: | Jack Drost; Sarah Garrett; 'Lee Ann Nobles'; mooredp@email.uah.edu |
| Subject: | Re: SCU Changing Names! |

Dear Dr. White and Dr. Turner:

Thanks for the info. And good luck with Regions.

I am quite surprised at the total shock of such a massive change with no advance warning here for us as it regards our services and support. We will do what we can as soon as we can please.

We are up to our eyeballs in projects, issues, problems, staffing, and anything else that you could name. We are concerned about the quick date that you gave us as regards both the Website changes and particularly the student ID/format changes.
We will, of course, work to help you as much and as soon as we can.
But with our semester opening in less than 2 weeks here at UAH in addition to many other pressing matters, I am not certain how many more priorities I can put on top of the dozens of existing ones that I have already assigned!
Good luck with Regions. Is this related to the Bank and if so may I applaud you with double congratulations!!!!!!

I wish us all well as we begin the term.
We will be in touch.

Wilson Luquire


At 03:37 PM 8/9/2006 -0500, David P. Moore wrote:
>John White just informed me that SCU is now Regions University. I
>didn't ask about possible conflict with the bank of the same name!
>
>See more here:
>
>http://www.southernchristian.edu/regionsname.htm
>
>Jack (and Lee Ann), the SCU download has "scu" as an ID prefix, and
>this will change for the fall semester, beginning August 23rd. Any
>foreseeable problems?
>
>John will send me new logo info tomorrow. We will need Daniel to work
>up a new site, I guess.
>
>David
>

**RU 1909**

EXHIBIT
35

**Rick Johnson**

From:      Gamecock4Jesus [Gamecock4Jesus@bellsouth.net]
Sent:      Thursday, August 31, 2006 12:09 AM
To:        Rick Johnson
Subject:   Re: Regions University - Bible Programs

Mr. Johnson:

thanks for your e-mail but as an alumnus of S.C.U. I really hate to hear that the name has been changed - again. The continual changing of names may cause doubt in the minds of the public as to the legitimacy of our degrees. Furthermore, as much of the Church of Christ brotherhood has often not understood just who/what our school is, if they even realize it exists as a Church of Christ school, this name change will make that situation even worse because alums such as myself will now have to explain yet another variable in the mix of ACSR/SCU/ and now RU????

Also, this new name demonstrates nothing about the school being a seminary or Christian institution. Why was "Regions" chosen? Did Regions Bank make a donation? I certainly hope something that shallow is not the reason. This school needs to be serious about being a Christian institution of biblical scholarship first rather than being a business first that continually seeks a new marketing gimmick/label.

sincerely,

Randy Gore
SCU M.S. '93

---- Original Message ----
From: Rick Johnson
To: gamecockbcm@sc.rr.com ; jon.dando@uscm.org ; frebyr@aol.com ; xareeves@yahoo.com ; Gamecock4Jesus@bellsouth.net ; hillelso@gwm.sc.edu ; lcmatusc@earthlink.net ; wallbrodie@aol.com ; jdeal131@hotmail.com ; protopop@yahoo.com ; jcook@shandonpres.org ; mlucas@firstprescolumbia.org ; tlijewski@aol.com ; Garrettis@gmail.com ; jbrewer@gwm.sc.edu ; csoehl@gwm.sc.edu ; lucht@sc.edu ; evans-carl@sc.edu ; kevin@sc.edu ; cutsinger@sc.edu
Sent: Wednesday, August 30, 2006 4:56 PM
Subject: Regions University - Bible Programs

Dear Sir or Madam,

We've received your contact information from the Career Center Program Manager Liaison to the College of Arts & Sciences and the Honors College University of South Carolina.

Attached you will find a brochure for each of our programs in Bible - undergraduate through Ph.D. We hope you will share this information with students who are seeking degrees in Bible.

Anyone interested may inquire about these programs by going to our homepage... http://www.regions.edu. Once there, have them just fill out the form found at the Request for Information link, on the homepage. Two things will then occur: First, the prospective student will immediately receive the requested brochures; and second, contact information from an advisor will be given for addressing additional questions.

2/13/2007                                                          **RU 1910**

*Respectfully,*

Rick Johnson
Director of Enrollment Management
Regions University
1-800-351-4040 ext. 7513
1-334-387-3878 (fax)

John 10:10

**RU 1911**

2/13/2007

Regions University Logo
effective August 15, 2006
*Logo retired 9/17/06

Font: ITC Cheltham Std Book

# REGIONS UNIVERSITY
Where Traditional and Online Education Merge

# REGIONS UNIVERSITY
Where Traditional and Online Education Merge



EXHIBIT

42

PENGAD 800-631-6989

**RU 191**

First realease of Regions University with Stacked Logo. 8/19/06

Stepping into the future...

President, Rex A. Turner Jr. announces university name change

A Christian University...Going into all the world

· read more

REGIONS
UNIVERSITY



EXHIBIT

43

PENGAD 800-631-6989

RU 193

EXHIBIT
44

#1

Regions University World Wide Commercial

  

How far are you willing to go for the Education you need?

  

Why not start with the university that brings the world to you. A school without walls

  

With 33 Academic Degree Programs, Regions University is an accredited institution with the faculty

  

and the technology to bring you the on-line education that works for you. Visit regionsuniversity.edu or

  

RU 208

Call 1-888.790.8080. With Regions University, you can get there from here. Are you ready for your future?

#2
Regions University World Business

  

How far are you willing to go for the Education you need?

  

Why not start with a degree in Business with a university that brings the world to you.

  

Regions University offers Bachelors and Masters Degree Programs in
Business, Leadership and Information Systems Management.

  

Regions University is an accredited institution with 33 Academic Degree Programs.

  

Visit us Online at regionsuniversity.edu or call 1-888.790.8080.
With Regions University, you can get there from here. Are you ready for your future?

RU 209

#3

Regions University General Studies

  

How far are you willing to go for the Education you need?

  

Why not start with a degree in Management Communication with a university that brings the world to you.

  

Regions University offers Bachelors Degree Programs in Human Resources, Liberal Studies and Criminal Justice

  

Regions University is an accredited institution with 33 Online Academic Degree Programs.

  

RU 210

Visit us Online at regionsuniversity.edu or call 1-888.790.8080.
With Regions University, you can get there from here. Are you ready for your future?

Regions University Counseling

  

How far are you willing to go for the Education you need?

  

Why not start with a degree in Counseling with a university that brings the world to you.

  

Regions University offers Masters and Doctoral Degree Programs in
Professional Counseling and Marriage and Family Therapy

  

Regions University is an accredited institution with 33 Online Academic Degree Programs.

  

Visit us Online at regionsuniversity.edu or call 1-888.790.8080.
With Regions University, you can get there from here. Are you ready for your future?

RU 211

Regions University Bible

  

How far are you willing to go for the Education you need?

  

Why not start with a degree in Biblical Studies with a university that brings the world to you.

  

Regions University offers Bachelors, Masters and PhD Degree Programs in Biblical Studies and Practical Theology

  

Regions University is an accredited institution with 33 Online Academic Degree Programs.

  

Visit us Online at regionsuniversity.edu or call 1-888.790.8080.
With Regions University, you can get there from here. Are you ready for your future?

RU 212

**Radio Anywhere :45**

How far are you willing to go for the Education you need?

Why not start with the university that brings the world to you?  A school without walls... Regions University.

With 33 Academic Degree Programs, Regions University has the accreditation, the faculty and the state of the art technology to bring you the on-line education that works for you.

Now enrolling!

Offering Bachelors, Masters, and Ph.D Degree Programs in Business, Management Communication and Counseling.

Visit us online at www.regionsuniversity.edu to view a full list of our 33 academic degree programs or call 1.888.790.8080

With Regions University, you can get there from here.

Are you ready for your future?



EXHIBIT
45

**RU 213**

*Regions University Media Placement February 2007 – Television, Radio, Billboards*

|  |  |  |  | February |
|---|---|---|---|---|
| **Alabama** | | | | |
| | **Birmingham** | 1st largest city | 231,483 people | |
| | | TV | | |
| | | FOX | WBRC | $ 7,050.00 |
| | | NBC | WVTM | $ 15,000.00 |
| | | Billboards | | |
| | | | Lamar (nothing available) | $ |
| | | Radio | | |
| | | | Cumulus | $ 5,000.00 |
| | **Montgomery** | 2nd largest city | 231,483 people | |
| | | TV | | |
| | | CBS | WAKA | $ 10,025.00 |
| | | NBC | WSFA | $ 12,500.00 |
| | | Radio | | |
| | | | Cumulus | $ 3,500.00 |
| | | Internet | | |
| | | NBC | WSFA | $ 4,000.00 |
| | | Billboards | | |
| | | | Lamar | $ 6,900.00 |
| | | Newspaper | | |
| | | | Montgomery Advertiser | $ 2,500.00 |
| | | | | $ 66,475.00 **Total for Alabama** |
| **Tennessee** | | | | |
| | **Nashville** | 2nd largest city | 549,110 people | |
| | | TV | | |
| | | NBC | WSMV | $ 10,000.00 |
| | | COMCAST | Cable | $ 3,001.00 |
| | | Billboards | | |
| | | | Lamar | $ 4,025.00 |
| | **Memphis** | 1st largest city | 672,277 people | |
| | | TV | | |
| | | CBS | WREG | $ 18,010.00 |
| | | NBC | WMC | $ 18,000.00 |
| | | Radio | | |
| | | | Cumulus | $ 7,625.00 |
| | | Billboards | | |
| | | | ? | $ |
| | | | | $ 60,661.00 **Total for Tennessee** |
| | | | **Total** | **$ 127,136.00** |



EXHIBIT
48
*Turner*

RU 1603

# Regions University Media Placement For 2007 - Television/Radio/Billboards

## Alabama

**Birmingham**

| | | | | | |
|---|---|---|---|---|---|
| | TV | | | | |
| | | WBRC | $ | 30,000.00 | 10k per semster |
| | Billboards | | | | |
| | | Lamar | $ | 18,000.00 | 6k per semster |
| | Radio | | | | |
| | | Cumulus | $ | 15,000.00 | 5k per semster |

**Mobile**

| | | | | | |
|---|---|---|---|---|---|
| | TV | | | | |
| | | WALA | $ | 22,500.00 | 7.5k per semster |

**Montgomery**

| | | | | | |
|---|---|---|---|---|---|
| | TV | | | | |
| | | WAKA | $ | 30,000.00 | 10k per semster |
| | | WSFA | $ | 36,000.00 | 12k per semster |
| | Internet | | | | |
| | | WSFA | $ | 12,000.00 | 4k per semster |
| | Billboards | | | | |
| | | Lamar | $ | 21,000.00 | 7k per semster |
| | Radio | | | | |
| | | Cumulus | $ | 10,500.00 | 3.5k per semster |
| | | | $ | **195,000.00** | **Total for Alabama** |

## Florida

**Jacksonville**

| | | | | | |
|---|---|---|---|---|---|
| | TV | | | | |
| | | WALA | $ | 33,000.00 | 22k per semster |

**Tallahassee**

| | | | | | |
|---|---|---|---|---|---|
| | TV | | | | |
| | | WCTV | $ | 30,000.00 | 10k per semster |
| | | | $ | **63,000.00** | **Total for Florida** |

## Louisiana

**Alexandria**

| | | | | | |
|---|---|---|---|---|---|
| | TV | | | | |
| | | KALB | $ | 33,000.00 | 11k per semster |

**Lake Charles**

| | | | | | |
|---|---|---|---|---|---|
| | TV | | | | |
| | | KPLC | $ | 30,000.00 | 10k per semster |

**West Monroe**

| | | | | | |
|---|---|---|---|---|---|
| | TV | | | | |
| | | KTVE | $ | 33,000.00 | 11k per semster |
| | | | $ | **96,000.00** | **Total for Branding in Louisiana** |

## Mississippi

**Jackson**

| | | | | | |
|---|---|---|---|---|---|
| | TV | | | | |
| | | WJTV | $ | 21,000.00 | 7k per semster |
| | | WLBT | $ | 45,000.00 | 15k per semster |

RU 1604

| | | | | | |
|---|---|---|---|---|---|
| | | | $ | 66,000.00 | **Total for Mississippi** |

**North Carolina**

| City | Media | Station | | Amount | Note |
|---|---|---|---|---|---|
| Charlotte | TV | WBTV | $ | 30,000.00 | 20k per semster |
| Raleigh & Fayetteville | TV | WRAL | $ | 34,000.00 | 18k per semster |
| Washington | TV | WITN | $ | 45,000.00 | 15k per semster |
| | | | $ | **109,000.00** | **Total for North Carolina** |

**Tennessee**

| City | Media | Station | | Amount | Note |
|---|---|---|---|---|---|
| Nashville | TV | WSMV | $ | 63,000.00 | 21k per semster |
| | Cable | Cable | $ | 21,000.00 | 7k per semster |
| | Billboards | Lamar | $ | 12,000.00 | 4k per semster |
| Memphis | TV | WREG | $ | 45,000.00 | 15k per semster |
| | Radio | Cumulus | $ | 22,500.00 | 7.5k per semster |
| | | | $ | **163,500.00** | **Total for Tennesse** |

**Texas**

| City | Media | Station | | Amount | Note |
|---|---|---|---|---|---|
| Huston | TV | KHOU | $ | 35,000.00 | 30k per semster |
| San Antonio | TV | KENS | $ | 35,000.00 | 30k per semster |
| | | | $ | **70,000.00** | **Total for Texas** |

**Virginia**

| City | Media | Station | | Amount | Note |
|---|---|---|---|---|---|
| Portsmouth | TV | WAVY | $ | 34,000.00 | 18k per semster |
| Richmond | TV | WWBT | $ | 35,000.00 | 20k per semster |
| | | | $ | **69,000.00** | **Total for Virginia** |

| | | | $ | **831,500.00** | **Total for year** |

RU 1605

## Print Advertising 2007

## Regions University

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Christianity Today | | Theological $ 5,262.28 | | | $ 5,262.28 | | | | | | $ 5,262.28 | | $ 15,786.84 |
| Christian Chronicle | | $ 3,150.00 | $ 3,150.00 | $ 3,150.00 | | $ 3,150.00 | $ 3,150.00 | | | | $ 3,150.00 | $ 3,150.00 | $ 22,050.00 |
| Pulpit Helps | | | | | | | $ 1,937.00 | | | | $ 1,937.00 | | $ 3,874.00 |
| Gopel Advocats | $ 595.00 | $ 595.00 | $ 595.00 | $ 595.00 | $ 595.00 | $ 595.00 | $ 595.00 | $ 595.00 | $ 595.00 | $ 595.00 | $ 595.00 | $ 595.00 | $ 7,140.00 |
| Local Advertising: | | | | | | | | | | | | | |
| Montgomery Advertiser | | | | | $ 2,294.50 | | | | | | $ 2,294.50 | | $ 4,589.00 |
| Military Times | | | $ 2,400.00 | | | | | $ 2,400.00 | | | $ 2,400.00 | | $ 7,200.00 |
| Phone Directorys | | | | | | | | | | | | | |
| Yellow pages - Montg | $ 800.50 | $ 800.50 | $ 800.50 | $ 800.50 | $ 800.50 | $ 800.50 | $ 800.50 | $ 800.50 | $ 800.50 | $ 800.50 | $ 800.50 | $ 800.50 | $ 9,606.00 |
| Internet/National Tile Ad Google,Yahoo, Bellsouth | $ 5,058.00 | $ 5,058.00 | $ 5,058.00 | $ 5,058.00 | $ 5,058.00 | $ 5,058.00 | $ 5,058.00 | $ 5,058.00 | $ 5,058.00 | $ 5,058.00 | $ 5,058.00 | $ 5,058.00 | $ 60,696.00 |
| Regional | | | | | | | | | | | | | |
| Yellow Book [illegible] and White Pages | $ 63.25 | $ 63.25 | $ 63.25 | $ 63.25 | $ 63.25 | $ 63.25 | $ 63.25 | $ 63.25 | $ 63.25 | $ 63.25 | $ 63.25 | $ 63.25 | $ 759.00 |
| Yellow pages - Nashville | $ 42.50 | $ 42.50 | $ 42.50 | $ 42.50 | $ 42.50 | $ 42.50 | $ 42.50 | $ 42.50 | $ 42.50 | $ 42.50 | $ 42.50 | $ 42.50 | $ 510.00 |
| Petersons | | | | | | | | | | | | | |
| *4 year College* | $ 3,500.00 | | | | | | | | | | | | $ 3,500.00 |
| *Distance Learning* | $ 3,500.00 | | | | | | | | | | | | $ 3,500.00 |
| CU Net | $ 6,500.00 | $ 6,500.00 | $ 6,500.00 | $ 6,500.00 | $ 6,500.00 | $ 6,500.00 | $ 6,500.00 | $ 6,500.00 | $ 6,500.00 | $ 6,500.00 | $ 6,500.00 | $ 6,500.00 | $ 78,000.00 |

[redacted]

RU 1606

*Summary Loans Disbursed Acad Yr 05-06 — Aug 11,0*
*Aug 2005*

| Lender Name | Loan Period Start Date | Loan Period End Date | Guarantee Date | Guarantee Amount | Gross Amount | Net Amount |
|---|---|---|---|---|---|---|
| ACADEMIC FINANCE CORP, US BANK ELT | 1/9/2006 | 8/11/2006 | 1/17/2006 | 4,964.00 | 2,482.00 | 2,407.54 |
| ACADEMIC FINANCE CORP, US BANK ELT | 1/9/2006 | 8/11/2006 | 1/17/2006 | 4,964.00 | 2,482.00 | 2,407.54 |
| ACADEMIC FINANCE CORP, US BANK ELT | 1/9/2006 | 8/11/2006 | 1/17/2006 | 3,692.00 | 630.37 | 611.46 |
| ACADEMIC FINANCE CORP, US BANK ELT | 1/9/2006 | 8/11/2006 | 1/17/2006 | 3,692.00 | 590.00 | 572.30 |
| ACADEMIC FINANCE CORP, US BANK ELT | 8/22/2005 | 4/21/2006 | 7/6/2005 | 8,500.00 | 4,250.00 | 4,122.50 |
| ACADEMIC FINANCE CORP, US BANK ELT | 8/22/2005 | 4/21/2006 | 7/6/2005 | 8,500.00 | 4,250.00 | 4,122.50 |
| ACADEMIC FINANCE CORP, US BANK ELT | 8/22/2005 | 4/21/2006 | 7/6/2005 | 10,000.00 | 5,000.00 | 4,850.00 |
| ACADEMIC FINANCE CORP, US BANK ELT | 8/22/2005 | 4/21/2006 | 7/6/2005 | 10,000.00 | 5,000.00 | 4,850.00 |
| ACADEMIC FINANCE CORP, US BANK ELT | 8/22/2005 | 8/11/2006 | 7/18/2005 | 8,500.00 | 2,834.00 | 2,748.98 |
| ACADEMIC FINANCE CORP, US BANK ELT | 8/22/2005 | 8/11/2006 | 7/18/2005 | 10,000.00 | 3,334.00 | 3,233.98 |
| **Subtotal** | | | | 72,812.00 | 30,852.37 | 29,926.80 |
| ACAPITA ED.FIN.CORP TRUSTEE US BNK | 1/9/2006 | 8/11/2006 | 12/14/2005 | 8,500.00 | 4,250.00 | 4,250.00 |
| ACAPITA ED.FIN.CORP TRUSTEE US BNK | 1/9/2006 | 8/11/2006 | 12/14/2005 | 8,500.00 | 4,250.00 | 4,250.00 |
| ACAPITA ED.FIN.CORP TRUSTEE US BNK | 1/9/2006 | 8/11/2006 | 12/14/2005 | 8,262.00 | 4,131.00 | 4,131.00 |
| **Subtotal** | | | | 33,524.00 | 16,762.00 | 16,762.00 |
| AMS EDUCATION LOAN TRUST/WILMINGTON | 1/9/2006 | 8/11/2006 | 11/22/2005 | 5,500.00 | 2,750.00 | 2,750.00 |
| AMS EDUCATION LOAN TRUST/WILMINGTON | 1/9/2006 | 8/11/2006 | 11/22/2005 | 5,500.00 | 2,750.00 | 2,750.00 |
| AMS EDUCATION LOAN TRUST/WILMINGTON | 1/9/2006 | 8/11/2006 | 11/22/2005 | 5,000.00 | 2,500.00 | 2,500.00 |
| AMS EDUCATION LOAN TRUST/WILMINGTON | 1/9/2006 | 8/11/2006 | 11/22/2005 | 5,000.00 | 2,500.00 | 2,500.00 |

RU 1670

EXHIBIT
50
ENGAD 800-631-6989



| | | | | | | |
|---|---|---|---|---|---|---|
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 7/18/2005 | 2,750.00 | 1,375.00 | 1,375.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 7/18/2005 | 350.00 | 175.00 | 175.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 7/18/2005 | 350.00 | 175.00 | 175.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 7/18/2005 | 2,750.00 | 1,375.00 | 1,375.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 7/18/2005 | 2,750.00 | 1,375.00 | 1,375.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 7/18/2005 | 2,500.00 | 1,250.00 | 1,250.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 7/18/2005 | 2,500.00 | 1,250.00 | 1,250.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 4/21/2006 | 8/25/2005 | 5,500.00 | 2,750.00 | 2,750.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 4/21/2006 | 8/25/2005 | 5,500.00 | 2,750.00 | 2,750.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 4/21/2006 | 8/25/2005 | 5,000.00 | 2,500.00 | 2,500.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 4/21/2006 | 7/18/2005 | 6,200.00 | 3,100.00 | 3,100.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 4/21/2006 | 8/25/2005 | 5,000.00 | 2,500.00 | 2,500.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 4/21/2006 | 7/18/2005 | 6,200.00 | 3,100.00 | 3,100.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 4/21/2006 | 7/18/2005 | 8,500.00 | 4,250.00 | 4,250.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 4/21/2006 | 7/18/2005 | 2,050.00 | 1,175.00 | 1,175.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 8/2/2005 | 4,250.00 | 1,375.00 | 1,375.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 8/2/2005 | 4,250.00 | 1,375.00 | 1,375.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 8/2/2005 | 4,131.00 | 1,250.00 | 1,250.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 8/2/2005 | 4,131.00 | 1,250.00 | 1,250.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 8/17/2005 | 2,500.00 | 1,250.00 | 1,250.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 12/9/2005 | 8/17/2005 | 2,500.00 | 1,250.00 | 1,250.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 8/11/2006 | 7/18/2005 | 8,500.00 | 2,834.00 | 2,834.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 8/11/2006 | 7/18/2005 | 8,500.00 | 2,833.00 | 2,833.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 8/11/2006 | 7/18/2005 | 8,500.00 | 2,833.00 | 2,833.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 8/11/2006 | 7/18/2005 | 5,650.00 | 1,066.00 | 1,066.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 8/11/2006 | 7/18/2005 | 5,650.00 | 1,066.00 | 1,066.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 8/11/2006 | 7/18/2005 | 5,650.00 | 2,292.00 | 2,292.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 8/11/2006 | 7/18/2005 | 8,500.00 | 4,250.00 | 4,250.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 8/11/2006 | 7/18/2005 | 8,500.00 | 4,250.00 | 4,250.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 8/11/2006 | 7/18/2005 | 10,000.00 | 5,000.00 | 5,000.00 |
| NELNET EDUCATION LOAN FUNDING | 8/22/2005 | 8/11/2006 | 7/18/2005 | 10,000.00 | 3,262.00 | 3,262.00 |
| **Subtotal** | | | | 543,209.00 | 202,232.00 | 202,232.00 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 8/19/2005 | 2,625.00 | 875.00 | 848.75 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 8/19/2005 | 4,000.00 | 1,334.00 | 1,293.98 |
| REGIONS BANK | 1/9/2006 | 8/11/2006 | 1/11/2006 | 2,625.00 | 1,313.00 | 1,273.61 |
| REGIONS BANK | 1/9/2006 | 8/11/2006 | 1/11/2006 | 2,625.00 | 1,312.00 | 1,272.64 |
| REGIONS BANK | 1/9/2006 | 8/11/2006 | 1/11/2006 | 4,000.00 | 2,000.00 | 1,940.00 |
| REGIONS BANK | 1/9/2006 | 4/21/2006 | 12/12/2005 | 1,351.00 | 676.00 | 655.72 |
| REGIONS BANK | 1/9/2006 | 4/21/2006 | 12/12/2005 | 1,351.00 | 675.00 | 654.75 |
| REGIONS BANK | 1/9/2006 | 8/11/2006 | 1/11/2006 | 4,000.00 | 2,000.00 | 1,940.00 |

**RU 1712**



| REGIONS BANK | 1/9/2006 | 8/11/2006 | 8/30/2005 | 3,500.00 | 1,750.00 | 1,697.50 |
|---|---|---|---|---|---|---|
| REGIONS BANK | 1/9/2006 | 8/11/2006 | 8/30/2005 | 3,500.00 | 1,750.00 | 1,697.50 |
| REGIONS BANK | 1/9/2006 | 8/11/2006 | 8/30/2005 | 4,000.00 | 2,000.00 | 1,940.00 |
| REGIONS BANK | 1/9/2006 | 8/11/2006 | 8/30/2005 | 4,000.00 | 2,000.00 | 1,940.00 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 8/29/2005 | 8,500.00 | 1,834.00 | 1,778.98 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 8/29/2005 | 8,500.00 | 1,833.00 | 1,778.01 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 8/29/2005 | 8,500.00 | 4,833.00 | 4,688.01 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 8/29/2005 | 6,882.00 | 1,667.00 | 1,616.99 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 8/29/2005 | 6,882.00 | 1,667.00 | 1,616.99 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 8/29/2005 | 6,882.00 | 3,548.00 | 3,441.56 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 8/31/2005 | 8,500.00 | 4,250.00 | 4,122.50 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 8/31/2005 | 8,500.00 | 4,250.00 | 4,122.50 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 8/31/2005 | 10,000.00 | 2,713.40 | 2,632.00 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 8/31/2005 | 10,000.00 | 5,000.00 | 4,850.00 |
| REGIONS BANK | 1/9/2006 | 8/11/2006 | 1/24/2006 | 5,500.00 | 2,750.00 | 2,667.50 |
| REGIONS BANK | 1/9/2006 | 8/11/2006 | 1/24/2006 | 5,500.00 | 2,750.00 | 2,667.50 |
| REGIONS BANK | 1/9/2006 | 8/11/2006 | 1/24/2006 | 1,820.00 | 910.00 | 882.70 |
| REGIONS BANK | 1/9/2006 | 8/11/2006 | 1/24/2006 | 1,820.00 | 910.00 | 882.70 |
| REGIONS BANK | 5/1/2006 | 8/11/2006 | 4/28/2006 | 4,250.00 | 4,250.00 | 4,122.50 |
| REGIONS BANK | 5/1/2006 | 8/11/2006 | 3/30/2006 | 7,658.00 | 7,658.00 | 7,428.26 |
| REGIONS BANK | 5/1/2006 | 8/11/2006 | 3/30/2006 | 723.00 | 723.00 | 701.31 |
| REGIONS BANK | 5/1/2006 | 8/11/2006 | 4/28/2006 | 5,000.00 | 5,000.00 | 4,850.00 |
| REGIONS BANK | 5/1/2006 | 8/11/2006 | 2/21/2006 | 2,939.00 | 2,171.00 | 2,105.87 |
| REGIONS BANK | 5/1/2006 | 8/11/2006 | 1/19/2006 | 2,875.00 | 1,438.00 | 1,394.86 |
| REGIONS BANK | 5/1/2006 | 8/11/2006 | 1/19/2006 | 2,875.00 | 1,437.00 | 1,393.89 |
| REGIONS BANK | 5/1/2006 | 8/11/2006 | 1/19/2006 | 320.00 | 160.00 | 155.20 |
| REGIONS BANK | 5/1/2006 | 8/11/2006 | 1/19/2006 | 320.00 | 160.00 | 155.20 |
| REGIONS BANK | 5/1/2006 | 8/11/2006 | 4/19/2006 | 2,625.00 | 1,470.00 | 1,425.90 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/6/2005 | 8,500.00 | 4,250.00 | 4,122.50 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/6/2005 | 8,500.00 | 1,416.00 | 1,373.52 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/6/2005 | 10,000.00 | 3,334.00 | 3,233.98 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/6/2005 | 10,000.00 | 3,831.00 | 3,716.07 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/6/2005 | 10,000.00 | 497.00 | 482.09 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 9/8/2005 | 3,500.00 | 1,750.00 | 1,697.50 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 9/8/2005 | 3,500.00 | 1,750.00 | 1,697.50 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 9/8/2005 | 4,000.00 | 2,000.00 | 1,940.00 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 9/8/2005 | 4,000.00 | 2,000.00 | 1,940.00 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 7/25/2005 | 164.00 | 0.00 | 0.00 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 7/25/2005 | 7,429.00 | 3,797.00 | 3,683.09 |
| REGIONS BANK | 8/22/2005 | 12/9/2005 | 7/6/2005 | 4,250.00 | 2,125.00 | 2,061.25 |

RU 1713



| | | | | | |
|---|---|---|---|---|---|
| REGIONS BANK | | | | | |
| REGIONS BANK | 8/22/2005 | 12/9/2005 | 7/6/2005 | 4,250.00 | 2,125.00 | 2,061.25 |
| REGIONS BANK | 8/22/2005 | 12/9/2005 | 7/6/2005 | 1,318.00 | 659.00 | 639.23 |
| REGIONS BANK | 8/22/2005 | 12/9/2005 | 7/6/2005 | 1,318.00 | 659.00 | 639.23 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 7/27/2005 | 2,625.00 | 1,313.00 | 1,273.61 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 7/27/2005 | 2,625.00 | 1,312.00 | 1,272.64 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 7/27/2005 | 4,000.00 | 2,000.00 | 1,940.00 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/12/2005 | 4,000.00 | 2,000.00 | 1,940.00 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/12/2005 | 8,500.00 | 2,834.00 | 2,748.98 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/12/2005 | 8,500.00 | 2,833.00 | 2,748.01 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/12/2005 | 8,500.00 | 2,833.00 | 2,748.01 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/12/2005 | 10,000.00 | 3,334.00 | 3,233.98 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/12/2005 | 10,000.00 | 3,333.00 | 3,233.01 |
| REGIONS BANK | 8/22/2005 | 12/9/2005 | 7/20/2005 | 10,000.00 | 3,333.00 | 3,233.01 |
| REGIONS BANK | 8/22/2005 | 12/9/2005 | 7/20/2005 | 1,234.00 | 617.00 | 598.49 |
| REGIONS BANK | 8/22/2005 | 12/9/2005 | 7/20/2005 | 1,234.00 | 617.00 | 598.49 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 6/21/2005 | 1,446.00 | 723.00 | 701.31 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 6/21/2005 | 1,446.00 | 723.00 | 701.31 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 6/21/2005 | 8,500.00 | 2,834.00 | 2,748.98 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 6/21/2005 | 8,500.00 | 2,833.00 | 2,748.01 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 6/21/2005 | 8,500.00 | 2,833.00 | 2,748.01 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 7/18/2005 | 10,000.00 | 3,334.00 | 3,233.98 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 7/18/2005 | 10,000.00 | 3,333.00 | 3,233.01 |
| REGIONS BANK | 8/22/2005 | 12/9/2005 | 8/10/2005 | 5,500.00 | 1,018.00 | 987.46 |
| REGIONS BANK | 8/22/2005 | 12/9/2005 | 8/10/2005 | 8,465.00 | 4,233.00 | 4,106.01 |
| REGIONS BANK | 8/22/2005 | 12/9/2005 | 8/10/2005 | 2,750.00 | 1,375.00 | 1,333.75 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 7/13/2005 | 2,750.00 | 1,375.00 | 1,333.75 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 7/13/2005 | 446.00 | 223.00 | 216.31 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 7/13/2005 | 446.00 | 223.00 | 216.31 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 8/19/2005 | 2,625.00 | 1,313.00 | 1,273.61 |
| REGIONS BANK | 8/22/2005 | 4/21/2006 | 8/19/2005 | 2,625.00 | 1,312.00 | 1,272.64 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 6/21/2005 | 3,766.00 | 1,883.00 | 1,826.51 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/6/2005 | 3,766.00 | 1,883.00 | 1,826.51 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/26/2005 | 8,500.00 | 4,250.00 | 4,122.50 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/26/2005 | 10,000.00 | 5,000.00 | 4,850.00 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/26/2005 | 10,000.00 | 3,333.00 | 3,233.01 |
| | | | | 8,500.00 | 2,834.00 | 2,748.98 |
| | | | | 5,500.00 | 1,834.00 | 1,778.98 |
| | | | | 5,500.00 | 1,833.00 | 1,778.01 |
| | | | | 5,000.00 | 1,667.00 | 1,616.99 |
| | | | | 5,000.00 | 1,667.00 | 1,616.99 |

RU 1714



| Account | | | | | | |
|---|---|---|---|---|---|---|
| REGIONS BANK | | | | | | |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/29/2005 | 5,500.00 | 1,834.00 | 1,778.98 |
| REGIONS BANK | 8/22/2005 | 8/11/2006 | 7/29/2005 | 5,000.00 | 1,667.00 | 1,616.99 |
| Subtotal | | | | 466,926.00 | 194,989.40 | 189,139.72 |
| REGIONS BANK 710612 | 1/9/2006 | 8/11/2006 | 12/22/2005 | 8,500.00 | 4,250.00 | 4,250.00 |
| REGIONS BANK 710612 | 1/9/2006 | 8/11/2006 | 12/22/2005 | 8,500.00 | 4,250.00 | 4,250.00 |
| REGIONS BANK 710612 | 1/9/2006 | 8/11/2006 | 12/22/2005 | 2,068.00 | 1,034.00 | 1,034.00 |
| REGIONS BANK 710612 | 1/9/2006 | 8/11/2006 | 12/22/2005 | 2,068.00 | 1,034.00 | 1,034.00 |
| REGIONS BANK 710612 | 8/22/2005 | 8/11/2006 | 8/10/2005 | 8,500.00 | 2,834.00 | 2,748.98 |
| REGIONS BANK 710612 | 8/22/2005 | 8/11/2006 | 8/10/2005 | 8,500.00 | 2,833.00 | 2,748.01 |
| REGIONS BANK 710612 | 8/22/2005 | 8/11/2006 | 8/10/2005 | 8,500.00 | 2,833.00 | 2,748.01 |
| REGIONS BANK 710612 | 8/22/2005 | 8/11/2006 | 8/10/2005 | 10,000.00 | 3,334.00 | 3,233.98 |
| REGIONS BANK 710612 | 8/22/2005 | 8/11/2006 | 8/10/2005 | 10,000.00 | 3,333.00 | 3,233.01 |
| REGIONS BANK 710612 | 8/22/2005 | 8/11/2006 | 8/10/2005 | 10,000.00 | 3,333.00 | 3,233.01 |
| REGIONS BANK 710612 | 5/1/2006 | 8/11/2006 | 5/22/2006 | 3,000.00 | 3,000.00 | 3,000.00 |
| REGIONS BANK 710612 | 5/1/2006 | 8/11/2006 | 5/22/2006 | 5,000.00 | 5,000.00 | 5,000.00 |
| REGIONS BANK 710612 | 8/22/2005 | 4/21/2006 | 8/11/2005 | 4,270.00 | 2,135.00 | 2,070.95 |
| REGIONS BANK 710612 | 8/22/2005 | 4/21/2006 | 8/11/2005 | 4,270.00 | 2,135.00 | 2,070.95 |
| REGIONS BANK 710612 | 8/22/2005 | 4/21/2006 | 8/11/2005 | 7,055.00 | 2,778.00 | 2,694.66 |
| REGIONS BANK 710612 | 8/22/2005 | 4/21/2006 | 8/11/2005 | 7,055.00 | 4,277.00 | 4,148.69 |
| Subtotal | | | | 107,286.00 | 48,393.00 | 47,498.25 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 8/25/2005 | 3,500.00 | 1,167.00 | 1,131.99 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 8/25/2005 | 4,000.00 | 1,334.00 | 1,293.98 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 11/2/2005 | 5,500.00 | 1,650.00 | 1,600.50 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 11/2/2005 | 5,500.00 | 1,925.00 | 1,867.25 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 11/2/2005 | 1,924.00 | 962.00 | 933.14 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 11/2/2005 | 1,924.00 | 962.00 | 933.14 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 8/16/2005 | 10,000.00 | 3,333.00 | 3,233.01 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 8/16/2005 | 10,000.00 | 3,333.00 | 3,233.01 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 8/16/2005 | 8,500.00 | 2,834.00 | 2,748.98 |
| SALLIE MAE TRUST | 1/9/2006 | 8/11/2006 | 12/22/2005 | 10,000.00 | 1,121.63 | 1,087.98 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 9/26/2005 | 4,000.00 | 2,000.00 | 1,940.00 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 9/26/2005 | 10,000.00 | 1,667.00 | 1,616.99 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 9/26/2005 | 10,000.00 | 1,667.00 | 1,616.99 |
| SALLIE MAE TRUST | 1/9/2006 | 8/11/2006 | 12/22/2005 | 10,000.00 | 2,500.00 | 2,425.00 |
| SALLIE MAE TRUST | 1/9/2006 | 8/11/2006 | 12/22/2005 | 328.00 | 164.00 | 159.08 |
| SALLIE MAE TRUST | 1/9/2006 | 8/11/2006 | 12/22/2005 | 328.00 | 164.00 | 159.08 |
| SALLIE MAE TRUST | 1/9/2006 | 8/11/2006 | 12/22/2005 | 4,519.00 | 2,259.00 | 2,191.23 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 8/8/2005 | 4,519.00 | 2,260.00 | 2,192.20 |
| SALLIE MAE TRUST | 8/22/2005 | 8/11/2006 | 8/8/2005 | 5,500.00 | 1,375.00 | 1,333.75 |
| SALLIE MAE TRUST | | | | 5,500.00 | 2,750.00 | 2,667.50 |

RU 1715

Loans Disbursed Acad yr 06-07
August 21, 2006 – February 02

| Lender Name | Loan Period Start | Loan Period End | Guarantee Date | Guarantee Amount | Gross Amount | Net Amount |
|---|---|---|---|---|---|---|
| ACADEMIC FINANCE CORP, US BANK ELT | 8/21/2006 | 8/10/2007 | 8/16/2006 | 8500 | 2834 | 2777.32 |
| ACADEMIC FINANCE CORP, US BANK ELT | 8/21/2006 | 8/10/2007 | 8/16/2006 | 8500 | 2833 | 2776.34 |
| ACADEMIC FINANCE CORP, US BANK ELT | 8/21/2006 | 8/10/2007 | 8/16/2006 | 3500 | 1167 | 1143.66 |
| ACADEMIC FINANCE CORP, US BANK ELT | 8/21/2006 | 8/10/2007 | 8/16/2006 | 3500 | 264 | 258.72 |
| ACADEMIC FINANCE CORP, US BANK ELT | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 2834 | 2777.32 |
| ACADEMIC FINANCE CORP, US BANK ELT | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 2833 | 2776.34 |
| ACADEMIC FINANCE CORP, US BANK ELT | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 3334 | 3267.32 |
| **Subtotal** | | | | **61000** | **19432** | **19043.36** |
| ACAPITA ED.FIN.CORP TRUSTEE US BNK | 8/21/2006 | 8/10/2007 | 8/2/2006 | 8500 | 2834 | 2834 |
| ACAPITA ED.FIN.CORP TRUSTEE US BNK | 8/21/2006 | 8/10/2007 | 8/2/2006 | 8500 | 2833 | 2833 |
| ACAPITA ED.FIN.CORP TRUSTEE US BNK | 8/21/2006 | 8/10/2007 | 8/2/2006 | 10000 | 3334 | 3334 |
| ACAPITA ED.FIN.CORP TRUSTEE US BNK | 8/21/2006 | 8/10/2007 | 8/2/2006 | 10000 | 3333 | 3333 |
| **Subtotal** | | | | **37000** | **12334** | **12334** |
| AMS EDUCATION LOAN TRUST/WILMINGTON | 8/21/2006 | 8/10/2007 | 7/20/2006 | 8500 | 2834 | 2834 |
| AMS EDUCATION LOAN TRUST/WILMINGTON | 8/21/2006 | 8/10/2007 | 7/20/2006 | 8500 | 2833 | 2833 |
| AMS EDUCATION LOAN TRUST/WILMINGTON | 8/21/2006 | 8/10/2007 | 7/20/2006 | 10000 | 800 | 800 |
| AMS EDUCATION LOAN TRUST/WILMINGTON | 8/21/2006 | 8/10/2007 | 7/20/2006 | 10000 | 800 | 800 |
| AMS EDUCATION LOAN TRUST/WILMINGTON | 8/21/2006 | 8/10/2007 | 8/17/2006 | 2000 | 667 | 646.99 |

**RU 1800**

EXHIBIT 51

PENGAD 800-631-6989

| Lender | Date 1 | Date 2 | Date 3 | Amt 1 | Amt 2 | Amt 3 |
|---|---|---|---|---|---|---|
| NELLIE MAE TRST | | | | | | |
| NELLIE MAE TRST | 8/21/2006 | 8/10/2007 | 8/1/2006 | 5500 | 875 | 875 |
| NELLIE MAE TRST | 8/21/2006 | 8/10/2007 | 8/1/2006 | 5500 | 1833 | 1833 |
| NELLIE MAE TRST | 8/21/2006 | 8/10/2007 | 8/1/2006 | 5000 | 333 | 333 |
| NELLIE MAE TRST | 8/21/2006 | 8/10/2007 | 8/1/2006 | 5000 | 1334 | 1334 |
| NELLIE MAE TRST | 8/21/2006 | 8/10/2007 | 7/17/2006 | 5000 | 1667 | 1667 |
| NELLIE MAE TRST | 8/21/2006 | 8/10/2007 | 7/17/2006 | 5500 | 1833 | 1833 |
| NELLIE MAE TRST | 8/21/2006 | 8/10/2007 | 7/17/2006 | 5500 | 1834 | 1834 |
| NELLIE MAE TRST | 8/21/2006 | 8/10/2007 | 1/23/2007 | 5000 | 1667 | 1667 |
| NELLIE MAE TRST | 1/8/2007 | 8/10/2007 | 1/23/2007 | 5000 | 1667 | 1667 |
| Subtotal | 1/8/2007 | | | 8500 | 4250 | 4250 |
| | | | | 8575 | 4288 | 4288 |
| NELNET EDUCATION LOAN FUNDING | | | | 104700 | 34938 | 34938 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 12/8/2006 | 7/17/2006 | 8520 | 8520 | 8520 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 8/10/2007 | 8/1/2006 | 12995 | 6167 | 6167 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 8/10/2007 | 8/1/2006 | 12995 | 2353 | 2353 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 12/8/2006 | 8/1/2006 | 4353 | 4353 | 4353 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 2834 | 2834 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 1416 | 1416 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 3334 | 3334 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 12/8/2006 | 8/1/2006 | 10000 | 1666 | 1666 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 8/10/2007 | 8/1/2006 | 10500 | 6495 | 6495 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 8/10/2007 | 8/1/2006 | 4298 | 632 | 632 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 12/8/2006 | 8/15/2006 | 9868 | 2869 | 2869 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 12/8/2006 | 8/1/2006 | 2700 | 2700 | 2700 |
| NELNET EDUCATION LOAN FUNDING | 8/21/2006 | 8/10/2007 | 8/10/2006 | 5500 | 5500 | 5500 |
| Subtotal | | | | 995 | 995 | 995 |
| | | | | 3500 | 1750 | 1750 |
| REGIONS BANK | | | | 113224 | 51584 | 51584 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 7/17/2006 | 5500 | 1834 | 1815.66 |
| REGIONS BANK | 8/21/2006 | 12/8/2006 | 7/17/2006 | 5000 | 1667 | 1650.33 |
| REGIONS BANK | 8/21/2006 | 12/8/2006 | 9/20/2006 | 4735 | 4735 | 1815.66 |
| REGIONS BANK | 8/21/2006 | 4/20/2007 | 9/20/2006 | 2342 | 2342 | 4687.65 |
| REGIONS BANK | 8/21/2006 | 4/20/2007 | 8/1/2006 | 3500 | 1750 | 2318.58 |
| REGIONS BANK | 1/8/2007 | 4/20/2007 | 8/1/2006 | 4000 | 2000 | 1732.5 |
| REGIONS BANK | 1/8/2007 | 4/20/2007 | 1/9/2007 | 1750 | 1750 | 1980 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 1/9/2007 | 2000 | 2000 | 1732.5 |
| | | | 8/1/2006 | 2625 | 875 | 1980 |
| | | | | | | 866.25 |

**RU 1899**



| | | | | | | |
|---|---|---|---|---|---|---|
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 8/1/2006 | 2625 | 875 | 866.25 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 8/1/2006 | 4000 | 1333 | 1319.67 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 8/1/2006 | 4000 | 1334 | 1320.66 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 1/9/2007 | 2625 | 1313 | 1299.87 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 7/17/2006 | 4000 | 2000 | 1980 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 2834 | 2805.66 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 2833 | 2804.67 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 3334 | 3300.66 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 8/28/2006 | 10000 | 3333 | 3299.67 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 8/28/2006 | 8500 | 2834 | 2805.66 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 8/28/2006 | 8500 | 2833 | 2804.67 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 8/28/2006 | 10000 | 3334 | 3300.66 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 3333 | 3299.67 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 2834 | 2805.66 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 2833 | 2804.67 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 3334 | 3300.66 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 8/1/2006 | 10000 | 3333 | 3299.67 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 8/1/2006 | 874 | 874 | 865.26 |
| REGIONS BANK | 1/8/2007 | 4/21/2007 | 1/3/2007 | 9626 | 7846 | 7767.54 |
| REGIONS BANK | 8/21/2006 | 4/21/2007 | 8/22/2006 | 1780 | 1780 | 1762.2 |
| REGIONS BANK | 8/21/2006 | 4/21/2007 | 8/22/2006 | 8500 | 4250 | 4207.5 |
| REGIONS BANK | 8/21/2006 | 4/21/2007 | 8/22/2006 | 8500 | 4250 | 4207.5 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 5000 | 4950 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 5000 | 4950 |
| REGIONS BANK | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 3334 | 3300.66 |
| REGIONS BANK | 1/8/2007 | 8/10/2007 | 11/28/2006 | 8500 | 3333 | 3299.67 |
| REGIONS BANK | 1/8/2007 | 8/10/2007 | 11/28/2006 | 8500 | 2834 | 2805.66 |
| | | | | 8500 | 2833 | 2804.67 |
| Subtotal | | | | 10000 | 4250 | 4207.5 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/22/2006 | 264482 | 113394 | 112260.06 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/22/2006 | 5500 | 1834 | 1834 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/22/2006 | 5500 | 1833 | 1833 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 9/7/2006 | 5000 | 1667 | 1667 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 9/7/2006 | 5000 | 1667 | 1667 |
| | | | | 5500 | 1834 | 1834 |
| | | | | 5500 | 3666 | 3666 |

RU 1900

| | | | | | | |
|---|---|---|---|---|---|---|
| REGIONS BANK 710612 | | | | | | |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 9/7/2006 | 5000 | 1667 | 1667 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 9/7/2006 | 5000 | 3333 | 3333 |
| REGIONS BANK 710612 | 1/8/2007 | 8/10/2007 | 12/12/2006 | 8500 | 4250 | 4250 |
| REGIONS BANK 710612 | 1/8/2007 | 8/10/2007 | 12/12/2006 | 9500 | 4750 | 4750 |
| REGIONS BANK 710612 | 1/8/2007 | 8/10/2007 | 1/9/2007 | 8500 | 4250 | 4250 |
| REGIONS BANK 710612 | 1/8/2007 | 8/10/2007 | 1/9/2007 | 7358 | 3679 | 3679 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/10/2006 | 6589 | 2197 | 2197 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/10/2006 | 6589 | 2196 | 2196 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/10/2006 | 6518 | 2403 | 2403 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 6518 | 2058 | 2058 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 2834 | 2834 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 2833 | 2833 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/13/2006 | 10000 | 3334 | 3334 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/13/2006 | 10000 | 3333 | 3333 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/13/2006 | 8500 | 2834 | 2834 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 2833 | 2833 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 3334 | 3334 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 3333 | 3333 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/28/2006 | 8500 | 2834 | 2834 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/28/2006 | 8500 | 2833 | 2833 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/28/2006 | 10000 | 3334 | 3334 |
| REGIONS BANK 710612 | 1/8/2007 | 8/10/2007 | 1/16/2007 | 10000 | 3333 | 3333 |
| REGIONS BANK 710612 | 1/8/2007 | 8/10/2007 | 1/16/2007 | 5500 | 2750 | 2750 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 5000 | 2500 | 2500 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10500 | 3500 | 3500 |
| REGIONS BANK 710612 | 1/8/2007 | 8/10/2007 | 12/29/2006 | 10500 | 3500 | 3500 |
| REGIONS BANK 710612 | 1/8/2007 | 8/10/2007 | 12/29/2006 | 8500 | 4250 | 4250 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/10/2006 | 8540 | 4270 | 4270 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/10/2006 | 8500 | 2834 | 2834 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/10/2006 | 8500 | 2833 | 2833 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/10/2006 | 10000 | 3334 | 3334 |
| REGIONS BANK 710612 | 1/8/2007 | 8/10/2007 | 1/11/2007 | 10000 | 3333 | 3333 |
| | | | | 2187 | 1094 | 1094 |

RU 1901

| | | | | | | |
|---|---|---|---|---|---|---|
| REGIONS BANK 710612 | 1/8/2007 | 8/10/2007 | 1/11/2007 | 2000 | 1000 | 1000 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/1/2006 | 3500 | 1167 | 1167 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/1/2006 | 3500 | 1167 | 1167 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/1/2006 | 4000 | 1334 | 1334 |
| REGIONS BANK 710612 | 8/21/2006 | 4/20/2007 | 8/10/2006 | 4000 | 1333 | 1333 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/22/2006 | 2625 | 1313 | 1313 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/22/2006 | 8500 | 2834 | 2834 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/22/2006 | 8500 | 2833 | 2833 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/22/2006 | 10000 | 3334 | 3334 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 3333 | 3333 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 2834 | 2834 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 8500 | 2833 | 2833 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 3334 | 3334 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 10000 | 3333 | 3333 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 6393 | 2131 | 2131 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 6393 | 2131 | 2131 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 7/17/2006 | 12107 | 4036 | 4036 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/20/2006 | 12107 | 4036 | 4036 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/20/2006 | 8500 | 4250 | 4250 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/21/2006 | 10000 | 5000 | 5000 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/21/2006 | 5500 | 1834 | 1834 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/21/2006 | 5500 | 1833 | 1833 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/21/2006 | 5000 | 1667 | 1667 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 9/7/2006 | 5000 | 1667 | 1667 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 9/7/2006 | 8500 | 8500 | 8500 |
| REGIONS BANK 710612 | 8/21/2006 | 4/20/2007 | 1/9/2007 | 1955 | 1955 | 1955 |
| REGIONS BANK 710612 | 8/21/2006 | 12/8/2006 | 7/17/2006 | 8045 | 8045 | 8045 |
| REGIONS BANK 710612 | 8/21/2006 | 12/8/2006 | 7/17/2006 | 8500 | 8500 | 8500 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/10/2006 | 1955 | 1955 | 1955 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/10/2006 | 8500 | 2834 | 2834 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/10/2006 | 8500 | 2833 | 2833 |
| REGIONS BANK 710612 | 8/21/2006 | 8/10/2007 | 8/10/2006 | 10000 | 3334 | 3334 |
| **Subtotal** | | | | 10000 | 3333 | 3333 |
| SALLIE MAE EDUCATION TRUST | 1/8/2007 | 4/20/2007 | 12/1/2006 | 573879 | 228674 | 228674 |
| SALLIE MAE EDUCATION TRUST | 1/8/2007 | 4/20/2007 | 12/1/2006 | 2625 | 2625 | 2625 |
| SALLIE MAE EDUCATION TRUST | 1/8/2007 | 4/20/2007 | 12/13/2006 | 4000 | 4000 | 4000 |
| | | | | 8600 | 3000 | 3000 |

RU 1902

🏠 home page   ✉ email   🔍 site map

# REGIONS UNIVERSITY
*Where Traditional and Online Education Merge*

Regions University Online

**Log In: RU students** | **Academic** | **Academic** | **Library** | **Conta**
Online Courses | Calendar | Catalog | Resources | Us

**Degree programs**

**Admissions information**

**Financial Aid services**

**Student resources**

### REQUEST INFORMATION

ONLINE COURSE

Click here

Call us today and learn more about our 33 degree programs reaching students around the world

**1.888.790.8080**



---

**Welcome to our site!**

Choose your program:

**College of Business and Leadership**

• read more ::::::::::::::::::::::::::::::::::

**College of General Studies**

• read more :::::::::::::::::::::::::::::::::::

**School of Human Services**

• read more :::::::::::::::::::::::::::::::::::

**Turner School of Theology**

• read more :::::::::::::::::::::::::::::::::::



Calendar   September 2006



• **Mid Terms**
  October 2-6 2006
• **Fall Semester over**
  December 8, 2006

On August 2, 2006, the Board of Regents of Southern Christian University changed the institution's name to **REGIONS UNIVERSITY**. They determined that this name would enhance the university's opportunities and would complement the purpose and vision of this university as it accelerates its educational and religious heritage of *Going into all the regions of the world.*

News/Events



• **Spiritual Enrichment Forum**
  Sept. 25-27 2006
  >>read more

| S | M | T | W | TH | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

**Is Regions Online learning program for me?**
• Try a sample course
• FAQ

---

**Home | Blackboard Support | Careers | Site Map | Library | Electronic Campus | Armed Forces**

Regions University is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools (1866 Southern Lane, Decatur, Georgia 30033-4097; Telephone number 404.679.4501) to award Associate of Arts, Bachelor of Arts, Bachelor of Science, Master of Arts, Master of Science, Master of Divinity, Doctor of Ministry, and Doctor of Philosophy degrees.



EXHIBIT
65

# REGIONS UNIVERSITY

### Where Traditional and Online Education Merge

### www.regionsuniversity.edu



PENGAD 800-631-6989

EXHIBIT

69

Castanza

RU 237

FEB 07
#1 —Lamar



REGIONS UNIVERSITY
A Christian University

Get Your Degree Online
With An Accredited University!

33 Online Degree Programs

regionsuniversity.edu | 1.888.790.8080

RU 1628

LANPR – FEB 07 #2



LAMAR - FEB 07 #3



RU 1630



# Academic Catalog



## REGIONS UNIVERSITY

Where Traditional and Online Education Merge

www.regionsuniversity.edu

1.800.351.4040  -  334.387.3877

New Student Inquiries:  1.888.790.8080

Regions University is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools (1866 Southern Lane  Decatur Georgia 30033-4097 Telephone number 404.679.4501) to award Associate of Arts, Bachelor of Arts, Bachelor of Science, Master of Arts, Master of Science, Master of Divinity, Doctor of Ministry, and Doctor of Philosophy degrees.

EXHIBIT

tabbies

11 3

RU 1943

# *Regions University Academic Catalog*

2006-2007 Academic Year (Version 7.3, Effective May 5, 2007)



within the Regions University Catalog.

## UNDERGRADUATE ENTRY-LEVEL
## ADMISSION REQUIREMENTS

### Undergraduate Entry-Level College Admission—Unconditional:

1. Admission to Regions University's baccalaureate programs (four-year) will be granted to high school diploma graduates who score 17 or above on the American College Test (ACT) or 700 or above on the Scholastic Aptitude Test (SAT) of the College Entrance Examination Board. Applicants must present proof of a high school diploma and provide ACT or SAT scores to the Admissions Office at Regions University.

2. Applicants who are 20 years of age or older may be accepted without taking an aptitude test, but must present proof of a high school diploma or a GED to be unconditionally admitted.

3. Applicants who have not completed high school may be admitted on the basis of a GED.

4. Home-schooled applicants who have a composite ACT test score of 17 or an SAT score of 700 may be admitted as unconditional students. Additionally, a comprehensive Portfolio must be provided prior to admission (i.e., list of courses, books used, laboratory work, and any experiential learning). In addition, an interview with the student will be conducted by the Vice President of Academic Affairs or his or her designee.

5. Applicants from non-accredited high schools who have a composite ACT test score of 17 or an SAT score of 700 may be admitted as unconditional students. Graduates of non-accredited high schools must provide proof of a high school diploma and have completed a minimum of fifteen Carnegie Units. Also, an interview with the student will be conducted by the Vice President of Academic Affairs or his or her designee.


**REGIONS UNIVERSITY**

RU 2018

ADVERTISING EXPENDITURES Jan. 1, 2004 — June 30, 2004

08/06/05
01:18:22 PM

S C U
LEDGER TRIAL BALANCE (ALL ACCOUNTS)
CLOSED & POSTED LEDGERS 7/01/2003 TO 6/30/2004

GLTB1
Page 205

| ACCOUNT | DESCRIPTION | REFERENCE | BAL FWD | DEBIT | CREDIT | END BAL |
|---------|-------------|-----------|---------|-------|--------|---------|
| 842-01-00009-03-01-1 | ADVERTISING | | | | | |
| | C POSTED FROM A/P OPEN | A/P 20030710 41 | | | | |
| | C POSTED FROM A/P OPEN | A/P 20030729 35 | | | | |
| | C POSTED FROM A/P OPEN | A/P 20030808 13 | | | | |
| | C POSTED FROM A/P OPEN | A/P 20030808 | | | | |
| | C POSTED FROM A/P OPEN | A/P 20030821 61 | | | | |
| | C POSTED FROM A/P OPEN | A/P 20030822 3 | | | | |

EXHIBIT
123

RU 2720

Case 2:06-cv-00882-MHT-TFM   Document 95-20   Filed 08/17/2007   Page 2 of 8

08/06/05
01:18:23 PM

ACCOUNT

S C U
LEDGER TRIAL BALANCE (ALL ACCOUNTS)   7/01/2003 TO 6/30/2004

RU 2721

| DESCRIPTION | REFERENCE | BAL FWD | DEBIT | CREDIT | END BAL |
|---|---|---|---|---|---|
| CLOSED & POSTED LEDGERS | | | | | |
| POSTED FROM A/P OPEN | A/P 20030905 11 | | 43,770.63 | | |
| POSTED FROM A/P OPEN | A/P 20030924 11 | | 14,034.36 | | |
| POSTED FROM A/P OPEN | A/P 20030924 35 | | | | |
| POSTED FROM A/P OPEN | A/P 20031002 35 | | 1,535.60 | | |
| POSTED FROM A/P OPEN | A/P 20031010 15 | | 5,174.65 | | |
| POSTED FROM A/P OPEN | A/P 20031016 11 | | 11,746.85 | | |
| POSTED FROM A/P OPEN | A/P 20031030 65 | | 300.00 | | |
| POSTED FROM A/P OPEN | A/P 20031031 7 | | 434.01 | | |
| POSTED FROM A/P OPEN | A/P 20031120 35 | | | | |
| POSTED FROM A/P OPEN | A/P 20031128 39 | | | | |
| POSTED FROM A/P OPEN | A/P 20031201 21 | | | | |
| POSTED FROM A/P OPEN | A/P 20031201 37 | | | | |
| POSTED FROM A/P OPEN | A/P 20031216 19 | | 3,822.00 | | |
| POSTED FROM A/P OPEN | A/P 20040112 27 | | 430.50 | | |
| POSTED FROM A/P OPEN | A/P 20040124 13 | | | | |
| POSTED FROM A/P OPEN | A/P 20040206 31 | | | | |
| POSTED FROM A/P OPEN | A/P 20040211 15 | | 14,375.00 | | |
| POSTED FROM A/P OPEN | A/P 20040209 17 | | 5,351.60 | | |
| POSTED FROM A/P OPEN | A/P 20040216 13 | | 1,890.00 | | |
| POSTED FROM A/P OPEN | A/P 20040219 29 | | 16,960.16 | | |
| POSTED FROM A/P OPEN | A/P 20040224 41 | | 575.00 | | |
| POSTED FROM A/P OPEN | A/P 20040226 7 | | 7 | | |
| POSTED FROM A/P OPEN | A/P 20040226 11 | | 4,139.00 | | |
| POSTED FROM A/P OPEN | A/P 20040311 19 | | 38,787.53 | | |
| POSTED FROM A/P OPEN | A/P 20040311 43 | | 5,886.50 | | |
| POSTED FROM A/P OPEN | A/P 20040401 67 | | 50,817.90 | | |
| POSTED FROM A/P OPEN | A/P 20040402 7 | | | | |
| POSTED FROM A/P OPEN | A/P 20040406 15 | | | | |
| POSTED FROM A/P OPEN | A/P 20040406 7 | | | | |
| POSTED FROM A/P OPEN | A/P 20040415 17 | | | | |
| POSTED FROM A/P OPEN | A/P 20040623 7 | | | | |
| POSTED FROM A/P OPEN | A/P 20040511 21 | | | | |
| POSTED FROM A/P OPEN | A/P 20040511 51 | | 20,047.71 | 2,761.50- | |
| POSTED FROM A/P OPEN | A/P 20040525 37 | | 9,728.25 | | |
| POSTED FROM A/P OPEN | A/P 20040604 23 | | 11,050.85 | | |
| POSTED FROM A/P OPEN | A/P 20040608 9 | | 50.00 | | |
| POSTED FROM A/P OPEN | A/P 20040610 9 | | 15,620.00 | | |
| POSTED FROM A/P OPEN | A/P 20040615 11 | | 434.01 | | |
| POSTED FROM A/P OPEN | A/P 20040620 2 | | | | |
| CHRISTIANITY TODAY REIMBURSE | JAN 656 2 | | | | |
| REV FY A/P ACCRUALS | JUL 304 12 | | 867.85 | 981.49- | |
| RECORD FY 2004 A/P ACCRUALS | JUN 797 1 | | 50.00 | 1,886.32- | |
| RECORD FY 2004 A/P ACCRUALS | JUN 798 5 | | | | |

Net Change

*ADVERTISING EXPENDITURES JULY 1, 2004 — JUNE 30, 2005*

08/06/05
11:43:41 AM

S C U
LEDGER TRIAL BALANCE (ALL ACCOUNTS)
CLOSED & POSTED LEDGERS   7/01/2004 TO 6/30/2005

GLTB1
Page 212

| ACCOUNT | DESCRIPTION | REFERENCE | BAL FWD | DEBIT | CREDIT | END BAL |
|---|---|---|---|---|---|---|
| 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-03-01-1 | ADVERTISING | | | | | |
| | C  POSTED FROM A/P OPEN | A/P 2004070 9 | 23 | 35,076.19 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004072 1 | 15 | 1,827.00 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004072 7 | 33 | 14,817.65 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004072 7 | 35 | 31,787.29 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004080 6 | 15 | 26,366.77 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004081 6 | 13 | 4,356.75 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004081 9 | 7 | 4,551.75 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004082 4 | 37 | 15,655.00 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004090 1 | 35 | 2,457.01 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004091 0 | 11 | 12,292.60 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004091 4 | 5 | 11,741.25 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004093 0 | 41 | 10,431.23 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004100 5 | 13 | 15,125.00 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004101 4 | 9 | 1,517.25 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004102 5 | 43 | 11,673.96 | | |
| | C  POSTED FROM A/P OPEN | A/P 2004110 4 | 19 | 575.00 | | |

RU 2722



08/06/05
11:43:42 AM

S C U
LEDGER TRIAL BALANCE (ALL ACCOUNTS)  7/01/2004 TO 6/30/2005

CLOSED & POSTED LEDGERS

RLTB1
Page 213

| ACCOUNT | DESCRIPTION | REFERENCE | BAL FWD | DEBIT | CREDIT | END BAL |
|---|---|---|---|---|---|---|
| | POSTED FROM A/P OPEN | A/P 2004 1108 | 5 | 867.85 | | |
| | POSTED FROM A/P OPEN | A/P 2004 1118 | 11 | 5,806.00 | | |
| | POSTED FROM A/P OPEN | A/P 2004 1115 | 1 | 4,447.50 | | |
| | POSTED FROM A/P OPEN | A/P 2004 1116 | 7 | 6,000.00 | | |
| | POSTED FROM A/P OPEN | A/P 2004 1124 | 35 | 34,500.00 | 34,500.00- | |
| | POSTED FROM A/P OPEN | A/P 2004 1201 | 13 | 300.00 | | |
| | POSTED FROM A/P OPEN | A/P 2004 1202 | 3 | 43,258.05 | | |
| | POSTED FROM A/P OPEN | A/P 2004 1210 | 5 | 43,174.50 | | |
| | POSTED FROM A/P OPEN | A/P 2004 1213 | 21 | 12,095.78 | | |
| | POSTED FROM A/P OPEN | A/P 2004 1823 | 43 | 41,734.01 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0106 | 15 | 9,595.26 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0120 | 39 | 8,662.00 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0201 | 39 | 1,077.50 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0208 | 23 | 4,681.79 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0218 | 39 | 6,000.00 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0321 | 15 | 1,459.81 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0321 | 41 | 1,459.00 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0404 | 33 | 24,151.56 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0412 | 13 | 50.00 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0413 | 11 | 14,337.42 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0414 | 7 | 13,700.01 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0504 | 13 | 31,659.29 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0505 | 5 | 33,537.07 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0510 | 9 | 6,000.00 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0519 | 7 | 22,616.25 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0526 | 5 | 434.01 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0536 | 69 | 24,101.26 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0609 | 21 | 71,495.08 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0629 | 67 | 434.01 | | |
| | POSTED FROM A/P OPEN | A/P 2005 0630 | 1 | 4,216.01 | | |
| | POSTED FROM A/P OPEN | 2005 0630 | 3 | | | |
| | REVERSE FY 2004 A/P ACCRUALS | JUL 329 | 5 | | 867.85- | |
| | REVERSE FY 05 ACCRUALS | JUL 326 | 1 | 867.85 | | |
| | RECORD FY 05 ACCRUALS | JUN 855 | 5 | 50.00 | 50.00- | |
| | RECORD FY 05 ACCRUALS | JUN 863 | 2 | 2,850.00 | | |
| | RECORD FY 05 ACCRUALS | JUN 863 | 9 | 36,129.89 | | |
| | FY 2004 AUDIT ADJUSTMENT | NOV 426 | 1 | | 34,158.34- | |

Net Change        637,718.32        707,294.51    69,576.19-

RU 2723

*ADVERTISING EXPENDITURES JULY 1, 2005 — JUNE 30, 2006* (handwritten)

07/18/06
03:30:39 PM

S C
LEDGER TRIAL BALANCE (ALL ACCOUNTS)    7/01/2005 TO 6/30/2006
CLOSED & POSTED LEDGERS    (Period 1 TO Period 12)

GLTB1
Page 229

ACCOUNT: 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-03-01-1

Net Change

ADVERTISING

| ACCOUNT | DESCRIPTION | REFERENCE | BAL FWD | DEBIT | CREDIT | END BAL |
|---|---|---|---|---|---|---|
| | | | 0.00 | | | |
| 1 7/31/2005 | POSTED FROM A/P OPEN | A/P 20050714 17 | | 50.00 | 50.00- | |
| 1 7/31/2005 | POSTED FROM A/P OPEN | A/P 20050714 53 | | 38,679.89 | | |
| 1 7/13/2005 | POSTED FROM A/P OPEN | A/P 20050726 37 | | 1,034.01 | | |
| 1 7/13/2005 | REVERSE A/P ACCRUALS | JUL 357 5 | | | | |
| 2 8/31/2005 | REVERSE A/P ACCRUALS | JUL 358 | | | 2,850.00- | |
| 1 7/13/2005 | REVERSE A/P ACCRUALS | JUL 357 | | | 36,129.89- | |
| 2 8/31/2005 | POSTED FROM A/P OPEN | A/P 20050810 9 | | 77,775.39 | | |
| 1 7/31/2005 | POSTED FROM A/P OPEN | A/P 20050831 13 | | 32,651.76 | | |
| 3 9/30/2005 | POSTED FROM A/P OPEN | A/P 20050831 47 | | 24,532.45 | | |
| 3 9/30/2005 | POSTED FROM A/P OPEN | A/P 20050909 11 | | 1,034.01 | | |
| 3 9/30/2005 | POSTED FROM A/P OPEN | A/P 20050919 13 | | 1,879.50 | | |
| 3 9/30/2005 | POSTED FROM A/P OPEN | A/P 20051001 33 | | 3,577.00 | | |
| 4 10/31/2005 | POSTED FROM A/P OPEN | A/P 20051003 71 | | 1,227.00 | | |
| 4 10/31/2005 | POSTED FROM A/P OPEN | A/P 20051003 33 | | 2,730.00 | | |
| 4 10/31/2005 | POSTED FROM A/P OPEN | A/P 20051006 11 | | 5,507.01 | | |
| 4 10/31/2005 | POSTED FROM A/P OPEN | A/P 20051013 17 | | 6,000.00 | | |
| 3 10/31/2005 | POSTED FROM A/P OPEN | A/P 20051020 17 | | 3,150.00 | | |
| 5 11/30/2005 | POSTED FROM A/P OPEN | A/P 20051108 7 | | 11,643.20 | | |
| 5 11/30/2005 | POSTED FROM A/P OPEN | A/P 20051111 19 | | 37,000.61 | | |
| 5 11/30/2005 | POSTED FROM A/P OPEN | A/P 20051111 65 | | 23,053.11 | | |
| 5 11/30/2005 | POSTED FROM A/P OPEN | A/P 20051213 15 | | 600.00 | | |
| 6 12/31/2005 | POSTED FROM A/P OPEN | A/P 20051213 39 | | 94,903.35 | | |
| 6 12/31/2005 | POSTED FROM A/P OPEN | A/P 20051220 33 | | 65.00 | | |
| 6 12/31/2005 | POSTED FROM A/P OPEN | A/P 20051222 9 | | | | |
| 7 1/31/2006 | POSTED FROM A/P OPEN | A/P 20060118 9 | | | | |
| 7 1/31/2006 | POSTED FROM A/P OPEN | A/P 20060131 7 | | | | |
| 7 1/31/2006 | POSTED FROM A/P OPEN | A/P 20060131 9 | | 16,980.75 | | |
| 7 1/31/2006 | POSTED FROM A/P OPEN | A/P 20060201 19 | | 11,831.78 | | |
| 7 1/31/2006 | POSTED FROM A/P OPEN | A/P 20060201 9 | | | 200.00- | |
| 8 2/28/2006 | POSTED FROM A/P OPEN | A/P 20060214 9 | | 1,580.59 | | |
| 8 2/28/2006 | POSTED FROM A/P OPEN | A/P 20060220 13 | | 14,454.86 | | |
| 8 2/28/2006 | POSTED FROM A/P OPEN | A/P 20060310 45 | | 4,085.00 | | |
| 8 2/28/2006 | POSTED FROM A/P OPEN | A/P 20060315 9 | | 17,400.00 | | |
| 9 3/31/2006 | POSTED FROM A/P OPEN | A/P 20060315 33 | | | | |
| 9 3/31/2006 | POSTED FROM A/P OPEN | A/P 20060330 33 | | | | |
| 9 3/31/2006 | POSTED FROM A/P OPEN | A/P 20060330 9 | | 29,286.45 | | |
| 9 3/31/2006 | POSTED FROM A/P OPEN | A/P 20060406 15 | | 1,344.00 | | |
| 10 4/30/2006 | POSTED FROM A/P OPEN | A/P 20060406 5 | | 14,357.23 | | |
| 10 4/30/2006 | POSTED FROM A/P OPEN | A/P 20060418 11 | | | | |
| 10 4/30/2006 | POSTED FROM A/P OPEN | A/P 20060419 | | | | |

07/18/06
03:30:42 PM

LEDGER TRIAL BALANCE (ALL ACCOUNTS)
S C
CLOSED & POSTED LEDGERS    7/01/2005 TO 6/30/2006
(Period 1 TO Period 12)

GL:TB1
Page 230

| ACCOUNT | | | DESCRIPTION | REFERENCE | BAL FWD | DEBIT | CREDIT | END BAL |
|---|---|---|---|---|---|---|---|---|
| 10 | 4/30/2006 | C | POSTED FROM A/P OPEN | A/P 20060419 29 | | 3,679.84 | | |
| 10 | 4/30/2006 | C | POSTED FROM A/P OPEN | A/P 20060420 29 | | 16,950.00 | 201.50- | |
| 10 | 4/30/2006 | C | POSTED FROM A/P OPEN | A/P 20060427 33 | | 793.50 | | |
| 11 | 5/31/2006 | C | POSTED FROM A/P OPEN | A/P 20060516 21 | | 112,609.47 | | |
| 11 | 5/31/2006 | C | POSTED FROM A/P OPEN | A/P 20060527 35 | | 24,152.13 | | |
| 11 | 5/31/2006 | C | POSTED FROM A/P OPEN | A/P 20060601 33 | | 11,481.75 | | |
| 12 | 6/30/2006 | C | POSTED FROM A/P OPEN | A/P 20060602 5 | | 49,987.99 | | |
| 12 | 6/30/2006 | C | POSTED FROM A/P OPEN | A/P 20060614 5 | | | | |
| 12 | 6/30/2006 | P | POSTED FROM A/P OPEN | A/P 20060615 21 | | | 523.48- | |
| 12 | 6/30/2006 | P | POSTED FROM A/P OPEN | A/P 20060626 5 | | 7,034.59 | | |
| 12 | 6/30/2006 | P | POSTED FROM A/P OPEN | A/P 20060628 67 | | 12,969.60 | | |
| 12 | 6/30/2006 | P | POSTED FROM A/P OPEN | A/P 20060630 7 | | 5,460.00 | | |
| 12 | 6/30/2006 | P | RECORD A/P ACCRUALS | JUN 908 7 | | 5,149.20 | | |
| 12 | 6/30/2006 | P | RECORD A/P ACCRUALS | JUN 908 8 | | 17,322.08 | 39,954.87- | |

Net Change    746,304.10    706,349.23    706,349.23    706,349.23

RU 2725

06/29/07
10:33:37 AM

REGIONS UNIVERSITY
LEDGER TRIAL BALANCE (ALL ACCOUNTS)
CLOSED & POSTED LEDGERS   7/01/2006 TO 6/30/2007
(Period 1 TO Period 12)

GL TB1
Page 1

ACCOUNT
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-03-01-1   ADVERTISING

| DATE | DESCRIPTION | REFERENCE | | BAL FWD | DEBIT | CREDIT | END BAL |
|---|---|---|---|---|---|---|---|
| | | | | 0.00 | | | |
| 7/31/2006 | O POSTED FROM A/P OPEN | A/P 20060724 | 17 | | 22,471.20 | | |
| 7/31/2006 | O POSTED FROM A/P OPEN | A/P 20060724 | 69 | | | 5,149.20- | |
| 7/24/2006 | O REVERSE FY 06 ACCRUALS | JUL 376 | 7 | | | 17,322.06- | |
| 7/24/2006 | O REVERSE FY 06 ACCRUALS | JUL 376 | 8 | | | 2,146.06- | |
| 7/31/2006 | O REVERSE AUDIT ADJ 5--ACCRUALS | JUL 392 | 6 | | | | |
| 8/31/2006 | O POSTED FROM A/P OPEN | A/P 20060803 | 39 | | 21,301.50 | | |
| 8/31/2006 | O POSTED FROM A/P OPEN | A/P 20060803 | 39 | | 109,265.19 | | |
| 9/30/2006 | O POSTED FROM A/P OPEN | A/P 20060929 | 37 | | 23,144.86 | | |
| 9/30/2006 | O POSTED FROM A/P OPEN | A/P 20060929 | 5 | | 59,928.08 | | |
| 10/31/2006 | O POSTED FROM A/P OPEN | A/P 20061003 | 13 | | 19,820.47 | | |
| 10/31/2006 | O POSTED FROM A/P OPEN | A/P 20061010 | 11 | | 23,965.22 | | |
| 10/31/2006 | O POSTED FROM A/P OPEN | A/P 20061011 | 19 | | 2,787.70 | | |
| 10/31/2006 | O POSTED FROM A/P OPEN | A/P 20061030 | 7 | | 1,634.59 | | |
| 10/31/2006 | O POSTED FROM A/P OPEN | A/P 20061030 | 19 | | 21,178.00 | | |
| 11/30/2006 | O POSTED FROM A/P OPEN | A/P 20061030 | 23 | | 31,447.50 | | |
| 11/30/2006 | O POSTED FROM A/P OPEN | A/P 20061102 | 11 | | | 7,000.00- | |
| 11/30/2006 | O POSTED FROM A/P OPEN | A/P 20061117 | 7 | | 1,176.90 | | |
| 11/30/2006 | O POSTED FROM A/P OPEN | A/P 20061122 | 5 | | 2,495.61 | | |
| 12/31/2006 | O POSTED FROM A/P OPEN | A/P 20061130 | 37 | | 6,436.16 | | |
| 12/31/2006 | O POSTED FROM A/P OPEN | A/P 20061207 | 9 | | 3,150.00 | | |
| 12/31/2006 | O POSTED FROM A/P OPEN | A/P 20061215 | 1 | | 17,551.10 | | |
| 12/31/2006 | O POSTED FROM A/P OPEN | A/P 20061219 | 11 | | 23,402.50 | | |
| 12/31/2006 | O POSTED FROM A/P OPEN | A/P 20061220 | 3 | | 26,050.00 | | |
| 12/31/2006 | O POSTED FROM A/P OPEN | A/P 20061223 | 3 | | 49,811.40 | | |
| 1/31/2007 | O POSTED FROM A/P OPEN | A/P 20070103 | 11 | | 54.00 | | |
| 1/31/2007 | O POSTED FROM A/P OPEN | A/P 20070109 | 18 | | 4,521.45 | | |
| 1/31/2007 | O POSTED FROM A/P OPEN | A/P 20070109 | 8 | | 3,780.00 | | |
| 1/31/2007 | O POSTED FROM A/P OPEN | A/P 20070111 | 9 | | 11,574.00 | | |
| 1/31/2007 | O POSTED FROM A/P OPEN | A/P 20070119 | 4 | | 147,590.60 | | |
| 1/31/2007 | O POSTED FROM A/P OPEN | A/P 20070124 | 6 | | 38,347.60 | | |
| 1/31/2007 | O POSTED FROM A/P OPEN | A/P 20070124 | 24 | | 2,625.00 | | |
| 1/31/2007 | O POSTED FROM A/P OPEN | A/P 20070126 | 8 | | 6,686.10 | | |
| 2/28/2007 | O POSTED FROM A/P OPEN | A/P 20070207 | 10 | | 14,550.00 | | |
| 2/28/2007 | O POSTED FROM A/P OPEN | A/P 20070208 | 2 | | 14,911.29 | | |
| 2/28/2007 | O POSTED FROM A/P OPEN | A/P 20070212 | 12 | | 21,558.70 | | |
| 2/28/2007 | O POSTED FROM A/P OPEN | A/P 20070213 | 20 | | 12,579.60 | | 4,000.00- |
| 2/28/2007 | O POSTED FROM A/P OPEN | A/P 20070214 | 7 | | 56.00 | | |
| 2/28/2007 | O POSTED FROM A/P OPEN | A/P 20070221 | 10 | | 71,900.00 | | |
| 3/31/2007 | O POSTED FROM A/P OPEN | A/P 20070227 | 34 | | 71,174.00 | | 1,620.00- |
| 3/31/2007 | O POSTED FROM A/P OPEN | A/P 20070309 | 8 | | 82,282.83 | | |
| 3/31/2007 | O POSTED FROM A/P OPEN | A/P 20070314 | 8 | | 5,615.00 | | |
| 3/31/2007 | O POSTED FROM A/P OPEN | A/P 20070320 | 8 | | | | |

RU 2726

REGIONS UNIVERSITY
LEDGER TRIAL BALANCE (ALL ACCOUNTS)
CLOSED & POSTED LEDGERS   7/01/2006 TO 6/30/2007
(Period 1 TO Period 12)

GLTB1
Page 2

| ACCOUNT | | DESCRIPTION | REFERENCE | | BAL FWD | DEBIT | CREDIT | END BAL |
|---|---|---|---|---|---|---|---|---|
| 9 | 3/31/2007 | C POSTED FROM A/P OPEN | A/P 20070330 | 10 | | 2,867.96 | | |
| 10 | 4/30/2007 | C POSTED FROM A/P OPEN | A/P 20070405 | 8 | | 32,902.50 | | |
| 10 | 4/30/2007 | C POSTED FROM A/P OPEN | A/P 20070406 | 2 | | 3,543.75 | | |
| 10 | 4/30/2007 | C POSTED FROM A/P OPEN | A/P 20070412 | 12 | | 22,054.62 | | |
| 10 | 4/30/2007 | C POSTED FROM A/P OPEN | A/P 20070423 | 14 | | 1,618.81 | | |
| 10 | 4/30/2007 | C POSTED FROM A/P OPEN | A/P 20070427 | 12 | | 7,311.96 | | |
| 11 | 5/31/2007 | C POSTED FROM A/P OPEN | A/P 20070504 | 8 | | 7,951.10 | | |
| 11 | 5/31/2007 | C POSTED FROM A/P OPEN | A/P 20070504 | 6 | | 5,985.00 | | |
| 11 | 5/31/2007 | C POSTED FROM A/P OPEN | A/P 20070508 | 20 | | 12,618.90 | | |
| 11 | 5/31/2007 | C POSTED FROM A/P OPEN | A/P 20070515 | 12 | | 158,252.22 | | |
| 11 | 5/31/2007 | C POSTED FROM A/P OPEN | A/P 20070523 | 12 | | 21,019.50 | | |
| 11 | 5/31/2007 | C POSTED FROM A/P OPEN | A/P 20070529 | 16 | | 9,507.50 | | |
| 12 | 6/30/2007 | P POSTED FROM A/P OPEN | A/P 20070605 | 16 | | 16,023.50 | | |
| 12 | 6/30/2007 | P POSTED FROM A/P OPEN | A/P 20070608 | 14 | | 34,536.45 | | |
| 12 | 6/30/2007 | P POSTED FROM A/P OPEN | A/P 20070611 | 6 | | 6,512.50 | | |
| 12 | 6/30/2007 | P POSTED FROM A/P OPEN | A/P 20070615 | 4 | | 19,015.50 | | |
| 12 | 6/30/2007 | P POSTED FROM A/P OPEN | A/P 20070619 | 8 | | 4,425.25 | | |
| 12 | 6/30/2007 | P POSTED FROM A/P OPEN | A/P 20070622 | 10 | | 1,082.66 | | |
| 12 | 6/30/2007 | P POSTED FROM A/P OPEN | A/P 20070626 | 4 | | 15,606.13 | | |
| 12 | 6/30/2007 | P POSTED FROM A/P OPEN | | | | 5,400.00 | | |

|  | | | | | BAL FWD | DEBIT | CREDIT | END BAL |
|---|---|---|---|---|---|---|---|---|
| Net Change | | | | | 0.00 | 1,208,250.04 | 37,237.28- | 1,251,012.76 |
|  | | | | | | 1,251,012.76 | | 1,251,012.76 |

RU 2727

# SHLESINGER, ARKWRIGHT & GARVEY LLP

PATENT, TRADEMARK & COPYRIGHT LAW

ESTABLISHED 1950

1420 KING STREET
SUITE 600
ALEXANDRIA, VIRGINIA 22314

JAMES E. SHLESINGER
JOSEPHINE P. DE LION
MICHAEL M. ZADROZNY*
TERRENCE L H. BROWN*
DANIEL T. EARLE

OF COUNSEL
B. EDWARD SHLESINGER, JR.

*ADMITTED TO A BAR OTHER THAN VIRGINIA

GEORGE A. ARKWRIGHT (RET.)
GEORGE A. GARVEY (RET.)

TELEPHONE  (703) 684-5600
FAX  (703) 836-5288
FAX  (703) 836-5698
EMAIL  PATENTS@SAGLLP.COM

OUR REF. NO.

T-299/06

August 2, 2006

Southern Christian University
1200 Taylor Road
Montgomery, Alabama   36117

Attention:     Dr. Rex Turner

Re:     Service Mark Registrability Searches and Opinions
        TURNER UNIVERSITY
        REX UNIVERSITY
        REGIONS UNIVERSITY
        Our Docket No. T-299/2006

Dear Dr. Turner:

Further to prior telephone discussions and e-mail correspondence, and confirming our e-mail, dated July 27, 2006, we conducted searches of the trademark records at the United States Patent and Trademark Office in an effort to determine registrability of each of the above-identified marks, with use in association with educational services at the post-secondary level.

Our searches developed the following trademarks, copies enclosed:

A.    Service Mark – **TURNER UNIVERSITY**:

TURNER & DESIGN            2,013,135
TURNER LEARNING
& DESIGN                  2,268,183
TURNER HILL               2,527,970

RU 3635

Exhibit 501

Southern Christian University
August 2, 2006
Page -2-

|                                      |            |
|--------------------------------------|------------|
| TURNER SOUTH                         | 2,605,159  |
| TURNER KNOWLEDGE NETWORK             | 3,066,274  |
| TURNER ADVENTURE LEARNING            | 1,999,110  |

B.    Service Mark - **REX UNIVERSITY**:

|                              |            |
|------------------------------|------------|
| REX READER                   | 2,894,999  |
| REX READER                   | 76/078,467 |
| MOTHER T-REX ADVENTURES      | 76/544,634 |
| REX RIGHT & DESIGN           | 2,566,454  |
| MIDAS REX                    | 1,563,872  |
| IREX                         | 79/016,734 |
| MULTITREX (STYLIZED)         | 78/913,083 |
| REX ROUNDTABLES FOR EXECUTIVES | 78/585,097 |
| REXCOR                       | 75/717,997 |
| REXIS                        | 74/038,909 |
| TREX                         | 2,937,507  |
| EUREX                        | 2,941,068  |
| REXLINK                      | 2,376,763  |
| RMX                          | 79/018,518 |
| REX MAGAZINE                 | 78/234,273 |

C.    Service Mark - **REGIONS UNIVERSITY**:

|                                           |            |
|-------------------------------------------|------------|
| REGION 4 EDUCATED SOLUTIONS & DESIGN      | 78/787,111 |
| REGIONS CHARITY CLASSIC                   | 78/868,133 |
| BIOCONNEX CONNECTING THE REGION'S BIOTECH COMMUNITY & DESIGN | 3,115,769 |
| REGIONAL CONNECTS                         | 3,087,626  |

RU 3636

Southern Christian University
August 2, 2006
Page -3-

| | |
|---|---|
| NORTH CENTRAL REGIONAL EDUCATION LABORATORY | 2,692,034 |
| REGIONAL LEADERSHIP INSTITUTE | 2,791,070 |
| UNIVERSITAS REGISIANA | 3,100,077 |
| REGIS UNIVERSITY | 3,081,812 |
| REGENT UNIVERSITY & DESIGN | 1,682,259 |
| REGENTS OF THE UNIVERSITY OF MINNESOTACOMMUNE VINCULUM OMNIBUS ANTIBUS & DESIGN | 1,163,131 |
| REGAL UNIVERSITY | 3,074,386 |
| REGIS COLLEGE AND ADVANTAGE PROGRAM | 2,749,900 |

## O P I N I O N

As you have been previously advised, we are of the opinion that the marks, REX UNIVERSITY, and, REGIONS UNIVERSITY, are registrable with the United States Patent and Trademark Office. Assuming you adopt one or more of these marks, we recommend that you proceed with applications at this time.

For a single class application, our cost to prepare and file the Application is ▓▓▓▓▓▓.  The government filing fee is $325.00.  For your consideration, a single application would cover educational services.  It would not cover, however, products or merchandise incidental to the services.  Thus, for example, if you wish to protect the mark for clothing, you would need to file a separate application to cover the clothing classification of goods.

If you wish to proceed with an application, kindly advise if the ownership of the mark is different from the registration issued for the mark, SOUTHERN CHRISTIAN UNIVERSITY.  If the owner is different, we would need the exact corporate name, state of incorporation, and principal place of business.

RU 3637

Southern Christian University
August 2, 2006
Page Two

Finally, please feel free to give me a call to discuss any aspect of the application, including broadening the scope of services or goods associated with the mark at issue.

Our statement for services is also enclosed.  If you have any questions, please advise.

Very truly yours,


James E. Shlesinger

JES/ds                    SHLESINGER, ARKWRIGHT & GARVEY LLP
Enclosures

RU 3638





| | |
|---|---|
| **Word Mark** | TURNER |
| **Goods and Services** | IC 041. US 100 101 107. G & S: television programming. FIRST USE: 19700101. FIRST USE IN COMMERCE: 19700101 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 26 11 27 : Oblongs |
| **Serial Number** | 74640752 |
| **Filing Date** | February 28, 1995 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | August 13, 1996 |
| **Registration Number** | 2013135 |
| **Registration Date** | November 5, 1996 |
| **Owner** | (REGISTRANT) Turner Broadcasting System, Inc. CORPORATION GEORGIA One CNN Center Box 105366 Atlanta GEORGIA 303485366 |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

RU 3639

Trademark Electronic Search System (TESS)

Page 1 of 1



| | |
|---|---|
| **Word Mark** | TURNER LEARNING |
| **Goods and Services** | IC 041. US 100 101 107. G & S: Production of educational television programs and live television presentations designed specifically for school use to help students learn about current events, science, business, geography and global affairs. FIRST USE: 19970211 FIRST USE IN COMMERCE: 19970211 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 24.17.25 - Biohazard symbol; Degree sign; Equal sign; Greater than symbol (mathematical); Handicapped symbol; Hazardous materials symbol; Less than symbol (mathematical); Peace symbol; Pound sign (#); Recycling symbol; Yin Yang symbol 26.11.21 - Rectangles that are completely or partially shaded |
| **Serial Number** | 75335019 |
| **Filing Date** | August 4, 1997 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | May 18, 1999 |
| **Registration Number** | 2268183 |
| **Registration Date** | August 10, 1999 |
| **Owner** | (REGISTRANT) Turner Learning, Inc. CORPORATION GEORGIA One CNN Center Box 105366 Atlanta GEORGIA 303480366 |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

RU 3640

Trademark Electronic Search System (TESS)

Page 1 of 1

## Typed Drawing

| | |
|---|---|
| **Word Mark** | TURNER HILL |
| **Goods and Services** | IC 041. US 100 101 107. G & S: Recreational facility services, namely provision of cross-country skiing trails, hiking trails, tennis courts, golf course, health club facilities. FIRST USE: 20010501. FIRST USE IN COMMERCE: 20010501 |
| | IC 042. US 100 101. G & S: Resort hotel services, providing general purpose conference facilities and health spa facilities. FIRST USE: 19970600. FIRST USE IN COMMERCE: 19970600 |
| | IC 037. US 100 103 106. G & S: real estate development. FIRST USE: 20010601. FIRST USE IN COMMERCE: 20010601 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Design Search Code** | |
| **Serial Number** | 75637045 |
| **Filing Date** | February 10, 1999 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | May 2, 2000 |
| **Registration Number** | 2527970 |
| **Registration Date** | January 8, 2002 |
| **Owner** | (REGISTRANT) Turner Hill Preservation Associates, LLC LTD LIAB CO MASSACHUSETTS 306 Dartmouth Street Boston MASSACHUSETTS 02116 |
| **Attorney of Record** | ROBERT M. O'CONNELL JR |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

RU 3641

Trademark Electronic Search System (TESS)

## Typed Drawing

| | |
|---|---|
| **Word Mark** | TURNER SOUTH |
| **Goods and Services** | IC 041. US 100 101 107. G & S: entertainment and education services in the nature of television and computer on-line programming distributed via cable and broadcast television, radio and the global information services network. FIRST USE: 19991001. FIRST USE IN COMMERCE: 19991001 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Design Search Code** | |
| **Serial Number** | 75634965 |
| **Filing Date** | February 5, 1999 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | August 28, 2001 |
| **Registration Number** | 2605159 |
| **Registration Date** | August 6, 2002 |
| **Owner** | (REGISTRANT) TURNER REGIONAL ENTERTAINMENT NETWORK, INC. CORPORATION GEORGIA TURNER BROADCASTING SYSTEM, INC. ONE CNN CENTER, BOX 105573 ATLANTA GEORGIA 30348

(LAST LISTED OWNER) TURNER ENTERTAINMENT NETWORKS, INC. CORPORATION GEORGIA ONE CNN CENTER, 13 NORTH C/O TURNER BROADCASTING SYSTEM, INC. ATLANTA GEORGIA 30303 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Cathy Hampton |
| **Prior Registrations** | 1960664;1950985;2007595;2013135;2073516;AND OTHERS |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SOUTH" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

RU 3642



Trademark Electronic Search System (TESS)

Page 1 of 1

## Typed Drawing

| | |
|---|---|
| **Word Mark** | TURNER KNOWLEDGE NETWORK |
| **Goods and Services** | IC 037. US 100 103 106. G & S: Providing computer hypertext links to the websites of others via the Internet featuring construction management and building construction information; providing databases in the fields of building construction and construction management services; and providing online information and news in the field of construction. FIRST USE: 20020501. FIRST USE IN COMMERCE: 20020501

IC 041. US 100 101 107. G & S: Educational services, namely, providing training in the fields of construction, insurance, financial, mechanical and electrical industries. FIRST USE: 20020501. FIRST USE IN COMMERCE: 20020501 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Design Search Code** | |
| **Serial Number** | 76378599 |
| **Filing Date** | March 6, 2002 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | March 2, 2004 |
| **Registration Number** | 3066274 |
| **Registration Date** | March 7, 2006 |
| **Owner** | (REGISTRANT) Turner Corporation, The CORPORATION DELAWARE Bank of America Plaza 901 Main Street, Suite 4900 Dallas TEXAS 75202 |
| **Attorney of Record** | Diane K. Lettelleir, Esq. |
| **Prior Registrations** | 2380945;2380949;2440011 |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "NETWORK" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

RU 3643

Trademark Electronic Search System (TESS)                                    Page 1 of 1

## Typed Drawing

| | |
|---|---|
| **Word Mark** | TURNER ADVENTURE LEARNING |
| **Goods and Services** | (CANCELLED) IC 041. US 100 101 107. G & S: education and entertainment, namely developing, producing and providing electronic field trips which are telecast via cable or satellite and which are supported by computer on line services, manuals and workbooks. FIRST USE: 19940518. FIRST USE IN COMMERCE: 19940518 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Design Search Code** | |
| **Serial Number** | 74601963 |
| **Filing Date** | November 22, 1994 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | June 18, 1996 |
| **Registration Number** | 1999110 |
| **Registration Date** | September 10, 1996 |
| **Owner** | (REGISTRANT) Turner Educational Services, Inc. CORPORATION GEORGIA One CNN Center Box 105366 Atlanta GEORGIA 303485366 |
| **Attorney of Record** | Monica Valencia Franklin |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "LEARNING" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | DEAD |
| **Cancellation Date** | June 14, 2003 |

RU 3644

*** User: tms18    *** Ser 1 Number: 76557905 *** 15.2006 9:41:24 AM ***

(Typed Drawing)

Mark
    RFX READER

Goods and Services
    IC  041.  US 100 101 107.  G & S: EDUCATIONAL SERVICES, NAMELY PROVIDING
    ELEMENTARY LEVEL READING ACTIVITIES AND GAMES, OFFERED ON THE INTERNET,
    TO ENHANCE THE READING SKILLS OF THE PARTICIPANT.  FIRST USE: 20031009.
    FIRST USE IN COMMERCE: 20031009

Mark Drawing Code
    (1) TYPED DRAWING

Serial Number
    76557905

Filing Date
    October 24, 2003

Current Filing Basis
    1A

Original Filing Basis
    1A

Publication for Opposition Date
    July 27, 2004

Registration Number
    2894999

Registration Date
    October 19, 2004

Owner Name and Address
    (REGISTRANT) Sylvan Learning, Inc. CORPORATION MARYLAND 1000 Lancaster
    Street Baltimore MARYLAND 21202

Type of Mark
    SERVICE MARK

Register
    PRINCIPAL

Live Dead Indicator
    LIVE

Attorney of Record
    Mark B. Harrison

*** Search: 2 *** Document Number: 15 ***

**RU 3645**

*** User: tms18    *** Ser l Number: 76078467 ***    5/2006 9:41:25 AM ***

(Typed Drawing)

Mark
     RFX READER

Goods and Services
     (ABANDONED) IC 041. US 100 101 107. G & S: EDUCATIONAL SERVICES,
     NAMELY, PROVIDING ELEMENTARY LEVEL READING ACTIVITIES AND GAMES, OFFERED
     ON A GLOBAL COMPUTER NETWORK, TO ENHANCE THE READING SKILLS OF THE
     PARTICIPANT. FIRST USE: 19990421. FIRST USE IN COMMERCE: 19990421

Mark Drawing Code
     (1) TYPED DRAWING

Serial Number
     76078467

Filing Date
     June 27, 2000

Current Filing Basis
     1B

Original Filing Basis
     UNKNOWN

Publication for Opposition Date
     September 17, 2002

Owner Name and Address
     (APPLICANT) Sylvan Learning Systems, Inc. CORPORATION MARYLAND 1000
     Lancaster Street Baltimore MARYLAND 21202

Assignment Recorded
     ASSIGNMENT RECORDED

Disclaimer Statement
     NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "READER" APART FROM THE
     MARK AS SHOWN

Type of Mark
     SERVICE MARK

Register
     PRINCIPAL

Live Dead Indicator
     DEAD

Abandonment Date
     December 8, 2003

Attorney of Record
     MARK HARRISON

*** Search: 2 *** Document Number: 20 ***

**RU 3646**

*** User: tms16   *** Serial Number: 76544634   ***   15/2006 9:41:25 AM   ***

(Typed Drawing)

Mark
    MOTHER TIPPY ADVENTURES

Goods and Services
    IC 041   US 100 101 107.   G & S: Educational services, namely providing
    courses of instruction at various levels from preschool through high
    school; entertainment services, namely, organizing and conducting student
    sporting, music and dance events

Mark Drawing Code
    (1) TYPED DRAWING

Serial Number
    76544634

Filing Date
    September 15, 2003

Current Filing Basis
    1B

Original Filing Basis
    1B

Publication for Opposition Date
    June 8, 2004

Owner Name and Address
    (APPLICANT) Dawson, John INDIVIDUAL UNITED STATES 9331B Katy Freeway PMB
    132 Houston TEXAS 77024

Type of Mark
    SERVICE MARK

Register
    PRINCIPAL

Live Dead Indicator
    LIVE

Attorney of Record
    ELIZABETH R HALL

*** Search: 2 *** Document Number: 16 ***

RU 3647



\*\*\* Usaba trade \*\*\* Sac  Number: 75817424 \*\*\*     10 2006 9:41:25 AM \*\*\*



Mark
     REX RIGHT

Goods and Services
     IC  016.  US 002 005 022 023 029 037 038 050.  G & S: NOTEBOOKS FOR
     ORGANIZING AND STORING PAPERWORK ASSOCIATED WITH THE DISPENSING OF
     CONTROLLED SUBSTANCES; AND PRINTED EDUCATIONAL BROCHURES TEACHING THE
     DISPENSING OF CONTROLLED SUBSTANCES.  FIRST USE: 19981026.  FIRST USE IN
     COMMERCE: 19981026

     IC  041.  US 100 101 107.  G & S: PROVIDING EDUCATIONAL INFORMATION TO
     PHARMACIES INSTRUCTING A) HOW TO COMPLY WITH US DRUG ENFORCEMENT AGENCY
     REGULATIONS CONCERNING CONTROLLED SUBSTANCES, AND B) HOW TO DISPENSE
     CONTROLLED SUBSTANCES.  FIRST USE: 19981026.  FIRST USE IN COMMERCE:
     19981026

Mark Drawing Code
     (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS

Design Code
     02.01.31    Men, stylized, including men depicted in caricature form
     26.01.03    Circles, plain single line; Plain single line
     circles

Ser Al Number
     75817494

Filing Date
     October 7, 1999

Current Filing Basis

\*\*\* Section: 2 \*\*\* Document Number: 26 \*\*\*

**RU 3648**

(cont)

** User: cmslR  *** Serial Number: 75817484 ***

1A

Current Filing Basis
1A

Publication for Opposition Date
February 12, 2002

Registration Number
2566454

Registration Date
May 7, 2002

Owner Name and Address
(REGISTRANT) Mallinckrodt Inc. CORPORATION DELAWARE 675 McDonnell
Boulevard P.O. Box 5840 St. Louis MISSOURI 63134

Type of Mark
TRADEMARK.   SERVICE MARK

Register
PRINCIPAL

Live Dead Indicator
LIVE

Attorney of Record
Jeffrey S. Boone

*** User: hrs19   ***   Ser  1 Number: 73778773  ***   D 2005 9:41:26 AM ***

[Typed Drawing]

Mark
    MIDAS REX

Goods and Services
    IC  041.  US 100 101 107.  G & S: EDUCATIONAL SERVICES, NAMELY,
    CONDUCTING SEMINARS AND HANDS-ON WORKSHOPS IN THE FIELD OF [ POSTGRADUATE
    ] NEUROSURGERY, BONE DISSECTION, CRANIAL SURGERY, FACIAL SURGERY, SPINAL
    SURGERY, BIOPLASTICS AND BIOMETALS.  FIRST USE: 19800900.  FIRST USE IN
    COMMERCE: 19800900

Mark Drawing Code
    (1) TYPED DRAWING

Serial Number
    73778773

Filing Date
    February 6, 1989

Current Filing Basis
    1A

Original Filing Basis
    1A

Publication for Opposition Date
    August 8, 1989

Registration Number
    1563872

Registration Date
    October 31, 1989

Owner Name and Address
    (REGISTRANT) MIDAS REX PNEUMATIC TOOLS, INC. CORPORATION TEXAS P.O. BOX
    911001 FORT WORTH TEXAS 76111

    (LAST LISTED OWNER) MEDTRONIC, INC. CORPORATION MINNESOTA 710 MEDTRONIC
    PARKWAY MINNEAPOLIS MINNESOTA 554325604

Assignment Recorded
    ASSIGNMENT RECORDED

Prior Registration(s)
    1435578

Type of Mark
    SERVICE MARK

Register
    PRINCIPAL

**RU 3650**

*** Search: 2 *** Document Number: 45 ***

(cont.)

** User: UNSIR   *** Serial Number: 74735773 ***

Affidavit Text
      SECT 15    SECT 8  & YRS.

Live Dead Indicator
      LIVE

Attorney of Record
      JAMES E. BRADLEY

*** USPTO TESS *** Serial Number: 79015734 ***

Type of Mark
        TRADEMARK   SERVICE MARK

Register
        PRINCIPAL

Live/Dead Indicator
        LIVE

*** Search: 6 *** Document Number: 1 ***

RU 3653

*** User: tasl6  *** Ser: ? Number: 78913083  ***    16/2006 9:48:45 AM ***

# MULTITREX®

Mark
    MULTITREX

Goods and Services
    IC 016.  US 002 005 022 023 029 037 039 050.  G & S: Workbooks directed
    to adult vocational **education**.  FIRST USE: 19981101.  FIRST USE IN
    COMMERCE: 19981101

Mark Drawing Code
    (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM

Serial Number
    78913083

Filing Date
    June 21, 2006

Current Filing Basis
    1A

Original Filing Basis
    1A

Owner Name and Address
    (APPLICANT) Goodwill Industries of Northern Illinois, Inc. NON-PROFIT
    CORPORATION ILLINOIS 1907 Kishwaukee St. Rockford ILLINOIS 611048121

Prior Registration(s)
    2224511

Description of Mark
    The mark consists of The word MULTITREX in capital letters..

Type of Mark
    TRADEMARK

RU 3654

*** Search: 6 *** Document Number: 2 ***                    (cont)

*** User: tmslB    *** Serial Number: 78913083 ***

Register
    PRINCIPAL

Live Dead Indicator
    LIVE

*** Search: 6 *** Document Number: 2 ***

RU 3655

*** User: tmsl8   *** Ser  l Number: 78585097 ***   05/2006 9:48:45 AM ***

# REX ROUNDTABLES
# FOR EXECUTIVES

Mark
    REX ROUNDTABLES FOR EXECUTIVES

Goods and Services
    IC 041.  US 100 101 107.  G & S: **EDUCATION** SERVICES, NAMELY,
    CONDUCTING ROUND TABLE EDUCATIONAL CONFERENCES FOR EXECUTIVES.  FIRST
    USE: 20040420.  FIRST USE IN COMMERCE: 20040420

Standard Characters Claimed
    STANDARD CHARACTERS CLAIMED

Mark Drawing Code
    (4) STANDARD CHARACTER MARK

Serial Number
    78585097

Filing Date
    March 11, 2005

Current Filing Basis
    1A

Original Filing Basis
    1A

Owner Name and Address
    APPLICANT: UT2, Inc CORPORATION CALIFORNIA 13920 Olive Mesa Court Poway
    CALIFORNIA 92064

Disclaimer Statement
    NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE ROUNDTABLES FOR EXECUTIVES
    APART FROM THE MARK AS SHOWN

Type of Mark
    SERVICE MARK

Register
    PRINCIPAL

*** Search:  d *** Document Number:  4 ***

RU 3656

(cont)

*** User: hms18    *** Serial Number: 78585097 ***

Live Dead Indicator
    LIVE

Attorney of Record
    Christopher J. Day

*** Search: 6 *** Document Number: 4 ***

User: tmsl8   ***   Ser  l Number: 75717997   ***   10/2/06 9:48:45 AM   ***

Mark                          (Typed Drawing)

    REXCUB

Goods and Services
    (ABANDONED) IC  016.  US 002 005 022 023 029 037 038 050.  G & S: Paper
    and paper articles, namely, writing paper, construction paper, craft
    paper, wrapping paper, loose leaf paper; trading cards; stationery; paper
    and cardboard cut-out figures for use as wall decorations; paper and
    cardboard cut-out figures for educational purposes; gift wrapping paper;
    paper party goods, namely, paper party bags, paper party decorations,
    paper party hats; paper cake decorations; pictures, photographic prints,
    mounted photographs, unmounted photographs, posters and art
    reproductions; publications, namely, magazines for children's **education**
    and entertainment: books, namely, picture books, children's activity
    books, notebooks, scrap books, diaries, composition books, telephone and
    address books, coloring and children's books, loose leaf binders; photo
    and stamp albums; paper banners; cartoons, namely, cartoon prints,
    newspaper cartoons; newspaper comic strips; series of comic books;
    bulletin boards; blackboards; clip boards; calendars; pens and pencils;
    pen and pencil boxes and cases; erasers; markers; crayons; chalk; paper
    staplers; arts and crafts paint kits; art paper; crepe paper; painting
    sets for children; easels; paint brushes; appliques in the form of
    decals; greeting, note, blank and playing cards; writing and note paper
    and pads; book covers, book marks; desk sets; desk top organizers; paper
    napkins; paper place mats; paper bags; paper and cardboard boxes; decals,
    stickers, bumper stickers; table linens made of paper; bathroom and
    facial tissues; plastic place mats and rubber stamps

Mark Drawing Code
    (1) TYPED DRAWING

Serial Number
    75717997

Filing Date
    May 28, 1999

Current Filing Basis
    1B

Original Filing Basis
    1B

Publication for Opposition Date
    November 23, 1999

Owner Name and Address
    (APPLICANT) Fox Family Properties, Inc. CORPORATION DELAWARE 10960
    Wilshire Boulevard Los Angeles CALIFORNIA 90024

Type of Mark
    TRADEMARK

**RU 3658**

*** Search: 6 *** Document Number: 75 ***

(Cont'd)

*** User: tms18    *** Serial Number: 75717397 ***

Register
        PRINCIPAL

Live Dead Indicator
        DEAD

Abandonment Date
        June 10, 2002

Attorney of Record
        Angela Small

*** Search: 6 *** Document Number: 15 ***

RU 3659

*** User: tmsl8    ***    Ser l Number: 74038909  ***    ?5/2006 3:48:46 AM  ***

                                    (Typed Drawing)
Mark
        NEXIS

Goods and Services
        (ABANDONED) IC  038.  US 104.  G & S: research, **education**, licensing
        and training related to an electronic multi dimensional reference system

Mark Drawing Code
        (1) TYPED DRAWING

Serial Number
        74038909

Filing Date
        March 16, 1990

Current Filing Basis
        1B

Original Filing Basis
        1B

Owner Name and Address
        (APPLICANT) Filley & Company, Inc. CORPORATION NEW JERSEY Somerset
        Airport Bedminster NEW JERSEY 07921

Type of Mark
        SERVICE MARK

**Register**
        PRINCIPAL

Live Dead Indicator
        DEAD

Abandonment Date
        January 12, 1991

Attorney of Record
        Eliot S. Gerber

RU 3660

*** User: tms19 *** Serial Number: 76578679 ***    25/2006 9:31:24 AM ***

# TREX

Mark
     TREX

Goods and Services
     IC  016.  US 002 005 022 023 029 037 038 050.  G & S: Printed matter, namely brochures, pamphlets, and magazines in the field of composite building materials.  FIRST USE: 19940525.  FIRST USE IN COMMERCE: 19940525

     IC  035.  US 100 101 102.  G & S: Providing **online** product, technical, and warranty information concerning composite building materials; providing on-line warranty registration services; and providing on-line directory information services of suppliers, dealers, and contractors featuring hyperlinks to other websites.  FIRST USE: 19961118.  FIRST USE IN COMMERCE: 19961118

     IC  041.  US 100 101 107.  G & S: Providing on-line brochures, pamphlets and magazines featuring information relating to composite building materials.  FIRST USE: 19961118.  FIRST USE IN COMMERCE: 19961118

Standard Characters Claimed
     STANDARD CHARACTERS CLAIMED

Mark Drawing Code
     (4) STANDARD CHARACTER MARK

Serial Number
     76578679

Filing Date
     March 2, 2004

Current Filing Basis
     1A

Original Filing Basis
     1A

Publication for Opposition Date
     January 11, 2005

Registration Number
     2947507

*** Search: 7 *** Document Number: 17 ***

                                                            (cont)

**RU 3661**

*** User: tms18    *** Serial Number: 76578679 ***

Registration Date
       April 5, 2005

Owner Name and Address
       (REGISTRANT) Trex Company, Inc. CORPORATION DELAWARE 160 Exeter Drive
       Winchester VIRGINIA 226038605

Prior Registration(s)
       1881449;1938516;2325943;2336184;2470104;AND OTHERS

Type of Mark
       TRADEMARK.  SERVICE MARK

Register
       PRINCIPAL

Live Dead Indicator
       LIVE

Attorney of Record
       Naresh Kilaru

RU 3662

*** User: tms18  *** Serial Number: 76407098  ***     05/18/2006 9:51:24 AM ***

Mark                          (Typed Drawing)
        EUREX

Goods and Services
        IC  009.  US 021 023 026 036 038.  G & S: computer software for data
        processing in the field of stock exchanges, electronic stock exchanges,
        banking and financial clearinghouse services

        IC  016.  US 002 005 022 023 029 037 038 050.  G & S: printed matter and
        publications, namely, financial reports, brochures, newsletters, indexes
        and booklets pertaining to stock exchanges, stock indexes, option
        indexes, futures indexes, financial services, and banking services

        IC  036.  US 100 101 102.  G & S: Financial services, namely, conducting
        a stock exchange and electronic stock exchange; banking services;
        securities brokerage; financial brokerage; stock exchange quotation
        services; determination, calculating and providing information on stocks,
        options, and futures contract indexes; financial clearinghouse services;
        providing an **online** electronic database in the field of financial
        services, stock exchanges, electronic stock exchanges, banking and
        financial clearinghouse services

Mark Drawing Code
        (1) TYPED DRAWING

Serial Number
        76407098

Filing Date
        May 10, 2002

Current Filing Basis
        44E

Original Filing Basis
        1B;44E

Publication for Opposition Date
        July 20, 2004

Registration Number
        2941068

Registration Date
        April 19, 2005

Owner Name and Address
        (REGISTRANT) Deutsche Boerse AG CORPORATION FED REP GERMANY Neue
        Boersenstrasse 1 60487 Frankfurt am Main FED REP GERMANY

Type of Mark
        TRADEMARK.  SERVICE MARK

*** Search: 7 *** Document Number: 20 ***
                                                    (cont)

RU 3663

*** User: tms18    *** Serial Number: 76407098 ***

Register
        PRINCIPAL

Live Dead Indicator
        LIVE

Attorney of Record
        Susan M.  Freedman

*** Search: 7 *** Document Number: 20 ***

RU 3664

*** User: trs16   ***   Sec   Number: 75592517 ***      5/2006 9:51:25 AM  ...

Mark                                    (Typed Drawing)
      REXLINK

Pseudo Mark
      REXNORD LINK

Goods and Services
      IC 042. US 100 101. G & S: PROVIDING CUSTOMERS OF POWER TRANSMISSION
COMPONENTS WITH AN **ONLINE** SEARCHABLE DATABASE CONTAINING INFORMATION
ABOUT APPLICANT'S SERVICES AND GOODS, ORDERS FOR SUCH GOODS AND SERVICES,
AND MAINTENANCE AND REPAIR OF APPLICANT'S GOODS, ALL IN THE FIELD OF
POWER TRANSMISSION COMPONENTS; PROVIDING AN INTERACTIVE SEARCHABLE
DATABASE ON LOCAL AND GLOBAL COMPUTER NETWORKS THROUGH WHICH CUSTOMERS
OBTAIN ANSWERS TO QUESTIONS ABOUT APPLICANT'S SERVICES AND GOODS, ORDERS
FOR SUCH GOODS AND SERVICES, AND MAINTENANCE AND REPAIR OF APPLICANT'S
GOODS, ALL IN THE FIELD OF POWER TRANSMISSION COMPONENTS. FIRST USE:
19960908. FIRST USE IN COMMERCE: 19960908

      IC 035. US 100 101 102. G & S: ON-LINE RETAIL SERVICES FEATURING
POWER TRANSMISSION COMPONENTS, AND ALLOWING CUSTOMERS TO PLACE ORDERS
**ONLINE** FOR SUCH GOODS. FIRST USE: 19860908. FIRST USE IN COMMERCE:
19981120

Mark Drawing Code
      (1) TYPED DRAWING

Serial Number
      75592517

Filing Date
      November 20, 1998

Current Filing Basis
      1A

Original Filing Basis
      1A

Publication for Opposition Date
      May 23, 2000

Registration Number
      2376703

Registration Date
      August 15, 2000

Owner Name and Address
      (REGISTRANT) Rexnord Corporation CORPORATION DELAWARE 4701 West
Greenfield Avenue Milwaukee WISCONSIN 53214

Assignment Recorded
                                                              **RU 3665**
*** Search: 7 *** Document Number: 37 ***
                                                      (cont)

*** User: tms18    *** Serial Number: 75592517 ***

ASSIGNMENT RECORDED

Type of Mark
SERVICE MARK

Register
PRINCIPAL

Live Dead Indicator
LIVE

Attorney of Record
Dyann L. Kostello

*** Search: 7 *** Document Number: 37 ***

RU 3666

*** User: trsl9   *** Se:  1 Number: 79018518  ***   25/2006 9:53:35 AM ***



**Mark**

    RMX

**Goods and Services**

    IC  009.  US 021 023 026 036 038.  G & S: Scientific, photographic, cinematographic, optical, measuring, signaling, checking and teaching apparatus and instruments, namely self study manuals, software and/or hardware, trading simulation equipment, administration, data input, clearing and settlement simulation, testing, demonstration equipment; apparatus for recording, transmission or reproduction of sound and images; with programs and electronic handbooks, pre-recorded magnetic data carriers; cash registers, calculating machines, data processing equipments, namely input terminals and software, data viewing and administration hard and software, data transmission equipment, and computers

    IC  016.  US 002 005 022 023 029 037 038 050.  G & S: Paper, cardboards and goods made from these materials included in this class, namely hand books, newspapers, newsletters, brochures, books, flyers, pamphlets, posters, calendars, folders, certificates, stationery, forms, maps, business cards, post cards, paper bags; printed matter, namely hand books, newspapers, newsletters, brochures, books, flyers, pamphlets, posters, calendars, folders, certificates, stationery, forms, maps, business cards, post cards, paper bags, stickers; photographs; stationery; adhesives for stationery or household purposes; paint brushes; type writers and office requisites except furniture, namely pens, pencils, mouse pads, pin-boards and other promotional items; instructional and teaching materials except apparatus, namely hand books, brochures, books; printers type, printing blocks

    IC  035.  US 100 101 102.  G & S: Advertising; business management; business administration; office functions, rental of advertising space, including on the Internet, banner exchange; cost-price analysis; business inquiry; professional business and organizational consultancy; computerized file management; auctioneering, including on the Internet; business investigations; market research; opinion research; data search in computer files, namely search functionalities by different criteria such as price, different quality parameters, quantity among the offers made available on a system by third parties; search by different criteria in the files of individual persons; business inquiries; calculation of prices for goods and services; accountancy for electronic order and supply systems; organizing of commercial and business contacts, also by the Internet; compilation of data in computer databases; efficiency

*** Search: 10 *** Document Number: 1 ***

                                                  (cont)

expert opinions; business appraisals; data search in database and in the Internet for third parties, namely search functionalities by different criteria such as price, different quality parameters, quantity among the offers made available on a system by third parties; search by different criteria in the files of individual persons; search by different data of third persons, of credits input into the system, products traded on the exchange platform, trading activities, clearing and settlement data; data storage, namely of all data of third persons, of credits input into the system, products traded on the exchange platform, trading activities, clearing and settlement data

IC 036. US 100 101 102. G & S: Financial affairs, namely the business of the exchange, the business of a commodity exchange, the business of an exchange for the trading of loans and loan derivatives; monetary affairs, namely in connection with the clearing and settlement of transactions in relation with the above exchange business; clearing, namely the clearing of contracts listed at the exchange, the setting of margin, the determination of the forms in which margin, may be provided, the proscription of the clearing processes; financial clearing, namely the clearing of contracts listed at the exchange, the setting of margin, the determination of the forms in which margin may be provided, the proscription of the clearing processes; deposits of valuables, namely of cash, securities, bank guarantees and any other collateral deemed suitable as margin; brokerage of securities; financial information provided via the exchange's network, telecommunication equipment, the internet, print media, data vendors, electronic networks, radio and television, proprietary networks; financial consultancy; credit agencies; franchising services, namely transfer of financial know-how, namely with regard to the business model of the exchange

IC 038. US 100 101 104. G & S: Telecommunications, namely operation of a data transfer network; providing access to a worldwide computer network; providing access to information on the Internet by furnishing a web-site, utilizing the Internet for communication with third persons; collection and supply of news, namely the publication of price and turn over data for all trades at the exchange, information about the exchange, and its products and member firms; electronic mail services; web messaging

IC 041. US 100 101 107. G & S: **Education**, namely seminars, courses, tutorials, lectures, delivered in person or via print or electronic media, articles, instructions in the field of trading, administration, clearing and settlement, evaluation, hedging, risk management; providing of training in the field of trading, administration, clearing and settlement, evaluation, hedging, risk management; publication of printed matter in electronic form, also on the Internet; organization and arranging of conferences and seminars; **education** and further training of employees in the form of seminars, tutorials, coaching, lectures in the field of trading, administration, clearing and settlement, evaluation, hedging, risk management

IC 042. US 100 101. G & S: Design and development of computer hardware and software; consultancy services relating to computer hardware and software; updating of computer software; consultancy in the field of designing and developing of homepages; providing computer programs in data networks, namely a trading platform, programs for clearing and

(cont)

RU 3668

*** Upon: tms18    *** Serial Number: 79018518 ***

settlement, communication with and among third persons, input and
administration of loan data; rental and licensing of computer software
and data processing devices; rental and servicing of storage spaces,
namely of all data of third persons, of credits input into the system,
products traded on the exchange platform, trading activities, clearing
and settlement data, websites hosting for others; franchising services,
namely transfer of technical know-how, namely with regard to the business
model of the exchange; providing storage space in the Internet, namely of
all data of third persons, of credits input into the system, products
traded on the exchange platform, trading activities, clearing and
settlement data

Standard Characters Claimed
    STANDARD CHARACTERS CLAIMED

Mark Drawing Code
    (4) STANDARD CHARACTER MARK

Serial Number
    79018518

Filing Date
    July 29, 2005

Current Filing Basis
    66A

Original Filing Basis
    66A

Owner Name and Address
    (APPLICANT) RMX Risk Management Exchange AG Aktiengesellschaft (joint
    stock company) FED REP GERMANY Prinzenstrasse 17 30159 Hannover FED REP
    GERMANY

International Registration number(s)
    0870423

Priority Date
    February 1, 2005

Type of Mark
    TRADEMARK.  SERVICE MARK

Register
    PRINCIPAL

Live Dead Indicator
    LIVE

*** Search: 10 *** Document Number: 1 ***

RU 3669

*** User: bugis    *** Ser. Number: 78234273 ***    05/2006 13:17:39 AM ***

(Typed Drawing)

Mark
    BKK MAGAZINE

Goods and Services
    IC  016.  US 002 005 022 023 029 037 038 050.  G & S: Publications and
    printed matter namely, magazines, books, magazine supplements to
    newspapers and newsletters devoted to discussing issues related to
    general business and lifestyle topics

Mark Drawing Code
    (1) TYPED DRAWING

Serial Number
    **78234273**

Filing Date
    April 4, 2003

Current Filing Basis
    1B

Original Filing Basis
    1B

Publication for Opposition Date
    July 27, 2004

Owner Name and Address
    (APPLICANT) Booker Group, The S. Courtney Booker, III, a U.S. citizen
    SOLE PROPRIETORSHIP NEW YORK 155 west 118th street #1 new york NEW YORK
    10026

Disclaimer Statement
    NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "Magazine" APART FROM THE
    MARK AS SHOWN

Type of Mark
    TRADEMARK

Register
    PRINCIPAL

Live Dead Indicator
    LIVE

*** Search: 2 *** Document Number: 1 ***

RU 3670



| | |
|---|---|
| **Word Mark** | REGION 4 EDUCATED SOLUTIONS |
| **Goods and Services** | IC 041. US 100 101 107. G & S: Educational services, namely, conducting educational training for educators at primary and secondary level schools, and distributing course materials in connection therewith. FIRST USE: 20050300. FIRST USE IN COMMERCE: 20050300 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 01.03.05 - Apples |
| **Serial Number** | 78747111 |
| **Filing Date** | January 8, 2006 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Owner** | (APPLICANT) Region IV Education Service Center State Education Service Center TEXAS 7145 West Tidwell Houston TEXAS 770922096 |
| **Attorney of Record** | Chris D. Northcutt |
| **Description of Mark** | The mark consists of an outline of four apples in between region 4 and educated solutions |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

Trademark Electronic Search System (TESS) 

# Regions Charity Classic

| | |
|---|---|
| **Word Mark** | REGIONS CHARITY CLASSIC |
| **Goods and Services** | IC 041. US 100 101 107. G & S: Entertainment in the nature of a charity golf tournament. FIRST USE: 20051222. FIRST USE IN COMMERCE: 20051222 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Design Search Code** | |
| **Serial Number** | 76660133 |
| **Filing Date** | Apr. 24, 2006 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Owner** | (APPLICANT) Regions Asset Company CORPORATION DELAWARE Suite1212 300 Delaware Avenue Wilmington DELAWARE 19801 |
| **Attorney of Record** | Hope D. Mehlman |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

RU 3672





Connecting the Region's Biotech Community

| | |
|---|---|
| **Word Mark** | BIOCONNEX CONNECTING THE REGION'S BIOTECH COMMUNITY |
| **Goods and Services** | IC 041. US 100 101 107. G & S: Arranging and conducting educational, events, programs, workshops, conferences and seminars relative to the field of biotechnology; arranging for professional working groups that focus on issues relevant to biotechnology funding, administration and management; charitable services, namely, providing educational resources for biotechnology enterprises in the form of expertise, consultancy and information. FIRST USE: 20030917. FIRST USE IN COMMERCE: 20030917 |
| | IC 042. US 100 101. G & S: Providing information on the subject of scientific research in the field of biotechnology; design and maintenance of computer and websites for industry-specific regional, state, national and global information relevant to the biotechnology community. FIRST USE: 20030917. FIRST USE IN COMMERCE: 20030917 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 01.09.05 - Atomic models; Molecular models |
| **Serial Number** | 76627542 |
| **Filing Date** | January 10, 2005 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | January 17, 2006 |
| **Registration Number** | 3115769 |
| **Registration Date** | July 18, 2006 |
| **Owner** | (REGISTRANT) Center for Economic Growth, Inc. NOT-FOR-PROFIT CORPORATION NEW YORK 63 State Street Albany NEW YORK 12207 |
| **Attorney of Record** | Rosemary Weaver McKenna |
| **Description of Mark** | The color(s) black, green, yellow and gray is/are claimed as a feature of the mark. The mark is the word bioconnex in lower case type, with bio in black letters and connex in teal green letters. To the left of and overlapping the first letter is a molecular structure consisting of 3 teal green circles and one yellow circle connected by gray lines in a rhombus formation. |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

# REGIONAL CONNECTS

| | |
|---|---|
| **Word Mark** | REGIONAL CONNECTS |
| **Goods and Services** | IC 041. US 100 101 107. G & S: Conducting events for career development services for executive women in the food service industry. FIRST USE: 19950000. FIRST USE IN COMMERCE: 19950000 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Design Search Code** | |
| **Serial Number** | 78632222 |
| **Filing Date** | May 18, 2005 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | February 7, 2006 |
| **Registration Number** | 3087626 |
| **Registration Date** | May 2, 2006 |
| **Owner** | (REGISTRANT) Women's Foodservice Forum CORPORATION ILLINOIS 1550 West 82nd Street, Suite 650 Bloomington MINNESOTA 55431 |
| **Attorney of Record** | Liisa M. Thomas; Mary Hutchings Reed; Bryan Hildebrand; Brian Heidelberger, Sarah La Voi; Andrew P. Bridges; John C. Nishi; Jennifer A. Golinveaux; Matthew A. Scherb |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL-2(F) |
| **Live/Dead Indicator** | LIVE |

RU 3674

## Typed Drawing

Word Mark    NORTH CENTRAL REGIONAL EDUCATIONAL LABORATORY

Goods and    IC 009. US 021 023 026 036 038. G & S: Computer software and downloadable software from the
Services     Internet for use in educational services, namely, conducting seminars, workshops, conferences,
             training and classes in the field of education and distributing course material in connection therewith for
             educators, students, and researchers via the Internet or through a global computer network in the field
             of primary and secondary education for grades K-12 and college for a wide variety of subjects;
             prerecorded audio tapes featuring education, education research, technical assistance, teacher
             training, curriculum and instruction, school administration and education policy in the field of primary
             and secondary education for grades K-12 and college for a wide variety of subjects; prerecorded
             visual tapes featuring education, education research, technical assistance, teacher training, curriculum
             and instruction, school administration and education policy in the field of primary and secondary
             education for grades K-12 and college for a wide variety of subjects; multimedia software recorded on
             CD-ROM featuring education, education research, technical assistance, teacher training, curriculum
             and instruction, school administration and education policy in the field of primary and secondary
             education for grades K-12 and college for a wide variety of subjects; video discs featuring education,
             education research, technical assistance, teacher training, curriculum and instruction, school
             administration and education policy in the field of primary and secondary education for grades K-12
             and college for a wide variety of subjects; compact discs featuring education, education research,
             technical assistance, teacher training, curriculum and instruction, school administration and education
             policy in the field of primary and secondary education for grades K-12 and college for a wide variety of
             subjects; and digital video discs featuring education, education research, technical assistance, teacher
             training, curriculum and instruction, school administration and education policy in the field of primary
             and secondary education for grades K-12 and college for a wide variety of subjects, all for use in
             educational research, technical assistance for teachers and educational institutions or organizations,
             teacher training, educational publishing, teaching, and for use in management or policy assistance to
             educational institutions or organizations in the field of primary and secondary education for grades K-12
             and college for a wide variety of subjects. FIRST USE: 19891200. FIRST USE IN COMMERCE:
             19891200

             IC 016. US 002 005 022 023 029 037 038 050. G & S: Printed publications and printed matter, namely,
             magazines featuring education, curriculum and instruction, technology, education policy, education
             research, content area instruction and subject matter; newsletters featuring education, curriculum and
             instruction, technology, education policy, education research, content area instruction and subject
             matter; educational books featuring education, curriculum and instruction, technology, education policy,
             education research, content area instruction and subject matter; books featuring education, curriculum
             and instruction, technology, education policy, education research, content area instruction and subject
             matter; booklets featuring education, curriculum and instruction, technology, education policy,
             education research, content area instruction and subject matter; instructional manuals featuring
             education, curriculum and instruction, technology, education policy, education research, content area
             instruction and subject matter; printed research reports featuring education, curriculum and instruction,
             technology, education policy, education research, content area instruction and subject matter; printed
             research studies featuring education, curriculum and instruction, technology, education research,
             education policy, content area instruction and subject matter; printed guides featuring education,
             curriculum and instruction, technology, education policy, education research, content area instruction
             and subject matter; printed correspondence course materials featuring education, curriculum and
             instruction, technology, education policy, education research, content area instruction and subject
             matter; journals featuring education, curriculum and instruction, technology, education policy, education
             research, content area instruction and subject matter; treatises featuring education, curriculum and
             instruction, technology, education policy, education research, content area instruction and subject
             matter; leaflets featuring education, curriculum and instruction, technology, education policy, education
             research, content area instruction and subject matter; printed bulletins featuring education, curriculum
             and instruction, technology, education policy, education research, content area instruction and subject
             matter; printed curriculum featuring education, curriculum and instruction, technology, education policy,
             education research, content area instruction and subject matter; workbooks directed to education,
             curriculum and instruction, technology, education policy, education research, content area instruction
             and subject matter; printed brochures featuring education, curriculum and instruction, technology,
             education policy, education research, content area instruction and subject matter; training book
             materials featuring education, curriculum and instruction, technology, education policy, education
             research, content area instruction and subject matter; all for use by educators, students, and

**RU 3675**

for educators via the Internet or through a global computer network. FIRST USE: 19891200. FIRST USE IN COMMERCE: 19891200

IC 041. US 100 101 107. G & S: Education services, namely, conducting seminars, workshops, training, technical assistance, conferences, classes, in the field of education and distributing course material in connection therewith for educators, students, researchers via the Internet or through a global computer network. FIRST USE: 19891200. FIRST USE IN COMMERCE: 19891200

| | |
|---|---|
| Mark Drawing Code | (1) TYPED DRAWING |
| Design Search Code | |
| Serial Number | 76137522 |
| Filing Date | September 28, 2000 |
| Current Filing Basis | 1A |
| Original Filing Basis | 1A |
| Published for Opposition | December 10, 2002 |
| Registration Number | 2692034 |
| Registration Date | March 4, 2003 |
| Owner | (REGISTRANT) NORTH CENTRAL REGIONAL EDUCATIONAL LABORATORY NOT-FOR-PROFIT ILLINOIS 1120 EAST DIEHL ROAD SUITE 200 NAPERVILLE ILLINOIS 60523 |
| | (LAST LISTED OWNER) LEARNING POINT ASSOCIATES CORPORATION ILLINOIS 1120 EAST DIEHL ROAD, SUITE 200 NAPERVILLE ILLINOIS 60523 |
| Assignment Recorded | ASSIGNMENT RECORDED |
| Attorney of Record | Burton S. Ehrlich |
| Disclaimer | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "EDUCATIONAL LABORATORY" APART FROM THE MARK AS SHOWN |
| Type of Mark | TRADEMARK, SERVICE MARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

RU 3676

## Typed Drawing

| | |
|---|---|
| Word Mark | REGIONAL LEADERSHIP INSTITUTE |
| Goods and Services | IC 041. US 100 101 107. G & S: Educational services, namely, providing classes, conferences, courses, seminars and workshops in the field of leadership which services are designed to train future leaders for the Atlanta region. FIRST USE: 19910000. FIRST USE IN COMMERCE: 19910000 |
| Mark Drawing Code | (1) TYPED DRAWING |
| Design Search Code | |
| Serial Number | 76459742 |
| Filing Date | October 17, 2002 |
| Current Filing Basis | 1A |
| Original Filing Basis | 1A |
| Published for Opposition | September 30, 2003 |
| Registration Number | 2797070 |
| Registration Date | December 23, 2003 |
| Owner | (REGISTRANT) Atlanta Regional Commission STATE AGENCY GEORGIA 40 Courtland St NE Atlanta GEORGIA 30303 |
| Disclaimer | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "LEADERSHIP INSTITUTE" APART FROM THE MARK AS SHOWN |
| Type of Mark | SERVICE MARK |
| Register | PRINCIPAL-2(F) |
| Live/Dead Indicator | LIVE |

RU 3677



| | |
|---|---|
| **Word Mark** | UNIVERSITAS REGISIANA |
| **Translations** | The foreign wording in the mark translates into English as "Regis University." |
| **Goods and Services** | IC 041. US 100 101 107. G & S: Educational services, namely, providing courses of university instruction at the primary, secondary, collegiate, university and post-graduate and professional levels, and distribution of course material in connection therewith; Religious instruction services; Entertainment services, namely organizing and conducting athletic contests, exhibitions and lectures in a wide variety of subjects, live music concerts and theater productions. FIRST USE: 19010701. FIRST USE IN COMMERCE: 19010701 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Design Search Code** | |
| **Serial Number** | 78477521 |
| **Filing Date** | September 1, 2004 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | March 14, 2006 |
| **Registration Number** | 3100077 |
| **Registration Date** | June 6, 2006 |
| **Owner** | (REGISTRANT) Regis University NON-PROFIT CORPORATION COLORADO 3333 Regis Boulevard Denver COLORADO 802211099 |
| **Attorney of Record** | Charles F. Luce, Jr. |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "UNIVERSITAS" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

RU 3678



# REGIS UNIVERSITY

| | |
|---|---|
| **Word Mark** | REGIS UNIVERSITY |
| **Goods and Services** | IC 041. US 100 101 107. G & S: Educational services, namely, providing courses of university instruction at the primary, secondary, collegiate, university and post-graduate and professional levels, and distribution of course material in connection therewith; Religious instruction services; Entertainment services, namely organizing and conducting athletic contests and exhibitions, lectures, concerts and theater productions. FIRST USE: 19910701. FIRST USE IN COMMERCE: 19910701 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Design Search Code** | |
| **Serial Number** | 78477502 |
| **Filing Date** | September 1, 2004 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | January 24, 2006 |
| **Registration Number** | 3081812 |
| **Registration Date** | April 18, 2006 |
| **Owner** | (REGISTRANT) Regis University NON-PROFIT CORPORATION COLORADO 3333 Regis Boulevard Denver COLORADO 802211099 |
| **Attorney of Record** | CHARLES F LUCE JR |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "UNIVERSITY" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

RU 3679





| | |
|---|---|
| **Word Mark** | REGENT UNIVERSITY |
| **Goods and Services** | IC 041. US 107. G & S: educational services, namely, providing courses of study at the university level. FIRST USE: 19900101. FIRST USE IN COMMERCE: 19900101 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 24.01.02 - Shields or crests with figurative elements contained therein or superimposed thereon 24.09.07 - Advertising banners; Banners 24.11.01 - Crowns closed at the top |
| **Serial Number** | 74112380 |
| **Filing Date** | November 5, 1990 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | January 14, 1992 |
| **Registration Number** | 1682259 |
| **Registration Date** | April 7, 1992 |
| **Owner** | (REGISTRANT) REGENT UNIVERSITY NON-STOCK CORPORATION VIRGINIA 1000 Regent University Drive Virginia Beach VIRGINIA 234649000 |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "UNIVERSITY" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20020613 |
| **Renewal** | 1ST RENEWAL 20020613 |
| **Live/Dead Indicator** | LIVE |

RU 3680





| | |
|---|---|
| **Word Mark** | REGENTS OF THE UNIVERSITY OF MINNESOTA COMMUNE VINCULUM OMNIBUS ANTIBUS |
| **Goods and Services** | IC 041. US 107. G & S: Educational Services-Namely, Providing Instruction at the University Level FIRST USE: 19390509. FIRST USE IN COMMERCE: 19390509 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 13 01 03 - Hurricane lamps; Lamps, hurricane; Lanterns (kerosene) 14 07 05 - Agricultural implements (non motorized), plows; Farm equipment, agricultural implements (non-motorized), plows; Plows, farm and garden, non-motorized 16 03 05 - Binoculars; Glasses, field; Microscopes; Opera glasses, Telescopes 20 01 04 - Blackboards; Boards, bulletin; Boards, clip; Boards, drawing; Boards, memo, Bulletin and directory boards; Chalk boards; Clip boards; Clipboards; Easels; Memo boards, Palettes 20 03 01 - Paper with furled, fringed or scalloped edges 20 03 02 - Foil, aluminum (rolls); Gift wrapping paper (rolls); Paper towels (rolls), Paper, gift wrapping (rolls); Paper, rolls; Paper, toilet; Scrolls ; Toilet paper; Towels, rolls of paper towels; Wallpaper, rolled 24 01 02 - Shields or crests with figurative elements contained therein or super imposed thereon 24 05 01 - Circular or elliptical seals; Seals, circular or elliptical |
| **Serial Number** | 73236244 |
| **Filing Date** | October 22, 1979 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | May 5, 1981 |
| **Registration Number** | 1163131 |
| **Registration Date** | July 28, 1981 |
| **Owner** | (REGISTRANT) Regents of the University of Minnesota CORPORATION MINNESOTA 600 MCNAMARA CENTER 200 OAK ST., S.E. Minneapolis MINNESOTA 55455 |
| **Disclaimer** | The Latin words in the mark on the drawing, "Commune Vinculum - Omnibus Antibus" mean "A Common Bond For All The Arts" and, for the purposes of registration, no claim is made to the exclusive right to use these words apart from the mark as shown in the drawing; but the applicant waives none of its common law rights in said feature of the mark |
| **Description of Mark** | The lining and/or stippling shown in the mark on the drawing is a feature of the mark, and, does not indicate color, but the applicant waives none of its common law rights in said feature of the mark |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20010921 |
| **Renewal** | 1ST RENEWAL 20010921 |
| **Live/Dead Indicator** | LIVE |

RU 3681

# Regal University

| | |
|---|---|
| **Word Mark** | REGAL UNIVERSITY |
| **Goods and Services** | IC 041. US 100 101 107. G & S: Education services in the nature of courses at the university level. FIRST USE: 20011109. FIRST USE IN COMMERCE: 20011109 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Design Search Code** | |
| **Serial Number** | 78337905 |
| **Filing Date** | December 8, 2003 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | October 19, 2004 |
| **Registration Number** | 3074386 |
| **Registration Date** | March 28, 2006 |
| **Owner** | (REGISTRANT) Omniworld, Inc. CORPORATION ILLINOIS 3706 Burrmont Rd. Rockford ILLINOIS 61107 |
| **Prior Registrations** | 2230131;2230102;AND OTHERS |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "University" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

RU 3682

Typed Drawing

| | |
|---|---|
| Word Mark | REGIS COLLEGE ADVANTAGE PROGRAM |
| Goods and Services | IC 041. US 100 101 107. G & S: Educational services, namely, providing courses of instruction at the college level and distributing course material in connection therewith. FIRST USE: 20020804. FIRST USE IN COMMERCE: 20020804 |
| Mark Drawing Code | (1) TYPED DRAWING |
| Design Search Code | |
| Serial Number | 76439484 |
| Filing Date | August 12, 2002 |
| Current Filing Basis | 1A |
| Original Filing Basis | 1A |
| Published for Opposition | May 20, 2003 |
| Registration Number | 2749900 |
| Registration Date | August 12, 2003 |
| Owner | (REGISTRANT) Regis College CORPORATION MASSACHUSETTS 235 Wellesley Street Weston MASSACHUSETTS 024931571 |
| Attorney of Record | MAURICE J RINGEL |
| Disclaimer | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "COLLEGE ADVANTAGE PROGRAM" APART FROM THE MARK AS SHOWN |
| Type of Mark | SERVICE MARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

RU 3683

Date _____ Docket_____ _____
Person _Dr. The White_____ _____
Firm _____
Re: _800-351-4040_____ 9507__
(7905) __Dr. Turner_____
Search Type _____ _____ Auth. Amt._____
Report Date ____ _____ Phone___ _____
Remarks:

REGIONS UNIVERSITY

Back in Alabama
REGIONS BANK

Get on File, soon
3 brochures by
tomorrow File PRESS

RU 3684

Exhibit 502

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR   THE

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,          *
                                *
        Plaintiff,              *
                                *
Vs.                             *    CIVIL ACTION NUMBER
                                *
REGIONS UNIVERSITY, INC.,       *     2:06cv882-MHT
                                *
        Defendant.              *


        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


        Deposition of WILLIAM E. ASKEW, taken before

David Michael Camp, CSR, in the law offices of

Balch & Bingham, LLP, 1901 6th Avenue North,

Birmingham, Alabama, on August 2, 2007, commencing

at approximately 8:45 o'clock a.m.

William Askew                                          Victor Hudson

Page 2

1       A P P E A R A N C E S
2
3  For Plaintiff:
      STEPTOE & JOHNSON, LLP
4     Attorneys at Law
      1330 Connecticut Avenue
5     Washington, D.C. 20036
      (202) 429-3000
6     BY: WILLIAM G. PECAU
7
8
9  For Defendant:
      HUDSON & WATTS, L.L.P.
10    Attorneys at Law
      One St. Louis Centre, Suite 2500
11    Post Office Box 989
      Mobile, Alabama 36601
12    (251) 432-7200
      BY: VICTOR T. HUDSON
13
14
15
      Also present: REX A. TURNER, JR.
16
17     * * * * * * * * *
18
19
20
21
22
23

Page 3

1       I N D E X
2    Witness
      WILLIAM E. ASKEW
3
4      EXAMINATION
5  MR. HUDSON ............................. 6
   MR. PECAU ............................. 144
6  MR. HUDSON ............................. 148
7      * * * * * * * * *
8
9
10      EXHIBITS
11 DEFENDANT'S EXHIBIT ONE TWENTY-EIGHT ..... 66
   DEFENDANT'S EXHIBIT ONE TWENTY-NINE ...... 37
12 DEFENDANT'S EXHIBIT ONE THIRTY ........... 131
   DEFENDANT'S EXHIBIT ONE THIRTY-ONE ....... 131
13
       * * * * * * * * * *
14
15
16
17
18
19
20
21
22
23

Page 4

1       STIPULATION
2     It is stipulated by and between the parties
3  hereto and their respective attorneys at law that
4  the deposition on oral examination of the Witness,
5  WILLIAM E. ASKEW, may be taken before David
6  Michael Camp, Commissioner and Notary Public,
7  State of Alabama at Large, and that the said
8  deposition shall be taken in accordance with and,
9  when so taken, may be used in accordance with the
10 provisions of the Federal Rules of Civil
11 Procedure.
12    It is further stipulated and agreed that all
13 notices provided for by said Federal Rules of
14 Civil Procedure are waived, as is the reading over
15 of said deposition to or by the witness, the
16 signing thereof by the witness, the signing and
17 certification of said David Michael Camp, the
18 filing of said deposition with the Clerk of the
19 Court and all other requirements and
20 technicalities of every sort which would be a
21 prerequisite to the use of said deposition.
22    It is the intent of the parties hereto that
23 this deposition may be used in evidence as though

Page 5

1  all requirements of said Federal Rules of Civil
2  Procedure had been complied with.
3     It is further stipulated and agreed that all
4  parties hereto reserve the right to have
5  corrections made to this deposition as provided
6  for by said Federal Rules of Civil Procedure.
7     It is further stipulated and agreed that all
8  objections, save as to the form of the questions
9  asked and the responsiveness of the answers
10 thereto are reserved until the time of trial in
11 accordance with the provisions of said Federal
12 Rules of Civil Procedure.
13
14     * * * * * * * * * * *
15
16
17
18
19
20
21
22
23

2 (Pages 2 to 5)

William Askew                                                    Victor Hudson

Page 10

1  And/or.
2      A    Assisted me.  It's kind of a --
3      Q    Well, it's not meant to be a broad and
4  -- not meant to be a hard question.
5      A    We didn't have a committee, a
6  subcommittee of that group, if that's what you're
7  asking.
8      Q    Yeah.  And I asked it in the
9  alternative.  Were there individuals who also
10 participated in a more active way?
11     A    You're asking me something fourteen
12 years ago -- fifteen years.
13         MR. PECAU:
14             Just answer the questions the best
15             you can.
16         THE WITNESS:
17             If I understand your question, did
18             they -- were they working with me,
19             were they --
20 BY MR. HUDSON:
21     Q    No.
22     A    -- directly involved?  No.
23     Q    No.  That's not the question I was

Page 11

1  asking.  The question I was asking is, were there
2  certain individuals that took a particular
3  interest in the name and the logos and were
4  interacting more with you than others.
5         MR. PECAU:
6             I object to the question.  I just
7             object to the form of it.
8  BY MR. HUDSON:
9      Q    He can object to it but you still need
10 to answer it.
11     A    Okay.  No.  I -- I -- I developed it and
12 then I presented it to them.
13     Q    Is it fair to say that when you
14 presented it to them, they were enthusiastic and
15 proceeded from there?
16     A    Yes.
17     Q    Okay.  Now, when you presented it to
18 them, what did you say to them?  What ideas of
19 yours did you share with them?
20     A    I told them that if they liked it, we
21 still would have to -- it would be a long process
22 because we'd have to go and make sure that this --
23 it was not being used across the United States,

Page 12

1  we'd have to check every state.
2      We had a long process to go through to -- but
3  I said -- before I did that, I wanted to make sure
4  that they liked the name.
5      Q    All right.  Well, let's, if we may, go
6  to the "liked the name" first and the process
7  second.
8      A    Okay.
9      Q    When you described the name to them, did
10 you describe any attributes of the name that you
11 thought would make it attractive?
12     A    No.  It was -- it was just a good, solid
13 name that -- that had a good strong feel and a
14 good strong sense to them.  And so they all liked
15 it.  They liked the -- they liked the idea of the
16 name.
17     Q    Good strong feel about what?
18     A    Regions Bank.  Regions Financial
19 Corporation.  Regions.  It was a great name.
20     Q    Regions?
21     A    Regions.
22     Q    Well, it has a geographical connotation,
23 does it not?

Page 13

1         MR. PECAU:
2             Object to the form of the question.
3         THE WITNESS:
4             No.  That's part of the reason that
5             we liked it is because the other
6             names of banks, most of them had
7             "South" in the name.  That had
8             geographical connotations.  And we
9             -- we had visions of being more than
10            a southern bank.  We wanted to -- we
11            wanted to grow beyond -- we possibly
12            could grow beyond so we did not want
13            something that limited us
14            geographically.  So that's why we
15            picked Regions.  It specifically
16            avoided the "South" in the name for
17            that reason.
18 BY MR. HUDSON:
19     Q    And that would have been part of your
20 motivation in making that change?
21     A    No.  My motivation for making the change
22 was First Alabama Bank did not play well -- when
23 we First were in Alabama, it was the perfect

4  (Pages 10 to 13)

William Askew

Victor Hudson

**Page 14**

1  name. It was a great name. It was the best name
2  there was for a bank. First Alabama Bank. We had
3  wonderful name recognition.
4      But then when we went out of Alabama,
5  especially when we moved into Tennessee, Tennessee
6  did not like the name First Alabama Bank.
7      Q   When you moved out of Alabama and
8  Tennessee and then subsequent states, were you
9  moving into other regions of the country?
10     A   Sure. We moved to other parts of the
11 country, yes.
12     Q   And is that part of the connotation
13 that, in your mind, the name "Regions" had as
14 opposed to First Alabama?
15         MR. PECAU:
16         Object to the form of the question.
17         THE WITNESS:
18         It certainly has that, yes. I mean,
19         Regions speaks to -- anywhere you
20         are, it speaks to any market that
21         we're in, yeah.
22 BY MR. HUDSON:
23     Q   Were you familiar with the word

**Page 15**

1  "regions" prior to the time you thought it would
2  be a good name for your bank?
3      A   Yes. We had regions in our company. We
4  had the northern region, central region. We had
5  different regions in our company.
6      Q   And when did you first have those
7  different regions in your company?
8      A   They were formed early on. When I first
9  came into the company, almost twenty-four years
10 ago, it was soon after that that they developed
11 the regions.
12     Q   What, if anything, did you suggest be
13 done to distinguish the word "regions" as you used
14 it in the name of the bank or suggested it be used
15 in the name of the bank?
16         MR. PECAU:
17         I object to the form of the
18         question.
19 BY MR. HUDSON:
20     Q   Once again, you can answer.
21     A   I'm sorry. Repeat the question.
22     Q   Yeah. What, if anything, did you do or
23 recommend be done to distinguish the Regions name

**Page 16**

1  in its use in the name of your bank?
2          MR. PECAU:
3          Again, I've got to object to the
4          form of the question.
5          THE WITNESS:
6          I'm not sure I understand what
7          you're getting at. But if you're
8          asking me did I go and make sure
9          that Regions wasn't used in
10         different ways, I did. The first
11         thing I wanted to do was make sure
12         that Regions did not exist somewhere
13         else and wasn't -- wasn't being
14         used. And so that's the first thing
15         that we did to make sure it's
16         distinguished, is to go out, find
17         out and -- and it wasn't being
18         used. And so that -- that was --
19         that was why I felt like we could
20         distinguish the name. Plus we did
21         focus groups with people. We did
22         interviews with customers. We -- we
23         showed them the name. We talked

**Page 17**

1          about the name. And -- and they
2          received it very well. They liked
3          the name. And it was very
4          distinguishable.
5  BY MR. HUDSON:
6      Q   Thank you for that answer. And my
7  question was awkward and unclear. And I'm going
8  to get to that in a moment.
9      A   Okay.
10     Q   Mr. Dunman, when I took his deposition,
11 said that it was communicated to him at the time
12 of the name change that a thing that was initially
13 done to distinguish the Regions name as it applied
14 to the bank as opposed to its common English usage
15 was to stylize the G. Do you recall the G being
16 stylized?
17     A   Oh --
18         MR. PECAU:
19         Wait a minute. I object to the
20         characterization of Mr. Dunman's
21         testimony.
22         THE WITNESS:
23         Yeah. Are you --

5 (Pages 14 to 17)

William Askew                                          Victor Hudson

---

**Page 22**

1  Exhibit Two with the stylized G.
2      A    That's correct.
3      Q    But it was the intention ultimately to
4  change all of them?
5      A    As maintenance occurred on the signs.
6      Q    Okay.  Then recently as part of the
7  AmSouth merger, the logo has changed to Exhibit
8  One-O-three.  Am I correct in that?
9      A    That's correct.
10     Q    Is it the intention of the bank to
11 change all of its signage to the Exhibit
12 One-O-three logo?
13     A    Yes.
14     Q    And, in fact, it's implementing that
15 quite quickly, is it not?
16     A    That's correct.
17     Q    Have you gotten it all changed yet?
18     A    No.
19     Q    Can you give me an estimate of how far
20 along you are in terms of percentage?
21     A    I wouldn't want to guess.  I could find
22 that out but I wouldn't want to guess.
23     Q    That's all right.  I haven't seen any

---

**Page 23**

1  that isn't changed, is part of the reason I asked
2  that question.
3      A    We changed all of them in Florida and
4  Alabama.  That's why you haven't seen any.
5      Q    Okay.
6      A    All of them were changed in these two
7  states.  That's our first merger.  That's what I
8  need to be doing, is merging right now.
9      Q    Changing signs?
10     A    Yes, in the middle of this.
11     Q    Now, as to Exhibit Three, the idea was
12 to change a lot of signs and change others as you
13 got to the maintenance of those signs.  Is that
14 the same idea with respect to One-O-three or is it
15 your intention to get them all changed?
16     MR. PECAU:
17         I object to the form of the
18         question.
19     THE WITNESS:
20         Our plan is to change the signs, all
21         the signs to the new logo.
22 BY MR. HUDSON:
23     Q    Do you plan to change them rapidly or

---

**Page 24**

1  change them when an old sign needs maintenance?
2  I'm just trying to compare what you're doing now
3  to what you did at the time that you adopted
4  Exhibit Three.
5      A    We're changing -- our plan is to change
6  them all.  Not to wait for maintenance to change
7  them all.
8      Q    Okay.  Whose suggestion was it to use
9  the stylized G that is shown in Exhibit Two?
10     A    We -- I hired a marketing firm that went
11 out and developed that logo.  We just -- it was
12 strictly -- they came up with many different
13 logos.  And that was just the one that I chose.
14     Q    You chose that from a number of
15 alternatives that they suggested to you?
16     A    Uh-huh.  It was quite a lengthy process.
17     Q    Why was it that you wanted to look at
18 different logos and discuss that with the
19 marketing firm?
20     A    It's your brand.  It's the value of the
21 company.  Your name is the company.  It's so
22 important to spend time on it.  You would research
23 it and you would want to make sure that you made

---

**Page 25**

1  the right move before you did so.  It's just too
2  much at stake to -- to take lightly.
3      Q    Did the marketing company participate in
4  the decision to select the name "Regions"?
5      A    No.
6      Q    So the name had been selected "Regions"
7  and the marketing company was asked for advice
8  about what?
9      A    Developing a unique brand with a -- a
10 marketing look, pizzazz, if you will.
11     Q    All right.  And once the Regions name
12 with the stylized G was selected as the logo, did
13 you communicate to your employees that you made
14 that selection, "you" being the bank?  Did the
15 bank communicate to its employees that it had made
16 that selection?
17     A    Sure.
18     Q    And did it communicate to the employees
19 the reasons that it had made that selection?
20     A    The reason it had made the selection.
21 That's --
22     Q    Sir?
23     A    I -- I'm pondering your question.

---

7 (Pages 22 to 25)

Page 38

1  identify that for me.
2      A   No. I mean, this looks like a graphic
3  thing but I have not been involved with these type
4  levels because at this point, marketing --
5          MR. PECAU:
6          Just answer his question.
7  BY MR. HUDSON:
8      Q   Okay. As I understand it, One
9  Twenty-nine is something you would not have been
10 involved in. Marketing would have handled that.
11     A   Correct. They would show it to me.
12     Q   Well, have you seen it before?
13     A   I don't recall seeing this document, no.
14     Q   Have you seen before the logo that
15 appears on page one, the first page?
16     A   Absolutely.
17     Q   If you'll look at the next page, 11308,
18 it says "The basic elements of the new Regions
19 brand ID are the foundation for the rest of our
20 identity". Is that a correct statement in your
21 understanding?
22     A   I would assume so.
23     Q   Okay. The next sentence says "We must

Page 39

1  be consistent in the way we display our logo and
2  how we use our typefaces and colors in order to
3  make a strong impact with our employees and the
4  public at large."
5      Has that really been the purpose so long as
6  you've had logos?
7      A   Sure.
8      Q   Look at 11310. Is the logo as depicted
9  thereon used in that manner in your understanding?
10     A   Yes.
11     Q   Look at 11311. And my question is the
12 same one.
13     A   It looks like the same as that one to
14 me.
15     Q   Yeah.
16     A   Okay.
17     Q   It looks the same to me. Look at
18 11312. In your understanding, is the logo
19 utilized in the manner in which it is depicted
20 thereon?
21     A   I don't exactly know what they mean
22 about the pixels and why they're -- what that's
23 alluding to. But the logo looks -- it's just

Page 40

1  smaller. One of them is smaller and the other one
2  is bigger. That's all.
3      Q   Okay. 11313 speaks of the color
4  palette. Is that the color palette as you
5  understand its present use?
6      A   I assume so. It looks like it. Again,
7  I don't know these Pantone colors so I don't
8  know. I assume.
9      Q   Well, I'm not so interested in exactly
10 how it's printed or any of that.
11     A   Okay.
12     Q   I've got this document and I'm just
13 trying to establish it's what y'all use. I think
14 it is. Y'all gave it to me. If you look at
15 11317, is that how the logo presently appears on
16 your letterhead?
17     A   I believe so.
18     Q   Okay. And look at 11319.
19     A   Okay.
20     Q   Is that how the logo presently appears
21 on your envelopes?
22     A   I believe so.
23     Q   Now, look at 11320. Is that how the

Page 41

1  logo presently appears on your business cards?
2      A   Yes.
3      Q   Now, we talked about aspects of the
4  selection of the Regions name. One was
5  characterized as the process. I'm just trying to
6  get us back on track.
7      The process as you talked about it, I
8  understood, was when you looked at things like
9  whether others were using the name. Are we on the
10 same page?
11     I'm going to ask you some questions. I just
12 want to get on the right page.
13     A   I believe you're going way back now.
14     Q   I'm going way back.
15     A   Okay. All right. I'm with you.
16     Q   All right. Now, going back to the time
17 the name was initially selected, I want to talk
18 about the process --
19     A   Okay.
20     Q   -- that was followed. What did you do
21 in determining whether or not the name was used by
22 others?
23     A   We had a law firm, and the law firm did

11  (Pages 38 to 41)

Page 42

1  all the searches, all the registrations for the
2  name across all the states in the United States.
3  They did all the things to make sure that we could
4  use this name and it wasn't already being used and
5  there wouldn't be any issues if we -- and we could
6  get registration on it.
7      It was very important that this name be able
8  to be copyrighted, registered, because that's --
9  then you prevent people from using the brand. And
10 so we made sure that that could be done first.
11     And I had a law firm -- I didn't do it. I
12 had a law firm do it.
13     Q  Sure. Which law firm was it?
14     A  Lange Simpson.
15     Q  And did you learn that at the time there
16 was a Regions Hospital?
17     A  I don't recall that there was any
18 Regions. But I suppose there could have been a
19 Regions Hospital.
20     Q  But you don't recall whether others were
21 using the name or not at the time?
22     A  No. I do recall that we found no use of
23 the name. Now, I don't recall -- there might have

Page 43

1  been a couple of businesses that were out of our
2  footprint. I don't -- but I don't recall that.
3      MR. PECAU:
4      Just testify as to what you know.
5  BY MR. HUDSON:
6      Q  A couple of businesses that were out of
7  your what? What did you just say?
8      A  I don't recall. I don't recall any
9  names that were in use for this.
10     Q  But in your answer, you said there may
11 have been a couple of businesses that were out
12 your -- and I'm asking what you were saying.
13     A  Well, I -- I retract that because I
14 don't -- I don't recall any businesses that had
15 the name at the time, quite frankly.
16     Q  Was it your understanding that you
17 wanted the name registered for financial services?
18     A  I don't recall that.
19     Q  Was it your understanding that Region's
20 name was being registered for every single
21 purpose?
22     MR. PECAU:
23     I object to the form of the

Page 44

1      question.
2      THE WITNESS:
3      I don't recall that either.
4  BY MR. HUDSON:
5      Q  At the time that you registered the name
6  "Regions" or "Regions Bank", was it your
7  understanding that third parties would not be able
8  to use it to describe businesses such as Regions
9  Propane or Regions Hospital or Regions Air?
10     A  I don't recall that.
11     Q  Just don't know one way or the other, or
12 didn't think about it one way or the other?
13     A  No. I did think about it. I didn't
14 want any use of the name. But I don't recall any
15 specifics about what you're referring to.
16     Q  Well, let me ask you this.
17     A  You're testing my memory. It's too long
18 ago.
19     Q  This is what I'm struggling with.
20     A  And I'm not going to sit here and guess
21 at what I was thinking at the time. I can't
22 guess. I could guess but I know I shouldn't
23 guess.

Page 45

1      MR. PECAU:
2      You shouldn't guess.
3      THE WITNESS:
4      That's right. I shouldn't guess.
5  BY MR. HUDSON:
6      Q  Well, here is what I'm struggling with.
7  If, in fact -- and there was -- a registered
8  trademark for Regions Hospital at the time you
9  wanted to register yours for Regions Bank and that
10 came to your attention, would you think that you
11 could take Regions Hospital's name, and did you
12 intend to do that?
13     MR. PECAU:
14     First of all, I object to the
15     question on numerous grounds.
16 BY MR. HUDSON:
17     Q  You can answer the question.
18     MR. PECAU:
19     And don't speculate.
20     THE WITNESS:
21     I'm not going to speculate. I can't
22     speculate on something -- what I
23     would have thought fifteen years ago

12  (Pages 42 to 45)

## Page 142

1  no branding there. If there's something that a
2  university did, Alabama, something that -- a local
3  accomplishment in a community. And so we can have
4  local ads that recognize different events.
5      Q   Your endorsement or endorsement by the
6  Southeastern Conference, by the University of
7  Alabama, by Auburn University, in those instances,
8  are you the bank of the Southeastern Conference,
9  by way of example?
10     A   We are. We're the official bank of the
11 Southeastern Conference.
12     Q   And your association with Alabama and
13 Auburn, is it similar in the terms that you're the
14 bank of the university?
15     A   No. We're not the bank of the
16 university because they have other --
17     Q   Places --
18     A   They have other sponsors. So Regions,
19 it's really more just the name association with
20 the university. So what we'll do is Regions will
21 do their game day. And so if they're having a
22 game, then Regions is identified on that game
23 day.

## Page 143

1      We have the Regions fourth quarter -- Fifth
2  Quarter Show. The Regions Fifth Quarter Show.
3  And so it's just name recognition.
4      Q   And how is it identified? Is it
5  identified as Regions Bank, or otherwise?
6      A   No. It's identified as Regions Fifth
7  Quarter Show.
8      Q   And you put that on T-shirts and that
9  sort of thing?
10     A   No. It's on the radio.
11     Q   On the radio. Okay.
12     A   It's Eli Gold for Alabama. It's Mike
13 Hubbard for Auburn. We do this with many schools.
14     Q   Okay. To your knowledge, are any
15 instructions given to employees of Regions to look
16 out for third party use of the Regions name?
17     A   I don't know. Not to my knowledge.
18     Q   To your knowledge, is there any effort
19 to determine whether or not your customers include
20 people whose names have Regions in the name?
21     A   I -- I don't understand your question.
22 Try me again.
23     Q   If I represent to you that there are

## Page 144

1  people who have Regions in their names that are
2  also banking customers of Regions, is there
3  anything that Regions does, to your knowledge, to
4  try to recognize that fact?
5      A   No. Not to my knowledge.
6  WHEREUPON, A RECESS WAS TAKEN.
7          MR. HUDSON:
8          That's all I have.
9              EXAMINATION
10 BY MR. PECAU:
11     Q   You mentioned New South. Who are they?
12     A   New South Research? They're the
13 research firm that did our research that we went
14 through.
15     Q   For how many years did you use them?
16     A   Many, many years.
17     Q   More than five years?
18     A   Yes.
19     Q   More than ten years?
20     A   I believe so.
21     Q   Okay. And why did you use them year
22 after year?
23     A   I wanted consistency in what they were

## Page 145

1  telling me. And they did a good job. Other
2  banks, as I said a while ago, used them and highly
3  recommended them. And they did a good service for
4  us.
5      Q   And you relied upon the results of their
6  business in the normal course of your business?
7      A   Yes.
8      Q   And you relied on the results of their
9  surveys for your business decisions?.
10     A   Yes, in the sense that -- yes.
11     Q   Okay. And were these surveys
12 quantitative surveys?
13     A   Yes. Well, they did both qualitative
14 and quantitative surveys for us. But the surveys
15 we've been looking at are quantitative. And by
16 "quantitative", that means that they do enough
17 surveys based upon statistical empirical data
18 standards that they've done enough surveys to
19 validate -- you've heard of the polls.
20     If they poll an area, so many -- they call so
21 many people and it's valid. Well, they did those
22 statistics in quantitative. And then we went
23 beyond those numbers. And so I was very confident

37  (Pages 142 to 145)

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,

     Plaintiff,

Vs.                                    CIVIL ACTION NO.
                                   2:06CV882-MHT

REGIONS UNIVERSITY, INC.,

     Defendant.


\* \* \* \* \* \* \* \* \* \* \* \*


     DEPOSITION OF LAINA COSTANZA, taken
pursuant to stipulation and agreement before Lisa
J. Nix, Registered Professional Reporter and
Commissioner for the State of Alabama at Large, in
the Law Offices of Balch & Bingham, Suite 200, 105
Tallapoosa Street, Montgomery, Alabama on
Wednesday, May 16, 2007, commencing at
approximately 9:00 a.m.


\* \* \* \* \* \* \* \* \* \* \* \*

Page 2

```
 1              APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4   Mr. William G. Pecau
     Ms. Rachel M. Marmer
 5   STEPTOE & JOHNSON
     Attorneys at Law
 6   1330 Connecticut Avenue NW
     Washington, D.C. 20036-1795
 7
     Mr. Charles B. Paterson
 8   BALCH & BINGHAM
     Attorneys at Law
 9   Suite 200
     105 Tallapoosa Street
10   Montgomery, Alabama 36104
11   FOR THE DEFENDANT:
12   Mr. Victor T. Hudson
     HUDSON & WATTS
13   Attorneys at Law
     Suite 2500
14   One St. Louis Centre
     Mobile, AL 36602
15
     ALSO PRESENT:
16
     Rex Turner, Jr., Ed.D.
17
18      * * * * * * * * * * * * *
19
20           EXAMINATION INDEX
21   BY MR. PECAU . . . . . . . . . .   6
22
23
```

Page 3

```
 1              EXHIBIT INDEX
 2
 3   EXHIBIT
 4   57  Listing for Southern Christian      17
         University at www.universities.ac
 5
 6   58  8/9/06 email to Anita Crosby from Laina   69
         Costanza (RU-45)
 7   59  8/4/06 email to Laina Costanza, Barbara   72
         Turner, Anita Crosby from Rex Turner
 8       (RU-1234)
 9   60  Regions University - Tech Team -- to-do   73
         list (RU-47)
10
11   61  8/15/06 email to Barbara Turner from      77
         Laina Costanza (RU-202)
12   62  8/15/06 email string between Bob          77
         Rocheleau, Elaine Tarence and Laina
13       Costanza (RU-201)
14   63  8/17/06 email string between Bob          77
         Rocheleau, Elaine Tarence and Laina
15       Costanza (RU-200)
16   64  Email receipt - system users, student    78
         (Summer 2006) (RU-1278 - 1279)
17
     65  Home Page for Regions University         80
18       (RAC-00030552)
19   66  Photographs of signage (RAC00030559 -    90
         00030564)
20
     67  Invoices for promotional items (RU-1558  106
21       - 1661, 1663, 1665 - 1669)
22   68  Pictures of promotional items listed in  107
         Exhibit 67 (RU-227 - 232)
23
```

Page 4

```
 1
 2   69  Layout for tablecloth and graphics given  115
         to Lamar (RU-237, RU-1628 - 1630)
 3
 4   70  Ad that appeared in Christianity Today -  127
         March '07 (RU-218)
 5   71  Ad appearing in Military Times in Mar,    127
         Aug, Nov '07 (RU-215)
 6
 7   72  Email string between Dan Margolin and     130
         Anita Crosby re: Thomson Peterson's
 8       Annual Tuition Update with attached
         Peterson's update (RU-1380 - 1385)
 9   73  2006-2007 CTi Family of Magazines         133
         Advertising Contract/Proposal (RU-217)
10
11   74  Screen shot - Southern Christian          135
         University, Important Message from the
12       President (RAC00030565 - 00030566)
13   75  Logo sheet; samples of letterhead and     135
         registration form, seal, diploma and
14       display board
15   76  Invoices reflecting production costs for  139
         commercial (RU-1609 - 1612)
16   77  Invoices reflecting production costs for  141
         radio ad (RU-1607 - 1608)
17
18   78  Invoices reflecting radio broadcasting    142
         costs (RU-1637 - 1639, 1641, 1644 -
19       1647, 1633 -1636, 1642 - 1643, 1648
         -1652, 1640, 1653, 1657, 1656, 1654 -
20       1655)
21   79  Invoices reflecting billboard costs       145
         (RU-1615 - 1616, 1626 - 1627, 1631 -
22       1632, 1620 - 1625)
23
```

Page 5

```
 1                STIPULATION
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of LAINA COSTANZA is taken pursuant to
 5   the Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Lisa J. Nix,
 7   Registered Professional Reporter and Commissioner
 8   for the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23        It is further stipulated and agreed by and
```

Deposition of Laina Costanza                                    May 16, 2007

---

Page 22

1    and then from '95 to '99 I worked at
2    Pentland USA.
3    Q.  What was that?
4    A.  Pentland, P-E-N-T-L-A-N-D.
5    Q.  What do they do?
6    A.  They own -- well, they're part of Pentland,
7    PLC out of the U. K.  They own Mitre, Pony,
8    Reusch.  They own, like, probably 12, 15
9    brands.  And they brought it to the United
10   States to push those brands in the United
11   States.  It ranged from footwear to
12   sporting goods and fashionable clothing.
13   Q.  Where were they located?
14   A.  Pentland, USA was in Nashville, Tennessee
15   and also in New York.
16   Q.  When did you move to Montgomery?
17   A.  1998.  I got the date wrong on that now.
18   1998 was when I left Pentland, USA.  I
19   moved to Montgomery in '99.
20   Q.  So you've been in Montgomery since 1999?
21   A.  Yes.
22   Q.  And what was your first job while you were
23   in Montgomery?

Page 23

1    A.  My husband was doing his production still.
2    He worked with HGTV.  He was freelance, so
3    I worked with him.  Thought I might get in
4    that industry, in the production industry.
5        And then I started a company, Ruby Red
6    Company, and I thought I might do my own
7    clothing.  And then I got into the
8    graphics.  It's always something that I did
9    along with design and thought that might be
10   the best direction to go since you'll never
11   have any clothing design companies here in
12   Montgomery, Alabama.
13   Q.  So when did you start doing graphics?
14   A.  I've always been doing graphics since
15   probably 1993.  I started working on -- I
16   did print designs and a lot of computer
17   designs from '93 until today.  Always been
18   doing them.
19   Q.  So what was your first advertising job?
20   A.  I never had an advertising job.  When
21   you're a product manager, you manage the
22   advertising and marketing of your brand,
23   and that's how I have experience in the

Page 24

1    marketing area.
2    Q.  So what were the periods of time when you
3    were doing marketing?
4    A.  During -- While I worked at Pentland, USA.
5    Q.  And these were the various brands that you
6    were talking about?
7    A.  Yes.  I was product manager for Mitre,
8    Pony, Reusch, and Ellesse.
9    Q.  So when did you start -- When did you
10   become a media buyer?
11   A.  I think it's in 2002 or 2003.  I think it's
12   2003.
13   Q.  Do you ever do any research, marketing or
14   advertising research?
15   A.  Do I do it now or had I prior or ...
16   Q.  Well, why don't we start now.  Do you do it
17   now?
18   A.  Yes.
19   Q.  What sort of marketing research do you do?
20   A.  Do a lot of reading.
21   Q.  What do you mean by that?
22   A.  We do a lot -- We have a lot of marketing
23   information we get off the Internet with

Page 25

1    different sites.  I have a lot of
2    newsletters I have sent to myself.  But
3    it's not my -- I mean, there's lots of
4    things I'm reading besides marketing.
5    That's not the only thing I'm looking at.
6    I'm looking at, you know, graphics, design.
7    Q.  So what sort of marketing research have you
8    done?
9    A.  Besides the reading?
10   Q.  Yeah, beside reading.
11   A.  Nothing.
12   Q.  Have you ever been involved in focus
13   groups?
14   A.  We didn't do focus groups when -- I never
15   was involved in them at Pentland, no.
16   Q.  Well, since 2001, have you --
17   A.  No.
18   Q.  -- been involved in any focus groups?
19   A.  No.
20   Q.  What about any other kind of survey or that
21   kind of market, consumer market research?
22   Have you been involved in any consumer
23   market research?

Deposition of Laina Costanza                                    May 16, 2007

---

Page 34

1    doing is?
2    A.  No.  The only thing we use is we have an
3        RFI -- a very detailed RFI that will give
4        us some information if they fill it out
5        properly as to where they heard the
6        advertising.  There's a lot of things there
7        for them to choose from.
8    Q.  RFI, what does that mean?
9    A.  It's a request for information, and it's
10       required to be filled out before somebody
11       applies.  And some people don't actually go
12       through with the application, but it
13       will -- even if they call in, they're going
14       to have to go and fill out that RFI so that
15       we can have some information about them so
16       we can contact them back or answer any
17       questions they may have.
18   Q.  These RFI's, do you keep running reports of
19       them?
20   A.  Yes.  I don't personally keep them.  The
21       university has them and I can request a
22       report.
23   Q.  Let me show you what's been marked as --

---

Page 35

1        well, this is my copy of Exhibit 17.  You
2        mentioned that you see reports of what
3        students come from what states.  Is Exhibit
4        17 the kind of report that you get?
5    A.  Well, no.  There are a lot of different
6        reports that they run.  I have seen this
7        report before.  This is not the one -- the
8        only one I request, but this is one I could
9        request.
10   Q.  Who do you request these reports from?
11   A.  Anita Crosby.
12   Q.  In addition to Ms. Crosby and Dr. Turner,
13       is there anyone else you discuss
14       advertising budgets with for Regions
15       University?
16   A.  Barbara Turner is the bursar, and she might
17       be involved in the conversation, you know,
18       if Anita has a question or something like
19       that.  But it's more -- they're involved in
20       the money part of it, not the, you know,
21       advertising decisions.
22   Q.  And the advertising decisions, those
23       decisions are made by you and Dr. Turner?

---

Page 36

1             MR. HUDSON:  Object to the form.
2    Q.  I'll rephrase the question.  Those
3        decisions are made by Dr. Turner --
4    A.  Yes.
5    Q.  -- with your input?
6    A.  Sometimes, but he has the direction and I
7        implement it.  I am not a typical
8        advertising agency.  I'm more of a -- I
9        implement the vision or the direction that
10       the university wants to go in.  I do not
11       suggest -- not that I don't ever suggest,
12       but I don't tell them what to do and make
13       those decisions without their input.
14   Q.  Now, for the calendar year of 2006, do you
15       know approximately what the budget was for
16       Southern Christian University?
17   A.  I believe we estimated it would be
18       around -- around 700 and ...
19           When you're talking to the media and
20       different advertisers, there might be
21       something that comes up and we might
22       present it, and then the budget in essence
23       will go up.  But I believe we estimated it

---

Page 37

1        around 700, and it ended up being around
2        800, a little over 800.
3    Q.  And that's for 2006?
4    A.  Yeah.
5    Q.  2005, do you know approximately what the
6        budget was?
7    A.  I don't.  It's probably gone up 100,000 to
8        150,000 each year.
9    Q.  And who would have the records of the
10       amount spent?  Would that be Ms. Crosby
11       or --
12   A.  Yes.
13   Q.  -- Dr. Turner?
14   A.  Ms. Crosby.
15   Q.  Ms. Crosby?
16   A.  Yeah.
17   Q.  You mentioned one of the vehicles used to
18       promote the school was Web advertising; is
19       that correct?
20   A.  Yes.
21   Q.  What sort of form of Web advertising does
22       Southern Christian University use?
23   A.  We've not been in it a whole lot, but we

---

Deposition of Laina Costanza                                    May 16, 2007

---

Page 38

1   started out on a Christian site,
2   Christian-net, with Southern Christian
3   University. That was a paid
4   advertisement. We've done some with WSFA,
5   and we have collegesanduniversities.net.
6   Q. What's WSFA?
7   A. It's a television station, Channel 12,
8   WSFA.
9   Q. And you can do Internet advertising with
10  them?
11  A. Just Internet banners.
12  Q. Do any pop-up ads?
13  A. No.
14  Q. Do you buy any search placements?
15  A. No.
16  Q. Do you know what a search placement is?
17  A. I do.
18  Q. Just so the record is clear, can you tell
19  me what a search placement is?
20  A. It would be to go on Google and you can --
21  you can buy -- actually, you would be
22  buying key words and things like that to
23  increase your search on different sites,

Page 39

1   but we don't do any of that.
2   Q. Has the university ever done that?
3   A. No.
4   Q. When did Southern Christian University
5   start advertising on the Web?
6   A. Christian-net was in place when I took over
7   placement, so probably 2002, 2003. They
8   had something with Christian-net.
9   Q. Now, in addition -- now, in -- well, prior
10  to August of 2006, did Southern Christian
11  University use TV, radio, print and Web
12  advertising?
13  A. Yes.
14  Q. And used promotional materials as well?
15  A. Yes.
16  Q. And some of those promotional materials are
17  E promotional materials, electronic
18  promotional materials? I mean, somebody
19  calls you up, asks you for something, you
20  send them a --
21  A. Brochure.
22  Q. -- brochure electronically?
23  A. Yes.

Page 40

1   Q. So that's one way of doing it.
2       Do you print brochures and hard copies
3   as well?
4   A. The university has hard copies for people
5   that come into the school.
6   Q. Do you get -- What kind of foot traffic
7   does the university get, people coming into
8   the school that might be interested? Do
9   you know?
10  A. I'm not sure. My office is not there and
11  hasn't been there since 2002.
12  Q. So you work out of home?
13  A. Yes. I work out of three offices actually.
14  Q. Okay. I know two out of three, so -- one
15  is your home. Two is --
16  A. Armanda Costanza, Incorporated is in
17  Nashville, Tennessee, so that's perhaps the
18  one I didn't give you. It's 240 Great
19  Circle Road. We have to travel up there.
20  Q. How much time a year do you spend in
21  Nashville?
22  A. Well, lately, I haven't because I have a 19
23  month-old and the travel is not good. But

Page 41

1   before that, we'll be up there six, seven
2   times a year. But we have a conferencing
3   system where we can see them live, speak to
4   them as if we're there. It's not just a
5   company that runs itself without our help.
6   Q. Now, in terms of the media advertising of
7   Regions University or Southern Christian
8   University, is there a particular -- are
9   there particular times of year that you
10  concentrate your media buys in?
11  A. Yes, during enrollment.
12  Q. And when is that?
13  A. Enrollment is March through May, July
14  through September, and November to January.
15  Q. Now, in those -- so you have three
16  different periods there. Any one of those
17  periods do you more heavily concentrate on
18  than others?
19  A. No, not really.
20  Q. So if you have a budget of, let's say,
21  900,000, you would generally break it down
22  to 300, 300, 300?
23  A. Yes, but sometimes when you place -- you

Deposition of Laina Costanza                                    May 16, 2007

Page 42

1    know, like there's an election year and you
2    try to go and place, you may not get enough
3    spots. So you may have some money left
4    over so you can move it around into another
5    semester or, you know, do a billboard or do
6    a print ad.
7        So it's not written in stone. We try
8    to place it -- if we're going to place
9    something new, we ask, but we do have money
10   left over to work with from the budget.
11   Q. Now, if you have a television commercial,
12   how do you know if it's successful or not?
13   A. By the calls, by the RFI's. We speak to
14   the recruiters. You'll hear word of
15   mouth. We're in that industry, so ...
16   Q. In terms of -- you said the industry. What
17   industry are you referring to?
18   A. Well, I think I was thinking more like
19   whether or not the commercial was good.
20   I'm sorry. You know, we make commercials
21   for lots of different companies. We do
22   music videos. So I was thinking more like
23   whether or not the commercial was good.

Page 43

1    You were thinking whether it was helpful to
2    enrollment.
3    Q. And that's a goal of your commercials, for
4    them to be helpful to enrollment?
5    A. Yes. I just had my other hat on.
6    Q. My father used to always say that when he
7    had the ads that he really liked and he won
8    awards, that's when he lost a client.
9        So you try to keep track of the calls,
10   the RFI's, and speak to the recruiters
11   generally to see what the traffic you
12   obtain from your media buys; is that
13   correct?
14   A. Yes.
15   Q. And is it your experience that when you
16   have TV and radio and billboard
17   advertising, the calls tend to go up during
18   the time that you're actually advertising?
19   A. Yes.
20   Q. And then they go down when you're not
21   advertising; is that correct?
22   A. Right. They've stayed more consistent with
23   some of the internet advertising that we've

Page 44

1    done, but it -- there is a drop in calls
2    when we're not advertising.
3    Q. In terms of television advertising, what is
4    it -- your target audience?
5    A. Would be an individual 25 to 55, young
6    professional or a mother at home, someone
7    who needed to finish their degree or is
8    transferring, someone who wants to further
9    their education, someone who already has a
10   bachelor's. Usually it's more of a
11   professional -- you target more of a
12   professional market.
13   Q. As opposed to what market?
14   A. Disney Channel, WB. You're not going to
15   advertise on those channels.
16   Q. So you concentrate your advertising on news
17   programs and things of that sort?
18   A. Yes.
19   Q. What about billboard advertising? What's
20   the purpose of that?
21   A. What do you mean by purpose?
22   Q. What audience is billboard advertising
23   directed to?

Page 45

1    A. I think it's just for name recognition or
2    building your brand.
3    Q. When you say building your brand, what do
4    you mean by that?
5    A. Well, it probably comes from my
6    background. Just building almost a feeling
7    of what this brand is trying to get across,
8    how it looks.
9    Q. And that's sometimes called by
10   professionals as creating a brand
11   personality; is that correct?
12       MR. HUDSON: Object to the form.
13       You can answer the question.
14   A. A brand personality? That's not the
15   language I've used. I just call it
16   branding.
17   Q. Okay. Have you ever used -- heard the term
18   brand personality?
19   A. No.
20   Q. Have you ever taken any marketing courses?
21   A. I've taken probably -- well, I have a minor
22   in marketing. I've taken six, seven. I'm
23   not hired as that type of company. I'm an

Page 62

1   September, was it?
2   A.  Yes, one of the periods is that.
3   Q.  In July through September 2006, what media
4   advertising were you doing?
5   A.  We were doing Southern Christian
6   University.
7   Q.  And was that on television?
8   A.  Television.
9   Q.  Radio?
10  A.  We had just started radio. I'm not sure
11  that radio was in that period of that year.
12  Q.  Billboard advertising --
13  A.  No.
14  Q.  -- during that period?
15  Print advertising?
16  A.  Print advertising. I don't know how many
17  ads fell in that period. Print is a little
18  bit more random.
19  Q.  Now, in terms of preparing a television
20  commercial and then making media buys, how
21  much lead time do you generally need?
22  A.  We try to place two to three months in
23  advance if we can, especially -- you have

Page 63

1   to think about elections. You have to
2   think about certain things that are coming
3   on TV. Talk to your advertisers and
4   they'll tell you what's booked and, you
5   know, they'll tell you, actually, at the
6   first of the year some things to watch out
7   for so that you don't get bumped out of
8   your spot.
9   Q.  Now, in July through September of 2006, did
10  you get any direction from Dr. Turner to
11  try to reduce the amount of television
12  advertising that was budgeted for that
13  period of time?
14  A.  No.
15  Q.  When did you first learn that the school
16  was going to choose the name Regions?
17  A.  Probably the first of August.
18  Q.  And who told you?
19  A.  Dr. Turner.
20  Q.  He called you at home?
21  A.  (Witness nods head up and down.)
22  Q.  And what do you recall of that
23  conversation?

Page 64

1   A.  He just said that he thought the new name
2   for the university could be Regions
3   University.
4   Q.  And did you have any reaction at all?
5   A.  I did.
6   Q.  What did you say?
7   A.  I thought that was a good vision based
8   on -- the first thing that came to mind was
9   go into all the world, preach the gospel.
10  I don't know the verse verbatim, but I
11  thought of that, that was a good vision
12  because it kind of summarized the direction
13  he goes.
14  Q.  Did he tell you that he chose Regions
15  University for any particular reason?
16  Strike that. I'll rephrase that question.
17  Did he tell you he chose the name
18  Regions for any particular reason?
19  A.  No, he did not say I chose it for -- no, he
20  didn't get into any of that.
21  Q.  Did the Regions Bank name come to your mind
22  when he mentioned the word Regions?
23  A.  It did.

Page 65

1   Q.  And you said that at the time of
2   transition -- Strike that.
3   You said that you went on the Regions
4   Bank Web site at some time around that
5   period of time; is that correct?
6   A.  Not when he told me. I went and looked at
7   it -- I had designed a logo. I had gone
8   through a process of doing that. And the
9   bank near me is -- has a capital R, lower
10  case E-G-I-O-N-S. And I was driving by and
11  saw that Regions had a sign up for
12  financing some property and it was all in
13  capitals. And I thought, I need to look
14  and make sure, you know, what that is,
15  because I don't really know Regions, but I
16  think of branding. I think of that lower
17  case E with that G. I thought I need to
18  look at that and steer clear of that.
19  Q.  So you went on the Regions site at that
20  time?
21  A.  I did.
22  Q.  And approximately when was that? Do you
23  know?

Deposition of Laina Costanza                                    May 16, 2007

Page 94

1   A.  In the Christian community, yes.
2   Q.  Outside the Christian community, do you
3       know?
4   A.  I wouldn't know.
5   Q.  Has there been any -- since you've been at
6       Southern Christian University, has there
7       been any effort to determine what the
8       recognition of Southern Christian
9       University was?
10  A.  Has there been any effort to
11      determine ... I'm not sure.  I have not --
12      I have personally not tried to determine
13      that.  The school is separate, and I'm
14      not -- I'm not there day-to-day to know if
15      there's those discussions going on.
16  Q.  Well, have you ever seen any documents that
17      discuss the recognition of Southern
18      Christian University?
19  A.  No.
20          MR. PECAU:  This would be a good
21          time to take a short break.
22          (Brief recess was taken.)
23  Q.  Let me show you what's been previously

Page 95

1       marked as Exhibit 48.  Can you tell me what
2       this exhibit represents?
3   A.  This represents the plans for media
4       placement and print advertising for 2007.
5       It has not already been placed, but it's --
6       it is a plan for how we will place the
7       money for 2007.
8   Q.  And this plan covers the three periods of
9       time that you spoke about?
10  A.  Well, what we didn't speak about was that
11      within a year, there may be something
12      special that we do.  I don't know what year
13      it was, but -- maybe in 2004 that we did a
14      national spot that was not planned.  We did
15      it out of New York for Southern Christian
16      University.
17          There will be things that will come up
18      and we'll do.  There might be some extra
19      money and we'll say, oh, well, let's try
20      this or that because we've got money left
21      over.  We can't place $10,000 on this
22      station because they don't have it
23      available, so we take that money and we go

Page 96

1       do something different or we come up with a
2       whole new idea together and we look for
3       extra money or we move money around.
4   Q.  But this is -- but Exhibit 48 was your
5       media plan for the annual year 2007; is
6       that correct?
7   A.  Yes.
8   Q.  And what does the first page represent?
9   A.  It represents our first media placement for
10      2007, this first page.
11  Q.  So is this -- so this covers TV,
12      billboards, radio and newspapers?
13  A.  Yes.
14  Q.  So in your first media placement in 2007,
15      the only states that you advertised in were
16      Alabama and Tennessee; is that correct?
17  A.  Yes.
18  Q.  Between Alabama and Tennessee, you spent
19      more money in Alabama; is that correct?
20  A.  We did.
21  Q.  What's the Montgomery Advertiser?
22  A.  It is a newspaper.
23  Q.  In Montgomery?

Page 97

1   A.  Yes.
2   Q.  And was that $127,000 spent?
3   A.  No, we spent a little bit less than that.
4       I don't know the exact number.
5   Q.  Did you spend it in any markets other than
6       Alabama and Tennessee?
7   A.  No.
8   Q.  Now let's go to the next page, which is
9       1604.
10          Oh, incidentally, with respect to all
11      of the advertisements that are -- and
12      commercials on the first page of Exhibit
13      48, were all those for Regions University?
14  A.  Yes.
15  Q.  And you used the name Regions University in
16      each one of those ads?
17  A.  Yes.
18  Q.  And prior to February of 2007, did you have
19      television advertising referring to the
20      name Regions University?
21  A.  No.
22  Q.  So does Exhibit 48 represent the first
23      media advertising using Regions University?

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,

     Plaintiff,

Vs.

                          CIVIL ACTION NO.
                          2:06CV882-MHT

REGIONS UNIVERSITY, INC.,

     Defendant.


* * * * * * * * * * * *


     DEPOSITION OF ANITA CROSBY, taken pursuant to
stipulation and agreement before Pamela A. Wilbanks,
Registered Professional Reporter and Commissioner for
the State of Alabama at Large, in the Law Offices of
Balch & Bingham, 105 Tallapoosa Street, Suite 200,
Montgomery, Alabama, on Friday, July 13, 2007,
commencing at approximately 1:00 p.m.


* * * * * * * * * * * *

## Page 2

```
 1
 2              APPEARANCES
 3
 4   FOR THE PLAINTIFF:
 5   Mr. William G. Pecau
     Ms. Rachel M. Marmer
 6   STEPTOE & JOHNSON
     Attorneys at Law
 7   1330 Connecticut Avenue NW
     Washington, D.C. 20036-1795
 8
     FOR THE DEFENDANT:
 9
     Mr. Victor T. Hudson
10   HUDSON & WATTS
     Attorneys at Law
11   Suite 2500
     One St. Louis Centre
12   Mobile, AL 36602
13   ALSO PRESENT:
14   Mr. Rex Turner, Jr., Ed.D.
15
16
         * * * * * * * * * * * *
17
         EXAMINATION INDEX
18
     BY MR. PECAU . . . . . . . . . .   5
19
20       * * * * * * * * * * * *
21
22
23
```

## Page 3

```
 1         EXHIBIT INDEX
 2   120  Notice of deposition           17
 3   121  Degrees listed by term from Regions    20
          University
 4
     122  Degrees listed by date conferred from  22
 5        Regions University
 6   123  Ledger balance for advertising         33
          expenditures 1/1/04 through 6/30/04
 7
     124  Admissions Application for Regions     47
 8        University
 9   125  Regions University Student Application 55
          Needs List
10
     126  Letters sent to other universities for 87
11        notification of name change
12   127  8/7/06 letter to whom it may concern from  88
          Dr. Turner announcing the name change of
13        the university
14
15
16
17
18
19         STIPULATION
20       It is hereby stipulated and agreed by and
21   between counsel representing the parties that the
22   deposition of ANITA CROSBY is taken pursuant to the
23   Federal Rules of Civil Procedure and that said
```

## Page 4

```
 1   deposition may be taken before Pamela A. Wilbanks,
 2   Registered Professional Reporter and Commissioner for
 3   the State of Alabama at Large, without the formality
 4   of a commission, that objections to questions other
 5   than objections as to the form of the question need
 6   not be made at this time but may be reserved for a
 7   ruling at such time as the said deposition may be
 8   offered in evidence or used for any other purpose by
 9   either party provided for by the Statute.
10        It is further stipulated and agreed by and
11   between counsel representing the parties in this case
12   that the filing of said deposition is hereby waived
13   and may be introduced at the trial of this case or
14   used in any other manner by either party hereto
15   provided for by the Statute regardless of the waiving
16   of the filing of the same.
17        It is further stipulated and agreed by and
18   between the parties hereto and the witness that the
19   signature of the witness to this deposition is hereby
20   not waived.
21
22       * * * * * * * * * * * *
23
```

## Page 5

```
 1             ANITA CROSBY
 2        The witness, after having first been duly
 3   sworn to speak the truth, the whole truth and nothing
 4   but the truth testified as follows:
 5             EXAMINATION
 6   BY MR. PECAU:
 7   Q.  Could you state your full name for the record,
 8       please?
 9   A.  Anita Lynn Crosby.
10   Q.  And where do you live?
11   A.  Millbrook, Alabama.
12   Q.  Millbrook, Alabama. Is that near Montgomery?
13   A.  Yes. It's approximately 20 miles north of
14       Montgomery.
15   Q.  How long have you lived in the Montgomery
16       area?
17   A.  Since 1985.
18   Q.  And where did you move from?
19   A.  Schiller Park, Illinois.
20   Q.  You're presently employed by Regions
21       University; is that right?
22   A.  That's correct.
23   Q.  And that was formerly Southern Christian
```

Page 30

1     (Off-the-record discussion.)
2  Q.  So in 2005-2006, it says that the typical
3      undergraduate full-time tuition was $9,600.
4  A.  Correct.
5  Q.  Is that what it was?
6  A.  Yes.
7  Q.  So is there a reason -- were students charged
8      a different amount in 2005-2006 than they were
9      in 2006-2007?
10 A.  We restructured our tuition.  In 2005-2006
11     full-time undergraduate students received a
12     half tuition scholarship.  We did away with
13     the scholarship in 2006-2007 and so reduced
14     the tuition.  So the net result is just a
15     little increase in charging of tuition.
16 Q.  So in 2005-2006 every single undergraduate got
17     a scholarship of approximately $4,800?
18 A.  Every full-time undergraduate student.
19 Q.  And then in 2006-- Let me go back.  So in
20     2005 and 2006 for full-time undergraduates,
21     the typical ones, the university was netting
22     approximately $4,800 per student; is that
23     correct?

Page 31

1  A.  That's correct.
2  Q.  And then in 2006-2007, those same students,
3      the school was netting $6,000; is that
4      correct?
5  A.  Correct.  On tuition.  We also did away with
6      the comprehensive fee for undergraduate
7      students.  We had a $400 undergraduate
8      comprehensive fee in 2005-2006.  That was a
9      one-time fee per semester.  That wasn't based
10     on semester hours.  That was done away with.
11     You're right.  We netted 6,000 in tuition in
12     2006-2007.  We netted $4,800 plus the $400
13     comprehensive fee in 2005-2006.
14 Q.  Which is $5,200?
15 A.  Correct.
16 Q.  So, in essence, what you did is you raised the
17     tuition from 5200 net to 6,000?
18 A.  Correct.
19 Q.  Have you done any studies specifically to
20     determine whether, for example, with the
21     Turner School of Theology that the school
22     makes money with those students?
23 A.  Are you asking me if we're operating in the

Page 32

1      black in the Turner School of Theology?
2  Q.  Yes.
3  A.  Yes, we are.
4  Q.  Does the Turner School of Theology have a
5      larger net -- does it give a larger net income
6      to the school than, for example, the
7      undergraduate programs?
8  A.  No.
9  Q.  Most money is made with the undergraduate
10     programs?
11 A.  No, I wouldn't say that either.  We have
12     undergraduate and graduate programs.  We have
13     graduate programs that are not within the
14     Turner School of Theology.  So the Turner
15     School of Theology versus everybody else,
16     Turner School of Theology does not net as much
17     as everybody else.  As far as everybody else,
18     I don't separate those out.
19 Q.  In terms of everybody other than the Turner
20     School, all the programs net in the black?
21 A.  Yes.
22     MR. PECAU:  Let's mark this as the
23        next exhibit, which is 123.

Page 33

1      (Exhibit 123 marked for
2         identification.)
3  Q.  Incidentally, if you ever want to take a break
4      and run outside and get warm or have another
5      reason for a break, just let us know.
6      (Brief off-the-record discussion.)
7  Q.  Let me show you what's been marked as Exhibit
8      123 and ask if you'll tell me what's shown
9      here.
10 A.  This is a copy of the general ledger for
11     advertising expenditures for January 1st, 2004
12     through June 30th, 2004.
13 Q.  So this basically shows -- what is the
14     total -- How do I figure out what the total
15     advertising was for January 1, 2004 through
16     June 30, 2004?
17 A.  Well, since our fiscal year runs from July to
18     June, there's no total for a January through
19     June.  So you actually have to physically go
20     on the second page, RU-2721, and would have to
21     total the debit columns and subtract the
22     credit columns.
23 Q.  Well, we don't have to do that now, thank

Deposition of Anita Crosby

July 13, 2007

Page 34

1    goodness.
2        Can I tell from these references what --
3    For example, on page 2721 of Exhibit 123, can
4    I tell what, for example, the $43,770.63 is
5    for?
6  A.  It's just for advertising.  You could tell it
7    came from accounts payable, but that's all you
8    can tell.
9  Q.  That's all you can --
10 A.  That's right.
11 Q.  In terms of advertising, what do you include
12   in advertising?  Why don't you tell me first
13   and then I'll ask you some follow-up
14   questions.
15       The question is, what do you include in
16   these numbers for advertising that are shown
17   in Exhibit 123?
18 A.  I include media placement, print advertising,
19   Internet advertising, production of
20   commercials, branding, promotional materials,
21   such as pens and markers.
22 Q.  Okay.
23 A.  I can't think of any other off the top of my

Page 35

1    head.
2  Q.  When you say branding, what do you mean by
3    that?
4  A.  For example, getting our name out there.
5  Q.  Can you give me an example of what that
6    means?  I know media advertising would be like
7    TV, radio, billboards.  You have magazine and
8    newspaper advertising.  You have brochures
9    that you send out.  So what are additional
10   things that you would put under advertising?
11 A.  Well, I guess how I look at it -- I'm not a
12   marketing person so I'm talking strictly
13   from --
14 Q.  I just want to know it from the chief
15   accountant's point.
16 A.  How I look at it, at the beginning of the
17   year, actually in February, we develop the
18   institutional budget for the next year that
19   begins July 1st.  In that budget we have our
20   typical advertising, and then we just added
21   extra because we knew, you know, throughout
22   the year -- when we changed our name in
23   August, we were going to have to add some more

Page 36

1    into it.  So it's kind of part of the media
2    placement and the Internet.  You can kind of
3    look at it two ways, but I had to have another
4    line item to make sure we weren't going to
5    overspend.
6  Q.  Right.  But what's shown in Exhibit 123 is
7    what you actually spent, right?
8  A.  Correct.
9  Q.  So what's included in the expenditures in
10   addition to, you know, media buys, production
11   costs, mailing, brochures and things like
12   that?
13 A.  Now, mailing is not in there.  That would
14   be --
15 Q.  Mailing is out of that?
16 A.  You're talking about just mailing brochures?
17 Q.  Yeah.  That's not included?
18 A.  No.  And we don't do a whole lot of mailing of
19   brochures.  Most of our brochures are
20   distributed over the Internet.  People will go
21   online and request information, and a brochure
22   will be sent to them or they are taken to a
23   career day or something like that.  There's

Page 37

1    not a whole lot of mailing.  So if there's a
2    one or two brochure that gets mailed out, it
3    just goes into postage.
4  Q.  You have recruiters which I think you folks
5    call advisors; is that correct?
6  A.  That's correct.
7  Q.  Would any of the expenditures relating to them
8    be included in this advertising?
9  A.  You mean their salaries or anything like that?
10 Q.  Their salaries.
11 A.  No.
12 Q.  You have to have an 800 number, for example.
13   Would that be included in here?
14 A.  No.
15 Q.  What else might be included in branding?  Is
16   there anything else you can think of?
17 A.  No.
18 Q.  Now, with respect to 2006-2007 -- that would
19   be July 1, 2006 through June 29, 2007 -- those
20   numbers, I guess, appear on pages RU-2726 and
21   RU-2727; is that correct?
22 A.  Yes.
23 Q.  Now, the number that's down here on the end

Page 38

1   balance is $1,251,012.76?
2   A.  Correct.
3   Q.  And that's money that actually went out of the
4       pockets of the university and was spent on
5       advertising; is that correct?
6   A.  Correct.
7   Q.  Now, in terms of the advertising expenditures,
8       the left-hand column has dates.  Do you see
9       that?
10  A.  Yes.
11  Q.  What are those dates representing?  Are those
12      the dates that the expenditure was incurred or
13      that the money went out?
14  A.  It could be either.
15  Q.  So do you have a policy on when you book an
16      expenditure?
17  A.  We try to book it as soon as we get the
18      invoice, try to post it and pay it
19      immediately.  I'm not saying that happens a
20      hundred percent of the time.  But normally
21      when an invoice comes in, we'll post it.  If
22      it's a July invoice, it will appear -- the
23      left-hand date would be the month it occurs

Page 39

1   in.  It's always the last day of the month.
2   Q.  Right.
3   A.  And then we try to pay it right out.
4   Q.  Let's say you get a bill that comes in your
5       office on 12/15, for example, and it's for
6       advertising expenditures that occurred a month
7       earlier.  So that would be 11/15.  And then
8       you paid it.  Well, when would you invoice
9       it?  The invoice -- You would invoice it as
10      soon as you got it in, right?
11  A.  When would we invoice it?
12  Q.  Yes.  When would it be put on your system?
13      You got it on 12/15.  It would show up here as
14      12/31, correct?
15  A.  Correct.
16  Q.  And then you would pay it sometime close to
17      that?
18  A.  Right.
19  Q.  Now, in terms of the advertising expenditures
20      shown on July 1, 2006 through June 29, 2007,
21      my understanding is that there wasn't any
22      advertising of the term "Regions University"
23      until after the first of the year.  Do you

Page 40

1   have any understanding about that?
2   A.  That's my recollection as well.
3   Q.  Based on that, everything prior to 1/31 would
4       be for Southern Christian University.  Would
5       that be an accurate statement?
6   A.  I believe that is accurate.
7   Q.  Now, is there a budgeted amount -- this is
8       just through -- Now, for the year prior to
9       that, which would be July 1, 2005 through June
10      29, 2006, it looks like the total expenditures
11      were $706,349.23; is that correct?
12  A.  That's correct.
13  Q.  And the year prior to that, which is the
14      fiscal year ending 6/30/2005, the total
15      expenditures were $637,000 and change?
16  A.  That's correct.
17  Q.  It isn't shown here, but do you know
18      approximately what the total expenditures were
19      for the fiscal year prior to the one ending
20      6/30/2004?
21  A.  I believe it was 550,000 approximately.
22  Q.  Do these numbers include the 15 percent or
23      thereabouts fees for paying your advertisers?

Page 41

1   A.  Yes.
2   Q.  And that's Ms. Costanza?
3   A.  Right.  Blue Group.
4   Q.  Do you know when Southern Christian University
5       started advertising on television?
6   A.  No, I don't.  It's been several years.
7   Q.  Let me show you what's been marked previously
8       as Exhibit 48.  Do you see that?
9   A.  Yes.
10  Q.  At the end of that document, there's a
11      six-figure number.  What is that?  I don't
12      have it in front of me so I can't see it.
13          MR. HUDSON:  Let me try and read it.
14          MR. PECAU:  Let me point it out to
15              you.
16  Q.  This one, the second one on the page.
17  A.  831,500.
18  Q.  Can you tell me what that's supposed to
19      represent?  Do you know?
20  A.  That is projected expenditures from our media
21      company for the calendar year of 2007, and
22      that was done, looks like, several months ago.
23  Q.  And has that budget been revised since?  Do

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR   THE

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,          *
                                *
        Plaintiff,              *
                                *
Vs.                             *   CIVIL ACTION NUMBER
                                *
REGIONS UNIVERSITY, INC.,       *     2:06cv882-MHT
                                *
        Defendant.              *


    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


      Rule 30(b)(5) deposition of Regions Asset

Company, taken through the witness, RUSSELL S.

DUNMAN, before David Michael Camp, Commissioner,

in the law offices of Balch & Bingham, LLP, 105

Tallapoosa Street, Suite 200, Montgomery, Alabama,

on May 9th, 2007, commencing at approximately

9:17

        a.m.

Page 2

```
 1   A P P E A R A N C E S
 2
 3   For Plaintiff:
        BALCH & BINGHAM, LLP
 4      Attorneys at Law
        Post Office Box 78
 5      Montgomery, Alabama 36101
        (334) 834-6500
 6   BY: CHARLES PATERSON
 7      -AND-
 8      STEPTOE & JOHNSON, LLP
        Attorneys at Law
 9      1330 Connecticut Avenue
        Washington, D.C. 20036
10      (202) 429-3000
     BY: WILLIAM G. PECAU
11
12
     For Defendant:
13      HUDSON & WATTS, L.L.P.
        Attorneys at Law
14      One St. Louis Centre, Suite 2500
        Post Office Box 989
15      Mobile, Alabama 36601
        (251) 432-7200
16   BY: VICTOR T. HUDSON
17      -AND-
18      SHLESINGER, ARKWRIGHT & GARVEY, LLP
        Attorneys at Law
19      1420 King Street, Suite 600
        Alexandria, Virginia 22314
20      (703)684-5600
     BY: JAMES E. SHLESINGER
21
22   Also present: REX A. TURNER, JR.
23          * * * * * * * * * *
```

Page 3

```
 1        I N D E X
 2
 3   Witness
     RUSSELL S. DUNMAN
 4
 5
        EXAMINATION
 6
     MR. SHLESINGER ...................   6
 7
 8        * * * * * * * * *
 9
10
11
        EXHIBITS
12
     DEFENDANT'S EXHIBIT ONE ...........   61
13   DEFENDANT'S EXHIBIT TWO ...........   81
     DEFENDANT'S EXHIBIT THREE ........   85
14   DEFENDANT'S EXHIBIT FOUR .........   97
     DEFENDANT'S EXHIBIT FIVE ..........  143
15   DEFENDANT'S EXHIBIT SIX ...........  143
16
        * * * * * * * * * *
17
18
19
20
21
22
23
```

Page 4

```
 1        STIPULATION
 2        It is stipulated by and between the parties
 3   hereto and their respective attorneys at law that
 4   the deposition on oral examination of the Witness,
 5   RUSSELL S. DUNMAN, may be taken before David
 6   Michael Camp, Commissioner and Notary Public,
 7   State of Alabama at Large, and that the said
 8   deposition shall be taken in accordance with and,
 9   when so taken, may be used in accordance with the
10   provisions of the Federal Rules of Civil
11   Procedure.
12        It is further stipulated and agreed that all
13   notices provided for by said Federal Rules of
14   Civil Procedure are waived, as is the reading over
15   of said deposition to or by the witness, the
16   signing thereof by the witness, the signing and
17   certification of said David Michael Camp, the
18   filing of said deposition with the Clerk of the
19   Court and all other requirements and
20   technicalities of every sort which would be a
21   prerequisite to the use of said deposition.
22        It is the intent of the parties hereto that
23   this deposition may be used in evidence as though
```

Page 5

```
 1   all requirements of said Federal Rules of Civil
 2   Procedure had been complied with.
 3        It is further stipulated and agreed that all
 4   parties hereto reserve the right to have
 5   corrections made to this deposition as provided
 6   for by said Federal Rules of Civil Procedure.
 7        It is further stipulated and agreed that all
 8   objections, save as to the form of the questions
 9   asked and the responsiveness of the answers
10   thereto are reserved until the time of trial in
11   accordance with the provisions of said Federal
12   Rules of Civil Procedure.
13
14        * * * * * * * * * * *
15
16
17
18
19
20
21
22
23
```

2 (Pages 2 to 5)

Page 34

1    I object to the form of the
2    question.
3    THE WITNESS:
4    Trying to recall all those would be
5    futile on my part. But an example
6    would be -- for example, our check
7    supplier may be out of Atlanta.
8    Harland Check Company may come and
9    talk about a new check offering that
10   we would be offering to our
11   customers.
12   BY MR. SHLESINGER:
13   Q    Okay. What efforts, if you know, have
14   been taken by Regions Bank to enforce its name
15   against other companies?
16   A    I know of -- I know of no specific
17   instances.
18   Q    Okay. You're aware of this proceeding.
19   Correct?
20   A    Yes, sir, correct. This one. Beyond
21   this one.
22   Q    Aside from this one, you're not aware of
23   any?

Page 35

1    A    No, sir.
2    Q    Okay. Are you aware of anyone using the
3    name "Region" or "Regions" other than the bank or
4    Regions University?
5    A    No, sir. Other than involved in this
6    case.
7    Q    Okay. So you're not aware of any
8    businesses that use the name "Region" or "Regions"
9    other than Regions Bank and Regions University?
10   A    No, sir.
11   Q    Would you expect that someone would
12   bring that to your attention if they became aware
13   of that?
14   MR. PECAU:
15   I object to the form of the
16   question.
17   THE WITNESS:
18   Not necessarily, no.
19   BY MR. SHLESINGER:
20   Q    Okay. It's not one of your duties?
21   A    No, sir.
22   Q    That would be someone in Birmingham that
23   would have that responsibility, if you know?

Page 36

1    A    Yes, sir. That's what I would assume.
2    Q    Do you know who that would be?
3    A    I mentioned the name Bill Askew, would
4    be the individual that I would go to.
5    Q    Okay. Would you briefly describe the
6    types of services that the bank provides?
7    A    Basic banking services; checking
8    accounts, savings accounts or time deposit type
9    accounts. Loans. That would be the area that I
10   have most responsibility for, the wide range of
11   services, including trust, investment services,
12   real estate mortgage services, construction
13   lending, real estate lending, private banking
14   would be the majority.
15   Q    All right. Does the bank provide any
16   insurance services?
17   A    I'm sorry. Insurance services, yes,
18   sir.
19   Q    Any other services that the bank
20   provides? You've mentioned, of course, basic
21   banking, checking, loans, trusts, trust accounts,
22   investment services, real estate services,
23   lending, construction lending, and then insurance

Page 37

1    services. Did I miss anything?
2    A    I don't think so. That sounds like the
3    list.
4    Q    Okay. And do you know whether all of
5    these services are identified under the name
6    "Regions?"
7    A    They have Regions attached to them, yes,
8    sir.
9    Q    Are there other names that the bank uses
10   to identify these services?
11   A    In a hyphenated basis, I can only think
12   of one.
13   Q    What's that?
14   A    That would be Morgan Keegan, which would
15   be our investment service. And that is a Regions-
16   Morgan Keegan Investments.
17   Q    And does the Regions-Morgan Keegan
18   Investments also cover only the sixteen states in
19   which Regions does business?
20   A    Yes, sir, I think so.
21   Q    What types of insurance services does
22   the bank provide?
23   A    The ones that I'm familiar with would

10  (Pages 34 to 37)

Russell Dunman                                              James Shlesinger

Page 38

1  include credit insurance or credit life type
2  insurance, term life insurance. Others I'm not
3  familiar with because they are not typically dealt
4  with on the consumer side of the bank.
5      Q   I see. And who would be responsible for
6  or who would have the knowledge with respect to
7  the insurance part of the business?
8      A   I don't have a name for you at the
9  corporate location. Again, it would be in
10  Birmingham.
11      Q   Have you always worked in Montgomery
12  County?
13      A   Yes, sir.
14      Q   Mr. Dunman, let's go through the
15  category of customers that the bank services. For
16  basic banking services, who are your customers?
17      A   Anyone that can get to or call or work
18  on the internet to the bank, to Regions.
19      Q   So there's no restriction as to who
20  would be a customer of the bank?
21      A   None, whatsoever. No, sir.
22      Q   Could a minor be a customer?
23      A   With a parent's consent, yes, sir.

Page 39

1      Q   Would the same apply to checking
2  accounts?
3      A   Yes, sir.
4      Q   And loans?
5      A   Correct.
6      Q   What about investment services?
7      A   Anyone -- yes, sir. Anyone that's
8  eligible to request the service.
9      Q   You mentioned real estate lending. What
10  is that?
11      A   Primarily the commercial side of the
12  bank that deals with that would be loans for
13  construction of new housing, new homes, commercial
14  buildings, office buildings of all sorts.
15  Property development loans.
16      Q   Okay. Are you familiar with the bank's
17  Regions University?
18      A   Yes, sir, I am.
19      Q   Have you participated in that bank -- in
20  the bank's program?
21      A   Yes, sir, I have.
22      Q   When have you participated in that
23  program?

Page 40

1      A   It was an entity that was there that we
2  all used to carry on our ongoing internal
3  educational requirements. That is what we call
4  our educational arm of the company.
5      Q   So when you were first employed by the
6  bank, did you go through the Regions University
7  program?
8      A   That -- the Regions University was
9  nonexistent thirty-four years ago. So --
10      Q   Okay. When did it start up as an
11  institution?
12      A   I can't give you a date. Within the
13  last five years, I would say, is when that name
14  became part of our vocabulary here.
15      Q   When do you recall you first experienced
16  the Regions University service?
17      A   At the point that the company adopted --
18  changed its name of its training program from
19  whatever it was to Regions University, we were all
20  introduced to Regions University as where we would
21  go for corporate training that we would encounter.
22      Q   And do you recall when that was?
23      A   No, sir, I don't. I don't remember the

Page 41

1  date.
2      Q   Do you recall the name prior to adopting
3  that name?
4      A   No, sir.
5      Q   Okay. How often have you used the
6  corporate training program?
7      A   A lot. It's almost a -- it's almost a
8  daily ritual to look and see what courses are
9  required.
10      Q   And is that ritual through online?
11      A   Yes, sir. Most is online.
12      Q   But there is some that's not online?
13      A   There is face-to-face training involved,
14  as well, yes, sir.
15      Q   Okay. For the online training, is it
16  necessary to have some sort of access code to get
17  to that training service?
18      A   You have to sign on to your computer so
19  you use your password to get into your computer.
20  And then there may be additional passwords
21  required for registration purposes.
22      Q   So you have to have a password in order
23  to access the training program?

11 (Pages 38 to 41)

Russell Dunman                                          James Shlesinger

---

Page 42

1    A   The computer, yes, sir.
2    Q   Okay. And then you mentioned there are
3  some off-line parts of this service, as well.
4    A   Yes, sir.
5    Q   And what are those?
6    A   It would be classroom instruction that
7  the company has deemed a requirement rather than
8  online, where you face to face with an instructor
9  in a classroom setting.
10   Q   Okay. And where would the classroom
11 instruction take place?
12   A   Anywhere that the company sends an
13 instructor or invites the students. It can be at
14 any location. There aren't specific locations for
15 those classes.
16   Q   Have you attended any of those?
17   A   Yes, sir.
18   Q   Where would you have attended those?
19   A   Primarily in Birmingham would be where,
20 but Montgomery also hosts a number of those for
21 our area here.
22   Q   What type of programs are involved with
23 Regions University?

---

Page 43

1    A   For the online or the face to face?
2    Q   Let's start with the online.
3    A   It virtually goes from banking 101, if
4  you will. The day you're hired, you're introduced
5  to Regions University as the place you go to get
6  basic courses. And it goes through advanced
7  courses of all sorts, product specific, line of
8  business specific. It's where we all go for our
9  training.
10   Q   And with respect to the classroom
11 instruction, does that also include the basic
12 banking 101?
13   A   Yes, sir, it could. Some of those
14 classes are also basic banking courses.
15   Q   So it's fair to say the classroom
16 training would also cover the full gamut of the
17 services under this Regions University?
18   A   Yes, sir, correct.
19   Q   Do you know whether every employee is
20 required to go through a training program of this
21 type with the bank?
22   A   There are courses that require every
23 employee to enroll and complete the course, yes,

---

Page 44

1  sir.
2    Q   And do you know what courses those are?
3    A   One specific is what we call a Bank
4  Security Act and an anti money laundering course
5  that all of our bank associates are required to
6  take.
7    Q   Is there any type of ethics course that
8  the employees are required to take?
9    A   Correct, ethics courses. Business
10 Ethics is one also.
11   Q   You mentioned the Bank Security Act.
12   A   Yes, sir.
13   Q   What does that mean?
14   A   The Bank Security Act is a federal law
15 requiring banks to take certain action before and
16 during the account opening process.
17   Q   And the money laundering is also a
18 federal law?
19   A   Yes, sir.
20   Q   And so you're basically educating your
21 employees as to the requirements or parameters
22 involved with money laundering?
23   A   Correct.

---

Page 45

1    Q   Do you know whether the bank provides
2  these services to people not employed by the bank?
3    A   Not to my knowledge, no.
4    Q   So to the best of your knowledge, you
5  don't know -- it's strictly employees of the bank
6  that receive this training?
7    A   That's correct.
8    Q   For the corporate training, whether it
9  be the 101 type of training, the basic courses, or
10 even the specific courses having to do with bank
11 security or ethics, whatnot, it's all strictly
12 employees of the bank that are enrolled in these
13 programs. Correct?
14   A   Yes, sir.
15   Q   And to the best of your knowledge, no
16 one outside of the bank attends these programs.
17 Is that true?
18   A   That's correct.
19   Q   Does the bank offer any products to the
20 consuming public?
21   A   Yes, sir.
22   Q   What types of products?
23   A   Checking accounts, savings accounts,

---

12  (Pages 42 to 45)

Page 98

1   Exhibit Four doesn't have anything
2   to do with this witness.
3   MR. HUDSON:
4   No.  But the only reason I did that
5   is to keep a record for both you and
6   me that they've been produced by
7   you.
8   MR. PATERSON:
9   Sure.
10  MR. HUDSON:
11  And also to help you alleviate your
12  problem of not having them Bates
13  stamped.  So now you don't have to
14  worry about it.
15  MR. PECAU:
16  We will reproduce them with Bates
17  stamps.
18  MR. HUDSON:
19  That's fine.  If you want to Bates
20  stamp Four, that's all right too.  I
21  don't care.  I just want to take one
22  with me and I want to be able to
23  keep up with what has been produced

Page 99

1   as to you.  That's all I'm trying to
2   do.
3   MR. PECAU:
4   Sure.
5   BY MR. SHLESINGER:
6   Q   Mr. Dunman, are you familiar with the
7   Regions Charity Classic?
8   A   Yes, sir.
9   Q   And what is that?
10  A   It's an annual golf event held in
11  Birmingham each year.
12  Q   And is that a golf event for the
13  employees of Regions Bank?
14  A   No, sir.  It's a professional -- I think
15  it's the Senior PGA Tour that comes into
16  Birmingham.
17  Q   And how long has the bank been
18  sponsoring that event?
19  A   Two or three years.
20  Q   And so were there prior Regions Charity
21  Classics --
22  A   No, sir.
23  Q   -- before the sponsorship of this event?

Page 100

1   A   No, sir.
2   Q   Senior PGA Tour?
3   A   Yes, sir.
4   Q   Where is it located?
5   A   At Ross Bridge Resort and Golf in
6   Birmingham.
7   Q   What other types of events does the bank
8   sponsor?
9   A   Locally?
10  Q   Start locally.
11  A   We sponsor some community-wide events
12  such as the Montgomery Ballet's season opening
13  event in July of each year.
14  Q   Okay.
15  A   We sponsor the opening event of the
16  Montgomery Symphony each year in September, August
17  or September.  September, I guess.
18  Q   And when you say "sponsor," you are a
19  contributor --
20  A   We are the signature sponsor.  It's a
21  signature event.
22  Q   Okay.  Aside from the ballet and the
23  symphony, which others?

Page 101

1   A   The opening of the Arts, Fall Arts
2   exhibits each fall in September, is the Regions
3   Art Show.
4   Q   Any others?
5   A   We participate in a number of charitable
6   and community events that Regions is a major
7   sponsor of, such as the Heart Walk, the Arthritis
8   Walk, the Breast Cancer Awareness Walk, the United
9   Way campaign in a big way, sponsor at luncheons
10  and that sort of thing for United Way.
11  There are very few community-wide events that
12  Regions is not a part of.
13  Q   Okay.  Outside of the community events,
14  what more state-wide events are you sponsoring?
15  A   We are involved in the -- we're the --
16  Regions Bank is the official bank of the
17  Southeastern Conference.  And I think it's the
18  Gulf South Conference.  We have two major
19  conference sponsorships.
20  Q   Gulf South Conference?
21  A   I think that's correct, yes.
22  Q   With respect to your sponsorship of the
23  Southeastern Conference, what does that entail?

26 (Pages 98 to 101)

Page 102

1      A   Major advertising campaigns, sponsorship
2  of post-game shows on radio and participation in
3  Southeastern Conference events that surround those
4  activities. A lot of media coverage with that
5  sponsorship.
6      Q   What type of major advertising campaigns
7  are you talking about here with the Southeastern
8  Conference sponsorship?
9      A   Radio, television and print media.
10     Q   And with respect to the post-game show
11  sponsorship, what does that mean?
12     A   On the radio. It's the fifth quarter
13  show, if you will, the after-the-game report on
14  the game.
15     Q   How long have you been doing that?
16     A   That's been for a number of years.
17  Probably at least ten years we've been doing that
18  sort of activity with or for the Southeastern
19  Conference.
20     Q   And how long has the bank been
21  associated with sponsoring the Southeastern
22  Conference, if you know?
23     A   I don't know exactly as the official

Page 103

1  sponsor of the SEC. We've been involved with
2  sponsoring events with the SEC on a specific event
3  in a number of years, over ten years.
4      Q   When you say "official sponsor of the
5  SEC," what do you mean by that?
6      A   It's an endorsement that's paid for
7  through the Southeastern Conference to be named as
8  the official bank of the Southeastern Conference.
9      Q   And how long have you been the official
10  bank of the Southeastern Conference, if you know?
11     A   Three to five years. I don't know the
12  specific date.
13     Q   And then you mentioned the Gulf South
14  Conference?
15     A   And it may be the Sun Belt Conference.
16  I'm trying to remember the other conference we're
17  involved with. I think it's probably the Sun Belt
18  Conference.
19     Q   Okay. Are you the official sponsor of
20  that conference?
21     A   Yes, sir.
22     Q   And you mentioned that you get a lot of
23  media coverage as being the official sponsor of

Page 104

1  these conferences. What do you mean by that?
2      A   The campaigns that surround the fall of
3  each year, or the basketball season of each year,
4  use the football or basketball theme pretty
5  extensively in our advertising using the SEC
6  connection.
7      Q   In other words, the television coverage
8  of the games, you're saying, shows the Regions
9  name?
10     A   Yes, sir.
11     Q   As part of the sponsorship?
12     A   Correct.
13     Q   In what manner?
14     A   As -- in the voice-over or whatever you
15  call the voices discussing Regions Bank and the
16  logo would then be used as the screen at the time
17  the ad is shown.
18     Q   Do you have any signs that you display
19  at the various venues in these -- for the
20  Southeastern --
21     A   I can't speak to that. I haven't been
22  in the ballpark, if you will, to see that. I
23  don't know whether we use signage there or not.

Page 105

1      Q   Okay. And who is the person that's
2  responsible for the advertising and promotion of
3  the bank as it relates to sponsorship?
4      A   My contact would be Bill Askew again.
5      Q   Are you aware of any brand awareness
6  studies that have been performed concerning the
7  name "Regions?"
8      A   Yes, sir.
9      Q   And what is your understanding of that?
10  What is your understanding of brand awareness
11  studies that have been performed?
12     A   They are produced on a periodic basis at
13  the direction of the corporate area for use in
14  determining how we are perceived in the public,
15  our brand is recognized in the public.
16     Q   And do you receive copies of those
17  reports?
18     A   Yes, uh-huh.
19     Q   And do those reports cover the full
20  sixteen-state region for the bank?
21     A   Typically, I would receive an executive
22  summary of the entire company with specific
23  information regarding the area that I'm

27 (Pages 102 to 105)

Page 110

1  participating on the community level.
2      Q   In your judgement, would someone who is
3  familiar with all of the services that you provide
4  be confused with another institution that provides
5  higher education?
6      MR. PECAU:
7      I object to the form of the
8      question.
9      THE WITNESS:
10     In my opinion, it could be possible,
11     yes, sir.
12 BY MR. SHLESINGER:
13     Q   And why could that be possible?
14     MR. PECAU:
15     Object, asking for speculation.  You
16     can answer.
17 BY MR. SHLESINGER:
18     Q   Go ahead.  You can answer.
19     A   It's my opinion that Regions and its
20 predecessors, now Regions, have worked extremely
21 hard to make their name distinctive, very -- very
22 prevalent, very positive in the community, all the
23 communities we are in, without regard to where

Page 111

1  they are.
2      And anyone using that moniker or that name
3  could be confusing to the customer and could cause
4  some concern should their mission not be one that
5  would be something that Regions could embrace.  In
6  other words, I think our logo and our name stands
7  alone as an institution of integrity, high
8  community standing.
9      And we don't want to run the risk of having
10 that name associated with or mis-associated with
11 anyone or anything that may take away from that.
12 We've worked awfully hard to make the Regions name
13 the name everyone remembers for something
14 positive.
15     Q   It's true that your customers have a
16 relatively high degree of sophistication, correct,
17 in determining what bank to use or not use?
18     MR. PECAU:
19     Object to the form of the question.
20     THE WITNESS:
21     Answer?
22     MR. PECAU:
23     Go ahead.

Page 112

1      THE WITNESS:
2      We don't restrict our services to
3      anyone.  So levels of sophistication
4      is not something we typically try
5      and judge.  We want the name to be
6      positive because we work hard at
7      community involvement at all levels,
8      from first-time home buyers to the
9      less fortunate, if you will, through
10     charitable events and participation
11     in United Way and other things such
12     as that.  So I don't know that
13     customer sophistication has anything
14     to do with our desire to be
15     positive.  We want everyone to see
16     us in the same light.
17 BY MR. SHLESINGER:
18     Q   Has the bank ever gotten into the
19 education business that you're aware of?
20     A   Through Regions University, our Regions
21 University, we educate our employees.  We do
22 participate and sponsor community education
23 processes as they relate to banking or financial

Page 113

1  services such as a first-time home buyers seminar
2  sponsored by Regions, investment seminars
3  sponsored by Regions, how to open a checking
4  account seminars sponsored by Regions.
5      And in our educational connection with the
6  Montgomery Public Schools or Montgomery schools in
7  general, as far as that goes, we have a program
8  through The Alabama Young Bankers division of the
9  Alabama Bankers Association that goes into schools
10 and presents economic education programs.
11     We're very much involved in banking and
12 financial matter education in the community with
13 Regions as the -- as the lead sponsor.
14     Q   And you mentioned you sponsor education
15 community programs?
16     A   Yes, sir.
17     Q   What type of programs do you sponsor?
18     A   Some examples would be what we call
19 first-time home buyer programs where someone who
20 is not familiar with the mortgage process or how
21 to buy a home, we would offer a seminar to those
22 individuals, open to the public.
23     We would offer investment seminars to those

29 (Pages 110 to 113)

Russell Dunman                                                    James Shlesinger

---

**Page 114**

1  that are interested in, in this case, more
2  sophisticated but how to manage their
3  investments. And we would offer basic education
4  about how to open and manage a checking account.
5  We do that, as well.
6      Q   Do you offer these programs at the bank,
7  itself?
8      A   They can be offered at the bank, in the
9  lobby of a branch, in the facilities in the main
10  office, or they can be off site at the office or
11  the headquarters of an agency or community agency
12  who asks us to come in and present the program.
13      Q   Can you give me examples of the off-site
14  community education?
15      A   We have an organization here called OIC,
16  Opportunities Industrialization Council, I think,
17  is the name of it, and we go there. They are a
18  kind of a job training program and we give them
19  periodic, at their request or invitation, seminars
20  to their students on how to manage a checking
21  account, for example.
22      Q   You said OIC?
23      A   OIC.

---

**Page 115**

1      Q   Opportunity?
2      A   Opportunities Industrialization
3  Council. And I apologize if I don't have that
4  right. We just simply know it as Alabama OIC.
5      Q   Okay. And so you have employees go in
6  and train people on these various -- whether it be
7  home buying or investments or checking programs?
8      A   Yes, sir.
9      Q   Do you provide any education outside of
10  the training in various banking functions?
11      A   No, not typically. That's what we focus
12  on, is banking services and related financial
13  services information.
14      Q   What would be the atypical, if you do
15  provide it?
16      A   I guess an example of an atypical is an
17  invitation to speak to the -- I think the official
18  sponsor was maybe the Black Belt Mayors
19  Conference, and we go and talk about how to bank
20  the un-bankable or how to bank the un-bank, I
21  should say. Not the un-bankable.
22      Which is a general topic of how to maintain
23  your credit rating, how to maintain your checking

---

**Page 116**

1  account, how to do the right things, in other
2  words, to receive bank services. Again, it's
3  related to financial services but it has to do
4  with the impact that being associated with a bank
5  as a customer may have on your standing in other
6  areas.
7      Q   Do you go to any schools to educate them
8  on any of these services?
9      A   Yes, sir, we do.
10      Q   Okay. At the university level, do you
11  go to the schools?
12      A   We do go to the schools, yes, sir.
13      Q   Which schools?
14      A   In our area, we would participate with
15  AUM, Auburn University. We have participated with
16  Alabama State University, Huntingdon College,
17  Faulkner University.
18      Q   Faulkner, you said?
19      A   Yes, sir.
20      Q   Faulkner University?
21      A   Faulkner University. Any school in this
22  area from the grade school level -- typically,
23  that's not where we begin. But we do participate

---

**Page 117**

1  in Partners in Education there which is more
2  supportive.
3      But where we're invited or they have a need
4  for financial services or economic education, if
5  you will, we will go and partner with them and
6  help them by providing speakers to come to their
7  location.
8      Q   Okay. Staying with the university
9  level, you say you do send employees to speak or
10  talk at Auburn University, for example.
11      A   Yes, sir.
12      Q   And what types of topics do you discuss
13  with people at Auburn University?
14      A   The classes -- we would invite speakers
15  from some of our business partners, such as the
16  investment area, an investment analyst maybe, to
17  go into a classroom and discuss investment
18  strategies or general investment practices and
19  that sort of thing or from a basic banking point
20  of view, the Federal Reserve system and how it
21  works and how the effect of the economic system is
22  carried out through the Federal Reserve System,
23  how banks react to that.

---

30 (Pages 114 to 117)

Russell Dunman                                         James Shlesinger

Page 118

1    Q   Are you personally familiar with someone
2    speaking about the Federal Reserve System and how
3    it operates?
4    A   Not necessarily at the university
5    level. But at the high school level, yes, sir.
6    Q   And so someone would actually attend a
7    class, one of the high schools' classrooms, and
8    speak about that particular topic?
9    A   Yes, sir.
10   Q   Okay. And at the university level, what
11   about investment strategies? Are you familiar
12   with any of those?
13   A   Yes, sir.
14   Q   Okay. Can you identify one
15   specifically?
16   A   No. I don't have a class name or a
17   course name. It's an offering we have out there
18   that we make available to them and they -- they
19   would have a direct contact with someone, for
20   example, Morgan Keegan, our investment arm, to
21   make that contact to request a speaker to be
22   there.
23   Q   You don't operate any courses though on

Page 119

1    investment banking at any of these institutions?
2    A   No, sir.
3    Q   Are you familiar with some of the
4    regulations involving banking as to what a bank
5    can do and not do? And I'm being very broad
6    here. But I know it's a heavily regulated
7    industry. And maybe I'll just start with a simple
8    B-A-N-K versus B-A-N-C.
9    Do you have any knowledge as to why that is,
10   that someone can use B-A-N-C but not B-A-N-K, or
11   vice versa?
12   MR. PECAU:
13   I object to the form of the
14   question.
15   BY MR. SHLESINGER:
16   Q   If you know.
17   A   Not a clue, no, sir.
18   MR. HUDSON:
19   Let's take a lunch break.
20   MR. PECAU:
21   It's twelve-fifteen. So if you want
22   to.
23   MR. HUDSON:

Page 120

1    Yes.
2    WHEREUPON, A LUNCH RECESS WAS TAKEN.
3    BY MR. SHLESINGER:
4    Q   On the chain of command with Regions
5    Bank, you say you report to Arthur Ducote.
6    A   Ducote, correct.
7    Q   And what is his title again?
8    A   Area Executive.
9    Q   And is he in Birmingham?
10   A   He's here in Montgomery.
11   Q   He's in Montgomery.
12   A   Yes, sir.
13   Q   And who would he report to, if you know?
14   A   He reports to what we call the Regional
15   President. And his name is Sam Torticci,
16   T-O-R-T-I-C-C-I.
17   Q   He's the regional executive?
18   A   Regional President.
19   Q   Is he also in Montgomery?
20   A   He's in Montgomery.
21   Q   He's in Birmingham.
22   A   His region is Alabama. He has the state
23   of Alabama.

Page 121

1    Q   I see. And Mr. Torticci, who would he
2    then report to, if you know?
3    A   I'm not sure what the chain of command
4    is. With the new organization, at this point,
5    there's been some change. So I'm not sure I know
6    exactly where it goes from there with the new
7    organization.
8    Q   And we were discussing the education of
9    students and others at the various levels. We had
10   talked about Auburn University. And then the bank
11   had sent people there to instruct students about
12   investment programs.
13   A   That was one of the programs I suggested
14   that was offered if they wanted to take advantage
15   of it.
16   Q   What other programs have been offered at
17   Auburn University?
18   A   I could answer that better by saying
19   that Regions would offer its services or support
20   or a program they wanted to present there, as long
21   as the topic typically is about banking or
22   financial services of some sort.
23   Q   But you're personally aware that they

31 (Pages 118 to 121)

Page 126

1    But it was also chosen because it was a very
2    distinctive name, extremely distinctive in that
3    there was no other indication that we were
4    anything other than what we purported to be, and
5    that was a bank.  And we wanted it that way.
6        We chose the name "Regions" to be
7    distinctive, knowing that both concepts could
8    expand, no matter how far we took the company.
9        Q    So it's fair to say that the adoption of
10   the name was coincident with the dictionary
11   definition of the term "regions," that you had a
12   region in Alabama, you had a region in Mississippi
13   and it was this combination of these regions to
14   form Regions.  Is that correct?
15       MR. PECAU:
16           Objection to the form of the
17           question.
18       THE WITNESS:
19           That would be a part of it, yes.
20   BY MR. SHLESINGER:
21       Q    What other part of it would there be?
22       A    The distinct name, very distinct name.
23       Q    When you say a "distinct name," a

Page 127

1    distinct name in the sense that the logo, whether
2    in the first name with the stylized G, created the
3    distinctiveness of the name.  Correct?
4        MR. PECAU:
5            Object to the form.
6        THE WITNESS:
7            Again, I think two pieces to that.
8            That was the distinctive part of the
9            logo but the name, in and of itself,
10           was distinct.  There was nothing
11           like it that I recall seeing at the
12           time we investigated the name.
13   BY MR. SHLESINGER:
14       Q    So your understanding of "distinct" was
15   because there was no other business or concern or
16   whatever that was using that name?  Is that
17   correct?
18       A    That's correct.
19       Q    And then that's why you believe it is
20   distinctive?
21       A    The name creates -- we wanted our
22   reputation to be distinct in the sense of quality
23   of service and all the things we strive to be at

Page 128

1    Regions.  So we chose a name that was one of a
2    kind in our mind in order to make sure that we
3    were distinct in both name and service and quality
4    and the things that go with it.
5        Q    Except for the services that Regions
6    University provides, and I'm saying Regions Bank's
7    university, what similarities are in the services
8    that the bank provides and the services of a
9    higher education institution?
10       MR. PECAU:
11           I object to the form.  Go ahead and
12           answer.
13       THE WITNESS:
14           If I may, to be sure I answer the
15           question you're asking, what's the
16           difference between what services we
17           offer and what the services of what
18           a higher education institution
19           offer?
20   BY MR. SHLESINGER:
21       Q    Actually, the similarities.  What are
22   the similarities between the two?
23       A    I would think that any similarity would

Page 129

1    equate itself to the reputation it has, the
2    quality of the product, if you will, it delivers,
3    and the reputation it maintains in the community.
4        Q    I'll rephrase it.  And we're not talking
5    about Regions University.
6        A    I understand.  Right.
7        Q    Are there specific similarities that you
8    can pinpoint between the products and services
9    that the bank provides and the products and
10   services that are provided by a higher educational
11   institution?
12       MR. PECAU:
13           Object to the form of the question.
14           Go ahead and answer.
15       THE WITNESS:
16           I don't see a similarity because we
17           are in the financial services
18           business.  They are in the
19           educational business.  The joint
20           between the two is the support that
21           Regions provides to the educational
22           system through the issues we've
23           discussed already, the programs and

33  (Pages 126 to 129)

Russell Dunman

James Shlesinger

Page 130

1    the financial support and that sort
2    of thing.
3  BY MR. SHLESINGER:
4    Q    So the link or the similarity between
5  the two, you're saying, are these various programs
6  that you provide, these educational programs that
7  we've discussed, the ones that, for example, you
8  provide the universities and you provide to the
9  high schools?
10    A    That would be one of the links, that's
11  correct, and our desire to be a complete community
12  partner and support them in any way we can.
13    Q    And the other links are?
14    A    The community partnerships that we
15  have. Regions supports education at all levels
16  and endeavors to lend itself to that support in
17  any way that it can.
18    Q    What other community partnerships are
19  there besides the partnerships with these schools?
20    A    I suspect Regions is involved in our
21  community -- I'll speak to our community -- in
22  virtually every major community effort there is
23  from education, to community development, to

Page 131

1  industrial recruiting, to business development, to
2  -- anything that's good for the community or that
3  the community sees as a benefit to help the
4  community improve, Regions wants to be and will be
5  involved in that, from involvement in charitable
6  situations, through chambers of commerce, through
7  boards of directors of community activity
8  associations.
9    All the things that go on in the community,
10  we want to be very, very attuned to and want
11  Regions' name associated with if they are positive
12  for the community.
13    Q    Do you want Regions' name to be
14  associated with churches?
15    A    We -- we work with churches, certainly,
16  all the time, in terms of providing them with
17  services for loans and deposit accounts. We offer
18  them the same privilege, if you will, for banking
19  that we offer to all of our customers.
20    Q    Have you formed partnerships with any
21  churches?
22    A    Not in partnership form, no more than we
23  would with anyone else. We encourage our

Page 132

1  associates to be involved with civic and church
2  organizations where they feel comfortable and
3  where that's their calling, yes.
4    Q    Are there any other products or services
5  that are similar between a post secondary
6  institution and a bank that you're aware of?
7  MR. PECAU:
8    Again, I object to the form of the
9    question. But go ahead and answer.
10  THE WITNESS:
11    In trying to be sure I cover what I
12    feel, we would encourage our
13    associates to further their
14    education. I'm not sure this is
15    where you're going at all. We want
16    our associates to further their
17    education. We provide tuition
18    assistance programs to our
19    associates so they can further their
20    education. We encourage, if the
21    associate is so inclined, and is
22    asked to be -- I don't know what the
23    term is -- adjunct professor, if you

Page 133

1    will, if they want to go teach a
2    class in their area of expertise.
3    Not necessarily in banking but any
4    area that they're qualified. So we
5    allow our associates to be attuned
6    to that. I have an associate in my
7    office that works directly for me
8    that we have allowed and is now an
9    elected member of the Montgomery
10    County Board of Education. And we
11    support her efforts when she needs
12    time off or whatever we need in
13    terms of her serving that
14    constituency. We don't dictate to
15    her what she does. But we allow her
16    and support that activity. So I
17    think the relationship in that sense
18    in what we offer is the freedom of
19    our employees and the freedom of our
20    service too to be offered to the
21    community, and certainly offered to
22    the churches, as well as schools.
23  BY MR. SHLESINGER:

34 (Pages 130 to 133)

Deposition of Patsy Fulghum

August 15, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,

      Plaintiff,

Vs.

REGIONS UNIVERSITY, INC.,

      Defendant.

CIVIL ACTION NO.
2:06CV882-MHT


\* \* \* \* \* \* \* \* \* \* \* \*


TELEPHONIC DEPOSITION OF PATSY FULGHUM,
taken pursuant to stipulation and agreement before
Lisa J. Green, Registered Professional Reporter and
Commissioner for the State of Alabama at Large, in
the Law Offices of Balch & Bingham, Suite 200, 105
Tallapoosa Street, Montgomery, Alabama on
Wednesday, August 15, 2007, commencing at
approximately 3:00 p.m.


\* \* \* \* \* \* \* \* \* \* \* \* \*

## Page 2

1
2                    APPEARANCES
3
4    FOR THE PLAINTIFF:
     Mr. Charles B. Paterson
     BALCH & BINGHAM
5    Attorneys at Law
     Suite 200
6    105 Tallapoosa Street
     Montgomery, Alabama 36104
7
8
     FOR THE DEFENDANT:
9
     Mr. Victor T. Hudson (via telephone)
10   HUDSON & WATTS
     Attorneys at Law
11   Suite 2500
     One St. Louis Centre
12   Mobile, AL 36602
13
14
             * * * * * * * * * * * * *
15
16
         EXAMINATION INDEX
17
18   PATSY FULGHUM
        BY MR. PATERSON . . . . . . . . . 4
19
20
21
22   (No exhibits were marked to this deposition.)
23

## Page 3

1                    STIPULATION
2        It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of PATSY FULGHUM is taken pursuant to
5    the Federal Rules of Civil Procedure and that said
6    deposition may be taken before Lisa J. Green,
7    Registered Professional Reporter and Commissioner
8    for the State of Alabama at Large, without the
9    formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16       It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23       It is further stipulated and agreed by and

## Page 4

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby not waived.
4
5            * * * * * * * * * * * * *
6
7                  PATSY FULGHUM
8        The witness, after having first been duly
9    sworn to speak the truth, the whole truth and
10   nothing but the truth testified as follows:
11                  EXAMINATION
12   BY MR. PATERSON:
13   Q.  Ms. Fulghum, as I indicated to you, my name
14       is Charlie Paterson.  I'm a lawyer for
15       Regions Bank, and I've got a series of
16       questions for you.  And I'll try to move
17       through this rapidly because we're taking a
18       telephone deposition and taking up
19       everybody's -- your time and everybody
20       else's.
21   A.  Okay.
22   Q.  If you have any questions or you -- if I'm
23       unclear or you don't understand a question,

## Page 5

1        please tell me and I'll rephrase it.  Okay?
2    A.  All right.
3    Q.  I need you to state your whole name for the
4        record and then your residence address,
5        please.
6    A.  Patsy Mott Fulghum.  And my address is 62
7        Wateree Key Drive, Greensboro, South
8        Carolina 29180.
9    Q.  Okay.  Where are you located now?
10   A.  I'm at home.
11   Q.  You're at home?
12   A.  Yes.
13   Q.  Okay.  By whom are you employed?
14   A.  Regions University.
15   Q.  What are your duties with Regions
16       University?
17   A.  I'm the director of student services.
18   Q.  Okay.  And give me -- tell me what the
19       director of student services does.
20   A.  I basically handle student problems.  I
21       work with the appeals committee and the ADA
22       as ADA coordinator and handle problems that
23       may occur for students at the university.

Deposition of Patsy Fulghum

August 15, 2007

Page 14

1   A. Yes.
2   Q. Now, you're there in your home in North
3       Carolina, correct?
4   A. South Carolina.
5   Q. South Carolina. I'm sorry.
6       Is anybody there with you in the room?
7   A. No.
8   Q. Do you have any books or reports or records
9       or any kind of documents of any type that
10      you have there with you?
11  A. I don't understand what you're asking.
12          MR. HUDSON: Is there any
13              relevance to this?
14          MR. PATERSON: Yeah. Yeah. Yeah.
15  Q. I'm trying to find out if you've got any
16      list or documents or anything in -- any
17      written materials or anything on your
18      computer screen that you are referring to
19      when you're answering these questions.
20  A. No.
21  Q. You just have your normal records that
22      you --
23  A. Yes.

Page 15

1   Q. -- that are normally in your office?
2   A. Just my normal records.
3   Q. Have you talked to anyone before about this
4       lawsuit that's going on here entitled
5       Regions Financial versus Regions
6       University?
7           MR. HUDSON: Excuse me. Before
8               you answer -- you can answer
9               as to whether or not you've
10              talked to me or another
11              lawyer, but, please, don't
12              disclose the content of any
13              conversation with me or
14              another lawyer.
15  A. I've talked with the lawyer and --
16  Q. You talked with Mr. Hudson?
17  A. Yes.
18  Q. Okay. Who else have you talked with about
19      the case?
20  A. Just general talk with the college, and
21      that's it.
22  Q. Have you talked to Dr. Turner about it?
23  A. Yes, I have.

Page 16

1           MR. HUDSON: And let me say that
2               any conversation that she had
3               with Dr. Turner or anybody
4               else that I was not a
5               participant in, you may fully
6               answer with regard to that.
7               But if it was a conversation
8               that we participated in,
9               please don't answer about
10              that.
11  Q. How many times have you talked to
12      Dr. Turner about this lawsuit?
13  A. I would say probably three times.
14  Q. On each of those occasions, were any of the
15      lawyers present?
16  A. Yes.
17  Q. On one of them or two of them or three of
18      them?
19  A. On one occasion.
20  Q. On the occasions that -- where a lawyer was
21      not present, were those occasions on the
22      telephone when you talked to Dr. Turner?
23  A. Yes.

Page 17

1   Q. And what did he tell you about the case?
2   A. He just gave me -- informed me that there
3       was a case and -- with no details. That
4       was it. He just told me that there was a
5       case against the school based on the name.
6   Q. Can you remember anything else he told you?
7   A. That's all I can remember.
8   Q. What did he ask you to do regarding the
9       case?
10  A. He really didn't ask me to do anything.
11  Q. Did someone ask you to give a deposition in
12      the case?
13  A. I was told that there would be a deposition
14      when the lawyer -- when I talked with the
15      lawyer, and that was all.
16  Q. Okay. Other than Dr. Turner, have you
17      talked to anybody else at the school about
18      the case?
19  A. No, not really, nothing in-depth. We were
20      informed there was a case, and that's all
21      we know.
22  Q. Have you ever been informed or given any
23      information to give prospective students or

Page 18

1    prospective callers that call in wanting to
2    know about the case?
3    A.  Not that I recall.
4    Q.  Have you ever had anybody call you and ask
5    you about the lawsuit that's going on?
6    A.  No, I haven't.
7    Q.  Have you ever had anybody call you and ask
8    you if Regions University was in any way
9    connected with or affiliated with Regions
10   Bank?
11   A.  Yes, I have been called.
12   Q.  Tell me about that.
13   A.  The person that called in asked me if we
14   were affiliated with Regions Bank, and I
15   said, no, that we were Regions University.
16   Q.  How did you know that Regions Bank wasn't
17   affiliated with Regions University?
18   A.  Because I work with the university, and I
19   know we have no ties with Regions Bank.
20   Q.  You just know -- that's your own personal
21   knowledge?
22   A.  Yes.
23   Q.  Okay.  When you lived in Alabama, did you

Page 19

1    bank at Regions Bank?
2    A.  No.
3    Q.  And is it fair to say you were aware that
4    Regions Bank was a major bank in Alabama?
5    A.  I'm familiar with Regions Bank, yes.
6    Q.  When was that call when somebody called in
7    and asked that question of you?
8    A.  I can't recall.  It's been so long ago that
9    I just -- I can't recall exactly when it
10   was.
11   Q.  Do you think it was this calendar year in
12   '07?
13   A.  I'm just not sure.
14   Q.  So you don't know whether it was '06 or
15   '07?
16   A.  I don't.
17   Q.  Is that the only call you've ever gotten
18   with an inquiry of that nature?
19   A.  Yes.
20   Q.  Are you aware of any of your colleagues
21   that work for the school that have received
22   questions of that nature over the
23   telephone?

Page 20

1    A.  One other.
2    Q.  What's that person's name?
3    A.  Carolyn --
4    Q.  Hughes?
5    A.  Hughes, yes.
6    Q.  What did Ms. Hughes tell you about her
7    call?
8    A.  I can't remember.  It's been so long ago, I
9    really can't remember exactly what her call
10   was like.  We briefly talked, and that was
11   it.  And I can't even recall the
12   conversation it's been so long ago.
13   Q.  Where does Ms. Hughes live?  Do you know?
14   A.  She lives in Arkansas.
15   Q.  Do you know how Ms. Hughes came to work for
16   Regions University?
17   A.  No, I don't.
18   Q.  How long have you known Ms. Hughes?
19   A.  Since I've been employed with the
20   university.
21   Q.  Now, I think I've gone through some
22   questions about anyone you've talked to
23   about the case.  Can you remember anyone

Page 21

1    else you've talked to about this case?
2    A.  Not that I can remember.
3    Q.  Have you talked to anybody else about
4    Regions University and Regions Bank?
5    A.  No, I haven't.
6    Q.  Has anybody ever sent you any e-mails
7    making inquiry about Regions University and
8    Regions Bank and any possible connection?
9    A.  No.
10   Q.  Have you ever visited the Regions Bank Web
11   site?
12   A.  No.
13   Q.  Have you ever visited Regions University's
14   Web site?
15   A.  Regions University, yes.
16   Q.  Do you make -- do you routinely make use of
17   your company's -- I mean school's Web site?
18   A.  Yes.  I'm on our Web site daily.
19   Q.  What do you do on the Web site?  How do you
20   use it?
21   A.  If a student calls in for information, we
22   have a request for information on our Web
23   site that we -- if they have not filled it

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,

     Plaintiff,

Vs.

                        CIVIL ACTION NO.
                        2:06CV882-MHT

REGIONS UNIVERSITY, INC.,

     Defendant.


\* \* \* \* \* \* \* \* \* \* \* \*


TELEPHONIC DEPOSITION OF CAROLYN HUGHES,

taken pursuant to stipulation and agreement before

Lisa J. Green, Registered Professional Reporter and

Commissioner for the State of Alabama at Large, in

the Law Offices of Balch & Bingham, Suite 200, 105

Tallapoosa Street, Montgomery, Alabama on

Wednesday, August 15, 2007, commencing at

approximately 3:42 p.m.


\* \* \* \* \* \* \* \* \* \* \* \*

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:

Mr. Charles B. Paterson
BALCH & BINGHAM
Attorneys at Law
Suite 200
105 Tallapoosa Street
Montgomery, Alabama 36104

FOR THE DEFENDANT:

Mr. Victor T. Hudson (via telephone)
HUDSON & WATTS
Attorneys at Law
Suite 2500
One St. Louis Centre
Mobile, AL 36602

* * * * * * * * * * * * *

EXAMINATION INDEX

CAROLYN HUGHES
    BY MR. PATERSON . . . . . . . . .   4

(No exhibits were marked to this deposition.)

**Page 3**

STIPULATION

It is hereby stipulated and agreed by and
between counsel representing the parties that the
deposition of CAROLYN HUGHES is taken pursuant to
the Federal Rules of Civil Procedure and that said
deposition may be taken before Lisa J. Green,
Registered Professional Reporter and Commissioner
for the State of Alabama at Large, without the
formality of a commission, that objections to
questions other than objections as to the form of
the question need not be made at this time but may
be reserved for a ruling at such time as the said
deposition may be offered in evidence or used for
any other purpose by either party provided for by
the Statute.

It is further stipulated and agreed by and
between counsel representing the parties in this
case that the filing of said deposition is hereby
waived and may be introduced at the trial of this
case or used in any other manner by either party
hereto provided for by the Statute regardless of
the waiving of the filing of the same.

It is further stipulated and agreed by and

**Page 4**

between the parties hereto and the witness that the
signature of the witness to this deposition is
hereby not waived.

* * * * * * * * * * * *

CAROLYN HUGHES

The witness, after having first been duly
affirmed to speak the truth, the whole truth and
nothing but the truth testified as follows:

EXAMINATION

BY MR. PATERSON:

Q.  Ms. Hughes, would you state your whole name
and your residence address, please, ma'am.

A.  Carolyn Delight Hughes, 72 Military Road,
Marion, Arkansas.  Zip Code is 72364.

Q.  And where are you now, please, ma'am?

A.  I am at my residence at the section in the
house where I have the computer set up.

Q.  And have you got an in-house office there?

A.  Yes.

Q.  Are you employed by Regions University?

A.  Yes, sir.

**Page 5**

Q.  How long have you been employed at Regions?

A.  Since, I would say, November of 2005.

Q.  What is the mailing address where you
receive any kind of mail for your Regions
University job?

A.  Well, if the school mails me anything, they
mail it to probably Post Office Box 209,
Marion, Arkansas.

Q.  Is that where you get your paycheck?

A.  I believe so, yes.

Q.  And how often are you paid?

A.  Once a month, I believe.  I really don't
handle that.  My husband handles all that,
and he picks up the mail.  And I believe
it's once a month.

Q.  Are you on salary or are you on -- do you
work by the hour?

A.  I work by the hour.

Q.  And tell me what your compensation
arrangement is.  Do you get overtime or do
you -- how many hours a week do you work?
Let me back up and start over.  How
many hours a week do you work?

Deposition of Carolyn Hughes

August 15, 2007

Page 18

1  Q.  This question -- I want to be clear with
2      you. I know you may have talked to
3      Mr. Hudson or any other lawyer for Regions
4      University --
5          Have you talked with any of the
6      lawyers?
7  A.  No, sir.
8  Q.  Who have you talked with about this case
9      that you're testifying in today?
10 A.  Dr. Rex and Mr. Hudson.
11 Q.  You have talked to Mr. Hudson?
12 A.  Yes, sir.
13 Q.  Okay. Have you ever talked to Dr. Rex in
14     person about this case?
15 A.  Well, I talked with him about the phone
16     call I received before I knew anything
17     about the case.
18         MR. HUDSON: Ms. Hughes, just so
19     we won't make a mistake --
20     everybody is trying to be
21     careful. But any conversation
22     that you had with me is
23     privileged, and Mr. Paterson

Page 20

1  Q.  Let me ask it this way. I believe you
2      testified or told me that you had a
3      conversation with Dr. Rex about a call you
4      received, right?
5  A.  Yes, sir.
6  Q.  Tell me about that conversation. Tell me
7      what you told Dr. Rex.
8  A.  Okay. I don't remember exactly the reason
9      for -- or the initial reason for his phone
10     call, but I know in the -- in the
11     conversation that we had, I did bring up a
12     call that I had gotten the previous week
13     which was --
14         Well, I mentioned that phone call, and
15     then he -- we discussed that a little bit,
16     but I don't believe that was the purpose of
17     the phone call. I can't say what the
18     purpose of the phone call may have been
19     because it was quite some time ago.
20 Q.  When was it? Was it this calendar year,
21     '07?
22 A.  I really do not remember.
23 Q.  All right.

Page 19

1      is not asking you about that.
2          Any conversation that you
3      had with me in which other
4      people from Regions University
5      also participated is also
6      privileged, and he's not
7      asking you about that.
8          Now, he's entitled to
9      know if you had such a
10     conversation, but he's not
11     going to ask you to tell him
12     what was said in that
13     conversation.
14         Now, subject to that,
15     please answer his questions as
16     best you can.
17         THE WITNESS: Okay. Thank you.
18 Q.  In your conversation with Dr. Rex about the
19     lawsuit or about anything to do with the
20     lawsuit, was Tom Hudson on the phone with
21     you?
22 A.  Well, no, sir. The -- Could you ask the
23     question again?

Page 21

1  A.  It was after the name changed, but it could
2      have been, you know, before the beginning
3      of this year or it could have been after.
4      It's been so long ago, I really don't
5      remember.
6  Q.  That's fine. So sometime after the name
7      changed, you got a call from a prospective
8      student; is that correct?
9  A.  Yes. I will say that it was maybe two or
10     three months after the name change.
11 Q.  And, what? Did that prospective student
12     just call in on your number, correct?
13 A.  He called in on the queue which came to my
14     extension.
15 Q.  Okay. And do you remember about what time
16     of day that was?
17 A.  It would have been, I'm sure, after five
18     o'clock.
19 Q.  And what did the person ask you?
20 A.  Well, they were asking questions about --
21     it was a typical prospective student
22     calling in, asking questions about degree
23     programs. And we had probably talked about

Hope Mehlman

Tom Hudson

IN THE UNITED STATES DISTRICT COURT

FOR   THE

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,         *
                               *
        Plaintiff,             *
                               *
Vs.                            *    CIVIL ACTION NUMBER
                               *
REGIONS UNIVERSITY, INC.,      *     2:06cv882-MHT
                               *
        Defendant.             *



* * * * * * * * * * * * * * * * * * * * *

Rule 30(b)(6) deposition of Regions Asset

Company, taken through the witness,  HOPE D.

MEHLMAN, before David Michael Camp, Commissioner,

in the law offices of Balch & Bingham, LLP, 105

Tallapoosa Street, Suite 200, Montgomery, Alabama,

on June 28th, 2007, commencing at approximately

9:10 o'clock a.m.

Hope Mehlman

Tom Hudson

Page 2

1
2
3    A P P E A R A N C E S

3    For Plaintiff:
      STEPTOE & JOHNSON, LLP
4     Attorneys at Law
      1330 Connecticut Avenue
5     Washington, D.C. 20036
      (202) 429-3000
6     BY: WILLIAM G. PECAU
7
8
9    For Defendant:
      HUDSON & WATTS, L.L.P.
10    Attorneys at Law
      One St. Louis Centre, Suite 2500
11    Post Office Box 989
      Mobile, Alabama 36601
12    (251) 432-7200
      BY: VICTOR T. HUDSON
13        -AND-
      SHLESINGER, ARKWRIGHT & GARVEY, LLP
14    Attorneys at Law
      1420 King Street, Suite 600
15    Alexandria, Virginia 22314
      (703)684-5600
16    BY: JAMES E. SHLESINGER
17
18
19   Also present: REX A. TURNER, JR.
20
21        * * * * * * * * * *
22
23

Page 3

1
2         I N D E X
     Witness
     HOPE D. MEHLMAN
3
4         EXAMINATION
5    MR. HUDSON ........................  7
     MARKED QUESTION ......... Page 79, Line 8
6    MR. PECAU ........................  195
     MR. HUDSON ........................  196
7
          * * * * * * * * *
8
9
10
          EXHIBITS
11
     DEFENDANT'S EXHIBIT ONE-O-EIGHT ......  58
12   DEFENDANT'S EXHIBIT ONE-O-NINE .......  136
     DEFENDANT'S EXHIBIT ONE-TEN ..........  139
13   DEFENDANT'S EXHIBIT ONE-ELEVEN .......  143
14        * * * * * * * * *
15
16
17
18
19
20
21
22
23

Page 4

1
2         STIPULATION
2        It is stipulated by and between the parties
3    hereto and their respective attorneys at law that
4    the deposition on oral examination of the Witness,
5    HOPE D. MEHLMAN, may be taken before David Michael
6    Camp, Commissioner and Notary Public, State of
7    Alabama at Large, and that the said deposition
8    shall be taken in accordance with and, when so
9    taken, may be used in accordance with the
10   provisions of the Federal Rules of Civil
11   Procedure.
12       It is further stipulated and agreed that all
13   notices provided for by said Federal Rules of
14   Civil Procedure are waived, as is the reading over
15   of said deposition to or by the witness, the
16   signing thereof by the witness, the signing and
17   certification of said David Michael Camp, the
18   filing of said deposition with the Clerk of the
19   Court and all other requirements and
20   technicalities of every sort which would be a
21   prerequisite to the use of said deposition.
22       It is the intent of the parties hereto that
23   this deposition may be used in evidence as though

Page 5

1    all requirements of said Federal Rules of Civil
2    Procedure had been complied with.
3        It is further stipulated and agreed that all
4    parties hereto reserve the right to have
5    corrections made to this deposition as provided
6    for by said Federal Rules of Civil Procedure.
7        It is further stipulated and agreed that all
8    objections, save as to the form of the questions
9    asked and the responsiveness of the answers
10   thereto are reserved until the time of trial in
11   accordance with the provisions of said Federal
12   Rules of Civil Procedure.
13
14        * * * * * * * * * * *
15
16
17
18
19
20
21
22
23

2 (Pages 2 to 5)

Page 194

1  used by others that have the word "Regions" or
2  "Region" in them and are in use to the knowledge
3  of Regions entities that you represent, have not
4  been objected to by the Regions entities?
5      A   I don't know.
6      Q   Do you know of any?
7      A   Not that I'm aware of.
8      Q   Were you aware that there's a Regions
9  Hospital that has a registered service mark?
10     A   No.
11     Q   Have you ever undertaken to learn
12  whether there are other entities with registered
13  service marks that have Regions in their name?
14     A   Yes, I think so.  Through the reports
15  and through the watch reports.
16     Q   So, for instance, Regions Hospital is
17  identified there.  That would have been something
18  that may have come to your attention.  You just
19  don't recall as you sit here today?
20     A   I don't recall.  It may or may not have.
21     MR. HUDSON:
22        Thanks.
23     MR. PECAU:

Page 195

1         I have some questions.
2            EXAMINATION
3  BY MR. PECAU:
4      Q   You said that if the watch reports bore
5  you name that you had looked at them.
6      A   Right.
7      Q   Some of the reports in Exhibit One-O-
8  eight appear to have been addressed to Steptoe &
9  Johnson.  Did you review those reports?
10     A   No.
11     Q   Do you know who did review those
12  reports?
13     A   Steptoe & Johnson.
14     Q   Did you discuss any of the results of
15  those reports with anybody?
16     A   Yes.
17     Q   And were those with lawyers from Steptoe
18  & Johnson?
19     A   Yes.
20     Q   You had mentioned that you had monitored
21  the terms Regions Realty, Regions Home, Regions
22  Propane and Region 2020.
23     A   Uh-huh.

Page 196

1      Q   What did you mean by "monitored" in that
2  context?
3      A   What I meant -- it was sort of a passive
4  monitoring.  You look at watch reports, you look
5  to see if there's advertising, if somebody sent us
6  an email, made us aware that there was -- you
7  know, they were doing something that was different
8  from what they should have been doing or what we
9  agreed with them to do, that type of stuff.
10     Q   In addition to Regions University,
11  Regional Acceptance and regions.info, are you
12  aware of any other outstanding matters that were
13  the subject of objection based on the Regions
14  mark?
15     A   No.
16     MR. PECAU:
17        No more questions.
18            EXAMINATION
19  BY MR. HUDSON:
20     Q   When you were asked whether you were
21  aware of things by your counsel, in order to be
22  able to answer that question, did you make a full
23  searching inquiry of everyone at any of the

Page 197

1  Regions entities that might have knowledge of
2  those matters, or are you speaking just from your
3  own recollection?
4      A   From my own recollection.
5      Q   With respect to the watch reports that
6  were addressed to Steptoe & Johnson, did Steptoe &
7  Johnson communicate to you the content of those
8  watch reports?
9      A   If they had a concern, they would
10  communicate the content of the report.
11     Q   And did you make any record of those
12  communications?
13     A   No.  They were telephone conversations.
14     Q   Who established the criteria for
15  concern; Steptoe & Johnson, or you, or someone
16  else?
17     A   I think we came up with -- you know, we
18  talked about it when -- when they were hired.
19     Q   What is the criteria for concern?
20     A   I can't --
21     MR. PECAU:
22        We can't discuss that.  I object on
23        the basis of attorney-client

50  (Pages 194 to 197)

IN THE UNITED STATES DISTRICT COURT

FOR   THE

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,          *
                                *
        Plaintiff,              *
                                *
Vs.                             *    CIVIL ACTION NUMBER
                                *
REGIONS UNIVERSITY, INC.,       *      2:06cv882-MHT
                                *
        Defendant.              *


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Rule 30(b)(6) deposition of Regions Asset Company, taken through the witness, SCOTT M. PETERS, before David Michael Camp, Commissioner, in the law offices of Balch & Bingham, LLP, 105 Tallapoosa Street, Suite 200, Montgomery, Alabama, on June 27th, 2007, commencing at approximately 9:07 o'clock a.m.

Scott Peters

Tom Hudson

Page 2

```
1                    A P P E A R A N C E S

2

3         For Plaintiff:
            STEPTOE & JOHNSON, LLP
4           Attorneys at Law
            1330 Connecticut Avenue
5           Washington, D.C. 20036
            (202) 429-3000
6           BY: WILLIAM G. PECAU

7

8

9         For Defendant:
            HUDSON & WATTS, L.L.P.
10          Attorneys at Law
            One St. Louis Centre, Suite 2500
11          Post Office Box 989
            Mobile, Alabama  36601
12          (251) 432-7200
            BY: VICTOR T. HUDSON
13               -AND-
            SHLESINGER, ARKWRIGHT & GARVEY, LLP
14          Attorneys at Law
            1420 King Street, Suite 600
15          Alexandria, Virginia  22314
            (703)684-5600
16          BY: JAMES E. SHLESINGER

17

18

19        Also present: REX A. TURNER, JR.

20

21                  * * * * * * * * * *

22

23
```

1        A    Okay.  A broad base of services across

2    financial services from mass market consumer

3    financial services to include banking products.

4        Q    Mass market?

5        A    Financial services to include banking

6    products, investment products, and all the

7    services associated to those.  Also, business

8    services for small business, up through large

9    corporate commercial relationships.

10    A broad array of investment services to both

11    consumers, as well as institutions, to include

12    passive managed products like mutual funds, to

13    also providing investment products from other

14    companies, all the way up to investment banking

15    and companies that take their company public or

16    sell a company.

17        Capital markets, which include bond

18    offerings, business with public entities for their

19    financial services, whether it might be bond

20    offerings, to their checking account.  Non-profits

21    are our customers, as well.  Insurance services.

22    All kinds of payment services.

23        Q    All kinds of what?

Scott Peters

Tom Hudson

1        Q    As the Chief Marketing Officer, what

2   commercial benefit does the bank get from

3   interacting with the community?

4        A    We get a lot of benefits from that.  We

5   get benefits from the standpoint of the community

6   recognizing that we are more than just a bank,

7   that we interact with their lives and try to make

8   their lives a little bit better.  That's positive

9   for our image and our brand.

10        Q    And how do you benefit from that?

11        A    We benefit from it pretty much that

12   people tend to prefer to do business and be more

13   loyal to organizations that they like and that

14   they think are doing other positive things for

15   them in their community that they care about.

16        Q    And is it beneficial to do that sort of

17   thing in order to support the commercial aspects

18   of the business?

19        A    We think -- it's a couple of things.

20   One, we think it's our responsibility.  That's our

21   point of view.  But we also believe that it has

22   positive benefits for retaining customers over

23   long periods of time.

Scott Peters                                                      Tom Hudson

Page 60

1          And we also believe there's an employee or

2     associate benefit and that our associates really

3     personally want to give back to their

4     communities.  And by facilitating that, we keep

5     happier, good employees.

6          Q    I've heard it said that the first thing

7     an entrepreneur needs to learn is to keep his

8     employees happy.  Do you agree with that?

9          A    I would agree.

10         Q    Advertising, is that also under your

11    purview?

12         A    It is.

13         Q    And was it under your predecessor's

14    purview?

15         A    It was.

16         Q    If I've asked you this, I apologize.

17    I've taken us on a side track.  But what is brand

18    management?

19         A    You did ask it but I'll answer it again.

20         Q    If you would re-focus me, I'd appreciate

21    it.

22         A    Okay.  It's really everything that we do

23    to manage our image positively in the marketplace.

1              like tonality and things like that

2              that you saw in the other one

3              probably in pages three and four.  I

4              don't know.

5    BY MR. HUDSON:

6         Q    Things like tonality?

7         A    Yes.  I think --

8         Q    What is tonality?

9         A    Sort of like the tone of your voice.

10   You might be angry or happy or sad or whatever it

11   might be.  It's sort of the tone of the way you're

12   communicating.  Personality & Tonality, the one

13   you showed me.  Do you see that category?

14        Q    Uh-huh.

15        A    It appears that these documents were

16   speculating but prepared working with the same

17   agency using a standardized format for input.

18        Q    In any event, those documents would, and

19   did in each instance, identify the target

20   audience?

21        A    Yes.  They do all appear to do that.

22   Yes.

23        Q    Are there any Regions Bank briefs or

Scott Peters                                                    Tom Hudson

Page 87

 1    other documents of which you are aware that

 2    identify target audiences for advertising

 3    different than those in Ninety-one through One

 4    Hundred One?

 5        A    Not that I'm aware of.

 6        Q    Okay.  I'll show you what has been

 7    marked as Exhibit One-0-two and I'll represent to

 8    you that that was was produced to me as an extract

 9    from the Regions web page.  Have you seen that

10    before?

11        A    Yes.

12        Q    It purports to be frequently asked

13    questions about loans and student loans, student

14    loans in particular.  The first question says,

15    "How do I start the student loan application

16    process?"  And it says, "First contact the

17    Financial Aid Office at the school you will

18    attend".  Do you see that?

19        A    Uh-huh.  I do.

20        Q    Is that, in fact, the first step that

21    any such person who wants a student loan should

22    take?

23        A    I would assume, yes.  I don't run the

Scott Peters                                                      Tom Hudson

Page 112

1    focused, if I get this wrong, just make it right.

2        What are the different types of advertising

3    that are utilized by the bank now and is there any

4    difference between what is used now and what was

5    used prior to the merger?

6        A    We use print, internet, television,

7    radio, outdoor, merchandising, which we mentioned

8    before.  All of our signage is really a kind of a

9    form of advertising.  We will use some cinema.

10       And I would say that that primarily covers

11   most of the -- and as it applies to -- as it's

12   been used in the past, I would say yes to all of

13   those to my knowledge.

14       Q    I gather the difference between outdoor

15   and signage is whether it's signage owned by you

16   or leased from others?

17       A    Yes, that's correct.

18       Q    But outdoor would be signage?

19       A    Yes.  A typical example would be a

20   billboard or you might see -- like you see at bus

21   stops sometimes.

22       Q    Okay.  And merchandising would be what?

23       A    Merchandising again would be in-branch

Page 113

1   stuff.  So posters primarily was what I was

2   referencing.

3        Q    Is there any other form of merchandising

4   other than posters?

5        A    Yes.  Sometimes there could be display

6   units in branches.

7        Q    And what does a display unit look like?

8        A    For instance, we're about to give away

9   some bikes associated with the brand launch.  And

10  there will be a large cardboard cut-out of a

11  bike.  And you might view that as a poster.  But

12  it's a large display.

13       Q    And that large cut-out would have your

14  logo or something on it somewhere?

15       A    Uh-huh.

16       Q    And the internet, what has the internet

17  advertising been?

18       A    Well, it's been a combination of what is

19  on our own site and various promotions we may be

20  running or products we may be wanting to feature

21  on that, as well as banner advertising on other

22  sites.

23       Q    Which websites do you advertise on, or

Scott Peters                                                    Tom Hudson

1    have you advertised on?

2        A    Yahoo.  The one that has -- I don't want

3    to get this wrong.  Some of the home pages -- is

4    it -- the one owned by MSN -- excuse me.  MSN.

5    And various other ones.  I'd have to check on

6    that.  But basically, we work with our media

7    buying firm and they recommend the sites that are

8    going to give us good reach.

9        Q    And are these sites that you appear on

10   the home page as opposed to giving some

11   preferential treatment like Google, over on the

12   right side, a pop-up?

13       A    I'm sorry.  I didn't understand the

14   question.

15       Q    If I Google "socks", it will list ten

16   billion different people that sell socks but on

17   the right-hand side, it will pick out some

18   favorite people and put them up there.  Is that

19   the sort of advertising you do or is it different

20   than that?

21       A    No.  Typically, we'll do banners or

22   highlights on sites that might be topical or we

23   think are going to reach a broad base of the

Scott Peters                                                    Tom Hudson

Page 115

1   population we're trying to attract.

2        Q      When I was looking at your documents, I

3   thought I saw some discussion about buying cable

4   TV.  And the discussion essentially said that you

5   were doing that rather than buying in the specific

6   states because it was cheaper overall to buy it on

7   cable TV.  Do you recall that?

8        A      Yes.

9        Q      Except for cable TV buys like that, do

10  you advertise outside of the bank's sixteen-state

11  area?

12              MR. PECAU:

13              I object to the form of the

14              question.  Go ahead.

15              THE WITNESS:

16              I guess it depends on -- when you

17              say "advertise", we market broadly.

18              For instance, we purchase

19              sponsorships to give us exposure and

20              media exposure outside.  So, yeah,

21              outside of media, we do.

22  BY MR. HUDSON:

23       Q      Except for the sponsorships, do you

Page 116

1    advertise outside of your sixteen-state area?

2        A    Well, on the web, I would say we

3    advertise worldwide.

4        Q    As does everybody on the web, I

5    suppose.  The sponsorships you're speaking of are

6    things like the SEC, the Sun Belt, the University

7    of Indiana, that sort of thing.

8        A    Uh-huh.  Yes.

9        Q    And those people that are interested in

10   a sports team that you sponsor may live in some

11   area other than the state in which it's located.

12   Is that the sort of thing you're talking about?

13       A    That is, although I don't think the

14   audience is just people interested in that team.

15   For instance, the SEC --

16       Q    Is what?

17       A    I don't think the audience is just

18   people interested in that team, for instance.  The

19   SEC is an extremely strong and visible conference

20   so that there's lots of folks who live in various

21   places who have no affiliation who have some

22   interest in it.

23       Q    Well, for instance, do you buy

Scott Peters                                                    Tom Hudson

Page 117

1    advertising and invest advertising dollars in

2    states like Alaska?

3        A    Not directly just in Alaska, but to the

4    extent they get hit by the other advertising.

5        Q    There might be somebody in Alaska that's

6    interested in the SEC and knows that you're a

7    sponsor.

8        A    Or sees our advertisements.  Part of our

9    sponsorships are -- are media.

10       Q    And how would they see your

11   advertisement?

12       A    They're watching the game.

13       Q    During the course of the game, if you're

14   the bank of the SEC?

15       A    Yeah.  Actually, there's -- we sponsor

16   some of the colleges, as well, and we get media in

17   kind as part of the sponsorship.  So we would run

18   advertisements on that media.

19       Q    Now, radio.  Do you buy satellite radio

20   coverage?

21       A    Right now, I do not believe we're

22   purchasing satellite.

23       Q    Have you done it before?

Scott Peters                                                      Tom Hudson

Page 118

1        A    Not to my knowledge.

2        Q    The radio -- in what states have you

3    bought radio coverage?

4        A    I'd have to check on all the states.

5        Q    Have you bought any radio coverage

6    outside of the sixteen states in which you

7    operate?

8        A    Other than sponsorship media, again, the

9    answer would be the reach has been outside of our

10   sixteen states, but the stations would largely be

11   in the sixteen.

12       Q    With the exception of the cable TV ads

13   that we talked about a moment ago, have you bought

14   any television advertisement outside of the

15   sixteen states in which you operate?

16       A    Again, the sponsorships.  And that would

17   be both radio and television.

18       Q    Do you place outdoor advertising in

19   states other than the sixteen in which you do

20   business?

21       A    Not to my knowledge, no.

22       Q    Have you utilized merchandising in any

23   of the sixteen states outside of those in which

Scott Peters                                                    Tom Hudson

Page 126

1         Q    All I'm trying to get to is --

2    regardless of where the money comes from -- is a

3    comprehensive list of all of the sponsorships by

4    the bank.

5         A    And that was the other list that I

6    directed to you first, which was more

7    comprehensive.

8         Q    And that would be what?

9         A    The one that was in your hand.

10             MR. PECAU:

11             Eighty-six?

12             MR. HUDSON:

13             No.  He's talking about the one that

14             had all the tickets on it.

15             THE WITNESS:

16             Yes, had the tickets, as well as the

17             sponsorships.

18   BY MR. HUDSON:

19        Q    Eighty-seven.

20        A    Eighty-seven.

21        Q    So between Eighty-six and Eighty seven,

22   we've got all the sponsorships?

23        A    Yeah.  And the corporate ones are likely

Scott Peters                                                    Tom Hudson

Page 127

1    in there, as well.  That should be a more

2    comprehensive list.

3              MR. PECAU:

4              And he was referring to Exhibit

5              Eighty-seven.

6    BY MR. HUDSON:

7         Q    Has the bank, or anyone on the bank's

8    behalf, done any studies or made any determination

9    of how broad the reach of the advertisement that

10   is associated with sponsorships in Exhibit

11   Eighty-six and Eighty-seven is?

12        A    No.

13        Q    When you say that you believe that those

14   sponsorships may constitute advertisement outside

15   of the sixteen-state area in which the bank does

16   business, is that speculation on your part?

17        A    No.

18        Q    What is the basis for you saying that?

19        A    If a game is run on national television,

20   picked up by a major network, it's run around the

21   country.

22        Q    And can you give me an instance of that

23   happening?

Scott Peters                                                           Tom Hudson

Page 129

1    as a sponsor.

2         Q    And you make an election?  Do you make

3    the election of which you want?

4         A    No.  It's part of --

5         Q    It's in the contract?

6         A    It's part of a contract, that's correct.

7         Q    And typically, how are those contracts

8    phrased?  How are those decisions made about the

9    game?

10        A    I haven't examined all the contracts.

11   They're all different for the different schools.

12        Q    In those instances when you don't have

13   advertising, when you have sponsorship, how is the

14   sponsorship portrayed typically so the TV viewer

15   would see it?

16        A    Typically, that would be a mention of a

17   sponsor of the broadcast or a team.  So it would

18   be in the name of our company, potentially a

19   tag-on type thing.

20        Q    And it would say typically something

21   like "Bank of the Southeastern Conference", or

22   what would it say?

23        A    It probably would say "Regions" or the

Scott Peters                                                    Tom Hudson

```
                                                       Page 130

  1    tag line now would be, "It's time to expect

  2    more."  And, yeah, they would probably --

  3        Q    Tag line would be what?

  4        A    Our new tag line is "It's time to expect

  5    more."  And then we would probably say "The

  6    official bank of the Southeast Conference."

  7        Q    Whatever type of message you're trying

  8    to get out at the time.  That's the tag line

  9    you're trying to get out now.

 10        A    Yeah.  You tend to be consistent with

 11    that.

 12        Q    Okay.

 13        A    But we could modify the mention if we

 14    chose to do so.

 15        Q    And is the Regions Bank logo portrayed

 16    in these?

 17        A    Typically, yes.

 18             MR. HUDSON:

 19             We're through.

 20             MR. PECAU:

 21             I have no questions.  Thanks.

 22    FURTHER, DEPONENT SAITH NAUGHT.

 23             * * * * * * * *
```

Emmett M. Pollard

Victor Hudson

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR  THE

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,          *
                                *
        Plaintiff,              *
                                *
Vs.                             *    CIVIL ACTION NUMBER
                                *
REGIONS UNIVERSITY, INC.,       *    2:06cv882-MHT
                                *
        Defendant.              *


* * * * * * * * * * * * * * * * * * * *

Rule 30(b)(5); 30(b)(6) deposition of Regions

Asset Company, taken through the witness, EMMETT

M. POLLARD, before David Michael Camp,

Commissioner, in the law offices of Balch &

Bingham, LLP, 105 Tallapoosa Street, Suite 200,

Montgomery, Alabama, on May 10th, 2007, commencing

at approximately 8:59 o'clock a.m.

Emmett M. Pollard

Victor Hudson

Page 2

```
 1                A P P E A R A N C E S

 2

 3        For Plaintiff:
             BALCH & BINGHAM, LLP
 4           Attorneys at Law
             Post Office Box 78
 5           Montgomery, Alabama  36101
             (334) 834-6500
 6           BY: CHARLES PATERSON

 7                -AND-

 8           STEPTOE & JOHNSON, LLP
             Attorneys at Law
 9           1330 Connecticut Avenue
             Washington, D.C. 20036
10           (202) 429-3000
             BY: WILLIAM G. PECAU
11

12
          For Defendant:
13           HUDSON & WATTS, L.L.P.
             Attorneys at Law
14           One St. Louis Centre, Suite 2500
             Post Office Box 989
15           Mobile, Alabama  36601
             (251) 432-7200
16           BY: VICTOR T. HUDSON

17                -AND-

18           SHLESINGER, ARKWRIGHT & GARVEY, LLP
             Attorneys at Law
19           1420 King Street, Suite 600
             Alexandria, Virginia  22314
20           (703) 684-5600
             BY: JAMES E. SHLESINGER
21

22        Also present: REX A. TURNER, JR.

23                * * * * * * * * *
```

Emmett M. Pollard

Victor Hudson

Page 9

1      Q      Corporate training.  Now, was any part

2    or all of the AmSouth corporate training program

3    adopted by the new bank after the merger?

4      A      It depends on which systems are

5    surviving in the new company.  And so you would

6    say that the training programs that were

7    associated with the bank, the system that

8    survived, would have that training survive with it

9    because it supports it.  And so it would be

10   somewhat of a mix between both Regions and

11   AmSouth.

12     Q      Okay.  Sometimes in mergers, you tend to

13   take the best of both and put them together.  Was

14   that what was accomplished here?

15     A      I believe that was the attempt, yes.

16     Q      And I gather that prior to the merger,

17   Regions had its own corporate training program.

18     A      Yes.

19     Q      And by what name, if any, did Regions

20   refer to its corporate training program as?

21     A      Regions University.

22     Q      Okay.  Whose idea was it to use that

23   catchy name to describe the Regions corporate

Emmett M. Pollard

Victor Hudson

Page 10

```
 1   training program?

 2        A     The director of HR.

 3        Q     What was his name?

 4        A     John Daniel.

 5        Q     And when did he do that? When did that

 6   occur?

 7        A     John was the surviving head of HR out of

 8   the Regions/Union Planters merger.  Union

 9   Planters' training function was UP University.

10        Q     I'm sorry.  I didn't hear.  What

11   university?

12        A     Union Planters -- UP University.  And

13   that survived then into Regions.  So it became

14   Regions University at the merger between the two

15   companies.

16        Q     And what was the approximate date of

17   that merger?

18        A     I believe it was May of 2004.

19        Q     Okay.  Was any authority required by

20   someone senior to him in order to use that name?

21        A     I'm --

22        Q     Don't know?

23        A     -- not aware.  Don't know.
```

Page 31

1          I don't know.

2    BY MR. HUDSON:

3        Q    If there is, you don't know about it?

4        A    I don't know what you really mean by

5    "market" outside the bank.

6        Q    Is there any plan or proposal to use

7    Regions University for anything except the bank's

8    internal corporate training program?

9        A    Not that I'm aware of.

10       Q    Do you advertise in any way the

11   existence or services of Regions University?

12       A    Would you define the word "advertise?"

13       Q    I don't know if I can.  What I would do

14   is ask you what your understanding of the word

15   "advertising" is.  And you can tell me that and

16   then we can work with that.

17       A    If it's to communicate and display

18   information about the bank in order to attract

19   individuals to join the bank, the answer would be

20   yes.

21       Q    All right.  And how do you do that and

22   where do you do that?

23       A    There are brochures that are used by

Page 34

1    sought or obtained authorization from any state to

2    publish the use of the term "university" as it

3    apparently has done in Exhibits Nine, Ten and

4    Eleven?

5        A    Would you repeat that question, please?

6        Q    Sir?

7        A    Would you repeat the question?

8        Q    To your knowledge, has Regions ever

9    obtained authority from any state to authorize it

10    to publish the term "university" as it apparently

11    has done in Exhibits Nine, Ten and Eleven?

12        A    Not to my knowledge.

13        Q    Okay.  In fact, do Exhibits Nine, Ten

14    and Eleven reflect that Regions Asset Company

15    and/or Regions Financial Corporation have

16    published to the public the fact that it is using

17    the term "university?"

18        A    If that question is to mean by the fact

19    that those brochures are passed out to non-bank

20    people in an effort to solicit, you know, them to

21    consider joining the bank, making them public

22    solicitations and awareness, then, yes.

23        Q    Has the bank made any effort to limit

Emmett M. Pollard

Victor Hudson

1    word "university" outside of recruiting.

2         Q    Outside of trying to attract new hires?

3         A    To my knowledge.

4         Q    Okay.  Now, please, if you will,

5    identify for us Exhibits Nine, Ten and Eleven.

6         A    Nine is a recruiting brochure.  Ten is a

7    brochure, I believe, that's used in new employee

8    orientation.

9         Q    In what?

10        A    In new employee orientation.

11        Q    So Ten would not be publicly

12   disseminated.  That would be used within the bank?

13        A    My knowledge is that it was used for

14   orientation programs.  It could have been used for

15   something else but I'm not aware of it.

16        Q    All right, sir.  But Nine would have

17   been used publicly?

18        A    Yes.

19        Q    Okay.

20        A    And Eleven is a copy of a web page.

21        Q    And is that publicly available?

22        A    Yes.

23        Q    Okay.  Now, your attorney was kind

Emmett M. Pollard

Victor Hudson

Page 52

1  attention that former employees of the bank have

2  represented on their transcripts that they have

3  attended Regions University?

4              MR. PECAU:

5              I object to the form of the

6              question.

7              THE WITNESS:

8              It's not been brought to my

9              knowledge.

10  BY MR. HUDSON:

11      Q    Would you be surprised to learn that?

12             MR. PECAU:

13             Object to the question.

14             THE WITNESS:

15             I'm not sure what "surprised" would

16             be.

17  BY MR. HUDSON:

18      Q    Good answer.  If you want a break at any

19  time, just say so.

20      A    Thank you.

21      Q    Am I correct that the bank's Regions

22  University does not offer educational services of

23  any kind to the general public?

1      A    If I understand that to mean Regions

2   University, Regions University does not offer

3   courses to the public.

4      Q    Since you struggled, does the bank,

5   itself, in any way offer educational services to

6   the general public?

7      A    Other than what we've already talked

8   about.

9      Q    These American Bankers courses, that

10  sort of thing we talked about?

11     A    Yeah.

12     Q    Okay.  Has anyone brought to your

13  attention, any bank employee brought to your

14  attention, that they were confused about whether

15  the bank's corporate training program was the same

16  as Regions University being operated by the school

17  that was formerly Southern Christian University?

18     A    No associate has brought that to my

19  attention.

20     Q    Sir?

21     A    No employee has brought that to my

22  attention.

23     Q    The transcripts that you described

Emmett M. Pollard

Victor Hudson

Page 62

1    Q    Yes.

2    A    All of them are changes.

3    Q    But has it changed yet?

4    A    No, sir, it hasn't changed yet.

5    Q    Okay.  That's good enough.  Now, the

6    logos that are set forth on Exhibit Twelve, 1403

7    are those logos that have been used consistently

8    since the coming into existence of Regions

9    University as a name for the corporate training

10   program?  I'm speaking only of 1403.

11   A    Yes, sir.

12   Q    Okay.  And so, for instance, if a

13   certificate had Retail College on it, now that you

14   look at this, would you expect it to have Regions

15   University Retail College in the format of this

16   logo?

17             MR. PECAU:

18             I object to the form of the

19             question.  If you know, answer.  If

20             you don't --

21             THE WITNESS:

22             Yeah.  My understanding would be

23             that if it would have Retail College

Emmett M. Pollard

Victor Hudson

Page 65

1      Q    Okay.  Do you have any understanding of

2  what the significance of these three little leaves

3  in this column is that's depicted on Exhibit

4  Twelve, 1403?

5      A    You know, I've seen things where they

6  represented just different concepts, different

7  perspectives.  But none that I would say would be

8  official.

9      Q    Sir?

10     A    None that I'm aware of that, you know,

11  the company puts forth.

12     Q    Okay.  Look, if you would, please, sir,

13  at Exhibit Two that was previously marked in

14  another deposition, and also Exhibit Three that

15  was previously marked in another deposition.

16     Do you recognize a sign like the one depicted

17  in Exhibit Two?  I'm not asking you to identify

18  Exhibit Two.  I'm just asking you to look at the

19  picture.

20     A    I'm not sure what you're asking.

21     Q    Yeah.  It's a picture of a bank sign.

22  Have you seen one that looked like that before?

23     A    Yes, sir, I've seen this before.

Emmett M. Pollard

Victor Hudson

Page 69

1    Management Workshop.  Executive Coaching Workshop.

2        Q    Executive what?

3        A    Coaching.

4        Q    Coaching.

5        A    Internal Consulting Workshop.  Teller

6    Training.

7        Q    Sir?

8        A    Teller Training.  Teller, as in bank

9    tellers.

10        Q    Tellers.

11        A    Yes.  There are multiple courses within

12    the teller training curricula.

13        Q    Okay.  I don't need to hear those.  Just

14    whenever you can do it generically such as telling

15    me Teller Training, that's fine.

16        A    FSR training, Financial Services

17    Representative training, Branch Manager training,

18    Sales Management training for retail, Commercial

19    Loan Officer training, Commercial Admin training.

20        There's a Trust Administrator curricula.

21    Mortgage Loan Originator curricula.  Those are the

22    ones that come to mind.  And there are, you know,

23    three or four or five hundred online courses.

1      Q    Yeah.  I don't need to hear about them.
2   I think if you could just describe them in general
3   categories for me as you did with teller training,
4   that would be helpful.  And let's try to cover all
5   of the general categories.
6      A    Yeah.  Financial -- Finance and
7   Accounting would be one.  Communication Skills.
8   Supervision.  Human Resources.  Team Building.
9   Sales.  Customer Service.  Those are the ones that
10  come to mind.
11     Q    Is advancement in the bank tied in any
12  way to the successful completion of these courses?
13     A    There's -- there's a strong attempt to
14  manage that for entry level positions.  And so you
15  have to complete certain criteria, certain
16  curricula before you're eligible for promotion,
17  and, you know, strongly encouraged and supported.
18      There's a lot of recognition given to folks
19  who do complete courses.  And so, you know, I
20  wouldn't say we're mandatory in a lot of cases as
21  much as I would that it's looked on very
22  positively.
23     Q    Is it taken into consideration in salary

Emmett M. Pollard

Victor Hudson

Page 71

1   advances and promotions?

2       A    Some of it is, yes, sir.

3       Q    And are completion of these courses and

4   dedication to this training program something that

5   is promoted as a tool that an employee should

6   utilize in order to advance within the

7   organization?

8       A    That's the type of culture we've tried

9   to create.

10      Q    That's the purpose of it, isn't it?

11      A    That's the purpose, yes, sir.

12      Q    Okay.  I'm looking at what we've

13  previously marked as Exhibit Four.  And you've

14  identified that earlier as your file that you

15  reviewed in preparation for your deposition

16  today.  I don't have a lot of questions about it.

17  I'm going to skip around.

18      If you feel like you need to read something

19  in detail before you answer it, do that.  I'm not

20  trying to sneak up on you.  And I don't think my

21  questions are that tough.

22      I find under Strategic HR Initiatives this

23  phrase "to interact with business partners and

Emmett M. Pollard

Victor Hudson

Page 78

```
 1        Q    I'm just curious.  Why would he have
 2    handled the fee payment part of it and you would
 3    have handled other parts?  Is there any reason for
 4    that division of responsibility?
 5        A    He handled the development of the whole
 6    application.  I requested it.  I provided input
 7    into it.  But I didn't prepare it.
 8        Q    I understand.  And he would work under
 9    your supervision?
10        A    Yes, sir.
11        Q    And your direction.
12        A    Yes, sir.
13        Q    And whatever mechanical things were
14    required such as getting a check to pay the fee,
15    that would have been delegated to him.
16        A    Yes, sir.
17        Q    But it would have required your
18    approval, would it not?
19        A    Yes, sir.
20        Q    I'm not going to fly speck this.  If you
21    want to read it all, that's fine.  But my question
22    is, would this document which is captioned
23    "Training Top 100" and runs through the twenty
```

Emmett M. Pollard

Victor Hudson

Page 79

```
1    numbered pages fairly describe the corporate
2    training program as it existed on October 3, 2005,
3    the date of this document?
4         A    Yes, sir.
5         Q    Do you see this page?  Tell me which
6    number it is.  It says "Return On Investment" at
7    the top of it.
8         A    Page nine.
9         Q    All right, sir.  Looking at page nine of
10   this exhibit captioned "Return On Investment",
11   what was meant, in your understanding, of "Return
12   On Investment"?
13        A    The extent to which the company is able
14   to see some type of monetary or non-monetary
15   effect based on the resources that were allocated
16   to training.
17        Q    A measurable benefit to the company,
18   either monetary or non-monetary.  Would that be
19   correct?
20        A    Yes, sir.
21        Q    And did the Regions corporate training
22   program referring to it as Regions University
23   result by October 3, 2005 in generating a
```

Emmett M. Pollard

Victor Hudson

Page 83

1        Q      Thirteen.  Please look at the document

2    marked at its top "Top 100 Learning", page

3    thirteen, and look at the back side of thirteen,

4    Section 2.1.6.  It says "To better describe your

5    Corporate University -- ", and it goes forward.

6        In your understanding, are there other

7    corporations that refer to their internal training

8    programs as universities?

9        A      Yes, sir.

10       Q      Is that frequently done in your

11   understanding?

12       A      It's common.

13       Q      Okay.  Would you tell me those of which

14   you are aware?

15       A      Motorola University; McDonalds Hamburger

16   U, University; Delta University, Delta Airlines.

17       Q      Delta University?

18       A      Yes, sir.  I believe Delta Airlines

19   University.  SunTrust University.  Those are the

20   ones that come off the top.

21       Q      I notice that you told me that there

22   was, for instance, Delta Airlines University,

23   McDonald's Hamburger University.  Is there any

Emmett M. Pollard

Victor Hudson

Page 95

1        A     No, sir.

2        Q     And the English language I'm speaking

3   of.

4              MR. PECAU:

5              I object to the form.

6   BY MR. HUDSON:

7        Q     Do you teach Spanish-speaking people how

8   to speak English?

9        A     No, sir.

10       Q     And vice versa.  Do you teach English-

11  speaking people how to speak Spanish?

12       A     We have had some self-study courses in

13  the past on languages, Spanish being one of them,

14  on a volunteer basis.

15       Q     And have you done that under the

16  auspices of Regions University?

17       A     The materials were delivered by Regions

18  University, yes, sir.

19       Q     And from whom did you obtain the

20  materials?  You don't need to tell me the name of

21  the company.  Was it an outside vendor?

22       A     Outside vendor, yes.

23       Q     I'm going to show you Exhibits Fifteen

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,

     Plaintiff,

Vs.                                        CIVIL ACTION NO.
                                           2:06CV882-MHT
REGIONS UNIVERSITY, INC.,

     Defendant.


\* \* \* \* \* \* \* \* \* \* \* \*. \*


DEPOSITION OF REX A. TURNER, JR., Ed.D,

taken pursuant to stipulation and agreement before

Lisa J. Nix, Registered Professional Reporter and

Commissioner for the State of Alabama at Large, in

the Law Offices of Balch & Bingham, Suite 200, 105

Tallapoosa Street, Montgomery, Alabama on Tuesday,

May 15, 2007, commencing at approximately 9:00 a.m.


\* \* \* \* \* \* \* \* \* \* \* \* \*

Page 2

## APPEARANCES

1
2
3   FOR THE PLAINTIFF:
4   Mr. William G. Pecau
    Ms. Rachel M. Marmer
5   STEPTOE & JOHNSON
    Attorneys at Law
6   1330 Connecticut Avenue NW
    Washington, D.C. 20036-1795
7
    Mr. Charles B. Paterson
8   BALCH & BINGHAM
    Attorneys at Law
9   Suite 200
    105 Tallapoosa Street
10  Montgomery, Alabama 36104
11
12  FOR THE DEFENDANT:
13  Mr. Victor T. Hudson
    HUDSON & WATTS
14  Attorneys at Law
    Suite 2500
15  One St. Louis Centre
    Mobile, AL 36602
16
17
18         * * * * * * * * * * * * *
19
20         EXAMINATION INDEX
21  BY MR. PECAU . . . . . . . . . . 7
22
23

Page 3

## EXHIBIT INDEX

1
2
3   EXHIBIT NUMBER
4   17  Regions University Enrolled Students      31
        from Regular Fall 2006 through Regular
5       Spring 2007 (RU-1908)
6   18  Southern Christian University            38
        Undergraduate Expense form (RU-1374)
7
    19  Regions University advertisement         59
8       (RU-216)
9   20  Board of Regents Meeting Minutes FY      65
        7/1/05 - 6/30/06 (RU-109-111)
10
    21  Team Meeting Minutes 9/29/05 (RU-113 -   84
11      114)
12  22  Board Meeting minutes 12/16/05 (RU-117 - 87
        119)
13
    23  Board Meeting minutes 3/17/06 (RU-133 -  91
14      136)
15  24  Resolution dated 3/17/06 (RU-137 - 139)  95
16  25  Team Meeting Minutes 7/6/06 (RU-146 -    100
        148)
17
    26  U.S. Patent and Trademark Office         102
18      correspondence re: Masters University
        (RU-140 - 145)
19
    27  Team Meeting Minutes 7/27/06 (RU-149 -   108
20      151)
21  28  7/27/06 email to Rex Turner from Jim     129
        Shlesinger (RU-178 - 179)
22
23

Page 4

1
2
3   29  BellSouth White Pages listing beginning  139
        with Ralph Smith Motors and ending with
4       Rho, Frank
5   30  Email to Rex Turner from Rick Johnson    143
        re: Mark University (RU-180 - 181)
6
    31  Resolution dated 7/28/06 (RU-25 - 27)    150
7
    32  Team Meeting Minutes 7/31/06 (RU-152)    150
8
    33  Letter to Students, Faculty and Staff    169
9       from Rex Turner (RU-46)
10  34  Name Change Letter (RU-58 - 59)          169
11  35  Emails from Wilson Luquire and Randy     172
        Gore re: name change (RU-1909 - 1911)
12
    36  Regions University History, Mission and  187
13      Organization of Regions University
        (RU-80 - 108)
14
    37  8/18/06 letter to Rex Turner from        190
15      William Pecau (RU-63 - 65)
16  38  December 2006 letter to Dear Friend from 199
        Rex Turner (RU-1281 - 1282)
17
    39  Online Message from the President of     199
18      Regions University (RAC-30553 - 30554)
19  40  2 Corinthians - King James Bible         203
20  41  2 Corinthians - American Standard Bible  204
21  42  Regions University Logo effective        218
        8/15/06 (RU-191)
22
23

Page 5

1
2
3   43  First release of regions University with 220
        Stacked Logo 8/19/06 (RU-193)
4
    44  Photoboard (RU-208 - 212)                221
5
    45  Radio Anywhere commercial - 45 seconds   229
6       (RU-213)
7   46  Radio Anywhere commercial - 15 seconds   229
        (RU-214)
8
    47  Billboards (RU-1617 - 1619)              236
9
    48  Regions University Media Placement       237
10      February 2007 - Television, Radio
        Billboards (RU-1603 - 1606)
11
    49  Blackboard screen shots (RU-1498 - 1506) 243
12
    50  Excerpt of loans disbursed academic year 250
13      05-06 (RU-1670, 1712 - 1715)
14  51  Excerpt of loans disbursed academic year 250
        06-06 (RU-1800, 1899 - 1902)
15
    52  Tasks to be accomplished for name change 254
16      from SCU to Masters University (RU-167 -
        168)
17
    53  Regions University Academic Catalog      254
18      (RU-436 - 439, 648 - 659, 999 - 1012)
19  54  Regions University Quick Facts (RU-245)  257
20  55  Email string between Carol Vucovich and  257
        Anita Crosby (RU-48)
21
    56  Screen shots from Peterson's (RU-1400,   257
22      1432, 1451)
23

Page 6

1        STIPULATION
2        It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of REX A. TURNER, JR., Ed.D is taken
5    pursuant to the Federal Rules of Civil Procedure
6    and that said deposition may be taken before Lisa
7    J. Nix, Registered Professional Reporter and
8    Commissioner for the State of Alabama at Large,
9    without the formality of a commission, that
10   objections to questions other than objections as to
11   the form of the question need not be made at this
12   time but may be reserved for a ruling at such time
13   as the said deposition may be offered in evidence
14   or used for any other purpose by either party
15   provided for by the Statute.
16       It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23       It is further stipulated and agreed by and

Page 7

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby not waived.
4
5        * * * * * * * * * * * *
6
7        REX A. TURNER, JR., Ed.D
8        The witness, after having first been duly
9    sworn to speak the truth, the whole truth and
10   nothing but the truth testified as follows:
11       EXAMINATION
12   BY MR. PECAU:
13   Q.  Dr. Turner, are you on any drugs or
14       medication which would impair your
15       testimony today?
16   A.  I'm not aware of any that would impair, but
17       I can tell you what I'm taking.
18   Q.  I don't need that kind of detail.
19   A.  I'm not aware of any.
20   Q.  And you had mentioned this before we
21       started, that you have a little difficulty
22       hearing.
23   A.  That's right.

Page 8

1    Q.  If you don't hear a question I have, please
2        ask me --
3    A.  I will.
4    Q.  -- to try to --
5    A.  I will do my best to ask you again.
6    Q.  Okay.  And the reporter is taking down what
7        we're saying.  So if I don't remember what
8        I asked you, which is perfectly possible,
9        she'll have it down.
10   A.  Okay.
11   Q.  The other thing is, is that since you are
12       under oath, if you don't understand a
13       question, please tell me and I'll try to
14       rephrase it so that you understand it
15       because, you know, you are entitled to --
16   A.  I will.
17   Q.  -- understand what I'm asking you.  Okay?
18   A.  I will.
19   Q.  Do you live in the Montgomery area?
20   A.  Yes.
21   Q.  How long have you lived in the Montgomery
22       area?
23   A.  I moved back here in 1974.  1974.

Page 9

1    Q.  You moved from where?
2    A.  I moved from Clanton, Alabama.
3    Q.  Where is that?
4    A.  It's about 50 miles from here on the way to
5        Birmingham on I-65.
6    Q.  Have you ever banked at Regions?
7    A.  Yes.
8    Q.  When was that?
9    A.  When I moved back to this city, and I don't
10       remember if it was '74 or '75.  It was
11       First Alabama Bank at that time.
12   Q.  How long did you have an account with
13       Regions?
14   A.  Oh, I still have one.
15   Q.  As you drive around Montgomery, you see
16       Regions Bank signs; is that correct?
17   A.  Oh, yes.
18   Q.  And two of the tallest buildings in
19       Montgomery have Regions signs on them; is
20       that correct?
21   A.  Yes.
22   Q.  What is your current residence?
23   A.  It is 245 Tensaw, that's T-E-N-S-A-W, Road,

Page 10

1    Montgomery, Alabama 36117.
2    Q. How long have you lived there?
3    A. I believe we moved into that house which we
4    built in 1976.
5    Q. And how far away from the -- from your
6    school is it?
7    A. It's no more than four or five miles. I'm
8    not specific with that, but it's not very
9    far.
10   Q. Do you pass any Regions Banks on your way
11   to school?
12   A. No, I don't believe I do.
13   Q. So you've been aware of Regions since it's
14   changed its name around 1993; is that
15   correct?
16   A. Yes, whenever it changed its name.
17   Q. Do you recall seeing Regions commercials,
18   TV commercials?
19   A. Oh, yes.
20   Q. And you've seen Regions radio -- I mean --
21   seen Regions radio. You've seen Regions
22   magazine and newspaper advertising, is that
23   correct, through the years?

Page 11

1    A. I'm sure I have, but I just remember more
2    of the TV ads than I would anything. I
3    don't listen to much radio, and I'm not --
4    you know, I'm sure I've seen them, but --
5    yeah.
6    Q. Do you have any friends that work at
7    Regions Bank?
8    A. I don't really. I have -- My wife has a
9    niece who has someone who works with
10   Regions.
11   Q. What about members of the board of your
12   school? Do you know if any of them bank at
13   Regions Bank?
14   A. I'm not aware of where they bank.
15   Q. Do you know if any members of the board
16   work or have worked at Regions Bank?
17   A. I'm not aware of any board member that has
18   worked at Regions Bank.
19   Q. Are you a member of the Montgomery Chamber
20   of Commerce?
21   A. I'm not personally. The school is a member
22   of the Chamber.
23   Q. And when you say the school, you're

Page 12

1    referring to Regions University that was
2    formerly Southern Christian University; is
3    that correct?
4    A. That is correct.
5    Q. Are you a member of any civic
6    organizations?
7    A. Not presently. Used to be a member of the
8    Optimist Club.
9    Q. What's the Optimist Club?
10   A. It's just a local civic organization that
11   promotes good work, much like the Rotary
12   and so forth.
13   Q. Any charitable organizations that you're a
14   member of other than Regions University?
15   A. No, sir.
16   Q. Have you ever been a member of any school
17   boards other than Regions University?
18   A. No, I have not.
19   Q. I'm going to ask you a little bit about
20   your educational background now.
21   A. Sure.
22   Q. Did you go to high school in this area?
23   A. Yes, I went to Alabama Christian High

Page 13

1    School. It's now Alabama Christian
2    Academy.
3    Q. Is that a school that your father ran?
4    A. My father was president of what was Alabama
5    Christian College for 31 years, and the
6    high school at that time was under the
7    auspices of that college.
8    Q. And the name of your father?
9    A. It's Rex A. Turner, Sr.
10   Q. And when did you graduate from high school?
11   A. If I recollect correctly, it would have
12   been 1963.
13   Q. You beat me by six years.
14   A. Okay.
15   Q. And after high school, what was your
16   education?
17   A. May not get the dates all correct, but I
18   received an AA degree from Alabama
19   Christian College, a bachelor of arts
20   degree from Alabama Christian College,
21   which is all now Faulkner University.
22        I received a bachelor of science degree
23   in secondary education from what was then

Deposition of Rex Turner, Ed.D.

May 15, 2007

Page 18

1   A.  I cannot remember the exact dates, but
2       Barbara and I moved from Ozark, Alabama to
3       Clanton, and I believe that was 1971. I
4       believe that's correct. And we stayed
5       approximately four years in Clanton,
6       Alabama, and I was a minister of the
7       Clanton Church of Christ.
8   Q.  What are your roles as the president of
9       Regions University today?
10  A.  Well, do you want a facetious answer or do
11      you want --
12  Q.  Well, let's start with the facetious
13      answer.
14              MR. HUDSON:  No, no. Let's don't
15          have any facetious answers.
16  A.  I oversee all of the institution.
17  Q.  What does that entail?
18  A.  Well, I approve every major decision as far
19      as approval, budget, actions of the
20      institution. I make the final decision.
21  Q.  Hiring of faculty, is that your job as
22      well?
23  A.  Yes, I sign the contracts. I sign all

Page 19

1       faculty and administrative contracts.
2       That's my responsibility.
3   Q.  How many administrators are at Regions
4       University?
5   A.  When I think of administrators, I think of
6       those who are not serving in academic
7       situations. We're dealing with anywhere
8       from ten to 12 people.
9   Q.  Is that including yourself or in addition
10      to yourself?
11  A.  I'm not exactly sure.
12  Q.  So there --
13  A.  I don't have -- I don't have that number.
14      I could list them probably here and give
15      you the exact number.
16  Q.  Now, you said that you had responsibility
17      for the budget, so that would include any
18      advertising or promotion of Regions
19      University; is that correct?
20  A.  That's correct.
21  Q.  And you oversee the advertising that's been
22      done for the university?
23  A.  When you talk about advertising, the

Page 20

1       university has for the last four or five
2       years gone through a process by which each
3       semester, we look -- and I look at this
4       with the bookkeepers and -- our cash flow,
5       and we have gradually increased our
6       advertising semester by semester if at all
7       possible.
8           And so that is worked out in
9       relationship with our people in the
10      business office and with the advertising
11      agency that we use.
12  Q.  Who's your advertising agency?
13  A.  Blue Group.
14  Q.  And who's the person you deal with directly
15      at the Blue Group?
16  A.  Laina Costanza.
17  Q.  Does she have a position at Regions
18      University as well?
19  A.  Yes.
20  Q.  What's her position there?
21  A.  She is the Web designer.
22  Q.  Was she ever the publicist for Regions
23      University or Southern Christian

Page 21

1       University?
2   A.  Was the what, now?
3   Q.  Publicist.
4   A.  What you mean by publicist?
5   Q.  The public relations person for Southern
6       Christian University.
7   A.  We don't have a public relations person per
8       se.
9   Q.  Who handles the public relations function
10      at Regions University?
11  A.  Well, we do not have anybody filling that
12      title. We have those who are in
13      advancement who work among churches. They
14      handle public relations through that
15      process, and I guess -- and it's more word
16      of mouth.
17          Presently, we do not publish a paper on
18      a monthly basis or a semester basis to be
19      sent out to our university, you know,
20      alumni or students.
21  Q.  You mentioned advancement, working among
22      the churches. What do you mean by
23      advancement?

Page 58

1    Question: Now, is the purpose of
2        the College of General
3        Studies, broadly speaking, to
4        provide instruction/training
5        for Christian ministers and
6        religious workers?)
7    A.  No, it is not just for Christian workers or
8        whatever. It would be for anybody who
9        would want to receive a liberal arts
10       education, whether a minister, plumber, a
11       social worker or a mother who's in her home
12       that wants to attain a bachelor's degree.
13   Q.  Does Regions University have an endowment?
14   A.  Yes, but very limited.
15   Q.  Do you know approximately how much?
16   A.  I do not have that ... it is between 250
17       and $500,000.
18   Q.  Now, most of the income -- well, let's do
19       it as a pie chart. You get a certain
20       amount of cash coming into the school every
21       year. What percentage of that is tuition?
22   A.  I would say that it is -- approximately 97
23       percent is tuition and fees.

Page 59

1    Q.  And the other three percent you obtain
2        through the advancements?
3    A.  Yes.
4    Q.  So that's money coming in. The money going
5        out, what percentage of that goes to paying
6        your faculty?
7    A.  I do not know that total.
8    Q.  Well, what about faculty and
9        administrative --
10   A.  I don't have those figures.
11   Q.  So what are the major expenses that the
12       university has?
13   A.  Administration, faculty and staff; the
14       production of our online program and all of
15       the things that are involved in that;
16       advertising; general upkeep of the
17       institution. We have spent some money on
18       some land that we've -- which is 185 acres
19       about 15 miles up from our location.
20       MR. PECAU: I'd like to mark this
21            as the next exhibit.
22            (Exhibit 19 was marked for
23            identification.)

Page 60

1    Q.  Show you what's been marked as Exhibit 19.
2        Can you tell me what that is?
3    A.  It's an advertisement that Regions
4        University did. It's got down at the
5        bottom Gospel Advocate, February, March of
6        this -- 2007, and the Christian Chronicle,
7        February, March 2007. And it has a picture
8        of the world. Has on there A Christian
9        University, Teaching Christ --
10       MR. HUDSON: We can all see what's
11            on there. You don't have to
12            describe all of that.
13   Q.  When it says A Christian University, what
14       does that mean?
15   A.  Just means that the university has
16       Christian standards. We try to have people
17       who profess Christ teaching in the various
18       academic areas. We try to promote good
19       will and so forth.
20   Q.  When you said people who profess Christ,
21       what do you mean by that?
22   A.  People who believe in Christ.
23   Q.  Do you know what percentage of your faculty

Page 61

1        members are members of the Fellowship of
2        the Churches of Christ?
3    A.  I do not know that.
4    Q.  Do you know if you have any Jewish faculty
5        members?
6    A.  No, but we have some Baptist, Methodist,
7        and I'm not just so sure what all they are.
8    Q.  So is it Christian in the same sense that
9        Notre Dame would consider itself to be a
10       Christian institution?
11   A.  Notre Dame started on a Christian basis.
12       Vanderbilt started on a Christian basis.
13       Fisk started on a Christian basis.
14           We offer programs now more in a school
15       for the biblical part, but that does not
16       mean that the Christian principles would
17       not permeate the institution. We have
18       counseling programs that deal with the home
19       and the family which I would not on one
20       hand consider a Bible class, but on the
21       other hand I would consider it important
22       Christian principles.
23   Q.  I'm just trying to get this a little

Page 66

1    ex-officio member.
2    Q.  You're still a member of the board?
3    A.  I'm an ex-officio member.  That means I
4        have no voting rights.  And according to
5        Southern Association standards, I can't be
6        a president and be a member of the board of
7        regents.
8    Q.  Are any of the other members of the board
9        of regents relatives of yours?
10   A.  E. J. Turner who is listed there is my
11       dad's brother, and he has been on the board
12       for ...
13              MR. HUDSON:  He just asked you if
14           he was a relative.
15   A.  Yes.
16   Q.  Any other relatives on the board of
17       directors?
18   A.  Not listed here.
19   Q.  Any that are not listed here?
20   A.  There's a Donny Turner who is -- there's a
21       Donny Turner.
22   Q.  And what relation does he have to you?
23   A.  He is my first cousin.

Page 67

1    Q.  Let's go to page two, which also is marked
2        as RU-110.  Do you see that?
3    A.  Yes.
4    Q.  Before we get there, page one refers to
5        Southern Christian University, master
6        plan.  Can you tell me what that is?
7    A.  That is a document that we try to do on an
8        either annual or every-three-years basis,
9        accordingly, that lays out the future plans
10       of the institution, and it even broadens
11       out to, say, a ten-year plan.  And these
12       are just goals.  We may not attain them,
13       but it's overall objectives of the
14       university for the future.
15   Q.  Well, the master plan that was in place on
16       September 26, 2005, does that refer to a
17       possible change of the name of the
18       institution?
19   A.  Where is that so marked?
20   Q.  Well, the reference to Southern Christian
21       University master plan --
22              MS. MARMER:  Page three.
23   Q.  I'm sorry.  It's on page RU-111.  I

Page 68

1    apologize.
2    A.  I don't recollect whether it is in the
3        master plan or not.  I had presented this
4        concept to them at this meeting, and I do
5        not remember if it's in the master plan or
6        not.
7    Q.  When you say this concept, what are you
8        referring to?
9    A.  All the things listed on page two.
10   Q.  The concept was the enrollment trend and
11       rationale for considering a name change?
12   A.  Yes, and I mentioned courses online in
13       China.  It's not specifically stated here,
14       but our going to other states.
15   Q.  The first bullet point says needed to
16       increase enrollment in areas such as
17       business in order to support our degrees in
18       Turner School of Theology.  What does that
19       mean?
20   A.  Well, our degree programs are providing the
21       financial resources to help us to promote
22       the Turner School of Theology.  It all --
23       The Turner School of Theology has limited

Page 69

1    enrollment.
2    Q.  How many folks are enrolled in the Turner
3        School of Theology?
4    A.  I could not address that accurately.
5    Q.  Well, when you said limited enrollment,
6        what does limited enrollment mean to you?
7    A.  Probably 50 to 75 students.
8    Q.  And does the Turner School of Theology have
9        50 to 75 students?
10   A.  If that much.
11   Q.  So it might have less than 50 to 75?
12   A.  Yes.
13   Q.  Do you think it does have less than 50?
14   A.  It could possibly.
15   Q.  And who would know the number of students
16       who are attending the Turner School of
17       Theology?
18   A.  Our director of institutional research,
19       Dr. John White, would have all of those
20       figures.
21   Q.  Okay.  You had raised the possibility of
22       changing the institution to Masters
23       University; is that correct?

Deposition of Rex Turner, Ed.D.

May 15, 2007

Page 70

1　A.　Yes.
2　Q.　That would be changing the name of the
3　　　entire institution from Southern Christian
4　　　University to Masters University; is that
5　　　correct?
6　A.　Yes.
7　Q.　Who chose the name Masters University?
8　A.　Would you mind repeating that, because --
9　　　are we talking about at what point?
10　Q.　Well, who thought of the name Masters
11　　　University?
12　A.　Dr. White and I had discussed the name
13　　　Masters, and it had been talked among a few
14　　　other administrators. So we presented the
15　　　name -- I presented the name, and it was a
16　　　name that I had thought well of.
17　Q.　At what point in time did you discuss with
18　　　Dr. --
19　　　　Is it Dr. White?
20　A.　Yes.
21　Q.　What point in time did you speak to him
22　　　about Masters University as being a
23　　　possible new name for the institution?

Page 71

1　A.　Well, it would have just been casual. We
2　　　were working on our accreditation in 2005,
3　　　our re-affirmation with the Southern
4　　　Association of Colleges and Schools. And
5　　　the name came up, and that's about all it
6　　　was at that time.
7　Q.　And you said you spoke about it with other
8　　　members of the administration. What folks
9　　　were those?
10　A.　It was not many. I don't really
11　　　recollect. I may have mentioned it to
12　　　Dr. Patterson, but other than that, it
13　　　would not -- I mean, it was not mentioned
14　　　to many people.
15　Q.　You said you thought well of the name. Why
16　　　did you think well of the name Masters?
17　A.　I thought well of it because I could see in
18　　　it a Christian concept, Jesus, the Master
19　　　Teacher.
20　Q.　So why didn't you choose Master as opposed
21　　　to Masters?
22　A.　I don't really know that.
23　Q.　Did it have any other Christian

Page 72

1　　　connotation? I mean, Christ is the
2　　　Master. Does Masters, itself, have a
3　　　Christian connotation?
4　A.　Jesus, the Master Teacher, Masters.
5　Q.　Any other connotation you thought was
6　　　favorable for the name of the institution?
7　A.　Well, I'm dealing with a Christian
8　　　community and I'm dealing with a university
9　　　community, and it just seemed to be
10　　　appropriate.
11　Q.　Okay. The last bullet point on page
12　　　RU-110, do you see that?
13　A.　Okay.
14　Q.　Quote: This highlights our need, dash, we
15　　　need a for-profit type of name.
16　　　　Now, was Masters a for-profit type of
17　　　name?
18　A.　Let me see if I -- you said at the bottom
19　　　of 110?
20　　　　MR. HUDSON: Right here.
21　A.　Okay. I was taking this last bullet ...
22　Q.　Do you want me to read that --
23　　　MR. HUDSON: He can read it to

Page 73

1　　　himself.
2　Q.　I'll give it to you then. The last bullet
3　　　point under President Turner discussed
4　　　enrollment trends there, do you see that on
5　　　RU-110?
6　A.　Uh-huh. (Positive response.)
7　　　　MR. HUDSON: Yes.
8　A.　Yes.
9　Q.　Yes. Thank you.
10　　　　This highlights our need, dash, we need
11　　　a for-profit type of name. Is Masters in
12　　　your mind a for-profit type of name?
13　A.　Yes.
14　Q.　Okay. Why is it a for-profit type of name?
15　A.　It takes away the burden of a business
16　　　degree with Christian in the name.
17　Q.　And why did you need -- why did -- Strike
18　　　that.
19　　　　Why did Southern Christian University
20　　　need a for-profit type of name?
21　A.　We are a university to more than just a
22　　　Christian community, and we're offering --
23　　　we're now as of this, we're offering

19 (Pages 70 to 73)

Case 2:06-cv-00882-MHT-TFM    Document 95-38    Filed 08/17/2007    Page 9 of 25
Deposition of Rex Turner, Ed.D.

May 15, 2007

Page 74

1    business degrees.
2        And there are those who don't object to
3    a Christian university, but if they have a
4    business degree hanging on their wall, they
5    would rather it not say Christian. And so
6    anything without the Christian in it would
7    better represent in their minds a degree.
8    Q.  Now, why would somebody prefer not to have
9    Christian in the name of the school with a
10   business degree?
11   A.  Well, they just do.
12   Q.  You don't know why they do?
13   A.  Because they go into these corporations and
14   they hang their diplomas up for others to
15   see, and they had rather have a Masters
16   University rather than a Masters Christian
17   University there for a bachelors in
18   information systems.
19   Q.  Has anyone ever told you that they have
20   that preference?
21   A.  Yes.
22   Q.  Did they explain to you what negative
23   connotation might arise from the use of

Page 75

1    Christian in the name of a Christian
2    university?
3    A.  I just told you their preference.
4    Q.  Did you ask them why they had that
5    preference?
6    A.  Well, I don't think I had to ask them,
7    because they stated it.
8    Q.  You weren't interested why someone would
9    have that preference?
10   A.  Well, I could understand why someone would
11   rather have a name without Christian in it
12   in order to better promote their degree
13   within the business that they're in. I
14   understood that. I understood the
15   explanation.
16   Q.  So what is your understanding why it would
17   be better to have a business degree without
18   the word Christian in it for an institution
19   that provides a business degree that calls
20   itself a Christian university?
21   A.  Well, as the university expands, just like
22   a Vanderbilt or a Fisk or a Notre Dame, the
23   reasons become more and more apparent. As

Page 76

1    new academic degree programs -- which we
2    want to add a nursing degree program.
3    We're right now doing our prospectus for
4    it.
5        This process all lays the groundwork
6    for the growth of a university. We have
7    within our institution a school within that
8    university that represents a theological
9    institution.
10   Q.  So getting back to my question, what
11   negative connotation is it to have
12   Christian as a part of the name of a
13   university that calls itself a Christian
14   university?
15   A.  We're not talking about a negative
16   connotation. We're talking about a
17   preference for jobs and their relationship
18   with a community that they come in contact
19   with. They have nothing against
20   Christian. They just prefer it not to be
21   on their diploma.
22   Q.  And there's no reason for that preference
23   to your understanding?

Page 77

1    A.  I've stated it about as accurate as I know
2    how.
3    Q.  Okay. Going back to the bullet point, it
4    refers to a broad name. Do you know what
5    is meant by a broad name in that context?
6    A.  There are so many bullet points, where are
7    we talking about?
8    Q.  The one we were just talking about here.
9    It refers to a broad name. Do you see that
10   on RU-110 in Exhibit 20?
11   A.  That is a broad name?
12   Q.  Yes.
13   A.  It's the very thing I've been trying to say
14   about a university. We're broadening our
15   academic -- the academics of the university
16   as time passes.
17   Q.  The next sentence says: This would bring
18   in students that would help fund the
19   degrees in the Turner School of Theology.
20   Now, how is that?
21   A.  As the university grows, it will help the
22   Turner School of Theology to be able to
23   better operate because it will not have the

Page 86

1   name of the institution at that time to
2   Masters University; is that correct?
3   A. Just give me a moment, please.
4   Q. Sure. To speed things up, you might want
5   to look at the last paragraph on RU-114.
6   A. You're talking about the last paragraph,
7   item six, name change?
8   Q. Yeah.
9   A. Yeah. Okay. Ask the question.
10  Q. On September 29, 2005, you were considering
11  changing the name of the institution; is
12  that correct?
13  A. Yes, at least it was being discussed.
14  Q. And the name that was being discussed at
15  that time was Masters University; is that
16  correct?
17  A. I was bringing that to their attention, and
18  I believe that that is after our meeting
19  with the board.
20  Q. Were there any other names considered
21  around September 29th, 2005?
22  A. No.
23         MR. PECAU: Let's mark the next

Page 87

1          exhibit Exhibit 22.
2          (Exhibit 22 was marked for
3          identification.)
4   Q. Let me show you what's been marked as
5   Exhibit 22. Can you tell me what that is?
6   A. This is a board meeting conducted by the
7   board of regents on December the 16th,
8   2005.
9   Q. Is this the entire board of regents of
10  Regions University that's shown on Exhibit
11  22?
12  A. No, it's not the entire board.
13  Q. How many folks are missing?
14  A. How many what?
15  Q. How many people are missing?
16  A. I do not have that total. I could get you
17  the total.
18  Q. Who's Carl Barker?
19  A. Carl Barker has been on the board a long
20  time. He lived in Eclectic -- He lives in
21  Eclectic. He was -- been a long-time board
22  member.
23  Q. He's never been employed by Regions Bank,

Page 88

1          has he, to your knowledge?
2   A. To my knowledge, I don't -- I'm not aware
3   that he was. He was president of the bank
4   of Eclectic, if I recall, and he's been out
5   of that position for a long time. And, in
6   fact, he's not doing well physically at
7   this time, and, in fact, he had ...
8   Q. Okay. On page RU-118 of Exhibit 22 --
9   that's the second page -- there's a
10  reference to Turner University. Around
11  December 16th, 2005, was Turner University
12  one of the names that were considered for
13  the new university?
14  A. It was mentioned. And as I have stated,
15  there are those who very much love and
16  appreciate my father and all of the
17  sacrifice that he had made through the
18  years.
19  Q. Who prepares the minutes of these board
20  meetings? Do you know?
21  A. Yes. Anita Crosby sits in our meetings,
22  and she does the final preparation.
23  Q. And at the beginning of each board meeting,

Page 89

1   the minutes of the prior board meeting are
2   approved, aren't they?
3   A. Yes.
4   Q. This document suggests that some folks
5   thought that Turner University would
6   suggest to others that Ted Turner was a
7   founder of the university; is that correct?
8   A. Well, the connotation of Ted Turner and his
9   lifestyle run amok with our university and
10  its Christian principles, and they worried
11  about that relationship.
12  Q. I mean, as far as you know, nobody has ever
13  thought that the Turner School of Theology
14  had any relationship to Ted Turner; is that
15  correct?
16  A. No. The Turner School of Theology is a
17  part of the university, and the Turner
18  School of Theology would not be construed
19  in that light to be Ted Turner.
20  Q. Why did anyone think that there might be a
21  connection of Ted Turner with a Turner
22  University whose main campus is in
23  Montgomery, Alabama?

Page 90

1　A.　Well, we're in 50 states. We have students
2　　　in 50 states. Not just looking at
3　　　Montgomery, Alabama.
4　Q.　So why do you think people would think
5　　　there is a connection with Ted Turner and a
6　　　Turner University?
7　A.　I don't know why they would, but I think
8　　　that they think that -- you know, he's, you
9　　　know, from Atlanta and well-known. I don't
10　　think he's living in Atlanta now,
11　　but ... it was just something that was
12　　mentioned.
13　Q.　So you never took seriously, though, that
14　　somebody would be confused between Turner
15　　University and Ted Turner; is that correct?
16　A.　Time takes care of a lot of things.
17　Q.　But you never thought that anybody would
18　　really confuse Turner University with Ted
19　　Turner; isn't that correct?
20　A.　I don't think I personally did.
21　Q.　At this board meeting, the board voted to
22　　go ahead with Masters; is that correct?
23　A.　Well, in this meeting, they made a motion

Page 91

1　　　to seek to have Masters University
2　　　trademark-registered, and I think that they
3　　　were sitting back and making sure that
4　　　maybe that could occur at this point in
5　　　time. But that's all they gave. They
6　　　didn't give the whole -- they didn't give
7　　　everything that would come later.
8　Q.　So basically, you were given the authority
9　　　to get a registration for Masters
10　　University; is that correct?
11　A.　That's correct.
12　Q.　In addition to Masters University and
13　　Turner University, were there any other
14　　names that were discussed in this board
15　　meeting on December 16th, 2005 that you
16　　recall?
17　A.　I'm not aware of any other names.
18　　　　　MR. HUDSON: Let's go to RU-133.
19　　　　(Exhibit 23 was marked for
20　　　　identification.)
21　Q.　Let me show you Exhibit 23. Do you
22　　recognize that?
23　A.　Board meeting of March 17, yes.

Page 92

1　Q.　And you attended that board meeting?
2　A.　Yes.
3　Q.　Page RU-34 --
4　　　　　MR. HUDSON: 34?
5　　　　　MR. PECAU: I'm sorry. 134.
6　　　　　MR. HUDSON: I'm looking at the
7　　　　wrong thing. I'm sorry.
8　Q.　In this board meeting, were you given
9　　　approval to choose when to officially make
10　　the name change to Masters University?
11　A.　Yes.
12　Q.　And then in the second -- well, the first
13　　full paragraph -- well, maybe it's the
14　　second paragraph. In the second paragraph
15　　on page RU-134 of Exhibit 23, it says,
16　　quote: We will not officially change our
17　　name until we have a trademark, end quote.
18　　What does that mean?
19　A.　Do you want me to answer all of the
20　　sentence, or do you want me to answer just
21　　the last thing?
22　Q.　Just the last sentence. What does it mean
23　　when it says we will not officially change

Page 93

1　　　our name until we have a trademark?
2　A.　Well, I think it just means what it means.
3　Q.　Well, when you say we have a trademark, are
4　　　you referring to the registration of a
5　　　trademark or the use of a trademark? What
6　　　does that mean?
7　A.　I don't think at that time that we
8　　　understood what we understand today about
9　　　trademarks.
10　Q.　So putting your mind back then, what do you
11　　think was meant when --
12　A.　I would say that at the point that it would
13　　be registerable.
14　Q.　And that's registerable -- I should be able
15　　to pronounce that. Do you mean that --
16　　When you said that, it would be
17　　registerable, you mean registerable on the
18　　register of the patent and trademark
19　　office?
20　A.　Yes. In other words, that the attorney
21　　would have at least put us up to the point
22　　that it would go for publication.
23　Q.　And then before the official change, it was

Page 94

1  understood that you would change the signs
2  on the building; is that correct?
3  A.  I think that that was just a general
4  discussion, that when we made the changes,
5  that we would try to have the sign and all
6  of the things done.
7  Q.  So that before the official change, you
8  would change the sign on your building,
9  your e-mails, your advertising, et cetera?
10 A.  I don't think that it was saying that we
11 would have everything done the day we
12 announced the name.
13 Q.  But you would have some of those things
14 done --
15 A.  Some of those things --
16 Q.  She can't take both of us at the same
17 time.  She can't take both of us at the
18 same time.
19    So are you finished answering the
20 question?
21 A.  I'm sorry.  Go ahead.
22 Q.  I apologize as well.  My question is, was
23 it the intent to change the sign on the

Page 95

1  building before the official name change?
2  A.  No.  I think our intent would be to get our
3  name done.  The sign takes time to plan and
4  to draw and to get it done right.
5    We did proceed with getting the
6  e-mails, .edu e-mails kind of in order.
7  But other than that, that's all we did.
8  Q.  What?  Did you prepare any advertising for
9  the change to Masters University?
10 A.  If we did, I'm not really aware of any
11 because we were just on a wait-see, and
12 there was no need to do something until we
13 kind of knew what we were going to -- what
14 was going to happen.
15    MR. PECAU:  Let's mark this as
16    Exhibit 24, please.
17    (Exhibit 24 was marked for
18    identification.)
19 Q.  Let me show you what's been marked as
20 Exhibit 24.  Is this the resolution that
21 was adopted on March 17th, 2006 in
22 connection with the March 17, 2006 board
23 meeting?

Page 96

1  A.  This is the resolution that came as a
2  result of the board meeting on March 17.
3  Q.  And was it the resolution of the board that
4  it believed that the use of Masters
5  University would increase its -- the
6  school's attractiveness to potential
7  students?
8  A.  Well, I think that they would surely think
9  that they would hope so.
10 Q.  And was it the board's belief that changing
11 the institution's name to Masters
12 University would assist the university in
13 projecting itself as a nationally-
14 recognized university of prominence?
15    MR. HUDSON:  Are you reading
16    Exhibit 24?
17    MR. PECAU:  Yes.
18    MR. HUDSON:  I was trying to find
19    where you were reading from.
20    MR. PECAU:  The third Whereas.
21    MR. HUDSON:  Thanks.
22 A.  You know, we're just talking about dreams
23 and beliefs --

Page 97

1    MR. HUDSON:  He just asked you if
2    it says that.
3  A.  Oh, did you ask does it say it?  Yes, it
4  says it.
5  Q.  Well, I asked you if it was the board's
6  belief that changing the institution's name
7  would also assist the university in
8  projecting itself as a nationally-
9  recognized university of prominence.
10 A.  Yes, in time.
11 Q.  Does the university -- Well, in 2006 when
12 this resolution was passed, did the
13 university attempt to project itself as a
14 nationally-recognized university of
15 prominence?
16 A.  I don't think so.  That comes in time.
17 Q.  Well, today, does the university attempt to
18 project itself as a nationally-recognized
19 university of prominence?
20 A.  I know that we are known in 50 states, and
21 I know that we are recognized in Iraq and
22 Germany and a lot of places.  But to
23 compare it as a national research

25 (Pages 94 to 97)

Deposition of Rex Turner, Ed.D.

May 15, 2007

Page 106

1    and we had to re-file it, and so that
2    process had occurred at this time. And it
3    was just mentioned that this could be
4    another problem in this, so ...
5        And if you look at all of the 2006
6    Higher Education Directories, you observe a
7    lot of names there, and they have similar
8    names. Some will be a college with the
9    same first name and there will be others
10   who will have university, and so there will
11   be a lot of, you know, changes.
12       And so the 2006 Higher Education
13   Directory did note Masters College of
14   Bible.
15   Q.  So you weren't concerned about the Masters
16       College of Bible as being too close to your
17       Masters University?
18   A.  I don't think that it was determined so by
19       Jeff Foshee and John White back in December
20       of 2005.
21   Q.  So the patent attorney that you refer to in
22       Washington, who was he?
23   A.  That would be James Shlesinger.

Page 107

1    Q.  Did he tell you that Masters Bible College
2        was a concern?
3            MR. HUDSON: Hold on just a
4            minute. Let's go off the
5            record.
6            (Off-the-record discussion.)
7            MR. PECAU: Let's go back on the
8            record and just say that we're
9            going to leave the question
10           pending, subject to a
11           determination of whether the
12           question falls within -- well,
13           the answer falls within the
14           attorney-client privilege.
15           MR. HUDSON: Sure.
16   Q.  Now, it says here that -- on the last
17       sentence in the paragraph we were looking
18       at, under item 11, Masters University, the
19       last sentence --
20   A.  Is this Exhibit 26?
21   Q.  25.
22   A.  Okay.
23   Q.  The last sentence says: This will probably

Page 108

1    add two months to the process. This will
2    delay our roll-out. Why would it delay the
3    roll-out of the name Masters University?
4    A.  The descriptive nature of the trademark
5        attorney caused us some real concerns and,
6        also, the concern of Masters College of
7        Bible, and so we just -- it was just simply
8        a statement that this was going to be a
9        delay.
10   Q.  Okay. At some point, you decided to choose
11       another name; is that correct?
12   A.  That is correct.
13   Q.  And what caused that determination to
14       choose another name?
15   A.  I'm going to let you repeat it again.
16   Q.  Actually, I'll show you another exhibit and
17       ask you another question.
18           MR. PECAU: Let's mark this as 27.
19           (Exhibit 27 was marked for
20           identification.)
21   Q.  Let me show you what's been marked as
22       Exhibit 27. Do you see that, and can you
23       tell me what that is?

Page 109

1    A.  I'll just read it. There was a discussion
2        concerning Masters University. It was
3        reported that we were about to announce the
4        name change about a week ago. It was then
5        brought to the attention of our trademark
6        attorney that there was a Masters College
7        of Bible. Our trademark attorney, Jim
8        Shlesinger, recommended that we not change
9        to Masters University. He indicated that
10       they could contest it and that could pose a
11       serious problem.
12   Q.  Is that what happened?
13   A.  Yes.
14   Q.  And this was a meeting of July 27th, 2006;
15       is that correct?
16   A.  That's correct.
17   Q.  Is this approximately when the real concern
18       about Masters University arose?
19   A.  It had occurred approximately two weeks
20       before that, and I'm saying approximately.
21   Q.  Okay. It says here it was then -- Who
22       brought it to your -- to Mr. Shlesinger's
23       attention that there was a Masters College

Page 110

1    of Bible?
2    A.  I did.
3    Q.  And how did you find out there was a
4        Masters College of Bible?
5    A.  I was aware of it.  I was aware of it from
6        the beginning.  And that is in the 2006
7        Higher Education -- they're listed there.
8            But as you go through and you look at
9        all of the higher educations, there's --
10       let's just take, for instance, Heritage.
11       There's a Heritage University, a Heritage
12       College, a Heritage Christian University.
13       There's a Lincoln College; there's a
14       Lincoln University.  There are schools that
15       have the same name that exist in the United
16       States that are not the same institution.
17           And so, you know, this is just a
18       concept.  And at the point of this -- and I
19       want to emphasize that Jim Shlesinger was
20       not in the beginning at all involved in
21       Masters University.  This was with Jeff
22       Foshee and John White.  He was not
23       involved.

Page 111

1        We were about to announce the roll-out,
2        and he just mentioned, you know, hey, this
3        is something that you might would want to
4        look at.  And it was at that point and the
5        description that we said enough is enough.
6    Q.  And then what did you decide to do?
7    A.  Look at some more possible names.
8    Q.  And what were the names that you came up
9        with?
10   A.  I have listed them.  I think they're
11       available, the names that came up that were
12       mentioned -- that were considered:
13       Graystone, Providence, Regions, Regal.
14       You'll have to give me a document.  I'll
15       have to have some help with some of the
16       names.  It's listed in the interrogatories.
17           MR. HUDSON:  Based on the
18               understanding that you-all
19               will not contend that's a
20               waiver of the attorney-client
21               privilege with regard to
22               communications between
23               Mr. Shlesinger and Dr. Turner

Page 112

1            concerning Masters
2            University -- or that topic
3            will not constitute or be
4            contended to constitute a
5            waiver of any other aspect of
6            attorney-client privilege,
7            we'll let him go ahead and
8            answer about communications
9            with Mr. Shlesinger.
10           MR. PECAU:  That's understood.
11   Q.  Let me show you the answers to
12       defendant's -- to plaintiff's first set of
13       interrogatories, and in particular I'm
14       going to show you the response --
15   A.  Royal was one of them.
16           MR. HUDSON:  He's going to show
17               you the list.
18   Q.  I'm just going to show this to you to
19       refresh your recollection.  I'm not going
20       to put it into evidence.
21   A.  Okay.  These listed are Masters, Rex
22       University, Turner University, Regions
23       University, Graystone University, Royal

Page 113

1        University, Providence University, and
2        Regal University.
3    Q.  Did you come up with all these names?
4    A.  Providence -- not Providence.  Graystone
5        was mentioned by somebody else.  I never
6        liked it.
7    Q.  And the other --
8    A.  All of these others were names that I kind
9        of favorably considered and, you know,
10       those -- these were the primary ones.
11   Q.  Okay.  So Rex University, what was the
12       benefit of that name?
13   A.  Well, it's the name of my father who is a
14       founder of the school, so that's why Rex
15       University.
16   Q.  Does it have any Christian connotation that
17       was favorable?
18   A.  Only a founder's relationship that I know
19       of.  Of course, the name Rex in Latin means
20       king, but it has -- only from the founder,
21       and the same would be true of Turner
22       University.
23   Q.  And neither one of those has any

Page 114

1    geographical connotation, does it?
2    A.  I'm not aware that they do.
3    Q.  And Graystone, was there any favorable
4        connotation to that?
5    A.  No.  I thought of a housing project with
6        Graystone.
7    Q.  And Royal University, what was the
8        favorable connotation about that?
9    A.  There were some R's that came up, if I
10       can -- there were some R's that came up.
11       In Royal and Regal and Regions, those names
12       came up and were looked at from meanings.
13       Regal and Royal and Regions all have some
14       emphasis, you know, of prominence.
15   Q.  What do you mean by some emphasis of
16       prominence?
17   A.  I'm sorry.  I have forgotten the exact
18       meanings of each one, but Regal has a good
19       connotation from the dictionary.  Royal
20       would have a good connotation.  Regions
21       expresses the theme of our Christian calls
22       of going into all the world or into all the
23       regions of the world.

Page 115

1    Q.  Did you consider Region alone?
2    A.  I don't recollect doing so.  I did a
3        trademark search and saw that there were --
4        you know, if you do Region, you see a lot.
5        I remember when you do Regions, you see a
6        good bit, and as I remember, you know, 300
7        and something.  I can't remember the
8        totals, but ...
9    Q.  Why didn't you consider Region alone?
10   A.  I think Regions expressed the fact that we
11       would go into all regions of the world, and
12       it would be many and not one.  And when you
13       begin to think about the 50 states, those
14       would be regions.  Then when you think
15       about it nationwide, then you're thinking
16       about the United States of America and
17       Canada and Mexico, then those would be
18       regions.  And the word regions has a far
19       extensive viewpoint and meaning with the
20       'S' on it.
21   Q.  So as far as you're concerned, the
22       difference between regions and region or
23       regions and regional is significant?

Page 116

1        MR. HUDSON:  Object to the form.
2    A.  Regions better expresses the totality of
3        the world.  Region would express maybe a
4        location and not the totality.  That's to
5        my way of thinking.  Now, I could be wrong,
6        but I don't think I am.
7    Q.  And regional would have the same problem
8        that region alone would have in terms of
9        the connotation that you refer to?
10   A.  I don't think regional was ever considered.
11   Q.  Okay.  You said you did a search.  What
12       kind of search did you do?
13   A.  Well, I'll tell you.  I depended on other
14       people doing this, and I just got to the
15       point and I'm having to look at it -- we
16       should have already changed our name seven
17       or eight months ago.
18       And I just had a practice.  Just went
19       in -- I was going through that Higher
20       Education -- 2006 Higher Education
21       Directory looking at names.  Then I would
22       go out and I would do a check of the U.S.
23       Patent and Trademark Office on those names,

Page 117

1    which I did on all of those listed, and see
2    the availability of trademarks in the area
3    of the total name, like Regal University or
4    Regions University.
5        To my knowledge, I did not, except for
6    Regal -- let me see the list if you don't
7    mind.  Except for Regal, I did not find a
8    single trademark of these others, such as
9    Providence University or such as Royal
10   University, so I did not find those
11   trademarks -- or Regions University or
12   Turner University or Rex University or
13   Masters.
14   Q.  Did you limit your search just to Regions
15       University?
16   A.  (Shakes head from side to side.)
17   Q.  Did you look for Regions alone?
18   A.  I looked at all of them.  I looked at
19       Region.  I looked at Regions.
20   Q.  And when you were looking at Regions, did
21       you see any other marks that appeared just
22       with the word Regions in it?
23   A.  I think I'm going to need for you to --

Page 118

1   because we're talking about trademarks, I
2   need for you to --
3   Q. You said you did a search on the United
4      States Patent and Trademark Office Web
5      site.
6   A. Yes, online.
7   Q. Did you type in the word Regions alone to
8      see what would came up?
9   A. Yes.
10  Q. And did any other names come up?
11  A. Sure, about 300 -- I want to say about 300
12     names. I could be totally wrong by 300.
13  Q. With the word Regions alone?
14  A. Had Regions and had another additional
15     part, like Regions Cafe, Regions Hospital,
16     Regions Air, denoting a different service.
17     Regions ...
18        I'm sorry. I'm kind of blank at this
19     point. I'll think of another one at
20     another time.
21  Q. Did you keep a copy of this search that you
22     did?
23  A. I did a check, and to my recollection I did

Page 119

1   not print out a copy.
2   Q. All right. Now, in addition to doing that,
3      did you check, for example, the White
4      Pages, the Montgomery White Pages, the
5      telephone directory to see if there were
6      any other Regions business names?
7   A. I didn't -- I didn't check any -- the White
8      Pages.
9   Q. Now, when you first thought of the name
10     Regions, did you talk to anybody about it
11     prior to this July 27th meeting?
12  A. The most significant person that I talked
13     to was James Shlesinger.
14  Q. Well, did you talk to anyone other than
15     Mr. Shlesinger about the name Regions prior
16     to this July 27th meeting?
17  A. No one of the committee of the policy
18     review team that I recall or recollect.
19  Q. Other than Regions, a financial --
20  A. Now, that's the committee members.
21        MR. HUDSON: He asked you who you
22     talked to. Tell him who you
23     talked to.

Page 120

1   A. I talked to my wife and I talked to my
2      sister, and that's about the only two
3      people I remember talking to.
4   Q. Okay.
5   A. And my sister happened to be there because
6      my mother-in-law had just passed away and
7      we had buried her that week. Aleta Parker
8      was her name.
9   Q. Aside from Regions, the financial
10     institution, back on July 27th, 2006, were
11     you aware of any other use of the name
12     Regions with the plural by any other
13     business or institution?
14  A. Prior to July 27th?
15  Q. Yeah.
16  A. Are you just saying Regions, or are you
17     describing a service?
18  Q. Regions. Regions.
19  A. I remember a Regions For Wine.
20  Q. And what was that?
21  A. It's a registration out there. I don't
22     know if they have put it into use, but it's
23     gone all the way through opposition as I

Page 121

1   understand it.
2   Q. What I'm asking you is, were you aware of
3      any business institution actually using the
4      name Regions as part of its name or its
5      trademark prior to July 27th, 2006 other
6      than the Regions financial institution?
7   A. Well, I would think it's a fair
8      statement --
9        COURT REPORTER: I'm sorry?
10       THE WITNESS: Huh?
11       MR. HUDSON: Wait. Let me look at
12     that question.
13  A. When we talk about --
14       MR. HUDSON: Wait just a minute.
15       Okay. Go ahead.
16       MR. PECAU: Do you want to restate
17     the question? It's been a
18     little bit --
19       MR. HUDSON: I was just --
20       MR. PECAU: No, that's all right.
21       MR. HUDSON: The question excluded
22     the bank, and I thought that's
23     what you were doing. I just

Page 130

1  Q. Okay.
2  A. I don't know if he does patents or not, but
3     I consider him a trademark attorney.
4  Q. Now, were you the person at -- I guess it
5     was Southern Christian University then who
6     was dealing directly with Mr. Shlesinger?
7  A. I'm not the only one who has talked to
8     Mr. Shlesinger. Dr. White has talked with
9     him, but I am the one that specifically
10    called him on Monday morning relative to
11    this document, 28, that -- and which I
12    asked him to give me a written opinion of
13    Turner University, Rex University, and
14    Regions University. And this is his
15    response on Thursday morning of July the
16    27th.
17 Q. So you called him up on Monday morning of
18    that week?
19 A. Yes.
20 Q. Okay. And you gave him those three names?
21 A. Yes.
22 Q. Had you dealt with Mr. Shlesinger
23    beforehand?

Page 131

1        MR. HUDSON: I think he's asking
2     about whether the university
3        had or not.
4  A. Well, I'll just go back and put in a
5     capsule. He originally did Southern
6     Christian University trademark for us. And
7     we had some discussions relative to Masters
8     University, nothing in writing, because
9     most all that work was done by Jeff Foshee
10    and Dr. White. And it was on that Monday
11    morning that I called him and asked him to
12    do this review for us.
13 Q. So did you in around July 27, 2006, feel a
14    lot of pressure to choose a name? You said
15    you were a couple of months behind in
16    choosing a name.
17       MR. HUDSON: Object to the form.
18 A. Well, we needed to have changed our name
19    seven months before, and so this was a
20    means by which to try to resolve the issue.
21 Q. So you did feel some time pressure to
22    choose a name; is that correct?
23       MR. HUDSON: Object to the form.

Page 132

1  A. I just -- I mean, as an institution, I knew
2     that we needed to change our name.
3  Q. Okay. Did you call Mr. Shlesinger
4     directly?
5  A. Yes.
6  Q. Okay. And what did you tell him that
7     Monday morning?
8  A. I just simply called and said I have made a
9     review of these marks -- I said marks. I
10    have made a review of these names, and when
11    I'm talking about names, I'm talking about
12    university: Turner University, Rex
13    University, and Regions University. And I
14    would like for him to give us a trademark
15    opinion.
16 Q. Opinion as to what?
17 A. As to the registerability of these names.
18 Q. Did you ask him to do a search?
19 A. What do you mean by -- or how do you define
20    search?
21 Q. Did you ask him to search whether the mark
22    was available?
23 A. Yes.

Page 133

1  Q. Did he tell you that there are different
2     kinds of searches that could be done?
3  A. We did not go into that.
4  Q. Did you ask him just to search the Patent
5     and Trademark Office records?
6  A. I think it was understood that he knew that
7     we were trying to change our name. He knew
8     the impact of such a decision, and I was
9     expecting him to do whatever appropriate
10    search that he was supposed to do to give
11    me some kind of definitive statement as to
12    the registerability of that.
13 Q. Did he ask you if you wanted to do -- have
14    a search conducted of uses of the marks
15    that -- of the marks that might not be
16    registered?
17 A. I think you're going to have to explain
18    that a little bit from your trademark
19    background for my lack of knowledge.
20 Q. It's possible to search marks in addition
21    to marks that are registered. It's often
22    done. Did he suggest to you that you
23    should do a search of marks that weren't

Deposition of Rex Turner, Ed.D.

May 15, 2007

Page 134

1    registered?
2    A.  Give me an example.
3    Q.  Well, Masters Bible College is not a
4    registered mark.  There are means of
5    searching marks that aren't registered
6    marks.  Did you ask him to do that kind of
7    search?
8    A.  I do not recollect any discussion of that.
9    I think he understood the import because of
10   the names and the potential thereof, and so
11   that's all I know.  That's all I can speak
12   to.
13   Q.  Do you recall discussing with him the price
14   of different kinds of searches?
15   A.  You know, I don't -- he told me
16   approximately about how much it would be.
17   But, you know, I don't even -- I never saw
18   the bill.  I do not know how much he
19   charged and ...
20   Q.  Did you tell him that there was a time
21   limit when you needed his opinion by?
22   A.  I did not give him a timeline.
23   Q.  Prior to talking to Mr. Shlesinger, did you

Page 135

1    talk to any of the other administrators
2    about these three names?
3    A.  Well, obviously, Turner and Rex have been
4    out there and have been understood out
5    there and have been out there for -- you
6    know, but I don't know that --
7        Now, Turner University has been, but
8    Rex University, in no special way had it
9    really been discussed because it was not
10   even up for consideration, and the same is
11   true of Regions.
12   Q.  So do you recall discussing with anyone
13   prior to speaking to Mr. Shlesinger
14   about -- I mean, in addition to your wife
15   and your sister about the possibility of
16   adopting Regions as a mark?
17   A.  No, I did not talk to anybody else.
18   Q.  Did your wife or your sister mention the
19   bank when you said the name Regions
20   University?
21   A.  I do not recollect.  I don't recollect that
22   they did.  They may have, but they -- I
23   don't recollect that.

Page 136

1    Q.  When you spoke to -- Now, you know Regions
2    is the largest bank in Montgomery, right?
3    A.  Well, I didn't know that personally.  No
4    one has told me that.  Colonial has a
5    mighty big presence here in this city with
6    their having their headquarters here.  I
7    know that Regions is prominent, but I also
8    know that there are other banks here that
9    are just as prominent as well.
10   Q.  Prior to speaking to Mr. Shlesinger, do you
11   remember in that summer, stories on
12   television and in newspapers about the
13   merger of AmSouth and Regions?
14   A.  Yes, I knew about that, and I also -- you
15   need to know that I said to Mr. Shlesinger
16   on that Monday morning, there is a Regions
17   Bank here.
18   Q.  So you made him aware that Regions was a
19   prominent bank in your community?
20   A.  I didn't say --
21        MR. HUDSON:  Object to the form of
22        the question.
23   A.  I didn't say prominent.  I just said

Page 137

1    there's a Regions Bank.
2    Q.  Did you describe how big Regions was to
3    Mr. Shlesinger at all?
4    A.  Huh-uh.  (Negative response.)
5    Q.  Did he ask you anything about the bank?
6    A.  Well, his comment was, well, I don't know
7    anything about them up here in Virginia.
8    Q.  So what did you tell him about people's
9    knowledge of Regions in Montgomery?
10   A.  That was not discussed.
11   Q.  Well, did you tell him it was a well-known
12   bank in Alabama?
13   A.  Regions Bank, Regions University, Troy
14   Bank & Trust, Troy University, Tuskegee
15   University, First Tuskegee Savings, Regal
16   Bank, Regal University -- it's service, and
17   those are my concepts.
18   Q.  Did you tell him that Regions was a
19   well-known bank in Alabama when you spoke
20   to him?
21   A.  No, I just said there's a Regions Bank.
22   Q.  So as far as you know, Mr. Shlesinger
23   didn't know that Regions was the largest

Page 162

1    objected to it; is that correct?
2    A.  This day and time with litigation, you
3    would never know what somebody would
4    oppose.
5    Q.  All right.  Now, you sent out the next --
6    was it the next week you sent out a letter
7    to -- an e-mail to the students?
8    A.  Yes, approximately.  I can't remember what
9    date, but it was the next week.
10   Q.  And before that, you had a meeting of the
11   executive leadership team; is that correct?
12   A.  The executive leadership team, if I recall
13   correctly, met on a Monday morning.
14   Q.  Let me show you what's been marked as
15   Exhibit 32.
16   A.  Of course, you understand this is before we
17   officially changed our name on the 2nd
18   because the board gave me the authority to
19   change the name; in other words, at the
20   point that I so chose.
21      In other words, they made the decision
22   on the 28th for Regions University,
23   formerly Southern Christian, but they gave

Page 163

1    me the authority to announce when.  It
2    could have been another week.  It could
3    have been another two weeks.
4    Q.  All right.
5    A.  And this meeting here was a meeting of our
6    executive leadership team, which is the
7    president's cabinet, and we were having a
8    meeting that morning.
9    Q.  So basically the meetings that you had were
10   on July 27th, you had the meeting of --
11   A.  Policy review team.
12   Q.  Right.  And then on July 28th, you had the
13   meeting of the board of directors?
14   A.  Board of regents.
15   Q.  Board of regents.
16      And then on July 31st, you had your
17   executive leadership team; is that correct?
18   A.  That is exactly correct.
19   Q.  And there are six -- seven people on the
20   executive leadership team, is that correct,
21   or six?
22   A.  Yes.
23   Q.  Six people?

Page 164

1    A.  Yes.
2    Q.  All right.  And there was -- the meeting
3    was all about Regions University, right?
4    A.  Yes, it was.  We were -- I was informing
5    them of the board's decision on that
6    Friday.
7    Q.  Now, somebody mentioned Regions Bank in
8    that meeting; is that correct?
9    A.  That is correct.  Dr. Stanley Patterson,
10   who is the vice-president of academic
11   affairs, alluded to the fact that he
12   thought that there was a Regions University
13   within the bank, internal within the bank.
14   Q.  At least some people knew about Regions
15   University outside the bank; is that
16   correct?
17      MR. HUDSON:  Object to the form.
18   A.  That's confusing.  What do you mean outside
19   the bank?
20   Q.  Well, Dr. Patterson isn't a member of
21   Regions Bank, is he?
22   A.  I don't know.  He is the vice-president of
23   academic affairs.

Page 165

1    Q.  And he was aware of Regions University of
2    the bank?
3    A.  He was the -- a dean at Trenholm here in
4    town before he came -- became
5    vice-president of academic affairs with
6    us.  And he received an employment
7    application from somebody from Regions
8    Bank, and they put on there that they had
9    attended Regions University.
10      He became alarmed by that because he
11   didn't know anything about a Regions
12   University.  And, of course, here he is as
13   dean looking at an application or a resume
14   with Regions University on it and he's
15   saying, well, now, how is this like a
16   University of Alabama or an Auburn
17   University or a Troy University?
18      And so then he has to go back to this
19   person who made the application, and he
20   then discovers that it's an internal thing
21   and not an accredited university.
22   Q.  So he was aware of Regions University at
23   that point?

Deposition of Rex Turner, Ed.D.

May 15, 2007

Page 166

1    A.  We were all made aware at that point.
2    Q.  Did he get the resume that day?
3    A.  Well, he had -- you understand, he had
4        worked prior at Trenholm, formerly
5        Patterson Tech here in town.  He was a dean
6        for a long time.  And he retired from the
7        State and came with us and has been an
8        excellent vice-president of academic
9        affairs.  Probably one of the best
10       decisions I've ever made.
11   Q.  So he was aware of Regions University from
12       his other employment is what you're saying?
13   A.  That's exactly right.
14   Q.  And then at this meeting, everybody knew
15       who Regions Bank was, didn't they, at the
16       meeting?
17   A.  Sure.  Everybody knows who Regions Bank is.
18   Q.  And he said that Regions Bank had an
19       internal Regions University?
20   A.  He just said, folks, I have remembered --
21       and this is the first time he had mentioned
22       it.  Said, this is my remembrance, and so
23       he said that -- I think there's a Regions

Page 167

1        University within the bank.
2    Q.  Now, did he tell it to you in this meeting
3        or did he tell it to you before July 31st?
4    A.  No, sir.  He told us at this meeting, and
5        there was no mention at all and there was
6        no effort on his part to keep it from us.
7    Q.  Now, the next paragraph says:  Dr. White --
8        And what's Dr. White's position at the
9        university?
10   A.  He is the director for institutional
11       research.
12   Q.  Dr. White contacted the trademark
13       attorney's office to ensure that this would
14       not pose a problem.
15       Now, the trademark attorney's office is
16       Mr. Shlesinger?
17   A.  Yes.
18   Q.  Did he contact him during the meeting?
19   A.  No, he did not, but he contacted -- if you
20       want the complete explanation, James
21       Shlesinger left on that Friday to go on
22       vacation.  Dan Earl, who is also in that
23       attorney's office, he said if there's any

Page 168

1        contact that needed to be made, contact Dan
2        Earl.
3            And so I asked Dr. White, I said, would
4        you please get in touch with Dan Earl in
5        the office and bring this to him.
6    Q.  Okay.  Now, you contact --
7    A.  Dr. White made the contact.  I didn't.
8    Q.  I'm just trying to get the timing here.  So
9        you have this -- so you had the meeting,
10       and then it was part of the meeting you
11       guys told Dr. White to contact the
12       trademarks attorney to ensure that Regions
13       University would not pose a problem to your
14       adoption of Regions University?
15   A.  That's right.
16   Q.  And did he do that?
17   A.  I asked him -- yes, he did.
18   Q.  And what did he tell you?
19   A.  He contacted Dan Earl.  From just my
20       knowledge of the events, Dan Earl checked
21       Regions Bank's Web site.  He could not find
22       anything of Regions University at all on
23       the Web site.  And after a complete review

Page 169

1        by him, then on the following day he called
2        us and he said that this is internal within
3        the bank; therefore, this would not pose a
4        registration issue.
5    Q.  Now, when you said he called the next day,
6        that was on August 1st he called?
7    A.  That would have been Tuesday.  What day
8        would that have been?
9    Q.  This meeting was July 31st.
10   A.  That's a Monday.
11   Q.  So Earl called you on --
12   A.  Right.  He got back with us on the next
13       day, which is the 1st.
14           MR. HUDSON:  Is this a good time
15           to take a short break?
16           MR. PECAU:  Yes.
17           (Brief recess was taken.)
18           (Exhibits 33 and 34 were marked for
19           identification.)
20   Q.  Dr. Turner, I want to show you what's been
21       marked as Exhibit 33.  Is that the first
22       public announcement of the name change?
23   A.  No, sir.

43  (Pages 166 to 169)

Page 170

1    Q.   What was the first public announcement?
2    A.   The day we changed our name, we told
3         everybody there at the school that we had
4         changed our name. And we started giving
5         instructions to -- We started brochures and
6         started disseminating that information out,
7         even told our phone operators to begin to
8         answer Regions University, formerly
9         Southern Christian University.
10        And then at the appropriate time -- you
11        understand that here we are, and there was
12        not a whole lot of planning in every
13        process that we were able to do, to go and
14        the day you announce something, everything
15        is all done. But we did make sure that we
16        had an in-use trademark on the 2nd.
17   Q.   All right. Now, with respect to August
18        2nd, you said -- how did you make the
19        announcement at the school? I mean, there
20        are not many folks at the school, are
21        there?
22   A.   Not that many, but, you know, we started
23        making the announcement. I don't know that

Page 171

1    there's a rule of how many people at one
2    time.
3    Q.   In terms of the students, was August 8th
4         the first time that the students were -- I
5         mean, a wide group of the students that you
6         have were told about the change of name?
7    A.   It was the day that everybody that was
8         enrolled got the official announcement.
9         Many of them already knew through various
10        means, but it was the day in which that was
11        sent out. Let's see. That was on August
12        the 8th. I can't remember. Was that on a
13        Tuesday or a Wednesday? I can't recall.
14   Q.   Wednesday.
15   A.   Wednesday?
16   Q.   And the first bit of confusion occurred on
17        August 9th; is that right?
18            MR. HUDSON: Object to the form of
19        the question.
20   A.   I think you would have to produce whatever
21        documents you have. I did not deal with
22        that, and I'm not so sure there was
23        confusion as much as there was affiliation

Page 172

1    concerns as between, you know, is Regions
2    University in some way affiliated. Other
3    than that, as far as confusion --
4         There was ample distinction between
5    university and a bank. But all I can do is
6    refer you to the documents as to what
7    actually happened. If you want to pull
8    those out, we'll be glad to discuss those.
9            MR. PECAU: Do you want to mark
10       that as Exhibit 35, please.
11           (Exhibit 35 was marked for
12           identification.)
13   Q.   Let me show you what's been marked as
14        Exhibit 35. Do you know who Dr. Wilson
15        Luquire is?
16   A.   Yes, sir, I know him real well.
17   Q.   Who is he?
18   A.   I don't know if he is the dean, but he is
19        at the University of Alabama in
20        Huntsville.
21        Regions University has a contract with
22        UAH. We are able to provide through our
23        contract with them and other contracts we

Page 173

1    have -- particularly, we have a contract
2    with Brigham Young University, and we
3    provide over 10 million books accessible to
4    our students. And he knew and -- He was
5    gigging us if you want to know the truth.
6    Q.   Now, you sent him -- he's replying to an
7    e-mail that you sent him; is that correct?
8    A.   Well, we informed him of our name change
9    because, understand, when you come into our
10   Web site, if you click on university, that
11   portion was prepared by the University of
12   Alabama-Huntsville, prepared in-house by
13   them. And we have a contract that we pay
14   them on an annual basis. So they had to
15   change it from Southern Christian
16   University to Regions University. And you
17   would just have to know Dr. Luquire.
18   Q.   At the end, he says --
19   A.   But let me say this. He knows the
20   difference in an accredited university. He
21   knows that we're accredited with the
22   Southern Association of Colleges and
23   Schools. In fact, we went through a year

Page 178

1    is an employee of UAH, and that's his
2    e-mail.
3    Q.  And who did he send the e-mail to?
4    A.  Well, David's comments are at 3:37, I
5    assume, on the 9th, and Dr. Luquire's is
6    3:59.
7        So David -- And I do not deal with
8    David Moore.  Dr. White does.  And he was
9    informing them of the name change and that
10   we need to get Regions University on that
11   portion of our Web site that deals with the
12   library.
13   Q.  Shouldn't --
14   A.  And all I can say is what's here, because I
15   made no -- I had no contact at all with
16   Wilson Luquire or with David.  And I'm sure
17   Dr. White had contact with David, and I
18   doubt if he did with Daniel, but he may
19   have had some with Daniel to work up the
20   site.  But that's basically what it had to
21   do with.
22   Q.  Did Dr. White forward you this e-mail from
23   David Moore?

Page 179

1    A.  I don't know.  Evidently, I received --
2    let's see here.  There's several people
3    involved up there, copies to.  You know,
4    that was all sent to those people.  And I
5    got this.  I remember seeing it.  But I'm
6    just telling you that I did not respond to
7    Dr. Luquire or to David.
8    Q.  Now, is this e-mail from David Moore the
9    first one that raised a possible conflict
10   with the Regions financial institution?
11   A.  I don't know.  I don't know who -- who did
12   what first.  We would have to ask them or
13   ask Dr. White as to the process by which
14   this was done.
15   Q.  Now, in your conversations with people
16   explaining to them that you're adopting
17   this new Regions University name, did any
18   folks inquire as to affiliation between
19   Regions University and Regions, the
20   financial institution that you recall?
21   A.  Not other than the documentation that we
22   have given you that I am aware of any
23   affiliation.  People -- You know how people

Page 180

1    will do.  They'll come up and tell you, oh,
2    y'all must have gotten some money or
3    something.  And they know good and well
4    that Regions Bank is one thing and Regions
5    University, an accredited school, is
6    another.  They love to put a pin in you.
7    Q.  So some people have come up to you and
8    kidded you that Regions Bank must have
9    given you some money and that's why you
10   chose the name?
11   A.  Well, you know, it has occurred in one --
12   one or two occasions.
13   Q.  Well, why don't you tell me about those
14   occasions.  Do you recall --
15   A.  I don't remember any.  That's exactly what
16   he's doing right here, Dr. Luquire is.
17   Q.  That's what you're inferring?
18   A.  That's what I read into it.
19   Q.  Incidentally, in the year prior to August
20   2, 2006, Southern Christian University, did
21   it have any TV advertising?
22   A.  Prior to when?
23   Q.  August 2, 2006.

Page 181

1    A.  What kind of TV advertising?
2    Q.  You know, like a 60-second TV commercial
3    saying come to Southern Christian
4    University.
5    A.  I'm sure we had commercials.  Let's see.
6    At this time, we were probably letting --
7    we had let the contracts for the fall.  In
8    other words, we were in that process of --
9    and they were already playing at that
10   time.  I would say, yes, we were playing
11   Southern Christian University ads.
12   Q.  So you had Southern Christian University
13   television ads?
14   A.  Yes.
15   Q.  Did you have Southern Christian University
16   radio ads in 2005 and 2006?
17   A.  I really do not know.  I could be wrong.  I
18   do not think so, but we kind of have a
19   general feel -- most of the time, it is
20   television ads, certain print ads.
21       And I know that it has been the
22   position of the advertising group that they
23   prefer the TV ads over the radio ads,

Page 190

1  happy to have students from various
2  religious backgrounds enrolled in our
3  courses.
4  Q.  Let me show you what's been marked as
5  Exhibit 34.  Do you recognize this Exhibit
6  34?
7  A.  Yes, I do.
8  Q.  Did you write this?
9  A.  Yes, I did.  I did write it.  I had some
10  people to correct it for grammar, but I
11  wrote the letter.
12  Q.  Okay.  And you sent this out on August
13  16th, '07?
14  A.  That is correct.
15  Q.  And then on August 18th -- I'm sorry.
16  August 16th, '06 you sent it out; is that
17  correct?
18  A.  Yes, 16th of August.
19  Q.  And then on August 18th, you got the first
20  protest letter from Regions; is that
21  correct?
22  A.  That doesn't measure up in time.
23        (Exhibit 37 was marked for

Page 191

1        identification.)
2  A.  Okay.  Up at the top here, I believe that
3  it was delivered on August the 20th, that
4  evening, but I do not know why it was
5  delivered at the phones.  It was not opened
6  until August the 21st, that morning of the
7  21st.
8  Q.  So the day you got it and you opened it and
9  looked at it, it was --
10  A.  August the 21st, yes.
11  Q.  Now, prior to getting this letter, do you
12  recall getting any phone calls from any
13  people asking about affiliation between
14  Regions University and Regions?
15  A.  No, sir.  We have given you, I think, the
16  documentation on communication, and I don't
17  have it in front of me.  And I'd rather
18  that that documentation speak ...
19  Q.  Okay.  Interrogatory number 13 asked for
20  each instance in which a person directed a
21  communication meant for Regions, the
22  defendant, who inquired as to the
23  relationship, association, or connection of

Page 192

1  Regions or Regions' mark, service or
2  business of Regions with defendant or its
3  businesses or services and each person
4  having knowledge thereof.
5        It refers to a telephone call
6  concerning degree programs and inquiring as
7  to affiliation of university with Regions
8  Bank.  Do you see that?  And your name is
9  identified as a person having knowledge of
10  that telephone call.
11  A.  Well, only knowledge in that somebody else
12  told me about it.
13  Q.  So somebody else told you about that
14  telephone call?
15  A.  I mean, I didn't get the call.
16  Q.  All right.
17  A.  And, in fact -- Go ahead.  I'm sorry.
18  Q.  And what do you recall about what you were
19  told about that telephone call?
20  A.  They called about the degree programs and
21  they just wanted to ask if there was any
22  affiliation with Regions Bank.  They did
23  not call and say, is this Regions Bank?

Page 193

1  Q.  All right.  Now, are you aware of any other
2  telephone calls to Regions University
3  asking about an affiliation between Regions
4  Bank and Regions University?
5  A.  I think we have disclosed everything to
6  you.  I'd rather that that disclosure be
7  what we've said.
8  Q.  Well, I understand the preference, sir, but
9  I'm asking you in addition to that
10  telephone call that's referred to there,
11  are you aware of any other telephone calls
12  to Regions University that asked about an
13  affiliation between Regions University and
14  Regions, the financial institution?
15  A.  I'm not aware of any.  There may have been
16  some.  I'm not aware of any.  But there's a
17  lot of difference between somebody asking
18  about an affiliation and somebody confusing
19  that this is a bank.  And nobody to my
20  knowledge has called us and asked us, how
21  much is in my checking account?
22  Q.  All right.  Actually, I'm more interested
23  in the question, in any -- let me go back.

Page 222

1     was a mock-up. Now you're
2     telling me something
3     different.
4     THE WITNESS: I'm still talking
5     about the first one.
6     MR. HUDSON: Okay. I'm sorry.
7 A. I mean, the only one that we have done is
8     the first one.
9 Q. So the first page of Exhibit 44 is what
10     folks sometimes call a photoboard; is that
11     correct?
12 A. It is a photoboard.
13 Q. And it's a photoboard of a commercial that
14     Regions University ran; is that correct?
15 A. That's right. The pictures -- of course,
16     the world, the world turning, all of that
17     is there, but these pictures that are on
18     the photoboard are not exactly as it
19     appeared on the commercial.
20     This was just -- the words were checked
21     and I think the words are -- they may have
22     been in some way changed, but other than
23     that, I don't think they were. There may

Page 223

1     have been slight variations of words on the
2     first one.
3 Q. Now, the storyboard -- the storyboard for
4     this TV commercial -- you said there's only
5     one actual television commercial.
6 A. That has been produced and advertised.
7 Q. How much does the production of this
8     commercial shown in Exhibit 44 cost,
9     approximately?
10 A. I do not know that. We have reported that
11     to you. We've given you -- I've looked
12     through the documentation. We've given you
13     the bills and the basic cost of what those
14     things cost.
15 Q. So as you're sitting here now, you don't
16     know approximately how much --
17 A. I don't know how much that cost to do
18     that. I know that there was some special
19     work that was done to create that world to
20     evolve, and it was sent off somewhere
21     else. I thought I noticed a bill for it
22     when I was looking at some of the
23     documents.

Page 224

1 Q. In Exhibit 44, there's no mention of a
2     Christian university as describing Regions
3     University. What's the reason for that?
4 A. Well, these were -- these were layouts
5     here. But on the one that actually is
6     played, it has a Christian university on
7     the back slide.
8 Q. On the last panel?
9 A. Yes.
10 Q. Do you know how long that panel is showed,
11     how many seconds?
12 A. I don't know. You're talking about 30
13     seconds for the whole thing, and it's the
14     last one.
15 Q. So it would just be a couple of seconds?
16     MR. HUDSON: Object to the form.
17 Q. Is there anything in the voice-over that
18     refers to Regions University as a Christian
19     university?
20 A. I don't think that it does. It conveys
21     it -- a lot of times we have to do that
22     because you just cannot get all the words
23     in.

Page 225

1 Q. Is there any reference to Southern
2     Christian University in Exhibit 44?
3 A. No, not that I'm aware of.
4 Q. Is there a reason why there isn't any
5     reference to Southern Christian University
6     in Exhibit 44?
7 A. Well, we changed our name on August the
8     2nd. We had already let the advertising.
9     We got a letter from the bank, from you,
10     Mr. Pecau. We, of course, were naturally
11     concerned, but we had already let our
12     advertising as Southern Christian
13     University. It played until the end of
14     December. That was for the fall semester.
15     When the spring semester began -- we
16     have about a week window, and I can't
17     remember in 2007, but we're dealing with
18     the second or third -- I can't remember.
19     But it was at that time that we and the --
20     I don't think the TV ad was all done. It
21     takes time to do this.
22     And we immediately did radio spots
23     because that was something that was easy to

Deposition of Rex Turner, Ed.D.

May 15, 2007

Page 262

1  A.  I don't know who she is. I would say she
2      is a potential student or ...
3          MR. HUDSON: The question is, do
4          you know who she is?
5  A.  Oh, I'm looking down here at the bottom.
6      This is not a student. I'm sorry. This is
7      a secretary at the Alabama Independent
8      Colleges, which is called AAICU. They
9      presently are housed at Huntingdon
10     College.
11         This is a group of nonprofit
12     institutions in the state of Alabama
13     that -- we work together. The State of
14     Alabama provides scholarships to students
15     who are Alabama students. And so Carol is
16     trying to get information from us relative
17     to our program and some important
18     information. And they seek that
19     information from us on an annual basis.
20         And I'm sure that they were addressing
21     some tuition -- okay. The subject is
22     tuition numbers needed. And Anita is
23     responding to her on the tuition of the

Page 263

1      undergraduate tuition.
2          You see, this is the -- The State of
3      Alabama provides money to the student --
4      not to the university, but to the student.
5      And it's so much based upon how many
6      courses that they take, and I don't know
7      the complete formula. I'm totally
8      unprepared to deal with this.
9          But she is correcting -- I have already
10     alluded to the fact where we changed our
11     fees. We had higher tuition costs and
12     fees, and we were giving -- the institution
13     was giving an institutional scholarship.
14     We did away with that. And according to
15     this document, she said that it is now $250
16     a semester hour and there are no fees with
17     it. And that is the price that we charge
18     per semester hour, so she's just giving --
19     and she is not a student of the
20     institution.
21 Q.  Now, you were here in the room when Russ
22     Dunham testified under oath. Do you
23     remember that?

Page 264

1  A.  Yes.
2  Q.  Do you recall that he testified that there
3      are over 20 times in which people ask about
4      the affiliation between Regions and Regions
5      University? Do you remember that?
6          MR. HUDSON: Object to the form of
7          the question.
8  A.  I noticed and read the e-mails that were
9      sent to Russ.
10 Q.  Were you surprised by the number of times
11     that people indicated that they thought
12     there was some sort affiliation between
13     Regions University and Regions?
14         MR. HUDSON: Object to the form of
15         the question.
16 A.  I was surprised in that -- well, let me
17     restart that. In viewing those e-mails, it
18     was obvious to me that there was not
19     confusion, but that the people were seeking
20     or wanting to know affiliation, if there
21     was any affiliation between the two, but
22     that they understood the difference between
23     a bank and an accredited university. I

Page 265

1      think I saw that in the e-mails.
2          Now, you asked me for my opinion. I
3      read them. It's amazing what everybody can
4      read, but that's what I gathered because
5      some of them were not even -- they were at
6      church, and people would come up and just
7      ask if there were affiliation.
8          MR. PECAU: I have no further
9          questions. Thank you very
10         much for your time today.
11         (Deposition concluded at 5:30 p.m.)
12
13
14
15
16     * * * * * * * * * * * *
17     FURTHER DEPONENT SAITH NOT
18     * * * * * * * * * * * *
19
20
21
22
23

N THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION and REGIONS BANK | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 2:06-cv-882-MHT |
| v. | ) ) | |
| REGIONS UNIVERSITY, INC. | ) ) | |
| Defendant. | | |

**BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**

Charles B. Paterson (PAT018)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500

ATTORNEY FOR PLAINTIFFS

OF COUNSEL:

William G. Pecau
Rachel M. Marmer
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202)429-6244

Dated: August 17, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ iii

I.    INTRODUCTION ................................................................................ 1

II.   Statement of Facts ............................................................................. 3

   A.   Regions and its REGIONS Mark ...................................................... 3

      1.   The REGIONS Name Identifies Plaintiffs and their Many
           Businesses and Services ........................................................... 3

      2.   Regions Businesses and Services ............................................... 4

      3.   Regions Is a Community Presence .............................................. 5

         a.   REGIONS Is Physically Located in Its Communities .................. 5

         b.   Everyone Is a REGIONS Customer ....................................... 5

         c.   Regions Involvement in its Communities ................................ 5

         d.   REGIONS Public Educational Efforts .................................... 7

      4.   REGIONS UNIVERSITY ............................................................ 8

      5.   Use of the REGIONS Mark and Name ........................................ 10

         a.   REGIONS Adopted Because the Name Was a Distinctive
              and Different for a Trademark ........................................... 10

         b.   Advertising and Promotion of REGIONS ............................... 12

         c.   REGIONS Sponsorship of Universities and Their
              Conferences .................................................................. 13

         d.   Hundreds of Millions of Dollars Spent Promoting the
              REGIONS Mark .............................................................. 14

      6.   REGIONS Fame: Everybody Knows REGIONS ............................. 14

      7.   The REGIONS Brand Is One of Regions' Most Valuable Assets .......... 16

      8.   REGIONS Registrations ........................................................... 16

   B.   The Defendant Southern Christian University, Now Regions University .......... 16

      1.   The School Depends on Tuition .................................................. 16

      2.   The School's Program ............................................................. 17

      3.   The School's Students Come Primarily from the South ...................... 17

      4.   The School's Marketing for Students ........................................... 17

      5.   The Adoption of a "For-Profit" Name: Regions University .................. 18

|  |  | a. | The School Needed a For-Profit Name to Increase Enrollment and to Support the Theology School | 18 |
|  |  | 6. | The School Was Well-Aware of the Fame of the REGIONS Name | 19 |
|  |  | 7. | Defendant's Use of Regions University Has Caused Immediate Confusion | 22 |
|  |  | 8. | Defendant Admits to Confusion | 25 |
| III. | Argument |  |  | 26 |
|  | A. | The Standard for Summary Judgment |  | 26 |
|  | B. | Defendant's Use of the REGIONS Is Likely to Cause Confusion and Has Caused Confusion with Plaintiffs' REGIONS Mark |  | 27 |
|  |  | 1. | Plaintiffs' REGIONS Mark Is Strong and Worthy of a High Degree of Protection | 30 |
|  |  | 2. | Plaintiffs and Defendant's REGIONS Marks Are Similar | 36 |
|  |  | 3. | The Parties' Services Are Related | 38 |
|  |  | 4. | The Parties Serve the Same Customers and Retail Markets | 40 |
|  |  | 5. | The Parties Use the Same Advertising Media | 42 |
|  |  | 6. | Defendant Chose Its For-Profit REGION UNIVERSITY Name To Take Advantage of the Goodwill Represented by the Famous REGIONS Mark and to Project Itself as an Institution of National Prominence. | 42 |
|  |  | 7. | Substantial Confusion Has Arisen From the Use of REGIONS UNIVERSITY | 47 |
|  |  | 8. | Defendant's Use of the REGIONS UNIVERSITY and REGIONS Is Likely to Cause Confusion | 49 |
|  | C. | Regions Is Entitled to Summary Judgment on its State Dilution Claim |  | 50 |
|  |  | 1. | Defendant's Use of the Famous REGIONS Mark Constitutes Dilution Under Alabama State Law | 50 |
|  |  | 2. | Defendant's Use of REGIONS UNIVERSITY Is Likely to Cause Dilution of Plaintiffs' REGIONS Mark under the Federal Dilution Act | 52 |
|  |  | a. | Plaintiffs' REGIONS Mark Is Famous | 53 |
|  |  | b. | Defendant's Use of the REGIONS Mark Is Likely to Cause Dilution by Blurring | 54 |

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Farm Bureau Fed'n v. Alabama Farmers Fed'n*,
   935 F. Supp. 1533 (M.D. Ala. 1996) ...................................................................28, 43, 48

*American Int'l Reinsurance Co. v. Airco, Inc.*,
   570 F.2d 941 (C.C.P.A. 1978) ................................................................................... 32

*Amstar Corp. v. Domino's Pizza, Inc.*,
   615 F.2d 252 (5th Cir. 1980) ...............................................................................35, 36

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................. 26

*Arthur Young, Inc. v. Arthur Young & Co.*,
   579 F. Supp. 384 (N.D. Ala. 1983) ........................................................................... 51

*Babbit Electronics, Inc. v. Dynascan Corp.*,
   38 F.3d 1161 (11th Cir. 1994) ..............................................................................38, 43

*Bd. Of Supervisors of La. State Univ. v. Smack Apparel Co.*,
   438 F. Supp. 2d 653 (E.D. La. 2006) ........................................................................ 48

*Burger King Corp. v. Mason*,
   710 F.2d 1480 (11th Cir. 1983) ................................................................................. 28

*Burton v. City of Belle Glade*,
   178 F.3d 1175 (11th Cir.1999) .................................................................................. 27

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .................................................................................................. 26

*Choice Hotels Int'l, Inc. v. Kaushik*,
   147 F. Supp. 2d 1242 (M.D. Ala. 2000) ................................................................... 27

*Citibank N.A. v. Citibanc Group, Inc.*,
   215 U.S.P.Q. 884 (N.D. Ala. 1982) .......................................................................... 30

*Commerce Foods, Inc. v. PLC Commerce Corp.*,
   504 F. Supp. 190 (S.D.N.Y. 1980) ........................................................................... 33

*Compton v. Fifth Avenue Ass'n*,
   7 F.Supp.2d 1328 (M.D. Fla. 1998) .......................................................................... 38

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
   604 F.2d 200 (2d Cir. 1979)..............................................................................28

*E. Remy Martin & Co. v. Shaw-Ross Int'l Imports*,
   756 F.2d 1525 (11th Cir. 1985)........................................................................41

*ECO Mfg LLC v. Honeywell International, Inc.*,
   No.1:03-CV-0170-DFH, 2003 WL 18888988 (S.D. Ind. Apr. 11, 2003) ............................46

*Freedom Savings & Loan v. Way*,
   757 F.2d 1176 (11th Cir. 1985)........................................................................48

*Frehling Enters. v. Int'l Select Group, Inc.*,
   192 F.3d 1330 (11th Cir. 1999)............................................................29, 37, 43

*Herbko Int'l., Inc. v. Kappa Books, Inc.*,
   308 F.3d 1156 (Fed. Cir. 2002)........................................................................37

*In re Shell Oil Co.*,
   992 F.2d 1204 (Fed. Cir. 1993)........................................................................38

*Int'l Stamp Art, Inc. v. United States Postal Service*,
   456 F.3d 1270 (11th Cir. 2006)........................................................................26

*James Burrough, Ltd. v. Sign of Beefeater, Inc.*,
   547 F.2d 266 (7th Cir. 1976)..........................................................................30

*Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*,
   716 F.2d 833 (11th Cir. 1983)............................................................29, 34, 43

*Miranda v. B&B Cash Grocery Store, Inc.*,
   975 F.2d 1518 (11th Cir. 1992)........................................................................30

*Miss Universe, Inc. v. Little Miss U.S.A., Inc.*,
   212 U.S.P.Q. 425 (N.D. Ga. 1981)....................................................................34

*O'Ferrell v. United States*,
   253 F.3d 1257 (11th Cir. 2001)........................................................................26

*Ross Bicycles, Inc. v. Cycles USA, Inc.*,
   765 F.2d 1502 (11th Cir. 1985)........................................................................42

*Sullivan v. CBS Corp.*,
   385 F.3d 772 (7th Cir. 2004)..........................................................................31

*Texas Tech. Univ. v. Speigberg*,
   461 F. Supp. 2d 510 (N.D. Tex. 2006) ................................................................48

*The Breakers of Palm Beach, Inc. v. Int'l Beach Hotel Development, Inc.*,
   824 F. Supp. 1576 (S.D. Fla. 1993) ................................................................. 34

*Turner v. HMH Publishing Co.*,
   380 F.2d 224 (5th Cir. 1967), cert. denied, 389 U.S. 1006 (1967) ...................... 34

*Universal Money Ctrs. v. AT&T*,
   22 F.3d 1527 (10th Cir. 1994) ............................................................................ 29

*University of Georgia Athletic Ass'n v. Laite*,
   756 F.2d 1535 (11th Cir. 1985) ...................................................................passim

*Virgin Enters. V. Nawab*,
   335 F.3d 141 (2d. Cir. 2003) ........................................................................31, 37

*Yale Electric Corp. v. Robertson*,
   26 F.2d 972 (2d Cir. 1928) ................................................................................ 28

STATUTES

Ala. Code § 8-12-16 .................................................................................................. 27

Ala. Code 8-12-17 ................................................................................................50, 51

Ala. Code § 8-12-19 .................................................................................................. 27

15 U.S.C. § 1065 ...................................................................................................... 16

15 U.S.C. § 1114 ...................................................................................................... 29

15 U.S.C. §1125(a) ................................................................................................... 29

15 U.S.C. § 1125(c): ................................................................................................. 53

15 U.S.C. § 1125(c)(1) ............................................................................................. 53

15 U.S.C. § 1125(c)(2)(A) ........................................................................................ 54

15 U.S.C. § 1125(c)(2)(B) ........................................................................................ 54

RULES

Fed. R. Civ. P. 56(c) ................................................................................................ 26

**BOOKS AND ARTICLES**

Glenn A. Gundersen, *Trademark Searching* (1994) ................................................................. 46

Restatement (Third) of Unfair Competition § 21, comment (1995) .......................................... 30

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (4th ed. 2007) ....passim

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION and REGIONS BANK | ) ) ) ) ) |  |
| Plaintiffs, | ) ) | Civil Action No. 2:06-cv-882-MHT |
| v. | ) ) |  |
| REGIONS UNIVERSITY, INC. | ) ) |  |
| Defendant. | ) |  |

**BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Regions Asset Company, Regions Financial Corporation and Regions Bank ("Regions"), through its undersigned counsel, respectfully submit this Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment.[1]

**I.    INTRODUCTION**

Southern Christian University ("SCU"), headquartered in Montgomery, decided that it wanted a "for-profit kind of name" so that it could project itself as an institution of national renown. It adopted plaintiffs' name REGIONS -- the name of the largest financial institution in Montgomery, the largest Alabama corporation, and one of the largest financial institutions in the United States -- as the university's new for-profit name. The fame of the REGIONS brand and defendant's knowledge of its prominence is beyond serious question. Defendant's president

---

[1]    Certain declarations and exhibits are being filed conventionally with the Court as confidential under the parties' protective order, along with a motion to file under seal. A chart of these documents is attached hereto.

himself admitted this numerous times: "I know Regions is prominent."[2] "Everybody knows who Regions bank is."[3]

As soon as the REGIONS UNIVERSITY name was adopted by defendant confusion was almost immediate -- people thought that there must be a connection between the school and the financial institution.  SCU received e-mails asking if the change to REGIONS was prompted by a donation or other affiliation with the bank.  And since then, there have been numerous instances of actual confusion as to the connection between these two REGIONS institutions. Even defendant's president admitted that he was personally aware of persons believing that Regions University was sponsored or affiliated with Regions.[4]

The state and federal laws of trademark infringement, trademark dilution and unfair competition all prohibit the use of the same (or similar) mark by others whose use is (i) likely to cause just this kind of confusion as to origin, association, sponsorship and affiliation and (ii) is likely to dilute the distinctiveness of a famous, established mark.  Further, the law of unfair competition prohibits the adoption of a name by another that will take advantage of the goodwill and fame by another – in other words, it prohibits a free ride on the reputation and goodwill associated with another's mark.

Defendant's motion for summary judgment betrays a fundamental misunderstanding of the purpose of the laws of trademark infringement and unfair competition.  Defendant cannot by using the REGIONS UNVERSITY name take advantage of the goodwill of REGIONS with impunity and cause confusion as to sponsorship and affiliation..  The undisputed facts, or the

---

[2] Turner Tr. 136.

[3] Turner Tr. 166.

[4] Turner Tr.

facts that are not subject to rational dispute, establish the infringement of the REGIONS mark and unfair competition as a matter of law. Accordingly, Regions cross-moves for summary judgment for trademark infringement and unfair competition under federal and Alabama law and dilution under Alabama law.

## II.    STATEMENT OF FACTS

### A.    Regions and its REGIONS Mark

#### 1.    The REGIONS Name Identifies Plaintiffs and their Many Businesses and Services

REGIONS is plaintiffs' principal brand and chief symbol of corporate identification. The REGIONS brand has central importance to the company. "It's your brand. It's the value of the company. Your name is the company." Askew Tr. 24. The REGIONS name and mark is used for all of Regions' businesses and services. Dunman Tr. 36-37. Plaintiffs' Regions Financial Corporation, Regions Asset Company and Regions Bank[5] and the names of many of their affiliates, business units and divisions, such as Regions Insurance Group, RegionsNet, Regions Mortgage, Regions Funding and Regions University all use REGIONS as the distinctive element of their names. Regions 800 number is 1-800-Regions. Regions' website's domain name is www.regions.com. REGIONS appears on all the company's stationery, business cards, signage advertisements, TV and radio commercials, billboards, promotional materials, checks and on Regions online website, and every other thing that names Regions' businesses, services or products. Peters Tr. 112-18, Abernethy Rep. 14.

---

[5] The plaintiffs Regions Financial Corporation, Regions Bank and Regions Asset Corporation are all related companies. Regions Financial Corporation is a bank holding company. Regions Bank is its wholly owned subsidiary and is a bank operating company. Regions Asset Company is a wholly owed subsidiary of Regions Bank and is an intellectual property holding company. "Regions" is used in this brief to refer collectively to all three Regions plaintiffs and their predecessors.

### 2.    Regions Businesses and Services

Regions is headquartered in Birmingham and began in 1971 from a combination of three Alabama banks located in Montgomery, Birmingham and Huntsville.

Since then, Regions has expanded geographically into sixteen states with its primary focus in the Southeast.[6]  Regions also operates one of the largest online banking sites in the United States at www.regions.com.  In 2006, the Regions online banking site had over a million households as customers having deposits in excess of 16 billion dollars.  Peters Tr. Ex. 88.

Regions now is the largest corporation with its headquarters in Alabama.  With assets in excess of 140 *billion* dollars, Regions is the largest financial institution in Alabama and one of the ten largest financial institutions in the United States.

As befitting its size, Regions supplies a full range of financial products and services for consumers, small businesses, non-profits, large corporations, and public entities that touch in one way or another virtually every aspect of people's financial lives.  Peters Tr. 52.   The consumer services include basic banking services like checking accounts, savings accounts, time deposit type of accounts, various kinds of loans like college loans and automobile loans, trust services, investment services, mortgage services, real estate lending, and private banking services. Dunman Tr. 36. Other services include insurance services such as credit insurance, credit life insurance, and term life insurance. Dunman Tr. 38   The corporate services run from bond offerings, to employee payment services, and letters of credit.  Scott Tr. 52.

---

[6] The Regions footprint is across the following states: a 16-state geographic footprint: Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee, Texas and Virginia.

### 3.    Regions Is a Community Presence

#### a.    REGIONS Is Physically Located in Its Communities

At its heart and the basis of its success is that Regions remains in its essence a community bank. Askew Decl. ¶ 3. This means that Regions is a community presence. REGIONS is physically in its communities and its presence through the many bank branches and their signage is large. For example, in Montgomery there are 25 Regions branches and in the state of Alabama there are over 250 branches.  Askew Decl. ¶ 3  Altogether, Regions has 1,900 branches and 2,400 ATMs across its footprint.  Askew Decl. ¶ 3.  This makes Regions the seventh largest network of bank branches in the country.  Askew Decl. ¶ 3.

#### b.    Everyone Is a REGIONS Customer

It also means that Regions is a bank whose customers come from every strata of its community.  A Regions customer is anyone who can open a checking or saving account, even a minor with parental permission, or who otherwise could use the financial services like car and student loans that are offered by Regions.  There is no restriction on the type of customer who banks with Regions.  Dunman Tr. 38, Abernethy p. 13. Indeed, 30 percent of Regions' customers have incomes of less than $30,000.  Ex. 88

#### c.    Regions Involvement in its Communities

Regions' involvement with and support of its communities is a part of its basic drive. This is spelled out in its 2006 services report:

> At Regions Financial Corporation, we want you to expect more—not just in the way we do business but in the way we serve our communities.  We employ exceptional bankers who focus on building customer relationships and contributing to our success.  And while this focus is both necessary and admirable, it doesn't fully explain who we are or the role we aspire to play.  Our associates bring great gifts to the communities where we live and work.  Gifts of compassion and creativity.  Gifts of enthusiasm and encouragement.  The gift of our individual and collective financial resources.

Jackson Decl. Ex. A.

Russell Dunman, the head of Regions' consumer banking for Montgomery and Central

Alabama explains Regions commitment to his community:

> I'll speak to our community—in virtually every major community effort there is from education, to community development, to industrial recruiting, to business development, to—anything that's good for the community or that the community sees as a benefit to help the community improve, Regions wants to be and will be involved in that, from involvement in charitable situations, through chambers of commerce, through boards of directors of community activity associations.
>
> All the things that go on in the community, we want to be very, very attuned to and want Regions' name associated with if they are positive for the community.

Dunman Tr. 131-132.

In 2006 alone, Regions provided more than $1.5 billion dollars in loans to low-to

moderate-income borrowers and in low-to moderate-income census tracts.  Jackson Decl. Ex. ¶4.

Also in 2006, Regions originated $6.9 billion dollars in CRA small business loans; 1.5 billion

dollars of this amount was to businesses located in low/moderate income areas.  Jackson

Decl. ¶ 4.  The U.S. Small Business Administration consistently ranks Regions as one of the top

small business-friendly financial service providers in the country.  Jackson Decl. ¶ 4.

Going forward, Regions has a commitment of investing at least $100 **billion** dollars from

2007 through 2013 to support community development, small business lending and mortgage

lending for low and moderate income communities and borrowers.  Jackson Decl. ¶ 5.

This Regions' assistance to its community also is in the form of charitable contributions

to the community.  For example, in Montgomery, Regions is the signature sponsor of the

Montgomery Ballet's season opening, the Montgomery Symphony and the Regions Art Show;

Regions also is a major sponsor of the Heart Walk, Arthritis Walk, Breast Cancer Awareness

- 6 -

Walk, and the United Way campaign.  Dunman Tr. 101.  As Mr. Dunman testified about the

Montgomery community: "There are very few community-wide events that Regions is not a part

of." Dunman Tr. 101.

<div align="center">

**d.     REGIONS Public Educational Efforts**

</div>

Regions encourages its managers and other associates to be involved in its community

affairs and, Regions, as part of these efforts is very involved in education – directly with its

communities and schools, also indirectly with its scholarship programs with many colleges and

universities within its footprint and its sponsorships of various and many schools and

universities.

Regions' direct involvement in education takes the form of lectures and talks on financial

matters of interest to its customers and community.  These include seminars for first

homebuyers, investment management, how to open a checking account, maintain your credit

rating or just how to do the right things to receive bank services.  These talks and seminars are

given at the banks or their lobbies or at the office of an agency or a community center.  For

example, at the OIC, Opportunities Industrialization Counsel, job training programs in

Montgomery, Regions has been involved periodically in programs that explain how to manage a

checking account.  Dunman Tr. 112-116.

In addition, Regions associates have given talks and lectures concerning banking services

and related financial services at all levels of schools from primary grades in the Montgomery

Public Schools in high schools in a seminar on federal reserve system, or in university level

schools like AUM, Auburn University, Alabama State University, Huntington College and where

a Regions speaker might discuss investment strategies or general investment practices.  Dunman

Tr. 117-118.

These kinds of educational services to the community and to school and universities are provided by Regions throughout its footprint.  Jackson Decl. ¶ 2.  Scott Peters, Regions' Chief Marketing Officer, explained the benefits to Regions from its deep community involvement:

> We get benefits from the standpoint of the community recognizing that we are more than just a bank that we interact with their lives and try to make their lives a little bit better.  That's positive for our image and our brand.

Peters Tr. 59.

> Regions also believes that community involvement also has "positive benefits for retaining customers overlong periods of time."  Community service also has "an employee or associate benefit and that our associates really personally want to give back to their communities.  And by facilitating that, we keep happier, good employees."

Peters Tr. 60.

But the primary reason for Regions' contributions to its communities was stated simply by Mr. Peters – "One, we think it's our responsibility."  Peters Tr. 59.

### 4.    REGIONS UNIVERSITY

Regions, like many corporations,[7] has used its name "Regions" along with the word "university" in its internal corporate training program.  The use of "Regions University" began in 2004 after Region's merger with Union Planters.  Pollard Tr. 9-10.

The logo used for Regions University appears below:

---

[7] Other examples of corporations using their names along with "university" include "Black & Decker University," "Motorola University," "SunTrust University."  Pollard Tr. 83. Training magazine uses the term "corporate university" as a generic term for a corporate training program, e.g. in its award application it asks: "to better describe your Corporate University (CU), please. . . ." Ex. 4 at RAC 31081.



Pollard Tr. 62; *see also* Ex. 13.

The training courses under the auspices of Regions University are offered twenty four

hours a day seven days a week online that are accessible from an employee's office or home.

There are three to five hundred courses offered online in categories such as finance and

accounting, and communication skills.  Pollard Tr. 69-70.  In addition, there are instructor-led

training labs that have classroom spaces offered either in company-owned or rented facilities.

Courses offered include Financial Services training, Financial Services Representative Training,

Branch Manager training, Commercial Loan Officer training, Trust Administrator curricula, and

Mortgage Loan Originator curricula.  Pollard Tr. 65.  There have been some self-study courses in

languages.  Pollard Tr. 95.

> Russ Dunman explains the importance of training to Regions and its employees:

> > The day that you are hired, you're introduced to Regions
> > University as the place you go to get basic courses. And it goes
> > through advanced courses of all sorts. . . .  It's where we all go for
> > our own training.

Dunman Tr. 43.

Every employee at Regions is required to take certain training courses.  For example,

Business Ethics, Bank Security Act and anti-money laundering courses are required for all

employees.  Dunman Tr. 44.  In the year 2005 alone, 25,000 Regions employees took Regions

University courses for a total number of hours of about 750,000 hours.  Pollard Tr. 78-79, Ex. 4 at RAC 31078 – 31081.

Employees are "strongly encouraged and supported" to take courses offered.  Pollard Tr. 70.  As Mike Pollard, the Director of Organizational Development for Regions testified, dedication to training is "the type of culture we've tried to create."  Pollard Tr. 71.

Regions University does not offer its Regions University programs outside of the bank. Pollard Tr. 31, 34, 52-53.  However, Regions University has been used as a recruitment tool and the Regions University name has appeared in recruitment brochures and on Regions website. Pollard Tr. 34, 36.  *See* Exhibits 9 and 11.  Of course, employees who take courses at Regions' Regions University can and do, at time, fairly indicate on their resumes the courses they have taken at Regions University.  Turner Tr. 115-16.

Regions has expended enormous amounts on employee training and courses under Regions University.  In the years 2005 and 2006, Regions spent well over 24 million dollars on corporate training.  Pollard Tr. Ex. 14.

Regions' corporate training efforts have been recognized.  Regions was ranked 66 in 2005 and 46 in 2006 in the <u>Training Magazine</u> Training Top 100 companies for employee training and development.  Marmer Decl. Ex. D.

### 5.    Use of the REGIONS Mark and Name

#### a.    REGIONS Adopted Because the Name Was a Distinctive and Different for a Trademark

The REGIONS name was adopted over 14 years ago in late 1993 as the company expanded beyond its Alabama origins.  According to Bill Askew who found and developed the Regions name, he needed a new name because the company's First Alabama name did not play well outside Alabama, especially Tennessee.  Askew Tr. 13-14.  REGIONS was chosen because

it had no geographical connotation.  Askew Tr. 12-13.   Mr. Askew said of the REGIONS brand: "it was a good solid name that - that had a strong feel to it," "[i]t was powerful.  It was well-received by the public.  It was not in use so it was perfect."  Askew Tr. 13, 16.

The absence of use of REGIONS as a business name and trademark by others was a particularly important consideration to the company when it chose the REGIONS name.  A unique brand like REGIONS would allow the company to have a brand that was distinct from other companies and products names so that it could develop and control its own identity and distinguish it from others.  Abernethy Report p. 4-6.  In Bill Askew's words:

> But if you're asking me did I go and make sure Regions wasn't used in different ways, I did.  The first thing I wanted to do was make sure that Regions did not exist somewhere else and wasn't – wasn't being used.  And so that's the first thing that we did to make sure it's distinguished, is to go out, find out and – and it wasn't being used.  And so that – that was – that was why I felt like we could distinguish the name.  Plus we did focus groups with people.  We did interviews with customers.  We – we showed them the name.  We talked about the name.  And – and they received it very well.  They liked the name.  And it was very distinguishable.

Askew Tr. 16.  And, Bill Askew testified that there was an extensive amount of searching conducted to determine whether the mark REGIONS was available and the result of these searches -- "I do recall we found no use of the [REGIONS] name."  Askew Tr. 41-42.  Russell Dunman testified the same:  "There was nothing like it that I recall seeing at the time we investigated the name."  Dunman Tr. 127.  Again, the distinct REGIONS name was chosen because, as Mr. Dunman said:

> [W]e wanted our reputation to be distinct in the sense of quality of service and all the things we strive to be at Regions.  So we chose a name that was one of a kind in our mind in order to make sure that we were distinct in both name and service and quality and the things that go with it.

Dunman Tr. 127-128.

- 11 -

b.    **Advertising and Promotion of REGIONS**

The REGIONS mark and name has been widely and extensively advertised and promoted by Regions since its adoption in 1993. Regions uses print, internet, television, radio, outdoor, merchandising, billboards, cinema and, of course, the signs at its 3,000 branches and ATMs to advertise and promote its REGIONS business, products and services. Peters Tr. 112-113. As appears from Regions Creative Briefs which show advertising strategy and the ads and commercials themselves, Regions promotes Regions as the customer's financial partner "understanding of consumer needs, competent advice and banking services." Abernethy Rep. 14, Peters Decl. Ex. C. Regions is positioned "in a strong, industry leadership manner by creating a lasting relationship-based brand that is capable of meeting the customer's financial needs throughout the course of their banking life cycle." RAC00031144 (emphasis in the original). The personality and tonality of the ads are:

"Competence – this is an intelligent, reliable, hardworking, trust-worthy and up-to-date brand . . . .

Sincerity – warm friendly, genuinely cares, positive (customer's best interests at heart)."

Peters Decl. Ex. C at RAC00031146. Regions marketing is deliberately inclusive and welcoming to all persons. As noted by Professor Abernethy, "This is done both in the human models used in advertising (wide variety of races, age groups, and apparent social status), the background music, and the Regions name." Abernethy Rep. 15. The tagline that Regions used for the past couple of years "Everyday Confidence" encapsulates the key idea of REGIONS advertising. *See e.g.* Peters Decl. Ex. A.

c.     REGIONS Sponsorship of Universities and
       Their Conferences

As part of its commitment to being an active presence in its community and to promote

the REGIONS brand, Regions has for years supported a number of college conferences and

colleges and universities located in its 16-state footprint.  The annual marketing spent by

Regions for these sponsorships in recent years has been six million dollars.  Peters Tr. Ex. 86.

Regions has been the corporate sponsor and official bank of the Southeastern Conference since

1993.  Peters Decl. ¶ 6; Peters Decl. Ex. A, Ex.. D and Ex. E.  Regions also is a corporate partner

with a number of SEC universities: University of Alabama, University of Arkansas, Auburn

University, University of Georgia, Louisiana State University, University of Mississippi,

Mississippi State University and the University of South Carolina.  *Id.*  Another college

conference sponsored by Regions is the Sun Belt.  Peters Decl. ¶ 6; Peters Dec. Ex. A, Ex. D.  In

addition, Regions sponsors many additional colleges and universities on a local basis like Indiana

University, Purdue and Florida State.  Peters Decl; ¶ 6.

Regions also sponsors the Regions Charity Classic golf tournament, the Regions Morgan

Keegan tennis tournament and a variety of professional sports.  Peters Decl. ¶ 7; Peters Decl. Ex.

A, Ex. D.  In addition, the stadium for the Birmingham Barons has been renamed Regions Park.

Peters Tr. 126-127; Exs. 86-87.

All these sponsorships create strong associations between the various schools, school

conferences, tournaments and other local community based organizations and Regions.  The

association is created by mentions during broadcasts like, "Regions.  It's time to expect more.

The official bank of the SEC," and REGIONS banners, signs, and graphics shown during the

telecast.  Peters Tr. 129-130.  Regions augments the association by additional advertising during

the telecasts and shows like the Regions Fifth Quarter radio show after the telecast that tout

Regions' many sponsorships of colleges and their conference (also banners, signs and graphics shown during the telecasts). Dunman Tr. 102; *see e.g.*, Peters Decl. Ex. A, D, E. Regions long use of the REGIONS name and mark, its extensive marketing efforts and its deep involvement in its communities.

In addition, Regions has provided millions in scholarships to universities. For example, December 2006, Regions provided the University of Alabama with a $1 million gift for business school scholarships under the "Our Students. Our Future." program. Marmer Decl. Ex. H.

### d. Hundreds of Millions of Dollars Spent Promoting the REGIONS Mark

In total, Regions has spent hundreds of millions of dollars promoting the REGIONS brand and its business. Abernethy Rep. 15. In the years 2005 and 2006 alone, the amount spent on marketing was in excess of 50 million dollars each year. Peters Decl. Ex. B.

### 6. REGIONS Fame: Everybody Knows REGIONS

Regions has become near universally known within its footprint. As defendant's President admitted, "Everybody knows who Regions Bank is." Turner Tr. 166. Dr. Turner's understanding of the fame of Regions is borne out by scientific projectable brand awareness surveys that Regions has had conducted by an independent research firm New South over approximately ten years. Askew Tr. 145.

A scientific, quantitative brand awareness study in 2007 showed Regions is very strong in aided awareness in Birmingham (98%), Mobile (93%), Nashville (87%), Memphis (91%), and Jackson (88%). Regions familiarity is high in other cites as well – Atlanta (83%), St. Louis (78%), New Orleans (84%). Regions was familiar to a large percentage of the population of other city markets tested: Indianapolis (69%), Miami (54%), Orlando (43%) and Tampa (44%). In 2006, the results were similar for aided awareness: 98% in Birmingham, 99% in Mobile; 95%

in Memphis, and 90% in Nashville. Jager Decl. ¶ 6; Jager Decl. Ex. A.  The aided awareness for

Montgomery would be at least as high as the 98% aided awareness found in Birmingham

because Montgomery has historically had a higher awareness of REGIONS than Birmingham.

Jager Decl. ¶ 8.

Unaided recall,[8] "very difficult memory task" for consumers, of REGIONS very high.

Askew Tr. Ex. 130 at RAC 22362.  Dr, Abernethy, a Professor of Marketing at Auburn,

comments that, "This is an extraordinarily high level of unaided recall which equals or exceeds

other major banks in the Regions market area." Abernethy Report 18.  Similar results are shown

in the brand awareness study in 2007.  Jager Decl. ¶ 6; Jager Decl. Ex. A.

Regions' market research over the years has tracked the general public's attitudes

towards it and its financial services and its own customers' satisfaction.  Regions has had high

satisfaction scores.  Jager Dec. Ex. A.  The overall "very satisfied" figures have been very high.

The 2000 through 2003 studies have the number of very satisfied customers at Jager Decl. Exs.

C-F at RAC 22863, 22790, 22612, and 22398.  As Dr. Abernethy reports: "They [Regions]

rigorously check consumer opinions at each branch to make sure that the brand promise of

consistent, competent, friendly banking service open to all is provided.  This in turn forged a

deep connection with its current customers via high satisfaction scores and with the general

public that views the bank quite favorably."  Abernethy Report p. 16.

These results confirm the testimony of Russ Dunman the person in charge of Regions

consumer banking in Montgomery and Central Alabama said: "We've worked awfully hard to

---

[8] Dr. Abernethy explains unaided brand awareness: "Unaided brand awareness is when a member of the public is asked names of banks without any assistance or information to aid memory.  This is a very difficult memory task in marketing."  Abernethy Report p. 18.

make the Regions name, the name everyone remembers for something positive."  Dunman Tr.
111.

### 7.    The REGIONS Brand Is One of Regions' Most Valuable Assets

Dr. Abernethy's conclusions about the REGIONS brand is that: "Regions is easy to
pronounce, has close to universal familiarity, and very high unaided recall.  Based on the
materials I have reviewed, in my opinion the REGIONS brand is well known, strongly positive,
holds a clear and distinct image in the minds of consumers.  It is a very powerful asset to
Regions."  Abernethy Tr. 30-31.  Bill Askew describes the value of REGIONS to Regions: "The
REGIONS brand, which represents who we are and all of our values and vision, might be the
most valuable asset of Regions.  It is certainly one of our most valuable assets."  Askew Decl. ¶
2.

### 8.    REGIONS Registrations

The REGIONS mark, alone and with other elements, has long been registered in the
United States Patent and Trademark Office.  Almost 20 REGIONS marks are registered,
including REGIONS, REGIONS MORTGAGE, REGIONSBANK, REGIONS FINANCIAL
CORP.  Certified copies of Regions' marks listed in its First Amended complaint are attached as
Marmer Decl. Ex. A.

The REGIONS mark is uncontestable by virtue of 15 U.S.C. § 1065.

### B.    The Defendant Southern Christian University, Now Regions University

### 1.    The School Depends on Tuition

Defendant SCU, now Regions University, is an online school with its headquarters in
Montgomery.  Ninety-five percent of all its students take their courses on line.  The school has
no bookstore or dormitories.  Virtually all – 97% -- of the school's income comes through tuition

and fees.  Turner Tr.58-59.  It has no real endowment and no apparent alumni financial support.  The school runs in the black.  Crosby Tr. 32.

The school's admission standards are minimal.  Admissions are online.  Standardized tests are not required; letters of recommendation are not required; class ranking is not required; an essay is not required.  Abernethy Report 21.  Basically, if an applicant has a high school diploma or its equivalent and the tuition, the applicant will be admitted to the school.

### 2.    The School's Program

The school advertises 33 degree programs offered online.  Exs. 44, 45, 47, 69 at RU 1628-29.  The professional or applied degree programs such as business, human services, human resources, public safety and the like are where most tuition revenue is generated.  Turner Tr. 68-69; Abernethy Tr. 22.  In addition, the school, which is affiliated with the Churches of Christ, has the Turner School of Theology with about 50 students that offers doctorate degrees in Ministry and in Biblical Studies.  Turner Tr. 69.  There is some residency requirement for the doctorate programs.

### 3.    The School's Students Come Primarily from the South

There are not more than 730 or 740 students in any given semester.  Crosby Tr. 21.  The school students are concentrated geographically.  Over two-thirds (69.9%) are from the Old Confederacy and border states.  Two hundred and forty (27.4%) of the total are from Alabama.  There were no apparent international students in 2006.Ex. 17; Abernethy Tr. 22-23.

### 4.    The School's Marketing for Students

The school spent over $1,250,000 dollars advertising in the 2006 – 2007 school year.  Crosby Tr. 37-38, Ex. 123.  Its primary media was television, radio, and billboard.  These advertising vehicles account for more than 80% of its planned advertising budget in 2006.  Reflecting the location of its students, the school concentrates its advertising in Alabama,

- 17 -

Tennessee, Texas and the Carolinas. Exs. 48, 123. In 2006, all advertising expenditures except some Christian magazines, was in the South. Exs. 48; 123

When Laina Costanza, who does the school's advertising under the direct supervision of Rex Turner,[9] was deposed on May 16, 2007, all the media placements for 2006 were in Alabama and Tennessee. Costanza Tr. 96, Ex. 48.

The target market for the school is "an individual 25 – 55, young professional or a mother at home, someone who needed to finish their degree or is transferring, someone who wants to further their education, someone who already has a bachelor's." Costanza Tr. 23.

As Dr. Abernethy describes the clear overall marketing strategy of the defendant institution: "Heavy advertising is focused on generating paying students, not building the image of the program. Programs are designed to maximize student revenues by offering applied, technical education (excepting the 6% of the student body enrolled in the Turner School of Theology.)" Abernethy Rep. 24.

### 5.     The Adoption of a "For-Profit" Name: Regions University

#### a.     The School Needed a For-Profit Name to Increase Enrollment and to Support the Theology School

In September 2005, SCU began to consider a name change. Rex Turner, the President of the school, told his Board that a name change should be considered because the school "needed to increase enrollment in areas such as business in order to support our degrees in the Turner School of Theology." The Board's September 25, 2005 minutes stated:

> This highlights our need – we need a *for-profit type name* that is a broad name. This would bring in students that would help fund the degrees in the Turner School of Theology.

---

[9] Dr. Turner makes all the decisions concerning the advertising of the school. Turner Tr. 19; Costanza Tr. 35-36.

(Emphasis added).  Turner Tr. 72-74, Ex. 20 at RU 110.

In its December 16, 2005 meeting, the Board debated the names Masters and Turner for the university's new name.  Turner Tr. 87-91, Ex. 22 RU 117-119.  Turner was the name of the school's founders and the name of its Theological University.  But even so, the Board was concerned that "some might think that it was named after Ted Turner."  Ex. 22 at RU 118. Instead, the Masters name was chosen and the Board directed Dr. Turner to get a registration for the name Masters University.  Once that was accomplished, the Board would make a final decision to rename the institution's name.  Ex. 22 at RU 118.

The Masters University mark encountered difficulties in the registration process and the school's trademark counsel expressed concern with another school's name. Rex Turner thought of additional names -- Rex, Royale, Providence, Regal and Regions – for the school's new name. Turner Tr. 111-112.  Rex Turner narrowed the list to 3 names – Turner University, Rex University and Regions University.  Turner Tr. 112.

**6.     The School Was Well-Aware of the Fame of the REGIONS Name**

Rex Turner came up with "Regions."  Turner Tr. 111.  He was well acquainted with REGIONS name.  He has banked with Regions continuously since 1974, when he moved to Montgomery.  Turner Tr. 8-9.  And, he admits to knowing the mark REGIONS since the bank changed its name.  Turner Tr. 10.  He remembers REGIONS television commercials and newspaper ads.  He regularly sees REGIONS signs driving around Montgomery, and he is aware that two of the tallest buildings in Montgomery bear REGIONS signage.  Turner Tr. 9-11.  Dr. Turner admitted:  "I know Regions is prominent."  Indeed, he was aware of stories in television and newspapers that summer of the merger of AmSouth and Regions.  Turner Tr. 136.  When asked if his policy team knew who Regions was Dr. Turner replied, "Everybody knows who Regions bank is."  Turner 166.

- 19 -

After he thought of REGIONS as the new school name, without speaking to anyone at the school, Rex Turner called up James Shlesinger on July 24, 2006.  Turner Tr. 119.  Dr. Turner told Mr. Shlesinger that he wanted an opinion of the "registrability of these names":  TURNER UNIVERSITY, REX UNIVERSITY and REGIONS UNIVERSITY.  Turner Tr. 132.

Dr. Turner mentioned to Mr. Shlesinger that "there is a Regions bank here" and Mr. Shlesinger commented "well, I don't anything about them up here in Virginia."  Turner Tr. 137. Dr. Turner did not tell Mr. Shlesinger anything about Regions:

>     Q.    So you made him aware that Regions was a
>           prominent bank in the community?
>     A.    I didn't say – [objection omitted]  I didn't say
>           prominent.  I just said there's a Regions bank.
>     Q.    Did you describe how big Regions was to Mr.
>           Shlesinger at all?
>     A.    Huh-uh (Negative response.) . . .
>     Q.    So what did you tell him about people's knowledge
>           of Regions in Montgomery?
>     A.    That was not discussed . . .
>     Q.    Did you tell him that Regions was a well known
>           bank in Alabama when you spoke to him?
>     A.    No, I just said there's a Regions bank.

Turner Tr. 136-137.

Three days later, Mr. Shlesinger sent Dr. Turner a short email concerning the "registerability" of the marks TURNER UNIVERSITY, REX UNIVERSITY, and REGIONS UNIVERSITY.  Ex. 28.  Mr. Shlesinger said that Turner University might encounter difficulties because of confusions as to sponsorship with some Turner companies.  Rex University appeared registrable.  For Regions University, "based on the search results, is registrable for education services, namely providing instruction at the university level."  *Id.*  There was no discussion in the e-mail concerning the REGIONS mark or Regions bank or contain an opinion regarding the risk of objection for infringement or dilution arising from Regions or anyone else.  *Id.* at RU 179.

There was no reference to the use of any mark – only marks that were registered on the USPTO. *See* Exhibit 28.  In fact, the e-mail does not refer to any mark containing the word "REGIONS" as its distinctive element.  Indeed, the "full report" (which perhaps has less discussion than the almost non-existent discussion in Shlesinger's July 27 email) only refers to one mark containing the word "Regions" -- that is, Regions' mark REGIONS CHARITY CLASSIC that is also registered in Int. Cl. 41.  Ex. 501.

The next day the Board gave Dr. Turner authority to change the name to Regions University.  The resolution states that name Regions University was chosen to replace Southern Christian University to "increase the school's attractiveness to potential students, not just regionally but internationally," and "changing the name will also assist the University *in projecting itself as a nationally recognized school of prominence*."  (emphasis added)  Ex. 31.

REGIONS bank came up again the following Monday, July 31, 2006.  In the school's team meeting, Dr. Turner announced the approval of the name change to REGIONS UNIVERSITY.  The minutes state: "It was brought up brought up that Regions Bank has an internal 'Regions University'."  Turner Tr. 165.  A team member said: "I think there's a Regions University within the bank."  Turner Tr. 166-167.

Dr. White, a team member and school consultant, apparently called Daniel Earle, an attorney at Mr. Shlesinger's firm.  The notes produced by Mr. Shlesinger's firm concerning this call are dated July 28 of a call from Dr. John White.  It states:

> REGIONS UNIVERSITY
> Bank in Alabama
> REGIONS BANK
> Get on File, soon
> 3 Brochures by tomorrow
> File PRESS today

Exhibit 502.  Mr. Earle was advised by the school that Regions University is internal within the bank.  He told them orally that "this would not pose a registration issue."  Turner Tr. 168.

### 7.     Defendant's Use of Regions University Has Caused Immediate Confusion

On August 2, 2007, Rex Turner decided to proceed with the use of the name REGIONS UNIVERSITY.  Turner Tr. 170-71.  The adoption and use of the mark REGIONS UNIVERSITY has been in steps.  The school did not begin advertising itself as REGIONS UNIVERSITY until January of this year.  Turner Tr. 225.  It still has not completely adopted the REGIONS UNIVERSITY name.  The signs for the school at its headquarters today say: "SOUTHERN CHRISTIAN UNIVERSITY."

An official announcement of the name change to REGIONS UNIVERSITY was sent out by email to the students on August 8, 2006.  Confusion as to sponsorship and affiliation occurred almost immediately.

The first evidence of confusion was an email on August 9, 2006, the day following the announcement of defendant's name change from Dr. Wilson Luquire to Dr. John White and Dr. Rex Turner of Regions University:

> "Good luck with Regions.  Is this related to the Bank and if so
> many I applaud you with double congratulations!!!!!!"  Ex. 35.

Also, on August 9, 2006, there was an email, from David P. Moore: "John White just informed me that SCU is now Regions University.  I didn't ask about the possible conflict with the bank of the same name!"  Ex. 35.

A former student at SCU, Randy Gore wrote to Rick Johnson on August 31, 2006: "Why was 'Regions' chosen?  Did Regions Bank make a donation?"  Ex. 35.  Even Laina Costanza, the person in charge of marketing at defendant, instantly thought of Regions the financial institution

when Dr. Turner told her that he was considering changing defendant's name to Regions University.  Costanza Tr. 64.

In January 2007, SCU began advertising Regions University to the public on television, radio, billboards and by other means. This advertising has caused significant confusion.

- Phone call to Regions University on an unrecalled date asking about degree programs and whether Regions University is affiliated with Regions Bank. Fulghum Tr. 17-18.

- Phone call to Regions University on an undisclosed date asking about degree programs and whether Regions University is affiliated with Regions Bank. Hughes Tr. 20.

- Phone call on or around March or April, 2007, to Regions' call center asking if Regions is affiliated with Regions University and where Regions University is located.  Wilson Affidavit.

- Phone call within the last three months, to Regions' call center asking if Regions University was affiliated with Regions Bank.  Burton Affidavit.

- In June 2007, Mr. Brian Warwick, an attorney at the law firm of Maynard Cooper & Gale LLC in Birmingham, AL, saw a television advertisement for Regions University.  He thought that it might be affiliated with Regions Bank. He had not been aware of other companies using Regions as its name and is acquainted with Regions as one of the largest financial institutions in Birmingham and elsewhere.  He thought Regions may have started a school, much like graduate school courses offered by the United States Department of Agriculture, whose courses were advertised on the public transit in Washington, DC, when he lived there.  Warwick Decl.

- Mr. Jack Galassini, who banks at Regions in Montgomery and is aware of the large and respected presence of Regions in Alabama and elsewhere, saw a commercial for Regions University and thought that it might have "some type of relationship with Regions Bank."  He was informed by Mr. Dunman at a social event that there is no affiliation.  Galassini Affidavit.

- Ms. Terry Boyd, the Branch Manager of Regions Bank Moores Mill Road Office in Auburn, AL, and her husband saw an advertisement for Regions University.  Her husband asked if there was a connection between the university and the bank.  She was not sure and learned from bank management that there was no connection.  Furthermore, two of her employees asked her if there was a connection between Regions University and Regions Bank.  Boyd Affidavit.

- 23 -

- Mr. David Green, Assistant Branch Manager of Regions Bank Autauga County Office in Prattville, AL, saw a billboard for Regions University at I-85 and Taylor Road in Montgomery.  He asked Denise Murphy, the Branch Manager, if it had something to do with Regions Bank.  Green Affidavit; Murphy Affidavit.

- Ms. Wanda Norris, an employee at Regions Bank in Enterprise, AL, and her husband saw a television advertisement for Regions University.  They both wondered if it was affiliated with Regions Bank.  She later had a conversation with her manager, Robbin Thompson, who indicated to her that he had also seen the ad, and told her that there was no affiliation.  Norris Affidavit; Thompson Affidavit.

- Mr. Kiel Odom, Branch Manager of the Regions Bank Village West Office, was approached by a teller, Mattie Sanders, who had seen an advertisement for Regions University and indicated to him that she thought Regions Bank had "bought a university."  He explained to her that bank management informed him that there was no affiliation.  Odom Affidavit.

- Ms. Karan Rudolph, the Human Resources Assistant of Regions Financial Corporation in Montgomery, AL, saw a billboard at I-85 and Taylor Road and thought there may be some connection between Regions University and Regions Bank.  She "Googled" the web to satisfy her curiosity and learned what Regions University is and that there is no connection.  Rudolph Affidavit; Sanders Affidavit.

- Mr. Craig Smith, Branch Manager of Regions Bank in Wetumpka, AL, heard radio advertisements and saw television advertisements for Regions University.  He thought Regions University may be related with Regions Bank, but later learned from bank management that it was not.  Several of his employees have told him that customers have inquired about the name Regions University and have specifically asked whether or not Regions University is affiliated with Regions Bank.  He has instructed personnel in his branch to answer these customers by telling them that there is no connection.  Smith Affidavit.

- Ms. Sheila Noblitt, author of the blog entitled Alabama Kitchen Sink posted a conversation about public and private institutions in Alabama with the following discussion:

  > Sheila: "I started to throw in the privates in town, Faulkner, Huntingdon, South University and I believe, Regions University (which used to be Southern Christian). I don't know if I left anyone out. I think that's it...."

  > Jay Croft: "Regions University?  Regions is a bank!"

> Sheila: "Jay, Regions is a bank and that's why I was
> puzzled that Southern Christian University changed its
> name.  I always think that the bank is behind the university.
> Ha."
>
> Jay Croft: "It's like Western Maryland College in
> Westminster, MD.  It is the only college in the USA named
> for a railroad.  (Western Maryland Railway donated the
> land for the college many years ago.  Westminster is not in
> the western part of Maryland at all.)  A deep-pockets donor
> gave a sizeable contribution and Behold!  It is McDaniel
> College now."   Marmer Decl. Ex. C.

### 8.    Defendant Admits to Confusion

Dr. Turner admits to confusion arising from defendant's use of REGION UNIVERSITY.

When asked if the confusion began on August 9, 2006, Dr. Turner replied:  "I'm not so sure

there was confusion as much as there was affiliation concerns as between, you know, is Regions

University in some way affiliated."  Turner Tr. 171-72.

Dr. Turner was himself aware of confusion.  He describes a telephone call:

> They called about the degree programs and they just wanted to ask
> if there was any affiliation with Regions Bank.  They did not call
> and say, is this Regions Bank?

Turner Tr. 192.

In fact, Dr. Turner has had people come up to him and ask if Regions donated money to

the school.

> Q.   Now, in your conversations with people explaining to them
> that you're adopting this new Regions University name, did any
> folks inquire as to affiliation between Regions University and
> Regions, the financial institution that you recall?
>
> A.   Not other than the documentation that we have given you that
> I am aware of any affiliation.  People -- You know how people will
> do.  They'll come up and tell you, oh, y'all must have gotten some
> money or something.  And they know good and well that Regions
> Bank is one thing and Regions University, an accredited school, is
> another.  They love to put a pin in you.

> Q.  So some people have come up to you and kidded you that Regions Bank must have given you some money and that's why you chose the name?
>
> A.  Well, you know, it has occurred in one -- one or two occasions.

Turner Tr. 179 – 180.

Dr. Turner's answers to questions concerning the confusion of the relationship between Regions, the bank, and Regions University, the school, betray his unconcern with such confusion and his belief that causing confusion as to affiliation with Regions is acceptable so long as people do not confuse a bank with a school or, in his words, think that Regions University offers checking accounts:

> But there's a lot of difference between somebody asking about an affiliation and somebody confusing that this is a bank.  And nobody to my knowledge has called us and asked us, how much is in my checking account.

Turner Tr. 193.

## III.    ARGUMENT

### A.    The Standard for Summary Judgment

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Int'l Stamp Art, Inc. v. United States Postal Service*, 456 F.3d 1270, 1273 (11th Cir. 2006), citing Fed. R. Civ. P. 56(c).  An issue is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party requesting summary judgment bears the initial burden of determining that such a judgment is proper.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *O'Ferrell v. United States,* 253 F.3d 1257, 1265 (11th Cir. 2001).  The evidence and all

reasonable inferences drawn therefrom are construed in the light most favorable to the nonmovant. *Burton v. City of Belle Glade,* 178 F.3d 1175, 1187 (11th Cir.1999).

Here, the facts that are of record demonstrate as a matter of law that defendant's use of the REGIONS UNIVERSITY name and mark is likely to cause, and has caused, confusion as to its connection and affiliation with Regions, and, consequently, has infringed the well-known REGIONS trademark and name and engaged in unfair competition.

### B.    Defendant's Use of the REGIONS Is Likely to Cause Confusion and Has Caused Confusion with Plaintiffs' REGIONS Mark

For trademark infringement and unfair competition, whether under state[10] or federal law and whether for a registered or unregistered mark, plaintiffs must show (1) that their mark has priority over the mark defendant is using; and (2) that defendant's use of the mark is likely to cause confusion among consumers. *Choice Hotels Int'l, Inc. v. Kaushik*, 147 F. Supp. 2d 1242, 1247 (M.D. Ala. 2000). Regions' REGIONS mark and name has priority over defendant's REGIONS UNIVERSITY and REGIONS –Regions' REGIONS mark has been federally registered, alone and with other elements, and has been in use for over 14 years – long before defendant began to use REGIONS UNIVERSITY and REGIONS.

The undisputed facts establish that confusion as to sponsorship and affiliation is established through the many instances of actual confusion of record and the defendant's own admissions of the confusion that has occurred. Defendant's fundamental mistake both as expressed by Dr. Rex Turner in his testimony and in its various trademark infringement and

---

[10] Defendant is mistaken that Regions' marks must be registered in Alabama for it to be liable under Alabama law for trademark infringement. Def. Br. at 70-71. Ala. Code § 8 -12-16, to which Defendant refers, begins with the condition, "Subject to the provisions of Section 8-12-19 . . .." Section 8-12-19 provides, "Nothing in this article shall adversely affect the rights or the enforcement of rights in marks acquired in good faith at any time at common law." Ala. Code § 8-12-19.

unfair competition claims is that (1) the confusion prohibited by trademark and unfair competition laws includes confusion as to source and sponsorship and (2) it has no right to take the advantage of the goodwill of another by adopting the famous mark of another that is not a competitor.

For trademark infringement and unfair competition actions, whether under state or federal law, the question to determine is whether the use of a mark is likely to cause confusion as to the source of the products. Confusion as to source includes confusion as to sponsorship or approval. "[T]he unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement." *American Farm Bureau Fed'n v. Alabama Farmers Fed'n*, 935 F. Supp. 1533, 1546, (M.D. Ala. 1996), citing *Burger King Corp. v. Mason*, 710 F.2d 1480, 1491-92 (11th Cir. 1983). *See Beer Nuts, Inc.*, 805 F.2d at 924. S*ee also University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546 (11th Cir. 1985); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.").

This is because a trademark symbolizes the reputation of its owner, for good or ill, and is something that its possessor has the right to control and the right to exploit. Judge Learned Hand famously explained:

> His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask.

*Yale Electric Corp. v. Robertson,* 26 F.2d 972, 974 (2d Cir. 1928).

- 28 -

Section 43(a) of the United States Trademark Act, which codifies the federal law of unfair competition, explicitly provides:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin . . . which – (A) is likely to cause confusion, or to cause mistake, or to deceive as to the ***affiliation, connection, or association*** of such person with another person, or as to the ***origin, sponsorship, or approval*** of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. §1125(a).  This "likely to cause confusion" standard is the same whether under this Section 43(a) or under Section 32, which codifies liability for infringement of a federally registered mark, 15 U.S.C. § 1114.  J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:1 (4th ed. 2007); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 839 (11th Cir. 1983).

In determining whether confusion is likely under trademark or unfair competition, seven factors are considered by a court:

1. the type of mark used by the plaintiff;

2. the similarity of the marks;

3. the similarity of the goods or services represented by the marks;

4. the similarity of the retail outlets and the customers served;

5. the similarity of the advertising media used by the parties;

6. whether the defendant had the intent to infringe; and

7. any evidence of actual consumer confusion.

*Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

Because likelihood of confusion requires a complex analysis of the effect of symbols and their use on the public, summary judgment is not usually appropriate or granted.  *See Universal*

*Money Ctrs. v. AT&T*, 22 F.3d 1527, 1530 n.2 (10th Cir. 1994) (noting that "likelihood of confusion is frequently a fairly disputed issue of fact on which reasonable minds may differ"); *Miranda v. B&B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992) ("If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment").

However, this case -- where the tremendous fame of the REGIONS mark in Montgomery and the state of Alabama and elsewhere cannot be disputed defendant admits to knowledge of the fame of the REGIONS mark, there are numerous instances of actual confusion and defendant admits to confusion -- is the unusual case where sufficient material facts are admitted or are so beyond dispute that a reasonable fact finder would have to find that confusion is likely and that defendant has infringed the plaintiffs' REGIONS mark and name.

      1.    **Plaintiffs' REGIONS Mark Is Strong and Worthy of a High Degree of Protection**

The strength of a mark is its power to indicate source or origin. McCarthy § 11:74n1 (citing Restatement (Third) of Unfair Competition § 21, comment (1995). Even marks that originally were inherently weak can become strong through length of use, advertising, promotion, sales and other means by which marks gain strength. *See Citibank N.A. v. Citibanc Group, Inc.,* 215 U.S.P.Q. 884, 907 (N.D. Ala. 1982).

Strength is a measure of the effect of the mark on the mind of the consuming public. A mark that has become strong due to its "fame or uniqueness is more likely to be remembered and more likely to be associated in the public mind with a greater breadth of products and services than is a mark that is weak because relatively unknown or very like similar marks or very like the name of the product." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:73 (4th ed. 2007) (citing *James Burrough, Ltd. v. Sign of Beefeater, Inc.,* 547 F.2d 266 (7th

Cir. 1976)).  Thus, it is fundamental to the law of trademark infringement and unfair competition that a mark that has "achieved widespread customer recognition as a symbol of origin is more likely to result in confusion" by a junior user's similar mark than a mark with little consumer recognition.  McCarthy § 11:73; *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004)("the legal strength of a mark is usually the same as its economic and marketing strength"); *Virgin Enters. V. Nawab*, 335 F.3d 141, 148-49 (2d. Cir. 2003).

Regions by any measure is a strong mark in Montgomery, the State of Alabama, Regions' footprint in 16 states, primarily in the South and the border states, and nationally as well. Regions, after all, is one of the largest financial institutions in the United States.  The REGIONS online bank is one of the largest in the country serving over a million households and representing assets of many billions of dollars.  In addition, the REGIONS mark is promoted nationally through Regions' sponsorship of the SEC, Sunbelt and other schools in its footprint and that like REGIONS are geographically located in the South, but are nationally known.

Regions has spent hundreds of millions of dollars promoting the REGIONS brand since its adoption in late 1993.  It is a huge institution by any standard in its geography.  The largest corporation headquartered in Alabama, the largest financial institution in Alabama, the number 1 share of market in numerous states, tens of thousands of employees and so on.  However, the fame and strength of the REGIONS mark and name is also, and perhaps primarily, reflected by Regions presence and involvement in its communities.  The 2,000 REGIONS branch banks, 2,400 ATMS means that REGIONS is there and known in its communities.  For example, if you live in Montgomery, you have to be aware of REGIONS.  There are 25 REGIONS branches and the signs on the two largest buildings are REGIONS signs.

Further, Regions deep involvement in its communities – from its sponsorships of cultural events, colleges and universities, its educational programs in its communities and school involvement of many REGIONS associates in their communities -- all contribute to the awareness and strength of the REGIONS name and mark.

All this is represented by the REGIONS mark that Regions uses to identify everything that it does – the names of its businesses and divisions like Regions Bank, Regions Mortgage, Regions Insurance Group and Regions University – and that appears on virtually everything that is disseminated to the public from signs and advertising to checks and credit cards. As Bill Askew said the REGIONS brand "represents who we are and all of our values and vision." Askew Decl. ¶ 2.

Even Regions University, the name of Regions' top ranked internal corporate training program has contributed to the overall equity of the REGIONS brand and itself has its own equity. After all, tens of thousands of people have taken Regions University courses. In 2006 alone, 20,000 employees of Regions a course at REGIONS UNIVERSITY. This is a greater number of Regions University participants in one year than all the students who have ever attended the defendant school in any of its incarnations. Moreover, the fame of Regions University is not sealed in Regions or its large employee population. Defendant itself knew of Regions' Regions University before it chose Regions University. It is well recognized that "[u]sing a mark in selling goods or rendering services only to employees can constitute a bona fide public 'use' of a mark. This is a bona fide use, albeit to a defined segment of the general public." McCarthy § 16:7. *See also American Int'l Reinsurance Co. v. Airco, Inc.*, 570 F.2d 941, 941 (C.C.P.A. 1978) (holding that a manufacturing company could register a service mark for the service of administering a retirement plan for its employees).

The strength of the REGIONS name and mark is scientifically shown through the many surveys Regions has conducted over the years as part of its business to understand its REGIONS brand and customers. These surveys that have been conducted in cities in the Regions footprint show near universal awareness of REGIONS in Alabama and strong awareness in other parts of the REGIONS footprint.

The fame of the mark REGIONS is shown by the reaction to the REGIONS UNIVERSITY name and the confusion that has been engendered. Laina Costanza, the school's advertising person, said that Regions Bank came to her mind when Dr. Turner mentioned that the new name of the university could be Regions University on August 1, 2006. Costanza Tr. 64. The many instances where someone asked whether Regions contributed to Regions University or was affiliated with REGIONS UNIVERSITY all reflect the great strength of the REGIONS brand and that if another institution uses REGIONS there probably is a connection. *Commerce Foods, Inc. v. PLC Commerce Corp.*, 504 F. Supp. 190, 194 (S.D.N.Y. 1980) (explaining instances of actual confusion are useful in assessing the strength of a mark).

> **(1)    Regions Diligently Polices Its REGIONS Name and Mark and Little Third Party Use of Its Mark Exists**

Defendant's submissions of third party business names and other filings do not detract from the strength of plaintiff's REGIONS name and mark. Many of the business names are no longer in use, are internal uses only, use "regions" only descriptively, such as "River Regions," are for goods or services extremely different than Regions, or are at most mom & pop stores of which the general public has never heard used, including defendant until this case was brought. Defendant has learned of them only through extensive searches through databases and business

records,[11] and there are no commercials on television or on the radio any of these names of which anyone is aware.  Furthermore, trademark registrations, business name registrations and domain name registrations are not evidence of use.  *See* McCarthy § 11:88 ("Third party registrations are not evidence of use 'so as to have conditioned the mind of prospective purchasers'").  The mere existence of a registration does not mean that the owner is using the name or mark and provides no probative information that consumers would know the name or mark exists.  *See Miss Universe, Inc. v. Little Miss U.S.A., Inc.*, 212 U.S.P.Q. 425, 429 (N.D. Ga. 1981) ("[T]he Fifth Circuit refused to assume, even from evidence of federal registration, that third-party marks were in use.") (citing *Turner v. HMH Publishing Co.*, 380 F.2d 224, 228 n.2 (5th Cir. 1967), cert. denied, 389 U.S. 1006 (1967)).

These small, insignificant and unknown or virtually unknown records do not weaken the REGIONS mark.  "[U]nauthorized use of a mark does not necessarily render a mark weak.  The proper inquiry is whether the third party use significantly diminishes the publics perception that the mark identifies services connected with the owner."  *The Breakers of Palm Beach, Inc. v. Int'l Beach Hotel Development, Inc.*, 824 F. Supp. 1576 (S.D. Fla. 1993); Univ. of Ga., 756 F.2d at 1545, n.27.  *See also Jellibeans*, 716 F.2d at 841 n.20 ("The fact that other local businesses used the same mark to identify unrelated products, the district court properly held, did not dilute the strength of Jellibeans, Inc.'s mark").

Others are business records of the word "Region" instead of "Regions."  Third party listings of "Region" do not detract strength from "Regions," particularly where the marks at issue are both REGIONS.  Dr. Turner recognized that there is a significant difference between

---

[11] Defendant has only hearsay evidence of use and has submitted no actual evidence of third party use of a REGIONS mark.

"Region" and "Regions" when he testified as to this difference and explained that he chose "Regions" and never considered "Region."  Turner Tr. 115-16.

None of the names or marks that defendant has identified has caused any known confusion with Regions in sharp contract with the immediate and substantial confusion caused by defendant's use of the REGIONS mark.  When Regions has identified confusingly similar uses or potential uses, it has objected by sending a cease and desist letter.  Regions have sent more than 300 such cease and desist letters and have been successful in preventing and stopping infringement of its mark.  Virtually every objection by Regions to another's use of another REGIONS mark has ended.  Other than defendant Regions University, Regions is unaware of any case of the REGIONS mark that has caused confusion that it has not been able to stop. Mehlman Tr. 196.

Accordingly, the facts of this case are very different than the facts of the *Amstar* case relied upon by defendant.  There, the word "Domino" was the subject of 72 registrations at the USPTO and "extensive evidence" of third party use of the Domino name dating back to 1885. *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 259 (5th Cir. 1980).  There was also evidence that the plaintiff had not been diligently protecting its rights in the DOMINO mark because it had not objected to 72 third-party registrations of the mark DOMINO, and did not even bring suit against the defendant until 10 years following the defendant's first use of the DOMINO mark.  *Id.* at 265.

Here, there are very few instances of another's use of REGIONS or in the marketplace or of other REGISONS registrations.  Regions is vigilant in protecting its mark and has successfully persuaded many business operators and domain name owners from using its mark.  Regions has objected to defendant's use of REGIONS UNIVERSITY within a month of its first use and only

a couple of weeks after its public announcement.  Accordingly, *Amstar* is inapplicable to the instant facts, and Regions continues to enjoy substantially exclusive use of the REGIONS name and mark.

### 2.     Plaintiffs and Defendant's REGIONS Marks Are Similar

Regions uses the mark and name REGIONS alone.  In addition, Regions uses REGIONS with various generic descriptors as marks and names for its various businesses and services. These include REGIONS MORTGAGE, REGIONS INSURANCE GROUP, REGIONS BANK, REGIONSNET, REGIONS PREFERRED BANKING, REGIONS CHARITY CLASSIC and REGIONS UNIVERSITY.  Regions is commonly known and referred to as "REGIONS."

Defendant uses REGIONS and the generic descriptor University for its mark REGIONS UNIVERSITY.  Defendant also frequently uses REGIONS alone as its name.  For example on its website on its homepage is the quotation "Is *Regions* Online learning program for me?" and on its FAQ page it begins "What degrees are offered at *Regions*?"  Also other examples of the many uses of Regions alone on that page are:  "Are all *Regions* degrees offered fully online?'; "To find our degree offerings, go to *Regions*' homepage . . ."; In addition, *Region's* Turner School of Theology is . . . ."; "Does *Regions* accept military educational benefits?"; "Much of the information about *Regions* library can be accessed at . . . ." and so on.  (emphasis added). Regions University has a website address: www.regions.edu.  Similarly, in its online Academic Catalog defendant frequently refers to itself simply as "Regions."

Also, the public and the press naturally refer to Regions University just as "Regions."  In the only known newspaper article about defendant after it name changed the headline is "*Regions*" grads come from near and far."  Marmer Decl. Ex. F.

Accordingly, defendant's comparison only of the marks REGIONS BANK with REGIONS UNIVERSITY is somewhat disingenuous and does not reflect commercial reality. *See* Def. Br. at 34.

In fact, the parties both use the marks REGIONS and REGIONS UNIVERSITY – while Regions uses many other REGIONS based marks. Accordingly, the parties use the identical marks and the distinctive element of their marks is plaintiffs core mark and name REGIONS. This is just inescapable reality.

Defendant seeks to distinguish the parties REGIONS marks by their stylization. First, it is well-known that a word mark is the dominant element of stylized mark. McCarthy § 23:47; *Herbko Int'l., Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1165 (Fed. Cir. 2002); *see also* Frehling, 192 F.3d at 1337. After all, a mark is referred to by its name, not its stylization. *See Virgin Enters.*, 335 F.3d at 149 (finding similarity where defendant used same name as plaintiffs despite presence of logo). Second, defendant's initial stylization used for REGIONS UNIVERSITY is remarkably similar the stylization used by Regions for its REGIONS and REGIONS UNIVERSITY marks as appears below:



Exs. 42, 43, 65.

Third, the stylizations for marks change. The REGIONS mark has undergone three changes in stylization since the adoption of REGIONS in 1993 – two changes in stylization have occurred in the last three years – and all three are concurrently in use. Yet, not even defendant suggests, that anyone would think that different stylizations indicate different REGIONS. Defendant, itself, in the short time that it has used REGIONS UNIVERSITY.

Forth, stylizations are often not used and often make no impression. For example, the REGIONS and REGIONS UNIVERSITY marks are without stylization in radio ads, television voice overs, word of mouth or newspaper headlines or stories. And, when they do appear the public does not focus on trademark stylization when driving down a highway and seeing REGIONS or REGIONS UNIVERSITY on a billboard or flipping through a newspaper or magazine.

Moreover, contrary to defendant's claim (Def. Br. at 36) there is no inference that services are unrelated merely because the trademark examiner at the USPTO passed the REGIONS UNIVERSITY trademark application to publication without citing any of the Regions' REGIONS mark. In fact, the REGIONS UNIVERSITY mark is passed to publication, not to registration. The USPTO, recognizing the limitations of the examination process, passes a mark on to publication to allow persons who believe that they would be harmed by the registration of the mark to oppose the application. *See Compton v. Fifth Avenue Ass'n*, 7 F.Supp.2d 1328, 1333 (M.D. Fla. 1998) (explaining that cancellation and opposition proceedings are the "second backstop" to ex parte examination). Regions opposed the REGIONS UNIVERSITY application based on its REGIONS mark and name. Marmer Decl. Ex. F.

### 3.    The Parties' Services Are Related

Where marks are identical the goods or services don't need to be that close. *In re Shell Oil Co.*, 992 F.2d 1204, 1207 (Fed. Cir. 1993).

Services need not be identical but only need to be related in some way. *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1179 (11th Cir. 1994) (explaining that confusion does not require competition). Regions is a financial institution, but in many ways, Regions and its services are related to colleges and universities.

Regions contributes millions of dollars for sponsorships and charitable contributions to college conferences like the SEC, the Sunbelt Conference and many individual colleges and universities. It actively and prominently advertises and promotes these sponsorships and contributions. Sponsorships and association with a well-known and respected institution that possesses significant goodwill is worth a lot. The public is aware of these sponsorships and that wealthy corporations and individuals often contribute to schools and universities. Abernethy Rep. 28.

The public also knows that often where a significant contribution is made that it is very typical for a person or a business to sponsor a university or donate much money to a university. In honor of such donations and sponsorships, universities often name buildings, schools and even the name of the university in the donor or sponsor's honor. Examples abound: Duke University was named after James Duke; Vanderbilt University was named after Commodore Cornelius Vanderbilt.

Defendant is well aware of the kind of associations, positive and negative, that might be made between universities and individuals and corporations. Concern with an association was one of the principle reasons discussed for not choosing Turner University even though the school already had a Turner School of Theology and its founder was named Turner. Turner Tr. 89.

Also, defendant's attorney warned of "confusion as to sponsorship" as to various Turner companies. Ex. 28.

Regions provides hundreds of millions of dollars of loans for students. Even for defendant's students, Regions has provided in 2005 and 2006 more than $500,000 in loans for students attending SCU. Ex. 50-51.

The connection in the public mind between Regions and educational services is further enhanced by the many educational seminars, presentations and talks concerning banks and other financial matters to the public and to schools of all levels. Regions employees have taught grade students and college students about money and finances. It provides educational scholarships at various universities and also has a matching program for educational scholarships.

Regions has its own Regions University for corporate training in which employees take various courses on financial topics organized into colleges. In 2006 alone, 20,000 employees took courses at Regions University – a population in one year significantly larger than the combined enrollment of defendants entire history under its various names. That Regions University is known outside of Regions is shown by defendant's own knowledge of Regions' Regions University when defendant chose Regions University.

### 4.     The Parties Serve the Same Customers and Retail Markets

Regions has millions of customers. They are everyone who is old enough to have a bank account. Abernethy Rep. 13. "A very important part of Regions customer base are ordinary people needing routine banking services." *Id.*; *see also* Dunman Tr. 38. Regions University target customers necessarily overlaps the broad REGIONS customer base. The target audience for a Regions University television commercial "[w]ould be an individual 25 to 55, young professional or a mother at home, someone who needed to finish their degree or is transferring, someone who wants to further their education, someone who already has a bachelor's. Usually it's more of a professional – you target more of a professional market." Costanza Tr. 44.

Many of Regions' customers and Regions University customers are not sophisticated purchasers. "[T]he wide range of products offered [by Regions] targets almost any adult or child with enough money to open a basic or savings account. For this reason, the current and potential customers of Regions Bank are no more sophisticated than the general population." Abernethy

Rep. 14.  Because the market includes individuals without a high school diploma or a high

degree of familiarity with the English language, "some of Regions customers would have far less

education and sophistication than the general population."  *Id.*

Likewise, Regions University targets a diverse customer base including persons who

have only a high school diploma or GED equivalent, persons who have begun college but are

transferring, and persons who are at home without previous education.  Costanza Tr. 44.  As

Exhibit 113 explains, undergraduates who are older than 20 need not take or submit to Regions

University scores for standardized tests such as the SAT or ACT.  Ex. 113 at  2018.

Even sophisticated members of the public can be confused, particularly where, as here,

the parties' marks are identical in their distinctive element.  Merely because someone is

sophisticated does not mean that the person is sophisticated about trademarks or divining the

source of origin of goods or services.  *Cf. E. Remy Martin & Co. v. Shaw-Ross Int'l Imports*, 756

F.2d 1525, 1530 (11th Cir. 1985) (finding in a case regarding cognac and brandy, "[t]o us it

appears quite likely that, even assuming a sophisticated consumer from the drinking world, such

a consumer could easily conclude that Remy Martin had undertaken the production and sale of

wine and that its name and goodwill therefore attached to Myers' product, both products

originating in France").

Indeed, here many of the persons who were confused are sophisticated.  The first instance

of actual confusion known, the day after defendant's announcement was an email from Dr.

Wilson Luquire.  "Is this related to the Bank and if so many I applaud you with double

congratulations!!!!!!  Ex. 35.  Jack Galassini saw a REGIONS UNIVERSITY commercial and

thought the school might have some kind of relationship with Regions Bank."  Galassini

Affidavit.

### 5.    The Parties Use the Same Advertising Media

Regions and Regions University use the same advertising media and advertise their services in the same markets.  Defendant has admitted this fact. Def. Br. 41.  Regions University advertises on television, radio, billboards, magazines, newspapers, merchandising and the Internet.  Exhibits 43 and 123 show the areas in which Regions has concentrated its advertising: it has advertised exclusively in the Old South, save for one national cable television commercial.  It has advertised mostly in Alabama and Tennessee, the locations of Regions University's campuses, and states in which Regions is universally recognized.

Regions advertises using the same media in the same geographic footprint, and also on national television and the Internet.  *See* Peters Tr. 112-13.  Defendant is well aware of the overlap.  Dr. Turner said that he recalls seeing the Regions name in television commercials and that he has seen Regions newspaper advertisements.  Turner Tr. 10-11.

This overlap in advertising is a reason why there have been so many instances of confusion.

### 6.    Defendant Chose Its For-Profit REGION UNIVERSITY Name To Take Advantage of the Goodwill Represented by the Famous REGIONS Mark and to Project Itself as an Institution of National Prominence.

Defendant's intent is not a necessary element in a claim for trademark infringement or unfair competition, but it is, as the Eleventh Circuit instructs, "[t]hat a latecomer adopts another's name, deliberately seeking to capitalize on the other's reputation and benefit from the confusion, is an important factor for a court."  *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1508 (11th Cir. 1985).  A bad faith intent alone may even justify a finding of infringement:  "If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that

there is confusing similarity." *Frehling*, 192 F.3d at 1340; *Am. Farmer Bureau*, 935 F. Supp. at 1548, citing *Babbit*, 38 F.3d at 1179 1994) ("A likelihood of confusion can be found as a matter of law if the defendant intended to derive benefit from the plaintiff's trademark").

People who adopt another's mark to take advantage of the goodwill of another's well-known mark usually do not admit their intent and defendant does not do so in this case. "[I]ntent, as the district court noted, must often be proved by circumstantial evidence." *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 843 (11th Cir. 1983). Usually, the facts and circumstances surrounding second comer's adoption and use reveal his true intent. *Id.*

Here, the circumstantial evidence surrounding defendant's adoption and use of the Regions University mark shows as a matter of law defendant chose the REGIONS UNIVERSITY mark with the intention of taking advantage of the goodwill of the famous REGIONS name.

Defendant's purpose, as revealed by its Board minutes, in choosing a new name could not be clearer – the school needed a "for-profit type name" "to increase enrollment in areas such as business in order to support our degrees in the Turner School of Theology." Turner Tr. 72-74, Ex. 20 at RU 110. The institution was seeking tuition-paying students in business and other professional and applied degree programs and it decided that business students "if they have a business degree handing on their wall, they would rather it not say Christian." Turner Tr. 74.

The other purpose in changing the name, as set out in the Board's resolution, was to "assist the University in projecting itself as a nationally recognized school of prominence." Ex. 31. Defendant whatever its merits, is not in any sense "a nationally recognized school of prominence." The school has never been referred to as a nationally recognized school of prominence in any publication, article, report or by any person. Crosby Tr. 55.

Accordingly, defendant was looking for a name that, apart from any goodwill that it had created, would allow it to indicate to the potential students who were the targets of its marketing efforts that defendant was an institution of national prominence – something that it was not.

So, what did defendant do? It chose the probably the most prominent for-profit name in its state of Alabama – the name of the state's largest financial institution and largest corporation, a name having about 100% recognition and the name of an institution that, in fact, was an institution of national prominence.

Regions is so well known and powerful that when Rex Turner told his advertising person, the name Regions immediately came to mind.

Further, Rex Turner and his board were sensitive to the association that might be made between it and a famous name. The school did not choose the name Turner in 2005 because of a perceived negative impact if there were an association with Ted Turner. And, the following year its trademark attorney advised that the USPTO might refuse registration of Turner University based on a number of Ted Turner marks "on grounds of likelihood of confusion as to association or sponsorship." Ex. 28.

The adoption of the REGIONS name gave defendant precisely what it was seeking. REGIONS provided the benefit and association with a for-profit institution. Just the kind of benefit Regions itself pays millions of dollars annually for with its sponsorships of the SEC and Sunbelt conferences and many colleges and universities. Further, the REGIONS UNIVERSITY name gave it credibility for its business degrees that the school intended to drive the acquisition of tuition-paying students to support the Turner School of Theology. And for the school as a whole, its new name REGIONS UNIVERSITY, that incorporates Regions' famous name, allows it to project itself as a national institution of prominence.

Defendant claims that REGIONS was chosen only because "regions" suggests the Christian mission of going to all the regions of the world to preach the gospel. This is pretextual. Regions might have a felicitous connotation of more than one region or many regions and this Christian connotation. But, defendant could have chosen many words conveying this suggestion. It is telling that none of the other names – Turner, Rex, Providence, Regal or Masters – considered had any suggestion of this Christian prescription or geographical breath. And almost any word, if you think hard enough, could have a same Christian or biblical suggestion. For example, Dr. Turner was asked the Christian connotation of "Masters." He said: "Jesus, the Master Teacher." But then he had no explanation why the word chosen was "Masters" rather than "Master." Turner Tr. 71-72. It appears that, just as with the word "Masters," and "Regal," the word "Regions" was chosen and then a Christian connotation was developed to satisfy the school's Christian contingency.

Defendant seeks to hide behind a short email sent on July 27, 2006 from its trademark attorney regarding the "registerability of the marks Turner University, Rex University and Regions University". Ex. 28. The email is inadequate on its face. It makes no reference to any REGIONS mark, even the REGIONS CHARITY CLASSIC, that came up in the attorney's search of the USPTO records. Ex. 501. It makes no evaluation of the risk of use of the Regions University mark or any reference to the use of any mark' it only concerns registerability. It does not refer to any sources searched other than simply the USPTO database. At most, the search is a preliminary, screening search for registerability and to spot obvious conflicts to avoid unnecessary expense.

> The purpose of a preliminary search (also known as a "screening" or "knockout" search) is to spot obvious conflicts at the outset, thereby avoiding the expense and time required for a full search. The preliminary search uses a limited number of resources that the

> searcher deems most likely to yield relevant marks with minimum effort. It serves to rule out marks which are clearly unavailable, not to reach a definitive answer on the availability of those marks which survive.
>
> If a mark survives its initial screening, the usual procedure is to request a professional search firm to conduct a full search. The standard full search involves a broader array of federal and common law sources than the typical preliminary search. These typically include federal applications and registrations, state trademark registrations, business names, and listings from trade directories and industry databases.

Glenn A. Gundersen, *Trademark Searching* (1994). No full search was conducted. Defendant adopted the REGIONS UNIVERSITY mark the day after the search.

Defendant's intent is most clearly shown by the information that he withheld from his counsel – crucial information that would be necessary for a trademark counsel to provide an opinion that truly considered and evaluated the risk of adopting the REGIONS UNIVERSITY mark. Dr. Turner in his call to his trademark attorney, about search and opinion, mentioned that there was a Regions bank in Alabama. When his attorney told Dr. Turner that he had not heard of the bank, Dr. Turner told him nothing. Turner Tr. 137. So, Dr. Turner had Regions Bank on his mind, but provided his attorney absolutely no information that would give him any idea of how well known the REGIONS MARK is or the size of Regions.

An infringer can be shown in several ways, including, for example, that a person's choice not to provide all the relevant facts to his attorney demonstrates that he did not reasonably and honestly rely on the opinion of an attorney. *ECO Mfg LLC v. Honeywell International, Inc.*, No.1:03-CV-0170-DFH, 2003 WL 18888988 (S.D. Ind. Apr. 11, 2003), at *6.

Defendant's bad faith is further shown by its persisting in its adoption of the REGIONS UNIVERSITY mark despite the actual confusion arising from its use that began the day after defendant's adoption of the REGIONS UNIVERSITY name. Even more telling of defendant's

- 46 -

intent is the absence of any concern by Dr. Turner that people believed that his school was sponsored or affiliated with Regions.

### 7.    Substantial Confusion Has Arisen From the Use of REGIONS UNIVERSITY

Defendant only adopted REGIONS UNIVERSITY a year ago and only began advertising it this year.  In that short time, Defendant's use of REGIONS UNIVERSITY and REGIONS has caused a significant amount of confusion as appears from the many instances of actual confusion in the record.

More than twenty people have inquired as to the connection or affiliation of defendant with Regions.  Some have believed that Regions the financial institution had started a university or bought a university.  Others have inquired as to an affiliation or connection between Regions and Regions University.

Notably, this evidence of actual confusion is from all sectors: from the consuming public, from Regions employees, from persons affiliated with Regions University and former students of Regions University, and from telephone operators.  Dr. Turner has admitted that persons have inquired of him whether Regions University is affiliated with Regions Bank.  In response to the question, "[D]id any folks inquire as to affiliation between Regions University and Regions, the financial institution that you recall?" Dr. Turner testified, "People – You know how people will do.  They'll come up and tell you, oh, y'all must have gotten some money or something."  Turner Tr. 179-80.  And, when asked if he was surprised at the number of times people had indicated that they thought there was some sort of affiliation between the Regions University and Regions, Dr. Turner responded, "[I]t was obvious to me that there was not confusion, but that the people were seeking or wanting to know affiliation, if there was any affiliation between the two, but that they understood the difference between a bank and an accredited university."  Turner Tr. 264.

Moreover, the amount of confusion in this case is significant. "Actual confusion by a *few* customers is the best evidence of likelihood of confusion by many customers." *American Farm Bureau*, 935 F. Supp. at 1548 (emphasis added) (citing *Freedom Savings & Loan v. Way*, 757 F.2d 1176, 1185 (11th Cir. 1985)); *see also Texas Tech. Univ. v. Speigberg*, 461 F. Supp. 2d 510, 522-23 (N.D. Tex. 2006) ("Further, 'reason tells us that . . . . very little proof of actual confusion would be necessary to prove the likelihood of confusion"). For example, Texas Tech had only three instances of confusion as to whether it had licensed its marks to the defendant, and the court found this evidence sufficient in finding actual confusion. *Texas Tech.*, 461 F. Supp. 2d. at 523.

Many other cases involving universities as parties have also found infringement where there was evidence of confusion as to sponsorship or affiliation. *See, e.g.*, *Texas Tech.*, 461 F. Supp. 2d at 523 (at least three customers expressed actual confusion as to whether university had licensed the infringing products); *Bd. Of Supervisors of La. State Univ. v. Smack Apparel Co.*, 438 F. Supp. 2d 653, 662 (E.D. La. 2006) (noting that even if the products were not competing, confusion could exist because consumers may be confused as to sponsorship or affiliation).

In *University of Georgia*, the Eleventh Circuit found fifteen instances of actual confusion persuasive where each instance of confusion related to an inquiry of whether the defendant, a beer brewer, was connected with the University or if the University licensed its mark to the defendant. *Univ. of Ga.*, 756 F.2d at 1546. That no one actually believed the university had gone into the beer brewing business was entirely irrelevant. *Id.* at 1547.

The cases cited by defendant, such as *Nora Beverages*, are inapplicable to the facts of this case. In those cases, the issue was whether a small amount of confusion over many years was significant enough to find that the factor of actual confusion weighed in the plaintiff's favor.

Here, it has been just one year since Regions University announced its name change.  Just days following the name change announcement, Regions University began to receive emails and phone calls from the public asking whether the university and Regions were affiliated or if Regions donated money to the university.  *See* Ex. 35; Response to Interrogatory No. 13 of Plaintiff's First Set of Interrogatories.  Regions has received many inquiries.  See pages – *infra.*

Finally, it is not a remedy that those who have inquired as to affiliation have been informed that there is no affiliation between Regions University and Regions.  Words that seek to correct confusion are "insufficient to remedy illegal confusion.  Only a prohibition of the unauthorized use will sufficiently remedy the wrong."  *Univ. of Georgia*, 756 F.2d at 1547.

### 8.    Defendant's Use of the REGIONS UNIVERSITY and REGIONS Is Likely to Cause Confusion

As appears from the above, a review of the factors shows overwhelmingly that confusion is likely to arise from the use of the REGIONS UNIVERSITY and REGIONS MARKS BY DEFENDANT.  The fame of REGIONS IN Montgomery and Alabama and other the other states where most of defendant's students are located and virtually all its advertising is conducted cannot be seriously disputed.  Also, the marks of the parties REGIONS UNIVERSITY and REGIONS are the same.  The parties' services differ – Regions does not offer secondary education and Regions University does not provide checking services, but Regions has many relationships with colleges and universities, provides educational seminars to its communities and to schools at all levels, Regions has its own corporate training program with the Regions University that has far more participants than defendant's enrollment in all the years it has operated.

Regions University's customers are within the broad customer base of Regions. Region and Regions University advertise through the same media – television, radio, billboards, newspapers and the Internet.

Regions University's intent is obvious. It wanted a "for-profit kind of name" that would permit itself to project itself – misleadingly – as a nationally recognized university of prominence. And that is exactly what it got when it picked REGIONS as the University's name. Defendant chose probably the most well-known for-profit name in Alabama – its number 1 financial institution and corporation – that was an institution of national prominence, one of the top 10 financial institutions in the United States.

And, defendant's use of REGIONS UNIVERSITY did cause confusion immediately – as evidenced by the instances of actual confusion, generally rare, starting the day after the announcement of the name change. Most strikingly is that defendant's president, Rex Turner, who chose the name Regions University, admits the confusion that has arisen, but takes the view that confusion as to sponsorship and affiliation does not count. But is does count. State and federal laws prohibit confusion as to sponsorship and affiliation. It is beyond peradventure that confusion is likely to arise from the parties' use of REGIONS AND regions university and, in fact, is occurring. This Court, now, under the material facts that cannot be in dispute, should grant Regions' motion and enjoin defendant's further use of REGIONS UNIVERSITY.

### C. Regions Is Entitled to Summary Judgment on its State Dilution Claim

#### 1. Defendant's Use of the Famous REGIONS Mark Constitutes Dilution Under Alabama State Law

Alabama law prohibits dilution of distinctive quality marks or names notwithstanding the absence of competition between the parties or the confusion of source or services. Specifically, Ala. Code 8-12-17 provides:

> Likelihood of injury to business reputation or of dilution of the
> distinctive quality of a mark registered under this article, or a mark
> valid at common law, including a trade name valid at common law,
> shall be a ground for injunctive relief notwithstanding the absence
> of competition between the parties or the absence of confusion as
> of the source of goods or services.

*Id.* Professor McCarthy explains dilution and its underlying rationale as follows:

> The dilution theory grants protection to strong, well-recognized
> marks even in the absence of a likelihood of confusion, if
> defendant's use is such as to be likely to diminish or dilute the
> strong identification value of the plaintiff's mark even while not
> confusing customers as to source, sponsorship, affiliation or
> connection. The underlying rationale of the dilution doctrine is
> that a gradual attenuation or whittling away of the value of a
> trademark, resulting from use by another, constitutes an invasion
> of the senior user's property right in its mark and gives rise to an
> independent commercial tort.

McCarthy of Trademarks, *supra*, § 24:72 at 24-174.

Dilution is illustrated in the Alabama court case *Arthur Young, Inc. v. Arthur Young & Co.*, 579 F. Supp. 384 (N.D. Ala. 1983). There, the court found that where a mark is strong and distinctive through extensive promotion over many years, the use of a virtually identical mark was likely to dilute the mark's distinctiveness. *Id.* at 390.

By any measure the REGIONS mark of Regions is famous, strong and distinctive in the State of Alabama. The mark has been extensively promoted for more than 14 years in all markets of Alabama. Regions is the number one financial institution in Alabama. Even defendant's president, who has been banking with Regions for decades has testified that everyone knows who Regions is. Indeed, everyone in Alabama does know Regions – Regions has a close to 100% familiarity level and an extraordinarily high unaided awareness level in Alabama for its REGIONS mark. And, few others use the Regions name in Alabama. Regions was the only REGIONS name in the Montgomery White Pages before defendant changed its name to Regions University. *See* Ex. 29. Other third party use is minimal, is obscure use

sometimes by one- or two-person companies or is use to which Regions has protested.  Courts

have in the past found such small and obscure uses to be insignificant to the strength of an

otherwise strong mark.  In *University of Georgia*, for example, the court found that the "fact that

many other colleges, junior colleges and high schools use an English bulldog as a symbol does

not significantly diminish the strength of [the university's] mark."  University of Georgia, 675

F.2d at 1544.  The court reasoned that some schools were geographically remote or used a

different color scheme.  "The remaining schools are so few in number and small in size that they

pose no real threat to the strength of [the university's] mark."  *Id.*

     This evidence of the fame of Regions' mark is really representative of the singular place

that the REGIONS mark holds in consumers' minds.  When people in Alabama think of the word

"Regions" in the context of an institution, they think of the plaintiffs – as Laina Costanza did

when Rex Turner said he was thinking of using "Regions University" as the school's name.  The

use of the same mark REGIONS by defendant means that Regions has lost that unique position

of being the only known REGIONS entity.  When people in Alabama hear or see the word

"Regions" they now have to think and determine who owns the Regions name.  Alabama's state

dilution act is designed to prevent this kind of injury to plaintiffs and to allow them to continue

to enjoy the singular, unique position that it has built in the minds of consumers over the past

nearly 15 years.

         **2.**      **Defendant's Use of REGIONS UNIVERSITY Is Likely to Cause Dilution of Plaintiffs' REGIONS Mark under the Federal Dilution Act**

     Federal law also prohibits dilution of strong, distinctive marks.  It protects the owner of a

famous mark against another's adoption of a mark that is likely to cause dilution, whether or not

actual or likely confusion or economic injury exists.  The Trademark Dilution Revision Act of

2006 provides:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is ***likely to cause dilution*** by blurring or dilution by tarnishment of the famous mark, ***regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury***.

Trademark Dilution Revision Act of 2006, H.R. 683 (109th), Lanham Act § 43(c)(1), 15 U.S.C. § 1125(c)(1) (emphasis added).

The Act defines dilution by blurring as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." *Id.* at § 1125(c)(1)(B)(1). Plaintiffs' REGIONS Mark Is Distinctive

As discussed in detail in Section II(A)(1) and (b) above, the REGIONS mark of Regions is inherently distinctive, and has strong market power. Consumers recognize the REGIONS mark as belonging to Regions.

### a.  Plaintiffs' REGIONS Mark Is Famous

Fame has a legal test under 15 U.S.C. § 1125(c):

[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A). As Regions has demonstrated, its federally registered REGIONS mark is widely recognized by the general consuming public of the United States. Regions is certainly widely known in its 16 state footprint with extraordinarily high aided and unaided awareness. Beyond these 16 states, Regions has a strong internet presence, is the sponsor of sports teams whose competitions, and therefore Regions commercials, are nationally televised, is the sponsor of a widely known golf tournament in Alabama and provides banking services, mortgage and lending services, insurance services and other financial services to customers regardless of their residence. Its use has been consistent and prominent over the past 14 years and has been advertised widely throughout the 16 states, on cable television and on the Internet. Its sales continue to grow to the extent that Regions has $143 billion in assets as of 2006.

> **b.** **Defendant's Use of the REGIONS Mark Is Likely to Cause Dilution by Blurring**

To determine whether a mark or trade name is likely to cause dilution by blurring, the Court may consider all relevant factors, including the following:

> (i) The degree of similarity between the mark or trade name and the famous mark.

> (ii) The degree of inherent or acquired distinctiveness of the famous mark.

> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

> (iv) The degree of recognition of the famous mark.

> (v) Whether the user of the mark or trade name intended to create an association with the famous mark.

> (vi) Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B).

As Regions has explained, defendant has adopted the same name Regions as plaintiffs. Plaintiffs' REGIONS mark is inherently distinctive by means of its federal registrations and is

strong in the market. Plaintiffs have had substantially exclusive use of the REGIONS mark since its adoption in 1993. Very few other uses of the name Regions exist and defendant has not introduced any evidence of use except for hearsay. Regions' REGIONS Mark is recognized widely; the brand awareness studies dating back to 2000 show close to 100% recognition in some of its markets and strong unaided awareness levels in its markets. As Regions explained in great detail, defendant's intent to create an association with the famous mark is evident from defendant's knowledge of the REGIONS mark, the circumstances surrounding the adoption of its mark, the benefits it would gain from adopting Regions' famous REGIONS mark, the lack of an opinion as to the availability of the mark for use and a lack of an opinion on the risks associated with using the REGIONS mark, and the intentional omission of any explanation whatsoever of Regions to the attorney charged with evaluating the name Regions University for registrability. Furthermore, Regions has listed in Section II(B)(4) the many instances of actual associations between defendant's name and Regions' famous REGIONS mark.

Accordingly, the evidence points to the conclusion that defendant's use of the REGIONS mark is likely to dilute the distinctiveness of Regions' famous REGIONS mark and defendant should be enjoined from such use.

Respectfully submitted this the 17th day of August, 2007.

/s/ William G. Pecau
One of the Attorneys for Plaintiffs Regions Asset
Company, Regions Financial Company and Regions
Bank

**OF COUNSEL:**

Charles B. Paterson (PAT018)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
cpaterson@balch.com
pclark@balch.com

William G. Pecau
Rachel M. Marmer
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone:  (202)429-6244
Facsimile:  (202)429-3902
wpecau@steptoe.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using

the CM/ECF system and service will be perfected upon any CM/ECF participants electronically

and by overnight mail service a copy of the foregoing document to all participating and non-

CM/ECF participants this the 17th day of August, 2007:

Victor T. Hudson                     James E. Shlesinger
William W. Watts, III                Shlesinger, Arkwright & Garvey LLP
Hudson & Watts, LLP                  1420 King Street
Post Office Box 989                  Suite 600
Mobile, Alabama 36601-0989           Alexandria, Virginia 22314


                                     /s/ William G. Pecau
                                     Of Counsel