# UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

OFFICE OF THE CLERK

POST OFFICE BOX 711

MONTGOMERY, ALABAMA 36101-0711

DEBRA P. HACKETT, CLERK

TELEPHONE (334) 954-3600

August 20, 2007

# NOTICE OF CORRECTION

**From:**                           **Clerk's Office**

**Case Style:**                  **Regions Asset Company, et al. v. Regions University, Inc.**

**Case Number:**             **#2:06-cv-00882-MHT**

**Referenced Document:**   **Document #95**
                                       **Brief in Support**

**This Notice has been docketed to correct the pdf attached to the referenced document.  The original pdf was incorrectly titled.  The corrected pdf is attached to this document.**

N THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION and REGIONS BANK | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 2:06-cv-882-MHT |
| v. | ) ) | |
| REGIONS UNIVERSITY, INC. | ) ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**

Charles B. Paterson (PAT018)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500

ATTORNEY FOR PLAINTIFFS

OF COUNSEL:

William G. Pecau
Rachel M. Marmer
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone:  (202)429-6244

Dated: August 17, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

I. INTRODUCTION ........................................................................................ 1

II. Statement of Facts......................................................................................... 3

  A. Regions and its REGIONS Mark ......................................................... 3

    1. The REGIONS Name Identifies Plaintiffs and their Many Businesses and Services................................................................ 3

    2. Regions Businesses and Services .............................................. 4

    3. Regions Is a Community Presence ............................................ 5

      a. REGIONS Is Physically Located in Its Communities .................. 5

      b. Everyone Is a REGIONS Customer ..................................... 5

      c. Regions Involvement in its Communities .................................... 5

      d. REGIONS Public Educational Efforts ........................................... 7

    4. REGIONS UNIVERSITY.................................................................. 8

    5. Use of the REGIONS Mark and Name.................................... 10

      a. REGIONS Adopted Because the Name Was a Distinctive and Different for a Trademark ....................................... 10

      b. Advertising and Promotion of REGIONS .................................. 12

      c. REGIONS Sponsorship of Universities and Their Conferences ................................................................... 13

      d. Hundreds of Millions of Dollars Spent Promoting the REGIONS Mark................................................................... 14

    6. REGIONS Fame: Everybody Knows REGIONS.................................... 14

    7. The REGIONS Brand Is One of Regions' Most Valuable Assets ........... 16

    8. REGIONS Registrations ...................................................... 16

  B. The Defendant Southern Christian University, Now Regions University............ 16

    1. The School Depends on Tuition ............................................. 16

    2. The School's Program........................................................... 17

    3. The School's Students Come Primarily from the South........................... 17

    4. The School's Marketing for Students ...................................... 17

    5. The Adoption of a "For-Profit" Name: Regions University .................... 18

a.    The School Needed a For-Profit Name to Increase
Enrollment and to Support the Theology School ......................... 18

6.    The School Was Well-Aware of the Fame of the REGIONS Name ........ 19

7.    Defendant's Use of Regions University Has Caused Immediate
Confusion ...................................................................................... 22

8.    Defendant Admits to Confusion .............................................................. 25

III.    Argument ....................................................................................................................... 26

A.    The Standard for Summary Judgment ................................................................. 26

B.    Defendant's Use of the REGIONS Is Likely to Cause Confusion and Has
Caused Confusion with Plaintiffs' REGIONS Mark ........................................... 27

1.    Plaintiffs' REGIONS Mark Is Strong and Worthy of a High
Degree of Protection ................................................................................. 30

2.    Plaintiffs and Defendant's REGIONS Marks Are Similar ...................... 36

3.    The Parties' Services Are Related ............................................................ 38

4.    The Parties Serve the Same Customers and Retail Markets .................... 40

5.    The Parties Use the Same Advertising Media .......................................... 42

6.    Defendant Chose Its For-Profit REGION UNIVERSITY Name To
Take Advantage of the Goodwill Represented by the Famous
REGIONS Mark and to Project Itself as an Institution of National
Prominence. ............................................................................................... 42

7.    Substantial Confusion Has Arisen From the Use of REGIONS
UNIVERSITY ........................................................................................... 47

8.    Defendant's Use of the REGIONS UNIVERSITY and REGIONS
Is Likely to Cause Confusion ................................................................... 49

C.    Regions Is Entitled to Summary Judgment on its State Dilution Claim ............. 50

1.    Defendant's Use of the Famous REGIONS Mark Constitutes
Dilution Under Alabama State Law ........................................................... 50

2.    Defendant's Use of REGIONS UNIVERSITY Is Likely to Cause
Dilution of Plaintiffs' REGIONS Mark under the Federal Dilution
Act ............................................................................................................. 52

a.    Plaintiffs' REGIONS Mark Is Famous ........................................ 53

b.    Defendant's Use of the REGIONS Mark Is Likely to Cause
Dilution by Blurring .................................................................... 54

# TABLE OF AUTHORITIES

Page(s)

CASES

*American Farm Bureau Fed'n v. Alabama Farmers Fed'n,*
  935 F. Supp. 1533 (M.D. Ala. 1996) ...................................................................... 28, 43, 48

*American Int'l Reinsurance Co. v. Airco, Inc.,*
  570 F.2d 941 (C.C.P.A. 1978) ........................................................................................ 32

*Amstar Corp. v. Domino's Pizza, Inc.,*
  615 F.2d 252 (5th Cir. 1980) ...................................................................................... 35, 36

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ........................................................................................................ 26

*Arthur Young, Inc. v. Arthur Young & Co.,*
  579 F. Supp. 384 (N.D. Ala. 1983) ................................................................................. 51

*Babbit Electronics, Inc. v. Dynascan Corp.,*
  38 F.3d 1161 (11th Cir. 1994) ..................................................................................... 38, 43

*Bd. Of Supervisors of La. State Univ. v. Smack Apparel Co.,*
  438 F. Supp. 2d 653 (E.D. La. 2006) .............................................................................. 48

*Burger King Corp. v. Mason,*
  710 F.2d 1480 (11th Cir. 1983) ...................................................................................... 28

*Burton v. City of Belle Glade,*
  178 F.3d 1175 (11th Cir.1999) ........................................................................................ 27

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ........................................................................................................ 26

*Choice Hotels Int'l, Inc. v. Kaushik,*
  147 F. Supp. 2d 1242 (M.D. Ala. 2000) ......................................................................... 27

*Citibank N.A. v. Citibanc Group, Inc.,*
  215 U.S.P.Q. 884 (N.D. Ala. 1982) ................................................................................ 30

*Commerce Foods, Inc. v. PLC Commerce Corp.,*
  504 F. Supp. 190 (S.D.N.Y. 1980) ................................................................................. 33

*Compton v. Fifth Avenue Ass'n,*
  7 F.Supp.2d 1328 (M.D. Fla. 1998) ............................................................................... 38

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
  604 F.2d 200 (2d Cir. 1979)................................................................................ 28

*E. Remy Martin & Co. v. Shaw-Ross Int'l Imports*,
  756 F.2d 1525 (11th Cir. 1985)........................................................................... 41

*ECO Mfg LLC v. Honeywell International, Inc.*,
  No.1:03-CV-0170-DFH, 2003 WL 18888988 (S.D. Ind. Apr. 11, 2003) ........................... 46

*Freedom Savings & Loan v. Way*,
  757 F.2d 1176 (11th Cir. 1985)........................................................................... 48

*Frehling Enters. v. Int'l Select Group, Inc.*,
  192 F.3d 1330 (11th Cir. 1999)...................................................................29, 37, 43

*Herbko Int'l., Inc. v. Kappa Books, Inc.*,
  308 F.3d 1156 (Fed. Cir. 2002) .......................................................................... 37

*In re Shell Oil Co.*,
  992 F.2d 1204 (Fed. Cir. 1993) .......................................................................... 38

*Int'l Stamp Art, Inc. v. United States Postal Service*,
  456 F.3d 1270 (11th Cir. 2006)........................................................................... 26

*James Burrough, Ltd. v. Sign of Beefeater, Inc.*,
  547 F.2d 266 (7th Cir. 1976).............................................................................. 30

*Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*,
  716 F.2d 833 (11th Cir. 1983)......................................................................29, 34, 43

*Miranda v. B&B Cash Grocery Store, Inc.*,
  975 F.2d 1518 (11th Cir. 1992)........................................................................... 30

*Miss Universe, Inc. v. Little Miss U.S.A., Inc.*,
  212 U.S.P.Q. 425 (N.D. Ga. 1981)........................................................................ 34

*O'Ferrell v. United States*,
  253 F.3d 1257 (11th Cir. 2001)........................................................................... 26

*Ross Bicycles, Inc. v. Cycles USA, Inc.*,
  765 F.2d 1502 (11th Cir. 1985)........................................................................... 42

*Sullivan v. CBS Corp.*,
  385 F.3d 772 (7th Cir. 2004).............................................................................. 31

*Texas Tech. Univ. v. Speigberg*,
  461 F. Supp. 2d 510 (N.D. Tex. 2006) .................................................................. 48

*The Breakers of Palm Beach, Inc. v. Int'l Beach Hotel Development, Inc.*,
    824 F. Supp. 1576 (S.D. Fla. 1993) ....................................................................... 34

*Turner v. HMH Publishing Co.*,
    380 F.2d 224 (5th Cir. 1967), cert. denied, 389 U.S. 1006 (1967)........................ 34

*Universal Money Ctrs. v. AT&T*,
    22 F.3d 1527 (10th Cir. 1994)................................................................................ 29

*University of Georgia Athletic Ass'n v. Laite*,
    756 F.2d 1535 (11th Cir. 1985)........................................................................passim

*Virgin Enters. V. Nawab*,
    335 F.3d 141 (2d. Cir. 2003)............................................................................31, 37

*Yale Electric Corp. v. Robertson*,
    26 F.2d 972 (2d Cir. 1928) .................................................................................... 28

## STATUTES

Ala. Code § 8-12-16 ........................................................................................................ 27

Ala. Code 8-12-17 .....................................................................................................50, 51

Ala. Code § 8-12-19 ........................................................................................................ 27

15 U.S.C. § 1065 ............................................................................................................. 16

15 U.S.C. § 1114 ............................................................................................................. 29

15 U.S.C. §1125(a) .......................................................................................................... 29

15 U.S.C. § 1125(c): ....................................................................................................... 53

15 U.S.C. § 1125(c)(1) .................................................................................................... 53

15 U.S.C. § 1125(c)(2)(A) .............................................................................................. 54

15 U.S.C. § 1125(c)(2)(B) .............................................................................................. 54

## RULES

Fed. R. Civ. P. 56(c) ....................................................................................................... 26

**BOOKS AND ARTICLES**

Glenn A. Gundersen, *Trademark Searching* (1994) .................................................................. 46

Restatement (Third) of Unfair Competition § 21, comment (1995) ........................................... 30

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (4th ed. 2007) ....passim

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION and REGIONS BANK | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 2:06-cv-882-MHT |
| v. | ) ) | |
| REGIONS UNIVERSITY, INC. | ) ) ) | |
| Defendant. | | |

**BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Regions Asset Company, Regions Financial Corporation and Regions Bank ("Regions"), through its undersigned counsel, respectfully submit this Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment.[1]

**I.     INTRODUCTION**

Southern Christian University ("SCU"), headquartered in Montgomery, decided that it wanted a "for-profit kind of name" so that it could project itself as an institution of national renown.  It adopted plaintiffs' name REGIONS -- the name of the largest financial institution in Montgomery, the largest Alabama corporation, and one of the largest financial institutions in the United States -- as the university's new for-profit name.  The fame of the REGIONS brand and defendant's knowledge of its prominence is beyond serious question.  Defendant's president

---

[1]     Certain declarations and exhibits are being filed conventionally with the Court as confidential under the parties' protective order, along with a motion to file under seal.  A chart of these documents is attached hereto.

himself admitted this numerous times: "I know Regions is prominent."[2] "Everybody knows who Regions bank is."[3]

As soon as the REGIONS UNIVERSITY name was adopted by defendant confusion was almost immediate -- people thought that there must be a connection between the school and the financial institution. SCU received e-mails asking if the change to REGIONS was prompted by a donation or other affiliation with the bank. And since then, there have been numerous instances of actual confusion as to the connection between these two REGIONS institutions. Even defendant's president admitted that he was personally aware of persons believing that Regions University was sponsored or affiliated with Regions.[4]

The state and federal laws of trademark infringement, trademark dilution and unfair competition all prohibit the use of the same (or similar) mark by others whose use is (i) likely to cause just this kind of confusion as to origin, association, sponsorship and affiliation and (ii) is likely to dilute the distinctiveness of a famous, established mark. Further, the law of unfair competition prohibits the adoption of a name by another that will take advantage of the goodwill and fame by another – in other words, it prohibits a free ride on the reputation and goodwill associated with another's mark.

