IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| REGIONS ASSET COMPANY, | * | |
| Plaintiff, | * | |
| VS: | * | CIVIL ACTION NO. 2:06cv882-MHT |
| REGIONS UNIVERSITY, INC. | * | |
| Defendant. | * | |

**MOTION TO STRIKE DECLARATION OF JIM JAGER**

Comes now defendant and moves to strike the declaration of Jim Jager and, in support of said motion, shows unto this Honorable Court as follows:

1. The Pre-Trial Order provides at Section 8 that the plaintiffs must disclose the identity of any person who may be used at trial to present evidence under Rule 702, 703 or 705 and provide the reports of retained experts on or before June 15, 2007.[1] On that date, plaintiffs disclosed the expert testimony of only one witness, Avery Abernethy. The disclosure of Abernethy's expert testimony is attached as Exhibit A. Abernethy's report is so long and rambling that it is difficult to distinguish his opinions from the facts upon which he relied in order to form his opinions. Because of that, at his deposition, he highlighted those portions of his report that constitute his opinions. (Abernethy P32).[2] In his expert report, Abernethy heavily relied upon brand awareness surveys made by New South Research.

---

1 The court denied plaintiffs' motion to extend the time for expert disclosures. (Doc. 34).

2 Because highlighting will not appear on an electronic scan, those parts have been underlined on Exhibit B. Excerpts from the deposition of Abernethy are attached as Exhibit B.

2. From the "Report," nothing could be reasonably ascertained about the bona fides of the brand awareness surveys such as their methodology, etc. (Exhibit A); only that Abernethy relied upon brand awareness studies made by New South Research. At his deposition on August 13, it was learned that Abernethy made no inquiry about the fundamental basis for the surveys. For instance, he does not know the wording of the questions; he does not know whether the surveyors used a representative sample; he does not know whether or not a fair, correct method of questioning was used by the interviewees; he does not know whether or not the persons conducting the survey were recognized experts; he does not know whether the data gathered was accurately reported; he does not know whether the samples, the questionnaire and the interviews were in accordance with generally accepted standards of objective procedures and statistics in the field of such survey; he does not know whether the interviewers were adequately trained in the field. (Abernethy pp. 61, 137-138). These factors come directly from the Handbook for Recommended Procedures for the Trial of Protracted Cases, issued by the Judicial Conference of the United States in 1960, 25 FRD 365, 429 (1960). The factors were adopted by the 11th Circuit in Brook Shoe Manufacturing Co. v. Suave Shoe Corp., 716 F.2d 854 (11th Cir. 1983) as being appropriate to validate survey evidence. Expert trademark counsel would be expected to be aware of these factors and of the need to use them to validate the surveys.

3. Defendant's discovery, fairly construed, requested this information; but it was not produced until after the expiration of discovery. Two months ago, on June 19, the 30(b)(6) deposition of plaintiff was noticed on the following topic:

> "(2) Brand awareness studies including those of the type referred to by Russell Dunman in his deposition at Page 105."

A 30(b)(5) request for documents was included for this topic. The notice is attached as Exhibit C. An earlier, broader notice of deposition had been sent. The original Notice of Deposition that is attached as Exhibit D stated "11. Any and all surveys performed by the plaintiffs, jointly or separately, or contemplated to be performed, in connection with any claims presented in the complaint." It contained a 30(b)(5) request for all documents that pertain or relate to that category. Plaintiffs' counsel responded to both notices with a letter marked as Exhibit 82 to the deposition, attached hereto as Exhibit E. It says that the deponent would testify about "Recognition of REGIONS in general and geographically, and related surveys (5)(7)(11)."[3] His designation was agreed to on Page 10 of the record of Mr. Peters' deposition with the following colloquy: "Mr. Hudson: And I gather because of our other category designation areas, that Mr. Peters will testify about the brand awareness studies that you did produce." "Mr. Pecau: That's correct." And at Page 15 "Mr. Pecau: Right. He's going to testify as to the categories which I think are broadly defined in Exhibit 82." Excerpts from the deposition of Peters are attached hereto as Exhibit F.

4. Accordingly, Scott M. Peters was designed as a 30(b)(6) witness and it was agreed that he would be the spokesman and would testify about all brand aware surveys produced. (Peters, P. 10-11). There was a 30(b)(5) request for documents that pertain or relate to the brand awareness studies.

---

[3] 5, 7 and 11 are categories in the original deposition notice.

5.      No documents concerning the methodology for the survey were produced. As the 30(b)(6) witness, Mr. Peters was unable to respond as to the class of interviewees. (Peters, P.75).  He was unable to say whether the information assembled by New South Research was statistically significant even though he and his department had specific experience in designing surveys.  (Peters, P. 75-76).  As the spokesman for the Bank on this very topic, he said that he couldn't testify about anything concerning the New South Research surveys except what was contained within the four corners of the surveys themselves.  (Peters, P. 79, 93).  From the surveys themselves, Peters was unable to determine the questions that were asked; he didn't even know "what was being surveyed."  (Peters, P. 96).

6.      Plaintiffs waited until the expiration of discovery (August 15) to produce the questions asked by New South Research, even though this information was clearly requested in the 30(b)(5) and 30(b)(6) deposition notice months earlier and even though it was essential to their expert, Abernethy's, opinion.  See Exhibit G attached hereto which is plaintiff's letter of August 15 forwarding the questions which states "Enclosed please find additional documents for production."

7.      Still later, on August 22, seven days after the expiration of discovery and a scant three days before defendant's responsive brief in support of its motion for summary judgment is due, plaintiffs filed the declaration of Jim Jager, president of New South Research attaching to it a stack of documents five inches thick which seem to include, in substantial part, the very same New South Research surveys that were the topic of the 30(b)(6) deposition.  Buried within the stack are the survey questions.  They are attached

as Exhibit H. The Declaration and its exhibits were filed after the fact in a belated attempt to shore up Abernethy's testimony.

8. Not being satisfied with the late production of documents germane to the 30(b)(5) request and essential to Abernethy's opinion, after the expiration of discovery, plaintiffs also seek to designate a new expert. The Declaration is attached hereto without its numerous exhibits, as Exhibit I. Jager's Declaration proffers expert opinions even though he has never been designated as an expert and has never submitted an expert report. He expresses expert opinions that the surveys were "quantitative research surveys which are scientifically conducted and projectable surveys (meaning that the survey results can be replicated with the same results within defined percentages with a defined confidence level and qualitative surveys like focus groups which are not projectable but provide other, more subjective, information about consumers and their attitudes." He sets forth a number of other opinions about the surveys methodology including that the sample was representative, the questions were fair and correct, the persons conducting the survey were recognized experts, etc. He covers all of the 11th Circuit with conclusory opinions. He also opines that the surveys are "scientific quantitative surveys" and states his expert opinion as follows:

> "It is my opinion that the unaided awareness of Regions today in Montgomery would be at least as high as aided awareness of Regions in Birmingham shown in Exhibit A."

9. The Declaration and the documents belatedly produced are due to be stricken for the following reasons:

(a) The documents were requested and available prior to discovery cutoff. They were not produced timely and defendant is prejudiced for having been

unable to question the 30(b)(6) witness, Peters, Abernethy, Mehlman, and others about them.

(b) The Declaration of Jager is a blatant attempt to name a new, different expert over two months after the date provided in the Pre-Trial Order, five weeks after defendant's brief in support of its motion for summary judgment had been filed and three days before defendant's response to plaintiffs' reply brief is due. No expert report, as required by the federal rules and the court's pre-trial order, has ever been filed by Jager.

WHEREFORE, defendant moves the Court to strike the Declaration of Jager together with its exhibits.

/s/victor t. hudson _________________

VICTOR T. HUDSON (HUD012)
Attorney for defendant

OF COUNSEL:

HUDSON & WATTS, LLP
P.O. Box 989
Mobile, AL 36601
(251) 432-7200 Phone

James E. Shlesinger, Esquire
SHLESINGER, ARKWRIGHT & GARVEY, LLP
1420 King Street, Suite 600
Alexandria, VA 22314

CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

William Pecau, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

Charles B. Paterson, Esq.
Paul A. Clark, Esq.
BALCH & BINGHAM, LLP
105 Tallapoosa Street, Suite 200
Montgomery, Alabama 36104

/s/victor t. hudson _________________

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION, and REGIONS BANK,

Plaintiffs,

v.

REGIONS UNIVERSITY, INC.

Defendant.

Civil Action No. 2:06-cv-882-MHT

## DISCLOSURE OF EXPERT TESTIMONY

Come now Regions Asset Company, Regions Financial Corporation, and Regions Bank, Plaintiffs in the above-styled cause, and pursuant to the Uniform Scheduling Order entered in this cause, hereby notify the Defendant that Avery M. Abernethy may be used at trial to present expert testimony. The written report of Avery M. Abernethy is attached hereto as Exhibit A and incorporated by reference herein.

Respectfully submitted this the 15th day of June, 2007.

One of the Attorneys for Plaintiff, Regions Asset Company, Regions Financial Corporation and Regions Bank

OF COUNSEL:

Charles B. Paterson (PAT018)
Paul A. Clark (CLA076)
Balch & Bingham LLP
105 Tallapoosa Street, Suite 200
P.O. Box 78 (36101-0078)
Montgomery, AL 36104
Tel: (334) 269-3143
Fax: (334) 269-3115

William G. Pecau, Esq. (DC Bar # 478341)
Rachel M. Marmer, Esq. (DC Bar # 489606)
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel.: (202) 429-3000
Fax: (202) 429-3902

Exhibit A

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the parties listed below by placing a copy thereof in the United States Mail, postage prepaid and properly addressed to them on this the 15th day of June, 2007:

Victor T. Hudson
William W. Watts, III
Hudson & Watts, LLP
Post Office Box 989
Mobile, Alabama 36601-0989

James E. Shlesinger
Shlesinger, Arkwright & Garvey LLP
1420 King Street
Suite 600
Alexandria, Virginia 22314

Of Counsel

Report by Avery Abernethy for

Regions Asset Company, Regions Financial Corp., Regions Bank v. Regions University, Inc.

6/14/07

**I. - Brief Background of Avery Abernethy**

I am Avery M. Abernethy, Professor of Marketing at Auburn University. I joined the Auburn faculty in 1988. I was promoted to the rank of Professor in 1999. I have taught marketing classes in the undergraduate, graduate, and executive education levels. I received my Ph.D. in Marketing from the University of South Carolina in Columbia in 1988. My major field of study was marketing and my minor was in econometrics. In addition to my graduate classes, I also passed comprehensive written and oral examinations in marketing and econometrics. I also passed a comprehensive oral exam on economics. I am on the editorial review boards of several journals and have published scores of articles in marketing, advertising, and marketing education journals. I have won awards for teaching and research. My vita is attached in an appendix to this report.

I have expertise in marketing, advertising and marketing education. In my Auburn classes I have taught material on marketing strategy, branding, brand equity, trademarks, consumer decision making, advertising, demographics and many other marketing topics. I am paid for my work by Regions in this case at a rate of $250 an hour for work outside of Auburn and $150 an hour for work done in Auburn plus reimbursement of direct expenses.

**II. My Charge -**

I have been asked by Regions for my expert opinion on the following topics:

1] Defining a brand from a marketing standpoint and the goal of branding for a firm. This discussion includes why branding is important; how strong brands build brand equity; how strong brands bring important sales advantages and cost savings to companies. How consumers

view brands and use brand information in their purchase decisions is also covered.

2] The customer base, marketing strategy, and advertising strategy employed by Regions. My opinion of the actions that Regions has taken over many years to build and strengthen its brand. My opinion of the strength of the Regions brand. My opinion of the sophistication of Regions Bank current and potential customers.

3] My opinion of the business, marketing and advertising strategy of Regions University. The target market of Regions University. Marketing reasons for Southern Christian Universities name change. If Southern Christian University could gain anything of marketing value by using the "Regions" name.

4] What is the significance of the Regions brand? How the Regions brand could be effected by another's use of the Regions name.

**III. Evidence Reviewed for this Report:**

I have reviewed the following information in preparation of this expert report. Depositions of Emmett Pollard, Laina Constanza, Russell Dunman, and Rex Turner. Advertisements of Regions Bank and Regions University. The geographic market coverage of Regions Financial and Regions University. Responses to interrogatories. Ad awareness, consumer tracking reports, creative briefs and other marketing materials from Regions Financial Corporation. Phone book information. Web searches using www.google.com. Several Principles of Marketing textbooks referenced in the bibliography of this report.

**IV. Defining a brand from a marketing standpoint and the goal of branding for a firm. This discussion includes why branding is important; how strong brands build brand equity; how strong brands bring important sales advantages and cost savings to companies. How consumers view brands and use brand information in their purchase decisions is also covered.**

1] What is a brand from a marketing standpoint?

"Marketers recognize the powerful influence that products and product lines have on customer behavior, and they work to create strong identities for their products and protect them. Branding is the process of creating that identity. A brand is a name, term, sign, symbol, design, or some combination that identifies the products of one firm while differentiating these products from competitors' offerings" (Boone & Kurtz 2008, pg 378).

"Brands are more than just names and symbols. They are a key element in the company's relationships with consumers. Brands represent consumers' perceptions and feelings about a product and its performance - everything that the product or service *means* to consumers. In the final analysis, brands exist in the minds of consumers" (Kotler & Armstrong 2008, pg 230).

The value of a brand to a company goes beyond just the name or symbol. Brands also include the current and potential customer's perceptions of the product or service. Anything that can lower the attitude of current and potential customers towards the brand causes harm to a company. This is one of the reasons that many companies go to great effort to choose a brand name and symbol different from other brands in the marketplace.

A company wants to control its own destiny. If another company has the same or similar

name or symbol, then consumers can become confused and have less favorable attitudes towards the company and its products due to the actions of a different firm. The actions, values, products offered, and the performance of those products for a different company/brand with the same or similar name can harm the company holding the brand name originally. For example, suppose a shipping company was allowed to trademark the name "Coke Shipping Line." A shipping company is an entirely different industry than consumer beverages. Yet, if a ship owed by "Coke Shipping Line" suffered an accident and damaged the environment, the name "Coke" has been damaged by a very negative association. Consumers would hear the name "Coke" associated with a very negative event. Even if they realized the companies were different, the value of the Coke brand name would be damaged by the actions of the shipping company with the same name. This negative association could lower consumer attitudes and harm current and future sales.

Avoiding negative brand associations is one of the reasons celebrity endorsers are often immediately dropped from their contract if they have negative publicity. Just recently Michael Vick, the quarterback for the Atlanta Falcons, was dropped from a major endorsement deal for AirTran Airways because of controversy surrounding an alleged dog fighting ring. Some companies fear negative associations for their brands so strongly that they use animated "spokes characters" for their brand. The Pillsbury doughboy never gets in the news for a drunk driving arrest.

Strong companies sometimes buy weaker firms in part to purchase a distinctive and well known brand name holding favorable consumer attitudes. For example, SBC Communications purchased AT&T and renamed the company AT&T because of the well known and favorably

viewed brand name. Similarly, Wachovia Bank was purchased by First Union (a much larger bank covering a bigger geographic market). The merged company took the name Wachovia because the name is so distinctive from competitors. The managers of the merged bank thought that having a distinctive name was so important that they were willing to spend a considerable amount of money promoting the new brand name "Wachovia" in the many markets served by First Union but not Wachovia.

2] The goal of branding for a firm and why branding is important.

Firms have multiple, nonexclusive goals for branding. They want the brand to be recognized by everyone who is a current or potential customer. If one is familiar with a brand name they often will pay a premium price on that information alone. Often widespread brand name awareness by itself can allow companies to successfully charge a premium price. For example, Morton Salt charges a considerably higher price for a product identical to other brands of household salt excepting the brand name, symbol, and mark.

Marketers want consumers to have a favorable perception, attitude, and feeling about the brand. The brand name can even become the basis on which a whole story can be built around a product's special qualities (Kotler & Armstrong 2008, pg 226). Marketers use advertising, employee training, products offered, music, lighting, colors, public relations, packaging and a host of other tools designed to work together in unison to present a single favorable perception, attitude and feeling about the brand to the target market. A strong brand name can evoke a strong positive emotional response by the target market. One good example is Harley-Davidson Motorcycles. These motorcycles are more expensive than competing brands. Some people buy

the motorcycles, clothing and other products with the brand name to more closely associate themselves with Harley-Davidson identity.

A company with a successful brand can more easily market and sell other products related to the primary brand. This is why another goal of branding is to promote a clear identity in the consumer's mind. If a brand has a strong, positive identity it is easier to sell more units, charge a higher price, and successfully launch new products. This is why you often see the same brand name used across a variety of related product such as Arm & Hammer baking soda, laundry detergent and toothpaste. A strong brand name gives the company credibility with current and potential customers and makes it easier to successfully launch new products or extend product or service offering to new geographic markets.

A positive feature of a good brand name is one that is easy to pronounce, distinctive, and extendable to additional products or services (Kotler & Armstrong 2008, pg 232). Many companies want their brands to have a name distinct from other companies and products both within an industry and across the entire marketplace. For example, when you think of heavy duty mowing equipment (called rotary cutters), the first name that comes to mind for many is "Bush Hog." The name is well recognized and respected for quality, performance and durability. In addition, the name "Bush Hog" is not used by other companies or brands both within agriculture and in other industries. This is an example of a brand name that is distinct, has a very clear identity, high name recognition, and a clear brand identity/personality.

3] Why branding is important and how strong brands build brand equity. How strong brands bring important sales advantages and cost savings to companies.

Successfully managing brands is one of the most important skills of a marketer. "Perhaps the most distinctive skill of professional marketers is their ability to build and manage brands (Kotler & Armstrong 2008, pg 225). "Companies must manage their brands carefully. First, the brand's positioning must be continuously communicated to consumers. Major brand marketers often spend huge amounts on advertising to create brand awareness and to build preference and loyalty" (Kotler & Armstrong 2008, pg 238).

A strong brand is a very valuable asset to a company. The value of the brand name alone is thought by some CEOs and marketing professionals to be worth more than everything else owned by the company. "Some analysts see brands as *the* major enduring asset of a company, outlasting the company's specific products and facilities. John Stewart, co-founder of Quaker Oats, once said, "If this business were split up, I would give you the land and the bricks and mortar, and I would keep the brands and trademarks, and I would fare better than you." A former CEO of McDonald's agrees: "If every asset we own, every building, and every piece of equipment were destroyed in a terrible natural disaster, we would be able to borrow all the money to replace it very quickly because of the value of our brand ... The brand is more valuable than the totality of all of these assets" (Kotler & Armstrong 2008, pg 230). According to one estimate, the brand value of Coca-Cola is $67 billion, Microsoft is $57 billion, and IBM is $56 billion (Kotler and Armstrong 2008, pg 231).

"Brand equity refers to the added value that a certain brand name gives to a product in the marketplace. Brands with high equity confer financial advantages on a firm because they often command comparatively large market shares and consumers may pay little attention to differences in prices. Studies have also linked brand equity to high profits and stock returns.

Service companies are also aware of the value of brand equity" (Kurtz and Boone 2008, pg 382).

