IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

_____
REGIONS ASSET COMPANY, et al.,)
                              )
        Plaintiffs,           )
                              )
                              ) Civil Action No. 2:06-cv-882-MHT
                              )
REGIONS UNIVERSITY, INC.      )
                              )
        Defendant.            )
_____)


REGIONS UNIVERSITY, INC.'S REPLY BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT


VICTOR T. HUDSON
WILLIAM W. WATTS, III
Hudson & Watts, LLP
Post Office Box 989
Mobile, Alabama 36601


JAMES E. SHLESINGER
Shlesinger, Arkwright &
    Garvey LLP
1420 King Street, Suite 600
Alexandria, Virginia 22314

ATTORNEYS FOR DEFENDANT

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . 2

I.   NO LIKELIHOOD OF CONFUSION EXISTS AS A
     MATTER OF LAW BECAUSE PLAINTIFFS' MARK IS
     EXTREMELY WEAK OUTSIDE THE BANKING FIELD . . . . . . . . 3

     A.   Commercial Weakness of Mark Outside
          Banking Field . . . . . . . . . . . . . . . . . . .  3

     B.   Weakness of "Regions" Mark as Common
          English Word Used Descriptively . . . . . . . . . 21

     C.   Common English Words Which Are the Key
          Words in the Marks of Hundreds of
          Banking Institutions Have Been Adopted
          by Hundreds of Universities, Colleges
          and Other Businesses Without Danger of
          Infringement . . . . . . . . . . . . . . . . . . . 22

II.  THE PARTIES MARKS ARE NOT SIMILAR . . . . . . . . . . 25

III. THE BANK CAN BRING NO CLAIM FOR INFRINGEMENT
     BASED ON ALLEGED CONFUSION AS TO AFFILIATION
     WITH A UNIVERSITY; THE BANK IS PROHIBITED
     BY LAW FROM OFFERING SUCH EDUCATIONAL SERVICES
     AND SUCH SERVICES ARE THEREFORE BEYOND ITS
     ZONE OF NATURAL EXPANSION . . . . . . . . . . . . . . 27

IV.  PLAINTIFFS HAVE NO PROBATIVE EVIDENCE OF ACTUAL
     CONFUSION . . . . . . . . . . . . . . . . . . . . . . 35

V.   NO EVIDENCE EXISTS THAT THE UNIVERSITY,
     IN CHANGING ITS NAME, DELIBERATELY SOUGHT TO
     CAPITALIZE ON THE REPUTATION OF REGIONS BANK . . . . . 38

VI.  THE BANK'S NAME IS NEITHER FAMOUS NOR DISTINCTIVE
     FOR FEDERAL OR STATE DILUTION PURPOSES . . . . . . . . 41

     A.   Federal Dilution Claim . . . . . . . . . . . . . 41

     B.   State Dilution Claim . . . . . . . . . . . . . . 44

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

_____

REGIONS ASSET COMPANY, et al.,)
                            )
        Plaintiffs,      )
                            )
                            ) Civil Action No. 2:06-cv-882-MHT
                            )
REGIONS UNIVERSITY, INC.    )
                            )
        Defendant.      )
_____)

**REGIONS UNIVERSITY, INC.'S REPLY BRIEF**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I.

**NO LIKELIHOOD OF CONFUSION EXISTS AS A MATTER OF LAW BECAUSE PLAINTIFFS' MARK IS EXTREMELY WEAK OUTSIDE THE BANKING FIELD**

    A.   Commercial Weakness of Mark Outside Banking Field

In their opposition, plaintiffs devote much ink to claiming fame and reputation in the banking field. The defendant University does not quarrel with the fact that, in some states and in some cities, the Bank may have built up name recognition for itself in the banking field.[1] However, for purposes of its

---

[1] Defendant objects to and has moved to strike the affidavit testimony of a previously undisclosed expert, Jim Jager, president of New South Research, who seeks to validate the methodology used in the brand awareness surveys, in order to support the admissibility of the survey reports prepared by New South. The Bank had produced the survey reports but never established the bona fides of these surveys. Mr. Jager was never disclosed as an expert and an expert report was never sent as required by Rule 26 and the Court's pretrial order. Furthermore, the documents attached to his declaration were requested by the University before discovery cutoff and were not produced in response to these requests. For similar reasons, defendant objects to, and

action for infringement against the University, a not-for-profit post-secondary educational institution, the issue is not the strength of its mark in the field of banking or other financial services. The issue is the strength of its mark outside of that field. Indeed, the issue is the strength of its mark in areas completely beyond the fields in which it might foreseeably expand, such as post-secondary education. In these non-financial markets, the Bank's mark has no strength. The undisputed evidence shows extensive third party usage of the common English word, "Region" or "Regions," by businesses offering a great diversity of services, even when limited to use in a non-geographical sense and to the sixteen state region in which the Bank does business. Investigation has confirmed, to-date, some 72 businesses in the sixteen state region which are currently doing business, or until recently have been doing business, using "Region" or "Regions" in their trade name in a non-geographical sense. *See* Affidavit and Supplemental Affidavit of Stephen J. Stricklin and Affidavit of Andrea B. Bender. Just a sampling of these are the following:

> 1. **Regions Café** in Chicago, Illinois, which has had a **federally registered trademark Regions Café** for restaurant services since 1988, employs some 40 people, advertises in the yellow and white pages and

---

will move to strike, the opinions of Dr. Abernethy which rest upon this inadmissible survey evidence. Abernethy relies upon the surveys almost exclusively to opine about the strength of the Bank's brand. His opinions mischaracterize the surveys by saying that Regions has high unaided awareness because the interviewees were asked to name a bank.

at www.restaurant.com, with annual sales of $1,500,000. (Bender Affidavit at p. 5.).

2. **Regions Community Behavioral Health Center** in Louisiana which has three out-patient mental health facilities and some 40 employees, is listed in the white pages at www.realpageslive.com, and is listed in the D&B listings at www.westlaw.com. (Bender Affidavit at p. 7; Holder Affidavit re: Business Listings, Exs. A and B.).

3. **Regions Land and Investments, Inc. d/b/a/ Regions Realty** in Georgia, in business since 1997, employing some six agents, with annual sales of some $3 Million, advertising in the white and yellow pages and through signage, and is listed in the D&B listings at www.westlaw.com. *See* regionsrealty.com. (Bender Affidavit at p. 4; Holder Affidavit re: Business Listings, Ex. G.).

4. **Regions Facility Services**, operating in Alabama, Florida, Georgia, North Carolina, South Carolina and Tennessee, with annual sales of some $3 Million, two offices and some 20+ employees, providing service and labor to restaurants, and advertising in the white pages at www.realpageslive.com, www.yellowpages.com, www.superpages.com, and www.yp.com, and listed in the D&B listings at www.westlaw.com. *See* regionsfacilityservices.com. (Stricklin Affidavit at p.13; Holder Affidavit re: Business Listings, Exs. A-C, E, and G.).

5. **Regions Propane**, which operated under that name from 1997 until 2004, with six branches in Alabama, Georgia, Tennessee and North Carolina, employing some 25 people. (Stricklin Affidavit at p. 3.).

6. **Regions Hospitality** in Georgia, providing hospitality management at hotels, operating in Georgia, Florida, South Carolina and Arkansas, with some 250 employees and advertising in www.superpages.com. (Stricklin Affidavit at p. 15; Holder Affidavit re: Business Listings, Ex. C.).

7. **Regions Development Group** in Tennessee, a real estate development company with some $18 Million to $20 Million in annual sales and is listed in the D&B

listings at www.westlaw.com. (Stricklin Affidavit at p. 29; Holder Affidavit re: Business Listing, Ex. G.).

8. **Region Welding** in Missouri, which has operated under that name since 1983, with annual sales of $3 to $4 Million, 19 employees, and providing services across the entire nation, advertising through flyers and industry-specific magazines, and is listed in the D&B listings at www.westlaw.com. *See* regionwelding.com. (Stricklin Affidavit at p. 26; Holder Affidavit re: Business Listings, Ex. G.).

9. **Regions Oil and Gas** in Texas, a publicly traded oil and gas exploratory company (RGNO) with some 5 to 25 employees, with operations in Texas, Oklahoma and Louisiana. See regionsoil.com. (Bender Affidavit at p. 9.).

10. **Regions Contractors**, operating in Florida, Arkansas and Tennessee, with some 22 employees, advertising in www.realpageslive.com, www.yellowpages.com, www.superpages.com, www.yp.com, listed in the D&B listings at www.westlaw.com. *See* regionscontractors.com. (Stricklin Affidavit at p. 11; Holder Affidavit re: Business Listings, Exs. A-C, E, and G.).

11. **Regions Van Lines** in Miami, Florida, with annual sales of some $2 Million (as per D&B report) and some 15 employees. *See* www.regionsvanlines.com. (Stricklin Affidavit at p. 14; Holder Affidavit re: Business Listings, Ex. G.).

12. **Region First Realty** in Tennessee, with annual sales of some $1.2 Million, some eight years in operation, and listed in the D&B listings at www.westlaw.com. (Stricklin Affidavit at p. 29; Holder Affidavit re: Business Listings, Ex. G.).

13. **Region Metal**, a scrap metal recycling business in Illinois, operating under that name for some thirty years, until 2004, with some 5 to 7 employees, advertising in the white and yellow pages. (Bender Affidavit at p. 5.).

14. **Region Signs** in Indiana, in operation for some 32 years as per their website, and with some 10 to 11 employees, advertising in the white and yellow pages and through local newspaper ads. Listed at www.realpageslive.com, www.yellowpages.com, and www.superpages.com. *See* regionsigns.com. (Bender Affidavit at p. 6, Ex. 4; Holder Affidavit re: Business Listings, Exs. B, C, and E.).

15. **All Regions Services f/k/a All Regions Forestry**, a reforesting and nursery business in Louisiana, with some 100 to 200 employees, and operations in Arkansas, Louisiana, Maine, Mississippi and Wisconsin, and listed in the D&B listings at www.westlaw.com. (Stricklin Affidavit at p. 24; Holder Affidavit re: Business Listings, Ex. G.).

16. **Region Insulation** in Louisiana, an industrial insulation service company, in business for some eleven years, with annual sales of $1.5 Million and 25 employees, with operations in Colorado, Louisiana, Montana, Oklahoma, Texas and Wyoming. (Stricklin Affidavit at p. 22.).

17. **Regions Realty Group** in Tennessee, with some nine agents, advertising in magazines and newspapers and by signage, and listed in the D&B listings at www.westlaw.com. (Stricklin Affidavit at p. 30; Holder Affidavit re: Business Listings, Ex. G.).

18. **Region Realty** of St. Tamany in Louisiana, which has been in business since 1980 and is listed at www.realpageslive.com. (Stricklin Affidavit at p. 21; Holder Affidavit re: Business Listings, Ex. A.).

19. **Regions Construction** in Mississippi, which has operated under that name for some fifteen years and which is listed in the D&B listings at www.westlaw.com. (Stricklin Affidavit at p. 25; Holder Affidavit re: Business Listings, Ex. G.).

Other "Regions" businesses with federal trademarks include:

1. **Regions Hospital** in Minnesota, with **federally registered marks "REGIONS" and "REGIONS HOSPITAL"** for hospital services. Regions Hospital is a full service private hospital in St. Paul, Minnesota with annual

revenues in excess of $400 Million *See* www.regionshospital.com (2005-2006 fact sheet).

2. **RegionsAir, Inc.**, with a **federally registered mark RegionsAir** for air transportation, a regional passenger airline in Tennessee. Although this company has temporarily ceased operations, it has had annual sales of some $24 Million and some 200 employees, operating a total of five carriers, with flights to Illinois, Iowa, Kentucky, Missouri and Tennessee.(See Appx. A attached hereto.)

Additionally, there are several other non-profit religious organizations which have adopted the term "Regions" in their names, including:

1. **Regions Christian Center** in Texarkana, Texas, listed at www.yellowbook.com; *see* www.regionschristiancenter.org. (Bender Affidavit at p. 9; Holder Affidavit re: Business Listings, Ex. F.).

2. **Regions Beyond, Inc.** in Jacksonville, Arkansas, which publishes Christian literature and a monthly publication entitled "Regions Beyond." *See* www.regbeyond.com. (Bender Affidavit at p. 2, Ex. 1).

3. **Regions Beyond Ministries, Inc.** in Columbus, Georgia, a Christian mission outreach. Listed at yp.com and in the D&B listings at www.westlaw.com.(Stricklin Affidavit at p. 16; Holder Affidavit re: Business Listings, Exs. E and G.).

4. **Regions Beyond International**, a missionary organization based in Tallahassee, Florida with a federally registered trademark "Regions Beyond International." Listed in the D&B listings at www.westlaw.com. *See* www.regionsbeyond.org. (Stricklin Affidavit at p. 10; Holder Affidavit re: Business Listings, Ex. G.).

Many of the above companies, as well as numerous others, have telephone listings in the current telephone directories published by AT&T and/or are listed online at

8

www.yellowpages.com, www.superpages.com, local.yahoo.com, yp.com and/or www.yellowbook.com.    *See* Holder Affidavit re: Business Listings, Exs. A-F.

The University has also submitted 32 Dun & Bradstreet reports confirming the active nature of many of the businesses contacted by its investigators.    *See* Affidavit of Pauline Holder re: Business Listings, Ex. G.    Such reports have been admitted as evidence of third party use.    *See* First Savings Bank v. First Bank System, Inc., 101 F.3d 645, 654 (10th Cir. 1996); Big Dog Motorcycles, LLC v. Big Dog Holdings, Inc., 402 F.Supp.2d 1312, 1323 (D. Kan. 2005).

