**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION and REGIONS BANK | ) ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) ) | Civil Action No. 2:06-cv-882-MHT |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| REGIONS UNIVERSITY, INC. | ) ) |  |
|  | ) |  |
| Defendant. | ) ) ) |  |

**PLAINTIFFS' REPLY BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**

Charles B. Paterson (PAT018)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500

ATTORNEY FOR PLAINTIFFS

**OF COUNSEL:**

William G. Pecau
Rachel M. Marmer
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202)429-6244


Dated: August 31, 2007

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..................................................................................................ii

I.    CONFUSION ARISING FROM DEFENDANT'S USE OF THE REGIONS
      MARK IS REAL AND CONCRETE...........................................................................1

      A.    The Legal Standard for Confusion Includes Confusion as to Sponsorship
            or Affiliation ...................................................................................................1

      B.    Actual Confusion Is the Best Evidence of Likelihood of Confusion.......................3

      C.    There is Substantial Evidence of Actual Confusion ............................................4

II.   REGIONS IS A STRONG MARK.............................................................................8

      A.    Plaintiffs' REGIONS Mark Is Entitled to Broad Protection....................................8

      B.    The REGIONS Mark Is Distinctive..................................................................10

III.  REGIONS AND EDUCATIONAL INSTITUTIONS AND SERVICES ARE
      CLOSELY RELATED ..........................................................................................11

IV.   THE STRENGTH OF THE REGIONS MARK IS NOT DIMINISHED BY THE
      MARKS CITED BY DEFENDANT ........................................................................13

V.    DEFENDANT INTENDED TO TAKE ADVANTAGEOF THE GOODWILL OF
      THE REGIONS NAME.........................................................................................17

      A.    The Circumstantial Evidence Shows that Defendant Adopted Regions
            University with the Intent of Taking Advantage of Regions' Goodwill ...............17

      B.    Defendant's Reliance on Advice of Counsel Was Unreasonable and Does
            Not Purge Its Bad Faith....................................................................................19

      C.    Summary: Persons Have and Are Likely to Think that Regions Sponsors
            Regions University............................................................................................20

VI.   REGIONS IS ENTITLED TO SUMMARY JUDGMENT ON STATE
      DILUTION ..........................................................................................................21

      A.    Alabama Has Not Repealed Its Dilution Statute...................................................21

VII.  FEDERAL DILUTION SHOULD NOT BE DETERMINED BY SUMMARY
      JUDGMENT.........................................................................................................23

# TABLE OF AUTHORITIES

**CASES**                                                            **Page(s)**

*American Farm Bureau Fed'n v. Alabama Farmers Fed'n,*
   935 F. Supp. 1533 (M.D. Ala. 1996), *aff'd without op.,* 121 F.3d 223 (11th Cir. 1997) ..........1

*Amstar Corp. v. Domino's Pizza, Inc.,*
   615 F.2d 252 (5th Cir. 1980) .................................................................................7, 10, 16

*Arthur Young, Inc. v. Arthur Young & Co.,*
   579 F. Supp. 384 (N.D. Ala. 1983)...........................................................................22

*Breakers of Palm Beach, Inc. v. Int'l Beach Hotel, Inc.,*
   824 F. Supp. 1576 (S.D. Fla. 1993) .....................................................................13, 16

*Community Fed. Sav. & Loan Ass'n v. Orondorff,*
   678 F. 2d 1034 (11th Cir. 1982) ..............................................................................23

*Contemporary Restaurant Concepts, Ltd. v. Las Tapas-Jacksonville, Inc.,*
   753 F. Supp. 1560 (M.D. Fla. 1991)........................................................................14

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center,*
   109 F.3d 275 (6th Cir. 1997) ....................................................................................14

*Express Funding, Inc. v. Express Mortgage, Inc.,*
   894 F. Supp. 1095 (E.D. Mich. 1995).......................................................................14

*Frehling Enters. v. Int'l Select Group, Inc.,*
   192 F.3d 1330 (11th Cir. 1999) ..................................................................................3

*Gold Kist, Inc. v. Conagra, Inc.,*
   708 F. Supp. 1291 (N.D. Ga. 1989).........................................................................14

*In re Shell Oil Co.,*
   992 F.2d 1204 (Fed. Cir. 1993)................................................................................11

*John H. Harland Co. v. Clarke Checks, Inc.,*
   711 F.2d 966 (11th Cir. 1983) ....................................................................................3

*Katz v. Modiri,*
   283 F. Supp. 2d 883 (S.D.N.Y. 2003)......................................................................14

*Kroger Co. v. Superx, Inc.,*
   193 U.S.P.Q. 245 (E.D. Pa. 1976) ..............................................................................4

*Planetary Motion, Inc. v. Techplosion, Inc.,*
    261 F.3d 1188 (11th Cir. 2001) ............................................................................2

*Prudential Ins. Co. v. Prudential Title Co.,*
    189 U.S.P.Q. 617 (S.D. Tex. 1976) ......................................................................4

*Quality Inns Int'l, Inc. v. McDonald's Corp.,*
    695 F. Supp. 198 (D. Md. 1988)................................................................8, 10, 13

*Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,*
    675 F.2d 1160 (11th Cir. 1982) ...................................................................passim

*Scarves by Vera, Inc. v. Todo Imports, Ltd.,*
    544 F.2d 1167 (2d Cir. 1976)...............................................................................14

*Specialty Measurements, Inc. v. Measurement Sys., Inc.,*
    763 F. Supp. 91 (D.N.J. 1991) .............................................................................13

*Steinway & Sons v. Demars & Friends,*
    210 U.S.P.Q. 954 (C.D. Cal. 1981)........................................................................4

*Susan's, Inc. v. Thomas,*
    26 U.S.P.Q.2d 1804 (D. Kan. 1993) ......................................................................4

*Texas Tech Univ. v. Speigberg,*
    461 F. Supp. 2d 510 (N.D. Tex. 2006) ..................................................................7

*The Board of Regents of the University System of Georgia v. Buzas Baseball, Inc.,*
    176 F. Supp. 2d 1338 (N.D. Ga. 2001)................................................................15

*University of Georgia Athletic Ass'n v. Laite,*
    756 F.2d 1535 (11th Cir. 1985) .............................................................2, 4, 15, 22

*World Carpets, Inc. v. Dick Littrell's New World Carpets,*
    438 F.2d 482 (5th Cir. 1971) .................................................................................3


## AGENCY PROCEEDINGS

*Amsted Indus. Inc. v. Nat'l Castings Inc.,*
    16 U.S.P.Q.2d (BNA) 1737 (N.D. Ill. 1990) .......................................................20


## STATUTES

15 U.S.C. §1125(a) .......................................................................................................2

15 U.S.C. § 1125(c) ........................................................................................................24

Ala. Code § 8-12-17........................................................................................................21

## BOOKS AND ARTICLES

Anne Gilson Lalonde, *et al.*, *Gilson on Trademarks* § 5A.02 (2007).............................21

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:13 (4th ed. 2007) .............................................................................................................................3

Restatement (Third) of Unfair Competition § 21 ..........................................................8

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION and REGIONS BANK | ) ) ) ) |  |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) | Civil Action No. 2:06-cv-882-MHT |
| REGIONS UNIVERSITY, INC. | ) ) ) |  |
| Defendant. | ) ) ) |  |

**PLAINTIFFS' REPLY BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Regions Asset Company, Regions Financial Corporation and Regions Bank

("Regions") respectfully submit this Reply Brief in opposition to defendant's motion for

summary judgment and in support of plaintiffs' cross motion for summary judgment.

**I.     CONFUSION ARISING FROM DEFENDANT'S USE OF THE REGIONS MARK
IS REAL AND CONCRETE**

**A.     The Legal Standard for Confusion Includes Confusion as to Sponsorship or
Affiliation**

"[T]he unauthorized use of a trademark which has the effect of misleading the public to

believe that the user is sponsored or approved by the registrant can constitute infringement."

*American Farm Bureau Fed'n v. Alabama Farmers Fed'n*, 935 F. Supp. 1533, 1546, (M.D. Ala.

1996), *aff'd without op.*, 121 F.3d 223 (11th Cir. 1997). The prohibition of confusion as to

sponsorship and affiliation is codified in the federal law of unfair competition. Section 43(a) of

the Lanham Act provides:

> Any person who, on or in connection with any goods or services
> . . . uses in commerce any word, term, name, symbol or device, or
> any combination thereof, or any false designation of origin . . .
> which – (A) is likely to cause confusion, or to cause mistake, or to
> deceive as to the *affiliation, connection, or association* of such
> person with another person, or as to the *origin, sponsorship, or
> approval* of his or her goods, services, or commercial activities by
> another person . . . shall be liable in a civil action by any person
> who believes that he or she is or is likely to be damaged by such
> act.

15 U.S.C. §1125(a) (emphasis added).  Accordingly, Defendant is simply wrong as a matter of

law when it argues that confusion is limited to only situations where persons have a mistaken

belief that Regions and Regions University are the same entities.  Def. Reply Br. 35.  A case in

point of confusion as to sponsorship and affiliation is found in the *University of Georgia* case.

There, the issue was not whether the university manufactured and sold beer but whether a beer

distributor's use of the University of Georgia's marks was likely to cause people to think that the

university sponsored the beer distributor.  *University of Georgia Athletic Ass'n v. Laite*, 756 F.2d

1535, 1546-47 (11th Cir. 1985).  This Circuit held that the fact that no one actually believed the

university had gone into the brewing business was entirely irrelevant.  *Id.* at 1547.

Similarly, there is no issue here concerning the zone of natural expansion[1] or whether

Regions can legally operate a post-secondary education university.[2]  The real issue is not

whether people believe that Regions has begun a post-secondary education school or would

---

[1] The case defendant relies upon, *Planetary Motion*, explains the concept of the zone of natural expansion: "The theory of 'natural expansion' . . . 'relates to a situation where the senior user of mark A on product line X expands use of mark A to product line Z and conflicts with an "intervening junior user" who has already been using mark A on product line Z." *Planetary Motion, Inc. v. Techplosion, Inc.*, 261 F.3d 1188, 1201 n.3 (11th Cir. 2001) (*citing* McCarthy § 24:20).  This is not the circumstance in this case.

