IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION and REGIONS BANK<br><br>    Plaintiffs,<br><br>v.<br><br>REGIONS UNIVERSITY, INC.<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 2:06-cv-882-MHT<br>)<br>)<br>)<br>)<br>)<br>) |

### PLAINTIFFS' SURREPLY IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE THE DECLARATION OF JIM JAGER

Plaintiffs, Regions Asset Company, Regions Financial Corporation and Regions Bank ("Regions"), respectfully submit this sur-reply brief in opposition to defendant's motion to strike. Defendant's seek to exclude important evidence that the Regions name and brand enjoys widespread recognition in Alabama as well as the other states in which Regions does business. Unfortunately for defendant, neither law nor fact supports its motion. The brand awareness surveys attached to the Jager declaration are admissible as business records and Jager is not being offered as a Rule 26(a)(2)(A) expert. The motion should be denied.

Defendant's reply brief misses the mark for three reasons. *First*, every case cited by defendant in its reply concerns survey evidence prepared for litigation. The surveys at issue here, however, were prepared in the ordinary course of business and not for litigation – a critical distinction. *Second*, Regions' surveys fall squarely within the business records exception to the hearsay rule. *Third*, plaintiffs' production of the July 2007 study questionnaire was not and

could not have been untimely. It was produced the same day plaintiffs' counsel received it and not long after defendant requested it.

## I. REGIONS SURVEYS ARE BUSINESS RECORDS

Evidence such as the New South Research surveys are routinely admitted as business records. Put differently, Regions does not need Jim Jager to offer "expert" opinions to admit these studies. Fed. R. Evid. 803(6) provides in relevant part:

> **(6) Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a **person with knowledge**, if **kept in the course of a regularly conducted business activity**, and if it was the **regular practice of that business activity** to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or **other qualified witness** . . . .

Fed. R. Evid. 803(6) (emphasis added).

Regions' head of consumer banking, William Askew, authenticated the New South Research brand awareness surveys as business records during his deposition testimony. Mr. Askew testified that he commissioned New South Research, an outside market research firm, to conduct market studies for Regions. (Ex. A, Askew Tr. 144.) Moreover, Regions has used New South Research to conduct market research for more than 10 years. *Id.* Askew also testified that he specifically continued to use New South Research for market analysis because he wanted consistent and reliable research findings. *Id.* at 144-145. Further, the surveys were kept in the ordinary course of business and the results were used by Regions to make important business decisions. *Id.*

Reliability is the hallmark of admissibility under Fed. R. Evid. 803(6). *Saks Int'l, Inc. v. M/V "Export Champion"*, 817 F.2d 1011, 1013 (2d Cir. 1987) ("The principal precondition to admission of documents as business records . . . is that they have sufficient indicia of

2

trustworthiness to be considered reliable."). As set forth above, Mr. Askew testified at length about the reliability of the New South Research studies. The declaration of Jim Jager merely supplements the testimony provided by Mr. Askew on this point. Indeed, Mr. Jager can be considered an "other qualified witness" who has testified as to the reliability of the market surveys as business records. While Mr. Jager is an "expert" in the field of market research, he is offered only as a fact witness here.

Non-litigation surveys such as those prepared by New South are routinely admitted as business records without expert testimony. Indeed, the law draws a clear distinction between surveys prepared for litigation and those prepared for business. This distinction is based on the inherent reliability of surveys prepared in the ordinary course of business. *See* Joseph M. McLaughlin, ed., *Weinstein's Federal Evidence Second Edition* § 803.08[6][d] (2007) ("If the proponent can show that the report was not created for litigation purposes, it is admissible."); *See Hutchinson v. Essence Comm'ns, Inc.*, 769 F. Supp. 541, 562 (S.D.N.Y. 1991) (admitting market reports because the defendant's president testified that "he routinely relies on the reports in the course of his business"); *Harrington v. Commissioner of Internal Revenue*, 404 F.2d 237, 240-41 (5th Cir. 1968) ("[T]his evidence falls within the business record exception to the hearsay rule because these surveys were recorded and kept in the regular course of business"); *P&G v. Colgate-Palmolive Co.*, No. 96 Civ. 9123, 1998 U.S. Dist. LEXIS 17773, at *234 (admitting market research studies as business records of the plaintiff under Rule 803(6)); *see also Matador Drilling Co. v. Post*, 662 F.2d 1190, 1199 (5th Cir. 1981) (admitting drilling reports not prepared in anticipation of litigation); *Rosenberg v. Collins*, 624 F.2d 659, 665 (5th Cir. 1980) (explaining that business records at issue were admissible because they were prepared before the litigation at issue); *Crimm v. Missouri Pacific Railroad Co.*, 750 F.2d 703, 709 (8th Cir. 1984) (admitting

