## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **REGIONS ASSET COMPANY,** | ) | |
| **REGIONS FINANCIAL CORPORATION,** | ) | |
| **and REGIONS BANK** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:06-CV-882-MHT** |
| | ) | |
| **REGIONS UNIVERSITY, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## JOINT NOTICE OF FILING OF DEPOSITION DESIGNATIONS

**THE PARTIES** have jointly designated the unstricken portions of the attached

depositions of the following people:

1.  Emmett M. Pollard;

2.  Carolyn Hughes;

3.  Patsy Fulghum;

4.  Neal Berte;

5.  Samuel E. Upchurch, Jr.;

6.  Janet Armitage; and

7.  George Jackson Allen

The Parties stipulate that the unstricken portions shall be introduced into evidence at trial.

DATED this 8th day of January, 2008

/s/ Charles B. Paterson
One of the Attorneys for Plaintiffs Regions
Asset Company, Regions Financial
Company and Regions Bank

OF COUNSEL:
Charles B. Paterson (PAT018)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
cpaterson@balch.com


William G. Pecau
Rachel M. Marmer
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone:  (202)429-6244
Facsimile:  (202)429-3902
wpecau@steptoe.com


/s/ William T. Watts, III
One of the Attorneys for Defendant
Regions University


OF COUNSEL:
Victor T. Hudson
William W. Watts, III
Hudson & Watts, LLP
Post Office Box 989
Mobile, Alabama 36601-0989

James E. Shlesinger
Shlesinger, Arkwright & Garvey LLP
1420 King Street
Suite 600
Alexandria, Virginia 22314

George Jackson Allen

July 18, 2007



**Page 1**

IN THE U.S. DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

REGIONS ASSET COMPANY,

        Plaintiff,    CAFN:2:06-CV-00882-MHT

    vs.

REGIONS UNIVERSITY,

        Defendant.
------------------------

VIDEOTAPED DEPOSITION OF
GEORGE JACKSON ALLEN

July 18, 2007
9:31 a.m.

Southern Association of
Colleges and Schools
1866 Southern Lane
Decatur, Georgia

Debra C. Verrill, Certified Court Reporter

**Page 2**

```
 1              APPEARANCES
 2
 3    FOR THE PLAINTIFF:
 4    CHARLES B. PATTERSON, Esquire
 5    Balch & Bingham, LLP
 6       105 Tallapoosa Street, Suite 200
 7       Montgomery, Alabama 36104
 8       334.269.3143
 9       334.269.3115 fax
10       cpaterson@balch.com
11
12    FOR THE DEFENDANT:
13    VICTOR T. HUDSON, III, Esquire
14    Hudson & Watts, LLP
15       One St. Louis Centre, Suite 2500
16       Mobile, Alabama 36601
17       251.432.7200
18       251.432.0073 fax
19       victor@alabamatriallaw.com
20
21
22
23
24
25
```

**Page 3**

```
 1          APPEARANCES (Continued)
 2
 3    FOR THE DEPONENT:  (George Jackson Allen)
 4    PATRICK W. MCKEE, Esquire
 5    McKee & Mitchell
 6       19 Spring Street
 7       Newnan, Georgia 30263
 8
 9    ALSO PRESENT:
10    Patrick D. Gilmore (Videographer)
11    Dr. Rex A. Turner, Jr.
12
13              C O N T E N T S
14    Deponent                          Page
15    George Jackson Allen
16    Examination by Mr. Hudson          5
17    Examination by Mr. Patterson       27
18    Cross-Examination by Mr. Hudson    86
19    Compliance with O.C.G.A. 9-11-28(d) on
20    Disclosure Statement               102
21
22
23
24
25
```

**Page 4**

```
 1    VIDEOTAPED DEPOSITION OF GEORGE JACKSON ALLEN
 2                 July 18, 2007
 3
 4    THE VIDEOGRAPHER:  9:34.  On the record.
 5    Whereupon,
 6         GEORGE JACKSON ALLEN,
 7    was called as a deponent herein, and having
 8    first been duly sworn, was examined and deposed
 9    as follows:
10              CROSS-EXAMINATION
11    BY MR. HUDSON:
12         Q   Would you please state your name for
13    the record?
14         A   It's George Jackson Allen.
15         Q   Are you Dr. Allen?
16         A   Right.
17         Q   And, Dr. Allen, where are you
18    employed?
19         A   At the Southern Association of
20    Colleges and Schools.  I'm a Vice President of
21    the Commission on Colleges.
22         Q   What is the Commission on Colleges?
23         A   The Commission on Colleges is an
24    elective body from the 11 Southern states and a
25    couple of foreign areas, like Mexico and Costa
```




BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen

July 18, 2007

---

**5**

1  Rica, that is elected to oversee the
2  accreditation process for its membership. We
3  have 77 people on that commission elected from
4  all the states according to a formula and some
5  are elected at large.
6      Q     And what is accreditation?
7      A     Accreditation is, in a heart sense of
8  the word, an evaluation of an academic
9  institution that offers degrees by peer
10 reviewers from other institutions that also
11 offer degrees according to a set of standards
12 that are agreed on by the almost 800 members
13 that we have. And that goes to assure the
14 public and other students, faculty and other
15 folks that institutions meet our minimum
16 requirements and are striving for improvement.
17     Q     If you can give us just a little
18 historical background. How did this process
19 begin? How did it start?
20     A     The gestation period for this, I
21 think, started with folks from Vanderbilt in
22 the 1880s, early 1890s when the Southern region
23 did not really have any standards that were
24 agreed upon. There was no system of education
25 that existed in that sense, and so there was

---

**7**

1  things that we've come to know as part of the
2  collegiate experience. They were highly
3  quantitative in the early days because it was
4  easy to apply those quantitative standards
5  because most of those colleges were liberal
6  arts colleges, and they were very similar in
7  nature.
8      Q     Now, are they quantitative today?
9      A     No, they aren't. And the reason
10 that's happened primarily is because the
11 association has in response to a number of
12 types of institutions decided to expand the
13 accreditation functions and include those. We
14 didn't accredit two-year colleges in the
15 beginning or state teacher's colleges or even
16 technical colleges. All of those have come
17 into the membership over the years since 1920.
18 And so in order to accommodate these, you
19 really didn't want to create six or seven
20 different sets of standards. What they decided
21 at a certain point was to have one set of
22 standards that would be applied to all
23 institutions according to what their purpose in
24 education was.
25     And so we don't have things that say

---

**6**

1  not much of a differentiation between high
2  schools and colleges. And so certain
3  institutions in the south, Vanderbilt, Duke,
4  University of North Carolina, University of the
5  South, University of Tennessee, University of
6  Mississippi, among others, and others who
7  weren't the original members got together in
8  Atlanta and decided that they wanted to
9  separate off colleges from high schools, and so
10 they decided to adopt a set of standards that
11 would effectively do that.
12     Q     And did those standards evolve over
13 time?
14     A     They did evolve. Primarily at first,
15 they were admission standards that said that
16 you had to have something in high school
17 requiring the units to proceed onto college or
18 the colleges had to have admission standards,
19 these kinds of things. Eventually starting in
20 1920, the standards expanded to include lots of
21 things that we think of as part of the integral
22 core of a college now; faculty requirements,
23 requirements for endowment, or per student
24 expenditure, if you were a public institution,
25 requirements for libraries and all of these

---

**8**

1  you need 10,000 books in your library. It's
2  according to what you -- the purpose of your
3  institution is. The University of Georgia
4  would have a different purpose than a community
5  college, for example.
6      Q     But by way of example, when the peer
7  review -- when these colleges seeking
8  accreditation are submitted to peer review, are
9  they compared in accordance with the category
10 they're in; four-year colleges compared to
11 other four-year colleges as opposed to four-
12 year colleges compared to your genuine
13 colleges?
14     A     Yeah. That's generally the case.
15 Our process involves people at all levels of
16 institutions; from two-year colleges through
17 comprehensive graduate institutions. And so
18 for the most part, we try to have similar types
19 of institutions, the evaluation, those
20 evaluated institution of similar type. But on
21 the other hand, we don't want it to be all
22 uniform. It would result in separate sets of
23 accreditation. So there are other eyes in this
24 as well, and so we have people with
25 comprehensive institutions that will be part of

---



BROWN & GALLO
LLC.

Telephone (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen                                    July 18, 2007

|   | 9 |
|---|---|
| 1 | the evaluation at some stage on a two-year |
| 2 | college, for example. |
| 3 | Q    Well, let me ask you some more |
| 4 | specific questions. In 1986 when Regions |
| 5 | University, then Southern Christian University, |
| 6 | was accredited, were there criteria for |
| 7 | accreditation that were imposed by the |
| 8 | Commission on Colleges? |
| 9 | A    Yes. In fact, they were called the |
| 10 | criteria for accreditation at that point. |
| 11 | There were a number of assessed and fairly |
| 12 | specific standards that the institutions were |
| 13 | required to meet, not only for their initial |
| 14 | candidacy for accreditation, but for -- We |
| 15 | don't call it full accreditation -- for their |
| 16 | accreditation process itself. |
| 17 | --- |
| 18 | (Whereupon, Defendant's |
| 19 | Exhibit No. 1 was marked |
| 20 | marked for identification) |
| 21 | --- |
| 22 | BY MR. HUDSON: (Resuming) |
| 23 | Q    I'll show you what I've marked as |
| 24 | Exhibit 1 and ask you if those are the |
| 25 | criteria. |

|   | 11 |
|---|---|
| 1 | they give them a little bit more flexibility in |
| 2 | demonstrating how they do that. |
| 3 | Q    And the Southern Christian |
| 4 | University, now Regions University, would have |
| 5 | been accredited under Exhibit 1 criteria? |
| 6 | A    That's right. |
| 7 | --- |
| 8 | (Whereupon, Defendant's |
| 9 | Exhibit No. 2 was marked |
| 10 | for identification) |
| 11 | --- |
| 12 | BY MR. HUDSON: (Resuming) |
| 13 | Q    All right. So then I show you the |
| 14 | principles of accreditation that have been |
| 15 | marked as Exhibit 2, the 2007 interim addition, |
| 16 | and ask you if those are the principles to |
| 17 | which you refer. |
| 18 | A    That's right. |
| 19 | Q    Are those the principles that are -- |
| 20 | A    Current. |
| 21 | Q    -- that are utilized today? |
| 22 | A    Current. |
| 23 | Q    Current accreditations? |
| 24 | A    Yes. |
| 25 | Q    Now, discussing the accreditation |

|   | 10 |
|---|---|
| 1 | A    Those are, uh-huh (affirmative). |
| 2 | Q    And did those in time evolve into the |
| 3 | principles of accreditation? |
| 4 | A    They did. Over the last few years, |
| 5 | the decision was made, I think, to allow a |
| 6 | little bit more flexibility without giving up |
| 7 | the rigor that's part of the accreditation |
| 8 | process. In other words, without all of the |
| 9 | specifics, institutions were still going to be |
| 10 | required to provide resources, faculty re- |
| 11 | qualified, and these kinds of things. But |
| 12 | there was, I think, an intent to allow them a |
| 13 | little bit more flexibility in demonstrating |
| 14 | that those things occurred. |
| 15 | And so that's the transition between |
| 16 | the criteria, which had about three or 400 |
| 17 | specific requirements to the set of |
| 18 | requirements that we have now, which are called |
| 19 | the principles of accreditation. |
| 20 | Q    Principles of accreditation are |
| 21 | similar to the criteria, but a little bit more |
| 22 | challenging? |
| 23 | A    There's several in the intent that |
| 24 | the institution would maintain the rigor of the |
| 25 | process and their educational programs, but |

|   | 12 |
|---|---|
| 1 | process itself as it relates to peer review |
| 2 | that comes from the Commission on Colleges. |
| 3 | Would you describe to me how in 1986 and today, |
| 4 | in general terms, an institution seeks |
| 5 | accreditation and how that process works? |
| 6 | A    In terms of seeking accreditation, we |
| 7 | have these items in current principles that are |
| 8 | called core requirements. In 1986, they were |
| 9 | called conditions of eligibility. Essentially |
| 10 | the same types of requirements. Each |
| 11 | institution that applied for membership needed |
| 12 | to meet those core requirements plus the |
| 13 | faculty area, credentials area, their faculty |
| 14 | qualifications in order to be considered for |
| 15 | candidacy. And then we would have a committee |
| 16 | or peers that would visit the institution and |
| 17 | decide whether indeed they were going to be |
| 18 | awarded candidacy. |
| 19 | Q    And when you say a committee of |
| 20 | peers, what is that? Who would that be? |
| 21 | A    That would be in the case of, say, a |
| 22 | private institution, perhaps we might have |
| 23 | seven or eight, perhaps nine people who would |
| 24 | visit the institution. There would be a |
| 25 | business officer, the librarian, a number of |





BROWN & GALLO
LLC

Telephone  (404) 495-0777  (404) 876-8979
Toll Free  (877) 495-0777  (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen                                    July 18, 2007

13

1   academics, perhaps someone who had expertise in
2   institutional research to look at the outcome
3   as part of our process.
4           So there would be a good cross-
5   section of people represented. They would
6   visit the institution and prepare a report,
7   which would -- At that time, they actually made
8   a recommendation for whether the institution
9   should have candidacy or not. I don't think
10  that's the case now, but the decision would be
11  made on the basis of that report whether the
12  institution were awarded candidacy.
13          And then the same process would
14  repeat itself after a period of time where the
15  institution would have to demonstrate
16  compliance with all of the requirements, not
17  just the core requirements, or what they were
18  called in the conditions of eligibility, but
19  all of them. And that would occur usually
20  within about two years of the awarding of
21  candidacy. They couldn't go beyond four years
22  after they were awarded candidacy.
23      Q    Once that occurs, the second stage
24  after the two-year period, is all or any
25  information submitted to the Commission on

14

1   Colleges?
2       A    Well, all of the reports -- If, for
3   example, the candidacy stage, with that
4   committee, they would send their report to the
5   Commission alone and the institution would
6   respond to it, and the Commission would make a
7   decision on candidacy. And the same thing
8   would happen in the case of the accreditation
9   committee, which would be there to examine them
10  for the purposes of awarding accreditation.
11          So all of that would go up to the
12  Commission, so there were certain rules of
13  evaluation there. First, the committee visit,
14  then the Commission action.
15      Q    And by whom would the decision be
16  made about whether or not the institution would
17  be accredited?
18      A    It would be made by the 77 members of
19  the Commission on Colleges. The elected body,
20  as I have mentioned, from the states that we
21  represent, the 11 Southern states. Kentucky to
22  Florida, Virginia to Texas, and to Mexico and
23  Costa Rica. They will make the final decisions
24  on these.
25      Q    In fact, they were the only ones that

15

1   can make a decision?
2       A    That's right.
3       Q    And that's part of the peer review
4   process, the peers make the decision --
5       A    That's right.
6       Q    -- on whether to include this
7   institution as one of their members?
8       A    That's right.
9           - - -
10          (Whereupon, Defendant's
11          Exhibit No. 3 was marked
12          for identification)
13          - - -
14  BY MR. HUDSON: (Resuming)
15      Q    Let me show you what has been marked
16  as Exhibit 3 and ask you if you can identify
17  that.
18      A    This is the current list of the
19  members of the Commission on Colleges that are
20  elected by the membership. And these would
21  include a number of college presidents, some
22  other administrators, perhaps some faculty and
23  some public members that represent their
24  particular sector that aren't associated with
25  colleges.

16

1           MR. PATTERSON: Excuse me, Tom. Is
2   that the list of the 77 people that are on
3   the committee that make the decision?
4           THE DEPONENT: This is the 77 --
5           MR. HUDSON: The Commission on
6   College's 77 members. Yes. That's a
7   composition on it.
8   BY MR. HUDSON: (Resuming)
9       Q    And can you give me a -- just a rough
10  idea of what percentage of the membership
11  ordinarily is composed of college presidents?
12      A    I would say about three quarters of
13  the Commission on Colleges presidents. I'd
14  have to look through this.
15      Q    Count up.
16      A    Count up to make sure. Others,
17  again, are administrators or some faculty, and
18  we're probably going to be adding more faculty
19  to the mix in the future. And then, again,
20  there are a number of public members. For
21  example, I see on the first page Ms. Gale
22  Adcock, Director, Corporate Health Services at
23  a health center in North Carolina who represent
24  the public interest part of this.
25      Q    So the peer review process also



BROWN & GALLO
                                          LLC

Telephone (404) 495-0777  (404) 876-8979
Toll Free  (877) 495-0777  (800) 637-0293
          Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

17

1  brings in not only the college peer review, but
2  the public -- invited public interest members
3  as well?
4       A    That's right.
5       Q    Okay. Does the Commission on
6  Colleges also have a chairman or presiding
7  officer of some sort?
8       A    They do. There's a chair of the
9  Commission, yes.
10      Q    Can you give me an example of some of
11 those who have served in that position?
12      A    Well, the current chair of the
13 Commission is Phil Stone, who is the president
14 of Bridgewater College up in Virginia.
15 Previous presidents have included -- The recent
16 president chairs has included Jim Barker, who
17 is president of Clemson; John Casteen,
18 president of the University of Virginia; Robert
19 Khayat, president of the University of
20 Mississippi; and Mike Adams, president of the
21 University of Georgia.
22      Q    Has --
23      A    Those have been recent --
24      Q    Okay.
25      A    -- chairs.

18

1       Q    Now, the process itself I'd like to
2  talk to you about just a little bit more. Once
3  an institution is accredited, is there any
4  follow-up with regard to that institution?
5       A    There is. Normally in the
6  accreditation process, which we go through a
7  cycle every ten years. It's mandatory.
8  There's usually follow-up after those visits in
9  that ten-year period. Almost every institution
10 has some type of follow-up report to submit.
11           In addition to that, we have a
12 situation whereby if an institution changes
13 significantly, if they offer a new level of
14 programming, say, from bachelor's to master's,
15 master's to doctorate, or if they introduce
16 significantly new types of programs even at
17 their own level, then that would call for not
18 only a notification by the institution, but
19 submission of a respectus, and in most cases, a
20 visit to review those particular changes.
21           So it's a dynamic process that just
22 doesn't occur every ten years, depending on
23 what happens with the institution.
24      Q    And has Regions University had those
25 substantial changes over the years?

19

1       A    They have had some changes, yes. We
2  can look at those.
3       Q    And had some recent ones as well?
4       A    That's right. The most recent one
5  was a doctoral program; marriage and family
6  counseling.
7       Q    Now, are there also annual audits and
8  annual reviews?
9       A    There are. There are annual profiles
10 that are submitted that do contain some
11 financial information and enrollment figures.
12 We also have what's called a fifth-year report
13 that can be asked for for institutions for
14 follow-up on certain things that might have
15 been noted about their reaffirmation process,
16 if the Commission would like to re-evaluate at
17 some point. And our new process, not only do
18 we have -- We're in the process of some change
19 now, but we ask -- we're going to ask for a
20 fifth-year report on what's called the quality
21 enhancement plan, which is required of all
22 institutions that go through the process. And
23 they will need to report on how that's worked
24 itself out, whether they succeeded or failed or
25 what their experience has been with that.

20

1           In addition, the Department of
2  Education, the United States Department of
3  Education has asked that we require, and we
4  will be doing this, a more comprehensive review
5  of standards at the fifth year. I don't know
6  exactly how that's going to be worked out, but
7  there will be a review of that.
8       Q    But speaking specifically about the
9  accreditation of Southern Christian University.
10 It would have been accredited in 1986. And
11 then each year after that, would there have
12 been annual reviews and annual audits?
13      A    There's an annual profile. It's not
14 necessarily audits. The fifth year we do
15 require audits.
16      Q    And there was one required of Regions
17 University?
18      A    Yeah.
19      Q    And the ten-year audit or review that
20 you referred to, what is that called?
21      A    It's called reaffirmation of
22 accreditation. Some people refer to it as
23 reaccreditation. We say reaffirmation of
24 accreditation.
25      Q    Whether it's called reaccreditation



BROWN & GALLO
LLC

Telephone (404) 495-0777  (404) 876-8979
Toll Free  (877) 495-0777  (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen                                          July 18, 2007

21

1  or reaffirmation of accreditation, would that
2  process have been one that Regions University
3  would have successfully completed?
4      A    That's correct.
5      Q    And also as it had substantial
6  changes, that would have triggered other
7  reviews?
8      A    That's correct, too.
9      Q    Now, the -- Is accreditation required
10  by the U.S. Department of Education for any
11  particular program or benefit?
12      A    I'm not sure about the pragmatic
13  requirements, but for most institutions, some
14  accreditations is required for the extension of
15  student loans, research monies, and these kinds
16  of things. And the Department of Education
17  maintains a list of recognized accrediting
18  bodies, such as the Southern Association. As
19  does the private counterpart of that counsel
20  for higher education accreditation, which also
21  maintains a list.
22      Q    And does the U.S. Department of
23  Education require that an institution be
24  accredited by a recognized accrediting
25  association in order to qualify for VA

22

1  benefits?
2      A    As far as I know, that's correct. I
3  mean, they may have some exceptions in their
4  policy, but I think the general requirement is
5  you need an accreditation by a recognized
6  accrediting body to receive those kinds of
7  benefits.
8      Q    And is there also similarly a general
9  requirement for student loans, Pell grants, and
10  research funding?
11      A    As far as I know, there is.
12      Q    Okay. Now, if something like the
13  reaffirmation of accreditation or an annual
14  review or complaints that come to your
15  attention, anything, is there anything that can
16  subsequently affect an accreditation once
17  given?
18      A    Yes. Other than the substantive
19  change items and the usual follow-ups that we
20  have on accreditation visits, if it comes to
21  the Commission's attention that there is a
22  problem with an institution that comes through
23  people letting us know, complaints, newspaper
24  reports, or whatever, we can act on it. We
25  need to investigate those if they show some

23

1  significant problems with our accreditation
2  requirements.
3      Q    And in the event that your
4  investigation shows some negative result, what
5  are you entitled to do?
6      A    Well, the institution can certainly
7  correct whatever the situation is. They could
8  be placed on some type of warning sanction,
9  probation, these kinds of things, ask for some
10  follow-up.
11          So there are a wide range of things
12  that could happen in a case of an institution
13  that is in violation of one of our
14  requirements.
15      Q    And in the extreme, what can occur?
16      A    They could lose membership.
17      Q    And --
18      A    In other words, lose their
19  accreditation.
20      Q    And are there steps prior to their
21  losing their accreditation, such as warnings
22  and probation?
23      A    That's normally the case. Although,
24  as a counterpart, if a situation develops
25  that's so serious, whether it involves the

24

1  integrity of the institution or a complete
2  violation of our requirements, they could be
3  dropped from membership --
4      Q    Immediately.
5      A    -- immediately. By action of the
6  Commission.
7      Q    And once again, the Commission itself
8  relies upon its peer review capabilities?
9      A    That's right.
10      Q    Now, notwithstanding that, would you
11  describe the system of warnings and probation
12  to us?
13      A    This gets a little bit technical, but
14  when we review an institution and a report
15  comes in to the Commission, that starts a
16  process of monitoring the institution, if there
17  are problems. And the Department of Education
18  asked us, and we've adopted this policy, that
19  if an institution does not correct whatever
20  deficiency there is in relation to our
21  standards within two years, then they have to
22  be either dropped from membership or placed on
23  probation, if they show significant
24  improvement. But we still have to track it.
25          Now, anytime within those two years,



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen

July 18, 2007

---

25

1 the institution could also be put on a warning
2 status, which is usually the first thing we do.
3 Warning status would interfere with their
4 reaffirmation. That could be postponed because
5 of that. The next stage is usually probation,
6 which is usually considered a more serious
7 sanction and indicates that the institution, if
8 they don't meet certain deadlines, is going to
9 be in real trouble. They could lose their
10 membership.
11       Q    And how long is the probationary
12 period?
13       A    According to the schedule, it could
14 last up to two years. But an institution
15 cannot stay on probation more than two years,
16 consecutive years.
17       Q    All right. You say it can't. I
18 mean, if it's at the end of the two years and
19 it hadn't rectified the problem, does that mean
20 it loses its accreditation?
21       A    It would lose its accreditation, yes.
22       Q    Has Auburn University been on
23 probation?
24       A    Yeah. They were on probation, I
25 think, for a year.

---

26

1       Q    Has Regions University ever been on
2 probation, then issued a warning, had its
3 accreditation threatened?
4       A    I'd have to review that, but I don't
5 recall anything of that nature at all with
6 Regions.
7       Q    If you would address just a moment
8 the -- Strike that.
9             MR. HUDSON:  I don't have any further
10 questions.
11
12            EXAMINATION
13 BY MR. PATTERSON:
14       Q    Dr. Allen, my name is Charlie
15 Patterson and I represent Regions Bank and I
16 have a few questions.
17       A    All right.
18       Q    When did you become aware that
19 Southern Christian University had changed its
20 name to Regions University?
21       A    Let's see. I think that was in the
22 last year or so, I believe. I'm not exactly
23 sure one way or the other.
24       Q    I'll represent to you it changed its
25 name in August of '06.

---

27

1       A    Yeah, okay.
2       Q    And how did you become aware that it
3 had, in fact, changed its name?
4       A    They notified us they wanted to
5 change the name.
6       Q    Is that part of the process?
7       A    That's part of the process that they
8 would need to notify us. And if it represented
9 a significant change in the institution, then
10 we would probably have some substantive change
11 visit.
12       Q    Do you have a copy of their notice of
13 their application to you for permission to
14 change their name?
15       A    I think so. I don't think I have it
16 with me, but I have a letter somewhere in my
17 materials that acknowledges that the name has
18 been changed.
19       Q    Would that be a letter from them
20 seeking that or a letter from this institution?
21       A    No. This is a letter that actually
22 reacknowledged -- Somewhere I have it.
23            MR. PATTERSON:  Well, just take -- If
24 you would, if you need to take a break to
25 find it, you take just a second and see if

---

28

1 you can find that.
2            THE VIDEOGRAPHER:  Off the record.
3
4            (Whereupon, a short break was taken)
5
6            (Whereupon, Defendant's
7            Exhibit No. 4 was marked
8            for identification)
9
10           THE VIDEOGRAPHER:  10.03.  On the
11 record.
12 BY MR. PATTERSON:  (Resuming)
13       Q    Dr. Allen, I'm going to ask you to
14 take a look at a letter dated August 2nd, 2006,
15 which I've marked as Exhibit No. 4.  This is a
16 letter to Dr. Belle Wheelan from Rex Turner.
17 Is this the letter notifying your institution
18 that Southern Christian University had changed
19 its name to Regions University?
20       A    Right.
21       Q    Now, this letter just is a -- Am I
22 right? It's just a notice to your institution
23 that they have, in fact, changed it. Did they
24 have to seek any type of permission or anything
25 to change it?

---



BROWN & GALLO LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

George Jackson Allen

**29**

1    A   The only time that they would need to
2  seek permission would be if it represented a
3  major change in the programming of the
4  institution, if they were going to offer a new
5  level of programming of some nature change.
6  Otherwise, we normally would just go ahead and
7  accept notice of their name change, if that
8  isn't the situation.
9        Q   And your institution would rely on
10 the school that was submitting this name change
11 to be sure that the name was changed in the
12 appropriate manner?
13     A   That's correct.
14     Q   As a matter of fact, your institution
15 relies heavily on things that are submitted by
16 its members?
17     A   That's correct. We expect members to
18 report accurately information to us.
19
20            (Whereupon, Defendant's
21            Exhibit No. 5 was marked
22            for identification)
23
24 BY MR. PATTERSON: (Resuming)
25     Q   Defendant's Exhibit No. 5 is a letter

**31**

1    their name?
2        A   I don't think so. If they did, I
3  don't recall.
4        Q   Okay. Was anyone in your
5  organization at SACS consulted or involved in
6  any way in the name change other than
7  exchanging this correspondence we previously
8  talked about?
9        A   No, not that I know of.
10       Q   Has your organization -- Can I call
11 it SACS?
12       A   Sure.
13       Q   Has SACS ever had occasion to get
14 involved when a member school changes the name?
15       A   I can't recall any instance where
16 there's been a major problem with a name
17 change. The only time that we usually get
18 involved with it, of course, we want to know if
19 it represents any change in their academics.
20 If they're going to start a medical school or
21 if they're, you know, doing this or that, we
22 would want to know that. But in terms of a
23 name change, unless it -- there's some problem
24 with it, we wouldn't get involved with it.
25       Q   Has your organization ever passed

**30**

1    dated August 11th, 2006. Is this your
2  institution's response to Defendant's Exhibit
3  4?
4        A   That is. It is.
5        Q   And those two documents are part of
6  your records here --
7        A   That's right.
8        Q   -- that you produced today? Okay.
9  Thank you.
10           How did you personally become aware
11 that they changed their name? This
12 correspondence wasn't created to or from this.
13       A   I think that I was informed possibly
14 by John White at the institution that the name
15 change was imminent and that -- what did they
16 need to do? I believe that was the case. I'm
17 not sure when that happened.
18       Q   Did John White tell you why the name
19 was being changed?
20       A   I don't recall that.
21       Q   Do you recall why --
22       A   I mean, it just -- I'm sorry. Why
23 the name was being changed?
24       Q   Did anyone at what is now Regions
25 University tell you why they were changing

**32**

1    judgement on the propriety of the name of any
2  institution?
3        A   I think that there have been some
4  questions in the past about institutions that
5  might call themselves a university, if they're
6  not offering graduate programs or other types
7  of things you would normally associate with a
8  university. But those issues have usually been
9  resolved and we pretty much allow institutions
10 as long as it doesn't misrepresent the
11 situation to call themselves what they want.
12 If we had a two-year college that called
13 themselves a university, perhaps that might be
14 a situation we might get into. But as long as
15 there's no attempt to mislead or no attempt to
16 advertise something that you aren't, we
17 wouldn't have a problem with it.
18       Q   Are you aware of situations where
19 schools have changed their names to reflect the
20 influence of supporters and donors --
21     A   Yes.
22     Q   -- and things like Eckerd College --
23     A   Yeah.
24     Q   -- and Duke University --
25     A   Duke University.


BROWN & GALLO
LLC

Telephone (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309


www.galloreporting.com

George Jackson Allen

July 18, 2007

## 33

```
1           Q    -- things like that?
2           A    Yeah.
3           Q    Does that occur very often anymore
4    where someone puts -- you know, someone makes
5    enough of an impact on a school, financial or
6    otherwise, to make the schools change?
7           A    I don't think we've had too many
8    change the name of the institution recently.
9    Sometimes usually it's a building that's named
10   for them, but not necessarily the -- I can't
11   recall any right off.
12          Q    Okay.  But you recognize that as a
13   common practice, institutions are often named
14   for significant supporters and alums?
15          A    That's true.
16          Q    Now, I think you said this earlier,
17   but SACS expects the schools that it accredits
18   to conduct their affairs with integrity,
19   correct?
20          A    Correct.
21          Q    And you expect them to deal honestly
22   and openly with all of their constituents;
23   students, faculty, the public?
24          A    Correct.
25          Q    And, as a matter of fact, one of the
```

## 34

```
1    -- I think this has been marked as Plaintiff's
2    Exhibit -- I'm sorry -- just Exhibit No. 2 in
3    your principles of accreditation.  If you would
4    take a look at that document.  I think it's on
5    page 6 of that document.  Turn to page 6.  Is
6    that the one that has section one at the top?
7           A    The integrity section?
8           Q    Yes.  And section one is entitled
9    "The Principle of Integrity."
10          A    Correct.
11          Q    So that's your number one numbered
12   paragraph in "The Principles of Accreditation"
13   -- is that this organization demands integrity?
14          A    Uh-huh (affirmative).
15          Q    And that's probably the cornerstone
16   of your requirements, isn't it?
17          A    It's a good part of it.  It's an
18   important part.
19          Q    And in this -- I'm quoting from a
20   part of this.  It says, "SACS requires that the
21   accreditation requires that the institution is
22   to operate with integrity in all matters."  Do
23   you recognize that as
24          A    I do.
25          Q    part of your requirements?
```

## 35

```
1           A    Uh-huh (affirmative).
2           Q    And is this organization serious
3    about that?
4           A    We are serious about that.
5           Q    And if you don't conduct your -- If
6    the school doesn't conduct itself with
7    integrity, you're subject to sanctions from
8    this organization, including the loss of
9    accreditation?
10          A    That's correct.
11          Q    Now, if a school -- Have you ever had
12   a situation where a school put out
13   advertisements or brochures which were
14   misleading to prospective students or the
15   public?  Have you ever had a situation like
16   that?  And I'm not asking you to call names of
17   the people you had problems with, but have you
18   ever in your experience here encountered a
19   situation where the misleading ads or
20   misleading brochures were used?
21          A    I don't think we've had anything
22   that's been purposely misleading, according to
23   this.  We have -- We require institutions to
24   state their accreditation status with us
25   according to some technical prescribed words.
```

## 36

```
1    And in some cases, they haven't gotten the
2    wording right.  But I don't think it's been
3    intentional on their part and put our phone
4    number in there.  Those are the kinds of things
5    sometimes we follow up on.  A number of
6    institutions have had to correct the wording in
7    that, but we haven't had, as far as I know, a
8    situation where an institution has inaccurately
9    described themselves to the public or put out
10   misleading kinds of things to the public.
11          Q    If you did have a situation like
12   that, could that affect the school's
13   accreditation if it hadn't been corrected?
14          A    It could.  It could, yes.
15          Q    Now, have you had a situation where a
16   school willfully violated applicable laws, and
17   there are numeral laws that apply to the
18   operation of schools nowadays.  I mean, from
19   labor laws to Title IX of the Civil Rights law
20   to you name it.  Everything applies to school
21   systems nowadays, including the trademark laws.
22   Had you ever had a situation where you've had
23   to deal with a school that willfully violated
24   the law that was applicable to the operation of
25   the school in its form?
```



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen

July 18, 2007

37

1    A    Not that I know of, not copyright
2 laws.
3    Q    Okay. If you found that a school
4 willfully violated the law, it could be a
5 federal or state law, in the area where they
6 operated, could that affect accreditation?
7    A    Right now in our standards, we're not
8 specific about requiring an institution to
9 comply with our laws because we're not aware of
10 all the laws of the states, and it's very
11 difficult to do that.
12    Q    Nor has anyone.
13    A    In fact, it's impossible.
14    Q    Nor has anyone.
15    A    But anyway, we are required as part
16 of our accreditation process to follow-up on
17 any Title IV problems that an institution has
18 with the feds, and we have done that on
19 occasion. We usually rely on them to give us
20 information about an institution where they're
21 fulfilling their responsibilities under this,
22 but there are so many other types of things.
23 Equal Opportunity things, affirmative action
24 things, these are very difficult for an
25 accreditation agency or association like ours

38

1 to make legal decisions like that on them.
2    Q    Well, if it is -- Let me ask you this
3 specific question: If it's determined by a
4 court in this proceeding that Regions
5 University willfully violated the trademark
6 laws when it changed its name from Southern
7 Christian University to Regions University, is
8 this something that could affect the school's
9 accreditation?
10    A    I really don't have an opinion that.
11 I'm not sure I can answer that because I don't
12 know how the Commission would receive that kind
13 of information.
14    Q    You don't know one way or another?
15    A    No.
16    Q    Now, who have you talked to about
17 this case, this lawsuit that we're here today
18 on?
19    A    Let's see. The only thing I've
20 talked with is we had a conference yesterday
21 and we talked about what the Commission does,
22 what its activities are, and that kind of
23 thing.
24    Q    You had a talk with Mr. Hudson and
25 your counsel --

39

1    A    Right.
2    Q    Mr. McKee?
3    A    Right
4    Q    Okay. The three of them?
5    A    Right.
6    Q    Have you ever had a conversation with
7 Mr. Hudson or any lawyer for Regions University
8 without your counsel present?
9    A    No.
10    Q    Is anybody here at your institution,
11 to your knowledge?
12    A    Yes.
13    Q    Have they had a discussion with
14 anyone at Regions University about this case?
15    A    I don't think so because we assign a
16 staff person to each institution, and I'm the
17 staff person assigned to Regions.
18    Q    And who's your normal contact as
19 being the staff person assigned to Regions?
20    A    Normal contact is John White at the
21 institution
22    Q    Have you talked to John White about
23 this litigation?
24    A    I think that he -- Well, he called me
25 and said that there was a possibility of the

40

1 deposition. Other than that . . .
2    Q    Did he ask you -- tell you what he
3 wanted you to say in the deposition?
4    A    No, he didn't. He just said that
5 there was some questioning between the names,
6 the two different institutions.
7    Q    What is your understanding of what
8 this lawsuit is about?
9    A    I don't have too much understanding
10 of what it's about. I assume that it has to do
11 with the name, use of the name.
12    Q    Anybody tell you that or you just
13 deduct that from the questions you've been
14 asked?
15    A    Well, I mean, from what John White
16 told me, that's why we're coming together for
17 this. That there was some question about the
18 use of the name.
19    Q    Are you familiar with Regions Bank?
20    A    Not at all.
21    Q    You've never seen a Regions Bank
22 sign, seen a branch bank?
23    A    I probably have. Do they have
24 branches in Atlanta?
25    Q    Do you ever recall seeing one in --



BROWN & GALLO
LLC

Telephone (404) 495-0777   (404) 876-8979
Toll Free (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen

July 18, 2007

---

41

1    You've lived in Texas recently.
2       A    No, I haven't been in Texas recently.
3    I mean, I have lived in Texas.
4       Q    Oh, I'm sorry. I thought that you —
5       A    No. I've been living in Atlanta for
6    the last 35 years.
7       Q    Over the last 35 years you living in
8    Atlanta, have you ever heard of Regions Bank?
9       A    I've heard of Regions Bank, yeah.
10      Q    Did you ever bank there?
11      A    No, I haven't.
12      Q    What occasioned you to even hear of
13   Regions Bank?
14      A    Probably commercials, advertisements.
15   I may have gone by one. I have forgotten
16   whether there was one in this area or not.
17      Q    Is it fair to conclude that you heard
18   of the name Regions long before Souther
19   Christian University ever changed their name to
20   Regions?
21      A    That's probably fair.
22      Q    Now, when you heard about this name
23   change from Southern Christian University to
24   Regions University, did you in your own mind
25   wonder whether there was some way that Regions

---

42

1    Bank was associated with or supporting Regions
2    University?
3       A    I really didn't make any connection
4    like that at all.
5       Q    If you think that — If you had a
6    school that changed its name to Wachovia
7    University, would you have any thought about
8    that whether that was appropriate or
9    inappropriate?
10      MR. MCKEE: I'm going to object to
11   the form of the question calling for
12   speculation, counsel.
13   BY MR. PATTERSON: (Resuming)
14      Q    You may answer.
15      MR. MCKEE: If you know. If you have
16   an opinion.
17      THE DEPONENT: No, I don't have an
18   opinion.
19   BY MR. PATTERSON: (Resuming)
20      Q    You don't have an opinion one way or
21   another. If a member or institution changed
22   its name to say Wachovia University or SunTrust
23   University, would you wonder that had any
24   connection with Wachovia Bank or SunTrust Bank?
25      MR. MCKEE: Same objection.

---

43

1    BY MR. PATTERSON: (Resuming)
2       Q    Would you have any thought of that?
3       A    No. I don't have an opinion.
4       Q    Do you think it would be appropriate
5    for an institution to change its name to
6    Wachovia University if it had no relationship
7    with Wachovia Bank?
8       MR. MCKEE: Same objection.
9       THE DEPONENT: I don't have any
10   opinion.
11   BY MR. PATTERSON: (Resuming)
12      Q    No opinion on that.
13   Now, has anyone at Regions University
14   or Southern Christian University ever told you
15   that they changed the name to enhance the
16   university's opportunity or enhance the
17   university's image?
18      A    I don't recall that. In fact, I
19   don't recall any details about why their name
20   was changed.
21      Q    Do you think that renaming this
22   school Regions University would enhance
23   Southern Christian University's opportunities
24   and make the school more prominent?
25      MR. MCKEE: Object to the form of the

---

44

1    question. Calls for speculation.
2    BY MR. PATTERSON: (Resuming)
3       Q    Do you have any judgement on that?
4       A    No, I don't.
5       Q    Did anyone at Southern Christian or
6    Regions ever tell you that they considered the
7    use of the name Turner University before they
8    changed their name to Regions?
9       A    I don't recall anything like that.
10      Q    Did anyone at Southern Christian or
11   Regions ever tell you that they considered the use
12   of the name Regions University
13   ever tell you that they considered the use of
14   the name Masters University before they changed
15   their name to Regions?
16      A    I don't recall that either.
17      Q    Now, you've been in the — How long
18   have you been here?
19      A    In the Commission? Since 1978.
20      Q    Since '78, okay. Have you ever come
21   across a situation where a corporation has used
22   the term "university" for its purposes, for
23   example, McDonald's University or Disney
24   University? Have you ever come across that?
25      A    I've heard of those.
26      Q    You've heard of those. They get —

---



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free    (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com




George Jackson Allen                                                July 18, 2007

45

1   You read about that in the press, though?
2        A    Right.
3        Q    And you're aware that corporations
4   often use the university as part of their
5   training program, correct?
6        A    No.
7        Q    Has this institution or any similar
8   institution -- I know you're one of four in the
9   country, I think.
10       A    Six.
11       Q    Six. One of six in the country. Has
12  this institution or any one of your sister
13  institutions ever gone through an accreditation
14  process for one of these, what I call, in-house
15  universities?
16       A    You mean a --
17       Q    Like a McDonald's University or a
18  Disney University?
19       A    In order for us to consider an
20  institution like that for accreditation, they
21  would have to offer degrees. And I'm not sure
22  --
23       Q    You've never had any such application
24  like that?
25       A    I don't think so. We have someone

46

1   who reviews applicant institutions. But as far
2   as I know, we've never had one that's -- an in-
3   house one like that, like McDonald's
4   University.
5        Q    Had you ever taken any action to try
6   to keep a company from using the term
7   "university" in connection with their employee
8   training?
9        A    Not that I know of.
10       Q    Because I think I did understand you.
11  if I understood your prior testimony correctly,
12  you had had some situations where a school that
13  does not have the proper amount of curriculum
14  and faculty sometimes try to use the name
15  university, and you will step in and tell them
16  they can't use "university" under those
17  circumstances?
18       A    Well, I think the way that's been
19  resolved is we pretty much have allowed
20  institutions to use the term "university" if
21  it's not a violation of our requirements. I
22  guess you could stretch that and say it would
23  probably not be wise for a two-year college to
24  call themselves a university. I think that
25  would be beyond the definition anybody would

47

1   probably except as a university.
2        Q    Is that something that your
3   institution would prohibit?
4        A    Well, I'm not sure because that's
5   never really come up. We never had that
6   situation where a two-year college has decided
7   it's going to call itself a university.
8        Q    Okay. I think you answered this
9   previously, but I'm not sure I heard it. How
10  many accredited -- How many schools do you
11  accredit here in the region?
12       A    It's almost 800. I get a little off
13  on the numbers. A couple fewer than that.
14       Q    And you have six, what I call, sister
15  institutions around the country. How many
16  accredited colleges are there in the United
17  States?
18       A    Oh, gee.
19       Q    Round numbers. You do close to 800.
20       A    I can guess. Yeah, we're 800. North
21  Central is about a thousand. At least 3,000.
22       Q    At least 3,000 in the country?
23       A    Yeah.
24       Q    Now, am I right in understanding that
25  SACS doesn't -- it doesn't rank universities or

48

1   monitor the academic quality of the schools
2   that it accredits, does it?
3        MR. MCKEE: Object to the form of the
4   question. You've got two questions there.
5   Ask one at a time. Rank and then academic
6   quality.
7   BY MR. PATTERSON: (Resuming)
8        Q    You don't rank -- I'll rephrase that.
9   Am I correct in understanding SACS
10  doesn't rank universities?
11       A    That's correct.
12       Q    Okay. It doesn't rank the schools
13  that it accredits?
14       A    That's right.
15       Q    And does it monitor the academic
16  quality of the schools it accredits?
17       A    That's correct.
18       Q    It does?
19       A    Yes.
20       Q    Okay. And how does it do that?
21       A    Well, we do that in several ways,
22  some of which I've already talked about. Every
23  ten years the institution goes through about a
24  two-year process of reaffirmation of
25  accreditation where they supply a compliant



BROWN & GALLO
                                        LLC

Telephone (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
       Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

49

1  certification document that's reviewed. We
2  have a site visit to the institution. They're
3  required to develop what we call a quality
4  enhancement plan that focuses on student
5  learning that we follow-up on after five years.
6  We're developing a process now where we'll have
7  a fifth year review that will be more extensive
8  than we had in the past, but we can also ask
9  for follow-up reports after this reaffirmation
10 process if there's some concern. And even if
11 the institution is in compliance with the
12 requirements, we could still ask for a follow-
13 up at this fifth year. It's called a fifth
14 year report. If we want to re-evaluate
15 something during that time frame. And, again,
16 if the institution makes any substantive
17 changes, for example, if they open an off
18 campus site, they begin distance education, if
19 they create a new level of programming, going
20 from bachelor's to master's, master's to
21 doctorate, we have evaluations of that.
22        Q   Are you familiar with various
23 publications to this? But probably one of the
24 more well known is "U.S. News and World Report".
25 ranks universities in the country and does it

50

1  once a year. Are you familiar with that
2  process?
3        A   I'm not too familiar with the
4  process. I know about the rankings because
5  institutions sometimes publicize that.
6
7        (Whereupon, Defendant's
8        Exhibit No. 6 was marked
9        for identification.)
10
11 BY MR. PATTERSON: (Resuming)
12        Q   Let me show you what has been marked
13 as Exhibit No. 6. This is something basically
14 taken off the Internet. It says, "U.S. News
15 dot com, America's best colleges of 2007." And
16 I will represent to you it talks about how they
17 go about ranking these schools for their
18 purposes. Have you ever seen anything like
19 that before?
20        A   I really haven't looked too much at
21 these particular rankings. The way I usually
22 run across them is that colleges put those in
23 their publications sometimes if they have
24 comments about the U.S. News and World Report
25 rankings. And, again, I can't comment on it

51

1  too much because I don't know how they rate
2  those.
3        Q   Sure.
4        A   I'm not familiar with their
5  requirements.
6        Q   Sure.
7        A   Though there's a list of them right
8  here apparently.
9        Q   But that is not -- I want to be
10 clear. That is not something. That is not an
11 exercise that your organization goes through?
12        A   That's right. This would not be a
13 part of our evaluation.
14        Q   Okay. So I think I'm correct in
15 reading your materials that SACS relies on the
16 truthful reporting by the schools seeking to
17 get or maintain accreditation, correct?
18        A   Partially correct. We do our own
19 exploration of things. And so we expect an
20 institution to report accurately to us, but we
21 also check things as well. We don't rely
22 completely on what the institution has
23 furnished us in our evaluations.
24        Q   So if a school represents to SACS
25 that it has a faculty that has all master's

52

1  degrees and the people teach in the areas
2  they're trained in and made those kind of
3  representations to you, those would be the kind
4  of things you'd rely on?
5        A   Well, what we do is we ask the
6  institutions to fill out a fairly detailed
7  roster of their faculty, stating exactly what
8  those credentials are, other qualifications,
9  and we usually make the judgements on the basis
10 of that, but we also, in most cases, will
11 check. In most cases, institutions will have
12 areas of their faculty that we need to check
13 on, and we'll look at the files of those
14 faculty on campus, the transcripts and so
15 forth.
16        Q   Do you monitor situations like if
17 someone has a master's in biology and they end
18 up teaching English at the college, in other
19 words, they're teaching outside of their area
20 of expertise and training, do you monitor
21 things like that?
22        A   That's the kind of thing we would
23 review at this ten-year interval and follow-up
24 on if there are any problems in that area until
25 the institution has corrected or whatever the


BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen                                    July 18, 2007

53

1    problem we noted with them.
2         Q    Would that be a problem if someone
3    was teaching out of their area of training?
4         A    It would be unless they had other
5    qualifications. If, for example, there was a
6    Nobel prize winner in biology that had a degree
7    in English, we probably wouldn't go ahead with
8    that.
9         Q    Yeah. I understand. Looking at your
10   requirements — I don't want to go through this
11   in detail because it's lengthy, but in your
12   Principles of Accreditation, the first
13   principle of accreditation was the principle of
14   integrity. We talked a little about that.
15   Section two over on page seven says, "Core
16   Requirements," and then number three gets to
17   "Comprehensive Standards," and the other gets
18   to —
19        A    Federal requirements.
20        Q    "Federal Requirements." And can
21   you just take these on at a time just in
22   layman's language. I don't want you to read
23   this to me or anything, but in layman's
24   language, what are the core requirements? Give
25   me an overview of that.

54

1         A    The core requirements are similar to
2    what we used to call the conditions of
3    eligibility back when this institution was
4    first accredited. They're very similar. They
5    are the basic requirements that an institution
6    needs to meet in order to even be considered
7    for accreditation. So those are the basic, as
8    they say, core requirements. And so these are
9    really important areas to us, and if an
10   institution has a problem with these, it's
11   going to cause a problem with their
12   reaffirmation or their accreditation.
13            And the comprehensive standards are
14   in some cases related to the core requirements,
15   but they are more specifics in those in going
16   to more detail about other areas other than the
17   core requirements.
18        Q    That kind of relate to the operation
19   of the school?
20        A    Yeah. For example, one of our core
21   requirements is you have to be in operation and
22   enrolling students. I mean, that's a basic
23   requirement.
24        Q    What about the federal requirements?
25        A    The federal requirements are labeled

55

1    that because even though they're labeled
2    federal requirements, they're our requirements.
3    But they are requirements that we have needed
4    to put into our standards because these are
5    part of the Department of Education's
6    recognition requirements. In other words, our
7    institutions need to meet these, and we need to
8    have them as part of our requirements to meet
9    the federal requirements to be re-recognized as
10   an accrediting association.
11        Q    So it basically says you're going to
12   comply with the U.S. Department of Education's
13   guidelines?
14        A    That's right. Now, some of these
15   overlap with things we have and the other areas
16   are, so they aren't completely different. We
17   just want to identify those as ones that aren't
18   federally related.
19        Q    I believe you testified that in
20   December of '06 that SACS reaffirmed Regions
21   University's accreditation, the accreditation
22   for another ten years; is that correct?
23        A    Well, as you've pointed out, we do
24   have review processes in between. So
25   officially, we don't give a number of years,

56

1    but that would be the normal cycle that they
2    would come up in the next ten years.
3         Q    But in December of 2006, they got
4    reaffirmed?
5         A    That's right.
6         Q    Okay. And do you know what fee they
7    paid to this institution as a part of that
8    application process?
9         A    Um —
10        Q    What fees are typically paid?
11        A    Yeah. There's an annual dues that's
12   paid that's based on enrollment and
13   expenditures. I don't have that formula. We
14   could get it for you, if you needed it.
15            What they do pay for is expenses that
16   are incurred when committees visit the
17   institution, but there's no special fee in
18   regard to ten-year reaffirmation of
19   accreditation.
20        Q    I want you to explain to me what was
21   done by this institution in connection with
22   this reaffirmation. First of all, start off
23   with did anyone visit there?
24        A    What we've got as part of our process
25   now is we first have what's called an off-site



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen

July 18, 2007

---

57

1  review, and as part of that, the institution
2  provides what we call a compliance
3  certification in when they provide information
4  on all of these requirements; the core
5  requirements, and the comprehensive standards.
6  They could do it somewhat electronically, they
7  could write a hard copy. That goes to a peer
8  review committee that evaluates the written
9  documents, the electronic documents, whatever
10 and makes certain recommendations or
11 suggestions of what we need to follow-up on,
12 whether they're in compliance or noncompliance
13 according to their judgement.
14     So the areas that are marked follow-
15 up, then, oh, it's probably about three or four
16 months after that we will have an on-site visit
17 where we send committee members to the campus.
18 Not the same ones, but different ones to the
19 campus to follow-up on those areas in which
20 there needs to be clarification where they're
21 concerned.
22     Q    Was there a visit made by people from
23 your institution in connection with this
24 December '06 reaffirmation?
25     A    That's correct.

58

1     Q    It was?
2     A    Yeah.
3     Q    Were you part of that group?
4     A    I was.
5     Q    How many were there?
6     A    I'm trying to recall. The minimum
7  number we usually have is about seven.
8     Q    Can you give me the names of any of
9  the individuals that accompanied you there?
10    A    I don't have the names. I can get
11 those for you, if you need them.
12    Q    How long did you stay?
13    A    We usually stay two to three days.
14 And a lot of the work is done in advance.
15    Q    And this occurred sometime prior to
16 December 2006?
17    A    Yeah. I'm trying to remember when
18 the visit was. It was probably spring of 2006,
19    Q    So if they were reaffirmed in
20 December of 2006, it would have been the spring
21 before that the visit occurred?
22    A    Yeah. That's the normal procedure.
23    Q    Okay. And do you recall what you did
24 when you came to the campus of Southern
25 Christian University?

59

1     A    Well, what the committees normally
2  do, and it's sort of hard to recall all the
3  details of each visit, but if there were areas
4  that were marked as needing clarification or
5  follow-up on, then people in our committee
6  would set up interviews with the appropriate
7  people on campus, they would look at
8  documentation. The institution has a chance to
9  respond to that first report, that off-site
10 report. So their response goes to our
11 committee members, they examine it, and they
12 will set up interviews, they'll ask for
13 documentation, and so when they get on campus,
14 they'll finalize their report after they've had
15 a chance to talk with people and look at this
16 documentation.
17    Q    And so the people that accompanied
18 you there, were they employees of this
19 institution, your institution SACS, or were
20 they employees of other institutions that you
21 would consider to be a peer?
22    A    Yeah. The only person who is an
23 employee that went was me, and the rest of them
24 were from institutions at various colleges in
25 the south. Not from Alabama. That's part of a

60

1  conflict of interest, so they were -- I guess
2  they were primarily, as I would -- with not
3  having the roster in front of me, they were
4  primarily private college people.
5     Q    Do you have records to show who went
6  to Montgomery to visit this campus?
7     A    We do.
8     Q    Is that something you could get and
9  get to your attorney?
10    A    Yeah.
11    Q    I ask that you please do that. I'm
12 going to try to circumvent the subpoena process
13 with less information if I could have it.
14    MR. McKEE: What sort of time frame
15 are you interested in having that?
16    MR. PATTERSON: Your convenience.
17    MR. McKEE: Okay. We don't need it
18 today?
19    MR. PATTERSON: Not tomorrow.
20    MR. McKEE: Okay. We'll be delighted
21 to do that.
22    MR. PATTERSON: If you could just --
23 if you could gather a list of the people
24 that went with you and the paperwork that
25 was generated by you there.



# BROWN & GALLO

LLC

Telephone (404) 495-0777  (404) 876-8979
Toll Free  (877) 495-0777  (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen

---

61

1  MR. MCKEE: I assume that that is
2  part of the request. . . . that's part of
3  the request pursuant to the subpoena that
4  we're under now. Is that a fair
5  statement?
6  MR. HUDSON: No.
7  MR. MCKEE: If that's not, then I'm
8  going to have to insist on a subpoena.
9  MR. PATTERSON: Okay.
10  MR. MCKEE: If it's not.
11  MR. HUDSON: If it's -- I mean, I'm
12  not trying to be obstructing, but it's
13  not.
14  MR. MCKEE: Okay. Then
15  MR. PATTERSON: So in order to get
16  that information, you think your client
17  would require a subpoena?
18  MR. MCKEE: I know our client
19  requires a subpoena. I mean, that is our
20  process.
21  MR. PATTERSON: Okay. All right.
22  MR. MCKEE: If it's not part of this
23  subpoena, then you're going to have to get
24  a separate one.
25  MR. PATTERSON: All right. Let me

---

62

1  just proceed in identifying what's there
2  then and we will know what that's for.
3  MR. MCKEE: Sure.
4  BY MR. PATTERSON: (Resuming)
5  Q  So you do have a roster of --
6  A  We do, yeah.
7  Q  You do have some paperwork that was
8  generated on that visit?
9  A  That's correct.
10  Q  Is there a file that contains the
11  paperwork related to that visit?
12  A  Yeah. We're in the process of
13  scanning all of our documents now. I'd have to
14  locate them. I'm not sure where it's located.
15  I think I can get that.
16  Q  And was there a report of any type
17  produced by the group that went to Montgomery
18  including you?
19  A  There wasn't a report.
20  Q  So that is something that was a part
21  of your records?
22  A  That's right.
23  Q  And was that report ultimately
24  submitted to this 77 person body that made the
25  decision about the reaffirmation?

---

63

1  A  Yeah. The process works this way:
2  We divide those 77 people up into -- usually in
3  the December meeting into five committees, and
4  their report went to one of those committees.
5  And that committee makes a recommendation and
6  then they get back together and reaffirm all of
7  these recommendations or reverse them or
8  whatever. It did go to people on the
9  Commission.
10  Q  So I understand, at the end of the
11  day, did the entire 77 person body approve
12  this?
13  A  Yes.
14  Q  Okay. I want to try to be clear on
15  what you didn't consider. Did you attend any
16  classes when you were there?
17  A  Normally our committee members don't
18  attend classes. It's more of an auditing of
19  information in the files, documentation. They
20  do interview students normally. I'm not sure.
21  They don't always do that, but usually they do.
22  Particularly with our new process that looks at
23  a student learning as a part of the process.
24  Q  Did you look at any examinations,
25  exams?

---

64

1  A  Usually in most cases, the
2  institution will provide certain outcomes
3  assessment documents that they have about what
4  students have done on this test or this test or
5  this test. I can't say that every committee
6  looks particularly at tests that are given on a
7  graduate level. In some cases, they will look
8  at graduate projects, dissertations, et cetera.
9  Again, that varies according to what concerns
10  that they might have about a particular area.
11  Q  Do you recall looking at any test or
12  exams?
13  A  I don't recall that, but it could
14  have happened.
15  Q  Do you recall checking to see if the
16  teachers had degrees in the subjects they were
17  teaching?
18  A  We did do that as part of the off-
19  site and on-site visit, as I recall.
20  Q  Did you review the admission
21  requirements of the school?
22  A  Yeah, we did.
23  Q  And when you say review the admission
24  requirements, tell me what you did to review
25  that.

---



BROWN & GALLO
LLC

Telephone (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen

July 18, 2007

---

65

1    A    Well, you know, I can't recall. Some
2  of this is reviewed by the off-site committee
3  and they get documents from the institution
4  about what their admissions policies are, what
5  type of tests, what -- do they require a high
6  school diploma, a GED, these kinds of things
7  for the undergraduate program. And in terms of
8  graduate programs, we also get similar kinds of
9  information about who they're going to be
10  admitted -- who are going to be admitted.
11    Q    Are you aware that the admission
12  requirements at Regions University for
13  applicants in excess of 20 years of age are
14  simply a high school diploma or a GED?
15    A    I'm not necessarily aware of that,
16  but if --
17    Q    That would pass SAC's minimum
18  requirements, right?
19    A    For an undergraduate program.
20    Q    Correct?
21    A    Yeah.
22    Q    As a matter of fact, any applicant
23  that's finishing high school can get admitted
24  to Regions University on the basis of a GED,
25  correct?

---

66

1    A    I'm not sure about that.
2    Q    But that would be within the minimum
3  requirements of SACS if that was the case,
4  correct?
5    A    Well, I suppose it could be a
6  judgement on the part of the Commission
7  depending on what programs we've got at the
8  institution as to whether that was appropriate.
9  But that's a general requirement that we have
10  that people should have the equivalent of a
11  high school diploma or show like a GED or have
12  some other experience in their background,
13  which would lead the institution to believe
14  that they could be successful in the program.
15    Q    The fact that Regions University is
16  accredited by SACS, do you feel like that
17  creates national recognition or recognition of
18  prominence for a school that's accredited?
19    A    Well, the only thing I can say is
20  that apparently it does because the Department
21  of Education relies on that, to expend funds,
22  to extend funds to students. And so in that
23  sense, some states do the same thing in many
24  cases. So that's one of the purposes
25  accreditation serves. It's not the original

---

67

1    purpose we have. The original purpose is to
2  establish standards. In those days, there
3  wasn't that kind of money that flowed, but as
4  time went on, more and more of that became a
5  standard for receiving federal funds and state
6  funds.
7    Q    And I think you said you're vice
8  president of Commission on Colleges?
9    A    Right. We have seven or eight of us.
10    Q    Just in layman's terms, what do you
11  do? Tell me what you do on a daily basis.
12    A    Okay. There are a number of us that
13  have that same title and what we do is we serve
14  as a contact person for perhaps 70 or 80
15  institutions. And when those institutions go
16  through the accreditation process, we serve as
17  a liaison with the institution. We are there
18  for advising them as the process moves on. We
19  also will develop a committee that will visit
20  that institution.
21    And so we just -- We oversee the
22  process on the side and are there as a presence
23  when the committee comes, but, again, we're not
24  part of the peer review process. We just
25  coordinate and facilitate it.

---

68

1    Q    Do you know what peers accompanied
2  you on that trip?
3    A    No. That's what I answered before.
4    Q    I know you don't know the individual
5  names, but do you know what representatives of
6  what other schools?
7    A    I would really have to look at the
8  roster of the committee members.
9    Q    Okay.
10    A    We have so many committees it's a
11  little bit difficult to remember.
12    Q    Okay. What is your educational
13  background?
14    A    I have a bachelor's degree in history
15  from the University of South Florida. Also, a
16  master's degree in social science from the
17  University of South Florida and a PhD in
18  history from Georgia State University here in
19  Atlanta.
20    MR. PATTERSON: I believe I am done.
21  I may have -- Let me review my notes, and
22  I think we're done.
23    MR. MCKEE: Do you want to take a bit
24  of time? Do you want to take a break?
25    MR. PATTERSON: Take a quick break.

---

# BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen

July 18, 2007

69

1    THE VIDEOGRAPHER: Off the record.
2
3    (Whereupon, a short break was taken.)
4
5    THE VIDEOGRAPHER: 10:51. Back on
6    the record.
7    BY MR. PATTERSON: (Resuming)
8    Q    Let me draw your attention on your
9    visit in sometime during 2006 related to the
10    reaffirmation of Regions University.
11    A    This just may have been 2005. I'd
12    have to check.
13    Q    Well, 2005, 2006. At either one of
14    those times, the trip was occasioned by the
15    reaffirmation process for Regions University?
16    A    That's right.
17    Q    And you came to Montgomery. And you
18    think you spent a couple of days there?
19    A    Yeah. We also looked at, I think a
20    substantive change there for the graduate
21    program, the PhD program in marriage and family
22    therapy.
23    Q    Okay. You've got some papers there
24    in front of you and a computer in front of you.
25    Do you have any papers with you that would shed

70

1    any light on what you did or who went with you?
2    A    I don't. That's the one you wanted
3    a subpoena on?
4    MR. MCKEE: If you're referring to
5    them now, then I think he has a right to
6    look at them, but if they aren't something
7    you're referring to in response to that
8    question, we're going to need a subpoena
9    on that.
10    BY MR. PATTERSON: (Resuming)
11    Q    What papers do you have here with you
12    today?
13    A    Um. I've got
14    Q    Just generally describe them to me.
15    A    I've got something called C&R
16    actions, which is a committee on criteria and
17    reports. That's part of the Commission I
18    mentioned that there are five committees
19    usually in December that review these. There
20    are called committees on criteria and reports.
21    These are the actions.
22    Q    Do any of these relate to Regions
23    University?
24    A    Yeah. These are the Regions
25    University actions here.

71

1    Q    And when you say actions, this is
2    when they're trying to change their curriculum
3    to get approved for different things?
4    A    Well, there are various things here
5    that have to do with the reaffirmation of
6    accreditation and the new program.
7    Q    Could you fish out for me what has to
8    do with the reaccreditation and let me take a
9    look at that?
10    MR. MCKEE: You can do that. Since
11    you brought that here to refer to it, I
12    think that's covered by the subpoena.
13    THE DEPONENT: These are the last
14    actions since 1994.
15    MR. PATTERSON: Do you want to go off
16    the record now and have both of us look at
17    that?
18    THE VIDEOGRAPHER: Off the record.
19    THE DEPONENT: Now, these
20    MR. MCKEE: Wait a second, Jack.
21    We're off the record.
22    MR. PATTERSON: Let me identify them
23    and then we
24    MR. MCKEE: Yes, of course.
25    MR. PATTERSON: Go ahead and stay on.

72

1    BY MR. PATTERSON: (Resuming)
2    Q    Go ahead. You were going to say
3    something?
4    A    These are essentially the minutes.
5    These aren't the official letters that we send
6    out. They're just minutes. And so we keep
7    those as a record in our Institutional
8    directory that we head up. And I think if you
9    note that the date was for reaffirmation was
10    2005 rather than 2006, as I recalled.
11    Q    What other documents do you have here
12    with you today?
13    A    There's some documents that have to
14    do with substantive changes.
15    Q    These documents relate to Regions
16    University?
17    A    They do.
18    MR. PATTERSON: Well, I think we do
19    need to take a break and we do need to
20    look at these documents. Let me try to
21    finish with my questioning, just to button
22    up initial questioning, and then we'll
23    take a break and Tom and I will look
24    through the documents to see if there's
25    anything else here.


BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen

July 18, 2007

73

1   THE DEPONENT: Now, this document is
2   not their official file. This is what we
3   call the blue file, and some of the
4   documents that pertain to Regions are not
5   in this. So it may be kind of spotty. I
6   mean, not everything is in there. And
7   some of those may be in the process of
8   being scanned. I'm not sure.
9   BY MR. PATTERSON: (Resuming)
10  Q   Well, regarding your visit, do you
11  recall whether or not either you or any of the
12  people with you actually attended a classroom
13  setting to observe the rigor of the classes?
14  MR. MCKEE: Asked and answered.
15  THE DEPONENT: Huh?
16  MR. MCKEE: Object to the form of the
17  question. Asked and answered. Go ahead
18  and answer.
19  BY MR. PATTERSON: (Resuming)
20  Q   Go ahead. You can answer.
21  A   As far as I know, I really not sure
22  who visited what. The usual procedure is not
23  to visit classrooms primarily because it's an
24  artificial situation. It's not the normal
25  routine for the institution, and the class

74

1   function may be a little bit different.
2   Q   Does your organization even attempt
3   to monitor the rigor of classes and how tough
4   the courses are and that kind of thing?
5   A   What we do is we rely on the
6   institutions to provide us information on,
7   first, the goals of the program, the objectives
8   of the program, how they appear to be achieving
9   those goals, but we don't rely on that solely.
10  We rely on faculty, qualifications. If they've
11  got appropriately qualified faculty, we assume
12  that some -- those courses are going to be a
13  function of their abilities and their advanced
14  degrees and so forth. But we do -- That's
15  ultimately what we're interested in is student
16  learning. I mean, that's the focus of all of
17  this, whether it's -- whether it involves
18  governments, whether it involves a library,
19  whether it involves finances. Ultimately we
20  are concerned about the results of education
21  and that's where our focus I think is primarily
22  right now.
23  Q   But to be clear about your specific
24  visit there, am I correct in understanding that
25  you don't recall whether or not you observed

75

1   any classroom activity?
2   A   I don't recall that.
3   Q   Either way?
4   A   Either way.
5   Q   Okay. Now, do you recall either way
6   whether or not anybody in your group that went
7   there reviewed the ACT, SAT, or GED scores of
8   the enrolled students?
9   A   I'm not sure whether that was part of
10  the compliance review, which certification was
11  just an off-site review we had or whether they
12  looked at that on campus. I'm not sure.
13  Q   Okay. Do you recall doing anything
14  like that?
15  A   No.
16
17  (Whereupon, Defendant's
18  Exhibit Nos. 7 and 8 were
19  marked for identification)
20  ---
21  BY MR. PATTERSON: (Resuming)
22  Q   If I can get you to identify what's
23  been marked Exhibit 8. Is this an application
24  for membership for your organization? Is that
25  the form that needs to be filled out when

76

1   people apply for accreditation or either
2   reaffirmation?
3   A   Yeah. I think this is also used for
4   a change in level, if they go from bachelor's
5   to master's, master's to doctorate. I think
6   this is the current form.
7   Q   And then I'm going to show you what's
8   been marked Exhibit 7. And this, I'll
9   represent to you, is a list of accredited
10  institutions as of January of 2007. Is that --
11  Can you identify that for me?
12  A   Is this taken from our website? I
13  assume this is --
14  Q   And what I'm trying to establish, to
15  your knowledge, is that the schools that you
16  have received your accreditation from?
17  A   That looks to be them.
18  MR. PATTERSON: Tom, how do you --
19  I'm done questioning him. And subject to
20  that, do you want to take a quick look at
21  these documents and we'll be done?
22  MR. HUDSON: Yeah. I'm going to have
23  a little cross-examination. Not much, but --
24
25  MR. PATTERSON: Do you want to review



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen

July 18, 2007

77

1  these documents while you're --
2  MR. HUDSON: No. Let's do the
3  documents first and then go back to it.
4  MR. PATTERSON: Let's take a break.
5  THE VIDEOGRAPHER: Off the record.
6  - - -
7  (Whereupon, a short break was taken)
8
9  THE VIDEOGRAPHER: 11:16. Back on
10 the record.
11 BY MR. PATTERSON: (Resuming)
12 Q.  Dr. Allen, can you tell me who James
13 T. Rogers is?
14 A.  Jim Rogers was our former -- At that
15 time, we called him the executive director of
16 the Commission. The title was changed to
17 president of the Commission, which is Belle
18 Wheelen's position now. He was the formal one
19 up until about three years ago.
20 Q.  Did he have any role in the
21 reaffirmation of the accreditation?
22 A.  No. Other than being executive
23 director of the Commission, which was an
24 oversight type of position, executive position.
25 He wasn't in contact with the institution or

78

1  did he play a role in reaffirmation.
2  Q.  In response to the deposition notice
3  today, you have produced a stack of papers I'm
4  holding in my hand consisting of a number of
5  pages. You've also produced a document that's
6  contained in a blue folder -- several documents
7  contained in a blue folder. What is that blue
8  folder? What do you call it?
9  A.  We call this a blue file. It's not
10 an official file of documents, but it enables
11 the staff person to sort of keep track of
12 what's going on. The official file is a file
13 that goes into what we call the back files, or
14 the black files, and that contains all the
15 official correspondence with the institution
16 and so forth. We also maintain the committee
17 reports. We're required to do that for ten
18 years.
19 Q.  So if we sent you a subpoena asking
20 for the official files, or the black files, you
21 would know what I'm talking about?
22 A.  Yeah.
23 Q.  What we would like today is get a
24 copy of your -- And we don't have to take it
25 with us today. We ask that this blue file be

79

1  copied, to identify to be copied, and also
2  these documents that I'm holding, the other set
3  of documents that you came in here today just
4  be copied and furnished to us. We will be glad
5  to reimburse for any copying expense.
6  Before I conclude, I do have a
7  question on some of the documents I'm holding.
8  There is an e-mail, and it's got some names on
9  the e-mail. One, two, three, four, five
10 people. Can you tell me what this is?
11 A.  Oh, yeah. This is not actually an e-
12 mail. It's something I copied today. These
13 are the representatives on the Commission from
14 Alabama because I thought maybe that might be a
15 question you might ask. And so these are the
16 people on the Commission from Alabama. Mark
17 Foley from the University of Mobile is on the
18 executive council, which is the one person from
19 each state. So it's not really an e-mail.
20 It's just a copy I made today.
21 Q.  Did these individuals, Mark Foley,
22 Joe Lee, Michele Gerlach, James Krudop, Bruce
23 Murphy have anything to do with the
24 reaffirmation of Regions University?
25 A.  Well, that happened in December of

80

1  2005. You know, and I'd have to go back and
2  check to see which of those folks were actually
3  on the Commission at that point. If they were
4  on the Commission -- Here's what happens. When
5  those votes come before the Commission about
6  the reaffirmation of an institution, we
7  automatically recuse people from the state. So
8  they would have had no vote on that particular
9  item that the Commission reviewed.
10 Q.  You also have in front of you a
11 computer.
12 A.  Correct.
13 Q.  Do you have any information in your
14 computer that's before you today that will shed
15 any light on who the individuals were that
16 accompanied you to Montgomery in 2005?
17 A.  It's possible. I can check and see.
18 That's why I brought it, but . . .
19 Q.  Can you look and see if you can find
20 out and tell me who went with you? And I guess
21 are there any -- A secondary question is are
22 there any documents that are stored in that
23 computer that relate to that 2005 visit by this
24 institution to Regions University? And if so,
25 just tell us about them.



BROWN & GALLO
LLC

Telephone (404) 495-0777  (404) 876-8979
Toll Free  (877) 495-0777  (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

81
1    MR. MCKEE: Why don't you go ahead
2    and answer. Let's answer one question at
3    a time.
4    BY MR. PATTERSON: (Resuming)
5    Q    Search your computer and tell us if
6    any of those individuals -- if you can recall
7    any of the individuals that accompanied you
8    MR. MCKEE: Do you mind going off the
9    record while he does that?
10   MR. PATTERSON: No. Let's go off.
11   THE VIDEOGRAPHER: Off the record.
12   - - -
13   (Whereupon, a short break was taken)
14   - - -
15   THE VIDEOGRAPHER: 11:26. Back on
16   the record.
17   BY MR. PATTERSON: (Resuming)
18   Q    Dr. Allen, we asked you during the
19   break to please give us -- if you could access
20   your computer and tell us the names of the
21   individuals that accompanied you to Montgomery
22   in 2005 regarding the Regions University
23   reaffirmation.
24   A    Okay. Now, this is my electronic
25   record. I assume this is the final roster. It

82
1    looks like it is. Carl Hunt.
2    Q    Read them slowly for the court
3    reporter.
4    A    Okay. Carle Hunt. That's C-a-r-l-e
5    Hunt. He was the chair of the committee. He's
6    from, strangely enough, Regent University.
7    Q    R-e-g-e-n-t?
8    A    Right.
9    Q    All right. Where is that located?
10   A    That's in Virginia Beach, Virginia.
11   Q    Go ahead.
12   A    Christopher Bean, B-e-a-n from
13   Shennandoah University in Virginia. Pamela
14   Bell, B-e-l-l, Strayer University online.
15   Q    S-l-r-a?
16   A    S-t-r-a-y-e-r University online.
17   This is in Virginia. Linda Bridges, B-r-i-d-g-
18   e-s, Wake Forest University in North Carolina.
19   Sara Connor, C-o-n-n-o-r. She's with the Board
20   of Regents in Georgia. There's another Connor
21   on the committee, too. Don't confuse those.
22   Susan Connor, who is at Florida Southern
23   College in Florida. Let's see. Linda
24   Peterson, P-e-t-e-r-s-o-n, from Barry
25   University, B-a-r-r-y, University in Florida.

83
1    William Hyndman, H-y-n-d-m-a-n, who is with
2    Crown College in Minnesota. Bruce Moore, M-o-
3    o-r-e from Gardner Webb University. That's G-
4    a-r-d-n-e-r, W-e-b-b University in North
5    Carolina. And Cerla Myers, M-y-e-r-s at
6    Georgia State University in Atlanta. I think
7    that's all of them. Yeah, that's it.
8    Q    That's a total of ten people. Did
9    you accompany all ten of those people to come
10   to Montgomery, Alabama?
11   A    I did.
12   Q    Do you remember where you stayed
13   there?
14   A    I'm not sure what hotel we stayed in.
15   Q    But all of you came there?
16   A    Yeah. Well, I'd have to check
17   because sometimes these rosters change at the
18   last minute. I think this is the final one
19   that we have. I'd need to check that to see.
20   Q    Do you think you spent more than two
21   nights there?
22   A    Typically we would come in on one
23   day, be there the next day, and either leave
24   afternoon of the following day or the morning
25   of the next day. So there would be at least

84
1    two days there.
2    Q    Do you have any records of any
3    expenses? I think you said that the school
4    that's being looked at picks up the expenses
5    for this entourage --
6    A    That's right.
7    Q    -- to come in. Do you have any
8    notations in your records that you could give
9    me?
10   A    I wouldn't have that in mine. Our
11   business office keeps track of all that.
12   Q    But things like meals and out-of-
13   pocket incidentals to traveling is something
14   the institution pays for?
15   A    The normal process is that we give
16   each committee member an expense voucher. They
17   put their flight expenses on there with
18   receipts. If they incur any meal costs, they
19   put those on there. Normally the institution
20   will pick up the hotel bill, essentially bill
21   it. I -- If I go with the committee out to
22   eat, I'll pick up those bills and put those on
23   my expense voucher. And then at that time, I
24   believe, the chair of the committee gets a
25   hundred dollars as a miscellaneous expense


BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen

85

1  ~~allowance, and the committee members got fifty~~
2  ~~dollars. I believe that was in place at the~~
3  ~~time.~~
4      ~~Q   The financial records relating to~~
5  ~~that visit would be -- would they be in that~~
6  ~~black file that we talked about earlier?~~
7      ~~A   No, it wouldn't be. They would be~~
8  ~~with our business office.~~
9
10            ~~(Whereupon, Defendant's~~
11            ~~Exhibit Nos. 9 and 10 were~~
12            ~~marked for identification)~~
13
14  ~~BY MR. PATTERSON: (Resuming)~~
15     ~~Q   You have also produced here today a~~
16  ~~document -- several documents that include --~~
17  ~~enclose what we have referred to all day as a~~
18  ~~blue file, and the blue file is there in front~~
19  ~~of you. I've marked that as Exhibit No. 10 and~~
20  ~~ask that it be -- the original be copied and~~
21  ~~the copy attached to the deposition.~~
22     ~~Also, No. 9 is a -- Exhibit No. 9 is~~
23  ~~a group of documents that you produced that~~
24  ~~appear to be in no particular order, but~~
25  ~~they're just loose papers that were produced~~

86

1  ~~here pursuant to your Notice of Deposition and~~
2  ~~subpoena. Some of which we've talked about,~~
3  ~~and some we have not. So if you would do that~~
4  ~~and accommodate us with these copies.~~
5        ~~MR. HUDSON: Now, the copies you~~
6     ~~wanted, are they the ones marked in green?~~
7        ~~MR. PATTERSON: No. Do not attach~~
8     ~~any significance to what's marked in~~
9     ~~green. That was marked before we figured~~
10    ~~the best thing to do was have them all.~~
11    ~~And I don't have anymore questions,~~
12    ~~Tom, if you have some.~~
13       ~~MR. HUDSON: Just a few.~~
14
15       CROSS-EXAMINATION
16  BY MR. HUDSON:
17     Q   Dr. Allen, in the course of Mr.
18  Patterson's interrogation, he asked about
19  whether integrity was the pillar or the
20  cornerstone of the accreditation process. Do
21  you recall that testimony?
22     A   Yes, I do.
23     Q   And, in fact, is it a cornerstone?
24     A   It is.
25     Q   And is the continued integrity of an

87

1  institution necessary to continue to be
2  accredited?
3     A   That's correct.
4     Q   And was that taken in -- Was the
5  integrity of Regions University taken into
6  account during this reaffirmation of
7  accreditation process that occurred in 2005?
8     A   It was.
9     Q   And is it taken into account on an
10  ongoing basis even up through today?
11    A   That's correct.
12    Q   And are there . . . are there any
13  accredited institutions that have over the
14  years lost their accreditation because of
15  integrity issues?
16    A   The one I can think of is Edward
17  Waters College in Florida. There was an
18  integrity issue. I don't think they eventually
19  lost their accreditation, but I think that the
20  Commission had to make -- voted to drop them
21  from membership.
22    Q   Have other been, for one reason or
23  the other, dropped from membership by the
24  Commission?
25    A   On integrity issues?

88

1     Q   On any issue.
2     A   Oh, yeah.
3     Q   Can you give us examples of those who
4  have been dropped?
5     A   Morris Brown College in Atlanta,
6  Knoxville College in Tennessee, Mary Holmes
7  College in Mississippi, St. Andrews
8  Presbyterian College, which was just dropped at
9  our recent annual meeting. Those are the ones
10  that come to mind, recent ones. There was
11  another one in Mississippi. The one in Georgia
12  was Hiawasee College.
13    Q   Have there been colleges or
14  institutions placed -- Strike that.
15       Have there been institutions placed
16  on suspension?
17    A   Yeah. Numerous institutions have had
18  -- We don't call it suspension. We would say
19  either they've been placed on warning or
20  probation. They still retain their
21  accreditation, but those are both sanctions.
22    Q   Can you give me an example of some of
23  them?
24    A   University of Texas, Georgia Tech.
25  Let's see. There are a number of other



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen                                            July 18, 2007

89

1   institutions. I'd have to consult a list, but
2   a number of them have been placed on warning or
3   probation.
4        Q   I'm just asking you the ones that
5   come to mind.
6        A   Yeah.
7        Q   Now --
8        A   These are the ones that I happen to
9   be assigned to.
10        Q   That you personally were assigned to
21   them?
12        A   Yeah.
13        Q   Now, as I understand this process,
14   SACS and the Commission on Colleges deals with
15   the accreditation of institutions that apply;
16   is that correct?
17        A   Uh-huh (affirmative).
18        Q   And does the Commission on Colleges
19   and both SACS seek to enforce whether or not a
20   corporate training program, such as McDonald's
21   University, improperly uses the name university
22   in its name?
23        A   Now, I don't know of any instance
24   where the Commission on Colleges has entered
25   into that type of action to force somebody

91

1   goes back and forth is not really things that
2   we'd want to keep forever.
3        Q   Yes.
4        A   I mean, if we're just talking about
5   arrangement for a committee visit, we wouldn't
6   put that in that file.
7        Q   So would it be fair to characterize
8   the black file in part as evidence of the due
9   diligence that was performed by SACS and to
10   ensure that Regions University was properly
11   reaffirmed for its accreditation?
12             MR. MCKEE:  Object to form.  You can
13   answer.
14             MR. HUDSON:  No, he can't either.
15   I've already asked him.
16   BY MR. HUDSON:  (Resuming)
17        Q   Can you point to examples of due
18   diligence that was utilized by SACS or the
19   College of -- Commission on Colleges in order
20   to determine whether the reaffirmation for
21   accreditation in 2005 of Regions University was
22   appropriate?
23        A   Well, I think we have a record of the
24   correspondence that goes back and forth between
25   the Commission and the institution.  We have a

90

1   outside of -- We have probably no legal way to
2   do that.  I don't know.
3        Q   No jurisdiction that you're aware of?
4        A   No jurisdiction.  Our jurisdiction is
5   over our own institutions and not over other
6   institutions.
7        Q   And matters that involve enforcement
8   of the laws of the various states are those
9   things that SACS and the Commission on Colleges
10   leaves to the state to enforce?
11        A   Yeah.  That's our usual procedure is
12   to leave those.
13        Q   We have looked at briefly what has
14   been marked as 9 and 10.  We've heard a
15   description of the blue file and the black
16   file.  My understanding is that the blue file
17   is an incomplete rendition of the black file
18   and the black file itself relates in whole or
19   substantial part to the reaffirmation for
20   accreditation for Regions University in 2005.
21   Am I correct in that understanding?
22        A   The black file would contain all the
23   official actions on that and the letters of
24   correspondence that go back and forth between
25   the institutions.  Some correspondance that

92

1   record of what they've submitted to us in terms
2   of responses to any areas that we wanted
3   followed up on.  I think you would find that in
4   the record, if you looked at it.  And certainly
5   we've had a committee there, we followed up on
6   those reports from the committee, and I think
7   the last report we asked from them was due
8   before our meeting in December 2006.  And at
9   that time, they had satisfied all of the
10   concerns that the Commission had in terms of
11   follow up.
12        Q   Jack, would you hand me Exhibit 10
13   please for a moment?
14   By way of example, would you --
15             MR. HUDSON:  Well, you took the green
16   tags off.  I didn't ask you not to.
17   BY MR. HUDSON:  (Resuming)
18        Q   But by way of example, when the
19   committee visits, would it identify concerns
20   and questions that it might have?
21        A   That's correct.
22        Q   All right.  And is that one of the
23   purposes of the visit?
24        A   It is.
25        Q   And are those then addressed to the



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen

July 18, 2007

### 93

1 institution?
2 A What typically happens is that we
3 have an off-site review. If there are some
4 areas that need clarification, those are
5 pointed out by the off-site team. And so those
6 are the areas that our on-site team
7 concentrates on. And so each member of that
8 committee may have his or her own questions
9 that they would like the institution to respond
10 to, and the institution has a chance to respond
11 to the off-site report anyway. So but if there
12 are additional things that they might want,
13 they have the opportunity to call up the
14 institution, ask for documentation, have things
15 explained to them, and to set up interviews
16 with appropriate people when they come on
17 campus.
18 Q And by way of example, I'm looking at
19 a letter dated April 6th, 2005 from James T.
20 Rogers. That would be Dr. Turner. I'll show
21 it to you. But what it refers to is -- in
22 particular is a professor who is teaching a
23 marketing course and asking about her
24 qualifications to do that and then there's a
25 February 24, 2005 letter that seems to discuss

### 94

1 the same thing, and there are other within
2 this. This is a thick file, and I haven't
3 isolated it. Just look at them quickly. I
4 guess my question is for your general.
5 A This is a substantive change
6 application for a new program, bachelor of
7 science and business administration. And
8 typically what happens is that we have a number
9 of people in our office that review those, and
10 if they have questions about any aspect of the
11 prospectus, whether it's somebody's
12 qualifications to teach, whether it's library,
13 finances, or whatever, they just ask for some
14 follow-up on only this. And I think this is what
15 this is because it's one of these .... one of
16 these asks for further response to some
17 questions that they had. That's February 24th.
18 And then there's an April 6th letter, I think,
19 asking for some further information.
20 Q All right.
21 A So that's a typical type of thing
22 that we go through when we get these
23 applications or prospectuses for substantive
24 change or adding significantly different
25 programs.

### 95

1 Q And would that also be the sort of
2 thing or the kind of thing, the kind of
3 questions that may be raised during a
4 reaffirmation process?
5 A Exactly, yes.
6 Q And you raise questions and seek
7 answers that are satisfactory?
8 A That's right.
9 Q And if the answers are satisfactory,
10 is then the accreditation reaffirmed?
11 A Typically what happens is when we
12 have an accreditation visit or reaffirmation
13 visit, the ten-year visit like we had at
14 Regions, they have five months to respond to
15 that particular report. Assuming if there are
16 recommendations in the report. Now,
17 recommendation in our scheme of things is an
18 area that an institution has to follow up on.
19 That might be a problem then. And so they have
20 five months to respond to it. They respond,
21 that goes to the Commission, and then there
22 might be further follow-up on that particular
23 area.
24 Q You mentioned in your testimony that
25 one of the things that SACS looks at is with

### 96

1 regard to the students' outcome assessment.
2 Now, would you tell us what outcome assessment
3 is?
4 A What we ask in our standards -- And
5 this is probably common to all the accrediting
6 associations now -- is that in addition to
7 having those elements that we all agree are
8 part of a collegiate experience and are
9 necessary, faculty, library, money, and these
10 kinds of things, that the institution also look
11 at systematically how they achieve student
12 success, student learning. How do they measure
13 this in some way? How do they -- And that
14 involves goal setting, for not only in classes,
15 but also for programs. And that we ask them to
16 show us how they do this.
17 And then, of course, we have to make
18 a basic judgement, and all of our committees
19 have to do this. Is it collegiate level? We
20 don't have any quantifying things to say about
21 this or test that they ought to pass, but there
22 needs to be a basic judgement that this is
23 collegiate level. And it's the institution's
24 responsibility to demonstrate this. Not only
25 through their curriculum, but what the students

BROWN & GALLO
LLC

Telephone (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

George Jackson Allen                                      July 18, 2007

97

1  have done in it, and we ask them to show us
2  that. Not only that, but we also ask if they
3  have this same process for their administrative
4  areas. We ask that the student affairs area
5  have goals and objectives and they measure
6  whether they've achieved these outcomes.
7        We also have requirements in there
8  that faculty be evaluated. We have
9  requirements that administrators be evaluated,
10  including the president. So there's a lot of
11  evaluative kinds of things going on. Not that
12  we're going to prescribe any particular test or
13  any score on a particular test, but the
14  institution is asked to demonstrate those
15  things.
16        Q    And asked to demonstrate those things
17  to its peers?
18        A    To its peers.
19        Q    And its peers are these people, 77
20  people who appear on Exhibit 3, 70 percent of
21  which are college presidents?
22        A    Right. And the type of people would
23  also appear on that roster of members it
24  visited there.
25        MR. HUDSON: I have no further

99

1   EXHIBITS
2       Defendant's  1 - page 10
3       Defendant's  2 - page 12
4       Defendant's  3 - page 16
5       Defendant's  4 - page 29
6       Defendant's  5 - page 30
7       Defendant's  6 - page 51
8       Defendant's  7 - page 76
9       Defendant's  8 - page 76
10      Defendant's  9 - page 86
11      Defendant's 10 - page 86

98

1  questions. Thank you, sir.
2        MR. PATTERSON: No further questions
3  here. Thank you, sir.
4        THE VIDEOGRAPHER: Off the record.
5        - - -
6        (Whereupon, the deposition was
7  concluded at 11:46 a.m.)
8        - - -

100

1                CERTIFICATE
2
3  STATE OF GEORGIA    )
4  COUNTY OF FAYETTE   )
5
6        I hereby certify that the foregoing
7  deposition was taken down, as stated in the caption,
8  and the questions and the answers thereto were
9  reduced to typewriting by me; that the foregoing
10  ____ pages represent a true, correct, and complete
11  transcript of the evidence given by the deponent,
12  who was first duly sworn by me; that I am not a
13  relative, employee, attorney, or counsel of any of
14  the parties; am not a relative or employee of
15  attorney or counsel for any of said parties; that I
16  have no contract with either party nor am I
17  financially interested in the action.
18
19        This, the 30th day of July 2007.
20
21
22
23  _____
    Debra C. Verrill
24  Certified Court Reporter
25  Certificate B-2304



BROWN & GALLO
                              LLC
Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

```
1              IN THE UNITED STATES DISTRICT COURT

2                          FOR  THE

3                  MIDDLE DISTRICT OF ALABAMA

4                       NORTHERN DIVISION

5

6

7    REGIONS ASSET COMPANY,        *

                                   *

8              Plaintiff,          *

                                   *

9    Vs.                           *   CIVIL ACTION NUMBER

                                   *

10   REGIONS UNIVERSITY, INC.,     *     2:06cv882-MHT

                                   *

11             Defendant.          *

12

13

14

15

16      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

17

18          Deposition of JANET ARMITAGE, taken before

19      David Michael Camp, CSR, in the law offices of

20      Balch & Bingham, LLP, 1901 6th Avenue North,

21      Birmingham, Alabama, on August 14, 2007,

22      commencing at approximately 12:31 o'clock p.m.

23
```

```
 1                    A P P E A R A N C E S
 2
 3         For Plaintiff:
               STEPTOE & JOHNSON, LLP
 4             Attorneys at Law
               1330 Connecticut Avenue
 5             Washington, D.C. 20036
               (202) 429-3000
 6             BY: WILLIAM G. PECAU
 7
 8
 9         For Defendant:
               HUDSON & WATTS, L.L.P.
10             Attorneys at Law
               One St. Louis Centre, Suite 2500
11             Post Office Box 989
               Mobile, Alabama  36601
12             (251) 432-7200
               BY: VICTOR T. HUDSON
13
14
15
           Also present: REX A. TURNER, JR.
16
17
                    * * * * * * * * * *
18
19
20
21
22
23
```

```
 1                  I N D E X

 2      Witness

        JANET ARMITAGE

 3

 4                  EXAMINATION

 5   MR. HUDSON  ............................    6

 6   MARKED QUESTION .............. Page 30, Line 23

 7               * * * * * * * * *

 8

 9

10                  EXHIBITS

11   DEFENDANT'S EXHIBIT ONE THIRTY-EIGHT  .....   39

12               * * * * * * * * * *

13

14

15

16

17

18

19

20

21

22

23
```

1                          STIPULATION

2          It is stipulated by and between the parties

3    hereto and their respective attorneys at law that

4    the deposition on oral examination of the Witness,

5    JANET ARMITAGE, may be taken before David Michael

6    Camp, Commissioner and Notary Public, State of

7    Alabama at Large, and that the said deposition

8    shall be taken in accordance with and, when so

9    taken, may be used in accordance with the

10   provisions of the Federal Rules of Civil

11   Procedure.

12         It is further stipulated and agreed that all

13   notices provided for by said Federal Rules of

14   Civil Procedure are waived, as is the reading over

15   of said deposition to or by the witness, the

16   signing thereof by the witness, the signing and

17   certification of said David Michael Camp, the

18   filing of said deposition with the Clerk of the

19   Court and all other requirements and

20   technicalities of every sort which would be a

21   prerequisite to the use of said deposition.

22         It is the intent of the parties hereto that

23   this deposition may be used in evidence as though

1    all requirements of said Federal Rules of Civil

2    Procedure had been complied with.

3        It is further stipulated and agreed that all

4    parties hereto reserve the right to have

5    corrections made to this deposition as provided

6    for by said Federal Rules of Civil Procedure.

7        It is further stipulated and agreed that all

8    objections, save as to the form of the questions

9    asked and the responsiveness of the answers

10    thereto are reserved until the time of trial in

11    accordance with the provisions of said Federal

12    Rules of Civil Procedure.

13

14                    * * * * * * * * * * *

15

16

17

18

19

20

21

22

23

```
1               JANET ARMITAGE, having been first duly sworn

2          to speak the truth, the whole truth, and nothing

3          but the truth, testified as follows:

4                              EXAMINATION

5      BY MR. HUDSON:

6          Q    Would you please state your name for the

7     record?

8          A    Janet Armitage.

9          Q    Where are you employed, Ms. Armitage?

10         A    I'm employed by Regions Asset Company.

11         Q    Is it Mrs. or Ms.?

12         A    It's Ms.

13         Q    In what capacity are you employed?

14         A    I'm the president of Regions Asset

15    Company.

16         Q    How long have you held that position?

17         A    One year.

18         Q    For whom did you work prior to becoming

19    the president of Regions Asset Company.

20         A    For four years, I was a stay-at-home

21    mom.  Before that, I worked for Deutsche Bank

22    Securities.  And before that, I worked for the

23    Chase Manhattan Bank.
```

1    ~~Q    In your earlier experience, did you have~~

2    ~~any experience that was the same or similar to~~

3    ~~your present job?~~

4    ~~A    In my Deutsche Bank job, I had an~~

5    ~~oversight role that oversaw the equities trading~~

6    ~~businesses in North America.~~

7    ~~Q    I'm trying to make this short for you if~~

8    ~~I can.~~

9    ~~A    Uh-huh.~~

10         Q    Tell me what your job responsibilities

11    as president of Regions Asset Company are.

12         A    We do maintenance and registration of

13    all the trademarks.  I work with outside counsel

14    and our internal IP counsel on protest letters.

15    We also do evaluation of the trademarks held by

16    Regions Asset Company.

17         And we license the intellectual property for

18    use by Regions Bank and Regions Financial

19    Corporation, and we have some third party

20    licenses.

21    ~~Q    Have you reviewed those licenses in~~

22    ~~preparation for your deposition today?~~

23    ~~A    The licenses with Regions Bank and~~

1   ~~Regions Financial Corporation?~~

2   ~~Q    Yes, as well as the third-party~~

3   ~~licenses.~~

4   ~~A    Not in preparation for this deposition.~~

5   ~~Q    Did you assist in collecting them so~~

6   ~~that they could be produced in this litigation?~~

7   ~~A    Yes.~~

8   ~~Q    And have they all been produced?~~

9   ~~A    The ones I was asked to produce are the~~

10  ~~Regions Bank and Regions Financial Corporation~~

11  ~~licenses.~~

12  ~~Q    Okay.~~

13  ~~A    And I believe they've been produced.~~

14       Q     What other third party licenses are

15  there?

16       A     We have some sponsorships with sports

17  arenas and we have some licenses with some

18  suppliers, I think, property developers.

19       Q     Licenses with suppliers and property --

20       A     Well, maybe not suppliers.  With some --

21  some of our clients who are property developers.

22       Q     Have those been produced?

23       A     I did not produce them.

```
 1        Q    Okay.  Other than sponsorships and

 2   licenses with clients who are property developers,

 3   are there other licenses?

 4        A    Not that I'm aware of.

 5        Q    Okay.  Now, can you describe in more

 6   general terms to me a license with a client that

 7   is a property developer?

 8        A    We allow -- or we have the use of our

 9   logo on their website, which is to our benefit as

10   giving business to some of our mortgage lenders,

11   and I guess to their benefit for having -- for

12   showing a list of banks maybe that people could

13   get mortgages from.

14        Q    And who are those customers?

15        A    I don't recall.

16        Q    Do you recall any of them?

17        A    Well, I don't have the names on top of

18   my head.

19        Q    Maybe I mischaracterized it.  The

20   licenses with clients.  Who are the clients that

21   you have licenses with?

22        A    These are some property developers but I

23   can't recall the names.
```

```
 1         Q    Okay.  Now, sponsorships.  What sort of
 2    sponsorships are there?
 3         A    One was sponsorship with the Birmingham
 4    Barons, naming the ballpark Regions Park.
 5         Q    Okay.
 6         A    And we have another one with the -- I
 7    believe -- is it the Devil Rays?
 8         Q    Double A baseball team?
 9         A    Is it the Tampa Bay Devil Rays?
10         Q    I don't know.
11         A    I think it's the Tampa Bay Devil Rays.
12    I'm not sure if they're a double A baseball team.
13              Q    Okay.  With regard to the sponsorships
14    with clients involved in property development,
15    those sponsorships all have used the logo?
16              A    Yes.
17              Q    Okay.  Now, prior to having your job,
18    your present job, did you have anything in your
19    prior experience that was the same or similar to
20    your job responsibilities today?
21              MR. PECAU:
22                   Objection, asked and answered.  You
23                   can answer.
```

1 ~~THE WITNESS:~~

2 ~~Oh. I would say that my role of~~

3 ~~oversight in coordinating a lot of~~

4 ~~different functions was the same~~

5 ~~general type of responsibility that~~

6 ~~I have today.~~

7 ~~BY MR. HUDSON:~~

8 ~~Q Oversight and coordination of different~~

9 ~~functions. Where did you have that job~~

10 ~~responsibility?~~

11 ~~A Deutsche Bank Securities.~~

12 ~~Q Where?~~

13 ~~A Deutsche Bank Securities.~~

14 ~~Q And what did you oversee and coordinate~~

15 ~~there?~~

16 ~~A I oversaw all the North American equity~~

17 ~~businesses and I coordinated input from our legal~~

18 ~~department, our controller's department, the~~

19 ~~traders in compliance.~~

20 ~~Q Okay. I'm just trying to cut this short~~

21 ~~so I don't have to go through everything that you~~

22 ~~did with every job. But let me see if I~~

23 ~~understand correctly. From each job, we~~

1    frequently take skills forward to the next job.

2          A    Uh-huh.

3          Q    In this respect, the skills that you

4    took forward, I gather, were oversight and

5    coordination skills that you were able to bring to

6    your present job.

7          A    Yes.

8          Q    Was there any other skill set that was

9    in an earlier job that you were able to bring to

10    your present job?

11          A    In both the Deutsche Bank job and the

12    Chase job, I did a lot of quantitative analysis

13    which is helpful in the evaluation studies that we

14    have had for the intellectual property.

15          Q    Okay.  Now, was it your job

16    responsibility to evaluate your company's

17    intellectual property?

18          A    At Chase or Deutsche Bank?

19          Q    I'm sorry.  In your present job.

20          A    In my present job?

21          Q    Yes.

22          A    In my present job, it's my

23    responsibility to assist with writing a request

1    for proposal to have a third party evaluation firm

2    do the evaluation.

3        Q    And have you done that?

4        A    I'm in the process of doing that.

5        Q    Has the intellectual property yet been

6    evaluated?

7        A    It's been evaluated in previous studies

8    before I joined.  And this will -- I think about

9    every -- you know, every period of years, a new

10   evaluation study needs to be done.

11       Q    Am I correct that during your tenure, an

12   evaluation study has not been completed?

13       A    Correct.

14       Q    And do you have any knowledge of the

15   past evaluation studies other than to know that

16   they exist?

17       A    Yes.  I've read them.

18       Q    Excuse me?

19       A    Yes.  I've read them.  I have copies of

20   them.

21       Q    Okay.  But except for what appears in

22   them that you could gather from reading them, do

23   you have any knowledge of them?

1          A    No.

2          Q    Had you had any previous experience in

3    evaluating intellectual property?

4          A    In evaluating intellectual property, no.

5          Q    Who owns the Regions trademarks and

6    logos?

7          A    Regions Asset Company.

8          Q    All right.  How many employees does

9    Regions Asset Company have?

10          A    I'm the full-time employee.  And we have

11    some part-time employees.

12          Q    One?

13          A    Well —

14          Q    I'm hard of hearing.  If you'll forgive

15    me.

16          A    Okay.  I'm the full-time employee.  And

17    then we have, I believe, two part-time employees.

18          Q    Okay.  You believe two?

19          A    Well, I know two.  Two.

20          Q    Okay.  And where are you located?

21          A    In Wilmington, Delaware.

22          Q    And where are your part-time employees?

23          A    In Wilmington, Delaware.

1      ~~Q     Do you have office space?~~

2      ~~A     Yes.~~

3      ~~Q     Is your office space in a Regions Bank~~

4    ~~building?~~

5      ~~A     No.~~

6      Q     Does Regions Bank have a market presence

7    in Delaware?

8      A     No.

9      Q     Is Regions Bank a Delaware corporation?

10     A     I believe so.

11     Q     Is Regions Asset Company a Delaware

12    corporation?

13     A     Yes.

14     ~~Q     Do you know why you're located in~~

15    ~~Delaware as opposed to some place within the~~

16    ~~market area of Regions Bank?~~

17     ~~A     I believe the intent was to centralize~~

18    ~~the management and the maintenance of intellectual~~

19    ~~property, and it could be located anywhere.  And I~~

20    ~~understand there is a tax advantage to doing it in~~

21    ~~Delaware.~~

22     ~~Q     Is your home Delaware?~~

23     ~~A     Yes.~~

1          Q   So that was an advantage, as well, to

2   you.

3          A   Oh, to me.  Definitely.

4          Q   Okay.  Now, was part of your

5   responsibility the protection of the Regions mark

6   and name?

7          A   Yes.

8          Q   And who had the responsibility prior to

9   you?

10         A   Pam Jasinski.

11         Q   Name?

12         A   Pam Jasinski.

13         Q   Pam Jasinski?

14         A   It's J-A-S-I-N-S-K-I.

15         Q   And how long did she have that

16   responsibility?

17         A   I don't know.

18         Q   Do you have any feel for how long she

19   worked there before you?

20             MR. PECAU:

21             Objection.

22             THE WITNESS:

23             No, I don't.

1    BY MR. HUDSON:

2        Q    Was she still there when you got there?

3        A    No -- well, she was -- she was still

4    there.  She does a different function.

5        Q    What is the function she does now?

6        A    She does the maintenance -- maintenance

7    of the bank accounts.

8        Q    Is she one of the two part-time

9    employees?

10       A    Yes.

11       Q    Was she demoted?

12       A    Well, her function has been reduced.

13       Q    And does she now report to you?

14       A    Yes.

15       Q    Was she previously the president of

16   Regions Asset Company?

17       A    I don't believe so but I don't know.

18       Q    Do you know who was the president of

19   Regions Asset Company at any time prior to you?

20       A    I don't.

21       Q    Who hired you for your job?

22       A    Jim Ahern.

23       Q    And where does he work?

1 ~~A    He left Regions Bank in February.~~

2 ~~Q    Prior to that, where did he work?~~

3 ~~A    He worked in the tax group at Regions~~

4 ~~Bank in the accounting area.~~

5 ~~Q    And in what office?~~

6 ~~A    Do you mean the location?~~

7 ~~Q    Yeah.~~

8 ~~A    Here in Birmingham.~~

9 ~~Q    Okay.  And what was his title?~~

10 ~~A    I don't know.~~

11 ~~Q    To whom do you report now?~~

12 ~~A    Linda Kern.~~

13 ~~Q    And what is her title?~~

14 ~~A    She's -- I believe she's a senior vice~~

15 ~~president in that same group.~~

16 ~~Q    In the tax accounting group?~~

17 ~~A    I think it's called Tax Accounting.~~

18      Q    Does Regions Asset Company have a board

19   of directors?

20      A    Yes.

21      Q    And who serves on that board?

22      A    I serve.  Tonya Murray serves, and

23   William Askew serves.

1     Q    Does the board have a chairman?

2     A    I'm not aware of who the chairman is.

3     Q    Okay.  Does the board meet?

4     A    Yes, the board has meetings.

5     Q    How frequently does the board meet?

6     A    It has to be within every thirteen

7   months at a maximum.

8     Q    Okay.  How many times has the board met

9   since you have been the president and a member of

10   the board?

11     A    It has not met since I've been a member

12   of the board.

13     Q    Okay.  And were you made a member of the

14   board at the same time you were made president?

15     A    No.

16     Q    Okay.  How many times has it met since

17   you have been president?

18     A    I don't believe it's met.  I don't

19   believe it's met.  I believe they've had special

20   phone meetings but I don't believe it's physically

21   met.

22     Q    Okay.  Are you responsible for enforcing

23   the Regions mark against third party use?

1          A     Yes.

2          Q     And did I ask you who had that

3     responsibility before you?

4          A     I believe you -- if you --

5          Q     I'm not trying to ask questions twice.

6          A     If you asked me, I believe it would have

7     been Pam Jasinski.

8          Q     All right.   That is how we got to her.

9     Did you review her books and records to determine

10    what she had done to enforce the mark against

11    third party use?

12         A     No.

13         Q     Do you know what she would have done to

14    enforce the mark against third party use?

15         A     No.

16         Q     Okay.   What have you done to enforce the

17    mark against third party use?

18         A     I've worked with our outside counsel and

19    our internal counsel.

20         Q     And who is that?

21         A     Our internal counsel -- our internal IP

22    counsel is Hope Mehlman.   And our external IP

23    counsel is Steptoe.   And I get watch reports and I

1    get an analysis of the watch reports.

2          Our external counsel generally writes the

3    protest letters.  And I get copies of the protest

4    letters, their analysis.  I speak to them, speak

5    to Hope as to whether -- you know, as to issues

6    there.  So that's what I've done.

7          Q     Do you rely upon them to tell you

8    whether or not to proceed with a particular third

9    party usage?

10         A     Yes.

11         Q     Okay.  Do you make any independent

12   decisions with respect to whether or not to

13   proceed against a third party?

14         A     "Independent", meaning without taking

15   their advice, without asking for their advice?

16         Q     Well, advice is just that.  It's

17   advice.  But ultimately, the decision is yours, is

18   it not?

19         A     I do take those decisions, relying on

20   their advice.

21         Q     Okay.  And you don't make any

22   independent decisions of your own?

23               MR. PECAU:

```
1              Objection to the form of the

2              question.

3              THE WITNESS:

4              I always get the advice of our

5              outside counsel and oftentimes of

6              our internal counsel.

7    BY MR. HUDSON:

8        Q    And always rely upon it?

9              MR. PECAU:

10             Objection.  Let her finish answering

11             the question.

12             THE WITNESS:

13             To date, I believe I've followed

14             their advice.

15   BY MR. HUDSON:

16       Q    Always?

17       A    So far to date, yes, I've followed their

18   advice.

19       Q    Have you established any criteria,

20   yourself, as a business person in charge of the

21   enforcement of the Regions Asset Company's mark as

22   to what criteria you consider should be utilized

23   in challenging third party use?
```

```
 1          MR. PECAU:

 2          You can't answer -- you can't

 3          give --

 4          MR. HUDSON:

 5          Wait a minute.

 6          MR. PECAU:

 7          Okay.  I have an objection on the

 8          basis of the attorney-client

 9          privilege.  I'm advising the client

10          that she has a privilege with

11          respect to anything that her

12          attorney has told her.

13          MR. HUDSON:

14          I agree with that.

15          MR. PECAU:

16          And she cannot disclose any advice

17          that she's been given from her

18          attorney.  Now, I don't know that

19          she can answer this question without

20          disclosing the advice that she's

21          gotten.  So I'm warning her that she

22          can't.

23     BY MR. HUDSON:
```

1        Q    Would you like the question read back to

2    you?

3        A    Okay.  Yes.

4             THE REPORTER:

5             "Have you established any criteria,

6             yourself, as a business person in

7             charge of the enforcement of the

8             Regions Asset Company's mark as to

9             what criteria you consider should be

10            utilized in challenging third party

11            use?"

12            MR. PECAU:

13            Same objection.

14            THE WITNESS:

15            So am I supposed to answer that or

16            not answer that?

17            MR. PECAU:

18            Can you answer it without disclosing

19            advice of counsel?

20            THE WITNESS:

21            Could you read the question one more

22            time, please?

23            THE REPORTER:

```
 1                    "Have you established any criteria,

 2                    yourself, as a business person in

 3                    charge of the enforcement of the

 4                    Regions Asset Company's mark as to

 5                    what criteria you consider should be

 6                    utilized in challenging third party

 7                    use?"

 8             THE WITNESS:

 9             I would -- I rely on legal criteria

10             so I rely on my legal counsel, or --

11             MR. PECAU:

12             That's enough.

13      BY MR. HUDSON:

14        Q    All right.  Now, regardless of where you

15      got the information to establish the criteria, are

16      there criteria that are utilized by you as the

17      president of Regions Asset Company to determine

18      whether or not to challenge third party use?

19             MR. PECAU:

20             Again, I caution you about

21             disclosing any advice that you've

22             gotten from counsel.

23             MR. HUDSON:
```

```
 1              Well, I don't care if she got advice
 2              from counsel.
 3              MR. PECAU:
 4              It makes a big difference.
 5              MR. HUDSON:
 6              Well, I understand that.  But I want
 7              to know as matter of a business
 8              position whether or not Regions
 9              Asset Company has any criteria that
10              it relies upon in determining
11              whether or not to challenge third
12              party use.
13    BY MR. HUDSON:
14        Q   I'm not picking at you.
15              MR. PECAU:
16              I'm telling you that if there's
17              additional criteria that you use in
18              addition to what your counsel has
19              told you that's independent of your
20              counsel's advice, then you can
21              answer the question.  But only to
22              that additional matter.
23              THE WITNESS:
```

```
 1                    Okay.  Well, as a business person,

 2                    my decision is that this is really a

 3                    legal matter with legal

 4                    definitions.  So I rely on my legal

 5                    counsel.

 6                 MR. HUDSON:

 7                 Okay.  Now, this is -- we're going

 8                 to have to deal with this,

 9                 ourselves.  But I want to ask the

10                 question again because I want to be

11                 understood.

12         BY MR. HUDSON:

13           Q    I'm not asking you about legal advice

14    that you got.

15           A    Uh-huh.

16           Q    And I don't intend to ask you about

17    legal advice.  But if you got legal advice or you

18    got advice from some business person, wherever you

19    got the advice, if you decided to implement the

20    advice and develop criteria, I think I'm entitled

21    know what the criteria is.

22              And so I'm not asking about who told you what

23    or why you decided to do something.  I'm simply
```

1    asking you, does Regions Asset Company have

2    criteria for the enforcement of its intellectual

3    property rights, and, in particular, its

4    enforcement of its trademark rights concerning

5    third parties and third party usage?

6                   MR. PECAU:

7                   I object.  It's been asked and

8                   answered already.

9                   MR. HUDSON:

10                  No, it hasn't been answered.

11                  MR. PECAU:

12                  Yes, it has.

13                  MR. HUDSON:

14                  There's a fundamental difference in

15                  what we're saying.  Your view is

16                  that if she got legal advice and

17                  then acted on it and made it part of

18                  the business practice of the

19                  company, that simply because it came

20                  from legal advice that it is

21                  protected forever.  And I think it's

22                  not.

23                  MR. PECAU:

1       ~~Well, let's raise it with the court~~

2       ~~then because the witness isn't going~~

3       ~~to answer it.~~

4       ~~MR. HUDSON:~~

5       ~~Well, that's fine.  Do I have to~~

6       ~~keep asking other questions on this~~

7       ~~subject to make the point or can we~~

8       ~~agree that it's sufficiently~~

9       ~~developed that we can go to court on~~

10      ~~it?~~

11      ~~MR. PECAU:~~

12      ~~I think it's sufficiently~~

13      ~~developed.~~

14      ~~MR. HUDSON:~~

15      ~~Okay.  Fine.~~

16      ~~MR. HUDSON:~~

17      ~~Let's go off the record.~~

18   ~~WHEREUPON, THERE WAS AN OFF-THE-RECORD~~

19   ~~DISCUSSION.~~

20   ~~BY MR. HUDSON:~~

21      Q    I was given this morning some answers to

22   interrogatories that were filed and that my office

23   received this morning, and they are set up for

1      signature by you.  And I want to ask you if you've

2      seen them before.

3           A    I would say yes.  I mean, from my

4      memory, I've seen certainly something like this.

5           Q    You're going to be -- apparently, you're

6      going to be asked to sign it and swear that it's

7      correct.  That's what's indicated there.

8                MR. PECAU:

9                Only as to the facts.  Not to any

10               legal conclusions.

11     BY MR. HUDSON:

12          Q    Yes.  Do you want to look at it and see

13     if, in fact, you can tell us that it is correct?

14     Take your time.

15               MR. PECAU:

16               Are these the contention

17               interrogatories?

18               MR. HUDSON:

19               They may well be.

20               MR. PECAU:

21               They are contention interrogatories.

22     BY MR. HUDSON:

23          Q    Are those interrogatories true and

1    ~~correct such that you would sign them?~~

2    ~~MR. PECAU:~~

3    ~~I object to the form of the~~

4    ~~question.~~

5    ~~THE WITNESS:~~

6    ~~I --~~

7    ~~MR. PECAU:~~

8    ~~Actually, I'm going to make a~~

9    ~~speaking objection.  I'm objecting~~

10   ~~to the form of the question because~~

11   ~~these are contention~~

12   ~~interrogatories.  And the~~

13   ~~verification is based on her own~~

14   ~~personal knowledge and facts that~~

15   ~~have been told to her that she~~

16   ~~believes to be true.  That's what a~~

17   ~~verification is.  It's a legal issue~~

18   ~~that is outside the ken of this~~

19   ~~witness.  If you want to ask her~~

20   ~~specific questions about particular~~

21   ~~things in here, that's fine.  But I~~

22   ~~object to the question.  It's an~~

23   ~~unfair question.  It's~~

1 ——————— gamesmanship. It has nothing to do

2 ——————— with finding the facts and she's a

3 ——————— fact witness.

4 ——————— MR. HUDSON:

5 ——————— That, in fact, is a speaking

6 ——————— objection. I ask you, please, not

7 ——————— to make another one.

8 ——————— MR. PECAU:

9 ——————— If you ask questions like that, I'll

10 ——————— make another speaking objection.

11 ——————— It's an unfair question.

12 ——————— MR. HUDSON:

13 ——————— Mark that, please.

14 — BY MR. HUDSON:

15      Q    I'll ask the question again. Are these

16 interrogatory responses true and correct, to your

17 knowledge, sufficiently for you to be able to sign

18 and verify them?

19      A    To my knowledge, either -- yes. I've

20 either been told of these or I know these other

21 facts to be correct.

22      Q    Thank you. One of the questions asked,

23 it says -- in Paragraph Seven of your complaint,

```
 1      you allege that Regions now, and since prior to

 2      the acts of Defendant complained of herein, has

 3      been a famous name in Alabama and elsewhere in the

 4      United States.  State each and every fact upon

 5      which you rely in support of the allegation that

 6      Regions is quote "a famous name in Alabama" close

 7      quote, and in support of the allegation that

 8      Regions is a famous name quote "elsewhere in the

 9      United States".

10          Do you have any facts upon which you can base

11      a conclusion that Regions is a famous name

12      elsewhere in the United States?

13              MR. PECAU:

14              Object to the form of the question.

15              THE WITNESS:

16              I've been told that we've done

17              marketing studies in other states in

18              addition to Alabama that show that

19              Regions has a high name

20              recognition.

21      BY MR. HUDSON:

22          Q    Were you also told that those marketing

23      studies were all in states in which Regions has a
```

1    market and a presence?

2         A    I haven't been told that they were all

3    in the states in which Regions has a presence.    I

4    believe I have been told that the name recognition

5    is high in states where Regions has a presence and

6    higher in some states, in Alabama, for instance.

7         Q    Do you have any information or have you

8    been told any information about whether Regions'

9    name is a famous name in every state of the United

10   States?

11        A    I have not been told.

12        Q    Is Regions a famous name in Delaware?

13             MR. PECAU:

14             Object to the form of the question,

15             asking for a legal conclusion.

16             THE WITNESS:

17             I haven't been told that.

18   BY MR. HUDSON:

19        Q    To your knowledge, is it a famous name

20   in Delaware?

21             MR. PECAU:

22             Objection.

23             THE WITNESS:

```
1                    I don't know.  I have not asked.

2     BY MR. HUDSON:

3          Q    Okay.  Well, if it is a famous name in

4     Delaware, that has not come to your attention.  Is

5     that correct?

6               MR. PECAU:

7               Objection to the form of the

8               question.

9               THE WITNESS:

10              It's not something that I have any

11              direct knowledge of.

12    BY MR. HUDSON:

13         Q    Okay.  In response to the first

14    interrogatory -- and we can look at the question.

15    I'm not trying to deprive you of that but I'm

16    interested in part of the answer.  It says,

17    "documents showing Regions great and successful

18    efforts to protect its famous Regions mark."

19              What information do you have about Regions

20    great and successful efforts to protect its famous

21    Regions mark?

22         A    I have copies of opposition letters that

23    have been sent out and copies of the replies that
```

1    have been made saying that the person will cease

2    and desist using the name.

3        Q    Were you able to determine when Regions

4    first started getting watch reports?

5        A    I don't know.  I believe I have watch

6    reports going back to, say, maybe 2002, 2003.  But

7    I don't know if that was when they first started

8    getting watch reports.

9        Q    And do you know when Regions first

10    started getting trademark search reports?

11        A    I don't know.

12        Q    Okay.  Do you have any information to

13    indicate that Regions did anything proactive to

14    protect its mark between 1994 and 2002?

15        A    I don't know.

16        Q    Okay.  Who should know the answer to

17    that question?

18            MR. PECAU:

19            Objection.

20            THE WITNESS:

21            I don't know.

22    BY MR. HUDSON:

23        Q    Okay.  Does Regions, to your knowledge,

1      do anything today to protect its mark proactively

2      other than to obtain trademark search reports,

3      watch reports and to write cease-and-desist

4      letters and to file a lawsuit like this one or the

5      one against Regional Finance?

6                      MR. PECAU:

7                      Objection to the form of the

8              question.

9                      THE WITNESS:

10                     Could you read the question back,

11             please?

12                     THE REPORTER:

13                     "Does Regions, to your knowledge, do

14                     anything today to protect its mark

15                     proactively other than to obtain

16                     trademark search reports, watch

17                     reports and to write

18                     cease-and-desist letters and to file

19                     a lawsuit like this one or the one

20                     against Regional Finance?"

21                     THE WITNESS:

22                     I'm not sure that the watch reports

23                     are the sole thing that's relied

```
 1                    on, in that I might get email

 2                    correspondence from Hope or I might

 3                    speak to Hope and some names will

 4                    come up that may not have been in

 5                    the watch reports.

 6    BY MR. HUDSON:

 7         Q    Are you the business person that that

 8    information is supposed to come to?

 9         A    Any information -- information comes to

10    me from different sources.  So Hope would be one

11    good example.  And then, yes, it generally comes

12    to me.

13         Q    Who is primarily responsible for having

14    that information within Regions Asset Company?

15         A    I would be within Regions Asset Company.

16         Q    And do you delegate the responsibility

17    for obtaining that information to lawyers?

18         A    Yes.  I would rely on Hope internally

19    and I would rely on, say, Steptoe externally.  And

20    where Hope gets her information, I don't know.

21    Watch reports is one source.

22         Q    Is there a reason that you don't order

23    the watch reports directly, yourself?
```

1        A    They've been ordered through counsel in

2    the past, and I rely on counsel's advice in

3    interpreting them.

4        Q    Is that the only reason that you don't

5    order them, yourself?

6        A    That's a sufficient reason.

7        Q    Is there any other?

8        A    No.

9        Q    Is the same true of trademark search

10    reports?

11        A    Yes.

12        Q    Now, is the same true of searching the

13    internet to determine whether there are domain

14    names or other names in third party use?

15        A    Again, we get that through the search --

16    or the watch reports.  I sometimes go on the

17    internet to search, myself.  But I really

18    systematically would rely on our outside counsel

19    and the -- or our counsel and the watch reports.

20        Q    Because you delegate that

21    responsibility?

22        A    To get the watch reports, yes.

23        Q    Okay.  I've marked for identification

```
 1      Exhibit One Thirty-eight.  Are those, in fact, the

 2      interrogatories that I asked you about and that

 3      you've read and answered questions about in this

 4      deposition?  I'm just trying to identify them so

 5      when we can go back to the record, we'll know what

 6      you are looking at.

 7             A    Yes.

 8                  MR. HUDSON:

 9                  I don't have any further questions.

10                  MR. PECAU:

11                  I have no questions.

12

13      FURTHER, DEPONENT SAITH NAUGHT.

14                      * * * * * * * * *

15

16

17

18

19

20

21

22

23
```

```
1                        CERTIFICATE
2
3        STATE OF ALABAMA:
         COUNTY OF MOBILE:
4
5
             I, David Michael Camp, a Notary Public in and
6
         for the State of Alabama at Large, hereby certify
7
         that the within-named witness, JANET ARMITAGE, who
8
         was made known to me, was, by me, first duly sworn
9
         to speak the truth, the whole truth, and nothing
10
         but the truth in the case aforesaid; that the
11
         testimony then given by said witness was, by me,
12
         reduced to shorthand in the presence of said
13
         witness, afterwards transcribed; and that the
14
         foregoing is a true and correct transcription of
15
         the testimony so given by the witness as
16
         aforesaid.
17
             I further certify that this deposition was
18
         taken at the time and place as specified in the
19
         foregoing caption and was completed without
20
         adjournment.
21
             I further certify that I am not a relative,
22
         counsel or attorney for either party, or otherwise
23          interested in the outcome of this action.
```

1          IN WITNESS WHEREOF, I have hereunto set my

2     hand and affixed my seal at Mobile, Alabama on

3     this, the 14th day of August, 2007.

4

5

6                         _____

7                         David Michael Camp

                          Notary Public in and

8                         For Alabama at Large.

9

10    My Commission expires February 20, 2008.

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                       FOR  THE

 3              MIDDLE DISTRICT OF ALABAMA

 4                    NORTHERN DIVISION

 5

 6

 7   REGIONS ASSET COMPANY,        *

                                   *

 8           Plaintiff,            *

                                   *

 9   Vs.                           *   CIVIL ACTION NUMBER

                                   *

10   REGIONS UNIVERSITY, INC.,     *   2:06cv882-MHT

                                   *

11           Defendant.            *

12

13

14

15

16       * * * * * * * * * * * * * * * * * * * * * *

17

18        Deposition of NEAL BERTE, taken before David

19   Michael Camp, CSR, in the law offices of Balch &

20   Bingham, LLP, 1901 6th Avenue North, Birmingham,

21   Alabama, on August 14, 2007, commencing at

22   approximately 9:32 o'clock a.m.

23
```

```
 1                   A P P E A R A N C E S
 2
          For Plaintiff:
 3            BALCH & BINGHAM, LLP
              Attorneys at Law
 4            Post Office Box 78
              Montgomery, Alabama   36101
 5            (334) 834-6500
              BY: CHARLES PATERSON
 6
 7
          For Defendant:
 8            HUDSON & WATTS, L.L.P.
              Attorneys at Law
 9            One St. Louis Centre, Suite 2500
              Post Office Box 989
10            Mobile, Alabama   36601
              (251) 432-7200
11            BY: VICTOR T. HUDSON
12
13
14        Also present: REX A. TURNER, JR.
15
16                 * * * * * * * * * *
17
18
19
20
21
22
23
```

1                    I N D E X

2

3

        Witness

4    NEAL BERTE

5

                 EXAMINATION

6

     MR. HUDSON   ...........................    6

7    MR. PATERSON  ..........................   33

     MR. HUDSON   ...........................   41

8

                 * * * * * * * * *

9

10

11

12

13

                  EXHIBITS

14

     DEFENDANT'S EXHIBIT ONE THIRTY-SEVEN  ....   14

15

                 * * * * * * * * *

16

17

18

19

20

21

22

23

1                    STIPULATION

2          It is stipulated by and between the parties

3     hereto and their respective attorneys at law that

4     the deposition on oral examination of the Witness,

5     NEAL BERTE, may be taken before David Michael

6     Camp, Commissioner and Notary Public, State of

7     Alabama at Large, and that the said deposition

8     shall be taken in accordance with and, when so

9     taken, may be used in accordance with the

10    provisions of the Federal Rules of Civil

11    Procedure.

12         It is further stipulated and agreed that all

13    notices provided for by said Federal Rules of

14    Civil Procedure are waived, as is the reading over

15    of said deposition to or by the witness, the

16    signing thereof by the witness, the signing and

17    certification of said David Michael Camp, the

18    filing of said deposition with the Clerk of the

19    Court and all other requirements and

20    technicalities of every sort which would be a

21    prerequisite to the use of said deposition.

22         It is the intent of the parties hereto that

23    this deposition may be used in evidence as though

1     all requirements of said Federal Rules of Civil

2     Procedure had been complied with.

3          It is further stipulated and agreed that all

4     parties hereto reserve the right to have

5     corrections made to this deposition as provided

6     for by said Federal Rules of Civil Procedure.

7          It is further stipulated and agreed that all

8     objections, save as to the form of the questions

9     asked and the responsiveness of the answers

10    thereto are reserved until the time of trial in

11    accordance with the provisions of said Federal

12    Rules of Civil Procedure.

13

14                    * * * * * * * * * *

15

16

17

18

19

20

21

22

23

```
 1              NEAL BERTE, having been first duly sworn to

 2      speak the truth, the whole truth, and nothing but

 3      the truth, testified as follows:

 4                          EXAMINATION

 5      BY MR. HUDSON:

 6           Q     Dr. Berte, would you please state your

 7      name for the record?

 8           A     Neal Berte.

 9           Q     Would you give us a brief sketch of your

10      employment history over the past twenty-five

11      years?

12           A     All those years, I was at Birmingham

13      Southern, twenty-eight and a half years as

14      President and then two and half years as

15      chancellor.  And then I'm fully retired now and I

16      have an office in downtown Birmingham at the

17      Landmark Center.

18           Q     What association did you have with

19      Region 2020?

20           A     I was the founding Chairman.

21           Q     And what is the business of Region 2020?

22           A     It is a citizen-driven region-wide

23      organization that gathered citizens together
```

 1      across seventeen community meetings throughout

 2      central Alabama and asked them to develop

 3      priorities for the region of central Alabama.

 4          And then we took all the priorities that the

 5      citizens had come up with.  This is almost from

 6      Montgomery to Walker County to Cullman, throughout

 7      central Alabama, Jefferson and other areas.  And

 8      then they prioritized those, the citizens did, at

 9      a meeting at the Birmingham Museum of Art.

10          And so that's the agenda for Region 2020.  As

11      you would expect, the priorities that citizens

12      came up with were education, economic development,

13      all sorts of environmental concerns and amenities,

14      if you will, quality of life issues.

15          Q      And does Region 2020 have a mission?

16          A      It does.

17          Q      What is that?

18          A      It's a citizen-driven mission to improve

19      the overall development of central Alabama.

20          Q      Can you tell me the counties that are

21      within central Alabama that are part of the Region

22      2020 outreach?

23          A      Well, it really shifted in recent years

```
1     from twelve counties down to -- again, I'm no
2     longer Chairman of the board.  But shifted to a
3     smaller number.
4         I think it's primarily about eight now.  So
5     -- and as you would, those -- those -- as you
6     would expect, those are contiguous to the largest
7     populated area of Jefferson County.
8         Q     Do you have an estimate of the
9     percentage of the population of Alabama that would
10    be within those eight counties?
11        A     It would just be a guesstimate to be
12    honest with you.  But, you know, my guess would be
13    somewhere in the range of thirty-three to forty
14    percent, something like that.
15        Q     And do you recall the names of the eight
16    counties?
17        A     Now, you're testing me here.  Some of
18    them were in and some of them were out.
19        Q     Well, just do your best.
20        A     Certainly Jefferson County, Cullman,
21    Walker, St. Clair, Blount, Shelby.  I'm trying to
22    think which ones stayed in and which ones didn't
23    originally.  Those are the primary ones, I guess,
```

1    now, for the mission of the organization.

2        But again, we went as far as Wetumpka and

3    Prattville in the citizen-driven meetings, and

4    also, I guess, the northern part of Cullman County

5    was as far as we went north.

6        Q    Are there some counties that were once

7    in and are no longer in that you can recall?

8        A    Well, I'm going to let Dalton respond to

9    that, the Executive Director.  They shifted that

10   in the last year or so since he's the new

11   Executive Director.  I'm no longer --

12       Q    So you're not sure which ones are in

13   now?

14       A    That's right.  He can tell you that when

15   you meet with him.

16       Q    Would you give me your best recollection

17   of which counties were in at the time that you

18   were serving?

19       A    Well, I'm just -- I want to be honest

20   here.  All the way down to north of Montgomery.

21   And again, I think northern Cullman County was as

22   far north as we went.  So Calhoun County certainly

23   was included.  I just don't want to say the wrong

1    thing.

2         And I'm not sure what that's got to do with

3    anything, to be honest with you.  But that's my

4    best recollection.

5         Q    Thank you.  Who chose the name Region

6    2020?

7         A    It was decided by about forty

8    individuals that met for a couple-year period and

9    looked at what other parts of the country did, for

10   example, Portland, Oregon; Chattanooga, Charlotte,

11   in terms of getting people to think outside their

12   immediate jurisdiction where they lived and try to

13   look at a larger perspective in terms of utilizing

14   the strengths of the central Alabama area, working

15   together to ameliorate the weaknesses.

16        And out of that, there have been some

17   significant developments.  I mean, in this area,

18   Homewood, Mountain Brook, Vestavia are now

19   cooperating on building a jail rather than all

20   three jurisdictions building a jail separately.

21        Lots of inter-library cooperation that wasn't

22   there before.  We've made some in-roads on waste

23   management issues for central Alabama, also made

1    some in-roads on purchasing, cross communication

2    across law enforcement jurisdictions has

3    improved.

4        It still isn't what it needs to be but that's

5    the reason we chose Region 2020.  We knew we

6    couldn't do this overnight.

7        And also, we continued to do some things like

8    professional development opportunities for

9    teachers.  We would get grants and do that kind of

10   thing, as well.

11       Q    Among these forty people that you spoke

12   of that chose the name Region 2020, were any of

13   them associated with then First Alabama Bank or

14   now, Regions Financial, or Regions Bank?

15       A    You know, I really don't know.  There

16   were forty individuals, community types from all

17   walks of life; I mean, from social service areas,

18   education areas.  Business certainly was

19   represented.  The church community was

20   represented.  Racial diversity.  But I can't tell

21   you, you know.

22       Q    Were banks represented?

23       A    I'm sure they were.

1    Q    All right.  And these people, were they

2    fairly senior members of the community that

3    participated?

4    A    They were -- really, it was a diverse

5    group, all ages.

6    Q    When I said "senior", that didn't make

7    sense.  I meant prominent.

8    A    Well, they were leaders, you know, in

9    their own areas, some neighborhood presidents, for

10    example, community leaders from Jefferson County,

11    but also, somebody who worked in the utility area

12    out of Wetumpka.  So it was a cross section,

13    deliberately a cross section of folks.

14    Q    And whoever served, for instance, from

15    banking would be a leader, as well, in that field?

16    A    Well, Richard Moore, for example, was --

17    still is, I think, involved from -- I think

18    Richard is from down in Coosa, down in that area,

19    Coosa County.  I'll be honest with you.  I cannot

20    remember who else out of the banking community

21    even locally here would have been involved.  I

22    really can't.

23    Q    Is there a member of the board presently

1   who is associated with Regions Bank or Regions

2   Financial?

3        A    If you give me the list, I can tell you

4   that.

5        Q    I don't think I have it in front of me.

6        A    Okay.

7        Q    Is there a Dowd somebody?

8        A    I don't think Dowd Ritter is a member of

9   the board currently.  And I'm not sure he ever

10  was, to be honest with you.  He may have been.  If

11  you have a list --

12       Q    If I had it, I'd give it to you.

13       A    Okay.

14       Q    I'm not holding anything back from you.

15       A    Okay.

16       Q    Who is Dowd Ritter?

17       A    He's chairman of Regions Bank.

18       Q    Has he ever participated in any way with

19  Region 2020?

20       A    Now, I don't know the answer to that.

21       Q    Okay.

22       A    He certainly is a civic minded

23  individual and supportive of community causes.

1    ~~But whether or not he's been in any of the~~

2    ~~meetings, I simply don't know, or can't remember.~~

3        Q    I'm going to show you a document that

4    I'll mark as One Thirty-seven.  I'll tell you that

5    it's a non-exclusive license agreement that

6    purports to have been signed by you on December 2,

7    1997.  Have you seen that recently?

8        A    Well, I did, because I asked for a file

9    copy from the Region 2020 office after I spoke

10   with you the other day briefly.  I said to my

11   secretary -- and I think I mentioned that to you

12   too -- that I remember something back there.

13       And so -- and obviously, when I got the

14   subpoena, I thought, well, I better remember more

15   specifically.  So I called and asked the Region

16   2020 office to send me a copy.

17       And my recollection was correct.  There was

18   something back there that lawyers had worked out,

19   this non-exclusive agreement.  And I signed it as

20   then Chairman of the board.

21       Q    Do you recall now that you signed it at

22   that time?

23       A    I do.  And this is my signature.

1    ~~Q   All right, sir.  Now, after you signed~~

2    ~~that agreement —~~

3    ~~MR. PATERSON:~~

4    ~~Can we mark that, Tom?~~

5    ~~MR. HUDSON:~~

6    ~~It's marked.~~

7    ~~MR. PATERSON:~~

8    ~~I'm sorry.  I didn't hear you.  I~~

9    ~~apologize.~~

10   ~~MR. HUDSON:~~

11   ~~It was marked as One Thirty-seven.~~

12   ~~MR. PATERSON:~~

13   ~~Okay.  I just didn't hear the~~

14   ~~exhibit number.~~

15   ~~BY MR. HUDSON:~~

16        Q    After you signed Exhibit One

17   Thirty-seven, do you recall occasions when the

18   bank raised any question with you about the use of

19   its name?

20        A    I do not.

21        Q    Do you recall anything that the bank did

22   with respect to quality control concerning the use

23   of its name?

```
1              MR. PATERSON:

2              I object to the form.

3              THE WITNESS:

4              I just want to make sure everybody

5              understands.  I was the volunteer

6              Chairman.  I think if there was any

7              official contact from the bank,

8              possibly I would have known that.  I

9              can't recall any of that.  But I

10             think obviously the person who might

11             know that would be the Executive

12             Director, who was the paid

13             professional.  But I don't recall --

14             I don't recall anything, any contact

15             after we signed this.

16  BY MR. HUDSON:

17       Q    Okay.  And that's consistent with what

18  you told Dr. Turner, as well, isn't it?

19       A    It is.

20       Q    Now, let me show you --

21       A    Actually, I didn't -- I was not totally

22  sure when we talked because I -- this was a bolt

23  out of the blue.  But anyway, I would just say to
```

```
 1      you, I recalled something.  But, you know, I had

 2      to go get this.  I've signed a lot of stuff as a

 3      volunteer Chairman or the college over the years.

 4           Q    I understand.  When you talked to Dr.

 5      Turner, do you remember saying to him that you

 6      didn't think the names were similar and that you

 7      didn't think that you needed the permission of the

 8      bank to use the name Region 2020?

 9                MR. PATERSON:

10                Object to the form.

11                THE WITNESS:

12                Well, I mean, we did talk about the

13                term, Region 2020.  And I had a

14                tough time even understanding what

15                Regions University was, to be honest

16                with you.  But that's correct.

17      BY MR. HUDSON:

18           Q    That is correct?

19           A    Right.

20           Q    Now, let me show you Exhibit One-ten

21      that was previously marked, and ask you if you've

22      seen that before.

23                MR. PATERSON:
```

1            Tom, what is that?

2            MR. HUDSON:

3            Here's a copy of it.

4            THE WITNESS:

5            It seems to me there was some sort

6            of -- this is probably not the right

7            word here.  But lawyering, if you

8            will.  I don't mean to say that

9            despairingly.  Back and forth.  And

10           this was probably an earlier

11           document.  I'm shown here as getting

12           a copy of it.  But I -- you know,

13           that's about all I can say.

14   BY MR. HUDSON:

15      Q    Let me see if I can summarize

16   correctly.  Exhibit One-ten contains some earlier

17   drafts, what ultimately was signed as Exhibit One

18   Thirty-seven, but they are different.  And you

19   expect there was some lawyering going on before

20   the final document was executed?

21      A    That would be my guess.  And again, I

22   don't know that that would be irregular.  I mean,

23   I think that's sort of --

1      Q    Normal?

2      A    That would be normal, I would think.

3      Q    Okay.

4      A    Before you finalized a document.  But I

5    don't know.

6      Q    Now, if you look at the first page of

7    Exhibit One-ten, it's addressed to Ann Florie,

8    F-L-O-R-I-E.  Who is she?

9      A    She was then the Executive Director of

10    Leadership Birmingham -- I mean, Region 2020.

11    She's now the Executive Director of Leadership

12    Birmingham.

13      Q    How long did she serve as Executive

14    Director?

15      A    Maybe seven or eight years.  Something

16    in there.

17      Q    The present Executive Director, as I

18    understand it, she or he has only been there a

19    very short period of time.  Is that your

20    understanding?

21      A    It is, uh-huh.

22      Q    And who was the previous Executive

23    Director?

1       A    Who followed Ann Florie?

2       Q    Yes.

3       A    Guin Robinson.

4       Q    Where is she located now?

5       A    That's a man.  He's --

6       Q    I'm sorry?

7       A    It's a man, G-U-I-N.  And he, I believe,

8    lives in Talladega County.  He had been a long

9    time mayor of Pell City, and as a volunteer, had

10    been very active in citizen meetings for Region

11    2020.  And he was really a natural to move up to

12    that position.  He was head and shoulders the

13    strongest candidate to follow in.

14       Q    Do you know whether he's employed or not

15    now?

16       A    I think the last I heard, he was

17    employed doing some sort of manpower training

18    program through the state.  In other words,

19    working for the State of Alabama.  I think that's

20    right, in the area of manpower training in

21    Talladega.

22       He may still live in Birmingham because I

23    think he's a member of the Regional Transportation

1    Board in Birmingham still.

2          Q    Did you have an opportunity to review

3    Exhibit One ten prior to today?

4          A    Did not.  I mean, I may have.  It shows

5    that I got a copy back in October of '97 but I did

6    not see this in the same way --

7          Q    You didn't review it in preparation for

8    your deposition today?

9          A    Not at all.

10          Q    Would you look at the fourth paragraph

11    of the Non-exclusive License Agreement attached to

12    Exhibit One ten, please?

13          A    Duration and termination?  Is it 4.1?

14          Q    "Whereas the license name is deceptively

15    similar".  Do you see that?

16          MR. PATERSON:

17          Is this the one that's signed or not

18          signed?

19          MR. HUDSON:

20          One ten.

21    BY MR. HUDSON:

22          Q    And I would also like you to compare it

23    to the one that was signed, Exhibit One Thirty-

1    seven.  Do you see the clause that says, "the

2    Licensee's name is deceptively similar"?

3          A    I'm sorry.  Just a minute here.  I

4    apologize.

5          Q    Let me point it out to you.

6          A    Sure.

7          Q    Right here.

8          A    Oh, okay.

9          Q    And I would ask you to compare it with

10   One Thirty-seven.  If you'd look at One-ten,

11   please, sir, you can see the phrase that says,

12   "where the Licensee's name is deceptively similar

13   to the Licensor's Registered Marks so as to be

14   likely to cause confusion in the marketplace."

15         A    Uh-huh.

16         Q    Yes?

17         A    I see that, uh huh.

18         Q    All right.  And was that clause omitted

19   from the Exhibit One Thirty-seven that you signed?

20         A    I believe so.

21         Q    Do you recall why that was omitted?

22         A    I really don't.

23         Q    Okay.  Now, if you'll look, please, at

1     the first license agreement that appears in

2     Exhibit One-ten, and look at Section 2.1 of it

3     where it says "Royalty Payment".

4         A    Uh-huh.

5         Q    And then compare that, if you will, to

6     the second license agreement that is attached to

7     One-ten, specific to Section 2.1.

8         A    It's a difference of a thousand dollars

9     in one versus the hundred dollars in the other.

10        Q    Yes, sir.  Specifically, it says for the

11    record, "Licensee shall pay to Licensor a royalty

12    of one thousand dollars per year until the

13    expiration of the Registered Marks or any renewals

14    thereof", and it goes on.

15        And in the second one, it says, "Licensee

16    shall pay the Licensor a royalty of one hundred

17    dollars per year until the expiration of the

18    Registered Marks or any renewals thereof".

19        Is that correct?

20        A    It is.

21        Q    And would you compare that to Section

22    2.1 of One Thirty-seven, the one you signed?

23        A    You mean the thousand dollars versus the

1    hundred dollars?

2         Q    Yes.  What does it say in 2.1 of the one

3    you signed?

4         A    "Royalty Payment.  Licensee shall pay to

5    Licensor a royalty of a thousand dollars per year

6    until the expiration of the Registered Marks or

7    any renewals thereof.  All royalties shall be paid

8    yearly, based on a calendar year, on or before the

9    last day of any month following the end of a

10    calendar year".

11         Is that what you're —

12         Q    I think we're confused.  You're reading

13    from One-ten.

14         A    I apologize.

15         Q    That's all right.  Let's start over

16    again and it will make the record make more

17    sense.  And that's quite all right.

18         Would you first look at Exhibit One-ten at

19    Section 2.1, the first license agreement?  Does it

20    say "Licensee shall pay the Licensor a royalty of

21    a thousand dollars per year until the expiration

22    of the Registered Marks or any renewals thereof"?

23         A    It does.

1        Q    And then later in One-ten, as part of

2    the attachments, there is another unexecuted

3    license agreement, is there not?

4        A    Why don't you just tell me exactly where

5    you're looking?

6        Q    Yes.  Right here.

7        A    And you're saying One-ten?

8        Q    You can use mine.

9        A    Okay.  I apologize.  I'm not trying to

10    be dense here.

11        Q    Okay.  If you would just read Section

12    2.1 of that.

13        A    "Licensee shall pay to Licensor a

14    royalty of a hundred dollars per year until the

15    expiration of the Registered Marks or any renewals

16    thereof."

17        Q    All right.  Now, let's look at Section

18    2.1 of Exhibit One Thirty-seven, which is the

19    license agreement you actually executed.

20        A    Right.

21        Q    What does it say?

22        A    "Licensee shall pay to Licensor a total

23    royalty of a hundred dollars which shall be the

1    ~~total payment due from Licensee during the~~

2    ~~duration of this license.~~

3    ~~Q   Okay.  Can you shed any light on how the~~

4    ~~negotiation progressed from being asked for a~~

5    ~~thousand dollars per year to then being asked for~~

6    ~~a hundred dollars per year, to then being asked~~

7    ~~for a hundred dollars as a total payment?~~

8    ~~A   I really can't.  I mean, I wasn't~~

9    ~~involved.  To my knowledge, I was not involved in~~

10   ~~all that.  If I was, it's been a while and I don't~~

11   ~~recall any negotiation like that.~~

12        Q    But you do know that you were asked to

13   sign the final agreement.

14        A    I was, uh-huh.

15        Q    Why would it be that you would sign the

16   final agreement?

17        A    I guess we're incorporated as a -- and

18   still are -- as a not-for-profit 501 -- is it (c)

19   (3) or (3)(c) -- organization.  So as Chairman of

20   the board, along with the Executive Director, I

21   would have, I guess, had that responsibility, or

22   that's what Alton Parker recommended, who

23   represented Region 2020 in all this.

```
1          Q     Recommended that you sign documents such

2     as Exhibit One Thirty-seven?

3          A     Well, he's the one that recommended

4     this.  There's no question about that.

5          Q     Do you recall that?

6          A     I do not.

7          Q     Okay.

8          A     In fact, again, I had to think about it

9     after we had the initial conversation.  And then I

10    got the subpoena and thought about it some more

11    and said to my secretary, you know, what I did.

12    And then we called Region 2020 and asked for a

13    xerox copy and they sent it over Thursday.

14         Q     And is it fair to say that but for that

15    inquiry, you wouldn't have thought about any

16    relationship between Region 2020 and Regions Bank

17    at all?

18              MR. PATERSON:

19              Object to the form.

20              THE WITNESS:

21              I don't think so.

22    BY MR. HUDSON:

23         Q     You don't think you would have thought
```

1    of it?

2        A    Right.

3        Q    How long were you the Chairman of the

4    board of Region 2020?

5        A    From its inception until last February.

6        Q    This February?

7        A    This past February, '07.

8        Q    And what are the job responsibilities of

9    the Chairman of the board of Region 2020?

10        A    Convene the annual meeting and serve as

11   a member of the executive committee.   And in the

12   course of the ten years plus of the organization,

13   that involved participating on search committees

14   to hire the Executive Director, very much an

15   Executive Director driven organization in terms of

16   the day-to-day operation, as a lot of non-profits

17   are.

18        Q    Were you paid as Chairman of the board?

19        A    No.

20        Q    Did you attend each board meeting?

21        A    I did.

22        Q    How frequently did the board meet?

23        A    Annually.   And there were maybe one or

1     two times that we met twice a year.  But

2     typically, it was just an annual meeting to

3     approve the budget and the finances and get a

4     status report on what happened during that year.

5           Q     Did you participate in other meetings

6     with Region 2020 that were not board meetings?

7           A     I went to almost all seventeen meetings

8     all over central Alabama.

9           Q     And how frequently were those meetings

10    conducted?

11          A     Well, those were conducted in about a

12    four-month period all over central Alabama back

13    when we started the organization.

14          Q     Okay.  Did you attend any other meetings

15    of Region 2020?

16          A     I'm sure, off and on, I did attend

17    public hearings and just as an interested citizen,

18    not necessarily as Chairman of board.  But I

19    certainly attended educational functions because

20    of my role and my interest in education, but also

21    attended a few other public hearings on issues

22    over the period of time.

23          Q     Did the board do any of its work through

1    committees?

2        A   Not — not really.  The executive

3    committee was the strongest organized group.  And

4    basically, we did not function by committees.  We

5    had a strong, lean staff with the Executive

6    Director and a secretary, basically.  And then we

7    hired somebody part-time to assist with public

8    information and that kind of thing.

9        Q   To whom did the Executive Director

10   report?

11       A   To the executive committee.

12       Q   And were you on the executive committee?

13       A   I was.

14       Q   For this entire time?

15       A   Yes.

16       Q   And was the Executive Director

17   responsible to the executive committee?

18       A   Yes.

19       Q   Did the executive committee direct, at

20   least in broad terms, the activities of the

21   Executive Director?

22       A   Yet.  But I think it's fair to say that

23   the mission of Region 2020 is to implement the

1     citizen developed goals from those seventeen

2     meetings that we had all over central Alabama.

3           In other words, it was not an executive

4     committee driven organization, nor was it a full

5     bore driven organization.  It was, these are the

6     goals the citizens have come up with, now, do what

7     you can to try to implement those.

8           Q    And was the Executive Director's

9     function primarily one of implementation of those

10    goals?

11          A    It was.

12          Q    Did the board, itself, set the goals?

13          A    Citizens set the goals.

14          Q    Okay.  Once the goals were recommended

15    and suggested by citizens, did the board determine

16    which would be pursued and which would not?

17          A    Well, I mean, the mission is to pursue

18    all of them.  That sounds very idealistic, but

19    that was the goal anyway.  So we didn't pick and

20    choose.

21          Q    Did you prioritize?

22          A    We didn't.  The citizens did, the

23    Birmingham Museum of Art.

1      ~~Q    Okay.  Now, to whom was the Executive~~
2    ~~Director expected to turn for advice and help in~~
3    ~~the event that the Executive Director encountered~~
4    ~~some difficulty in performing the job?~~
5      ~~A    She would talk certainly to members of~~
6    ~~the board, members of the executive committee.~~
7    ~~And then because of the citizen-driven nature of~~
8    ~~the organization, she would also talk to experts~~
9    ~~in the field.~~
10      ~~For example, she might talk to the chief of~~
11    ~~police in Birmingham, as well as the Sheriff of~~
12    ~~Jefferson County about law enforcement issues,~~
13    ~~even though those individuals were not on the~~
14    ~~executive committee or on the board, to my~~
15    ~~knowledge, if I'm remembering correctly.~~
16      ~~But that's just an example.  In other words,~~
17    ~~you went for resources across the area in the~~
18    ~~particular topic area of interest or work area at~~
19    ~~that point; somebody from waste management,~~
20    ~~whatever.~~
21      ~~But certainly, you know, try to respect the~~
22    ~~goals that the citizens had come up with.~~
23        ~~MR. HUDSON.~~

1    ~~I don't have any further questions,~~

2    ~~Dr. Berte.  Thank you.~~

3    ~~EXAMINATION~~

4    ~~BY MR. PATERSON:~~

5         Q    Dr. Berte, my name is Charlie Paterson.

6    I represent Regions in this litigation.  I have

7    just a very few questions for you.

8         During the course of your relationship with

9    Region 2020, are you aware of any violation of

10    this license agreement that has been identified, I

11    think, as Exhibit Number One Thirty-seven?

12         A    I am not.  And I do think, as a member

13    of the executive committee, I would have known if

14    something like that came up.  But I don't recall

15    ever.

16    ~~Q    If Regions 2020 violated the license and~~

17    ~~used the name in a way that was offensive to~~

18    ~~Regions Bank, would you, as an executive committee~~

19    ~~member, expect to hear from Regions Bank?~~

20    ~~A    I would.  And I don't mean to be out of~~

21    ~~line here.  But it is Region 2020.  It's not~~

22    ~~Regions 2020.  And I don't --~~

23    ~~Q    Did I say "Regions"?  I'm sorry if I~~

1   ~~did.~~

2   ~~A   You did.  But I just want to be sure.~~

3   ~~Q   Okay.~~

4   ~~A   In fact, we even set it up in such a way~~

5   ~~that Region 2020, I think the N actually, with the~~

6   ~~logo, runs into the first 2.~~

7        Q    Did Regions Bank or Regions Financial

8   always participate in Region 2020 as a supporter

9   and a contributor?

10       A    You use the word "always".  I'll just

11  qualify and say to my knowledge, they usually

12  did.  And again, it's just another example.  Both

13  AmSouth and Regions have been great community

14  citizens.  So, yes, they typically were one of the

15  funders of the organization.

16       Q    Take a look at this Exhibit One-ten that

17  was placed in front of you.  Look at the last page

18  of it.  This is a copy of a letter that was cc'd

19  to you on November 2nd, 1997.  Do you see that?

20       A    Yes.

21       Q    Look down at the directors.  Am I

22  correct in understanding that this is the board of

23  directors of Region 2020 at the time shown here,

1    November of 1997?

2        A    I believe that's correct.

3        Q    Now, if you look down on that list, you

4    see the name Stan Mackin, Mr. Stan Mackin.  It's

5    about halfway down.

6        A    Yes, sir.

7        Q    Do you know Stan Mackin?

8        A    I do.

9        Q    Who is he?

10       A    He's the retired chairman of the board

11   of Regions Bank.

12       Q    Okay.  And was Stan Mackin on the board

13   of directors of Region 2020 in November of '97?

14       A    Yes, sir.

15       Q    Now, I also see down -- look down below

16   Mr. Mackin's name.  There's a name, Alton Parker.

17   Is that the lawyer at the Spain Gillon firm that

18   assisted Region 2020 with this license agreement?

19       A    It is.  And I can also say that Alton

20   was one of the original forty or so folks that

21   served as a volunteer and came to all those

22   meetings we had that decided what the organization

23   could look like.  And I see Dowd Ritter's name

1    there too, in response.  I want to be honest about

2    that.

3        Q    So that's the Dowd Ritter that is

4    currently the chairman of Regions Bank?

5        A    That's correct.

6        Q    Do you know a lady named Sheila Blair?

7        A    I do.

8        Q    Do you know whether or not Sheila Blair

9    has ever served on the board of directors of

10   Regions Financial?

11       A    I do.  She did.

12       Q    Does she still serve?

13       A    I think she's fully retired.  If she

14   does, I'm not aware that she's currently serving.

15   But she did at one point.

16       Q    Now, when did you become aware that

17   Southern Christian University had changed its name

18   to Regions University?

19       A    Well, no offense.  But it was when I got

20   the phone call from Dr. Turner.

21       Q    And tell me about that phone call.  When

22   was it and what was discussed?

23       A    It was within the last two to three

1    months.  And you left me a number of messages

2    indicating that we needed to talk, and left me

3    your cell phone.  And I called back and you called

4    back.  And we missed each other and finally we

5    connected.

6        Q    And what was the substance of that

7    conversation, just in your own words?

8        A    Just asked me about the relationship

9    between Region 2020 and Regions Bank.  And that's

10    -- it was a pretty short conversation, reminded me

11    that we had met at the university years ago.  And

12    I appreciated that.  But that -- that was also

13    part of our conversation.

14        Q    Did he tell you that Southern Christian

15    University had changed its name to Regions

16    University?

17        A    I think so.  I think that's where I

18    first learned that the change had taken place.

19        Q    Did you have any discussion with Dr.

20    Turner as to why they changed their name?

21        A    Not to my knowledge.

22        Q    Did you talk about this lawsuit that

23    you're here today testifying in?

1    ~~A    No.  I asked what was going on.  And I~~

2    ~~can't remember the exact words.  But it was~~

3    ~~pointed out that there was some confusion and~~

4    ~~questions being raised about Regions University,~~

5    ~~the new name for Southern Christian and the bank.~~

6    ~~Q    What did he tell you about that~~

7    ~~confusion?~~

8    ~~A    Well, he just wanted to know from my~~

9    ~~perspective about Region 2020.  And I was a little~~

10   ~~bit confused and a little more dense, I guess,~~

11   ~~than I am this morning.  But it took me a while to~~

12   ~~really connect as to what issue we had.~~

13        Q    Now, you were Chancellor of Birmingham

14   Southern College for how long?

15        A    Let's see.  Two and a half years.  Till

16   this past December 31st, '06.

17        Q    And you have been in the education

18   business a number of years, haven't you?

19        A    I have.

20        Q    Are you aware of a situation where

21   schools sometimes change their names to reflect

22   the influence of financial support of Donors?

23        A    I am.

```
 1        Q    Can you give me an example of some of
 2    those?
 3        A    Well, I mean, there are all sorts of
 4    motivations for changing names.  Southwestern
 5    University certainly did that.
 6        Q    What about Duke University?
 7        A    Duke did that, certainly.  Babson
 8    College up in New York State.  I mean, there are a
 9    number of schools.
10        Q    Did Oral Roberts do that?
11        A    Sure.
12        Q    Now, if a school -- if a college changed
13    its name to Wachovia University or SunTrust
14    University, would you think or wonder if those
15    schools were associated with the banks by those
16    respective names?
17             MR. HUDSON:
18             Object to the form of the question.
19             THE WITNESS:
20             I would.  I mean, those are -- those
21             are direct links to very visible
22             corporate entities.  So -- so I
23             would.
```

1    BY MR. PATERSON:

2         Q    Other than your chats with Dr. Turner,

3    have you had any chats with anybody else about

4    this deposition today or about this lawsuit?

5         A    I did call Ann Florie, who was the

6    former Executive Director, since I'm in the same

7    building with her, and asked her if she had been

8    subpoenaed.  And she said she had not been.

9         And we both sort of agreed we wouldn't talk

10   further.  And she said, you really need to talk to

11   Dalton to get a copy of that form that I raised

12   with her that I said back in the back of my mind.

13        And so I called then Dalton who was down at

14   the beach, Dalton Smith.  And he said he would

15   have his secretary fax me a copy, and she did.

16        Q    Have you talked to anyone else about it?

17        A    No.

18        Q    Have you talked to Mr. Hudson, here?

19        A    I'm sorry.  He called -- I called him

20   the other day because I couldn't figure out what

21   was going on.  His secretary said something about

22   I was going to get a subpoena.

23        And my secretary didn't ask enough questions

1   ~~that I thought, well, this is a bit of -- I have~~

2   ~~no idea what this is about.  So I called back and~~

3   ~~asked.~~

4   ~~Q    Did Tom tell you what the case was~~

5   ~~about?~~

6   ~~A    Yeah.  I mean --~~

7   ~~Q    What did he tell you?~~

8   ~~A    Just --~~

9   ~~Q    In your own words.~~

10  ~~A    Just that it would be helpful if I would~~

11  ~~testify as one of the persons involved in the~~

12  ~~early operation of Region 2020.~~

13  ~~Q    Did he ask you to testify to any~~

14  ~~particular thing or anything like that?~~

15  ~~A    He did not.~~

16  ~~MR. PATERSON:~~

17  ~~I don't have any further questions.~~

18  ~~Thank you so much though.~~

19  ~~EXAMINATION~~

20  ~~BY MR. HUDSON:~~

21  ~~Q    I've got just a couple and then we'll be~~

22  ~~through.  Do you recall that when Dr. Turner~~

23  ~~called you that you told him that you were unable~~

1    to connect Region 2020 with Regions Bank?

2         A   Well, I said, "I'm having difficulty

3    trying to figure out what this is really all

4    about."  And then I finally did as we talked

5    further.  But I wasn't even clear then other than

6    in the back of my mind.

7         And when I hung up the phone, I talked to my

8    secretary, who's been with me for thirty-one

9    years.  And I thought that's what it was.

10        Q   Before you talked to your secretary, did

11   you even remember that you had signed Exhibit One

12   Thirty-seven?

13        A   I remembered that there was some

14   conversation, some issue back there early on.  But

15   I'll be honest with you, until I sat and thought

16   about it, I didn't -- didn't put together the -- I

17   didn't remember the agreement.  And so --

18        Q   And do you remember after the date that

19   the agreement was signed, anything coming up about

20   the subject of the agreement at all at any time?

21        A   I don't.  And I think I would have known

22   if Regions was upset with Region 2020.  I think I

23   would have known about that.

1            ~~MR. HUDSON.~~

2            ~~Thank you, sir.~~

3            ~~MR. PATERSON.~~

4            ~~Thank you.~~

5

6    FURTHER, DEPONENT SAITH NAUGHT.

7                    * * * * * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1                           CERTIFICATE
2
3          STATE OF ALABAMA:
           COUNTY OF MOBILE:
4
5
               I, David Michael Camp, a Notary Public in and
6
           for the State of Alabama at Large, hereby certify
7
           that the within-named witness, NEAL BERTE, who was
8
           made known to me, was, by me, first duly sworn to
9
           speak the truth, the whole truth, and nothing but
10
           the truth in the case aforesaid; that the
11
           testimony then given by said witness was, by me,
12
           reduced to shorthand in the presence of said
13
           witness, afterwards transcribed; and that the
14
           foregoing is a true and correct transcription of
15
           the testimony so given by the witness as
16
           aforesaid.
17
               I further certify that this deposition was
18
           taken at the time and place as specified in the
19
           foregoing caption and was completed without
20
           adjournment.
21
               I further certify that I am not a relative,
22
           counsel or attorney for either party, or otherwise
23         interested in the outcome of this action.

1          IN WITNESS WHEREOF, I have hereunto set my

2     hand and affixed my seal at Mobile, Alabama on

3     this, the 16th day of August, 2007.

4

5

6                              _____

7                              David Michael Camp

                               Notary Public in and

8                              For Alabama at Large.

9

10    My Commission expires February 20, 2008.

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF ALABAMA

 3                      NORTHERN DIVISION

 4

 5    REGIONS ASSET COMPANY,

 6           Plaintiff,

 7    Vs.                              CIVIL ACTION NO.

                                       2:06CV882-MHT

 8    REGIONS UNIVERSITY, INC.,

 9           Defendant.

10

11              * * * * * * * * * * * * *

12

13           TELEPHONIC DEPOSITION OF PATSY FULGHUM,

14    taken pursuant to stipulation and agreement before

15    Lisa J. Green, Registered Professional Reporter and

16    Commissioner for the State of Alabama at Large, in

17    the Law Offices of Balch & Bingham, Suite 200, 105

18    Tallapoosa Street, Montgomery, Alabama on

19    Wednesday, August 15, 2007, commencing at

20    approximately 3:00 p.m.

21

22              * * * * * * * * * * * * *

23
```

```
1                          APPEARANCES
2
3       FOR THE PLAINTIFF:
4       Mr. Charles B. Paterson
        BALCH & BINGHAM
5       Attorneys at Law
        Suite 200
6       105 Tallapoosa Street
        Montgomery, Alabama  36104
7
8
        FOR THE DEFENDANT:
9
        Mr. Victor T. Hudson (via telephone)
10      HUDSON & WATTS
        Attorneys at Law
11      Suite 2500
        One St. Louis Centre
12      Mobile, AL  36602
13
14
                    * * * * * * * * * * * *
15
16
                        EXAMINATION INDEX
17
18      PATSY FULGHUM
            BY MR. PATERSON  . . . . .  . . . .     4
19
20
21
22          (No exhibits were marked to this deposition.)
23
```

1                          STIPULATION

2              It is hereby stipulated and agreed by and

3        between counsel representing the parties that the

4        deposition of PATSY FULGHUM is taken pursuant to

5        the Federal Rules of Civil Procedure and that said

6        deposition may be taken before Lisa J. Green,

7        Registered Professional Reporter and Commissioner

8        for the State of Alabama at Large, without the

9        formality of a commission, that objections to

10       questions other than objections as to the form of

11       the question need not be made at this time but may

12       be reserved for a ruling at such time as the said

13       deposition may be offered in evidence or used for

14       any other purpose by either party provided for by

15       the Statute.

16             It is further stipulated and agreed by and

17       between counsel representing the parties in this

18       case that the filing of said deposition is hereby

19       waived and may be introduced at the trial of this

20       case or used in any other manner by either party

21       hereto provided for by the Statute regardless of

22       the waiving of the filing of the same.

23             It is further stipulated and agreed by and

```
 1    between the parties hereto and the witness that the

 2    signature of the witness to this deposition is

 3    hereby not waived.

 4

 5                    * * * * * * * * * * * *

 6

 7                        PATSY FULGHUM

 8          The witness, after having first been duly

 9    sworn to speak the truth, the whole truth and

10    nothing but the truth testified as follows:

11                        EXAMINATION

12    BY MR. PATERSON:

13    Q.   Ms. Fulghum, as I indicated to you, my name

14         is Charlie Paterson.  I'm a lawyer for

15         Regions Bank, and I've got a series of

16         questions for you.  And I'll try to move

17         through this rapidly because we're taking a

18         telephone deposition and taking up

19         everybody's -- your time and everybody

20         else's.

21    A.   Okay.

22    Q.   If you have any questions or you -- if I'm

23         unclear or you don't understand a question,
```

1    ~~please tell me and I'll rephrase it.  Okay?~~

2    ~~A.   All right.~~

3    Q.   I need you to state your whole name for the

4         record and then your residence address,

5         please.

6    A.   Patsy Mott Fulghum.  And my address is 62

7         Wateree Key Drive, Greensboro, South

8         Carolina 29180.

9    ~~Q.   Okay.  Where are you located now?~~

10   ~~A.   I'm at home.~~

11   ~~Q.   You're at home?~~

12   ~~A.   Yes.~~

13   Q.   Okay.  By whom are you employed?

14   A.   Regions University.

15   Q.   What are your duties with Regions

16        University?

17   A.   I'm the director of student services.

18   Q.   Okay.  And give me -- tell me what the

19        director of student services does.

20   A.   I basically handle student problems.  I

21        work with the appeals committee and the ADA

22        as ADA coordinator and handle problems that

23        may occur for students at the university.

1    Q.    What kind of thing would be appealed?  Tell
2          me about that.
3    A.    Just if we have students with problems and
4          maybe -- just any type problem, and they
5          would appeal it to the committee.
6    Q.    A problem with a grade or a problem with a
7          course?  What kind of problem?  Personal
8          problems?  What kind of problems typically?
9    A.    Primarily grades and the courses and maybe
10          registration.  They may have had problems
11          with registration.  Just anything that a
12          student has that the appeals committee can
13          address and help them with it.
14    Q.    Tell me what the appeals committee is.
15    A.    The appeals committee is basically for
16          students when they need assistance and no
17          one -- due to policy, someone cannot do
18          anything about it and then they go to the
19          appeals committee to appeal any problem
20          they may have, and so the committee
21          addresses that.
22    Q.    Can you tell me who currently serves on the
23          appeals committee?

1    A.    Yes.  It's Dr. Stanley Patterson, Dr. -- I

2          mean, I'm sorry.  Dr. Stanley Patterson,

3          Rick Johnson, Barbara Turner, Anita Crosby,

4          Elaine Tarence --

5    Q.    Does Tarence start with a T?

6    A.    Tarence, yes.

7                    -- and Rosemary Kennington.

8    Q.    Do you know where they all live?

9    A.    No, I don't.

10   Q.    Do any of them live in Montgomery, Alabama?

11   A.    I'm not sure.

12   Q.    Okay.  Have you ever had occasion to come

13         to Montgomery, Alabama and perform services

14         for Regions University?

15   A.    Yes, I've been on campus.

16   Q.    When is the last time you were on campus?

17   A.    It's been several months ago.  I'm really

18         not sure, but it's been, I want to --

19         before Christmas, but I'm not sure.

20   Q.    How many times have you been on campus?

21   A.    Probably three times.

22   Q.    Okay.  And how long have you worked for

23         Regions University?

```
 1    A.    Approximately a year and a few months.

 2    Q.    Do you work from an office or do you work

 3          from home?

 4    A.    I work from home.  I have an office in my

 5          home.

 6    Q.    In a typical day's activities, give me an

 7          idea of what you do in a typical day for

 8          Regions University.

 9    A.    Basically what I stated prior to with the

10          committees.  I work with the committees,

11          and I work with students.  At certain

12          times, if we're -- you know, someone is

13          out, I may answer the phone for them or

14          catch something.  But most of the time,

15          it's what I stated prior to.

16    Q.    Are you obligated to put in an eight-hour

17          day or is your time flexible?

18    A.    My time is basically a standard eight-hour

19          day, 40 hours a week.

20    Q.    And when do you start and when do you stop?

21    A.    I start at eight o'clock Eastern Time, and

22          I'm off at five o'clock in the afternoon.

23    Q.    And I know the number I called you -- the
```

1    ~~number I called today is your work number?~~

2    ~~A.    Yes.~~

3    Q.    Is most of your contact with people on

4          behalf of Regions University, is that done

5          by telephone --

6    A.    Yes.

7    Q.    -- and the computer?

8    A.    Yes.

9    Q.    So e-mails and conference calls on the

10         telephone?

11   A.    Yes.

12   Q.    Do you have occasion to see anybody in

13         person while performing duties for Regions

14         University?

15   A.    No.

16   ~~Q.    Do you have any kind of other employment~~

17   ~~other than your employment for Regions~~

18   ~~University?~~

19   ~~A.    No.~~

20   ~~Q.    How did you get your job with Regions?~~

21   ~~A.    I was just hired as an advisor.~~

22   ~~Q.    You were hired as an advisor?~~

23   ~~A.    Yes, I was hired as an advisor.~~

1    Q.    Did you apply for --

2    A.    I applied --

3    Q.        work there or --

4    A.    Yes.

5    Q.    How did you even know about it?

6    A.    I just had a friend that informed me of the

7          job, and I applied for it.

8    Q.    Who was that friend?

9    A.    Well, actually, he was -- let me think.  It

10         was Dr. John White.  He was actually my

11         previous boss at another job prior to

12         working for here, and he -- he was the one

13         that contacted me.  He was also a friend of

14         mine.

15    Q.    Okay.  So he solicited you to see if you

16         wanted to come to work there, right?

17    A.    Yes, to see if I was interested in the job.

18    Q.    And you were, and you submitted an

19         application?

20    A.    Correct.

21    Q.    Who did you submit that to?

22    A.    To Regions University.

23    Q.    Here in Montgomery?

1    ~~A.    Yes.~~

2    Q.    How are you compensated?

3    A.    I'm paid by salary.

4    Q.    Do you receive a monthly salary or a weekly

5          salary?

6    A.    A monthly salary.

7    ~~Q.    Okay.  Do you receive any payment for~~

8    ~~overtime if you have occasion to work~~

9    ~~overtime?~~

10   ~~A.    No.~~

11   ~~Q.    Do you know the difference between an~~

12   ~~exempt employee and a non-exempt employee~~

13   ~~for overtime purposes?~~

14   ~~A.    If you can explain that, I would appreciate~~

15   ~~it.~~

16   ~~Q.    Are you part of management?~~

17   ~~A.    Well, as director of student services, I'm~~

18   ~~considered in administration.~~

19   ~~Q.    So you don't get overtime if you happen to~~

20   ~~work more than 40 hours, correct?~~

21   ~~A.    No.  That's correct.  I don't.~~

22   ~~Q.    Okay.  Are you eligible for any type of~~

23   ~~bonus arrangement?~~

1      A.   No.

2      Q.   Do you ever have occasion to -- when you

3           say you sometimes answer the phone, are you

4           answering the phone of people that have

5           inquiries -- prospective students that have

6           inquiries about the school?

7      A.   Yes.

8      Q.   What percentage of your time is taken up

9           with talking with prospective students as

10          opposed to existing students?

11     A.   Probably about five percent of the time.

12     Q.   Is prospective students?

13     A.   Yes.  It depends on the time, but probably

14          five to ten percent of the time.

15     Q.   Okay.  Now, when prospective students call,

16          do you get any kind of bonus or any kind of

17          additional compensation for signing them up

18          as students?

19     A.   No.

20     Q.   Are you aware of anybody who works for

21          Regions University that gets any kind of

22          additional compensation or a bonus for

23          signing up students?

1     A.   No.

2     Q.   What was your prior employment?  What did

3          you do?

4     A.   I worked for Alabama Southern Community

5          College in Alabama.

6     Q.   And where is that located?

7     A.   My campus was in Jackson, Alabama.

8     Q.   Did you have any experience as a recruiter

9          there?

10    A.   Yes, I did.

11    Q.   Tell me what you did for them.

12    A.   When I left them, I was the director of a

13         campus -- of Jackson campus.  I was the

14         coordinator of federal programs, of three

15         federal programs.

16    Q.   Have you had any experience as a telephone

17         operator?

18    A.   Yes, I have.

19    Q.   Tell me about that.

20    A.   It was a similar fashion.  If someone was

21         out, I caught the phone.

22    Q.   And just catching the general phone for the

23         school -- phone number for the school?

1    A.   Yes.

2    Q.   Now, you're there in your home in North

3         Carolina, correct?

4    A.   South Carolina.

5    Q.   South Carolina.  I'm sorry.

6              Is anybody there with you in the room?

7    A.   No.

8    Q.   Do you have any books or reports or records

9         or any kind of documents of any type that

10        you have there with you?

11   A.   I don't understand what you're asking.

12             MR. HUDSON:  Is there any

13             relevance to this?

14             MR. PATERSON:  Yeah.  Yeah.  Yeah.

15   Q.   I'm trying to find out if you've got any

16        list or documents or anything in -- any

17        written materials or anything on your

18        computer screen that you are referring to

19        when you're answering these questions.

20   A.   No.

21   Q.   You just have your normal records that

22        you --

23   A.   Yes.

1    Q.    -- that are normally in your office?

2    A.    Just my normal records.

3    Q.    Have you talked to anyone before about this

4          lawsuit that's going on here entitled

5          Regions Financial versus Regions

6          University?

7                    MR. HUDSON:  Excuse me.  Before

8                    you answer -- you can answer

9                    as to whether or not you've

10                   talked to me or another

11                   lawyer, but, please, don't

12                   disclose the content of any

13                   conversation with me or

14                   another lawyer.

15   A.    I've talked with the lawyer and --

16   Q.    You talked with Mr. Hudson?

17   A.    Yes.

18   Q.    Okay.  Who else have you talked with about

19         the case?

20   A.    Just general talk with the college, and

21         that's it.

22   Q.    Have you talked to Dr. Turner about it?

23   A.    Yes, I have.

1 ~~MR. HUDSON:  And let me say that~~

2 ~~any conversation that she had~~

3 ~~with Dr. Turner or anybody~~

4 ~~else that I was not a~~

5 ~~participant in, you may fully~~

6 ~~answer with regard to that.~~

7 ~~But if it was a conversation~~

8 ~~that we participated in,~~

9 ~~please don't answer about~~

10 ~~that.~~

11    Q.    How many times have you talked to

12          Dr. Turner about this lawsuit?

13    A.    I would say probably three times.

14    ~~Q.    On each of those occasions, were any of the~~

15          ~~lawyers present?~~

16    ~~A.    Yes.~~

17    ~~Q.    On one of them or two of them or three of~~

18          ~~them?~~

19    ~~A.    On one occasion.~~

20    ~~Q.    On the occasions that -- where a lawyer was~~

21          ~~not present, were those occasions on the~~

22          ~~telephone when you talked to Dr. Turner?~~

23    ~~A.    Yes.~~

1      Q.   And what did he tell you about the case?

2      A.   He just gave me -- informed me that there

3           was a case and -- with no details.  That

4           was it.  He just told me that there was a

5           case against the school based on the name.

6      Q.   Can you remember anything else he told you?

7      A.   That's all I can remember.

8      Q.   What did he ask you to do regarding the

9           case?

10     A.   He really didn't ask me to do anything.

11     Q.   Did someone ask you to give a deposition in

12          the case?

13     A.   I was told that there would be a deposition

14          when the lawyer -- when I talked with the

15          lawyer, and that was all.

16     Q.   Okay.  Other than Dr. Turner, have you

17          talked to anybody else at the school about

18          the case?

19     A.   No, not really, nothing in depth.  We were

20          informed there was a case, and that's all

21          we know.

22     Q.   Have you ever been informed or given any

23          information to give prospective students or

1 ~~prospective callers that call in wanting to~~

2 ~~know about the case?~~

3 ~~A.   Not that I recall.~~

4 ~~Q.   Have you ever had anybody call you and ask~~

5 ~~you about the lawsuit that's going on?~~

6 ~~A.   No, I haven't.~~

7 Q.   Have you ever had anybody call you and ask

8      you if Regions University was in any way

9      connected with or affiliated with Regions

10      Bank?

11 A.   Yes, I have been called.

12 Q.   Tell me about that.

13 A.   The person that called in asked me if we

14      were affiliated with Regions Bank, and I

15      said, no, that we were Regions University.

16 Q.   How did you know that Regions Bank wasn't

17      affiliated with Regions University?

18 A.   Because I work with the university, and I

19      know we have no ties with Regions Bank.

20 Q.   You just know -- that's your own personal

21      knowledge?

22 A.   Yes.

23 ~~Q.   Okay.  When you lived in Alabama, did you~~

| 1 | | ~~bank at Regions Bank?~~ |
| 2 | ~~A.~~ | ~~No.~~ |
| 3 | Q. | And is it fair to say you were aware that |
| 4 | | Regions Bank was a major bank in Alabama? |
| 5 | A. | I'm familiar with Regions Bank, yes. |
| 6 | Q. | When was that call when somebody called in |
| 7 | | and asked that question of you? |
| 8 | A. | I can't recall.  It's been so long ago that |
| 9 | | I just -- I can't recall exactly when it |
| 10 | | was. |
| 11 | Q. | Do you think it was this calendar year in |
| 12 | | '07? |
| 13 | A. | I'm just not sure. |
| 14 | Q. | So you don't know whether it was '06 or |
| 15 | | '07? |
| 16 | A. | I don't. |
| 17 | Q. | Is that the only call you've ever gotten |
| 18 | | with an inquiry of that nature? |
| 19 | A. | Yes. |
| 20 | Q. | Are you aware of any of your colleagues |
| 21 | | that work for the school that have received |
| 22 | | questions of that nature over the |
| 23 | | telephone? |

```
1     A.    One other.

2     Q.    What's that person's name?

3     A.    Carolyn --

4     Q.    Hughes?

5     A.    Hughes, yes.

6     Q.    What did Ms. Hughes tell you about her

7           call?

8     A.    I can't remember.  It's been so long ago, I

9           really can't remember exactly what her call

10          was like.  We briefly talked, and that was

11          it.  And I can't even recall the

12          conversation it's been so long ago.

13    Q.    Where does Ms. Hughes live?  Do you know?

14    A.    She lives in Arkansas.

15    Q.    Do you know how Ms. Hughes came to work for

16          Regions University?

17    A.    No, I don't.

18    Q.    How long have you known Ms. Hughes?

19    A.    Since I've been employed with the

20          university.

21    Q.    Now, I think I've gone through some

22          questions about anyone you've talked to

23          about the case.  Can you remember anyone
```

1    ——————— else you've talked to about this case?

2    —— A.   —Not that I can remember.

3       Q.   Have you talked to anybody else about

4            Regions University and Regions Bank?

5       A.   No, I haven't.

6       Q.   Has anybody ever sent you any e-mails

7            making inquiry about Regions University and

8            Regions Bank and any possible connection?

9       A.   No.

10   —— Q.   —Have you ever visited the Regions Bank Web

11   ——————— site?

12   —— A.   —No.

13   —— Q.   —Have you ever visited Regions University's

14   ——————— Web site?

15   —— A.   —Regions University, yes.

16   —— Q.   —Do you make —— do you routinely make use of

17   ——————— your company's —— I mean school's Web site?

18   —— A.   —Yes.  I'm on our Web site daily.

19   —— Q.   —What do you do on the Web site?  How do you

20   ——————— use it?

21   —— A.   —If a student calls in for information, we

22   ——————— have a request for information on our Web

23   ——————— site that we —— if they have not filled it

1    ~~out, we fill out the request for~~

2    ~~information for that student -- or~~

3    ~~prospective student I should say.~~

4    Q.    Was the person that called you and asked

5          about Regions Bank in connection with

6          Regions University, was that a prospective

7          student?

8                    MR. HUDSON:  If you know.

9    A.    I don't know that that was -- That was the

10         whole conversation.  It was based on --

11         What I told you was pretty well the primary

12         conversation.

13   Q.    And they didn't identify themselves?

14   A.    No, they did not.

15   ~~Q.    Do you have any kind of recording or~~

16   ~~anything of that call?~~

17   ~~A.    No, I don't.~~

18   ~~Q.    Have you had any conversations with Anita~~

19   ~~Crosby about this lawsuit?~~

20   ~~A.    She informed me of the time of the~~

21   ~~deposition.  She's the one that coordinated~~

22   ~~this with me and the lawyer and you.~~

23   ~~Q.    And I want to be careful with you.  I want~~

1          to know about conversations you had with

2          Ms. Crosby not in the presence or not on

3          the phone with a lawyer.  Okay?

4              Did Ms. Crosby tell you anything about

5          what the case was about?

6     A.   No.  She was in the meeting with the

7          lawyer.

8     Q.   Who do you report to in your job?

9     A.   Dr. Stanley Patterson and Dr. Rex Turner.

10    Q.   Where is Dr. Patterson located?

11    A.   He's in north Alabama.

12    Q.   Do you know where?

13    A.   No, I don't.

14    Q.   Do you communicate with him by telephone

15         and e-mail?

16    A.   Yes.

17    Q.   Have you ever met him?

18    A.   Not in person.

19    Q.   Have you ever met Dr. Turner in person?

20    A.   Yes.

21    Q.   How many times?

22    A.   The three times that I was on campus.

23    Q.   Okay.  Have you ever attended -- I think

1           we've talked about your in-person meetings,

2           and I think we've talked about your

3           telephone conferences.

4               Have you ever had any other kind of

5           meetings, like a group of employees of the

6           school would get together for a seminar or

7           anything like that or training?

8       A.   We've had training on the Web, but I

9           haven't had anything in person as far as

10          the university.  I provided one training

11          workshop for the advisors.

12      Q.   Okay.  How do you --

13      A.   That was in person.

14      Q.   Was there -- What type of training program

15          did you receive?  Can you describe that for

16          me?

17      A.   I was the one that provided the training,

18          and it was on just team building.

19      Q.   So you did team building training on --

20          using the internet?

21      A.   No, that was on campus.  That was in

22          person.

23      Q.   Okay.  So you came to Montgomery and

1           presented -- made a presentation to a group

2           of people in person?

3    A.    Yes.

4    Q.    How long did that last?

5    A.    That was a half of a day training.

6    Q.    Was that one of the times you came to

7           Montgomery?

8    A.    Yes, it is.

9    Q.    Where did you get your information about

10          team building?  Where did you get your

11          expertise in that area?

12   A.    I've done some consultant work in team

13          building and so forth within the industry

14          over the years.

15   Q.    What is your educational background?

16   A.    My four-year degree is in business, and my

17          master's degree is in counseling.

18   Q.    Where are those degrees from?

19   A.    My four-year degree is from Athens State

20          University, and my master's degree is from

21          West Alabama.

22   Q.    Livingston?

23   A.    Yes.

1    Q.   I don't know whether you're married or --

2         Are you married?

3    A.   Yes, I am.

4    Q.   And what was your -- the name under which

5         your degrees were obtained?

6    A.   Under Patsy Mott.

7    Q.   M-O-T-T?

8    A.   Yes.

9    Q.   Can you tell me when those degrees were

10        obtained?

11   A.   Oh, my goodness.  Not really.  It's been so

12        long, I couldn't tell you the exact years.

13   Q.   I understand.  I understand that pretty

14        well.  Have you received any materials in

15        addition to what you can get off the

16        school's Web site that help you in your

17        job?

18             And what I'm trying to figure out -- I

19        wasn't very clear with that.  What I'm

20        trying to figure out, have they shipped you

21        any materials in addition to what you can

22        download or view on the Internet?

23   A.   By mail or UPS -- no, I haven't that I can

1        remember.  I mean, over the past year or

2        so, there could have been something sent to

3        me by mail.  Sometimes I get mail there and

4        they send it, but I don't remember anything

5        specific.  I mean, I could have.  I just --

6        I just don't remember.

7    Q.   How do you get your paycheck?

8    A.   I get it by mail.

9    Q.   Does it come from Montgomery?

10   A.   Yes, it does.

11   Q.   Does ever a part of your job -- Does your

12        job ever include talking to prospective

13        students and trying to sell them on the

14        school or convince them that it's a good

15        thing to do, enroll in the school?

16             MR. HUDSON:  Object to the form.

17   Q.   You can answer.

18   A.   I'm sorry.  I didn't hear that.

19   Q.   Do you ever have occasion in the course of

20        your job duties to try to convince somebody

21        to attend Regions University?

22   A.   As a recruiter, yes, I have.

23   Q.   Do you have any recruiting tools other than

```
 1              what you may get off the internet, the
 2              school's Web site?
 3        A.    I primarily go by the Web site.
 4        Q.    Do you keep either some kind of record,
 5              either paper or electronic, of the number
 6              of calls you get from prospective students?
 7        A.    No, I don't.
 8        Q.    If you wanted to try to figure out how many
 9              prospective students that you've helped get
10              enrolled there, how would I go about doing
11              that?
12        A.    The students generally fill out a request
13              for information on the Web or we will fill
14              it out for them, and the request for
15              information is the only way I can go back
16              and access that.
17        Q.    Would any request for information have a
18              reference to someone like yourself they've
19              talked to?
20                   In other words, if the school has a
21              record -- like if I have a request for
22              information, me personally, at the school
23              and I've talked to someone like you, would
```

1          it make reference that I had spoken with a

2          representative of the school?

3     A.   I don't know.  I don't know.  I don't get

4          that information, so I don't know.

5     Q.   Do you help prospective students fill in

6          this form online when they call you?

7     A.   At certain times.  If they have not filled

8          it out, I do.

9     Q.   And when you're filling it out, do you ever

10         make reference to the fact that they've

11         talked to you?

12    A.   There may be times -- certain times on the

13         comment section that I may say that I spoke

14         with that student on the telephone and that

15         they are interested in an advisor calling

16         them, and I will put my initials on there,

17         but that's only if I -- if they want to

18         talk with an advisor.

19    Q.   Now, if someone just -- do you have caller

20         ID on your phone?

21    A.   Yes, I do.

22    Q.   What does it show -- where does it show

23         this call was initiated from today we're

1         making?

2    A.   334-956-8143.

3    Q.   Do you have a caller ID record of the

4         people that call in there?  Does the phone

5         company print that out for you at the end

6         of the month, anything like that?

7    A.   No.

8    Q.   Do you keep a record of it?

9    A.   I'm sorry?

10   Q.   Do you keep a record of the date and time

11        and numbers of calls that come in?

12   A.   No, I don't.

13   Q.   So you can't -- you have no record -- am I

14        correct in understanding, you have no

15        records that show how many calls you field

16        per week?

17   A.   No, I don't have that record, no.

18   Q.   I mean, is there such a record?

19   A.   I don't know.

20   Q.   If you wanted to figure out how many calls

21        you fielded last week, what would you do?

22   A.   The only thing I would do is -- my

23        telephone does keep the caller ID for so

 1        many -- for a certain number of calls and

 2        then it will drop the calls.  So I can look

 3        back, but it only records a certain number

 4        of calls as far as I know.  I've never had

 5        to do that, so I really don't know.

 6    Q.  Nobody at the school has ever asked you to

 7        go back and say, how many people did you

 8        talk to last month or last week?

 9    A.  No.

10    Q.  And am I right in understanding that the

11        information you give to prospective

12        students about the school you get off the

13        school's Web site?

14    A.  Generally, yes, either the Web site or the

15        catalog that's on the Web site.

16    Q.  If I was a prospective student and called

17        you and asked you the question how many

18        undergraduate students were enrolled in the

19        school last year, how would you go about

20        finding that answer?

21    A.  I would probably contact someone at the

22        college and try to get that number.

23    Q.  Who would you call?

1     A.     I'd probably call Barbara Turner in the

2           business office.

3     Q.     Do you know how many undergraduates were

4           enrolled last year at the school?

5     A.     I really don't.

6     Q.     Have you got any judgment?  I mean, is it a

7           hundred or 500 or a thousand?

8     A.     I don't --- I don't know.

9     Q.     Do you know how many are enrolled right

10          now?

11    A.     No, I don't.

12    Q.     Do you know what the current tuition is for

13          a prospective student in the undergraduate

14          program?

15    A.     Yes, I do.

16    Q.     How much is that?

17    A.     250 per credit hour.

18    Q.     And where do you get that information from?

19    A.     It's on the Web site.

20    Q.     So you don't have any judgment at this time

21          about how many undergraduate students there

22          are?

23    A.     I don't.

1    Q.   If a student asked you about what the

2         admission standards are, what do you tell

3         them?

4    A.   I direct them to the Web site.  And on the

5         Web site it's got four steps, and they are

6         to follow those four steps of admission.

7                   MR. PATERSON:  Let me ask you

8                   this.  We have another -- I'm

9                   just about -- I'm almost done

10                  with you, a few more

11                  questions.  But we have

12                  another telephone deposition

13                  of Mrs. Carolyn Hughes, and

14                  she's at another number.

15                       I think what I need to do

16                  is call Mrs. Hughes and tell

17                  her we're going to be a few

18                  minutes late, so can we take a

19                  quick break and -- or, Tom, do

20                  you want to do that?

21                  MR. HUDSON:  No, that's fine.

22                  Somebody needs to do it I

23                  suppose.

1    ~~THE WITNESS: If you don't mind, I~~
2    ~~can do that. I can just pause~~
3    ~~this and call her.~~
4    ~~MR. PATERSON: Pause it and -- do~~
5    ~~that and tell her it will be~~
6    ~~about 15 to 20 minutes and~~
7    ~~we'll be in touch with her.~~
8    ~~(Brief recess was taken.)~~
9    Q.   So if a student calls and asks what type
10        of -- you know, are any high school grades
11        required or any standardized test scores,
12        anything like that required, how would you
13        answer those kind of questions?
14   A.   All of that is on the Web site.  And they
15        could go to the Web site and see what the
16        admissions requirements are and register --
17        they can register online.  They find out
18        all that information there.
19   Q.   Do you typically get calls from prospective
20        students at some times of the year more
21        than others?  Like now it's August now.  Do
22        you get more calls, say, this time of year
23        for people trying to enroll in the fall?

```
 1    A.   Yes, we do.

 2    Q.   So there's some times of the year more

 3         active than others with prospective

 4         students?

 5    A.   Oh, yes.

 6    Q.   What are your most active times?

 7    A.   Generally, it's the fall of the year

 8         because everybody looks at that as the

 9         beginning.

10    Q.   Okay.  Do you typically get those calls

11         from prospective students during the day?

12         I guess you would because you work during

13         the day, don't you?

14    A.   Yes.

15    Q.   If I called your number after hours, would

16         I get an answering machine and you'd call

17         me back?

18    A.   Well, since I'm at home, I do answer the

19         phone at times.  But if I'm not logged in

20         and you called the general number, it would

21         not go through.  If you called my number

22         direct, I would answer it if I was in the

23         house.
```

1    Q.    If you're not available -- let's say you're
2          in the yard and you go -- walk to the
3          mailbox and your number, you know, rings,
4          will it roll over to someone else?
5    A.    Yes, it will roll over.
6    Q.    Who does it roll over to?
7    A.    I'm not sure, but I think it goes to the
8          basic operator.
9    Q.    All right.  And do you know where that
10         person is located?
11   A.    Well, the main operators are on the main
12         campus in Montgomery.
13   Q.    Now, do you know when the school advertises
14         on TV or radio?
15   A.    I don't.
16   Q.    Do you know who determines what schedule
17         the advertisements will be placed?
18   A.    I think it's our marketing director.
19   Q.    Who is that?
20   A.    Laina Costanza.
21   Q.    Do you typically field more calls from
22         prospective students after advertising has
23         been run?

1    A.    I really don't know.  A lot of times they

2          don't say, so I couldn't answer that.  I

3          don't know.

4    Q.    Are you advised by the school prior to the

5          time ads are going to be run?

6    A.    No.

7    Q.    Now, let me call your attention to calendar

8          year '07, which is this year, as opposed to

9          calendar year of last year.  In your

10         judgment, have you received more calls from

11         prospective students this year or last

12         year?

13   A.    I really haven't noticed any difference.

14   Q.    Is it fair to conclude -- In your judgment,

15         it's about the same each year?

16   A.    I just can't remember last year as opposed

17         to this year, so I really couldn't answer

18         that.

19   Q.    Did you tell me previously there are no

20         logs or records that would show the volume

21         of calls that you receive?

22   A.    Actually, I don't -- I don't know if there

23         are records.  I don't get those records, so

1          I don't know.

2     Q.   Like if I was trying to figure out did you

3          talk to more prospective students in August

4          of this year or August of last year, do you

5          know how I might go about figuring that

6          out?

7     A.   I really don't know.

8     Q.   Who would you contact if you wanted to

9          know?

10    A.   Probably either Barbara Turner at the

11         business office or we have an enrollment

12         management area.

13    Q.   Has anyone at the school ever told you how

14         to reply to someone that asked if there was

15         a connection between Regions University and

16         Regions Bank?

17    A.   Not that I remember.

18    Q.   What I'm trying to figure out is, have you

19         gotten any instructions on how to field a

20         question like that?

21    A.   We pretty well field the question with --

22         stating that we're Regions University.  I

23         don't know that it's -- we haven't had any

1    training in that.

2    Q.    Let me review my notes.  I think we're

3    about done.

4         When you received the call asking

5    whether or not there was some connection

6    between Regions University and Regions

7    Bank, did you report this to anyone at the

8    school?

9    A.    I didn't report it.  It was just mentioned

10    in a general conversation.

11    Q.    Who did you tell about that?

12    A.    Dr. Rex Turner.

13    Q.    What did you tell him?

14    A.    Just in a general conversation, I told him

15    that we had received a call that someone

16    asked if we were affiliated.

17    Q.    And what was his reply to you?

18    A.    He just -- he didn't really have much to

19    say.  He just didn't reply -- I mean, he

20    didn't really say much of anything.

21    Q.    Was that a face-to-face conversation with

22    Dr. Turner or over the telephone?

23    A.    No, that was on the phone.

1                              MR. PATERSON:  I think that's all

2                          I've got, and I sure

3                          appreciate your help.

4                    THE WITNESS:  Okay.

5                    MR. PATERSON:  Tom?

6                    MR. HUDSON:  I don't have any

7                    questions.  Thank you.

8                    (Deposition concluded at 3:40 p.m.)

9

10

11

12

13

14

15

16              *  *  *  *  *  *  *  *  *  *  *  *

17         FURTHER DEPONENT SAITH NOT

18              *  *  *  *  *  *  *  *  *  *  *  *

19

20

21

22

23

```
1                    REPORTER'S CERTIFICATE

2    STATE OF ALABAMA:

3    MONTGOMERY COUNTY:

4           I, Lisa J. Green, Registered Professional

5    Reporter and Commissioner for the State of Alabama

6    at Large, do hereby certify that I reported the

7    deposition of:

8                    PATSY FULGHUM

9    who was first duly sworn by me to speak the truth,

10   the whole truth and nothing but the truth, in the

11   matter of:

12                REGIONS ASSET COMPANY,

13                Plaintiff,

14                Vs.

15                REGIONS UNIVERSITY, INC.,

16                Defendant.

17                In The U.S. District Court

18                For the Middle District of Alabama

19                Northern Division

20                Case Number 2:06CV882-MHT

21   on Wednesday, August 15, 2007.

22           The foregoing 40 computer printed pages

23   contain a true and correct transcript of the
```

1    examination of said witness by counsel for the

2    parties set out herein.  The reading and signing of

3    same is hereby not waived.

4            I further certify that I am neither of kin

5    nor of counsel to the parties to said cause nor in

6    any manner interested in the results thereof.

7            This 17th day of August 2007.

8

9

10                    _____

                    Lisa J. Green, Registered

11                    Professional Reporter and

                    Commissioner for the State

12                    of Alabama at Large

13

14

15

16

17

18

19

20

21

22

23

1

2

3          I, Patsy Fulghum, hereby certify that I have

4     read the foregoing transcript of my deposition

5     given on Wednesday, August 15, 2007, and it is a

6     true and correct transcript of the testimony given

7     by me at the time and place stated with the

8     corrections, if any, and the reasons therefor noted

9     on a separate sheet of paper and attached hereto.

10

11

12

13                              _____

                                Patsy Fulghum

14

15

16

17          SWORN TO AND SUBSCRIBED before me this

18     _____ day of _____, 20___.

19

20

21                              _____

                                NOTARY PUBLIC

22

23

1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE MIDDLE DISTRICT OF ALABAMA

3                            NORTHERN DIVISION

4

5    REGIONS ASSET COMPANY,

6            Plaintiff,

7    Vs.                                    CIVIL ACTION NO.

                                            2:06CV882-MHT

8    REGIONS UNIVERSITY, INC.,

9            Defendant.

10

11                    * * * * * * * * * * * *

12

13            TELEPHONIC DEPOSITION OF CAROLYN HUGHES,

14    taken pursuant to stipulation and agreement before

15    Lisa J. Green, Registered Professional Reporter and

16    Commissioner for the State of Alabama at Large, in

17    the Law Offices of Balch & Bingham, Suite 200, 105

18    Tallapoosa Street, Montgomery, Alabama on

19    Wednesday, August 15, 2007, commencing at

20    approximately 3:42 p.m.

21

22                    * * * * * * * * * * * *

23

```
 1                        APPEARANCES
 2
 3      FOR THE PLAINTIFF:
 4      Mr. Charles B. Paterson
        BALCH & BINGHAM
 5      Attorneys at Law
        Suite 200
 6      105 Tallapoosa Street
        Montgomery, Alabama   36104
 7
 8
        FOR THE DEFENDANT:
 9
        Mr. Victor T. Hudson (via telephone)
10      HUDSON & WATTS
        Attorneys at Law
11      Suite 2500
        One St. Louis Centre
12      Mobile, AL   36602
13
14
                   * * * * * * * * * * * *
15
16
                     EXAMINATION INDEX
17
18      CAROLYN HUGHES
            BY MR. PATERSON  . . . . .  . . .     4
19
20
21
22      (No exhibits were marked to this deposition.)
23
```

1                         STIPULATION

2          It is hereby stipulated and agreed by and

3     between counsel representing the parties that the

4     deposition of CAROLYN HUGHES is taken pursuant to

5     the Federal Rules of Civil Procedure and that said

6     deposition may be taken before Lisa J. Green,

7     Registered Professional Reporter and Commissioner

8     for the State of Alabama at Large, without the

9     formality of a commission, that objections to

10    questions other than objections as to the form of

11    the question need not be made at this time but may

12    be reserved for a ruling at such time as the said

13    deposition may be offered in evidence or used for

14    any other purpose by either party provided for by

15    the Statute.

16         It is further stipulated and agreed by and

17    between counsel representing the parties in this

18    case that the filing of said deposition is hereby

19    waived and may be introduced at the trial of this

20    case or used in any other manner by either party

21    hereto provided for by the Statute regardless of

22    the waiving of the filing of the same.

23         It is further stipulated and agreed by and

1    between the parties hereto and the witness that the

2    signature of the witness to this deposition is

3    hereby not waived.

4

5                    * * * * * * * * * * * *

6

7                         CAROLYN HUGHES

8         The witness, after having first been duly

9    affirmed to speak the truth, the whole truth and

10   nothing but the truth testified as follows:

11                        EXAMINATION

12   ~~BY MR. PATERSON:~~

13   Q.    Ms. Hughes, would you state your whole name

14         and your residence address, please, ma'am.

15   A.    Carolyn Delight Hughes, 72 Military Road,

16         Marion, Arkansas.  Zip Code is 72364.

17   Q.    And where are you now, please, ma'am?

18   A.    I am at my residence at the section in the

19         house where I have the computer set up.

20   Q.    And have you got an in-house office there?

21   A.    Yes.

22   Q.    Are you employed by Regions University?

23   A.    Yes, sir.

```
 1      Q.   How long have you been employed at Regions?

 2      A.   Since, I would say, November of 2005.

 3      Q.   What is the mailing address where you

 4           receive any kind of mail for your Regions

 5           University job?

 6      A.   Well, if the school mails me anything, they

 7           mail it to probably Post Office Box 209,

 8           Marion, Arkansas.

 9      Q.   Is that where you get your paycheck?

10      A.   I believe so, yes.

11      Q.   And how often are you paid?

12      A.   Once a month, I believe.  I really don't

13           handle that.  My husband handles all that,

14           and he picks up the mail.  And I believe

15           it's once a month.

16      Q.   Are you on salary or are you on -- do you

17           work by the hour?

18      A.   I work by the hour.

19      Q.   And tell me what your compensation

20           arrangement is.  Do you get overtime or do

21           you -- how many hours a week do you work?

22           Let me back up and start over.  How

23           many hours a week do you work?
```

1    A.   I work 40 hours a week.

2    ~~Q.   All right.  And what are those typical~~

3    ~~hours?~~

4    ~~A.   On Monday, Tuesday, and Thursday, I work~~

5    ~~from 2:00 to 10:00 p.m.  On Wednesday, I~~

6    ~~work 2:00 to 5:00 p.m., and on Friday, I~~

7    ~~work — I work noon to 10:00 p.m.  And~~

8    ~~then — That's not quite 40 hours.  I round~~

9    ~~out the 40 hours on the weekend by things~~

10   ~~that come in over the computer.~~

11   ~~Q.   Do you spend most of your time on the~~

12   ~~telephone or on the computer?~~

13   ~~A.   Well, most of the time on the computer.~~

14   ~~Q.   If you happen to work more than 40 hours in~~

15   ~~any one week, are you paid overtime?~~

16   ~~A.   Well, if I — if I put it down on my time~~

17   ~~sheet.  I basically keep it at 40 hours a~~

18   ~~week.~~

19   ~~Q.   Have you ever had occasion to where you~~

20   ~~were paid overtime by the school?~~

21   ~~A.   I really don't know.~~

22   ~~Q.   Have you ever applied for overtime pay?~~

23   ~~A.   Well, I just turn in a time sheet at the~~

1      ~~end of the month. And like I said, I~~
2      ~~really don't keep up with that. My husband~~
3      ~~handles all the finances. I just fill out~~
4      ~~a time sheet and turn it in, and I think~~
5      ~~basically it's just 40 hours a week.~~
6    Q.  ~~Who do you turn your time sheet in to?~~
7    A.  ~~To Barbara Turner.~~
8    Q.  ~~Is that something you e-mail to her?~~
9    A.  ~~Yes, sir.~~
10   Q.  ~~Do you keep a paper record of your hours~~
11     ~~that you've worked?~~
12   A.  ~~Well, I just keep documents on the~~
13     ~~computer.~~
14   Q.  ~~But you could print something out showing~~
15     ~~how many hours you've worked, I guess,~~
16     ~~every month since you've been there, right?~~
17   A.  ~~Yes, sir.~~
18   Q.  ~~Have you ever had occasion where you've~~
19     ~~worked over 40 hours in any one week?~~
20   A.  ~~I would have to go back and check.~~
21   Q.  What are your duties?  What's your -- Do
22       you have a job title?
23   A.  I'm a recruiter.

```
 1    Q.   And what does a recruiter do for Regions
 2         University?
 3    A.   Well, what I do is, I answer the phones
 4         for -- when the advisors -- when the
 5         advisors leave at 5:00, I answer the phone
 6         for people calling in to the school
 7         requesting information or that have
 8         questions.  And the request for information
 9         forms that come in over the computer, I
10         will look at those and see what needs to be
11         done with those.
12    Q.   When requests for information come in, how
13         do you typically process those?
14    A.   Well, if they come in from our Web site, I
15         may try to contact the person to set up a
16         time for an advisor to give them a call.
17              If the form comes in from another
18         company, I will have to transfer that
19         information onto our form, and I will still
20         try to give them a call to set up a time
21         with an advisor.
22    Q.   Give me just your own version of how you
23         spend your typical working activities.
```

```
 1              What do you do?  You come in and log -- you
 2              go into your home office, and you log in?
 3              Is that the first thing you do?
 4     A.       Yes, I log in to the computer system, and
 5              then I log in to the queue to be able to
 6              answer phone calls that come in to the
 7              school.  I check through the archives that
 8              have come in to keep track of those, just
 9              whatever needs to be done, you know, that
10              particular day.
11     Q.       And is that what some people refer to as an
12              internet, that everybody that's employed --
13              or a number of people that are employed
14              there at Regions University can log in and
15              get online and be online together?
16     A.       I don't understand the question.
17     Q.       Is your -- When you say you log in, do you
18              become part of the computer system or share
19              part of the computer system at Regions
20              University?
21     A.       Well, when I log in, I log in to the e-mail
22              system.  I log in to the system that will
23              allow me to check, well ...
```

1     ~~Q.    Do you have to go on the internet to do~~

2     ~~that?~~

3     ~~A.    Yes, I have to be on the internet to get to~~

4     ~~the school.~~

5     ~~Q.    And then you just log in, and you've got~~

6     ~~your account there.  That's how you~~

7     ~~communicate with the school, right?~~

8     ~~A.    Yes.~~

9     ~~Q.    Most --~~

10    ~~A.    Through e-mail or telephone.~~

11    ~~Q.    What percentage of your communication with~~

12    ~~either the school or with prospective~~

13    ~~students or anybody is done on the phone as~~

14    ~~opposed to the internet?  I'm trying to~~

15    ~~figure out how much of your work is phone~~

16    ~~work as opposed to computer work.~~

17    ~~A.    I guess I would say the phone work is a~~

18    ~~minor -- you know, unless I get, you know,~~

19    ~~a student that really has a lot of~~

20    ~~questions or, you know, something, the~~

21    ~~phone calls that I get are limited because~~

22    ~~they are in the evening.~~

23    Q.    Do you have occasion to talk to prospective

```
 1              students about enrolling in the school?
 2      A.      Yes, sir.
 3      Q.      Do you make an effort and try to recruit
 4              them as enrollees of the school?
 5      A.      Yes.
 6      Q.      What are some of the things you tell them
 7              to try to recruit them?
 8      A.      Well, usually, they ask me questions about
 9              particular things.  I try to answer their
10              questions as far as I know.  But basically
11              what I try to do is set up a time when an
12              advisor can call them because the advisors,
13              they know all the answers to all the
14              questions.
15      Q.      Do you rely upon the school's Web site for
16              information?
17      A.      Yes, sir.
18      Q.      Do you have anything else like a manual or
19              a book or anything there in your home
20              office that you rely on?
21      A.      Not a manual so to speak.
22      Q.      Anything in writing there you rely upon?
23      A.      Not really.  Basically, what I use, you
```

1           know, comes from the Web site or, you know,

2           what I have heard from the other advisors

3           over -- you know, over the year and a half

4           that I've been with the school.

5       Q.   What did you do before you became employed

6           at Regions University?

7       A.   Immediately before, I was unemployed. The

8           job that I had before that was a computer

9           operator at the local hospital.

10      Q.   What is your educational background?

11      A.   I have a bachelor's degree in human

12           resource leadership.

13      Q.   From where?

14      A.   From Regions University.  I just graduated.

15      Q.   And what's your degree in? I'm sorry.

16      A.   Human resource leadership.

17      Q.   Any other -- What was your high school

18           education?

19      A.   I graduated.

20      Q.   Where did you go to high school?

21      A.   Pine Forest High School, Fayetteville,

22           North Carolina.

23      Q.   How did you become aware of Regions

1           University?

2      A.    Through my husband.

3      Q.    What's his connection with Regions?

4      A.    Well, he attended -- he's been a student

5            from years ago and has known Dr. Turner and

6            his dad.  And he graduated.  He has

7            received a degree from Regions and

8            presently is a professor for Regions

9            University.

10     Q.    The phone faded out a little bit.  What

11           does your husband currently do?

12     A.    Well, currently, he's a minister, a Church

13           of Christ minister here in Marion,

14           Arkansas, and he also is a professor for

15           Regions University.

16     Q.    Does he teach courses online?

17     A.    Yes, sir.

18     Q.    And where did you tell me -- what is his

19           educational background?

20     A.    He has a master's -- well, I don't know

21           exactly what they're in or -- I do know he

22           has a master's degree.

23     Q.    From Regions University?

1    A.    He has a degree from Regions.  I'm not -- I

2          believe that's his master's.

3    Q.    Does he have any other degrees other than

4          Regions?

5    A.    He has a bachelor's degree from Troy

6          University.

7    Q.    Is that in Alabama?

8    A.    Yes, sir.

9    Q.    Did he attend Troy in person or did he

10         attend Troy online?

11   A.    I believe we attended -- I was over there

12         for some of my time.  I believe if I

13         remember correctly we attended classes out

14         at Moody Air Force base in Valdosta,

15         Georgia.

16   Q.    Have you ever lived in Alabama?

17   A.    No, sir.

18   Q.    What has been your success rate -- I'm

19         trying to figure out what your success rate

20         is in recruiting students for Regions

21         University.  If I wanted to find out how

22         successful you've been and how good a job

23         you're doing, how would I go about figuring

1    ~~that out?~~

2    ~~A.   I don't really know.  The advisors really~~

3    ~~are the ones who, I guess you would say,~~

4    ~~you would have to maybe get a success rate~~

5    ~~from.~~

6    Q.   Do you keep a log of the contacts you

7         receive by telephone or by computer?

8    A.   I have a notebook that I do keep notes in

9         as I speak with people.  I don't always

10        have the same kind of thing written down

11        for each call.  Sometimes I don't make a

12        note for a call because sometimes I put it

13        in the computer as I speak.  Sometimes, you

14        know, it might not be required for an

15        individual call.

16   ~~Q.   Have you ever worked in a call center~~

17   ~~before where individuals call in, seeking~~

18   ~~information about a company?~~

19   ~~A.   No, sir.~~

20   ~~Q.   Did you get any -- What kind of training~~

21   ~~did you get from Regions University to do~~

22   ~~your current job?~~

23   ~~A.   I came down to the campus for basically~~

1           about two days.

2      Q.   When was that?

3      A.   That was in June of 2005.

4      Q.   And when you came down, it was called

5           Southern Christian University?

6      A.   Yes, sir.  My husband and I both came down

7           at the same time.

8      Q.   When your husband got his degree, was it

9           called Southern Christian University or

10          Regions University?

11     A.   Southern Christian University.  I believe

12          that's -- He has a bachelor's and a

13          master's, and I think the master's is with

14          Southern Christian.  I'm not positive.

15     Q.   Is your degree from Regions University or

16          Southern Christian?

17     A.   Regions University.

18     Q.   What do you know, if anything, about why

19          Southern Christian changed its name to

20          Regions?

21     A.   Well, I know in a letter that was sent by

22          Dr. Rex the reason that the board of

23          regents changed the name.

1    Q.   And what is that?

2    A.   Well, they wanted to -- they felt --

3         basically, I'm reading from the letter

4         which says:  This name reflects the

5         founder's vision and goal of having a

6         school without walls that could provide

7         accredited, quality academic and Christian

8         education to all regions of the world.

9    Q.   Do you have any other documents there

10        before you there in your office that you're

11        using to -- in connection with your answers

12        today?

13   A.   No.  I just pulled this out as you asked

14        the question.

15   Q.   Okay.  Are you there by yourself, or is

16        someone there with you in your office?

17   A.   I'm the only one in the office.  My

18        daughter is here in the house with me.

19   Q.   Have you ever gotten -- Are you eligible

20        for earning any kind of bonus or anything

21        like that, bonus compensation based on the

22        number of students you help recruit?

23   A.   No, sir.

1    ~~Q.   This question -- I want to be clear with~~

2    ~~you.   I know you may have talked to~~

3    ~~Mr. Hudson or any other lawyer for Regions~~

4    ~~University --~~

5    ~~Have you talked with any of the~~

6    ~~lawyers?~~

7    ~~A.   No, sir.~~

8    Q.   Who have you talked with about this case

9         that you're testifying in today?

10   A.   Dr. Rex and Mr. Hudson.

11   Q.   You have talked to Mr. Hudson?

12   A.   Yes, sir.

13   Q.   Okay.  Have you ever talked to Dr. Rex in

14        person about this case?

15   A.   Well, I talked with him about the phone

16        call I received before I knew anything

17        about the case.

18   ~~MR. HUDSON:  Ms. Hughes, just so~~

19   ~~we won't make a mistake --~~

20   ~~everybody is trying to be~~

21   ~~careful.  But any conversation~~

22   ~~that you had with me is~~

23   ~~privileged, and Mr. Paterson~~

1            is not asking you about that.
2                Any conversation that you
3            had with me in which other
4            people from Regions University
5            also participated is also
6            privileged, and he's not
7            asking you about that.
8                Now, he's entitled to
9            know if you had such a
10           conversation, but he's not
11           going to ask you to tell him
12           what was said in that
13           conversation.
14               Now, subject to that,
15           please answer his questions as
16           best you can.
17               THE WITNESS:  Okay.  Thank you.
18      Q.   In your conversation with Dr. Rex about the
19           lawsuit or about anything to do with the
20           lawsuit, was Tom Hudson on the phone with
21           you?
22      A.   Well, no, sir.  The -- Could you ask the
23           question again?

```
 1    Q.   Let me ask it this way.  I believe you

 2         testified or told me that you had a

 3         conversation with Dr. Rex about a call you

 4         received, right?

 5    A.   Yes, sir.

 6    Q.   Tell me about that conversation.  Tell me

 7         what you told Dr. Rex.

 8    A.   Okay.  I don't remember exactly the reason

 9         for -- or the initial reason for his phone

10         call, but I know in the -- in the

11         conversation that we had, I did bring up a

12         call that I had gotten the previous week

13         which was --

14             Well, I mentioned that phone call, and

15         then he -- we discussed that a little bit,

16         but I don't believe that was the purpose of

17         the phone call.  I can't say what the

18         purpose of the phone call may have been

19         because it was quite some time ago.

20    Q.   When was it?  Was it this calendar year,

21         '07?

22    A.   I really do not remember.

23    Q.   All right.
```

1      ~~A.    It was after the name changed, but it could~~

2      ~~have been, you know, before the beginning~~

3      ~~of this year or it could have been after.~~

4      ~~It's been so long ago, I really don't~~

5      ~~remember.~~

6      Q.    That's fine.  So sometime after the name

7            changed, you got a call from a prospective

8            student; is that correct?

9      A.    Yes.  I will say that it was maybe two or

10           three months after the name change.

11     Q.    And, what?  Did that prospective student

12           just call in on your number, correct?

13     A.    He called in on the queue which came to my

14           extension.

15     Q.    Okay.  And do you remember about what time

16           of day that was?

17     A.    It would have been, I'm sure, after five

18           o'clock.

19     Q.    And what did the person ask you?

20     A.    Well, they were asking questions about --

21           it was a typical prospective student

22           calling in, asking questions about degree

23           programs.  And we had probably talked about

```
 1              five minutes about, you know, different

 2              questions, you know, transcripts and -- you

 3              know, the questions that they generally

 4              ask.  And then he said, are y'all

 5              affiliated with Regions Bank?  And I said,

 6              no, we don't have anything -- we're not

 7              affiliated at all with Regions Bank.

 8                    And then we probably had another five

 9              minutes of his questions about the things

10              pertaining to school and the degree

11              program.  And I probably set up a call back

12              with one of the advisors.

13     Q.     Do you remember who this person was?

14     A.     I do not.

15     Q.     Do you have any kind of records or phone

16              log or caller ID that could tell you who

17              the person was?

18     A.     No, sir.  The notes that I do have, I have

19              not been able to find anything in there

20              about that particular phone call.

21     Q.     So you've searched your notes, and you

22              can't find anything about this call, right?

23     A.     Right.  As I said, it was a typical
```

1      prospective student call, and I don't -- I

2      don't keep the same type of notes, you

3      know, on each call because each call is

4      different, so I couldn't tell you what ...

5   Q.   How did you know -- when you talked to this

6        student, how did you know that Regions

7        University had no connection with Regions

8        Bank?

9   A.   Well, I believe I was told that. You know,

10       it's my understanding of the history of the

11       school is there's no connection whatsoever

12       with Regions Bank.

13  Q.   Did you answer that question for that

14       prospective student based on your own

15       knowledge or your own thoughts, or had

16       someone told you specifically in advance

17       that they were not connected?

18  A.   Well, I'm sure that -- well, you know, when

19       the name was changed and we received the

20       letter from Dr. Rex, you know, maybe that

21       was -- that settled it. There was no

22       indication at all that there was any

23       connection with Regions Bank.

```
 1    Q.   When they changed the name, did you wonder

 2         whether it was connected with Regions Bank?

 3    A.   No, sir.

 4    Q.   You're familiar with Regions Bank?

 5    A.   Yes, sir.

 6    Q.   They're in Arkansas, correct?

 7    A.   Yes, sir.

 8    Q.   Have you ever banked there?

 9    A.   We do.

10    Q.   So you bank there now?

11    A.   Yes, sir.

12    Q.   Did you ever ask anyone at Regions Bank

13         whether or not the bank was connected with

14         Regions University?

15    A.   No, sir.

16    Q.   Have you ever had any conversation with

17         anyone at Regions Bank, a teller or a loan

18         officer or anybody at Regions Bank, about

19         Regions University?

20    A.   No, sir.

21    Q.   I believe you said you came to Montgomery

22         for some training.  How many other times

23         have you been in Montgomery to the main
```

1      campus of Regions University?

2      A.   I believe two other times.

3      Q.   And what was the purpose of those visits?

4      A.   Both were for training.

5      Q.   I believe you told me -- I don't know

6           whether you told me or not.  Tell me what

7           kind of training you have received here on

8           the main campus.

9      A.   Well, the initial training was basically to

10          get familiar with the computer system that

11          they have and how the calls would be coming

12          in and how I would answer them and where I

13          could find answers to their questions.

14     Q.   Who provided that training to you?

15     A.   Rick Johnson mostly.  While I was there, we

16          did speak with the -- we did spend time

17          with each of the other advisors to, you

18          know, just speak with them individually

19          about, you know, how they handle the job, I

20          guess.

21     Q.   How many people attended this training

22          session with you?

23     A.   That was just Michael and myself.

```
 1     Q.    Do you know how many other people work for

 2           Regions University that do jobs like you

 3           do?

 4     A.    As far as I know, just Patsy Fulghum as far

 5           as not being on campus.

 6     Q.    Patsy Fortune?

 7     A.    Fulghum.

 8     Q.    Fulghum.  Okay.  The lady that transferred

 9           the call to you?

10     A.    Right.  Yes.

11     Q.    Now, the other two times you were on campus

12           for training, what were you trained -- what

13           kind of training did you get then?

14     A.    I guess basically just more in-depth

15           training of some of the same stuff, maybe

16           some refresher, maybe some new things.

17                 Since I'm not on campus, there's still

18           a lot to learn, you know, being there with

19           the other ones and picking up things of

20           maybe the way they do things or whatever.

21     Q.    Has the school ever sent you any training

22           materials by mail?

23     A.    I wouldn't say -- well, no.  I would say
```

1       ~~no.~~

2       ~~Q.   Do you get training materials over the~~

3       ~~internet, online?~~

4       ~~A.   Well, basically, what I use is the Web~~

5       ~~site, the Web site and the school catalog.~~

6       Q.   Is part of your job to convince prospective

7            students to enroll in the school?

8       A.   Well, if I can do that, that's a good

9            thing.  Basically, I answer questions for

10           them and try to set up a call with an

11           advisor.

12      ~~Q.   Do you know how many different advisors the~~

13      ~~school has that might talk to students?~~

14      ~~A.   Yes.~~

15      ~~Q.   How many?~~

16      ~~A.   Robert, Steve, Margaret, Joe.  They're the~~

17      ~~advisors.  Then Rick is the head over them.~~

18      ~~Q.   So there are three?~~

19      ~~A.   Four.~~

20      ~~Q.   I didn't catch those names.  Say those~~

21      ~~names real distinctly.~~

22      ~~A.   Robert Holland, Steve Redding, Joe Zerk.~~

23      ~~Q.   Can you spell that for me?~~

1    A.    Z-E-R-K.

2    Q.    Okay.  Thank you.

3    A.    And Margaret Newett.

4    Q.    The last name?

5    A.    Newett, N-E-W-E-T-T.

6    Q.    Okay.  Do you know where these people are

7          located?

8    A.    They're located on campus there.

9    Q.    In Montgomery?

10   A.    Yes.

11   Q.    Thank you for spelling that.  The court

12         reporter was having trouble getting the

13         spelling right, so thank you for doing

14         that.

15   A.    You're welcome.

16   Q.    In a typical week, about how many calls

17         from prospective students do you get on

18         average?

19   A.    Maybe 20.  Maybe 20 to 25, something like

20         that.

21   Q.    When they call in, you answer their

22         questions and you get them to sign -- you

23         help them go through the request for

1          information form online?

2    A.   Sometimes they have already filled one

3          out.  I try to fill them out when I can to

4          make sure they have one.

5    Q.   When you're not -- you know, the 20 or so

6          times a week when you're not talking on the

7          phone to somebody, what are you typically

8          doing in the course of your job?

9    A.   Checking the request for information forms

10         that come in and trying to call those

11         people, or I may have projects I'm working

12         on or ...

13   Q.   I'm sorry if I've asked you this, but who

14         is your boss?

15   A.   Rick Johnson.

16   Q.   Have you ever met Rick in person?

17   A.   Yes, sir.

18   Q.   When is the last time you've met him in

19         person?

20   A.   The last time was June of this year.

21   Q.   Where were you?

22   A.   I was on campus.  I had come down for

23         graduation and then I stayed over for a

1        couple of days of training.

2    Q.   So you went through the graduation ceremony

3         that was held here in Montgomery in June,

4         right?

5    A.   Yes, sir.

6    Q.   Where was that held?

7    A.   At Davis Auditorium.

8    Q.   At the Davis Auditorium in downtown

9         Montgomery?

10   A.   Yes, sir.

11   Q.   That's on Troy State Montgomery's campus?

12   A.   I believe so.

13   Q.   When you were in school -- When you were

14        down here in Montgomery in June of this

15        year, did you see any advertisements either

16        on billboards or hear any radio or TV ads

17        for Regions University?

18   A.   No, sir.

19   Q.   Do you know how many people were in your

20        graduating class?

21   A.   No, sir.

22   Q.   Well, I mean, did you walk across the stage

23        with a bunch of people and get a diploma?

1        A.    Yes, sir.

2        Q.    About how many people do you think walked

3              across that stage and got a diploma?  I

4              mean, was it ten or a hundred?  Give me

5              some judgment.

6        A.    Maybe a hundred.

7        Q.    Okay.

8        A.    I know they don't -- you know, all

9              graduates were not there.

10       Q.    Right.  When you got your degree, were you

11             charged per semester hour tuition to go to

12             school?

13       A.    Yes, sir.

14       Q.    What did you pay per semester hour?

15       A.    I believe it was -- well, I went on a work

16             study, so I'm not sure how all the

17             financial --

18       Q.    So you got some credit for working?

19       A.    Yes, sir.

20       Q.    If a prospective student calls in and asks

21             you the question of what does it cost to

22             attend Regions University, what do you tell

23             them?

1      A.   I usually refer them to the advisors or to

2           Phillip.  I try not to get into the

3           financial aspects.

4      Q.   Do you know how much of your own money you

5           spent getting your degree?

6      A.   No, sir.

7      Q.   If a student asked you how many

8           undergraduates are enrolled in the school

9           at this time, how would you go about

10          finding the answer to that?

11     A.   I would probably call one of the advisors

12          and ask.

13     Q.   Do you have any judgment about how many

14          people are enrolled at this time?

15     A.   If I had to give a ballpark figure, I might

16          would —

17               MR. HUDSON:  Don't speculate or

18               guess.  That's not going to

19               help us.

20               THE WITNESS:  Okay.

21     A.   No.

22     Q.   Well, just give us — if you have a

23          judgment about how many are enrolled, is it

1        ~~a hundred or is it 500 or is it ten?~~

2        ~~A.    I would say maybe between 700 and a~~

3        ~~thousand.~~

4        ~~Q.    Have you ever had any conversations with~~

5        ~~prospective students or been asked~~

6        ~~questions about admission standards?~~

7        ~~A.    I'm sure I have.~~

8        ~~Q.    If someone calls and says what are your~~

9        ~~admission standards, what kind of high~~

10        ~~school scores -- grades do I need or what~~

11        ~~kind of standardized tests do I need, what~~

12        ~~would you do to answer those questions?~~

13        ~~A.    I would either refer them to the catalog or~~

14        ~~I would try to find the answer in the~~

15        ~~catalog.~~

16        Q.    Are there times of year that you get more

17              calls than others from prospective

18              students?  Like this is -- for example,

19              this is August.  Are you getting more calls

20              now than, say, you would at another time of

21              year because of the approaching fall

22              semester?

23        A.    We usually get more calls during the

1            registration period.

2       Q.   What are your typical registration periods?

3       A.   I think they usually run -- like this

4            registration period began, I think, July

5            27th and runs through the 17th.  Then we

6            have late registration.

7       Q.   So you typically get more calls during the

8            registration periods?

9       A.   Yes, sir.

10      ~~Q.~~  ~~If I wanted to find out what the~~

11      ~~registration periods are, you could just go~~

12      ~~online and do that?~~

13      ~~A.~~  ~~Yes, sir.  I would do it through the school~~

14      ~~calendar.~~

15      Q.   Are you aware that the school advertises on

16           TV and radio and billboards?

17      A.   Yes, sir.

18      Q.   How did you become aware of that?

19      A.   Well, the RFI forms that come in, one of

20           the questions is how -- you know, how they

21           found out -- how they discovered Regions

22           University.

23      Q.   So some of those reply that they have seen

1          advertisements?

2      A.    Yes, sir.

3      ~~Q.    Does the school tell you when they are~~

4      ~~prepared to run advertisements so you can~~

5      ~~be expecting more calls?~~

6      ~~A.    No, sir.~~

7      ~~Q.    Do you know anything about the advertising~~

8      ~~schedule?~~

9      ~~A.    No, sir.~~

10     ~~Q.    Who would you think might determine the~~

11     ~~advertising schedule?~~

12     ~~A.    Laina Costanza is the only one I would~~

13     ~~know.~~

14     ~~Q.    Do you have a judgment about whether -- I'm~~

15     ~~trying to contrast 2007, which is this~~

16     ~~year, to 2006, which was last year.  Do you~~

17     ~~think you've gotten more calls from~~

18     ~~prospective students this year or last~~

19     ~~year?~~

20     ~~A.    I really don't know about that at all.~~

21     ~~Q.    Do you have any judgment -- let's say from~~

22     ~~August of this year as compared to August~~

23     ~~of last year, do you think you've gotten~~

1          more or less calls this year?

2      A.   I really don't know.

3      Q.   Okay.  Are there any logs or records there

4           that you could look at that would -- that

5           you might be able to get an answer for

6           that?

7      A.   Not that I know of.

8      Q.   You said you keep some notes on people who

9           call.  Do you think you have more notes

10          this August than you had last August?

11     A.   Well, no, because, actually, I take less

12          notes now than I did when I first started,

13          so I couldn't really go by the notes.

14     Q.   How did you find out that Regions Bank and

15          Regions University were in a lawsuit?

16     A.   We were notified at the school.

17     Q.   How were you notified and what were you

18          told?

19     A.   Well, it's been some time.  I think we

20          received a phone call saying that the

21          school was notified that a lawsuit was

22          being brought.

23     Q.   Do you remember what they told you about

1      ~~it?~~

2      ~~A.   Not really.~~

3      Q.   Has anybody -- anybody told you what this

4           lawsuit is about?

5      A.   I'm sure they did at that time.  The only

6           thing I can say is just the fact that the

7           names are the same.

8      Q.   The names are the same?

9      A.   You know, they both have Regions in the

10          name.

11     ~~Q.   That's your knowledge of what you think the~~

12     ~~lawsuit is about?~~

13     ~~A.   Yes, sir.~~

14     ~~Q.   Did anybody tell you what to tell someone~~

15     ~~if they called in and asked if there was a~~

16     ~~connection between the school and the bank?~~

17     ~~A.   Well, we got this letter from Dr. Rex, you~~

18     ~~know, explaining why the name was changed,~~

19     ~~and we were told that if anyone calls to~~

20     ~~that letter would be -- you know, would~~

21     ~~have the information that we needed to give~~

22     ~~them.~~

23     Q.   Well, were you ever told to tell anybody

```
 1            there was no connection?

 2    A.    I don't know.

 3    Q.    Other than that one -- we've talked about a

 4          phone call you got from a prospective

 5          student where they asked if there was any

 6          connection and you told them no, correct?

 7    A.    Correct.

 8    Q.    And you don't remember exactly when that

 9          was, right?

10    A.    No, it's been so long ago.

11    Q.    Have you ever gotten any other phone calls

12          of that nature?

13    A.    No, sir.

14    Q.    Have you ever gotten any e-mail inquiries

15          of that nature?

16    A.    I never got any e-mail inquiries.

17    Q.    Anybody ever ask you personally a question

18          like that?

19    A.    Do you mean like here in Arkansas?

20    Q.    Yes, ma'am.

21    A.    No, sir, not that I recall.

22    Q.    Have you ever heard any employee of Regions

23          University ask you if there was any
```

1          connection between the two?

2      A.  No, sir.

3      Q.  So other than the one call we've talked

4          about, am I right in understanding you

5          never have gotten any other calls from

6          anyone that mentioned Regions Bank?

7      A.  No, sir.

8      Q.  Is that right?

9      A.  Yes, sir.  That's right.

10     Q.  When you got the call where the person

11         asked about Regions Bank, did I hear you

12         correctly that you told Dr. Turner about

13         that call?

14     A.  Yes, sir.

15     Q.  What occasioned you to talk to Dr. Turner

16         about that call?

17     A.  It's hard to remember.  And probably the

18         only reason I remembered is -- is because I

19         think he called, like, about the week after

20         I had received the call, and so it was kind

21         of fresh on my mind.

22     Q.  Well, I mean, have you ever gotten any

23         instructions from the school or Dr. Turner

```
 1              or anybody that if somebody calls in and
 2              asks about Regions Bank to report that to
 3              somebody?
 4      A.     I don't think so.
 5      Q.     What occasioned you and Dr. Turner to talk
 6             about that?
 7      A.     Well, like I said, I don't remember the
 8             reason for the phone call.  It's been so
 9             long ago that I just know that we had -- we
10             had the conversation and discussed the
11             phone call.  And I probably only remembered
12             it because it had just been so recent.
13      Q.     Have you ever talked to Anita Crosby about
14             this lawsuit?
15      A.     No, sir.
16      Q.     Has anybody ever showed you any documents,
17             anything in writing about this lawsuit?
18      A.     No, sir.
19                     MR. PATERSON:  I think that's all
20                     I've got.  I sure appreciate
21                     it.
22                     Tom, have you got any
23                     questions?
```

1                         ~~MR. HUDSON:  I don't have any~~

2                         ~~questions.  Thank you.~~

3                         (Deposition concluded at 4:25 p.m.)

4

5

6                    * * * * * * * * * * * * *

7                    FURTHER DEPONENT SAITH NOT

8                    * * * * * * * * * * * * *

9

10                   REPORTER'S CERTIFICATE

11   STATE OF ALABAMA:

12   MONTGOMERY COUNTY:

13             I, Lisa J. Green, Registered Professional

14   Reporter and Commissioner for the State of Alabama

15   at Large, do hereby certify that I reported the

16   deposition of:

17                   CAROLYN HUGHES

18   who was first duly affirmed by me to speak the

19   truth, the whole truth and nothing but the truth,

20   in the matter of:

21                   REGIONS ASSET COMPANY,

22                   Plaintiff,

23                   Vs.

1          REGIONS UNIVERSITY, INC.,

2          Defendant.

3          In The U.S. District Court

4          For the Middle District of Alabama

5          Northern Division

6          Case Number 2:06CV882-MHT

7     on Wednesday, August 15, 2007.

8          The foregoing 41 computer printed pages

9     contain a true and correct transcript of the

10    examination of said witness by counsel for the

11    parties set out herein.  The reading and signing of

12    same is hereby not waived.

13         I further certify that I am neither of kin

14    nor of counsel to the parties to said cause nor in

15    any manner interested in the results thereof.

16         This 17th day of August 2007.

17

18

19                         _____

                           Lisa J. Green, Registered

20                         Professional Reporter and

                           Commissioner for the State

21                         of Alabama at Large

22

23

```
 1

 2

 3          I, Carolyn Hughes, hereby certify that

 4    I have read the foregoing transcript of my

 5    deposition given on Wednesday, August 15, 2007, and

 6    it is a true and correct transcript of the

 7    testimony given by me at the time and place stated

 8    with the corrections, if any, and the reasons

 9    therefor noted on a separate sheet of paper and

10    attached hereto.

11

12

13

14                           _____

                                  Carolyn Hughes

15

16

17

18          SWORN TO AND SUBSCRIBED before me this

19    _____ day of _____, 20__.

20

21

22                           _____

                                  NOTARY PUBLIC

23
```

1           IN THE UNITED STATES DISTRICT COURT
2                    FOR   THE
3            MIDDLE DISTRICT OF ALABAMA
4                 NORTHERN DIVISION
5
6
7    REGIONS ASSET COMPANY,          *
                                      *
8              Plaintiff,            *
                                      *
9    Vs.                             *   CIVIL ACTION NUMBER
                                      *
10   REGIONS UNIVERSITY, INC.,       *   2:06cv882-MHT
                                      *
11             Defendant.            *
12
13
14
15
         *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
16
         Rule 30(b)(5); 30(b)(6) deposition of Regions
17
     Asset Company, taken through the witness, EMMETT
18
     M. POLLARD, before David Michael Camp,
19
     Commissioner, in the law offices of Balch &
20
     Bingham, LLP, 105 Tallapoosa Street, Suite 200,
21
     Montgomery, Alabama, on May 10th, 2007, commencing
22
     at approximately 8:59 o'clock a.m.
23

```
 1                  A P P E A R A N C E S
 2
 3        For Plaintiff:
              BALCH & BINGHAM, LLP
 4            Attorneys at Law
              Post Office Box 78
 5            Montgomery, Alabama  36101
              (334) 834-6500
 6            BY: CHARLES PATERSON
 7                  -AND-
 8            STEPTOE & JOHNSON, LLP
              Attorneys at Law
 9            1330 Connecticut Avenue
              Washington, D.C. 20036
10            (202) 429-3000
              BY: WILLIAM G. PECAU
11
12
          For Defendant:
13            HUDSON & WATTS, L.L.P.
              Attorneys at Law
14            One St. Louis Centre, Suite 2500
              Post Office Box 989
15            Mobile, Alabama  36601
              (251) 432-7200
16            BY: VICTOR T. HUDSON
17                  -AND-
18            SHLESINGER, ARKWRIGHT & GARVEY, LLP
              Attorneys at Law
19            1420 King Street, Suite 600
              Alexandria, Virginia  22314
20            (703)684-5600
              BY: JAMES E. SHLESINGER
21
22        Also present: REX A. TURNER, JR.
23                  * * * * * * * * * *
```

```
 1                    I N D E X
 2
 3       Witness
      EMMETT M. POLLARD
 4
 5
                   EXAMINATION
 6
         MR. HUDSON  ........................    6
 7
 8              * * * * * * * * *
 9
10
11

                    EXHIBITS
12
```

```
      DEFENDANT'S EXHIBIT SEVEN   .........    28
13    DEFENDANT'S EXHIBIT EIGHT   .........    28
      DEFENDANT'S EXHIBIT NINE   ..........    34
14    DEFENDANT'S EXHIBIT TEN   ...........    34
      DEFENDANT'S EXHIBIT ELEVEN   ........    34
15    DEFENDANT'S EXHIBIT TWELVE   ........    58
      DEFENDANT'S EXHIBIT THIRTEEN   ......    60
16    DEFENDANT'S EXHIBIT FOURTEEN   ......    89
      DEFENDANT'S EXHIBIT FIFTEEN   .......    96
17    DEFENDANT'S EXHIBIT SIXTEEN   .......    96
```

```
18
                * * * * * * * * * *
19
20
21
22
23
```

1                              STIPULATION

2              It is stipulated by and between the parties

3        hereto and their respective attorneys at law that

4        the deposition on oral examination of the Witness,

5        EMMETT M. POLLARD, may be taken before David

6        Michael Camp, Commissioner and Notary Public,

7        State of Alabama at Large, and that the said

8        deposition shall be taken in accordance with and,

9        when so taken, may be used in accordance with the

10       provisions of the Federal Rules of Civil

11       Procedure.

12             It is further stipulated and agreed that all

13       notices provided for by said Federal Rules of

14       Civil Procedure are waived, as is the reading over

15       of said deposition to or by the witness, the

16       signing thereof by the witness, the signing and

17       certification of said David Michael Camp, the

18       filing of said deposition with the Clerk of the

19       Court and all other requirements and

20       technicalities of every sort which would be a

21       prerequisite to the use of said deposition.

22             It is the intent of the parties hereto that

23       this deposition may be used in evidence as though

1    all requirements of said Federal Rules of Civil

2    Procedure had been complied with.

3         It is further stipulated and agreed that all

4    parties hereto reserve the right to have

5    corrections made to this deposition as provided

6    for by said Federal Rules of Civil Procedure.

7         It is further stipulated and agreed that all

8    objections, save as to the form of the questions

9    asked and the responsiveness of the answers

10   thereto are reserved until the time of trial in

11   accordance with the provisions of said Federal

12   Rules of Civil Procedure.

13

14                   * * * * * * * * * *

15

16

17

18

19

20

21

22

23

```
1              EMMETT M. POLLARD, having been first duly

2    sworn to speak the truth, the whole truth, and

3    nothing but the truth, testified as follows:

4                        EXAMINATION

5    BY MR. HUDSON:

6         Q    Mr. Pollard, would you please state your

7    name for the record?

8         A    Mike Pollard.

9         Q    Where are you employed, Mr. Pollard?

10        A    Regions Bank.

11        Q    In what capacity?

12        A    Director of Organization Development.

13        Q    How long have you been in that position?

14        A    Officially, since the merger, which

15   would be November of last year.

16        Q    The AmSouth merger?

17        A    Yes.

18        Q    And what position did you hold prior to

19   the AmSouth merger?

20        A    It was called the Director of

21   Organizational Development Learning.

22        Q    Why was the name changed?

23        A    We took the responsibilities and split
```

1    them in half so that the person that essentially

2    had the kind of job I did at AmSouth and I -- you

3    know, they put the two banks together, just kind

4    of separated the collective training and

5    development functions for the company.

6        Q    Perhaps you could explain the difference

7    to me between organizational development and

8    learning as those terms are used by your banks.

9        A    Okay.  Organizational development is

10   kind of used to kind of focus on the systems that

11   are in place, and HR, such as performance

12   management, talent management, leadership

13   development, executive development, employee

14   selection and assessment.

15       The learning part is focused on technical

16   training.

17       ~~Q    Would it be fair to say that -- and any~~

18   ~~time somebody says "fair to say," get ready~~

19   ~~because that's some kind of leading question.  In~~

20   ~~this case, it's not.  But would it be fair to say~~

21   ~~that the organizational development part is more~~

22   ~~traditional HR functions?~~

23       ~~And if not, let's just find some~~

1    ~~classification so I can get my arms around it.~~

2    ~~A    They would be, yes.  It's probably more~~

3    ~~of the cutting edge kind of things you find in HR~~

4    ~~today.  When you use the word "traditional",~~

5    ~~that's not what you would have found fifteen or~~

6    ~~twenty years ago necessarily.~~

7    ~~Q    I didn't mean it that way.  I meant if~~

8    ~~you went to a modern day HR department, you'd find~~

9    ~~those things.~~

10    ~~A    That's right.~~

11        Q    And the learning aspect, how do you

12    classify that?

13        A    The corporate training.

14    ~~Q    Okay.  And did AmSouth Bank have a~~

15    ~~program of its own for corporate training prior to~~

16    ~~the merger?~~

17    ~~A    Yes.~~

18    ~~Q    What, if any, name was given to their~~

19    ~~program?~~

20    ~~A    All I know is that the function was~~

21    ~~called corporate training.~~

22    ~~Q    I'm hard of hearing.  I'm sorry?~~

23    ~~A    It was called corporate training.~~

1    ~~Q    Corporate training.  Now, was any part~~

2    ~~or all of the AmSouth corporate training program~~

3    ~~adopted by the new bank after the merger?~~

4    ~~A    It depends on which systems are~~

5    ~~surviving in the new company.  And so you would~~

6    ~~say that the training programs that were~~

7    ~~associated with the bank, the system that~~

8    ~~survived, would have that training survive with it~~

9    ~~because it supports it.  And so it would be~~

10    ~~somewhat of a mix between both Regions and~~

11    ~~AmSouth.~~

12    ~~Q    Okay.  Sometimes in mergers, you tend to~~

13    ~~take the best of both and put them together.  Was~~

14    ~~that what was accomplished here?~~

15    ~~A    I believe that was the attempt, yes.~~

16        Q    And I gather that prior to the merger,

17    Regions had its own corporate training program.

18        A    Yes.

19        Q    And by what name, if any, did Regions

20    refer to its corporate training program as?

21        A    Regions University.

22        Q    Okay.  Whose idea was it to use that

23    catchy name to describe the Regions corporate

1      training program?

2          A      The director of HR.

3          Q      What was his name?

4          A      John Daniel.

5          Q      And when did he do that?  When did that

6      occur?

7          A      John was the surviving head of HR out of

8      the Regions/Union Planters merger.  Union

9      Planters' training function was UP University.

10         Q      I'm sorry.  I didn't hear.  What

11     university?

12         A      Union Planters -- UP University.  And

13     that survived then into Regions.  So it became

14     Regions University at the merger between the two

15     companies.

16         Q      And what was the approximate date of

17     that merger?

18         A      I believe it was May of 2004.

19         Q      Okay.  Was any authority required by

20     someone senior to him in order to use that name?

21         A      I'm --

22         Q      Don't know?

23         A      -- not aware.  Don't know.

1    Q    Please tell us your background and

2    training.  And it would be easier if you did it in

3    a narrative way.  And what I'd be interested in

4    hearing is your college education and then your

5    training and work experience.

6    A    Okay.  Graduated from East Carolina

7    University in 1972 with an undergraduate degree in

8    Psychology, pursued a Master's degree in

9    Psychology and Counseling and Management Sciences

10    from the University of Memphis and graduated in

11    1991.

12    Started a professional career with Cannon

13    Mills in 1972 as a Management Trainer.  I left

14    Cannon Mills and went to work for Menica Bank &

15    Trust out of Berkford in '76 as a Human Resource

16    Specialist that focused on leadership training.

17    I joined First Oklahoma Bank Corporation in

18    '79 as their Director of Training.  I had the

19    opportunity in '80 to go over to the First Bank of

20    Memphis and head up their training function.

21    In '99, I left First Tennessee and consulted

22    for about two years.  In September of 2000 —

23    Q    Excuse me just one second.  You

1    consulted in what?

2        A    Human resource practices, leadership

3    development, executive coaching assessments.

4        And then in September of 2000, I went to work

5    for Union Planters as their Director of Career

6    Management.  And then in 2003, I moved into the

7    Director of Organizational Development Learning

8    position.

9        Q    Was there any practical difference,

10   speaking in generalities, between being the

11   Director of Career Management in 2000 with one

12   company and in 2003 holding the position that you

13   held with Regions?

14       A    Yes.

15       MR. PECAU:

16           Object to the form of the question.

17   BY MR. HUDSON:

18       Q    The answer is yes?

19       A    Yes.

20       Q    What would the difference be?

21       A    Scope of the job.

22       Q    Sir?

23       A    Scope.

1    Q    And would you describe the difference in

2    the scope?

3    A    The Manager of Career Development was an

4    individual contributor position.  The Director of

5    Organization Development and Learning had, you

6    know, several dozen reports and responsibility for

7    the University.

8    Q    Okay.  Now, I may go through those

9    several dozen but I may be able to short circuit

10    it.  With regard to the learning part, the

11    Director of Organization Development and Learning

12    that you had in 2003 — with regard to the

13    learning aspect, was that substantially the same

14    as the job that you had in 2000 where you were the

15    Director of Career Management?

16    A    No.

17    Q    Okay.  It might serve if you explained

18    the function of what you had in 2003, Director of

19    — what was it?

20    A    Organization Development and Learning.

21    Q    If this were a jury case and you were

22    explaining to a layman what your job was, would

23    you please explain it in those terms so that a

1    layman would understand what a Director of

2    Organization Development and Learning is?

3         A    It had the responsibility for

4    understanding the skill development needs of the

5    workforce and working on putting programs in place

6    to address those skill needs, responsibilities for

7    understanding the systems that were needed out of

8    HR, to provide management with information on

9    performance and talent.

10        Q    And provide -- I got systems needed out

11   of HR.  And then what was the next thing you said?

12        A    Information on performance and talent.

13        Q    If you left out the systems part, would

14   what you were doing be to identify the skills that

15   you needed to train your workforce to be able to

16   accomplish and then develop a method of training

17   your workforce to accomplish those skills?

18             MR. PECAU:

19             I object to the form of the

20             question.  Go ahead and answer if

21             you can.

22             THE WITNESS:

23             I don't know how you can do that.  I

1      don't know.

2    BY MR. HUDSON:

3      Q    Well, when you say that you wanted to

4    identify the skills needed, what does that mean?

5      A    Well, what we did was develop competency

6    models on positions, understand the competency

7    requirements of jobs.  We would go in and study

8    then those competencies to understand high

9    performer behaviours.

10      And then we would develop our training

11    programs to try to replicate what a person needed

12    to learn to be a high performer.

13      Q    Okay.  How would you develop the

14    competency models?

15      A    We developed a process that would take

16    about three months per model.  It began with basic

17    job analysis work, where you would go out in the

18    field, talk to folks to try to determine, you

19    know, the --

20      Q    I'm going to interrupt you only because

21    I asked a question that I don't need an answer to

22    and it's going to require a lot of time.  Which

23    jobs within Regions did you develop competency

1    ~~models for?~~

2    ~~A    At last count, it was about sixty jobs~~

3    ~~that covered eighty percent of what we'd call high~~

4    ~~incumbent positions.~~

5    ~~Q    What positions?~~

6    ~~A    High incumbent.  It would be the jobs~~

7    ~~that you had the most folks in.  So tellers,~~

8    ~~customer service representatives, assistant branch~~

9    ~~managers, branch managers, group sales managers,~~

10   ~~relationship bankers, commercial bankers, trust~~

11   ~~administrators, IT systems programmers, HR~~

12   ~~managers, accountants, auditors.  I don't think we~~

13   ~~got into the legal force though.~~

14   ~~Q    They are hard to train, aren't they?~~

15   ~~MR. PECAU:~~

16   ~~Like cats.~~

17   ~~BY MR. HUDSON:~~

18        Q    Was it your job attempt to improve,

19   through training, the competency of variably all

20   of the Regions employees?

21        A    I would classify that as management's

22   job.  I supported management in that effort.

23        Q    And was the training that you oversaw,

 1      coordinated or whatever you did with respect to

 2      that training designed specifically to increase

 3      the competency of the Regions workforce?

 4           A    Yes, sir.

 5           Q    Was it designed for any other purpose?

 6           A    No.

 7           Q    Okay.  Was Regions University purely a

 8      corporate training program?

 9           A    I'm not sure what you mean by "corporate

10      training program".

11           Q    Well, you had used that term earlier and

12      told us, as I remember, of a man who now has come

13      over from AmSouth and was in charge of their

14      corporate training program.

15           A    You can, you know, kind of use corporate

16      training to -- I just want to make sure we didn't

17      say corporate training is just over the corporate

18      part of the bank.  "Corporate" in this case would

19      mean the whole bank.

20           Q    The whole bank.

21           A    Yes.

22           Q    And is that purely what this program

23      was, was a bank training program for bank

1    employees?

2          A    That's right.

3          Q    And has Regions University ever offered

4    any training or service of any kind or nature to

5    anyone who is not an employee of the bank?

6          A    There would be various outreaches from

7    the organization that would provide training.

8          Q    Okay.

9          A    Not out of my area though.  This would

10   just be individuals that were asked to, you know,

11   step into a civic responsibility and provide a

12   program to a local school or to an organization

13   that wanted to know more information about

14   banking.

15          Q    Maybe this is an unfair

16   characterization.  But it seems to me that's more

17   sort of a show-and-tell kind of presentation.  Is

18   that correct?

19                MR. PECAU:

20                I object to the form of the

21          question.

22                THE WITNESS:

23                No.  I think it was — I don't know

```
 1  ──────── how to answer that.

 2  ─ BY MR. HUDSON:

 3        Q    Okay.  Would it be your testimony that

 4   Regions University would actually go out into the

 5   public and use the name Regions University and

 6   offer educational training services to the public?

 7        A    No.  That was not the purpose of it.

 8        Q    Is Regions University accredited in any

 9   state as an educational institution?

10        A    I don't believe so.

11  ──────── Q    Has Regions University applied for and

12  ─ received an exemption from any state in order to

13  ─ conduct its affairs?

14  ──────────── MR. PECAU:

15  ──────────── Object.  I object to the form of the

16  ──────────── question.

17  ──────────── THE WITNESS:

18  ──────────── I don't know how to answer that.

19  ─ BY MR. HUDSON:

20  ──────── Q    Well, to your knowledge, has Regions

21  ─ University applied for and obtained an exemption

22  ─ from any authority in any state in order to

23  ─ conduct its business?
```

```
 1              MR. PECAU:
 2              Objection, form.
 3    BY MR. HUDSON:
 4         Q    You can answer the question.
 5         A    I don't know.
 6         Q    Okay.  At the time that you were the
 7    Director of Organization Development and Learning
 8    in 2003, if it were necessary for Regions
 9    University to obtain an exemption from any state
10    in order to conduct its business, would it have
11    been your responsibility to obtain that
12    exemption?
13              MR. PECAU:
14              That's a long question.  Could you
15              read that back?
16              THE REPORTER:
17              "At the time that you were the
18              Director of Organization Development
19              and Learning in 2003, if it were
20              necessary for Regions University to
21              obtain an exemption from any state
22              in order to conduct its business,
23              would it have been your
```

```
 1              responsibility to obtain that

 2              exemption?"

 3              MR. PECAU:

 4              I object to the form.

 5              THE WITNESS:

 6              In 2003, Regions University -- it

 7              didn't take shape until 2004.

 8   BY MR. HUDSON:

 9       Q    Okay.  And in 2004, did you still hold

10   the position as Director of Organization

11   Development and Learning?

12       A    Yes, sir.

13       Q    And did you hold that position when

14   Regions University took shape?

15       A    Yes.

16       Q    At that time, if an exemption were

17   required from any state in order for Regions

18   University to conduct its business, would it have

19   been your responsibility to obtain that

20   exemption?

21              MR. PECAU:

22              Objection as to form.

23              THE WITNESS:
```

1            I don't know what any of that would
2            have entailed. And so if it would
3            have been my responsibility, I don't
4            know.
5    BY MR. HUDSON:
6        Q    Okay. You just know you didn't do it.
7        A    I didn't — no.
8        Q    Okay. And you don't know if anybody
9    else did?
10       A    I don't know if it was supposed to be
11    done.
12       Q    Okay. To your knowledge, was any
13    consideration given by anyone at the bank to the
14    use of the term "university" as it was used by the
15    organization, entity or whatever you might call
16    it, quote "Regions University" close quote?
17            MR. PECAU:
18            Object to the form of the question.
19            THE WITNESS:
20            I don't understand the question.
21    BY MR. HUDSON:
22       Q    Are you familiar with entities that
23    regulate banks?

1      A    No, sir.

2          Q    Any of them?  I mean, do you know the

3    FDIC exists?

4          A    I know the name, yes.

5          Q    And you know regulators come into the

6    bank.  You know everybody gets nervous when they

7    come in?

8          A    Yes, sir.

9          Q    Do you have any personal knowledge about

10    whether or not those who are not regulated by

11    federal authority are prohibited from using the

12    word "bank?"

13              MR. PECAU:

14              I object to the form.

15              THE WITNESS:

16              I have no knowledge, no.

17    BY MR. HUDSON:

18          Q    Do you have any knowledge as to whether

19    those who are not appropriately approved by state

20    authority are prohibited from using the word

21    "university?"

22              MR. PECAU:

23              I object to the form of the

1    ~~question.~~

2    ~~THE WITNESS:~~

3    ~~I have no knowledge.~~

4    ~~BY MR. HUDSON:~~

5    ~~Q    To your knowledge, has anyone at the~~

6    ~~bank investigated whether or not the bank is~~

7    ~~permitted to use the word "university" without~~

8    ~~being appropriately licensed?~~

9    ~~MR. PECAU:~~

10    ~~Same objection.~~

11    ~~THE WITNESS:~~

12    ~~I have no knowledge.~~

13    ~~BY MR. HUDSON:~~

14    Q    Okay.  You had mentioned some outreach

15    programs.  Do you recall when we talked about

16    those?

17    A    Uh-huh.

18    Q    I've changed the subject.  Can you give

19    me the names, titles or descriptions of the

20    outreach programs to which you refer?

21    A    The ones that I remember were designed

22    by the American Bankers Association.  And they

23    were built in modules.

1        Q     I'm sorry?

2        A     They were built in modules, learning

3     modules.

4        Q     Modules.

5        A     So they would have kind of a complete

6     package, would have facilitator's guide, probably

7     a video, handouts, et cetera.

8           And the subject matter I remember was around

9     personal banking, you know, what was a checking

10    account, what was the life of a check, the general

11    products that a bank offers; loans, checking

12    accounts, investments.  Another one was, you know,

13    how to save money.  Those are the ones I recall.

14       Q     Do those modules still exist?

15       A     I don't know.

16       Q     I don't want to limit my question.  So

17    I'm really looking for some descriptive term to

18    describe the training materials to which you have

19    referred.  Is there a descriptive term that I

20    could use that, if I asked for them in an

21    appropriate request for production, you would know

22    what I was asking for?

23           Let me tell you what I'm driving at.  In the

1    ~~case, I may ask your lawyers to let me see these~~

2    ~~materials. And when I ask for them, I want to ask~~

3    ~~for them in a way that you'll know what I'm~~

4    ~~talking about.~~

5    ~~A    All I would know is that they would be~~

6    ~~materials produced by the American Bankers~~

7    ~~Association.~~

8    ~~Q    And if we call them that, you would know~~

9    ~~what we are talking about, these materials that~~

10    ~~you and I are conversationally discussing now?~~

11    ~~A    That's what I remember, yeah.~~

12    ~~Q    Okay. Good. Are there any other~~

13    ~~programs you've used in outreach that occur to you~~

14    ~~other than the American Bankers Association~~

15    ~~programs?~~

16    ~~A    It wasn't my job to be involved in~~

17    ~~outreach. So, not to my knowledge.~~

18        Q    Okay. Whose job would outreach have

19    been? And I know I've asked -- when I've asked

20    that question, I guess I would begin in 2004 and

21    not go back farther than that.

22        A    You know, the way I remember that

23    working is, it was mainly done by folks that had a

1    relationship with the community.  So it would be a

2    branch manager or a regional sales manager with

3    branches reporting to them.

4        That person probably -- it wasn't all of

5    them, but for some that also had a relationship

6    with the state banking association, or that would

7    be called upon by a member of the ABA.  It's all

8    volunteer.  So there wasn't any form or fashion,

9    if you will.

10       But those who had a desire or, you know, saw

11   it as something that they could do to contribute

12   back to the community would be the ones that would

13   usually tend to step up.  So passed down by word

14   of mouth, passed down by relationships, passed

15   down by association, newsletters.

16       So, you know, the materials are the ones that

17   were kind of passed around.  I mean, there wasn't

18   any kind of system that I'm aware of.

19       Q    Sure.  In any event, that wouldn't have

20   been either under the auspices of Regions

21   University or under your supervision or control.

22       A    No.

23       Q    Actually, it was a double negative.  So

1    I guess the answer would be yes.  It wasn't under

2    your control and it wasn't under their auspices.

3    Is that right?

4         A    No.  That's correct.

5         Q    Thank you.  We have marked deposition

6    notices as Exhibits Seven and Eight.  Have you had

7    an opportunity to see these before today?

8         One is your individual deposition notice and

9    the other is what lawyers refer to as a 30(b)(5;)

10   30(b)(6) notice.  And the one that is the

11   30(b)(5;) 30(b)(6) notice has a list of things

12   that we want to ask you about.

13        A    Mr. Pecau, you know, showed me some

14   paperwork so I didn't have it in my hand.

15        Q    I'm just asking you if you've seen it

16   before.

17        A    I don't know.

18        Q    Okay.  I believe that you are being

19   designated on the categories listed on Exhibit

20   Eight except for category Six.  Is that correct?

21             MR. PECAU:

22             I'll answer that question.  That's

23             correct.

```
 1    BY MR. HUDSON:
 2         Q    Did you review documents in preparation
 3    for your deposition here today?
 4         A    I did go back and look at my own files
 5    that I've had over the years.
 6         Q    Did you bring those files with you
 7    today?
 8         A    No.
 9         Q    Did you realize that they had been
10    requested that you bring them here today?
11         A    No.
12         Q    Can you describe to me the files that
13    you looked at?  Let's do something as a shorthand
14    rendition.  I'm going to take that question back
15    just for a moment.
16         We were given what was marked as Exhibit
17    Four.  And my guess is that it probably came from
18    your files.
19         A    These would be the files.
20         Q    Were there any files that you looked at
21    that are not included in Exhibit Four?
22         A    I'm sorry.  I don't understand the
23    question.
```

1     ~~Q    Your testimony, as I recall it, is that~~

2    ~~in preparation for your deposition today, you~~

3    ~~looked at your files.  And I've shown you Exhibit~~

4    ~~Four.  And my question is, is Exhibit Four the~~

5    ~~entirety of the file that you looked at before you~~

6    ~~came here to testify today?~~

7     ~~A    Yes, sir.~~

8     ~~Q    Okay.~~

9     ~~A    These are the files I looked at.~~

10     ~~Q    Okay.  And did you look at anything else~~

11    ~~before you came here to testify today in~~

12    ~~preparation for your testimony?~~

13     ~~A    No, sir.~~

14     ~~Q    Did you discuss your testimony, your~~

15    ~~proposed testimony or any aspect of your testimony~~

16    ~~with anyone except your lawyers?~~

17     ~~A    No, sir.~~

18        Q    Is there any plan or proposal to market

19    Regions University outside of the bank?

20           MR. PECAU:

21           I object to the form of the

22           question.

23           THE WITNESS:

1          I don't know.

2     BY MR. HUDSON:

3          Q     If there is, you don't know about it?

4          A     I don't know what you really mean by

5     "market" outside the bank.

6          Q     Is there any plan or proposal to use

7     Regions University for anything except the bank's

8     internal corporate training program?

9          A     Not that I'm aware of.

10         Q     Do you advertise in any way the

11    existence or services of Regions University?

12         A     Would you define the word "advertise?"

13         Q     I don't know if I can.  What I would do

14    is ask you what your understanding of the word

15    "advertising" is.  And you can tell me that and

16    then we can work with that.

17         A     If it's to communicate and display

18    information about the bank in order to attract

19    individuals to join the bank, the answer would be

20    yes.

21         Q     All right.  And how do you do that and

22    where do you do that?

23         A     There are brochures that are used by

1    recruiters as they, you know, market the bank to

2    prospective candidates for hire.

3         Q    I'll mark these in a moment.  But just

4    to get us on the same track, are these examples of

5    the sort of brochures you're speaking of?

6         A    I don't see what I was speaking of in

7    here.

8         Q    Would you describe the brochures that

9    you're speaking of so that we can ask for them to

10   be produced, as well?  If we just called them

11   brochures, would that be enough?

12              MR. PECAU:

13              Well, they have been produced.

14              MR. HUDSON:

15              Have they?

16              MR. PECAU:

17              Yeah.

18              MR. HUDSON:

19              And I didn't recognize them.  Okay.

20   BY MR. HUDSON:

21        Q    Then would you describe to me the

22   brochures?

23        A    It's been so long since I've seen those

1    ~~-- I remember on the phone --~~

2    ~~MR. PECAU:~~

3    ~~Let's go off the record.~~

4    ~~WHEREUPON, THERE WAS AN OFF-THE-RECORD~~

5    ~~DISCUSSION.~~

6    ~~BY MR. HUDSON:~~

7        Q    Mr. Pollard, to your knowledge, has

8    Regions ever been approved by a regional

9    accrediting body recognized by the U.S. Secretary

10   of Education or the U.S. Department of Education?

11       A    Not to my knowledge.

12       Q    To your knowledge, has Regions ever

13   filed for recognition or exemption under the post

14   secondary education laws of any particular state

15   to use the term "Regions University" or to operate

16   it's program for Regions University?

17       A    Not to my knowledge.

18       Q    To your knowledge, has Regions ever

19   sought or obtained authorization from any state to

20   use the term "university" for its training

21   program?

22       A    Not to my knowledge.

23       Q    To your knowledge, has Regions ever

```
 1      sought or obtained authorization from any state to
 2      publish the use of the term "university" as it
 3      apparently has done in Exhibits Nine, Ten and
 4      Eleven?
 5           A     Would you repeat that question, please?
 6           Q     Sir?
 7           A     Would you repeat the question?
 8           Q     To your knowledge, has Regions ever
 9      obtained authority from any state to authorize it
10      to publish the term "university" as it apparently
11      has done in Exhibits Nine, Ten and Eleven?
12           A     Not to my knowledge.
13           Q     Okay.  In fact, do Exhibits Nine, Ten
14      and Eleven reflect that Regions Asset Company
15      and/or Regions Financial Corporation have
16      published to the public the fact that it is using
17      the term "university?"
18           A     If that question is to mean by the fact
19      that those brochures are passed out to non-bank
20      people in an effort to solicit, you know, them to
21      consider joining the bank, making them public
22      solicitations and awareness, then, yes.
23           Q     Has the bank made any effort to limit
```

1    ~~its publication of its use of the term~~

2    ~~"university" such as is reflected in Exhibits~~

3    ~~Nine, Ten and Eleven, or elsewhere, to trying to~~

4    ~~attract new employees to the bank?~~

5    ~~MR. PECAU:~~

6    ~~I object to the form of the~~

7    ~~question.~~

8    ~~THE WITNESS:~~

9    ~~I don't understand the question.~~

10   ~~BY MR. HUDSON:~~

11       Q    To the extent that the bank has made

12   public its use of the term "university", has the

13   use of that been limited to its attempt to attract

14   new hires?

15       A    I don't know.

16       Q    Do you know of any other reason that the

17   bank has made public its use of the word

18   "university" except in an attempt to attract new

19   hires as is reflected in Exhibits Nine, Ten and

20   Eleven?

21       A    That would be what I would think would

22   be -- that would be what I'm aware of.  I'm not

23   aware of any other efforts that they've used the

1    word "university" outside of recruiting.

2        Q    Outside of trying to attract new hires?

3        A    To my knowledge.

4        Q    Okay.  Now, please, if you will,

5    identify for us Exhibits Nine, Ten and Eleven.

6        A    Nine is a recruiting brochure.  Ten is a

7    brochure, I believe, that's used in new employee

8    orientation.

9        Q    In what?

10       A    In new employee orientation.

11       Q    So Ten would not be publicly

12   disseminated.  That would be used within the bank?

13       A    My knowledge is that it was used for

14   orientation programs.  It could have been used for

15   something else but I'm not aware of it.

16       Q    All right, sir.  But Nine would have

17   been used publicly?

18       A    Yes.

19       Q    Okay.

20       A    And Eleven is a copy of a web page.

21       Q    And is that publicly available?

22       A    Yes.

23       Q    Okay.  Now, your attorney was kind

```
 1      enough to give us Nine, Ten and Eleven because I

 2      didn't have them here this morning, and

 3      represented that this may or may not be all of the

 4      brochures that were distributed outside the bank.

 5           In your recollection, were there brochures

 6      distributed outside the bank touting the existence

 7      of Regions University other than Exhibit Nine?

 8           A     I believe that there have been other

 9      brochures that I have seen over the last three or

10      four years that communicate, you know, Regions

11      University, especially in its connection with

12      careers at the company.  And they could have been

13      used for recruiting.

14           Q     Could have been?  Sir?

15           A     Could have been used for recruiting.

16           Q     Okay.  And if they were used in any

17      respect, in conjunction with somebody who is not

18      an employee of the bank, the purpose would have

19      been recruiting.  Is that correct?

20           A     Yes, to my knowledge.

21           Q     Okay.  Now, when I'm looking at Exhibit

22      Nine, the reference I see -- and there may be

23      more.  I just skimmed it.  The reference I see to
```

1    Regions University is on what has been Bates stamp

2    numbered 12341.  Do you see that?

3         A    Uh-huh.

4              MR. PECAU:

5              He can't take down "uh-huh".  So

6              could you say it?

7              THE WITNESS:

8              Yes.  I see that.  Yes.

9    BY MR. HUDSON:

10        Q    Thank you.  Would you quickly thumb

11   through there and just see if you see any other

12   reference to Regions University or RU?

13        A    That's the one notice of Regions

14   University that I see.

15        Q    And would you please look at Exhibit

16   Eleven, Bates stamp number 126, that says

17   "Regions1Source and RU Learning (Regions

18   University Learning)" on it?  Do you see that?

19        A    Yes, sir.

20        Q    Is there any other place to your

21   recollection as you sit here today where RU

22   Learning or Regions University appears on a

23   website that is available to the public?

1    ~~A    Yes, sir.~~

2    ~~Q    Where is that?~~

3    ~~A    It's on a link off of Regions -- Life at~~

4    ~~Regions.  There's a place, I think that you click~~

5    ~~where it says "Training."  And then it will take~~

6    ~~you to another place where you can click on a link~~

7    ~~for RU Learning.~~

8    ~~Q    And as you recall, when you click that~~

9    ~~link, what does that bring up?~~

10    ~~A    As I recall, it brings up -- I believe~~

11    ~~it's the RU Learning site page.~~

12    ~~Q    RU Learning what?~~

13    ~~A    The site page, the home page.~~

14    ~~MR. PECAU:~~

15    ~~I think there is some confusion~~

16    ~~going on.~~

17    ~~MR. HUDSON:~~

18    ~~I think there is too.~~

19    ~~BY MR. HUDSON:~~

20    Q    The testimony yesterday, as I understood

21    it -- and it may be inaccurate.  But as I

22    understood it -- and my understanding may be wrong

23    -- was that the Regions University home page, the

1       training that is available online is available to

2       employees and it's password protected.  Is that

3       correct?

4           A    It's -- well, my understanding is it's

5       available 24/7.

6           Q    Right.

7           A    And you can access it from your home.

8           Q    If you're an employee of Regions.

9           A    If you're an employee of Regions, yes.

10          Q    What I'm really asking about is what the

11      general public can get to.

12          A    Okay.  Yeah.  I'm not aware of anything

13      that the general public can see then.

14          Q    All right.  And is there, in your

15      recollection, any reference to Regions University,

16      RU Learning or RU that the general public's eyes

17      would see except for perhaps this reference on

18      Defendant's Exhibit Eleven?

19          A    That would be my understanding.

20 ——————— Q —— Okay.  And does Regions have web pages

21 —— and links to its human resources department?

22 ——————— A —— I believe so.

23 ——————— Q —— At one point, did your responsibilities

1    ~~also include human resources?~~

2    ~~A    Not at Regions.~~

3        Q    Okay.  What I'm curious about -- and

4    maybe you can help me with it -- on Exhibit Eleven

5    -- I think you told us it was your belief that

6    Exhibit Eleven is available to the general

7    public.  And I don't want to be argumentative.

8        But Exhibit Eleven looks like something that

9    would go to the employees that says "Let's Get

10   Started", and it tells employees how to go about

11   doing things.  Is that correct?

12       A    It looks like it's information about the

13   company, www.regions.com.  I believe

14   www.regions.com is a public website.

15       Q    Okay.  I'm no tech guy.  I'm in real

16   trouble with it.  You may be too.  And I guess

17   we'll ultimately just get somebody in front of the

18   computer and pull up what they can.  But what it

19   says is "regions.com" and then it says "/welcome/

20   lets_get_started".  It has more than that in that

21   address.

22       Do you know as you sit here today whether or

23   not that full address on this page, in fact, is

1      available to the general public or is something

2      that is available to Regions people?

3          A    No, not for sure.

4          Q    Okay.

5          A    I'd have to go on there to see.  What I

6      do know is that usually when you see -- when

7      you're looking at something like that -- and

8      again, I'm not a tech person either -- it's

9      usually HTTPS, which indicates it's a secured

10     server.  That doesn't have an S beside the P.

11         Q    So that normally wouldn't be a secure

12     server?

13         A    That address would be -- if it had an S

14     on it, it would be a secured server.

15         Q    And just assuming that this may be

16     publicly available, Exhibit Eleven, in your

17     capacity as operating the Regions University and

18     being in charge of learning -- I don't want to

19     mischaracterize it -- but as you previously

20     testified, can you think of any reason that you

21     would make available to the general public

22     information about how to get started as an

23     employee at Regions?

1          A    I think it would be a good way to show

2     the general public that the bank has a process in

3     which, you know, if you come join the bank, that

4     we can take care of you from day one.  So it would

5     -- you know, I could see where it could be used as

6     a good recruiting tool.

7          Q    And we'll just have to find out what it

8     is.  You can't tell us.  Is that correct?

9          A    That's correct.

10          ~~Q    Okay.  Now, when we looked at Exhibit~~

11     ~~Eleven earlier, I asked you to look at Bates stamp~~

12     ~~126 where it says "Human Resources and training~~

13     ~~systems.  Two of these systems you will find~~

14     ~~particularly helpful is Regions1Source and RU~~

15     ~~Learning (Regions University Learning).  Is there~~

16     ~~any link from that to anywhere else?~~

17          ~~A    On that page?~~

18          ~~Q    Yes.~~

19          ~~A    I don't know.~~

20          Q    Okay.  If somebody wanted to test me on

21     this, I'd fail miserably.  We'll just have to ask

22     somebody that knows about it.  I gather from your

23     testimony that Regions University conducts some of

```
 1      its training online.  Am I correct in that?
 2          A    Yes, sir.
 3          Q    Is training also conducted by your
 4      corporate training program that is not online?
 5          A    Yes, sir.
 6          Q    And where is that training conducted?
 7          A    It would usually be within the footprint
 8      of the company.  And so Regions is in sixteen
 9      states.  And so the training could be delivered
10      anywhere within those sixteen states.
11          Q    Okay.  What physical locations are
12      typically used?
13          A    For the instructor-lead training, there
14      are quite a few, we'd call, training labs.  They'd
15      have classroom spaces so they would have your
16      classic teller training.
17          Q    Owned by the company?
18          A    Owned by the company.  We also use
19      external sites, like the Marriott Conference
20      Center here in Prattville.  So we've got -- we've
21      probably used that several times in the last
22      couple of years to deliver executive leadership
23      courses.
```

1     ~~Q     Are there any other places that you can~~

2     ~~think of that are used?  I'm not asking for every~~

3     ~~conference center that you rent.  But I gather you~~

4     ~~rent conference centers for that purpose.~~

5     ~~A     Yes, sir.~~

6     ~~Q     Is there any other place other than~~

7     ~~these company-owned facilities or facilities that~~

8     ~~you rent specifically for the purpose of training~~

9     ~~your employees that are used?~~

10    ~~A     Yes, sir.~~

11    ~~Q     What are they?~~

12    ~~A     Well, the conference centers.~~

13          Q     My question was so awkward, I

14    apologize.  Am I correct in saying that you

15    operate this corporate training program when you

16    teach physically and not online either at company-

17    owned facilities or at facilities you specifically

18    rent for that purposes?

19          A     Yes, sir.

20          Q     And there aren't any other places that

21    you do it that you can think of today?

22          A     Not to my knowledge.

23          Q     Okay.  Are your employees required to

1    take corporate training?

2        A    There are mandatory curriculum that must

3    be completed for some job families.  And then I

4    guess everyone is -- is subjected to having to

5    complete compliance training.  So, I guess the

6    answer would be yes.

7        Q    Do you issue any diplomas or

8    certificates upon completion of any course or any

9    part of the training?

10       A    Yes, sir.

11       Q    Which?  Diplomas or certificates, or

12   both?

13       A    Certificates.

14       Q    And would you tell me the typical form

15   of the certificate, what it would say?

16       A    It would say something, in recognition

17   of completion of a certain course, you know, this

18   certificate is presented to, the person's name,

19   and it would be signed by the instructor.  You

20   know, it could be signed by the chairman of the

21   bank.  Just depending on what the course is.

22       Q    All right.  Capable of being framed?

23       A    Yes, sir.

1        Q    And does the bank intentionally prepare

2    the certificates in a way that they would be

3    attractive if framed?

4        A    Yes, sir.

5        Q    And have you seen them framed and hung

6    on walls?

7        A    Yes, sir.

8        Q    Have you seen that frequently?

9        A    Yes, sir.

10   ~~Q    Have you seen people display them~~

11   ~~outside the bank?~~

12   ~~A    I'm not -- I don't remember seeing any~~

13   ~~outside the bank.~~

14       Q    Does the bank allow its employees to

15   represent to others that they have completed

16   courses of study at Regions University?

17       A    I would answer that as, we have produced

18   transcripts for folks that have needed to prove to

19   an association that they have completed certain

20   numbers of hours of course work to keep their --

21   whatever it is, you know, like a CPA, valid.

22       Q    So would you please tell me more about

23   the transcripts that are produced?  Would you

1    describe one such transcript?

2         A    The ones I've seen would have their

3    name.  Below their name, they would have the list

4    of courses that they would have completed, the

5    dates that they would have completed and the

6    amount of contact hours that that course consisted

7    of.

8         Q    And those transcripts might be used, for

9    instance, in aid of obtaining a CPA?  Is that what

10   you said?

11        A    Well, the CPA -- to maintain the CPA

12   license, you have to have so many hours of --

13        Q    Continuing learning?

14        A    Yes, continuing learning on a one-year

15   or three-year basis.  So some courses we offer

16   have satisfied those requirements in the past.

17        Q    And for what purposes other than these

18   CPA Requirements have you produced transcripts?

19        A    That's -- that's -- that's pretty much

20   what I remember that we've done for folks that

21   have said, I need to have a record of course work

22   that I've taken.  It's usually for some kind of an

23   association licensure that they have to provide

1    recognition of training taken.

2        Q    And in conjunction with their

3    professional licensure?

4        A    Yes, sir.

5    ~~Q    Have you provided transcripts to schools~~

6    ~~or colleges?~~

7    ~~A    Not that I'm aware of.~~

8    ~~Q    Are any steps taken by the bank, to your~~

9    ~~knowledge, to prevent such transcripts from being~~

10   ~~presented by graduates of Regions University to~~

11   ~~schools or colleges?~~

12   ~~MR. PECAU:~~

13   ~~I object to the form of the~~

14   ~~question.~~

15   ~~THE WITNESS:~~

16   ~~Could you repeat that, please?~~

17   ~~THE REPORTER:~~

18   ~~"Are any steps taken by the bank, to~~

19   ~~your knowledge, to prevent such~~

20   ~~transcripts from being presented by~~

21   ~~graduates of Regions University to~~

22   ~~schools or colleges?"~~

23   ~~THE WITNESS:~~

1          ~~I don't know how to answer that.~~

2              ~~I'm not sure what a graduate from~~

3              ~~Regions University is.~~

4      ~~BY MR. HUDSON:~~

5          Q    Fair enough.  Are any steps taken by the

6      bank, to your knowledge, to prevent attendees at

7      Regions University from presenting transcripts of

8      their attendance at Regions University to schools

9      or colleges?

10              MR. PECAU:

11              I object to the form of the

12              question.

13              THE WITNESS:

14              I'm not aware of any.

15      ~~BY MR. HUDSON:~~

16          ~~Q    Okay.  Are attendees at Regions~~

17      ~~University encouraged by the bank to let members~~

18      ~~of the general public know that they've attended~~

19      ~~Regions University?~~

20          ~~A    Would you repeat that question?~~

21              ~~THE REPORTER:~~

22              ~~"Are attendees at Regions University~~

23              ~~encouraged by the bank to let~~

1    ~~members of the general public know~~

2    ~~that they've attended Regions~~

3    ~~University?"~~

4    ~~MR. PECAU:~~

5    ~~I object to the form of the~~

6    ~~question.~~

7    ~~THE WITNESS:~~

8    ~~I'm not aware of that.~~

9    ~~BY MR. HUDSON:~~

10        Q    Are any steps taken within your

11    knowledge to caution attendees of Regions

12    University not to represent to members of the

13    public that they have attended Regions

14    University?

15            MR. PECAU:

16            I object to the form of the

17            question.

18            THE WITNESS:

19            Not to my knowledge.

20    ~~BY MR. HUDSON:~~

21    ~~Q    Sir?~~

22    ~~A    Not to my knowledge.~~

23        Q    Okay.  Has it been brought to your

1    attention that former employees of the bank have

2    represented on their transcripts that they have

3    attended Regions University?

4              MR. PECAU:

5              I object to the form of the

6              question.

7              THE WITNESS:

8              It's not been brought to my

9              knowledge.

10   ~~BY MR. HUDSON:~~

11   ~~Q    Would you be surprised to learn that?~~

12   ~~MR. PECAU:~~

13   ~~Object to the question.~~

14   ~~THE WITNESS:~~

15   ~~I'm not sure what "surprised" would~~

16   ~~be.~~

17   ~~BY MR. HUDSON:~~

18   ~~Q    Good answer.  If you want a break at any~~

19   ~~time, just say so.~~

20   ~~A    Thank you.~~

21        Q    Am I correct that the bank's Regions

22   University does not offer educational services of

23   any kind to the general public?

1        A     If I understand that to mean Regions

2    University, Regions University does not offer

3    courses to the public.

4        Q     Since you struggled, does the bank,

5    itself, in any way offer educational services to

6    the general public?

7        A     Other than what we've already talked

8    about.

9        Q     These American Bankers courses, that

10   sort of thing we talked about?

11       A     Yeah.

12       Q     Okay.  Has anyone brought to your

13   attention, any bank employee brought to your

14   attention, that they were confused about whether

15   the bank's corporate training program was the same

16   as Regions University being operated by the school

17   that was formerly Southern Christian University?

18       A     No associate has brought that to my

19   attention.

20       Q     Sir?

21       A     No employee has brought that to my

22   attention.

23       Q     The transcripts that you described

1    earlier in your testimony, does the name "Regions

2    University" appear on the transcripts, or do you

3    recall?

4         A    I don't recall.

5         Q    If we would like to see those

6    transcripts, if we just describe them as

7    "transcripts", would you know what we were

8    speaking of?

9         A    Yes.

10        Q    Okay.  Do you maintain copies of them

11   after they're issued?

12        A    No.

13        Q    Does the bank maintain copies?

14        A    No.  Those transcripts are created off

15   of the Learning Management System.

16        Q    The what?

17        A    The Learning Management system.

18        Q    Okay.

19        A    And so it maintains the information on

20   the associate.  But there's no hard copies kept.

21        Q    Is there an electronic copy of the

22   transcript that was issued?

23        A    I don't think so.  I think what you do

1    ~~-- you create a report and that is essentially a~~

2    ~~transcript. And then once you create it, it~~

3    ~~disappears. You create it, print it off and it~~

4    ~~doesn't exist anymore.~~

5    ~~Q   I'm just trying to visualize this. But~~

6    ~~I gather that there is a central place where~~

7    ~~electronically, the training records of every~~

8    ~~employee are maintained. Is that what you're~~

9    ~~saying?~~

10   ~~A   That's the Learning Management System,~~

11   ~~yes, sir.~~

12   ~~Q   So what you would do, if, for instance,~~

13   ~~I wanted a transcript, you would call up Victor~~

14   ~~Hudson in your computer and push a button and it~~

15   ~~would print my training transcript.~~

16   ~~A   Yes, sir. You would put in some~~

17   ~~parameters, like courses from this date to this~~

18   ~~date.~~

19   ~~Q   Okay. And it would print those. And~~

20   ~~that's what would be used by somebody, for~~

21   ~~instance, for their CPA Licensure?~~

22   ~~A   Yes, sir.~~

23         Q    Has it ever been brought to your

1      attention that either any employee or former

2      employee has used those transcripts or information

3      from those transcripts on any resume?

4          A      I think it would be smart if they did.

5      But I don't know if I've ever seen a resume from

6      someone who had a transcript that used it to

7      create it.

8          Q      They wouldn't give you the resume, would

9      they?

10         A      You know, it would be like, you mean

11     you're looking for a job outside the bank now?

12         Q      That makes good sense.  But it's the

13     kind of information you would expect them to use

14     on a resume?

15         A      I have personally used some of the

16     courses that I've taken in the past in a similar

17     kind of situation on a resume.  So I would only

18     say, you know -- you know, we have offered, in the

19     past, four-week executive development courses.

20         You know, when you complete that, it's a

21     pretty big deal.  And some folks would recognize

22     that.

23         Q      And you get a certificate for that also?

1          A     Yes, sir.

2          Q     And that's the sort of certificate that

3     you might well attach to your resume.

4          A     Yes, sir.

5          Q     And would the certificate that is issued

6     now have the name "Regions University" on it?

7          A     Not today.

8          Q     And I wish I hadn't asked the question

9     that way.  At any point in time, did the

10    certificates have "Regions University" on them?

11         A     I don't know.  I'd have to go back and

12    look at them to answer that.

13         Q     Well, do you have any certificates with

14    Regions University on them?

15         A     I mean, they are around the company.

16    So, you walk into an office, you're likely to see

17    one, as well as not see one.  So when you walk in

18    an executive's office, if they've been through any

19    of the executive, you know, workshops, you may see

20    it.  I would have to go around and look.

21         Q     Well, I'm really being awkward in my

22    question.  At any time if you looked at a typical

23    certificate, would it have on its heading or

 1   somewhere else, the words "Regions University"?

 2         A    I'd have to go look.

 3         Q    You don't remember?

 4         A    I don't remember.

 5         Q    Fair enough.

 6         A    I do remember that some of the

 7   certificates had colleges on them.  Now, whether

 8   they would have actually said "Regions

 9   University", I don't know.  But I know a lot of

10   them had like "Retail College", "Commercial

11   College".  Now, if it would have said of the

12   University, I don't know.

13         Q    Each certificate would have on it at

14   least the college, Retail College, or one of the

15   others, and may also have Regions University on

16   it.  Is that correct?

17         A    It could.  There was also another

18   component of the University called the Leadership

19   and Sales institute.  It could have had that on

20   it.

21         Q    Well, let's look.  This may help us a

22   little and make it easier for us.  Look, if you

23   will, please, sir, at Exhibit Twelve marked for

```
 1      identification and tell me if you can identify

 2      that.

 3          A    Yes, sir.

 4          Q    And it's several pages long.  You might

 5      want to thumb through it.  The Bates stamp numbers

 6      go from 1403 through 1407.

 7          A    It brings back memories.

 8          Q    Pleasant ones.  What is it?  I don't

 9      know what it is.

10          A    This was the original artist renditions

11      of Regions University logos.

12          Q    I think what you just looked at is Bates

13      stamp number 1404.  Is that correct?

14          A    All right.  This -- that's what all this

15      is.

16          Q    All right.  All of that -- this entire

17      exhibit is the original artist renditions of the

18      logos?

19          A    That we had to choose from.

20          Q    All right.

21          A    And then we had chose the ones that are

22      on page 1403.

23          Q    Okay.
```

```
 1        A    I haven't seen these in years.

 2        Q    But in any event, the ones on 1403 are

 3   the ones that have been chosen?

 4        A    Yes, sir.

 5        Q    All right.  Now, let me show you Exhibit

 6   Thirteen marked for identification and ask you if

 7   you could tell me what that is.

 8        A    I recognize the logos but I don't

 9   recognize the pictures.

10        Q    Let me tell you, I'm not all that

11   interested in knowing whether you remember this

12   particular picture or anything like that.

13        I would think your recollection of what I'm

14   driving at might be more general and it might be

15   something like, well, this is typical of the sort

16   of thing we used for such and such, whatever.  But

17   that's the kind of thing I'm going to ask you

18   about.

19        A    Yeah.  That would be my assumption, that

20   these were, I guess, the ability to start the

21   development of brochures or it could have been web

22   pages for the University website.  Here's one for

23   a leader's guide.
```

```
 1          So that would have been the front cover of an

 2     instructor's manual.  That would, you know,

 3     signify the college that it represented within the

 4     University.

 5          Q     And those all would have been

 6     distributed internally.  Is that correct?  Or used

 7     internally and solely internally?

 8          A     These would be used internally, yes,

 9     sir.

10          Q     Look, for instance, at Exhibit Thirteen,

11     the top one, which is 1300.  You see "Regions

12     University" and under that in smaller letters,

13     "Retail College".  And if you look at Exhibit

14     Twelve, you find the same logo.  Do you see that?

15          A     Yes, sir.

16          Q     Now, unless it's changed, it looks to me

17     like the logo that's used when you refer to the

18     Retail College would be in the format that you see

19     on Thirteen, Exhibit Thirteen, Bates stamp number

20     1300.  Am I correct in that?

21          A     Yes, sir.

22          Q     And has that logo changed?

23          A     Today?
```

1         Q     Yes.

2         A     All of them are changes.

3         Q     But has it changed yet?

4         A     No, sir, it hasn't changed yet.

5         Q     Okay.  That's good enough.  Now, the

6    logos that are set forth on Exhibit Twelve, 1403

7    are those logos that have been used consistently

8    since the coming into existence of Regions

9    University as a name for the corporate training

10   program?  I'm speaking only of 1403.

11        A     Yes, sir.

12        Q     Okay.  And so, for instance, if a

13   certificate had Retail College on it, now that you

14   look at this, would you expect it to have Regions

15   University Retail College in the format of this

16   logo?

17             MR. PECAU:

18             I object to the form of the

19             question.  If you know, answer.  If

20             you don't --

21             THE WITNESS:

22             Yeah.  My understanding would be

23             that if it would have Retail College

```
 1              -- if it be a Retail College

 2              certificate, this would be what

 3              would be displayed as a logo.

 4    BY MR. HUDSON:

 5         Q    On that Exhibit Twelve, would you please

 6    circle what you're indicating would be the logo

 7    that you expect would be displayed on a

 8    certificate from the Retail College?

 9         A    Yes, sir.

10         Q    Okay.  And similarly, if the certificate

11    were issued by the Operations College, the

12    Mortgage College, the Corporate Support College,

13    the Trust College, the Commercial College or the

14    Leadership and Sales Institute, would you expect

15    the certificate to bear the corresponding logo

16    that appears on Exhibit Twelve, Bates stamp number

17    1403?

18              MR. PECAU:

19              Object to the form of the question.

20              THE WITNESS:

21              We would like for it to have had

22              that.

23    BY MR. HUDSON:
```

1          Q      These three leaves that appear on the

2     logo that are depicted on Exhibit Twelve, 1403,

3     are those similar to the three leaves that are

4     depicted in the triangular logo that's used by

5     Regions Bank?

6          A      Yes, sir.

7          Q      Earlier testimony, as I understood it to

8     be -- and I'm just asking you if you have the same

9     understanding -- is that that was adopted to

10    depict the joinder between Union Planters and

11    Regions.  Do you have any recollection about that?

12               MR. PECAU:

13                    Object to the form of the question.

14    BY MR. HUDSON:

15         Q      When was the triangle with the three

16    leaves first used as a part of the Regions logo?

17    I'm speaking now of the bank, or the Regions

18    companies, the Regions logo, in your recollection.

19         A      In my recollection, it would have been

20    in 2004.

21         Q      And was there any seminal event that was

22    associated with that?

23         A      I don't recall.

1    Q    Okay.  Do you have any understanding of

2    what the significance of these three little leaves

3    in this column is that's depicted on Exhibit

4    Twelve, 1403?

5        A    You know, I've seen things where they

6    represented just different concepts, different

7    perspectives.  But none that I would say would be

8    official.

9        Q    Sir?

10        A    None that I'm aware of that, you know,

11    the company puts forth.

12        Q    Okay.  Look, if you would, please, sir,

13    at Exhibit Two that was previously marked in

14    another deposition, and also Exhibit Three that

15    was previously marked in another deposition.

16        Do you recognize a sign like the one depicted

17    in Exhibit Two?  I'm not asking you to identify

18    Exhibit Two.  I'm just asking you to look at the

19    picture.

20        A    I'm not sure what you're asking.

21        Q    Yeah.  It's a picture of a bank sign.

22    Have you seen one that looked like that before?

23        A    Yes, sir, I've seen this before.

1    Q    Okay.  And is that typical of the signs

2  that Regions Bank uses to identify its banks?

3         MR. PECAU:

4            Object to the form of the question.

5            THE WITNESS:

6            This is an old sign, I believe,

7            prior to the changeover.

8  BY MR. HUDSON:

9    Q    Now you're pointing to exhibit what,

10  Three?

11    A    Three.

12    Q    And with the changeover, do you now have

13  on your signs Regions and that little triangle?

14    A    Yes, sir.

15    Q    Now, when I drove into Montgomery, I saw

16  a big tall building that had Regions on the top

17  and it was written just like it is on Exhibit

18  Two.  Have you seen that?

19    A    I didn't recognize that.

20    Q    You didn't look to see it?

21    A    I didn't look to see it.

22    Q    Well, if I'm wrong, you tell me.  But I

23  think I see a lot of them still that look like

1    Exhibit Two.  Do you?

2        A    That's not something I pay attention to,

3    to be honest with you.

4        Q    That's fair enough.  But in any event,

5    they are supposed to either look like Two or

6    Three, one or the other?

7            MR. PECAU:

8            Object to the form of the question.

9            THE WITNESS:

10           I know that Exhibit Three is what

11           the corporate standard has been

12           that's been what the company has

13           been working towards.

14    BY MR. HUDSON:

15        Q    Right.  And they've told you that in

16    your training programs?

17        A    No, sir.  That comes from management

18    communications.

19        Q    Okay.  In any event, upper management

20    has told you that.

21        A    Yes, sir.  That's —

22        Q    Okay.  And they've told you they're

23    working to move from the depiction in Exhibit Two

1    ~~towards the one in Exhibit Three?~~

2    ~~A    Yes, sir.~~

3    ~~MR. PECAU:~~

4    ~~Object to the form of the question.~~

5    ~~BY MR. HUDSON:~~

6    ~~Q    The answer is yes?~~

7    ~~A    Yes.~~

8        Q    Thank you.  I don't intend to make this

9    a memory contest so I'm asking you to just do as

10   best you can.  Would you please, as you can,

11   recite for me the courses or subjects that are

12   offered by the bank's corporate training program,

13   Regions University?

14       A    In the areas of leadership, you would

15   have Management Foundations.  You would have

16   Exceptional Practices for Managerial --

17       Q    Sir?

18       A    Exceptional Practices for Managerial --

19   for Managers.  You would have the Senior

20   Leadership Workshop.  You would have Behavioral

21   Interviewing.

22       Q    Sir?

23       A    Behavioral Interviewing.  Performance

1    Management Workshop.  Executive Coaching Workshop.

2         Q    Executive what?

3         A    Coaching.

4         Q    Coaching.

5         A    Internal Consulting Workshop.  Teller

6    Training.

7         Q    Sir?

8         A    Teller Training.  Teller, as in bank

9    tellers.

10        Q    Tellers.

11        A    Yes.  There are multiple courses within

12   the teller training curricula.

13        Q    Okay.  I don't need to hear those.  Just

14   whenever you can do it generically such as telling

15   me Teller Training, that's fine.

16        A    FSR training, Financial Services

17   Representative training, Branch Manager training,

18   Sales Management training for retail, Commercial

19   Loan Officer training, Commercial Admin training.

20        There's a Trust Administrator curricula.

21   Mortgage Loan Originator curricula.  Those are the

22   ones that come to mind.  And there are, you know,

23   three or four or five hundred online courses.

1        Q    Yeah.  I don't need to hear about them.

2    I think if you could just describe them in general

3    categories for me as you did with teller training,

4    that would be helpful.  And let's try to cover all

5    of the general categories.

6        A    Yeah.  Financial -- Finance and

7    Accounting would be one.  Communication Skills.

8    Supervision.  Human Resources.  Team Building.

9    Sales.  Customer Service.  Those are the ones that

10   come to mind.

11       Q    Is advancement in the bank tied in any

12   way to the successful completion of these courses?

13       A    There's -- there's a strong attempt to

14   manage that for entry level positions.  And so you

15   have to complete certain criteria, certain

16   curricula before you're eligible for promotion,

17   and, you know, strongly encouraged and supported.

18       There's a lot of recognition given to folks

19   who do complete courses.  And so, you know, I

20   wouldn't say we're mandatory in a lot of cases as

21   much as I would that it's looked on very

22   positively.

23       Q    Is it taken into consideration in salary

1    advances and promotions?

2          A    Some of it is, yes, sir.

3          Q    And are completion of these courses and

4    dedication to this training program something that

5    is promoted as a tool that an employee should

6    utilize in order to advance within the

7    organization?

8          A    That's the type of culture we've tried

9    to create.

10         Q    That's the purpose of it, isn't it?

11         A    That's the purpose, yes, sir.

12         Q    Okay.  I'm looking at what we've

13    previously marked as Exhibit Four.  And you've

14    identified that earlier as your file that you

15    reviewed in preparation for your deposition

16    today.  I don't have a lot of questions about it.

17    I'm going to skip around.

18         If you feel like you need to read something

19    in detail before you answer it, do that.  I'm not

20    trying to sneak up on you.  And I don't think my

21    questions are that tough.

22         I find under Strategic HR Initiatives this

23    phrase "to interact with business partners and

1    ~~college learning officers".  And my question~~

2    ~~simply is, what is this document referring to when~~

3    ~~it refers to "Business Partners" and what it is~~

4    ~~referring to, in your understanding, when it~~

5    ~~refers to "College Learning Officers?"~~

6    ~~A    The Business Partner would be a position~~

7    ~~held by a senior HR manager.~~

8    ~~Q    Within the bank?~~

9    ~~A    Within the bank, yes, sir.~~

10   ~~Q    Okay.~~

11   ~~A    The College Officer would be the person~~

12   ~~who managed that particular line of business~~

13   ~~training within the University.~~

14   ~~Q    Also within the bank?~~

15   ~~A    Within the bank, yes, sir.~~

16        Q    Okay.  When you look at Exhibit Four --

17   this isn't Bates stamp numbered.  But the first

18   page isn't numbered and the next are.  So it would

19   be effectively numbered one through eight.  Do you

20   see that collection?  Pages one through eight.

21        A    Yes, sir.

22        Q    Is that current?  Is this a current

23   doctrine or policy or is this an older one?

1          A     This is a document that was put together

2     in the summer of 2004 to represent the area of

3     responsibility that I had to the Management

4     Consulting Group within the company.  And it is

5     what we've operated under until the merger with

6     AmSouth.

7          Q     If I say this wrong, you tell me.  At

8     that time, the organization development part was

9     severed from the learning part and you took the

10    learning part.

11         A     I took the organization development

12    part.

13         Q     I'm sorry.  Okay.  But notwithstanding

14    that, you are sufficiently familiar with the

15    learning part to still testify here today in a

16    knowledgeable way?

17         A     I understand its basics, yes, sir.

18         Q     Sir?

19         A     I understand the basics of it, yes, sir.

20         Q     When you say "basics", I'm not asking

21    questions about the fine points of some course.

22    Have you been comfortable in your testimony so

23    far?

1         A    Yes, sir.

2         Q    Okay.  Now, if you would, please, sir,

3    move forward in this collection of documents until

4    you get to the page once again unnumbered that

5    says "Top 100".

6         A    Yes, sir.

7         Q    Now, if you would, would you please go

8    forward, thumb forward and tell me when you get to

9    the end of the group of documents that go with

10   that cover page?

11        A    Yes, sir.

12        Q    Would you be so kind as to put in the

13   lower right-hand corner of that group and start

14   with the one that says "Top 100," put a "1" and

15   then just number the rest all the way through

16   that?

17        A    On the inside too?

18        Q    No.  Just on the front so that later we

19   can figure out what we're talking about.

20        A    Okay.

21             MR. HUDSON:

22             Thank you.  Let's take a break just

23             a moment.

1    WHEREUPON, A RECESS WAS TAKEN.

2    BY MR. HUDSON:

3        Q    What is Training Top 100?

4        A    It's an annual competition you can enter

5    in to have your learning organization judged to

6    see how it stacks up with other companies'

7    training functions across -- most of this is U.S.

8        Q    When you say "stacks up" against other

9    training, is that other corporate training

10   programs?

11       A    Yes, sir.

12       Q    And you may not be aware of this.  But

13   if there's an allegation in this lawsuit that

14   Regions University has been recognized by Top 100

15   training, has that been recognized among corporate

16   training programs?

17       A    Yes, sir.

18       Q    Does Top 100 training recognize anything

19   except, in your knowledge, corporate training

20   programs?

21       A    Would that include non-profit in your

22   definition of "corporate"?

23       Q    Yes, sir.

1    ~~A    I think that would be the case.~~

2    ~~Q    Is the name of the magazine Training~~

3    ~~Magazine?~~

4    ~~A    Yes, sir.~~

5    ~~Q    And is Training Magazine, in your~~

6    ~~understanding, devoted to profit and non-profit~~

7    ~~corporate training programs?~~

8    ~~A    I have no knowledge of that.~~

9    ~~Q    Do you have any understanding of that at~~

10   ~~all?~~

11   ~~A    No, sir.  You're saying, would it apply~~

12   ~~for folks in educational settings?~~

13        Q    No.  Actually, I'm not asking for you to

14   testify about what Training Magazine is.  I'm

15   simply asking you for your understanding of what

16   Training Magazine is.  And you might not have any

17   at all.

18        A    My understanding, it would be for folks

19   that have an interest in education and training of

20   the workforce.

21        Q    For the workforce.

22        A    Yes, sir.

23        Q    And you don't know whether that's just

1    corporate training programs or not?

2        A    No.

3        Q    You just don't know?

4        A    Don't know.

5        Q    Did you participate in the initiative to

6    apply for this award?

7        A    Yes, sir.

8        Q    Were you the one who, in fact, took the

9    initiative?

10        A    I requested that we do it, yes, sir.

11        Q    And was it necessary to pay a fee in

12    order to do that?

13        A    I believe there was an application fee.

14        Q    An application fee that was paid to

15    Training Magazine?

16        A    I didn't handle it so I don't know the

17    details.  But I would assume it would have been

18    paid to Training Magazine.

19        Q    Who would have handled that?

20        A    The individual's name is Todd Massey.

21        Q    And what is his job?

22        A    He is an Organizational Development

23    Consultant.

1 ~~Q    I'm just curious.  Why would he have~~

2 ~~handled the fee payment part of it and you would~~

3 ~~have handled other parts?  Is there any reason for~~

4 ~~that division of responsibility?~~

5 ~~A    He handled the development of the whole~~

6 ~~application.  I requested it.  I provided input~~

7 ~~into it.  But I didn't prepare it.~~

8 ~~Q    I understand.  And he would work under~~

9 ~~your supervision?~~

10 ~~A    Yes, sir.~~

11 ~~Q    And your direction.~~

12 ~~A    Yes, sir.~~

13 ~~Q    And whatever mechanical things were~~

14 ~~required such as getting a check to pay the fee,~~

15 ~~that would have been delegated to him.~~

16 ~~A    Yes, sir.~~

17 ~~Q    But it would have required your~~

18 ~~approval, would it not?~~

19 ~~A    Yes, sir.~~

20         Q    I'm not going to fly speck this.  If you

21     want to read it all, that's fine.  But my question

22     is, would this document which is captioned

23     "Training Top 100" and runs through the twenty

1    numbered pages fairly describe the corporate

2    training program as it existed on October 3, 2005,

3    the date of this document?

4        A    Yes, sir.

5        Q    Do you see this page?  Tell me which

6    number it is.  It says "Return On Investment" at

7    the top of it.

8        A    Page nine.

9        Q    All right, sir.  Looking at page nine of

10   this exhibit captioned "Return On Investment",

11   what was meant, in your understanding, of "Return

12   On Investment"?

13       A    The extent to which the company is able

14   to see some type of monetary or non-monetary

15   effect based on the resources that were allocated

16   to training.

17       Q    A measurable benefit to the company,

18   either monetary or non-monetary.  Would that be

19   correct?

20       A    Yes, sir.

21       Q    And did the Regions corporate training

22   program referring to it as Regions University

23   result by October 3, 2005 in generating a

1    corporate benefit to Regions Bank?

2        A    Yes, sir, in many ways.

3        Q    All right.  And did it do so in a

4    monetary way?

5        A    We've always tried to, you know, see if

6    we can't document the impact of the training that

7    we've offered.  And in some cases, we've been able

8    to.

9        Q    And did you attempt to reflect those

10   cases in this document at page nine?

11       A    Yes, sir.  I think one of the projects

12   we were working on.

13       Q    And what was the monetary benefit that

14   you were able to document with respect to a

15   portion of this Regions University corporate

16   training program?

17       A    There's a statement in this document in

18   paragraph four, page nine that says "applying a

19   conservative five percent value estimate, the

20   increase in profitability would exceed one point

21   nine million".

22       Q    One point nine million dollars?

23       A    Yes, sir.

1      ~~Q   Okay.  And at the top, referring just to~~
2   ~~Executive Coaching, as I read it, you said that~~
3   ~~you've invested thirty thousand dollars in your~~
4   ~~corporate executive coaching program and that's~~
5   ~~resulted in a documented two hundred and fifty~~
6   ~~thousand dollars in additional revenue for the~~
7   ~~bank.~~
8      ~~Is that correct?  Have I read that correctly~~
9   ~~or do I understand that correctly?~~
10     ~~A   No, sir.~~
11     ~~Q   Would you straighten me out?~~
12     ~~A   I believe the top of the page where it~~
13  ~~says "describe your best return on investment~~
14  ~~outcome.  For example --"~~
15     ~~Q   Oh.  I see.  That's their example?~~
16     ~~A   That's their example.~~
17     ~~Q   I'm sorry.  Do you see this page, sir?~~
18     ~~A   Did that come before or after?~~
19     ~~Q   It comes after this one.  There it is.~~
20     ~~A   It's page twelve.~~
21     Q   All right, sir.  If we can look at page
22  twelve, please, sir, of Exhibit Four, a portion of
23  Exhibit Four, it says at the top "Top 100

1    Training", what do those blocks in that diagram at

2    Number Eleven signify?

3        A    They would signify the change in the

4    composition of training that you would -- that we

5    had offered from 2004 to 2005.

6        Q    When I look at that block that starts at

7    the top "Percentage of learning content (provided)

8    devoted to the following areas", and then it lists

9    areas A through M, would that be descriptive of

10   the areas of training that were offered by Regions

11   University during that time period, the bank's

12   corporate training program?

13       A    Yes, sir.   That, I believe, was our best

14   attempt to try to document the training that we

15   offered and to fit it into the categories that the

16   application asked us to fit it into.

17       Q    And that would have been all of the

18   categories using their format?

19       A    Yes, sir.

20       Q    Do you see this page?

21       A    Yes, sir.   It's page thirteen.

22       Q    Sixteen?

23       A    Thirteen.

1          Q      Thirteen.  Please look at the document

2     marked at its top "Top 100 Learning", page

3     thirteen, and look at the back side of thirteen,

4     Section 2.1.6.  It says "To better describe your

5     Corporate University -- ", and it goes forward.

6          In your understanding, are there other

7     corporations that refer to their internal training

8     programs as universities?

9          A      Yes, sir.

10         Q      Is that frequently done in your

11    understanding?

12         A      It's common.

13         Q      Okay.  Would you tell me those of which

14    you are aware?

15         A      Motorola University; McDonalds Hamburger

16    U, University; Delta University, Delta Airlines.

17         Q      Delta University?

18         A      Yes, sir.  I believe Delta Airlines

19    University.  SunTrust University.  Those are the

20    ones that come off the top.

21         Q      I notice that you told me that there

22    was, for instance, Delta Airlines University,

23    McDonald's Hamburger University.  Is there any

```
 1    reason that your corporate training program isn't

 2    referred to as Regions Bank University?

 3              MR. PECAU:

 4              I object to the form of the

 5              question.

 6              THE WITNESS:

 7              I don't know how to answer that.

 8    BY MR. HUDSON:

 9         Q    Was the name Regions Bank University

10    considered by you, by the bank or by anybody?

11         A    No, sir, not to my knowledge.

12         Q    Would you please look, sir, at Exhibit

13    Four, the pages that follow the one that you had

14    marked with a twenty?  And they start at the top

15    "2006 CLO Award".

16         A    Yes, sir.

17         Q    Do the next four pages go together?

18         A    Yes, sir.

19         Q    Would you please label them at the

20    bottom A, B, C and D?  Thank you.  What is the CLO

21    Award?

22         A    It's the Corporate Learning Officer

23    Award that is managed by CLO Magazine, similar to
```

1    Training Magazine, that recognizes that function

2    within companies.

3        Q    This is an individual award?

4        A    Yes, sir.  But in many cases, the

5    individual award is substantiated based on the

6    work that's done in the function.

7        Q    Have you been the recipient of this

8    individual award?

9        A    Yes, sir.

10        Q    And were you the recipient of that award

11    in 2006?

12        A    2005, I believe, sir.

13        Q    Is that something you also make

14    application for?

15        A    Yes, sir.

16        ~~Q    And with whom do you make application?~~

17        ~~A    The -- I don't remember the name of the~~

18    ~~firm.  But it's the magazine that sponsors the~~

19    ~~award.  It's something Media.  I don't remember~~

20    ~~the name.~~

21        ~~Q    And I think you said that that would~~

22    ~~have been in part because of the work that you've~~

23    ~~done with the corporate training program for the~~

1    ~~bank.~~

2    ~~A    Yes, sir.~~

3    ~~Q    Was there any other basis other than the~~

4    ~~work you've done with the bank's corporate training~~

5    ~~program?~~

6    ~~A    No.~~

7         Q    Okay.  If you look, please, sir, at page

8    B, under item number 3, "Describe the impact of

9    the initiative on the company and its

10   stakeholders", do you see that?

11        A    Yes, sir.

12        Q    Is that an accurate statement of the

13   impact of the corporate training program at

14   Regions Bank referred to by the bank as Regions

15   University that was administrated by you during

16   this relevant time period?

17        A    Yes, sir.

18        Q    And did you help in the preparation of

19   that statement?

20        A    I reviewed it.

21        Q    And approved it?

22        A    Yes, sir.

23   ~~Q    The statement -- I asked you about the~~

1    ~~statement on B, page B.  But, in fact, it carries~~

2    ~~over to page C.  So you might look at C also to be~~

3    ~~sure that we're still in accord on your answer.~~

4    ~~MR. PECAU:~~

5    ~~Do you want the question read back~~

6    ~~to you?~~

7    ~~THE WITNESS:~~

8    ~~Please.~~

9    ~~MR. HUDSON:~~

10   ~~Let me ask another one.~~

11   ~~BY MR. HUDSON:~~

12       Q    I was unfair to you and it wasn't on

13   purpose.  When I asked you a series of questions

14   about whether or not item number 3 on page B is

15   accurate and reflects the program and its impact

16   on the company at the time this statement was

17   written, I asked you just to look at page B.  But,

18   in fact, it carries over to page C too.

19       So my question is, does the statement on

20   pages B and C accurately reflect the impact of the

21   corporate training program known as Regions

22   University administered by you as to its impact

23   on Regions Bank during the time period reflected

1    in this document?

2         A    The thing that we were the proudest of

3    in looking at this, the approach was a very

4    efficient use of training.  And so that when it

5    comes down to it, we reduced the number of

6    training hours required to fulfill the strategy

7    and that resulted in a return on investment of

8    over seven hundred percent.  That was right on

9    target.

10        Q    Well, if there's any trick in this

11   question, I don't know what it is.  Under your

12   supervision and direction, was this document which

13   is captioned at its top "2006 CLO Award"

14   prepared?  Was this prepared under your

15   supervision and direction?

16        A    Yes, sir.

17        Q    And the assessment of the impact of the

18   initiative on the company and its stakeholders as

19   what was being referred to as the initiative in

20   that sentence, was that the corporate training

21   program?

22        A    Yes, sir.

23        Q    And so was the impact of the corporate

1    training program referred to as Regions University

2    on Regions Bank and its stakeholders at the time

3    this document was prepared reflected in the answer

4    set forth under Exhibit Three?

5         A    Yes, sir.

6         Q    Okay.  I'm not going to mark this yet.

7    Do you see that budget or whatever that is, that

8    spreadsheet?  Do you recognize that and know what

9    it is?  It's with other documents.

10        A    It looks like a budget document, Regions

11   corporate training, October of 2006.

12        Q    Well, let me make it simpler.  It could

13   be a lot of things.  One thing it could be is a

14   budget for Regions University.  If it's not that,

15   I'm not interested in asking you about it.

16        A    Okay.  I believe this is maybe the last

17   report that we had prior to the AmSouth merger.

18   So that would probably be a valid snapshot of the

19   corporate University.

20        Q    Okay.  I'll mark that as Exhibit

21   Fourteen, what we referred to just a moment ago.

22   And in my understanding, that would be a valid

23   snapshot of the expenditures for corporate

```
 1     training by the corporate training arm of Regions

 2     Bank just prior to the AmSouth merger.  Is that

 3     correct?

 4         A    Yes, sir.

 5         Q    Now, look, please, sir, at page 30356.

 6         A    30356?

 7         Q    Yes, sir.  Do you see up at the top

 8     where it says in bold, "NewRegions-Corporate

 9     Training" with the words "new" and "Regions"

10     merged into one word?

11         A    Yes, sir.

12         Q    What is that referring to?

13         A    I don't know.

14         Q    Are you familiar with the term

15     "NewRegions" in any context?

16         A    Yes, sir.  It would be, I believe, a

17     recognition of the company after the Regions/

18     AmSouth merger.

19         Q    Has that term been used with any degree

20     of frequency after the merger?

21         A    Yes, sir.

22         Q    And how and where has it been used, to

23     your knowledge?
```

```
1          A    Just as a way to signify the operations

2     of the new company, the combined efforts between

3     AmSouth and Regions.

4          Q    Has it been used publicly?

5          A    I don't know.

6          Q    Please look at Bates stamp number 30353.

7          A    Yes, sir.

8          Q    What sort of legal and professional fees

9     would the corporate training department have?

10    That line item is about four down.

11         A    Legal and Professional would be a

12    general ledger account line that would be used to

13    house expenses that the function would have for

14    external consultants that are used to deliver

15    programs for the company.

16         Q    So if you hire somebody to come in and

17    put on a special training program, that would be

18    the line item to show what you paid?

19         A    Yes, sir.

20         Q    Okay.  Now, there's also a line item for

21    Outside Services.  How is that different?

22         A    I don't know all that goes into Outside

23    Services.  But some of that that goes into there
```

1    could be catering.  It could be purchase of

2    materials.  It just depends on how something gets

3    classified in accounting.

4        Q    Okay.  Travel & Business Development.

5    Do you see that?

6        A    Yes, sir.

7        Q    What would that be?

8        A    That would be mainly for instructor

9    travel.  So where we have folks that are going

10   out, you know, into the footprint delivering

11   courses.

12       Q    The corporate training program known as

13   Regions University wouldn't have any business

14   development, per se, would it?

15       A    No, sir.

16       Q    Okay.  Now, Miscellaneous Expense, do

17   you see that?

18       A    Yes, sir.

19       Q    It's a huge item.  I'm just wondering

20   how does a banker get away with lumping a million

21   dollars into miscellaneous expense.  You don't

22   have to answer that.

23       A    Buy a lot of miscellaneouses.

1    ~~Q    Yeah, a lot of them.~~

2    ~~MR. HUDSON:~~

3    ~~Let us spend a few minutes.~~

4    ~~WHEREUPON, A RECESS WAS TAKEN.~~

5    ~~BY MR. HUDSON:~~

6        Q    Does the corporate training program,

7    Regions University, utilize any outside media to

8    promote itself to the public?

9        A    Nothing other than the logo that you've

10    seen in trying to go over the artwork.  No, sir.

11        Q    Now, when I say "outside media," I mean

12    television, radio, that sort of thing.

13        A    No, sir.

14        Q    Do you charge tuition?

15        A    Some of the courses require managers and

16    departments to pay for their folks to attend.

17        Q    To personally pay?

18        A    No.  The company pays.  Our cost center

19    will budget for folks to go through training.

20        Q    But except for accounting and cost

21    centers, there's no tuition charge?

22        A    No, sir.

23        Q    Do you give grades?

1          A     No, sir.

2          Q     Do you have a pass/fail system?

3          A     In some courses.

4          Q     So is there any testing associated with

5     many of the courses?

6          A     Courses where you have to prove

7     proficiency, for example, compliance, there's a

8     pass/fail cutoff score that's established.  But

9     those are few, compared to all that are offered.

10         Q     And would you please tell me which those

11    are?

12         A     There's a series of, you know,

13    regulation law courses.  I can't tell you

14    specifically all of them.

15         Q     But they're all required as part of the

16    bank's compliance with regulatory requirements?

17         A     Yes, sir.

18         Q     Do you teach in Spanish?

19         A     We have converted some of our course-

20    ware to Spanish to recognize some of the markets

21    that we're in.

22         Q     Do you offer any courses in English to

23    Hispanic speakers?

```
 1        A    No, sir.

 2        Q    And the English language I'm speaking

 3   of.

 4             MR. PECAU:

 5             I object to the form.

 6   BY MR. HUDSON:

 7        Q    Do you teach Spanish-speaking people how

 8   to speak English?

 9        A    No, sir.

10        Q    And vice versa.  Do you teach English-

11   speaking people how to speak Spanish?

12        A    We have had some self-study courses in

13   the past on languages, Spanish being one of them,

14   on a volunteer basis.

15        Q    And have you done that under the

16   auspices of Regions University?

17        A    The materials were delivered by Regions

18   University, yes, sir.

19             Q    And from whom did you obtain the

20   materials?  You don't need to tell me the name of

21   the company.  Was it an outside vendor?

22             A    Outside vendor, yes.

23        Q    I'm going to show you Exhibits Fifteen
```

```
 1       and Sixteen that I've marked for identification.

 2       And I want to ask you about something in

 3       particular about them.  Each of them has at the

 4       bottom "https".  Do you see that?

 5              A    Yes, sir.

 6              Q    In the web address or whatever you call

 7       that.  Is that the "S" that you referred to as a

 8       secure site?

 9              A    Yes, sir.

10              Q    And so both Fifteen and Sixteen would be

11       available only to bank employees who had a

12       password in order to access it?

13              A    Yes, sir.

14                        MR. HUDSON:

15                        Thank you, sir.

16                        MR. PECAU:

17                        I have no questions.

18

19       FURTHER, DEPONENT SAITH NAUGHT.

20                        * * * * * * * * *

21

22

23
```

1                          CERTIFICATE

2

3          STATE OF ALABAMA:

4          COUNTY OF MOBILE:

5                  I, David Michael Camp, a Notary Public in

6     and for the State of Alabama at Large, hereby

7     certify that the within-named witness, EMMETT, M.

8     POLLARD, who was made known to me, was, by me,

9     first duly sworn to speak the truth, the whole

10    truth, and nothing but the truth in the case

11    aforesaid; that the testimony then given by said

12    witness was, by me, reduced to shorthand in the

13    presence of said witness, afterwards transcribed;

14    and that the foregoing is a true and correct

15    transcription of the testimony so given by the

16    witness as aforesaid.

17         I further certify that this deposition was

18    taken at the time and place as specified in the

19    foregoing caption and was completed without

20    adjournment.

21         I further certify that I am not a relative,

22    counsel or attorney for either party, or otherwise

23    interested in the outcome of this action.

1        IN WITNESS WHEREOF, I have hereunto set my

2    hand and affixed my seal at Mobile, Alabama on

3    this, the 12th day of May, 2007.

4

5                          _____

                           David Michael Camp

6                          Notary Public in and

                             for Alabama at Large.

7

                                8

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                          FOR   THE

 3                 MIDDLE DISTRICT OF ALABAMA

 4                      NORTHERN DIVISION

 5

 6

 7   REGIONS ASSET COMPANY,          *

                                     *

 8            Plaintiff,             *

                                     *

 9   Vs.                             *   CIVIL ACTION NUMBER

                                     *

10   REGIONS UNIVERSITY, INC.,       *   2:06cv882-MHT

                                     *

11            Defendant.             *

12

13

14

15

16      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

17

18        Deposition of SAMUEL E. UPCHURCH, JR., taken

19   before David Michael Camp, CSR, in the law offices

20   of Balch & Bingham, LLP, 1901 6th Avenue North,

21   Birmingham, Alabama, on August 14, 2007,

22   commencing at approximately 10:19 o'clock a.m.

23
```

```
 1                A P P E A R A N C E S

 2

 3        For Plaintiff:

          BALCH & BINGHAM, LLP
 4        Attorneys at Law

          Post Office Box 78
 5        Montgomery, Alabama   36101

          (334) 834-6500
 6        BY: CHARLES PATERSON

 7

 8        For Defendant:

          HUDSON & WATTS, L.L.P.
 9        Attorneys at Law

          One St. Louis Centre, Suite 2500
10        Post Office Box 989

          Mobile, Alabama   36601
11        (251) 432-7200

          BY: VICTOR T. HUDSON
12

13

14

          Also present: REX A. TURNER, JR.
15

16                   * * * * * * * * * *

17

18

19

20

21

22

23
```

```
1                    I N D E X

2

3

          Witness

4    SAMUEL E. UPCHURCH, JR.

5

                    EXAMINATION

6

     MR. HUDSON  ............................    6

7    MR. PATERSON  ..........................   27

     MR. HUDSON  ............................   30

8

                * * * * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

1               STIPULATION

2          It is stipulated by and between the parties

3     hereto and their respective attorneys at law that

4     the deposition on oral examination of the Witness,

5     SAMUEL E. UPCHURCH, JR., may be taken before David

6     Michael Camp, Commissioner and Notary Public,

7     State of Alabama at Large, and that the said

8     deposition shall be taken in accordance with and,

9     when so taken, may be used in accordance with the

10    provisions of the Federal Rules of Civil

11    Procedure.

12         It is further stipulated and agreed that all

13    notices provided for by said Federal Rules of

14    Civil Procedure are waived, as is the reading over

15    of said deposition to or by the witness, the

16    signing thereof by the witness, the signing and

17    certification of said David Michael Camp, the

18    filing of said deposition with the Clerk of the

19    Court and all other requirements and

20    technicalities of every sort which would be a

21    prerequisite to the use of said deposition.

22         It is the intent of the parties hereto that

23    this deposition may be used in evidence as though

1    all requirements of said Federal Rules of Civil

2    Procedure had been complied with.

3        It is further stipulated and agreed that all

4    parties hereto reserve the right to have

5    corrections made to this deposition as provided

6    for by said Federal Rules of Civil Procedure.

7        It is further stipulated and agreed that all

8    objections, save as to the form of the questions

9    asked and the responsiveness of the answers

10    thereto are reserved until the time of trial in

11    accordance with the provisions of said Federal

12    Rules of Civil Procedure.

13

14               * * * * * * * * * * *

15

16

17

18

19

20

21

22

23

```
 1           SAMUEL E. UPCHURCH, JR., having been first

 2    duly sworn to speak the truth, the whole truth,

 3    and nothing but the truth, testified as follows:

 4                         EXAMINATION

 5    BY MR. HUDSON:

 6         Q    Mr. Upchurch, would you please state

 7    your name for the record?

 8         A    Samuel E. Upchurch, Jr.

 9         Q    Until recently, where were you employed?

10         A    Regions Bank.  Regions Financial

11    Corporation.

12         Q    In what capacity?

13         A    Most recent capacity, I was in charge of

14    general bank.

15         Q    Can you tell me in layman's terms what

16    that means?

17         A    That means all of the banking -- all the

18    people that work for the bank, as opposed to lines

19    of business, directly or indirectly reported to

20    me.

21         Q    And what would be the definition of the

22    lines of business?

23         A    Retail, commercial.  Commercial's broken
```

1        down into several different lines, private

2        banking.  Regions runs a matrix system where they

3        have general bank officers and they have lines of

4        business that work together in matrix.  So the

5        people who worked in the general bank reported

6        directly or indirectly to me.

7            Q    And being in charge of the bank, would

8        that be for the bank and all of its locations?

9            A    Yes, it was.

10           Q    All right.  And previous to that, what

11       was your job?

12           A    Previous to that, I was the director of

13       corporate strategic initiatives for Regions Bank.

14           Q    Did you hold an office?

15           A    Yeah.  I was Executive Vice President.

16           Q    And when you were in charge of all of

17       the bank, were you also an Executive Vice

18       President?

19           A    I was Senior Executive Vice President

20       then.

21           Q    Okay.  Prior to your corporate strategic

22       position, what was your position?

23           A    I was the -- I've forgotten what they

```
 1      call it.  It was either President or CEO -- I've

 2      forgotten what they call it -- of the Central

 3      Region, which was comprised of Alabama, the

 4      Panhandle of Florida and east -- all of Tennessee

 5      besides Memphis.

 6           Q    And prior to that, what was your

 7      position?

 8           A    Prior to that, I was Executive Vice

 9      President, General Counsel and Corporate

10      Secretary.

11           Q    What was the period of time that you

12      were the General Counsel?

13           A    I'd say from 1994 to 2004, something

14      like that.  I don't remember the exact end date.

15           Q    Close enough.  What responsibility did

16      you have at any time for the enforcement of the

17      trademark name "Regions" or "Regions Bank"?

18           A    I had direct responsibility for all

19      legal oversight for the company, which would

20      include the enforcement of marks.

21           Q    Did you still have that oversight after

22      2004?

23           A    I did not have the oversight after I
```

```
 1    left, after I left the position as General

 2    Counsel.

 3        Q    Did you have any responsibility in that

 4    regard after you left the situation of General

 5    Counsel?

 6        A    Did not.

 7        Q    Can you tell me what the criteria was

 8    for the enforcement of the mark that was utilized

 9    from a corporate standpoint from 1994 through

10    2004?

11        A    Well, we had trademark counsel so we

12    would follow their responsibilities.  But it

13    was -- it was just a general knowledge of

14    protecting the mark.  You know, we had a mark and

15    it needed to be protected.

16        And, you know, if we -- if we did not protect

17    the mark, we would lose the ability to protect

18    it.  So just general corporate knowledge of

19    protection of the mark.

20        Q    Who made the decision about whether a

21    particular third party use of the name was a

22    threat to the mark or not?

23        A    I don't know if there was any one person
```

```
 1    who made the decision.  But, I mean, generally it

 2    would be -- we would talk with counsel about it

 3    and it would be decided to proceed or not.

 4         Q    And who would make the business decision

 5    about whether to pursue it?

 6         A    Oh, probably -- from a business decision

 7    perspective?

 8         Q    Uh-huh.

 9         A    I don't -- I don't recall a business

10    decision.  It was always a legal decision.

11         Q    Well, I mean, you agree with me that

12    lawyers can recommend but lawyers ultimately have

13    to act upon whatever the business people tell them

14    to do or not to do.

15         A    But in this instance, that would have

16    been totally delegated to the lawyers.

17         Q    Totally.

18         A    Totally.

19         Q    So the lawyers made the decisions as

20    well as listened to the recommendations from

21    others?

22         A    Well, whether or not to enforce the mark

23    would have been -- would have been a legal
```

1    decision.

2        Q    Okay.  At least from 1994 to 2004.

3        A    When I was there.  Correct.

4        Q    And to your knowledge, did that change

5    at any time after you left?

6        A    Not to my knowledge.

7        Q    Okay.  Now, was there any particular

8    criteria that were utilized by the legal

9    department in determining whether or not to

10   challenge a third party use?

11       A    I can't -- once again, I can't recall

12   any specific criteria other than -- than someone

13   using a mark that was deceptively similar and the

14   need to protect the mark on Regions.

15       Q    Have you recently seen what was marked

16   as Exhibit One-O-nine?

17       A    No.  I haven't seen this recently.

18            MR. PATERSON:

19            What is that, Tom?

20            MR. HUDSON:

21            Here.

22            MR. PATERSON:

23            We've got so many papers in this

```
 1              case, it's hard to keep up.

 2              MR. HUDSON:

 3              Sure.

 4              THE WITNESS:

 5              Yeah.  To answer your

 6              question, no, I've not recently seen

 7              this.

 8  BY MR. HUDSON:

 9      Q    Now that you've read it, do you recall

10  the letter?

11      A    I do not.

12      Q    Is that your signature?

13      A    It is.

14      Q    Is the content of the letter true and

15  correct?

16      A    I assume it is.  I don't remember the

17  circumstances.  But I assume it's correct.

18      Q    Well, you would have endeavored to make

19  it true and correct at the time that you wrote

20  it?

21      A    That's correct.

22      Q    Do you recall there being other third

23  party uses of the name "Regions" that came to your
```

1       attention that involved third parties that were

2       not in the same business as the bank?

3            A     Yes, I do.

4            Q     And do you recall whether or not the

5       bank challenged those third party uses?

6            A     Yes, I do.

7            Q     And what is your recollection?

8            A     I recall several challenges.  I don't

9       remember the specifics.  I remember them being

10      discussed at a Board meeting of the subsidiary

11      company that owned the marks.  The marks were

12      transferred.  But I don't remember the specifics.

13      The only one I really remember specifics about was

14      Regions 2020.

15           Q     Okay.  We'll talk about that in a

16      moment.  You say that you remember several.  Would

17      the several include this Regions Propane?

18           A     I don't remember the Regions Propane but

19      it very -- very possibly could have.

20           Q     And you do remember Region 2020.

21           A     I do.

22           Q     And within the period of 1994 to 2004,

23      there are several that you recall, and one in

1    particular is the name Region 2020?

2         A    I have a recollection of it being

3    discussed.  I would say several.  More than one.

4    I can't tell you how many because I don't have

5    specific recollections of any besides Regions

6    2020.

7         Q    Okay.  And the best you can do is that

8    it was more than once?

9         A    Yes.

10        Q    Okay.  Was this something that came up

11   frequently, this sort of topic, or it came up

12   infrequently?

13        A    Oh, it would only came up when somebody

14   identified something they thought was an

15   infringement.

16        Q    Okay.  During that period of time, was

17   there any outreach that was being done by your

18   department to determine whether or not third

19   parties were using the name "Regions"?

20        A    We were more reactive.  When we would

21   see it or when someone would -- would send

22   something to the legal department that showed a

23   usage, that would be how we would get involved.

1          Q     Reactive as opposed to proactive?

2          A     That's correct.

3          Q     So you were not proactive?

4          A     We were not proactive to my knowledge.

5          Q     Okay.  You spoke of Region 2020.  Let me

6    show you what was previously marked as Exhibit

7    One-ten and Exhibit One Thirty-seven that's in

8    front of you there, and ask you if you recall

9    seeing those before today.

10         A     Yes, I do.

11         Q     When did you see them last?

12         A     Oh, probably -- I can't recall when I

13   saw them last.  Years ago.

14         Q     Do you want to take a moment and read

15   both of them, please?

16         A     Okay.

17         Q     All right, sir.  If we can look first at

18   Exhibit One-ten --

19         A     All right.

20         Q     -- the cover letter purports to have

21   been drafted by Stephen Leara, addressed to Ann

22   Florie and copied to you, together with an

23   enclosure which is a draft of the Non-exclusive

1    License Agreement.  Have I correctly characterized

2    that?

3         A    It appears to be that, yes.

4         Q    Do you recall, now that you've looked at

5    this letter and the attached draft license

6    agreement, this transaction?

7         A    Yes.

8         Q    Tell me what you recall about the

9    transaction.

10        A    I recall being familiar with Regions

11   2020, that Regions 2020 -- from what I recall,

12   raising an issue with their use of the name.  I

13   recall asking counsel, outside counsel, to draft

14   the agreement.  I recall speaking with Ann Florie

15   about it.

16        I recall receiving it, having it -- reviewing

17   the draft.  I recall receiving the finally

18   executed copy.  Just the general -- general

19   situation around the execution of the document.

20        Q    Look, please, sir, at the document,

21   itself that is attached to the October 20, 1997

22   letter, being the first draft of the Non-exclusive

23   License Agreement.  And if you'd look at the third

```
 1      whereas clause, do you see where it says "Whereas,

 2      the Licensee's mark is deceptively similar to the

 3      Licensor's Registered Marks so as to be likely to

 4      cause confusion in the marketplace"?

 5           A    I see that.

 6           Q    Okay.  Now, would you please look at the

 7      next draft that is attached to the November 11,

 8      1997 letter?

 9                MR. PATERSON:

10                That's the signed copy?

11                MR. HUDSON:

12                No.

13                MR. PATERSON:

14                Okay.

15                THE WITNESS:

16                Okay.

17      BY MR. HUDSON:

18           Q    Do you see that same provision in that

19      draft?

20           A    Yes, I do.

21           Q    Now, would you please look at the

22      executed copy, Exhibit One Thirty-seven?

23           A    Okay.
```

1          Q     Has that provision been removed from

2     that draft?

3          A     It is not in that draft.

4          Q     Can you tell us why it was removed?

5          A     No, I cannot.

6          Q     Do you recall that there was a

7     negotiation between the lawyers for Region 2020

8     and either you or the lawyers you employed over

9     the terms of this license agreement?

10         A     I recall some drafts going back and

11    forth but I don't recall the specifics of any of

12    it.

13         Q     But in any event, drafts going back and

14    forth constitutes negotiation over the language,

15    does it not?

16         A     I don't know that I would term it

17    negotiations.  Some discussions went on.

18         Q     Well, is it fair to say that the first

19    draft would have been the proposal of the bank?

20         A     It is.

21         Q     And the final draft that was executed

22    would have been the proposal of Region 2020?

23         A     Not necessarily.

1          Q      That's true.  The final agreement that

2     was executed would have been what both sides

3     agreed to do rather than what just the bank

4     proposed.

5          A      Correct.

6          Q      I think your testimony is that you don't

7     have any particular recollection why this clause

8     was removed.  All you can tell us is that in order

9     for the copy to be executed, it had to be removed.

10              MR. PATERSON:

11              Object to the form.

12              THE WITNESS:

13              Really, all I could tell you is that

14              it was removed in the executed copy.

15     BY MR. HUDSON:

16          Q      Okay.  Now, if you'll look, please, sir,

17     at One-ten at Section 2.1, the royalty payment for

18     the first draft, which appears after the October

19     20 letter, it says in pertinent part "Licensee

20     shall pay to Licensor a royalty of $1,000.00 per

21     year until the expiration of the Registered Marks,

22     or any renewals thereof."

23              And then the next draft which is attached to

1    the October 20, 1997 agreement says at 2.1,

2    "Licensee shall pay to Licensor a royalty of

3    $100.00 per year until the expiration of the

4    Registered Marks, or any renewals thereof."

5        The cover letter that goes with that second

6    draft, October 20 cover letter says "At the

7    request of Sam Upchurch, I have drafted, and am

8    enclosing herewith, a licensing agreement setting

9    forth the terms and conditions under which Regions

10   Financial Corporation will allow Region 2020, Inc.

11   to use its registered name.  Please review this

12   document and call me if you have any questions."

13       Do you recall why the change was made from a

14   thousand dollars per year to a hundred dollars per

15   year?

16       A    I don't recall specifically why except

17   that it was requested by -- it was a request by

18   Regions 2020.

19       Q    Okay.  And if you would, look at the one

20   that was executed, please, sir, at 2.1 which is

21   One Thirty-seven.  Take a look at 2.1.

22       A    Right.

23       Q    The final agreement for payment turned

1    out to be a one-time one hundred dollar payment.

2    Do you see that?

3         A    Yes, I do.

4         Q    If you'd just read into the record that

5    sentence.

6         A    It says "Royalty Payment".  "Licensee

7    shall pay to Licensor a total royalty of $100.00,

8    which shall be the total payment due from Licensee

9    during the duration of this license."

10        Q    All right, sir.  Do you recall that that

11   would have been requested by Region 2020?

12        A    Yeah.  Regions 2020 at the time was a

13   fledgling, kind of start up 501(c)(3) charity.  I

14   do recall them raising the point that they didn't

15   have a lot of money and so they didn't want --

16   yes.

17        Q    Okay.  Now, the license agreement

18   purportedly was signed on December 3, 1997.  After

19   the date of its signature, do you recall anything

20   that Regions Bank did to police the mark or police

21   the licensing of the mark?

22                    MR. PATERSON:

23                    At any time, Tom?

```
 1   ————————  THE WITNESS:

 2                 Well, I was familiar with what

 3                 Regions 2020 did because I was

 4                 actively involved with them many

 5                 times.  So policing the mark -- I

 6                 was familiar with what they did so I

 7                 was familiar that they were not

 8                 violating the terms of the

 9                 agreement.

10   BY MR. HUDSON:

11        Q    How many times did you attend meetings

12   of Region 2020 after 1997?

13        A    I can't tell you.  I worked on task

14   forces with them, both in my capacity as a Regions

15   executive and my capacity in the Chamber of

16   Commerce.  And Florie lived next door to me.  I

17   knew Dr. Berte well.  So I can't tell you how many

18   times.

19        And it was also very public what they were

20   doing, particularly during this time frame.  It

21   was very public, in the newspapers a lot.  So --

22        Q    Was it public from 1997 through 2004?

23        A    Yeah.  I think -- I think so.  I think
```

1    even today, they're still public.  Their purpose

2    is to be kind of a public forum for change in the

3    city.

4        Q    When you were General Counsel, were you

5    involved with the selection of a logo?

6        A    I was not.

7        Q    Who had that responsibility?

8        A    That would have been through the

9    marketing department.  Probably Bill Askew would

10    have been the principal person.

11        Q    Were you involved at all with the

12    registration of the logo?

13        A    Peripherally.  A lawyer who worked for

14    me.  I was aware of it but I was not directly

15    involved.

16        Q    Did the lawyers that worked for you

17    report to you with regard to the logo and its

18    selection?

19        A    I don't recall any specific -- I mean,

20    other than just generally aware that the legal

21    matters had been covered.

22        Q    Were you aware that there were companies

23    that used the name "Regions" that were registered

1    with the United States Trademark Office?

2         A    I recall one specific company that used

3    -- that I think had had it reserved or had used it

4    that we ended up negotiating with and buying it

5    back from, and then later bought the company.  So

6    I thought that was kind of clever.

7         Q    That would have been at the time that

8    you wanted to register your mark?

9         A    That's correct.

10        Q    And they would have used it in

11   relationship to banking or financial services?

12        A    I don't recall whether or not they

13   actually used it.  But, yes, in connection with

14   banking and financial services.

15        Q    And were you aware that there were other

16   companies that had registered the Regions

17   trademark for services outside of banking and

18   financial services?

19        A    I don't recall that but it wouldn't

20   surprise me.

21        Q    Okay.  In any event, was it your

22   understanding that your mark had been registered

23   for banking and financial services?

1        A    Yes, it was.

2        Q    Okay.  Were you aware that there was a

3    company called Regions Beyond International that

4    had a Registered Mark?

5        A    I don't recall.

6        Q    That there was a Regions Air that had a

7    Regions Registered Mark?

8        A    I don't recall.

9        Q    That there was a Regions Hospital that

10   had a Registered Mark?

11       A    No.  The only one I recall was a mark

12   registered by First Commercial Corporation.

13       Q    Is it fair to say that that wouldn't

14   have troubled you as long as those companies

15   weren't involved in banking and financial

16   services?

17            MR. PATERSON:

18            Object to the form.

19            THE WITNESS:

20            I really can't say whether it would

21            have troubled me or not.  It would

22            not have troubled me if our

23            trademark counsel said it was not

1              something we had to worry about.

2    BY MR. HUDSON:

3        Q     Did you ever get any suggestion or

4    advice that you should be concerned with companies

5    who used the name "Regions" but were not involved

6    in banking or financial services?

7        A     Yes, I did.

8        Q     Okay.  I think you said during the time

9    you were General Counsel, the bank was not

10   proactive in seeking out the names of others who

11   used the name "Regions" as third party names for

12   third party companies.

13       A     We did not proactively search for people

14   using the names.

15       Q     Okay.  And that would mean that you

16   wouldn't have searched the records of the

17   Secretary of State of Alabama --

18       A     That's correct.

19       Q     Nor for domain names on the web.

20       A     I don't recall any search for domain

21   names.

22       Q     Or for the U.S. Trademark Office.

23       A     Right.  Typically, as I said earlier, we

1    would -- when we would become aware of any usage,

2    that's when it would be referred to the legal

3    department.

4                        MR. HUDSON:

5                        Thank you, sir.

6                        THE WITNESS:

7                        Thank you.

8                        EXAMINATION

9    BY MR. PATERSON:

10        Q    Mr. Upchurch, let me look at my notes

11   and see if I can confirm a couple of things.  When

12   you were associated with Regions Bank or Regions

13   Financial in any capacity, be it General Counsel

14   and your other executive capacity, were you aware

15   of any violation of this license agreement with

16   Region 2020?

17        A    No, I was not.

18        Q    If Region 2020 had violated the license

19   or used the name in a way that was offensive to

20   Regions Bank, would you have expected to hear from

21   someone at Regions Bank?

22                        MR. HUDSON:

23                        Object to the form.

1        ~~THE WITNESS:~~

2              Yes.

3    ~~BY MR. PATERSON:~~

4        Q    To your knowledge, has Regions Bank

5    always, and continuing to this day, been a

6    financial supporter and contributor to Region

7    2020?

8        A    Yes.

9        Q    At the time that the license was entered

10   into, what was Stan Mackin's role at Regions Bank?

11       A    Stan Mackin was the CEO.

12       Q    Of Regions Bank?

13       A    Of Regions Bank and of Regions Financial

14   Corporation.

15   ~~Q    And are you aware of whether or not he~~

16   ~~was on the board of directors of Region 2020 at~~

17   ~~the time the license agreement was signed?~~

18   ~~A    I don't recall.~~

19       Q    If his name is on the letterhead -- do

20   you recognize his name on the letterhead there?

21       A    Yes, I do.

22       Q    Okay.  And I guess at the time, he would

23   have been ultimately your boss.  Correct?

```
1        A    That's correct.

2        Q    And do you have a recollection whether

3   or not he was on the board of Region 2020?

4        A    Based on this, it appears he was.

5        Q    Okay.  And there's a lady named Sheila

6   Blair on there, as well.  Was Sheila Blair a

7   director of Regions Financial at the time?

8        A    She was.

9        Q    Do you recall any conversations with

10  Sheila Blair or Stan Mackin about the license

11  agreement that you have been asked about today?

12       A    I don't recall any specific

13  conversations with either one of them.

14       Q    When did you become aware that Southern

15  Christian University had changed its name to

16  Regions University in August of '06?

17       A    I was never aware of the name, any name

18  change.

19       Q    Have you talked to anybody about this --

20  I called you yesterday.  Have you talked to

21  anybody about this litigation or about the fact

22  that you would be giving a deposition here today?

23       A    Oh, my wife.  No.
```

1    Q    You haven't talked to anybody that's

2    affiliated with Regions University?

3    A    I have not.

4    Q    Okay.  Do you know anything about why

5    they changed their name to Regions University?

6    A    I have no idea.

7    Q    Okay.

8    MR. PATERSON:

9    I don't believe I have any more

10    questions.  Thank you so much.

11    EXAMINATION

12    BY MR. HUDSON:

13    Q    I've got just one.  What did you and

14    Charlie talk about?

15    A    Oh.  Just, he asked me if I had any

16    questions about, you know, what was going on and

17    whether or not I had given a deposition before,

18    and just questions like that.

19    MR. HUDSON:

20    Thank you.

21

22    FURTHER, DEPONENT SAITH NAUGHT.

23    * * * * * * * * *

```
1                        CERTIFICATE
2
3        STATE OF ALABAMA:
         COUNTY OF MOBILE:
4
5
             I, David Michael Camp, a Notary Public in and
6
         for the State of Alabama at Large, hereby certify
7
         that the within-named witness, SAMUEL E. UPCHURCH,
8
         JR., who was made known to me, was, by me, first
9
         duly sworn to speak the truth, the whole truth,
10
         and nothing but the truth in the case aforesaid;
11
         that the testimony then given by said witness was,
12
         by me, reduced to shorthand in the presence of
13
         said witness, afterwards transcribed; and that the
14
         foregoing is a true and correct transcription of
15
         the testimony so given by the witness as
16
         aforesaid.
17
             I further certify that this deposition was
18
         taken at the time and place as specified in the
19
         foregoing caption and was completed without
20
         adjournment.
21
             I further certify that I am not a relative,
22
         counsel or attorney for either party, or otherwise
23         interested in the outcome of this action.
```

1        IN WITNESS WHEREOF, I have hereunto set my

2    hand and affixed my seal at Mobile, Alabama on

3    this, the 14th day of August, 2007.

4

5

6                          _____

7                          David Michael Camp

                           Notary Public in and

8                          For Alabama at Large.

9

10   My Commission expires February 20, 2008.

11

12

13

14

15

16

17

18

19

20

21

22

23