**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION and REGIONS BANK ) ) ) ) Plaintiffs, ) ) v. ) ) REGIONS UNIVERSITY, INC. ) ) Defendant. ) ) | Civil Action No. 2:06-cv-882-MHT |

## JOINT REPORT ON PARTIES' OBJECTIONS TO EXHIBITS

Plaintiffs, Regions Asset Company, Regions Financial Corporation and Regions Bank, and Defendant, Regions University, Inc., respectfully submit this joint report on the status of the parties' objections to exhibits in accordance with this Court's January 3, 2008, Order. The parties conferred telephonically and in person. The parties reserve their rights in their remaining objections and sets forth the grounds in Section II as a basis for those objections.

**I.    Withdrawn Objections**

Plaintiffs have agreed to withdraw their objections to the following exhibits: DX 610-647, 702, 703, and 706-708.  Plaintiffs have further agreed to withdraw PX 131, 365, 425, 426, 133, and 447 from their exhibit list.  A copy of Plaintiffs' amended objections to Defendant's exhibits is attached as Exhibit A.

Defendant has agreed to withdraw its objections to the following exhibits: PX 1, 225, 487, 488, 489, and 491- 494.  A copy of Defendant's amended objections to Plaintiffs' exhibits is attached as Exhibit B.

## II.    Remaining Objections

### A.    Plaintiffs' Objections to Defendant's Exhibits

#### 1.    Defendant's Exhibit 591, Affidavit of Jean Patterson

##### a.    Plaintiffs' Argument

Regions objects to Defendant's Exhibit 591, the July 16, 2007, affidavit of Jean A. Patterson ("Patterson Aff.") on the grounds that it contains improper expert testimony.

Rule 26(a)(2)(A) obligates a party who wishes to offer expert testimony to disclose, during pretrial proceedings, "the identity of any person who may be used at trial to present evidence under Rules 702, 703 and 705 of the Federal Rules of Evidence." Fed. R. Civ. P. 26(a)(2)(A). Additionally, if an expert witness is "retained or specially employed to provide expert testimony in the case," the party seeking to offer testimony from such an expert must submit a written report containing, *inter alia*, detailed information as to the qualifications and intended testimony of the witness. Fed. R. Civ. P. 26(a)(2)(B). As used in Rule 26, the term "expert" refers to "those persons who will testify under Rule 702 of the Federal Rules of Evidence [by giving opinion testimony] with respect to scientific, technical, and other specialized matters." Fed. R. Civ. P. 26(a)(2) advisory committees' note to the 1993 amendments. Pursuant to the Uniform Scheduling Order in this case, expert disclosures were to be made no later than July 15, 2007.

Ms. Patterson is in the specialized business of "conducting research and investigation of trademark records at the United States Patent and Trademark Office." Patterson Aff. at ¶ 2. According to her affidavit, she reviewed the file histories for various pending trademark applications. She then proceeds to summarize the "search strategy" employed by the Examining Attorney at the Trademark Office – information that cannot be readily ascertained by a lay person without specialized training in the research and investigation of trademark records. Ms.

Patterson ultimately concludes, "it is clear to me from the search strategy employed by the Trademark Examining Attorney . . . that [certain trademarks] were reviewed by the Examining Attorney in making a finding whether to approve or disapprove" the trademark application. There is nothing in the file histories that lists the trademarks that the Examining Attorney considered in deciding whether to approve or disapprove the particular trademark applications discussed by Ms. Patterson. Instead, she has called on her expertise in the area of trademark research and investigation to render expert opinion.

Ms. Patterson's identity was not timely disclosed to Regions, nor has she submitted an expert report. Her declaration contains improper expert testimony and should not be admitted in this case.

**b.    Defendant's Argument**

Plaintiffs object to the affidavit of Jean E. Patterson (Def. Ex. 591) on the grounds that it is irrelevant and inadmissible expert testimony. The affidavit is relevant to show that the USPTO examining attorney reviewed marks related to the plaintiff Regions Bank, in reaching his determination to approve the application of the defendant for the mark "Regions University" for publication, and also reviewed defendant's pending application for the mark "Regions University," in examining and approving for publication the plaintiffs' application for the mark "Regions University" for its employee training program. This evidence is relevant to show that the examining attorney concluded that there was no confusing similarity between defendant's application for the mark "Regions University" for educational services, and the Bank's marks, including "Regionsbank," and further found no confusing similarity between the plaintiffs' application for the mark "Regions University" for its internal training program and the defendant's application for "Regions University" for educational services.

- 3 -

The affidavit does not consist of any expert opinion testimony. It is simply a narrative of the steps taken by the trademark examining attorney based upon the search strategy contained in the trademark file history for the applications. Anyone with access to the internet who can read and copy entries displayed on the computer can perform the same exercise performed by both Mr. Paterson and the Trademark Examining Attorney, and will achieve the same result. The Bank has not disputed that, if someone were to perform the same search as the Trademark Examining Attorney, the same result would occur.

## B.    Defendant's Objections to Plaintiffs' Exhibits

### 1.    Plaintiffs' Exhibit No. 104, 135, 216-220, 267, Market Research Reports

#### a.    Defendant's Argument

Defendant objects to a series of exhibits that relate to brand awareness surveys and other customer satisfaction surveys which have been performed by the plaintiffs. (Pl. Exs. 104, 131, 135, 216-220, 267). These surveys are hearsay and inadmissible unless the evidence becomes admissible under the residual hearsay exception, Rule 807, because of "circumstantial guarantees of trustworthiness." *See Pittsburgh Press Club v. U.S.*, 579 F.2d 751, 757-58 (3rd Cir. 1978). Such "circumstantial guarantees of trustworthiness" can only be satisfied if the poll was conducted in accordance with generally accepted survey principles and if the results are used in a statistically correct way. *Id.* "[S]urveys, since they involve hearsay, must be conducted with proper safeguards to insure accuracy and reliability." 579 F.2d at 758. The Judicial Conference Study Group, in its *Handbook of Recommended Procedures for the Trial of Protracted Litigation*, 25 F.R.D. 351 (1960) (hereinafter the "Handbook"), discusses the several factors which must be examined when determining whether a survey or poll meets generally accepted survey principles. This Handbook has been adopted by the Eleventh Circuit. *See Brook Shoe*

- 4 -

*Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854 (11th Cir. 1983).[1] That Handbook discusses the

admissibility of the results of "polls" in the following terms:

> "The offeror has the burden of establishing that a proffered poll was conducted in accordance with accepted principles of survey research, i.e, that the proper universe was examined, that a representative sample was drawn from that universe and that the mode of questioning the interviewees was correct. He should be required to show that:  the persons conducting the survey were recognized experts; the data gathered was accurately reported; the sample design, the questionnaire and the interviewing were in accordance with generally accepted standards of objective procedure and statistics in the field of such survey; the sample design and the interviews were conducted independently of the attorney; and the interviewers, trained in this field, had no knowledge of the litigation or the purposes for which the survey was to be used.  Normally, this showing will be made through the testimony of the persons responsible for the various parts of the survey." *Id.* at 429.

"Courts have generally found consumer survey evidence admissible under <u>Daubert</u> <u>if a</u>

<u>qualified expert testifies</u> that the survey was conducted in a proper manner ... ." *Simon Property*

*Group LP v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1040 (S.D. Ind. 2000)(emphasis added);

*Accord Menasha Corp. v. News America Marketing In-store, Inc.*, 238 F.Supp.2d 1024, 1030

(N.D. Ill. 2003). "Consumer survey results must be presented through experts." *Sears Roebuck*

*& Co. v. Minard*, 72 U.S.P.Q. 2d 1221, 2003 WL 168642 (N.D. Ill. 2003). Professor McCarthy

recognizes in his treatise that the person who designs the consumer survey "must qualify as an

expert in the field of designing, conducting and analyzing surveys. If he or she does not qualify,

then the survey is properly not allowed into evidence." *McCarthy on Trademarks*, § 32:182.

