## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| REGIONS ASSET COMPANY, REGIONS FINANCIAL CORPORATION and REGIONS BANK | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 2:06-cv-882-MHT |
| REGIONS UNIVERSITY, INC. | ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFFS' PRETRIAL BRIEF

Charles B. Paterson (PAT018)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500

ATTORNEY FOR PLAINTIFFS

**OF COUNSEL:**

William G. Pecau
Michael J. Allan
Rachel M. Hofstatter
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone:  (202)429-3000

Dated: January 9, 2008

TABLE OF CONTENTS

Page

Table of Authorities ...................................................................................................ii

I.　Statement of Facts...............................................................................................1

　A.　Regions and its REGIONS Mark and Name.......................................................1

　　1.　Regions Businesses and Services.................................................................1

　　2.　Regions Is a Community Institution ...........................................................3

　　3.　Regions' Regions University .....................................................................5

　　4.　Use of the REGIONS Mark .......................................................................6

　　　(1)　REGIONS Sponsorships.....................................................................7

　　　(2)　REGIONS Brand Messages and Personality ......................................9

　　　b.　Consumer Awareness of REGIONS ....................................................9

　　5.　Regions' Enforcement Efforts .................................................................11

　B.　The Defendant, Southern Christian University, Now Regions University......................13

　　1.　The Defendant's Services and Advertising.................................................13

　　2.　Defendant's Advertising: Expenditures, Geographies and Target Audience ..............14

　　3.　The Adoption of REGIONS by Defendant.................................................15

　　4.　Promotion of REGIONS UNIVERSITY .....................................................20

　　5.　The Affiliation Connection and Association of REGIONS and REGIONS UNIVERSITY.....................................................................................21

II.　Legal Analysis ..................................................................................................23

　A.　Confusion as to Sponsorship or Affiliation Constitutes Trademark Infringement and Unfair Competition .................................................................................23

　　1.　Trademark Law Protects an Owner's Right to Control its Reputation.........................23

　　2.　Likelihood Confusion of Source, Affiliation, Association or Sponsorship Is Trademark Infringement and Unfair Competition ...........................................................25

　　3.　Actual Confusion Has Occurred ...............................................................30

　　　a.　The Confusion is Real and Concrete .....................................................30

　B.　Substantial Evidence Indicates Defendant's Intent to Trade on Regions' Goodwill and Reputation ...........................................................................................34

　　1.　The Registrability E-mail Does Not Change Defendant's Intent Nor Is It Reliable .....39

　C.　Regions is a strong and famous mark. ..............................................................43

　　1.　Defendant's Efforts to Find Evidence of Third Party Use Demonstrate the Strength of the REGIONS Mark...................................................................................45

　D.　Defendant's Use of the REGIONS Name and Mark Dilutes the Distinctiveness of Regions' famous REGIONS Name and Mark .....................................................46

i

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A. Bourjois & Co. v. Katzel,*
    260 U.S. 689, 67 L. Ed. 464, 43 S. Ct. 244 (1923)....................................................24

*Aetna Casualty & Surety Co. v. Aetna Auto Finance, Inc.,*
    123 F.2d 582 (5th Cir. 1941) ...................................................................................34

*Ambrit, Inc. v. Kraft, Inc.,*
    812 F.2d 1531 (11th Cir. 1986) .........................................................................30, 39

*American Farm Bureau Fed'n v. Alabama Farmers Fed'n,*
    935 F. Supp. 1533 (M.D. Ala. 1996) ......................................................................26

*Amstar Corp. v. Domino's Pizza, Inc.,*
    615 F.2d 252 (5th Cir. 1980) .............................................................................30, 34

*Arthur Young, Inc. v. Arthur Young & Co.,*
    579 F. Supp. 384 (N.D. Ala. 1983)..........................................................................47

*Board of Supervisors of the Louisiana State University and Agricultural and Mechanical*
*College v. Smack Apparel Co.,*
    438 F. Supp. 2d 653 ................................................................................................28

*Bonte, Inc. v. Bonte Epicure,*
    1993 WL 148954 (S.D.N.Y. 1993)..........................................................................32

*Breakers of Palm Beach, Inc. v. Int'l. Beach Hotel Development, Inc.,*
    824 F. Supp. 1576, 28 U.S.P.Q.2d 1606 (S.D. Fla. 1993).................................31, 45

*Brookfield Comm'ns v. West Coast Entertainment Corp.,*
    174 F.3d 1036 (9th Cir. 1999) .................................................................................29

*Burger King Corp. v. Mason,*
    710 F.2d 1480 (11th Cir. 1983) ...............................................................................26

*Champion Spark Plug Co. v. Globe-Union Mfg. Co.,*
    88 F.2d 970 (C.C.P.A. 1937) ..................................................................................44

*Champions Golf Club, Inc. v. Sunrise Land Corp.,*
    846 F. Supp. 742 (W.D. Ark. 1994).........................................................................25

*Choice Hotels Int'l, Inc. v. Kaushik,*
    147 F.Supp.2d 1242 (M.D. Ala. 2000) ....................................................................35

*Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.*,
   934 F.2d 1551, 19 U.S.P.Q.2d 1401 (11th Cir. 1991) ..............................................30

*Country Floors, Inc. v. Partnership Composed of Gepner and Ford*,
   930 F.2d 1056, 18 U.S.P.Q.2d 1577 (3rd Cir. 1991) ..............................................31

*Cuisinarts, Inc. v. Robot-Coupe Int'l. Corp.*,
   580 F. Supp. 634 (S.D.N.Y. 1984) ..............................................39

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
   604 F.2d 200 (2d Cir. 1979)..............................................26

*Eco Mfg. LLC v. Honeywell Int'l, Inc.*,
   2003 WL 1888988 (S.D. Ind. 2003) ..............................................40, 42

*Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.*,
   2001 WL 1397304 (S.D. Ind. 2001) ..............................................42

*Elvis Presley Enters. v. Capece*,
   141 F.3d 188 (5th Cir. 1998) ..............................................29

*First Nationwide Bank v. Nationwide Savings and Loan Ass'n*,
   682 F. Supp. 965 (E.D. Ark. 1988) ..............................................39

*First Sav. Bank, F.S.B. v. U.S. Bancorp*,
   117 F. Supp. 2d 1078 (D. Kan. 2000) ..............................................39

*Foxworthy v. Custom Tees, Inc.*,
   879 F. Supp. 1200 (N.D. Ga. 1995) ..............................................29

*Frehling Enters., Inc. v. International Select Group, Inc.*,
   192 F.3d 1330 (11th Cir. 1999) ..............................................35

*Gideons International, Inc. v. Gideon 300 Ministries, Inc.*,
   94 F.Supp.2d 566 (E.D. Pa. 1999) ..............................................32

*Haney's Café, Inc. v. Haney's Smokehouse, Inc.*,
   2004 U.S. Dist. LEXIS 24959 (M.D. Fla. 2004) ..............................................34

*Howard Johnson Int'l, Inc. v. Craven Properties Ltd.*,
   2002 U.S. Dist. LEXIS 19744 (M. D. Fla. 2002) ..............................................34, 35

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
   846 F.2d 1079, 6 U.S.P.Q.2d 1977 (7th Cir. 1988) ..............................................32

*Inwood Labs. v. Ives Labs.*,
   456 U.S. 844 (1982) ..............................................24

*James Burrough, Ltd. v. Sign of the Beefeater, Inc.,*
  540 F.2d 266 (7th Cir. 1976) ...................................................................................44

*Jellibeans, Inc. v. Skating Clubs of Georgia,*
  716 F.2d 833, 222 U.S.P.Q. (BNA) 10 (11th Cir. 1983) .............................................30, 34, 45

*John H. Harland Co. v. Clarke Checks, Inc.,*
  711 F.2d 966 (11th Cir. 1983) ..............................................................................39

*Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.,*
  963 F.2d 350 (Fed. Cir. 1992), *cert. denied*, 506 U.S. 862 (1992)...........................................45

*King of the Mountain Sports, Inc. v. Chrysler Corp.,*
  968 F. Supp. 568 (D. Col. 1997)..............................................................................26

*Marketing Displays, Inc. v. Traffix Devices, Inc.,*
  200 F.3d 929 (6th Cir. 1999) .................................................................................39

*Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.,*
  316 U.S. 203 (1942).....................................................................................23, 24

*Mobil Oil Corp. v. Pegasus Petroleum Corp.,*
  818 F.2d 254 (2d Cir. 1987)..................................................................................29

*Mont. Prof'l Sports, LLC v. Leisure Sports Mgmt.,*
  422 F.Supp.2d 1271 (M.D. Fla. 2006)........................................................................34

*Moore Bus. Forms, Inc. v. Ryu,*
  960 F.2d 486, 22 U.S.P.Q.2d 1773 (5th Cir. 1992) ...............................................................32

*Nailtiques Cosmetic Corp. v. Salon Sciences Corp.,*
  41 U.S.P.Q.2d (BNA) 1995, 1997 U.S. Dist. LEXIS 462 ......................................................35

*Nassau v. Unimotorcyclists Soc. of America, Inc.,*
  59 F.Supp.2d 1233, 51 U.S.P.Q.2d 1261 (M.D. Fla. 1999)....................................................31

*Ortho Pharmaceutical Corp. v. Smith,*
  959 F.2d 936 (Fed. Cir. 1992)................................................................................43

*Popular Bank of Florida v. Banco Popular de Puerto Rico,*
  9 F.Supp.2d 1347 (S.D. Fla. 1998) ...........................................................................31

*Quality Inns Int'l, Inc. v. McDonald's Corp.,*
  695 F. Supp. 198 (D. Md. 1988)..............................................................................43

*Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,*
  675 F.2d 1160, 216 U.S.P.Q. (BNA) 599 (11th Cir. 1982) ................................................31, 45

*Schieffelin & Co. v. The Jack Co. of Boca, Inc.*,
   850 F. Supp. 232 (S.D.N.Y. 1994) ....................................................................................26

*Steinway & Sons v. Demars & Friends*,
   210 U.S.P.Q. 954, 1981 WL 40530 (C.D. Cal. 1981) ..............................................32

*Sullivan v. CBS Corp.*,
   385 F.3d 772 (7th Cir. 2004) .........................................................................................44

*Susan's Inc. v. Thomas*,
   26 U.S.P.Q.2d 1804, 1993 WL 93333 (D. Kan. 1993) ..............................................31

*The Board of Trustees of the University of Arkansas v. Professional Therapy Services,
Inc.*,
   873 F. Supp. 1280 (W.D. Ark. 1995).............................................................................28

*The Sports Authority, Inc. v. Prime Hospitality Corp.*,
   89 F.3d 955 (2d Cir. 1996).............................................................................................25

*Thorn EMI North America, Inc. v. Micron Technology, Inc.*,
   837 F. Supp. 616 (D. Del. 1993).....................................................................................42

*University of Georgia Athletic Ass'n v. Laite*,
   756 F.2d 1535 (11th Cir. 1985) ...........................................................................27, 31, 45

*University of Pittsburgh v. Champion Products, Inc.*,
   686 F.2d 1040 (3d Cir. 1982).................................................................................27, 28

*Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*,
   123 F. Supp. 2d 293 (E.D. Pa. 2000) ...........................................................................28

*Virgin Enters. v. Nawab*,
   335 F.3d 141 (2d Cir. 2003)...........................................................................................44

*Wendt v. Host Int'l, Inc.*,
   125 F.3d 806 (9th Cir. 1997) ...................................................................................28, 29

*World Carpets, Inc. v. Dick Littrell's New World Carpets*,
   438 F.2d 482 (5th Cir. 1971) .........................................................................................44

*Yale Electric Corp. v. Robertson*,
   26 F.2d 972 (2d Cir. 1928)..............................................................................................24

## STATUTES

15 U.S.C. § 1014...............................................................................................................25

15 U.S.C. §1125(a) ...................................................................................................26

15 U.S.C. § 1125(c) ..................................................................................................48

Ala. Code 8-12-17......................................................................................................46


**BOOKS AND ARTICLES**

Anne Gilson Lalonde, *et al., Gilson on Trademarks* ....................................................27

Glenn A. Gundersen, *Trademark Searching* (2d ed. 2000) ..........................................40

Glenn A. Gundersen, *Trademark Searching* (1994) ............................................... 41-42

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th ed. 2007) ...........25

Louis Altman, *Callmann on Unfair Competition, Trademarks, and Monopolies* § 21:4
(4th ed. 2007)............................................................................................................25

Restatement (Third) of Unfair Competition § 21 ......................................................43

Plaintiffs, Regions Asset Company, Regions Financial Corporation and Regions Bank ("Regions") respectfully submit this pretrial brief.

## I.     STATEMENT OF FACTS

### A.     Regions and its REGIONS Mark and Name

#### 1.     Regions Businesses and Services

Regions,[1] one of the largest banks in the United States, has its roots in Alabama.  Regions was formed in a 1971 merger of First National Bank of Montgomery, First National Bank of Huntsville and Exchange Security Bank of Birmingham.  Its original headquarters were in Montgomery until 1993 when they were moved to Birmingham. (Askew ET)[2]

Regions has grown significantly over the years and, with assets in excess of 138 *billion* dollars, is the largest financial institution in Alabama, the largest corporation headquartered in Alabama and one of the ten largest financial institutions in the United States. (Askew ET; Marmer Decl. ¶ 3 and Ex. B, PX 366, 1001)  Regions has also expanded geographically into sixteen states with its primary focus in the South.  Its key markets are in Alabama, Georgia/South Carolina, Louisiana, Florida, Tennessee and Arkansas/East Texas.  Regions has the number one market share in Alabama and Arkansas, the number two market share in Tennessee, the number three market share in Louisiana, the number four market share in Florida, and the number five market share in Georgia.  (Askew Decl. ¶ 7, PX 490)  Regions has the seventh largest branch

---

[1] The plaintiffs Regions Financial Corporation ("RFC"), Regions Bank and Regions Asset Company (collectively "Regions") are affiliated companies.  (Stip. Fact 5) RFC is a bank holding company. (Askew ET)  Its operating subsidiary Regions Bank is an Alabama banking corporation (Stip. Fact Nos. 3 and 4), its subsidiary, Regions Asset Company  (Stip. Fact 3) is the owner of the REGIONS marks and their registrations and licenses Regions Bank, RFC and its other affiliates the right to use those REGIONS marks. (Stip. Fact 15; certified registrations of plaintiffs' REGIONS marks; Marmer Decl. ¶ 1 and Ex. A, PX 366, 1000; PX 368-371)

[2] Expected testimony of William Askew, Senior Executive Vice President, Consumer Banking at Regions Financial Corporation.

network in the United States with at least 1,900 branches and 2,400 ATMs, including 225 branches in Alabama and 25 in Montgomery. (Askew Decl. ¶ 3, PX 190)  Regions also operates one of the largest online banking sites in the United States at www.regions.com. (Stip. Fact 21; Askew ET)  In 2006, the Regions online banking site had over a million households as customers having deposits in excess of 16 billion dollars.  (PX 88)

The REGIONS name, adopted in late 1993, is Regions' chief symbol of corporate identification and its principal mark.  The name REGIONS is the distinctive element of each of plaintiffs' names and many of Regions' affiliates, business units and divisions, such as: REGIONS INSURANCE GROUP, REGIONSNET, REGIONS MORTGAGE, REGIONS CHARITY CLASSIC, REGIONS BANK and REGIONS UNIVERSITY (Stip. Facts No. 20, 27)

The REGIONS name and mark, alone or with other elements, is registered in the United States Patent and Trademark Office ("USPTO").  For example, registered marks of plaintiffs include REGIONS, REGIONS BANK, REGIONS CHARITY CLASSIC, REGIONSNET, REGIONS FINANCIAL CORP., REGIONS FUNDS, REGIONS QUICK DEPOSIT, REGIONSREWARD, REGIONS BASIC BANKING, REGIONS CLASSIC BANKING, REGIONS REWARDS, REGIONS LIFESPAN ACCOUNTS, REGIONS MANAGEMENT ACCOUNT, REGIONS COLLEGIATE CHECKING, REGIONS MORTGAGE, REGIONS MOR LINKED CHECKING, and REGIONS E-SSENTIAL BANKING.  (Stip. Fact 12; certified registrations, PX 271-279; 398-410)

Regions supplies under its REGIONS mark a full range of financial products and services for consumers, small businesses, non-profits, large corporations, and public entities.  REGIONS offers all manners of financial services from basic banking services, lending services such as real estate, car and student loans, retirement services, commercial banking, securities brokerage and

2

insurance services. (Stip. Fact 6)  As such, Regions promotes its REGIONS products and services broadly to nearly all demographics and segments of society.  Anyone needing basic banking services is a potential REGIONS customer.  (Askew ET; Dunman ET[3])  Demographic data compiled by Regions illustrates its broad customer base.  For example, in 2001 24% of Regions customers had annual incomes of less than $25,000; 40% had incomes between $25,000 and $50,000.  (PX 218 at 22632)  In the same year, 34% of Regions customers were male and 66% were female.  (PX 218 at 22632)  Regions' demographic data has remained consistent. (*See, e.g.*, PX 219 at RAC 22802 and PX 220 at RAC22877)

### 2.    Regions Is a Community Institution

Regions is a community bank.  Regions, through its extensive branch network, heavily supports the communities in which it does business by charitable assistance, small business assistance and providing financial education services to its communities.