Defendant's motion for summary judgment betrays a fundamental misunderstanding of the purpose of the laws of trademark infringement and unfair competition. Defendant cannot by using the REGIONS UNVERSITY name take advantage of the goodwill of REGIONS with impunity and cause confusion as to sponsorship and affiliation.. The undisputed facts, or the

---

[2] Turner Tr. 136.

[3] Turner Tr. 166.

[4] Turner Tr.

facts that are not subject to rational dispute, establish the infringement of the REGIONS mark and unfair competition as a matter of law.  Accordingly, Regions cross-moves for summary judgment for trademark infringement and unfair competition under federal and Alabama law and dilution under Alabama law.

## II.    STATEMENT OF FACTS

### A.    Regions and its REGIONS Mark

#### 1.    The REGIONS Name Identifies Plaintiffs and their Many Businesses and Services

REGIONS is plaintiffs' principal brand and chief symbol of corporate identification.  The REGIONS brand has central importance to the company.  "It's your brand.  It's the value of the company.  Your name is the company."  Askew Tr. 24.  The REGIONS name and mark is used for all of Regions' businesses and services.  Dunman Tr. 36-37.  Plaintiffs' Regions Financial Corporation, Regions Asset Company and Regions Bank[5] and the names of many of their affiliates, business units and divisions, such as Regions Insurance Group, RegionsNet, Regions Mortgage, Regions Funding and Regions University all use REGIONS as the distinctive element of their names.  Regions 800 number is 1-800-Regions.  Regions' website's domain name is www.regions.com.  REGIONS appears on all the company's stationery, business cards, signage advertisements, TV and radio commercials, billboards, promotional materials, checks and on Regions online website, and every other thing that names Regions' businesses, services or products.  Peters Tr. 112-18, Abernethy Rep. 14.

---

[5] The plaintiffs Regions Financial Corporation, Regions Bank and Regions Asset Corporation are all related companies.  Regions Financial Corporation is a bank holding company. Regions Bank is its wholly owned subsidiary and is a bank operating company. Regions Asset Company is a wholly owed subsidiary of Regions Bank and is an intellectual property holding company.  "Regions" is used in this brief to refer collectively to all three Regions plaintiffs and their predecessors.

2.        **Regions Businesses and Services**

Regions is headquartered in Birmingham and began in 1971 from a combination of three Alabama banks located in Montgomery, Birmingham and Huntsville.

Since then, Regions has expanded geographically into sixteen states with its primary focus in the Southeast.[6]  Regions also operates one of the largest online banking sites in the United States at www.regions.com.  In 2006, the Regions online banking site had over a million households as customers having deposits in excess of 16 billion dollars.  Peters Tr. Ex. 88.

Regions now is the largest corporation with its headquarters in Alabama.  With assets in excess of 140 *billion* dollars, Regions is the largest financial institution in Alabama and one of the ten largest financial institutions in the United States.

As befitting its size, Regions supplies a full range of financial products and services for consumers, small businesses, non-profits, large corporations, and public entities that touch in one way or another virtually every aspect of people's financial lives.  Peters Tr. 52.   The consumer services include basic banking services like checking accounts, savings accounts, time deposit type of accounts, various kinds of loans like college loans and automobile loans, trust services, investment services, mortgage services, real estate lending, and private banking services. Dunman Tr. 36. Other services include insurance services such as credit insurance, credit life insurance, and term life insurance. Dunman Tr. 38   The corporate services run from bond offerings, to employee payment services, and letters of credit.  Scott Tr. 52.

---

[6] The Regions footprint is across the following states: a 16-state geographic footprint: Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee, Texas and Virginia.

### 3.     Regions Is a Community Presence

#### a.     REGIONS Is Physically Located in Its Communities

At its heart and the basis of its success is that Regions remains in its essence a community bank. Askew Decl. ¶ 3. This means that Regions is a community presence. REGIONS is physically in its communities and its presence through the many bank branches and their signage is large. For example, in Montgomery there are 25 Regions branches and in the state of Alabama there are over 250 branches.  Askew Decl. ¶ 3  Altogether, Regions has 1,900 branches and 2,400 ATMs across its footprint.  Askew Decl. ¶ 3.  This makes Regions the seventh largest network of bank branches in the country.  Askew Decl. ¶ 3.

#### b.     Everyone Is a REGIONS Customer

It also means that Regions is a bank whose customers come from every strata of its community.  A Regions customer is anyone who can open a checking or saving account, even a minor with parental permission, or who otherwise could use the financial services like car and student loans that are offered by Regions.  There is no restriction on the type of customer who banks with Regions.  Dunman Tr. 38, Abernethy p. 13. Indeed, 30 percent of Regions' customers have incomes of less than $30,000.  Ex. 88

#### c.     Regions Involvement in its Communities

Regions' involvement with and support of its communities is a part of its basic drive. This is spelled out in its 2006 services report:

> At Regions Financial Corporation, we want you to expect more—not just in the way we do business but in the way we serve our communities.  We employ exceptional bankers who focus on building customer relationships and contributing to our success.  And while this focus is both necessary and admirable, it doesn't fully explain who we are or the role we aspire to play.  Our associates bring great gifts to the communities where we live and work.  Gifts of compassion and creativity.  Gifts of enthusiasm and encouragement.  The gift of our individual and collective financial resources.

Jackson Decl. Ex. A.

Russell Dunman, the head of Regions' consumer banking for Montgomery and Central

Alabama explains Regions commitment to his community:

> I'll speak to our community—in virtually every major community
> effort there is from education, to community development, to
> industrial recruiting, to business development, to—anything that's
> good for the community or that the community sees as a benefit to
> help the community improve, Regions wants to be and will be
> involved in that, from involvement in charitable situations, through
> chambers of commerce, through boards of directors of community
> activity associations.
>
> All the things that go on in the community, we want to be very,
> very attuned to and want Regions' name associated with if they are
> positive for the community.

Dunman Tr. 131-132.

In 2006 alone, Regions provided more than $1.5 billion dollars in loans to low-to

moderate-income borrowers and in low-to moderate-income census tracts.  Jackson Decl. Ex. ¶4.

Also in 2006, Regions originated $6.9 billion dollars in CRA small business loans; 1.5 billion

dollars of this amount was to businesses located in low/moderate income areas.  Jackson

Decl. ¶ 4.  The U.S. Small Business Administration consistently ranks Regions as one of the top

small business-friendly financial service providers in the country.  Jackson Decl. ¶ 4.

Going forward, Regions has a commitment of investing at least $100 **billion** dollars from

2007 through 2013 to support community development, small business lending and mortgage

lending for low and moderate income communities and borrowers.  Jackson Decl. ¶ 5.

This Regions' assistance to its community also is in the form of charitable contributions

to the community.  For example, in Montgomery, Regions is the signature sponsor of the

Montgomery Ballet's season opening, the Montgomery Symphony and the Regions Art Show;

Regions also is a major sponsor of the Heart Walk, Arthritis Walk, Breast Cancer Awareness

- 6 -

Walk, and the United Way campaign.  Dunman Tr. 101.  As Mr. Dunman testified about the

Montgomery community: "There are very few community-wide events that Regions is not a part

of." Dunman Tr. 101.

**d.      REGIONS Public Educational Efforts**

Regions encourages its managers and other associates to be involved in its community

affairs and, Regions, as part of these efforts is very involved in education – directly with its

communities and schools, also indirectly with its scholarship programs with many colleges and

universities within its footprint and its sponsorships of various and many schools and

universities.

Regions' direct involvement in education takes the form of lectures and talks on financial

matters of interest to its customers and community.  These include seminars for first

homebuyers, investment management, how to open a checking account, maintain your credit

rating or just how to do the right things to receive bank services.  These talks and seminars are

given at the banks or their lobbies or at the office of an agency or a community center.  For

example, at the OIC, Opportunities Industrialization Counsel, job training programs in

Montgomery, Regions has been involved periodically in programs that explain how to manage a

checking account.  Dunman Tr. 112-116.

In addition, Regions associates have given talks and lectures concerning banking services

and related financial services at all levels of schools from primary grades in the Montgomery

Public Schools in high schools in a seminar on federal reserve system, or in university level

schools like AUM, Auburn University, Alabama State University, Huntington College and where

a Regions speaker might discuss investment strategies or general investment practices.  Dunman

Tr. 117-118.

These kinds of educational services to the community and to school and universities are provided by Regions throughout its footprint.  Jackson Decl. ¶ 2.  Scott Peters, Regions' Chief Marketing Officer, explained the benefits to Regions from its deep community involvement:

> We get benefits from the standpoint of the community recognizing that we are more than just a bank that we interact with their lives and try to make their lives a little bit better.  That's positive for our image and our brand.

Peters Tr. 59.

> Regions also believes that community involvement also has "positive benefits for retaining customers overlong periods of time."  Community service also has "an employee or associate benefit and that our associates really personally want to give back to their communities.  And by facilitating that, we keep happier, good employees."

Peters Tr. 60.

But the primary reason for Regions' contributions to its communities was stated simply by Mr. Peters – "One, we think it's our responsibility."  Peters Tr. 59.

### 4.     REGIONS UNIVERSITY

Regions, like many corporations,[7] has used its name "Regions" along with the word "university" in its internal corporate training program.  The use of "Regions University" began in 2004 after Region's merger with Union Planters.  Pollard Tr. 9-10.

The logo used for Regions University appears below:

---

[7] Other examples of corporations using their names along with "university" include "Black & Decker University," "Motorola University," "SunTrust University."  Pollard Tr. 83. Training magazine uses the term "corporate university" as a generic term for a corporate training program, e.g. in its award application it asks: "to better describe your Corporate University (CU), please. . . ." Ex. 4 at RAC 31081.



Pollard Tr. 62; *see also* Ex. 13.

The training courses under the auspices of Regions University are offered twenty four hours a day seven days a week online that are accessible from an employee's office or home. There are three to five hundred courses offered online in categories such as finance and accounting, and communication skills.  Pollard Tr. 69-70.  In addition, there are instructor-led training labs that have classroom spaces offered either in company-owned or rented facilities. Courses offered include Financial Services training, Financial Services Representative Training, Branch Manager training, Commercial Loan Officer training, Trust Administrator curricula, and Mortgage Loan Originator curricula.  Pollard Tr. 65.  There have been some self-study courses in languages.  Pollard Tr. 95.

Russ Dunman explains the importance of training to Regions and its employees:

> The day that you are hired, you're introduced to Regions University as the place you go to get basic courses. And it goes through advanced courses of all sorts. . . .  It's where we all go for our own training.

Dunman Tr. 43.

Every employee at Regions is required to take certain training courses.  For example, Business Ethics, Bank Security Act and anti-money laundering courses are required for all employees.  Dunman Tr. 44.  In the year 2005 alone, 25,000 Regions employees took Regions

University courses for a total number of hours of about 750,000 hours.  Pollard Tr. 78-79, Ex. 4 at RAC 31078 – 31081.

Employees are "strongly encouraged and supported" to take courses offered.  Pollard Tr. 70.  As Mike Pollard, the Director of Organizational Development for Regions testified, dedication to training is "the type of culture we've tried to create."  Pollard Tr. 71.

Regions University does not offer its Regions University programs outside of the bank. Pollard Tr. 31, 34, 52-53.  However, Regions University has been used as a recruitment tool and the Regions University name has appeared in recruitment brochures and on Regions website. Pollard Tr. 34, 36.  *See* Exhibits 9 and 11.  Of course, employees who take courses at Regions' Regions University can and do, at time, fairly indicate on their resumes the courses they have taken at Regions University.  Turner Tr. 115-16.

Regions has expended enormous amounts on employee training and courses under Regions University.  In the years 2005 and 2006, Regions spent well over 24 million dollars on corporate training.  Pollard Tr. Ex. 14.