"A powerful brand has high brand equity. Brand equity is the positive differential effect that knowing the brand name has on customer response to the product or service. One measure of a brand's equity is the extent to which customers are willing to pay more for the brand. One study found that 72 percent of customers would pay a 20 percent premium for their brand of choice relative to the closest competing brand; 40 percent said they would pay a 50 percent premium" (Kotler & Armstrong 2009, pg 231).

Let me share an example of the financial benefits of a strong brand I use in my Auburn classes. Coke and Big K Cola (the store brand of Kroger) are very, very similar cola beverages. In terms of ingredients the two brands are virtually identical. But Coke sells far more units than Big K. In addition, Coke is able to charge a 50% price premium (or more) for Coke over Big K. This market power is why the Coke brand name is thought to be worth more than $60 billion dollars. Morton Salt often sells for double the price of store brands although the products are literally identical excepting the brand name and mark.

A strong brand also provides cost savings to companies. A company with a strong brand name widely recognized by its target market can spend far less on advertising to build and maintain brand name awareness. Brand name awareness is important because many consumers will pick a brand (and sometimes pay a small price premium) if the brand name is familiar. Often, consumers will only purchase brands that readily "come to mind" when they think of the product category. If the brand has a favorable positive attitude and association with the target market, less money will be spent on advertising trying to promote brand advantages.

It is amazingly expensive to build brand name awareness and favorable brand

associations and attitudes when launching a new product with a new brand name. Often a new product has a marketing budget more than triple the marketing budget of the brand with the highest market share. The cost to simply obtain brand name recognition for the new brand can be very high. Having a strong, unique brand name with positive associations and attitudes with the target market is a very valuable asset. It is very, very costly for a company to gain a strong brand name for a new or renamed product or service.

Having a unique name different from other companies or brands is important to having a successful brand. This is because it is easier to differentiate the brand. Successfully launching new products or services is easier and less expensive for companies with a strong brand. This is why so many products you see in the grocery store share the same brand name like "Scott" for paper products or "Arm & Hammer" for cleaning products. Firms with strong brands launch new lines by building on the company's reputation in its other lines.

4] How consumers view brands and use brand information in their purchase decisions.

Most people are very busy and do not wish to spend their time shopping. Although shopping can often save money and identify optimal brand choice decisions, shopping takes time. Most people use brand names to identify products and services benefitting them. A brand also says something about product quality and consistency. Buyers who always buy the same brand know they will get the same features and benefits from purchasing the brand (Kotler & Armstrong 2008, pg 226). Some brands forge deep connections with consumers and help reinforce a chosen self-image and identity. They purchase clothes, cars, and services that fit their self image. Some people take this to an extreme level by putting symbols on their cars that poke

fun or show spite towards other car brands (frequently between Ford and Chevy truck owners).

For a consumer, a brand is the promise of a company to deliver specific desired features, benefits, services and experiences to the buyer every time they make a purchase. Brands simplify shopping and make it easier for a consumer to successfully satisfy the needs they have for a particular product category.

Brands are not viewed equally by consumers. Consumers have little or no familiarity with the brand name or brand performance of most products available for purchase. Other brands are recognized, but not preferred. A very strong brand is both recognized and preferred by a consumer. The strongest brands of all are recognized, preferred by a sizable number of consumers, and command a price premium over close substitutes. Having a unique name not shared by other brands help a company build strong brand recognition and preference. This is because the brand is unlikely to be confused with other brands or companies.

An important part of consumer behavior is something called routine response behavior. With routine response behavior a brand has satisfied the customer well enough that when they have a need for the product category, the consumer buys the same product again without looking at alternative choices. Most consumer products are purchased using routine response behavior. In fact, for many people the shopping cart never stops moving as they choose products during their shopping trip. When a customer has tried a brand in the past, is satisfied with the past product purchase, and has had no other negative experience with the brand they will often purchase the same brand again without examining other brands or prices.

For this reason, companies want brands with a high name recognition, that have a clear and beneficial position in the mind of the consumer, that also provide a consistent level of

service. Companies want brands that are distinct in the minds of consumers. This includes having a distinctive brand name. If the brand has a distinctive name, it is unlikely that unfavorable actions of another company or brand will have a negative impact on brand equity.

According to Kurtz and Boone (2008), "A brand can go a long way toward making or breaking a company's reputation. A strong brand identity backed by superior quality offers important strategic advantages for a firm. First, it increases the likelihood that consumers will recognize the firm's product or product line when they make purchase decisions. Second, a strong brand identity can contribute to buyer's perceptions of product quality. Branding can also reinforce customer loyalty and repeat purchases. A consumer who tries a brand and likes it will probably look for that brand ..." (pg 382).

**V] The customer base, marketing strategy, and advertising strategy employed by Regions Bank. My opinion of the strength of the Regions brand. My opinion of the actions that Regions has taken over many years to strengthen its brand. My opinion of the sophistication of Regions Bank current and potential customers.**

1] <u>The customer base and sophistication of Region's Bank current and potential customers</u>.

Based on my review of the Regions website and marketing materials supplied in discovery, <u>Regions Bank is a full service bank serving many different market segments.</u> Regions Bank has a very large retail presence with 2,000 full service outlets in seventeen states (AK, AL, FL, GA, IA, IL, IN, KY, MO, MS, NC, SC, TN, and TX). Regions provides service in even

more locations through its online banking website and ATM network. Additionally, Regions offers brokerage and investment banking products, securities brokerage, mortgages, personal and commercial insurance and credit related insurance products among other services (see finance.yahoo.com). A full list of services can be obtained from www.regions.com.

Regions customer base is anyone with enough financial assets to open a checking or savings account within Regions' geographic area. Regions customer base also includes anyone qualifying for a basic loan (car or home), and anyone purchasing basic insurance (property, casualty, life, health, accident, credit, or mortgage). A very important part of Regions customer base are ordinary people needing routine banking services. Regions gains revenues from ordinary customers from fees, loans, and insurance purchases. Additionally, Regions gains considerable assets through checking and savings deposits which it in turn lends out at a higher rate of interest.

Due to banking regulations, Regions cannot discriminate against current or potential customers for a wide variety of reasons. Banks have more stringent anti-discrimination regulation than most industries.

Regions attempts to appeal to everyone meeting the most minimal financial requirements. This can be seen in Region's advertisements. Regions ads depict people of all races and age groups. Additionally, Regions attempts to project a positive self-image in the communities they serve while avoiding offending any current or potential customer. Regions gave more than $12 million in charitable contributions in 2005. Regions also made $2 billion in loans to low and moderate income consumers in 2005. The primary charities Regions contributed to are on its website. They concentrate on noncontroversial good works such as the United Way, arts,

education and cultural charities in its market area.

Although specific Regions products are aimed at specific target markets, the wide range of products offered targets almost any adult or child with enough money to open a basic checking or savings account. For this reason, the current and potential customers of Regions Bank are no more sophisticated than the general population. Regions target market includes individuals without a high school diploma or even a high degree of familiarity with the English language. For this reason, some of Regions customers would have far less education and sophistication than the general population.

2] The marketing and advertising strategy employed by Regions Bank. My opinion of the actions that Regions has taken over many years to build and strengthen its brand.

Regions employs the name "Regions," in all of its advertisements. The Regions name is on its bank signs, ATMs, web address and a host of other points where Regions comes into contact with current or potential customers.

They employ the Regions name consistently in its advertising. The creative briefs of Regions provide its overall advertising strategy. The creative brief is a planning document for advertising campaigns listing overall goals including things that must be included in every ad. The tagline is "everyday confidence."

Regions advertising and marketing strategy presents Regions as the consumers' financial partner. Regions offers expert guidance and provides the financial products and services needed to meet the consumers financial goals today, tomorrow and in the future. They wish to reflect an understanding of the customers needs, competent advise and banking services. Presented in a

sincere manner that is warm, friendly, caring, positive.

Regions advertising and marketing efforts try to project competence, caring, and being welcoming to any customer. This is done both in the human models used in the advertising (wide variety of races, age groups, and apparent social status), the background music, and the Regions name. The goals of specific Regions ads may vary, but the name, mood, and types of human models used are consistent across ads.

Regions Bank spends the most money on cable TV, broadcast TV, radio, outdoor, magazines and internet advertising. The 2006 advertising budget was $23,157,5000. ALL Regions advertising promotes the Regions name and Regions brand. This is a "mandatory" for its advertising agency according to the creative briefs. Regions also spends a large proportion of its advertising budget on local marketing with $4,500 allocated per branch in 2006 (27% of total advertising spending, see RAC00022954). This is noteworthy because Regions has more than 2000 branches according to its website. Regions Bank advertising is not limited to big cities. Regions advertises its brand everywhere there is a branch bank.

The more than $23 million spent in 2006 on advertising alone by Regions is only part of its efforts to promote the Regions brand. Regions branch signs, signs at ATMs, extensive employee training all help build consumer awareness of Regions and a favorable attitudinal response towards the Regions brand. Regions has spent hundreds of millions of dollars promoting the Regions name and brand since 1994. Regions also spent a considerable sum to become the "official bank of the Southeastern Conference." They also sponsor the Sun Belt Conference, Louisiana State University, The University of Arkansas, Texas A&M, and powerboat racing.

Regions marketing research indicates that its advertising goals include brand name awareness, advertising awareness, and positive customer attitudes towards Regions. They also carefully measure current customer satisfaction with Regions financial services. They relate these numbers to growth in deposits. They have detailed customer satisfaction surveys using 28 separate measures of customer satisfaction (see RAC00022986). They carefully conduct customer research to determine the most important contributors to customer satisfaction (see RAC00022990). They also rank branches in terms of customer satisfaction. Satisfaction with Regions is compared to satisfaction with other banks in the markets Regions serves.

Expensive and extensive surveys of the general public (other than current customers) are done to determine awareness of the Regions brand. I have reviewed detailed reports of these survey responses going back to 2000. They track brand name awareness throughout its market area as well as awareness in many specific cities in its market area.

Consistent with my review of the fundamental branding literature, the Regions brand means to consumers in its market that consistently high quality banking services are provided. They rigorously check customer opinions at each branch to make sure that the brand promise of consistent, competent, friendly banking service open to all is provided.. This has in turn forged a deep connection with its current customers via high satisfaction scores and with the general public that views the bank quite favorably. Note that this brand image and promise are made to both current and potential customers.

In my professional opinion, Regions Bank has employed a sophisticated marketing and advertising strategy to build the Regions brand and promote the Regions name. Regions has spent hundreds of millions of dollars building the Regions brand name, including awareness and

positive attitudes towards the brand. Regions has an integrated effort to promote the brand. They use a consistent name, imagery, and message in its business offerings and in its advertising. The target of these communications is extremely broad encompassing almost everyone with any financial assets regardless of race, creed or other beliefs. They also have a very sophisticated tracking system for general consumer awareness and familiarity with the Regions brand along with general consumer positive feelings towards the Regions brand. They compare brand awareness and consumer beliefs about the Regions brand to other banks. In addition, they have a very sophisticated tracking system of current customer satisfaction with current bank operations. Regions has an integrated, ongoing, and sophisticated policy of building the Regions brand. The "Regions" brand represents a major asset for Regions Bank.

3] My opinion of the strength of the Regions brand.

The "Regions" name holds some strong advantages for Regions Bank. "Regions" is very easy to pronounce in English. Having an easy to pronounce name makes building brand name awareness easier. Another goal for branding is having a brand that identifies products from one firm while differentiating these products from competitors' offerings (Boone & Kurtz 2008, pg 378). I have not found the name "Regions" to be widely used by other companies or brands which helps make differentiate it from other companies and brands. Firms wishing to offer a broad array of products or services benefit from having a name that is not descriptive of their services. "Roto-Rooter" could have difficulty expanding into services outside of plumbing and drain work because its name is tied to its core service offering. A nondescriptive brand name makes it easier to launch new products or services outside the core current offerings of a firm.

Unaided brand awareness is a very strong measure of brand name knowledge. Unaided awareness is when a member of the public is asked to names of banks without any assistance or information given to aid memory. This is a very difficult memory task in marketing. Unaided awareness of the Regions brand is very high. For example, unaided recall of Regions Bank in 2006 are almost 40% in Birmingham, 55% in Mobile, 47% in Memphis and 25% in Nashville in 2006 (RAC00022362). This is an extraordinarily high level of unaided recall which equals or exceeds other major banks in the Regions market area (see RAC00022362).

In terms of familiarity with the Regions brand name, in 2006 98% of consumers surveyed were familiar with the brand name in Birmingham, 99% in Mobile, 95% in Memphis and 90% in Nashville. This shows almost everyone has heard of the Regions brand within the banks market area. In addition, according to consumer surveys Regions is viewed very favorably throughout its market area.

Let me contrast public knowledge of the Regions brand with the general public's knowledge of other important information. According to a national survey conducted by the Pew Research Center of the People and the Press in February of 2007, only 66% of citizens could name their State Governor (http://people-press.org). This means a third of the citizens of any State do not know the name of their Governor. Pew has conducted these surveys since 1989 and these results are similar to previous studies. The familiarity with the Regions Brand equals or exceeds the knowledge the general public has of very important elected leaders.

Being aware of a brand is a big help in getting new customers. Having positive attitudes towards the brand is even more helpful in gaining and retaining customers. Regions' high levels of brand name awareness is unusual. Brand name awareness yields a significant marketing

advantage and can provide increases in sales and price margins. Having widespread favorable attitudes towards the brand is an even stronger advantage. The Regions brand has almost universal familiarity in its market area. Unaided recall levels are very high. The Regions brand is also viewed very favorably both by current customers and by the general public.

Another indicator of brand strength is how much must be spent on advertising and marketing to keep the brand name in the top of the consumers mind. Companies with very strong brands do not have to advertise as much as competing firms to maintain high levels of brand name awareness and familiarity to potential customers. According to multiple surveys, Regions spends far less to maintain a very high level of brand name awareness compared to other banks in the States where Regions operates. Alabama is one of the strongest areas for Regions in terms of unaided brand recall, brand familiarity, and positive attitudes by the general public. The "bang for the buck" that Regions obtains from its advertising compared to other banks has been a major advantage for the company going back many years. This advantage was present in the most recent marketing research and in the oldest marketing research data that I reviewed from 2000. Therefore, because Regions has high familiarity and low ad spending they have a strong brand.

In summary, the strength of the Regions brand is indicated in several ways. The name is easy to pronounce and not descriptive of the core products offered. Unaided recall of the Regions name is very high. Familiarity with the Regions name is almost 100% in Alabama and 90% or better in other States. The general public has very favorable attitudes towards the Regions brand. The strength of the Regions brand is so great that Regions does not have to advertise nearly as much as competing banks to maintain a very high level of brand name recall

and familiarity. Accordingly, the Regions Brand is a very important financial asset for Regions. It helps Regions generate revenues. The power of the brand name also lowers advertising costs.

The careful attention that Regions has paid to its brand name is a good example of what Kotler and Armstrong recommend: "brands are powerful assets that must be carefully developed and managed" (pg 230). "Companies must manage their brands carefully. First, the brand's positioning must be continuously communicated to consumers. Major brand marketers often spend huge amounts on advertising to create brand awareness and to build preference and loyalty" (pg 238). My opinion of the strength of the Regions brand is in the mainstream of marketing thought. The strong unaided recall of Regions, the 98% familiarity rate with the Regions Brand in Alabama, the 90%+ familiarity with Regions in its market, and the very strong positive consumer attributes found both by Regions current customers and the general consumers all are very powerful indicators of the strength of the Regions brand. This opinion is shared by the marketing profession, "the strongest brands are positioned on strong beliefs and values" (Kotler and Armstrong 2008, pg 232).


**VI] My opinion of the business, marketing and advertising strategy of Regions University. The target market of Regions University. Marketing reasons for Southern Christian Universities name change. If Southern Christian University could gain anything of marketing value by using the "Regions" name.**


1. My opinion of the business, marketing and advertising strategy of Regions University. The target market of Regions University.

Regions University generates almost all of its cash flow (95%+) from student tuition and fees according to the deposition of Rex Turner. Because Regions University has a very small endowment and also is a private school (not State supported), student tuition is essential for the continued operation of the school. Only 875 students were enrolled in 2006 through 2007 (RU 1908).

Regions University's admission standards are much lower than more established universities. Almost all established institutions of higher learning require applicants to take a standardized test run by an independent body to assess the quality of the applicant. For undergraduates, the most common tests are the SAT and the ACT. For graduate programs, common tests include the GMAT, GRE and LSAT. Almost all established universities use a combination of grades and standardized test scores to select applicants for admission. Many universities also require a student essay and letters of recommendation when students apply for admission. Many universities request information on extracurricular activities, if the student graduated first or second from their high school, or if the student is a national merit scholar. Almost all State universities and well established private universities turn down the applications of many who either do not meet their standards or who have weaker credentials than other applicants.

Students apply for admission to Regions University online. Standardized tests are not mentioned anywhere on the application form and so are not part of the admissions process. Students do not have to submit an application essay. No letters of recommendation are required. Students are not asked if they graduated first or second in their class or if they are a merit scholar. This application process suggests low entrance requirements. Additionally, students are

requested to list their religious affiliation which is not done by most established universities (online application accessed on 6/7/07).

Regions University has a very large advertising budget compared to its enrollment. Approximately $800,000 was spent in 2006 according to the depositions of Ms. Costanza and Dr. Turner. This represents an advertising expenditure of $914 per student enrolled. The advertising goal of Regions University is to generate tuition paying students. According to the deposition of Ms. Constanza, the effectiveness measures of the advertising are the number of inquiries from potential students and the number of students who enroll. Additionally, students who enroll are asked where they heard about Regions University and this information is used to adjust the advertising strategy. The core advertising strategy is determined Dr. Turner and carried out by Ms. Costanza according to their depositions. In contrast, more established universities spend far less on advertising to attract students and turn down many applicants able to pay tuition.

Regions University offers 33 degree programs according to its advertisements. All classes currently offered by Regions University are online. The professional or applied degree programs such as business, human sciences, human resources, public safety and the like are where most tuition revenue is generated. The Turner School of Theology has a very small number of students (approximately 50 according to Dr. Turner) and represents a very small cash flow to the University. Regions University primary course offerings and source of tuition revenue is business and other technical degree fields.

RU 1908 provides a breakdown on the 875 students enrolled in Regions University from 2006 through 2007. Regions students are living in the United States. Only 2 of the 875 students

do not have a State identifier. Although Regions University may aspire to having an international student body, they currently have no (or almost no) students from other countries.

Regions University students are highly concentrated geographically. 240 students are from Alabama (27.4% of total enrollment). Most students come from states that made up the old Confederacy and border states (AK, AL, FL, GA, KY, LA, MD, MS, NC, SC, TN, TX and VA). Students from these states total 612 (69.9% of total enrollment).

According to Ms. Costanza the target market is "an individual 25 to 55, young professional or a mother at home, someone who needed to finish their degree or is transferring, someone who wants to further their education, someone who already has a bachelor's. Usually it's more of a professional – you target more of a professional market" (pg 34). Advertising is designed to attract paying students as noted by her statement "there is a drop in calls when we're not advertising" (pg 34). Advertising spending is concentrated in Alabama, Tennessee, Texas and the Carolinas according to Ms. Costanza. All advertising expenditures for 2006 were in the South (excepting some specialized ads in Christian magazines). Media placements made in 2007 were only in Alabama and Tennessee. All planned media expenditures for 2007 are in the South (pg 93).