Finally, the University has introduced some 98 domain names containing the word "Region" or "Regions," and identifying active businesses or organizations.    *See* Affidavit of Pauline Holder re: Domain Names.    Evidence of such similar domain names is relevant to the issue of third party use, serving to dilute the strength of a mark.    *See, e.g.,* Data Concepts, Inc. v. Digital Consulting, Inc., 150 F.3d 620, 625 (6th Cir. 1998); Gulf Coast Commercial Corp. v. Gordon River Hotel Associates, 2006 WL 1382072 (M.D. Fla. May 18, 2006); First Franklin Financial Corp. v. Franklin First Financial Ltd., 356 F.Supp.2d 1048 (N.D. Cal. 2005).

Despite plaintiff's claims of hearsay, documents located through the search of online databases are admissible as an

exception to the hearsay rule because there is no bias in such databases used to compile such information and they are maintained on an ongoing basis for general business use rather than being prepared for particular litigation. *See* <u>Fed. R. of Evid.</u> 803(17) (tabulations, lists, directories or other published compilations generally used and relied upon by the public or persons in particular occupations are not excluded by the hearsay rule).

Plaintiffs summarily dismiss this evidence of third party usage because "many of the business names are no longer in use, are internal uses only, use "Regions" only descriptively, such as "River Regions," are for goods or services extremely different than Regions, or are at most mom and pop stores which the general public has never heard used, ... ." (Pl. Brief at p. 33.) The fact that the business names are "for goods or services extremely different than Regions" is, of course, the point of the evidence – to show the weakness of the mark outside the field of banking services. The fact that some names may no longer be in use, are internal uses only, or are small businesses without a wide recognition is simply not relevant to the fact that this common English word has been, is now, and will continue to be used by many, many businesses in many, many fields, other than financial services, thereby negating any reasonable probability that any of these other businesses,

10

offering dissimilar goods or services, including Regions University, would ever be confused with Regions Bank or its affiliates.

The criticisms leveled by the Bank against this third party use evidence mirrors the criticisms made by the lower court in Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252 (5th Cir. 1980), criticisms the Fifth Circuit rejected in concluding that the lower court's finding of likelihood of confusion was clearly erroneous. An extended analysis of the lower court's findings in that case is warranted because the facts of this binding precedent are so similar.

In the first place, the record was replete with evidence of the national fame and reputation of the plaintiff's mark "Domino" for the sale of its sugar products and other related food condiments. The fame of "Regions" or "Regions Bank" for banking services pales in comparison. Plaintiff adopted the trademark "Domino" prior to 1900. Amstar Corp. v. Domino's Pizza, Inc., 205 U.S.P.Q. 128, 131, 1979 WL 25080 (N.D. Ga. 1979). Sales of Domino's sugar products had exceeded $300 million every year since 1953, with cumulative sales of some $14.6 billion over the course of forty years. Id. at 132. The plaintiff was one of the first consumer product companies in the nation to extensively promote its trademark, advertising in nationally circulated popular magazines, institutional

11

industrial trade journals, and sponsoring national network television shows. Id. at 132. Market research showed that close to 100% of the national public recognized the Domino mark as the source of plaintiff's sugar products. Consumers were "highly likely" to associate "any food products" sold in supermarkets, groceries or other food stores under the Domino mark with the Domino food product sold by plaintiff. Id. at 133. Since 1916, the plaintiff had continuously sold Domino sugar products in packets to restaurants, pizza parlors and other fast food chains, and the public was accustomed to seeing the Domino mark featured on such packets. Indeed, the sugar packets would often have the name and logo of the restaurant printed on one side of the package with the Domino mark on the other side, including the names of several major chains of pizza restaurants. Id. at 133-34. The Domino mark had such a high commercial acceptance and quality image that other companies contracted to have their products and services advertised on the side panels of Domino's sugar packets. Id. at 134.

In 1964, plaintiff began using the Domino mark on a new line of portion-controlled food products sold to the food service industry, including salt, pepper, mustard and catsup. Id. at 134. Thereafter, it extended use of the mark to jam, jellies, salad dressings, mayonnaise, relish, taco sauce, honey, tartar sauce, table syrup and cranberry sauce. Id. at 135.

Plaintiff was the largest distributor of portion-controlled products to restaurants in the United States. <u>Id</u>. at 135-36. Like other major food competitors, the plaintiff had also begun planning for the possibility of acquiring or opening a fast food restaurant chain. <u>Id</u>. at 136. As a result of plaintiff's widespread use, advertising and promotion of the Domino trademark on such a great variety of food products, the district court found that "the consuming public is very likely to believe that Domino's Pizza, sold in a separate food store outside of the supermarket, is in some way or manner sponsored by or affiliated with, or connected with, or emanates from plaintiff." <u>Id</u>. at 136-37.

The district court discounted the 15 third party uses of the mark "Domino" shown by the defendant because all of the uses were "long abandoned, remote as to goods or geography, or small, obscure and localized." <u>Id</u>. at 142. None of the uses "have had any effect on the public's perception of plaintiff's Domino trademark as the source of food products bearing that mark." <u>Id</u>. For more than a decade, there had been no other national or even regional food company which used the mark "Domino" for any food products other than the plaintiff and defendant. <u>Id</u>. The district court dismissed a number of the third party uses cited by the defendants as not related to food products or services and therefore irrelevant to the scope of plaintiff's rights in

its trademark, including **DOMINO tobacco and cigarettes**, which had not advertised since 1933 and which had sales of less than 4,000 cartons per month, and **DOMINO matches** which had no advertising directed to the public for decades.  It also dismissed as "very small, obscure and localized" and as "known by such few people as not to affect plaintiff's Domino trademark rights," a small restaurant in a New Orleans suburb known as "**Domino's Restaurant and Pizzeria**," a small pizza parlor in New York operated as "**Domino's Pizza**," and two small "**Domino Supermarkets**" in residential neighborhoods in the Bronx.  Id. at 143.  It also dismissed General Mills' **DOMINO yeast raised doughnut mix** because the product was sold only to the bakery trade for use in making doughnuts and thus never came to the attention of the consuming public.  Id.

In reversing the district court, the Fifth Circuit signaled out these six businesses and products as exemplary, characterizing these uses, and the ten other, more limited or purely historical uses of the Domino mark, as "extensive."  615 F.2d 259.  Such evidence could not be "so readily dismissed" as the district court had done in describing them as "either long abandoned; remote as to goods or geography; small, obscure and localized; or used only in shipments to the trade."  Id.  The Court continued:

"The impact of such evidence is not
dispelled merely because 'Domino' cigarettes
and matches are not leading brands, or
because some uses of the mark 'Domino' by
third parties have not been related to food
products ... As stated in Comment g to the
Restatement of Torts, § 729 (1938) 'the
greater the number of identical or more or
less similar trademarks already in use on
different kinds of goods, the less is the
likelihood of confusion ... .' The
extensive third party uses documented in
this case were entitled to much greater
weight than were accorded them by the
district court."

Id. at 259-60.  The Court recognized that the plaintiff's mark

was "a distinctive, well known mark for its sugar and related

products."  Id. at 260.  However, the evidence of third party

use and registrations "limit[ed] the protection to be accorded

plaintiff's mark outside the uses to which plaintiff had already

put its mark."  Id.

    Plaintiffs suggest that the Amstar case is distinguishable

because of the 72 registrations at the USPTO and the "extensive

evidence" of third party use of the name in that case.  (Pl.

Brief at p. 35.)  If the Amstar case is distinguishable at all,

it is distinguishable in the University's favor - the evidence

of third party use in that case was far less extensive, the

plaintiffs' mark far more famous, and the services offered by

defendant under the allegedly infringing mark far <u>more</u> related to the plaintiffs' mark.[2]

Plaintiffs also maintain that the <u>Amstar</u> case is distinguishable because the Fifth Circuit noted that the plaintiff in that case had "not been vigilant in protecting its rights in the Domino mark." 615 F.2d at 265. It failed to object to the 72 third party registrations of the Domino mark, had written some letters requesting discontinuance of the mark by third parties, but had never brought suit alleging infringement until the present action. <u>Id</u>. The court noted that the district court itself had stated that the plaintiff "has not maintained, has not policed its mark." <u>Id</u>. Rather than forming a basis for distinguishing this case, these remarks lend further support to the University's summary judgment motion.

Recent discovery in this case has revealed that, until 2004, the plaintiffs were <u>not</u> actively policing or enforcing their marks. Samuel E. Upchurch, Sr., general counsel from 1994 until 2004, with direct responsibility for enforcement of the marks, testified that while he was general counsel, the Bank did not proactively search for businesses using their "Regions" mark. (Upchurch depo. at pp. 8, 14-15, 26.) He could not

---

[2] The fact that there were 72 registrations of the word "Domino," as compared to a more limited number of registrations in this case, cannot serve to distinguish that case. As the plaintiffs themselves recognized, trademark registrations "are not evidence of use." (Pl. Brief at p. 34.) Apparently, among the registrations, only 15 actual uses could be confirmed.

recall such businesses as "Regions Air" or "Regions Hospital" or "Regions Beyond International," which had federally registered marks.  (Upchurch depo. at pp. 25-26.)

Mr. Upchurch could specifically recall the names of only two similarly named businesses coming up during his tenure: Regions Propane and Region 2020.  (Upchurch depo. at pp. 11-13.) As to Regions Propane, he authored a letter to that company in March of 1999, acknowledging the Bank's awareness that Regions Propane was using that name, but stating that, at the present time, "I do not foresee any problems with your company's use of Regions in the name of your business."  He informed Regions Propane that if the Bank ever entered into the propane business, the Bank believed it would then have the ability to enforce its right to "Regions."  (Upchurch depo. at p. 12; Ex. 109.)  As to Region 2020, Mr. Upchurch recalled the negotiation of a license agreement for the use of the name.  (Upchurch depo. at p. 16.) The initial draft of the license agreement recited that Region 2020's name was "deceptively similar to [the Bank's] Registered Marks so as to be likely to cause confusion in the marketplace." (Upchurch depo. at pp. 16-18; Ex. 110.)  Ultimately, any reference to the marks being deceptively similar was omitted and the royalty payment was changed from $1,000 per year to a one time payment of $100.  (Upchurch depo. at pp. 18-21; Ex. 137.) After the license agreement was signed in 1997, the Bank never

raised any question about further use of the name and imposed no quality control measures concerning the use of the name. (Deposition of Neal Berte at pp. 15-16.)

Except for Regions Construction Company, LLC in Harvest, Alabama, none of the 72 businesses which defendant's investigators have contacted, and which are currently, or recently, using the word "Region" or "Regions" in their trade names, has ever received any communication from the plaintiffs objecting to their use of this word in their name (*see* Stricklin and Bender Affidavits), even though trademark search reports utilized by the Bank have brought to its attention many of the foregoing third party usages over the years. (Mehlman depo. at p. 58; Ex. 108.). Regions Construction Company simply dropped the "LLC" and continued to do business, as the Bank's attorney had requested. (Stricklin Affidavit). A cease and desist letter was sent to Regions Propane in March of 2000 (RAC 12388; Appx. D). Regions Propane, however, continued to operate under that name until 2004 when a new owner changed the name to his surname. (Stricklin Affidavit at pp. 3-4.) This present action is the first infringement suit that plaintiffs have ever brought against any third party using their mark. Nor has the Bank objected to any of the third party "Region" or "Regions" federal registrations or applications currently pending in the PTO (except for the University's).

Plaintiffs also discount third party usage of the word "Region" instead of "Regions," claiming that this singular form of the mark does not detract from the strength of its mark "Regions." (Plaintiff's Brief at p. 34.) As described above, it gave a license to use the name "Region 2020" after asserting that the name was likely to cause confusion with its "Regions" mark. Moreover, the Fifth Circuit in Domino's Pizza made no such distinction between the marks "Domino" and "Domino's" in third party uses. *See also* Michael Caruso and Co. v. Estefan Enterprises, Inc., 994 F.Supp. 1454 (S.D. Fla. 1998), *aff'd*, 166 F.3d 353 (11th Cir. 1998)(third party uses of "Bongo" and "Bongos" weakened plaintiff's mark "Bongo").

As further support for its argument that the mark is not weakened by the existence of numerous other similarly named businesses outside the banking field, plaintiffs cite to cases where the alleged infringer was using the plaintiff's mark to identify the same type of services offered by the plaintiff under its mark. *See* Breakers of Palm Beach, Inc. v. International Beach Hotel Development, Inc., 824 F.Supp. 1576 (S.D. Fla. 1993)(two competing hotel properties); Jelly Beans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833 (11th Cir. 1983)(two competing skating rinks). In these cases, what was at issue was the strength of the plaintiff's mark within the scope of the services which it offered. Third party usage of the mark

19

to identify other <u>unrelated</u> products or services would, of course, be of limited impact upon the strength of the mark within the field of the mark owner's services.

Plaintiffs also discount the evidence of federal trademark registrations and corporate and LLC registrations with the Secretaries of State. However, the Eleventh Circuit and the old Fifth Circuit have found such registrations relevant to the strength of the plaintiff's mark. *See* <u>Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Association</u>, 651 F.2d 311, 315 (5th Cir. 1981)(numerous registrations with the Florida Secretary of State and other federally registered trade and service marks using the word "Sun" was "impressive evidence that there would be no likelihood of confusion between Sun Banks and Sun Federal."); <u>Amstar Corp. v. Domino's Pizza, Inc.</u>, 615 F.2d at 260 (federal registrations of the mark "Domino" was relevant to strength of plaintiff's mark).