[2] Regions' REGIONS UNIVERSITY name for its corporate training program is a legal name for its corporate university.  "Corporate university" is a generic term for a kind of corporate training. Marmer Supp. Decl. Ex. D.

naturally expand its services into post-secondary education, but whether Regions would be likely to sponsor a university – Regions sponsors many universities and colleges[3] – and whether defendant's adoption and use of Regions' REGIONS mark for the school's REGIONS UNIVERSITY name is likely to cause people to believe that the school has been sponsored by or is otherwise affiliated or connected with Regions.

Here, there is substantial evidence of actual confusion that shows such confusion is not only likely, but in fact is occurring.

### B.    Actual Confusion Is the Best Evidence of Likelihood of Confusion

It is well settled that the evidence of actual confusion is the best evidence of a likelihood of confusion. *Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1340 (11th Cir. 1999). As Professor McCarthy states: "Any evidence of actual confusion is strong proof of the fact of likelihood of confusion." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:13 (4th ed. 2007). Very little proof of actual confusion is necessary to establish a likelihood of confusion. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 978 (11th Cir. 1983) (*citing World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d

---

[3] Regions has been the official bank and corporate sponsor of the SEC since 1993.  Peters Decl. ¶ 6; Peters Decl. Exs. A and E.  Regions sponsors the individual schools within the SEC as well, including the University of Alabama, University of Arkansas, Auburn University, University of Georgia, Louisiana State University, University of Mississippi, Mississippi State University and University of South Carolina. *Id.* Regions is also a sponsor of the Sun Belt conference, which consists of Arkansas State University, University of Arkansas at Little Rock, University of Denver, Florida Atlantic University, Florida International University, University of Louisiana at Lafayette, University of Louisiana at Monroe, Middle Tennessee State University, University of New Orleans, University of North Texas, University of South Alabama, Troy University, and Western Kentucky University. *See* Peters Decl. ¶ 6; Peters Dec. Ex. A, Ex. D. In addition, Regions sponsors many additional colleges and universities on a local basis like Indiana University, Purdue and Florida State. Peters Decl; ¶ 6. Regions' financial support of these universities is more than $6 million per year. Peters Tr. Ex. 86.

482, 490 (5th Cir. 1971)). Such confusion by sponsorship or affiliation may take many forms.
In *Safeway*, the Eleventh Circuit held that an inquiry by a supplier to the defendant was evidence
of actual confusion. *Id.* In *University of Georgia*, the evidence was ten to fifteen inquiries about
whether the defendant beer distributor had a connection with the plaintiff university. *University
of Georgia*, 756 F.2d at 1546. Other circuits agree. *See, e.g.*, McCarthy § 23:16 n.1 (*citing
Prudential Ins. Co. v. Prudential Title Co.*, 189 U.S.P.Q. 617 (S.D. Tex. 1976); *Kroger Co. v.
Superx, Inc.*, 193 U.S.P.Q. 245 (E.D. Pa. 1976); *Steinway & Sons v. Demars & Friends*, 210
U.S.P.Q. 954 (C.D. Cal. 1981); *Susan's, Inc. v. Thomas*, 26 U.S.P.Q.2d 1804, 1807 (D. Kan.
1993) ("It is logical to conclude that these inquiries are evidence of some confusion regarding
plaintiff's possible affiliation with defendant's business")).

## C.    There is Substantial Evidence of Actual Confusion

Defendant claims that an assumption of sponsorship and affiliation between Regions and
Regions University is "completely speculative." Def. Reply Br. 31. Nothing could be further
from the truth. There is substantial, concrete and very real evidence that people believe that
Regions University is sponsored or otherwise affiliated with Regions.

Carolyn Hughes, a recruiter for defendant, testified that she received a call from "a
typical prospective student calling in, asking questions about degree programs." Hughes Tr. 21.
And, in the midst of the call the prospective student said: "are y'all affiliated with Regions
Bank." Hughes Tr. 22. Patsy Fulghum, the director of student affairs for defendant, also testified
that she answered a call to the school where "the person that called in asked me if we were
affiliated with Regions Bank." Fulghum Tr. 18. Regions itself also received inquiries at its call
center whether it was affiliated with Regions University. Wilson Affidavit; Burton Affidavit.

Further instances of confusion have occurred with Regions customers and Regions
employees. The husband of Ms. Terry Boyd, the manager of a Regions branch in Auburn, AL,

- 4 -

asked her if there was a connection between the university and the bank, and two of her employees also asked her if there was a connection. Boyd Affidavit. Mr. David Green, the assistant manager of a Regions branch in Pratville, AL, saw a billboard on I-85 and Taylor Road advertising Regions University, and asked his branch manager if it was connected to Regions Bank. Green Affidavit; Murphy Affidavit. Ms. Wanda Norris, a Regions employee in Enterprise, AL, and her husband saw a television commercial for Regions University and both wondered if it was affiliated with Regions Bank. Norris Affidavit; Thompson Affidavit. Ms. Mattie Sanders, a teller at Regions Bank Village West Office, had seen an advertisement for Regions University and indicated to her branch manager, Mr. Kiel Odom, that she thought Regions Bank had "bought a university." Odom Affidavit. Mr. Karan Rudolph, the Human Resources Assistant of Regions Financial Corporation in Montgomery, AL, saw the billboard for Regions University at I-85 and Taylor Road and thought there was a connection between Regions University and Regions Bank. Rudolph Affidavit. Mr. Craig Smith, the manager of a branch in Wetumpka, AL, heard radio advertisements and saw television commercials for Regions University and thought that it might be related with Regions Bank. Smith Affidavit. Furthermore, several of Mr. Smith's employees reported to him that customers had inquired about the name Regions University and specifically asked whether or not Regions University is affiliated with Regions Bank. Smith Affidavit.

In this case, actual confusion is not limited to inquiries obtained by plaintiffs and defendants. The connection between Regions University and Regions Bank was the subject of a discussion on the Internet blog called Alabama Kitchen Sink. Marmer Decl. Ex. C. At the mention of Regions University, a blog commentator wrote, "Regions University? Regions is a bank!" The blog owner replied, "Jay, Regions is a bank and that's why I was puzzled that

Southern Christian University changed its name. I always think that the bank is behind the university. Ha." And in reply, the commentator compared the situation to one in which Western Maryland Railway donated land to a college and it was called West Maryland College. Then, a "deep-pockets donor gave a sizeable contribution and Behold! It's McDaniel College Now." Marmer Decl. Ex. C.

There are additional instances of confusion. Soon after defendant changed its name to REGIONS UNIVERSITY an alumnus of defendant, Randy Gore, asked defendant, "Why was 'Regions' chosen? Did Regions Bank make a donation?" Ex. 35. Similar questions have been asked of Dr. Turner. In response to the question of whether people have asked him if people inquired as to an affiliation between Regions and Regions University, Dr. Turner replied, "People – You know how people will do. They'll come up and tell you, oh, y'all must have gotten some money or something." Turner Tr. 179-80. Dr. Turner tries to explain these inquires away as by saying that "they know good and well Regions Bank is one thing and Regions University, an accredited school, is another." This explanation misses the core issue that defendant's adoption of the name REGIONS has caused people to believe that Regions has sponsored or is affiliated with Regions University because of their common use of Regions' name REGIONS.

Dr. Turner also tries to dismiss the significance of these inquiries as to sponsorship and affiliation by claiming that they are jokes. However, even if some of the inquiries are "jokes", the jokes reveal the truth that the defendant's use of REGIONS in its name creates an immediate association with Regions and indicates that there is some connection between Regions and Regions University, like a substantial donation, because of that common name. This is illustrated by Dr. Turner's friend, Dr. Luquire, who wrote on the day following the

- 6 -

announcement of the school's change of its name to Regions University: "Good luck with Regions. Is this related to the Bank and if so may I applaud you with double congratulations!!!!!" Ex. 35.

This evidence is substantial and shows that dozens of people have thought that Regions donated money to or sponsors defendant. It is certainly much more evidence of confusion than other cases in this Circuit such as *Safeway* , which found two instances of actual confusion evidence to be convincing. *Safeway*, 675 F.2d at 1167. It is more evidence than existed in *Texas Tech*, where the court found persuasive three inquiries as to an affiliation between the parties. . *Texas Tech Univ. v. Speigberg*, 461 F. Supp. 2d 510, 523 (N.D. Tex. 2006).

The substantial evidence of actual confusion of a connection between Regions and Regions University sharply distinguishes this case from the *Amstar* case relied upon by defendant, *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir. 1980). These dozens of instances of confusion of affiliation between Regions and Regions University have occurred in a very short time. Defendant began use of Regions University only in August 2006 and still has not completely adopted the name. Defendant's advertising of REGIONS UNIVERSITY on television and radio did not begin until February 2007. Constanza Tr. 97, Ex. 48. Defendant still has not replaced the SOUTHERN CHRISTIAN UNIVERSITY signs on its campus. Costanza Tr. 91-92. The *Amstar* Court recognized that "actual confusion is the best evidence of likelihood of confusion." *Id.* at 263. However, in contrast with dozens of instances of confusion here in a very short period of time with a relatively small defendant, in *Amstar* it was the virtual absence of any evidence of actual confusion – 2 inquiries and 1 misdirected letter – over "nearly 15 years of extensive concurrent sales [amounting to tens of millions of dollars annually by each party] under the parties' respective marks." *Id.*

- 7 -

## II.    REGIONS IS A STRONG MARK

### A.    Plaintiffs' REGIONS Mark Is Entitled to Broad Protection

REGIONS is a strong and famous mark particularly in Alabama and in its footprint in 16 states. Strong marks are entitled to protection on a wide range of goods and services. Restatement (Third) of Unfair Competition § 21, comment i. *See also Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F. Supp. 198, 210 (D. Md. 1988) ("The extent to which he may protect this interest relates directly to the strength of his mark. While one mark may not enjoy the strength of identity to preclude use of a junior mark in a related field or neighboring market, another may enjoy such recognition that confusion might result outside his own field or beyond the markets in which he does business.") (and cases cited therein).

Defendant has not contested many pertinent facts establishing the strength of the REGIONS mark. Defendant does not contest that Regions, with assets over 140 billion dollars, is the largest corporation in Alabama, the largest financial institution in Montgomery and in all of Alabama, that Regions has the 7th largest branch network in the United States with a strong physical presence in its footprint, e.g., 25 branches in Montgomery and 250 branches in Alabama. Likewise, defendant does not contest that Regions has spent hundreds of millions of dollars advertising its mark and that the REGIONS mark is used for all of Regions' businesses and appears on all of its stationery, business cards, signage, advertisements, TV and radio commercials, billboards, and checks. Defendant also does not contest that Regions' 25,000 employees in 2005 took REGIONS UNIVERSITY corporate training courses or that Regions spent more than $24 million in 2005 and 2006 on corporate training.