investigation reports in part because they were not prepared in anticipation of litigation); *E.C. Ernst, Inc. v. Koppers Co.*, 626 F.2d 324, 330-31 (3d Cir. 1980) (admitting price sheets that were not prepared in anticipation of litigation).

Defendant contends, however, that a rigorous *Daubert* test is required to admit these surveys. Defendant is wrong. The former Fifth Circuit recognized the obvious distinction between litigation and non-litigation surveys in *Colorificio Italiano Max Mayer, S.P.A. v. S/S Hellenic Wave*, 419 F.2d 223 (5th Cir. 1969). The *Colorficio* court stated that litigation surveys cannot be business records because their "objectivity is suspect because of their intended use in litigation." *Id.* at 225. Thus, courts have adopted a fairly stringent set of requirements to test the admissibility of litigation surveys. These tests, which are the focus of Defendant's reply, have little relevance to the admissibility of business records and often require expert testimony. *See, e.g., T. Harris Young & Associates, Inc. v. Marquette Electronics, Inc.*, 931 F.2d 816, 828 (11th Cir. 1991) (requiring expert testimony for phone surveys done for the purpose of the litigation at issue).

Regions is not required to proffer expert testimony to admit the non-litigation New South Research surveys. They were not prepared for litigation and instead satisfy all the requirements for admission as business records. Moreover, Jim Jager is not being offered as a Rule 26(a)(2)(A) expert. He is a fact witness who has offered additional testimony as to the reason the New South Research studies are admissible as business records. Jager stated, "All these surveys were conducted for business purposes only without any anticipation of their use in litigation or for litigation purposes." Ex. B, Jager Decl. ¶ 2. Regions had no obligation to disclose Mr. Jager as an expert, and the exclusion of his testimony for the failure to identify him as an "expert" is improper.

4

## II. THE 2007 QUESTIONNAIRE WAS TIMELY PRODUCED

Defendant claims that Regions failed to produce the questionnaire from the 2007 New South Research survey in a timely manner. Defendant's argument fails for three reasons. *First*, the questionnaire was produced on August 15, 2007 – the same day plaintiffs' counsel received it – and concerned the study Mr. Jager's firm completed in mid-July. (Ex. B, Jager Decl. ¶ 3.) Regions simply could not have produced the questionnaire any earlier. *Second*, defendant's claim that the questionnaire had been requested "much earlier"[1] is just wrong. Defendant's June 19, 2007 amended 30(b)(5) notice was the first discovery tool through which defendant requested documents such as the questionnaire.[2] And, in all events, it was propounded prior to the July 2007 study with which the questionnaire was used. Regions produced the questionnaire within a reasonable time of that request on the same day it became available. *Third*, as explained above, the July 2007 survey is admissible as a business record. Thus, deposition testimony on the questionnaire is not necessary for admissibility purposes. Nevertheless, should defendant seek limited testimony on the questionnaire, Regions is willing to produce a witness on that subject.

Defendant's argument that the questionnaire was not timely produced should be rejected. The motion to strike should be denied.

## III. CONCLUSION

For all the reasons set forth above and in Regions' opposition to defendant's motion filed on September 5, 2007, defendant's motion should be denied.

---

[1] Defendant's Reply at 4.

[2] Defendant's original 30(b)(6) and 30(b)(5) requests did not ask for brand awareness studies or surveys. Defendant's amended notice included a request for "Brand Awareness Studies including those of the type referred to by Russell Dunman in his deposition at Page 105." The 30(b)(5) request asked for "Any and all documents which pertain to or relate to categories Nos. 1 and 2 of this Amended 30(b)(6) notice." (Ex. 3 to Motion to Strike Jager Declaration.)

Respectfully submitted this the 4th day of October, 2007.