Plaintiffs argue that their market surveys are admissible, without expert testimony,

because they were prepared as business records and not with litigation in mind. *See* Plaintiffs'

---

[1] Plaintiffs claim this case is inapposite because it pertains only to the admission of surveys that measure the potential confusion existing in the use of competing marks.  The standards set forth in the handbook are not so limited nor have they have been so limited by the courts.  They are applicable in assessing the reliability and trustworthiness of any poll or survey which seeks to draw conclusions from that survey.

Surreply in Opposition to Defendant's Motion to Strike the Declaration of Jim Jager  (Doc. 128).
First of all, the Eleventh Circuit has held that customer surveys are not admissible under the
business records exception to the hearsay rule.  *See ADP-Financial Computer Services, Inc. v.
First National Bank of Cobb County*, 703 F.2d 1261, 1266 (11th Cir. 1983).  Secondly, the
Brand Awareness surveys (P. Exs. 135, 216-220, 267) are <u>not</u> records prepared by the Bank but
by a third party; they cannot qualify as business records of the <u>Bank</u>.  Finally, even if the
"business records" exception were applicable and overcame any hearsay objections, that does not
make the polling results admissible.  The methodology used in taking the poll must still be
demonstrated.  Footnote 131 of the Handbook states:

> "Where sample polls are held non-hearsay, the propriety of the polling techniques
> employed must, of course, still be adequately demonstrated to justify their
> admission."

    *See also Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 695 (2nd Cir.
1994)(district court properly rejected proffer of market research surveys because proponent
failed to show "that the surveys were properly conducted **and** that they were business records
within the meaning of <u>Federal Rules of Evidence</u> 803(6)."  (emphasis added).

    The cases cited by the plaintiffs in support of their position that the documents are
inadmissible do <u>not</u> involve <u>polls</u>.  *See Hutchinson v. Essence Commissions, Inc.*, 769 F.Supp.
541, 562 (S.D. N.Y. 1991)(admitting public market reports under Rule 803(17) <u>F.R.E.</u>);
*Herrington v. Commissioner of Internal Revenue*, 404 F.2d 237, 240-41 (5th Cir.
1968)(involving oil well surveys); *P&G v. Colgate Palmolive Co.*, 1998 U.S. District Lexis
17773 (admitting market research studies but giving them little weight because they did not meet
the criteria specified in Federal Judicial Center Reference Manual on Scientific Evidence);
*Matador Drilling Co. v. Post*, 662 F.2d 1190 (5th Cir. 1981)(drilling reports); *Rosenburg v.*

- 6 -

*Collins*, 624 F.2d 659 (5th Cir. 1980)(involving records of commodity trading activity of

bankrupt debtor); *Crimm v. Missouri Pacific Railroad*, 750 F.2d 703 (8th Cir.

1984)(investigation reports); *E. C. Ernst, Inc. v. Coppers Co.*, 626 F.2d 324 (price sheets);

*Cocolorificio Italiano Max Mayer SPA v. S/S Helenic Wave*, 419 F.2d 223 (5th Cir.

1969)(involving "survey" of damage to bulk shipments). The above surveys did not involve

polling of individuals. Their admissibility did not depend on proof of the appropriate

methodology, as used in a poll, to substantiate the reliability of the results.

In summary, in the absence of expert testimony establishing their reliability and

trustworthiness, the brand awareness and customer satisfaction reports prepared through the

years by New South Research, based on polling data, are not admissible. The necessary

foundation for those survey reports can only be provided by expert testimony.

## b.    Plaintiffs' Argument

Plaintiffs seek to introduce several market research reports prepared over the years for

Regions by New South Research. These are reports of the results of consumer research surveys

conducted by New South Research that measured, among other things, consumer awareness of

the REGIONS brand.  New South Research is a market research firm located in Birmingham.

Regions had these studies conducted by New South Research to obtain information about its

markets and consumers in order to make important business and marketing decisions and have

been used by Regions executives in making such decisions. All these reports were prepared and

the surveys were conducted for business, not litigation purposes.

Defendant has objected to the admission of these surveys on the grounds that they are

hearsay under F.R.E. 802 and inadmissible expert testimony under F.R.E. 702. The market

reports are neither hearsay, nor "expert testimony." Because neither of these objections have

merit, the market research reports should be admitted into evidence.

### (1)    The Market Research Reports Are Business Records

The market research reports offered by Plaintiffs fall squarely within the business records exception to the hearsay rule. Fed. R. Evid. 803(6)[2]. Reliability is the hallmark of admissibility under Fed. R. Evid. 803(6). *See, e.g., Saks Int'l, Inc. v. M/V "Export Champion"*, 817 F.2d 1011, 1013 (2d Cir. 1987) ("The principal precondition to admission of documents as business records . . . is that they have sufficient indicia of trustworthiness to be considered reliable."). This rule applies to market research surveys prepared for business purposes. In *Nestle Co. v. Chester's Market, Inc.*, 571 F. Supp. 763, 776 (D. Conn. 1983), the court found market surveys not prepared in anticipation of litigation admissible. The court found that "less foundation evidence is required to satisfy the element of trustworthiness" for these kinds of surveys and that "the same standard should not apply when admitting survey evidence developed before litigation as is applied to surveys developed for the purposes of litigation." As the court explained, "[t]he former are inherently more trustworthy" in part because of the "strong economic incentive for the people conducting [the survey] to do a proper job, *i.e.*, one that met accepted principles of survey research." *Id.* at 776. *See also Coach, Inc. v. We Care Trading Co., Inc.*, No. 99 CIV. 1162, 2001 U.S. Dist. LEXIS 9879 (S.D.N.Y. July 19, 2001) (holding market surveys admissible to show secondary meaning in a mark); *Binney & Smith v. Rose Art Indus.*, No. 00-2939, 2000 U.S. Dist. LEXIS 18384 (E.D. Pa. Dec. 21, 2000), at *16-17 (market surveys performed prior to litigation were evidence of high marketplace recognition among the plaintiffs' target customers).

---

[2] **F.R.E. 803(6): Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . .

Defendant cites *ADP-Financial Computer Services, Inc. v. First National Bank of Cobb County*, 703 F.2d 1261, 1266 (11th Cir. 1983), for the proposition that the Eleventh Circuit has held that customer surveys are not admissible under the business records exception to the hearsay rule. This case has no such blanket statement concerning the admissibility of customer surveys. Rather, the Court found that a party could not use the other party's customer service surveys for impeachment purposes. From the case itself it is impossible to know whether the surveys at issue were prepared in anticipation of the litigation or for business purposes. *ADP-Financial* simply does not stand for the proposition that a party's market surveys done for more than 10 years as part of a party's regular business conduct and not in anticipation of litigation are inadmissible hearsay.

The reports proffered by Plaintiffs satisfy all requisite hallmarks of reliability.  Plaintiffs have provided ample testimony concerning the authenticity and reliability of these reports as business records.  Unlike the *Ortho* case cited by defendant,[3] which disallowed surveys as business records because they were proffered by a witness who did not commission them, plaintiffs have submitted portions of the deposition of William Askew, Regions' head of consumer banking, who testified to the authenticity of these reports as business records. Specifically, Mr. Askew has testified that New South Research conducted market studies for Regions for more than 10 years under his direction.  (Ex. C, Askew Tr. 144-146.)  Mr. Askew further testified that these market research reports were prepared and kept in the ordinary course of business.  *Id.*  He further testified about the reliability of the New South Research studies and, perhaps most relevant, that these studies were prepared solely for business purposes and that

---

[3] *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690 (2d Cir. 1994).  Lower court decision at 828 F. Supp. 1114 (S.D.N.Y. 1993).  *See id.* at 1122, 1120 (although stating that it did not find as a rule that market surveys are inadmissible, the court rejected surveys that were not authenticated by a person who directed or ordered the surveys).