Regions has a commitment of investing at least $100 billion dollars from 2007 through 2013 to support community development, small business lending and mortgage lending for low and moderate income communities and borrowers.  (Jackson Decl. ¶ 5, PX 1008; Askew Decl. ¶ 6, PX 490)  In 2006, Regions provided more than $1.5 billion dollars in loans to low-to moderate-income borrowers and in low-to moderate-income census tracts.  (Jackson Decl. Ex. ¶ 4, PX 1008)  Also in 2006, Regions originated $6.9 billion dollars in CRA small business loans; 1.5 billion dollars of this amount was to businesses located in low/moderate income areas. (Jackson Decl. ¶ 4, PX 1008)  The U.S. Small Business Administration ranks Regions as one of the top small business-friendly financial service providers in the country.  (Jackson Decl. ¶ 4, PX 1008; Askew ¶ 4, PX 490)

---

[3] Expected testimony of Russell Dunman, head of Regions' consumer banking for Montgomery and Central Alabama, retired.

This Regions assistance to its community also is in the form of charitable contributions. (Jackson Decl. ¶ 3, PX 1008)  For example, in Montgomery, Regions is the signature sponsor of the Montgomery Ballet's season opening, the Montgomery Symphony and the Regions Art Show; Regions also is a major sponsor of the Heart Walk, Arthritis Walk, Breast Cancer Awareness Walk, and the United Way campaign.  (Dunman ET)  Regions has also co-sponsored the Indiana Black Expo Black Business Conference (PX 313) and has supported Meals on Wheels (PX 347), the YMCA (PX 346), Performance on the Green (PX 322), and the Civil Theatre of Greater Lafayette (PX 351).  Regions associates also volunteer for various community organizations such as Boy Scouts of America, American Heart Association, American Cancer Society, March of Dimes, Alzheimer's Association, Habitat for Humanity, and SOWEGA Food Bank.  (PX 354; Jackson Decl. ¶ 3, PX 1008)

Regions provides educational services to the public through lectures and talks on financial matters of interest.  These include seminars on home buying, investment management, credit maintenance and basic banking.  In addition, Regions also educates students about banking and financial services.  (Dunman ET)  Regions provides these financial counseling services beginning in grade school and through college.  For example, Regions educates Montgomery Public School students about the infrastructure of the Federal Reserve System.  Regions has also educated students at schools like AUM, Auburn University, Alabama State University, Huntingdon College and others about investment strategies and general investment practices. (Dunman ET)  Regions provides such services in many of the communities in which it does business.  (Jackson Decl. ¶ 2, PX 1008)

4

### 3. Regions' REGIONS UNIVERSITY

Regions has used the name REGIONS UNIVERSITY for its internal corporate university training program.[4] (*See* Stip. Fact 27) It began use of the name REGIONS UNIVERSITY in 2004 after its merger with Union Planters. (Stip. Fact 28; Pollard Tr. 9:16-21) The logo used for Regions University appears below:



(Pollard Tr. 62:5-11; *see also* PX 13)

In 2005, approximately 25,000 Regions employees took Regions University courses totaling about 750,000 hours. (PX 4 at RAC 31078 – 31081) In the years 2005 and 2006, Regions spent over 24 million dollars on corporate training. (PX 14) Three to five hundred Regions University courses have been offered online. (Pollard Tr. 69:16-23) Graduates of Regions' Regions University have received diplomas and other certificates indicating completion of Regions University coursework. (Pollard Tr. 46:7-12) Regions University has also been used as a recruitment tool and the Regions University name has appeared in recruitment brochures and on the Regions website. (Pollard Tr. 34:13-22, 36:4-22; PX 9 and 11)

---

[4] The term "corporate university" is used to describe certain kinds of corporate training programs. (Marmer Decl. ¶ 5 and Ex. D, PX 388, 442-444) Corporations use the term "university" along with their names to identify their corporate university training programs. (PX 4, *Training* magazine at RAC 31081) Examples are: "Black & Decker University," "Motorola University," "SunTrust University." (*See* Pollard Tr. 83:6-20) The following corporate names have been registered for this kind of employee training: COMMERCE UNIVERSITY, UFIRST UNIVERSITY, SUPERVALU UNIVERSITY, ALLSTATE AGENCY UNIVERSITY, BLACK & DECKER UNIVERSITY, AFLAC UNIVERSITY, MACGREGOR UNIVERSITY, EL DORADO UNIVERSITY, THRIFTY UNIVERSITY, STANDARD UNIVERSITY THE STANDARD PARKING TRAINING CENTER, U LAND ROVER UNIVERSITY, QUALCOMM CDMA UNIVERSITY, CARLIN UNIVERSITY, VISX UNIVERSITY, MERVYN'S UNIVERSITY, EPIX UNIVERSITY, MARRIOTT UNIVERSITY, and CASTLE UNIVERSITY. (PX 452-472)

### 4.    Use of the REGIONS Mark

Regions has used the REGIONS name since late 1993 and early 1994.[5] (Stip. Fact 16) Regions has spent hundreds of millions of dollars to advertise and promote its REGIONS brand, services and businesses. (Peters Decl. ¶ 2, PX 1010; Askew Decl. ¶ 2, PX 490) In the years 2005 and 2006, the amount spent on marketing was in excess of $50,000,000 each year. (Peters Decl. ¶ 2 and Ex. B, PX 1010, 1012) In 2007, Regions spent nearly $134 million on marketing and promotional efforts which included $47 million on marketing related to the merger of Regions and AmSouth. (PX 1026)

REGIONS is promoted through all major advertising channels including television, radio, print, internet, direct mail, merchandising, and billboard. (Stip. Fact 24; Dunman ET; PX 162-196, 204-209, 224, 226-229, 246-248, 280-326, 332-349, 353-361, 411-424, 445, 1011, 1016) REGIONS appears alone on the signage for its 1,900 branches and 2,400 ATMs. (PX 174 at RAC 10059, 186, 191, 473) After its merger with AmSouth in 2006, Regions spent $87,000,000 updating all its signs. (PX 473; Peters ET[6]) In addition, the REGIONS mark appears on credit cards, checks, monthly statements, bills and other such items seen by customers and potential customers daily or monthly. (Stip. Fact 23; Dunman ET; PX 171, 292, 302-303)

REGIONS always has been the consistent and dominant element of REGIONS advertisements. (*See* PX 157-159, 162, 355, 168, 169, 207, 228, 263, 298, 324, 356) Since adoption of the REGIONS name in 1993, the name "REGIONS" has been featured in several

---

[5] REGIONS was first used as the sole name for its banks outside Alabama and as a umbrella brand for its FIRST ALABAMA banks in Alabama – FIRST ALABAMA, A REGIONS Bank – until 1996 when the Alabama banks were all changed to REGIONS. (*See, e.g.*, PX 190, 192) This was done to retain and transfer the First Alabama goodwill to the Regions brand.

[6] Expected testimony of Scott Peters, Chief Marketing Officer of Regions Financial Corporation.

colors and various fonts. (*See e.g.* Exhibit A attached hereto; PX 228, 310, 157, 286, 288, 294, 201, 176, 178, 312, 314, 332, 346, 349 and 353) In addition, the REGIONS name and mark is often promoted through the spoken word. For example, Regions advertises on radio (PX 199) and television (PX 411-424). These and other "voice overs" state and repeat the REGIONS name. (PX 261) Regions' toll free number for its call center is 1-800-REGIONS.

### (1)    REGIONS Sponsorships

Sponsorships are a part of Regions' marketing strategy. (Peters Decl. ¶ 6, PX 1010) In 2007 alone, Regions spent $6.7 million on sponsorships and paid affiliations. (PX 1026; Peters Decl. ¶ 8, PX 1010) For example, Regions sponsors several universities within its communities. Regions has been the official bank and a corporate sponsor of the Southeastern Conference ("SEC") since 1993 and is a corporate sponsor of the Sun Belt Conference. (Peters Decl. ¶ 6, PX 1010-1013, 1017, 361; Stip. Fact Nos. 25 and 26)

As such, Regions enjoys an affiliation with its host and added marketing exposure through additional signage and broadcasts at games (Peters ET, PX 1013). Regions also appears on conference websites such as secsports.com and sunbeltsports.org (Marmer Decl. ¶ 4 and Ex. C, PX 388, 1017; PX 272), hosts the Regions Bank SEC Football Travel Planner at secroadtripplanner.com (PX 428 at RAC 32263) and the Regions Bank SEC Fan Poll at secsports.com (PX 428 at RAC 32264).

Regions sponsors many universities:  University of Alabama (PX 164, 165, 193, 338, 416), University of Arkansas (PX 227, 339), Auburn University (PX 166, 193, 341, 418), University of Georgia, Louisiana State University (PX 263, 417), University of Mississippi, Mississippi State University and the University of South Carolina (PX 343, 357). Regions sponsors many other universities throughout its footprint including Indiana University (PX 314, 340), Purdue University (PX 342), Texas A&M University (PX 428 at RAC 32255), and SIU

School of Medicine (PX 348). (*See, e.g.*, PX 164-167, 172, 193, 227, 228, 247, 261, 262, 287, 304, 309, 314, 336, 338-343, 355, 357, 361, 1011 at RAC 28612, 1554).[7] Regions uses its academic and sports sponsorships to advertise directly to students who Regions targets for its consumer banking business (*See* PX 172, 303, 304, 314, 355) and for its large student loan business.[8] (*See* PX 178, 194, 195, 296, 323, 344)

Regions also has provided to universities and colleges academic scholarships, usually for students in the business schools. Schools receiving Regions scholarships include the University of Alabama, Auburn University, Alabama State University, Alabama A&M, Florida State University, Clark Atlanta University, Southern Methodist University and Texas Southern University. (PX 251-258).

Regions has also obtained rights to name tournaments and even a stadium with its REGIONS brand as additional means of paid sponsorship. For example, Regions sponsors and has named the REGIONS CHARITY CLASSIC golf tournament in Birmingham and Hoover, Alabama and the REGIONS MORGAN KEEGAN tennis tournament in Memphis, Tennessee. (Peters ET; Peters Decl. ¶ 7, PX 1010; PX 428 at RAC 32257-59, PX 1011 at RAC 5356) The baseball stadium in Birmingham is named REGIONS PARK. (Peters ET; Peters ¶ 5, PX 1010; PX 428 at RAC 32269). REGIONS PARK is publicized as being the home of the Birmingham

---

[7] Universities have often named buildings after financial institutions who sponsor or donate money to universities. For example, Wells Fargo Arena at Arizona State University; Chevy Chase Bank Field at the University of Maryland; BankUnited Center at the University of Miami; TCF Bank Stadium at University of Minnesota; BB&T Field at Wake Forest University; Bank of America Arena at University of Washington; First United Bank Center at West Texas A&M. (Miller Decl. Exs. A and C, PX 492 and 494)

[8] Regions University students alone have received hundreds of thousands of dollars in student loans from Regions. (PX 50, 51)

Barons baseball team, the SEC baseball championship tournament, high school football games, concerts, business meetings and group outings. (PX 428 at RAC 32269)

(2)    **REGIONS Brand Messages and Personality**

The REGIONS brand is promoted and advertised with a consistent message and theme. REGIONS advertisements project confidence. (Creative Briefs, Peters Decl. ¶ 3, PX 1010; PX 232-245). Regions' chief marketing officer, Scott Peters, testified, "Everyday Confidence is a credo, not just a tagline, and the company works hard to convey that through its advertising." (*See* PX 233 at RAC00031144-46; *see e.g.,* Peters Decl. Ex. A, PX 1011).

b.    **Consumer Awareness of REGIONS**

The fame of the REGIONS brand has been tracked by Regions for many years through scientific market research surveys.[9]  Regions had studies conducted by an independent market research company, New South Research, for business purposes and used the results to make important business and marketing decisions.  This market research demonstrates a consistently high level of consumer awareness of the REGIONS name and brand in Alabama and throughout the Regions' business footprint.

In July 2007, Regions conducted a brand awareness study that showed aided awareness[10] of REGIONS of 98% in Birmingham, 93% in Mobile, 87% in Nashville, 91% in Memphis, 96% in Jackson; 83% in Atlanta, 78% in St. Louis, 84% in New Orleans: 69% in Indianapolis, 54% in Miami, 43% in Orlando and 44% in Tampa. (PX 265) The awareness of REGIONS for

---

[9] Regions spent more than $2.3 million on market research in 2006 and budgeted $2 million for 2007, in addition to $2.8 million in 2006 and 2007 for consumer and market research targeted to the merger of AmSouth into Regions. (Tankersley Decl. ¶ 2 and Ex. A, PX 1014, 1015)

[10] The study asked respondents the following question: "Which of the following banks or financial services companies are you aware of? (Read list and rotate and circle all yes answers) Birmingham – A AmSouth B Compass C Regions D Wachovia." (PX 266)

9

Montgomery would be at least as high as the 98% aided awareness found in Birmingham because Montgomery has historically had a higher awareness of REGIONS than Birmingham. (Jager Decl. ¶ 8, PX 499)

A 2000 quantitative study showed similarly high awareness results. (PX 217) This study, which consisted of monthly telephone surveys in several different locations where Regions does business,[11] showed REGIONS was the market leader in awareness in 4 of the 6 markets tested with Regions banks: Alabama, Florida, Georgia/South Carolina, and Arkansas/Texas and was second in Tennessee and Louisiana. (PX 217 at RAC 22376) Of the five markets tested, Regions had the lowest cost of awareness – meaning Regions incurred the least cost related to awareness. (PX 217 at 22378) This reflects the acquired strength of the REGIONS brand. (Askew ET) This 2000 study also shows Regions with 83% customer satisfaction in Alabama and 77% overall satisfaction in the markets studied. (PX 217 at RAC 22398-22399)

Market research studies conducted in 2001, 2002 and 2003 showed similarly high results with Regions leading or tied for first in market awareness for several of its key markets. (PX 218-220) These studies also demonstrate the consistently strong brand awareness enjoyed in Alabama. In 2001, 2002 and 2003, Regions was the market leader in Alabama for consumer awareness, consumer predisposition toward Regions, and account share. (PX 218 at RAC22639, PX 219 at RAC22825 and PX 220 at RAC22903)

---

[11] Regions conducted similar monthly surveys since the early 1990s. (Askew ET; Expected testimony of Jim Jager, president of New South Research) In Alabama alone, the surveys were conducted in Birmingham, Mobile, Montgomery, Huntsville, Tuscaloosa, Dothan and Gadsen. (PX217)

### 5.    Regions' Enforcement Efforts

Regions has policed its REGIONS mark against potential infringers. (Dunman ET, Askew ET, PX 350)  Over the years, Regions has obtained trademark search reports for REGIONS marks to protect its name. (*See e.g.* PX 331)  Regions also receives monthly trademark watch reports for the REGIONS marks. (DX 108)  Over the years, Regions has sent out over 250 cease and desist letters objecting to possible uses of marks or names that might infringe the REGIONS marks. (PX 350)  When necessary, Regions filed trademark oppositions to prevent another from infringing its REGIONS mark. (Marmer Decl. ¶ 8 and Ex. G, PX 366, 1006)  The success of Regions' enforcement efforts has been shown by defendant's evidence.