Regions' corporate training efforts have been recognized.  Regions was ranked 66 in 2005 and 46 in 2006 in the <u>Training Magazine</u> Training Top 100 companies for employee training and development.  Marmer Decl. Ex. D.

**5.    Use of the REGIONS Mark and Name**

**a.    REGIONS Adopted Because the Name Was a Distinctive and Different for a Trademark**

The REGIONS name was adopted over 14 years ago in late 1993 as the company expanded beyond its Alabama origins.  According to Bill Askew who found and developed the Regions name, he needed a new name because the company's First Alabama name did not play well outside Alabama, especially Tennessee.  Askew Tr. 13-14.  REGIONS was chosen because

- 10 -

it had no geographical connotation.  Askew Tr. 12-13.   Mr. Askew said of the REGIONS brand:
"it was a good solid name that - that had a strong feel to it," "[i]t was powerful.  It was well-
received by the public.  It was not in use so it was perfect."  Askew Tr. 13, 16.

The absence of use of REGIONS as a business name and trademark by others was a
particularly important consideration to the company when it chose the REGIONS name.  A
unique brand like REGIONS would allow the company to have a brand that was distinct from
other companies and products names so that it could develop and control its own identity and
distinguish it from others.  Abernethy Report p. 4-6.  In Bill Askew's words:

> But if you're asking me did I go and make sure Regions wasn't
> used in different ways, I did.  The first thing I wanted to do was
> make sure that Regions did not exist somewhere else and wasn't –
> wasn't being used.  And so that's the first thing that we did to
> make sure it's distinguished, is to go out, find out and – and it
> wasn't being used.  And so that – that was – that was why I felt
> like we could distinguish the name.  Plus we did focus groups with
> people.  We did interviews with customers.  We – we showed them
> the name.  We talked about the name.  And – and they received it
> very well.  They liked the name.  And it was very distinguishable.

Askew Tr. 16.  And, Bill Askew testified that there was an extensive amount of searching
conducted to determine whether the mark REGIONS was available and the result of these
searches -- "I do recall we found no use of the [REGIONS] name."  Askew Tr. 41-42.  Russell
Dunman testified the same:  "There was nothing like it that I recall seeing at the time we
investigated the name."  Dunman Tr. 127.  Again, the distinct REGIONS name was chosen
because, as Mr. Dunman said:

> [W]e wanted our reputation to be distinct in the sense of quality of
> service and all the things we strive to be at Regions.  So we chose a
> name that was one of a kind in our mind in order to make sure that
> we were distinct in both name and service and quality and the
> things that go with it.

Dunman Tr. 127-128.

b.        **Advertising and Promotion of REGIONS**

The REGIONS mark and name has been widely and extensively advertised and promoted by Regions since its adoption in 1993.  Regions uses print, internet, television, radio, outdoor, merchandising, billboards, cinema and, of course, the signs at its 3,000 branches and ATMs to advertise and promote its REGIONS business, products and services.  Peters Tr. 112-113.  As appears from Regions Creative Briefs which show advertising strategy and the ads and commercials themselves, Regions promotes Regions as the customer's financial partner "understanding of consumer needs, competent advice and banking services."  Abernethy Rep. 14, Peters Decl. Ex. C.  Regions is positioned "in a <u>strong, industry leadership manner</u> by creating a lasting <u>relationship-based</u> brand that is <u>capable of meeting the customer's financial</u> <u>needs throughout the course of their banking life cycle</u>."  RAC00031144 (emphasis in the original).  The personality and tonality of the ads are:

"<u>Competence</u> – this is an intelligent, reliable, hardworking, trust-worthy and up-to-date brand . . . .

<u>Sincerity</u> – warm friendly, genuinely cares, positive (customer's best interests at heart)."

Peters Decl. Ex. C at RAC00031146.  Regions marketing is deliberately inclusive and welcoming to all persons.  As noted by Professor Abernethy, "This is done both in the human models used in advertising (wide variety of races, age groups, and apparent social status), the background music, and the Regions name."  Abernethy Rep. 15.  The tagline that Regions used for the past couple of years "Everyday Confidence" encapsulates the key idea of REGIONS advertising.  *See e.g.* Peters Decl. Ex. A.

c.    REGIONS Sponsorship of Universities and
Their Conferences

As part of its commitment to being an active presence in its community and to promote

the REGIONS brand, Regions has for years supported a number of college conferences and

colleges and universities located in its 16-state footprint.  The annual marketing spent by

Regions for these sponsorships in recent years has been six million dollars.  Peters Tr. Ex. 86.

Regions has been the corporate sponsor and official bank of the Southeastern Conference since

1993.  Peters Decl. ¶ 6; Peters Decl. Ex. A, Ex.. D and Ex. E.  Regions also is a corporate partner

with a number of SEC universities: University of Alabama, University of Arkansas, Auburn

University, University of Georgia, Louisiana State University, University of Mississippi,

Mississippi State University and the University of South Carolina.  *Id.*  Another college

conference sponsored by Regions is the Sun Belt.  Peters Decl. ¶ 6; Peters Dec. Ex. A, Ex. D.  In

addition, Regions sponsors many additional colleges and universities on a local basis like Indiana

University, Purdue and Florida State.  Peters Decl; ¶ 6.

Regions also sponsors the Regions Charity Classic golf tournament, the Regions Morgan

Keegan tennis tournament and a variety of professional sports.  Peters Decl. ¶ 7; Peters Decl. Ex.

A, Ex. D.  In addition, the stadium for the Birmingham Barons has been renamed Regions Park.

Peters Tr. 126-127; Exs. 86-87.

All these sponsorships create strong associations between the various schools, school

conferences, tournaments and other local community based organizations and Regions.  The

association is created by mentions during broadcasts like, "Regions.  It's time to expect more.

The official bank of the SEC," and REGIONS banners, signs, and graphics shown during the

telecast.  Peters Tr. 129-130.  Regions augments the association by additional advertising during

the telecasts and shows like the Regions Fifth Quarter radio show after the telecast that tout

- 13 -

Regions' many sponsorships of colleges and their conference (also banners, signs and graphics shown during the telecasts).  Dunman Tr. 102; *see e.g.*, Peters Decl. Ex. A, D, E.  Regions long use of the REGIONS name and mark, its extensive marketing efforts and its deep involvement in its communities.

In addition, Regions has provided millions in scholarships to universities.  For example, December 2006, Regions provided the University of Alabama with a $1 million gift for business school scholarships under the "Our Students. Our Future." program.  Marmer Decl. Ex. H.

### d.    Hundreds of Millions of Dollars Spent Promoting the REGIONS Mark

In total, Regions has spent hundreds of millions of dollars promoting the REGIONS brand and its business.  Abernethy Rep. 15.  In the years 2005 and 2006 alone, the amount spent on marketing was in excess of 50 million dollars each year.  Peters Decl. Ex. B.

### 6.    REGIONS Fame: Everybody Knows REGIONS

Regions has become near universally known within its footprint.  As defendant's President admitted, "Everybody knows who Regions Bank is."  Turner Tr. 166.  Dr. Turner's understanding of the fame of Regions is borne out by scientific projectable brand awareness surveys that Regions has had conducted by an independent research firm New South over approximately ten years.  Askew Tr. 145.

A scientific, quantitative brand awareness study in 2007 showed Regions is very strong in aided awareness in Birmingham (98%), Mobile (93%), Nashville (87%), Memphis (91%), and Jackson (88%).  Regions familiarity is high in other cites as well – Atlanta (83%), St. Louis (78%), New Orleans (84%).  Regions was familiar to a large percentage of the population of other city markets tested: Indianapolis (69%), Miami (54%), Orlando (43%) and Tampa (44%).  In 2006, the results were similar for aided awareness: 98% in Birmingham, 99% in Mobile; 95%

in Memphis, and 90% in Nashville. Jager Decl. ¶ 6; Jager Decl. Ex. A.  The aided awareness for

Montgomery would be at least as high as the 98% aided awareness found in Birmingham

because Montgomery has historically had a higher awareness of REGIONS than Birmingham.

Jager Decl. ¶ 8.

Unaided recall,[8] "very difficult memory task" for consumers, of REGIONS very high.

Askew Tr. Ex. 130 at RAC 22362.  Dr, Abernethy, a Professor of Marketing at Auburn,

comments that, "This is an extraordinarily high level of unaided recall which equals or exceeds

other major banks in the Regions market area." Abernethy Report 18.  Similar results are shown

in the brand awareness study in 2007.  Jager Decl. ¶ 6; Jager Decl. Ex. A.

Regions' market research over the years has tracked the general public's attitudes

towards it and its financial services and its own customers' satisfaction.  Regions has had high

satisfaction scores.  Jager Dec. Ex. A.  The overall "very satisfied" figures have been very high.

The 2000 through 2003 studies have the number of very satisfied customers at Jager Decl. Exs.

C-F at RAC 22863, 22790, 22612, and 22398.  As Dr. Abernethy reports: "They [Regions]

rigorously check consumer opinions at each branch to make sure that the brand promise of

consistent, competent, friendly banking service open to all is provided.  This in turn forged a

deep connection with its current customers via high satisfaction scores and with the general

public that views the bank quite favorably."  Abernethy Report p. 16.

These results confirm the testimony of Russ Dunman the person in charge of Regions

consumer banking in Montgomery and Central Alabama said: "We've worked awfully hard to

---

[8] Dr. Abernethy explains unaided brand awareness: "Unaided brand awareness is when a member of the public is asked names of banks without any assistance or information to aid memory.  This is a very difficult memory task in marketing."  Abernethy Report p. 18.

make the Regions name, the name everyone remembers for something positive."  Dunman Tr.
111.

### 7.    The REGIONS Brand Is One of Regions' Most Valuable Assets

Dr. Abernethy's conclusions about the REGIONS brand is that: "Regions is easy to
pronounce, has close to universal familiarity, and very high unaided recall.  Based on the
materials I have reviewed, in my opinion the REGIONS brand is well known, strongly positive,
holds a clear and distinct image in the minds of consumers.  It is a very powerful asset to
Regions."  Abernethy Tr. 30-31.  Bill Askew describes the value of REGIONS to Regions: "The
REGIONS brand, which represents who we are and all of our values and vision, might be the
most valuable asset of Regions.  It is certainly one of our most valuable assets."  Askew Decl. ¶
2.

### 8.    REGIONS Registrations

The REGIONS mark, alone and with other elements, has long been registered in the
United States Patent and Trademark Office.  Almost 20 REGIONS marks are registered,
including REGIONS, REGIONS MORTGAGE, REGIONSBANK, REGIONS FINANCIAL
CORP.  Certified copies of Regions' marks listed in its First Amended complaint are attached as
Marmer Decl. Ex. A.

The REGIONS mark is uncontestable by virtue of 15 U.S.C. § 1065.

### B.    The Defendant Southern Christian University, Now Regions University

### 1.    The School Depends on Tuition

Defendant SCU, now Regions University, is an online school with its headquarters in
Montgomery.  Ninety-five percent of all its students take their courses on line.  The school has
no bookstore or dormitories.  Virtually all – 97% -- of the school's income comes through tuition

and fees.  Turner Tr.58-59.  It has no real endowment and no apparent alumni financial support.
The school runs in the black.  Crosby Tr. 32.

The school's admission standards are minimal.  Admissions are online.  Standardized
tests are not required; letters of recommendation are not required; class ranking is not required;
an essay is not required.  Abernethy Report 21.  Basically, if an applicant has a high school
diploma or its equivalent and the tuition, the applicant will be admitted to the school.

### 2.    The School's Program

The school advertises 33 degree programs offered online.  Exs. 44, 45, 47, 69 at RU
1628-29.  The professional or applied degree programs such as business, human services, human
resources, public safety and the like are where most tuition revenue is generated.  Turner Tr. 68-
69; Abernethy Tr. 22.  In addition, the school, which is affiliated with the Churches of Christ, has
the Turner School of Theology with about 50 students that offers doctorate degrees in Ministry
and in Biblical Studies.  Turner Tr. 69.  There is some residency requirement for the doctorate
programs.

### 3.    The School's Students Come Primarily from the South

There are not more than 730 or 740 students in any given semester.  Crosby Tr. 21.  The
school students are concentrated geographically.  Over two-thirds (69.9%) are from the Old
Confederacy and border states.  Two hundred and forty (27.4%) of the total are from Alabama.
There were no apparent international students in 2006.Ex. 17; Abernethy Tr. 22-23.