In summary, Regions University depends almost totally on tuition revenue. The enrolment is relatively small and is concentrated in the South. Advertising has been exclusively in the South in 2006 and 2007. Admissions standards are very low. Heavy advertising is used to attract paying students. The effectiveness of advertising is measured two ways: the number of inquiries from potential students and a survey given to new students asking how they heard about the school. According to Dr. Turner, 94% of the students are enrolled in degree programs other

than the Turner School of Theology. The target market is someone who wants to further their education who already has a bachelor's or some college living in the South (particularly Alabama and Tennessee). Regions University's advertising is targeting a "professional market." Regions University uses an advertising campaign with the goal of generating additional student revenue.

From the materials and testimony I have reviewed, the overall marketing strategy appears to be highly coordinated with clear goals. The low admission standards increase the pool of potential paying customers. It is easy to apply to Regions University. Heavy advertising is focused on generating paying students, not building the image of the program. Programs are designed to maximize student revenues by offering applied, technical education (excepting the 6% of the student body enrolled in the Turner School of Theology). Advertising effectiveness measures are directly related to generating student inquiries and paying customers. All advertising spending in 2006-2007 is in the South, especially in Alabama and Tennessee. The current student body reflects Regions University's marketing efforts with around 100% US students with 70% from the South.

2. Marketing reasons for Southern Christian Universities name change.

According to Dr. Turner, Southern Christian University desired to attract more paying students. This desire is consistent with the admissions, marketing and advertising strategies employed currently and in previous years.

A Christian focus was a second desire of Dr. Turner. In his words: "the university has Christian standards. We try to have people who profess Christ in teaching in the various academic areas. We try to promote good will and so forth" (pg 47 Turner deposition). There is a

very lengthy statement of the theological beliefs of the school on its website (see www.southernchristian.edu/aboutRegionsUniversity.htm accessed on 6/12/07). Dr. Turner also hoped to generate additional student revenue to support the teaching mission of the Turner School of Theology (pg 60 of Turner deposition and RU 110).

Dr. Turner's deposition describes the dilemma facing the school in 2005-2006. Tuition pays the bills. Almost all of the students are in professional and applied degree programs. The divinity program has very few students (around 50). Southern Christian needed to increase enrollment. In addition, part of the funding of Southern Christian University is from a government grant (Title III grant). This money from the government is being used to pay some salaries in the operating budget (see minutes of Board of Regents Meeting of 9/26/2005 RU109-111). But the grant was runs out in the first quarter of 2008.

According to Dr. Turner's testimony, the name "Southern Christian University" harmed student recruitment efforts. Two elements of the name were judged by Dr. Turner and the Board to be problems: "Southern" and "Christian." Southern Christian needed a "for-profit type of name" (Turner deposition pg 56 and RU 110). Specifically, "if they have a business degree hanging on their wall, they would rather it not say Christian. And so anything without the Christian in it would better represent in their minds a degree" (pg 57). The preference to remove "Christian" from a business degree was directly expressed to Dr. Turner by students (pg 58). Turner stated on page 113, "there is no real profit that I can really find in Christian education, any financial profit." The term "Southern" was felt by Dr. Turner and the Board to impede efforts to recruit students from other areas of the United States and internationally. Dr. Turner and the Board also wished to have a "broad name."

The name "Turner University" (in honor of Dr. Turner's father) was considered and rejected. An unfavorable association with Ted Turner, Turner Broadcasting, and other business entities founded or named after Ted Turner was feared. Ted Turner's pubic statements and actions were deemed to be a poor role model. On page 69 of Rex Turner's deposition he states that: "some folks thought that Turner University would suggest that Ted Turner was a founder of the University." "Ted Turner" would be a negative association and would have harmed the Southern Christian University brand. Dr. Turner's fear that some might think that Southern Christian University was named after Ted Turner was shared by the Board of Regents and included in the minutes of the 12/16/05 Board meeting (see RU 117-119).

Instead, Dr. Turner and the Board of Regents settled on "Masters University" because it would assist the University "in projecting itself as a nationally-recognized university of prominence" (pg 75). A motion to rename the school subject to obtaining a trademark passed the Board on 3/17/06. The proposed name "Masters University" was later dropped.

Dr. Turner then decided on the name "Regions University" and the Board of Regents passed a resolution to adopt the name on 7/28/06. Dr. Turner and the Board thought that the name "Regions University" would increase the attractiveness of the school to students. In Dr. Turner's opinion the new name would be beneficial because "anytime you can take the ugly off of something, it becomes attractive" (pg 122). "And that attractiveness of Southern Christian was not attractive at all in New York and it's not attractive in Chicago, Illinois. So every time we turn around, there's something hitting at us that is a problem, and we were trying to deal with a problem" (pg 123).

During an Executive Leadership Team meeting on 7/31/06 (3 days after the Board voted

to change the name), it was discussed that there was a "Regions University" as part of Regions Bank (pg 128 and RU 152). Dr. Turner also states that all Board members were very familiar with Regions bank.

3.If Southern Christian University could gain anything of marketing value by using the "Regions" name.

Region's Bank has heavily advertised through the media and retail banking locations the name "Regions" in 17 states (AK, AL, FL, GA, IA, IL, IN, KY, MO, MS, NC, SC, TN, and TX). The market coverage of Regions bank represents 71% of the States of students enrolled in the University from 2006 to 2007 (622/875 = 71%; see RU 1908).

The name recognition of "Regions" is more than 97% in Alabama according to marketing research conducted for Regions Bank. The name recognition in other States where Regions Bank operates is 90% or more. "Regions" was established as a well known brand name. "Regions" also has a reputation for competence, integrity, business and finance. These were the same qualities sought by Southern Christian University whose primary objective in the name change was to enhance the reputation of the school and to attract more students seeking business and other professional degrees.

As discussed in section IV of this report, it is extraordinarily expensive to build brand name recognition and a positive attitudinal response for a new brand. Regions Bank had already gained this through its marketing, advertising, and retail banking operations for the term "Regions" in the vast majority (71%) of Southern Christian University's market area. The name recognition, positive attitudes, and consumer preference for "Regions" in this market was gained

through hundreds of millions of dollars of expenditures over many years by Regions Bank.

Dr. Turner and the Board of Regents were also aware that the general public can draw inferences about the name of a school to other individuals and companies. Fear of unfavorable associations with Ted Turner and Turner Companies was the reason given for rejecting the name "Turner University." Dr. Turner also noted several times in his deposition that he views Vanderbilt favorably. Several very strong Universities took the name of substantial donors (Vanderbilt and Duke are examples).

Dr. Turner is also quite familiar with the common practice of universities to name buildings, degree programs, and even entire schools (Vanderbilt) after substantial donors or individuals important to the institution. At Southern Christian University, the Turner School of Theology was named after Rex and Opal Turner. This practice of naming Schools at Southern Christian University after important people was established in 1999. Many universities name buildings or schools after major donors. I work in the "Edward L. and Catherine K. Lowder" building. The school where I received my doctorate was renamed to the "Darla Moore School of Business" after she made a $45 million donation.

In addition, important donors to universities often become involved in determining important policies, procedures and decisions of their school. Robert Lowder is a major contributor to Auburn. He and his company (Colonial Bank) sponsor many scholarships, and faculty chairs. The Business School building is named after his family. Mr. Lowder has been on the Auburn Board of Trustees for many years. Darla Moore who donated $45 million to the Business School at the University of South Carolina is a member of the business school advisory council and is also on the University of South Carolina board of trustees. Vanderbilt University

(mentioned several times by Dr. Turner in his deposition) was founded through a $1 million donation by Cornelius Vanderbilt and the school was named after him.

Even religious schools will change their name after substantial donations. Duke University was originally named Trinity College and was affiliated with the Methodists. However, James B. Duke made a substantial contribution to Trinity University and the school was renamed "Duke." It is interesting to note that James B. Duke first tried to give the money to Wake Forest University but the school refused his donation because it came from selling tobacco. Wake Forest feared harming their brand by associating with a tobacco company and CEO.

Renaming the university "Regions University" can give Southern Christian many important benefits. There was instant name recognition in 17 states representing 71% of the student body. Name recognition and positive brand attitudes towards "Regions" was even stronger in Alabama which represents 27.4% of current students. "Regions" is also strongly associated with business, the key area where the university wanted to attract more students. Given the common practice of universities to adopt the name of major donors, Southern Christian could also expect many to believe or wonder if Regions Bank had started a school or made a substantial donation to Southern Christian. The "Regions" name may give many consumers the impression that Regions Bank contributes to and supports the school. Better yet, the market coverage of Regions Bank had a 71% overlap with the student body of Regions University.

**VII] What is the significance of the Regions brand? How the Regions brand could be effected by another's use of the Regions name.**

1. What is the significance of the Regions brand?

As covered in my discussion of branding in this report, the Regions brand is very strong and has high brand equity. This helps Regions maintain current customers, attract new customers, launch new products more easily, and have lower advertising costs.

Currently, Regions has 98% name recognition in Alabama and greater than 90% recognition in other states where Regions operates. This is clearly a situation where "Regions" is a very widely known name. The survey data supplied by Regions Bank that I have reviewed going back to 2000 show that a member of the general population is highly aware of the Regions name. Prior to Southern Christian University taking the name Regions, various locations and affiliates of Regions were the only name listed in the Montgomery white pages under "Regions."

Regions is viewed very favorably by current customers and potential customers. The bank has successfully built a brand with the reputation for trust, consumer confidence, financial knowledge, and welcoming to all with minimal assets. Regions advertising and marketing is purposely designed to be open to those of all faiths and ethnic groups. The print ad run by Regions Bank in December said "Happy Holidays" and not "Merry Christmas." The ad is deliberately vague to appeal to those with and without religious faith. The images in the ad are jingle bells, nutcrackers and tree lights. "Regions" is easy to pronounce, has close to universal familiarity, and very high unaided recall. Based on the materials I have reviewed, in my opinion the "Regions" brand is well known, strongly positive, and holds a clear and distinct image in the

minds of consumers.  It is a very powerful asset to Regions.  As mentioned earlier in my report, some CEOs and marketing experts value the strongest brands at more than $50 billion dollars. Some CEOs think that their company's single greatest asset is their brand name.

The Regions brand promise to consumers in its market is that consistently high quality banking services are provided.  Consumers can have confidence in the ability of the bank to provide a full range of competent banking services.  Regions Bank rigorously checks customer opinions at each branch to make sure that the brand promise of consistent, competent, friendly banking service open to all is provided.  This has in turn forged a deep connection with its current customers via high satisfaction scores.  The strong brand image is shared by the general public (both those who are and are not current customers) who view the bank quite favorably. This brand image and promise are made to both current and potential customers.

In summary, the Regions brand is very valuable.  The high familiarity, unaided recall, positive customer attitudes, and positive general public attitudes are all indicators of a very strong brand.  Being able to maintain these advantages with a disproportionally small advertising budget is another indicator of brand strength as well as a direct cost savings to Regions.

2. How the Regions brand could be affected by another's use of the Regions name.

The "Regions" brand is more likely to suffer harm if another company using the "Regions" name has a high degree of overlap with its market area.  For example, a "Regions Concrete Company" located in Scotland might cause some very minor consumer confusion due to both coming up on the same web search.  But because the customers of Regions Bank and Regions Concrete are separated by the Atlantic Ocean, almost no Regions Bank customers would

see Regions Concrete trucks, locations or advertising.

The greater the overlap of marketing and advertising efforts between two companies using the same or similar names, the more likely it is that consumers will be confused about the relationship between the two companies and brands. If the two companies have highly visible advertising and marketing campaigns reaching the same pool of customers, consumer confusion concerning a relationship between the two companies/brands is more likely to occur.

2a. Degree of target market and advertising overlap between Regions Bank and Regions University

The enrollment of Regions University from 2006 through 2007 was 875 students. 27.4% of those students were from Alabama where Regions Bank has its highest levels of brand name familiarity. 71% of Regions University current students come from States where Regions Bank operates (see RU 1908). In 2006 all advertising for Regions University was in the South. All planned expenditures for 2007 are also in the South were Regions Bank operates.

Regions University is also targeting adults in its media plan. Specifically, adults 25-55, young professionals or mothers at home. The especially target someone who already has a bachelors degree (deposition of Ms. Costanza pg 34). This market is also a prime target market for Regions Bank since this group consists of people in their prime earning years with a strong need for banking services.

For these reasons, the advertising done by Regions University has a close to 100% overlap with Regions Bank locations and customers. In terms of student overlap, 71% of Regions University's current student body comes from States where Regions Bank has retail

locations. Additionally, the main building for Regions University is on I-85 in Montgomery. It is in a highly prominent location. I-85 has 82,600 cars passing this location every day in 2006 and 82,670 cars daily in 2005. Regions University spent $800,000 in media advertising in 2006 and plans to spend even more in 2007.

Prior to Southern Christian University's name change, the only "Regions" in the Montgomery phone book was for companies affiliated with Regions. In the most recent white pages, Regions University long listing of phone numbers immediately follows those of Regions Bank. Now, anyone looking up a phone number for "Regions Bank" is likely to see the numerous numbers for "Regions University." Given the immediate proximity of the names in the phone book, many Regions Bank customers may wonder about an association or relationship between the bank and Regions University. A Google search using "Regions Montgomery" has Regions University as the first link appearing.

The location of the school by I-85, billboards purchased by Regions University in Montgomery, the $800,000+ advertising spending by the school, and the back-to-back listings in the white pages of the phone book make it likely that many average consumers in the Regions Bank market will hear the term "Regions University." There is almost 100% overlap between the advertising and marketing efforts of Regions University and Regions Bank. This greatly increases the likelihood that the same consumer will hear the names "Regions Bank" and "Regions University."

2b. How the Regions Bank brand could be effected by any other company using the Regions name within its market area.

Many Regions Bank customers lack sophistication. Regions is targeting everyone within its geographic market area who has even the most minimal assets necessary to obtain a checking account or a car loan. For example, Regions sells car insurance which is required of all drivers licensed in Alabama.

From a marketing perspective the Regions brand name is so strong and so widely known that any use by a another company of "Regions" in the bank's market area may be associated with Regions bank in the minds of consumers. Any other company prominently using the name "Regions," having signs or locations using the word "Regions" and advertising the name "Regions" within the Regions Bank market area makes the "Regions Brand" less distinctive in the minds of current and potential customers of Regions Bank.

As I have discussed previously in this report, Regions has spent hundreds of millions of dollars advertising the Regions brand. The bank has a very carefully thought out marketing and advertising strategy designed to be open, professional, friendly, caring. The brand image and consumer perceptions of "Regions" prior to the use of the term by Regions University was strong, positive and unique to the bank in its market. For these reasons, *any company* targeting consumers in the same market area in addition to the bank prominently using the Regions name and advertising Regions is likely to weaken the brand strength and meaning consumers have for Regions Bank. This in turn is likely to lower positive attitudes towards the Regions brand, require Regions to spend far greater sums on advertising to promote the bank, and open Regions Bank to possible damage if unfavorable news of any type concerning Regions University is covered in the media.

2c. Special problems which may occur when a University takes the name of an established company.

It is standard practice at Universities to name buildings and even entire schools for those making significant donations. This practice is known by Dr. Turner, the person most responsible for Southern Christian University deciding to change their name to "Regions University" according to Board minutes and Dr. Turner's deposition. In 1999 Regions renamed their divinity school the Turner School of Theology to honor Rex and Opal Turner. This is a specific case where Regions University changed the name of a program to honor individuals. Dr. Turner mentions Vanderbilt University several times in his deposition. Vanderbilt University was founded through a $1 million donation by Cornelius Vanderbilt. Duke University was originally named Trinity College and was affiliated with the Methodists. However, James B. Duke made a substantial contribution to Trinity University and *this religiously affiliated school was renamed "Duke."*

Many schools rename buildings or schools after major donors. Those making large donations often become important decision makers at the University. Robert Lowder who is on the board of trustees of Auburn University and Darla Moore who is on the board of trustees of the University of South Carolina both have buildings named after them or their family members. *Both building name changes came after a substantial donation was made to the university. In these cases important donors helped set the policy of the University. The University became closely affiliated with the individual/company making the donation.*

Dr. Turner and the University Board are aware that the general public can draw inferences about the name of a school to other individuals and companies. Fear of unfavorable associations

with Ted Turner and Turner Companies was the reason given for rejecting the name "Turner University." Dr. Turner and the Board of Regents feared ordinary people would draw the inference that Ted Turner had founded, made a large donation to, or was connected with Southern Christian University. This means in marketing terms that Dr. Turner and the Board of Regents of Southern Christian University thought that their brand and brand image would be damaged by using the name "Turner."

Given the common practice of universities to adopt the name of major donors, many ordinary consumer may believe or wonder if Regions Bank had started a school or made a substantial donation to Southern Christian. Ordinary people may also think that Regions Bank or important executives at Regions Bank are involved in the decision making at Regions University. For these reasons, "Regions University" has the potential to cause far more potential damage to the brand name and image of Regions Bank than another business with the Regions name such as Regions Concrete Company.

There are many examples of this happening in the materials supplied by Regions Bank and the materials supplied by Regions University. Regions University made an official announcement of the name change by email on 8/8/06 (Turner deposition pg 133). The next day Dr. Turner, received an email from Dr. Luquire of the University of Alabama at Huntsville asking about a connection with Regions bank (Turner deposition pg 134 - 139). Dr. Luquire asked if the University may have received a substantial donation from Regions Bank. Although Dr. Turner claims that Dr. Luquire "knows that this is not the case at all," given the history of schools changing names after substantial donations Luquire's query was a good example of confusion that could exist of in the mind of even sophisticated consumers highly familiar with

Southern Christian University.

An email was sent to important officers of Regions University shortly thereafter by David Moore asking about a potential conflict with Regions Bank (pg 139).

In Dr. Turner's deposition he mentions that multiple people stated that "y'all must have gotten some money or something" from Regions Bank (pg 140). Although Dr. Turner passes this off as a joke, this association between Regions University and Regions by individuals knowing him personally simply follows the common practice of how Universities change names after substantial donations. *This fact is known by ordinary people.*

Phone calls also came into Regions University inquiring about the affiliation of the University with Regions Bank (see Turner deposition page 149 - 150). Another email from Randy Gore was sent to the University. He asked "did Regions Bank make a donation" (pg 153).

In sum, information obtained in discovery from Regions University finds that some familiar with Southern Christian University thought there was a substantial donation made by Regions Bank or an affiliation between the school and the Bank. Some people inquiring about this connection know Dr. Turner personally and are also very familiar with the University. These people would have a sophisticated amount of knowledge, yet they still saw a connection between the school and the bank.

Inquiries about a connection between Regions University and Regions Bank were also made to bank offices and employees. Russell Dunman's deposition mentions multiple people asking him about a connection between the bank and the school in several different situations (Dunman deposition pg 50 - 54; 79-81; 93-96). In addition, Regions Bank supplied more a dozen email responses noting situations where customers, bank employees, friends and

acquaintances of bank employees, and others directly asked about a connection between the Bank and the University.