Other lower courts in this circuit have been equally liberal in allowing admission of such third party use evidence. In <u>Michael Carruso & Co. v. Estefan Enterprises, Inc.</u>, 994 F.Supp. 1454 (S.D. Fla. 1998), *aff'd*, 166 F.3d 353 (11th Cir. 1998), the court considered evidence of some 75 other businesses throughout the United States which had incorporated "Bongo" or "Bongos" into their marks, as well as a number of state and federal trademark registrations on appeal. In its brief on

appeal, the plaintiff complained about the lack of evidence of actual use by third parties of the "Bongo" mark. The testimony at trial essentially consisted of a paralegal in defendant's attorneys' office who had collected the third party use information and who had no information concerning the nature, duration or extent of the third party use as disclosed by the information nor did he know the channels of trade or marketing efforts of any of the third party users. *See* Brief of Appellants, 1998 WL 34184691, *27. Nonetheless, the district court considered this evidence as probative of the strength of plaintiff's mark and the Eleventh Circuit affirmed.

     B.   <u>Weakness of "Regions" Mark as Common English Word Used Descriptively</u>

The Fifth Circuit in <u>Domino's Pizza</u> found "additional support" for its conclusion that the plaintiff's mark should be accorded "only limited protection outside of the plaintiff's sugars and related food products" due to the nature of the mark itself. <u>Id</u>. at 260. "Domino" was not only a surname for a number of people but also was a "common English word." <u>Id</u>. Even though its application to sugar might be "arbitrary," it could not be accorded the same degree of protection as coined or fanciful terms. <u>Id</u>.

The same can be said for the plaintiffs' mark in this case, but even more strongly because the plaintiffs' mark is not used

in an arbitrary sense but descriptively.  See Def. Opening brief at pp. 24-27.  Regions is obviously a common English word. Moreover, some of the "Regions" businesses identified by investigators have adopted business names based upon the surname of their business owners.  *See* Stricklin Affidavit at p. 25 (Regions Construction) and p. 31 (Region Enterprises, Inc.).

> C.  Common English Words Which Are the Key Words in the Marks of Hundreds of Banking Institutions Have Been Adopted by Hundreds of Universities, Colleges and Other Businesses Without Danger of Infringement

It should come as no surprise to the Bank that numerous businesses have adopted the word "Regions" to describe the non-localized nature of their services.  It should also come as no surprise that these third party uses of such a common word does not lead to a likelihood of confusion with the Bank's mark.  The country's most prominent bank, Chase Manhattan, has had a federally registered mark in the word "Chase" for banking services since 1989, first having used the mark in 1975.  *See* Appx. B attached hereto (Reg. No. 1521765).  Nevertheless, third parties have been permitted to register the following "Chase" marks since that time, the PTO having necessarily found no confusingly similar marks on file:

| Name of Mark | Registration No. | Date of Registration |
|---|---|---|
| CHASE SCHOOL OF MEDICAL TRANSCRIPTION | 2,584,872 | 06/25/02 |

22

```
CHASE (for restaurant and
bar services)                          3,252,829        06/19/07

CHASE (for health services)            2,063,396        05/20/97

CHASE (for printing services)          2,032,161        01/21/97

CHASE (for court reporting)            3,145,348        09/19/06

CHASE (for wine)                       3,064,939        03/07/06

CHASE (for yachts)                     2,284,982        10/12/99

CHASE (for child car seats)            2,730,529        06/24/03

CHASE (for rodent repellents)          2,944,441        04/26/05

CHASE (for aluminum and galvanized
steel tubes and pipes)                 2,590,811        07/09/02

CHASE (for radiowave monitoring
instrumentation)                       2,166,783        06/23/98
```

(Appx. B attached hereto.)

The Bank lists Colonial Bancgroup as one of the top institutions in Alabama. *See* Rachel Marmer Declaration, Ex. B. Colonial Bancgroup has had a federal registration for its mark, Colonial Bank, since March 12, 2002, first having used the mark in 1981. (Appx. C). According to its webpage, www.colonialbank.com, Colonial Bancgroup is a $23 billion bank holding company headquartered in Montgomery, Alabama with more than 300 banking offices in Florida, Alabama, Georgia, Nevada and Texas. Nevertheless, the PTO has permitted the filing of the "Colonial" marks for the following services:

|                      |                    | Date of          |
| Name of Mark         | Registration No.   | Registration     |
| --- | --- | --- |

23

```
COLONIAL (and Design) (for life
accident and health insurance)      3195055          01/02/07

COLONIAL (and Design) (for real
estate appraisal)                   2486440          09/11/01

COLONIAL (for computer software)    3217983          03/13/07

COLONIAL (for parking lot
services)                           2631635          10/08/02

COLONIAL (for commercial metal
safes)                              3189278          12/26/06

COLONIAL (for paintbrushes)         3186003          12/19/06

COLONIAL (for folding camping
trailers)                           2997832          09/20/05

COLONIAL (for meat)                 2806581          01/20/04

COLONIAL STONE (for hardscape
materials)                          2880782          09/07/04

COLONIAL (for clock parts)          2762018          09/09/03

COLONIAL (for flowers)              1868509          12/20/94

COLONIAL (for golf clubs)           1422072          12/23/86
```

(Appx. C attached hereto.)

Not only are such prominent banking institutions not threatened by a likelihood of customer confusion from these unrelated third party uses of the same mark, but, more particularly, hundreds of banks coexist with colleges and universities sharing the same key word in their marks. The Affidavit of Lily Monir Matini, filed concurrently herewith, contains a listing of some 83 federally registered marks

identifying banks or other financial institutions where the key word in the mark is also used as the key word in the name of a higher educational institution listed in the 2006 Higher Education Directory.   The Declaration of Doris Dimino, filed concurrently herewith, similarly shows a listing of some 264 financial institutions and 264 post-secondary educational institutions which share in common the same key word mark in their names but which have no affiliation or relationship to one another.

II.

<u>THE PARTIES MARKS ARE NOT SIMILAR</u>

Plaintiffs claim that the parties' marks are similar because they both use "Regions" and "Regions University." (Plaintiff's Brief at pp. 36-38.)  <u>There is no evidence that the University has ever advertised or marketed itself as "Regions."</u> There may be internal statements on its webpage which refer to the University as "Regions."  However, these statements are made within the context of a webpage which, on its face, identifies the institution as "Regions University."   The website address, www.regions.edu, cannot mislead the public as to any connection with the Bank.   The .edu domain is available only to post-secondary institutions that are institutionally accredited.   *See* www.educause.edu/edudomain/policy.asp.

25

Conversely, there is no evidence that the plaintiffs hold themselves out as "Regions University" to the general public. Indeed, if they did so, they would be violating the education laws of just about every state in which they do business. They are not licensed as a post-secondary institution and cannot hold themselves out as such under the laws of these states. Plaintiffs are certainly walking on thin ice, if not violating the law outright, if they are describing themselves as a "university" in recruitment efforts, as argued on page 10 of their Brief. Under the laws of at least six states where they do business, they cannot use the term "university" in advertising or promoting their training program. *See* Def. Opening Brief at pg. 59.

Plaintiffs describe their "Regions University" name as appearing on their website. However, there is no evidence that this particular webpage (Ex. 11) is accessible by the general public. (Pollard depo. at p. 42.) One can navigate their pubic website without ever finding any reference to "Regions University."

In summary, the University does not market itself as "Regions" without the word "University" and the Bank does not hold itself out to the general public as "Regions University." It is the Bank's arguments to the contrary, not the University's comparison of the marks, that are "disingenuous."

At page 38 of their Brief, plaintiffs dispute the argument that an inference can be drawn, from an initial trademark examination releasing the application to publication, that the mark is not likely to lead to confusion.  This is exactly what the Fifth Circuit concluded in <u>Amstar</u>.  *See* 615 F.2d at 261.  The determinations made by the trademark examiner in that case were initial determinations, approving the applications for publication.  *See* 205 U.S.P.Q. at 137-38.

In conclusion, the mark "Regions," used to identify the plaintiffs' financial services, is not similar, either as a word mark alone or, more significantly, with its accompanying logo, to the defendant's mark "Regions University," with or without its accompanying logo.[3]

III.

<u>THE BANK CAN BRING NO CLAIM FOR INFRINGEMENT BASED ON ALLEGED CONFUSION AS TO AFFILIATION WITH A UNIVERSITY; THE BANK IS PROHIBITED BY LAW FROM OFFERING SUCH EDUCATIONAL SERVICES AND SUCH SERVICES ARE THEREFORE BEYOND ITS ZONE OF NATURAL EXPANSION</u>

In their brief, plaintiffs put heavy emphasis upon confusion as to "sponsorship" or "affiliation," as used in 15 U.S.C. § 1125(a), quoted at page 29 of plaintiffs' brief.  There can be no probable confusion, however, as to an affiliation with another person or sponsorship of his goods or services where those goods or services are completely remote from and unrelated

---

[3] At page 37 of their Brief, plaintiffs reproduce a stylization for Regions University which lasted for about a month. The font on Exhibit 65 was changed in September or October of 2006.  (Costanza depo. at p. 81.)

to the goods or services of the mark owner.  A trademark owner's rights are "limited to goods on which the mark has already been used or that lie within the realm of natural expansion." Planetary Motion, Inc. v. Techsplosion, 261 F.3d 1188, 1201 (11th Cir. 2001).  Goods or services that cannot, by law, be sold or offered by the mark owner are not within his zone of natural expansion and he therefore cannot assert a claim of infringement based on a similar mark on such goods or services.

In Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc., 214 F.3d 432 (3rd Cir. 2000), an insurance agency sought to enjoin a bank from using the agency's mark "Commerce" in the offering of insurance products through a subsidiary.  The district court consolidated with this suit another action brought by the bank against the insurance agency claiming infringement of its mark.  The district court determined that the bank's right to the mark encompassed both banking and insurance services.  Id. at 437.  It found a likelihood of confusion on the assumption that banking and insurance were similar industries in the minds of consumers and that consumers would expect banks to expand into the insurance industry.  Id. at 441.  On review, the Third Circuit reversed this finding as erroneous because banks were prohibited from selling general insurance services or products at the time the agency began using the mark.  This prior statutory bar

28

"eviscerates the possibility that prior to 1996 southern New Jersey consumers reasonably expected [the bank] to engage in the insurance industry." Id. at 442; cf. Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d at 1202, n. 27 (11th Cir. 2001)(citing Commerce National approvingly but distinguishing it on facts).

Similarly, in Bay States Savings Bank v. Bay State Financial Services, LLC, 484 F.Supp.2d 205 (D. Mass. 2007), the court refused relief to the plaintiff, a savings and loan institution, claiming infringement of its mark "Bay State" by a financial services company offering insurance and investment products. The court concluded that the sale of investment and insurance products was not within the zone of "natural expansion" of the bank because it was "legally prohibited" from offering such products at the time and therefore "no reasonable consumer would have expected plaintiff to be selling those products and services." Id. at 217 (citing Commerce National Insurance Services, supra).

In the present case, the Bank is legally prohibited from operating or holding itself out as a post-secondary educational institution, given the statutory restrictions upon the powers of banks as well as state laws regulating the licensure of post-secondary educational institutions. Such a prohibition "eviscerates the possibility" that the consuming public could

reasonably expect Regions Bank to be engaged in furnishing or sponsoring post-secondary educational services.

Amazingly, the Bank suggests that, notwithstanding these prohibitions, the public associates it with education because it sponsors college football teams and conferences, gives money to individual colleges and universities, makes loans to students, and gives talks about financial matters to students. These activities hardly lead the public to reasonably assume the Bank is in the post-secondary education business itself. It is common knowledge that large corporations scramble to get their names before the public through the sponsoring of college athletic events, particularly well-telecast football games. Regions Bank is one of eleven corporate sponsors in the second tier of sponsorship of the SEC conference, according to the conference webpage, www.secsports.com. Other efforts to promote better education in the community is again something many businesses do as corporate citizens, without being confused with any schools receiving assistance.

The Bank flatters itself to imagine that a private Christian university, even one interested in promoting itself as a provider of online learning in areas of business and other "secular" vocations, would want to choose the name of a bank to foster that image. Such an association in the public mind, if successful, would tie the school to the vicissitudes of public

opinion about a particular bank, including reaction to negative publicity over mergers, such as the Bank has undergone, when jobs are lost or customer accounts have to be divested.

In changing its name, the University wanted no association with Regions Bank. It adopted a common English word, "Regions," that signified other "regions" of the world from which it wanted to draw students for online learning and that carried Biblical connotations of its global outreach. It adopted a word that, in fact, is popularly used by several other missionary organizations and at least one church in the Bank's sixteen state footprint.

The suggestion that people will assume some sponsorship or affiliation between a university or college and a bank or other prominent business, based on a similar name, is completely speculative and flies in the face of the peaceful coexistence of such institutions throughout the country. *See* Matini and Dimino Affidavits.

The Bank relies upon a series of cases involving universities, where infringement was found due to evidence of confusion as to sponsorship or affiliation. (Plaintiff's Brief at p. 48.) These cases all involve hawkers of goods, such as t-shirts or other merchandise, on which they have they imprinted an exact (or nearly identical) copy of the university's registered design mark. In these cases, the school actually

31

sold similar goods itself or licensed the sale of such goods by others.  *See* Texas Tech, 461 F.Supp.2d 510, 515 (N.D. Tex. 2006); Board of Supervisors of Louisiana State University v. Smack Apparel Co., 483 F.Supp.2d 653, 660 (E.D. La. 2006). Members of the public often assume that products bearing the mark of a school or a sports team are sponsored or licensed by that team or school.  *See* University of Georgia Athletic Association v. Laite, 756 F.2d 1535, 1547, n. 28.  These cases involve situations where the public knows that the trademark, which is the "triggering mechanism" for the sale of the product, originates with the plaintiff.  Id. at 1546 (quoting Boston Professional Hockey Assn, Inc. v. Dallas Cap and Emblem Mfg, Inc., 510 F.2d 1004, 1012 (5th Cir.), *cert. denied*, 423 U.S. 868 (1975)); cf. Glen Raven Mills, Inc. v. Ramada Int'l, Inc., 852 F.Supp. 1544, 1549 (M.D. Fla. 1994)(distinguishing the "triggering mechanism" cases and rejecting "confusion of sponsorship" argument, where plaintiff failed to provide any evidence that purchase of defendant's vacation packages was triggered by recognition of the "Sunbrella" mark as plaintiff's mark).