Even more, the strength of the Regions mark beyond mere financial services is evidenced through its deep involvement in the communities it serves. Not only does Regions provide every kind of financial service for its customers but it is a strong community presence. Regions is

everywhere: it sponsors universities, university athletic conferences and provides student loans and scholarships to universities. It hosts the Regions Charity Classic golf tournament, the Regions Morgan Keegan Tennis Tournament, and has named the Birmingham Barons' stadium Regions Park. Regions provides millions of dollars in low- to moderate-income homeowners and small businesses. Regions also sponsors many cultural events and provides many educational outreach programs. *See* Jackson Decl. and Jackson Decl. Ex. A.

Even Defendant admits that everyone in Montgomery and at defendant knows Regions Bank. Turner Tr. 166. The strength and near universal awareness of the REGIONS mark is shown by the scientific, quantitative brand awareness studies that Regions has regularly conducted over the years. A July 2007 survey showed very high awareness in, for example, Birmingham of 98%, Mobile of 93%, Nashville of 87%, Memphis of 91%, Jackson of 88%, Atlanta of 83%, St. Louis of 78%, and New Orleans of 84%. Aided awareness in Montgomery historically has had a higher awareness of REGIONS than Birmingham and would be as high as the 98% awareness found in Birmingham. Jager Decl. ¶ 8. Moreover, as Dr. Abernethy explained and as the surveys show, Regions' REGIONS mark has a high level of unaided recall. Abernethy Rep. 18; Jager Decl. ¶ 6; Jager Decl. Ex. A.

The strength of the REGIONS mark is shown concretely by the reactions of persons encountering the name REGIONS UNIVERSITY. As Jay Croft said on the Internet, "Regions University? Regions is a bank!" And, David Moore wrote to defendant the day after the announcement of the name REGIONS UNIVERSITY:

> John White just informed me that SCU is now Regions University.
> I didn't ask about the possible conflict with the bank of the same
> name.

Ex. 35.

Contrary to Defendant's argument (Def. Reply Br. 3), the scope of protection afforded the REGIONS mark is not strictly bounded by the use to which the REGIONS mark is used, but how far its goodwill extends. As Judge Niemeyer explains:

> A mark is the identity of a corporation, a product or service, and to the extent goodwill attaches, it knows no boundaries.

*Quality Inns,* 695 F.Supp. at 211. The scope of protection of the REGIONS mark, as any other strong brand, is determined not by any abstract test of relatedness, but by whether the junior user's use of the mark causes confusion and takes advantage of the senior user's goodwill. *Id.* at 211.

### B.    The REGIONS Mark Is Distinctive

The REGIONS mark does not describe anything about Regions' services and, at most, is vaguely geographically suggestive of being available in more than one place. Defendant's use of REGIONS in REGIONS UNIVERSITY has the same connotation. This is very different than the *Amstar* case, where the connotation of the mark DOMINO'S PIZZA mark was different that the connotation of the DOMINO mark alone. There, the court held that the DOMINO'S PIZZA name created a distinct Italian connotation with the use of the apostrophe "'s" that emphasized the Italian surname "Domino" combined with the well-know Italian dish "pizza." The word DOMINO alone as a mark did not convey this Italian connotation and therefore the marks created a different commercial impression. *Amstar*, 615 F.2d at 261.

Here, in contrast, plaintiffs and defendant use the identical word REGIONS in their names. The addition of the word "university" does not alter the connotation of the word "Regions" in REGIONS UNIVERSITY, just as, when Regions uses REGIONS with other generic terms for its corporate and division names, the connotation of the word "Regions" is not altered, e.g., in REGIONS BANK, REGIONS INSURANCE, REGIONS MORTAGE,

- 10 -

REGIONS PARK, REGONS CHARITY CLASSIC and Regions' own REGIONS

UNIVERSITY.

Where marks are identical, have the same connotation and provide the same commercial

impression, this weighs heavily against the defendant and makes confusion more likely. *In re*

*Shell Oil Co.*, 992 F.2d 1204, 1206 (Fed. Cir. 1993) (noting in a case involving the mark SHELL,

a common English word, "The identity of words, connotation, and commercial impression

weighs heavily against the applicant").

## III.   REGIONS AND EDUCATIONAL INSTITUTIONS AND SERVICES ARE CLOSELY RELATED

There is a close relationship between Regions and educational institutions and services

and this close relationship is an important factor and reason that people are likely to and do

believe that Regions has sponsored Regions University.  It is undisputed that Regions is a

sponsor of many universities and has been sponsoring schools in connection with the REGIONS

brand as long as the mark has been used.  Regions' financial support of these universities is more

than $6 million per year.  Peters Tr. Ex. 86.

During university events and through advertising, Regions has created a strong

association between these schools and Regions.  Regions' mark appears on the SEC and Sunbelt

web pages as a corporate sponsor. *See* Marmer Supp. Decl. Ex. C.   Other associations are

created through mentions during broadcasts on television, through the Regions Fifth Quarter

radio show following telecasts, through banners, signs and graphics at the games and on

telecasts.  Peters Tr. 129-130; Dunman Tr. 102; Peters Decl. Exs. D and E.

Regions' further sponsorship of schools is in the form of scholarships.  For example, in

December 2006, Regions provided the University of Alabama with a $1 million gift for business

school scholarships under the "Our Students. Our Future." program.  Marmer Decl. Ex. H.

- 11 -

Further connections with education are its hundreds of millions of dollars in student loans, as evidenced by hundreds of thousands of dollars that Regions has serviced in loans for Southern Christian University. Exs. 50, 51. Regions also has branches on university campuses creating an additional connection with universities. *See, e.g.*, Marmer Supp. Decl. Ex. B. ("University Oaks Office Grand Opening").

Regions also provides educational services to its communities. Regions provides seminars to the public and to students at all levels of education about financial matters. *See* Jackson Decl. Ex. A.

Regions educates its own employees through the REGIONS UNIVERSITY corporate training program.[4] In 2005 more people took REGIONS UNIVERSITY courses through plaintiffs than have ever attended defendant: 22,000 employees took more than 750,000 hours of courses. Ex. 4.

It is further well-known that universities change their names to honor large benefactors. Abernethy Rep. 28; Berte Tr. 38-39 (naming Duke University and Babson College as examples). Defendant is aware of this practice as its Turner School of Theology is named after the founders of the school, and because it was concerned that if it changed the name of the entire university to Turner University that persons might think the school is associated with the controversial Ted Turner. Turner Tr. 89-90. Others have illustrated this association with the Regions name. For example, defendant's alumnus Randy Gore specifically asked in his email whether the name Regions was chosen because Regions donated money. Ex. 35.

---

[4] The term "corporate university" is a generic term for corporate training programs. See Marmer Supp. Decl. Ex. D.

Such an association is not surprising considering the strength of Regions' mark, the use of the Regions name alone and without other elements by both parties,[5] and the overlap in the advertising media of the parties.

## IV.   THE STRENGTH OF THE REGIONS MARK IS NOT DIMINISHED BY THE MARKS CITED BY DEFENDANT

Defendant seeks to justify its use of the REGIONS mark by pointing to a number of third party uses which all are for different marks, or marks whose use is obscure, has ended, or is outside the parties' core markets. But, it is well settled that a defendant cannot justify its infringement by relying on third party use. *See,* McCarthy § 31:160 (jus tertii, claiming that a third party has superior rights to the plaintiff, is not a defense); *Specialty Measurements, Inc. v. Measurement Sys., Inc.,* 763 F. Supp. 91, 95 (D.N.J. 1991) ("Jus tertii, or raising the rights of third parties, should not be allowed as a defense in any trademark case").

Third party use is "relevant only insofar as it diminishes Plaintiff's mark." *Breakers of Palm Beach, Inc. v. Int'l Beach Hotel, Inc.,* 824 F. Supp. 1576, 1584 (S.D. Fla. 1993). Thus, the only relevant question is whether third party uses of the REGIONS mark are so prevalent that the public would not likely be confused by defendant's use of the REGIONS mark. *Quality Inns,* 695 F. Supp. at 214. But, here, defendant only pointed out that uses may exist, but it has not shown any impact of third party use on the public perception of the REGIONS mark. Defendant

---

[5] Plaintiffs use REGIONS as its corporate identification. Plaintiff also uses the REGIONS mark alone in its advertising. *See* Peters Decl. Ex. A examples. Regions has named the stadium for the Birmingham Barons Regions Park, and calls its golf tournament the Regions Charity Classic. Its domain name is regions.com, and its toll-free number is 1-800-Regions. Likewise, because REGIONS is the distinctive element of the name Regions University, defendant uses the domain name regions.edu, and uses calls itself Regions on its website and in advertisements. *See* Marmer Decl. Ex. H for examples of how defendant uses REGIONS. Moreover, the only public reference to Regions University by a newspaper is a reference to it as Regions: "Regions grads come from near and far" was the headline for a Montgomery Advertiser article about defendant's graduation ceremony held in June 2007. Marmer Decl. Ex. F.

has shown no evidence of advertisements, radio or television references or any indication that the marks or names are recognized by consumers.

Courts in this Circuit and other circuits agree that to prove weakness of plaintiffs' mark due to third party use, the defendant must prove the extent to which the marks are used, and not merely cite third party uses. Defendant "must introduce evidence which clearly establishes that these alleged third-party marks are in fact in use." *Gold Kist, Inc. v. Conagra, Inc.*, 708 F. Supp. 1291, 1298 (N.D. Ga. 1989); *see also Contemporary Restaurant Concepts, Ltd. v. Las Tapas-Jacksonville, Inc.*, 753 F. Supp. 1560, 1563 (M.D. Fla. 1991) ("Defendants do not offer any proof of the extent to which the marks are used"); *see also Express Funding, Inc. v. Express Mortgage, Inc.*, 894 F. Supp. 1095, 1100 (E.D. Mich. 1995) (holding the existence of records of a mark insufficient to show third party use. "In order to be accorded weight a defendant must show what actually happens in the marketplace"); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 281 (6th Cir. 1997) (holding the existence of records insufficient to show third party use. "In order to be accorded weight a defendant must show what actually happens in the marketplace"); *Katz v. Modiri*, 283 F. Supp. 2d 883, 894 (S.D.N.Y. 2003) ("The significance of third-party trademarks depends wholly on their usage. The mere existence of other trademarks without evidence that they are actually in use, does not indicate that a mark has been weakened in the marketplace." The court concluded, "without further evidence that the aforementioned marks 'compete either in quality, price, or location with [plaintiff], the Court cannot conclude that the mark has been weakened"); *Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976) ("The significance of third-party trademarks depends wholly upon their usage. Defendant introduced no evidence that these

trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers").