/s/ William G. Pecau
One of the Attorneys for Plaintiffs Regions Asset
Company, Regions Financial Corporation and
Regions Bank

**OF COUNSEL:**

Charles B. Paterson (PAT018)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
cpaterson@balch.com
pclark@balch.com

William G. Pecau
Rachel M. Marmer
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202)429-6244
Facsimile: (202)429-3902
wpecau@steptoe.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and service will be perfected upon any CM/ECF participants electronically and I have mailed by United States Postal Service a copy of the foregoing document to any non-CM/ECF participants this the 4th day of October, 2007:

| Victor T. Hudson<br>William W. Watts, III<br>Hudson & Watts, LLP<br>Post Office Box 989<br>Mobile, Alabama 36601-0989 | James E. Shlesinger<br>Shlesinger, Arkwright & Garvey LLP<br>1420 King Street<br>Suite 600<br>Alexandria, Virginia 22314 |
|---|---|

/s/ William G. Pecau
Of Counsel

# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

REGIONS ASSET COMPANY,          *
                                *
        Plaintiff,              *
                                *
Vs.                             *   CIVIL ACTION NUMBER
                                *
REGIONS UNIVERSITY, INC.,       *   2:06cv882-MHT
                                *
        Defendant.              *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Deposition of WILLIAM E. ASKEW, taken before David Michael Camp, CSR, in the law offices of Balch & Bingham, LLP, 1901 6th Avenue North, Birmingham, Alabama, on August 2, 2007, commencing at approximately 8:45 o'clock a.m.

William Askew                                              Victor Hudson

```
                                Page 2                                              Page 4
 1       A P P E A R A N C E S                 1            STIPULATION
 2                                             2       It is stipulated by and between the parties
 3   For Plaintiff:                            3   hereto and their respective attorneys at law that
       STEPTOE & JOHNSON, LLP                  4   the deposition on oral examination of the Witness,
 4     Attorneys at Law
       1330 Connecticut Avenue                 5   WILLIAM E. ASKEW, may be taken before David
 5     Washington, D.C. 20036                  6   Michael Camp, Commissioner and Notary Public,
       (202) 429-3000                          7   State of Alabama at Large, and that the said
 6     BY: WILLIAM G. PECAU                    8   deposition shall be taken in accordance with and,
 7
 8                                             9   when so taken, may be used in accordance with the
 9   For Defendant:                           10   provisions of the Federal Rules of Civil
       HUDSON & WATTS, L.L.P.                 11   Procedure.
10     Attorneys at Law                       12       It is further stipulated and agreed that all
       One St. Louis Centre, Suite 2500
11     Post Office Box 989                    13   notices provided for by said Federal Rules of
       Mobile, Alabama  36601                 14   Civil Procedure are waived, as is the reading over
12     (251) 432-7200                         15   of said deposition to or by the witness, the
       BY: VICTOR T. HUDSON                   16   signing thereof by the witness, the signing and
13
14                                            17   certification of said David Michael Camp, the
15                                            18   filing of said deposition with the Clerk of the
     Also present: REX A. TURNER, JR.         19   Court and all other requirements and
16                                            20   technicalities of every sort which would be a
17         * * * * * * * * * *
18                                            21   prerequisite to the use of said deposition.
19                                            22       It is the intent of the parties hereto that
20                                            23   this deposition may be used in evidence as though
21
22
23
```

```
                                Page 3                                              Page 5
 1          I N D E X                          1   all requirements of said Federal Rules of Civil
 2   Witness                                   2   Procedure had been complied with.
     WILLIAM E. ASKEW                          3       It is further stipulated and agreed that all
 3
 4       EXAMINATION                           4   parties hereto reserve the right to have
 5   MR. HUDSON .................  6           5   corrections made to this deposition as provided
     MR. PECAU .................. 144          6   for by said Federal Rules of Civil Procedure.
 6   MR. HUDSON ................. 148          7       It is further stipulated and agreed that all
 7       * * * * * * * *                       8   objections, save as to the form of the questions
 8
 9                                             9   asked and the responsiveness of the answers
10        EXHIBITS                            10   thereto are reserved until the time of trial in
11   DEFENDANT'S EXHIBIT ONE TWENTY-EIGHT ..... 66   11   accordance with the provisions of said Federal
     DEFENDANT'S EXHIBIT ONE TWENTY-NINE ...... 37   12   Rules of Civil Procedure.
12   DEFENDANT'S EXHIBIT ONE THIRTY ........... 131  13
     DEFENDANT'S EXHIBIT ONE THIRTY-ONE ....... 131  14       * * * * * * * * * *
13
         * * * * * * * * *                    15
14                                            16
15                                            17
16                                            18
17                                            19
18                                            20
19
20                                            21
21                                            22
22                                            23
23
```