Regions made important business and marketing decisions based on the results of these studies. *Id.* Regions provided additional evidence authenticating these studies as business records through Jim Jager, the president of New South Research, who worked at Regions' direction. Mr. Jager, like Mr. Askew, testified that "[a]ll these surveys were conducted for business purposes only without any anticipation of their use in litigation or for litigation purposes." (Ex. D, Jager Decl. ¶ 2, PX 499; Ex. E, Peters Tr. 61 (explaining that satisfaction, awareness and name recognition are all part of Regions' brand management); Ex. F, Tankersley Decl. ¶ 2 and Tankersley Decl. Ex. A (Regions' market research expenses)) These studies were created in the ordinary course of business and are routinely relied on by Regions. They possess all the characteristics and inherent reliability of business records and should be admitted.

### (2)    Further Scientific Testimony is Not Required for Admission of the Surveys

Defendant maintains that a rigorous *Daubert* style test is required to admit these reports. Defendant's argument is without support. Defendant fails to recognize the distinction between market research reports prepared for routine business purposes and those prepared for litigation. Indeed, the law draws a clear distinction between surveys prepared for litigation and those prepared for business. This distinction is based on the inherent reliability of surveys prepared in the ordinary course of business. *See* Joseph M. McLaughlin, ed., *Weinstein's Federal Evidence Second Edition* § 803.08[6][d] (2007) ("If the proponent can show that the report was not created for litigation purposes, it is admissible."); *Hutchinson v. Essence Comm'ns, Inc.*, 769 F. Supp. 541, 562 (S.D.N.Y. 1991) (admitting market reports because the defendant's president testified that "he routinely relies on the reports in the course of his business"); *Harrington v. Commissioner of Internal Revenue*, 404 F.2d 237, 240-41 (5th Cir. 1968) ("[T]his evidence falls within the business record exception to the hearsay rule because these surveys were recorded and

kept in the regular course of business"); *P&G v. Colgate-Palmolive Co.*, No. 96 Civ. 9123, 1998 U.S. Dist. LEXIS 17773, at *234 (admitting market research studies as business records of the plaintiff under Rule 803(6)); *see also Matador Drilling Co. v. Post*, 662 F.2d 1190, 1199 (5th Cir. 1981) (admitting drilling reports not prepared in anticipation of litigation); *Rosenberg v. Collins*, 624 F.2d 659, 665 (5th Cir. 1980) (explaining that business records at issue were admissible because they were prepared before the litigation at issue); *Crimm v. Missouri Pacific Railroad Co.*, 750 F.2d 703, 709 (8th Cir. 1984) (admitting investigation reports in part because they were not prepared in anticipation of litigation); *E.C. Ernst, Inc. v. Koppers Co.*, 626 F.2d 324, 330-31 (3d Cir. 1980) (admitting price sheets that were not prepared in anticipation of litigation).

The treatment of routine market research business records stands in stark contrast to that of market research surveys prepared for litigation. As the former Fifth Circuit has recognized, surveys prepared for use in litigation have questionable objectivity and reliability. *Colorificio Italiano Max Mayer, S.P.A. v. S/S Hellenic Wave*, 419 F.2d 223, 255 (5th Cir. 1969) (holding that litigation surveys cannot be business records as their "objectivity is suspect because of their intended use in litigation"). Because of the distinction between non-litigation and litigation surveys, courts have adopted a fairly stringent set of requirements to test the admissibility of litigation surveys. These tests, however, which often require expert testimony to establish the reliability of the results, have virtually no relevance to the admissibility of reliable business records.

Regions is not required to proffer further authentication testimony to admit the *non-litigation* New South Research reports. The studies are business records and were relied on by

senior executives at Regions.  They possess all requisite elements of business records and should be admitted.

Plaintiffs address PX 104 below.

### 2. Plaintiffs' Exhibit No. 104, Branch Quality Satisfaction Index

#### a. Defendant's Argument

See Argument above under B.1.a.

#### b. Plaintiffs' Argument

Plaintiffs' Exhibit 104 is an additional market research document that concerns Regions' branch satisfaction data.  The admissibility analysis related to this market research report is the same as PX 135, 216-220, 267, set forth above.  The only difference between this report and PX 135, 216-220, 267 is that it was not prepared by New South Research.  Scott Peters, Regions' Chief Marketing Officer, testified that this exhibit is an ongoing research study performed to "keep your finger on the pulse of the satisfaction of your customers to understand what makes them happy, what makes them sad, and to the extent you're doing things that they don't like to try to take corrective action in your organization." (Ex E, Peters Tr. 93-94)  Such reports were thus prepared for business purposes, not for litigation, and business decisions were made based on the data contained therein.

They are proper business records and should be admitted into evidence.

### 3. Plaintiffs' Exhibit No. 499, Declaration of Jim Jager

#### a. Defendant's Argument

Plaintiffs also identify the declaration of Jim Jager as an exhibit, to which defendant objects.  (Pl. Ex. 499).  It is through the testimony of Mr. Jager that plaintiffs seek to lay the necessary foundation for the admission of their brand awareness survey reports.  The affidavit is,

of course, hearsay itself and inadmissible. To the extent Mr. Jager is called as a witness by the plaintiffs, he would necessarily have to offer expert opinions, and does offer such opinions in his declaration, with respect to the methodology of the survey, whether its results are statistically significant, and the defined confidence level that can be placed in these reports. Mr. Jager was not disclosed as an expert pursuant to the Court's pretrial order, and has never submitted an expert report as required under Rule 26(a)(2)(B), F.R.C.P. Under these circumstances, he should not be permitted to testify as an expert in this case.

### b.    Plaintiffs' Argument

Defendant objects to the admission of the Jager Declaration on four grounds: 1) inadmissible expert testimony under F.R.E. 702, 2) undisclosed expert under F.R.C.P 26, 3) failure to provide an expert witness report pursuant to F.R.C.P. 26, and 4) hearsay. None of these objections have merit. To begin, Defendant moved to strike the Jager Declaration on the first three grounds relied upon here. The Court denied the motion to strike thus rejecting Defendant's improper expert testimony objections. *See e.g.,* Doc. 102, 121, 140. Moreover, as noted in plaintiffs' Opposition to Defendant's Motion to strike Declaration of Jim Jager, the declaration is admissible as Mr. Jager is not being offered as a Rule 26(a)(2)(A) expert, but rather as a fact witness who is not providing testimony under Rule 702. (Doc. 113, 128.)

The declaration is also not inadmissible hearsay. The Jager declaration contains facts within his personal knowledge concerning the market research reports he prepared for Regions since the early 1990s. The declaration is being offered to bolster the testimony of William Askew and authenticate the market research reports (PX 135, 216-220, 267) as authentic business records. Importantly, Plaintiffs offered to produce Mr. Jager for deposition, but

Defendant never sought the deposition.  (Doc. 128.)  Accordingly, the Jager declaration should

be admitted into evidence.

Respectfully submitted this the 9th day of January, 2007.