Defendant has submitted eight affidavits from two investigators and a paralegal to try to show third party use of the word REGIONS as a business name in Regions' 16 state footprint. (*See* DX 504-519, 548-599, 602-687)  A review of the paper (more than 1000 pages) offered by defendant demonstrates that actual use of the name REGIONS is *de minimis*. Defendant has failed to identify any other business or entity that uses the name REGIONS as a brand or business name in any television, radio or billboard advertising – other than REGIONS UNIVERSITY.

In Alabama alone, defendant contends there are 15 entities, other than the parties to this suit, that use the name REGIONS.[12]  Defendant is wrong.  Eight of these entities use the word "Region," not "Regions" and this use refers to a particular geographic area such as "Gulf

---

[12] Regions Construction Company, LLC; Regions Pest Control; Regions Propane; Regions Real Estate; Region Computer Services, Inc.; River Region Appraisals, LLC; River Region Home Inspections, LLC; Regions Facility Services, Inc.; Gulf Region Information Technology Services, LLC, River Region Hospital, LLC; River Region Veterinary Services, P.C.; River Regions Developers, LLC; River Regions Realty, LLC; Region 2020, Inc.; River Region Productions, Inc.(no longer in business).  (DX 594 ¶¶ 6(a)-(e); 7(a)-(h), 9(g); DX 603 ¶ 2, 3)

Region" or "River Region." Defendant's investigator, Stephen Stricklin, who called many entities in an effort to develop proof of use, admitted that "region" is used geographically. (DX 594 at ¶ 7) Stricklin further admits that two companies, Regions Propane and Regions Computer Services, Inc., no longer use the name "Regions." (DX 594 at p.5-6) A third entity identified by Stricklin, Regions Real Estate, has agreed to change its name at Regions' request. (PX 350 at RAC00041442) Moreover, Regions Construction Company, which has been sent numerous protest letters by Regions, appears to have stopped using Regions in its name. (Allan Decl., PX 1029-1032). The last entity cited by defendants in Alabama, Region 2020, operates under a license agreement with Regions. (PX 137) Regions Pest Control, a small business in Trafford, Alabama, with limited sales and no advertising, is the *only* company in Alabama to use REGIONS in its name other than the parties.

The remaining third party evidence defendant has offered further proves the success of Regions' enforcement efforts. Attached as Exhibit B is a chart summarizing the third party evidence provided by defendant. As set forth in Exhibit B, there is very little evidence of third parties actually using the word "Regions" in their business name. There is no evidence of any third party use of the word "Regions" by entities that market to consumers through mass media outlets such as television and radio. Regions' marketing expert, Dr. Abernethy, has analyzed the third party use evidence presented by defendants. He is expected to testify that the Regions brand and name is not materially weakened by Defendant's evidence. (Abernethy ET) This conclusion is supported by the significant brand awareness REGIONS enjoys throughout Regions footprint.

12

**B.    The Defendant, Southern Christian University, Now Regions University**

**1.    The Defendant's Services and Advertising**

Defendant Southern Christian University, now Regions University, is located in Montgomery, Alabama. (Stip. Fact 35) It offers educational services online. (*See* Stip. Fact 41) The school has a non-profit tax status and is affiliated with the Churches of Christ. (*See* Stip. Fact 36) Ninety-seven percent (97%) of defendant's income comes through tuition and fees. (Turner ET[13]) The defendant runs its educational services business in the black. (Crosby ET[14])

Defendant advertises 33 degree programs. (PX 44, 45, 47, 69 at RU 1628-29) All students take their courses online.[15] (*See* Stip. Fact 41) Defendant recently began offering accredited business degrees in the Fall semester 2005. (PX 113 at RU 1970) These degrees include a Bachelor of Science degree in Business Administration – General Business, Business Administration – Information Communication, Business Administration – Information Systems Management; Master of Science in Leadership and Management; Master of Arts in Behavioral Leadership and Management. (PX 113 at RU 1970, 2160-2168)

The school's admissions are online. Standardized tests are not required for students over 21 applying for undergraduate courses, many programs do not require letters of recommendation, class ranking is not required, an essay is not required, and the application requests no information concerning extra curricular activities. (PX 113 at RU 2015 *et seq.*) If an applicant has a high school diploma or its equivalent – and the tuition – the applicant will be admitted to

---

[13] Expected testimony of Rex Turner, Jr., president of defendant.

[14] Expected testimony of Anita Crosby, chief accountant for defendant.

[15] Some doctoral candidates have to take some courses at the school's Montgomery headquarters to satisfy residency requirements. (Crosby ET; *see e.g.*, PX 113 at RU 2493)

13

the undergraduate school. (Turner ET; Crosby ET)  For transfer students, transfer is
unconditional, if a student has a GPA of 2.0.  (PX 113 at RU 2019)

Around 730 or 740 students are enrolled at defendant in its Fall and Spring semesters; the
Summer semester enrollment is about 560 students.  (Crosby ET; Stip. Fact Nos. 61-63; PX 498)
Ninety-nine percent of the students came from the United States in 2006.  (PX 17)  Two hundred
and forty (27.4%) of the total are from Alabama.  Seventy percent are from the 11 southern
states.[16]  (PX 17)

### 2.    Defendant's Advertising: Expenditures, Geographies and Target Audience

The goal of defendant's advertising is to generate tuition paying students. (Turner ET;
Costanza ET[17]) Defendant spent $1,251,012.76 advertising its educational services in its 2006-
2007 fiscal year,[18] an increase of $540,000 over the advertising expenditures of the prior year.
(*See* Stip. Fact 56; PX 123; Crosby ET)  In the 2004-2005 fiscal year, the advertising
expenditures were $637,000; in 2003-2004, the expenditures were about $555,000.  (Costanza
ET; Crosby ET)  In 2006-2007, eighty-five percent of the defendant's advertising expenditures
were on TV, radio and billboards placement and production.  (Stip. Fact 59; Crosby ET)  Twelve
percent of defendant's advertising expenditures, about $150,000, consisted of Internet
advertising.  (Stip. Fact 57)  Three percent, about $40,000, consisted of print advertising.  (Stip.
Fact 58)  Defendant has budgeted approximately $1,200,000 in advertising for its 2007/2008
calendar year.  (PX 48)

---

[16] Alabama, Arkansas, Texas, Mississippi, Louisiana, Florida, Virginia, North Carolina,
South Carolina, and Georgia.

[17] Expected testimony of Laina Costanza, defendant's web designer and advertiser
through her company, Blue Group.

[18] Defendant's fiscal year is from July 1 to June 30.

All defendant's advertising promotes an 800 number directing inquiries to its recruiters, called "advisors," and defendant's website address. Any requests for information from prospective students from its site are followed up by a call from a recruiter within 30 minutes. (PX 496) Defendant determines the effectiveness of its advertising by the number of student inquiries. (Costanza ET)

Geographically, defendant's advertising in 2006 and planned advertising in 2007 focused on the South. The geographical concentration of its advertising is Alabama, Tennessee, Texas and the Carolinas. (PX 48, 123) In 2006, all defendant's advertising expenditures except some Christian magazines, was in the South. (PX 48, 123)

The target market for the school and its advertising is "an individual 25 – 55, young professional or a mother at home, someone who needed to finish their degree or is transferring, someone who wants to further their education, someone who already has a bachelor's." (Costanza ET)

### 3.    The Adoption of REGIONS by Defendant

Southern Christian University began its name change to Regions University on August 2, 2006. (Stip. Fact 42) The name was changed to increase business school enrollment, to make the school's name as one palatable outside the US, and to assist defendant in appearing to be a nationally recognized and prominent school. As the school's president, Dr. Rex Turner, Jr., told his Board on September 25, 2005, the school "needed to increase enrollment in areas such as business in order to support our degrees in the Turner School of Theology." [19] The Southern Christian University name did not fit the school's recent business degree offerings: "the name

---

[19] Approximately ten percent of the enrollment is in the Turner School of Theology. (PX 498). There were 10 Ph.D candidates in the Turner School of Theology in the Fall semester of 2006. (PX 498)

'Christian' does not serve our business degrees well." (PX 20 at RU 110) The Board's September 25, 2005 minutes also stated:

> This highlights our need – we need a *for-profit type name* that is a broad name. This would bring in students that would help fund the degrees in the Turner School of Theology.

(Emphasis added) (PX 20 at RU 110) The word "Christian" in the name was limiting because certain countries such as China would not permit Christian institutions to operate in their boundaries. (PX 20)

The resolution of the Board on July 28, 2006, giving Dr. Turner authority to change the name to REGIONS UNIVERSITY states that name REGIONS UNIVERSITY was chosen to "increase the school's attractiveness to potential students, not just regionally but internationally," and "changing the name will also assist the University *in projecting itself as a nationally recognized university of prominence*." (Emphasis added) (PX 31)

Originally, the university was going to change its name to Masters University. The name "Masters" was chosen over "Turner," the name of the school's founders and the Turner School of Theology because of concern with a possible association with Ted Turner. The December 16, 2005, Board minutes stated the concern with the "Turner University" name: "some might think that it was named after Ted Turner." (PX 22 at RU118)

The Board on December 16, 2005, determined that before it made a final determination to rename the school MASTERS UNIVERSITY, the school should obtain a service mark registration of the name. (PX 22 at RU118) Southern Christian University applied to register MASTERS UNIVERSITY on December 19, 2005, in the United States Patent and Trademark Office ("USPTO"). (PX 367) Later, on March 17, 2007, Rex Turner was given approval by the Board to change the name of the school to Masters when the mark was registered. "We will not officially change over our name until we have a trademark." (PX 23, RU134)

16

The MASTERS UNIVERSITY trademark application in the USPTO encountered initial difficulties. In an Office Action dated June 6, 2006, the Trademark Examiner made an initial determination that the name "Masters" was descriptive of educational services and would not be entitled to registration on the Principal Register.[20]  (Office Action June 22, 2006, PX 26 at RU 140)  Also, the school's trademark attorney, James Shlesinger, indicated to Rex Turner that he had concerns about a Masters College of the Bible school in California that Dr. Turner had known about.  (Turner ET; 2006 Higher Education Directory with R. Turner Notes, DX 142 at RU 1926)

On July 7, 2006, Dr. Turner reported to his Policy Review Team that these developments would delay the adoption of MASTERS UNIVERSITY by a couple of months.  (PX 25 at RU 148)  Ultimately, the USPTO withdrew the rejection based on descriptiveness and determined that MASTERS UNIVERSITY was registrable on the Principal Register.  (PX 367, 1025)  The MASTERS UNIVERSITY mark was published in the Trademark Office's *Official Gazette* on November 13, 2007.  (PX 1025)

In July of 2006, Rex Turner decided to consider further names.  Among the names considered were Rex, Royale, Greystone, Providence, Regal, Turner and Regions.  The REGIONS name was Dr. Turner's idea.  (Turner ET)  Dr. Turner has banked with REGIONS since 1974 and remembers REGIONS television commercials and newspaper ads.  (Turner ET) He regularly sees REGIONS signs driving around Montgomery, and he is aware that two of the tallest buildings in Montgomery bear REGIONS signage.  (Turner ET)  Dr. Turner was aware of stories in television and newspapers in 2006 concerning the Regions/AmSouth merger prior to the adoption of the Regions name.  (Turner ET)

---

[20] Descriptive marks are permitted registration on the Supplemental Register.  Trademark Act § 1091.

17

Dr. Turner narrowed his list to three names:  TURNER UNIVERSITY, REX UNIVERSITY and REGIONS UNIVERSITY.  In a call on July 24, 2006, Dr. Turner asked Mr. Shlesinger for an opinion of the registrability of these names.  (Turner ET)  In this call, Dr. Turner mentioned to Mr. Shlesinger that "there is a REGIONS  bank here" and Mr. Shlesinger commented "well, I don't know anything about them up here in Virginia."  (Turner ET)  Dr. Turner did not respond to Mr. Shlesinger's comments or explain anything about REGIONS. (Turner ET).

On July 27, 2006, three days later, Mr. Shlesinger sent Dr. Turner an email concerning the "registrability" of the marks TURNER UNIVERSITY, REX UNIVERSITY, and REGIONS UNIVERSITY.  (PX. 28)  Mr. Shlesinger said that TURNER UNIVERSITY might encounter difficulties in the USPTO because of confusion as to sponsorship with some Turner companies. REX UNIVERSITY and REGIONS UNIVERSITY appeared "registrable."  (PX 28)  There was no discussion in the e-mail concerning the REGIONS mark or REGIONS bank nor did it contain an opinion regarding the risk of objection for infringement or dilution arising from Regions or anyone else.  (PX 28 at RU 179)  There was no reference to the *use* of any mark – only marks that were registered on the USPTO.  (*See* PX 28)  The e-mail does not refer to any mark containing the word "REGIONS" as its distinctive element.  Shlesinger's email states that a "full report" and a search would be provided.  However, there is no indication that the school received either the full report or the search.  (Turner ET)

July 27, 2006, also was the first time Rex Turner advised anyone at defendant that he was considering REGIONS UNIVERSITY as the school's name.  (Turner ET)  This was in a Policy Team Meeting.  (PX 27)  The next day, Friday, July 28, 2006, the Board granted Rex Turner the

18

authority to rename the school REGIONS when he deemed fitting. (Stip. Fact 43; DX 144) The Alabama Secretary of State name change application was also executed on July 28th. (PX 446)

On the following Monday, July 31, 2006, when Dr. Turner announced at the Policy Team Meeting of the intended adoption of REGIONS UNIVERSITY, he was advised that REGIONS bank has a REGIONS UNIVERSITY. According to the minutes of the meeting, Dr. White, a team member, "contacted the trademark attorney's office to ensure that this would not pose a problem." and was advised that there was no impediment to registration. (PX 32)

On August 2, 2006, defendant began answering its telephones "REGIONS UNIVERSITY." (Turner ET)  An official announcement of the name change to REGIONS UNIVERSITY was sent out by email to the students on August 8, 2006, and a letter to students was mailed August 16, 2006. (PX 33, 34) Defendant later sent the same name change in a letter to its "friends" in December 2006. (PX 38)

Laina Costanza is defendant's full time web designer and does the marketing and advertising for defendant through her advertising agency, Blue Group. (Turner ET; Costanza ET and Crosby ET) Ms. Costanza admitted that she thought of REGIONS bank when Dr. Turner told her that he was changing defendant's name to REGIONS UNIVERSITY. (Costanza ET) Also, she went to Regions' website within days of the adoption of the REGIONS UNIVERSITY name. (Costanza ET) She chose the following font for REGIONS UNIVERSITY (Stip. Fact 50):

# REGIONS UNIVERSITY

The font predominantly used by Regions at that time was (Stip. Fact 18):

# REGIONS △.

On August 18, 2006, Regions sent to defendant its first objection to the use of REGIONS

UNIVERSITY. Regions sent a subsequent objection on September 14, 2006. It sued defendant

on September 29, 2007.