### 4.    The School's Marketing for Students

The school spent over $1,250,000 dollars advertising in the 2006 – 2007 school year.
Crosby Tr. 37-38, Ex. 123.  Its primary media was television, radio, and billboard.  These
advertising vehicles account for more than 80% of its planned advertising budget in 2006.
Reflecting the location of its students, the school concentrates its advertising in Alabama,

Tennessee, Texas and the Carolinas.  Exs. 48, 123.  In 2006, all advertising expenditures except some Christian magazines, was in the South.  Exs. 48; 123

When Laina Costanza, who does the school's advertising under the direct supervision of Rex Turner,[9] was deposed on May 16, 2007, all the media placements for 2006 were in Alabama and Tennessee.  Costanza Tr. 96, Ex. 48.

The target market for the school is "an individual 25 – 55, young professional or a mother at home, someone who needed to finish their degree or is transferring, someone who wants to further their education, someone who already has a bachelor's."  Costanza Tr. 23.

As Dr. Abernethy describes the clear overall marketing strategy of the defendant institution:  "Heavy advertising is focused on generating paying students, not building the image of the program.  Programs are designed to maximize student revenues by offering applied, technical education (excepting the 6% of the student body enrolled in the Turner School of Theology.)"  Abernethy Rep. 24.

### 5.     The Adoption of a "For-Profit" Name: Regions University

#### a.     The School Needed a For-Profit Name to Increase Enrollment and to Support the Theology School

In September 2005, SCU began to consider a name change.  Rex Turner, the President of the school, told his Board that a name change should be considered because the school "needed to increase enrollment in areas such as business in order to support our degrees in the Turner School of Theology."  The Board's September 25, 2005 minutes stated:

> This highlights our need – we need a *for-profit type name* that is a broad name.  This would bring in students that would help fund the degrees in the Turner School of Theology.

---

[9] Dr. Turner makes all the decisions concerning the advertising of the school.  Turner Tr. 19; Costanza Tr. 35-36.

(Emphasis added).  Turner Tr. 72-74, Ex. 20 at RU 110.

In its December 16, 2005 meeting, the Board debated the names Masters and Turner for the university's new name.  Turner Tr. 87-91, Ex. 22 RU 117-119.  Turner was the name of the school's founders and the name of its Theological University.  But even so, the Board was concerned that "some might think that it was named after Ted Turner."  Ex. 22 at RU 118.  Instead, the Masters name was chosen and the Board directed Dr. Turner to get a registration for the name Masters University.  Once that was accomplished, the Board would make a final decision to rename the institution's name.  Ex. 22 at RU 118.

The Masters University mark encountered difficulties in the registration process and the school's trademark counsel expressed concern with another school's name.  Rex Turner thought of additional names -- Rex, Royale, Providence, Regal and Regions – for the school's new name.  Turner Tr. 111-112.  Rex Turner narrowed the list to 3 names – Turner University, Rex University and Regions University.  Turner Tr. 112.

### 6.    The School Was Well-Aware of the Fame of the REGIONS Name

Rex Turner came up with "Regions."  Turner Tr. 111.  He was well acquainted with REGIONS name.  He has banked with Regions continuously since 1974, when he moved to Montgomery.  Turner Tr. 8-9.  And, he admits to knowing the mark REGIONS since the bank changed its name.  Turner Tr. 10.  He remembers REGIONS television commercials and newspaper ads.  He regularly sees REGIONS signs driving around Montgomery, and he is aware that two of the tallest buildings in Montgomery bear REGIONS signage.  Turner Tr. 9-11.  Dr. Turner admitted:  "I know Regions is prominent."  Indeed, he was aware of stories in television and newspapers that summer of the merger of AmSouth and Regions.  Turner Tr. 136.  When asked if his policy team knew who Regions was Dr. Turner replied, "Everybody knows who Regions bank is."  Turner 166.

After he thought of REGIONS as the new school name, without speaking to anyone at the school, Rex Turner called up James Shlesinger on July 24, 2006. Turner Tr. 119. Dr. Turner told Mr. Shlesinger that he wanted an opinion of the "registrability of these names": TURNER UNIVERSITY, REX UNIVERSITY and REGIONS UNIVERSITY. Turner Tr. 132.

Dr. Turner mentioned to Mr. Shlesinger that "there is a Regions bank here" and Mr. Shlesinger commented "well, I don't anything about them up here in Virginia." Turner Tr. 137. Dr. Turner did not tell Mr. Shlesinger anything about Regions:

> Q. So you made him aware that Regions was a
> prominent bank in the community?
> A. I didn't say – [objection omitted] I didn't say
> prominent. I just said there's a Regions bank.
> Q. Did you describe how big Regions was to Mr.
> Shlesinger at all?
> A. Huh-uh (Negative response.) . . .
> Q. So what did you tell him about people's knowledge
> of Regions in Montgomery?
> A. That was not discussed . . .
> Q. Did you tell him that Regions was a well known
> bank in Alabama when you spoke to him?
> A. No, I just said there's a Regions bank.

Turner Tr. 136-137.

Three days later, Mr. Shlesinger sent Dr. Turner a short email concerning the "registerability" of the marks TURNER UNIVERSITY, REX UNIVERSITY, and REGIONS UNIVERSITY. Ex. 28. Mr. Shlesinger said that Turner University might encounter difficulties because of confusions as to sponsorship with some Turner companies. Rex University appeared registrable. For Regions University, "based on the search results, is registrable for education services, namely providing instruction at the university level." *Id.* There was no discussion in the e-mail concerning the REGIONS mark or Regions bank or contain an opinion regarding the risk of objection for infringement or dilution arising from Regions or anyone else. *Id.* at RU 179.

There was no reference to the use of any mark – only marks that were registered on the USPTO. *See* Exhibit 28. In fact, the e-mail does not refer to any mark containing the word "REGIONS" as its distinctive element. Indeed, the "full report" (which perhaps has less discussion than the almost non-existent discussion in Shlesinger's July 27 email) only refers to one mark containing the word "Regions" -- that is, Regions' mark REGIONS CHARITY CLASSIC that is also registered in Int. Cl. 41. Ex. 501.

The next day the Board gave Dr. Turner authority to change the name to Regions University. The resolution states that name Regions University was chosen to replace Southern Christian University to "increase the school's attractiveness to potential students, not just regionally but internationally," and "changing the name will also assist the University *in projecting itself as a nationally recognized school of prominence*." (emphasis added) Ex. 31.

REGIONS bank came up again the following Monday, July 31, 2006. In the school's team meeting, Dr. Turner announced the approval of the name change to REGIONS UNIVERSITY. The minutes state: "It was brought up brought up that Regions Bank has an internal 'Regions University'." Turner Tr. 165. A team member said: "I think there's a Regions University within the bank." Turner Tr. 166-167.

Dr. White, a team member and school consultant, apparently called Daniel Earle, an attorney at Mr. Shlesinger's firm. The notes produced by Mr. Shlesinger's firm concerning this call are dated July 28 of a call from Dr. John White. It states:

> REGIONS UNIVERSITY
> Bank in Alabama
> REGIONS BANK
> Get on File, soon
> 3 Brochures by tomorrow
> File PRESS today

Exhibit 502.  Mr. Earle was advised by the school that Regions University is internal within the bank.  He told them orally that "this would not pose a registration issue."  Turner Tr. 168.

### 7.    Defendant's Use of Regions University Has Caused Immediate Confusion

On August 2, 2007, Rex Turner decided to proceed with the use of the name REGIONS UNIVERSITY.  Turner Tr. 170-71.  The adoption and use of the mark REGIONS UNIVERSITY has been in steps.  The school did not begin advertising itself as REGIONS UNIVERSITY until January of this year.  Turner Tr. 225.  It still has not completely adopted the REGIONS UNIVERSITY name.  The signs for the school at its headquarters today say: "SOUTHERN CHRISTIAN UNIVERSITY."

An official announcement of the name change to REGIONS UNIVERSITY was sent out by email to the students on August 8, 2006.  Confusion as to sponsorship and affiliation occurred almost immediately.

The first evidence of confusion was an email on August 9, 2006, the day following the announcement of defendant's name change from Dr. Wilson Luquire to Dr. John White and Dr. Rex Turner of Regions University:

> "Good luck with Regions.  Is this related to the Bank and if so
> many I applaud you with double congratulations!!!!!!"  Ex. 35.

Also, on August 9, 2006, there was an email, from David P. Moore: "John White just informed me that SCU is now Regions University.  I didn't ask about the possible conflict with the bank of the same name!"  Ex. 35.

A former student at SCU, Randy Gore wrote to Rick Johnson on August 31, 2006: "Why was 'Regions' chosen?  Did Regions Bank make a donation?"  Ex. 35.  Even Laina Costanza, the person in charge of marketing at defendant, instantly thought of Regions the financial institution

when Dr. Turner told her that he was considering changing defendant's name to Regions University.  Costanza Tr. 64.

In January 2007, SCU began advertising Regions University to the public on television, radio, billboards and by other means. This advertising has caused significant confusion.

- Phone call to Regions University on an unrecalled date asking about degree programs and whether Regions University is affiliated with Regions Bank. Fulghum Tr. 17-18.

- Phone call to Regions University on an undisclosed date asking about degree programs and whether Regions University is affiliated with Regions Bank. Hughes Tr. 20.

- Phone call on or around March or April, 2007, to Regions' call center asking if Regions is affiliated with Regions University and where Regions University is located.  Wilson Affidavit.

- Phone call within the last three months, to Regions' call center asking if Regions University was affiliated with Regions Bank.  Burton Affidavit.

- In June 2007, Mr. Brian Warwick, an attorney at the law firm of Maynard Cooper & Gale LLC in Birmingham, AL, saw a television advertisement for Regions University.  He thought that it might be affiliated with Regions Bank. He had not been aware of other companies using Regions as its name and is acquainted with Regions as one of the largest financial institutions in Birmingham and elsewhere.  He thought Regions may have started a school, much like graduate school courses offered by the United States Department of Agriculture, whose courses were advertised on the public transit in Washington, DC, when he lived there.  Warwick Decl.

- Mr. Jack Galassini, who banks at Regions in Montgomery and is aware of the large and respected presence of Regions in Alabama and elsewhere, saw a commercial for Regions University and thought that it might have "some type of relationship with Regions Bank."  He was informed by Mr. Dunman at a social event that there is no affiliation.  Galassini Affidavit.

- Ms. Terry Boyd, the Branch Manager of Regions Bank Moores Mill Road Office in Auburn, AL, and her husband saw an advertisement for Regions University.  Her husband asked if there was a connection between the university and the bank.  She was not sure and learned from bank management that there was no connection.  Furthermore, two of her employees asked her if there was a connection between Regions University and Regions Bank.  Boyd Affidavit.

- 23 -

- Mr. David Green, Assistant Branch Manager of Regions Bank Autauga County Office in Prattville, AL, saw a billboard for Regions University at I-85 and Taylor Road in Montgomery. He asked Denise Murphy, the Branch Manager, if it had something to do with Regions Bank. Green Affidavit; Murphy Affidavit.

- Ms. Wanda Norris, an employee at Regions Bank in Enterprise, AL, and her husband saw a television advertisement for Regions University. They both wondered if it was affiliated with Regions Bank. She later had a conversation with her manager, Robbin Thompson, who indicated to her that he had also seen the ad, and told her that there was no affiliation. Norris Affidavit; Thompson Affidavit.

- Mr. Kiel Odom, Branch Manager of the Regions Bank Village West Office, was approached by a teller, Mattie Sanders, who had seen an advertisement for Regions University and indicated to him that she thought Regions Bank had "bought a university." He explained to her that bank management informed him that there was no affiliation. Odom Affidavit.

- Ms. Karan Rudolph, the Human Resources Assistant of Regions Financial Corporation in Montgomery, AL, saw a billboard at I-85 and Taylor Road and thought there may be some connection between Regions University and Regions Bank. She "Googled" the web to satisfy her curiosity and learned what Regions University is and that there is no connection. Rudolph Affidavit; Sanders Affidavit.