Marketing professionals know that only a very small number of people will ask questions about a business strategy that they don't understand. Few customers or members of the general public who are upset by business actions will directly complain. Asking questions or raising complaints causes conflict that most people just want to avoid.

When teaching my Auburn classes I discuss the most and least common things that a customer will do when they have a bad experience with a product or service. By far the most common is just not buying the brand in the future. The second most common thing ordinary consumers do is inform their family and friends about the negative experience. It is far, far less likely that someone who is upset will complain to a low level employee. Almost none will contact senior mangers of the company or write a letter of complaint. This is a topic I cover in multiple classes. I almost always ask the class to indicate what they do when upset with a company or disappointed in a consumption experience by a show of hands. The responses from my students over decades of classes in Alabama follow the same pattern seen in the marketing literature. People stop buying and tell their family and friends. Very few complain orally to the company and almost none write a letter or talk to senior managers.

When something irritates a customer or potential customer it may also change their attitudes towards the brand and the likelihood that they will purchase the brand. This directly harms the brand strength and brand image and harms future sales. Bad word of mouth is very damaging to a brand. People distrust salespeople and advertisements. They realize the individual or company is trying to sell them something that will bring the seller financial

benefits. In contrast, people place far more trust and are more likely to change their brand purchase decisions when a friend, family member or acquaintance discussed brand experiences that are positive or negative. Word of mouth is stronger than advertising.

2d How brands are fragile.

Brands are fragile. Positive associations, favorable customer relations, and positive brand name association built over years and decades can be destroyed by unfavorable information. According to Michael Eisner the former CEO of Disney: "A brand is a living entity and it is enriched or undermined cumulatively over time, the product of a thousand small gestures" (Kotler and Armstrong 2008, pg 238). One unfavorable incident can harm the image of a brand and damage sales for many years. This is why when a plane crashes the flight number is never used again by that airline or other airlines. This is why companies spend heavily on public relations consultants to handle potentially unfavorable news.

It can take many years and hundreds of millions of dollars to build a brand name. Just one or two public mistakes can damage or destroy the asset of a strong brand name. When another company uses a widely known brand name, then the actions of the other company can also damage the brand. In addition, firms must continue to spend large sums to keep brand name awareness and brand equity. There are many brands that were once market leaders who now have left the market or have tiny shares due to company mistakes or lack of marketing support (Lucky Strike cigarettes, Bon Ami cleaner, Pepsodent toothpaste). If multiple companies have the same name, the advertising costs to maintain and grow the brand name recognition and favorability are higher.

2e. How Regions Bank can lose control of one of its most valuable assets established at considerable expense.

Companies spend huge amounts of money to publicize a brand name and build favorable associations with the brand. Regions Bank uses random surveys of the general population and detailed surveys of current customers to determine the knowledge and feelings people have towards the Regions brand. As stated by Regions Bank officer Russell Dunman, Regions has: "worked extremely hard to make their name distinctive, very - - very prevalent, very positive in the community, all the communities we are in, without regard to where they are.

And anyone using that moniker or that name could be confusing to the customer and could cause some concern should their mission not be one that would be something that Regions could embrace. In other words, I think our logo and our name stands alone as an institution of integrity, high community standing.

And we don't want to run the risk of having that name associated with or mis-associated with anyone or anything that may take away from that. We've worked awfully hard to make the Regions name the name everyone remembers for something positive" (pg 110-111).

Mr. Dunman gives a "textbook" reply to the goals a company has for a brand. As I quoted from Boone and Kurtz (2008, pg 378) at the beginning of this report: "Marketers recognize the powerful influence that products and product lines have on customer behavior, and they work to create strong identities for their products and protect them. Branding is the process of creating that identity. A brand is a name, term, sign, symbol, design, or some combination that identifies the products of one firm while differentiating these products from competitors' offerings."

"A name plays a central role in establishing a brand and product identity" (Boone and Kurtz 2008, pg 384). If that name is confused with another company or product, the firm loses control of one of their most important assets. Regions Bank wishes to appeal to everyone. They do not ask about the religious affiliation of its employees or customers - something done by Regions University.

Regions Bank currently has extraordinarily high levels of brand familiarity in its market area. They also have very high levels of unaided recall. Current customers view Regions Bank very favorably. Potential customers also view Regions bank very favorably. Regions has a unique image built through more than a decade of multimillion dollar spending and marketing. They have built a strong and consistent image. Regions Bank is able to spend less on advertising because they have such a strong brand name and image. If another company uses the Regions brand name it may weaken the brand.

A University using the Regions name poses special problems due to the common practice of renaming buildings, schools and entire Universities after major donors. Many major donors become policy makers for the University and have even greater association with the school. Even the regents of Regions University were concerned that naming the school "Turner University" would confuse their current and potential students and donors about a connection between the school and Ted Turner or Ted Turner's businesses.

Signature: ______________________
Avery M. Abernethy
Date: 6/14/07

Bibliography:

Luis E. Boone and David L. Kurtz, Contemporary Marketing 13th edition, Thomson South-Western, 2008.

Philip Kotler and Gary Armstrong, Principles of Marketing 12th edition, Pearson Prentice Hall, 2008.

William D. Perreault Jr., Joseph P. Cannon and E. Jerome McCarthy, Basic Marketing: A Marketing Strategy Planning Approach 16th edition, McGraw-Hill, Irwin, 2008.

Note: This should be considered a preliminary report. Additional material may be added to this report concerning branding, brand awareness, market coverage, impact of branding, complaint behavior, and additional topics mentioned in this report after having time to review the literature in more detail. A more detailed report of the marketing and advertising strategies of Regions Bank and Regions University is also possible as I continue to review the large amount of material I currently have and the materials that may become available after further discovery.

Appendix - Vita of Avery Abernethy

AVERY M. ABERNETHY

**OFFICE ADDRESS:**
Dept. of Marketing and Transportation
201 Lowder Business Building
College of Business Administration
Auburn University, Alabama 36849
(334) 844-2458
fax (334) 844-4032
abernav@auburn.edu

**HOME ADDRESS:**
401 Mockingbird Lane
Auburn, Alabama 36830
(334) 887-3514

**POSITIONS HELD:**
Auburn University
Professor Department of Marketing
Fall 1999 to present

Auburn University
Associate Professor Department of Marketing and Transportation
Fall 1994 to Summer 1999

Auburn University
Assistant Professor Department of Marketing and Transportation
Summer 1988 to Summer 1994

University of South Carolina
Graduate Instructor and Research Assistant
Summer 1984 to Spring 1988

**INSTRUCTION:**
Real Estate Sales and Marketing (Undergraduate Level)
Marketing Management (Masters and Undergraduate Level)
Promotional Strategy (Masters and Undergraduate Level)
Basic Marketing (Masters and Undergraduate Level)
Sales Management (Masters and Undergraduate Level)
Professional Selling (Executive Education)
Services Marketing (Masters and Undergraduate Level)
Personal Selling (Undergraduate Level)
Buyer Behavior (Undergraduate Level)
Industrial/Channels Marketing (Undergraduate Level)

Teaching Awards:
Outstanding Teaching Award Department of Marketing 2004.
Faculty Honoree for Camp War Eagle, Auburn's Freshman Orientation 2001
(one of only eight university wide)
Outstanding Teaching Award Department of Marketing & Transportation, 1998.
Panhellenic Council Outstanding Professor, Fall 1995 (university wide).
Panhellenic Council Outstanding Professor, Winter 1996 (university wide).
Panhellenic Council Outstanding Professor, Winter 1998 (university wide).

Instructional Seminars Given/Attended:
Presentation on Integrating Technology & Teaching for the AU Provost's Educational Enhancement and Faculty Recognition Day, Spring, 1998.
Daniel Breeden Endowment Grant for Faculty Enhancement, 4/1/97.
Freedom Forum Seminar on Teaching Improvement (week long), held at UNC-CH, 1990.
Multimedia Marketing Instruction, University of Alabama, October 27, 1995.

**RESEARCH AWARDS:**
Winner of the 1996-1998 Best Paper Award for the *Journal of Public Policy and Marketing* for "FTC Regulatory Activity and the Information Content of Advertising" with George R. Franke
Co-Winner of the 1996 Best Paper Award for the *Journal of Advertising* for "The Information Content of Advertising: A Meta-Analysis" with George R. Franke.
Winner of the Best Paper Award in the Research Methods and Techniques Track at the 2002 *American Marketing Association Winter Educators Conference* with Mariea Hoy for "Nonresponse Assessment in Marketing Research: Current Practice and Suggested Improvements."
Highest Quality Rating by ANBAR Electronic Intelligence for the "The Information Content of Advertising: A Meta-Analysis" with George R. Franke.
Highest Quality Rating by ANBAR Electronic Intelligence for the "Television station acceptance of AIDS prevention PSAs and condom advertisements" with Jan LeBlanc Wicks.
Third place in the 1997 Media Management and Economics Division of the AEJMC, with Jan Wicks.
*Journal of Advertising* Outstanding Reviewer Award, 1999.

**EDUCATION:**
Doctor of Philosophy in Business Administration (Marketing), University of South Carolina.
Degree awarded in Spring, 1988.

Bachelor of Science in Business Administration, University of North Carolina at Chapel Hill.
Degree awarded in Spring, 1984.

**JOURNAL PUBLICATIONS:**

Beard, T. Randolph and Avery M. Abernethy (2005), "Costs and Benefits of FTC "Do Not Call" Regulations: A Second look and Reply to Anderson," accepted for publication in the *Journal of Public Policy and Marketing*.

Sutherland, John, Lisa Duke and Avery Abernethy (2004), "A Model of Marketing Information Flow: What Creatives Obtain and Want to Know From Clients," *Journal of Advertising*, 33 (Winter), 39-52.

Beard, T. Randolph and Avery M. Abernethy (2005), "Consumer Prices and the FTC's "Do Not Call" Program," Journal of Public Policy and Marketing, 24 (Fall), 253-259.

Abernethy, Avery M. and William L. Lett III (2005), "You Are Fired! A Method to Control and Sanction Free Riding in Group Assignments," *Marketing Education Review*, 15 (Spring), 47-54..

Abernethy, Avery M. and David LaBand (2004), ""The Impact of Trademarks and Ad Size on Yellow Page Call Rates: Results From 78 Split Book Tests," *Journal of Advertising Research* 44 (March), 119-125.

Abernethy, Avery M. and David LaBand (2002), "The Customer Pulling Power of Different Sized Yellow Pages Advertisements," *Journal of Advertising Research*, 42 (May/June), 66-72.

Cannon, Hugh M., John D. Leckenby and Avery Abernethy (2002), "Beyond Effective Frequency: Evaluating Media Schedules Using Frequency Value Planning," *Journal of Advertising Research*, 42 (November/December), 33-47.

Wicks, Jan LeBlanc and Avery M. Abernethy (2001), "Effective Consumer Protection or Benign Neglect? A Model of Television Infomercial Clearance," *Journal of Advertising*, 30 (Spring), 41-55.

Abernethy, Avery M. and Jan LeBlanc Wicks (2001), "Self-Regulation and Television Advertising: A Replication and Extension," *Journal of Advertising Research*, 41 (May/June), 31-38.

Abernethy, Avery M. (2000), "Analyzing Media Messages: Using Quantitative Content Analysis in Research," *Journal of Advertising*, 29 (Summer), 77-80. (Book review).

Abernethy, Avery M. and James I. Gray (2000), "Integrating Marketing and Financial Decision Making: Experiential Spreadsheet Applications,"*Marketing Education Review*, 10 (Spring), 35-46.

Abernethy, Avery M. and Daniel D. Butler (1999), "Yellow Pages Advertising Strategy for Attorneys," *Journal of Professional Services Marketing*, 18 (2), 21-37.

Abernethy, Avery M. and David Laband (1999), "The Influence of Price, Population and New Residents on the Purchase of Service Marketer's Yellow Page Display Ads," *Journal of Advertising Research*, 39 (September/October), 15-26.

Abernethy, Avery M. and Jan LeBlanc Wicks (1998), "Television Station Acceptance of AIDS Prevention PSAs and Condom Advertisements," *Journal of Advertising Research*, 38 (September/October), 53-62.

Abernethy, Avery M. and George R. Franke (1998), "FTC Regulatory Activity and the Information Content of Advertising", *Journal of Public Policy and Marketing,* 17 (Fall), 239-256. [Paper was the 1996-1998 winner of the Best Paper award for the Journal].

Abernethy, Avery M. and Daniel D. Butler (1998), "Accountant Yellow Page Advertising: Current Practice and Consumer Desires," *Journal of Professional Services Marketing*, vol 18 (1), 159-173.

Abernethy, Avery M., James I. Gray and Daniel D. Butler (1997), "Radio Advertising Information Strategy: Differences Between Services and Products," *Journal of Services Marketing*, 11 (5), 344-355.

Abernethy, Avery M. and George R. Franke (1996), "The Information Content of Advertising: A Meta-Analysis," *Journal of Advertising*, 25 (Summer), 1-17. [Paper was co-winner of best article in the Journal for 1996].

Butler, Daniel D. and Avery M. Abernethy (1996), "Yellow Page Advertising by Physicians," *Journal of Health Care Marketing*, 16 (Spring), 45-50.

Gray, James I. and Avery M. Abernethy (1994), "Pros and Cons of Lecture Note and Handout Packages: Faculty and Student Opinions," *Marketing Education Review* 4 (Fall), 22-26.

Butler, Daniel D. and Avery M. Abernethy (1994), "Consumer Information Needs for Attorney and Accountant Yellow Pages Advertising," *Journal of Services Marketing*, 8 (2), 46-56.

Butler, Daniel D. and Avery M. Abernethy (1994), "Information Consumers Seek From Advertising: Are There Differences Between Services and Goods?," *Journal of Professional Services Marketing*, 10 (2), 75-92.

Abernethy, Avery M. (1993), "Advertising Clearance Practices of Radio Stations: A Model of Advertising Self-Regulation," *Journal of Advertising*, 22 (September), 15-26.

Abernethy, Avery M. and Daniel D. Butler (1993), "The Scaled Case Grading Form: A Method To Improve the Assessment of Student Case Performance," *Marketing Education Review* 3 (Fall), 40-46.

Abernethy, Avery M. and Daniel D. Butler (1993), "Promoting Customer Contact People: A Key Difference in Service and Product Advertising," *Journal of Services Marketing* 7 (1) 4-12.

Abernethy, Avery M., James I. Gray and Herbert J. Rotfeld (1993), "Combinations of Creative Elements in Radio Advertising," *Journal of Current Issues and Research in Advertising*, 15 (Spring), 87-99.

Abernethy, Avery M. and Daniel Butler (1992), "Advertising Information: Services vs. Products," *Journal of Retailing*, 68 (Winter), 398-419.

Abernethy, Avery M. (1992), "The Information Content of Newspaper Advertising," *Journal of Current Issues and Research in Advertising*, 14 (Fall), 63-8.

Rotfeld, Herbert J. and Avery M. Abernethy (1992), "Radio Station Standards for Acceptable Advertising," *Journal of Business Research*, 24 (June), 361-375.

Abernethy, Avery M. (1991), "Differences Between Advertising and Program Exposure For Car Radio Audiences," *Journal of Advertising Research*, 31 (April/May), 33-42.

Rotfeld, Herbert J. and Avery M. Abernethy (1991), "Radio Station Acceptance of AIDS-Related Advertising Messages," *Journal of Health Care Marketing*, 11, (June), 33-40.

Abernethy, Avery M. (1990), "Television Exposure: Programs vs. Advertising," *Current Issues and Research in Advertising*, volume 13, 61-78.

Rotfeld, Herbert J., Avery M. Abernethy and Patrick R. Parsons (1990), "Self-Regulation and Television Advertising," *Journal of Advertising* 19 (4), 18-26.

Rotfeld, Herbert J., Patrick R. Parsons, Avery M. Abernethy and John Pavlik (1990), "Television Station Standards for Acceptable Advertising," *Journal of Consumer Affairs*, 24 (Winter), 392-410.

Abernethy, Avery M. (1989), "ADLAB - A Media Software Review," *Journal of Advertising*, 18 (4), 65-66. (review of a media planning software package).

Abernethy, Avery M. (1989), "The Accuracy of Diary Measures of Car Radio Audiences: An Initial Assessment," *Journal of Advertising*, 18 (3) 33-39.

Abernethy, Avery M. and Jesse E. Teel (1986), "Advertising Regulation's Effect Upon Demand For Cigarettes," *Journal of Advertising*, 15 (4), 51-55.

**PROCEEDINGS EDITED:**

Avery M. Abernethy (ed.) *Proceedings of the 2002 Conference of the American Academy of Advertising.*

**PROCEEDINGS ARTICLES & PRESENTATIONS:**

Cornell, Lisa Duke, John Sutherland, Avery Abernethy, and Ziad Ghanimi (2007), "How Brief: A Content Analysis of Creative Briefs From 153 of the Top US Agencies," accepted for the *Proceedings of the 2007 American Academy of Advertising.*

Cornell, Lisa Duke, Avery Abernethy, Ziad Ghanimi and John Sutherland (2006), "Briefing the Big Winners: An Analysis of Creative Briefs From Clio-Winning Agencies," abstracted in the *Proceedings of the 2006 American Academy of Advertising.*

Abernethy, Avery M., Alyse Lancaster and Kent Lancaster (2005), "How Frequently Do Large Consumer Magazines Fail to Achieve Their Advertising Rate Base? An Analysis of Publishers' Statements and Audit Reports," abstracted in the *Proceedings of the 2005 American Academy of Advertising.*

Sutherland, John, Lisa Duke and Avery Abernethy (2003), "Market Intelligence: What Creatives Obtain and Want to Know from Clients," abstracted in the *Proceedings of the 2003 American Academy of Advertising* pg 8.

Hoy, Mariea and Avery Abernethy (2002), "Nonresponse Assessment in Marketing Research: Current Practice and Suggested Improvements," *Proceedings of the 2002 AMA Winter Educators Conference*, pg 204. (Winner of Best Paper in the Research Methods and Techniques Track).

Hoy, Mariea and Avery Abernethy (April 12, 2002), "Nonresponse Assessment in Marketing Research: Current Practice and Suggested Improvements - Presentation at the University of Tennessee College of Communications 24th Annual Communications Research Symposium

Baglione, Stephen L. and Avery M. Abernethy (2002), "The Internet's Effect on Other Media," *Association Of Marketing Theory and Practice Proceedings*, 11 (Section 7.4), 9-13.

Abernethy, Avery (2002), "Is Academic Advertising Research Ever Important to Practitioners?," *AAA Newsletter*, March, pg 2.

Abernethy, Avery M. and Stephen L. Baglione (2001), "Orphan Media: Does Published Advertising Research Reflect Real World Spending?," in *Proceedings of the Atlantic*

*Marketing Association*, Jerry W. Wilson (ed), 601-610.