In contrast, where businesses, rather than simply slapping the university's trademark insignia on their products, have identified their goods or products simply by incorporating a common English word that also happens to be the mark of a famous

university, the university has not been successful in demonstrating a likelihood of confusion. *See, e.g.,* University of Notre Dame v. J. C. Gourmet Food Imports Company, Inc., 703 F.2d 1372 (Fed. Cir. 1983)(no likelihood of confusion in European cheese importer's registration of the trademark "Notre Dame" for cheese, given differences in goods and services offered by university and goods offered by importer); Trustees of Columbia University v. Columbia/HCA Health Care Corporation, 965 F.Supp. 733 (S.D. N.Y. 1997)(discussed in Def. Opening Brief at p. 37).

In the present case, of course, the University is the defendant, not the plaintiff, and is being sued not because it has used the plaintiffs' exact mark as a "trigger" for the sale of goods or services which the Bank also sells or licenses for sale. It has adopted a common English word to describe its university, for the furnishing of educational services which the Bank not only does not furnish but is legally prohibited from furnishing. This is unlike the sale of "unlicensed" products bearing university insignias where the public has come to expect licensing and endorsement of a product by the use of such insignia. It is, rather, like the Notre Dame case, the employment of a common word for a mark to identify services completely unrelated to those offered by the Bank.

There can be no confusion as to "sponsorship," as that term is used in 15 U.S.C. § 1125(a), where the goods or services are so unrelated that the public would not reasonably expect the plaintiff to be the maker or sponsor of the other goods or services. *See* Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1201-02 (11th Cir. 2001); Worthington Foods, Inc. v. Kellogg Company, 732 F.Supp. 1417, 1454 (S.D. Oh. 1990)(on "confusion of sponsorship" claim, plaintiff must show that parties' goods are "related to an extent which could permit confusion of sponsorship, affiliation or connection to arise"). This doctrine is often referred to as the "related goods or services" rule. McCarthy on Trademarks, § 24:6. Where the goods are unrelated as a matter of law, there can be no confusion as to sponsorship or source. *See* Toho Company Limited v. Sears Roebuck & Co., 645 F.2d 788, 791 (9th Cir. 1981)(television cartoon series and garbage bags); Blazon, Inc. v. Blazon Mobile Homes Corp., 416 F.2d 598 (7th Cir. 1969)(children's toys/sport equipment and travel trailers/pickup campers); *see generally* 3A Callman on Unfair Competition, Trademarks and Monopolies § 21:55 and n. 23 (non-competing goods so different that no probability of confusion exists). See also Def. Opening Brief at pp. 38-39. The dissimilarity of the services of the parties in this case is at least as great, if

not greater, than the dissimilarity of goods or services in the above cases.

IV.

PLAINTIFFS HAVE NO PROBATIVE EVIDENCE OF ACTUAL CONFUSION

Defendant has discussed at length, in its original brief (pp. 43-53), the legal principles defining what constitutes relevant, admissible evidence of "actual confusion." The evidence submitted by the Bank fails to meet the standards for such evidence. A business name may call to mind some other well known mark of a dissimilar business. This is not actual confusion for infringement purposes. McCarthy on Trademarks, § 23:9 ("'confusion' means more than that the junior user's mark merely 'calls to mind' the senior user's mark."). It may even cause people to be curious or wonder whether there was some kind of connection, leading them to inquire. This is not actual confusion. *See* Def. Opening Brief at pp. 45-47. Actual confusion means customers have a mistaken belief that the businesses are the same or are affiliated, as demonstrated, for instance, by correspondence or communication directed to one business which is intended for the other. No such evidence exists in this case.

The Bank's affidavits are, for the most part, affidavits by Bank employees about other Bank employees initially wondering

35

whether there was a connection.[4]  Such persons, of course, may be sensitive to other businesses adopting a similar name, but any short-lived concern in their minds is simply irrelevant.  One must look for actual confusion by potential customers and, more importantly, potential customers of the University's educational services.  *See* Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d at 264 (appropriate universe in market survey is fair sampling of purchasers most likely to partake of the alleged infringer's goods or services).

With respect to such customers, the Bank points to three mails received by the University, a couple of unidentified callers inquiring about potential affiliation, and testimony by Dr. Turner and Laina Costanza.  Affidavits of Dr. Wilson Luquire and David P. Moore, filed concurrently herewith, demonstrate that in their e-mails to the University they were joking and did not actually believe that there was some connection between the University and the Bank, just as Dr. Turner had testified.  The other email from Randy Gore and the two anonymous phone calls are, at best, simply evidence of the kind of customer inquiries that courts have concluded reveal not confusion but rather an

---

[4] To the extent these affidavits refer to any customer inquiries or confusion due to the University's mark, they are inadmissible hearsay.  *See* U.S.. v. Samaniego, 345 F.3d 1280, 1283 (11th Cir. 2003)(state of mind exception to hearsay rule – Rule 803(3) – does not allow testimony as to declarant's reason for statement of mind, or anything else except declaration of one's immediate mental condition).  The affidavits do not show confusion anyway, only inquiries.

awareness of a distinction that the mind is still making and that the inquiry is intended either to confirm or disavow.

The Bank claims that Laina Costanza "instantly thought" of Regions' financial institution when Dr. Turner told her that he was considering changing the University's name to Regions University. (Plaintiff's Brief at p. 22.) This completely mischaracterizes her testimony. Her <u>initial</u> reaction was "I thought it was a good vision based on – **the first thing that came to mind** was going to all the world, preach the gospel ... ." (Costanza depo. at p. 64.)(emphasis added). In any event, as discussed above, such "calling to mind" of the other mark is not confusion.

The other non-Bank employee affidavit testimony submitted by the Bank also reflects, at best, inquiries, not actual confusion. The affidavit testimony of Mr. Dunman's friend, Jack Galassini, and that of Brian Warwick, a lawyer with Maynard, Cooper & Gale, are noteworthy by their use of language suggesting mental speculation about possibilities, not actual confusion. *See* Warwick Affidavit (stating he thought the Bank "may" have started a school and that it "might be" affiliated with Regions Bank); Galassini Affidavit (thinking that school had "some type of relationship" with the Bank and was "curious" about this). Warwick also does not identify himself as a customer of Regions, and is a dubious witness, being a lawyer in

the law firm that represents the Bank. *See* www.mcglaw.com/representative_clients.aspx. Finally, the Alabama Kitchen Sink blog "evidence" of a conversation about Regions University and the Bank is rank hearsay as to any evidence of confusion and, even on its face, does not reflect actual confusion by anyone.

As to the alleged "admissions" by the defendant as to confusion (Plaintiff's Brief at p. 25), there was no such admission at all. Dr. Turner <u>denied</u> any confusion, making the same kind of distinction that trademark law makes between actual confusion and inquiries about affiliation. (Turner depo. at p. 171-72.) These are not admissions of actual confusion. The people who approached him about Regions donating money to the school, on "one or two occasions," were kidding him. (Turner depo. at pp. 179-180.)

In summary, the "evidence" put forward by the Bank fails to show even one instance of actual confusion by a potential customer of either the Bank's services or the University's services.

V.

<u>NO EVIDENCE EXISTS THAT THE UNIVERSITY, IN CHANGING ITS NAME, DELIBERATELY SOUGHT TO CAPITALIZE ON THE REPUTATION OF REGIONS BANK</u>

The Bank's efforts to characterize the University's actions, in changing its name, as some kind of bad faith attempt

38

to capitalize on the Bank's name, is built upon innuendos and speculation that contradict the actual evidence. The minutes of confidential meetings of executive committees and the University Board contain not one shred of evidence of such a motivation. The choice of "Regions" was only made after the first choice, "Masters," was refused by the PTO. The name had legitimate connotations of the kind of image the University wished to project, i.e., a national and international distance learning school, and its Christian roots, as the minutes reflect. There is simply no evidence that this motivation was "pretextual." The people at these meetings had no reason to try to disguise their true motivation: This was before anyone had any idea the Bank would claim infringement.

The Bank latches on to Dr. Turner's use of the phrase "for profit" in describing the kind of name the University was seeking. This has nothing to do with the choice of some name similar to a commercial business. Rather, Dr. Turner was referring to names used by "for profit" corporations operating as schools. When the U. S. Department of Education chose SCU as part of its online demonstration program, this immediately placed the school in competition with these "for profit" schools, also known as "proprietary" institutions. Most of the schools have "snappy," two-word names, such as Kaplan University, Walden University or Capella University. SCU wanted

such a name and, accordingly, considered Masters University, Rex University, Turner University, Greystone University, Regal University, Royal University, Providence University and Regions University. *See* Affidavit of Rex Turner filed concurrently herewith.

The Bank characterizes the email from trademark counsel as "inadequate on its face" because it only concerns registerability and is, at most, a "preliminary screening search." Of course, registerability, in and of itself, is indicative of the lack of any confusingly similar marks for those goods or services. Furthermore, the question is not the <u>adequacy</u> of the opinion but whether or not the University relied in good faith upon that opinion. No evidence exists that it did not.[5]

Finally, the idea that Dr. Turner intentionally withheld "crucial information" from his counsel, because he only said there was a Regions Bank in Alabama without telling him anything further, is preposterous. No evidence exists that counsel asked him anything further about the Bank, or that he should have independently known to volunteer more information. Obviously, counsel needed to know nothing further, other than that it was a

---

[5] The Bank does not explain what different result would have been reached by a "fuller" search except to show the Bank had similar registered marks on completely <u>unrelated</u> services. The failure to do a search that would have only led to such a discovery is not existence of bad faith in adopting a mark. *See* <u>Savin Corp. v. Savin Group</u>, 391 F.3d 439, 460 (2nd Cir. 2004)(trademark search, if performed, would have led to discovery of plaintiff's marks for unrelated goods, giving defendant no reason to believe using the same name for its services would infringe plaintiff's marks).

bank, not a university. If the school were trying to hide information from trademark counsel, why would they go to the lengths of calling that counsel at the last minute about their discovery of an internal training program used by the Bank styled "Regions University," making sure this would not be a problem?

VI.

THE BANK'S NAME IS NEITHER FAMOUS NOR DISTINCTIVE FOR FEDERAL OR STATE DILUTION PURPOSES

A.   Federal Dilution Claim

The Bank does not dispute that, in order to state a claim under the Federal Trademark Dilution Revision Act, its name must be both famous and distinctive. It does not dispute that its fame must extend to the "general consuming public of the United States." Its evidence of "extraordinarily high aided and unaided awareness" of **its name as a bank**, through consumer surveys in some states and cities, hardly establishes this fact within all sixteen states of its "footprint," let alone within the rest of the country. The president of Regions Asset Company, who lives in Delaware, admitted that the Bank has no market presence in Delaware (Armitage depo. at p. 15). She has no direct knowledge that Regions has any fame in Delaware (Armitage depo. at p. 35). The Bank relies upon its sponsorships of sports teams whose competitions, and therefore

41

the Bank's commercials, might be nationally televised.  Neither the nature, frequency, nor even the existence of such nationally televised commercials has been placed into evidence, let alone evidence that any such coverage actually led to any name recognition in those states.  The Bank also relies upon the fact that its banking, lending, and insurance services are provided to customers "regardless of their residence," but there is no evidence of whether any, let alone how many, Bank customers, might live beyond the sixteen state footprint.  There is a complete failure of evidence that the name is widely recognized by the general consuming public of the United States.  The claim under the Federal Dilution Act must fail.

The claim must also fail because the name lacks distinctiveness, as more fully argued in Defendant's Opening Brief (pp. 62-68).  The word "Regions" is a common English word used extensively by a great variety of businesses throughout the sixteen state region and is a word adopted by a number of other federal trademark applicants, like the "Domino" mark in Amstar.  Outside of the plaintiffs' line of financial services, the mark is extremely weak and lacks the distinctive quality necessary for a dilution claim.  *See* Amstar Corp., 615 F.2d at 265 (dismissing claim under Georgia anti-dilution statute).

Plaintiffs claim distinctiveness, citing the testimony of Mr. Bill Askew, who selected the name "Regions" for the Bank,

and claimed the mark was "not in use." (Plaintiff's Brief at pp. 9-10.) He claims to have found "no use of the [Regions] name." (Askew depo. at p. 41-42.) In fact, the Bank was <u>not</u> the first to register a trademark for "Regions." A restaurant in Chicago had registered the mark "Regions Café" six years earlier. *See* Notice of Filing of Certified Registrations (Doc. 52). Indeed, the Bank was not even the first to use the mark for banking and financial services. In order to register the mark, the Bank had to first buy the right to the mark from the third party who was using it for banking and financial services. (Upchurch depo. at pp. 24-25.) The Bank registered the mark for banking and financial services only. After that registration, other companies continued to register the mark "Regions" or "Region" for different purposes, including "REGIONS BEYOND INTERNATIONAL" for mission services, "REGIONS AIR" for air transportation, "CARE AND REGIONS" for charitable fund raising, "THE REGIONS HOMEPAGE" for online computer services, "REGIONS" and "REGIONS HOSPITAL" for medical services, "REGIONSERV" for telecommunication services, "REGION" (and design) for clothing, "REGIONS" for wine (notice of approval issued), "REGIONS FOUNDRY" for faucets and shower fixtures (approved for publication) and "REGIONS SPECIALTY COFFEE" (application pending). The marks "REGIONS CAFÉ" for restaurant services, "REGIONS" and "REGIONS HOSPITAL" for medical services, and

"REGION" for clothing are now incontestable.  Plaintiffs are in no position argue that their "Regions" mark for financial services has the necessary "distinctiveness" for a dilution claim when that mark has already been watered down and "diluted" by these other incontestable marks in other goods and services, to say nothing of the numerous other businesses using the same marks.