Likewise, the evidence defendant seeks to rely upon is of unknown, obscure uses that would not make an impression upon Regions' customers. "The proper inquiry is whether the unauthorized third-party uses significantly diminish the public's perception that the mark identifies items connected with the owner of the mark." *University of Ga.*, 756 F.2d at 1545 n. 7. *See also, The Board of Regents of the University System of Georgia v. Buzas Baseball, Inc.*, 176 F. Supp. 2d 1338, 1351-52 (N.D. Ga. 2001) (discounting 85 registered marks and 67 applications in part because third party users "engaged in distinctly different businesses, may not significantly diminish the strength of the mark"). As this Circuit held in *Safeway*, an evaluation of the context and goods and services of the "we believe a further consideration relevant in determining the significance of third-party use is the entire name a third party uses, as well as the kind of business in which the user is engaged. Third-party users that incorporate the word Safeway along with distinctive additional words, or engage in a business different from that of Safeway Stores, may not diminish the strength of the Safeway mark." *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, (11th Cir. 1982).

For example, the third party uses in Alabama are minimal. The Montgomery phone book listed only Regions Bank names prior to defendant's name change. Ex. 29. Other White Pages and Yellow Pages in Regions' 16 state footprint have many listings for plaintiffs and almost no other Regions listed. Marmer Supp. Decl. Ex. A, at RAC 31201. Mr. Stricklin's affidavit, when stripped of the irrelevant "Region" names, names no longer in use (such as Regions Propane), and names where "regions" is used in its primary meaning (such as All Regions Services (Def. Reply Br. 7), Regions Beyond, Inc., Regions Beyond Ministries, Inc. and Regions Beyond

- 15 -

International (Def. Reply. Br. 8)), has identified only three names that may be in use in Alabama: Regions Real Estate, Regions Construction Co., and Regions Pest Control. Stricklin Affidavit p. 3-5. Regions Pest Control provides services that are entirely unrelated to Regions and therefore falls squarely within the *Safeway* holding that third party names for unrelated services do not diminish the strength of the mark. Regions Real Estate and Regions Construction Co. are small companies with no evidence that they advertise their marks on television, radio, billboards or otherwise prominently in a way that would dilute the strength of Regions' mark. This lack of evidence means that the Court cannot find that the public perception of Regions is affected by use of these two business names.

Similarly, the uses of the word "Region" in business names are irrelevant and do not diminish the strength of plaintiffs' REGIONS mark or the infringement of that mark by the REGIONS UNIVERSITY name. First, this case involves the identical mark REGIONS against REGIONS. Second, as Rex Turner admitted, the connotation of the plural word as a mark is distinctly different than the singular "Regions." Turner Tr. 115-16. "Regions" conveys a suggestion of many places, "Region" only one. As the *Amstar* Court found, the addition of a single letter can create a significantly different commercial impression. *Amstar*, 615 F.2d at 261. Thus, use of the word "region" by others does not dilute the strength of the REGIONS mark.

Further, a plaintiff "is not obligated to litigate against each and every potential infringer." *Breakers*, 824 F. Supp. at 1584. However, Regions has maintained a program of objecting to third party use of the REGIONS mark when it becomes aware of confusingly similar use. Mr. Upchurch did not testify, as the defendant argues, that Regions did not police its mark for 10 years. Rather, he testified that when Regions or its legal department learned of a confusingly similar use of the REGIONS mark, Regions would object. *See* Upchurch Tr. 11, 14. From 1994

- 16 -

to 2004, Mr. Upchurch recalled that several challenges were made and that the marks were transferred to Regions. "I remember them being discussed at a Board meeting of the subsidiary company that owned the marks." Upchurch Tr. 13.

Mr. Upchurch noted that the target of Regions' challenges were companies for which Regions had concern that confusion would result. Upchurch Tr. 13. With respect to the Region 2020 license agreement, Mr. Upchurch said that the reason for a one time payment of $100 as a royalty was that Region 2020 was a fledgling charity and did not have the money to pay $1,000 per year royalty. Upchurch Tr. 20. Such a decision does not diminish Regions' control over its REGIONS mark. Regions has been well aware of the activities of Region 2020. Mr. Upchurch testified that he was actively involved with Region 2020 through participation on task forces and knew that Region 2020 was "not violating the terms of the agreement." Upchurch Tr. 22. Regions' current and former CEOs, Stan Mackin and Dowd Ritter, and other Regions officers and directors have been on the Board or otherwise involved in Region 2020. Berte Tr. 34-36. Also, Regions itself has been one of the funders of the organization. Berte Tr. 34. Accordingly, Regions has been aware of the activities of Region 2020 and has evidently concluded that Region 2020 has not violated the terms of the agreement.

## V.    DEFENDANT INTENDED TO TAKE ADVANTAGE OF THE GOODWILL OF THE REGIONS NAME

### A.    The Circumstantial Evidence Shows that Defendant Adopted Regions University with the Intent of Taking Advantage of Regions' Goodwill

The circumstantial evidence that defendant adopted the REGIONS UNIVERSITY name to take advantage of the fame of the REGIONS mark is compelling. The minutes of defendant's board are clear that it was seeking a for-profit kind of name, and a for-profit name that would allow it to have acceptability to business students so it could support its small school of theology.

- 17 -

Dr. Turner admitted that he wanted the for-profit name so that graduates could hang their diplomas on walls for others to see. Turner Tr. 74.

The resolution of defendant's Board adopting the Regions University name tellingly states that "changing the name will also assist the University in projecting itself as a nationally recognized school of prominence." Ex. 31. The defendant's own reputation and its own name is not a "nationally recognized school of prominence." Crosby Tr. 55. The only means of projecting itself as a "nationally recognized school of prominence" is to ride on the goodwill of an institution that is a nationally recognized institution of prominence. Regions is one of the 10 largest financial corporations in the United States, the largest corporation in Alabama, and a corporation having near universal recognition in defendant's headquarters in Montgomery and very high recognition in the South, where most of defendant's students came from and where defendant focuses its marketing expenditures. The REGIONS name and Regions' goodwill is what allows defendant to project itself as a "nationally recognized school of prominence."

Defendant was perfectly aware of Regions, and the strength of the REGIONS brand. Turner Tr. 8-11. "Everybody knows who Regions bank is." Turner Tr. 166. The Board's discussions of the name Turner and its decision not to adopt that name because of the possible association with Ted Turner, shows that defendant was aware of the association that might arise if it adopted another's famous name. Ex. 22 at RU118. The benefits to defendant from adopting the famous name of a financial institution that would provide defendant with instant credibility and allow defendant to project itself immediately as a "nationally recognized university of prominence."

Defendant, after all, was merely adopting a basic and well known marketing principal that it is beneficial to adopt an established and well-known mark: such a mark brings instant

- 18 -

name recognition, instant credibility, and in this case would help the defendant become the nationally recognized school of prominence it desired to be. *See* Abernethy Rep. 27-28.

**B.    Defendant's Reliance on Advice of Counsel Was Unreasonable and Does Not Purge Its Bad Faith**

That defendant's "opinion" from counsel, Exhibit 28, was inadequate on its face means that it was obvious from any reasonable standpoint, including defendant's, that email could not be relied upon for use of the REGIONS UNIVERSITY name. The email only referred to the registerability of the name; it gave no consideration of the risks that the school might encounter from other uses of REGIONS marks; indeed, the email did not even refer to any use of any marks, only what turned up from the USPTO database. Defendant, despite its knowledge of plaintiffs' size, prominence, advertising and marks, unreasonably relied on a registrability opinion that it knew omitted any evaluation of plaintiffs' marks and was therefore inadequate. A full trademark search for the mark REGIONS would have revealed the vast array of plaintiffs' marks and various uses of its mark. Any search for plaintiffs would show its REGIONS' EDUCATIONAL LENDING services, and its website delves greatly into the topics of its college sponsorships and educational outreach. Indeed, defendant already knew that Regions provided educational services through its Regions University corporate training program before adopting the new name. Thus, a complete review for REGIONS would have shown defendant that plaintiffs' services are very much related to educational services, and it was unreasonable to rely on an entirely deficient email opinion that does not at all analyze plaintiffs' REGIONS mark.

Dr. Turner would not have mentioned to his counsel that there is a bank in Alabama named REGIONS unless it concerned him. His silence when his attorney said he knew nothing about REGIONS bank was profoundly misleading – in light of Rex Turner's knowledge of the prominence and recognition of REGIONS. Without this information, counsel had no reason to

believe that REGIONS was anything more than a small neighborhood bank. Indeed, the partial revelation provided defendant an argument that relevant facts were known to its attorney, but, in reality, hide the pertinent facts that would allow its attorney to provide a meaningful evaluation of the risks inherent in adopting one of the most famous marks in defendant's home city and state.

Moreover, no opinion of counsel works as an absolution for a defendant's own bad faith. As the court in *Amsted Industries Inc. v. National Castings Inc.* said, "[b]ecause the focus of the good faith inquiry is upon the defendant's state of mind, even the most authoritative of opinion letters will be of no avail when evidence is damning as to the defendant's actual mental state." *Amsted Indus. Inc. v. Nat'l Castings Inc.*, 16 U.S.P.Q.2d (BNA) 1737, 1742-1743 (N.D. Ill. 1990) (internal citations omitted).

These facts show that defendant wanted a for-profit name for the purpose of assisting it in portraying itself as a nationally recognized university of prominence, that it had much to gain by adopting the REGIONS name, and that it had no reasonable basis to rely on an opinion of counsel that did not adequately evaluate the REGIONS mark of plaintiffs.