2 (Pages 2 to 5)

5009 Aldebaran Way West Camp & Associates  Mobile, Alabama  36693
Phone (888) 661-8833    www.campandassociates.com    Fax (888) 661-8844
8fb12432-5c79-4ff0-855b-9574151a82bb

William Askew                                                          Victor Hudson

Page 142

1  no branding there. If there's something that a
2  university did, Alabama, something that -- a local
3  accomplishment in a community. And so we can have
4  local ads that recognize different events.
5      Q   Your endorsement or endorsement by the
6  Southeastern Conference, by the University of
7  Alabama, by Auburn University, in those instances,
8  are you the bank of the Southeastern Conference,
9  by way of example?
10     A   We are. We're the official bank of the
11 Southeastern Conference.
12     Q   And your association with Alabama and
13 Auburn, is it similar in the terms that you're the
14 bank of the university?
15     A   No. We're not the bank of the
16 university because they have other --
17     Q   Places --
18     A   They have other sponsors. So Regions,
19 it's really more just the name association with
20 the university. So what we'll do is Regions will
21 do their game day. And so if they're having a
22 game, then Regions is identified on that game
23 day.

Page 143

1      We have the Regions fourth quarter -- Fifth
2  Quarter Show. The Regions Fifth Quarter Show.
3  And so it's just name recognition.
4      Q   And how is it identified? Is it
5  identified as Regions Bank, or otherwise?
6      A   No. It's identified as Regions Fifth
7  Quarter Show.
8      Q   And you put that on T-shirts and that
9  sort of thing?
10     A   No. It's on the radio.
11     Q   On the radio. Okay.
12     A   It's Eli Gold for Alabama. It's Mike
13 Hubbard for Auburn. We do this with many schools.
14     Q   Okay. To your knowledge, are any
15 instructions given to employees of Regions to look
16 out for third party use of the Regions name?
17     A   I don't know. Not to my knowledge.
18     Q   To your knowledge, is there any effort
19 to determine whether or not your customers include
20 people whose names have Regions in the name?
21     A   I -- I don't understand your question.
22 Try me again.
23     Q   If I represent to you that there are

Page 144

1  people who have Regions in their names that are
2  also banking customers of Regions, is there
3  anything that Regions does, to your knowledge, to
4  try to recognize that fact?
5      A   No. Not to my knowledge.
6  WHEREUPON, A RECESS WAS TAKEN.
7      MR. HUDSON:
8      That's all I have.
9             EXAMINATION
10 BY MR. PECAU:
11     Q   You mentioned New South. Who are they?
12     A   New South Research? They're the
13 research firm that did our research that we went
14 through.
15     Q   For how many years did you use them?
16     A   Many, many years.
17     Q   More than five years?
18     A   Yes.
19     Q   More than ten years?
20     A   I believe so.
21     Q   Okay. And why did you use them year
22 after year?
23     A   I wanted consistency in what they were

Page 145

1  telling me. And they did a good job. Other
2  banks, as I said a while ago, used them and highly
3  recommended them. And they did a good service for
4  us.
5      Q   And you relied upon the results of their
6  business in the normal course of your business?
7      A   Yes.
8      Q   And you relied on the results of their
9  surveys for your business decisions?.
10     A   Yes, in the sense that -- yes.
11     Q   Okay. And were these surveys
12 quantitative surveys?
13     A   Yes. Well, they did both qualitative
14 and quantitative surveys for us. But the surveys
15 we've been looking at are quantitative. And by
16 "quantitative", that means that they do enough
17 surveys based upon statistical empirical data
18 standards that they've done enough surveys to
19 validate -- you've heard of the polls.
20     If they poll an area, so many -- they call so
21 many people and it's valid. Well, they did those
22 statistics in quantitative. And then we went
23 beyond those numbers. And so I was very confident

37 (Pages 142 to 145)