/s/ William G. Pecau
One of the Attorneys for Plaintiffs Regions Asset
Company, Regions Financial Corporation and
Regions Bank

**OF COUNSEL:**

Charles B. Paterson (PAT018)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
cpaterson@balch.com
pclark@balch.com

William G. Pecau
Michael J. Allan
Rachel M. Hofstatter
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone:  (202)429-6244
Facsimile:  (202)429-3902
wpecau@steptoe.com
mallan@steptoe.com
rhofstatter@steptoe.com

/William W. Watts, III/
One of the Attorneys for Defendant Regions
University

**OF COUNSEL:**
Victor T. Hudson
William W. Watts, III
Hudson & Watts, LLP
Post Office Box 989
Mobile, Alabama 36601-0989

James E. Shlesinger
Shlesinger, Arkwright & Garvey LLP
1420 King Street
Suite 600
Alexandria, Virginia 22314

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION and REGIONS BANK | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 2:06-cv-882-MHT |
| v. | ) ) | |
| REGIONS UNIVERSITY, INC. | ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' AMENDED OBJECTIONS TO DEFENDANT'S TRIAL EXHIBITS

Plaintiffs, Regions Asset Company, Regions Financial Corporation and Regions Bank

("Regions"), respectfully submit these objections defendant's trial exhibits.

| Exhibit No. | Objection | Rule |
|---|---|---|
| 591 | Inadmissible expert testimony | FRE 702 FRCP 26 |

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

REGIONS ASSET COMPANY, et al.,)
                            )
        Plaintiffs,     )
                            )
                            ) Civil Action No. 2:06-cv-882-MHT
                            )
REGIONS UNIVERSITY, INC.     )
                            )
        Defendant.      )
                            )

## <u>DEFENDANT'S REVISED OBJECTIONS TO PLAINTIFF'S EXHIBITS</u>

COMES NOW the defendant Regions University, Inc. and, pursuant to this Court's Uniform Scheduling Order, files the following revised objections to the plaintiff's designation of exhibits:

| Exhibit No. | Objection | Rule |
|---|---|---|
| 104 | hearsay<br>irrelevant<br>inadmissible<br>expert testimony | Rule 802, F.R.E.<br>Rule 402, F.R.E.<br>Rule 702, F.R.E. |
| 135 | hearsay<br>inadmissible<br>expert testimony | Rule 802, F.R.E.<br>Rule 702, F.R.E. |
| 216 | hearsay<br>inadmissible<br>expert testimony | Rule 802, F.R.E.<br>Rule 702, F.R.E. |

| 217 | hearsay<br>inadmissible<br>expert testimony | Rule 802, <u>F.R.E.</u><br>Rule 702, <u>F.R.E.</u> |
| 218 | hearsay<br>inadmissible<br>expert testimony | Rule 802, <u>F.R.E.</u><br>Rule 702, <u>F.R.E.</u> |
| 219 | hearsay<br>inadmissible<br>expert testimony+ | Rule 802, <u>F.R.E.</u><br>Rule 702, <u>F.R.E.</u> |
| 220 | hearsay<br>inadmissible<br>expert testimony | Rule 802, <u>F.R.E.</u><br>Rule 702, <u>F.R.E.</u> |
| 267 | hearsay<br>inadmissible<br>expert testimony | Rule 802, <u>F.R.E.</u><br>Rule 702, <u>F.R.E.</u> |
| 499 | hearsay<br>inadmissible<br>expert testimony<br>undisclosed expert<br>failure to provide<br>expert witness<br>report pursuant to<br>Rule 26, <u>F.R.C.P.</u> | Rule 802, <u>F.R.E.</u><br>Rule 702, <u>F.R.E.</u><br>Rule 26, <u>F.R.C.P.</u> |

Respectfully submitted,

<u>/s/ WILLIAM W. WATTS</u>
WILLIAM W. WATTS, III
[WATTW5095]
bill@alabamatrial.com
[HUDSV1684]
tom@alabamatrial.com
Hudson & Watts, LLP
Post Office Box 989
Mobile, Alabama 36601


JAMES E. SHLESINGER

Shlesinger, Arkwright &
Garvey LLP
1420 King Street, Suite 600
Alexandria, Virginia 22314

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

William G. Pecau, Esq.
Rachel M. Marmer, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

Charles B. Paterson, Esq.
Paul A. Clark, Esq.
BALCH & BINGHAM, LLP
105 Tallapoosa Street, Suite 200
Montgomery, Alabama  36104

/s/ WILLIAM W. WATTS

3

# EXHIBIT C

William Askew                                    Victor Hudson

Page 1

              IN THE UNITED STATES DISTRICT COURT

                        FOR  THE

                 MIDDLE DISTRICT OF ALABAMA

                     NORTHERN DIVISION


REGIONS ASSET COMPANY,        *
                              *
        Plaintiff,            *
                              *
Vs.                           *   CIVIL ACTION NUMBER
                              *
REGIONS UNIVERSITY, INC.,     *    2:06cv882-MHT
                              *
        Defendant.            *



        * * * * * * * * * * * * * * * * * * * *


        Deposition of WILLIAM E. ASKEW, taken before

    David Michael Camp, CSR, in the law offices of

    Balch & Bingham, LLP, 1901 6th Avenue North,

    Birmingham, Alabama, on August 2, 2007, commencing

    at approximately 8:45 o'clock a.m.

William Askew                                    Victor Hudson

## Page 2

```
 1         A P P E A R A N C E S
 2
 3   For Plaintiff:
        STEPTOE & JOHNSON, LLP
 4      Attorneys at Law
        1330 Connecticut Avenue
 5      Washington, D.C. 20036
        (202) 429-3000
 6      BY: WILLIAM G. PECAU
 7
 8
 9   For Defendant:
        HUDSON & WATTS, L.L.P.
10      Attorneys at Law
        One St. Louis Centre, Suite 2500
11      Post Office Box 989
        Mobile, Alabama 36601
12      (251) 432-7200
        BY: VICTOR T. HUDSON
13
14
15
     Also present: REX A. TURNER, JR.
16
17
           * * * * * * * * *
18
19
20
21
22
23
```

## Page 3

```
 1            I N D E X
 2   Witness
        WILLIAM E. ASKEW
 3
 4        EXAMINATION
 5   MR. HUDSON ..............................  6
     MR. PECAU ..............................  144
 6   MR. HUDSON ..........................  148
 7        * * * * * * * * *
 8
 9
10          EXHIBITS
11   DEFENDANT'S EXHIBIT ONE TWENTY-EIGHT ..... 66
     DEFENDANT'S EXHIBIT ONE TWENTY-NINE ...... 37
12   DEFENDANT'S EXHIBIT ONE THIRTY ........... 131
     DEFENDANT'S EXHIBIT ONE THIRTY-ONE ....... 131
13
           * * * * * * * * *
14
15
16
17
18
19
20
21
22
23
```

## Page 4

```
 1            STIPULATION
 2      It is stipulated by and between the parties
 3   hereto and their respective attorneys at law that
 4   the deposition on oral examination of the Witness,
 5   WILLIAM E. ASKEW, may be taken before David
 6   Michael Camp, Commissioner and Notary Public,
 7   State of Alabama at Large, and that the said
 8   deposition shall be taken in accordance with and,
 9   when so taken, may be used in accordance with the
10   provisions of the Federal Rules of Civil
11   Procedure.
12      It is further stipulated and agreed that all
13   notices provided for by said Federal Rules of
14   Civil Procedure are waived, as is the reading over
15   of said deposition to or by the witness, the
16   signing thereof by the witness, the signing and
17   certification of said David Michael Camp, the
18   filing of said deposition with the Clerk of the
19   Court and all other requirements and
20   technicalities of every sort which would be a
21   prerequisite to the use of said deposition.
22      It is the intent of the parties hereto that
23   this deposition may be used in evidence as though
```

## Page 5

```
 1   all requirements of said Federal Rules of Civil
 2   Procedure had been complied with.
 3      It is further stipulated and agreed that all
 4   parties hereto reserve the right to have
 5   corrections made to this deposition as provided
 6   for by said Federal Rules of Civil Procedure.
 7      It is further stipulated and agreed that all
 8   objections, save as to the form of the questions
 9   asked and the responsiveness of the answers
10   thereto are reserved until the time of trial in
11   accordance with the provisions of said Federal
12   Rules of Civil Procedure.
13
14        * * * * * * * * * * *
15
16
17
18
19
20
21
22
23
```

2 (Pages 2 to 5)

William Askew                                    Victor Hudson

Page 142

1  no branding there. If there's something that a
2  university did, Alabama, something that -- a local
3  accomplishment in a community. And so we can have
4  local ads that recognize different events.
5     Q   Your endorsement or endorsement by the
6  Southeastern Conference, by the University of
7  Alabama, by Auburn University, in those instances,
8  are you the bank of the Southeastern Conference,
9  by way of example?
10    A   We are. We're the official bank of the
11 Southeastern Conference.
12    Q   And your association with Alabama and
13 Auburn, is it similar in the terms that you're the
14 bank of the university?
15    A   No. We're not the bank of the
16 university because they have other --
17    Q   Places --
18    A   They have other sponsors. So Regions,
19 it's really more just the name association with
20 the university. So what we'll do is Regions will
21 do their game day. And so if they're having a
22 game, then Regions is identified on that game
23 day.