### 4.    Promotion of REGIONS UNIVERSITY

Defendant did not begin to advertise REGIONS UNIVERSITY to the public on

television, radio and billboards until 2007. (Stip. Facts No. 54 and 60) The REGIONS

UNIVERSITY advertising began in February of 2007 in Alabama's two largest cities,

Montgomery and Birmingham, and in Tennessee's two largest cities, Nashville and Memphis.

Defendant spent $127,136.00 for this advertising. (PX 48 at RU 1603) The 2007 Media

Placement Plan was for expenditures of $831,500 on television, radio and billboard in large cities

in the states of Alabama ($195,000), Tennessee ($163,000), North Carolina ($109,000),

Louisiana ($96,000), Texas ($70,000), Virginia ($69,000) and Florida ($63,000). (PX 48) In the

cities of Alabama where REGIONS UNIVERSITY advertised, recognition of the REGIONS

brand approaches 100%. (PX 265) The recognition of REGIONS in Nashville is 87% and in

Memphis is 91%. (PX 265) The only local print advertising planned was in Montgomery. (PX

48 at RU1606) The only local Yellow Pages advertising planned was in Montgomery and

Nashville. (PX 48 at RU1606; PX 477)

The REGIONS UNIVERSITY television, radio and billboard advertising does not refer

to SOUTHERN CHRISTIAN UNIVERSITY or indicate that REGIONS UNIVERSITY was

known by any other name. The television commercial's voiceover (the same as the radio spot)

is:

> How far are you willing to go for the education you need?
> Why not start with the university that brings the world to you?
> Offering 33 academic degree programs, Regions University is an
> accredited institution with the faculty and technology to bring you the on-
> line education that works for you.

Visit us online at www.regionsuniversity.edu or call 1-888-790-8080.
With Regions University, you can get there from here.
Are you ready for your future?

(PX 44, 45)  The commercial plays light music in the background showing a globe followed by

many fluid images in bubbles of a lecturer, a young mother picking up her child while looking at

a computer screen, a graduate, a young mother looking at a computer screen, a young mother

reading to her child, and ending with the name "REGIONS UNIVERSITY" along with either the

tagline "Where Traditional and Online Education Merge" or "A Christian University."  (PX 482,

483; Costanza ET; Turner ET)

In October 2007, defendant removed the SOUTHERN CHRISTIAN UNIVERSITY

signs[21] from its headquarters in Montgomery and erected two large electronic signs – one with

the name "REGIONS" stacked over "UNIVERSITY" and one horizontal "REGIONS

UNIVERSITY."  (PX 474)

### 5.    The Affiliation, Connection and Association of REGIONS and REGIONS UNIVERSITY

Perceived association between REGIONS and REGIONS UNIVERSITY began

immediately.  The day following the August 8, 2006, announcement of defendant's name

change, Dr. Wilson Luquire sent an email to Dr. John White and Dr. Rex Turner of Regions

University:

"Good luck with Regions.  Is this related to the Bank and if so many I
applaud you with double congratulations!!!!!!"

(PX 35)  On the same day, there was an email, from David P. Moore: "John White just informed

me that SCU is now Regions University.  I didn't ask about the possible conflict with the bank of

---

[21] Photos of the former SOUTHERN CHRISTIAN UNIVERSITY signs appear at PX 66.

21

the same name!" (PX 35)  On August 31, 2006, a SCU alumnus, Randy Gore, wrote to

defendant: "Why was 'Regions' chosen?  Did Regions Bank make a donation?"  (PX 35)

People have come up to Dr. Turner and asked if REGIONS donated money to the school.

(Turner ET)  At least two potential students have called REGIONS UNIVERSITY to ask about

degree programs and whether REGIONS UNIVERSITY is affiliated with REGIONS bank.

(Fulghum Tr. 18; Hughes Tr. 21-23)  Regions' call center (1-800-REGIONS) has received

similar telephone calls asking if REGIONS and REGIONS UNIVERSITY are affiliated.

(Wilson Affidavit, PX 384; Burton Affidavit, PX 385)

Brian Warwick of Maynard Cooper & Gale LLC in Birmingham and Ms. Mattie Sanders

of Regions' Bank Village West Office, thought that Regions had started a university or bought a

university.  (Warwick Decl., Odom Affidavit, PX 386, 392)  Other employees, family members

of employees and customers thought that the university and Regions were related or affiliated in

some way.  (PX 1; Affidavits of Galassini, Boyd, Green, Murphy, Norris, Thompson, Rudolph,

M. Sanders, and Smith, PX 387, 389-391, 393-397)

On the Internet, Ms. Sheila Noblitt, author of the blog entitled "Alabama Kitchen Sink"

posted a conversation about public and private institutions in Alabama with the following

discussion:

> Sheila: "I started to throw in the privates in town, Faulkner, Huntingdon,
> South University and I believe, Regions University (which used to be
> Southern Christian). I don't know if I left anyone out. I think that's it…."
>
> Jay Croft: "Regions University?  Regions is a bank!"
>
> Sheila: "Jay, Regions is a bank and that's why I was puzzled that Southern
> Christian University changed its name.  I always think that the bank is
> behind the university. Ha."
>
> Jay Croft: "It's like Western Maryland College in Westminster, MD.  It is
> the only college in the USA named for a railroad.  (Western Maryland
> Railway donated the land for the college many years ago.  Westminster is

22

not in the western part of Maryland at all) A deep-pockets donor gave a
sizeable contribution and Behold! It is McDaniel College now."

(Marmer Decl. ¶ 4 and Ex. C, PX 366, 1002)

More recently, Robert Jeffrey Boles of Montgomery saw the new REGIONS

UNIVERSITY signs and thought that the school was affiliated with REGIONS. (Boles

Affidavit, PX 488) Justin Kribbs saw the REGIONS UNIVERSITY signs and thought that

REGIONS bought a university to send its bankers to for training. (Kribbs Affidavit, PX 489) A

customer of REGIONS bank showed Connie M. Wehner, Vice President and Consumer Sales

Manager at Regions bank in Dotham, Alabama a piece of paper bearing the name REGIONS

UNIVERSITY and asked her if REGIONS UNIVERSITY was related to REGIONS bank.

(Wehner Affidavit, PX 487)

## II.    LEGAL ANALYSIS

### A.    Confusion as to Sponsorship or Affiliation Constitutes Trademark
Infringement and Unfair Competition

#### 1.    Trademark Law Protects an Owner's Right to Control its Reputation

Regions brought this action to protect its name and reputation. Through years of effort,

the word REGIONS, particularly in Alabama and its core markets in the South but also

elsewhere in the United States, has come to mean Regions, its businesses, products and services.

Trademark law is the recognition of the important psychological value in our commercial world

of reputation and the marks that symbolize reputation. Justice Frankfurter famously noted that a

trademark owner's efforts "to impregnate the atmosphere of the market with the drawing power

of a congenial symbol" creates something of value that cannot be infringed. *Mishawaka Rubber

& Woolen Mfg. Co. v. S. S. Kresge Co.,* 316 U.S. 203, 205 (1942):

> Whatever the means employed, the aim is the same-to convey through the
> mark, in the minds of potential customers, the desirability of the
> commodity upon which it appears. Once this is attained, the trade-mark

23

> owner has something of value. If another poaches upon the commercial
> magnetism of the symbol he has created, the owner can obtain legal
> redress.

*Id.*

More recently, in *Inwood Labs. v. Ives Labs.*, the Supreme Court explained the harm of

infringement: "the [trademark] infringer deprives the owner of the goodwill which he spent

energy, time, and money to obtain." *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 855, n.14 (1982).

The law and the Courts recognize the vulnerability of trademarks and reputation. A

trademark "deals with a delicate matter that may be of great value but that easily is destroyed,

and therefore should be protected with corresponding care." *A. Bourjois & Co. v. Katzel*, 260

U.S. 689, 692, 67 L. Ed. 464, 43 S. Ct. 244 (1923).

The harm to the trademark owner by infringement is the loss of control over its reputation

which is symbolized by his mark. The law protects Regions and the reputation and goodwill

represented by its REGIONS mark from infringement by others. It does not matter that the use

might be for services that are not competitive or even if there is no immediate apparent

tarnishment by another's use. This is long settled law. As Judge Learned Hand explained the

basis for trademark protection:

> His mark is his authentic seal; by it he vouches for the goods which bear
> it; it carries his name for good or ill. If another uses it, he borrows the
> owner's reputation, whose quality no longer lies within his own control.
> This is an injury, even though the borrower does not tarnish it, or divert
> any sales by its use; for a reputation, like a face, is the symbol of its
> possessor and creator, and another can use it only as a mask.

*Yale Electric Corp. v. Robertson,* 26 F.2d 972, 974 (2d Cir. 1928).

Thus, a trademark owner is harmed regardless of whether the junior user's products or

services are of good or bad quality: "Even if the defendant is presently making a fine product,

there is no assurance that he will always continue to do so; and so control over the plaintiff's

reputation is in the defendant's hands." Louis Altman, *Callmann on Unfair Competition,*

*Trademarks, and Monopolies* § 21:4 (4th ed. 2007) (cited with approval by *Champions Golf*

*Club, Inc. v. Sunrise Land Corp.*, 846 F. Supp. 742, 756 (W.D. Ark. 1994)). The same is true for

non-competitive goods and services: "To permit a non-competitive business to create confusion

by the use of a similar mark would subject the first user of the mark to the risks and hazards of

another's business." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §

24:15 (4th ed. 2007). *See also The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d

955, 964 (2d Cir. 1996) (holding that use of the mark on a non-competitive product would

confuse consumers as to whether the plaintiff sporting goods store sponsors the defendant

restaurant, "with a resulting loss of control by [the plaintiff] over how the public perceives [the

restaurant's] stores and the services that they provide").

### 2.    Likelihood Confusion of Source, Affiliation, Association or Sponsorship Is Trademark Infringement and Unfair Competition

The scope of protection afforded a trademark and the point at which trademark

infringement (and unfair competition) occurs depend upon whether the second comer's use of its

mark is likely to cause confusion.   Sections 32 and 43(a) of the U.S. Trademark Act, 15 U.S.C.

§§ 1014 and 1125(a). This confusion includes confusion as to source and to sponsorship,

connection, affiliation and approval. The protection against likely confusion as to sponsorship

and affiliations is an explicit statutory right:

> Any person who, on or in connection with any goods or services . . . uses
> in commerce any word, term, name, symbol or device, or any combination
> thereof, or any false designation of origin . . . which – (A) is likely to
> cause confusion, or to cause mistake, or to deceive as to the ***affiliation,***
> ***connection, or association*** of such person with another person, or as to the
> ***origin, sponsorship, or approval*** of his or her goods, services, or
> commercial activities by another person . . . shall be liable in a civil action
> by any person who believes that he or she is or is likely to be damaged by
> such act.

15 U.S.C. §1125(a).

The broad protection against confusion against sponsorship and affiliation merely reflects the law's recognition of the human propensity (and the marketing reality) that persons are judged by the company they keep and the alliances they make. Marketers spend billions each year for sponsorships, endorsements and licenses by universities, sports teams, celebrities and brands based on the beneficial effect of this propensity. Because sponsorship joins the reputation of sponsor and sponsored, marketers are quick to disassociate themselves if either an endorsing party or an endorsed party becomes involved in a scandal.[22]

A great number of cases recognized that the owners of well known marks have the right to prevent others from using the same or similar marks that would likely cause an appreciable number of persons to believe that the adopted mark indicates the trademarks owner's affiliation, sponsorship or approval of the second comer. "[T]he unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement." *American Farm Bureau Fed'n v. Alabama Farmers Fed'n*, 935 F. Supp. 1533, 1546 (M.D. Ala. 1996), citing *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983). *See also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement."); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 968 F. Supp. 568, 572 (D. Col. 1997) ("[P]laintiff need only prove that the public is likely to be confused . . . about affiliations or sponsorships among the parties and their products or services."); *Schieffelin & Co. v. The Jack Co. of Boca, Inc.*, 850

---

[22] This psychological reality is reflected in political campaigns where candidates are judged by their supporters; endorsements are sought; and contributions are often returned if the contributor has some antithetical position or past.

26

F. Supp. 232, 242 (S.D.N.Y. 1994) ("[P]laintiff need not prove that consumers would believe that Schieffelin actually produced and marketed defendants' goods; rather 'the public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.'"); Anne Gilson Lalonde, et al., *Gilson on Trademarks* §5.01[3][b] (2007) ("With this type of confusion [sponsorship], consumers believe that the plaintiff approves of the defendant's product and the defendant thereby benefits from the plaintiff's good will and reputation").

A number of sponsorship confusion cases involve universities. The Eleventh Circuit case of *University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535 (11th Cir. 1985), is illustrative. There, the University of Georgia, whose nickname was the "Bulldogs" and owned a registration of BULLDOGS with a picture of a bulldog wearing a sweater with a "G," sued a beer brewer who sold, in Georgia, BATTLIN' BULLDOG BEER, with a similar picture of a bulldog and a disclaimer of association with the school. *Id.* at 1537. The defendant claimed confusion was not likely because of extensive third-party use of the same or similar marks and because no one would believe that the university was the source of the beer. The Court held that actionable confusion under trademark and unfair competition law included confusion as to the sponsorship of the product caused by the use of a similar mark. *Id.* at 1546.

Similarly, in *University of Pittsburgh v. Champion Products, Inc.*, 686 F.2d 1040 (3d Cir. 1982), the court found confusion where defendant sold t-shirts with the university's marks. The court held, "In this case, there is no consumer confusion in the traditional sense. No one would seriously assert that a significant segment of the public believes that Pitt actually manufactured the goods involved." *Id.* at 1047. Rather, the issue involved confusion as to sponsorship and the defendant's profiting from the plaintiffs' goodwill. Champion "seeks to profit from Pitt's

27

investment, particularly in its athletic program." *Id. See also Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College v. Smack Apparel Co.*, 438 F. Supp. 2d 653 (granting summary judgment to plaintiffs because the defendant's use of the color schemes and trademarks of the schools would cause consumers to be confused as to the sponsorship or endorsement of the schools).

The harm and the basis for a finding of infringement in these cases (and other non-competitive trademark and unfair competition cases) is that the unapproved use of the school's mark (or a similar mark) cause schools to lose control of their reputation and goodwill represented by their marks. *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 310 (E.D. Pa. 2000) ("The irreparable harm to Villanova University includes the loss of control of its reputation and loss of good will engendered by actual or likely confusion."); *The Board of Trustees of the University of Arkansas v. Professional Therapy Services, Inc.*, 873 F. Supp. 1280 (W.D. Ark. 1995) (finding infringement of the university's RAZORBACK mark (despite 140 separate Arkansas business telephone listings with Razorback in their names) where a health clinic changed its name to RAZORBACK SPORTS AND PHYSICAL THERAPY because of a likelihood of confusion and a serious risk to the University that it will lose control over its public image).

Similarly, confusion as to sponsorship occurs where consumers are confused into believing that a celebrity or public figure has actively associated himself or herself with the product, sponsoring or approving it. Gilson § 7.02[6][e]. An example is *Wendt v. Host Int'l, Inc.*, 125 F.3d 806 (9th Cir. 1997), where the use of animatronic robots that looked like the stars of the television show "Cheers," in airport bars could cause persons to believe that the plaintiffs sponsored or endorsed the bars. The confusion was not confusion as to the source of the bar but

rather confusion as to the celebrities' endorsement of the bar and whether the celebrities gave permission to the bar to use their images. *Wendt*, 125 F.3d at 812-814.