- Mr. Craig Smith, Branch Manager of Regions Bank in Wetumpka, AL, heard radio advertisements and saw television advertisements for Regions University. He thought Regions University may be related with Regions Bank, but later learned from bank management that it was not. Several of his employees have told him that customers have inquired about the name Regions University and have specifically asked whether or not Regions University is affiliated with Regions Bank. He has instructed personnel in his branch to answer these customers by telling them that there is no connection. Smith Affidavit.

- Ms. Sheila Noblitt, author of the blog entitled Alabama Kitchen Sink posted a conversation about public and private institutions in Alabama with the following discussion:

  > Sheila: "I started to throw in the privates in town, Faulkner, Huntingdon, South University and I believe, Regions University (which used to be Southern Christian). I don't know if I left anyone out. I think that's it…."

  > Jay Croft: "Regions University? Regions is a bank!"

> Sheila: "Jay, Regions is a bank and that's why I was puzzled that Southern Christian University changed its name. I always think that the bank is behind the university. Ha."
>
> Jay Croft: "It's like Western Maryland College in Westminster, MD. It is the only college in the USA named for a railroad. (Western Maryland Railway donated the land for the college many years ago. Westminster is not in the western part of Maryland at all.) A deep-pockets donor gave a sizeable contribution and Behold! It is McDaniel College now." Marmer Decl. Ex. C.

### 8. Defendant Admits to Confusion

Dr. Turner admits to confusion arising from defendant's use of REGION UNIVERSITY. When asked if the confusion began on August 9, 2006, Dr. Turner replied: "I'm not so sure there was confusion as much as there was affiliation concerns as between, you know, is Regions University in some way affiliated." Turner Tr. 171-72.

Dr. Turner was himself aware of confusion. He describes a telephone call:

> They called about the degree programs and they just wanted to ask if there was any affiliation with Regions Bank. They did not call and say, is this Regions Bank?

Turner Tr. 192.

In fact, Dr. Turner has had people come up to him and ask if Regions donated money to the school.

> Q. Now, in your conversations with people explaining to them that you're adopting this new Regions University name, did any folks inquire as to affiliation between Regions University and Regions, the financial institution that you recall?
>
> A. Not other than the documentation that we have given you that I am aware of any affiliation. People -- You know how people will do. They'll come up and tell you, oh, y'all must have gotten some money or something. And they know good and well that Regions Bank is one thing and Regions University, an accredited school, is another. They love to put a pin in you.

Q. So some people have come up to you and kidded you that Regions Bank must have given you some money and that's why you chose the name?

A. Well, you know, it has occurred in one -- one or two occasions.

Turner Tr. 179 – 180.

Dr. Turner's answers to questions concerning the confusion of the relationship between Regions, the bank, and Regions University, the school, betray his unconcern with such confusion and his belief that causing confusion as to affiliation with Regions is acceptable so long as people do not confuse a bank with a school or, in his words, think that Regions University offers checking accounts:

But there's a lot of difference between somebody asking about an affiliation and somebody confusing that this is a bank. And nobody to my knowledge has called us and asked us, how much is in my checking account.

Turner Tr. 193.

## III. ARGUMENT

### A. The Standard for Summary Judgment

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Int'l Stamp Art, Inc. v. United States Postal Service*, 456 F.3d 1270, 1273 (11th Cir. 2006), citing Fed. R. Civ. P. 56(c). An issue is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party requesting summary judgment bears the initial burden of determining that such a judgment is proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *O'Ferrell v. United States,* 253 F.3d 1257, 1265 (11th Cir. 2001). The evidence and all

- 26 -

reasonable inferences drawn therefrom are construed in the light most favorable to the

nonmovant. *Burton v. City of Belle Glade,* 178 F.3d 1175, 1187 (11th Cir.1999).

Here, the facts that are of record demonstrate as a matter of law that defendant's use of

the REGIONS UNIVERSITY name and mark is likely to cause, and has caused, confusion as to

its connection and affiliation with Regions, and, consequently, has infringed the well-known

REGIONS trademark and name and engaged in unfair competition.

### B.    Defendant's Use of the REGIONS Is Likely to Cause Confusion and Has Caused Confusion with Plaintiffs' REGIONS Mark

For trademark infringement and unfair competition, whether under state[10] or federal law

and whether for a registered or unregistered mark, plaintiffs must show (1) that their mark has

priority over the mark defendant is using; and (2) that defendant's use of the mark is likely to

cause confusion among consumers. *Choice Hotels Int'l, Inc. v. Kaushik*, 147 F. Supp. 2d 1242,

1247 (M.D. Ala. 2000). Regions' REGIONS mark and name has priority over defendant's

REGIONS UNIVERSITY and REGIONS –Regions' REGIONS mark has been federally

registered, alone and with other elements, and has been in use for over 14 years – long before

defendant began to use REGIONS UNIVERSITY and REGIONS.

The undisputed facts establish that confusion as to sponsorship and affiliation is

established through the many instances of actual confusion of record and the defendant's own

admissions of the confusion that has occurred. Defendant's fundamental mistake both as

expressed by Dr. Rex Turner in his testimony and in its various trademark infringement and

---

[10] Defendant is mistaken that Regions' marks must be registered in Alabama for it to be liable under Alabama law for trademark infringement. Def. Br. at 70-71. Ala. Code § 8 -12-16, to which Defendant refers, begins with the condition, "Subject to the provisions of Section 8-12-19 . . .." Section 8-12-19 provides, "Nothing in this article shall adversely affect the rights or the enforcement of rights in marks acquired in good faith at any time at common law." Ala. Code § 8-12-19.

unfair competition claims is that (1) the confusion prohibited by trademark and unfair competition laws includes confusion as to source and sponsorship and (2) it has no right to take the advantage of the goodwill of another by adopting the famous mark of another that is not a competitor.

For trademark infringement and unfair competition actions, whether under state or federal law, the question to determine is whether the use of a mark is likely to cause confusion as to the source of the products.  Confusion as to source includes confusion as to sponsorship or approval. "[T]he unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement." *American Farm Bureau Fed'n v. Alabama Farmers Fed'n*, 935 F. Supp. 1533, 1546, (M.D. Ala. 1996), citing *Burger King Corp. v. Mason*, 710 F.2d 1480, 1491-92 (11th Cir. 1983).  *See Beer Nuts, Inc.*, 805 F.2d at 924.  S*ee also University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546 (11th Cir. 1985); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.").

This is because a trademark symbolizes the reputation of its owner, for good or ill, and is something that its possessor has the right to control and the right to exploit.  Judge Learned Hand famously explained:

> His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill.  If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control.  This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask.

*Yale Electric Corp. v. Robertson,* 26 F.2d 972, 974 (2d Cir. 1928).

Section 43(a) of the United States Trademark Act, which codifies the federal law of unfair competition, explicitly provides:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin . . . which – (A) is likely to cause confusion, or to cause mistake, or to deceive as to the *affiliation, connection, or association* of such person with another person, or as to the *origin, sponsorship, or approval* of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. §1125(a). This "likely to cause confusion" standard is the same whether under this Section 43(a) or under Section 32, which codifies liability for infringement of a federally registered mark, 15 U.S.C. § 1114. J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:1 (4th ed. 2007); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 839 (11th Cir. 1983).

In determining whether confusion is likely under trademark or unfair competition, seven factors are considered by a court:

1. the type of mark used by the plaintiff;

2. the similarity of the marks;

3. the similarity of the goods or services represented by the marks;

4. the similarity of the retail outlets and the customers served;

5. the similarity of the advertising media used by the parties;

6. whether the defendant had the intent to infringe; and

7. any evidence of actual consumer confusion.

*Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

Because likelihood of confusion requires a complex analysis of the effect of symbols and their use on the public, summary judgment is not usually appropriate or granted. *See Universal*

*Money Ctrs. v. AT&T*, 22 F.3d 1527, 1530 n.2 (10th Cir. 1994) (noting that "likelihood of confusion is frequently a fairly disputed issue of fact on which reasonable minds may differ"); *Miranda v. B&B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992) ("If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment").

However, this case -- where the tremendous fame of the REGIONS mark in Montgomery and the state of Alabama and elsewhere cannot be disputed defendant admits to knowledge of the fame of the REGIONS mark, there are numerous instances of actual confusion and defendant admits to confusion -- is the unusual case where sufficient material facts are admitted or are so beyond dispute that a reasonable fact finder would have to find that confusion is likely and that defendant has infringed the plaintiffs' REGIONS mark and name.

**1.    Plaintiffs' REGIONS Mark Is Strong and Worthy of a High Degree of Protection**

The strength of a mark is its power to indicate source or origin.  McCarthy § 11:74n1 (citing Restatement (Third) of Unfair Competition § 21, comment (1995).  Even marks that originally were inherently weak can become strong through length of use, advertising, promotion, sales and other means by which marks gain strength.  *See Citibank N.A. v. Citibanc Group, Inc.,* 215 U.S.P.Q. 884, 907 (N.D. Ala. 1982).

Strength is a measure of the effect of the mark on the mind of the consuming public.  A mark that has become strong due to its "fame or uniqueness is more likely to be remembered and more likely to be associated in the public mind with a greater breadth of products and services than is a mark that is weak because relatively unknown or very like similar marks or very like the name of the product."  J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:73 (4th ed. 2007) (citing *James Burrough, Ltd. v. Sign of Beefeater, Inc.,* 547 F.2d 266 (7th

Cir. 1976)).  Thus, it is fundamental to the law of trademark infringement and unfair competition that a mark that has "achieved widespread customer recognition as a symbol of origin is more likely to result in confusion" by a junior user's similar mark than a mark with little consumer recognition.  McCarthy § 11:73; *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004)("the legal strength of a mark is usually the same as its economic and marketing strength"); *Virgin Enters. V. Nawab*, 335 F.3d 141, 148-49 (2d. Cir. 2003).

Regions by any measure is a strong mark in Montgomery, the State of Alabama, Regions' footprint in 16 states, primarily in the South and the border states, and nationally as well. Regions, after all, is one of the largest financial institutions in the United States.  The REGIONS online bank is one of the largest in the country serving over a million households and representing assets of many billions of dollars.  In addition, the REGIONS mark is promoted nationally through Regions' sponsorship of the SEC, Sunbelt and other schools in its footprint and that like REGIONS are geographically located in the South, but are nationally known.

Regions has spent hundreds of millions of dollars promoting the REGIONS brand since its adoption in late 1993.  It is a huge institution by any standard in its geography.  The largest corporation headquartered in Alabama, the largest financial institution in Alabama, the number 1 share of market in numerous states, tens of thousands of employees and so on.  However, the fame and strength of the REGIONS mark and name is also, and perhaps primarily, reflected by Regions presence and involvement in its communities.  The 2,000 REGIONS branch banks, 2,400 ATMS means that REGIONS is there and known in its communities.  For example, if you live in Montgomery, you have to be aware of REGIONS.  There are 25 REGIONS branches and the signs on the two largest buildings are REGIONS signs.

Further, Regions deep involvement in its communities – from its sponsorships of cultural events, colleges and universities, its educational programs in its communities and school involvement of many REGIONS associates in their communities -- all contribute to the awareness and strength of the REGIONS name and mark.

All this is represented by the REGIONS mark that Regions uses to identify everything that it does – the names of its businesses and divisions like Regions Bank, Regions Mortgage, Regions Insurance Group and Regions University – and that appears on virtually everything that is disseminated to the public from signs and advertising to checks and credit cards.  As Bill Askew said the REGIONS brand "represents who we are and all of our values and vision."  Askew Decl. ¶ 2.

Even Regions University, the name of Regions' top ranked internal corporate training program has contributed to the overall equity of the REGIONS brand and itself has its own equity.  After all, tens of thousands of people have taken Regions University courses.  In 2006 alone, 20,000 employees of Regions a course at REGIONS UNIVERSITY.  This is a greater number of Regions University participants in one year than all the students who have ever attended the defendant school in any of its incarnations.  Moreover, the fame of Regions University is not sealed in Regions or its large employee population.  Defendant itself knew of Regions' Regions University before it chose Regions University.  It is well recognized that "[u]sing a mark in selling goods or rendering services only to employees can constitute a bona fide public 'use' of a mark.  This is a bona fide use, albeit to a defined segment of the general public."  McCarthy § 16:7.  *See also American Int'l Reinsurance Co. v. Airco, Inc.*, 570 F.2d 941, 941 (C.C.P.A. 1978) (holding that a manufacturing company could register a service mark for the service of administering a retirement plan for its employees).