Wicks, Jan LeBlanc and Avery M. Abernethy (2001), "An Exploratory Study: Are Managerial, Organizational or Market Factors Related to Complaints About Infomercials?," *Proceedings of the American Academy of Advertising,* Charles R. Taylor (ed), *82-88.*

Abernethy, Avery M. and Jan LeBlanc Wicks (2000), "The Influence of Management Ethics, Station Policy, and Market Forces on Television Advertising Clearance Decisions," abstracted in the *Proceedings for the Society For Marketing Advances*, pg 20-21.

Hoy, Mariea Grubbs and Avery Abernethy (2000), "Gatekeeping in Survey Research: An Analysis of JM and JMR, 1994-1999," abstracted in the *Proceedings of the Society For Marketing Advances*, pg 20.

Abernethy, Avery M. and Jan LeBlanc Wicks (2000), "Self Regulation and Television Advertising: A Replication and Extension," abstracted in the *Proceedings of the 2000 Annual conference of the American Academy of Advertising*, Mary Alice Shaver (ed)., pg 1.

Wicks, Jan LeBlanc and Avery M. Abernethy (2000), "Infomercial Clearance and Profitability Concerns: Are Some TV Stations Neglecting Consumer Protection for the Bottom Line?," in the *Proceedings of the 2000 Annual conference of the American Academy of Advertising*, Mary Alice Shaver (ed)., pg 223-229.

Abernethy, Avery M. (2000), "FTC Regulatory Activity and the Information Content of Advertising." Invited presentation to the Auburn University Honors College.

Abernethy, Avery M. (1999), "FTC Regulatory Activity and the Information Content of Advertising." Invited presentation at the University of Arkansas.

Abernethy, Avery M. (1999), "FTC Regulatory Activity and the Information Content of Advertising." Invited presentation at New Mexico State University.

Abernethy, Avery M. (1998), "FTC Regulatory Activity and the Information Content of Advertising." Invited presentation at the University of South Carolina Marketing Department.

Abernethy, Avery M. and George R. Franke (1998), "Media Differences in Advertising Information: A Global Review," *Proceedings of the 1998 Society for Marketing Advances Conference,* Duncan Herrington and Ronald D. Taylor eds, 28-35.

Abernethy, Avery M. (1998), "The Perspective of a New Advisor," presentation on the *Realities of Student Organization Sponsorship: How to Survive and Succeed: A Panel Discussion*

at the 1998 Society for Marketing Advances Conference in New Orleans.

Abernethy, Avery M. and Jan LeBlanc Wicks (1998), "Television Station Acceptance of AIDS Prevention PSAs and Condom Advertisements," abstracted in the *Proceedings of the 1998 Annual Conference of the American Academy of Advertising*, Darrel Muehling (ed.). pg 204.

Wicks, Jan LeBlanc and Avery M. Abernethy (1997), "Do Employee Ethical Beliefs Affect Advertising Clearance Decisions at Commercial Television Stations? Presented at Media Management & Economics Division of the Association for Education in Journalism and Mass Communications. Won 3rd Place in Faculty paper competition.

Cannon, H.M., J.D. Leckenby and A.M. Abernethy (1996), "Modeling Advertising Media Effectiveness," abstracted in *Annual Conference of the Association for Business Simulations and Experiential Learning.*

Cannon, H.M., J.D. Leckenby and A.M. Abernethy (1996), "Overcoming the Media Planning Paradox: From (In)Effective to Optimal Reach and Frequency," in *Proceedings of the 1996 Annual Conference of the American Academy of Advertising*, Gary Wilcox ed., 34-39.

Abernethy, Avery M. (1995), "Are Radio and Television Becoming More Alike?  Some Possible Programming and Attention Level Interactions and Their Influence on Media Planning," abstracted in *Proceedings of the 1995 Conference of the American Academy of Advertising*, Charles S. Madden Ed., (Waco, TX: Hankamer School of Business), 226-7.

Abernethy, Avery M. and James I. Gray (1995), "Currently Available Entry Level Marketing Jobs: Should Marketing Academics Respond to Employer Demand? in the *1995 Southern Marketing Conference Proceedings*, Brian T. Engelland and Denise T. Smart eds., 255-258.

Abernethy, Avery M. and James Gray (1994), "The Information Content of Comparative and Noncomparative Newspaper     Advertising," in the *1994 Southern Marketing Conference Proceedings*, Brian T. Engelland and Alan J. Bush eds, 143-7.

Abernethy, Avery M. and James I. Gray (1993), "The Use of Comparative Advertisements in Newspapers and Radio," in the *1993 Southern Marketing Conference Proceedings*, Tom K. Massey, ed., 313-6.

Abernethy, Avery M. (1991), "Physical and Mechanical Avoidance of Television Commercials: An Exploratory Study of Zipping, Zapping and Leaving," in *1991 American Academy of Advertising Proceedings*, Rebecca H. Holman ed., 223-31.

Abernethy, Avery M. and Herbert J. Rotfeld (1991), "Assessing Attitudes Toward Radio Advertising," in *1991 American Academy of Advertising Proceedings*, Rebecca H. Holman ed. 73-80.

Rotfeld, Herbert J., Avery M. Abernethy and Daniel D. Butler (1990), "Acceptance of Products For Television Advertising," in the *Proceedings of the 36th Annual Conference of the American Council on Consumer Interests*, M. Carsky, ed. (Columbia, MO: American Council on Consumer Interests), 299-304.

Abernethy, Avery M. and Herbert J. Rotfeld (1989), "Factors Impacting Audience Exposure to Radio Advertising," in the *American Marketing Association's Educators Proceedings*, William L. Wilkie et al. ed., 22-26.

**TRADE PRESS, REPRINTS AND GOVERNMENT DOCUMENTS:**
Abernethy, Avery M. and Herbert Rotfeld (1991), "Zipping Through TV Ads Is Old Tradition - But Viewers Are Getting Better At It," *Marketing News*, 25 (January 7), 6 & 14.

**BUSINESS (INSTRUCTIONAL) CASES:**
Abernethy, Avery M. (2006), "Venture Insurance," (Case focuses on handling a major dispute of unfair termination and discrimination. Considerable analysis of compensation plan and annual review procedures also required).

Abernethy, Avery M. (2006), "Atomic Company." published in William L. Cron and Thomas E. DeCarlo Sales Management, 9th edition. Hoboken, NJ: John Wiley & Sons Inc., pg 424-428.

Abernethy, Avery M. (2006), "Inject Plastics." published in William L. Cron and Thomas E. DeCarlo Sales Management, 9th edition. Hoboken, NJ: John Wiley & Sons Inc., pg 461-464.

Abernethy, Avery M. (2005), "Captain's Pleasure," (Case focuses on analysis of sales expenses, compensation rates, and the relationship between expenses and compensation for a luxury product).

Abernethy, Avery M. (2004), "Atomic Pants." published in Douglas J. Dalrymple, William L. Cron and Thomas E. DeCarlo Sales Management, 8th edition. Hoboken, NJ: John Wiley & Sons Inc., pg 288-292.

Abernethy, Avery M. (2004), "Inject Plastics," (Case focuses on using web technology to replace some sales tasks, selecting salespeople for termination, and writing termination letters. Includes financial analyses of potential downsizing).

Abernethy, Avery M. (2003), "Sales Manager Position at Buy Here, Pay Here Autos," (Case analyses the buy here, pay here used car market. Target market are consumers with very poor or no credit. Student must understand the business model for this industry, the requirements of a sales manager for this company, and decide if they wish to take the job).

Abernethy, Avery M. (1993), "Robert's Comics and Collectables." (Setting a budget, deciding a target market, and designing a promotional strategy for a small, successful specialty retailer who is faced with competitive entry. Combines pricing strategy with promotional strategy).

Abernethy, Avery M. (1992), "Tracks Inc.." (Media budget allocation problem combining budgeting, target selection, and creative considerations).

Abernethy, Avery M. (1992), "Reliable Tire." (Calculating the impact of a sales promotion campaign on brand, product line and overall firm profits. Also requires estimation of cross-elasticities of demand and forecasts of demand for product lines and brands).

Abernethy, Avery M. (1992), "Clorox Company Aqua-Rid Marine Mildew Remover." (Promotional and target market selection considerations for a brand extension launch. Includes setting overall promotional budgets, allocating funds between magazines, publicity and trade shows, goal setting for different promotional tools and assessing the impact of those tools).

Abernethy, Avery M. (1992), "Law Office of Aaker and Smith." (Setting a budget, deciding a target market, and designing a promotional strategy for a service firm with very limited funds. Combines the normal difficulties associated with promoting a service firm with a very tight budget constraint).

Abernethy, Avery M. (1991), "Friends of El Salvador." (Media clearance case for a ad submission. Ethics, estimating the probable actions of players in the marketing environment, and estimating the bottom line impact is emphasized).

Abernethy, Avery M. (1991), "Arm & Hammer's Media Strategy." (Illustrates how media planning involves hard numbers, target marketing, and creative considerations. Shows how management judgement (qualitative analysis) interacts with media planning's quantitative analysis).

Abernethy, Avery M. (1987), "Zing Putter." (Case focuses on production, pricing and distribution of a "fashion" product).

**SERVICE:**

Member of the Editorial Review Board for the *Journal of Advertising Research*: 2000 -
Member of the Editorial Review Board for *Marketing Education Review* 1999 -
Member of the Editorial Review Board for the *Journal of Interactive Advertising* 2000 -
Member of the Editorial Review Board for the *Journal of Current Issues and Research in Advertising* 2002 -
Member of the Editorial Review Board for the *Journal of Public Policy & Marketing*: 2006 -
Member of the Editorial Review Board for the *Journal of Advertising*: 2000 - 2006
Reviewer for Journal of Advertising: 1989 - 1999
Reviewer for JA Special Issue on Service Advertising: 1996.
Reviewer for Journal of Retailing: 1992 - 1993. 1997
Reviewer for Journal of Public Policy and Marketing: 1992 - 1994, 1997, 2000.
Reviewer for Journal of Business Research: 1992, 1995 - 1996
Special IMC Issue, 1996 - Special Issue on Replication.
Reviewer for *Marketing Education Review*: 1998
Reviewer for *Science Communication*: 1999
Reviewer for American Academy of Advertising: 1988 - current
Reviewer for Academy of Marketing Science (proceedings): 1989, 1992, 1995, 1998.
Reviewer for Academy of Marketing Science, World Marketing Conference: 1997 - current.
Reviewer for the Journal of Marketing Theory and Practice special issue on promotion: 1994.
Reviewer for the Journal of the Academy of Marketing Science: 2005
Reviewer for the Journal of Retailing and Consumer Services: 1994, 1999
Reviewer for the Southern Marketing Association (proceedings): 992 - 1993, 1996-present.
Reviewer for the AMA Winter Educators Proceedings: 1992, 1995, 1999
Reviewer for the AMA Educators Proceedings: 1992 - 1993, 1999.
Reviewer for the Marketing and Public Policy Conference: 1995, 1997, 1999, 2003
Reviewer for International Marketing Strategy Conference: 1998.
Reviewer for American Academy of Advertising Research Proposals: 1999 - current.
Reviewer for American Academy of Advertising Special Topic Proposals: 2005.

Vice President, American Academy of Advertising 2002.
1999 Advertising and Integrated Communications Track Chair, Society for Marketing Advances Conference.

1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

REGIONS ASSET COMPANY, *
Plaintiff, *
Vs. * CIVIL ACTION NUMBER
REGIONS UNIVERSITY, INC., * 2:06cv882-MHT
Defendant. *

ORIGINAL

* * * * * * * * * * * * * * * * * * * * * * *

Deposition of AVERY M. ABERNETHY, taken before David Michael Camp, CSR, in the law offices of Balch & Bingham, LLP, 1901 6th Avenue North, Birmingham, Alabama, on August 13, 2007, commencing at approximately 1:51 o'clock p.m.

Camp & Associates
Certified Shorthand Reporters
5009 Aldebaran Way, West
Mobile, Alabama 36693-4206
www.campandassociates.com
Toll free (888) 661-8833 Fax (888) 661-8844
Local (251) 661-8833 Fax (251) 666-9797

32

One Thirty-three, when I asked you to highlight what portion of that constitutes your opinions, that you don't know what I'm talking about? Is that correct?

MR. PECAU:

Do you know what he means by "your opinions"?

MR. HUDSON:

Now, wait a minute.

THE WITNESS:

Could you read the last question back?

MR. HUDSON:

Sure.

THE REPORTER:

"Is that correct, Mr. Abernethy; from this document in front of you, which is Exhibit One Thirty-three, when I asked you to highlight what portion of that constitutes your opinions, that you don't know what I'm talking about? Is that correct?"

Camp & Associates
Certified Shorthand Reporters
5009 Aldebaran Way, West
Mobile, Alabama 36693-4206
www.campandassociates.com

Toll free
(888) 661-8833
Fax
(888) 661-8844

Local
(251) 661-8833
Fax
(251) 666-9797

didn't rely upon it. In your report, you spoke of unaided awareness of the name "Regions", did you not?

A Yes.

Q And where did you get your information concerning unaided awareness of Regions?

A From the reports from, I believe, New South Marketing. I believe in some instances in my report, I give it a specific Bates stamp number.

Q Okay. And those reports would be within Exhibit One-O-five, would they not?

A I believe so.

Q Okay. And when you read those reports, did you know what questions were asked of the people who were being interviewed?

A I did not know the specific wording of all of the questions.

Q Did you know the specific wording of any of the questions?

A I don't recall.

Q Okay. Is that important?

MR. PECAU:

Q Only in?

A Only in the research reports.

Q One-O-five. Exhibit One-O-five?

A Yes.

Q Okay. with respect to the surveys that are contained within Exhibit One-O-five, did you make an independent determination of whether or not a representative sample was drawn for those surveys?

A No.

Q Did you make an independent determination of whether or not a fair and correct method of questioning the interviewees was used for those surveys?

A No.

Q Did you make an independent determination of whether or not the persons conducting the survey were recognized experts?

A Beyond the opinions given by the Regions Bank officers, no.

Q By that, they told you they were experts and you didn't check on it. Is that correct?

A That is correct.

138

Q Okay. Did you make an independent determination about whether or not the data gathered was accurately reported?

A No.

Q Did you make an independent determination about whether the samples, the questionnaire and the interviewing were in accordance with generally accepted standards of objective procedures and statistics in the fields of such survey?

A No.

Q Did you make an independent determination about whether or not the interviewers were adequately trained in the field?

A No.

Q Do you have any evidence that any study was made to determine the brand awareness of the name "Regions" with respect to any goods or services other than banking and financial services and insurance and securities?

MR. PECAU:

Objection.

THE WITNESS:

Camp & Associates
Certified Shorthand Reporters
5009 Aldebaran Way, West
Mobile, Alabama 36693-4206
www.campandassociates.com
Toll free (888) 661-8833 Fax (888) 661-8844
Local (251) 661-8833 Fax (251) 666-9797

AMENDED NOTICE

FILE COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| REGIONS ASSET COMPANY, et al., Plaintiffs, v. REGIONS UNIVERSITY, INC. Defendant. | Civil Action No. 2:06-cv-882-MHT |

**AMENDED**

**30(b)(5) and 30(b)(6) NOTICE OF DEPOSITION**

DEPONENT: **30(b)(6) Representatives for REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION, REGIONS BANK**

DATE: **Wednesday, June 27, 2007**

TIME: **9:00 a.m.**

LOCATION: **Offices of:**
**BALCH & BINGHAM LLP**
**105 Tallapoosa Street**
**Suite 200**
**Montgomery, AL 36104**
**(334) 269-3143**

**DEFINITIONS**

The term "you" and "your" shall mean the plaintiffs including any and all agents, servants, employees, attorneys, consultants and experts including, without limitation, contractors, sub-contractors, agents and employees of experts, and all others acting on your behalf.

"Person" shall mean any individual, partnership, firm, association, corporation or other business, governmental or legal entity.

The term "Document" or "Documents" means and includes any kind of written, type written, printed, punched, taped, filmed or otherwise recorded or graphic material whatsoever, including, without limitation, papers, contracts, notes, memoranda, accident reports, correspondence, letters, telegrams, notes, catalogues, brochures, calendars, diaries, interoffice communications or notes, statements, notes to self or file, invoices, record books, corporate charters, reports, share certificates, stock transfer ledgers, records, accounting books, financial statements, financial information of any kind, transcriptions, accounts, bank accounts, checks, check books, check book ledgers, all financial documents or records in any way pertaining to the balance in any bank account, grafts, charts, recordings, computer records or tapes, computer software, photographs, recordings, phono records and other data compilations of any kind and nature from which information can be obtained, translated, in necessary, by the respondent through detection devices and into reasonable useable form, of which you have knowledge or information, whether in your possession, the possession of your representatives, including, without limitation, any attorney who now represents you or has represented you in the past or under your control, or under the control of any of your agents, servants, employees, officers, directors or shareholders, relating or pertaining in any way to the subject matters in connection with which it is used, and includes, but without limitation, originals, all file copies, all original file folders, all other copies, no matter how or by whom prepared, and all drafts prepared in connection with such writings, whether used or not.

"Pertaining to" or "relating to" means constituting, referring, reflecting, mentioning, evidencing, concerning, pertaining to, summarizing, analyzing, touching upon, or being logically or factually connected in any way with the matter discussed.

"Address" shall mean the street number, street, city and state of the subject person, business or other entity.

The terms "identify" or "identification" when used with reference to a person, shall mean to state the full name and the present or last known address of said person as well as his place of employment and job title.

Please take notice that Victor T. Hudson and/or William W. Watts, attorneys for defendant, will, in addition to the categories noted in the 30(b)(5) and 30(b)(6) Notice of Deposition dated the May 23, 2007, take the deposition of the person or persons with **REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION** and **REGIONS BANK** having the most complete knowledge of the following **two (2) additional items** and you are reminded that pursuant to Rule 30(b)(6), Federal Rules of Civil Procedure, you have a duty to designate the representative or representatives who will testify on your behalf on the following

two (2) additional categories as well as the sixteen categories set forth in the Notice dated May 23, 2007:

1. Each and every logo formerly or presently used by you that contains the word "Regions" either alone or with other elements.

2. Brand Awareness Studies including those of the type referred to by Russell Dunman in his deposition at Page 105.

**30(b)(5) DOCUMENTS TO BE PRODUCED**

Pursuant to Rule 30(b)(5) of the Federal Rules of Civil Procedure, the witnesses are requested to bring any documents touching or concerning or otherwise relating in any manner, to the following:

1. Any and all documents which pertain to or relate to categories Nos. 1 and 2 of this Amended 30(b)(6) notice.

2. Any and all documents reviewed by you in preparation for your deposition.

VICTOR T. HUDSON
Attorney for defendant

OF COUNSEL:

HUDSON & WATTS, LLP
Post Office Box 989
Mobile, AL 36601
(251) 432-7200 Phone

James E. Shlesinger, Esq.
SHLESINGER, ARKWRIGHT & GARVEY, LLP
1420 King Street, Suite 600
Alexandria, VA 22314

Civil Action No. 2:06-cv-882-MHT

CERTIFICATE OF SERVICE

I hereby certify that I have on this 19th day of June, 2007, served counsel for all parties to this action with a copy of the following by depositing a copy of same in the United States mail, properly addressed with postage thereon pre-paid and by email to:

Paul A. Clark, Esq.
Charles Paterson, Esq.
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078

William G. Pecau, Esq.
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

VICTOR T. HUDSON



ORIGINAL NOTICE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

REGIONS ASSET COMPANY, et al.,)
)
Plaintiffs, )
)
) Civil Action No. 2:06-cv-882-MHT
)
REGIONS UNIVERSITY, INC. )
)
Defendant. )
)

## 30(b)(5) and 30(b)(6) NOTICE OF DEPOSITION

DEPONENT: **30(b)(6) Representatives for REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION, REGIONS BANK**

DATE: **Wednesday, June 27, 2007**

TIME: **9:00 a.m.**

LOCATION: **Offices of:**
**BALCH & BINGHAM LLP**
**105 Tallapoosa Street**
**Suite 200**
**Montgomery, AL 36104**
**(334) 269-3143**

## DEFINITIONS

The term "you" and "your" shall mean the plaintiffs including any and all agents, servants, employees, attorneys, consultants and experts including, without limitation, contractors, sub-contractors, agents and employees of experts, and all others acting on your behalf.