B.   State Dilution Claim

For similar reasons, the plaintiffs' state anti-dilution claim must fail.   The mark is very weak and lacks distinctiveness outside the field of banking services. Distinctiveness is a statutory requirement identical to the distinctiveness required under the Federal Trademark Act.   *See* Def. Opening Brief at pp. 69-70.  The "Regions" mark used by the Bank – a common English word used descriptively, and weakened by extensive third party use of the same mark for other businesses – lacks distinctiveness.

The Bank relies upon Arthur Young, Inc. v. Arthur Young & Co., 579 F.Supp. 384 (N.D. Ala. 1983).   This case involved a party (Arthur Young, Inc.) using a name practically identical to the federally registered mark of the national accounting firm, Arthur Young & Co.  Both parties were engaged in the executive search business and both provided virtually the same services. Id. at 388.  The only evidence of third party use was a "Arthur

44

Young Chevrolet" in Illinois. Id. at 387. The accounting firm's mark, "Arthur Young," was arbitrary or fanciful. Id. The dilution of the national accounting firm's mark, by a competing business operating within its same service sector, is very different from the claim of dilution in this case, where there is no evidence that the plaintiff's mark has any strength outside of financial services and, in particular, in the field of post-secondary educational services.

Furthermore, in light of the recent changes to the federal trademark law, requiring fame on a national level in order to state a dilution claim, the Alabama anti-dilution statute should be interpreted in a similar fashion. Congress has now explicitly rejected any notion of "niche" fame, where the fame of a mark is restricted to a defined geographical area. Such a theory of relative strength is equally inappropriate to a state anti-dilution statute. See McCarthy on Trademarks, § 24:112 ("niche fame" confined to territorial area less than entire U.S. is "inappropriate for use via either the federal law or the various state statutes"). Plaintiffs' mark fails to meet this standard of national fame.

Dilution has proven to be a "dauntingly elusive concept." Ringling Brothers-Barnum & Bailey Circus Combined Shows, Inc. v. Utah Division of Travel Dev., 170 F.3d 449, 451 (4th Cir. 1999). It has been the subject of much judicial skepticism and critical

commentary.  *See e.g.,* McCarthy on Trademarks, § 24:100; Farley, "Why We Are Confused About The Trademark Dilution Law," 16 Fordham Intell. Prop. Media and Ent. L. J. 1175 (Summer 2006); McCarthy, "Proving A Trademark Has Been Diluted:  Theories Or Fact?" 41 Houston L. Rev. 713 (2004); Bone, "A Skeptical View Of The Trademark Dilution Revision Act," 11 Intell. Prop. L. Bull. 187 (Spring 2000); Klieger, "Trademark Dilution:  The Whittling Away Of The Rational Basis For Trademark Protection," 58 University of Pittsburgh L. Rev. 789 (1997); Welkowitz, "Reexamining Trademark Dilution," 44 Vanderbilt L. Rev. 531 (1991).  The Restatement notes:

> "In apparent recognition that broad interpretation of the statutes would undermine the balance between private and public rights that has informed the traditional limits of trademark protection, courts continue to confine the cause of action for dilution to cases in which the protectable interest is clear and the threat of interference is substantial."

Restatement (Third) of Unfair Competition §25, Com. b (1995); *see* Welkowitz, *supra* at 583 ("Courts are struggling to find a dilution theory and to distinguish it from infringement when no real theory or distinction may exist ... If the legislatures cannot summon the will to repeal dilution statutes, the statutes should be limited as much as their language will permit.").

A dilution theory, if applied indiscriminately, raises the specter of creating a trademark rights in gross, upsetting

trademark law's historic balance between free and fair competition, and undermining market efficiency and consumer welfare. Klieger, *supra,* text at n. 442. A dilution injunction has a far more sweeping impact on both fair commercial activity and free speech than one issued in an ordinary infringement case. McCarthy, *supra*, 41 Houston L. Rev. at 738. A dilution injunction essentially gives the plaintiff a perpetual monopoly on the use of its trademark or trade name.

In this case, in particular, the impact of a dilution injunction against the use of the word "Regions" will have sweeping effects upon any other business adopting this common word as part of its business, no matter how dissimilar its products or services. Such relief is completely unwarranted in light of the extremely weak character of the mark in any field beyond the Bank's own financial services industry. It would place unnecessary limits on the freedom of businesses to effectively communicate the regional nature of their services, all to the injury of consumers, who are not at risk of being confused.

Respectfully submitted,


/s/ WILLIAM W. WATTS
WILLIAM W. WATTS, III
[WATTW5095]

47

bill@alabamatrial.com
[HUDSV1684]
tom@alabamatrial.com
Hudson & Watts, LLP
Post Office Box 989
Mobile, Alabama 36601


JAMES E. SHLESINGER
Shlesinger, Arkwright &
    Garvey LLP
1420 King Street, Suite 600
Alexandria, Virginia 22314

ATTORNEYS FOR DEFENDANT


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 24, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

William G. Pecau, Esq.
Rachel M. Marmer, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

Charles B. Paterson, Esq.
Paul A. Clark, Esq.
BALCH & BINGHAM, LLP
105 Tallapoosa Street, Suite 200
Montgomery, Alabama  36104


<u>/s/ WILLIAM W. WATTS</u>

48



## Secretary of State
## Business Information Search

| Secretary of State Web Site | Instructions |
|---|---|

| Name | I.D. Number |
|---|---|
| REGIONSAIR, INC. | 0327443 |

**Business Type*:**                                   CORPORATION

**Profit/Nonprofit:**                                 FOR PROFIT

**Status*:**                                          ACTIVE

**Date of Formation/Qualification:**                  03/05/1997

**Domestic/Foreign:**                                 DOMESTIC

**Place of Incorporation/Organization:**              DAVIDSON

**Duration:**                                         PERPETUAL

**FYC(Fiscal Year Closing) Month:**                   DECEMBER

**Principal Office:**

**Address Line 1:**            693 FITZHUGH BLVD.

**Address Line 2:**

**City:**                      SMYRNA

**State:**                     TN

**Zip:**                       37167

**Other than USA:**

**Registered Agent:**

**Name:**                      DOUGLAS J. CALDWELL

**Address Line 1:**            693 FITZHUGH BLVD.

**Address Line 2:**

**City:**                      SMYRNA

**State:**                     TN

**Zip:**                       37167

**Business Filing History**

* **Important Note:** Business filing History includes information about (1) the basis for an inactive status and (2) the current true name and filing status of a business with an assumed name or a changed status.

Note: This information is current as of three working days prior to today's date.

Search Again

Report a Technical Issue

**Home**   **Find Companies:** U.S. | Worldwide   **Find U.S. Jobs**   **Browse:** Industries | Publishers | News   **Business Resources**

Manta > Find Companies > Smyrna, TN > Consumer Products & Services > Passenger Car Leasing > Air Transportation, Scheduled > Air transportation, scheduled > Regionsair, Inc

# Regionsair, Inc

693 Fitzhugh Blvd, Smyrna, TN, United States
**Phone:** (615) 223-5644
**URL:** www.corporateairlines.com
**Trade Style Names:** American Connections
**SIC:** Air Transportation, Scheduled
**Line of business:** Scheduled Air Transportation

*Ads by Google on Scheduled Air Transportation†*

**Airline Specials** Choose Your Flights and Times. Compare Prices and Save! Aff.

**All Business Class** Fly MAXjet from DC, NY and Vegas to London at $699 each way!

**Aviation Consulting** Airline and airport consulting in any area

†The ads are not affiliated with Regionsair, Inc

### Regionsair, Inc - Detailed Company Profile

**Year Started:** 1997
**State of Incorporation:** N/A
**URL:** www.corporateairlines.com
**Location type:** Headquarters
**Stock Symbol:** N/A
**Stock Exchange:** N/A
**Trade Style Names:** American Connections
**NAICS:** Scheduled Passenger Air Transportation
**Est. Annual Sales:** $24,000,000
**Est. Employees:** 220
**Est. Employees at Location:** 100
**Contact Name:** Douglas Caldwell
**Contact Title:** President

# *REGIONSAIR* ✈

**Corporate Offices**
**(**615) 223-5644
Fax: (615) 223-8631







## *About Us!*

**Corporate Offices**
(615) 223-5644
Fax: (615) 223-8631

**RegionsAir** *is known for the reliable service we've provided* for our customers since 1996. This commitment to superior service is reflected in our record for on time performance and passenger comfort. Uniform business class service and convenient flight schedules round out our reputation as a top performer.



Our entire fleet of aircraft feature standup headroom, convenient in cabin storage and plush leather seating. Our goal is to provide customers with a warm and inviting atmosphere not unlike that of a private club.

We invest a great deal of time and attention in recruiting and training pilots, maintenance technicians, ground support personnel and administrative staff. The result is a team committed to delivering the best travel experience possible, one customer at a time.

## *About Us!*

**Corporate Offices**
(615) 223-5644
Fax: (615) 223-8631

**RegionsAir** is known for the reliable service we've provided for our customers since 1996. This commitment to superior service is reflected in our record for on time performance and passenger comfort. Uniform business class service and convenient flight schedules round out our reputation as a top performer.

  Our entire fleet of aircraft feature standup headroom, convenient in cabin storage and plush leather seating. Our goal is to provide customers with a warm and inviting atmosphere not unlike that of a private club.

  We invest a great deal of time and attention in recruiting and training pilots, maintenance technicians, ground support personnel and administrative staff. The result is a team committed to delivering the best travel experience possible, one customer at a time.

HOME

# REGIONSAIR ✈



Manual Status

News By Date

Destinations

Employment

Our Fleet

Contact Us

Home

**Corporate Offices**
(615) 223-5644
Fax: (615) 223-8631



## *Airline News!*

On June 15, 2005, the Department of Transportation (DOT) reselected RegionsAir, Inc. d/b/a AmericanConnection to provide subsidized essential air service (EAS) at the following communities for a new two-year period from June 1, 2005 through May 31, 2007:

Burlington, Iowa
Cape Girardeau, Missouri
Ft. Leonard Wood, Missouri
Jackson, Tennessee
Marion/Herrin, Illinois
Owensboro, Kentucky
Kirksville, Missouri

In addition, on January 21, 2005, RegionsAir, Inc. was reselected by the DOT for another two-year term beginning August 1, 2005, for EAS at Quincy, Illinois.

A total of 5 air carriers were interested in the EAS markets, and the DOT made their decision based on four factors: (a) scheduled service reliability; (b) contractual and marketing arrangements with a large carrier to ensure service beyond the hub; (c) interline arrangements the applicant has made with a large carrier at the hub; and (d) community views.

RegionsAir, formerly known as Corporate Airlines, has been serving most of these communities for over 5 years, and with the contract renewals we look forward to a strong relationship with these communities for years to come.

Int. Cls.: 16 and 36

Prior U.S. Cls.: 38 and 102

## United States Patent and Trademark Office

Reg. No. 1,521,765
Registered Jan. 24, 1989

### TRADEMARK
### SERVICE MARK
### PRINCIPAL REGISTER

## CHASE

CHASE MANHATTAN CORPORATION, THE (DELAWARE CORPORATION)
1 CHASE MANHATTAN PLAZA
NEW YORK, NY 10081

FOR: PERIODICAL BANK REPORTS, PERIODICAL ECONOMIC AND FINANCIAL BULLETINS, EMPLOYEE NEWSLETTERS ISSUED PERIODICALLY, FINANCIAL LEAFLETS, PAMPHLETS AND BOOKLETS, ISSUED FROM TIME TO TIME , IN CLASS 16 (U.S. CL. 38).
FIRST USE 1-0-1975; IN COMMERCE 1-0-1975.
FOR: BANKING SERVICES- NAMELY, FINANCING, CREDIT AND LOAN SERVICES, COMPOUND INTEREST ACCOUNTS, CHECK-

ING ACCOUNTS, SPECIAL CHECKING ACCOUNTS, FOREIGN EXCHANGE, LETTERS OF CREDIT AND TRAVELERS' CHECKS, COMMERCIAL SAVINGS AND TRUST DEPARTMENT SERVICES, AND SAVINGS BANK CENTERS, IN CLASS 36 (U.S. CL. 102).
FIRST USE 1-0-1975; IN COMMERCE 1-0-1975.

OWNER OF U.S. REG. NOS. 1,393,993, 1,396,880 AND OTHERS.

SER. NO. 689,936, FILED 10-16-1987.

MICHAEL HAMILTON, EXAMINING ATTORNEY

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36 and 38

**United States Patent and Trademark Office**

Reg. No. 2,368,015

Registered July 18, 2000

## TRADEMARK
### PRINCIPAL REGISTER

# CHASE

CHASE MANHATTAN CORPORATION, THE (DELA-
WARE CORPORATION)
270 PARK AVENUE
NEW YORK, NY 10017

FOR: COMPUTER SOFTWARE IN THE FIELDS OF
BANKING AND FINANCIAL SERVICES USED BY
CUSTOMERS TO FACILITATE TRANSACTIONS
AND OBTAIN INFORMATION AND ADVICE, IN
CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 5–0–1997; IN COMMERCE 5–0–1997.