### C.    Summary: Persons Have and Are Likely to Think that Regions Sponsors Regions University

As appears from the above discussion, it is undisputed that confusion is likely to arise from the use of REGIONS and REGIONS UNIVERSITY by defendant. Plaintiffs have submitted overwhelming evidence that persons have already believed there to be a connection between Regions and Regions University in a short amount of time. Regions' REGIONS mark is strong and famous in Alabama and its 16 state footprint and Regions' services are related to educational services. Defendant does not contest that the its customers are in the broad customer

base of Regions and that the parties advertise in the same media of television, radio, billboards, newspaper and other print and the Internet.

Finally, defendant's intent to adopt the REGIONS mark to take advantage of Regions' goodwill is obvious: such a name would aid in its (misleading) portrayal of itself as a nationally recognized university of prominence. Any reliance upon the advice of counsel was unreasonable.

These material facts are not and cannot be in dispute. For this reason, the Court should grant Regions' motion, deny defendant's motion and enjoin defendant's further use of REGIONS.

## VI.    REGIONS IS ENTITLED TO SUMMARY JUDGMENT ON STATE DILUTION

### A.    Alabama Has Not Repealed Its Dilution Statute

Alabama's state dilution statute enjoins "dilution of the distinctive quality of a mark . . . valid at common law . . . notwithstanding the absence of confusion as of the source of goods or services." Ala. Code § 8-12-17. Defendant asserts that to enjoin its use under the Alabama statute, plaintiffs' mark must be famous across the entire United States. Def. Reply Br. 45. There is no support for such a statement and the legislative history of the federal statute provides that federal law does not preempt state anti-dilution statutes.[6]  Anne Gilson Lalonde, et al., Gilson on Trademarks § 5A.02[2] (2007) (citing H.R. 104-374, p. 43-312). The Alabama legislature has not repealed its state statute and has not amended it to require fame generally

---

[6] Like Alabama, more than half of the states have anti-dilution statutes. These states include Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Washington, West Virginia, and Wyoming. Gilson § 5A.02[1] n.1.

- 21 -

throughout the United States. Relief for marks famous in Alabama is therefore available under Alabama's anti-dilution statute.

The only fame an Alabama state statute requires is fame in Alabama, and it is undisputed that the REGIONS mark is famous, strong and distinctive in Alabama. Regions has used the REGIONS mark in Alabama for more than a decade. Defendant does not contest that Regions is the largest corporation in Alabama and the largest financial institution in Alabama. Everyone in Alabama knows Regions. Defendant testified that everyone at defendant knows of Regions, and Regions' scientific market surveys show a close to 100% familiarity rate in Alabama. Jager Decl. Ex. A. Moreover, Regions, until defendant changed its name, enjoyed substantially exclusive use of the REGIONS mark. Only 3 other uses of the name REGIONS appear to exist in Alabama: one for a pest control service, and two for small mom-and-pop enterprises all of which have no evidence of advertising or use in commerce. Such third party names do not diminish the fame and strength of the REGIONS mark. *University of Georgia*, 675 F.2d at 1544; *Safeway*, 675 F.2d at 1165.

This case is very much like *Arthur Young*, where the court found that where a mark is strong and distinctive through promotion over many years, use of the virtually identical mark is likely to dilute the mark's distinctiveness. *Arthur Young, Inc. v. Arthur Young & Co.*, 579 F. Supp. 384 (N.D. Ala. 1983). The same reasoning applies to the instant facts: the REGIONS mark is strong and distinctive through over a decade of extensive promotion, and defendant has adopted the same mark REGIONS and virtually identical mark REGIONS UNIVERSITY. Such use is likely to dilute the distinctiveness of the REGIONS mark.

Moreover, the association between Regions University and Regions is clear from the evidence. For example, Ms. Costanza testified that she thought of Regions when Dr. Turner told

- 22 -

her that he planned to rename the university Regions University. Costanza Tr. 64. Dr. Luquire congratulated the defendant on "Regions" and asked if it was related to the Bank. Ex. 35. Randy Gore asked why "Regions" was chosen and whether the bank donated money. Ex. 35.

Regions is harmed by defendant's continued use of REGIONS UNIVERSITY because Regions loses its singular place in the mind of the Alabama public and the distinctiveness of the REGIONS mark and name. This is exactly the kind of injury that the Alabama statute and other state anti-dilution statutes were designed to prevent. *See Community Fed. Sav. & Loan Ass'n v. Orondorff*, 678 F. 2d 1034, 1037 (11th Cir. 1982) (finding dilution under the Florida anti-dilution statute and explaining that the purpose of the Florida, New York and Georgia anti-dilution statutes is to protect a trademark owner against the erosion of the distinctiveness of its mark against unauthorized use by others).

## VII.    FEDERAL DILUTION SHOULD NOT BE DETERMINED BY SUMMARY JUDGMENT

Regions' distinctive and strong mark REGIONS has achieved fame. Regions' market surveys show fame and widespread recognition of its mark in the 16 states of Regions' footprint. Further, Regions, as one of the top 10 banks in the United States, has a national presence with its substantial REGIONS internet bank. Regions also advertises nationally through its promotion of its sponsorships of the SEC and Sunbelt conferences and many nationally known universities and colleges within its footprint in 16 states. Whether this fame of REGIONS is sufficient under the federal statute is a genuine issue of fact not ripe for determination as a matter of law. Facts remain in dispute concerning the duration, extent and geographic reach of advertising and publicity, the amount, volume and geographic extent of sales of services under the REGIONS mark outside its 16 state footprint, and the extent of recognition of the mark outside of its 16

state footprint.  15 U.S.C. § 1125(c).  Summary judgment on this claim should therefore be

denied.

     Respectfully submitted this the 31st day of August, 2007.

                         /s/ William G. Pecau _____

                         One of the Attorneys for Plaintiffs Regions Asset
                         Company, Regions Financial Company and Regions
                         Bank

**OF COUNSEL:**

Charles B. Paterson (PAT018)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
cpaterson@balch.com
pclark@balch.com

William G. Pecau
Rachel M. Marmer
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone:  (202)429-6244
Facsimile:  (202)429-3902
wpecau@steptoe.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using

the CM/ECF system and service will be perfected upon any CM/ECF participants electronically

and by overnight mail service a copy of the foregoing document to all participating and non-

CM/ECF participants this the 31st day of August, 2007:

Victor T. Hudson                        James E. Shlesinger
William W. Watts, III                   Shlesinger, Arkwright & Garvey LLP
Hudson & Watts, LLP                     1420 King Street
Post Office Box 989                     Suite 600
Mobile, Alabama 36601-0989              Alexandria, Virginia 22314