Page 146

1  in those numbers being accurate.
2     Q   Do you have an understanding of what
3  Regions' rank is as an advertiser in the state of
4  Alabama?
5     A   I know that we were probably out-
6  advertised. As an advertising spend --
7     Q   As an advertising spender in the state
8  of Alabama.
9     A   I know that we were outspent, if that's
10 what you're asking me. We were ranked below some
11 of the other banks who spend. But our awareness
12 was way above the other banks.
13    Q   And what does that mean to you?
14       MR. HUDSON:
15       Object to the form of the question.
16 BY MR. PECAU:
17    Q   What did that mean to you?
18       MR. HUDSON:
19       Object to the form of the question.
20 BY MR. PECAU:
21    Q   That you were outspent by other banks
22 and you had a high --
23       MR. HUDSON:

Page 147

1        Object to the form.
2        THE WITNESS:
3        What did it mean that -- that they
4        were spending more and our awareness
5        was higher?
6  BY MR. PECAU:
7     Q   Right.
8     A   It meant a good thing we were doing with
9  our advertising, for one thing. Our advertising
10 was effective. It meant our name was -- our brand
11 was very strong, our name brand was very strong,
12 Regions.
13    Q   And why is that?
14       MR. HUDSON:
15       Object to the form.
16       THE WITNESS:
17       Why do I think it's strong?
18 BY MR. PECAU:
19    Q   Yeah. Why did that indicate to you that
20 it was strong?
21       MR. HUDSON:
22       Object to the form.
23       THE WITNESS:

Page 148

1        Normally, a high advertising spend
2        will create higher awareness. And
3        since we were spending less than
4        that -- the compensating factor
5        there is recognition of the brand.
6  BY MR. PECAU:
7     Q   Are you aware of any other uses of the
8  name "Regions" as a brand or as a name of a
9  business other than Regions University and
10 Regions, the financial institution?
11    A   No. Other than what he mentioned to me
12 today. He named some today.
13    Q   Are you aware of any of those names
14 actually in use?
15    A   Not really.
16    Q   Okay.
17       MR. PECAU:
18       I don't have any further questions.
19             EXAMINATION
20 BY MR. HUDSON:
21    Q   I've got a few. I can tell you, we
22 found lots of names and we polled a lot of people
23 that said they're in use. So you didn't know

Page 149

1  about it. My question is, are you the guy that's
2  supposed to know about it?
3        MR. PECAU:
4        Well, first of all, I object to the
5        characterization of what you found.
6        But you can answer the question he
7        actually asked.
8        THE WITNESS:
9        Now, give me your question again.
10 BY MR. HUDSON:
11    Q   Yeah. We filed affidavits that list a
12 lot of third party use, and we've called a lot of
13 people and they've told us that those names are in
14 use. My understanding is that you don't -- we
15 went through some. We didn't go through lots.
16     But my understanding is that you really
17 didn't know about third party usage. And my
18 question is, are you the guy that was supposed to
19 know about third party usage?
20       MR. PECAU:
21       The same objection to the
22       characterization.
23       THE WITNESS:

38 (Pages 146 to 149)

5009 Aldebaran Way West   Camp & Associates   Mobile, Alabama 36693
Phone (888) 661-8833   www.campandassociates.com   Fax (888) 661-8844

8fb12432-5c79-4ff0-855b-9574151a82bb

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION and REGIONS BANK<br><br>Plaintiffs,<br><br>v.<br><br>REGIONS UNIVERSITY, INC.<br><br>Defendant. | Civil Action No. 2:06-cv-882-MHT |

### DECLARATION OF JIM JAGER

I, Jim Jager, declare and say:

1. I am the President of New South Research. New South Research is a marketing research firm. Our offices are located at 3000 Riverchase Galleria, Suite 630, Birmingham, Alabama 35244.

2. I have provided market research services to Regions Financial Corporation ("Regions") regularly since the early 1990's. The market research services provided to Regions by New South have included numerous quantitative research surveys which are scientifically conducted and projectible surveys (meaning that the survey results can be replicated with the same results within defined percentages with a defined confidence level) and qualitative surveys like focus groups that are not projectible but provide other, more subjective, information about consumers and their attitudes. These surveys were undertaken by New South to provide Regions with consumer information to help Regions understand its business and consumers and to help it make management decisions concerning its business. All these surveys were conducted for



business purposes only without any anticipation of their use in litigation or for litigation purposes.