Page 143

1     We have the Regions fourth quarter -- Fifth
2  Quarter Show. The Regions Fifth Quarter Show.
3  And so it's just name recognition.
4     Q   And how is it identified? Is it
5  identified as Regions Bank, or otherwise?
6     A   No. It's identified as Regions Fifth
7  Quarter Show.
8     Q   And you put that on T-shirts and that
9  sort of thing?
10    A   No. It's on the radio.
11    Q   On the radio. Okay.
12    A   It's Eli Gold for Alabama. It's Mike
13 Hubbard for Auburn. We do this with many schools.
14    Q   Okay. To your knowledge, are any
15 instructions given to employees of Regions to look
16 out for third party use of the Regions name?
17    A   I don't know. Not to my knowledge.
18    Q   To your knowledge, is there any effort
19 to determine whether or not your customers include
20 people whose names have Regions in the name?
21    A   I -- I don't understand your question.
22 Try me again.
23    Q   If I represent to you that there are

Page 144

1  people who have Regions in their names that are
2  also banking customers of Regions, is there
3  anything that Regions does, to your knowledge, to
4  try to recognize that fact?
5     A   No. Not to my knowledge.
6  WHEREUPON, A RECESS WAS TAKEN.
7        MR. HUDSON:
8        That's all I have.
9           EXAMINATION
10 BY MR. PECAU:
11    Q   You mentioned New South. Who are they?
12    A   New South Research? They're the
13 research firm that did our research that we went
14 through.
15    Q   For how many years did you use them?
16    A   Many, many years.
17    Q   More than five years?
18    A   Yes.
19    Q   More than ten years?
20    A   I believe so.
21    Q   Okay. And why did you use them year
22 after year?
23    A   I wanted consistency in what they were

Page 145

1  telling me. And they did a good job. Other
2  banks, as I said a while ago, used them and highly
3  recommended them. And they did a good service for
4  us.
5     Q   And you relied upon the results of their
6  business in the normal course of your business?
7     A   Yes.
8     Q   And you relied on the results of their
9  surveys for your business decisions?.
10    A   Yes, in the sense that -- yes.
11    Q   Okay. And were these surveys
12 quantitative surveys?
13    A   Yes. Well, they did both qualitative
14 and quantitative surveys for us. But the surveys
15 we've been looking at are quantitative. And by
16 "quantitative", that means that they do enough
17 surveys based upon statistical empirical data
18 standards that they've done enough surveys to
19 validate -- you've heard of the polls.
20    If they poll an area, so many -- they call so
21 many people and it's valid. Well, they did those
22 statistics in quantitative. And then we were very
23 beyond those numbers. And so I was very confident

37  (Pages 142 to 145)

William Askew                                                Victor Hudson

| Page 146 | Page 148 |
|---|---|

**Page 146**

1  in those numbers being accurate.
2      Q   Do you have an understanding of what
3  Regions' rank is as an advertiser in the state of
4  Alabama?
5      A   I know that we were probably out-
6  advertised. As an advertising spend --
7      Q   As an advertising spender in the state
8  of Alabama.
9      A   I know that we were outspent, if that's
10 what you're asking me. We were ranked below some
11 of the other banks who spend. But our awareness
12 was way above the other banks.
13     Q   And what does that mean to you?
14     MR. HUDSON:
15         Object to the form of the question.
16 BY MR. PECAU:
17     Q   What did that mean to you?
18     MR. HUDSON:
19         Object to the form of the question.
20 BY MR. PECAU:
21     Q   That you were outspent by other banks
22 and you had a high --
23     MR. HUDSON:

**Page 147**

1         Object to the form.
2     THE WITNESS:
3         What did it mean that -- that they
4         were spending more and our awareness
5         was higher?
6  BY MR. PECAU:
7      Q   Right.
8      A   It meant a good thing we were doing with
9  our advertising, for one thing. Our advertising
10 was effective. It meant our name was -- our brand
11 was very strong, our name brand was very strong,
12 Regions.
13     Q   And why is that?
14     MR. HUDSON:
15         Object to the form.
16     THE WITNESS:
17         Why do I think it's strong?
18 BY MR. PECAU:
19     Q   Yeah. Why did that indicate to you that
20 it was strong?
21     MR. HUDSON:
22         Object to the form.
23     THE WITNESS:

**Page 148**

1         Normally, a high advertising spend
2         will create higher awareness. And
3         since we were spending less than
4         that -- the compensating factor
5         there is recognition of the brand.
6  BY MR. PECAU:
7      Q   Are you aware of any other uses of the
8  name "Regions" as a brand or as a name of a
9  business other than Regions University and
10 Regions, the financial institution?
11     A   No. Other than what he mentioned to me
12 today. He named some today.
13     Q   Are you aware of any of those names
14 actually in use?
15     A   Not really.
16     Q   Okay.
17     MR. PECAU:
18         I don't have any further questions.
19         EXAMINATION
20 BY MR. HUDSON:
21     Q   I've got a few. I can tell you, we
22 found lots of names and we polled a lot of people
23 that said they're in use. So you didn't know

**Page 149**

1  about it. My question is, are you the guy that's
2  supposed to know about it?
3         MR. PECAU:
4             Well, first of all, I object to the
5             characterization of what you found.
6             But you can answer the question he
7             actually asked.
8         THE WITNESS:
9             Now, give me your question again.
10 BY MR. HUDSON:
11     Q   Yeah. We filed affidavits that list a
12 lot of third party use, and we've called a lot of
13 people and they've told us that those names are in
14 use. My understanding is that you don't -- we
15 went through some. We didn't go through lots.
16     But my understanding is that you really
17 didn't know about third party usage. And my
18 question is, are you the guy that was supposed to
19 know about third party usage?
20     MR. PECAU:
21         The same objection to the
22         characterization.
23     THE WITNESS:

38  (Pages 146 to 149)

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

REGIONS ASSET COMPANY, REGIONS
FINANCIAL CORPORATION and
REGIONS BANK

        Plaintiffs,

        v.

REGIONS UNIVERSITY, INC.

        Defendant.

Civil Action No. 2:06-cv 882-MHT

## DECLARATION OF JIM JAGER

I, Jim Jager, declare and say:

1.    I am the President of New South Research. New South Research is a marketing research firm. Our offices are located at 3000 Riverchase Galleria, Suite 630, Birmingham, Alabama 35244.

2.    I have provided market research services to Regions Financial Corporation ("Regions") regularly since the early 1990's. The market research services provided to Regions by New South have included numerous quantitative research surveys which are scientifically conducted and projectible surveys (meaning that the survey results can be replicated with the same results within defined percentages with a defined confidence level) and qualitative surveys like focus groups that are not projectible but provide other, more subjective, information about consumers and their attitudes. These surveys were undertaken by New South to provide Regions with consumer information to help Regions understand its business and consumers and to help it take management decisions concerning its business. All these surveys were conducted for



PLAINTIFF'S
EXHIBIT

CASE
NO. 2:06-cv-882

EXHIBIT
NO. 499





business purposes only without any anticipation of their use in litigation or for litigation purposes.

3.     New South conducted a quantitative survey for Regions from June 14 through June 25, 2007 called "Regions/AmSouth Awareness and Perception Survey July 2007 (the "2007 Regions Awareness Survey"). Attached as Exhibit A to my declaration is the report that I prepared in July 2007 for the management of Regions summarizing the methodology of the survey and its results. Among the other things that the 2007 Regions Awareness Survey measured was the unaided awareness of and the familiarity with the Regions brand in the markets of the following cities – Birmingham, Mobile, Nashville, Memphis, Jackson, St. Louis, New Orleans, Indianapolis, Atlanta, Miami, Orlando and Tampa.