As the law of trademark infringement prohibits a free ride on the goodwill of another and the harm that such a free ride entails, the use of another's mark to gain legitimacy, initial interest or otherwise to utilize a favorable connotation with an established brand, celebrity or business is prohibited even if the confusion of some persons is ultimately dispelled or occurs after a sale. The benefit is gained and damage has already been done. The infringer has benefited from its free ride on the trademark owner's name and goodwill by bringing patrons in. In a non-competitive goods and services case, the Fifth Circuit explained this principle: "Despite the confusion being dissipated, this initial-interest confusion is beneficial to the Defendants because it brings patrons in the door. . . . Once in the door, the confusion has succeeded because some patrons may stay, despite realizing that the [defendant] bar has no relationship with [the plaintiff]." *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 204 (5th Cir. 1998). *See also Brookfield Comm'ns v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1057 (9th Cir. 1999) (explaining that one harm of this kind of confusion is that the defendant uses the plaintiff's goodwill and thereby gains customers); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987) (explaining that by appropriating the plaintiff's goodwill, defendant gains credibility initially because customers think that the defendant is related to the plaintiff). The defendant, like Regions University, uses the association that consumers make between the defendant and the plaintiff, here Regions, to gain a competitive advantage. *Foxworthy v. Custom Tees, Inc.*, 879 F. Supp. 1200, 1215 (N.D. Ga. 1995) (explaining that the defendant's goods "utilized the association to gain a competitive advantage. . . . Confusion should be measured

based on an initial understanding, rather than an understanding that may develop after careful reading of the material.").

### 3.    Actual Confusion Has Occurred

#### a.    The Confusion is Real and Concrete

Actual confusion is rare, but when it is in evidence, it is the best evidence of likelihood of confusion. *Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1543 (11th Cir. 1986) *(*citing *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir. 1980). And, there is significant evidence of confusion. Dr. Turner admits that persons have inquired of him whether Regions University is affiliated with Regions Bank. (Turner ET) The day after the first announcement of the REGIONS UNIVERSITY name change, August 9, 2006, defendant received an inquiry about a connection with REGIONS. (PX 35) Inquiries about the connection of REGIONS UNIVERSITY and REGIONS have come from an alumnus of defendant ("Did Regions Bank make a donation?") (PX 35) and two prospective students (Fulghum Tr. 18:7-15; Hughes Tr. 21:6 – 12:4), at least two calls to 1-800-REGIONS (Wilson Affidavit, PX 487; Burton Affidavit, PX 385), other REGIONS customers and REGIONS employees (Boyd Affidavit; Green Affidavit; Murphy Affidavit; Norris Affidavit; Thompson Affidavit; Odom Affidavit; Rudolph Affidavit; Smith Affidavit), and on the Internet (PX 1002).

More recently, REGIONS has obtained evidence of further inquiries as to the relationship of REGIONS UNIVERSITY and REGIONS. (Wehner Affidavit, PX 487; Kribbs Affidavit, PX 489; Boles Affidavit, PX 488)

The Eleventh Circuit has time and again held that these kinds of inquiries as to affiliation are evidence of actual confusion. In *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 843-44, 222 U.S.P.Q. (BNA) 10 (11th Cir. 1983), three independent inquiries into affiliation supported a finding of actual confusion. In *Coach House Restaurant, Inc. v. Coach*

*and Six Restaurants, Inc.*, 934 F.2d 1551, 1563, 19 U.S.P.Q.2d 1401 (11th Cir. 1991), the Court found an earlier finding of no actual confusion erroneous because it did not consider inquiries as to affiliation between the restaurants which must have been influenced by the similar marks.  In *University of Ga. Athletic Ass'n*, 756 F.2d at 1547, n.28, the court found that where ten to fifteen people inquired about the connection between the University and the "Battlin' Bulldog Beer," it was evidence that some people "do assume that products bearing the mark of a school or sports team are sponsored or licensed by the school or team."  In *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167, 216 U.S.P.Q. (BNA) 599, 604 (11th Cir. 1982), the court held that one consumer inquiry, coupled with a misdirected letter, was sufficient evidence of actual confusion to be "worthy of some consideration."  In *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 9 F.Supp.2d 1347, 1360 (S.D. Fla. 1998), the court held that "instances of [actual] confusion include consumer inquiries regarding possible affiliation between the parties...."  The same court found in *Breakers of Palm Beach, Inc. v. International Beach Hotel Development, Inc.*, 824 F. Supp. 1576, 1580, 28 U.S.P.Q.2d 1606 (S.D. Fla. 1993), that evidence of actual confusion included regular inquiries from hotel guests whether the plaintiff and the defendant were affiliated.  In *Nassau v. Unimotorcyclists Soc. of America, Inc.*, 59 F.Supp.2d 1233, 1240-41, 51 U.S.P.Q.2d 1261 (M.D. Fla. 1999), the court, quoting *Popular Bank of Florida*, 9 F.Supp.2d at 1360, recognized that consumer inquiries regarding affiliation of the parties is acceptable evidence of actual confusion.

Many courts in other circuits agree that for sponsorship confusion, inquiries as to affiliation of the parties evidence actual confusion.[23]  The reason is simple: where the defendant

---

[23] *Susan's Inc. v. Thomas*, 26 U.S.P.Q.2d 1804, 1993 WL 93333, at *5 (D. Kan. 1993) ("It is logical to conclude that these inquiries are evidence of some confusion regarding plaintiff's possible affiliation with defendant's business"); *Country Floors, Inc. v. Partnership*

31

causes confusion as to sponsorship, people inquire as to a possible affiliation because they think that there is a relation. *Gideons International, Inc. v. Gideon 300 Ministries, Inc.*, 94 F.Supp.2d 566 (E.D. Pa. 1999).

It is clear that people think Regions gave money to defendant and that defendant changed its name to Regions University because of it. The reason that persons have been confused in this manner is that they are used to seeing universities, schools within universities and buildings at universities named after persons and corporations who have donated money or sponsored the university in some way. It is common knowledge that universities name schools, buildings, arenas, stadiums, and even themselves after persons, natural and juristic, who donate large sums of money. Mr. George Jackson Allen of the Southern Association of Colleges and Schools gave Duke University and Eckard University as examples of such schools and said that he recognized that as a common practice, institutions are often named for significant supporters and alumni. (Allen Tr. 32:18-25; 33:12-16) Mr. Berte gave Duke University, Southwestern University, Oral Roberts University and Babson College as examples. (Berte Tr. 38:20-39:11)

Other examples of universities that are named for major donors are Duke University, Clemson University Harvard University, Vanderbilt University, and Yale University.[24] For these and other examples, see Miller Decl. Ex. A-C, PX 492-494. University buildings named after financial institutions include Wells Fargo Arena at Arizona State University; Chevy Chase Bank

---

*Composed of Gepner and Ford*, 930 F.2d 1056, 18 U.S.P.Q.2d 1577 (3rd Cir. 1991); *Bonte, Inc. v. Bonte Epicure*, 1993 WL 148954 (S.D.N.Y. 1993); *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 6 U.S.P.Q.2d 1977 (7th Cir. 1988); *Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 22 U.S.P.Q.2d 1773 (5th Cir. 1992); *Steinway & Sons v. Demars & Friends*, 210 U.S.P.Q. 954, 1981 WL 40530 (C.D. Cal. 1981).

[24] Yale Lock Manufacturing Company was named after Linus Yale, Jr., a famous inventor of locks, particularly cylinder locks and holder of many patents for locks. (PX 1022, 1023)

Field at the University of Maryland; BankUnited Center at the University of Miami; TCF Bank Stadium at University of Minnesota; BB&T Field at Wake Forest University; Bank of America Arena at University of Washington, First United Bank Center at West Texas A&M. (Miller Decl. Exs. A and C, PX 492 and 494)

Dr. Turner and defendant's Board of Regents were aware that many people assume that a schools' adoption of a well-known name reflects a donation or a close association. Defendant's Board feared that if it named the overall university Turner University, persons would think the university changed its name to reflect a donation or association with Ted Turner, a controversial public figure with whom defendant did not want to be associated. (PX 22; Turner ET)

Such confusion has occurred with the adoption of the REGIONS name. Randy Gore, an alumnus of SCU, emailed "Why was 'Regions' chosen? Did Regions Bank make a donation?" (PX 35) Dr. Wilson Luquire asked defendant if the name change was related to Regions. (PX 35) Mr. David Moore emailed Dr. Luquire to inform him of the name change and commented that he "didn't ask about possible conflict with the bank of the same name!" (PX 35) Ms. Sheila Noblitt wrote that she thinks Regions was "behind" the name change of defendant to Regions University, and a comment posted immediately after her statement compared the situation to that of Western Maryland College, which changed its name to McDaniel University in recognition of a large donation. (PX 1002) This is a natural assumption and belief. REGIONS is extraordinarily well known and famous in Montgomery and Alabama where defendant and over a quarter of its student enrollment is located and where a defendant's greatest advertising expenditures are made. Moreover, Regions has long sponsored many universities and university conferences, contributes to many other charitable organizations in its communities and has had

events and buildings named after it such as REGIONS CHARITY CLASSIC and REGIONS PARK.

### B.    Substantial Evidence Indicates Defendant's Intent to Trade on Regions' Goodwill and Reputation

Although proof of intentional infringement is not required to establish infringement under the Trademark Act, an improper intent may alone be a sufficient basis for a finding of confusing similarity. As the Court in *Aetna Casualty & Surety Co. v. Aetna Auto Finance, Inc.*, 123 F.2d 582 (5th Cir. 1941) held, "[W]here as here, it plainly appears that there is a purpose to reap where one has not sown, to gather where one has not planted, to build upon the work and reputation of another, the use of the advertising or trade name or distinguishing mark of another, is in its nature, fraudulent and will be enjoined." *Id.* at 584. *See also Howard Johnson Int'l, Inc. v. Craven Properties Ltd.*, 2002 U.S. Dist. LEXIS 19744, at *13-14 (M. D. Fla. 2002); *Amstar Corp.*, 615 F.2d at 263. The issue is whether defendant hoped "to gain competitive advantage by associating their product with plaintiff's mark." *Haney's Café, Inc. v. Haney's Smokehouse, Inc.*, 2004 U.S. Dist. LEXIS 24959 (M.D. Fla. 2004), at *8.

There is an abundance of evidence of bad faith intent by defendant that sums to the conclusion that defendant intended to trade on the goodwill of Regions' famous REGIONS name and mark.

Because direct evidence is rarely available, courts accept circumstantial evidence as proof of defendant's intent. *Jellibeans, Inc.*, 716 F.2d at 843. Types of circumstantial evidence that courts have found probative on the issue include whether the defendant was aware of the plaintiff's mark when choosing its own and whether the defendant has a credible explanation for adoption of the mark, and the whether defendant sought advice of counsel. *Mont. Prof'l Sports, LLC v. Leisure Sports Mgmt.*, 422 F.Supp.2d 1271, 1281 (M.D. Fla. 2006) (court gave great

weight to the fact the defendants adopted confusingly similar marks when it was aware of the plaintiff's prior use); *Howard Johnson Int'l, Inc.*, 2002 U.S. Dist. LEXIS 19744, at *13 (quoting *Nailtiques Cosmetic Corp. v. Salon Sciences Corp.*, 41 U.S.P.Q.2d (BNA) 1995, 1997 U.S. Dist. LEXIS 462, at *8) ("A wrongful intent appears easy to infer where the defendant knew of the plaintiff's mark, had the freedom to choose any mark, and 'just happened' to choose a mark confusingly similar to the plaintiff's mark"); McCarthy §23:115 (explaining that such a choice may demonstrate the defendant's intent to free ride upon the reputation of the senior user's mark).

When a defendant had prior knowledge of the plaintiff's mark, the court may infer bad faith where the defendant adopts plaintiff's mark and has no credible explanation, or only a weak explanation. *Howard Johnson Int'l, Inc.*, 2002 U.S. Dist. LEXIS 19744, at *13-14 (holding that, under the circumstances, defendant's unexplained use suggests an intent to gain business by implying an association with plaintiff).[25]

Defendant knew of REGIONS prior to its adoption of REGIONS UNIVERSITY. It would have been impossible to deny it in light of the near universal familiarity of REGIONS in Alabama and Montgomery and the status of REGIONS as the largest financial institution in Alabama and its largest corporation. And, Dr. Turner, who chose the name REGIONS UNIVERSITY, admits that he has banked at REGIONS since 1974 and was aware of REGIONS

---

[25]    Even where defendant lacked purposeful intent, courts have held that "intentional blindness to the potential for confusion between his mark and that belonging to [plaintiff] was tantamount to an intent to infringe." *Choice Hotels Int'l, Inc. v. Kaushik*, 147 F.Supp.2d 1242, 1253 (M.D. Ala. 2000); *see also Frehling Enters., Inc. v. International Select Group, Inc.*, 192 F.3d 1330, 1340 (11th Cir. 1999). In *Choice Hotels Int'l*, the court found such intentional blindness where defendant was aware of plaintiff's mark yet claimed that he adopted his own, similar, mark because it "sounded like the name a national chain would use." *Id.* at 1253.

signs, advertising, renown and its announced merger with AmSouth prior to the selection of the REGIONS UNIVERSITY name.

The defendant's intention in its ultimate adoption of REGIONS as the name of its university is laid out in its stated goals for the selection of a new name appearing in the minutes of its September 26, 2005, Board meeting. The school's highlighted need for a new name was a "for-profit type name" that would bring in students for degrees in areas such as business "that would fund the degrees in the Turner School of Theology." (PX 20 at RU110) The school was conscious of the likely association of the school with a famous name – that is the reason the school rejected Turner (its founder's name). The school was afraid of an association with Ted Turner whose values are apparently antithetical to those of the school.

Further, the marketing purpose behind adopting the REGIONS UNIVERSITY name was stated explicitly in the Board's resolution on August 2, 2006, allowing Dr. Turner to adopt the REGIONS UNIVERSITY name. It states that the REGIONS UNIVERSITY name would "assist the University in projecting itself as a nationally recognized school of prominence." (PX 31)

Southern Christian University, whatever its virtues, is not a "nationally recognized school of prominence." And the school, which in 2007 finally began to promote REGIONS UNIVERSITY to students seeking business and similar degrees using the mass media of television, radio and highway billboards, made no efforts to build on or transfer goodwill that might have been represented by the Southern Christian University name. It relied solely on the name REGIONS UNIVERSITY. In Alabama, and the south, to a target seeking business degrees and the like, it is unavoidable that to many, if not most, the association of the name REGIONS UNIVERSITY was and is to REGIONS, nearly universally known as the largest Alabama business and one of the largest financial institutions in the country. Further, it is

unavoidable that defendant who was very conscious of association and meaning of its adopted name, who devoted over a million dollars in its 2006-2007 fiscal year (July 1 – June 30), who was seeking to attract business students – was aware of this association and intended to take advantage of it.

This appears from defendant's 2007 Marketing Plan. (PX 48)  The launch of the REGIONS UNIVERSITY advertising campaign in February 2007 was directed to Alabama and Tennessee, two of REGIONS' largest markets.  The other states where defendants chose to advertise the REGIONS UNIVERSITY brand were Louisiana, North Carolina, South Carolina, Mississippi, Georgia and Florida.  (PX 48).

The purpose of defendant's advertising is to generate inquiries into its toll free number or website and to obtain tuition paying students.  The use of the famous REGIONS name with its association with business, finance and success would generate interest, familiarity and credibility far more than a wholly unknown name.  Further, the belief that a respected and powerful financial institution like REGIONS supported the defendant would certainly provide the school with an instant "prominence," a second look and inquiries among business school-minded students that the school would not otherwise received.  This is a fact that was inescapable to a school so marketing savvy and so sensitive to the association of the name chosen.