The strength of the REGIONS name and mark is scientifically shown through the many surveys Regions has conducted over the years as part of its business to understand its REGIONS brand and customers.  These surveys that have been conducted in cities in the Regions footprint show near universal awareness of REGIONS in Alabama and strong awareness in other parts of the REGIONS footprint.

The fame of the mark REGIONS is shown by the reaction to the REGIONS UNIVERSITY name and the confusion that has been engendered.  Laina Costanza, the school's advertising person, said that Regions Bank came to her mind when Dr. Turner mentioned that the new name of the university could be Regions University on August 1, 2006.  Costanza Tr. 64. The many instances where someone asked whether Regions contributed to Regions University or was affiliated with REGIONS UNIVERSITY all reflect the great strength of the REGIONS brand and that if another institution uses REGIONS there probably is a connection.  *Commerce Foods, Inc. v. PLC Commerce Corp.*, 504 F. Supp. 190, 194 (S.D.N.Y. 1980) (explaining instances of actual confusion are useful in assessing the strength of a mark).

### (1)    Regions Diligently Polices Its REGIONS Name and Mark and Little Third Party Use of Its Mark Exists

Defendant's submissions of third party business names and other filings do not detract from the strength of plaintiff's REGIONS name and mark.  Many of the business names are no longer in use, are internal uses only, use "regions" only descriptively, such as "River Regions," are for goods or services extremely different than Regions, or are at most mom & pop stores of which the general public has never heard used, including defendant until this case was brought. Defendant has learned of them only through extensive searches through databases and business

records,[11] and there are no commercials on television or on the radio any of these names of which anyone is aware. Furthermore, trademark registrations, business name registrations and domain name registrations are not evidence of use. *See* McCarthy § 11:88 ("Third party registrations are not evidence of use 'so as to have conditioned the mind of prospective purchasers'"). The mere existence of a registration does not mean that the owner is using the name or mark and provides no probative information that consumers would know the name or mark exists. *See Miss Universe, Inc. v. Little Miss U.S.A.*, *Inc.*, 212 U.S.P.Q. 425, 429 (N.D. Ga. 1981) ("[T]he Fifth Circuit refused to assume, even from evidence of federal registration, that third-party marks were in use.") (citing *Turner v. HMH Publishing Co.*, 380 F.2d 224, 228 n.2 (5th Cir. 1967), cert. denied, 389 U.S. 1006 (1967)).

These small, insignificant and unknown or virtually unknown records do not weaken the REGIONS mark. "[U]nauthorized use of a mark does not necessarily render a mark weak. The proper inquiry is whether the third party use significantly diminishes the publics perception that the mark identifies services connected with the owner." *The Breakers of Palm Beach, Inc. v. Int'l Beach Hotel Development, Inc.*, 824 F. Supp. 1576 (S.D. Fla. 1993); Univ. of Ga., 756 F.2d at 1545, n.27. *See also Jellibeans*, 716 F.2d at 841 n.20 ("The fact that other local businesses used the same mark to identify unrelated products, the district court properly held, did not dilute the strength of Jellibeans, Inc.'s mark").

Others are business records of the word "Region" instead of "Regions." Third party listings of "Region" do not detract strength from "Regions," particularly where the marks at issue are both REGIONS. Dr. Turner recognized that there is a significant difference between

---

[11] Defendant has only hearsay evidence of use and has submitted no actual evidence of third party use of a REGIONS mark.

"Region" and "Regions" when he testified as to this difference and explained that he chose "Regions" and never considered "Region." Turner Tr. 115-16.

None of the names or marks that defendant has identified has caused any known confusion with Regions in sharp contract with the immediate and substantial confusion caused by defendant's use of the REGIONS mark. When Regions has identified confusingly similar uses or potential uses, it has objected by sending a cease and desist letter. Regions have sent more than 300 such cease and desist letters and have been successful in preventing and stopping infringement of its mark. Virtually every objection by Regions to another's use of another REGIONS mark has ended. Other than defendant Regions University, Regions is unaware of any case of the REGIONS mark that has caused confusion that it has not been able to stop. Mehlman Tr. 196.

Accordingly, the facts of this case are very different than the facts of the *Amstar* case relied upon by defendant. There, the word "Domino" was the subject of 72 registrations at the USPTO and "extensive evidence" of third party use of the Domino name dating back to 1885. *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 259 (5th Cir. 1980). There was also evidence that the plaintiff had not been diligently protecting its rights in the DOMINO mark because it had not objected to 72 third-party registrations of the mark DOMINO, and did not even bring suit against the defendant until 10 years following the defendant's first use of the DOMINO mark. *Id.* at 265.

Here, there are very few instances of another's use of REGIONS or in the marketplace or of other REGISONS registrations. Regions is vigilant in protecting its mark and has successfully persuaded many business operators and domain name owners from using its mark. Regions has objected to defendant's use of REGIONS UNIVERSITY within a month of its first use and only

a couple of weeks after its public announcement.  Accordingly, *Amstar* is inapplicable to the instant facts, and Regions continues to enjoy substantially exclusive use of the REGIONS name and mark.

**2.     Plaintiffs and Defendant's REGIONS Marks Are Similar**

Regions uses the mark and name REGIONS alone.  In addition, Regions uses REGIONS with various generic descriptors as marks and names for its various businesses and services.  These include REGIONS MORTGAGE, REGIONS INSURANCE GROUP, REGIONS BANK, REGIONSNET, REGIONS PREFERRED BANKING, REGIONS CHARITY CLASSIC and REGIONS UNIVERSITY.  Regions is commonly known and referred to as "REGIONS."

Defendant uses REGIONS and the generic descriptor University for its mark REGIONS UNIVERSITY.  Defendant also frequently uses REGIONS alone as its name.  For example on its website on its homepage is the quotation "Is *Regions* Online learning program for me?" and on its FAQ page it begins "What degrees are offered at *Regions*?"  Also other examples of the many uses of Regions alone on that page are:  "Are all *Regions* degrees offered fully online?'; "To find our degree offerings, go to *Regions*' homepage . . ."; In addition, *Region's* Turner School of Theology is . . . ."; "Does *Regions* accept military educational benefits?"; "Much of the information about *Regions* library can be accessed at . . . ." and so on.  (emphasis added).  Regions University has a website address: www.regions.edu.  Similarly, in its online Academic Catalog defendant frequently refers to itself simply as "Regions."

Also, the public and the press naturally refer to Regions University just as "Regions."  In the only known newspaper article about defendant after it name changed the headline is "*Regions*" grads come from near and far."  Marmer Decl. Ex. F.

Accordingly, defendant's comparison only of the marks REGIONS BANK with REGIONS UNIVERSITY is somewhat disingenuous and does not reflect commercial reality. *See* Def. Br. at 34.

In fact, the parties both use the marks REGIONS and REGIONS UNIVERSITY – while Regions uses many other REGIONS based marks. Accordingly, the parties use the identical marks and the distinctive element of their marks is plaintiffs core mark and name REGIONS. This is just inescapable reality.

Defendant seeks to distinguish the parties REGIONS marks by their stylization. First, it is well-known that a word mark is the dominant element of stylized mark. McCarthy § 23:47; *Herbko Int'l., Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1165 (Fed. Cir. 2002); *see also* Frehling, 192 F.3d at 1337. After all, a mark is referred to by its name, not its stylization. *See Virgin Enters.*, 335 F.3d at 149 (finding similarity where defendant used same name as plaintiffs despite presence of logo). Second, defendant's initial stylization used for REGIONS UNIVERSITY is remarkably similar the stylization used by Regions for its REGIONS and REGIONS UNIVERSITY marks as appears below:



Exs. 42, 43, 65.

Third, the stylizations for marks change. The REGIONS mark has undergone three changes in stylization since the adoption of REGIONS in 1993 – two changes in stylization have occurred in the last three years – and all three are concurrently in use. Yet, not even defendant suggests, that anyone would think that different stylizations indicate different REGIONS. Defendant, itself, in the short time that it has used REGIONS UNIVERSITY.

Forth, stylizations are often not used and often make no impression.  For example, the REGIONS and REGIONS UNIVERSITY marks are without stylization in radio ads, television voice overs, word of mouth or newspaper headlines or stories.  And, when they do appear the public does not focus on trademark stylization when driving down a highway and seeing REGIONS or REGIONS UNIVERSITY on a billboard or flipping through a newspaper or magazine.

Moreover, contrary to defendant's claim (Def. Br. at 36) there is no inference that services are unrelated merely because the trademark examiner at the USPTO passed the REGIONS UNIVERSITY trademark application to publication without citing any of the Regions' REGIONS mark.  In fact, the REGIONS UNIVERSITY mark is passed to publication, not to registration.  The USPTO, recognizing the limitations of the examination process, passes a mark on to publication to allow persons who believe that they would be harmed by the registration of the mark to oppose the application.  *See Compton v. Fifth Avenue Ass'n*, 7 F.Supp.2d 1328, 1333 (M.D. Fla. 1998) (explaining that cancellation and opposition proceedings are the "second backstop" to ex parte examination).  Regions opposed the REGIONS UNIVERSITY application based on its REGIONS mark and name.  Marmer Decl. Ex. F.

### 3.    The Parties' Services Are Related

Where marks are identical the goods or services don't need to be that close.  *In re Shell Oil Co.*, 992 F.2d 1204, 1207 (Fed. Cir. 1993).

Services need not be identical but only need to be related in some way.  *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1179 (11th Cir. 1994) (explaining that confusion does not require competition).  Regions is a financial institution, but in many ways, Regions and its services are related to colleges and universities.

Regions contributes millions of dollars for sponsorships and charitable contributions to college conferences like the SEC, the Sunbelt Conference and many individual colleges and universities. It actively and prominently advertises and promotes these sponsorships and contributions. Sponsorships and association with a well-known and respected institution that possesses significant goodwill is worth a lot. The public is aware of these sponsorships and that wealthy corporations and individuals often contribute to schools and universities. Abernethy Rep. 28.

The public also knows that often where a significant contribution is made that it is very typical for a person or a business to sponsor a university or donate much money to a university. In honor of such donations and sponsorships, universities often name buildings, schools and even the name of the university in the donor or sponsor's honor. Examples abound: Duke University was named after James Duke; Vanderbilt University was named after Commodore Cornelius Vanderbilt.

Defendant is well aware of the kind of associations, positive and negative, that might be made between universities and individuals and corporations. Concern with an association was one of the principle reasons discussed for not choosing Turner University even though the school already had a Turner School of Theology and its founder was named Turner. Turner Tr. 89.

Also, defendant's attorney warned of "confusion as to sponsorship" as to various Turner companies. Ex. 28.

Regions provides hundreds of millions of dollars of loans for students. Even for defendant's students, Regions has provided in 2005 and 2006 more than $500,000 in loans for students attending SCU. Ex. 50-51.

The connection in the public mind between Regions and educational services is further enhanced by the many educational seminars, presentations and talks concerning banks and other financial matters to the public and to schools of all levels. Regions employees have taught grade students and college students about money and finances. It provides educational scholarships at various universities and also has a matching program for educational scholarships.

Regions has its own Regions University for corporate training in which employees take various courses on financial topics organized into colleges. In 2006 alone, 20,000 employees took courses at Regions University – a population in one year significantly larger than the combined enrollment of defendants entire history under its various names. That Regions University is known outside of Regions is shown by defendant's own knowledge of Regions' Regions University when defendant chose Regions University.

### 4.    The Parties Serve the Same Customers and Retail Markets

Regions has millions of customers. They are everyone who is old enough to have a bank account. Abernethy Rep. 13. "A very important part of Regions customer base are ordinary people needing routine banking services." *Id.*; *see also* Dunman Tr. 38. Regions University target customers necessarily overlaps the broad REGIONS customer base. The target audience for a Regions University television commercial "[w]ould be an individual 25 to 55, young professional or a mother at home, someone who needed to finish their degree or is transferring, someone who wants to further their education, someone who already has a bachelor's. Usually it's more of a professional – you target more of a professional market." Costanza Tr. 44.