"Person" shall mean any individual, partnership, firm, association, corporation or other business, governmental or legal entity.

The term "Document" or "Documents" means and includes any kind of written, type written, printed, punched, taped, filmed or otherwise recorded or graphic material whatsoever, including, without limitation, papers, contracts, notes, memoranda, accident reports, correspondence, letters, telegrams, notes, catalogues, brochures, calendars, diaries, interoffice

communications or notes, statements, notes to self or file, invoices, record books, corporate charters, reports, share certificates, stock transfer ledgers, records, accounting books, financial statements, financial information of any kind, transcriptions, accounts, bank accounts, checks, check books, check book ledgers, all financial documents or records in any way pertaining to the balance in any bank account, grafts, charts, recordings, computer records or tapes, computer software, photographs, recordings, phono records and other data compilations of any kind and nature from which information can be obtained, translated, in necessary, by the respondent through detection devices and into reasonable useable form, of which you have knowledge or information, whether in your possession, the possession of your representatives, including, without limitation, any attorney who now represents you or has represented you in the past or under your control, or under the control of any of your agents, servants, employees, officers, directors or shareholders, relating or pertaining in any way to the subject matters in connection with which it is used, and includes, but without limitation, originals, all file copies, all original file folders, all other copies, no matter how or by whom prepared, and all drafts prepared in connection with such writings, whether used or not.

"Pertaining to" or "relating to" means constituting, referring, reflecting, mentioning, evidencing, concerning, pertaining to, summarizing, analyzing, touching upon, or being logically or factually connected in any way with the matter discussed.

"Address" shall mean the street number, street, city and state of the subject person, business or other entity.

The terms "identify" or "identification" when used with reference to a person, shall mean to state the full name and the present or last known address of said person as well as his place of employment and job title.

Please take notice that Victor T. Hudson and/or William W. Watts, attorneys for defendant, will take the deposition of the person or persons with **REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION** and **REGIONS BANK** having the most complete knowledge of the following items and you are reminded that pursuant to Rule 30(b)(6), Federal Rules of Civil Procedure, you have a duty to designate the representative or representatives who will testify on behalf of the following categories:

1. All services and products offered and/or sold by the plaintiffs.

2. The channels of trade associated with the business of the plaintiffs, and the types or categories of customers of the plaintiffs.

3. The advertising media used by the plaintiffs to promote their services and products.

4. Any incidents of actual confusion resulting from your use of any Regions name or REGIONS mark and the defendant's use of Regions University.

5. The demographics of the current and proposed market for services and products offered and/or sold by the plaintiffs, including, without limitation, the current trading area of the plaintiffs; the geographic degree of recognition of the plaintiffs' use of Regions; and the extent of advertisement and publicity of the plaintiffs outside of the sixteen state footprint within which the plaintiffs operate.

6. The use by the plaintiffs of the word, Regions, either alone or in combination with any words or designs, in connection with educational services.

7. The fame of the mark(s) used by the plaintiffs and any claimed dilution of the mark as a result of the defendant's use of Regions University.

8. The nature and extent of third party uses of any name or mark with Region or Regions, alone or in combination with any other term, including the uses of names listed in search reports produced by plaintiffs pursuant to discovery requests.

9. Any efforts, successful or not, in policing or enforcing the plaintiffs' name, Regions, either alone or in combination with any words or designs, against others, including, without limitation, any cease and desist letters written or contemplated, as well as any responses thereto; any contact with anyone you considered or contended was infringing any of your Regions names or marks, and the result of that contact; and any settlement or negotiations for settlement reached with anyone concerning your marks, including Region 2020.

10. Any information supporting the contention made by the plaintiff that defendant has acted in bad faith.

11. Any and all surveys performed by the plaintiffs, jointly or separately, or contemplated to be performed, in connection with any claims presented in the Complaint.

12. The organization, ownership, and corporate structure of plaintiffs and their affiliated companies, including any License Agreements between or among plaintiffs and their affiliated entities or with others; any licensing of the name, Regions, to others by the plaintiffs; and any negotiations or consideration for licensing the term, Regions, either alone or in combination with other terms, to any third party.

13. Any limitations or restrictions on the plaintiffs as it relates to the services the plaintiffs can provide by virtue of the plaintiffs' corporate charter, and state or federal banking laws.

14. The authority of the plaintiffs to operate a post-secondary educational institution such as a University, and the authority of the plaintiffs to call their corporate training program, Regions University.

15. The decision to employ "Regions University" as a mark to describe the plaintiffs' corporate training program, including any minutes of any meeting of the board of directors or of any committee for any of the plaintiffs authorizing, recommending or approving the name "Regions University" to describe said services.

16. The identity of all persons involved in the preparation of the plaintiffs' discovery responses.

**30(b)(5) DOCUMENTS TO BE PRODUCED**

Pursuant to Rule 30(b)(5) of the Federal Rules of Civil Procedure, the witnesses are requested to bring any documents touching or concerning or otherwise relating in any manner, to the following:

1. Any and all documents which pertain to or relate to category Nos. 4 through 16 of this 30(b)(6) notice.

2. Any and all documents reviewed by you in preparation for your deposition.

WILLIAM W. WATTS, III
Attorney for defendant

OF COUNSEL:

HUDSON & WATTS, LLP
Post Office Box 989
Mobile, AL 36601
(251) 432-7200 Phone

James E. Shlesinger, Esq.
SHLESINGER, ARKWRIGHT & GARVEY, LLP
1420 King Street, Suite 600
Alexandria, VA 22314

CERTIFICATE OF SERVICE

I hereby certify that I have on this 23rd day of May 2007, served counsel for all parties to this action with a copy of the following by depositing a copy of same in the United States mail, properly addressed with postage thereon pre-paid to:

Paul A. Clark, Esq.
Charles Paterson, Esq.
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078

William G. Pecau, Esq.
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

WILLIAM W. WATTS

STEPTOE & JOHNSON LLP

ATTORNEYS AT LAW

William G. Pecau
202.429.6244
wpecau@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Tel 202.429.3000
Fax 202.429.3902
steptoe.com

June 21, 2007

**Via E-Mail and First Class Mail**

Victor T. Hudson, Esq.
Hudson & Watts, LLP
One St. Louis Centre Suite 2500
Mobile, AL 36601

**RE: Regions Asset Company v. Regions University, Inc.
Case No. CV-06-882-MHT**

Dear Tom:

With respect to the 30(b)(6) deposition of Regions, two witnesses, Scott Peters and Hope Mehlman, will be designated for Regions on June 27 (Scott Peters) and on June 28 (Hope Mehlman) for the following topics in defendant's notice:

A. Scott Peters

1. REGIONS services and products (1)[1]

2. Advertising and promotion of REGIONS and REGIONS services and products (5)

3. Media used to promote REGIONS services (2) (3)

4. REGIONS retail outlets (branches and internet) (2)

5. REGIONS customers (demographic and geographic) (2)

---

[1] The numbers in parentheses refer to the categories appearing in the Notice of Deposition dated.

Their Designation

6. Recognition of REGIONS, in general and geographically, and related surveys (5) (7) (11)

7. Markets for REGIONS services (5)

8. Dilution of REGIONS brand and name by use of Regions by defendant (7)

B. Hope Mehlman

1. Third Party Use

   a. Third-party use of marks and business names including Regions, Region or Regional known to REGIONS (8)

   b. Policing REGIONS mark (9)

2. Corporate Structure of Plaintiffs and their Affiliates

   a. Corporate structure (12)

   b. Intracompany licensing agreements (12)

   c. Licenses to REGIONS to run a post-secondary educational institution (14)

3. Persons primarily involved in obtaining information for plaintiffs' responses to defendant's discovery requests (16).

Regarding your letter dated June 15, 2007, Regions will be producing a witness on the topics covered by Interrogatory Nos. 9 and 10. Regions believes that this witness's testimony should satisfy any legitimate concerns defendant may have concerning the information sought by these interrogatories.

Very truly yours,

William G. Pecau

cc: James Shlesinger, Esq.
Charles Paterson, Esq.

**joyce clayton**

**From:** "Pecau, William" <wpecau@steptoe.com>
**To:** "Tom Hudson" <tom@alabamatrial.com>
**Cc:** "Charlie Paterson" <cpaterson@balch.com>; "jim shlesinger" <jim@sagllp.com>; "Marmer, Rachel" <rmarmer@steptoe.com>
**Sent:** Thursday, June 21, 2007 1:26 PM
**Attach:** Hudson letter 6-21-07.pdf
**Subject:** RE: Regions Asset Company v. Regions University

Please see the attached letter.
Regards,
Will

**William G. Pecau**
**Steptoe & Johnson LLP**
**1330 Connecticut Avenue NW**
**Washington, DC 20036**
**202.429.6244 office**
**202.247.5425 cell**
**202.429.3902 fax**
**wpecau@steptoe.com**

The information contained in this e-mail message is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this transmission or its contents is strictly prohibited. If you have received this transmission in error, please notify the e-mail sender at "wpecau@steptoe.com." Thank you.

---

**From:** Tom Hudson [mailto:tom@alabamatrial.com]
**Sent:** Friday, June 15, 2007 6:23 PM
**To:** Marmer, Rachel
**Cc:** Pecau, William; Charlie Paterson; jim shlesinger
**Subject:** Regions Asset Company v. Regions University

**PLEASE SEE THE ATTACHED LETTER**

******************************************************************************************

PLEASE NOTE: The information in this email message is legally privileged and confidential information intended only for the use of the addressee(s) named above. If you, the reader of this message, are not the intended recipient, you are hereby notified that you should not further disseminate, distribute, or forward this email message. If you have received this email in error, please notify the sender at (251) 432-7200 as soon as possible. In addition, please delete the erroneously received message from any device/media where the message is stored. Thank you.

Regions reserves the right to assert additional and further objections to the Interrogatories to the extent that Regions' production of documents or information in this action reveals that such additional and further objections are appropriate.

In responding to the Interrogatories, Regions does not concede that any of the information sought or provided is relevant, material, admissible in evidence, or reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY RESPONSES**

**INTERROGATORY NO. 9:**

Identify each and every third party use of a designation concerning the term "Region" or "Regional," of which Plaintiff is or has been made aware, in connection with any type of product or service, and describe with particularity:

a. the name of the third party;

b. the goods or services;

c. the trademark, service mark, or other designation;

d. the identify (*sic.*) of any and all communications, agreements, licenses, and/or all other documents, relating to the third party's use; and

e. the details of any civil proceedings, administration proceedings, or other inter partes proceedings Plaintiff has been involved in concerning each and every third party use.

**RESPONSE TO INTERROGATORY NO. 9:**

Regions restates each General Objection as if fully set forth herein. Regions further objects to this Interrogatory on the grounds that it is overbroad, oppressive and unduly burdensome and vague, indefinite, and incapable of precise determination as it is unlimited in time and requests Regions to identify the use of "a designation concerning the term 'Region' or 'Regional,' without stating the kind or manner of use of these words in connection with a

product or service, and it concerns terms that are not the subject of the action that solely concerns the use of "REGIONS" as the only salient term for the business names and trademarks. Similarly, as the Interrogatory seeks information concerning terms that are not the subject of this action, it seeks information that is not relevant to the issues in this proceeding or likely to lead to the discovery of admissible evidence. Regions further objects to this Interrogatory on the grounds that it is vague, indefinite and incapable of precise determination insofar as it requests the "details" of proceedings, and to the extent it requests information that is subject to the attorney client or work product privileges. Regions objects to section (d) of this Interrogatory as overbroad to the extent that it asks for "all communications, agreements, licenses, and/or all other documents."

Subject to and without waiving the foregoing objections, Regions has already produced or is producing the following documents, some of which refer to the use or possible use of the terms REGION or REGIONAL as or as part of names, marks or domain names: (a) cease and desist letters sent to third parties to enforce Regions' rights to its REGIONS mark and any agreements relating to them at the following bates ranges: RAC00010467-959, RAC00011480-2125, RAC00012190-471, RAC00010465-66, RAC00011801-03, RAC00011835-37, and RAC00030557-58; (b) an *inter partes* Notice of Opposition, *Regions Financial Corporation v. Regional Acceptance Corporation*, Opp. No. 91155299, that Regions filed at the Trademark Trial and Appeal Board concerning the application to register the mark REGIONAL ACCEPTANCE and the Answer thereto at the following bates numbers: RAC00030359-87. Regions is not aware of any other legal proceeding brought by Regions concerning the use of the term REGIONAL or REGION. (c) Regions produced search reports

for the term Regions at the following bates numbers: RAC00015276-709 and RAC00017278-22256.

**INTERROGATORY NO. 10:**

      If Plaintiff has ever contacted another person, orally or in writing, directly or through a representative, for the purpose of objecting to or inquiring as to the use or potential use by someone else of the term "Region" or "Regional," state with particularity the full details of each such contact.

**RESPONSE TO INTERROGATORY NO. 10:**

      Regions restates each General Objection as if fully set forth herein. Regions further objects to this Interrogatory on the grounds that it is overbroad, oppressive and unduly burdensome and vague, indefinite, and incapable of precise determination as it is unlimited in time and requests Regions to identify the use of "a designation concerning the term 'Region' or 'Regional,' without stating the kind or manner of use of these words in connection with a product or service, and it concerns terms that are not the subject of the action that solely concerns the use of "REGIONS" as the only salient term for the business names and trademarks. Similarly, as the Interrogatory seeks information concerning terms that are not the subject of this action, it seeks information that is not relevant to the issues in this proceeding or likely to lead to the discovery of admissible evidence. Regions further objects to this Interrogatory on the grounds that it is vague, indefinite and incapable of precise determination insofar as it requests the "full details" of contact, and to the extent it requests information that is subject to the attorney client or work product privileges. Regions objects to section (d) of this Interrogatory as overbroad to the extent that it asks for "all communications, agreements, licenses, and/or all other documents."

      Subject to and without waiving the foregoing objections, Regions has already produced or is producing the following documents, some of which refer to the use or possible

use of the terms REGION or REGIONAL as or as part of names, marks or domain names: (a) cease and desist letters sent to third parties to enforce Regions' rights to its REGIONS mark and any agreements relating to them at the following bates ranges: RAC00010467-959, RAC00011480-2125, RAC00012190-471, RAC00010465-66, RAC00011801-03, RAC00011835-37, and RAC00030557-58; (b) an *inter partes* Notice of Opposition, *Regions Financial Corporation v. Regional Acceptance Corporation*, Opp. No. 91155299, that Regions filed at the Trademark Trial and Appeal Board concerning the application to register the mark REGIONAL ACCEPTANCE and the Answer thereto at the following bates numbers: RAC00030359-87. Regions is not aware of any other legal proceeding brought by Regions concerning the use of the term REGIONAL or REGION. (c) Regions produced search reports for the term Regions at the following bates numbers: RAC00015276-709 and RAC00017278-22256.

Objections to the foregoing interrogatories are made pursuant to Fed. R. Civ. P. 33 by attorneys for Regions Asset Company, Regions Financial Corporation and Regions Bank.

William G. Pecau / RM
One of the Attorneys for Plaintiffs Regions Asset Company, Regions Financial Company and Regions Bank

IN THE UNITED STATES DISTRICT COURT

FOR THE

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

REGIONS ASSET COMPANY, *

Plaintiff, *

Vs. * CIVIL ACTION NUMBER

REGIONS UNIVERSITY, INC., * 2:06cv882-MHT

Defendant. *

Condensed

* * * * * * * * * * * * * * * * * * * * * * *

Rule 30(b)(6) deposition of Regions Asset Company, taken through the witness, SCOTT M. PETERS, before David Michael Camp, Commissioner, in the law offices of Balch & Bingham, LLP, 105 Tallapoosa Street, Suite 200, Montgomery, Alabama, on June 27th, 2007, commencing at approximately 9:07 o'clock a.m.

Page 10

and we couldn't find any.
MR. HUDSON:
Okay. Well, are, in fact, there any outside of the sixteen-state area?
MR. PECAU:
I don't think so. I mean, I think that all the ones we produced --
MR. HUDSON:
Are within the area?
MR. PECAU:
-- are within the area. I don't know if, you know, there might be some -- I mean, I haven't looked at them so carefully to see if there are some, you know, like they might pull in a seventeenth state or something like that. I didn't look at that. I know that the focus of the ones I recall looking at were within that area.
MR. HUDSON:
Okay. And I gather because of our other category designation areas

Page 11

that Mr. Peters will testify about the brand awareness studies that you did produce.
MR. PECAU:
That's correct.
MR. HUDSON:
And finally, there are categories of witnesses or requests for testimony on categories on Exhibit Eighty for whom a witness has not been designated, and I sent you an email about those. But they are specifically categories Four, Six, Ten, Thirteen and Fifteen. Are we going to have a witness designated for those?
MR. PECAU:
I want to talk to you about those categories. I have a list of things that I want to discuss with you.
MR. HUDSON:
Well, if you want to have a discussion with me off the record,

Page 12

I'm willing to do that.
MR. PECAU:
Well, since you raised that, I'm not going to get into the whole discussion with you on the record. But basically, the education, we're working on it. The problem with education, it's part of Regions' DNA, it's been described to me, which means that it's all over the place. So we're working to find someone that can testify overall about education and outreach to communities.
I need to talk to you about bad faith. I think that's one of the categories, because I'm not sure what you're looking for. And I don't know the other categories referred to within that. But we can talk off the record and I'll tell you, you know, what we're going to give you and what we're not.

Page 13

In my letter to you -- I think I sent you a letter on the 30(b)(6) -- I think I indicated two areas that we had difficulty with because they're looking purely for legal research files, which we're not going to do.
MR. HUDSON:
Well, we can talk about that off the record.
MR. PECAU:
Okay.
MR. HUDSON:
And I understand that there are some more records that are going to be produced this morning and I'll look at them when I get them. They're on the way.
MR. PECAU:
Yeah.

EXAMINATION

BY MR. HUDSON:
Q All right. Mr. Peters, I gather that

Page 14

you understand that you have been designated to testify on these categories of these depositions that have been noticed that are referred to in Exhibits Eighty, Eighty-one and Eighty-two. Is that correct?