SER. NO. 75–640,674, FILED 2–16–1999.

JULIA HARDY COFIELD, EXAMINING ATTORNEY

Int. Cls.: 6, 8, 16, 18, 21, 24, 25 and 28

Prior U.S. Cls.: 1, 2, 3, 5, 12, 13, 14, 22, 23, 25, 28, 29, 30, 33, 37, 38, 39, 40, 41, 42, 44 and 50

**Reg. No. 2,096,499**

## United States Patent and Trademark Office

Registered Sep. 16, 1997

### TRADEMARK
### PRINCIPAL REGISTER

## CHASE

CHASE MANHATTAN CORPORATION, THE (DELAWARE CORPORATION)
1 CHASE MANHATTAN PLAZA
NEW YORK, NY 10081

FOR: METAL KEY HOLDERS, IN CLASS 6 (U.S. CLS. 2, 12, 13, 14, 23, 25 AND 50).
FIRST USE 1-0-1994; IN COMMERCE 1-0-1994.

FOR: POCKET KNIVES, IN CLASS 8 (U.S. CLS. 23, 28 AND 44).
FIRST USE 1-0-1994; IN COMMERCE 1-0-1994.

FOR: PENS, HIGH-LIGHTING MARKERS, LETTER OPENERS, PAPERWEIGHTS, NOTE PADS, AND LEATHER STATIONERY-TYPE DESK PORTFOLIOS, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).
FIRST USE 1-0-1994; IN COMMERCE 1-0-1994.

FOR: ATTACHE CASES, AND UMBRELLAS, IN CLASS 18 (U.S. CLS. 1, 2, 3, 22 AND 41).
FIRST USE 1-0-1994; IN COMMERCE 1-0-1994.

FOR: MUGS, ACRYLIC COASTERS, AND PLASTIC SPORTS BOTTLES SOLD EMPTY, IN CLASS 21 (U.S. CLS. 2, 13, 23, 29, 30, 33, 40 AND 50).
FIRST USE 1-0-1994; IN COMMERCE 1-0-1994.

FOR: TOWELS, IN CLASS 24 (U.S. CLS. 42 AND 50).
FIRST USE 1-0-1994; IN COMMERCE 1-0-1994.

FOR: CLOTHING, NAMELY, JACKETS, GOLF SHIRTS, T-SHIRTS, HATS, SWEAT-SHIRTS, SHORTS AND VISORS, IN CLASS 25 (U.S. CLS. 22 AND 39).
FIRST USE 1-0-1994; IN COMMERCE 1-0-1994.

FOR: TENNIS BALLS AND GOLF BALLS, IN CLASS 28 (U.S. CLS. 22, 23, 38 AND 50).
FIRST USE 1-0-1994; IN COMMERCE 1-0-1994.

OWNER OF U.S. REG. NOS. 1,521,765, 1,794,934 AND OTHERS.

SER. NO. 75-016,265, FILED 11-3-1995.

ADAM STRIEGEL, EXAMINING ATTORNEY

Int. Cl.: 41

Prior U.S. Cls.: 100, 101 and 107

**United States Patent and Trademark Office**

Reg. No. 3,217,280
Registered Mar. 13, 2007

## SERVICE MARK
### PRINCIPAL REGISTER



JPMORGAN CHASE & CO. (DELAWARE COR-
PORATION)
270 PARK AVENUE
NEW YORK, NY 10017

FOR: ENTERTAINMENT SERVICES IN THE
NATURE OF BASEBALL GAMES AND EXHIBI-
TIONS; STADIUM FACILITY SERVICES, NAMELY
PROVIDING STADIUM FACILITIES FOR THE PRE-
SENTATION OF ENTERTAINMENT, SPORTS
EVENTS, MUSICAL CONCERTS AND VARIETY
SHOWS, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 9-23-2005; IN COMMERCE 9-23-2005.

OWNER OF U.S. REG. NO. 1,393,993.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE FIELD, APART FROM THE MARK
AS SHOWN.

THE MARK CONSISTS OF A STYLIZED BANNER
DESIGN CONTAINING THE WORDS CHASE
FIELD; A FANCIFUL REPRESENTATION OF A
HOME PLATE IN BASEBALL, IN THE CENTER OF
WHICH IS APPLICANT'S LOGO; AND A FANCIFUL
REPRESENTATION OF A STRUCTURAL COMPO-
NENT OF A BUILDING.

SER. NO. 78-742,343, FILED 10-28-2005.

REBECCA EISINGER, EXAMINING ATTORNEY

Int. Cl.: 41

Prior U.S. Cls.: 100, 101 and 107

**United States Patent and Trademark Office**

Reg. No. 2,584,872
Registered June 25, 2002

## SERVICE MARK
### PRINCIPAL REGISTER



CHASE TRANSCRIPTIONS, INC. (OHIO CORPORATION)
PARK PLACE
10 WEST STREETSBORO STREET
HUDSON, OH 44691

FOR: EDUCATIONAL SERVICES, NAMELY, PROVIDING COURSES OF INSTRUCTION AT THE COLLEGE LEVEL IN THE FIELD OF MEDICAL TRANSCRIPTIONS , IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 9-0-1987; IN COMMERCE 9-0-1987.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SCHOOL OF MEDICAL TRANSCRIPTION", APART FROM THE MARK AS SHOWN.

THE LINING IS A FEATURE OF THE MARK AND DOES NOT INDICATE COLOR.

SER. NO. 76-197,398, FILED 1-22-2001.

CURTIS FRENCH, EXAMINING ATTORNEY

Int. Cl.: 43

Prior U.S. Cls.: 100 and 101

## United States Patent and Trademark Office

**Reg. No. 3,252,829**
Registered June 19, 2007

## SERVICE MARK
## PRINCIPAL REGISTER



GULFSTREAM PARK RACING ASSOCIATION, INC. (FLORIDA CORPORATION)
901 SOUTH FEDERAL HIGHWAY
HALLANDALE BEACH, FL 33009

FOR: RESTAURANT AND BAR SERVICES, IN CLASS 43 (U.S. CLS. 100 AND 101).

FIRST USE 11-15-2006; IN COMMERCE 11-15-2006.

THE COLOR(S) BLACK, CADET BLUE, MEDIUM BLUE, LIGHT BLUE IS/ARE CLAIMED AS A FEATURE OF THE MARK.

THE MARK CONSISTS OF A RECTANGLE, HALF BLACK, HALF CADET BLUE, WITH A MEDIUM BLUE WAVY STIPE IN THE MIDDLE SEPARATING THE TWO COLORS AND THE WORD CHASE IN LIGHT BLUE STYLIZED LETTERING.

SER. NO. 77-046,581, FILED 11-17-2006.

PAUL F. GAST, EXAMINING ATTORNEY

Int. Cl.: 42

Prior U.S. Cls.: 100 and 101

United States Patent and Trademark Office

Reg. No. 2,063,396

Registered May 20, 1997

## SERVICE MARK
### PRINCIPAL REGISTER

# CHASE

HARDAGE SUITE HOTELS, INC. (DELAWARE CORPORATION)
9255 TOWNE CENTRE DR., 9TH FLOOR
SAN DIEGO, CA 92121

FOR: HOTEL SERVICES, IN CLASS 42 (U.S. CLS. 100 AND 101).

FIRST USE 12-0-1994; IN COMMERCE 12-0-1994.

SER. NO. 75-129,109, FILED 7-2-1996.

ASSATA N. KIMBROUGH, EXAMINING ATTORNEY

Int. Cl.: 42

Prior U.S. Cls.: 100 and 101

**United States Patent and Trademark Office**

Reg. No. 2,032,161

Registered Jan. 21, 1997

## SERVICE MARK
### PRINCIPAL REGISTER

## CHASE

TAYLOR CORPORATION (MINNESOTA COR-
    PORATION)
P.O. BOX 3728
1725 ROE CREST DRIVE
NORTH MANKATO, MN 560023728

FOR: PRINTING SERVICES, IN CLASS 42
(U.S. CLS. 100 AND 101).

FIRST    USE    0-0-1948;    IN    COMMERCE
0-0-1948.

SER. NO. 75-064,282, FILED 2-27-1996.

WON TEAK OH, EXAMINING ATTORNEY

Int. Cl.: 42

Prior U.S. Cls.: 100 and 101

**United States Patent and Trademark Office**

Reg. No. 3,145,348
Registered Sep. 19, 2006

### SERVICE MARK
### PRINCIPAL REGISTER

# CHASE

MICHAELS & MICHAELS, CSR, INC. (CALIFOR-
NIA CORPORATION), DBA CHASE DEPOSI-
TION SERVICES
1370 BREA BLVD., SUITE 116
FULLERTON, CA 92835

FOR: COURT REPORTING; LITIGATION SUP-
PORT SERVICES, IN CLASS 42 (U.S. CLS. 100 AND
101).

FIRST USE 2-0-1997; IN COMMERCE 2-0-1997.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

SER. NO. 78-736,738, FILED 10-19-2005.

JORDAN BAKER, EXAMINING ATTORNEY

Int. Cl.: 33

Prior U.S. Cls.: 47 and 49

**United States Patent and Trademark Office**

Reg. No. 3,064,939
Registered Mar. 7, 2006

## TRADEMARK
### PRINCIPAL REGISTER

# CHASE

SIMPSON, PAMELA (UNITED STATES INDIVI-
 DUAL)
P.O. BOX 508
ST. HELENA, CA 94574 AND
SIMPSON, ANDREW (UNITED STATES INDIVI-
 DUAL)
P.O. BOX 508
ST. HELENA, CA 94574

 FOR: WINE, IN CLASS 33 (U.S. CLS. 47 AND 49).

FIRST USE 3-1-1997; IN COMMERCE 1-5-2000.

 THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

 SER. NO. 76-633,138, FILED 3-10-2005.

PATRICIA EVANKO, EXAMINING ATTORNEY

Int. Cl.: 12

Prior U.S. Cls.: 19, 21, 23, 31, 35 and 44

**Reg. No. 2,284,982**

## United States Patent and Trademark Office

Registered Oct. 12, 1999

## TRADEMARK
### PRINCIPAL REGISTER

## CHASE

CABO RICO YACHTS, INC. (FLORIDA CORPO-
RATION)
2258 S.E. 17TH STREET
FORT LAUDERDALE, FL 33316

FOR: YACHTS, IN CLASS 12 (U.S. CLS. 19, 21,
23, 31, 35 AND 44).

FIRST USE 12-17-1985; IN COMMERCE
4-1-1986.

SER. NO. 75-493,468, FILED 5-29-1998.

THEODORE MCBRIDE, EXAMINING ATTOR-
NEY

Int. Cl.: 12

Prior U.S. Cls.: 19, 21, 23, 31, 35, and 44

**United States Patent and Trademark Office**

Reg. No. 2,730,529
Registered June 24, 2003

## TRADEMARK
### PRINCIPAL REGISTER

## CHASE

EVENFLO COMPANY, INC. (DELAWARE COR-
PORATION)
707 CROSSROADS COURT
NORTHWOODS BUSINESS CENTER II
VANDALIA, OH 45377

FOR: CHILD CAR SEATS, IN CLASS 12 (U.S. CLS.
19, 21, 23, 31, 35 AND 44).

FIRST USE 11-0-2002; IN COMMERCE 11-0-2002.

SN 76-404,167, FILED 5-7-2002.

THEODORE MCBRIDE, EXAMINING ATTORNEY

Int. Cl.: 5

Prior U.S. Cls.: 6, 18, 44, 46, 51, and 52

United States Patent and Trademark Office

Reg. No. 2,944,441
Registered Apr. 26, 2005

## TRADEMARK
### PRINCIPAL REGISTER

## CHASE

PPI, INC. (KENTUCKY CORPORATION)
8459 U.S. HIGHWAY 42
SUITE 278
FLORENCE, KY 41042

    FOR: GARDEN PLANT PROTECTIVE PRODUCT
LINE, NAMELY GOPHER, MOLE, DEER, RABBIT
AND VERMIN REPELLENTS, IN CLASS 5 (U.S. CLS.
6, 18, 44, 46, 51 AND 52).

FIRST USE 5-30-2003; IN COMMERCE 5-30-2003.

SN 76-464,020, FILED 11-4-2002.

AISHA CLARKE, EXAMINING ATTORNEY

Int. Cls.: **6 and 17**

Prior U.S. Cls.: **1, 2, 5, 12, 13, 14, 23, 25, 35 and 50**

## United States Patent and Trademark Office

**Reg. No. 2,590,811**
Registered July 9, 2002

## TRADEMARK
### PRINCIPAL REGISTER

## CHASE

COLOMBO SALES & ENGINEERING, INC. (MI-
  CHIGAN CORPORATION)
2321 WOLCOTT STREET
FERNDALE, MI 48220

  FOR: ALUMINUM AND GALVANIZED STEEL
TUBES, PIPES AND CONDUIT RACEWAYS USED
FOR LEAKPROOF CONTAINMENT OF OTHER
TUBES, LINES AND PIPES TRANSPORTING ITEMS,
NAMELY, SODA, BEER, LIQUOR, SYRUP, CAR-
BON DIOXIDE, AND OTHER FOODSTUFFS UTI-
LIZED IN THE FOOD SERVICES AND BEVERAGE
INDUSTRIES, IN CLASS 6 (U.S. CLS. 2, 12, 13, 14, 23,
25 AND 50).

  FIRST USE 6-27-2001; IN COMMERCE 6-27-2001.