                                        /s/ William G. Pecau
                                        Of Counsel

Neal Berte                                              Tom Hudson

```
          IN THE UNITED STATES DISTRICT COURT

                    FOR  THE

           MIDDLE DISTRICT OF ALABAMA

                NORTHERN DIVISION



REGIONS ASSET COMPANY,          *
                                *
        Plaintiff,              *
                                *
Vs.                             *   CIVIL ACTION NUMBER
                                *
REGIONS UNIVERSITY, INC.,       *    2:06cv882-MHT
                                *
        Defendant.              *
```

```
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

    Deposition of NEAL BERTE, taken before David

Michael Camp, CSR, in the law offices of Balch &

Bingham, LLP, 1901 6th Avenue North, Birmingham,

Alabama, on August 14, 2007, commencing at

approximately 9:32 o'clock a.m.

5009 Aldebaran Way West Camp & Associates Mobile, Alabama  36693
Phone (888) 661-8833  www.campandassociates.com   Fax (888) 661-8844
c7bf637e-3b22-4f29-ac77-82e1d79081b1

Page 34

1  did.
2      A    You did.  But I just want to be sure.
3      Q    Okay.
4      A    In fact, we even set it up in such a way
5  that Region 2020, I think the N actually, with the
6  logo, runs into the first 2.
7      Q    Did Regions Bank or Regions Financial
8  always participate in Region 2020 as a supporter
9  and a contributor?
10     A    You use the word "always".  I'll just
11 qualify and say to my knowledge, they usually
12 did.  And again, it's just another example.  Both
13 AmSouth and Regions have been great community
14 citizens.  So, yes, they typically were one of the
15 funders of the organization.
16     Q    Take a look at this Exhibit One-ten that
17 was placed in front of you.  Look at the last page
18 of it.  This is a copy of a letter that was cc'd
19 to you on November 2nd, 1997.  Do you see that?
20     A    Yes.
21     Q    Look down at the directors.  Am I
22 correct in understanding that this is the board of
23 directors of Region 2020 at the time shown here,

Page 35

1  November of 1997?
2      A    I believe that's correct.
3      Q    Now, if you look down on that list, you
4  see the name Stan Mackin, Mr. Stan Mackin.  It's
5  about halfway down.
6      A    Yes, sir.
7      Q    Do you know Stan Mackin?
8      A    I do.
9      Q    Who is he?
10     A    He's the retired chairman of the board
11 of Regions Bank.
12     Q    Okay.  And was Stan Mackin on the board
13 of directors of Region 2020 in November of '97?
14     A    Yes, sir.
15     Q    Now, I also see down -- look down below
16 Mr. Mackin's name.  There's a name, Alton Parker.
17 Is that the lawyer at the Spain Gillon firm that
18 assisted Region 2020 with this license agreement?
19     A    It is.  And I can also say that Alton
20 was one of the original forty or so folks that
21 served as a volunteer and came to all those
22 meetings we had that decided what the organization
23 could look like.  And I see Dowd Ritter's name

Page 36

1  there too, in response.  I want to be honest about
2  that.
3      Q    So that's the Dowd Ritter that is
4  currently the chairman of Regions Bank?
5      A    That's correct.
6      Q    Do you know a lady named Sheila Blair?
7      A    I do.
8      Q    Do you know whether or not Sheila Blair
9  has ever served on the board of directors of
10 Regions Financial?
11     A    I do.  She did.
12     Q    Does she still serve?
13     A    I think she's fully retired.  If she
14 does, I'm not aware that she's currently serving.
15 But she did at one point.
16     Q    Now, when did you become aware that
17 Southern Christian University had changed its name
18 to Regions University?
19     A    Well, no offense.  But it was when I got
20 the phone call from Dr. Turner.
21     Q    And tell me about that phone call.  When
22 was it and what was discussed?
23     A    It was within the last two to three

Page 37

1  months.  And you left me a number of messages
2  indicating that we needed to talk, and left me
3  your cell phone.  And I called back and you called
4  back.  And we missed each other and finally we
5  connected.
6      Q    And what was the substance of that
7  conversation, just in your own words?
8      A    Just asked me about the relationship
9  between Region 2020 and Regions Bank.  And that's
10 -- it was a pretty short conversation, reminded me
11 that we had met at the university years ago.  And
12 I appreciated that.  But that -- that was also
13 part of our conversation.
14     Q    Did he tell you that Southern Christian
15 University had changed its name to Regions
16 University?
17     A    I think so.  I think that's where I
18 first learned that the change had taken place.
19     Q    Did you have any discussion with Dr.
20 Turner as to why they changed their name?
21     A    Not to my knowledge.
22     Q    Did you talk about this lawsuit that
23 you're here today testifying in?

Neal Berte                                              Tom Hudson

Page 38

1    A   No. I asked what was going on. And I
2 can't remember the exact words. But it was
3 pointed out that there was some confusion and
4 questions being raised about Regions University,
5 the new name for Southern Christian and the bank.
6    Q   What did he tell you about that
7 confusion?
8    A   Well, he just wanted to know from my
9 perspective about Region 2020. And I was a little
10 bit confused and a little more dense, I guess,
11 than I am this morning. But it took me a while to
12 really connect as to what issue we had.
13    Q   Now, you were Chancellor of Birmingham
14 Southern College for how long?
15    A   Let's see. Two and a half years. Till
16 this past December 31st, '06.
17    Q   And you have been in the education
18 business a number of years, haven't you?
19    A   I have.
20    Q   Are you aware of a situation where
21 schools sometimes change their names to reflect
22 the influence of financial support of Donors?
23    A   I am.

Page 39

1    Q   Can you give me an example of some of
2 those?
3    A   Well, I mean, there are all sorts of
4 motivations for changing names. Southwestern
5 University certainly did that.
6    Q   What about Duke University?
7    A   Duke did that, certainly. Babson
8 College up in New York State. I mean, there are a
9 number of schools.
10    Q   Did Oral Roberts do that?
11    A   Sure.
12    Q   Now, if a school -- if a college changed
13 its name to Wachovia University or SunTrust
14 University, would you think or wonder if those
15 schools were associated with the banks by those
16 respective names?
17       MR. HUDSON:
18       Object to the form of the question.
19    THE WITNESS:
20    I would. I mean, those are -- those
21    are direct links to very visible
22    corporate entities. So -- so I
23    would.

Page 40

1 BY MR. PATERSON:
2    Q   Other than your chats with Dr. Turner,
3 have you had any chats with anybody else about
4 this deposition today or about this lawsuit?
5    A   I did call Ann Florie, who was the
6 former Executive Director, since I'm in the same
7 building with her, and asked her if she had been
8 subpoenaed. And she said she had not been.
9       And we both sort of agreed we wouldn't talk
10 further. And she said, you really need to talk to
11 Dalton to get a copy of that form that I raised
12 with her that I said back in the back of my mind.
13       And so I called then Dalton who was down at
14 the beach, Dalton Smith. And he said he would
15 have his secretary fax me a copy, and she did.
16    Q   Have you talked to anyone else about it?
17    A   No.
18    Q   Have you talked to Mr. Hudson, here?
19    A   I'm sorry. He called -- I called him
20 the other day because I couldn't figure out what
21 was going on. His secretary said something about
22 I was going to get a subpoena.
23       And my secretary didn't ask enough questions

Page 41

1 that I thought, well, this is a bit of -- I have
2 no idea what this is about. So I called back and
3 asked.
4    Q   Did Tom tell you what the case was
5 about?
6    A   Yeah. I mean --
7    Q   What did he tell you?
8    A   Just --
9    Q   In your own words.
10    A   Just that it would be helpful if I would
11 testify as one of the persons involved in the
12 early operation of Region 2020.
13    Q   Did he ask you to testify to any
14 particular thing or anything like that?
15    A   He did not.
16       MR. PATERSON:
17       I don't have any further questions.
18       Thank you so much though.
19          EXAMINATION
20 BY MR. HUDSON:
21    Q   I've got just a couple and then we'll be
22 through. Do you recall that when Dr. Turner
23 called you that you told him that you were unable

11 (Pages 38 to 41)

c7bf637e-3b22-4f29-ac77-82e1d79081b1

Deposition of Laina Costanza                    May 16, 2007

                IN THE UNITED STATES DISTRICT COURT

              FOR THE MIDDLE DISTRICT OF ALABAMA

                     NORTHERN DIVISION


REGIONS ASSET COMPANY,

        Plaintiff,

Vs.                                 CIVIL ACTION NO.
                                    2:06CV882-MHT
REGIONS UNIVERSITY, INC.,

        Defendant.


              * * * * * * * * * * * *


        DEPOSITION OF LAINA COSTANZA, taken

pursuant to stipulation and agreement before Lisa

J. Nix, Registered Professional Reporter and

Commissioner for the State of Alabama at Large, in

the Law Offices of Balch & Bingham, Suite 200, 105

Tallapoosa Street, Montgomery, Alabama on

Wednesday, May 16, 2007, commencing at

approximately 9:00 a.m.


              * * * * * * * * * * * *

a6088201-6dd4-431a-975f-f3ea0b6a3d91

Deposition of Laina Costanza                    May 16, 2007

Page 90

1      press release relating to the name change?
2   A.  I did not release one. I do not know of
3      anything other than this letter.
4   Q.  Was there any discussion about whether the
5      school would issue a press release
6      concerning the name change?
7   A.  Not with me.
8   Q.  Did you ever ask Dr. Turner why there
9      wasn't a press release?
10  A.  I get my orders from the school, and I
11     don't make those -- I don't make
12     suggestions. He tells me what he's going
13     to do, and that's what we do.
14         (Exhibited 66 was marked for
15         identification.)
16  Q.  Let me show you what's marked as Exhibit
17     66. Do you recognize that?
18  A.  (Witness nods head up and down.)
19  Q.  Well, let's start with the first page.
20     What's shown in the first page of Exhibit
21     66?
22  A.  It is a tower sign of the school, and it
23     says Southern Christian University.

Page 91

1   Q.  And where is that tower sign located?
2   A.  At 1200 Taylor Road on the school property.
3   Q.  Is that the campus for the school?
4   A.  It is.
5   Q.  And is that the font that's used for
6      Southern Christian University?
7   A.  There are many, many, many fonts.
8   Q.  For the name Southern Christian University?
9   A.  Yes.
10  Q.  Is that sign still up today?
11  A.  It is.
12  Q.  And is this known as the tower sign in some
13     of the materials you've looked at?
14  A.  Yes, this would be the -- yes.
15  Q.  And I was referring to the first page of
16     Exhibit 66.
17  A.  Uh-huh. (Positive response.)
18  Q.  And then let's take -- do you see at the
19     bottom of the page it says RAC-30561?
20  A.  Okay.
21  Q.  Is there a sign that's shown there?
22  A.  Yes.
23  Q.  And what sign is that?

Page 92

1   A.  That's the street sign.
2   Q.  And is that also on the campus?
3   A.  Yes.
4   Q.  Are there any other signs -- any signs in
5      addition to what's shown on the first page
6      of Exhibit 66 and what's shown on page
7      30561 on page -- in Exhibit 66?
8   A.  There are only two signs on the school
9      property.
10  Q.  Now, do those signs have high visibility
11     from a public street?
12  A.  It's pretty good visibility. You can see
13     it.
14  Q.  What street is that?
15  A.  This one.
16  Q.  This one being Taylor Road?
17  A.  Taylor Road. That's the street sign.
18  Q.  Is that I-65? Can you see these signs from
19     I-65 as well?
20  A.  You cannot see the street sign, I don't
21     believe, from I-65.
22  Q.  What about the tower sign?
23  A.  You can from I-65.

Page 93

1   Q.  Or is it I-85?
2   A.  It's I-85.
3   Q.  Okay. Thanks.
4         (Brief interruption.)
5   Q.  In August -- well, actually, let me change
6      that. In July of 2006, what was the
7      recognition of the name Southern Christian
8      University in the Montgomery market?
9         MR. HUDSON: Object to the form.