3. New South conducted a quantitative survey for Regions from June 14 through June 25, 2007 called "Regions/AmSouth Awareness and Perception Survey July 2007 (the "2007 Regions Awareness Survey"). Attached as Exhibit A to my declaration is the report that I prepared in July 2007 for the management of Regions summarizing the methodology of the survey and its results. Among the other things that the 2007 Regions Awareness Survey measured was the unaided awareness of and the familiarity with the Regions brand in the markets of the following cities – Birmingham, Mobile, Nashville, Memphis, Jackson, St. Louis, New Orleans, Indianapolis, Atlanta, Miami, Orlando and Tampa.

4. The 2007 Regions Awareness Survey was conducted from a central telephone facility in Birmingham using random digit dialing of telephone numbers drawn from zip codes in those 12 city markets. I am attaching, as Exhibit B, the survey instrument (also known as the questionnaire) which is the script used by the professional interviews (a) to select the sample of persons who will respond to the survey questions (the "respondents") and (b) to ask the questions of the qualified respondents. As appears from the first two screening questions in Exhibit B, the survey sought respondents from every household in the markets – the persons who were primarily or jointly responsible for financial decision making in the households – and only excluded persons that worked for financial institutions and market research organizations. Other aspects of the methodology are reported on page 3 of the report.

5. As I said, 2007 Regions Awareness Survey is a scientific quantitative survey. As appears on page 3 of the report:

> "[t]he overall statistical margin of error for the study, based on 2492 interviews, is 2.0 percent at the 95 percent confidence



interval. That is, if all residents in all market areas were included in the survey, the results should vary no more than 2.0 percentage points from the results reported in this study 95 times out of a hundred.

In addition as appears in page 3 of the report, in each market surveyed, since approximately 200 interviews were conducted in each market, the survey results are projectible with a margin of error of 6.9 percent at the 95 percent confidence level.

6. The Introduction of the report on page 1 sets out the primary goals of the research. The first goal was: "What is the overall awareness of Regions (and AmSouth) in each market?" This was measured in two ways. The first was a measure of the unaided awareness of banks by asking the respondent to identify the banks the banks that came to mind without any prompting – Questions 3 and 4 in Exhibit B. The results are shown in the chart "Total Unaided Awareness" on page 12 of Exhibit B. It shows Regions to be the market leader in unaided awareness in Birmingham (70%) and Mobile (50%). Among other city markets tested, Regions had an unaided awareness of 24% in Nashville, 44% in Memphis and 29% in Jackson. The second measure was aided awareness where the respondents are asked if they are aware of 4 or 5 banks or financial services companies, depending on city. All respondents were asked if they were aware of Regions and AmSouth and, depending on the city, two or three other banks or financial services. The names of the banks and financial services companies were rotated to avoid positional bias. Exhibit B is the questionnaire for Birmingham. As I reported in Exhibit A (p. 4), Regions is very strong in aided awareness in Birmingham (98%), Mobile (93%), Nashville (87%), Memphis (91%), and Jackson (88%). Regions familiarity is high in other cites as well – Atlanta (83%), St. Louis (78%), New Orleans (84%). Regions familiarity in other city markets is: Indianapolis (69%), Miami (54%), Orlando (43%) and Tampa (44%).

99

7. The 2007 Regions Awareness Survey uses similar methodology that I and New South Research have used over the years in the quantitative scientific surveys that we have conducted for Regions concerning the awareness of Regions and customer satisfaction and perception. Some of the many other scientific quantitative surveys that I have conducted for Regions are:

    a. Regions Financial Corporation Ad Awareness & Tracking Report for the Year 2003 that, among other things, shows unaided recognition of Regions in various markets is attached as Exhibit C.

    b. Regions Financial Corporation Ad Awareness & Tracking Report for the Year 2002 that, among other things, shows unaided recognition of Regions in various markets is attached as Exhibit D.

    c. Regions Financial Corporation Ad Awareness & Tracking Report for the Year 2001 that, among other things, shows unaided recognition of Regions in various markets is attached as Exhibit E.

    d. Regions Financial Corporation Ad Awareness & Tracking Report for the Year 2000 that, among other things, shows unaided recognition of Regions in various markets is attached as Exhibit F.

8. Based upon the fact that historically the unaided awareness of Regions in Montgomery has been higher than Regions unaided awareness in Birmingham, it is my opinion that the aided awareness of Regions today in Montgomery would be at least as high as the aided awareness of Regions in Birmingham shown in Exhibit A.

I declare under penalty of perjury that the above facts are true to the best of my knowledge. Executed August 17, 2007.

                              Jim Jager