4.     The 2007 Regions Awareness Survey was conducted from a central telephone facility in Birmingham using random digit dialing of telephone numbers drawn from zip codes in those 12 city markets. I am attaching, as Exhibit B, the survey instrument (also known as the questionnaire) which is the script used by the professional interviews (a) to select the sample of persons who will respond to the survey questions (the "respondents") and (b) to ask the questions of the qualified respondents. As appears from the first two screening questions in Exhibit B, the survey sought respondents from every household in the markets – the persons who were primarily or jointly responsible for financial decision making in the households – and only excluded persons that worked for financial institutions and market research organizations. Other aspects of the methodology are reported on page 3 of the report.

5.     As I said, 2007 Regions Awareness Survey is a scientific quantitative survey. As appears on page 3 of the report.

     [T]he overall statistical margin of error for the study, based on 2492 interviews, is 2.0 percent at the 95 percent confidence





interval. That is, if all residents in all market areas were included in the survey, the results should vary no more than 2.0 percentage points from the results reported in this study 95 times out of a hundred.

In addition as appears in page 3 of the report, in each market surveyed, since approximately 200 interviews were conducted in each market, the survey results are projectable with a margin of error of 6.9 percent at the 95 percent confidence level.

6.     The Introduction of the report on page 1 sets out the primary goals of the research. The first goal was: "What is the overall awareness of Regions (and AmSouth) in each market?" This was measured in two ways. The first was a measure of the unaided awareness of banks by asking the respondent to identify the banks the banks that came to mind without any prompting – Questions 3 and 4 in Exhibit B. The results are shown in the chart "Total Unaided Awareness" on page 12 of Exhibit B. It shows Regions to be the market leader in unaided awareness in Birmingham (70%) and Mobile (50%). Among other city markets tested, Regions had an unaided awareness of 24% in Nashville, 44% in Memphis and 29% in Jackson. The second measure was aided awareness where the respondents are asked if they are aware of 4 or 5 banks or financial services companies, depending on city. All respondents were asked if they were aware of Regions and AmSouth and, depending on the city, two or three other banks or financial services. The names of the banks and financial services companies were rotated to avoid positional bias. Exhibit B is the questionnaire for Birmingham. As I reported in Exhibit A (p. 4), Regions is very strong in aided awareness in Birmingham (98%), Mobile (93%), Nashville (87%), Memphis (91%), and Jackson (88%). Regions familiarity is high in other cites as well – Atlanta (83%), St. Louis (78%), New Orleans (84%). Regions familiarity in other city markets is: Indianapolis (69%), Miami (54%), Orlando (73%) and Tampa (44%).

- 3 -

99



7.    The 2007 Regions Awareness Survey uses similar methodology that I and New South Research have used over the years in the quantitative scientific surveys that we have conducted for Regions concerning the awareness of Regions and customer satisfaction and perception. Some of the many other scientific quantitative surveys that I have conducted for Regions are:

a.    Regions Financial Corporation Ad Awareness & Tracking Report for the Year 2003 that, among other things, shows unaided recognition of Regions in various markets is attached as Exhibit C.

b.    Regions Financial Corporation Ad Awareness & Tracking Report for the Year 2002 that, among other things, shows unaided recognition of Regions in various markets is attached as Exhibit D.

c.    Regions Financial Corporation Ad Awareness & Tracking Report for the Year 2001 that, among other things, shows unaided recognition of Regions in various markets is attached as Exhibit E.

d.    Regions Financial Corporation Ad Awareness & Tracking Report for the Year 2000 that, among other things, shows unaided recognition of Regions in various markets is attached as Exhibit F.

8.    Based upon the fact that historically the unaided awareness of Regions in Montgomery has been higher than Regions unaided awareness in Birmingham, it is my opinion that the aided awareness of Regions today in Montgomery would be at least as high as the aided awareness of Regions in Birmingham shown in Exhibit A.

I declare under penalty of perjury that the above facts are true to the best of my knowledge. Executed August 17, 2007.


Jim Tuggy

- 4 -

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR  THE

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

REGIONS ASSET COMPANY,         *
                               *
        Plaintiff,             *
                               *
Vs.                            *   CIVIL ACTION NUMBER
                               *
REGIONS UNIVERSITY, INC.,      *     2:06cv882-MHT
                               *
        Defendant.             *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Rule 30(b)(6) deposition of Regions Asset

Company, taken through the witness, SCOTT M.

PETERS, before David Michael Camp, Commissioner,

in the law offices of Balch & Bingham, LLP, 105

Tallapoosa Street, Suite 200, Montgomery, Alabama,

on June 27th, 2007, commencing at approximately

9:07 o'clock a.m.

Page 2

```
 1        A P P E A R A N C E S
 2
 3   For Plaintiff:
        STEPTOE & JOHNSON, LLP
 4      Attorneys at Law
        1330 Connecticut Avenue
 5      Washington, D.C. 20036
        (202) 429-3000
 6      BY: WILLIAM G. PECAU
 7
 8
 9   For Defendant:
        HUDSON & WATTS, L.L.P.
10      Attorneys at Law
        One St. Louis Centre, Suite 2500
11      Post Office Box 989
        Mobile, Alabama 36601
12      (251) 432-7200
        BY: VICTOR T. HUDSON
13          -AND-
        SHLESINGER, ARKWRIGHT & GARVEY, LLP
14      Attorneys at Law
        1420 King Street, Suite 600
15      Alexandria, Virginia 22314
        (703)684-5600
16      BY: JAMES E. SHLESINGER
17
18
19   Also present: REX A. TURNER, JR.
20
21        * * * * * * * * *
22
23
```

Page 3

```
 1        I N D E X
 2   Witness
     SCOTT M. PETERS
 3
 4        EXAMINATION
 5   MR. HUDSON ..................  13
 6        * * * * * * * *
 7
 8        EXHIBITS
 9   DEFENDANT'S EXHIBIT EIGHTY .........   6
     DEFENDANT'S EXHIBIT EIGHTY-ONE ....    8
     DEFENDANT'S EXHIBIT EIGHTY-TWO ...     6
10   DEFENDANT'S EXHIBIT EIGHTY-THREE ..   62
     DEFENDANT'S EXHIBIT EIGHTY-FOUR ...   62
11   DEFENDANT'S EXHIBIT EIGHTY-FIVE ...  107
     DEFENDANT'S EXHIBIT EIGHTY-SIX ....  107
12   DEFENDANT'S EXHIBIT EIGHTY-SEVEN ..  122
     DEFENDANT'S EXHIBIT EIGHTY-EIGHT ..   65
13   DEFENDANT'S EXHIBIT EIGHTY-NINE ...   72
     DEFENDANT'S EXHIBIT NINETY .........   72
14   DEFENDANT'S EXHIBIT NINETY-ONE ....   80
     DEFENDANT'S EXHIBIT NINETY-TWO ...    85
15   DEFENDANT'S EXHIBIT NINETY-THREE ..   81
     DEFENDANT'S EXHIBIT NINETY-FOUR ...   85
16   DEFENDANT'S EXHIBIT NINETY-FIVE ...   85
     DEFENDANT'S EXHIBIT NINETY-SIX ...    85
17   DEFENDANT'S EXHIBIT NINETY-SEVEN .    85
     DEFENDANT'S EXHIBIT NINETY-EIGHT ..   85
18   DEFENDANT'S EXHIBIT NINETY-NINE ...   85
     DEFENDANT'S EXHIBIT ONE HUNDRED ...   85
19   DEFENDANT'S EXHIBIT ONE-O-ONE .....   85
     DEFENDANT'S EXHIBIT ONE-O-TWO .....   87
20   DEFENDANT'S EXHIBIT ONE-O-THREE ...   90
     DEFENDANT'S EXHIBIT ONE-O-FOUR ...    93
21   DEFENDANT'S EXHIBIT ONE-O-FIVE ...    96
     DEFENDANT'S EXHIBIT ONE-O-SIX ....   105
22   DEFENDANT'S EXHIBIT ONE-O-SEVEN ...  104
23        * * * * * * * * *
```