The special appeal of the REGIONS name to the school is apparent from its rush to adoption.  Whereas the MASTERS name was first mentioned to the Board in September 2005, a board resolution to seek a registration of MASTERS UNIVERSITY in the USPTO was made on December 2, 2005, a resolution to allow Rex Turner to adopt the name once the mark was determined to be registrable was made in March of 2006 ("We will not officially change our name until we have a trademark" (PX 23, RU134)); further meetings and discussions concerning

37

the MASTERS UNIVERSITY occurred in the following four months when it was decided to consider other names. In stark contrast to the deliberation for MASTERS UNVERSITY, Dr. Turner first revealed the REGIONS UNIVERSITY name to the school on Thursday, July 27, 2006; Friday, the next day, the Board authorized Dr. Turner to adopt the name and executed the change of name with the Alabama Secretary of State and the following Wednesday, August 2, began answering its phones as "REGIONS UNIVERSITY."

Defendant's intent is also reflected by its adoption of the identical REGIONS name along with the generic "University" – not "Region" or "Regional", not with other words like "ALL REGIONS", "REGIONS BEYOND", "RIVER REGIONS" and not other names having the same or similar primary meaning the DOMAINS, PRINCIPALITIES, PARTS, NATIONS, WORLD, GLOBE or so on. Although defendant vehemently denies that REGIONS bank was in its mind when it chose REGIONS UNIVERSITY, that cannot be, and is not reflected by the evidence we have. Dr. Turner's consciousness of REGIONS bank is shown by the fact that on July 24, 2006 when he first mentioned outside his family his idea to call the school REGIONS UNIVERSITY on July 4, 2006 he said unbidden to his attorney: "There is a Regions bank." Laina Costanza who does the school's advertising, said REGIONS bank came to mind when Rex Turner told her that the school's name would be REGIONS UNIVERSITY. And soon thereafter she went to the REGIONS website prior to designing the school's first REGIONS UNIVERSITY logo. This logo is initial capped and uses a font remarkably similar to the prevalent REGIONS logo used at the time. (*See* PX 39, 42)

Defendant's intent and continuing bad faith is further revealed by its continued use of the REGIONS name after it became aware that people thought REGIONS UNIVERSITY and REGIONS bank were affiliated, in August of 2006 after Regions objected to defendants use of

REGIONS UNIVERSITY in August and September of 2006, after this lawsuit was filed, and before it spent any money advertising the REGIONS UNIVERSITY in mass media which began in 2007 and long before it erected its large electronic REGIONS UNIVERSITY signs in October 2007. *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1088-89 (D. Kan. 2000) (finding that evidence of actual confusion is important in determining the defendant's good or bad faith in using a mark); *First Nationwide Bank v. Nationwide Savings and Loan Ass'n*, 682 F. Supp. 965, 977 (E.D. Ark. 1988) (finding that "[b]ad faith may also be found where defendant proceeded with knowledge of plaintiff's objection").

Defendant's tenacious clinging to the REGIONS UNIVERSITY name demonstrates that if recognized, even before it had done anything to build the REGIONS brand by its own efforts, the name REGIONS had a special meaning to its target audience of potential business students in Alabama and other parts of the South. That meaning of REGIONS clearly was the reputation and good will of REGIONS.

### 1. The Registrability E-mail Does Not Change Defendant's Intent Nor Is It Reliable

Defendant seeks to absolve itself of its bad intent by relying on an e-mail opinion of its trademark attorney. But, seeking legal advice does not necessarily mean the defendant acted in good faith and was not trying to trade on the senior user's reputation. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 977-78 (11th Cir. 1983); *Marketing Displays, Inc. v. Traffix Devices, Inc.*, 200 F.3d 929, 936 (6th Cir. 1999); *AmBrit, Inc.*, 812 F.2d at 1543("[E]ven an intent to come as close as the law will allow is an intent to derive benefit from the other party's reputation and is therefore probative on the likelihood of confusion issue.").

A reasonable reliance on an opinion of counsel requires the defendant to provide all relevant facts to his attorney. *Cuisinarts, Inc. v. Robot-Coupe Int'l. Corp.*, 580 F. Supp. 634, 638

(S.D.N.Y. 1984); *see also Eco Mfg. LLC v. Honeywell Int'l, Inc.*, 2003 WL 1888988, at \*6 (S.D. Ind. 2003) (can undercut reasonableness of reliance by showing defendant did not disclose all facts to attorneys).

Rex Turner kept from James Shlesinger, whose preliminary email opinion defendant relies upon, information that would be crucial to any opinion that could be reasonably relied upon. Mr. Shlesinger works in the metropolitan Washington, D.C., area, which is outside REGIONS footprint. Dr. Turner mentioned in his phone call with Mr. Shlesinger that "there is a Regions bank here." Mr. Shlesinger commented "well, I don't know anything about them up here in Virginia." And, Dr. Turner did not say anything. He did not tell Mr. Shlesinger anything about the prominence of REGIONS bank in Montgomery or Alabama, the size of REGIONS bank or how well known it was in Alabama. His attorney then knew nothing of the strength of the REGIONS mark or other elements generally considered that would allow him to evaluate the risk that the REGIONS UNIVERSITY mark would infringe or dilute the REGIONS mark.

But, in all events, Mr. Shlesinger never evaluated whether the REGIONS UNIVERSITY mark was available for use and was never asked to provide such an opinion. Rex Turner only asked Mr. Shlesinger for an opinion concerning the registrability of the names TURNER UNIVERSITY, REX UNIVERSITY, and REGIONS UNIVERSITY. And Mr. Shlesinger's email is clear that the opinion is limited to registrability – not use. This kind of search typically is a preliminary, initial screening search of USPTO records for "knockout" purposes but not for a determination of the risk and availability for use of any reasonably significant mark or name. *See* Glenn A. Gundersen, *Trademark Searching* (2d ed. 2000), at 26. The only trademark searches that were conducted were not of trademarks in use but only of the records of the

USPTO. Moreover, the purpose of the USPTO records search was only as to the marks'

registrability

> Pursuant to your request, we conducted searches of the United States
> Patent and Trademark Office (USPTO) records in an effort to determine
> registerability of each of the above identified marks, for use in association
> with educational services at the post secondary level.

(PX 28) The email discusses "the possibility that the UPSTO may refuse registration of your

proposed mark [TURNER UNIVERSITY] on grounds of a likelihood of confusion as to

sponsorship or affiliation," and the registrability of the REX and REGIONS marks. In fact, the

email only concludes that the defendant could "consider filing applications" for two marks.

Nowhere does the email discuss the *use* of any of the marks cited or the risk of adoption and use

of the potential marks or suggest that the potential marks are available for adoption and use.

Such a search would have required a full search. "The standard full search involves a broader

array of federal and common law sources than the typical preliminary search. These typically

include federal applications and registrations, state trademark registrations, business names, and

listings from trade directories and industry databases." Gundersen, *Trademark Searching*

(1994), at 17.

The opinion contained in this email is clearly limited by the nature of the search and

evaluation and its terms to a marks' registrability in the USPTO. There is no reasonable basis for

the defendant to believe that this email provides it with a legal opinion that the mark REGIONS

is available for use or evaluates the risk of infringement or dilution arising from the use of the

REGIONS mark. Unlike Mr. Shlesinger's opinion, a reliable opinion contains analysis of both

infringement and dilution.

> This analysis takes into account the inherent similarity of the marks in
> appearance, sound, and meaning; the marketplace relationship between the
> newcomer goods or services and those of the owner of the pre-existing
> mark; the inherent distinctiveness (or lack of distinctiveness) of the pre-

41

> existing mark; and the other factors that courts consider in determining
> whether a newcomer's mark infringes an established mark. At the same
> time, counsel must also gauge the likelihood that the new mark will dilute
> any existing famous marks.

Gundersen, 2d ed., at 3. Such an analysis is crucial for a business that is selecting a new name.

"The stakes can be high -- if the advice is wrong, or simply incomplete, the problems that result

can be very disruptive and expensive." *Id.* at 97. And, the failure to commission a full search

and evaluation of infringement and dilution is downright foolish. "For most marks that involve a

significant investment or hope to enjoy a reasonably long lifespan, the decision to forego the full

search is pennywise and pound foolish." *Id.* at 89.

The defendant's knowledge regarding the nature and extent of the attorney's analysis is

considered in whether defendant reasonably relied on defendant's opinion.

Also considered is whether the "opinion contains sufficient internal indicia of

credibility." *Eco Mfg. LLC*, 2003 WL 1888988, at *5 (quoting *Thorn EMI North America, Inc.*

*v. Micron Technology, Inc.*, 837 F. Supp. 616, 620 (D. Del. 1993)). To act as a defense, the

opinion should not be conclusory, it should illustrate that counsel "analyzed the relevant facts

and explained the conclusions in light of applicable law." *Eli Lilly & Co. v. Zenith Goldline*

*Pharmaceuticals, Inc.*, 2001 WL 1397304, at *16 (S.D. Ind. 2001). The Shlesinger email is

entirely conclusory and almost completely without analysis. There is no reasoned analysis of the

many factors used to determine whether infringement and confusion is likely. This is consistent

with an opinion whose only concern was registrability and whether an application might be filed

in the USPTO and where the only risk is the modest cost of a trademark application. The lack of

analysis underscores the unreasonableness of relying on such an opinion for something like the

adoption of a new business or university name where the attendant risk in terms of expense of

advertising, signage and litigation is so high. No reasonable person could rely on such a

conclusory opinion for such an important decision. As the Federal Circuit has held, the ultimate question is whether the opinion is "thorough enough, as combined with other factors, to instill a belief in the infringer that a court might reasonably" find no infringement. *Ortho Pharmaceutical Corp. v. Smith*, 959 F.2d 936, 944 (Fed. Cir. 1992). There, of course is no such analysis in the Shlesinger email. Rex Turner did not even wait for the "full report" and "references developed" referred to in the second paragraph of the email before REGIONS UNIVERSITY was approved by the Board on July 28, the day following the email. In fact, the full report and reference never came.

The Shlesinger email gave Rex Turner the cover he was seeking to adopt Regions' REGIONS name. He gave his attorney only limited information, he received a conclusory email concerning registrability, and rushed to adoption the next day without even a full opinion as to registerability. This all is indicative of guilty knowledge, rather than an honest and reasonable belief, that the use of the REGIONS UNIVERSITY mark did not present a risk of infringement.

### C.    REGIONS is a strong and famous mark.

The reason that defendant chose REGIONS and that confusion has occurred despite the differences in services is that REGIONS is a strong and famous mark with enormous goodwill. Strong marks are entitled to protection on a wide range of goods and services. Restatement (Third) of Unfair Competition § 21, cmt i. *See also Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F. Supp. 198, 209 (D. Md. 1988) ("The extent to which he may protect this interest relates directly to the strength of his mark. While one mark may not enjoy the strength of identity to preclude use of a junior mark in a related field or neighboring market, another may enjoy such recognition that confusion might result outside his own field or beyond the markets in which he does business.") (and cases cited therein). Overall strength of a mark is dependent upon the distinctiveness of the mark as well as its strength in the marketplace. McCarthy § 11:2.

43

The REGIONS mark is also inherently strong because it is arbitrary and does not describe or indicate anything about its services or geographical location. "[F]alling within the arbitrary use category are geographic terms with sweeping, all-inclusive meanings that do not suggest the place from which the goods come, such as GLOBE or WORLD." McCarthy § 14:7 (citing *Champion Spark Plug Co. v. Globe-Union Mfg. Co.*, 88 F.2d 970 (C.C.P.A. 1937); *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482 (5th Cir. 1971).

Whatever its initial, inherent distinctiveness, the REGIONS mark has become powerful through extensive marketing, and great sales and success. REGIONS is the eighth largest financial institution in the United States with its physical presence concentrated in a portion of the country. By any measure, REGIONS is the preeminent financial institution in Alabama. Within the marketplace, strength is a measure of the effect of the mark on the mind of the consuming public. A mark that has become strong due to its "fame or uniqueness, is more likely to be remembered and more likely to be associated in the public mind with a greater breadth of products and services than is a mark that is weak because relatively unknown or very like similar marks or very like the name of the product." McCarthy § 11:73 (4th ed. 2007) (citing *James Burrough, Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 276 (7th Cir. 1976)). Thus, it is fundamental to the law of trademark infringement and unfair competition that a mark that has "achieved widespread customer recognition as a symbol of origin is more likely to result in confusion" by a junior user's similar mark than a mark with little consumer recognition. McCarthy § 11:73; *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004) ("the legal strength of a mark is usually the same as its economic and marketing strength"); *Virgin Enters. v. Nawab*, 335 F.3d 141, 148-49 (2d Cir. 2003).

Like strong marks, famous marks are accorded a wide breadth of legal protection. *See Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350 (Fed. Cir. 1992), *cert. denied*, 506 U.S. 862 (1992) (holding that tolerance for similarity of marks varies inversely with fame of the mark).

### 1.    Defendant's Efforts to Find Evidence of Third Party Use Demonstrate the Strength of the REGIONS Mark.

Small, insignificant and unknown or virtually unknown business names do not weaken a strong mark. "[U]nauthorized use of a mark does not necessarily render a mark weak. The proper inquiry is whether the third party use significantly diminishes the public's perception that the mark identifies services connected with the owner." *The Breakers of Palm Beach, Inc.*, 824 F. Supp. at 1583; *University of Georgia Athletic Ass'n.*, 756 F.2d at 1545, n.27. *See also Jellibeans*, 716 F.2d at 841, n.20 ("The fact that other local businesses used the same mark to identify unrelated products, the district court properly held, did not dilute the strength of Jellibeans, Inc.'s mark."). Thus, as a matter of law and common sense, third party use will only weaken a well-known mark if consumers are aware of such use.

Evidence of business listings and registrations does not illustrate a third party use that weakens plaintiffs' REGIONS mark. Without information about the type of business using the mark, and the market in which it is being used, the court cannot evaluate the significance of the third party use. *The Breakers of Palm Beach, Inc.*, 824 F. Supp. at 1583 (citing *Safeway Stores, Inc.*, 675 F.2d at 1165). Mere registration or listing of a mark shows only that a third party had, at some point, intended to use the mark for some purpose. It does not show whether the mark was actually used, let alone the channels in which it was used or the type of advertising undertaken. Without this information, it is impossible to infer that the third party use altered the public's perception of the mark.

45

Third party use of the word "Region," in the singular, similarly does not detract strength from plaintiffs' REGIONS mark, particularly where the marks at issue are both "REGIONS." "Region" carries a different connotation than plaintiffs' mark. "Region" conveys a specific, limited location, but "Regions" when used alone is vague and arbitrary, having no particular geographic meaning, and conveying a different commercial impression. McCarthy § 14:7. Dr. Turner, President of Regions University, himself recognized that there is a difference between "Region" and "Regions" when he testified as to this difference and explained that he chose "Regions" and never considered "Region." (Turner ET)

That third party uses have not weakened plaintiffs' mark is further illustrated by the fact that none of the third party uses identified by defendant have caused any known confusion with Regions. This is in sharp contrast with the immediate and substantial confusion caused by defendant's use of plaintiffs' REGIONS mark. Regions has objected to every use it found confusingly similar by sending a cease and desist letter. More than 250 such letters have been sent, and Regions has been successful in preventing or stopping infringement of the REGIONS mark.

**D.      Defendant's Use of the REGIONS Name and Mark Dilutes the Distinctiveness of Regions' famous REGIONS Name and Mark**

Alabama law prohibits dilution of the distinctive quality of marks or names notwithstanding the absence of competition between the parties or the confusion of source or services. Specifically, Ala. Code 8-12-17 provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this article, or a mark valid at common law, including a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as of the source of goods or services.