Many of Regions' customers and Regions University customers are not sophisticated purchasers. "[T]he wide range of products offered [by Regions] targets almost any adult or child with enough money to open a basic or savings account. For this reason, the current and potential customers of Regions Bank are no more sophisticated than the general population." Abernethy

Rep. 14.  Because the market includes individuals without a high school diploma or a high

degree of familiarity with the English language, "some of Regions customers would have far less

education and sophistication than the general population."  *Id.*

Likewise, Regions University targets a diverse customer base including persons who

have only a high school diploma or GED equivalent, persons who have begun college but are

transferring, and persons who are at home without previous education.  Costanza Tr. 44.  As

Exhibit 113 explains, undergraduates who are older than 20 need not take or submit to Regions

University scores for standardized tests such as the SAT or ACT.  Ex. 113 at  2018.

Even sophisticated members of the public can be confused, particularly where, as here,

the parties' marks are identical in their distinctive element.  Merely because someone is

sophisticated does not mean that the person is sophisticated about trademarks or divining the

source of origin of goods or services.  *Cf. E. Remy Martin & Co. v. Shaw-Ross Int'l Imports*, 756

*F.2d 1525, 1530 (11th Cir. 1985) (finding in a case regarding cognac and brandy, "[t]o us it*

appears quite likely that, even assuming a sophisticated consumer from the drinking world, such

a consumer could easily conclude that Remy Martin had undertaken the production and sale of

wine and that its name and goodwill therefore attached to Myers' product, both products

originating in France").

Indeed, here many of the persons who were confused are sophisticated.  The first instance

of actual confusion known, the day after defendant's announcement was an email from Dr.

Wilson Luquire.  "Is this related to the Bank and if so many I applaud you with double

congratulations!!!!!!  Ex. 35.  Jack Galassini saw a REGIONS UNIVERSITY commercial and

thought the school might have some kind of relationship with Regions Bank."  Galassini

Affidavit.

### 5.    The Parties Use the Same Advertising Media

Regions and Regions University use the same advertising media and advertise their services in the same markets. Defendant has admitted this fact. Def. Br. 41. Regions University advertises on television, radio, billboards, magazines, newspapers, merchandising and the Internet. Exhibits 43 and 123 show the areas in which Regions has concentrated its advertising: it has advertised exclusively in the Old South, save for one national cable television commercial. It has advertised mostly in Alabama and Tennessee, the locations of Regions University's campuses, and states in which Regions is universally recognized.

Regions advertises using the same media in the same geographic footprint, and also on national television and the Internet. *See* Peters Tr. 112-13. Defendant is well aware of the overlap. Dr. Turner said that he recalls seeing the Regions name in television commercials and that he has seen Regions newspaper advertisements. Turner Tr. 10-11.

This overlap in advertising is a reason why there have been so many instances of confusion.

### 6.    Defendant Chose Its For-Profit REGION UNIVERSITY Name To Take Advantage of the Goodwill Represented by the Famous REGIONS Mark and to Project Itself as an Institution of National Prominence.

Defendant's intent is not a necessary element in a claim for trademark infringement or unfair competition, but it is, as the Eleventh Circuit instructs, "[t]hat a latecomer adopts another's name, deliberately seeking to capitalize on the other's reputation and benefit from the confusion, is an important factor for a court." *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1508 (11th Cir. 1985). A bad faith intent alone may even justify a finding of infringement: "If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that

there is confusing similarity." *Frehling*, 192 F.3d at 1340; *Am. Farmer Bureau*, 935 F. Supp. at 1548, citing *Babbit*, 38 F.3d at 1179 1994) ("A likelihood of confusion can be found as a matter of law if the defendant intended to derive benefit from the plaintiff's trademark").

People who adopt another's mark to take advantage of the goodwill of another's well-known mark usually do not admit their intent and defendant does not do so in this case. "[I]ntent, as the district court noted, must often be proved by circumstantial evidence." *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 843 (11th Cir. 1983). Usually, the facts and circumstances surrounding second comer's adoption and use reveal his true intent. *Id.*

Here, the circumstantial evidence surrounding defendant's adoption and use of the Regions University mark shows as a matter of law defendant chose the REGIONS UNIVERSITY mark with the intention of taking advantage of the goodwill of the famous REGIONS name.

Defendant's purpose, as revealed by its Board minutes, in choosing a new name could not be clearer – the school needed a "for-profit type name" "to increase enrollment in areas such as business in order to support our degrees in the Turner School of Theology." Turner Tr. 72-74, Ex. 20 at RU 110. The institution was seeking tuition-paying students in business and other professional and applied degree programs and it decided that business students "if they have a business degree handing on their wall, they would rather it not say Christian." Turner Tr. 74.

The other purpose in changing the name, as set out in the Board's resolution, was to "assist the University in projecting itself as a nationally recognized school of prominence." Ex. 31. Defendant whatever its merits, is not in any sense "a nationally recognized school of prominence." The school has never been referred to as a nationally recognized school of prominence in any publication, article, report or by any person. Crosby Tr. 55.

Accordingly, defendant was looking for a name that, apart from any goodwill that it had created, would allow it to indicate to the potential students who were the targets of its marketing efforts that defendant was an institution of national prominence – something that it was not.

So, what did defendant do? It chose the probably the most prominent for-profit name in its state of Alabama – the name of the state's largest financial institution and largest corporation, a name having about 100% recognition and the name of an institution that, in fact, was an institution of national prominence.

Regions is so well known and powerful that when Rex Turner told his advertising person, the name Regions immediately came to mind.

Further, Rex Turner and his board were sensitive to the association that might be made between it and a famous name. The school did not choose the name Turner in 2005 because of a perceived negative impact if there were an association with Ted Turner. And, the following year its trademark attorney advised that the USPTO might refuse registration of Turner University based on a number of Ted Turner marks "on grounds of likelihood of confusion as to association or sponsorship." Ex. 28.

The adoption of the REGIONS name gave defendant precisely what it was seeking. REGIONS provided the benefit and association with a for-profit institution. Just the kind of benefit Regions itself pays millions of dollars annually for with its sponsorships of the SEC and Sunbelt conferences and many colleges and universities. Further, the REGIONS UNIVERSITY name gave it credibility for its business degrees that the school intended to drive the acquisition of tuition-paying students to support the Turner School of Theology. And for the school as a whole, its new name REGIONS UNIVERSITY, that incorporates Regions' famous name, allows it to project itself as a national institution of prominence.

Defendant claims that REGIONS was chosen only because "regions" suggests the Christian mission of going to all the regions of the world to preach the gospel. This is pretextual. Regions might have a felicitous connotation of more than one region or many regions and this Christian connotation. But, defendant could have chosen many words conveying this suggestion. It is telling that none of the other names – Turner, Rex, Providence, Regal or Masters – considered had any suggestion of this Christian prescription or geographical breath. And almost any word, if you think hard enough, could have a same Christian or biblical suggestion. For example, Dr. Turner was asked the Christian connotation of "Masters." He said: "Jesus, the Master Teacher." But then he had no explanation why the word chosen was "Masters" rather than "Master." Turner Tr. 71-72. It appears that, just as with the word "Masters," and "Regal," the word "Regions" was chosen and then a Christian connotation was developed to satisfy the school's Christian contingency.

Defendant seeks to hide behind a short email sent on July 27, 2006 from its trademark attorney regarding the "registerability of the marks Turner University, Rex University and Regions University". Ex. 28. The email is inadequate on its face. It makes no reference to any REGIONS mark, even the REGIONS CHARITY CLASSIC, that came up in the attorney's search of the USPTO records. Ex. 501. It makes no evaluation of the risk of use of the Regions University mark or any reference to the use of any mark' it only concerns registerability. It does not refer to any sources searched other than simply the USPTO database. At most, the search is a preliminary, screening search for registerability and to spot obvious conflicts to avoid unnecessary expense.

> The purpose of a preliminary search (also known as a "screening" or "knockout" search) is to spot obvious conflicts at the outset, thereby avoiding the expense and time required for a full search. The preliminary search uses a limited number of resources that the

> searcher deems most likely to yield relevant marks with minimum
> effort.  It serves to rule out marks which are clearly unavailable,
> not to reach a definitive answer on the availability of those marks
> which survive.
>
> If a mark survives its initial screening, the usual procedure is to
> request a professional search firm to conduct a full search.  The
> standard full search involves a broader array of federal and
> common law sources than the typical preliminary search.  These
> typically include federal applications and registrations, state
> trademark registrations, business names, and listings from trade
> directories and industry databases.

Glenn A. Gundersen, *Trademark Searching* (1994).  No full search was conducted.  Defendant adopted the REGIONS UNIVERSITY mark the day after the search.

Defendant's intent is most clearly shown by the information that he withheld from his counsel – crucial information that would be necessary for a trademark counsel to provide an opinion that truly considered and evaluated the risk of adopting the REGIONS UNIVERSITY mark.  Dr. Turner in his call to his trademark attorney, about search and opinion, mentioned that there was a Regions bank in Alabama.  When his attorney told Dr. Turner that he had not heard of the bank, Dr. Turner told him nothing.  Turner Tr. 137.  So, Dr. Turner had Regions Bank on his mind, but provided his attorney absolutely no information that would give him any idea of how well known the REGIONS MARK is or the size of Regions.

An infringer can be shown in several ways, including, for example, that a person's choice not to provide all the relevant facts to his attorney demonstrates that he did not reasonably and honestly rely on the opinion of an attorney.  *ECO Mfg LLC v. Honeywell International, Inc.*, No.1:03-CV-0170-DFH, 2003 WL 18888988 (S.D. Ind. Apr. 11, 2003), at *6.

Defendant's bad faith is further shown by its persisting in its adoption of the REGIONS UNIVERSITY mark despite the actual confusion arising from its use that began the day after defendant's adoption of the REGIONS UNIVERSITY name.  Even more telling of defendant's

intent is the absence of any concern by Dr. Turner that people believed that his school was sponsored or affiliated with Regions.

### 7.    Substantial Confusion Has Arisen From the Use of REGIONS UNIVERSITY

Defendant only adopted REGIONS UNIVERSITY a year ago and only began advertising it this year.  In that short time, Defendant's use of REGIONS UNIVERSITY and REGIONS has caused a significant amount of confusion as appears from the many instances of actual confusion in the record.

More than twenty people have inquired as to the connection or affiliation of defendant with Regions.  Some have believed that Regions the financial institution had started a university or bought a university.  Others have inquired as to an affiliation or connection between Regions and Regions University.

Notably, this evidence of actual confusion is from all sectors: from the consuming public, from Regions employees, from persons affiliated with Regions University and former students of Regions University, and from telephone operators.  Dr. Turner has admitted that persons have inquired of him whether Regions University is affiliated with Regions Bank.  In response to the question, "[D]id any folks inquire as to affiliation between Regions University and Regions, the financial institution that you recall?" Dr. Turner testified, "People – You know how people will do.  They'll come up and tell you, oh, y'all must have gotten some money or something."  Turner Tr. 179-80.  And, when asked if he was surprised at the number of times people had indicated that they thought there was some sort of affiliation between the Regions University and Regions, Dr. Turner responded, "[I]t was obvious to me that there was not confusion, but that the people were seeking or wanting to know affiliation, if there was any affiliation between the two, but that they understood the difference between a bank and an accredited university."  Turner Tr. 264.

Moreover, the amount of confusion in this case is significant. "Actual confusion by a *few* customers is the best evidence of likelihood of confusion by many customers." *American Farm Bureau*, 935 F. Supp. at 1548 (emphasis added) (citing *Freedom Savings & Loan v. Way*, 757 F.2d 1176, 1185 (11th Cir. 1985)); *see also Texas Tech. Univ. v. Speigberg*, 461 F. Supp. 2d 510, 522-23 (N.D. Tex. 2006) ("Further, 'reason tells us that . . . . very little proof of actual confusion would be necessary to prove the likelihood of confusion"). For example, Texas Tech had only three instances of confusion as to whether it had licensed its marks to the defendant, and the court found this evidence sufficient in finding actual confusion. *Texas Tech.*, 461 F. Supp. 2d. at 523.

Many other cases involving universities as parties have also found infringement where there was evidence of confusion as to sponsorship or affiliation. *See, e.g.*, *Texas Tech.*, 461 F. Supp. 2d at 523 (at least three customers expressed actual confusion as to whether university had licensed the infringing products); *Bd. Of Supervisors of La. State Univ. v. Smack Apparel Co.*, 438 F. Supp. 2d 653, 662 (E.D. La. 2006) (noting that even if the products were not competing, confusion could exist because consumers may be confused as to sponsorship or affiliation).