A I don't know.

Q Your lawyer may need to tell you that.

A Well, I don't have Eighty, Eighty-one and Eighty-two in front of me.

MR. PECAU:

Well, he's going to testify as to the matters that are set out in Exhibit Eighty-two, which cover -- which indicate what topics that are covered in the Exhibits Eighty and Eighty-one.

MR. HUDSON:

Well, that was my understanding too. We're all being too cautious. I didn't understand that there was any -- that Eighty-two was an attempt to limit the category. There's a general description of it

Page 15

and he's the man that's going to testify on that particular category.

MR. PECAU:

Right. He's going to testify as to the categories which I think are broadly defined in Exhibit Eighty-Two.

MR. HUDSON:

That's what I thought.

BY MR. HUDSON:

Q Mr. Peters, would you please state your name for the record?

A Scott Michael Peters.

Q And where are you employed, Mr. Peters?

A At Regions, Regions Bank.

Q In what capacity?

A I'm the Chief Marketing Officer.

Q How long have you been with Regions?

A I've been with Regions since the merger. I was the Chief Marketing Officer at AmSouth. So when the merger occurred, I took on that same title.

Q Okay. Who was the Chief Marketing

Page 16

Officer at Regions prior to the merger?

A Andrew Rosen.

Q R-O-S-E-N?

A Yes.

Q And where is he employed now?

A I'm unsure. I believe he's at Washington Mutual.

Q With whom?

A Washington Mutual.

Q Okay. The mutual fund?

A No. They are an S&L.

Q Where are their offices?

A I believe they are in the Seattle area but I don't know the exact location.

Q Who would be the person that would be able to tell us his present location?

A I don't know.

Q Who is most likely in the bank to have that information? I don't want to pick at you but surely, you forward mail and things to him.

A I would assume somebody in human resources potentially.

Q Who is the director of the HR

Page 17

department?

A That's Dave Edmonds.

Q Edmonds? And where is he? Is he in Birmingham?

A He is in Birmingham.

Q Please give me your background starting with your college education up through your employment history and any relevant training that you might have had in the interim.

A Okay. I went to the University of Connecticut, graduated in 1983 with a business degree, marketing as the focus of that degree. I worked in the Boston area for a company called Coleman Pro Clean, which was a manufacturer of chemicals in a sales and marketing role.

I went to Portland, Maine a couple of years after that and worked for an advertising agency called Dagle Associates as an Account Executive. Following that, in 1987, I went to work for Citicorp, Citibank, Maine, located in South Portland, Maine, as a Product Marketing employee.

I held various positions with Citicorp from Branch Manager of the de novo branch on to Sales

Page 74

state of Alabama, assuming these are correct, these look similar to what today's customer base makeup looks like.

BY MR. HUDSON:

Q Like Eighty-nine and Ninety?

A Yeah, these two.

Q All right. Now, is your customer base across all of the banks since the merger significantly different than what is shown on Eighty-nine and Ninety?

A Similar, although the one thing I would like to identify on this is --

MR. PECAU:

You have to identify the exhibit.

THE WITNESS:

Exhibit Ninety. Is that we more recently seem to have some conflicting information on the male/female split, which I don't think is due to a change in the base but probably a change of who they surveyed versus who might be a

Page 75

primary account holder. So I'm not sure that's a material issue.

BY MR. HUDSON:

Q And otherwise, it's pretty much the same thing?

A Similar.

Q Okay. Returning to Exhibit Eighty-four, do you know who was surveyed in order to reach those conclusions in that information?

A Specifically, no. I know what this company does is they provide this kind of appended information to lots of --

Q But you just relied on them to give you the information and there it is in that exhibit?

A We provide them our customer base and where they live and the information we have.

Q Right.

A And then they append data to our customer base based on that information.

Q But whatever they have to do to make it statistically significant and do it in an appropriate way, you rely upon them to do that?

A That's correct.

Page 76

Q Have you designed any surveys, yourself?

A Myself?

Q Yes.

A As a company, yeah, we have. I'm not -- my acumen is not as a strict researcher.

Q Okay. Does Regions design its own surveys or does it rely upon professionals to do that for them?

A A combination of both. But typically, we rely upon professionals to do that for us, with our input, obviously.

Q Does Regions get involved in the details of the survey, such as being certain that a representative sample has been selected and that sort of thing?

A Uh-huh. Yes.

Q And who at Regions manages that?

A I would -- my division would manage that, the sample selection.

Q And would you help design the questions that are asked of the customers?

A We would.

Q How is the design of the questions that

Page 77

are asked important to the results?

A It's important in that typically when you do a survey, you have an objective of what you're trying to find out. So in order to do that, you need to ask the right questions and you need to try to do it in a way that's clear and understandable and that you're as sure as possible that you're getting the feedback that you're looking for. I don't know if I answered your question.

Q On particular targeted topics? Are the questions designed in order to get you information on particularly targeted topics?

A In some cases. In some cases, it's for broad perceptions. So it depends.

Q Okay. Now, these surveys of consumer awareness, were they prepared to get answers on particular targeted topics?

A I think what I've seen have been general awareness questions with varying layers of prompting.

Q Okay. You didn't see questions about whether or not they were happy with their checking

accounts and that sort of thing?
A I think you asked me about the awareness studies. In the other satisfaction studies, yes, there were particular, you know, specific topics, as well as broader topics that they are queried on.
Q And do you recall that the surveys of consumer awareness were designed to compare the consumer awareness of Regions Bank to other banks?
A I believe -- I'd have to look at them again.
Q We can look at them.
A I believe they started with name recognition, period.
Q Do you know if they started with name recognition of banks as opposed to just, period?
A Why don't you give them to me?
Q If you need them to answer the question, we can look at them and do that. And we will. And you've told me that you need to. All right?
A All right.
Q I was looking for a shortcut if there was one. If there's not, then we'll go to it.

A The ones I looked at were historical and didn't conduct them.
Q I know. And we can look at them. And your knowledge of those things is limited to what you were able to see in them. Is that correct?
A That's correct. I know typical surveying methodologies. But there are various ones. So --
Q But is it fair to say that with regard to the surveys of consumer awareness that you really can't tell us anything about them except what is contained within the four corners of the documents, themselves?
A Specific to those surveys, yes. As a general practice, I could probably provide information.
Q As a general practice, you could tell us what should have been done and what might have been done but you can't tell us specifically what was done. Is that correct?
A That's correct.
Q All right. The documents I'm referring to as surveys of consumer awareness are these that

I'll mark -- first, I'll just refer to them. They are from Bates stamp number RAC22357 through 22991. And I'm going to hand this to you and for this moment, I'll just ask you to thumb through it to see if, in fact, those are the ones that we're referring to that you've just referred to in response to my question.
You may find some extraneous material in there. It may be them plus some stuff because I didn't know where they started and where they stopped.
A Uh-huh. Yeah. This is some of what --
Q Just go ahead and thumb through all of that and be sure that's it. And we'll get to special questions later. But for now, I just want to try to identify them for the record.
A This looks like what I went through. Yeah, this looks like it.
Q Okay. Thank you. Let me show you Exhibit Ninety-one. And just in generic terms, can you tell me what that is? The reason I'm asking in generic terms is because we have a number of things that look sort of like it but are

different. So if we can get a category for it, then we can work from there.
A Okay. And the question is?
Q Yes. Generically, can you tell me what that is?
A It looks like a brief on the Union Planters/Regions merger and baseline information on some of the considerations with regard to introducing the Regions brand to those customers who might have been unfamiliar with it or it was new to them.
Q Okay. Look at Ninety-three and tell me what that is. Right now, I'm trying not to be specific. I'm trying to generally understand what those things are and what Ninety-one and Ninety-three have in common.
A Okay. It's basically -- they both appear to be briefs. This one is a broader one on an event. This one is very specific to a particular product that's being presented, advertised, marketed.
Q And what is a brief?
A A brief is to try to capture the salient

Okay.
BY MR. HUDSON:
Q I'll show you what's been marked as One-O-three and was recently produced to me, which I understand to be the new logo for Regions Bank after the merger. Am I correct in that understanding?
A That's correct.
Q Is it being used now?
A In some -- it is being used now. Not comprehensively.
Q But you're in transition?
A Correct.
Q And I'll show you previously what was marked as Exhibit Three to Mr. Dunman's deposition, and represent to you that it was his testimony that that was the previous logo used by Regions Bank. Is that correct?
A That's correct.
Q Has any other logo been used except those depicted in Exhibits Three and One-O-three?
A I don't know the answer to that. I do -- yeah. Actually, I do know of the logo

treatment of the G which was prior to the Union Planters merger, and was used.
Q With the stylized G?
A Correct.
Q And after the Union Planters merger, was the logo adopted as depicted in Exhibit Three?
A Yes.
Q Okay.
A Although the other logo is still widely in use.
Q With the stylized G?
A Yes.
Q And except for those, are there any other logos that you're aware of?
A Not that I know of.
Q Have you participated in any meeting or discussion with management in which there was any discussion, whatsoever, about the new logo?
A Yes.
Q Tell me what the reasons were for the choice of the new logo depicted in One-O-three as they were communicated to you.
A What we wanted to do was retain the

brand equity of the Regions name and familiarity with that while just kind of contemporizing it, updating it. And some of it was --
Q When you say "updating", you mean updating the logo as it appeared in Exhibit Three?
A One-O-three? This one?
Q No. From Exhibit Three to One-O-three.
A To the new one, yes. And also, there was, in the earlier logo, a direct tie to Union Planters based on the triangle and the plant.
Q That's the Exhibit Three?
A That's correct.
Q That shows the little plant.
A That's correct. And we wanted it to be focused on Regions and not try to tie together multiple legacy institutions like AmSouth and Union Planters at a high level.
Q So that was the reason for keeping the little triangle but stylizing the leaves?
A That's correct.
Q I'm sorry but I'm going to have to look over your shoulder on these. I only have one copy.

A That's okay.
Q Let me show you what has been marked as Exhibit One-O-four and ask if you could identify that.
A Yes. I'm familiar with the BQSI.
Q What is it?
A It was an ongoing study, research study for individuals who went into branches at Regions to assess their satisfaction with the experience.
Q Now, were you with Regions Bank at the time that study was made?
A No.
Q Do you have any knowledge of it except what is contained within the four corners of the document, itself?
A No.
Q Okay. Generally, what is the purpose for a quality satisfaction study?
A To keep your finger on the pulse of the satisfaction of your customers to understand what makes them happy, what makes them sad, and to the extent you're doing things that they don't like to try to take corrective action in your

organization.

Q This one seems to have specific categories like monthly trends and teller services satisfaction and that sort of thing. Is that typical for such surveys?

A Yes.

Q And that would be whether an existing customer was satisfied with tellers as a matter of course or not.

A Correct.

Q And the same would be true with officer service satisfaction.

A Uh-huh.

Q Yes?

A Yes.

Q And what is an officer?

A That would be basically a non-teller in the branch, someone who might sit on the platform and open accounts.

Q Okay.

A And perhaps answer more complex questions and queries.

Q All right. This particular page, which

is Bates stamp number 286 says, "How different Regions performed in comparison to RFC". Who is RFC?

A I believe what they're saying is RFC is the total score for the company, Regions Financial Corp, and then breaking it out -- this page is to break it out by different geographies.

Q Which branches are under-performing and which are performing well?

A No. Actually, I believe what it's meant to do is to look at different geographical areas of the company and to determine if different geographies are performing better or worse.

Q Okay. Than the average for the whole company?

A Correct.

Q These are the surveys of consumer awareness that you had previously identified for me that run from Bates stamp number 22357 through 22991.

MR. PECAU:
What exhibit number is that? Are you marking it?

MR. HUDSON:
No. I need to. One-O-five.

BY MR. HUDSON:

Q I've marked that as Exhibit One-O-five for identification. Do you recognize that as being the surveys about which we've just spoken?

A Yes.

Q Okay. Looking at page 22359, you had mentioned earlier that you thought that there was some unaided brand awareness inquiries that were made, and that you thought they might have been just on the name "Regions" as opposed to Regions against other banks.

A Uh-huh.

Q Can you tell from that page which it was?

A I can't.

Q Okay.

A Because I don't see the question.

Q Okay. If you don't see the questions for these surveys, it's very hard to know what was being surveyed, itself, isn't it?

A Well, what I would say from my

experience, it's one of two things. It was either an open-ended --

Q He's asked you not to speculate, and I agree with that.

MR. PECAU:
Well, I don't think this is speculating. He's testifying about his experience, which he can do.

THE WITNESS:
It's one of two things. They either did an open-ended, do you know this name, or they said, name any banks you know about in this area. But typically what they would have done is looked for the name.

BY MR. HUDSON:

Q But in any event, you don't know which they did?

A In this one, I do not. Either one or the other.

Q Okay. Now, we do see on the following page, 22361, there is a chart called Brand Awareness that says, "Unaided First Bank

Mention". Correct?
A Yes.
Q And in that one, would you expect the question to have been, name banks?
A I would.
Q Okay. The next one is 22362. And it says just "Brand Awareness Unaided" but it lists nothing but banks. Do you see that?
A Yes.
Q Would you expect that question to have also been to name banks?
A I would expect that.
Q Okay. And then do you see 22363 which says "Familiarity" and that compares only Regions to AmSouth? Do you see that?
A I do.
Q Both of which are banks.
A Correct.
Q 22364 is Customer Relationship and Satisfaction. And it discusses Regions, AmSouth and Wachovia, all of which are banks. Correct?
A Correct.
Q The same is true for the next page,

22365. I'm not going to cover every page of this. It's self-evident. 22368 is Unaided Ad Awareness. And that, again, lists only banks.
Would you expect that question would have been, give me the name of banks?
A Most likely.
Q Okay. It might make some more sense to do this. Why don't you thumb through these? They are here. See if you can find one that you think might have been awareness that wasn't asking about banks.
A Okay.
WHEREUPON, A RECESS WAS TAKEN.
THE WITNESS:
Okay. The primary things that I saw that were probably more broad based than banks was the inclusion of credit unions. Some questioning on that really showed up. And the other was some product listings, which you have copies in front of you, where they asked about different types of product usage and

whether they were using them with the bank or not, which included some categories like credit card, which could be credit card companies. Let me look at that again.
BY MR. HUDSON:
Q Okay.
A Stocks, bonds, mutual funds, IRAs, categories that would be outside of banking which potentially was eliciting responses outside of the banking arena. And the other was the mention of some bank holding companies that weren't necessarily sometimes present in the geographies they were asking about.
So it could have been around other lines of business outside of banking. So those were the only evidence I saw of going outside banking.
Q Can you give me a general description of what Exhibit One-O-five is?
A Yes. It's generally understanding -- well, it's a couple of things because there's both satisfaction and awareness research in this entire exhibit. Part of it is to understand how strong

recognition there is and awareness there is of the name "Regions" versus other competitors, primary competitors in the marketplace.
Q And who are the primary competitors in the marketplace?
A Well, it depends on the market. So you'll see --
Q All of them are banks though, aren't they?
A And credit unions were mentioned, as well.
Q Okay. In your field, what does "unaided recall" mean?
A It means without prompting with the name, and asking somebody -- an example would be -- might be, name any banks you know of in this area.
Q Okay. And that would be a question that would elicit names of banks. How would you design a question or how could you design a question that would elicit whether the name "Regions" standing alone is something somebody might come to?
A You might --

STEPTOE & JOHNSON LLP

ATTORNEYS AT LAW

Rachel M. Marmer
202.429.3903
rmarmer@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Tel 202.429.3000
Fax 202.429.3902
steptoe.com

August 15, 2007

**Via FEDERAL EXPRESS**

Victor T. Hudson, Esq.
Hudson & Watts, LLP
One St. Louis Centre Suite 2500
Mobile, AL 36601

**RE: Regions Asset Company v. Regions University, Inc.**
**Case No. CV-06-882-MHT**

Dear Tom:

Enclosed please find additional documents for production.

Very truly yours,

Rachel M. Marmer

Rachel M. Marmer

Enclosures

cc: James Shlesinger, Esq.
Charles Paterson, Esq.

Hello this is _____________ with New South Research. We are not a Telemarketing company and we are not trying to sell you anything. We are conducting a short survey and would like to include your opinion. It should only take about 5 minutes.

1. First, do you or anyone in your immediate family work in any of the following fields?

   1 Advertising, marketing or marketing research **Thank and Terminate**
   2 Banking or other financial services company **Thank and Terminate**

2. Are you the person who is primarily or jointly responsible for the financial decisions in your household?

   1 Yes
   2 No (if "No",ask if a decision-maker is available – if not, **Thank and Terminate)**

3. When thinking of banks or financial services companies in your area, what one first comes to mind? **(Do not read list - mark one bank)**

4. What other banks or financial services companies come to mind? **(Do not read list - record all mentions up to five)**

Birmingham:

1 AmSouth Bank
2 Colonial
3 Compass
4 First Commercial
5 Regions
6 Wachovia Bank
96 Other, please specify____________
99 None

5. Which of the following banks or financial services companies are you aware of? (Read list and rotate)

Birmingham:

A AmSouth
B Compass
C Regions
D Wachovia

***For any bank in Question #5 that respondent is aware of, ask Question #6.***

6. Please tell me how favorable you are toward (bank from Question #5). Let's use a scale of 1 to 5 with 5 being "very favorable" and 1 being "very unfavorable". **(encourage to rate base on perception if they have never used them)**



7. What banks or financial services companies do you currently do business with? **(Accept multiple responses up to 3) – Do not read list**

1. AmSouth Bank
2. Bancorpsouth
3. Bank of America
4. BankTrust
5. Colonial Bank
6. Compass Bank
7. Fifth Third Bank
8. First Tennessee Bank
9. Independent
10. Regions Bank
11. SunTrust
12. Trustmark national
13. US Bank
14. Wachovia
15. Whitney
16. Other (specify)______________
17. None

8. Many people have one bank they rely on more than any other. Which bank do you consider to be your main or primary bank? **(mark only one answer) – Do not read list**

1. AmSouth Bank
2. Bancorpsouth
3. Bank of America
4. BankTrust
5. Colonial Bank
6. Compass Bank
7. Fifth Third Bank
8. First Tennessee Bank
9. Independent
10. Regions Bank
11. SunTrust
12. Trustmark national
13. US Bank
14. Wachovia
15. Whitney
16. Other (specify)______________
17. None

9. How many years have you banked with [PRIMARY BANK - Q8]?

_____ **(Insert exact number of years)**

10. Overall, how satisfied are you with [PRIMARY BANK – Q8]? Please use a scale of 1 to 5 where "5" means "Extremely satisfied" and "1" means "Extremely dissatisfied?"

5. Extremely satisfied
4
3
2
1. Extremely dissatisfied
99 Don't know/refused

11. How likely are you to switch from your primary bank [PRIMARY BANK – Q8] in the next six months? Please use a scale of 1 to 5 where "5" means "Extremely likely to switch" and "1" means "Extremely Unlikely to switch?"

5. Extremely likely
4
3
2
1. Extremely Unlikely
99 Don't know/refused

12. Are there any banks in this area that you would purposely avoid or not use? **(Do not read – mark all mentions)**

Use market level code list

13. Please tell me which banks you have seen or heard any advertising for in the past 3 months either on television, on the radio, in magazines, in newspapers, in the mail, on billboards or on the internet?