  FOR: POLYETHYLENE PLASTIC AND PVC
TUBES, PIPES AND CONDUIT RACEWAYS USED
FOR LEAKPROOF CONTAINMENT OF OTHER
TUBES, LINES AND PIPES TRANSPORTING ITEMS,
NAMELY, SODA, BEER, LIQUOR, SYRUP, CAR-
BON DIOXIDE, AND OTHER FOODSTUFFS UTI-
LIZED IN THE FOOD SERVICES AND BEVERAGE
INDUSTRIES, IN CLASS 17 (U.S. CLS. 1, 5, 12, 13, 35
AND 50).

  FIRST USE 6-27-2001; IN COMMERCE 6-27-2001.

  SER. NO. 76-141,521, FILED 10-5-2000.

HELLEN BRYAN-JOHNSON, EXAMINING ATTOR-
  NEY

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36 and 38

**Reg. No. 2,166,783**

## United States Patent and Trademark Office

Registered June 23, 1998

## TRADEMARK
### PRINCIPAL REGISTER

## CHASE

CHASE ELECTRONICS LIMITED (UNITED KINGDOM CORPORATION)
ST. LEONARD'S HOUSE, ST. LEONARD'S ROAD
MORTLAKE, LONDON SW14 7LY, ENGLAND

FOR: INSTRUMENTS TO MEASURE AND MONITOR RADIO INTERFERENCE, RADIO WAVES, RADIO FREQUENCY AND ELECTRO-MAGNETIC COMPATIBILITY, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 0-0-1978; IN COMMERCE 0-0-1978.
OWNER OF UNITED KINGDOM REG. NO. 1365811, DATED 3-20-1992, EXPIRES 12-5-2005.
OWNER OF UNITED KINGDOM REG. NO. 1293311, DATED 11-20-1986, EXPIRES 11-20-2007.

SER. NO. 75-071,208, FILED 2-6-1996.

ERICA GLEMBOCKI, EXAMINING ATTOR-NEY

Int. Cl.: 36

Prior U.S. Cls.: 100, 101 and 102

**Reg. No. 2,545,610**

## United States Patent and Trademark Office

Registered Mar. 12, 2002

### SERVICE MARK
### PRINCIPAL REGISTER

## COLONIAL BANK

CBG, INC. (NEVADA CORPORATION)
2820 WEST CHARLESTON BOULEVARD
SUITE 41
LAS VEGAS, NV 89102

FOR: FINANCIAL SERVICES, NAMELY, FINAN-CIAL MANAGEMENT, FINANCIAL PLANNING, FINANCIAL PORTFOLIO MANAGEMENT, FINAN-CIAL SERVICES IN THE NATURE OF AN INVEST-MENT SECURITY, FINANCIAL INVESTMENT IN THE FIELD OF SECURITIES; BANKING SERVICES; ASSET MANAGEMENT SERVICES; MORTGAGE LENDING SERVICES; MORTGAGE BANKING SER-VICES; SAVINGS AND LOAN SERVICES; DEBIT

CHECK CARD SERVICES; CREDIT CARD SERVI-CES; REAL ESTATE TRUSTEE SERVICES; ESTATE TRUST MANAGEMENT, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 10-30-1981; IN COMMERCE 10-30-1981.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "BANK", APART FROM THE MARK AS SHOWN.

SER. NO. 75-606,827, FILED 12-16-1998.

BARBARA RUTLAND, EXAMINING ATTORNEY

**Int. Cl.: 36**

**Prior U.S. Cls.: 100, 101, and 102**

**United States Patent and Trademark Office**

**Reg. No. 3,195,055**

Registered Jan. 2, 2007

## SERVICE MARK
### PRINCIPAL REGISTER



COLONIAL LIFE & ACCIDENT INSURANCE COMPANY (SOUTH CAROLINA CORPORATION)
P.O. BOX 1365
1200 COLONIAL LIFE BOULEVARD, WEST COLUMBIA, SC 29202

FOR: INSURANCE UNDERWRITING IN THE FIELD OF LIFE AND ACCIDENT AND HEALTH, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 1-24-2002, 09/00/1939.; IN COMMERCE 1-24-2002, 01/01/1945..

OWNER OF U.S. REG. NOS. 2,730,258 AND 2,780,263.

THE MARK CONSISTS OF THE WORD COLONIAL ABOVE WHICH APPEAR TWO CRESCENTS OPEN TOWARDS EACH OTHER AND BETWEEN WHICH IS A CIRCLE.

SN 78-571,670, FILED 2-21-2005.

KARANENDRA S. CHHINA, EXAMINING ATTORNEY

Int. Cls.: 36 and 37

Prior U.S. Cls.: 100, 101, 102, 103 and 106

United States Patent and Trademark Office

Reg. No. 2,486,440
Registered Sep. 11, 2001

## SERVICE MARK
### PRINCIPAL REGISTER



COLONIAL REALTY LIMITED PARTNERSHIP
(DELAWARE LIMITED PARTNERSHIP)
2101 6TH AVENUE NORTH
SUITE 750
BIRMINGHAM, AL 35203

FOR: REAL ESTATE APPRAISAL; APPRAISALS FOR INSURANCE CLAIMS OF REAL ESTATE; REAL ESTATE BROKERAGE; FINANCIAL INVESTMENT IN THE FIELD OF REAL ESTATE; LAND ACQUISITION, NAMELY, REAL ESTATE BROKERAGE; LEASING OF REAL ESTATE; REAL ESTATE MANAGEMENT; FINANCIAL VALUATION OF PERSONAL PROPERTY AND REAL ESTATE; REAL ESTATE AGENCIES; REAL ESTATE EQUITY SHARING, NAMELY, MANAGING AND ARRANGING FOR CO-OWNERSHIP OF REAL ESTATE; REAL ESTATE LISTING; REAL ESTATE MANAGEMENT;

AND REAL ESTATE SYNDICATION, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 1-1-1996; IN COMMERCE 1-1-1996.

FOR: REAL ESTATE DEVELOPMENT SERVICES; REAL ESTATE SITE SELECTION; AND BUILDING CONSTRUCTION SERVICES, IN CLASS 37 (U.S. CLS. 100, 103 AND 106).

FIRST USE 1-1-1996; IN COMMERCE 1-1-1996.

OWNER OF U.S. REG. NOS. 2,113,049 AND 2,113,050.

SER. NO. 75-332,323, FILED 7-29-1997.

RONALD MCMORROW, EXAMINING ATTORNEY

Int. Cl.: 39

Prior U.S. Cls.: 100 and 105

## United States Patent and Trademark Office

Reg. No. 2,631,635

Registered Oct. 8, 2002

## SERVICE MARK
### PRINCIPAL REGISTER

## COLONIAL

COLONIAL PARKING, INC. (MARYLAND COR-
    PORATION)
1050 THOMAS JEFFERSON STREET, N.W.
SUITE 100
WASHINGTON, DC 20007

   FOR: PARKING LOT SERVICES, IN CLASS 39
(U.S. CLS. 100 AND 105).

FIRST USE 10-0-1953; IN COMMERCE 10-0-1953.

OWNER OF U.S. REG. NO. 2,417,432.

SER. NO. 76-363,587, FILED 1-29-2002.

JASON ROTH, EXAMINING ATTORNEY

Int. Cls.: 9 and 42

Prior U.S. Cls.: 21, 23, 26, 36, 38, 100 and 101

**United States Patent and Trademark Office**

Reg. No. 3,217,983
Registered Mar. 13, 2007

**TRADEMARK**
**SERVICE MARK**
**PRINCIPAL REGISTER**

# COLONIAL

MAXWELL SYSTEMS, INC. (PENNSYLVANIA CORPORATION)
2500 DEKALB PIKE
NORRISTOWN, PA 19401

FOR: COMPUTER SOFTWARE FOR PROVIDING BUSINESS MANAGEMENT APPLICATIONS FOR THE CONSTRUCTION AND COMMERCIAL PROPERTY MANAGEMENT INDUSTRIES , IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 0-0-1980; IN COMMERCE 0-0-1980.

FOR: COMPUTER SOFTWARE DESIGN, DEVELOPMENT AND IMPLEMENTATION FOR OTHERS; UPDATING OF COMPUTER SOFTWARE FOR OTH-

ERS; COMPUTER CONSULTATION; TECHNICAL SUPPORT SERVICES, NAMELY, TROUBLESHOOTING OF COMPUTER SOFTWARE PROBLEMS, IN CLASS 42 (U.S. CLS. 100 AND 101).

FIRST USE 0-0-1980; IN COMMERCE 0-0-1980.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 78-890,705, FILED 5-23-2006.

DOMINIC FATHY, EXAMINING ATTORNEY

Int. Cl.: 6

Prior U.S. Cls.: 2, 12, 13, 14, 23, 25 and 50

United States Patent and Trademark Office

Reg. No. 3,189,278
Registered Dec. 26, 2006

## TRADEMARK
## PRINCIPAL REGISTER

# COLONIAL

LIBERTY SAFE & SECURITY PRODUCTS, INC. (UTAH CORPORATION)

1199 WEST UTAH AVENUE

PAYSON, UT 84651

FOR: COMMERCIAL METAL SAFES, IN CLASS 6 (U.S. CLS. 2, 12, 13, 14, 23, 25 AND 50).

FIRST USE 3-10-1999; IN COMMERCE 3-10-1999.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 2,341,259.

SER. NO. 78-800,312, FILED 1-26-2006.

MATTHEW PAPPAS, EXAMINING ATTORNEY

Int. Cl.: 16

Prior U.S. Cls.: 2, 5, 22, 23, 29, 37, 38 and 50

## United States Patent and Trademark Office

Reg. No. 3,186,003
Registered Dec. 19, 2006

## TRADEMARK
### PRINCIPAL REGISTER

# Colonial

COLONIAL MARKETING, INC. (NEW YORK
CORPORATION)
131-11 ATLANTIC AVENUE
RICHMOND HILL, NY 11418

FOR: PAINT BRUSHES, PAINT ROLLER
FRAMES, PAINT ROLLER COVERS, FOAM PAINT
BRUSHES, ALL FOR USE IN PAINTING THE
INTERIOR AND EXTERIOR OF HOUSES , IN
CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 12-31-1996; IN COMMERCE 12-31-1996.

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

SER. NO. 78-663,557, FILED 7-5-2005.

ELISSA GARBER KON, EXAMINING ATTORNEY

Int. Cl.: 12

Prior U.S. Cls.: 19, 21, 23, 31, 35 and 44

United States Patent and Trademark Office

Reg. No. 2,997,832

Registered Sep. 20, 2005

## TRADEMARK
### PRINCIPAL REGISTER

# COLONIAL

FLEETWOOD ENTERPRISES, INC. (DELAWARE CORPORATION)
3125 MYERS STREET
POST OFFICE BOX 7638
RIVERSIDE, CA 925137638

FOR: FOLDING CAMPING TRAILERS, IN CLASS 12 (U.S. CLS. 19, 21, 23, 31, 35 AND 44).

FIRST USE 6-0-2004; IN COMMERCE 6-0-2004.

THE MARK CONSISTS OF STANDARD CHAR-ACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 78-455,679, FILED 7-23-2004.

TRACY CROSS, EXAMINING ATTORNEY

Int. Cl.: 29

Prior U.S. Cl.: 46

**United States Patent and Trademark Office**

Reg. No. 2,806,581
Registered Jan. 20, 2004

## TRADEMARK
### PRINCIPAL REGISTER

## COLONIAL

IBP FOODS CO., THE (DELAWARE CORPORA-
  TION)
800 STEVENS PORT DRIVE
DAKOTA DUNES, SD 57049

  FOR: MEAT, IN CLASS 29 (U.S. CL. 46).

  FIRST USE 5-1-1939; IN COMMERCE 5-1-1939.

SER. NO. 78-134,716, FILED 6-11-2002.

NORA BUCHANAN WILL, EXAMINING ATTOR-
NEY

Int. Cl.: 19

Prior U.S. Cls.: 1, 12, 33 and 50

## United States Patent and Trademark Office

Reg. No. 2,880,782

Registered Sep. 7, 2004

## TRADEMARK
### PRINCIPAL REGISTER

## COLONIAL STONE

E.P. HENRY CORPORATION (NEW JERSEY CORPORATION)
201 PARK AVENUE
WOODBURY, NJ 08096

FOR: HARDSCAPING MATERIALS, NAMELY PAVERS AND PAVING BLOCKS MADE OF NATURAL OR ARTIFICIAL STONE, IN CLASS 19 (U.S. CLS. 1, 12, 33 AND 50).

FIRST USE 6-0-1988; IN COMMERCE 6-0-1988.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "STONE", APART FROM THE MARK AS SHOWN.

SER. NO. 76-475,730, FILED 12-16-2002.

MARY BOAGNI, EXAMINING ATTORNEY

Int. Cl.: 14

Prior U.S. Cls.: 2, 27, 28, and 50

**Reg. No. 2,762,018**

## United States Patent and Trademark Office

**Registered Sep. 9, 2003**

### TRADEMARK
### PRINCIPAL REGISTER

## COLONIAL

EMPIRE CLOCK, INC. (MINNESOTA CORPORA-
TION)
1295 RICE STREET
ST. PAUL, MN 55117

FOR: CLOCKS AND PARTS FOR CLOCKS, IN
CLASS 14 (U.S. CLS. 2, 27, 28 AND 50).

FIRST USE 8-12-2002; IN COMMERCE 8-12-2002.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "CLOCK" , APART FROM THE
MARK AS SHOWN.

SN 75-450,123, FILED 3-13-1998.