10  A.  Could you be a little bit more specific?
11  Q.  Okay. Would you say that the Southern
12     Christian University name was well-known in
13     the Montgomery market?
14  A.  I would say it's well-known. There's a big
15     Christian community, and everyone I know
16     knows about Southern Christian University.
17  Q.  What about the recognition of Southern
18     Christian University in Alabama as a
19     whole? Do you think it's well-known in the
20     state?
21        MR. HUDSON: Object to the form.
22  A.  I wouldn't know the answer to that.
23  Q.  Has --

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,

     Plaintiff,

Vs.                       CIVIL ACTION NO.
                              2:06CV882-MHT

REGIONS UNIVERSITY, INC.,

     Defendant.



\* \* \* \* \* \* \* \* \* \* \*


     DEPOSITION OF ANITA CROSBY, taken pursuant to
stipulation and agreement before Pamela A. Wilbanks,
Registered Professional Reporter and Commissioner for
the State of Alabama at Large, in the Law Offices of
Balch & Bingham, 105 Tallapoosa Street, Suite 200,
Montgomery, Alabama, on Friday, July 13, 2007,
commencing at approximately 1:00 p.m.


            \* \* \* \* \* \* \* \* \* \* \* \*

Page 54

1    submit a transcript as well?
2    A.  They can, but it's not required.  They can
3        present a high school diploma or GED.
4    Q.  And on 2009 -- 2019 in Exhibit 113, it says
5        here, undergraduate transfer students
6        admission, unconditional.  Does this mean that
7        if someone is going to school and they have a
8        GPA of 2.0 that they are going to get into the
9        school?
10   A.  Provided they are not on suspension from
11       another institution.
12   Q.  Well, provided they are not on suspension.
13   A.  Yes, as far as the general policies are
14       concerned.  I would need to look at the
15       specific.
16   Q.  So if there's something else additionally
17       that's needed, it would be somewhere in
18       Exhibit 113?
19   A.  Yes.
20   Q.  Does the school keep any statistics on the SAT
21       scores of its students?
22   A.  We have so few entry-level students that don't
23       have prior college, they would just be

Page 55

1    maintained in their academic file.
2    Q.  Do you know if the school has ever been ranked
3        by any ranking agency or organization like the
4        U.S. News & World Report?
5    A.  You mean have we paid to be in one of those
6        things?  Is that what you're asking me?
7    Q.  I'm asking if you've ever been ranked without
8        being paid.
9    A.  Not that I'm aware of.  I get things in the
10       mail saying if you give us X amount of money,
11       we'll rank you.  And we're not going to buy
12       our ranking.
13   Q.  Have you ever been ranked without paying
14       anything?
15   A.  Not that I'm aware of.
16   Q.  Are you aware of any publications, articles,
17       reports, papers or persons that have ever
18       referred to SCU as a nationally-recognized
19       university of prominence?
20   A.  No.
21            (Exhibit 125 marked for
22            identification.)
23   Q.  Can you tell me what's shown in here?

Page 56

1    A.  This is a listing of students from spring 2004
2        through summer 2007 that had not met the
3        admissions requirements.
4    Q.  And then what's missing from their application
5        is shown in this document; is that right?
6    A.  Correct.
7    Q.  Now, how many faculty members does Southern
8        Christian University have?
9    A.  We have approximately for the past academic
10       year 80 teaching faculty members.
11   Q.  And when you say 80 teaching faculty members
12       those are 80 folks that are actually teaching
13       a course?
14   A.  Right.  Those are 80 that actually taught a
15       course this past academic year.  We have more
16       faculty members that for whatever reason may
17       not have taught.
18   Q.  Does Regions University give any scholarships?
19   A.  Yes.
20   Q.  About how many scholarship a year does it
21       give?
22   A.  I couldn't guess.
23   Q.  Any scholarships for undergraduate degrees?

Page 57

1    A.  No.
2    Q.  Are the scholarships limited to the Turner
3        School of Theology?
4    A.  No.
5    Q.  What other schools get scholarships?
6    A.  All of the graduate programs except for
7        doctoral and Ph.D.
8    Q.  And do you know how much money the school
9        gives in scholarship for these post graduate
10       programs per year or -- why don't I make it
11       easy -- last year?
12   A.  Last year complicates things a little bit
13       because you remember I told you that we did
14       away with the undergraduate scholarship and
15       just reduced tuition.  So there's no
16       scholarship on paper for them, but it happened
17       at the end of the year where summer gets put
18       in the different year.
19            So I'm saying all that to say that there
20       was a summer that had the undergraduate
21       scholarship in last year that will not be here
22       in this year.
23   Q.  And that's the scholarship that everybody

338209e3-ce50-4b63-b8f5-b33af239b8ea

Deposition of Carolyn Hughes                    August 15, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,

      Plaintiff,

Vs.                                      CIVIL ACTION NO.
                                         2:06CV882-MHT
REGIONS UNIVERSITY, INC.,

      Defendant.



        * * * * * * * * * * * *



     TELEPHONIC DEPOSITION OF CAROLYN HUGHES,
taken pursuant to stipulation and agreement before
Lisa J. Green, Registered Professional Reporter and
Commissioner for the State of Alabama at Large, in
the Law Offices of Balch & Bingham, Suite 200, 105
Tallapoosa Street, Montgomery, Alabama on
Wednesday, August 15, 2007, commencing at
approximately 3:42 p.m.



        * * * * * * * * * * * *

Deposition of Carolyn Hughes                    August 15, 2007

---

Page 22

1   five minutes about, you know, different
2   questions, you know, transcripts and -- you
3   know, the questions that they generally
4   ask. And then he said, are y'all
5   affiliated with Regions Bank? And I said,
6   no, we don't have anything -- we're not
7   affiliated at all with Regions Bank.
8       And then we probably had another five
9   minutes of his questions about the things
10  pertaining to school and the degree
11  program. And I probably set up a call back
12  with one of the advisors.
13  Q. Do you remember who this person was?
14  A. I do not.
15  Q. Do you have any kind of records or phone
16  log or caller ID that could tell you who
17  the person was?
18  A. No, sir. The notes that I do have, I have
19  not been able to find anything in there
20  about that particular phone call.
21  Q. So you've searched your notes, and you
22  can't find anything about this call, right?
23  A. Right. As I said, it was a typical

---

Page 23

1   prospective student call, and I don't -- I
2   don't keep the same type of notes, you
3   know, on each call because each call is
4   different, so I couldn't tell you what ...
5   Q. How did you know -- when you talked to this
6   student, how did you know that Regions
7   University had no connection with Regions
8   Bank?
9   A. Well, I believe I was told that. You know,
10  it's my understanding of the history of the
11  school is there's no connection whatsoever
12  with Regions Bank.
13  Q. Did you answer that question for that
14  prospective student based on your own
15  knowledge or your own thoughts, or had
16  someone told you specifically in advance
17  that they're not connected?
18  A. Well, I'm sure that -- well, you know, when
19  the name was changed and we received the
20  letter from Dr. Rex, you know, maybe that
21  was -- that settled it. There was no
22  indication at all that there was any
23  connection with Regions Bank.

---

Page 24

1   Q. When they changed the name, did you wonder
2   whether it was connected with Regions Bank?
3   A. No, sir.
4   Q. You're familiar with Regions Bank?
5   A. Yes, sir.
6   Q. They're in Arkansas, correct?
7   A. Yes, sir.
8   Q. Have you ever banked there?
9   A. We do.
10  Q. So you bank there now?
11  A. Yes, sir.
12  Q. Did you ever ask anyone at Regions Bank
13  whether or not the bank was connected with
14  Regions University?
15  A. No, sir.
16  Q. Have you ever had any conversation with
17  anyone at Regions Bank, a teller or a loan
18  officer or anybody at Regions Bank, about
19  Regions University?
20  A. No, sir.
21  Q. I believe you said you came to Montgomery
22  for some training. How many other times
23  have you been in Montgomery to the main

---

Page 25

1   campus of Regions University?
2   A. I believe two other times.
3   Q. And what was the purpose of those visits?
4   A. Both were for training.
5   Q. I believe you told me -- I don't know
6   whether you told me or not. Tell me what
7   kind of training you have received here on
8   the main campus.
9   A. Well, the initial training was basically to
10  get familiar with the computer system that
11  they have and how the calls would be coming
12  in and how I would answer them and where I
13  could find answers to their questions.
14  Q. Who provided that training to you?
15  A. Rick Johnson mostly. While I was there, we
16  did speak with the -- we did spend time
17  with each of the other advisors to, you
18  know, just speak with them individually
19  about, you know, how they handle the job, I
20  guess.
21  Q. How many people attended this training
22  session with you?
23  A. That was just Michael and myself.

0e44f35f-98d1-4ce1-afa7-46d1087aed82

IN THE UNITED STATES DISTRICT COURT

FOR  THE

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


REGIONS ASSET COMPANY,        *
                              *
        Plaintiff,            *
                              *
Vs.                           *   CIVIL ACTION NUMBER
                              *
REGIONS UNIVERSITY, INC.,     *    2:06cv882-MHT
                              *
        Defendant.            *



* * * * * * * * * * * * * * * * * * * *


    Deposition of SAMUEL E. UPCHURCH, JR., taken

before David Michael Camp, CSR, in the law offices

of Balch & Bingham, LLP, 1901 6th Avenue North,

Birmingham, Alabama, on August 14, 2007,

commencing at approximately 10:19 o'clock a.m.

Page 10

1  who made the decision. But, I mean, generally it
2  would be -- we would talk with counsel about it
3  and it would be decided to proceed or not.
4      Q   And who would make the business decision
5  about whether to pursue it?
6      A   Oh, probably -- from a business decision
7  perspective?
8      Q   Uh-huh.
9      A   I don't -- I don't recall a business
10 decision. It was always a legal decision.
11     Q   Well, I mean, you agree with me that
12 lawyers can recommend but lawyers ultimately have
13 to act upon whatever the business people tell them
14 to do or not to do.
15     A   But in this instance, that would have
16 been totally delegated to the lawyers.
17     Q   Totally.
18     A   Totally.
19     Q   So the lawyers made the decisions as
20 well as listened to the recommendations from
21 others?
22     A   Well, whether or not to enforce the mark
23 would have been -- would have been a legal

Page 11

1  decision.
2      Q   Okay. At least from 1994 to 2004.
3      A   When I was there. Correct.
4      Q   And to your knowledge, did that change
5  at any time after you left?
6      A   Not to my knowledge.
7      Q   Okay. Now, was there any particular
8  criteria that were utilized by the legal
9  department in determining whether or not to
10 challenge a third party use?
11     A   I can't -- once again, I can't recall
12 any specific criteria other than -- than someone
13 using a mark that was deceptively similar and the
14 need to protect the mark on Regions.
15     Q   Have you recently seen what was marked
16 as Exhibit One-O-nine?
17     A   No. I haven't seen this recently.
18         MR. PATERSON:
19         What is that, Tom?
20         MR. HUDSON:
21         Here.
22         MR. PATERSON:
23         We've got so many papers in this

Page 12

1      case, it's hard to keep up.
2          MR. HUDSON:
3          Sure.
4          THE WITNESS:
5          Yeah. To answer your
6          question, no, I've not recently seen
7          this.
8  BY MR. HUDSON:
9      Q   Now that you've read it, do you recall
10 the letter?
11     A   I do not.
12     Q   Is that your signature?
13     A   It is.
14     Q   Is the content of the letter true and
15 correct?
16     A   I assume it is. I don't remember the