Page 4

```
 1        STIPULATION
 2      It is stipulated by and between the parties
 3   hereto and their respective attorneys at law that
 4   the deposition on oral examination of the Witness,
 5   SCOTT M. PETERS, may be taken before David Michael
 6   Camp, Commissioner and Notary Public, State of
 7   Alabama at Large, and that the said deposition
 8   shall be taken in accordance with and, when so
 9   taken, may be used in accordance with the
10   provisions of the Federal Rules of Civil
11   Procedure.
12      It is further stipulated and agreed that all
13   notices provided for by said Federal Rules of
14   Civil Procedure are waived, as is the reading over
15   of said deposition to or by the witness, the
16   signing thereof by the witness, the signing and
17   certification of said David Michael Camp, the
18   filing of said deposition with the Clerk of the
19   Court and all other requirements and
20   technicalities of every sort which would be a
21   prerequisite to the use of said deposition.
22      It is the intent of the parties hereto that
23   this deposition may be used in evidence as though
```

Page 5

```
 1   all requirements of said Federal Rules of Civil
 2   Procedure had been complied with.
 3      It is further stipulated and agreed that all
 4   parties hereto reserve the right to have
 5   corrections made to this deposition as provided
 6   for by said Federal Rules of Civil Procedure.
 7      It is further stipulated and agreed that all
 8   objections, save as to the form of the questions
 9   asked and the responsiveness of the answers
10   thereto are reserved until the time of trial in
11   accordance with the provisions of said Federal
12   Rules of Civil Procedure.
13
14        * * * * * * * * * * *
15
16
17
18
19
20
21
22
23
```

2 (Pages 2 to 5)

1    broadest sense of the term.
2  BY MR. HUDSON:
3    Q   You don't understand the definition,
4  you're saying?
5    A   Yeah.
6    Q   Okay. Have you mentioned any services
7  to me in response to my question about what
8  services were offered by the bank -- have you
9  mentioned any that you wouldn't consider to be
10 either banking or financial services?
11   A   I'd say that we provide services that in
12 some cases would not be considered financial
13 services, in helping customers of charitable work,
14 donations, time that our employees give to their
15 communities. So that's not really offering it for
16 sale.
17    But in terms of things we do to interact with
18 our communities in order to enhance our image and
19 build relationships.
20   Q   And those would be marketing functions?
21   A   I don't know that I would call them
22 marketing functions. No, I don't direct those
23 activities, if that's the question.

1    Q   As the Chief Marketing Officer, what
2  commercial benefit does the bank get from
3  interacting with the community?
4    A   We get a lot of benefits from that. We
5  get benefits from the standpoint of the community
6  recognizing that we are more than just a bank,
7  that we interact with their lives and try to make
8  their lives a little bit better. That's positive
9  for our image and our brand.
10   Q   And how do you benefit from that?
11   A   We benefit from it pretty much that
12 people tend to prefer to do business and be more
13 loyal to organizations that they like and that
14 they think are doing other positive things for
15 them in their community that they care about.
16   Q   And is it beneficial to do that sort of
17 thing in order to support the commercial aspects
18 of the business?
19   A   We think -- it's a couple of things.
20 One, we think it's our responsibility. That's our
21 point of view. But we also believe that it has
22 positive benefits for retaining customers over
23 long periods of time.

1    And we also believe there's an employee or
2  associate benefit and that our associates really
3  personally want to give back to their
4  communities. And by facilitating that, we keep
5  happier, good employees.
6    Q   I've heard it said that the first thing
7  an entrepreneur needs to learn is to keep his
8  employees happy. Do you agree with that?
9    A   I would agree.
10   Q   Advertising, is that also under your
11 purview?
12   A   It is.
13   Q   And was it under your predecessor's
14 purview?
15   A   It was.
16   Q   If I've asked you this, I apologize.
17 I've taken us on a side track. But what is brand
18 management?
19   A   You did ask it but I'll answer it again.
20   Q   If you would re-focus me, I'd appreciate
21 it.
22   A   Okay. It's really everything that we do
23 to manage our image positively in the marketplace.

1    Q   Okay.
2    A   And their perceptions of who we are and
3  what we provide to the market.
4    Q   All right. Satisfaction research and
5  awareness name recognition that we talked about
6  earlier, was that done as a part of brand
7  management?
8    A   Yeah. I'd say so.
9    Q   Was there anything else done as part of
10 brand management that would be in the same species
11 of things as satisfaction research and awareness
12 name recognition?
13       MR. PECAU:
14       I object to the form of the
15       question.
16 BY MR. HUDSON:
17   Q   The satisfaction research is, to me, a
18 survey kind of related sort of thing, and
19 awareness name recognition seems to be also. Was
20 there any other sort of survey kind of work that
21 was done as part of brand management of which you
22 are aware?
23   A   Not -- not that I'm aware of prior to

1     Okay.
2  BY MR. HUDSON:
3     Q   I'll show you what's been marked as
4  One-O-three and was recently produced to me, which
5  I understand to be the new logo for Regions Bank
6  after the merger. Am I correct in that
7  understanding?
8     A   That's correct.
9     Q   Is it being used now?
10     A   In some -- it is being used now. Not
11  comprehensively.
12     Q   But you're in transition?
13     A   Correct.
14     Q   And I'll show you previously what was
15  marked as Exhibit Three to Mr. Dunman's
16  deposition, and represent to you that it was his
17  testimony that that was the previous logo used by
18  Regions Bank. Is that correct?
19     A   That's correct.
20     Q   Has any other logo been used except
21  those depicted in Exhibits Three and One-O-three?
22     A   I don't know the answer to that. I do
23  -- yeah. Actually, I do know of the logo

1  treatment of the G which was prior to the Union
2  Planters merger, and was used.
3     Q   With the stylized G?
4     A   Correct.
5     Q   And after the Union Planters merger, was
6  the logo adopted as depicted in Exhibit Three?
7     A   Yes.
8     Q   Okay.
9     A   Although the other logo is still widely
10  in use.
11     Q   With the stylized G?
12     A   Yes.
13     Q   And except for those, are there any
14  other logos that you're aware of?
15     A   Not that I know of.
16     Q   Have you participated in any meeting or
17  discussion with management in which there was any
18  discussion, whatsoever, about the new logo?
19     A   Yes.
20     Q   Tell me what the reasons were for the
21  choice of the new logo depicted in One-O-three as
22  they were communicated to you.
23     A   What we wanted to do was retain the

1  brand equity of the Regions name and familiarity
2  with that while just kind of contemporizing it,
3  updating it. And some of it was --
4     Q   When you say "updating", you mean
5  updating the logo as it appeared in Exhibit Three?
6     A   One-O-three? This one?
7     Q   No. From Exhibit Three to One-O-three.
8     A   To the new one, yes. And also, there
9  was, in the earlier logo, a direct tie to Union
10  Planters based on the triangle and the plant.
11     Q   That's the Exhibit Three?
12     A   That's correct.
13     Q   That shows the little plant.
14     A   That's correct. And we wanted it to be
15  focused on Regions and not try to tie together
16  multiple legacy institutions like AmSouth and
17  Union Planters at a high level.
18     Q   So that was the reason for keeping the
19  little triangle but stylizing the leaves?
20     A   That's correct.
21     Q   I'm sorry but I'm going to have to look
22  over your shoulder on these. I only have one
23  copy.