46

Dilution is illustrated in the Alabama court case *Arthur Young, Inc. v. Arthur Young & Co.*, 579 F. Supp. 384 (N.D. Ala. 1983). There, the court found that where a mark is strong and distinctive through extensive promotion over many years, the use of a virtually identical mark was likely to dilute the mark's distinctiveness. *Id.* at 390.

By any measure the REGIONS mark of Regions is famous, strong and distinctive in the State of Alabama, where it has been extensively promoted for more than 14 years in all markets, where Regions is the number one financial institution, where close to 100% of residents are familiar with REGIONS. There is no evidence of use other REGIONS mark or business names in television, radio, magazine or newspaper advertisements or signage. In fact, the only other use is Regions Pest Control, whose sole use in the record is one line the Birmingham Yellow Pages.

The dilution of the REGIONS name is evident from the Montgomery Yellow Pages. PX 29 shows 11 column inches devoted to REGIONS listings in the 2007 Montgomery Yellow Pages. There are no REGIONS names in the telephone book that are not associated with Regions. In the 2008 telephone book, which is after the adoption of REGIONS UNIVERSITY by defendant, following the REGIONS listings, 10 column inches are devoted to various REGIONS UNIVERSITY listings and an advertisement. (PX 477) There is a nearly half-page REGIONS UNIVERSITY advertisement on page 506 of the telephone book and REGIONS UNIVERSITY is prominently placed in an advertisement on the spine of the telephone book. (PX 477, RAC 41687-90)

This evidence indicates the singular place that the REGIONS mark holds in consumers' minds in Alabama. When people in Alabama think of the word "Regions" in the context of an institution, they think of the plaintiffs – as Laina Costanza did when Rex Turner said he was

47

thinking of using "Regions University" as the school's name. The use of the same mark REGIONS by the defendant means that Regions has lost that unique position of being the only known REGIONS entity. When people in Alabama hear or see the word "REGIONS" they now have to think and determine who owns the REGIONS name. Alabama's dilution act is designed to prevent this kind of injury to Regions and to allow Regions to continue to enjoy the singular, unique position after the REGIONS brand that it has built in the minds of consumers over the past nearly 15 years.

Federal law also protects the owner of a famous mark against another's adoption of a mark that is likely to cause dilution, whether or not actual or likely confusion or economic injury exists. Lanham Act § 43(c)(1), 15 U.S.C. § 1125(c)(1).

Accordingly, defendant's use of the REGIONS mark is likely to dilute the distinctiveness of Regions' famous REGIONS mark and defendant should be enjoined from such use.

Respectfully submitted this the 9th day of January, 2008.


/s/ William G. Pecau
One of the Attorneys for Plaintiffs Regions Asset Company, Regions Financial Corporation and Regions Bank

**OF COUNSEL:**

Charles B. Paterson (PAT018)
Paul A. Clark (CLA076)
BALCH & BINGHAM LLP
Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
cpaterson@balch.com
pclark@balch.com

William G. Pecau
Michael J. Allan
Rachel M. Hofstatter
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202)429-6244
Facsimile: (202)429-3902
wpecau@steptoe.com
mallan@steptoe.com
rhofstatter@steptoe.com

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the Court and service will be perfected electronically upon the following this 9th day of January 2008:

Victor T. Hudson
William W. Watts, III
Hudson & Watts, LLP
Post Office Box 989
Mobile, Alabama 36601-0989

James E. Shlesinger
Shlesinger, Arkwright & Garvey LLP
1420 King Street
Suite 600
Alexandria, Virginia 22314

/s/ William G. Pecau
One of the Attorneys for Plaintiffs Regions Asset
Company, Regions Financial Corporation and
Regions Bank

50

# EXHIBIT A

PD 3

**Plaintiffs' Exhibits Used for a Plaintiffs' Demonstrative PD 3**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PX 332 | PX 349 | PX 353 | PX 332 | PX 332 | PX 334 | PX 335 | PX 345 | PX 346 | PX 172 | PX 348 | PX 355 |
| PX 292 | PX 292 | PX 293 | PX 294 | PX 294 | PX 295 | PX 300 | PX 308 | PX 310 | PX 312 | PX 249 | PX 318 |
| PX 262 | PX 262 | PX 280 | PX 290 | PX 284 | PX 286 | PX 286 | PX 286 | PX 288 | PX 283 | PX 291 | PX 292 |
| PX 249 | PX 246 | PX 247 | PX 248 | PX 249 | PX 249 | PX 314 | PX 249 | PX 249 | PX 249 | PX 246 | PX 259 |
| | PX 196 | PX 200 | PX 204 | PX 205 | PX 206 | PX 207 | PX 208 | PX 209 | PX 226 | PX 228 | PX 228 | PX 229 |
| PX 178 | PX 178 | PX 183 | PX 183 | PX 187 | PX 187 | PX 190 | PX 192 | PX 193 | PX 192 | PX 195 | PX 197 |
| PX 130 | PX 10 | PX 102 | PX 157 | PX 157 | PX 161 | PX 164 | PX 169 | PX 170 | PX 171 | PX 346 | PX 178 |

## List of Plaintiffs' Exhibits Used for a Plaintiffs' Demonstrative PD 3

PX 10
PX 102
PX 130
PX 157
PX 161
PX 164
PX 169
PX 170 - 172
PX 178
PX 183
PX 187
PX 190
PX 192 - 193
PX 195 - 197
PX 200
PX 204 - 209
PX 226
PX 228 - 229
PX 246 -249
PX 259
PX 262
PX 280
PX 283 - 284
PX 286
PX 288
PX 290 -295
PX 300
PX 310
PX 312
PX 314
PX 318
PX 332
PX 334 – 335
PX 345 – 346
PX 348 -349
PX 353
PX 355

# Third Party Evidence

## SOME EVIDENCE OF USE

| Name of the business | Location | Source | Use |
|---|---|---|---|
| Regions Pest Control | Trafford, AL | DX 603 ¶ 2, 4, 8; DX 594 ¶ 6 (d) | Unrelated service; annual sales $300-400K (PX 447 ¶ 15(c)); one line in Birmingham Yellow Pages (PX 429) |
| Regions Title, LLC | Boca Raton, FL | DX 596 ¶ 7 (b); DX 589 ¶ 4 | No evidence of advertising. Regions is actively protesting; 4 employees (See protest PX 350 at RAC RAC00041422-23) |
| Regions Van Lines | Miami Gardens, FL | DX 587 ¶ 5; DX 603 ¶ 3 | No evidence of advertising. Regions is actively protesting  (See protest PX 350 at RAC00041403-04; response PX 350 at RAC00041430) |
| Regions Insurance Consultants, Inc. | Miami, FL | DX 594 ¶ 9 (i) | No evidence of advertising. The owner does not speak English; company has one office (DX 594 ¶ 9 (i)); (PX 447 ¶ 17) |
| Regions, An American Café | Chicago, IL | DX 596 ¶ 9 (a) | Restaurant in Chicago, where Regions does not do business.  (PX 447 ¶ 133) |
| Regions Security Insurance | Denham Springs, LA | DX 589 ¶ 10; DX 603 ¶ 2, 4, 8 | 4 employees. Regions protested. Limited advertising (RAC00041418; RAC00041428; RAC00041436) |
| Regions Community Behavioral Health Center, Inc. | Baton Rouge, Houma, and Covington, LA | DX 596 ¶ 11(a); DX 589 ¶10; DX 603 ¶2, 4, 8 | No evidence of advertising. Outpatient mental health facility; 40 employees (PX 447 ¶ 35) |
| Regions Wholesale Battery LLC | Baton Rouge, LA | DX 594 ¶ 13 (c); DX 589 ¶ 10; DX 603 ¶ 8 | No evidence of advertising. Unrelated business; $62,000 in annual revenue (PX 447 ¶ 21) |
| Regions Construction | Madison (Madison and Rankin Counties), MS; LA; TN | DX 594 ¶ 14(b); DX 603 ¶ 8 | No evidence of advertising. Named after its owner, Rickie Regions; one office  (PX 447 ¶ 22) |
| Regions Christian Center | Texarkana, TX | DX 596 ¶14(a); DX 594 ¶19(b); DX 589 ¶7, 8, 16 | Non-profit church. White pages listing (PX 447 ¶ 28). |
| Regions Properties, LLC | Panama City, FL; Peachtree, GA | DX 589 ¶ 4, 5; DX 595 ¶ 3 (e), (m) | No evidence of advertising. Sold only one or two properties (DX 595 ¶ 3 (e)) |

## NO LONGER IN USE / NAME CHANGE

| Name of the business | City / County | Source | Comment |
|---|---|---|---|
| Regions Communications, Inc. | Crown Point (Lake County), IN | DX 594 ¶ 12 (a) | No evidence of advertising business under name "Regions Communications, Inc." (PX 447 ¶ 20). |
| Regions Construction Company, LLC | Harvest, AL (Madison County) | DX 594 ¶ 6 (c) | Company appears to be out of business (Allan Decl. and Exhibits, PX 1029-1032); was a small business with only 1 employee and no evidence of advertising (PX 447 ¶ 15(b)) |
| Regions Propane | Centre & Scottsboro, AL; 6 branches in AL; Trion, GA; TN; Robbinsville, NC; Bryson City, NC | DX 594 ¶ 6 (a); DX 603 ¶ 3, 4; DX 589 ¶ 14, 15 | Not used "Regions Propane" since 2003  (PX 447 ¶ 14) |

# Third Party Evidence

| | | | |
|---|---|---|---|
| Regions Real Estate | Foley, AL (Baldwin County) | DX 594 ¶ 6 (b);  DX 603 ¶ 5 | Agreed to change name following protest (PX 350, RAC00041396-97; RAC00041442; RAC00041443) |
| Regions Financial Services, LLC | FL | DX 589 ¶ 4 | Changed name in April 2007 to Mortgagerich, LLC |
| Regions Publication Inc. | FL | DX 589 ¶ 4 | Changed name to Worldcap Media Network, Inc. in October 2006 |
| Regions Air, Inc. | IL, GA, IA, KY, MO, TN | DX 589 ¶ 2, 5, 6,  8, 9,12, 15 | PX 448; inactive |
| Regions Land and Investments, Inc. d/b/a Regions Real Estate | GA | DX 594 ¶  10(c); DX 610 | No evidence of use since protest by Regions; regionsrealty.com website forwards to virginiabeavers.com, with no use of "Regions" on the website.  (PX 350, RAC00041390-91), (PX 450) |
| Regions Realty Group, Inc. | Foxworth, MS; Columbia (Marion County), MS | DX 594 ¶ 14 (a); DX 589 ¶ 11 | Name changed to Phelps Realty Group |
| Regions Claim Management Group, LLC | Charlotte, NC; 30 counties in NC & SC | DX 594 ¶ 16 (a) | Agreed to change name following protest by Regions (PX 350, RAC00041392-33; RAC00041429; RAC00041435) |
| Regions Real Estate Services | Charlotte, NC | DX 603 ¶ 2, 8 | Has agreed to change its name following protest by Regions  (PX 350 RAC00041398-99; RAC00041433; RAC00041434) |
| Regions Hospitality, LLC | Jackson, TN | DX 589 ¶ 4, 5, 15; DX 594 ¶ 18(c). | Does not use this name; uses Quality Inn by Choice Hotel (DX 594 ¶ 18(c)) |
| Regions Skin Care | TX | DX 589 ¶ 16 | Assumed name only |
| Regions Diversified Capital-Howell LLC | TX | DX 589 ¶ 16 | Does business as Diversified Capital-Howell LLC |
| Regions Oil & Gas, Inc. | Addison, TX; Okmulgee, OK; TX, OK, LA, FL | DX 596 ¶ 14 (b); DX 589 ¶ 4, 16 | Changed name to F.U.T.P., Inc. in July 2007 (DX 589 ¶ 4) |
| The Designer Outlet & Region Liquidators Inc. | Crown Point, IN | DX 589 ¶ 7; DX 594 ¶ 12 (f) | No longer does business (DX 594 ¶ 12 (f)) |
| Regions Capital Mortgage, Inc. | FL | DX 589 ¶ 4 | Inactive |
| Regions North, Inc. | GA | DX 589 ¶ 5 | Inactive |
| Regions Construction Co. | FL | DX 589 ¶ 4 | Inactive |
| Regions Inc. | FL | DX 589 ¶ 4 | Inactive |
| Regions Mortgage Inc. | FL | DX 589 ¶ 4 | Inactive |
| Regions Express Corporation | TX | DX 589 ¶ 16 | Inactive |
| Regions Plumbing & Mechanical Co., LLC | LA | DX 589 ¶ 10 | Inactive |
| Region Reporting, PLC | AR | DX 589 ¶ 3 | Inactive |
| Region Sales Agency, Inc. | GA | DX 589 ¶ 5 | Inactive |
| Region South GA., Inc. | FL, GA | DX 589 ¶ 4, 5 | Inactive |
| The Region Marketing Group, LLC | FL | DX 589 ¶ 4 | Inactive |
| Region Auto Sales, LLC | IL | DX 589 ¶ 6 | Inactive |
| Region Construction Company | IL | DX 589 ¶ 6 | Inactive |
| Region Consulting Services, Ltd. | IL | DX 589 ¶ 6 | Inactive |
| Region Metal, Inc. | Westmont, IL | DX 596 ¶ 9 (b); DX 589 ¶6 | Inactive |

# Third Party Evidence

| Region Builders, Inc. | IN | DX 589 ¶ 7 | Inactive |
|---|---|---|---|
| Region Construction Corp. | IN | DX 589 ¶ 7 | Inactive |
| Region Electric Corp. | IN | DX 589 ¶ 7 | Inactive |
| Region Electric, Inc. | Gary, IN | DX 589 ¶7; DX 603 ¶4, 6 | Inactive |
| Region Motors Inc. | IN | DX 589 ¶ 7 | Inactive |
| Region Rats Baseball Club, Inc. | IN | DX 589 ¶ 7 | Inactive |
| Region Renovations, LLC | IN | DX 589 ¶ 7 | Inactive |
| Region Roofing, Inc. | Gary, IN | DX 589 ¶ 7; DX 603 ¶3, 4, 6 | Inactive |
| Region Title, LLC | Munster, IN | DX 589 ¶7; DX 596 ¶ 10 (d) | Inactive |
| Region Security Protection Agency, Inc. | Harahan, LA | DX 594 ¶13(e); DX 589 ¶10 | Inactive |
| Region Truck Parts and Service, Inc. | LA | DX 589 ¶ 10 | Inactive |
| Region Development, Inc. | TX | DX 589 ¶ 16 | Inactive |
| Region America, Inc. | Palm Beach Gardens, FL 33410 | DX 589 ¶ 4 | Inactive |
| Region Capital Resources, Inc. | FL | DX 589 ¶ 4 | Inactive |
| Region Management Corp. | FL | DX 589 ¶12 | Inactive |
| Region Med Corporation | FL | DX 589 ¶ 4 | Inactive |
| Region Realty, Inc. | FL | DX 589 ¶ 4 | Inactive |
| Region South GA., Inc. | FL; GA | DX 589 ¶4, 5 | Inactive |
| Region Trucking Service, Inc. | FL | DX 589 ¶ 4 | Inactive |
| Regionet Wireless Operations, LLC | FL | DX 589 ¶ 4 | Inactive |
| Region Design Group, Inc. | Munster & Hammond, IN | DX 587 ¶ 5; 603 ¶3, 4, 6; 589 ¶7; 596 ¶ 10 (a) | Inactive |
| Region Survey | Kansas City, MO | DX 603 ¶ 3; DX 596 ¶ 12 (b) | Inactive |
| Region Airlink, Inc. | SC | DX 589 ¶ 14 | Inactive |
| Region Parts, LLC | TX | DX 589 ¶16 | Inactive |

| NON-CONSUMER | | | |
|---|---|---|---|
| **Name of the business** | **City / County** | **Source** | **Business** |
| Regions Commercial Park, LLC | Fort Smith, AR | DX 596 ¶ 6 (b); DX 589 ¶ 3 | Small commercial property leased to two retailers, one of whom is the owner of the company.  No evidence of consumer advertising (PX 447 ¶ 30) |
| Regions Forest Services, LLP | Monticello, AR | DX 596 ¶6 (c); DX 589 ¶ 3 | Timber buying and selling company (DX 596 ¶ 6(c)); one location; no evidence of advertising (PX 447 ¶ 30) |
| Regions Capital, LLC | Spring Hill, FL | DX 594 ¶ 9(h) | Will lease building. No evidence of public use of name (DX 594 ¶ 9(h)) |
| Regions Center | St. Lucie, FL | DX 596 ¶ 7(a) | Single industrial park with 30 lots in one location (PX 447 ¶ 31) |
| Regions Contractors, Inc. | Crawfordville, FL; AR, LA, MS, TN | DX 589 ¶ 3, 4, 10, 11, 15; DX 594 ¶ 8(a), 9(b), 18(e); DX 603 ¶ 2, 3, 4, 6, 8 | Does not advertise; only provides services to select commercial entities  (PX 350 RAC RAC00041420-21; 41431-32; RAC00041438) |