In *University of Georgia*, the Eleventh Circuit found fifteen instances of actual confusion persuasive where each instance of confusion related to an inquiry of whether the defendant, a beer brewer, was connected with the University or if the University licensed its mark to the defendant. *Univ. of Ga.*, 756 F.2d at 1546. That no one actually believed the university had gone into the beer brewing business was entirely irrelevant. *Id.* at 1547.

The cases cited by defendant, such as *Nora Beverages*, are inapplicable to the facts of this case. In those cases, the issue was whether a small amount of confusion over many years was significant enough to find that the factor of actual confusion weighed in the plaintiff's favor.

Here, it has been just one year since Regions University announced its name change.  Just days following the name change announcement, Regions University began to receive emails and phone calls from the public asking whether the university and Regions were affiliated or if Regions donated money to the university.  *See* Ex. 35; Response to Interrogatory No. 13 of Plaintiff's First Set of Interrogatories.  Regions has received many inquiries.  See pages – *infra*.

Finally, it is not a remedy that those who have inquired as to affiliation have been informed that there is no affiliation between Regions University and Regions.  Words that seek to correct confusion are "insufficient to remedy illegal confusion.  Only a prohibition of the unauthorized use will sufficiently remedy the wrong."  *Univ. of Georgia*, 756 F.2d at 1547.

### 8.    Defendant's Use of the REGIONS UNIVERSITY and REGIONS Is Likely to Cause Confusion

As appears from the above, a review of the factors shows overwhelmingly that confusion is likely to arise from the use of the REGIONS UNIVERSITY and REGIONS MARKS BY DEFENDANT.  The fame of REGIONS IN Montgomery and Alabama and other the other states where most of defendant's students are located and virtually all its advertising is conducted cannot be seriously disputed.  Also, the marks of the parties REGIONS UNIVERSITY and REGIONS are the same.  The parties' services differ – Regions does not offer secondary education and Regions University does not provide checking services, but Regions has many relationships with colleges and universities, provides educational seminars to its communities and to schools at all levels, Regions has its own corporate training program with the Regions University that has far more participants than defendant's enrollment in all the years it has operated.

Regions University's customers are within the broad customer base of Regions.  Region and Regions University advertise through the same media – television, radio, billboards, newspapers and the Internet.

Regions University's intent is obvious.  It wanted a "for-profit kind of name" that would permit itself to project itself – misleadingly – as a nationally recognized university of prominence.  And that is exactly what it got when it picked REGIONS as the University's name.  Defendant chose probably the most well-known for-profit name in Alabama – its number 1 financial institution and corporation – that was an institution of national prominence, one of the top 10 financial institutions in the United States.

And, defendant's use of REGIONS UNIVERSITY did cause confusion immediately – as evidenced by the instances of actual confusion, generally rare, starting the day after the announcement of the name change.  Most strikingly is that defendant's president, Rex Turner, who chose the name Regions University, admits the confusion that has arisen, but takes the view that confusion as to sponsorship and affiliation does not count.  But is does count.  State and federal laws prohibit confusion as to sponsorship and affiliation.  It is beyond peradventure that confusion is likely to arise from the parties' use of REGIONS AND regions university and, in fact, is occurring.  This Court, now, under the material facts that cannot be in dispute, should grant Regions' motion and enjoin defendant's further use of REGIONS UNIVERSITY.

**C.    Regions Is Entitled to Summary Judgment on its State Dilution Claim**

**1.    Defendant's Use of the Famous REGIONS Mark Constitutes Dilution Under Alabama State Law**

Alabama law prohibits dilution of distinctive quality marks or names notwithstanding the absence of competition between the parties or the confusion of source or services. Specifically, Ala. Code 8-12-17 provides:

> Likelihood of injury to business reputation or of dilution of the
> distinctive quality of a mark registered under this article, or a mark
> valid at common law, including a trade name valid at common law,
> shall be a ground for injunctive relief notwithstanding the absence
> of competition between the parties or the absence of confusion as
> of the source of goods or services.

*Id.* Professor McCarthy explains dilution and its underlying rationale as follows:

> The dilution theory grants protection to strong, well-recognized
> marks even in the absence of a likelihood of confusion, if
> defendant's use is such as to be likely to diminish or dilute the
> strong identification value of the plaintiff's mark even while not
> confusing customers as to source, sponsorship, affiliation or
> connection.  The underlying rationale of the dilution doctrine is
> that a gradual attenuation or whittling away of the value of a
> trademark, resulting from use by another, constitutes an invasion
> of the senior user's property right in its mark and gives rise to an
> independent commercial tort.

McCarthy of Trademarks, *supra*, § 24:72 at 24-174.

Dilution is illustrated  in the Alabama court case *Arthur Young, Inc. v. Arthur Young & Co.*, 579 F. Supp. 384 (N.D. Ala. 1983).  There, the court found that where a mark is strong and distinctive through extensive promotion over many years, the use of a virtually identical mark was likely to dilute the mark's distinctiveness.  *Id.* at 390.

By any measure the REGIONS mark of Regions is famous, strong and distinctive in the State of Alabama.  The mark has been extensively promoted for more than 14 years in all markets of Alabama.  Regions is the number one financial institution in Alabama.  Even defendant's president, who has been banking with Regions for decades has testified that everyone knows who Regions is.  Indeed, everyone in Alabama does know Regions – Regions has a close to 100% familiarity level and an extraordinarily high unaided awareness level in Alabama for its REGIONS mark.  And, few others use the Regions name in Alabama.  Regions was the only REGIONS name in the Montgomery White Pages before defendant changed its name to Regions University.  *See* Ex. 29.  Other third party use is minimal, is obscure use

sometimes by one- or two-person companies or is use to which Regions has protested.  Courts have in the past found such small and obscure uses to be insignificant to the strength of an otherwise strong mark.  In *University of Georgia*, for example, the court found that the "fact that many other colleges, junior colleges and high schools use an English bulldog as a symbol does not significantly diminish the strength of [the university's] mark."  University of Georgia, 675 F.2d at 1544.  The court reasoned that some schools were geographically remote or used a different color scheme.  "The remaining schools are so few in number and small in size that they pose no real threat to the strength of [the university's] mark."  *Id.*

This evidence of the fame of Regions' mark is really representative of the singular place that the REGIONS mark holds in consumers' minds.  When people in Alabama think of the word "Regions" in the context of an institution, they think of the plaintiffs – as Laina Costanza did when Rex Turner said he was thinking of using "Regions University" as the school's name.  The use of the same mark REGIONS by defendant means that Regions has lost that unique position of being the only known REGIONS entity.  When people in Alabama hear or see the word "Regions" they now have to think and determine who owns the Regions name.  Alabama's state dilution act is designed to prevent this kind of injury to plaintiffs and to allow them to continue to enjoy the singular, unique position that it has built in the minds of consumers over the past nearly 15 years.

>    **2.     Defendant's Use of REGIONS UNIVERSITY Is Likely to Cause Dilution of Plaintiffs' REGIONS Mark under the Federal Dilution Act**

Federal law also prohibits dilution of strong, distinctive marks.  It protects the owner of a famous mark against another's adoption of a mark that is likely to cause dilution, whether or not actual or likely confusion or economic injury exists.  The Trademark Dilution Revision Act of 2006 provides:

> Subject to the principles of equity, the owner of a famous mark
> that is distinctive, inherently or through acquired distinctiveness,
> shall be entitled to an injunction against another person who, at any
> time after the owner's mark has become famous, commences use of
> a mark or trade name in commerce that is ***likely to cause dilution***
> by blurring or dilution by tarnishment of the famous mark,
> ***regardless of the presence or absence of actual or likely***
> ***confusion, of competition, or of actual economic injury***.

Trademark Dilution Revision Act of 2006, H.R. 683 (109th), Lanham Act § 43(c)(1), 15 U.S.C.

§ 1125(c)(1) (emphasis added).

The Act defines dilution by blurring as an "association arising from the similarity

between a mark or trade name and a famous mark that impairs the distinctiveness of the famous

mark." *Id.* at § 1125(c)(1)(B)(1).  Plaintiffs' REGIONS Mark Is Distinctive

As discussed in detail in Section II(A)(1) and (b) above, the REGIONS mark of Regions

is inherently distinctive, and has strong market power.  Consumers recognize the REGIONS

mark as belonging to Regions.

### a.    Plaintiffs' REGIONS Mark Is Famous

Fame has a legal test under 15 U.S.C. § 1125(c):

[A] mark is famous if it is widely recognized by the general consuming public of
the United States as a designation of source of the goods or services of the mark's
owner.  In determining whether a mark possesses the requisite degree of
recognition, the court may consider all relevant factors, including the following:

(i) The duration, extent, and geographic reach of advertising and publicity of the
mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services
offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act
of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).  As Regions has demonstrated, its federally registered REGIONS mark is widely recognized by the general consuming public of the United States.  Regions is certainly widely known in its 16 state footprint with extraordinarily high aided and unaided awareness.  Beyond these 16 states, Regions has a strong internet presence, is the sponsor of sports teams whose competitions, and therefore Regions commercials, are nationally televised, is the sponsor of a widely known golf tournament in Alabama and provides banking services, mortgage and lending services, insurance services and other financial services to customers regardless of their residence.  Its use has been consistent and prominent over the past 14 years and has been advertised widely throughout the 16 states, on cable television and on the Internet. Its sales continue to grow to the extent that Regions has $143 billion in assets as of 2006.

        **b.**       **Defendant's Use of the REGIONS Mark Is Likely to Cause Dilution by Blurring**

To determine whether a mark or trade name is likely to cause dilution by blurring, the Court may consider all relevant factors, including the following:

> (i) The degree of similarity between the mark or trade name and the famous mark.

> (ii) The degree of inherent or acquired distinctiveness of the famous mark.

> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

> (iv) The degree of recognition of the famous mark.

> (v) Whether the user of the mark or trade name intended to create an association with the famous mark.

> (vi) Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B).

As Regions has explained, defendant has adopted the same name Regions as plaintiffs. Plaintiffs' REGIONS mark is inherently distinctive by means of its federal registrations and is

strong in the market. Plaintiffs have had substantially exclusive use of the REGIONS mark since its adoption in 1993. Very few other uses of the name Regions exist and defendant has not introduced any evidence of use except for hearsay. Regions' REGIONS Mark is recognized widely; the brand awareness studies dating back to 2000 show close to 100% recognition in some of its markets and strong unaided awareness levels in its markets. As Regions explained in great detail, defendant's intent to create an association with the famous mark is evident from defendant's knowledge of the REGIONS mark, the circumstances surrounding the adoption of its mark, the benefits it would gain from adopting Regions' famous REGIONS mark, the lack of an opinion as to the availability of the mark for use and a lack of an opinion on the risks associated with using the REGIONS mark, and the intentional omission of any explanation whatsoever of Regions to the attorney charged with evaluating the name Regions University for registrability. Furthermore, Regions has listed in Section II(B)(4) the many instances of actual associations between defendant's name and Regions' famous REGIONS mark.

Accordingly, the evidence points to the conclusion that defendant's use of the REGIONS mark is likely to dilute the distinctiveness of Regions' famous REGIONS mark and defendant should be enjoined from such use.

Respectfully submitted this the 17th day of August, 2007.

/s/ William G. Pecau
One of the Attorneys for Plaintiffs Regions Asset
Company, Regions Financial Company and Regions
Bank

**OF COUNSEL:**

Charles B. Paterson (PAT018)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
cpaterson@balch.com
pclark@balch.com

William G. Pecau
Rachel M. Marmer
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone:  (202)429-6244
Facsimile:  (202)429-3902
wpecau@steptoe.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and service will be perfected upon any CM/ECF participants electronically and by overnight mail service a copy of the foregoing document to all participating and non-CM/ECF participants this the 17th day of August, 2007:

| | |
|---|---|
| Victor T. Hudson | James E. Shlesinger |
| William W. Watts, III | Shlesinger, Arkwright & Garvey LLP |
| Hudson & Watts, LLP | 1420 King Street |
| Post Office Box 989 | Suite 600 |
| Mobile, Alabama 36601-0989 | Alexandria, Virginia 22314 |

/s/ William G. Pecau
Of Counsel