**13A. Ad One (1st Mention)**

BANK:
1. AmSouth Bank
2. Bancorpsouth
3. Bank of America
4. BankTrust
5. Colonial Bank
6. Compass Bank
7. Fifth Third Bank
8. First Tennessee Bank
9. Independent
10. Regions Bank
11. SunTrust
12. Trustmark national
13. US Bank
14. Wachovia
15. Whitney
P. DO NOT RECALL

**13B. Ad Two (Next Mention)**

BANK:
1. AmSouth Bank
2. Bancorpsouth
3. Bank of America
4. BankTrust
5. Colonial Bank
6. Compass Bank
7. Fifth Third Bank
8. First Tennessee Bank
9. Independent
10. Regions Bank
11. SunTrust
12. Trustmark national
13. US Bank
14. Wachovia
15. Whitney
16. DO NOT RECALL

CONFIDENTIAL

**13C. Ad Three (Following Mention)**

BANK:

1. AmSouth Bank
2. Bancorpsouth
3. Bank of America
4. BankTrust
5. Colonial Bank
6. Compass Bank
7. Fifth Third Bank
8. First Tennessee Bank
9. Independent
10. Regions Bank
11. SunTrust
12. Trustmark national
13. US Bank
14. Wachovia
15. Whitney
16. DO NOT RECALL

14. Have you seen or heard any advertising for any of the following banks or financial institutions in the past 3 months either on television, on the radio, in magazines, in newspapers, in the mail, on billboards or on the internet? **(Rotate – Read List)**

| | | Yes | No |
|---|---|---|---|
| 1 | AmSouth | 1 | 2 **(if no skip Q16)** |
| 2 | Compass | 1 | 2 |
| 3 | Regions | 1 | 2 **(if no skip Q15)** |
| 4 | Wachovia | 1 | 2 |

15. What specifically do you recall about the Regions ad? **Creative/Message (Probe)**

______________________________________________

______________________________________________

2 DO NOT RECALL SPECIFICS JUST SAW AN AD

16. What specifically do you recall about the AmSouth ad? **Creative/Message (Probe)**

______________________________________________

______________________________________________

2 DO NOT RECALL SPECIFICS JUST SAW AN AD

17. Different banks and financial institution often use different slogans or taglines. What institution do you associate with? **(Read and Rotate)**

A The Relationship People
B Higher Standards
C Everyday Confidence
D Uncommon Wisdom for Shared Success
E Just A Little Better
F How Can We Help You
G. It's Time to Expect More

CONFIDENTIAL

18. Please rate financial service providers on the following statements that could be used to describe them. Please answer even if you've never conducted business with them. We're just interested in your general impressions. Please use a 1-10 scale where "1" means you Strongly Disagree and "10 means you Strongly Agree. On a scale from 1 to 10, how much do you agree or disagree that this describes…

    1 Regions Bank
    2 Randomly selected other bank they are aware of (from Question #5)

18A. Has a strong presence in the community.
18B. Makes banking simple, not complicated.
18C. Guides me in my financial needs.
18D. Is friendly and puts customers first.

Strongly Disagree Strongly Agree
1 2 3 4 5 6 7 8 9 10

Don't know/Refused - 99

**Now I need to ask you a few questions for classification purposes only:**

19. I am going to read several different age groupings. Please stop me when I read the group that includes your current age:

    1 18 to 24
    2 25 to 34
    3 35 to 44
    4 45 to 54
    5 55 to 64
    6 65+

20. I am going to read several different levels of education. Please stop me when I read the highest level of education you have completed.

    1 Less than high school
    2 High school graduate
    3 Some college
    4 College graduate or above
    5 Refused **(do not read)**

21. What race best describes you?

    1 African American
    2 Caucasian
    3 Hispanic
    4 Asian
    5 Other
    6 Refused **(do not read)**

22. I am going to read several different income groupings. Please stop me when I read the group that includes your household's total household income in 2006: (Read list)

    1. Less than $25,000
    2. $25,000 to $49,999
    3. $50,000 to $74,999
    4. $75,000 to $99,999
    5. $100,000 or more
    6. Refused **(do not read)**

23. Not including your home or retirement savings, please stop me when I read the category that best describes your investable savings: (Read list)

    1. Less than $5,000
    2. $5,000 but less than $20,000
    3. $20,000 but less than $50,000
    4. $50,000 but less than $100,000
    5. $100,000 but less than $500,000
    6. Or $500,000 or more
    7. Don't know/Refused **(do not read)**

24. Mark gender by observation:

    1 Female
    2 Male

Thank you for your time!

Respondent phone________________________ Interviewer ID________

Zip________________________

Hello this is _____________ with New South Research. We are conducting a very short survey of about 5 minutes and would like to include your opinion. We are not selling anything and only want your opinion.

1. First, do you or anyone in your immediate family work in any of the following fields?

| | | |
|---|---|---|
| 1 | Advertising, marketing or marketing research | **Thank and Terminate** |
| 2 | Banking or other financial services company | **Thank and Terminate** |

2. Are you the person who is primarily or jointly responsible for the financial decisions in your household?

   1 Yes
   2 No (if "No", ask if a decision-maker is available – if not, **Thank and Term)**

3. When thinking of banks or financial services companies in your area, what one first comes to mind? **(Do not read list - mark one bank)**

4. What other banks or financial services companies come to mind?
   **(Do not read list - record all mentions up to five)**

| Birmingham: | Q3 | Q4 |
|---|---|---|
| AmSouth Bank | 1 | 1 |
| Colonial | 2 | 2 |
| Compass | 3 | 3 |
| First Commercial | 4 | 4 |
| Regions | 5 | 5 |
| Wachovia Bank | 6 | 6 |
| Other, please specify___________ | 7 | 7 |
| None | 8 | 8 |

5. Which of the following banks or financial services companies are you aware of? (Read list and rotate and circle all yes answers)

   Birmingham:

| | | | |
|---|---|---|---|
| A | AmSouth | C | Regions |
| B | Compass | D | Wachovia |

***For any bank in Question #5 that respondent is aware of, ask Question #6.***

6. Please tell me how favorable you are toward (bank from Question #5). Let's use a scale of 1 to 5 with 5 being "very favorable" and 1 being "very unfavorable".
   **(encourage to rate base on perception if they have never used them)**

| | | |
|---|---|---|
| A | AmSouth | _____ |
| B | Compass | _____ |
| C | Regions | _____ |
| D | Wachovia | _____ |

7. What banks or financial services companies do you currently do business with? **(Accept multiple responses up to 3) – Do not read list**

1. AmSouth Bank
2. Bancorpsouth
3. Bank of America
4. BankTrust
5. Colonial Bank
6. Compass Bank
7. Fifth Third Bank
8. First Tennessee Bank
9. Independent
10. Regions Bank
11. SunTrust
12. Trustmark national
13. US Bank
14. Wachovia
15. Whitney
16. Other (specify)______________
17. None

8. Many people have one bank they rely on more than any other. Which bank do you consider to be your main or primary bank? **(mark only one answer) – Do not read list**

1. AmSouth Bank
2. Bancorpsouth
3. Bank of America
4. BankTrust
5. Colonial Bank
6. Compass Bank
7. Fifth Third Bank
8. First Tennessee Bank
9. Independent
10. Regions Bank
11. SunTrust
12. Trustmark national
13. US Bank
14. Wachovia
15. Whitney
16. Other (specify)______________
17. None

9. How many years have you banked with [PRIMARY BANK - Q8]?

_____ **(Insert exact number of years)**

10. Overall, how satisfied are you with [PRIMARY BANK – Q8]? Please use a scale of 1 to 5 where "5" means "Extremely satisfied" and "1" means "Extremely dissatisfied?"

5. Extremely satisfied
4
3
2
1. Extremely dissatisfied
99 Don't know/refused

11. How likely are you to switch from your primary bank [PRIMARY BANK – Q8] in the next six months? Please use a scale of 1 to 5 where "5" means "Extremely likely to switch" and "1" means "Extremely Unlikely to switch?"

    5. Extremely likely
    4
    3
    2
    1. Extremely Unlikely
    99 Don't know/refused

12. Are there any banks in this area that you would purposely avoid or not use?
    **(Do not read – mark all mentions)**

    Use market level code list

| | |
|---|---|
| AmSouth Bank | 1 |
| Colonial | 2 |
| Compass | 3 |
| First Commercial | 4 |
| Regions | 5 |
| Wachovia Bank | 6 |
| Other, please specify____________ | 7 |
| None | 8 |

13. Please tell me which banks you have seen or heard any advertising for in the past 3 months either on television, on the radio, in magazines, in newspapers, in the mail, on billboards or on the internet?

**13A. Ad One (1st Mention)**

BANK:
1. AmSouth Bank
2. Bancorpsouth
3. Bank of America
4. BankTrust
5. Colonial Bank
6. Compass Bank
7. Fifth Third Bank
8. First Tennessee Bank
9. Independent
10. Regions Bank
11. SunTrust
12. Trustmark national
13. US Bank
14. Wachovia
15. Whitney

P. DO NOT RECALL

**13B. Ad Two (Next Mention)**

BANK:
1. AmSouth Bank
2. Bancorpsouth
3. Bank of America
4. BankTrust
5. Colonial Bank
6. Compass Bank
7. Fifth Third Bank
8. First Tennessee Bank
9. Independent
10. Regions Bank
11. SunTrust
12. Trustmark national
13. US Bank
14. Wachovia
15. Whitney
16. DO NOT RECALL

**13C. Ad Three (Following Mention)**

BANK:
1. AmSouth Bank
2. Bancorpsouth
3. Bank of America
4. BankTrust
5. Colonial Bank
6. Compass Bank
7. Fifth Third Bank
8. First Tennessee Bank
9. Independent
10. Regions Bank
11. SunTrust
12. Trustmark national
13. US Bank
14. Wachovia
15. Whitney
16. DO NOT RECALL

14. Have you seen or heard any advertising for any of the following banks or financial institutions in the past 3 months either on television, on the radio, in magazines, in newspapers, in the mail, on billboards or on the internet? **(Rotate – Read List)**

| | | Yes | No |
|---|---|---|---|
| 1 | AmSouth | 1 | 2 **(if no skip Q16)** |
| 2 | Compass | 1 | 2 |
| 3 | Regions | 1 | 2 **(if no skip Q15)** |
| **4** | Wachovia | 1 | 2 |

15. What specifically do you recall about the Regions ad? **Creative/Message (Probe)**

________________________________________

________________________________________

2 DO NOT RECALL SPECIFICS JUST SAW AN AD

16. What specifically do you recall about the AmSouth ad? **Creative/Message (Probe)**

________________________________________

________________________________________

2 DO NOT RECALL SPECIFICS JUST SAW AN AD

17. Different banks and financial institution often use different slogans or taglines. What institution do you associate with? **(Read and Rotate)**

| | | **Enter bank code below** |
|---|---|---|
| A | The Relationship People | _______ |
| B | Higher Standards | _______ |
| C | Everyday Confidence | _______ |
| D | Uncommon Wisdom for Shared Success | _______ |
| E | Just A Little Better | _______ |
| F | How Can We Help You | _______ |
| G. | It's Time to Expect More | _______ |

18. Please rate financial service providers on the following statements that could be used to describe them. Please answer even if you've never conducted business with them. We're just interested in your general impressions. Please use a 1-10 scale where "1" means you Strongly Disagree and "10 means you Strongly Agree. On a scale from 1 to 10, how much do you agree or disagree that this describes…

1 Regions Bank
2 Randomly selected other bank they are aware of (from Question #5)

| | | Regions | Other Bank |
|---|---|---|---|
| 18A. | Has a strong presence in the community. | ______ | ______ |
| 18B. | Makes banking simple, not complicated. | ______ | ______ |
| 18C. | Guides me in my financial needs. | ______ | ______ |
| 18D. | Is friendly and puts customers first. | ______ | ______ |

Strongly Disagree Strongly Agree
1 2 3 4 5 6 7 8 9 10

Don't know/Refused - 99

**Now I need to ask you a few questions for classification purposes only:**

19. I am going to read several different age groupings. Please stop me when I read the group that includes your current age:

| | | | |
|---|---|---|---|
| 1 | 18 to 24 | 4 | 45 to 54 |
| 2 | 25 to 34 | 5 | 55 to 64 |
| 3 | 35 to 44 | 6 | 65+ |

20. I am going to read several different levels of education. Please stop me when I read the highest level of education you have completed.

| | | | |
|---|---|---|---|
| 1 | Less than high school | 4 | College graduate or above |
| 2 | High school graduate | 5 | Refused **(do not read)** |
| 3 | Some college | | |

21. What race best describes you?

| | | | |
|---|---|---|---|
| 1 | African American | 4 | Asian |
| 2 | Caucasian | 5 | Other |
| 3 | Hispanic | 6 | Refused **(do not read)** |

22. I am going to read several different income groupings. Please stop me when I read the group that includes your household's total household income in 2006: (Read list)

1. Less than $25,000
2. $25,000 to $49,999
3. $50,000 to $74,999
4. $75,000 to $99,999
5. $100,000 or more
6. Refused **(do not read)**

23. Not including your home or retirement savings, please stop me when I read the category that best describes your investable savings: (Read list)

1. Less than $5,000
2. $5,000 but less than $20,000
3. $20,000 but less than $50,000
4. $50,000 but less than $100,000
5. $100,000 but less than $500,000
6. Or $500,000 or more
7. Don't know/Refused **(do not read)**

24. Mark gender by observation:

1 Female
2 Male

Thank you for your time!

Respondent phone______________________________ Interviewer ID_________

Zip______________________________

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION and REGIONS BANK

Plaintiffs,

v.

REGIONS UNIVERSITY, INC.

Defendant.

Civil Action No. 2:06-cv-882-MHT

**DECLARATION OF JIM JAGER**

I, Jim Jager, declare and say:

1. I am the President of New South Research. New South Research is a marketing research firm. Our offices are located at 3000 Riverchase Galleria, Suite 630, Birmingham, Alabama 35244.

2. I have provided market research services to Regions Financial Corporation ("Regions") regularly since the early 1990's. The market research services provided to Regions by New South have included numerous quantitative research surveys which are scientifically conducted and projectible surveys (meaning that the survey results can be replicated with the same results within defined percentages with a defined confidence level) and qualitative surveys like focus groups that are not projectible but provide other, more subjective, information about consumers and their attitudes. These surveys were undertaken by New South to provide Regions with consumer information to help Regions understand its business and consumers and to help it make management decisions concerning its business. All these surveys were conducted for



business purposes only without any anticipation of their use in litigation or for litigation purposes.

3. New South conducted a quantitative survey for Regions from June 14 through June 25, 2007 called "Regions/AmSouth Awareness and Perception Survey July 2007 (the "2007 Regions Awareness Survey"). Attached as Exhibit A to my declaration is the report that I prepared in July 2007 for the management of Regions summarizing the methodology of the survey and its results. Among the other things that the 2007 Regions Awareness Survey measured was the unaided awareness of and the familiarity with the Regions brand in the markets of the following cities – Birmingham, Mobile, Nashville, Memphis, Jackson, St. Louis, New Orleans, Indianapolis, Atlanta, Miami, Orlando and Tampa.

4. The 2007 Regions Awareness Survey was conducted from a central telephone facility in Birmingham using random digit dialing of telephone numbers drawn from zip codes in those 12 city markets. I am attaching, as Exhibit B, the survey instrument (also known as the questionnaire) which is the script used by the professional interviews (a) to select the sample of persons who will respond to the survey questions (the "respondents") and (b) to ask the questions of the qualified respondents. As appears from the first two screening questions in Exhibit B, the survey sought respondents from every household in the markets – the persons who were primarily or jointly responsible for financial decision making in the households – and only excluded persons that worked for financial institutions and market research organizations. Other aspects of the methodology are reported on page 3 of the report.

5. As I said, 2007 Regions Awareness Survey is a scientific quantitative survey. As appears on page 3 of the report:

> "[t]he overall statistical margin of error for the study, based on 2492 interviews, is 2.0 percent at the 95 percent confidence



> interval. That is, if all residents in all market areas were included in the survey, the results should vary no more than 2.0 percentage points from the results reported in this study 95 times out of a hundred.

In addition as appears in page 3 of the report, in each market surveyed, since approximately 200 interviews were conducted in each market, the survey results are projectible with a margin of error of 6.9 percent at the 95 percent confidence level.

6. The Introduction of the report on page 1 sets out the primary goals of the research. The first goal was: "What is the overall awareness of Regions (and AmSouth) in each market?" This was measured in two ways. The first was a measure of the unaided awareness of banks by asking the respondent to identify the banks the banks that came to mind without any prompting – Questions 3 and 4 in Exhibit B. The results are shown in the chart "Total Unaided Awareness" on page 12 of Exhibit B. It shows Regions to be the market leader in unaided awareness in Birmingham (70%) and Mobile (50%). Among other city markets tested, Regions had an unaided awareness of 24% in Nashville, 44% in Memphis and 29% in Jackson. The second measure was aided awareness where the respondents are asked if they are aware of 4 or 5 banks or financial services companies, depending on city. All respondents were asked if they were aware of Regions and AmSouth and, depending on the city, two or three other banks or financial services. The names of the banks and financial services companies were rotated to avoid positional bias. Exhibit B is the questionnaire for Birmingham. As I reported in Exhibit A (p. 4), Regions is very strong in aided awareness in Birmingham (98%), Mobile (93%), Nashville (87%), Memphis (91%), and Jackson (88%). Regions familiarity is high in other cites as well – Atlanta (83%), St. Louis (78%), New Orleans (84%). Regions familiarity in other city markets is: Indianapolis (69%), Miami (54%), Orlando (43%) and Tampa (44%).

99

7.    The 2007 Regions Awareness Survey uses similar methodology that I and New South Research have used over the years in the quantitative scientific surveys that we have conducted for Regions concerning the awareness of Regions and customer satisfaction and perception. Some of the many other scientific quantitative surveys that I have conducted for Regions are:

a.    Regions Financial Corporation Ad Awareness & Tracking Report for the Year 2003 that, among other things, shows unaided recognition of Regions in various markets is attached as Exhibit C.

b.    Regions Financial Corporation Ad Awareness & Tracking Report for the Year 2002 that, among other things, shows unaided recognition of Regions in various markets is attached as Exhibit D.

c.    Regions Financial Corporation Ad Awareness & Tracking Report for the Year 2001 that, among other things, shows unaided recognition of Regions in various markets is attached as Exhibit E.

d.    Regions Financial Corporation Ad Awareness & Tracking Report for the Year 2000 that, among other things, shows unaided recognition of Regions in various markets is attached as Exhibit F.

8.    Based upon the fact that historically the unaided awareness of Regions in Montgomery has been higher than Regions unaided awareness in Birmingham, it is my opinion that the aided awareness of Regions today in Montgomery would be at least as high as the aided awareness of Regions in Birmingham shown in Exhibit A.

I declare under penalty of perjury that the above facts are true to the best of my knowledge. Executed August 17, 2007.

Jim Jager