ANGELA M. MICHELI, EXAMINING ATTORNEY

Int. Cl.: 31

Prior U.S. Cl.: 1

## United States Patent and Trademark Office

Reg. No. 1,868,509
Registered Dec. 20, 1994

## TRADEMARK
### PRINCIPAL REGISTER

## COLONIAL

CONTINENTAL FARMS, INC. (FLORIDA COR-
PORATION)
2020 N.W. 89TH PLACE
MIAMI, FL 33172

FOR: FRESH CUT FLOWERS, IN CLASS 31
(U.S. CL. 1).

FIRST USE 2–4–1991; IN COMMERCE
2–4–1991.

SER. NO. 74–202,714, FILED 9–12–1991.

CYNTHIA SUMMERFIELD, EXAMINING AT-
TORNEY

## Typed Drawing

| | |
|---|---|
| **Word Mark** | COLONIAL |
| **Goods and Services** | IC 028. US 022. G & S: GOLF CLUBS. FIRST USE: 19850600. FIRST USE IN COMMERCE: 19850600 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 73603381 |
| **Filing Date** | June 9, 1986 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | September 30, 1986 |
| **Registration Number** | 1422072 |
| **Registration Date** | December 23, 1986 |
| **Owner** | (REGISTRANT) ALLIED GOLF COMPANY CORPORATION ILLINOIS 4538-54 WEST FULLERTON AVENUE CHICAGO ILLINOIS 60639<br><br>(LAST LISTED OWNER) LASALLE NATIONAL BANK NATIONAL BANKING ASSOCIATION UNITED STATES 135 SOUTH LASALLE STREET CHICAGO ILLINOIS 606034105 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | MALCOLM MCCALEB, JR. |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

**LSR&S**

**LANGE, SIMPSON, ROBINSON & SOMERVILLE LLP**

ATTORNEYS AND COUNSELORS

HUNTSVILLE OFFICE
100 Jefferson Street, South
Huntsville, Alabama 35801-4849
Telephone (256) 533-3500
Facsimile (256)-533-4100

REAL ESTATE CLOSING OFFICE
728 Shades Creek Parkway, Suite 120
Birmingham, Alabama 35209-4453
Telephone (205) 870-1511
Facsimile (205) 870-1514

417 20th Street North, Suite 1700
Birmingham, Alabama 35203-3217
Telephone (205) 250-5000
Facsimile (205) 250-5034
*http://www.lawls.com*

Direct dial: 205-250-5074

MONTGOMERY OFFICE
200 South Hull Street, Suite 206
Montgomery, Alabama 36104-3531
Telephone (334) 241-0000
Facsimile (334) 241-0022

ANNISTON OFFICE
1000 Quintard Avenue, Suite 501
Anniston, Alabama 36201
Telephone (256) 236-1950
Facsimile (256) 236-1968

March 15, 2000

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Regions Propane
Attn:   President/Chief Executive Officer
208 Mull Road
Benton, Tennessee  37307

Dear Sir or Madam:

We represent Regions® Asset Company ("Regions") and discovered your new incorporation as listed in the enclosed page copied from a watching service report generated by Dun & Bradstreet, Inc.  Regions is the owner of the service mark and trade name "Regions®," and we are writing to you in connection with your company's use of the name "Regions Propane."

Regions views with great concern your company's use of the name "Regions" Propane.  The use of the name "Regions" by your company is likely to cause confusion in the market place.

"Regions®" is (i) the predominant part of the corporate name of Regions Asset Company, (ii) a distinctive trade name for this company, (iii) a federally registered service mark (registration certificate numbers 1,914,267 and 1,881,600, copies of which are enclosed), and (iv) the embodiment of substantial goodwill in the community.  As such, it is protected by the provisions of the Lanham Act, 15 U.S.C. 1051, et seq., prohibiting infringement of federally registered trademarks, and by various common law principles preventing trading on the goodwill of another and unfair competition.

In order to protect Regions' valuable rights in its service mark and trade name, we ask that Regions Propane not use "Regions" as its corporate name or in any of its advertising materials.  We request that you advise us of your intentions no later than March 31, 2000.

Should you believe it beneficial, you may telephone me at (205)250-5074 for purposes of discussing this matter.

RAC00012388

Regions Propane
March 15, 2000
Page Two

Sincerely yours,

LANGE, SIMPSON, ROBINSION & SOMERVILLE LLP

J. Eric Miles

Enclosures

cc:    Samuel E. Upchurch, Jr., Esq.
       Mr. William E. Askew
       Henry E. Simpson, Esq.
       Stephen P. Leara, Esq.

RAC00012389

COPYRIGHT 2000 DUN & BRADSTREET INC. - PROVIDED UNDER CONTRACT
FOR THE EXCLUSIVE USE OF SUBSCRIBER 099-004710L.

ATTN: LINDA ANDRY

***REVIEW IN PROCESS.  UPDATED REPORT WILL BE FORWARDED***

THE "DS" INDICATOR ASSIGNED TO THIS BUSINESS MEANS THAT THE LIMITED INFORMATION
CURRENTLY IN THE D&B FILE DOES NOT ALLOW US TO CLASSIFY IT WITHIN OUR RATING
SYSTEM.

WE ARE PROVIDING THIS INFORMATION TO YOU IMMEDIATELY IN THE INTEREST OF SPEED.
BECAUSE MANAGEMENT MAY HAVE NOT BEEN INTERVIEWED, THIS INFORMATION SHOULD NOT
BE CONSIDERED A STATEMENT OF EXISTING FACTS.  WE ARE CURRENTLY INVESTIGATING
FURTHER, AND AN UPDATED REPORT WILL BE SENT TO YOU SHORTLY.

| | | |
|---|---|---|
| DUNS: 11-743-0004 | DATE PRINTED | |
| REGIONS PROPANE | MAR 03 2000 | RATING    DS |
| 208 MULL RD | | |
| BENTON TN  37307 | RET LIQUEFIED | |
| TEL: 423 338-0085 | PETROLEUM GAS | |
| | SIC NO. | |
| | 59 84 | |

M JORDAN, PRINCIPAL

RECORD TYPE: DUNS SUPPORT

Sources contacted verified information on December 23, 1999.

================================================================
*  *  *   CUSTOMER SERVICE   *  *  *
================================================================
If you have questions about this report, please call our Customer Service
Center at 1-800-234-3867 from anywhere within the U.S. If you are outside the
U.S., contact your local D&B office.

*** Additional Decision Support Available ***

Additional D&B products, credit recommendations and specialized investigations
are available to help you evaluate this company or its industry. Call Dun &
Bradstreet's Solution Center at 1-800-362-3425 from anywhere within the U.S.

================================================================
*  *  *   SUMMARY ANALYSIS   *  *  *
================================================================

RATING SUMMARY . . . . .

A Summary Analysis is not available at this time.

================================================================
*  *  *   PAYMENT SUMMARY   *  *  *
================================================================

D&B has not received a sufficient sample of payment experiences to establish a
PAYDEX score.

D&B receives over 315 million payment experiences each year.  We enter these
new and updated experiences into D&B Reports as this information is received.
At this time, none of those experiences relate to this company.

-1-

RAC00012390

```
============================================================================
```

HISTORY
12/23/99
        M JORDAN, PRINCIPAL

        M JORDAN.  Work history unknown.

```
============================================================================
```

OPERATION
12/23/99      Retails liquefied petroleum gas, specializing in bottled propane.
              FACILITIES:  Operates from premises in building.

THE INFORMATION IN THE "PAYMENTS", "PUBLIC FILINGS" AND OTHER SECTIONS, WHEN
PRESENT, MAY NOT RELATE TO THIS BUSINESS DUE TO POSSIBLE CHANGES IN OWNERSHIP,
CONTROL, OR LEGAL STATUS SINCE THE DATA WAS COLLECTED.

        03-03(1VG   /181)                        040181181

                        FULL DISPLAY COMPLETE

RAC00012391

The United States of America

CERTIFICATE OF REGISTRATION

This is to certify that the records of the Patent and Trademark Office show that an application was filed in said Office for registration of the Mark shown herein, a copy of said Mark and pertinent data from the Application being annexed hereto and made a part hereof,

And there having been due compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks,

Upon examination, it appeared that the applicant was entitled to have said Mark registered under the Trademark Act of 1946, as amended, and the said Mark has been duly registered this day in the Patent and Trademark Office on the

PRINCIPAL REGISTER

to the registrant named herein.

This registration shall remain in force for TEN years unless sooner terminated as provided by law.



In Testimony whereof I have hereunto set my hand and caused the seal of the Patent and Trademark Office to be affixed this twenty-eighth day of February 1995.

Bruce Lehman

Commissioner of Patents and Trademarks

PTO-130
(Rev. 6-89)

RAC00012392

# NOTICE

*This Registration will be canceled by the Commissioner of Patents and Trademarks at the end of six years following the date of registration, unless within one year next preceding the expiration of such six years, the registrant files in the Patent and Trademark Office an affidavit showing that said mark is in use in Commerce or showing that its nonuse is due to special circumstances which excuse such nonuse and is not due to any intention to abandon the mark. A fee of $100.00 for each class must accompany the affidavit.*

RAC00012393

Int. Cl.: 36

Prior U.S. Cl.: 102

United States Patent and Trademark Office
Corrected

Reg. No. 1,881,600
Registered Feb. 28, 1995
OG Date Feb. 27, 1996

## SERVICE MARK
## PRINCIPAL REGISTER

REGIONS

REGIONS FINANCIAL CORPORATION (DELAWARE CORPORATION) 417 NORTH 20TH STREET BIRMINGHAM, AL 35203, BY CHANGE OF NAME FROM FIRST ALABAMA BANCSHARES, INC. (DELAWARE CORPORATION) BIRMINGHAM, AL

FOR: BANKING SERVICES, IN CLASS 36 (U.S. CL. 102).

FIRST USE 12-0-1993; IN COMMERCE 12-0-1993.

SER. NO. 74-431,003, FILED 8-30-1993.



*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Feb. 27, 1996.*

Bruce Lehman

COMMISSIONER OF PATENTS AND TRADEMARKS

RAC00012394

Int. Cl.: 36

Prior U.S. Cl.: 102

**United States Patent and Trademark Office**

Reg. No. 1,881,600
Registered Feb. 28, 1995

## SERVICE MARK
### PRINCIPAL REGISTER

## REGIONS

FIRST ALABAMA BANCSHARES, INC. (DELA-
WARE CORPORATION)
417 NORTH 20TH STREET
BIRMINGHAM, AL 35203

    FOR: BANKING SERVICES, IN CLASS 36
(U.S. CL. 102).

FIRST USE 12-0-1993; IN COMMERCE
12-0-1993.

SN 74-431,003, FILED 8-30-1993.

ALICE SUE CARRUTHERS, EXAMINING AT-
TORNEY

RAC00012395



### The United States of America

## CERTIFICATE OF REGISTRATION

This is to certify that the records of the Patent and Trademark Office show that an application was filed in said Office for registration of the Mark shown herein, a copy of said Mark and pertinent data from the Application being annexed hereto and made a part hereof,

And there having been due compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks,

Upon examination, it appeared that the applicant was entitled to have said Mark registered under the Trademark Act of 1946, as amended, and the said Mark has been duly registered this day in the Patent and Trademark Office on the

### PRINCIPAL REGISTER

to the registrant named herein.

This registration shall remain in force for TEN years unless sooner terminated as provided by law.



In Testimony whereof I have hereunto set my hand and caused the seal of the Patent and Trademark Office to be affixed this twenty-second day of August 1995.

*Bruce Lehman*

Commissioner of Patents and Trademarks

RAC00012396

# NOTICE

*This Registration will be canceled by the Commissioner of Patents and Trademarks at the end of six years following the date of registration, unless within one year next preceding the expiration of such six years, the registrant files in the Patent and Trademark Office an affidavit showing that said mark is in use in Commerce or showing that its nonuse is due to special circumstances which excuse such nonuse and is not due to any intention to abandon the mark. A fee of $100.00 for each class must accompany the affidavit.*

RAC00012397

Cl.: 36

Prior U.S. Cls.: 100, 101, and 102

Reg. No. 1,914,267

**United States Patent and Trademark Office**  Registered Aug. 22, 1995

### SERVICE MARK
PRINCIPAL REGISTER



REGIONS FINANCIAL CORPORATION (DELA-WARE CORPORATION)
417 NORTH 20TH STREET
BIRMINGHAM, AL 35203 BY CHANGE OF NAME FROM FIRST ALABAMA BANC-SHARES, INC. (DELAWARE CORPORATION) BIRMINGHAM, AL 35203

FOR: BANKING SERVICES, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 12-0-1993; IN COMMERCE 12-0-1993.
THE DRAWING IS LINED FOR THE COLORS GREEN AND GOLD, AND COLOR IS CLAIMED AS A FEATURE OF THE MARK.

SN 74-433,150, FILED 9-1-1993.

ALICE SUE CARRUTHERS, EXAMINING AT-TORNEY

TOTAL P.11

RAC00012398

Z 540 664 763

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

| Sent to | |
|---|---|
| President/ Chief Executive Officer | |
| Street & Number | |
| 208 Mull Road | |
| Post Office, State, & ZIP Code | |
| Benton, TN 37307 | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |

PS Form **3800**, April 1995

Fold at line over top of envelope to
the right of the return address

**CERTIFIED**

Z 540 664 763

Jun Regus4

**MAIL**

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

President/Chief Executive Officer
Regina Probone
208 Mull Road
Benton, TN 37307

2. Article Number *(Copy from service label)*
Z 540 664 7163

PS Form 3811, July 1999          Domestic Return Receipt          102595-99-M-1789

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by *(Please Print Clearly)*   B. Date of Delivery

C. Signature
X                                    ☐ Agent
                                     ☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

RAC00012399