17 circumstances. But I assume it's correct.
18     Q   Well, you would have endeavored to make
19 it true and correct at the time that you wrote
20 it?
21     A   That's correct.
22     Q   Do you recall there being other third
23 party uses of the name "Regions" that came to your

Page 13

1  attention that involved third parties that were
2  not in the same business as the bank?
3      A   Yes, I do.
4      Q   And do you recall whether or not the
5  bank challenged those third party uses?
6      A   Yes, I do.
7      Q   And what is your recollection?
8      A   I recall several challenges. I don't
9  remember the specifics. I remember them being
10 discussed at a Board meeting of the subsidiary
11 company that owned the marks. The marks were
12 transferred. But I don't remember the specifics.
13 The only one I really remember specifics about was
14 Regions 2020.
15     Q   Okay. We'll talk about that in a
16 moment. You say that you remember several. Would
17 the several include this Regions Propane?
18     A   I don't remember the Regions Propane but
19 it very -- very possibly could have.
20     Q   And you do remember Region 2020.
21     A   I do.
22     Q   And within the period of 1994 to 2004,
23 there are several that you recall, and one in

4 (Pages 10 to 13)

Page 14

1  particular is the name Region 2020?
2     A   I have a recollection of it being
3  discussed. I would say several. More than one.
4  I can't tell you how many because I don't have
5  specific recollections of any besides Regions
6  2020.
7     Q   Okay. And the best you can do is that
8  it was more than once?
9     A   Yes.
10    Q   Okay. Was this something that came up
11 frequently, this sort of topic, or it came up
12 infrequently?
13    A   Oh, it would only came up when somebody
14 identified something they thought was an
15 infringement.
16    Q   Okay. During that period of time, was
17 there any outreach that was being done by your
18 department to determine whether or not third
19 parties were using the name "Regions"?
20    A   We were more reactive. When we would
21 see it or when someone would -- would send
22 something to the legal department that showed a
23 usage, that would be how we would get involved.

Page 15

1     Q   Reactive as opposed to proactive?
2     A   That's correct.
3     Q   So you were not proactive?
4     A   We were not proactive to my knowledge.
5     Q   Okay. You spoke of Region 2020. Let me
6  show you what was previously marked as Exhibit
7  One-ten and Exhibit One Thirty-seven that's in
8  front of you there, and ask you if you recall
9  seeing those before today.
10    A   Yes, I do.
11    Q   When did you see them last?
12    A   Oh, probably -- I can't recall when I
13 saw them last. Years ago.
14    Q   Do you want to take a moment and read
15 both of them, please?
16    A   Okay.
17    Q   All right, sir. If we can look first at
18 Exhibit One-ten --
19    A   All right.
20    Q   -- the cover letter purports to have
21 been drafted by Stephen Leara, addressed to Ann
22 Florie and copied to you, together with an
23 enclosure which is a draft of the Non-exclusive

Page 16

1  License Agreement. Have I correctly characterized
2  that?
3     A   It appears to be that, yes.
4     Q   Do you recall, now that you've looked at
5  this letter and the attached draft license
6  agreement, this transaction?
7     A   Yes.
8     Q   Tell me what you recall about the
9  transaction.
10    A   I recall being familiar with Regions
11 2020, that Regions 2020 -- from what I recall,
12 raising an issue with their use of the name. I
13 recall asking counsel, outside counsel, to draft
14 the agreement. I recall speaking with Ann Florie
15 about it.
16    I recall receiving it, having it -- reviewing
17 the draft. I recall receiving the finally
18 executed copy. Just the general -- general
19 situation around the execution of the document.
20    Q   Look, please, sir, at the document,
21 itself that is attached to the October 20, 1997
22 letter, being the first draft of the Non-exclusive
23 License Agreement. And if you'd look at the third

Page 17

1  whereas clause, do you see where it says "Whereas,
2  the Licensee's mark is deceptively similar to the
3  Licensor's Registered Marks so as to be likely to
4  cause confusion in the marketplace"?
5     A   I see that.
6     Q   Okay. Now, would you please look at the
7  next draft that is attached to the November 11,
8  1997 letter?
9        MR. PATERSON:
10       That's the signed copy?
11       MR. HUDSON:
12       No.
13       MR. PATERSON:
14       Okay.
15       THE WITNESS:
16       Okay.
17 BY MR. HUDSON:
18    Q   Do you see that same provision in that
19 draft?
20    A   Yes, I do.
21    Q   Now, would you please look at the
22 executed copy, Exhibit One Thirty-seven?
23    A   Okay.

5009 Aldebaran Way West Camp & Associates Mobile, Alabama 36693
Phone (888) 661-8833  www.campandassociates.com  Fax (888) 661-8844

0a76847e-b83b-46e9-8072-4e8e935693a2

**Page 18**

1    Q    Has that provision been removed from
2    that draft?
3    A    It is not in that draft.
4    Q    Can you tell us why it was removed?
5    A    No, I cannot.
6    Q    Do you recall that there was a
7    negotiation between the lawyers for Region 2020
8    and either you or the lawyers you employed over
9    the terms of this license agreement?
10    A    I recall some drafts going back and
11    forth but I don't recall the specifics of any of
12    it.
13    Q    But in any event, drafts going back and
14    forth constitutes negotiation over the language,
15    does it not?
16    A    I don't know that I would term it
17    negotiations. Some discussions went on.
18    Q    Well, is it fair to say that the first
19    draft would have been the proposal of the bank?
20    A    It is.
21    Q    And the final draft that was executed
22    would have been the proposal of Region 2020?
23    A    Not necessarily.

**Page 19**

1    Q    That's true. The final agreement that
2    was executed would have been what both sides
3    agreed to do rather than what just the bank
4    proposed.
5    A    Correct.
6    Q    I think your testimony is that you don't
7    have any particular recollection why this clause
8    was removed. All you can tell us is that in order
9    for the copy to be executed, it had to be removed.
10    MR. PATERSON:
11    Object to the form.
12    THE WITNESS:
13    Really, all I could tell you is that
14    it was removed in the executed copy.
15    BY MR. HUDSON:
16    Q    Okay. Now, if you'll look, please, sir,
17    at One-ten at Section 2.1, the royalty payment for
18    the first draft, which appears after the October
19    20 letter, it says in pertinent part "Licensee
20    shall pay to Licensor a royalty of $1,000.00 per
21    year until the expiration of the Registered Marks,
22    or any renewals thereof."
23    And then the next draft which is attached to

**Page 20**

1    the October 20, 1997 agreement says at 2.1,
2    "Licensee shall pay to Licensor a royalty of
3    $100.00 per year until the expiration of the
4    Registered Marks, or any renewals thereof."
5    The cover letter that goes with that second
6    draft, October 20 cover letter says "At the
7    request of Sam Upchurch, I have drafted, and am
8    enclosing herewith, a licensing agreement setting
9    forth the terms and conditions under which Regions
10    Financial Corporation will allow Region 2020, Inc.
11    to use its registered name. Please review this
12    document and call me if you have any questions."
13    Do you recall why the change was made from a
14    thousand dollars per year to a hundred dollars per
15    year?
16    A    I don't recall specifically why except
17    that it was requested by -- it was a request by
18    Regions 2020.
19    Q    Okay. And if you would, look at the one
20    that was executed, please, sir, at 2.1 which is
21    One Thirty-seven. Take a look at 2.1.
22    A    Right.
23    Q    The final agreement for payment turned

**Page 21**

1    out to be a one-time one hundred dollar payment.
2    Do you see that?
3    A    Yes, I do.
4    Q    If you'd just read into the record that
5    sentence.
6    A    It says "Royalty Payment". "Licensee
7    shall pay to Licensor a total royalty of $100.00,
8    which shall be the total payment due from Licensee
9    during the duration of this license."
10    Q    All right, sir. Do you recall that that
11    would have been requested by Region 2020?
12    A    Yeah. Regions 2020 at the time was a
13    fledgling, kind of start up 501(c)(3) charity. I
14    do recall them raising the point that they didn't
15    have a lot of money and so they didn't want --
16    yes.
17    Q    Okay. Now, the license agreement
18    purportedly was signed on December 3, 1997. After
19    the date of its signing, do you recall anything
20    that Regions Bank did to police the mark or police
21    the licensing of the mark?
22    MR. PATERSON:
23    At any time, Tom?

6 (Pages 18 to 21)

5009 Aldebaran Way  West Camp & Associates  Mobile, Alabama  36693
Phone (888) 661-8833  www.campandassociates.com  Fax (888) 661-8844

0a76847e-b83b-46e9-8072-4e8e935693a2

**Page 22**

THE WITNESS:

Well, I was familiar with what Regions 2020 did because I was actively involved with them many times. So policing the mark -- I was familiar with what they did so I was familiar that they were not violating the terms of the agreement.

BY MR. HUDSON:

Q    How many times did you attend meetings of Region 2020 after 1997?

A    I can't tell you. I worked on task forces with them, both in my capacity as a Regions executive and my capacity in the Chamber of Commerce. And Florie lived next door to me. I knew Dr. Berte well. So I can't tell you how many times.

And it was also very public what they were doing, particularly during this time frame. It was very public, in the newspapers a lot. So --

Q    Was it public from 1997 through 2004?

A    Yeah. I think -- I think so. I think

**Page 23**

even today, they're still public. Their purpose is to be kind of a public forum for change in the city.

Q    When you were General Counsel, were you involved with the selection of a logo?

A    I was not.

Q    Who had that responsibility?

A    That would have been through the marketing department. Probably Bill Askew would have been the principal person.

Q    Were you involved at all with the registration of the logo?

A    Peripherally. A lawyer who worked for me. I was aware of it but I was not directly involved.

Q    Did the lawyers that worked for you report to you with regard to the logo and its selection?

A    I don't recall any specific -- I mean, other than just generally aware that the legal matters had been covered.

Q    Were you aware that there were companies that used the name "Regions" that were registered

**Page 24**

with the United States Trademark Office?

A    I recall one specific company that used -- that I think had had it reserved or had used it that we ended up negotiating with and buying it back from, and then later bought the company. So I thought that was kind of clever.

Q    That would have been at the time that you wanted to register your mark?

A    That's correct.

Q    And they would have used it in relationship to banking or financial services?

A    I don't recall whether or not they actually used it. But, yes, in connection with banking and financial services.

Q    And were you aware that there were other companies that had registered the Regions trademark for services outside of banking and financial services?

A    I don't recall that but it wouldn't surprise me.

Q    Okay. In any event, was it your understanding that your mark had been registered for banking and financial services?

**Page 25**

A    Yes, it was.

Q    Okay. Were you aware that there was a company called Regions Beyond International that had a Registered Mark?

A    I don't recall.

Q    That there was a Regions Air that had a Regions Registered Mark?

A    I don't recall.

Q    That there was a Regions Hospital that had a Registered Mark?

A    No. The only one I recall was a mark registered by First Commercial Corporation.

Q    Is it fair to say that that wouldn't have troubled you as long as those companies weren't involved in banking and financial services?

MR. PATERSON:

Object to the form.

THE WITNESS:

I really can't say whether it would have troubled me or not. It would not have troubled me if our trademark counsel said it was not

7  (Pages 22 to 25)

5009 Aldebaran Way West Camp & Associates Mobile, Alabama  36693
Phone (888) 661-8833  www.campandassociates.com  Fax (888) 661-8844

0a76847e-b83b-46e9-8072-4e8e935693a2