1     A   That's okay.
2     Q   Let me show you what has been marked as
3  Exhibit One-O-four and ask if you could identify
4  that.
5     A   Yes. I'm familiar with the BQSI.
6     Q   What is it?
7     A   It was an ongoing study, research study
8  for individuals who went into branches at Regions
9  to assess their satisfaction with the experience.
10     Q   Now, were you with Regions Bank at the
11  time that study was made?
12     A   No.
13     Q   Do you have any knowledge of it except
14  what is contained within the four corners of the
15  document, itself?
16     A   No.
17     Q   Okay. Generally, what is the purpose
18  for a quality satisfaction study?
19     A   To keep your finger on the pulse of the
20  satisfaction of your customers to understand what
21  makes them happy, what makes them sad, and to the
22  extent you're doing things that they don't like to
23  try to take corrective action in your

Page 94

1  organization.
2    Q    This one seems to have specific
3  categories like monthly trends and teller services
4  satisfaction and that sort of thing. Is that
5  typical for such surveys?
6    A    Yes.
7    Q    And that would be whether an existing
8  customer was satisfied with tellers as a matter of
9  course or not.
10    A    Correct.
11    Q    And the same would be true with officer
12  service satisfaction.
13    A    Uh-huh.
14    Q    Yes?
15    A    Yes.
16    Q    And what is an officer?
17    A    That would be basically a non-teller in
18  the branch, someone who might sit on the platform
19  and open accounts.
20    Q    Okay.
21    A    And perhaps answer more complex
22  questions and queries.
23    Q    All right. This particular page, which

Page 95

1  is Bates stamp number 286 says, "How different
2  Regions performed in comparison to RFC". Who is
3  RFC?
4    A    I believe what they're saying is RFC is
5  the total score for the company, Regions Financial
6  Corp, and then breaking it out -- this page is to
7  break it out by different geographies.
8    Q    Which branches are under-performing and
9  which are performing well?
10    A    No. Actually, I believe what it's meant
11  to do is to look at different geographical areas
12  of the company and to determine if different
13  geographies are performing better or worse.
14    Q    Okay. Than the average for the whole
15  company?
16    A    Correct.
17    Q    These are the surveys of consumer
18  awareness that you had previously identified for
19  me that run from Bates stamp number 22357 through
20  22991.
21      MR. PECAU:
22      What exhibit number is that? Are
23      you marking it?

Page 96

1      MR. HUDSON:
2      No. I need to. One-O-five.
3  BY MR. HUDSON:
4    Q    I've marked that as Exhibit One-O-five
5  for identification. Do you recognize that as
6  being the surveys about which we've just spoken?
7    A    Yes.
8    Q    Okay. Looking at page 22359, you had
9  mentioned earlier that you thought that there was
10  some unaided brand awareness inquiries that were
11  made, and that you thought they might have been
12  just on the name "Regions" as opposed to Regions
13  against other banks.
14    A    Uh-huh.
15    Q    Can you tell from that page which it
16  was?
17    A    I can't.
18    Q    Okay.
19    A    Because I don't see the question.
20    Q    Okay. If you don't see the questions
21  for these surveys, it's very hard to know what was
22  being surveyed, itself, isn't it?
23    A    Well, what I would say from my

Page 97

1  experience, it's one of two things. It was either
2  an open-ended --
3    Q    He's asked you not to speculate, and I
4  agree with that.
5      MR. PECAU:
6      Well, I don't think this is
7      speculating. He's testifying about
8      his experience, which he can do.
9      THE WITNESS:
10      It's one of two things. They either
11      did an open-ended, do you know this
12      name, or they said, name any banks
13      you know about in this area. But
14      typically what they would have done
15      is looked for the name.
16  BY MR. HUDSON:
17    Q    But in any event, you don't know which
18  they did?
19    A    In this one, I do not. Either one or
20  the other.
21    Q    Okay. Now, we do see on the following
22  page, 22361, there is a chart called Brand
23  Awareness that says, "Unaided First Bank

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

REGIONS ASSET COMPANY, REGIONS )
FINANCIAL CORPORATION and )
REGIONS BANK )
                               )
        Plaintiffs, )          Civil Action No. 2:06-cv-882-MHT
                               )
    v.                             )
                               )
REGIONS UNIVERSITY, INC. )
                               )
        Defendant. )

## DECLARATION OF CRAIG TANKERSLEY

I, Craig Tankersley, declare and say:

1.      I am the Vice President of Customer Insights and Analysis of Regions Financial Corporation ("Regions"). My office is located at 1900 5th Avenue North, 5th Floor, Birmingham Alabama 35203. My responsibilities include quantitative and qualitative consumer and market research for Regions.

2.      Regions maintains in its files records of the budgets and expenditures pertaining to its past market research. These records are kept in the ordinary course of its business and it is the regular practice of Regions' business to keep documents of this kind. I am attaching as Exhibit A Regions Research Budget for 2006 and 2007. This document is kept in the ordinary course of Regions' business and it is Regions' practice to keep such documents. This document shows that Regions spent over 2.3 million dollars on consumer and market research in 2006. In 2007, we are budgeted to spend 2.0 million dollars on our basic consumer and market research.



PLAINTIFF'S EXHIBIT

CASE NO. 2:06-cv-882

EXHIBIT NO. 1014

In addition, Regions is spending in the years 2006 and 2007 an additional 2.8 million dollars for consumer and market research targeted specifically to the merger of Regions and AmSouth.

I declare under penalty of perjury that the above facts are true to the best of my knowledge. Executed August 18, 2007.

_____
Craig Tankersley

Page 1 of 1

| RESEARCH | | '06 Current Budget | '06 Current Budget | Difference | Difference | 2007 BAU Budget | Variance | Merger Offsets | Comments/ |
|---|---|---|---|---|---|---|---|---|---|
| | Business Element | | | ASO - Regions | ASO + Regions | Estimated Budget Needs for 2007 | Variance Compared to Current Budget | Budget Offsets Due to Merger Activity in 2007 | Assumptions |
| Prim | Secondary Research | $ | 296,305 | $ | | $ | 284,305 | $ | 294,305 | $ | | $ | 500,000 | $ | 215,695 | Greenwich/Mercer research/may include this |
| Prim | Primary Research | $ | 186,000 | $ | 258,466 | $ | (77,866) | $ | 450,965 | $ | 300,000 | $ | (150,965) | InformaI, Gigaweb, Forrester Panel, Tracksion, BigEye, Harte-Hanks, RKPC consulting, etc. |
| Prim | Membership/Service Quality | $ | 226,000 | $ | 279,491 | $ | (54,460) | $ | 504,460 | $ | 360,000 | $ | (154,467) | Merger research impacts this |
| Prim | Mystery Shopping | $ | 751,000 | $ | 1,269,300 | $ | (518,300) | $ | 2,000,000 | $ | 1,650,000 | $ | (460,000) | Transfers related to SLG segment (Branch team, methodical level, etc.) will impact this |
| Prim | Qualitative Rsch/Focus Groups | $ | 200,000 | $ | | $ | 200,000 | $ | 200,000 | $ | | $ | (200,000) | Move to Primary Rsch category |
| Prim | E3R Market Insight/Volume Specimen | $ | 107,561 | $ | 516,923 | $ | (595,562) | $ | 546,925 | $ | 523,000 | $ | (107,561) | Move to Primary Rsch category |
| | Research TOTAL | $ | 1,749,490 | $ | 2,990,040 | $ | (916,560) | $ | 4,142,915 | $ | 3,845,000 | $ | (625,515) | |

| Research - SOFTWARE | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Lou | Function Code | $ | 12,000 | $ | 12,000 | $ | (12,000) | $ | 12,000 | $ | 12,000 | | |
| Pur | LEssen | $ | | $ | 12,000 | $ | (12,000) | $ | 12,000 | $ | 12,000 | | 1 desktop license |
| Pur | LEssen Multi, Audit (one item/fee for Audit on Financials Acs expenses) | $ | | $ | 59,000 | $ | (59,000) | $ | 59,000 | $ | 90,000 | $ | 31,000 | periodical software |
| | Research-Software TOTAL | $ | - | $ | 83,000 | $ | (83,000) | $ | 83,000 | $ | 114,000 | $ | 31,000 | |

RAC00041191

CONFIDENTIAL