# Third Party Evidence

| | | | |
|---|---|---|---|
| Regions Development Group, LLC | AR, GA, TN, FL | DX 589 ¶ 3, 5, 15; DX 594 ¶ 18(a); | Small business with one office; no evidence of TV or radio advertising (PX 447 ¶ 26) |
| Regions Development Group Inc. | 9539 Highway 92 Ste 160 Woodstock GA 301886410 | | Small development business; 3 employees; $630,000 in sales (DX 642, 643) |
| Regions Facility Services, Inc. | Brooksville, Tampa & Spring Hill, FL; Southeast US (AL, FL, GA, NC, TN, SC) | DX 589 ¶ 4; DX 587 ¶5; DX 594 ¶9(g); DX 603 ¶ 2,3,4,6,8 | Targets owners and operators of commercial restaurants; advertises using "RFS" instead of Regions (PX 447 ¶ 17) |
| Regions Aloft, LLC | Spring Hill, FL | DX 594 ¶ 9 (f) | Holding company for an airplane (DX 594 ¶ 9 (f)) |
| Regions Consulting Group, Inc. | TX | DX 589 ¶ 5, 16 | IT consulting business (DX 589 ¶ 5) |

## PRIMARY MEANING

| Name of the business | City / County | Source | Comment |
|---|---|---|---|
| River Regions Realty, LLC | Prattville, AL (Montgomery, Autauga and Elmore counties) | DX 594 ¶ 7 (b); DX 603 ¶ 8 | Regions used in its dictionary sense |
| River Region Appraisals, LLC | Montgomery, AL | DX 594 ¶ 7 (h) | Region used in its dictionary sense |
| River Region Home Inspections, LLC | Pike Road, AL (Montgomery, Elmore and Autauga counties) | DX 594 ¶ 7 (e) | Region used in its dictionary sense |
| River Region Hospital, LLC | Hartsville, AL | DX 594 ¶ 7 (g) | Region used in its dictionary sense |
| River Region Veterinary Services, P.C. | Prattville, AL | DX 594 ¶ 7 (d); DX 603 ¶ 8 | Region used in its dictionary sense |
| River Regions Developers, LLC | Prattville, AL | DX 594 ¶ 7 (c) | Regions used in its dictionary sense |
| Gulf Region Information Technology Services, LLC | Mobile, AL (between Houston, TX and Panama City, FL) | DX 594 ¶ 7 (a) | Region used in its dictionary sense |
| Regions Beyond, Inc. | Jacksonville, AR | DX 596 ¶ 6 (a) | Regions used in its dictionary sense |
| Regions Beyond International, Inc. | Tallahassee (Leon County), FL | DX 594 ¶ 9 (a) | Regions used in its dictionary sense |
| Regions Beyond Ministries, Inc. | FL; GA | DX 589 ¶ 4, 5; DX 594 ¶ 10(b) | Regions used in its dictionary sense |
| All Regions Services, Inc. | Bossier City, LA; TX, AR, MS, LA, ME, WI | DX 594 ¶ 13 (f); DX 589 ¶ 10 | Regions used in its dictionary sense |

## NO EVIDENCE OF USE

| Name of the business | City / County | Source |
|---|---|---|
| Regions Salon | Fayetteville, AR | DX 603 ¶ 6 |
| Regions Security and Investigations, Inc. | GA | DX 589 ¶ 5 |
| Regions South, LLC | GA | DX 589 ¶ 5 |

# Third Party Evidence

| Regions Hospitality, LLC | FL, GA, TN | DX 589 ¶ 4, 5, 15; DX 594 ¶10(a), 18(c). |
|---|---|---|
| Regions, Inc. | FL | DX 589 ¶ 4 |
| Regions Investment Group, Inc. | FL | DX 589 ¶ 4 |
| Regions Land Group, LLC | Bradenton, FL | DX 595 ¶ 3 (l) |
| Regions Mortgage & Financial Services, Corp. | FL | DX 589 ¶ 4 |
| Regions Development Ltd. Co. | Crawfordville, FL | DX 589 ¶4, 6 |
| Region's Contractor | Tallahassee, Milton, Pensacola, & Pace, FL; Greeneville, TN | DX 603 ¶ 2, 3, 4, 6 |
| Regions Realty, LLC | MS, TN, FL | DX 589 ¶ 4, 12, 15 |
| Regions South Enterprises, Inc. | Altamonte Springs, FL | DX 603 ¶ 2 |
| Regions Way, Inc. | FL | DX 589 ¶ 4 |
| Regions Title Corporation | IL | DX 589 ¶ 6 |
| Regions Land & Timber, LLC | LA | DX 589 ¶ 10 |
| Regions Auto Sales, LLC | MS | DX 589 ¶ 11 |
| Regions Realty, LLC | MS, TN, FL | DX 589 ¶ 4, 12, 15 |
| Regions Construction LLC | SC | DX 589 ¶14 |
| Regions Construction and Maintenance, LLC | SC | DX 589 ¶ 14 |
| Regions Realty Group, LLC | Jacksboro, TN | DX 603 ¶ 2, 3 |
| Regions Realty, LLC | MS, TN, FL | DX 589 ¶ 4, 12, 15 |
| Regions Agribusiness | Cordova, TN | DX 603 ¶ 3 |
| Region's Contractor | Tallahassee, Milton, Pensacola, & Pace, FL; Greeneville, TN | DX 603 ¶2, 3, 4, 6 |
| Regions Construction, Inc. | Huntersville, NC | DX 603 ¶ 8 |
| Regions Development, LLC | NC | DX 589 ¶ 13 |
| Regions of Texas Land Co., LLC | TX | DX 589 ¶ 16 |
| Regions Satellite & Co. | Dallas, TX | DX 603 ¶ 5 |
| Regions Tower Partners, LP | TX | DX 589 ¶ 16 |
| Regions Communications | Hutto, TX | DX 603 ¶ 4 |

## NON-REGIONS NAMES

| Name of the business | City / County | Source |
|---|---|---|
| Region 2020 | Birmingham, AL | DX 587 ¶ 5; DX 603 ¶ 2 |
| River Region Productions, Inc. | Leeds, AL (Elmore County) | DX 594 ¶ 7 (f) |
| Region Appraisal and Consulting Solutions, Inc. | 1031 Ives Dairy Rd 228 Miami, FL 33179 | DX 594 ¶ 9 (c); DX 589 ¶ 4; DX 587 ¶ 5 |
| Region Construction, LLC | FL | DX 589 ¶ 4 |

# Third Party Evidence

| | | |
|---|---|---|
| Region Extreme All Stars, Inc. | FL, IN | DX 589 ¶4, 7 |
| Region Group, LLC | Tampa, FL | DX 603 ¶ 8 |
| Region Realty | Covington, LA; Collinsville, IL; Panama City, FL | DX 603 ¶2, 3, 4; DX 589 ¶10 |
| Region South Enterprises, Inc. | Altamonte Springs, FL | DX 589 ¶ 4; DX 603 ¶ 3, 4, 6 |
| Region Trust, Inc. | Delray Beach (Palm Beach area), FL | DX 594 ¶ 9 (j) |
| Regionatlantic Realty, LLC | 4250 Cordgrass Inlet Drive, Jacksonville Beach, FL 32250 | DX 589 ¶ 4; DX 594 ¶ 9 (d) |
| The Region Group, LLC | Tampa, FL | DX 589 ¶ 4; DX 594 ¶ 9 (e) |
| Region Claims Service, Inc. | IL | DX 589 ¶ 6 |
| Region Fence Sales, Inc. | University Park, Harvey, Posen, and other locations in IL | DX 603 ¶3, 4, 8;  DX 594 ¶11(a); DX 589 ¶ 6 |
| Region Realty | Covington, LA; Collinsville, IL; Panama City, FL | DX 603 ¶2, 3, 4; DX 589 ¶10 |
| Region Realty, LLC | Edwardsville & Collinsville, IL | DX 594 ¶11(b); DX 603 ¶8 |
| Region Basketball, Inc. | IN | DX 589 ¶ 7 |
| Region Chem Dry | Highland and Hammond, IN | DX 603 ¶3,  6, 8 |
| Region Chem-Dry I & II, Inc. | Hammond, IN | DX 589 ¶ 7; DX 594 ¶ 12 (g) |
| Region Communications Inc. | Crown Point, IN | DX 589 ¶ 7; DX 587 ¶ 5; DX 603 ¶ 4, 6 |
| Region Cuppy S LLC | IN | DX 589 ¶ 7 |
| Region Datacom, LLC | Griffith, IN; Northwest IN; Chicago, IL | DX 594 ¶ 12 (b); DX 603 ¶ 6; DX 587 ¶ 5; DX 589 ¶ 7 |
| Region Destroyers, Inc. | IN | DX 589 ¶ 7 |
| Region Extreme All Stars, Inc. | FL, IN | DX 589 ¶4, 7 |
| Region Freight Lines | Schererville, IN | DX 603 ¶3 |
| Region Freight Lines, Inc. | Hammond and Schererville, IN | DX 589 ¶7; DX 603 ¶4, 6 |
| Region Home Improvement | Demotte, IN | DX 603 ¶3, 4, 6 |
| Region Home Inspection, Inc. | IN | DX 589 ¶ 7 |
| Region Idol | Crown Point, IN | DX 589 ¶7; DX 594 ¶ 12 (h) |
| Region Mall, Inc. | IN | DX 589 ¶ 7 |
| Region Pools | Gary, Hammond, & Schererville, IN | DX 603 ¶3, 4, 6, 8 |
| Region Pools, Inc. | Hammond, IN; Northwest IN | DX 594 ¶12(c); DX 589 ¶7 |
| Region Real Estate Resource | Whiting, IN | DX 603 ¶ 6 |

# Third Party Evidence

| | | |
|---|---|---|
| Region Real Estate, Inc. | Munster, Hammond, IN; Northwest IN | DX 603 ¶3, 4, 6, 8; DX 594 ¶12(e) |
| Region Realty Co. Inc. | IN | DX 589 ¶ 7 |
| Region Renovations, Inc. | IN | DX 589 ¶ 7 |
| Region Roundball Foundation, Inc. | IN | DX 589 ¶ 7 |
| Region Signs, Inc. | Whiting, IN | DX 595 ¶ 10(b); DX 587 ¶5; DX 603 ¶ 3, 4, 6; DX 589 ¶ 7 |
| Region Sports Network, L.L. | Michigan City, Elkhart, Highland, IN | DX 595 ¶ 10(b); DX 603 ¶ 4,  6 |
| Region, Inc. | IN | DX 589 ¶ 7 |
| The Region Enterprises Limited Partnership | IN | DX 589 ¶ 7 |
| Region Community Behavioral Health Center, Inc. | Covington, LA | DX 603 ¶ 3 |
| Region Electric, LLC | LA | DX 589 ¶ 10 |
| Region Farm, LLC | LA | DX 589 ¶ 10 |
| Region Insulation Co., Inc. | Baton Rouge, LA; CO, WY, TX, MT, OK | DX 589 ¶10, 16; DX 594 ¶ 13 (b) |
| Region Realty | Covington, LA; Colinsville, IL; Panama City, FL | DX 603 ¶2, 3, 4; DX 589 ¶10 |
| Region Realty of St. Tamany | Covington, LA | DX 594 ¶ 13 (a) |
| Region Land Survey, Inc. | Blue Springs, MO; KS | DX 603 ¶ 8; DX 594 ¶15(b); DX 589 ¶12 |
| Region Medical Equipment, LLC | Paris, MO | Bender's ¶ 12 (a) |
| Region Welding, Inc., a.k. Region Welding of Missouri, Inc.; Region Welding & Manufacturing, Inc. | Union, MO; across the entire US | DX 594 ¶ 15 (a); DX 589 ¶12 |
| Region Cleaning Masters | Asheville, Enka, and Candler, NC | DX 603 ¶ 2, 3, 4 |
| Region Construction, Inc. | Huntersville (Irdall County), NC | DX 594 ¶ 16 (b); DX 589 ¶ 13 |
| Region South Construction & Development, Inc. | NC | DX 589 ¶ 13 |
| Region's, Inc. | SC | DX 589 ¶ 14 |
| Region Properties, LLC | Florence, SC; Lake Village & Crown Point, IN; | DX 589 ¶ 6, 7, 14; DX 594 ¶ 12 (d), ¶ 17 (a) |
| Region South Realty, LLC | SC | DX 589 ¶ 14 |
| Region First Realty | Clinton, TN | DX 594 ¶ 18 (b); DX 603 ¶ 2, 8 |
| Region Realty Group, LLC | Jacksboro (Campbell County, TN | DX 603 ¶ 8; DX 594 18(d) |
| Region Stone Products | Maryville, TN | DX 603 ¶ 3 |
| Region Café | San Antonio, TX | DX 603 ¶ 4 |
| Region Cancer Center North Texas | McKinney, TX | DX 603 ¶ 4 |

# Third Party Evidence

| Region Enterprises, Inc. | Fort Worth, TX | DX 594 ¶19(a); DX 589 ¶16 |
|---|---|---|
| Region Health Care | McAllen, TX | DX 603 ¶ 4 |
| Region Health Care, Inc. | TX | DX 589 ¶16 |
| Region Insulation Co., Inc. | Baton Rouge, LA; TX | DX 589 ¶10, 16; DX 594 ¶ 13 (b) |
| Region Insulation, Inc. | Odessa, TX | DX 603 ¶ 4 |

| REGIONS Bank Branch | | | |
|---|---|---|---|
| **Name of the business** | **City / County** | **Source** | **Explanation** |
| Regions Financial Tower, LLP | FL | DX 589 ¶ 4 | Plaintiffs' location -- Regions' Palm Lakes Beach Branch; building has large REGIONS logo on it (http://www.deitzrealty.com/listing/listing_main.php#) |

| | |
|---|---|
| DX 587 | Affidavit of Pauline Holder re: domain names dated July 16 |
| DX 589 | Affidavit of Pauline Holder re: corporate/LLC registrations dated July 16, 2007 |
| DX 594 | Affidavit of Stephen J. Stricklin dated July 17, 2007 |
| DX 595 | Supplemental Affidavit of Stephen J. Stricklin dated July 31, 2007 |
| DX 596 | Affidavit of Andrea R. Bender dated August 9, 2007 |
| DX 603 | Affidavit of Pauline Holder re: Business Listings dated Aug. 8, 2007 |
| PX 447 | Supplemental Report of Avery Abernethy dated October 8, 2007 |